**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

FEDERAL TRADE COMMISSION,

                    Plaintiff,

      v.

TAPESTRY, INC.,

         and

CAPRI HOLDINGS LIMITED,

                 Defendants.

Case No. _____

**REDACTED VERSION OF
DOCUMENT SOUGHT TO
BE SEALED**

**COMPLAINT FOR A TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION PURSUANT TO SECTION 13(b) OF THE
FEDERAL TRADE COMMISSION ACT**

Plaintiff, the Federal Trade Commission ("FTC" or "Commission" or "Plaintiff"), by its

designated attorneys, petitions this Court to enter a stipulated temporary restraining order and

grant a preliminary injunction enjoining Defendant Tapestry, Inc. ("Tapestry") from

consummating its proposed acquisition (the "Proposed Acquisition") of Defendant Capri

Holdings Limited ("Capri"). The Commission seeks this relief pursuant to Section 13(b) of the

Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b), and Section 16 of the Clayton

Act, 15 U.S.C. § 26.

Plaintiff requires the aid of this Court to preserve the status quo and to protect

competition during the pendency of an administrative trial on the merits. The Commission

initiated the administrative trial, pursuant to Sections 7 and 11 of the Clayton Act, 15 U.S.C. §§ 18, 21, and Section 5 of the FTC Act, 15 U.S.C. § 45, by issuing an administrative complaint on April 22, 2024.  Pursuant to FTC regulations, the administrative proceeding on the merits will begin on September 25, 2024. The administrative proceeding will determine the legality of the Proposed Acquisition and will provide all parties a full opportunity to conduct discovery and present testimony and other evidence regarding the likely competitive effects of the Proposed Acquisition.

Allowing Tapestry and Capri (collectively, "Defendants") to consummate the Proposed Acquisition and combine their operations prior to the issuance of a decision on the merits by the Commission through the administrative process would harm consumers and undermine the Commission's ability to remedy the anticompetitive effects of the Proposed Acquisition if it is ultimately found unlawful.

Accordingly, pursuant to Section 13(b) of the Federal Trade Commission Act, Plaintiff requests (1) a preliminary injunction to protect the Commission's ability to evaluate the antitrust merits of the Proposed Acquisition and (2) enter a stipulated temporary restraining order to protect this Court's ability to decide the FTC's request for a preliminary injunction and order appropriate relief.

## NATURE OF THE CASE

1.      Tapestry proposes to acquire Capri in a $8.5 billion transaction that would combine six iconic brands, including three—Tapestry's Coach and Kate Spade and Capri's Michael Kors—that are close competitors, into a conglomerate that has professed goals of becoming a ███████████████████████████   In its own words, the goal of Tapestry's

M&A strategy is to ███████████████████████████ and ███ the

"accessible luxury" space in which Coach, Kate Spade, and Michael Kors compete. With

Tapestry's acquisition of Michael Kors, the closest competitor of Coach and Kate Spade,

consumers will lose the benefit of head-to-head competition on price, discounts and promotions,

innovation, design, marketing, and employee wages and workplace benefits.

2.    Today both companies compete on everything from clothing to eyewear to shoes.

But where Coach, Kate Spade, and Michael Kors most fiercely compete, and where they boast

eye-popping market shares, are in handbags—specifically, "accessible luxury" handbags—where

the parties offer high-quality products purchased by tens of millions of Americans. This is big

business too—Coach, Kate Spade, and Michael Kors handbags generated approximately ███

███ in sales in the United States in 2022. And it is in "accessible luxury" handbags that the

Proposed Acquisition will create a colossus with over ██ percent market share in the United

States, dwarfing all other market players and combining two firms to which Wall Street have

long referred as a ██████████

3.    The term "accessible luxury" was coined by Coach during its initial public

offering over 20 years ago to distinguish Coach products, which filled the void between "mass-

market" items on the one hand and "true luxury" products on the other. As Tapestry explained at

a recent Investor Day, "It was the idea that you didn't have to spend an exorbitant amount of

money to buy a high-quality bag." In the years since, the parties, along with other industry

players, have embraced the term—and its equivalents "affordable luxury" and "aspirational

luxury" (hereinafter "accessible luxury")—consistently, and routinely, using it in public

statements, in calls with investors, and in internal documents to describe a very distinct handbag

product: one that is crafted predominantly in Asia from high-quality materials with fine

craftsmanship at affordable prices, distinguishing "accessible luxury" handbags from both the

mass-market products that are made in bulk in China from lower-quality materials and sold at

lower prices, and the high-end luxury handbags crafted predominantly in Europe that sell at

significantly higher prices.

4.      Indeed, despite its incorporation of the word "luxury," "accessible luxury" is very

distinct from what the parties and other industry players call "luxury," "true luxury," "high-end

luxury" or "European luxury" (hereinafter, "true luxury") brands, like Chanel, Louis Vuitton,

and Hermes, whose handbags retail in the thousands of dollars—multiple times the prices of

Coach, Kate Spade, and Michael Kors handbags—and are made from the finest materials and

leather, often in Europe. These elite brands also claim affluent, high-wealth consumers—in

contrast to the millions of working- and middle-class clientele who comprise a large part of the

customer base for Coach, Kate Spade, and Michael Kors.

5.      Indeed, while the parties advertise their products in the hands of jet-setting

celebrities, the parties' reams of consumer research paint a different picture of their typical

consumer. These consumer surveys reveal that approximately ███ of Coach and Michael Kors

customers have household incomes of ████████████████████, ███████████

█████████████████████████████████████████████████████████

████████████████████████████



6.      As Coach has acknowledged in internal documents: ████████████████
████████████████████████████████████████████████ Or, as the Vice

President of Retail for Michael Kors has observed: ████████████████████████
████████████████████████████████████████ Kate Spade

sells its handbags to consumers with ██████ income demographics. It will be these everyday

American consumers—and employees of the companies—who will experience the effects of the

substantial lessening of competition as a result of the Proposed Acquisition.

7.      The Proposed Acquisition will eliminate fierce competition between Coach, Kate

Spade, and Michael Kors. A merger is unlawful if it substantially lessens competition between

the parties independent of the analysis of market shares, as recognized by the 2023 U.S.

Department of Justice and FTC Merger Guidelines (hereinafter, the "Merger Guidelines"). Tens

of millions of consumers are the beneficiaries of an intense, long-standing rivalry between Coach, Michael Kors, and Kate Spade that would be squelched as a result of the Proposed Acquisition. This fierce head-to-head competition, which is monitored by the highest levels of Tapestry and Capri, comes in many forms—prices, discounts, promotions, innovation, design, marketing, and brick-and-mortar store experiences.

