# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>             Plaintiff,<br>  v.<br><br>TAPESTRY, INC.,<br><br>and<br><br>CAPRI HOLDINGS LIMITED,<br><br>             Defendants. | Civil Action No. 1:24-cv-03109 (JLR) |

**DEFENDANTS' REPLY IN FURTHER SUPPORT OF THEIR
MOTION FOR A MORE DEFINITE STATEMENT OR, IN THE ALTERNATIVE,
TO REQUIRE PLAINTIFF TO ANSWER ONE CONTENTION INTERROGATORY**

**TABLE OF CONTENTS**

**Page**

ARGUMENT ...................................................................................................................................3

    1.    The FTC Steadfastly Refuses To Define Its Proposed Market. ...............................3

    2.    If The Contours Of An "Accessible Luxury Handbag" Market Are So Well-Known By Everyone In "The Industry," Why Can't The FTC Identify Them? ..............7

    3.    Defendants Are Not Asking The FTC To *Prove* Its Market Now, Merely To Define It ..................................................................................................................9

    4.    The FTC Is Hiding The Ball ..................................................................................10

    5.    Defendants Have Good Cause For Seeking One Early Interrogatory ...................10

## **TABLE OF AUTHORITIES**

Page(s)

**CASES**

*Brown Shoe Co. v. United States*,
 370 U.S. 294 (1962) ...........................................................................................................4, 6

*FTC v. Elders Grain, Inc.*,
 868 F.2d 901 (7th Cir. 1989) ..................................................................................................4

*FTC v. IQVIA Holdings Inc.*,
 No. 23-06188, 2024 WL 81232 (S.D.N.Y. Jan. 8, 2024) .........................................................5

*FTC v. RAG-Stiftung*,
 436 F. Supp. 3d 278 (D.D.C. 2020) ........................................................................................5

*FTC v. Simeon Mgmt. Corp.*,
 532 F.2d 708 (9th Cir. 1976) ..................................................................................................4

*FTC v. Thomas Jefferson Univ.*,
 505 F. Supp. 3d 522 (E.D. Pa. 2020) ......................................................................................4

*FTC v. Whole Foods Mkt., Inc.*,
 548 F.3d 1028 (D.C. Cir. 2008) (Brown, J.) ...................................................................6, 7, 9

*In re AMR Corp.*,
 No. 22-901, 2023 WL 2563897 (2d Cir. Mar. 20, 2023) .........................................................5

*Ohio v. Am. Express Co.*,
 138 S. Ct. 2274 (2018) ............................................................................................................6

*Starbucks Corp. v. McKinney for & on Behalf of Nat'l Lab. Rels. Bd.*,
 144 S. Ct. 679 (2024) ..............................................................................................................9

*United States v. Baker Hughes Inc.*,
 908 F.2d 981 (D.C. Cir. 1990) ................................................................................................5

*United States v. E.I. du Pont de Nemours & Co.*,
 351 U.S. 377 (1956) ................................................................................................................6

*United States v. Marine Bancorporation, Inc.*,
 418 U.S. 602 (1974) ................................................................................................................4

**STATUTES**

15 U.S.C.
  § 13(b)..................................................................................................................3, 4, 5, 9
  § 18..................................................................................................................................4
  § 53(b).............................................................................................................................3

29 U.S.C. § 160(b) ..................................................................................................................9

Clayton Act § 7 ...............................................................................................................*passim*

National Labor Relations Act § 10(j).....................................................................................9

**RULES**

Fed. R. Civ Proc. 12(e) .......................................................................................................3, 9

Fed. R. Civ Proc. 13(b) ..........................................................................................................9

The FTC's Opposition confirms that one of two things is true. Either it still has no idea what an "accessible luxury handbag" is or how it intends to define that term, or it knows but does not want to say. Either way, its current position is indefensible, because it has not set forth an intelligible statement of the relevant market at the core of this proceeding. Rather than simply moot this motion by pointing to a simple definition of the relevant market with basic contours, the FTC spends twenty pages on various diversions. It mischaracterizes Defendants' motion as dilatory, uses cherry-picked out-of-circuit dicta to claim it does not even need to define a market, asserts yet again its misguided view that the Court need not conduct a meaningful analysis of its likelihood of success, and even nonsensically argues that Defendants must know the definition of the market because they have stated publicly that they expect to prevail in this proceeding. Yet nowhere in its Opposition does the FTC simply set forth a clear definition of its proposed market; it won't even say what a "handbag" is, much less an "accessible luxury handbag." If the answer is so obvious, why hasn't the FTC just stated it? It is clear that, despite having studied this industry since September, the FTC is not going to answer unless the Court orders it to do so.

