O5DAFtcC

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  FEDERAL TRADE COMISSION,

4              Plaintiff,

5        v.                              24 Civ. 3109 (JLR)

6  TAPESTRY INC., CAPRI HOLDINGS
   LIMITED,
7                                        Remote Oral Argument

8              Defendants.

9  ------------------------------x
                                    New York, N.Y.
10                                  May 13, 2024
                                    3:00 p.m.
11
   Before:
12
                       HON. JENNIFER L. ROCHON,
13
                                        District Judge
14
                         APPEARANCES
15
   FEDERAL TRADE COMMISSION
16      Attorneys for Plaintiff
   BY:  ABBY L. DENNIS
17      DANIELLE C. QUINN

18 LATHAM & WATKINS LLP
        Attorneys for Defendant Tapestry
19 BY:  AL PFEIFFER, JR.
        AMANDA P. REEVES
20

21 WACHTELL, LIPTON, ROSEN & KATZ
        Attorneys for Defendant Capri
22 BY:  JONATHAN M. MOSES
        ELAINE P. GOLIN
23

24

25

O5DAFtcC

```
1        (Case called)
2        THE COURT:  Good afternoon, everyone.  Before we
3    begin, let me just place a few things on the record.  This
4    conference is being conducted through video conferencing on
5    Microsoft Teams.  As everyone knows, court proceedings are
6    public proceedings and therefore there was a listen-only line
7    that has been noted on the docket for anyone who wishes to
8    join.  We will not hear when people do join.  They just join
9    that listen-only line, so please presume that this is an open
10   forum.  I understand that we have several people, many people
11   on the line right now.
12       And on the line from my part there is my deputy, my
13   clerks, and we also have a court reporter who is transcribing
14   this proceeding.  And as a reminder, under the local civil
15   rules, no one other than court personnel are allowed to record,
16   rebroadcast, or disseminate this proceeding.  And that is for
17   the benefit of everyone who is on this call or video here
18   today.  No one is permitted to do that.  So we will first take
19   appearances.
20       Can I have appearances for the FTC first, please.
21       MS. DENNIS:  Yes, your Honor.  Good afternoon, Abby
22   Dennis for the Federal Trade Commission, and with me I have my
23   colleague Danielle Quinn.
24       THE COURT:  Good afternoon.  And, Ms. Dennis, will you
25   be handling the argument today or will Ms. Quinn be doing so?
```

O5DAFtcC

1          MS. QUINN:  I will be doing so, your Honor.

2          THE COURT:  Thank you.  And then who do we have here

3     from Tapestry?

4          MR. PFEIFFER:  Good afternoon, your Honor.  Alfred --

5          THE COURT:  Oh, you're on mute.

6          MR. PFEIFFER:  That was clumsy handwork by me.  Sorry.

7     Al Pfeiffer of Latham & Watkins on behalf of Tapestry.  Also

8     with me, my partner Amanda Reeves.

9          THE COURT:  And will you be handling the argument,

10    Mr. Pfeiffer?

11         MR. PFEIFFER:  Yes, your Honor.

12         THE COURT:  Thank you.  Good afternoon, Ms. Reeves, as

13    well.  Who do we have here from Capri Holdings?

14         MR. MOSES:  Good afternoon, your Honor.  Jonathan

15    Moses on behalf of Capri, and with me is my parter Elaine

16    Golin.

17         THE COURT:  Thank you.  And will you be handling the

18    argument, Mr. Moses?

19         MR. MOSES:  To the extent there's anything for us to

20    add, we will chime in.  But I anticipate Mr. Pfeiffer will take

21    the lions share of it.

22         THE COURT:  Thank you very much, and good afternoon

23    all.

24         We are holding this conference virtually for the

25    convenience of the parties.  I know people would be traveling

O5DAFtcC

1    in for this, D.C., California, etc., but I just want to place

2    out there at the outset of this case, if at any time the

3    parties wish to come in for any conference that I set, I am

4    happy to do that.  And certainly if I need you to come in, I

5    will order that as well.  But I'm doing this for your

6    convenience.  I'm always happy to have you here in person if

7    you would like.

8         Okay.  This motion, we are here for oral argument on

9    the motion for more definite statement or in the alternative

10   the request that plaintiff answer one contention interrogatory.

11   This is defendant's motion, so I will start with defendants and

12   hear from you.

13        I assume it's you, Mr. Pfeiffer, then I'll hear from

14   Ms. Dennis.  And then if you have a reply that you would like

15   to put forward, Mr. Pfeiffer, I'm happy to hear it.  I don't

16   have strict time limits for argument, but I ask that you be

17   reasonable.  I wouldn't imagine that either side needs anything

18   more than 15 minutes or so to argue.  You can assume great

19   familiarity with the papers on my behalf, and certainly feel

20   free to highlight anything that you need to highlight or wish

21   to highlight.

22        I do think that we should all be able to speak around

23   sealed specifics as far as I'm concerned.  That should be

24   possible during this argument.  If you want to direct me to

25   something in the complaint that I can look at without divulging

O5DAFtcC

 1    any sealed information, I'm happy to look there, but I think we

 2    can all manage to keep this proceeding open to the public

 3    without opening up any sealed or redacted information.

 4           So why don't we start with you, Mr. Pfeiffer.  I'm

 5    happy to hear from you now.

 6           MR. PFEIFFER:  Thank you, your Honor.  And of course

 7    we're most interested in addressing whatever concerns or

 8    questions you have.  So I hope and assume you won't be shy

 9    about letting me know.

10           THE COURT:  I won't.

11           MR. PFEIFFER:  In the meantime, I'll kick it off with

12    kind of our perspective on this.  And from our perspective, I

13    think it's both puzzling and kind of concerning that the FTC

14    has spent 20 pages in their opposition brief setting out all

15    kinds of reasons why they shouldn't have to provide us just a

16    simple intelligible statement of what they say the market is so

17    that we can know who and what they claim are in and out of the

18    market.  It's puzzling to start there because we know the FTC

19    absolutely has in mind what's in and out of the market in their

20    view in their market definition.

21           We know that precisely because they've included

22    allegations about post-merger market shares and market

23    concentration levels in the complaint.  They obviously had to

24    have a good faith, a good-faith basis rather, to say those

25    things under Rule 11 and we fully assume they did.  But you

O5DAFtcC

can't calculate market shares or market concentration figures without making a decision, without making a call about what's in the market and what's not because it's just math.

There's a numerator, which is us, the parties, and then there's the denominator, which is us plus everything else that they say makes up the total market. They calculated those figures, they say so in the complaint. So they know what they used as the denominator for the total market. So it's not a question of them not knowing what the market definition is. It's a matter of them refusing to tell us. And they frankly have been kind of blunt about that. They've told us in writing, and I think in meetings beforehand, that it's really a matter for experts in their view. And that's where I think it gets kind of concerning. Because in practical effect what they're saying is pretty remarkable.

They're saying, we are going to tell you more about the market, what our market definition means, but not until later. Much later from our perspective. Specifically when they serve their opening expert report, which is the same day fact discovery closes, which is July 26th. And that's just about ten day before we have to submit our own expert report.

That to us is concerning and kind of remarkable that we won't even know what they say is in and out of the market. We won't have that kind of definition until we're done with discovery, until our expert reports are basically done.