8.       The competition between the parties today benefits not just consumers, but other constituencies, such as employees. Tapestry and Capri together employ more than 33,000 employees worldwide and compete for employees working in a variety of locations and functions—including thousands of non-union retail employees. This competition for labor has resulted in higher wages, better benefits, and improved working conditions.

9.       For example, in July of 2021, Tapestry publicly committed to a $15/hour minimum wage for U.S. hourly employees, which CEO Joanne Crevoiserat internally acknowledged as ████████████████████████ Its rival Capri immediately took notice, with its CEO John Idol ████████████████████████████ ████████████████████████████████ Michael Kors' VP of Stores wrote separately: ████████████████████████████ ████████████████████████████████ Less than two months later, Michael Kors announced plans to raise its minimum wage to $15 per hour, effective ████████ which benefitted nearly ███ Capri employees.

10.      The elimination of this multi-faceted competition between the close rivals will harm consumers and employees, likely leading to higher prices, decreased innovation, and reduced wages. Indeed, it is not surprising that ████████████████████████████████

6

prices post-merger. Tapestry plans to do so by pulling back on wholesale channel sales—where brands have less control over pricing and discounting is more likely. ██████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████

11.     And with the eradication of this fierce rivalry, it is also no surprise that, as chronicled by Tapestry's own banker on the deal, Wall Street heralded the Proposed Acquisition

████████████████████████████████████████████████████████████████

████████████████

████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

12.     By combining three of the top players in the market for "accessible luxury" handbags in the United States—including the top two (Coach and Michael Kors) by far—the Proposed Acquisition will significantly increase concentration and result in a highly concentrated market, making the Proposed Acquisition presumptively unlawful under controlling caselaw and the Merger Guidelines, which are rooted in case law and outline the legal tests, analytical frameworks, and economic methodologies both agencies use to assess a transaction's legality.

13.     The Proposed Acquisition is also part of Tapestry's pattern and strategy of serial acquisitions. The Merger Guidelines state that a "firm that engages in an anticompetitive pattern

or strategy of multiple acquisitions in the same or related business lines may violate Section 7." The Proposed Acquisition builds on a deliberate, decade-long M&A strategy by Tapestry—and is just one in a string of acquisitions for Tapestry to achieve its goal to become the major American fashion conglomerate—or, in Tapestry's own words, a ███████████████████ ████████████ Its documents detail its strategy and goal of operating as a ███████████████ ████████████ and ███████████████ Tapestry's plan is to start first with █████████ ██████████████████████████████████████, which will only solidify its dominance in "accessible luxury," stifle competition from smaller competitors and potential entrants, and contribute to a trend of consolidation in the broader fashion industry. In the last decade, Tapestry has already consolidated Coach, Kate Spade, and Stuart Weitzman, and Capri consolidated Michael Kors, Versace, and Jimmy Choo. If the Proposed Acquisition is completed, Tapestry will have consolidated six viable firms into one.  And █████████████████████: its SVP of Strategy and Consumer Insights has observed that the Proposed Acquisition would ███ ██████████████████████████████.

14.     New entry will not be timely, likely, or sufficient to counteract the anticompetitive effects of the Proposed Acquisition. Even assuming that a new potential entrant could make a quick splash, scaling its sales and presence to replace the loss of competition between the parties would take many years. It would require, among other things, building a strong brand, a heavy brick-and-mortar presence, sizable investments in marketing and manufacturing, access to consumer data rivaling that of the parties, to name a few—all of which is extremely expensive and takes time. The story of Rebecca Minkoff embodies the struggle of an "accessible luxury" handbag entrant. Ms. Minkoff launched her brand in 2001, and the

eponymous founder has spoken openly about the significant challenges she faced in scaling her company. Ms. Minkoff ultimately sold her company to Los Angeles-based diversified apparel company Sunrise Brands in February 2022 for a price estimated between $13-19 million.

15.     Respondents also cannot show cognizable, merger-specific efficiencies that would offset the reasonably probable and substantial competitive harm resulting from the Proposed Acquisition.

16.     On April 22, 2024, by a bipartisan 5-0 vote, the Commission found reason to believe that the Proposed Transaction may substantially lessen competition or tend to create a monopoly in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 5 of the FTC Act, 15 U.S.C. § 45, or constitutes an unfair method of competition in violation of Section 5 of the FTC Act. On the same day, the Commission initiated an administrative proceeding to determine the antitrust merits of the Proposed Transaction. The ongoing administrative proceeding provides a forum for all parties to conduct discovery, followed by a hearing before an Administrative Law Judge with up to 210 hours of live testimony. After reviewing the recommended decision of the Administrative Law Judge, the Commission will issue a decision, which is then subject to review in a United States Court of Appeals.

17.     The parties have stipulated to entry of a temporary restraining order to preserve the status quo and protect competition while the Court considers the FTC's application for a preliminary injunction. Under this temporary restraining order, Defendants cannot consummate the Proposed Transaction until the fifth business day after the Court rules on the FTC's request for a preliminary injunction or until after the date set by the Court, whichever is later.

18.     Preliminary injunctive relief is necessary to preserve the status quo and protect competition during the Commission's ongoing administrative proceeding.  Allowing Defendants to consummate the Proposed Acquisition while the Commission adjudicates its merits would harm consumers and undermine the Commission's ability to remedy the anticompetitive effects of the Proposed Acquisition if it is found unlawful.

## JURISDICTION AND VENUE

19.     This Court's jurisdiction arises under Section 13(b) of the Federal Trade Commission Act, 15 U.S.C. § 53(b), and under 28 U.S.C. §§ 1331, 1337, and 1345.  This is a civil action arising under Acts of Congress protecting trade and commerce against restraints and monopolies, and is brought by an agency of the United States authorized by an Act of Congress to bring this action.

20.     Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), provides in pertinent part:

Whenever the Commission has reason to believe

(1)     that any person, partnership, or corporation is violating, or is about to violate, any provision of law enforced by the Federal Trade Commission, and

(2)     that the enjoining thereof pending the issuance of a complaint by the Commission and until such complaint is dismissed by the Commission or set aside by the court on review, or until the order of the Commission made thereon has become final, would be in the interest of the public,

the Commission by any of its attorneys designated by it for such purpose may bring suit in a district court of the United States to enjoin any such act or practice. Upon a proper showing that weighing the equities and considering the Commission's likelihood of

ultimate success, such action would be in the public interest, and after notice to the defendant, a temporary restraining order or a preliminary injunction may be granted without bond. . . .