The root of the FTC's dilemma is also now clear. The FTC brought a case based on the belief that two "close competitors" are merging and that the loss of that competition must be stopped. But a merger of close competitors has never been held by a court to be enough to state a claim under Section 7 of the Clayton Act. It is easy to see why. If "closeness" sufficed, every merger between "close competitors"—be they two sandwich shops across the street, two well-known brands that sit side-by-side in a store, or two lawn maintenance companies that work the same street—would be illegal simply because they "closely compete," no matter how many other competitors existed, and no matter the competitive significance of the two merging parties. That, fortunately, is not the law. The law that governs the FTC's lawsuit to block this deal indisputably

requires the FTC to plead that the transaction is likely to have substantial anticompetitive effects *in a relevant market*. We must at this point assume that the FTC is concerned about the vulnerability of any definition it might ask the Court to apply in this case. Understandably so. Defendants face fierce competition in every line of business in which they engage, from products far and wide, both geographically and across the price spectrum. But the law does not permit FTC to take a pass on this foundational question that is part of its prima facie burden. It must take a clear position now, at the outset of the case.

Discovery has only commenced in the last week. But even that initial discovery has underscored that the FTC's refusal to identify with clarity its proposed market is impeding the progress of this case. If the parties are going to have a full and fair determination of whether the FTC is likely to succeed on the merits of its Section 7 challenge, the FTC must provide more than the undefined label of "accessible luxury handbags," and it must do so now. The meaning of the FTC's proposed "accessible luxury" market is not obvious to Defendants, nor to the many third parties in "the industry" receiving subpoenas in this case, nor to the many fashion industry insiders who have publicly called the FTC's market "ill-defined," "fluid," "meaningless in practical terms," "not reflective of [ ] reality," "hard" to understand, and not "mak[ing] logical sense in many ways."[1] This is not a matter of semantics or nitpicking. Where the lines are drawn makes a real difference. Are bags priced at $75 from a brand like Lululemon in? Are handbags bought on discount at a Gucci outlet in or are they out? Is a men's briefcase a handbag? What about a backpack? If a Kate Spade handbag is on sale for Mother's Day at $60, is a handbag at a similar price point but made in China in or out? Or does the FTC claim that only some specific brands are in the market and, if so, which?

---

[1] Declaration of David Johnson (May 10, 2024) ("Johnson Decl.") Exs. 4–7.

The FTC does not enjoy the right to delay defining its market until it provides its expert reports, after the close of fact discovery. The FTC's protest notwithstanding, this motion is the opposite of dilatory—discovery has already begun and parties receiving subpoenas are asking questions. The definition of the relevant market with some reasonable contours is an essential element of the FTC's case, and the FTC's decision to delay providing a more definite statement regarding its impermissibly vague and unintelligible market is harming both Defendants and nonparties. It prejudices Defendants' ability to mount a defense in this expedited matter and will result in excess costs to third parties who will necessarily be subject to overbroad discovery. Defendants respectfully request that the Court grant their Motion.

## ARGUMENT

### 1.      The FTC Steadfastly Refuses To Define Its Proposed Market

The FTC first argues that its market definition cannot be "unintelligible" under Rule 12(e) because Defendants told the press and investors that they expect to prevail on the merits. Opp. at 7. But no authority supports that notion; indeed, the failure to define a cognizable market is one ground on which Defendants may prevail. A market that cannot be defined cannot be proven, and without a market, the FTC cannot show a likelihood of harm.