O5DAFtcC

1          There isn't time for this, your Honor.  The prejudice

2     to us we think is very clear.  As the FTC has certainly pointed

3     out this is a preliminary injunction proceeding, it's

4     proceeding on a very fast schedule.  The fact discovery, as I

5     said, ends on July 26th.  We don't have the luxury of waiting

6     for an expert to offer an opinion after fact discovery is over.

7     We need to know now what they say the basic parameters of this

8     market are so we can conduct our own discovery efficiently.

9     And frankly, effectively.  We want to be able to defend

10    ourselves.  We want to catch up to the seven-month head start

11    that the FTC has had during their investigation.  And we're

12    seeing real effects from this already, your Honor.

13         The third parties are as confused as we are.  Not just

14    in the Trade Press, which we've cited to you in our papers and

15    I won't belabor, but we've been hearing it from people, third

16    parties who we've served subpoenas on.  They don't know what we

17    mean when we say, you know, provide us information about

18    handbags.  What are you really looking at?  What parts of our

19    business are really at issue here?  We don't know what to say.

20    Either based on, you know, manufacturer or brand or price range

21    or customers, because the FTC won't tell us what they say is in

22    the market and out.

23         In fact, it's kind of telling that even in the own FTC

24    subpoenas that they have sent out in this litigation, they

25    still won't say.  In the second request process they had a

O5DAFtcC

1    definition of handbags that they had used during the

2    pre-complaint period, but we've literally gone backward now.

3    After seven months they don't have a definition of handbags in

4    the subpoenas that they're sending out.  And that all seems

5    conscious.  And I think what's going on here is it's ultimately

6    clear.  The FTC is concerned that if they do identify a market

7    with any real clarity, we're going to take aim at it and show

8    that it doesn't make sense, that we don't have enough market

9    power in the real world to cause any harm, that there's no

10   Section 7 concern here.  And I expect that they're right to be

11   concerned because we do know the entire bag industry, however

12   you slice it up, is highly competitive.  There's tons of people

13   in it.  But they don't, out of concern for protecting their

14   position, they don't get to hide the ball and hamper our

15   discovery because they're afraid to pin themselves down.

16          Your Honor, the FTC spends the biggest chunk of its

17   time arguing that they somehow don't have to plead a market

18   because this is just a preliminary injunction proceeding under

19   Section 13(b).  I think that's wrong on every conceivable

20   level.  I'm not going to revisit the idea of whether this is a

21   rubber-stamp process or not.  Your Honor has already clarified

22   that it's not.  But Section 13(b) itself makes clear that the

23   standard is the Court in this process is supposed to both weigh

24   the equities and consider the FTC's "likelihood of ultimate

25   success."

O5DAFtcC

1          So it's hard to see how you can conduct that analysis

2    with the FTC not making more clear what market they say is at

3    issue.  And I think, again, the *IQVIA* case very clearly made

4    clear that they have to do this.  It is part of 13(b) and

5    that's I think the most recent decision out of the Southern

6    District about this standard.

7          A couple quotes from *IQVIA*:

8          "Defining the relevant market is a necessary predicate

9    to finding a Clayton Act violation."

10          And another quote, "the scope of the relevant market

11    dictates the analysis of market power and the merger's

12    anticompetitive effects."

13          Now, to be clear, your Honor, we are not arguing,

14    though there was some suggestion of this in the opposition

15    brief, we're not arguing that the FTC needs to prove its market

16    is the correct one.  We're not saying that they need to put

17    forth right now in their complaint sufficient evidence to

18    obtain a permanent injunction or even a preliminary one.  But

19    that to us is a strong argument.  The question here on this

20    motion is not what standard of proof your Honor is going to

21    require at the hearing.  The question is do they have to set

22    forth a clear, intelligible definition of the market in the

23    first place.  Whatever else is true, Section 13(b) does not

24    relieve them of that duty.

25          Your Honor, I also did want to emphasize that this is

O5DAFtcC

1    not a semantic or hyper-technical exercise here.  The level of

2    vagueness that the FTC is engaging in is hampering our ability,

3    the parties' ability to defend ourselves.  We don't know the

4    most basic things about how they're framing the market, much

5    less precisely defining it.  Is it defined by some price range.

6    We don't even know that, much less what that price range is.

7    Is it defined in terms of some specific set of brands of

8    competitors?  We don't know that, much less who the competitors

9    are.  Is it defined around a specific set of customers?  Does

10   it include men's bags and briefcases in the definition of

11   handbags?  We don't know any of those things.  These are really

12   basic things that effect not just your analysis of the case,

13   but how we frame discovery so that we can make the presentation

14   to set up your analysis.

15            There are cases that have not required more detail

16   than a somewhat fuzzy market definition, your Honor.  But

17   they've done that when they've said, well, small differences in

18   where we draw the boundaries wouldn't really effect market

19   share calculations, so we don't need to do it here.  That's not

20   this case.  Here, small changes in market definition could make

21   a very big difference in what market share the parties are

22   deemed to have post merger and what potential harm to

23   competition would look like.

24            For example, on the price side, if you set the price

25   boundary as some of the documents that the FTC cites in the

O5DAFtcC

```
1    complaint would suggest, if you set that market boundary at
2    $100 or $150, that would make a big difference in what the
3    market share of the parties is because we already know that a
4    ton of the parties' products, their handbags, are sold below
5    that price point.  In some case, well below it.
6            So if you take that out of our market share, that
7    makes a big difference.  But if they conversely draw the line
8    lower and set a lower bottom bound of the market, that could
9    have a dramatic effect on market share because then you have to
10   contend with a huge volume of other bags sold at similar sub
11   100-dollar price points.
12           Either way, it effects what the post-merger market
13   shares will look like, and it effects what we need to do and
14   what kind of digging we need to do during discovery.  The same
15   is frankly true for the upper bound of the market to the extent
16   that this is intended to be price bounded.  Where you set that
17   price boundary makes a big difference.  And we don't know what
18   they have in mind, so we don't know exactly where to focus in
19   our discovery and our expert planning, all of that.
20           There's other ways they could be defining the market.
21   There's some suggestion about customers' income levels.  We
22   don't know whether they're trying to base this around a
23   specific identifiable customer segment based on customer
24   income.  What they have pled would indicate that it's not
25   possible because they talk about a 50/50 split of who buys
```

O5DAFtcC

```
1     where and a 60/40 split of who buys luxury and not.  We don't

2     know whether we need to do discovery on that because we don't

3     know if that's what they're claiming bounds the market.

4            The same is true about specific brands.  There's all

5     kinds of ways they could be doing this that would effect how we

6     defend ourselves and how we do discovery.  We just don't know,

7     so it is as real impact in this case.

8            It also, frankly, is at this point effecting us in the

9     Part 3 proceeding, which is supposed to be -- the internal

10    trial with the FTC is supposed to be according to the FTC our

11    real shot on the merits, but they use the same non-definition

12    of the market there.  And in that proceeding, unlike this one,

13    there is no process for a motion for a more definite statement.

14    The FTC eliminated that remedy about 15 years ago when they

15    changed their rules.  So what you do here will effect us both

16    in this proceeding and in the internal Part 3 proceedings at

17    the FTC.

18           We talked a little bit about this, so I'm not going to

19    beat it, but there is the fundamental issue of what's a

20    handbag.  And I do find it puzzling that the FTC had a

21    definition of what a handbag was during the second request

22    process, has withdrawn that definition.  When they filed their

23    opposition brief in this motion, they basically said they

24    didn't recognize their own definition of handbag, and since

25    that time they've refused to say whether that definition
```