21.     Defendants are, and at all relevant times have been, engaged in activities in or affecting "commerce" as defined in Section 4 of the FTC Act, 15 U.S.C. § 44, and Section 1 of the Clayton Act, 15 U.S.C. § 12.

22.     The Federal Trade Commission Act, 15 U.S.C. § 53(b), authorizes nationwide service of process, and personal jurisdiction exists where service is effected pursuant to federal statute.  Fed. R. Civ. P. 4(k)(1)(C).  Venue is proper in the Southern District of New York under 28 U.S.C. § 1391(c)(3), as well as under 28 U.S.C. § 1391(c)(2) and 15 U.S.C. § 53(b). Defendants are found, reside, and/or transact business in this state and district, and are subject to personal jurisdiction therein.

## THE PARTIES AND THE PROPOSED ACQUISITION

23.     Plaintiff, the Federal Trade Commission, is an agency of the United States government, established, organized, and existing pursuant to the FTC Act, 15 U.S.C. §§ 41 et seq., with its principal offices at 600 Pennsylvania Avenue, N.W., Washington, D.C. 20580. The Commission is vested with authority and responsibility for enforcing, inter alia, Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 5 of the FTC Act, 15 U.S.C. § 45.

24.     Defendant Tapestry is a global fashion firm incorporated in the state of Maryland and headquartered in New York City. Tapestry generated over $6.6 billion in revenue for the fiscal year spanning 2022-2023, $4.3 billion of which came from North American sales, with gross margins of approximately 71 percent.  Tapestry owns the following brands:

- **Coach:** Founded in New York City in 1941, Coach sells handbags, small leather goods, footwear, accessories, ready-to-wear apparel, jewelry, eyewear, luggage, watches, and fragrances. Coach accounts for 74.5% of Tapestry's total net sales.

- **Kate Spade:** Acquired by then-Coach for approximately $2.4 billion in 2017, Kate Spade sells handbags, small leather goods, ready-to-wear apparel, footwear, accessories, and home furnishings. Kate Spade accounts for 21.3% of Tapestry's total net sales.

- **Stuart Weitzman:** Stuart Weitzman predominantly sells women's footwear and accounts for less than 5 percent of Tapestry's total net sales. In 2015, then-Coach acquired Stuart Weitzman for approximately $530 million.

In 2017, after acquiring Kate Spade and Stuart Weitzman, Coach renamed itself "Tapestry." In North America, Tapestry operates 331 Coach stores and 205 Kate Spade stores. Coach and Kate Spade stores are located throughout the United States, not just in metropolitan centers and big cities such as New York, Los Angeles, or Miami. Coach and Kate Spade, for example, have stores in Branson, Missouri; Foley, Alabama; and Gretna, Nebraska.

25.     Defendant Capri is a global fashion firm incorporated in the British Virgin Islands and headquartered in the United Kingdom. Capri has U.S. corporate offices for Michael Kors, Jimmy Choo, and Versace in New York City. In the fiscal year spanning 2022-2023, Capri generated about $5.6 billion in total global revenue, including $3.2 billion in revenue in the Americas, with gross margins of approximately 66 percent. Capri owns the following brands:

- **Michael Kors:** Michael Kors founded his namesake brand in New York City in 1981, which now accounts for approximately 69% of Capri's overall revenue. The vast

majority of Michael Kors' sales come from its MICHAEL Michael Kors line, which sells women's handbags, small leather goods, other accessories, footwear, apparel, and luggage. Capri refers to MICHAEL Michael Kors as an "accessible luxury line" in SEC filings.

- **Versace:** Acquired by then-Michael Kors in 2018, Versace sells women's and men's ready-to-wear, footwear, handbags, home furnishing, accessories, small leather goods, and fragrance products, and haute couture.

- **Jimmy Choo:** Jimmy Choo's core product is women's footwear, but it also sells accessories, handbags, and small leather goods. In 2017, Capri acquired Jimmy Choo.

In 2018, when announcing its deal to acquire Versace, Michael Kors re-named itself Capri. Capri operates 224 Michael Kors stores in the United States. As with Coach and Kate Spade, Michael Kors stores are located throughout the United States, including, for example, Altoona, Iowa; Branson, Missouri; Foley, Alabama; and Gretna, Nebraska.

26.     On August 10, 2023, Tapestry and Capri entered into an Agreement and Plan of Merger, whereby Capri agreed to sell 100% of its voting securities to Tapestry for approximately $8.5 billion.

### THE MARKET FOR "ACCESSIBLE LUXURY" HANDBAGS

27.     The parties' Coach, Kate Spade, and Michael Kors brands compete to sell "accessible luxury" handbags to millions of American consumers each day. Industry participants recognize a distinct market for "accessible luxury" handbags, which have peculiar characteristics, as well as distinct prices and consumers and unique production facilities, that distinguish them from other types of handbags. A relevant antitrust market in which the

Proposed Acquisition may substantially lessen competition, or tend to create a monopoly, is "accessible luxury" handbags sold in the United States.

      **A.**      **The Parties Compete in a Relevant Market for "Accessible Luxury" Handbags.**

28.     In the two decades since Coach gave birth to the term "accessible luxury," the parties, press and analysts, and other industry participants have adopted "accessible luxury" to signify handbags that can boast quality leather and craftsmanship (as distinguished from mass-market handbags) at an affordable price (as distinguished from true luxury handbags). The major players in this market are Tapestry's Coach and Kate Spade, and Capri's Michael Kors.

29.     The term "accessible luxury"—or its equivalents, "affordable luxury" and "aspirational luxury"—is ubiquitous in the parties' ████████████████████████████ ██████, ████████████████████████████████████████████████████████████ ██████████████. For instance, even after the Proposed Acquisition was announced, Capri continued to present documents to its board that ██████████████████████████████ ████████████████████████████ And earlier in 2023, Tapestry's CEO Joanne Crevoiserat told the Business of Fashion: "For accessible luxury brands like those in Tapestry's stable, the key is to focus on creating value for the customer beyond pricing." The year before, Tapestry's Consumer Insights team ████████████████████████ ████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████

30.     Further establishing party recognition of a distinct market for "accessible luxury"

handbags, Coach made clear to the Tapestry board in ████████████████████████████

████████████████████████████████████████



31.     The repeated, and consistent, recognition of an "accessible luxury" market in the

████████████████████     mirrors their frequent references to "accessible luxury" and its

equivalents in their filings with the Securities and Exchange Commission and in earnings calls,

including in 10-Ks filed the year just prior to their deal:

- "Tapestry, Inc. is a leading New York-based house of **accessible luxury** accessories
  and lifestyle brands . . . . Coach is a leading design house of **accessible luxury**
  accessories and lifestyle collections, with a long-standing reputation built on quality
  craftsmanship." (emphases added).