The FTC sued under Section 7 of the Clayton Act. *See* Compl. ¶ 92. Yet the FTC's opposition omits any discussion of Section 7 from its three-page discussion of the legal standards, Opp. 4–6, and never tries to tether the concept of "unintelligibility" to the controlling statute. It chooses instead to act as though Section 13(b) establishes the intelligibility standard. That makes no sense—a defendant cannot violate Section 13(b). Section 13(b) simply provides the statutory authority for the FTC to seek a preliminary injunction in this Court to prevent the deal from closing while its own administrative proceedings play out. 15 U.S.C. § 53(b). To obtain that injunction under Section 13(b), however, the Commission must show "that, weighing the equities ***and***

3

***considering the Commission's likelihood of ultimate success***," an injunction "would be in the public interest." *Id.* (emphasis added). Section 13(b) provides a procedural overlay for this proceeding, but it does not, and cannot, change the substantive legal elements.

Courts always evaluate the FTC's "likelihood of ultimate success" in determining whether a transaction violates Section 7.[2] Market definition plays an indispensable role in that analysis. Section 7 prohibits transactions where "*in any line of commerce* . . . the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18 (emphasis added). As the Supreme Court has repeatedly held, the statutory term "line of commerce" means relevant product market. The FTC, as a Section 7 plaintiff, must plead and ultimately prove harm in a relevant antitrust market. *See, e.g.*, *Brown Shoe Co. v. United States*, 370 U.S. 294, 324 (1962) (area of effective competition "must be determined by reference to a product market (the 'line of commerce') and a geographic market (the 'section of the country')"). That is why "[d]etermination of the relevant product and geographic markets is 'a necessary predicate' to deciding whether a merger contravenes the Clayton Act." *United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 618 (1974). The FTC's attempts to suggest that Section 13(b) somehow relieves it of that obligation are not just unfounded, but contrary to the law.

Every court to consider a challenge to a merger under Section 7—including every decision in every injunctive challenge the FTC has ever brought—has acknowledged the central role of

---

[2]   The plain meaning of "*ultimate* success" requires more than merely concluding that the FTC is likely to win its own game in its own administrative proceeding—i.e., the one where the very Commission that just voted out the complaint as a prosecutor sits as an appellate decision-maker—but also that a federal court of appeals is likely to affirm that decision. *See, e.g.*, *FTC v. Simeon Mgmt. Corp.*, 532 F.2d 708, 715-16 (9th Cir. 1976) (a "favorable initial decision does not necessarily assure the FTC of ultimate success"); *FTC v. Elders Grain, Inc.*, 868 F.2d 901, 903 (7th Cir. 1989) ("likelihood of success" contemplates "a full administrative proceeding before the FTC, followed by judicial review . . . in one of the courts of appeals").

market definition in its analysis. *See, e.g.*, *FTC v. Thomas Jefferson Univ.*, 505 F. Supp. 3d 522, 557 (E.D. Pa. 2020) (denying preliminary injunction because "the Government has not identified a single relevant market to make its prima facie case"); *FTC v. RAG-Stiftung*, 436 F. Supp. 3d 278, 287 (D.D.C. 2020) ("[B]ecause evaluating a merger's competitive effects on a market requires the FTC to properly define a market in terms of both product and geography," the FTC's improper relevant product definition "all but precludes the Court from siding with it."). Indeed, step one of a court's ultimate analysis[3] is to determine whether the FTC has made out a prima facie case that the transaction is anticompetitive, which requires putting forth sufficient evidence that the transaction is unlawful. That, by definition, means the FTC must show that it is likely to succeed in showing that *the transaction will lead to substantial anticompetitive effects in a relevant market*.