O5DAFtcC

```
1    applies here.  Again, these are basics.  These are the kind of
2    things we're entitled to know in order to know how to defend
3    ourselves.  And again, we're not asking for something out of
4    the ordinary.  The FTC defines and defends markets all the
5    time, and they do so with a lot more precision when they want
6    to.  Sometimes they'll identify with the -- down to the
7    specific medical treatment that a drug applies to.  In the
8    Sonophy Mays case from just December of 2023, very precise
9    definition, and they also went through the exercise of pleading
10   and demonstrating facts to support the pleading that there was
11   no reasonably interchangeable substitute.
12        The same process in IQVIA.  And this case kind of
13   stands out for how different it is from how they approach the
14   relevant market in those cases.  The FTC wants to say that we
15   closely compete, but they won't say who else they claim
16   competes.  They won't say that even mass market and true
17   luxury, which they try to distinguish, they don't actually
18   plead that those are not actually interchangeable substitutes.
19   Even in terms of their proposed SSNIP analysis, they say that
20   in the event of a SSNIP, small substantial non-transitory
21   increase in price, the customers wouldn't switch to either mass
22   market or true luxury, but they don't say who are the
23   customers.  What is that customer segment that they have in
24   mind?  Have they done a SSNIP analysis?  If they've done so
25   then they know who those customers are.  If they're defining
```

O5DAFtcC

1    the market that way, they so say, what they've done, what it

2    means.

3             The bottom line, your Honor, we don't really have time

4    for this.  We're already being prejudiced because our discovery

5    is already underway and it's being effected and it just kind of

6    brings us to the ultimate question:  Why won't they just say,

7    since they've said they're going to tell us later?  We would

8    respectfully ask that you order the FTC to tell us now.

9             THE COURT:  Okay.  Mr. Pfeiffer, thank you.  Let me

10   ask a few questions.

11            So you criticize the FTC for not focusing on the

12   Section 7 standard enough in their papers.  But what is your

13   response to their argument that you don't seem to be focusing

14   on the 12(e) standard and how notice pleading is what is

15   required at this stage?  And, frankly, how many of the

16   arguments that you're raising may well go to the merits of the

17   claims or at least any motion that you have with respect to, or

18   arguments you have on preliminary injunction analyses as to

19   reasonable exchangeability, of substitutes, etc., all those

20   factors.  But that's not what is necessarily required for

21   notice pleading or on a 12(e) motion.

22            So can you talk to that standard a bit?

23            MR. PFEIFFER:  Absolutely, your Honor.  And the 12(e)

24   standard is ultimately intelligibility.  And it's not enough to

25   say that we've put a label on a product.  There are -- I'm

O5DAFtcC

1    forgetting now.  It's the case involving quote unquote local

2    advertising is I think very analogous to this.  That was a

3    12(e) case.  That was a case where the Court said, no, not

4    defining "local" is not good enough.  Local can mean lots of

5    different things.  You need to give better parameters.

6        So I do think we fit the 12(e) standard that this is

7    so incomplete, it's so undefined, that it really is

8    unintelligible.  And that I think is squarely within the

9    standard.  And it's, again, not just us.  This is not us

10   involved in gamesmanship here.  We know, we're seeing outside

11   commentators who are saying we don't understand what this

12   market means.  And we're hearing it from third parties who are

13   getting subpoenas.  We don't know what this means.  That is

14   unintelligibility.

15       So it is certainly within the confines of notice

16   pleading, but it has to actually put us on notice.  That's the

17   part of notice pleading that I think they're missing.

18       THE COURT:  Well, how much, Mr. Pfeiffer, definition

19   do you need at this stage?  I'm certain that you would want

20   more, but I hear from you that you need "basic" and quoting

21   "basic parameters of the market" that you just relayed to me.

22   And I see in their complaint parameters such as pricing

23   parameters, customer parameters, particular characteristics

24   related to quality, craftmanship, discounting, production

25   facilities.  I'm seeing a lot of those parameters and contours

O5DAFtcC

articulated in the complaint.  How much more in your view would

need to be articulated in order to satisfy the intelligibility

standard, the notice pleading standard that we need?

          MR. PFEIFFER:  And, your Honor, I think I would

respectfully disagree slightly that that's actually how they've

defined the market.  They did walk through the *Brown Shoe*

factors to try to show that there's a defensible market.  But

the *Brown Shoe* factors aren't used to define a market.  They're

used to say is this market actually properly defined?  Is it

defensible?  They talk about, okay, is this recognized in the

industry?  But they're not really about how do you sufficiently

plead a market.  And we know that because, again, they mention

a dollar range, but they mention actually different

inconsistent dollar ranges and they don't commit to say that

the market is actually defined in terms of dollars.  They

also -- they talk about customers and say some, again, I would

say inconsistent things about customers' income and how it

effects purchases, but they don't say that's how the market

should be defined.  That's really what we're asking for is

please tell us what is the methodology that you are using to

define this market.  We're not saying that they have to go and

say it's 29.99 versus $30.  What we are saying:  Are you

talking about this as a pricing market?  And, if so, what are

the basic bounds of that market?

          That's the kind of material they're not giving us and

O5DAFtcC

```
1    that the Brown Shoe factors that they walk through don't

2    actually pick a horse as to.  They just layout all these things

3    that come at it from different ways, but never say what it is

4    they purport to be defending.

5         THE COURT:  Does your client have a definition of

6    accessible luxury handbags?  I presume your client does many

7    different types of analyses regarding its competitors or its

8    market share or its marketing and that these terms have been

9    used by your client at least internally.  Is that correct?

10        MR. PFEIFFER:  So that is correct, your Honor.  We

11   have used those terms internally.  I think in fact Coach may

12   have gotten credit for initially coining the term "accessible

13   luxury".  But it's not something that we've actually used as a

14   way to conduct rigorous market analyses.  It was a way to try

15   to create an identity in the marketplace.  It was much more of

16   a sort of outward marketing-focused proposition than something

17   that was intended to be, okay, we're going to study our market

18   shares using these parameters and here is what "accessible

19   luxury" means.

20        Others that have better familiarity with all the

21   details of the record may correct me, but I don't believe we've

22   actually ever done that.  That's not how we use this phrase.

23   So the notion that we satisfy the Brown Shoe factor because

24   there's sort of an industry recognition of this term, actually

25   has it backwards.  I think we're seeing as people in the
```

O5DAFtcC

industry have seen the FTC's attempt to use this phrase to

define a market.  They've said that doesn't really define a

market.  We don't know what that means and our documents don't

say what it means.

THE COURT:  And why wouldn't fact and expert discovery

be the tool in which to flesh out the parameters and contours

of the market?