- "MICHAEL Michael Kors is the **accessible luxury collection** and offers women's accessories, primarily handbags and small leather goods, as well as footwear and apparel and is carried in all of the Michael Kors lifestyle stores and leading department stores around the world." (emphasis added).

32.     The parties are far from alone in their recognition of an "accessible luxury" handbag market.  Other industry participants widely acknowledge a distinct market for "accessible luxury" handbags. Likewise, press and analyst reports regularly address Coach, Kate Spade, and Michael Kors as "accessible luxury" brands. Even Morgan Stanley, Tapestry's investment banker for the Proposed Acquisition, ████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████

33.     As reflected in the ██████████████████████████, "accessible luxury" handbags have a distinct price range, which is recognized by other industry participants as well. The parties recognize this range as separate and distinct from mass-market offerings, which typically fall under $100, and true luxury handbags, which have an ████████████ Indeed, pricing analyses conducted by the parties ████████████████████████ ████████████████████████



34.     In another Tapestry board document, dated March 2022, Coach made it clear that



35.     The parties tout this pricing ▮▮▮▮▮▮▮▮▮▮ between their "accessible

luxury" brands and true luxury brands both to distinguish themselves from true luxury brands

and to demonstrate to investors that there is room to "elevate" their brands (i.e., raise prices)

without losing customers to the European luxury houses.

17

36.     The market for "accessible luxury" handbags also has distinct customers: middle- and lower-income consumers who seek out high-quality items at affordable prices. As previously explained, party documents consistently show that consumers with household incomes of ██ ███████████████ make up a large part—if not the majority—of purchasers for Coach, Kate Spade, and Michael Kors handbags. For instance, a Michael Kors consumer insights deck from last summer showed that the Michael Kors' handbag purchasers were a ████████████ ██████████████████████████████████████████████████████████████ ███████████████████████ A document presented to the Tapestry board just a few months earlier shows that ██████ percent of Coach consumers have household incomes of ██████████████████████████████████████████████████████████ ███████████ Kate Spade's income demographics are ██████ as are those of the other brands widely recognized as major (albeit much smaller) players in the "accessible luxury" space:

37.     In contrast, Capri estimated in 2023 that ███████ percent of the consumers of true luxury brands Gucci, Dior, Fendi, and Valentino had household income ██████████████████

38.     "Accessible luxury" handbags also have peculiar characteristics that distinguish them from those offered by mass-market brands and by the European true luxury fashion houses. These include:

39.     **Quality.** "Accessible luxury" handbags boast quality materials and craftsmanship. Coach states that it works ██████████████████████████████████████

██████████████████████████████████████

████████████ And Michael Kors specifically ████████████████████

██████████████████████████████████████████████

████████████████████████ These qualities separate "accessible luxury" from mass-market handbags, which are often composed of manmade materials such as polyurethane and nylon and produced in bulk in China. In fact, ████████████

██████████████████████████████ to China's State Administration for Market Regulation (China's antitrust regulatory authority), the parties argued that even ████████

██████████████████████████████████████

██████████████████████████████████████████

████████████████████████ On the other end of the spectrum, "true luxury" handbags carry the imprimatur of the finest craftsmanship and materials and are nearly all manufactured in Europe.

40.     **Discounting and Promotions.** "Accessible luxury" handbags are characterized by a high degree of, and frequent, discounting and promotions, particularly around major

19

shopping holidays like Black Friday and Mother's Day. For instance, ■ percent of Kate Spade's "full price" (non-outlet) customers purchase products with a discount. And a Tapestry analysis from late 2022 showed average selling price of "accessible luxury" handbags in the United States was close to ■ percent less than manufacturer's suggested retail price ("MSRP"). This is in stark contrast to true luxury brands. Louis Vuitton, Prada, and Gucci all have a very public no-discounting policy; this is one way that true luxury brands distinguish their authentic products from counterfeits.

41.      **Omnichannel Approach and Sales Experience.** "Accessible luxury" brands sell handbags through multiple sales channels: company-operated (also called "monobrand") stores, including retail and outlet stores; online retail and outlet websites; and wholesale stores (e.g., Nordstrom's, Macy's, TJ Maxx, Ross). And their in-store shopping experience is also widely available throughout the United States—not just in metropolitan centers and big cities such as New York, Los Angeles, or Miami. On the other hand, true luxury handbag brands narrow the channels through which a customer can acquire their products, offering a more exclusive shopping experience. Some true luxury brands do not sell their products in any outlet or wholesale channels, maintaining close control over the distribution of their wares. Chanel and Hermes even go so far as to never sell certain handbags online—a customer must go into a store to purchase a Chanel or certain Hermes bag.

42.      Finally, "accessible luxury" handbags are made in unique production facilities, typically offshore in Asia but still with quality craftsmanship, which distinguishes their production from mass-market handbags made in bulk in China. One key supplier for "accessible luxury" handbags is Simone, which touts its quality-assurance system and the craftsmanship of

its artisans, which has enabled it to "grow concurrently with the emergence of accessible luxury in the US market." Notably, Simone has acknowledged, ███████████████████████ ███████████████████████████████████████████████████ ███████████████████████ Tapestry integration planning documents are more blunt: ███████████████████████████████████

43.     True luxury and mass-market handbags do not share the same characteristics as "accessible luxury" handbags and thus are not part of the relevant product market. With jaw-dropping prices at multiples of the offerings of Coach, Kate Spade, and Michael Kors, true luxury handbags are not substitutes for "accessible luxury" handbags. In the words of Coach's President: ███████████████████████████████ The President of Kate Spade put it more bluntly: ███████████████████████████ ███████████████████████████████████████ Neither are mass-market handbags, which, as noted above, ███████████████████████ ██████████████

44.     Although a relevant antitrust market can be defined solely based on qualitative evidence regarding market characteristics, or "practical indicia," another common method employed by courts and the Agencies to determine the relevant market is the hypothetical monopolist test.