As court after court has held, an antitrust plaintiff, including the FTC, must plead a market with enough specificity to plausibly suggest the contours of its product market. *See* Mem. in Supp. of Mot. for a More Definite Statement at 10, ECF No. 74 ("Motion") (collecting cases). It must do so for Defendants to have a full and fair notice of the basis for its case. If anything, that need is more critical in a Section 13(b) setting, because Defendants face a very aggressive discovery schedule (in contrast to the FTC, which has been conducting discovery as part of its internal investigation for several months). To focus their discovery efforts effectively, Defendants must

---

[3] The FTC's refusal to discuss the Section 7 legal standard means its brief is likewise silent on the burden-shifting framework this Court must apply in this proceeding. *See, e.g.*, *United States v. Baker Hughes Inc.*, 908 F.2d 981, 982–83 (D.C. Cir. 1990); *see also In re AMR Corp.*, No. 22-901, 2023 WL 2563897, at *2 (2d Cir. Mar. 20, 2023) (collecting cases from other circuits that follow the burden-shifting approach). Under Step 1 of this standard, the FTC must make out a prima facie case that the merger is anticompetitive. *FTC v. IQVIA Holdings Inc.*, No. 23-06188, 2024 WL 81232, at *10 (S.D.N.Y. Jan. 8, 2024). If it does so, the burden shifts in Step 2 to the defendant to produce evidence rebutting that prima facie case. *Id.* And if the defendant is successful, the burden of production shifts back to the FTC in Step 3 and merges with the ultimate burden of persuasion, which is incumbent on the FTC at all times. *Id.* In the context of a challenge to a horizontal merger, again, *no court has held otherwise.*

know now with some clarity what is in and out of the FTC's "accessible luxury handbag" market so they can prepare a defense that includes, among other things, an informed assessment of true market shares to show the fallacy of the FTC's position that Defendants somehow constitute a duopoly. That is why the law requires the FTC to plead facts that explain how its market definition reflects "the area of effective competition," *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2285 (2018) (citation omitted), and why it must identify the products that are "reasonabl[y] interchangeab[le] for the purposes for which they are produced—price, use and qualities considered," *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 404 (1956).

The FTC refuses to acknowledge and comply with this uncontroverted body of law. The FTC says on the one hand it has met its obligation by invoking *Brown Shoe*, 370 U.S. at 324–25. But the *Brown Shoe* "practical indicia" factors do not obviate pleading a clear statement of what the market is. They provide a means to test the efficacy of an already defined market to determine whether the market is legally cognizable. In other words, courts apply the *Brown Shoe* factors to test whether the plaintiff has identified the right market, *after* it has been defined. They do not excuse a failure to articulate a coherent market in the first place.

Perhaps conscious of the weakness of its position, or alternatively in an effort to use this case to make new law, the FTC half-heartedly suggests that it might not have to define a relevant market at all, citing to a stray sentence of dicta in a footnote of a non-majority opinion in an out-of-circuit decision over 15 years ago. Opp. at 5, 13 (citing *FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1036 n.1 (D.C. Cir. 2008) (Brown, J.)). Despite the dicta, in *Whole Foods*, the Court expressly evaluated the FTC's market definition. *Id.* at 1037; *see also id.* at 1043–49 (Tatel, J.) (considering whether the FTC had properly defined the market). And while that opinion hypothesized that it "might" somehow be possible to obtain an injunction without defining a

market, courts in the real world have not done so.[4]  The *law* is that the FTC must plead a relevant market with enough clarity for Defendants to conduct discovery and test the FTC's theory—*i.e.*, who are the body of competitors that the FTC believes do and don't constrain Defendants' pricing today, and who has recently or might enter to compete.

2. **If The Contours Of An "Accessible Luxury Handbag" Market Are So Well-Known By Everyone In "The Industry," Why Can't The FTC Identify Them?**

The FTC's other main argument for why the label "accessible luxury handbags" sufficiently defines the relevant market is that the words "accessible luxury handbags" appear in some of Defendants' ordinary course documents, and everyone in "the industry" supposedly knows what those words mean.  Opp. at 14.  First, that is not true.  Second, if it were, then why has the FTC not simply set forth that universally accepted definition—or even cited to a document that lays it out?  The FTC has not done so, because it cannot.  Consider the following:

- The cited documents themselves suggest conflicting and shifting contours that lead to significant definitional differences.[5]

- The whole "industry" most certainly does not know what it means.  Third parties that Defendants have subpoenaed in this proceeding have already said they do not understand how the FTC is defining "handbags," much less "accessible luxury" ones.[6]

---

[4]     The FTC's reliance on *Whole Foods* is also curious because *Whole Foods* is considered the paradigmatic example of how the FTC defines narrow markets when it wants to challenge a deal between close competitors by identifying a wordy, narrow market to capture what the merging parties—and few others—do.