MR. PFEIFFER:  So I think they will do that, but we

need to know what we're aiming at.  I think, frankly, that

would be true in any setting but especially in an accelerated

13(b) process.  We need to know what we're trying to attack in

discovery so that we can frame it.  We absolutely -- we're not

trying to get a free pass around doing the hard work of

discovery.  We're not trying to get a free pass around doing

the hard work of experts.  And to be clear, your Honor, we're

also not saying that the FTC has to pick a market that

satisfies us or that we agree with.  Quite the opposite.  They

can pick their market, and we'll attack it.  But we need to

know what it is so that we can figure out, you know, maybe

they'll define a market in the way that we'll say we have no

good answer to that.  I don't know.  I can't imagine such a

market right now.  But right now we can't do the discovery and

the expert work that we need to do because we don't know the

basic target that we should be shooting at.

THE COURT:  Okay.  Thank you.  I may have more

O5DAFtcC

1    questions after you respond to Ms. Dennis.

2          Ms. Dennis.

3          MS. DENNIS:  Good afternoon, your Honor.

4          Your Honor, as defendants note, and why they brought

5    the *IQVIA* case, in nearly every merger case, the parties

6    dispute the adequacy of the government's market definition.

7    They say the boundaries aren't discernible enough or they're

8    not clear enough.  They say the dividing lines are arbitrary.

9    They make all these same arguments that defendants do in their

10   briefs.  These arguments go to the proof and they go to the

11   merits.  They do not provide the basis of a Rule 12(e) motion.

12         Defendants say every FTC complaint in modern history

13   provides this information about exactly what is in the relevant

14   market and what is out.  But they don't cite to a single

15   complaint in their papers.  Mr. Pfeiffer did mention *IQVIA* to

16   you, noteworthy in the *IQVIA* complaint, we don't list who's in

17   and out of the market.  We don't list the competitors.

18         So there's a reason why we do not cite anything

19   because it's just not true.  And we're happy to provide the

20   Court with additional FTC complaints.  We have also attached a

21   copy of a recent DOJ complaint in the *Bertelsmann* case.

22         But, in any event, if defendants thought the

23   allegations in the complaint were insufficient, the recourse

24   was to file a Rule 12(b)(6) motion and they could have filed

25   one of those motions in the Part 3 administrative proceeding as

O5DAFtcC

well.  While Part 3 does not allow for motions for a more

definite statement, it does allow respondents to file motions

to dismiss the complaint.

        Defendants did not do that here.  Instead, they filed

a Rule 12(e) motion seeking information about the FTC's market

definition.  What information they seek on market definition is

a bit of moving target.  But they've asked for a lot of

different things in their briefing.  And we've counted at least

eight different items of information.

        Mr. Pfeiffer here today talked about the methodology

by which we determine our market shares.  Their briefs also say

what specific products and brands are an accessible luxury

handbag market.  Again, the methodology the FTC relied upon

assigned to suit:  A price range for accessible luxury

handbags; how the FTC arrived at its calculations of market

shares; the set of patterns underlying those shares; the

relevant metrics for those shares, such as sales, units, etc;

the list of competitors who constrain defendant's pricing and

who has recently or might enter the market to compete.

        But the lack of any of that information does not make

the complaint unintelligible.  And that they can't answer the

complaint.  And the proper means by which to give this

information is through discovery which started on May 1st.

        Now, it is true that some of the information that

defendants seek is protected work product or premature expert

O5DAFtcC

1    discovery as explained in the anthem case.  I think that's true

2    of what Mr. Pfeiffer was asking for as far as methodology.  But

3    some of the things they ask for are not.  For instance, on

4    May 1st defendants could have, but did not, serve on

5    interrogatory that said identify each person you have included

6    as a competitor of Coach, Michael Kors, and Kate Spade in the

7    relevant antitrust market in your complaint.

8         The *IQVIA* defendants did that long before the time for

9    contention interrogatories and the FTC answered that long

10   before the time for contention interrogatories.

11        Notably, if defendants have propounded this

12   interrogatory, and if they accepted the 14-day deadline for

13   interrogatory responses the FTC proposed, in which they

14   rejected, they would have these answers on Wednesday.  And in

15   the meantime, the FTC would have the benefit of defendant's

16   answers and more fulsome Rule 26 disclosures, both of which the

17   defendants unilaterally have put on pause due to this motion,

18   making it harder for the FTC to conduct discovery on

19   defendant's defenses.

20        Instead, defendants have served no discovery requests

21   to the FTC at all.  We are here where defendants asked this

22   Court through Rule 12(e) motion for an overbroad contention

23   interrogatory.  That's improper under Rule 12(e), under the

24   local rules, and under the CMSO to which the parties stipulated

25   just two days prior to this instant motion.

O5DAFtcC

1          Moreover, the contention interrogatory that defendants

2     request is improper.  It is overbroad and improperly seeks

3     early expert discovery.

4          Define the market you intend to prove at trial is

5     asking us to prove our case up front.  I'm glad defendants

6     pointed to Judge Ramos' opinion in *IQVIA* where he says:  For

7     the FTC to make out a *prima facie* case, it must, one, define a

8     relevant market.  That's an issue of proof at the evidentiary

9     hearing.  Their *Sugar* case says the same thing.

10         So this contention interrogatory will keep us in front

11    of the court each week because defendants will say this we've

12    never adequately -- we've never adequately defined our market,

13    again, because that is a chief issue of dispute in these cases.

14         To be clear, the FTC is not trying to hide anything,

15    but the rules provide with an orderly and efficient means of

16    taking discovery.  Mr. Pfeiffer mentioned third parties and the

17    press, and I do note that in one of the -- I think in

18    Mr. Johnson's declaration, he mentioned unnamed party is

19    confused and is listening here to learn how we define the

20    relevant market.

21         Vast portions of the complaint are under seal, so

22    third parties do not currently have the benefit of seeing the

23    FTC's fulsome complaint.  We've been meeting and conferring

24    with defendants about unsealing the complaint.  They still

25    maintain 80 to 90 percent of the redactions are improper.  We

O5DAFtcC

1    do not agree.  We're working through those issues.  And to the

2    extent we can't resolve them, we will come to your Honor.  In

3    any event, we do not think third parties get more information

4    from discovery responses because those too maintain information

5    that defendants maintain is confidential.

6         A few more things I wanted to respond to

7    Mr. Pfeiffer's argument.  He mentioned that the parties use

8    excessive luxury internally.  They also use it in SEC filings.

9    Presumably, they have a definition of accessible luxury because

10   they use that term with investors.  He mentions that *Brown Shoe*

11   is not about defining the relevant market.  It's a legal test

12   where definition is proper.  That's not what the *Sugar* case

13   says.  I'll direct the Court to page 206 of that decision where

14   it makes clear a party can define a relevant market by

15   reference to the *Brown Shoe* factors.

16        Finally, Mr. Pfeiffer mentions "handbags."  Words used

17   in pleadings have their ordinary, everyday meaning.  Here

18   Merriam-Webster defines a handbag as:  A bag held in the hand

19   or hung from a shoulder strap and used for carrying small

20   personal articles and money.  And that's what we mean here.

21   And it is consistent with the definition of "handbag" used in

22   industry data sources like MPD, on which the parties rely in

23   the ordinary course.

24        Given that, and the repeated use of the term

25   "handbag", putting in their SEC filings is simply not credible

O5DAFtcC

1    that the parties are not on notice of what a handbag is or at

2    least can say whether they agree in that's correct or not.