45.     As explained by the case law and Merger Guidelines, the hypothetical monopolist test is a tool used to determine if a group of products is sufficiently broad to be a properly defined antitrust product market. If a single firm (i.e., a hypothetical monopolist) seeking to maximize profits controlled all sellers of a set of products or services and likely would undertake

a small but significant and non-transitory increase in price or other worsening of terms

("SSNIPT"), then that group of products is a properly defined antitrust product market. Here, a

hypothetical monopolist of "accessible luxury" handbags likely would undertake a SSNIPT on

consumers. In the event of a SSNIPT for "accessible luxury" handbags, consumers would not

switch to mass-market handbags or to true luxury handbags in sufficient volumes to render the

price increase unprofitable. Accordingly, "accessible luxury" handbags constitute a properly

defined product market.

      **B.**    **The Parties Compete in a Relevant Geographic Market of the United**
             **States.**

      46.    The parties compete in a relevant geographic market of the United States. Coach,

Kate Spade, and Michael Kors set pricing for "accessible luxury" handbags, including MSRP

and discounts, ███████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████ The parties' shipping practices, including limitations on international shipping,

also support that the geographic market is the United States. The parties and other "accessible

luxury" handbag industry participants have U.S.-specific marketing and business strategies for

their brands and handbags, monitor U.S. prices and market shares for handbags, and study U.S.

customers as distinct from other regional customer bases (e.g., Europe, China).

      47.    A hypothetical monopolist controlling all sellers of "accessible luxury" handbags

in the United States could profitably implement a SSNIPT in the United States. Therefore, the

United States is a relevant geographic market in which to assess the competitive effects of the

Proposed Acquisition.

## THE PROPOSED ACQUISITION WILL ELIMINATE
## DIRECT HEAD-TO-HEAD COMPETITION

48.     The elimination of head-to-head competition between Coach, Kate Spade, and

Michael Kors makes the Proposed Acquisition unlawful. A merger is unlawful if it substantially

lessens competition between the parties, as recognized by the Merger Guidelines. The parties'

internal documents show that Tapestry and Capri closely monitor each other's business strategy

and routinely respond to each other's competitive decision-making. The Proposed Acquisition

would eliminate this fierce competition, which manifests through pricing, discounts, promotions,

innovation, design, marketing, and brick-and-mortar store experiences—all of which benefit

consumers.

49.     Consumers are not the only constituency that profits from this rich, and fierce,

competition: employees reap rewards from head-to-head competition between the parties'

concerning wages and workplace policies.

50.     There is a reasonable probability that the elimination of competition as a result of

the Proposed Acquisition would result in increased prices, fewer discounts and promotions,

decreased innovation, and reduced wages and employee benefits.

### A.     Coach, Kate Spade, and Michael Kors Are Close Competitors.

51.     Tapestry and Capri recognize their Coach, Michael Kors, and Kate Spade brands

as close competitors for handbags, so much so that ███████████████████████████

████████████████████████████████████████████████████████████

██████████     While the company was negotiating the Proposed Acquisition, a Tapestry

shareholder stated in a letter to its Board of Directors that ██████████████████ ████████

████████     Another Tapestry document recognizes that ████████████████████████████

23

███████████████████████████████████████████ Similarly, Capri's

documents, including several that made their way to the company's Board of Directors, ████

██████████████████████████████████████████████

███████████████████ And Capri CEO and Chairman John Idol ████████████

████████████████████████████ ███████████████ Mr. Idol is not

alone: his counterpart at Tapestry, ████████████████████████

█████████████████████████ ████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████████

████ And internal Coach and Kate Spade documents discuss the goal to ██████████

in the words of a slide deck presented to Coach's Chief Marketing Officer in 2021, ████

      52.     Mr. Idol and Ms. Crevoiserat have good reason to focus on each other's

"accessible luxury" handbag brands, as the parties' own consumer research shows that their

customers ████████████████████████████ Tapestry's ████

██████████████████████████████████████████

for handbags across a myriad of metrics. For example, ██████████████████

███████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████ The data compiled in these consumer

surveys and █████████████████████████████████████

████████████████████████████████████ Capri has

conducted similar research, █████████████████████████

[BLACK REDACTION BAR]

[BLACK REDACTION BAR]

**B.     There Is a Reasonable Probability That the Proposed Acquisition Will Eliminate Head-to-Head Competition Between Coach, Kate Spade, and Michael Kors.**

53.     Coach, Kate Spade, and Michael Kors have a laser-like focus on each other, continuously monitoring each other's "accessible luxury" handbag brands from look and feel to pricing and performance, and then using that information to inform their strategic deliberations and actions. The Merger Guidelines state that "[c]ompetition often involves firms trying to win business by offering lower prices, new or better products and services, more attractive features, higher wages, improved benefits, or better terms relating to various additional dimensions of competition." All of those forms of competition are here—and there is a reasonable probability that all would be eliminated if the Proposed Acquisition is allowed to proceed.

54.     **Price and discounts.** Examples abound in the parties' documents of analyses

[BLACK REDACTION BAR]

[BLACK REDACTION BAR] Mr. Idol himself has instructed his subordinates to

[BLACK REDACTION BAR] And when a Coach email blast showed

Coach [BLACK REDACTION BAR]

[BLACK REDACTION BAR]

[BLACK REDACTION BAR] Indeed, Mr. Idol has testified on behalf of Capri [BLACK REDACTION BAR]

[BLACK REDACTION BAR]

55.     Price competition between Coach, Kate Spade, and Michael Kors occurs beyond simply aligning on list prices, however, as the parties ████████████████████████████ ████████████████████████████████████████████████████████ ███████████████████████████ In fact, the parties—and Wall Street—have complained about the fierce undercutting and discounting between these three brands, so much so that Michael Kors' CEO ████████████████████████████████████ ████████████████████████████████████████████████████████ ███████████████████████████████████

56.     **Marketing.** Coach, Kate Spade, and Michael Kors pay close each attention to each other's marketing—and no detail is too small. In May 2023, Mr. Idol wrote to his team: ████████████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████ The year before, █████████, Michael Kors' Group President of Retail, ██████████████████████████████████████████ ████████████████████████████████████████████ ██████████ Michael Kors' next step was clear: ████████████████████

57.     Competition between the parties is particularly fierce in internet search advertising. Both Capri and Tapestry engage in ████████████████████████████████ ████████████████████████████████████████████ ████████████████ At one point, this competition became so intense Michael Kors ████████████████████████████████████████████████████████ ████████████████████████████████████████

58.     **Brick-and-mortar stores.** Although each heavily relies on digital sales, the parties recognize the value of a strong brick-and-mortar presence, whether it be through their own retail stores or department stores like Macy's. As such, Coach, Kate Spade, and Michael Kors ███████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████ For example, when Michael Kors closed stores, Tapestry's CEO perceived opportunity: ████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████