[5]     *See* Motion at 7–9.

[6]     *See* Johnson Decl. ¶ 2.

- Reputable fashion industry insiders have widely criticized the FTC's use of "accessible luxury" as "ill-defined," "fluid," "meaningless in practical terms," "not reflective of [ ] reality," "hard" to define, and not "mak[ing] logical sense in many ways."[7]

- In the FTC's subpoenas to third parties, it fails to define even the simple term "handbag."[8] Instead, the FTC asks competitors and wholesalers to provide sales information, which will be the basis for its market shares, without defining the term.

- Perhaps most baffling is the FTC's decision to run away from (and pretend it does not even recognize) its own definition of "handbags," which it used in its seven-month pre-complaint investigation and forms the basis on which it commanded the production of millions of documents from the parties and third parties.[9] *See* Opp. at 14 n.5.

It is not a big ask for the FTC to set forth a clear, simple statement of what an "accessible luxury handbag" is. A review of the complaints the FTC has filed in other Section 7 challenges proves it knows how to execute on this simple task: at the culmination of its lengthy and detailed investigation where it has surveyed the facts, the data, and the industry, it provides a label and a definition. The fact that the FTC will not plead a definition here suggests the FTC does not have one—which is not acceptable as a matter of law at this stage.

The FTC's refusal to state what the "accessible luxury handbag" market means is also puzzling because the FTC's Complaint very clearly has a definition in mind. The FTC admits in the Complaint that it has conducted a market concentration analysis, which simply cannot exist in

---

[7]   *Id.* Exs. 4–7.

[8]   *Id.* ¶ 3, Ex. 1.

[9]   *Id.* ¶¶ 5–6, Exs. 2–3.

a vacuum.  *See* Compl. ¶¶ 2, 71, 75.  If the FTC believes that analysis is based on a proper relevant market, it should disclose what that market is.

> **3.  Defendants Are Not Asking The FTC To *Prove* Its Market Now, Merely To Define It**

The FTC next argues that the Court should deny this motion because the FTC is not required to "prove" a relevant market to obtain a preliminary injunction under Rule 13(b).  Opp. at 13.  To be clear, Defendants vehemently disagree with the FTC's repeated suggestions that this Court need not assess the FTC's likelihood of ultimate success.  *See Whole Foods*, 548 F.3d at 1060 (Kavanaugh, J., dissenting) (The "'serious questions' standard is inconsistent with [Section 13(b)'s] statutory text," which "unambiguously requires that courts consider 'the Commission's likelihood of ultimate success' when the FTC seeks to preliminarily enjoin a merger.").[10]  But in the context of the pending Rule 12(e) motion, the FTC's argument is either a misunderstanding or a non-sequitur.  Defendants are not asking the FTC to *prove* its relevant market now.  Defendants are merely asking the FTC to *define* the market's alleged contours now so that Defendants have a full and fair opportunity to develop the evidence necessary to mount a defense to it.  Defendants are not "nitpick[ing]" the Complaint (Opp. at 8), nor are Defendants asking the FTC to "prove" its relevant market with "an army of expert witnesses."  Opp. at 9.  But the Court must assess the FTC's likelihood of ultimately proving its case; it is hard to see how that assessment is even possible without a clear definition of the market that the entire case depends upon.  Defendants

---

[10]  The Supreme Court is currently reviewing the Sixth Circuit's watered-down, two-part test for allowing the National Labor Relations Board to seek preliminary injunctive relief under Section 10(j) of the National Labor Relations Act.  *See Starbucks Corp. v. McKinney for & on Behalf of Nat'l Lab. Rels. Bd.*, 144 S. Ct. 679 (2024).  Unlike Section 13(b), the statutory provision at issue in *Starbucks* does not even contain an express "likelihood of ultimate success" standard.  *See* 29 U.S.C. § 160(b) (authorizing temporary relief "as [the court] deems just and proper").  The Supreme Court's decision, which is expected by the end of June, may well further weaken the FTC's unfounded pleas for a lower-than-normal likelihood of success standard in this case.

ask only that the FTC identify the boundaries of its proposed market so that everyone can have the same understanding of the claim that the FTC has filed.