3            Now, the definition that was used in the second

4    request, the discovery request that the FTC propounded at the

5    beginning of the investigation, that definition was actually

6    provided by counsel for the defendants early in the

7    investigation, and it includes items like duffel bags and

8    backpacks and business bags, in addition to handbags.  It says:

9    Handbags include handbags and duffel bags and backpacks.

10   Counsel never cited document to support that definition.  And

11   they had every incentive, as they do here, to advocate for

12   broad market.

13           The FTC used that definition in a second request to

14   the parties because in investigations, we try to look at the

15   market as broadly as possible for narrowing down.  We did not

16   take that approach, defendants would argue our investigation

17   was not thorough or we went into it with a predetermined

18   relevant prong market.

19           Or the FTC would not have access to all the

20   potentially relevant investigation it needs to conduct an

21   appropriate investigation.  So we're not tied to a definition

22   provided to us in advocacy by the parties without citation back

23   in December of last year.

24           In sum, your Honor, there's a process by which the

25   parties can get information they request.  They have not

O5DAFtcC

1    propounded any discovery requests on us.  This is a discovery

2    dispute without a discovery request, and we ask that you deny

3    defendants' motion.

4            THE COURT:  Thank you, Ms. Dennis.  Let me ask a few

5    questions.

6            So I think I now know your response to whether, for

7    example, men's duffel bag falls within the accessible luxury

8    handbag definition; would it not?

9            MS. DENNIS:  I apologize, your Honor.  A duffel bag

10   would not.

11           THE COURT:  Okay.  And what is your response -- well,

12   what about men's products generally?  Is this market defined

13   only by women's products or men's as well?

14           MS. DENNIS:  I believe, your Honor, and I apologize,

15   there are other people on our team who have crunched these

16   numbers.  I believe right now it is both men's and women's

17   handbags.

18           THE COURT:  Thank you.  And what is your response to

19   defendants' argument that they will have to do broader

20   discovery if they have less clarity about the relevant market

21   that you're relying on?  And that that was a concern even that

22   you articulated at the beginning of this case about limiting

23   third-party discovery, etc.  So what's your response to their

24   argument that they'll have to go broader without some

25   parameters?

O5DAFtcC

1          MS. DENNIS:  Sure.  We are of course, your Honor,

2    worried about burdening third parties as well as I mentioned

3    during the conference two weeks ago.  Two responses to that.

4    One is defendants in all these cases think our market is too

5    narrowly defined.  They will subpoena anybody that they can

6    think of to put in that market.  I doubt -- you know, even if

7    they propound interrogatory asking us to include the

8    competitors in the market, which they have not done yet,

9    they're going to be satisfied with that answer and they'll go

10   beyond it.

11         Second, I'm not sure why they need the data that

12   they've said they need from these parties.  There's

13   industry-wide data that the parties rely on in the ordinary

14   course.  They use it in board presentations.  They use it

15   internally to make business decisions.  I understand that they

16   might want to attack that data, but it's not necessary to get

17   data from every single third party.

18         THE COURT:  Okay.  What is your response to

19   defendants' argument that the FTC has a clearer and more

20   definite definition of what the market is based on analyses of

21   market concentration and other things articulated in the

22   complaint that they are just simply not sharing with the

23   defendant?

24         MS. DENNIS:  Your Honor, I think the case law is

25   pretty clear.  A lot of that is attorney work product and

O5DAFtcC

```
1    expert discovery.  We do have preliminary analyses that we've
2    done to generate those preliminary numbers.  Normally when
3    defendants ask for that information, we object on privilege
4    grounds or we fight it out in contention interrogatories, but
5    that's something for later on in the process generally.
6            THE COURT:  Oh, I don't mean the sharing of the actual
7    methodology.  What I mean is that if there are particular
8    competitors or parameters of the market that are utilized in
9    those expert analyses, is that more information that you have
10   that you have not included in this complaint?
11           MS. DENNIS:  That information is not in the complaint,
12   your Honor.  But again, if they propound interrogatory like
13   most defendants do asking for the information, certainly with
14   the list of competitors, we'd provide that.  That's what was
15   done in the IQVIA.  It was done in the Meadow litigation in the
16   Northern State of California.  I think that's the proper way to
17   go about doing these things.  Competitors in our complaints.
18           THE COURT:  And you do agree, don't you, Ms. Dennis,
19   that I will have to assess likelihood of success on the merits
20   here, and that that would entail an analysis of whether you are
21   able to likely succeed in showing that there is a relevant
22   market that's been adversely impacted?  Not necessarily prove
23   it in front of me, but that you're likely to succeed and so I
24   will have to be analyzing ultimately your relevant market and
25   the parameters around that market in order to do my preliminary
```

O5DAFtcC

1   injunction analysis, correct?

2          MS. DENNIS:  I agree completely, your Honor.

3          One thing I did want to point out, in defendants'

4   reply brief, there's a footnote that the says:  Ultimate

5   success, the likelihood of ultimate success is determined by

6   appellate courts, federal appellate courts.  Most recently,

7   Judge Ramos, he's one of the most recent judges that says

8   that's not true.  It's likelihood of success in the

9   administrative proceeding.  And that's footnote ten in the

10  actual *IQVIA* PI hearing decision, and there's actually a

11  separate decision that Judge Ramos issued last fall granting

12  the FTC's motion to strike defendant's defenses where he

13  analyzes the case law that supports that conclusion.

14         THE COURT:  Thank you.  Thank you, Ms. Dennis.

15         Mr. Pfeiffer, anything you'd like to add?  And I have

16  some questions as well.

17         MR. PFEIFFER:  Yes, your Honor.  Sorry, I was making a

18  note there.

19         Let me start, if I may, your Honor, with the

20  proposition that all we had to do was ask how they got to their

21  market share figurers and they would have told us.  We

22  specifically asked for that information.  We met and conferred

23  about that and said you have market shares, tell us how you got

24  that.  And they said three things.  They said work product.

25  They said it might change, and it's for the experts.  At no

O5DAFtcC

1    point did they say send us an interrogatory and ask us who are

2    the individual people that went into that calculation of the

3    denominator and we will tell you.  This is the first time we're

4    hearing that today and it's -- I will apologize if we simply

5    didn't ask enough questions.  I didn't cross-examine hard

6    enough, but I got no impression that had we asked the question

7    in different ways, we would have gotten an answer.  So I'm

8    pleasantly surprised I guess to hear that, but I wish I had

9    heard it earlier.

10           Second point I do want to talk, your Honor, briefly

11   about the suggestion that we're asking for something different

12   than people ask for in other cases or that somehow that all

13   we're doing is attacking their market.  We certainly agree that

14   that's what the ultimate fight will be about is attacking their

15   market.  We're not, again, trying to attack their market.

16   We're trying to identify it so that we can attack it, so that

17   we can have a full and fair go at it.

18           And we're not saying that they have to say who's in

19   the market and who's out of the market.  We're not saying they

20   have to frame it in terms of competitors, but that's the point.

21   We don't know even how they're framing the market.  And it

22   actually is effecting our discovery.  And we are going to have

23   to go broader, potentially go into broader areas if we have to

24   go into an income-defined market, for example, which maybe I

25   heard an earlier that it's actually defined by competitors so

O5DAFtcC

1    we won't have to go there.  Knowing those kind of things

2    effects the discovery that we have to do.