59.     **Innovation and design.** Coach, Michael Kors, and Kate Spade also compete head-to-head on the quality of their products, including on designs of their handbags. Examples abound of Coach, Kate Spade, and Michael Kors ████████████████████████

███████████████████████████████ For example, █████████████████████

████████████████████████████████ █████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████████████ Capri CEO John Idol likewise monitored █████████████████████████████████████

███████████████████████

60.     Coach, Kate Spade, and Michael Kors compete on forms of innovation besides handbag design. For instance, when Coach launched Coach "(Re)Loved," its handbag recycling program, ████████████████████████████████████████████████

███████████████████████████ which it launched in August 2022 as the Michael

Kors "Pre-Loved" program. Tapestry ███████████████████████████████████

███████, and one executive called Michael Kors ████████████████████████████

███████████████████████████████

61.     **Labor.** Evidence shows that Tapestry and Capri compete on metrics that affect other constituencies, including their thousands of employees. Both parties have recognized their retail employees as providing a "competitive advantage" in the sale of their "accessible luxury" handbags—and both ████████████████████████████████████████

62.     For example, after Tapestry publicly committed to a $15/hour minimum wage for U.S. hourly employees, its rival Capri immediately took notice, with CEO John Idol ████████

███████████████████████████████████████████████████████

███████████████████████ Michael Kors' VP of Stores wrote separately: ████████████

████████████████████████████████████████████████████████

██████████████████████ Less than two months later, Michael Kors announced plans to raise its minimum wage to $15 per hour, effective ██████████████ which benefitted nearly

███ Capri employees despite estimates showing the initiative ████████████████████████

██████████████████

63.     The parties also closely follow how they compare to each other on labor conditions, ████████████████████████████████████████████████

███████████████████████████████████████ Reputation matters to both Capri and Tapestry—as it should, because analysts like ██████████████████████████████

█████████████████████████████████████████████████████████

██████████████████████ As Tapestry wrote, ████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████ Moreover, the parties publicly release annual reports that tout their goals and accomplishments with regard to employees, including information about work environment, compensation, leave policies, promotions and training programs. This competition prompts the parties to improve their workplaces and worker benefits to attract and retain employees—all to maintain a "competitive advantage" for selling their products, including their "accessible luxury" handbags. Its elimination as a result of the Proposed Acquisition could have substantial effects on employment wages, benefits, and conditions for people who work for or seek employment from the parties and their brands.

### C.     Tapestry Intends to Raise Michael Kors' Prices Post-Transaction by Reducing Discounts and Pulling Back from Wholesale.

64.     ███████████████████████████████████████

████████████████████████████████████████ Tapestry intends to raise prices for Michael Kors through reducing discounts and promotions and pulling back on wholesale (where it has less control over pricing)—which is exactly what Coach did in 2016 and Kate Spade later did following its acquisition in 2017.

65.     ███████████████████████████████████ Almost a decade ago, in 2016, Coach announced strategic plans to "rationalize" its department store distribution and remove Coach products from approximately a quarter of department stores, in a move "specifically designed to move away from the discounting." Coach's plans included reducing

markdown allowances, because "heavy discounts offered in [the department store] channel make
it harder for consumers to spend more on a similar bag at the company's own stores or its e-
commerce websites." These decisions helped Coach increase sales prices, with Coach's handbag
AURs (Average Unit Retail) increasing to over $300.

66.     After Coach (now Tapestry) acquired Kate Spade in 2017, it did not try to hide
that it intended to use similar strategies to reduce Kate Spade's wholesale presence and discounts
and to raise prices. As Coach's then-CFO ███████ explained in the press release announcing
the deal: "[T]o ensure the long-term viability and health of the Kate Spade brand, and similar to
the steps Coach has itself taken over the last three years, we plan to reduce sales in Kate Spade's
wholesale disposition and online flash sales channels."

67.     While Tapestry attempted to pursue this strategy with its Coach and Kate Spade
brands, Michael Kors has taken a different path, using discounts to undercut competitors and
increase its own sales volume and threatening to undermine the pricing "discipline" that Tapestry
had heralded to investors. Tapestry's acquisition of Capri will eliminate that competition. As
Morgan Stanley, Tapestry's bankers on the deal, wrote in a slide deck with investor commentary,



68.     Indeed, deal documents demonstrate that ████████████████████████

████████████████ post-acquisition. Specifically, Tapestry plans to ████████

████████████████████████████████████████████

████████████████████████████ It intends to

████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████

69.     Tapestry also plans to ████████████████████████████████████

███████████████████████████████████████████████

████████████ While observing ████████████████████████████████ Tapestry found

that ██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████





70.     Tapestry's plans will be fueled by its enormous consumer database and superior analytical capabilities. The company has assembled an arsenal of consumer data, boasting a database of ███████████████████████████████████ Rich data analysis, and heavy investment in other technological capabilities, such as artificial intelligence, have enabled Tapestry to strategically implement targeted price increases, reduce discounts and promotions, and limit inventory. Tapestry plans to leverage these capabilities for Capri's brands, including Michael Kors, to drive similar results.

### THE PROPOSED ACQUISITION IS PRESUMPTIVELY UNLAWFUL BECAUSE IT SIGNIFICANTLY INCREASES CONCENTRATION

71.     Apart from the elimination of fierce head-to-head competition, the Proposed Acquisition is also presumptively unlawful because it significantly increases concentration in the "accessible luxury" handbag market.  Already recognized by Wall Street as a ██████████

Tapestry and Capri combined would control more than ▮ percent of the market for "accessible luxury" handbags in the United States. Given the parties' high market shares, the Proposed Acquisition would lead to a significant increase in concentration in the "accessible luxury" handbag market that exceeds the threshold for presumptive illegality.

72.     The Merger Guidelines employ a metric known as the Herfindahl-Hirschman Index ("HHI") to assess market concentration. The HHI is the sum of the squares of the market shares of the market participants. For example, a market with five firms, each with 20% market share, would have an HHI of 2000 ($20^2 + 20^2 + 20^2 + 20^2 + 20^2 = 2000$).  The HHI is low when there are many small firms and grows higher as the market becomes more concentrated. A market with a single firm would have an HHI of 10,000 ($100^2 = 10,000$).