### 4. The FTC Is Hiding The Ball

The FTC also argues that the Court should deny Defendants' motion because it unfairly seeks to accelerate the normal discovery process and Defendants should sit back and wait for the FTC's expert report, at which point the FTC will apparently reveal the definition that it refuses to reveal now. Opp. at 8, 10–11. It is not clear that position would have merit in any proceeding, given how the proposed market affects discovery. But the point is especially ill-taken here. Defendants cannot wait for the FTC's expert report because fact discovery will be closed at that point. Forcing Defendants to wait until after fact discovery is closed to learn the most basic contours of the FTC's case would deprive Defendants of the right to marshal a full and fair defense. It is exactly the kind of trial-by-surprise gamesmanship the Federal Rules are designed to prevent.

### 5. Defendants Have Good Cause For Seeking One Early Interrogatory

Finally, the FTC wrongly argues that the CMO precludes the alternative relief of an early contention interrogatory. Opp. at 17–18. The CMO explicitly contains a provision allowing any party to seek modification for good cause, which is clearly met here. ECF No. 71 § E.10. Requiring the FTC to state the contours of its product market in response to an interrogatory is simply an alternative path to ordering the FTC to amend its Complaint to provide a more definite statement. Both procedures would accomplish the same objective, i.e., allow Defendants, the Court, and third parties to understand at the outset the contours of the claim and scope of discovery.

The FTC can rest assured that Defendants do not seek any of its attorney work product. Opp. at 18–19. Defendants simply want to know what the FTC contends is in its market and what is not—information the FTC has provided in every other complaint it has filed in modern history without worrying about disclosing attorney work product.

10

Dated: May 10, 2024                                    Respectfully submitted,

/s/ *Alfred C. Pfeiffer*
Alfred C. Pfeiffer (*pro hac vice*)
Christopher S. Yates (*pro hac vice*)
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Telephone: (415) 395-8240
Facsimile: (415) 395-8095
al.pfeiffer@lw.com
chris.yates@lw.com

Amanda P. Reeves (*pro hac vice*)
Ian R. Conner (*pro hac vice*)
Lindsey S. Champlin (*pro hac vice*)
Jennifer L. Giordano
David L. Johnson (*pro hac vice*)
Seung Wan (Andrew) Paik (*pro hac vice*)
Mary A. Casale (*pro hac vice*)
Christopher J. Brown (*pro hac vice*)
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
Telephone: (202) 637-2200
Facsimile: (202) 637-2201
amanda.reeves@lw.com
ian.conner@lw.com
lindsey.champlin@lw.com
jennifer.giordano@lw.com
david.johnson@lw.com
andrew.paik@lw.com
mary.casale@lw.com
chris.brown@lw.com

Lawrence E. Buterman
LATHAM & WAKINS LLP
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
Facsimile: (212) 751-4864
lawrence.buterman@lw.com

Sean M. Berkowitz (*pro hac vice*)
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800

        Chicago, IL 60611
        Telephone: (312) 876-7700
        Facsimile: (312) 993-9767
        sean.berkowitz@lw.com

        *Attorneys for Tapestry, Inc.*

        */s/ Jonathan M. Moses*
        Jonathan M. Moses[11]
        Elaine P. Golin
        Adam L. Goodman
        Brittany A. Fish
        51 West 52nd Street
        New York, New York 10019
        Telephone: (212) 403-1000
        JMMoses@wlrk.com
        EPGolin@wlrk.com
        ALGoodman@wlrk.com
        BAFish@wlrk.com

        *Attorneys for Capri Holdings Limited*

---

[11] Electronic signatures used with consent in accordance with Rule 8.5(b) of the Court's ECF Rules and Instructions.