3         The other thing I want to talk about, your Honor,

4    there was some suggestion about how we use the term "accessible

5    luxury" and that we've used it in an SEC filing and therefore

6    we must know who's in and out of that market.  They have our

7    documents from the second request process.  They have I assume

8    hundreds of thousands of our documents.  We don't use that term

9    to define a market of competitors.  It's not how we've used it.

10   It's a way we've tried to identify ourselves.  In fact they

11   would know since they have our documents, we stopped using that

12   phrase and there's a different phrase we use.  Because again,

13   these are marketing focused.  They're identification.  They're

14   not let's calculate market shares terms.

15        The last thing I would say, your Honor, is just we

16   obviously disagree on the issue of what ultimate success means.

17   I think there's some very interesting cases on that subject but

18   that's not for today.  We can brief that for you at an

19   appropriate time.

20        THE COURT:  Good.  What's your response to Ms. Dennis'

21   contention that counsel for defendants or defendants provided

22   that larger -- what you would probably characterize -- as a

23   more expansive definition of handbags that includes duffel

24   bags, backpacks, etc., not the FTC?

25        MR. PFEIFFER:  On this one, your Honor, I may have to

O5DAFtcC

1    defer to Ms. Reeves, who was involved in the second request

2    process, but my understanding is that came from the FTC during

3    the second request process.

4            MS. REEVES:  That's correct.  That was the definition

5    that was provided.

6            THE COURT:  Okay.  I'm seeing Ms. Dennis shake her

7    head.  Let me hear from you, Ms. Dennis, and then I will hear

8    from you, Mr. Moses, if there's anything you want to add.  I

9    don't want you to think you won't have an opportunity.

10           Ms. Dennis.

11           MS. DENNIS:  Yes, your Honor.  I'm reluctant to --

12   understanding that a lot of things are confidential and the

13   parties marked this letter confidential, they provided this

14   definition to us in a September 15th presentation and then it

15   was documented in a September 25th letter to staff that I'll

16   refer them to.

17           THE COURT:  Okay.  Thank you very much.  And it sounds

18   like we're clearing the air a bit about what can be asked in an

19   interrogatory if it's posed about competitors, so that's at

20   least good and a nice result of this hearing.

21           Mr. Moses, what else would you like to add to the

22   dialogue?  And you're on mute.

23           MR. MOSES:  I'm on mute.  Your Honor, I think it's

24   been well aired and appreciated.  And I'll just say I was --

25   the one thing I'll note in just listening is I was surprised to

O5DAFtcC

```
1    hear men's handbags is in this market.  And if they have --
2    they must have similar ideas like that which would really go a
3    long way for helping us shape discovery here.  We do think
4    getting this third-party data is very important.  Those
5    industry -- that industry material, which is the best we can do
6    without subpoena power, is quite limited.  But here we're in a
7    litigation and we have subpoena power.  And so, your Honor, I
8    would just -- I just wanted to linger on that one statement
9    that Ms. Dennis said about men's handbags, which took me by
10   surprise.
11             THE COURT:  Well, we're all learning a bit in this
12   hearing.  So, great.
13             Ms. Dennis, quick question on that, and you can answer
14   this however you feel best.  But is the market defined based on
15   competitors, pricing, customers, craftmanship, or is it a
16   combination of those things?
17             And I need you to be off mute.
18             MS. DENNIS:  It's a combination of those things, your
19   Honor.  That's how we define the market according to the *Brown*
20   *Shoe* factors.  That's how the law says that we are allowed to
21   define the market.  There's a qualitative way and there is also
22   a qualitative way, which we'll also have expert testimony on
23   that as well.
24             I think if you go any further it starts to get into
25   the methodology that we've used to construct those HHIs early
```

O5DAFtcC

1  in this process preliminary estimate, which is not the proper

2  subject of discovery at this point would be our position.

3         Just to clarify something, I don't want to over speak.

4  I haven't gotten a message from my team, but on the men's

5  versus women's handbag thing, we'll be glad to follow up with

6  defendants if I misspoke here.

7         THE COURT:  Okay.  Yes, it sounds like an important

8  discussion to have.  Yes.  Thank you.

9         Okay.  Is there anything further, Mr. Pfeiffer, you

10  would like to add?

11         MR. PFEIFFER:  No, your Honor.  Thank you very much.

12         THE COURT:  Mr. Moses, anything further?

13         MR. MOSES:  Nothing.  And thank you, your Honor.

14         THE COURT:  And, Ms. Dennis, anything further?

15         MS. DENNIS:  No, your Honor.  Thank you for your time

16  today.

17         THE COURT:  Okay.  Well, I think you'll have me for a

18  little bit longer.  So I'm going to give you my ruling now so

19  that this case can move along.  And so with your patience, I

20  will give you my ruling from the bench right now and thank you

21  for taking some time to sit and listen.

22         Okay.  On April 22, 2024, the Federal Trade

23  Commission, which I will reference as the FTC, initiated an

24  administrative proceeding to determine whether Tapestry, Inc.'s

25  proposed acquisition of Capri Holding Limited, which is

O5DAFtcC

1    referred to as the proposed acquisition, will harm competition.

2    That's ECF No. 1, the complaint, at 1-2.  The following day the

3    FTC initiated this action under Section 13(b) of the FTC Act,

4    15 U.S.C. Section 53(b), seeking a temporary restraining order

5    and preliminary injunction to preserve the status quo until the

6    Commission has had the opportunity to adjudicate the Proposed

7    Acquisition's legality in the administrative proceeding.  That

8    is complaint at 1.  The Court presumes familiarity with the

9    background and history of this case.

10          On May 3rd, 2024, defendants filed a motion under

11   Federal Rule of Civil Procedure 12(e), asserting that they are

12   entitled to a more definite statement from the FTC because the

13   relevant market is not sufficiently defined in the complaint.

14   In the alternative, defendants seek an order compelling the FTC

15   to answer on an expedited basis one contention interrogatory

16   regarding the relevant market.  That's at ECF No. 74.  And I'll

17   refer to that as the brief.

18          An expedited briefing schedule was agreed upon at ECF

19   No. 75, and on May 8, 2024, the FTC filed its opposition to

20   defendants' motion at ECF No. 81, which I will refer to as the

21   opposition.

22          Defendants filed a reply brief to further support

23   their motion on May 10, 2024, at ECF No. 84, which I will refer

24   to as the reply.

25          The Court heard oral argument on May 13, 2024, today,

O5DAFtcC

and for the following reasons defendants' motion is denied.

The Court first analyzed defendants' request for a more definite statement and then turns to defendants' alternate request.

Under Rule 12(e).  Rule 12(e) provides that "a party may move for a more definite statement of a pleading to which a responsive pleading is allowed, but which is so vague or ambiguous that the party cannot reasonably prepare a response. The motion must be made before filing a responsive pleading and must point out the defects complained of and the details desired." Federal Rule of Civil Procedure 12(e).