73.     The Department of Justice and the Federal Trade Commission jointly publish the Merger Guidelines. Rooted in established caselaw and widely accepted economic thinking, the Merger Guidelines outline the legal tests, analytical frameworks, and economic methodologies both agencies use to assess whether transactions violate the antitrust laws, including measuring market shares and changes in market concentration from a merger. The Merger Guidelines—themselves guided by numerous court decisions—support using the HHI method to calculate market concentration.

74.     The increase in market concentration caused by the Proposed Acquisition is indicative of the Proposed Acquisition's likely negative impact on competition. The Merger Guidelines explain that a merger that significantly increases market concentration is presumptively unlawful. Specifically:

- A merger that creates a firm with a market share of over 30 percent and that increases the HHI of the market by more than 100 points is presumed to substantially lessen competition in that market and is thus presumptively illegal.

- A merger is also likely to create or enhance market power—and, again, is presumptively illegal—when the post-merger HHI exceeds 1800 and the merger increases the HHI by more than 100 points.

75.     The Proposed Acquisition is presumptively illegal in the "accessible luxury" handbag market in the United States. Although a merger need meet only one of the two aforementioned measures to be presumptively illegal, the Proposed Acquisition satisfies both: it is presumed likely to create or enhance market power—and is presumptively illegal—in the "accessible luxury" handbag market because it increases the HHI in the market for "accessible luxury" handbags in the United States by over ███ points, leading to a post-acquisition HHI above ███ points and a post-acquisition market share for Tapestry of considerably more than 30 percent.

## THE PROPOSED ACQUISITION IS PART OF TAPESTRY'S STRATEGY OF SERIAL ACQUISITIONS

76.     In the last decade, Tapestry has already consolidated Coach, Kate Spade, and Stuart Weitzman. Capri has likewise consolidated Michael Kors, Versace, and Jimmy Choo. If the Proposed Acquisition is completed, Tapestry will have consolidated six viable firms into one.

77.     The Merger Guidelines state: "A firm that engages in an anticompetitive pattern or strategy of multiple acquisitions in the same or related business lines may violate Section 7." "[T]he Agencies will consider individual acquisitions in light of the cumulative effect of related patterns or business strategies."

34

78.     Tapestry has engaged in an anticompetitive pattern and strategy of acquisitions in the "accessible luxury" market and intends to continue this pattern and strategy after the Proposed Acquisition, in a quest to become a ████████████████████████ Its pattern and strategy of acquisition will entrench Tapestry as the dominant player in "accessible luxury" handbags and make it harder for new brands to both enter and have a meaningful presence.

79.     The Proposed Acquisition is part of Tapestry's long articulated strategy and pattern to become ████████████ and Tapestry's documents demonstrate that its goal is to ████████████████████████████████████████████████████ ████████████████

80.     This strategy began over a decade ago, when in 2012 then-Coach ████████ ████████████ to address ████████████████████████████████ ████████████████████ and buying ████████████████████ ████████████████████████ By the next year, Coach had set its sights on becoming ████████████████████ To do so, Coach devised ████████████████████████████████ ████████████████████████ ████████████████ ████████████████████████ ████████████████ ████████████████ ████████████████████████ ████████████ ████████████████

81.     In 2015, Coach successfully took its first steps to become this ████████████ ████████████████ when it purchased Stuart Weitzman for $574 million, to enable Coach, in part, to be ████████████████████████████ Just months after this

35

acquisition, Coach again looked at ███████████████████████ ████████████████

████████████████████████ █████████████████████████████

82.     A Kate Spade acquisition finally became a reality for Coach in 2017, when Coach

purchased the brand for $2.4 billion and became Tapestry. █ ████████████████████████

████████████████████ █████████████████████████████████████

████████████████████ and Coach told investors the merger would ██████

██████████████████████████████ Coach also acknowledged concerns of

███████████████████████████████ resulting from the merger. Notably, just

prior to purchasing Kate Spade, Coach told its board, ████████████████████████

███████████████████████████████████████████████████████

████████████████ and that Coach wanted to ███████████████████████

██████████

83.     That same year Coach also revisited its strategy to acquire ███████ Later, in

2019, Tapestry looked at acquiring █████████████████████ and, in 2022, it focused its

████████████ on ██████████████████████████████████

████████████ That same year, ████████████████████████████████████ ███████

████████ and, in fact, as it was ██████████████████████████████████

█████████████████████████████ Tapestry instructed Morgan Stanley to

██████████████████████████████████████████████

84.     Tapestry's strategy to acquire "accessible luxury" handbag brands is clear ███████

███████████ In 2021, Tapestry CEO Joanne Crevoiserat made clear that █████████████████

██████████████████████████████████████████████████ Tapestry

created documents for its Board of Directors leading up to the Proposed Acquisition saying it

 and its SVP of Strategy and Consumer Insights observed

Not only would the Proposed Acquisition create a North American "accessible luxury" handbag

powerhouse, but Tapestry would be able to leverage its combined size for even more acquisitions

of rivals in the "accessible luxury" handbag market by which it could entrench its position and

make it harder for smaller rivals and new entrants to compete. Indeed, using the new balance

sheet from the Capri acquisition, Tapestry would have

Additionally, Tapestry would have

## THERE ARE NO COUNTERVAILING FACTORS TO JUSTIFY THE PROPOSED ACQUISITION

85.     Entry and repositioning to counteract the Proposed Acquisition's anticompetitive

effects is not likely, timely, or sufficient. Coach, Kate Spade, and Michael Kors are household

names in the United States, scoring as some of the most recognized brands in the fashion

industry in consumer research studies. These types of brands do not appear overnight, and more

importantly, are not easily scaled; as designer Rebecca Minkoff, whose handbags compete in the

"accessible luxury" market, observed: "We've been doing it [the brand] for 15 years and

everyone who wants to have a brand forgets how long it takes….brands[s] are going to take 10-

15 years to really get into society and get to the middle of the country." The fact that Tapestry

has chosen to purchase Kate Spade, and now Michael Kors, instead of use that money to build

new brands demonstrates just how long, and difficult, it is to build a new "accessible luxury"

handbag brand.

37

86.     On top of the time and money it takes to build a brand are the costs associated with a brick-and-mortar presence. Tapestry has observed that █████████████ █████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████ ████████████████ Brick-and-mortar presence, however, is challenging and costly. Among other things, it requires hiring and training staff and employees—necessary not just to manage the location but also as a tool of building brand awareness and customer loyalty. Wholesale is also an option for an entrant, or smaller existing competitor, to achieve a brick-and-mortar presence. But wholesale distribution presents unique challenges, including building relationships with wholesalers as well as establishing strong brand recognition such that wholesalers will want to work with the entrant in the first place.