Courts have held that "if a pleading fails to specify the allegations in a manner that provides sufficient notice, a defendant can move for a more definite statement under Rule 12(e) before responding." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002).  "A Rule 12(e) motion is proper when a complaint pleads a viable legal theory, but is so unclear that the opposing party cannot respond to the complaint." *Ngambo v. Soc. Sec. Admin.*,  2023 WL 8275925, at *2 (S.D.N.Y. Nov. 30, 2023)(quoting *Humpherys v. Nager*, 962 F. Supp. 347, 352–53 (E.D.N.Y. 1997)).

Whether to "grant a motion for a more definite statement is within the discretion of the district court." *Akridge v. Whole Food Mkt. Grp., Inc.*,  2022 WL 955945, at *4 (S.D.N.Y. Mar. 30, 2022).  "Such motions are generally

O5DAFtcC

disfavored and are not intended to substitute for the normal

discovery process." *Id.* Importantly, Rule 12(e) is "designed

to remedy unintelligible pleadings, not merely to correct for

lack of detail." *Pelman ex rel. Pelman v. McDonald's Corp.*,

396 F. Supp. 2d 439, 443 (S.D.N.Y. 2005).

        The Complaint here is not so unintelligible or unclear

that Defendants lack "sufficient notice" of the allegations

made against them. *See Swierkiewicz*, 534 U.S. at 514. The FTC

laid out numerous parameters of the alleged relevant market in

the Complaint. In fact, nine pages of the Complaint were

dedicated to describing the alleged relevant market. *See*

Complaint at 13-22. The FTC specifically alleges that the

industry and the defendants here recognize "accessible luxury"

handbags as a distinct market, Complaint at paragraphs 28-32;

that the market has distinct pricing, Complaint at 33-35; that

the market has a distinct set of customers, Complaint at 36-37;

that the market has certain "peculiar characteristics" related

to quality, craftsmanship, discounting, promotions, and sales

experience, Complaint at paragraphs 38-41; and that the market

has "unique production facilities," Complaint at paragraph 42.

The FTC has also excluded certain products from the alleged

relevant market, including by differentiating the

characteristics of "accessible luxury" handbags with "true

luxury and mass-market handbags." See, for example, the

complaint paragraph 43 and 3-8. Indeed, in the Complaint, the

O5DAFtcC

1    FTC used parameters and terms that correspond with the

2    Defendants' own definitions of the market for "accessible

3    luxury" handbags.  Complaint at paragraphs 28-43 and 3-6.

4            Further, in defendants' opening brief, defendants

5    address in detail, albeit to contest, the contours of the

6    alleged relevant market.  See the brief at 6-10.  Among other

7    arguments, defendants present arguments about what types of

8    bags would qualify as "handbags;" whether "accessible luxury"

9    encompasses certain price points referred to in the complaint;

10   whether certain products are reasonably interchangeable, and;

11   whether the precise household income of "accessible luxury"

12   consumer is distinct from the household income of a "true

13   luxury" consumer; and whether certain promotional and

14   discounting activities distinguish the "accessible luxury"

15   handbag market from the markets for "true luxury" and

16   mass-market handbags.  Brief at 6-9.  By presenting these

17   arguments, Defendants have already begun to analyze the alleged

18   relevant market within the framework articulated by the Supreme

19   Court in *Brown Shoe*.  In that case, the Supreme Court

20   identified "practical indicia" useful to determine relevant

21   product markets for antitrust purposes, including "industry or

22   public recognition of the relevant market as a separate

23   economic entity, the product's peculiar characteristics and

24   uses, unique production facilities, distinct customers,

25   distinct prices, sensitivity to price changes, and specialized

O5DAFtcC

vendors." *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962).  The Court need not perform this *Brown Shoe* analysis and resolve questions regarding the alleged relevant market at this juncture.  Suffice it to say, the fact that Defendants were able to comprehend the FTC's allegations and present sophisticated merits-based arguments about the contours of the "accessible luxury" handbag market shows that, at a minimum, Defendants are on notice of the allegations against them, which is all that is required at this stage.  *See Swierkiewicz*, 534 U.S. at 514; *see Pelman*, 396 F. Supp. 2d at 443 (explaining that Rule 12(e) is "designed to remedy unintelligible pleadings, not merely to correct for lack of detail").  The comprehensive answers that the Defendants have filed in the related administrative proceedings on May 6, 2024, while qualified by noting their motion for a more definite statement here, also illustrate that Defendants have sufficient notice of the FTC's allegations such that they can adequately posit their responses.

It is also not unusual that there is disagreement between the parties on the precise contours of the alleged relevant market.  Indeed, in this Court's view, it would be unusual if, at this early stage in the litigation, the parties completely agreed on the parameters of the relevant market.  See, for example, *Federal Trade Commission v. IQVIA Holdings Inc.*, 2024 WL 81232, at *12 (S.D.N.Y. Jan. 8, 2024).  The

O5DAFtcC

parenthetical reads:  Noting that defendants "define the

relevant product market more broadly" than the FTC and that the

parties "fundamentally disagreed about whether certain products

qualify as reasonable substitutes;""); *Federal Trade Commission*

*v. Whole Foods Market, Inc.*, 548 F.3d 1028, 1040 (D.C. Cir.

2008).  And the parenthetical reads:  FTC asserted more narrow

market of premium natural and organic supermarkets while the

defendant contended that broader category of sellers such as

conventional supermarkets would fall within the relevant

market.  Even if the FTC were to further bound the parameters

of the alleged relevant market now, the Court anticipates that

Defendants would continue to press their disputes regarding

those parameters.  The relevant market definition will surely

be the subject of upcoming fact discovery, expert discovery,

and the ultimate preliminary injunction analyses that the

parties will present to the Court.

          Indeed, "a Rule 12(e) motion is not a substitute for

discovery." *CMT USA, Inc. v. Apex Tool Grp.*,  2023 WL 8622400,

at *4 (S.D.N.Y. Dec. 13, 2023).  The discovery process that is

already available to Defendants and to the FTC – including

fact, third-party, and expert – will undoubtedly be directed at

sussing out additional details about the alleged relevant

market, and, "in view of Rule 8(a)'s liberal pleading

requirements, and the availability of discovery to provide

additional factual detail for the parties' claims, motions

O5DAFtcC

under Rule 12(e) are generally disfavored because of their dilatory effect." *Joya v. Verizon N.Y., Inc.*, 2008 WL 4667987, at *1 (S.D.N.Y. Oct. 20, 2008). The relevant market share calculations and market share concentration can, and surely will, be the subject of the discovery process. And while defendants may have numerous arguments on the merits regarding the relevant market, and whether it is appropriately and definitely defined, the motion presently before the Court is a 12(e) motion. And at this point, notice pleading is all that is required.