87.     Marketing and advertising are essential for entrants to compete in the "accessible luxury" handbag market. The parties invest ███████████ each year across numerous promotional channels. The parties have entire departments dedicated to creating promotional advertisements, photoshoots, and marketing campaigns. They partake in special events for high-profile fashion events (e.g., fashion shows) around the world—something that is unavailable to new entrants.

88.     The parties' treasure trove of consumer data is also a barrier to entry. Tapestry has publicly and internally hailed its vast access to consumer data to leverage strategic promotions, increase prices, and respond to its customer demands. Capri has done the same. This data provides both Tapestry and Capri with a significant competitive advantage; as Tapestry's CEO told investors, "Tapestry is in a position of strength. Over the last few years, we've transformed

our business. We've leaned into brand building with our portfolio of iconic brands, we've created a dynamic platform with digital and data capabilities, which has enabled us to deliver strong and consistent results. And we see these as competitive advantages that are increasingly important in the environment today, and they're also scalable." Post-acquisition, Tapestry's vast access to data will increase barriers to entry, making it harder for smaller brands to enter and compete against the combined firm's ability to price, respond to consumer demand, and drive scale.

89.     Moreover, new entrants require access to manufacturing, and here too the parties' rich relationships with suppliers put them at a distinct advantage—and make it harder for new brands to emerge and scale to replace the loss of competition between the parties that would result from the Proposed Acquisition.

90.     Respondents cannot demonstrate merger-specific, verifiable, and cognizable efficiencies sufficient to rebut the presumption and evidence of the Proposed Acquisition's likely anticompetitive effects.

## LIKELIHOOD OF SUCCESS ON THE MERITS, BALANCE OF THE EQUITIES, AND NEED FOR RELIEF

91.     Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), authorizes the Commission, whenever it has reason to believe that an acquisition is unlawful, to seek preliminary injunctive relief to prevent consummation of the acquisition until the Commission has had an opportunity to adjudicate the acquisition's legality in an administrative trial. In deciding whether to grant relief, the Court must balance the likelihood of the Commission's ultimate success on the merits against the public equities. The principal public equity weighing in favor of issuance of preliminary

injunctive relief is the public interest in effective enforcement of the antitrust laws. Private equities affecting only Defendants' interest cannot defeat a preliminary injunction.

92.    The Commission is likely to succeed in proving that the effect of the Proposed Acquisition may be substantially to lessen competition in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, or Section 5 of the Federal Trade Commission Act, 15 U.S.C § 45, and that the Agreement and Plan of Merger and the Proposed Acquisition constitute unfair methods of competition in violation of Section 5 of the Federal Trade Commission Act.

93.    Preliminary relief is warranted and necessary. Should the Commission rule, after the full administrative trial, that the Proposed Acquisition is unlawful, reestablishing the status quo ante if the parties have consummated the Proposed Acquisition and combined their operations in the absence of preliminary relief would be extremely difficult.  Moreover, in the absence of relief from this Court, substantial harm to competition would likely occur in the interim.

94.    Accordingly, the equitable relief requested here is in the public interest. Wherefore, the Commission respectfully requests that the Court:

   a.   Enter the parties' stipulated temporary restraining order;

   b.   Preliminarily enjoin Defendants from taking any further steps to consummate the Proposed Acquisition, or any other acquisition of stock, assets, or other interests of one another, either directly or indirectly;

   c.   Retain jurisdiction and maintain the *status quo* until the administrative proceeding initiated by the Commission is concluded; and

d.  Award such other and further relief as the Court may determine is appropriate,

just, and proper.

Dated: April 22, 2024

Of counsel:

HENRY LIU
Director
Bureau of Competition

KYLE MACH
Acting Deputy Director
Bureau of Competition

SHAOUL SUSSMAN
Associate Director for Litigation
Bureau of Competition

Respectfully submitted,

DANIELLE QUINN (NY Bar No. 5408943)
Federal Trade Commission
600 Pennsylvania Avenue, NM
Washington, DC 20580
Phone: 202-326-2494
Email: dquinn@ftc.gov

ABBY DENNIS (DC Bar No. 994476)
Lead Counsel (*pro hac vice*)
Deputy Assistant Director

PEGGY BAYER FEMENELLA
(DC Bar No. 472770) (*pro hac vice*)
Assistant Director

NICOLE LINDQUIST (DC Bar No. 975593)
(*pro hac vice*)

LAURA ANTONINI (CA Bar No. 271658)
(*pro hac vice*)

BRANDON BOXBAUM
(DC Bar No. 1615988) (*pro hac vice*)

PETER COLWELL (DC Bar. No. 100287)
(*pro hac vice*)

KASSANDRA DIPIETRO
(MN Bar. No. 0403547) (*pro hac vice*)

FRANCES ANNE JOHNSON
(MD Bar – No Number) (*pro hac vice*)

SARAH KERMAN (DC Bar No. 90017957)
(*pro hac vice*)

ANDREW LOWDON (DC Bar No. 230095)
(*pro hac vice*)

41

BLAKE RISENMAY (WA Bar No. 52888)
(*pro hac vice*)

VICTORIA SIMS (DC Bar No. 1006974)
(*pro hac vice*)

TIMOTHY SINGER (DC Bar No. 1048769)
(*pro hac vice*)

*Counsel for Plaintiff Federal Trade
Commission*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on April 22, 2024, I electronically filed a true and correct copy of the foregoing document using the United States District Court for the Southern District of New York CM/ECF System.

I FURTHER CERTIFY that I served the foregoing document on the following counsel via electronic mail:

| | |
|---|---|
| Amanda P. Reeves<br>LATHAM & WATKINS LLP<br>555 Eleventh Street, N.W., Suite 1000<br>Washington, DC 20004<br>Phone:  202-637-2183<br>Email: amanda.reeves@lw.com<br><br>*Counsel for the Defendant Tapestry, Inc.* | Damian G. Didden<br>WACHTELL, LIPTON, ROSEN & KATZ<br>51 West 52nd Street<br>New York, NY 10019<br>Phone:  212-403-1113<br>Email:  DGDidden@wlrk.com<br><br>*Counsel for Defendant Capri Holdings Limited* |

Danielle Quinn
NY Bar No. 5408943
Federal Trade Commission
600 Pennsylvania Avenue, N.W.
Washington, DC 20580
Phone: 202-326-2494
Email: dquinn@ftc.gov

*Counsel for Plaintiff Federal Trade Commission*