Further, the legal standard that the Court must apply for a 12(e) motion does not change simply because this is a rapid case brought by the FTC to enjoin a merger. Defendants have cited no authority for their assertion that the Rule 12(e) standard has a different meaning in expedited cases or in Section 13(b) or in merger cases, nor has the Court independently located such authority. There is only one case that either side has cited that involves a Rule 12(e) motion in a merger case brought by the federal government or the FTC and that is *United States v. Dean Foods Co.*, 2010 WL 1417926, at *4 (E.D. Wis. Apr. 7, 2010). In that case, the court denied the requested relief, which also included a motion to dismiss under Rule 12(b)(6), because there was "simply . . . no basis to impose the type of highly specific pleading standard advocated by the defendant." *Id.* As in *Dean Foods*, if the

O5DAFtcC

```
1   Defendants disagree with the FTC's allegations that the
2   Defendants compete within a well-defined product market for
3   accessible luxury handbags, or that the acquisition will
4   eliminate competition or increase concentration, they can deny
5   as much and explore the allegations during discovery.  *See Dean*
6   *Foods*, 2010 WL 1417926, at *6 (rejecting 12(e) motion, holding
7   that "there is nothing about the complaint's allegations
8   regarding customers' ability to turn to outside sellers or
9   engage in arbitrage that is so vague that defendants cannot
10  reasonably respond" and "to the extent that Dean seeks
11  additional factual support for these premises, it may do so
12  through the discovery process").  Defendants have not provided
13  a basis upon which the Court should reach a different
14  conclusion here.  Even though this case is proceeding rapidly,
15  Defendants are only entitled to a more definite statement if
16  the Complaint is "so unclear" that they do not have sufficient
17  notice of the allegations against them.  *Pelman*, 396 F. Supp.
18  2d at 443;  Defendants have sufficient notice of the
19  allegations against them, and, just as in the administrative
20  action, can be expected to respond.
21          Indeed, the administrative rules for the FTC process
22  itself were amended in 2009 to disallow motions for more
23  definite statements because, among other things, they are
24  unlikely to be granted given that "Commission complaints are
25  typically very detailed," the motions "would result in
```

O5DAFtcC

substantial delay," and because "respondents may still raise
similar objections in a motion to dismiss."  That is Federal
Trade Commission Interim Final Rules with Request for Comment,
74 FR 1804-01, at 1808 (Jan. 13, 2009) (codified at 16 C.F.R.
Section 3.11).  So too here.

With respect to delay, the filing of this motion, far
from expediting a more streamlined resolution of issues as
Defendants assert, has delayed, albeit modestly, but relevantly
in an expedited proceeding, the filing of Defendants'
responsive pleading and curtailed the FTC's receipt of
Defendants' full initial disclosures.

In sum, because the Complaint is not "so vague or
ambiguous that Defendants cannot reasonably prepare a
response," Fed. R. Civ. P. 12(e), the Court denies Defendants'
motion for more definite statement.

The Court next analyzes Defendants' alternative
request for an order compelling the FTC to respond to one
contention interrogatory on an expedited basis regarding the
FTC's alleged relevant market.  This alternative request is
also denied.

Local Rule 33.3(c) provides that "at the conclusion of
other discovery, and at least 30 days prior to the discovery
cut-off date" contention interrogatories "may be served unless
the Court has ordered otherwise."  This local rule "anticipates
that contention interrogatories should generally not be served

O5DAFtcC

during the early stages of discovery and, indeed, courts have discretion to order that such interrogatories not be answered until other discovery is substantially completed." *Pratt v. Atalian Global Servs. Inc.* 2021 WL 1234253, at *2 (S.D.N.Y. Apr. 2, 2021)

Here, in the context of the proposed case management plan, which the Court has entered, the parties stipulated that contention interrogatories would be served "later in the discovery period pursuant to Local Rule 33.3." ECF No. 71 at 5. When Defendants agreed to the case management plan, they were already aware of the precise issue they raise now with respect to the alleged relevant market. During the April 29, 2024 conference that the Court held with the parties, counsel for Tapestry stated that "one big issue" was "the parameters of the relevant market," and that they sought for the FTC to give them a "prompt, defined statement of what markets we are supposedly shooting at." ECF No. 82-4 at 11:6-12:16. Despite relaying to the Court that defining the relevant market was a "big issue" for which they needed clarification from the FTC, *id.*, Defendants stipulated several days later to the case management plan which only allows contention interrogatories to be served "later in the discovery period pursuant to Local Rule 33.3," ECF No. 71 at 5. Had Defendants wished to agree to a modification of Local Rule 33.3 to allow for contention interrogatories earlier in the case management plan, they could

O5DAFtcC

1   have done so when they stipulated to the case management plan,

2   just as the parties agreed upon other modifications to the

3   local rules.  *See generally* ECF No. 71.

4           But even if Defendants had not so stipulated and

5   agreed, however, contention interrogatories are served toward

6   the end of discovery in this district for a reason.  They are

7   meant to "narrow, not bloom relevant issues" such that an

8   exception to the rule that contention interrogatories be served

9   toward the end of discovery is only appropriate where "future

10  discovery would be unhelpful or unlikely to elicit issues and

11  establish a necessary factual foundation in that particular

12  litigation."  In re Facebook, Inc., 2016 WL 5080152, at *4

13  (S.D.N.Y. July 7, 2016).  That is certainly not the case here

14  and there is no good cause to deviate from the local rules.

15          The Court therefore denies defendants alternative

16  request for an order compelling the FTC to respond to a

17  contention interrogatory.

18          Thank you very much for your patience.  I wanted to

19  make sure you got a decision as promptly as possible to move

20  the case along.  And now let's set that aside for a moment and

21  I just want to talk briefly about next steps here.

22          I do hope given the dialogue that we've had during

23  this proceeding that the parties can have some more frank and

24  fulsome discussions during this discovery process.  It's not

25  particularly heartening when people learn surprising

O5DAFtcC

1    information during these conferences, either about markets or

2    about information that the other side was willing to provide if

3    only asked, etc.

4            So I hope that the parties can have a more

5    constructive dialogue.  It sounds to me that Mr. Pfeiffer and

6    Mr. Moses will have an interrogatory to serve regarding the

7    competitors that the FTC views as their competitors, which will

8    give them hopefully some information that can be useful.  And

9    Ms. Dennis will be providing them with information about, for

10    example, do men's products fall within this definition or not.

11    These seem to be straightforward things that the parties should

12    be discussing at the outset of discovery.

13            It is in no one's interest to have there be any

14    discovery that is unnecessarily collected, overly burdensome,

15    or to create disputes where none need to arise with respect to

16    discovery when there can be a conversation about what the

17    appropriate parameters are and should be here.

18            So my decision today is meant only to suggest that the

19    standard for Rule 12(b) in terms of unintelligibility has not

20    been met, but not to suggest that there should not be more

21    dialogue between the parties about the parameters of what is

22    being alleged by the FTC and what should be produced during

23    discovery.

24            Are there any questions on that and is that clear,

25    Ms. Dennis?

O5DAFtcC

1          MS. DENNIS:  Yes, your Honor.  Thank you.

2          THE COURT:  Thank you very much.  And Mr. Pfeiffer,

3   all clear?

4          MR. PFEIFFER:  All clear.  We appreciate the guidance,

5   your Honor.  Thank you.

6          THE COURT:  Thank you very much.  Anything further,

7   Mr. Moses?

8          MR. MOSES:  No.  Thank you, your Honor.  Thank you

9   very much for this afternoon.

10          THE COURT:  No, thank you all for being here.  And

11   again, I appreciate the very well-done papers.  And I'll see

12   you if there's another issue that need resolving.  Otherwise,

13   good luck as you proceed through discovery, and court is

14   adjourned.  Thank you.

15          (Adjourned)

16

17

18

19

20

21

22

23

24

25