**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

FEDERAL TRADE COMMISSION,

                 Plaintiff,

      v.

TAPESTRY, INC.,

      and

CAPRI HOLDINGS LIMITED.

                Defendants.

Case No. 1:24-cv-03109-JLR

**REDACTED VERSION**

<u>**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR
PRELIMINARY INJUNCTION**</u>

# TABLE OF CONTENTS

**INTRODUCTION** ............................................................................................................ 1

**BACKGROUND** .............................................................................................................. 2

**ARGUMENT** .................................................................................................................. 6

I.      The FTC Is Likely to Succeed in the Administrative Proceeding. ................................... 7

    A.     The Proposed Acquisition Is Presumptively Unlawful Because It Significantly Increases Market Concentration. ................................................................. 9

        1.    "Accessible Luxury" Handbags in the United States Is a Relevant Market. ............ 10

            a.    The *Brown Shoe* Practical Indicia Demonstrate That "Accessible Luxury" Handbags Is a Relevant Product Market. ........................................... 11

            b.    "True Luxury" and Mass Market Handbags Are Not Reasonably Interchangeable with "Accessible Luxury" Handbags. ............................................... 17

            c.    The Relevant Geographic Market Is the United States. ..................................... 19

            d.    Economic Analysis Confirms "Accessible Luxury" Handbags in the United States Is a Relevant Market. ............................................................ 20

        2.    The Proposed Acquisition Will Lead to Undue Market Concentration. ................ 22

    B.     The Acquisition Is Unlawful Regardless of Market Concentration Because It Will Eliminate Substantial Head-To-Head Competition. ...................................... 23

    C.     Defendants Cannot Rebut the FTC's Prima Facie Case. .............................. 29

        1.    Entry and Expansion Will Not Be Timely, Likely, or Sufficient. ......................... 29

        2.    Any Efficiencies Are Not Merger-Specific, Cognizable, or Verifiable. ................ 33

II.     The Equities Support a Preliminary Injunction. ................................................. 34

**CONCLUSION** .............................................................................................................. 35

i

## TABLE OF AUTHORITIES

**Cases**

*Beatrice Foods Co. v. FTC*, 540 F.2d 303 (7th Cir. 1976) ............................................................ 12

*Chicago Bridge & Iron Co. N.V. v. FTC*, 534 F.3d 410 (5th Cir. 2008) ...................................... 30

*Credit Bureau Reps., Inc. v. Retail Credit Co.,* 358 F. Supp. 780 (S.D. Tex. 1971) ..................... 9

*FTC v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34 (D.D.C. 1998) ................................................. 19

*FTC v. Crescent Pub. Group, Inc.*, 129 F. Supp. 2d 311 (S.D.N.Y. 2001) ................................... 6

*FTC v. Elders Grain, Inc.*, 868 F.2d 901 (7th Cir. 1989) ............................................................. 8

*FTC v. H.J. Heinz Co.*, 246 F.3d 708 (D.C. Cir. 2001) ...................................................... 7, 33, 34

*FTC v. IQVIA Holdings Inc.*, 23 Civ. 06188 (ER), 2024 WL 81232

    (S.D.N.Y. Jan. 8, 2024) ...................................................................................... *passim*

*FTC v. IQVIA Holdings, Inc.*, No. 23 CIV. 06188, 2023 WL 7152577

    (S.D.N.Y. Oct. 31, 2023) ................................................................................................ 6

*FTC v. Lancaster Colony Corp.*, 434 F. Supp. 1088 (S.D.N.Y. 1977) .......................... 7, 8, 13, 34

*FTC v. Meta Platforms, Inc.*, No. 22 Civ. 04325 (EJD), 2022 WL 16637996

    (N.D. Cal. Nov. 2, 2022) ................................................................................................ 8

*FTC v. Peabody Energy Corp.*, 492 F. Supp. 3d 865 (E.D. Mo. 2020) ........................................ 35

*FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327 (3d Cir. 2016) ................................... *passim*

*FTC v. Staples, Inc.*, 190 F. Supp. 3d 100 (D.D.C. 2016) ........................................................... 10

*FTC v. Sysco Corp.*, 113 F. Supp. 3d 1 (D.D.C. 2015) ............................................................ *passim*

*FTC v. Univ. Health, Inc.*, 938 F.2d 1206 (11th Cir. 1991) ......................................................... 7

*FTC v. Warner Commc'ns Inc.*, 742 F.2d 1156 (9th Cir. 1984) .................................................... 8

*FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028 (D.C. Cir. 2008) ...................................... 7, 8, 11

*Geneva Pharm. Tech. Corp. v. Barr Labs Inc.*, 386 F.3d 485 (2d Cir. 2004) .............................. 14

*Reynolds Metals Co. v. FTC*, 309 F.2d 223 (D.C. Cir. 1962) ........................................................ 14

*United States v. Alum. Co. of Am.*, 377 U.S. 271 (1964) ............................................................ 10

*United States v. Bertelsmann SE & Co.*, 646 F. Supp. 3d 1 (D.D.C. 2022) ................................ 10

*United States v. Brown Shoe Co.*, 370 U.S. 294 (1962) ........................................... 10, 11, 12, 17

*United States v. First Nat'l Bank & Tr. Co. of Lexington*, 376 U.S. 665 (1964) ......................... 23

*United States v. Mfrs. Hanover Trust Co.*, 240 F. Supp. 867, 923 (S.D.N.Y. 1965) ............. 11, 23

*United States v. Pabst Brewing Co.*, 384 U.S. 546 (1966) .......................................................... 10

*United States v. Phila. Nat'l Bank*, 374 U.S. 321 (1963) ................................................... 8, 9, 22

## Statutes

15 U.S.C. § 18 ........................................................................................................... *passim*

15 U.S.C. § 53(b) ...................................................................................................... *passim*

## Other Authorities

2023 U.S. Dep't of Justice and FTC Merger Guidelines ........................................... *passim*

## Regulations

16 C.F.R. § 3.41(b) ............................................................................................................. 2

## INTRODUCTION

In the middle of the country, just a short drive from the capital of Iowa, lie the Outlets of Des Moines. There, Michael Kors maintains just one of its nearly 250 nationwide stores, within hundreds of feet of Coach and Kate Spade. The setting is the same in countless other communities across the country, from coast to coast, and in almost every state: at the Gulfport Premium Outlets in Gulfport, Mississippi; at the Macy's in Okemos, Michigan; at the Woodburn Premium Outlets forty minutes south of Portland, Oregon; at the University Mall in Mishawaka, Indiana, where Coach and Michael Kors have flagship stores within steps of each other; and at the famous Macy's in Herald Square in midtown Manhattan. These are three quintessential American fashion brands fiercely competing head-to-head to be purchased and worn by tens of millions of everyday Americans, especially women.

And compete they do—on price, on discounts and promotions, on design, on shopping experiences, on sustainability efforts, and even for retail employees—across a wide variety of products. But where Coach, Michael Kors, and Kate Spade most fiercely compete is in the sale of handbags, an item that is ubiquitous for half the population, who use handbags to carry phones, wallets, and keys, but also personal items like hygiene products and make-up. The numbers tell the story: Coach, Michael Kors, and Kate Spade combined boasted nearly ███ in sales of handbags in the United States alone in 2023.[1] And while other brands have come and gone, these three iconic American brands have withstood the test of time, duking it out in places like the Outlets of Des Moines in Altoona, Iowa.

Congress enacted the antitrust laws, including Section 7 of the Clayton Act, to protect this very sort of competition. That is why, following the announcement that Tapestry, Inc.

---

[1] PX6000 (Smith (FTC) Rep.) ¶ 186, tbl 7.

("Tapestry")—owner of the Coach and Kate Spade brands—intended to purchase Capri Holdings Limited ("Capri")—owner of the Michael Kors brand (among others)—for a staggering $8.5 billion (the "Proposed Acquisition"), the Federal Trade Commission ("FTC") opened an investigation, and ultimately elected, by a bipartisan vote of 5-0, to initiate an administrative proceeding to adjudicate the legality of that transaction. The merits trial in that proceeding begins September 25, 2024, where the parties will have up to 210 hours to present evidence on whether the Proposed Acquisition may substantially lessen competition in violation of Section 7 of the Clayton Act. 16 C.F.R. § 3.41(b).

In this federal court proceeding, however, the inquiry is "limited and narrow." *FTC v. IQVIA Holdings Inc.*, 23 Civ. 06188 (ER), 2024 WL 81232, at *9 (S.D.N.Y. Jan. 8, 2024). This Court must determine whether, "weighing the equities and considering the Commission's likelihood of ultimate success," the FTC is entitled to a preliminary injunction to preserve the status quo until the FTC has had the opportunity to adjudicate the Proposed Acquisition's legality in its administrative proceeding. *Id.* at *7–9 (quoting 15 U.S.C. § 53(b)). The FTC satisfies this burden if it "raise[s] serious questions about the antitrust merits that warrant thorough investigation in the first instance by the FTC." *Id*. Here, the FTC does so on two independent theories of anticompetitive harm: *First*, the Proposed Acquisition will lead to undue concentration in the market for "accessible luxury" handbags in the United States. *Second*, it will eliminate fierce head-to-head competition between the merging parties. The FTC thus respectfully asks this Court to preliminarily enjoin consummation of the Proposed Acquisition.

## BACKGROUND

On August 10, 2023, Tapestry announced its intention to purchase Capri for $8.5 billion,[2]

---

[2] PX7055 (Investor Call, Aug. 10, 2023) at 004.

2

its third major acquisition in a decade. After purchasing Stuart Weitzman in 2015 and Kate

Spade in 2017, Coach renamed itself "Tapestry,"[3] and the firm now looks to use the Proposed

Acquisition to add three more well-known fashion brands to its stable: Michael Kors, Jimmy

Choo, and Versace. Launched in 1981 in New York City, the Michael Kors brand, primarily

through its MICHAEL Michael Kors "accessible luxury line"[4] (hereinafter "Michael Kors"),

dominates Capri's portfolio.[5] It is also a chief rival to Tapestry's Coach and Kate Spade brands.

Wall Street lauded the Proposed Acquisition as creating a dominant firm in the mold of

the European fashion conglomerates. CNBC observed that the deal would give rise to an

"American fashion giant."[6] Bloomberg added that the combined firm was "likely to dominate the

U.S. handbag market,"[7] and that Coach had "won" the "ongoing battle" against long-time foe

Michael Kors.[8] ███████████████████████████████████████████████████

███████████████████████████████████████████████████████[9]████

██████████████████████████████████████████████████████████

██████████████████[10] As Tapestry's own investment banker observed following

announcement of the Proposed Acquisition: "Investors are looking forward to unnecessary

promotional activity, most of it viewed to be between Tapestry and Capri, subsiding. It felt like a

'race to the bottom' on price, and investors hope to see a return of more price integrity as a result

---

[3] PX7060 at 004; PX7123 at 001.
[4] PX7098 (Capri 2023 Form 10-K) at 009.
[5] *E.g.,* PX7098 (Capri 2023 Form 10-K) at 010; PX6000 (Smith (FTC) Rep.) ¶ 25.
[6] PX2197 (Capri) at 008 ██████████████████████████████████████
██████████████).
[7] PX2197 (Capri) at 007 ████████████████████████████████████████
████).
[8] PX7139 at 004 ███████████████████████████████████████████████
████).
[9] PX1374 (Tapestry) at 001 ████████████████████████████████
[10] PX1092 (Tapestry) at 104 ██████████████████████████████████

of the combination."[11] Indeed, an internal Tapestry analysis of the potential deal noted that a merger would ███████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████[12]

But while Wall Street may welcome the elimination of this competition and higher prices, the millions of Americans who purchase Coach, Michael Kors, and Kate Spade will not. These consumers are the beneficiaries of an intense, long-standing rivalry between these three iconic American brands—a fierce head-to-head competition that manifests not just through pricing and discounts, but also innovation, shopping experiences, and labor.[13] And this competition is monitored at the highest levels of each company. Capri CEO John Idol, who has referred to Coach as Michael Kors' "key competitor,"[14] frequently instructs his team ████████████

█████████████████████████████████████[15] ██████████████████

█████████████████████████████████████████████████████

██████████[16]

Aside from squelching this head-to-head competition, the Proposed Acquisition will also create—under even a *conservative* analysis—a colossus with over █ percent market share for "accessible luxury" handbags in the United States, with the next closest brands, ████████████

███████████████████████████████████████████ respectively.[17] Coined

---

[11] PX1074 (Tapestry) at 006 ████████████████████████████████████

████ ).

[12] PX1216 (Tapestry) at 001, 017-018.

[13] *See* Section I.B.

[14] PX2240 (Capri) at 001.

[15] *E.g.*, PX2075 (Capri) at 001-002; PX2098 (Capri) at 001.

[16] *E.g.*, PX1723 (Tapestry) at 009-10; PX1387 (Tapestry) at 043; PX1223 (Tapestry) at 007.

[17] PX6000 (Smith (FTC) Rep.) ¶ 186, tbl. 7.

by Coach as part of its initial public offering two decades ago, the term "accessible luxury"

denotes a ████████████████████████████████████████████████████████

████████████████████████[18] Or, as Coach's CEO and Brand President put it when

explaining to investors how Coach "invented Accessible Luxury": "It was the idea that you

didn't have to spend an exorbitant amount of money to buy a high quality bag."[19] In the years

since, Defendants,[20] along with other industry participants,[21] have consistently used "accessible

luxury" (along with its equivalents like "affordable luxury") to describe a particular market

segment. That segment stands in contrast to traditional European luxury, ████████████████

████████████[22]████████████████████████████████████████████████

████[23] Post-acquisition, Tapestry will dominate this space, at levels that easily give rise to a

presumption of illegality. But it does not intend on stopping there: ████████████████████

████████████████████████████[24] Tapestry sees the Proposed Acquisition as "set[ting]

the table for [a] string of pearls[,] or smaller deals,"[25] in quest of its plans to become a "Global

---

[18] *E.g.*, PX1704 (Tapestry) at 001 (████████████████████████████████████████
████████████████████████████████████████████████████████████████);
PX1731 (Tapestry) at 048 (████████████████████████████████████████████
████████████████████████████); PX5008 (Levine (Tapestry) Dep.) at
233:17-20, 235:14-236:5 ████████████████████████████████████████████
████████████████████████████████████████████████████

[19] PX1635 (Tapestry) at 006.
[20] *E.g.*, PX7105 (Tapestry 2023 Form 10-K) at 015; PX7104 (Tapestry 2022 Form 10-K) at 004,
005, 014, 024, 035, 069; PX7098 (Capri 2023 Form 10-K) at 009; PX7096 (Capri 2022 Form 10-
K) at 007; ████████████████████████████████████████████████████████
[21] *E.g.*, PX5026 ████████████████████; PX3201 ████████████; PX5032
████████; PX3150 ████; PX4000 ████████; PX5032
████████████████; PX5046 ████████████████
PX7182 (Rebecca Minkoff website) at 001 (an "industry leader in accessible luxury handbags").
[22] PX1431 (Tapestry) at 018.
[23] PX2061 (Capri) at 004; *see also* PX1088 (Tapestry) at 003.
[24] PX0010 (████████████████████████████████) at 107.
[25] PX1152 (Tapestry) at 001.

Premium Fashion Powerhouse."[26] Indeed, in a playbook just following the Kate Spade

acquisition, Tapestry ███████████████████████████████████████████[27]

## ARGUMENT

Section 7 of the Clayton Act prohibits transactions the effect of which "may be

substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18. The

Commission therefore voted 5-0 to commence an administrative proceeding to adjudicate the

legality of the Proposed Acquisition. This proceeding is well under way—and a merits hearing is

scheduled to begin on September 25, 2024. The FTC seeks from this Court only a preliminary

injunction to preserve the status quo until that proceeding has run its course to preserve the

Commission's ability to order effective relief and enforce the antitrust laws.

Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), "authorizes the Commission to obtain a

preliminary injunction '[u]pon a proper showing that, weighing the equities and considering the

Commission's likelihood of ultimate success, such action would be in the public interest.'" *FTC*

*v. Crescent Pub. Group, Inc.*, 129 F. Supp. 2d 311, 319 (S.D.N.Y. 2001) (quoting 15 U.S.C.

§ 53(b)). Unlike a private litigant seeking a preliminary injunction, the FTC does not have to

show irreparable harm. *FTC v. IQVIA Holdings, Inc.*, No. 23 CIV. 06188, 2023 WL 7152577, at

*5 (S.D.N.Y. Oct. 31, 2023); *see also Crescent Pub.*, 129 F. Supp. at 319. Rather, courts "follow

a two-step inquiry that asks (1) whether the FTC has shown a likelihood of ultimate success on

the merits in the administrative proceeding, and (2) whether the equities weigh in favor of an

injunction." *IQVIA*, 2024 WL 81232, at *7. In weighing the equities under § 13(b), the interests

of private parties carry "little weight" so as not to "undermine section 13(b)'s purpose of

protecting the public-at-large, rather than individual private competitors." *FTC v. Univ. Health,*

---

[26] PX1737 (Tapestry) at 004; PX1175 (Tapestry) at 004.
[27] PX8110 (Tapestry) at 046.

*Inc.*, 938 F.2d 1206, 1225 (11th Cir. 1991) (internal quotation marks omitted). Preliminary injunctions under § 13(b) "are meant to be readily available to preserve the status quo." *FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1036 (D.C. Cir. 2008).

### I.    The FTC Is Likely to Succeed in the Administrative Proceeding.

Under Section 13(b), the FTC satisfies its burden of showing a likelihood of success on the merits if it "raise[s] serious questions about the antitrust merits that warrant thorough investigation in the first instance by the FTC." *IQVIA*, 2024 WL 81232, at *9; *accord FTC v. Lancaster Colony Corp.*, 434 F. Supp. 1088, 1090 (S.D.N.Y. 1977) ("the FTC meets its burden on the 'likelihood of success' issue if it shows preliminarily, by affidavits or other proof, that it has a fair and tenable chance of ultimate success on the merits."). The district court "must exercise its independent judgment to determine" if the FTC has cleared that hurdle, but it "may not require the FTC to prove the merits of its case or to establish a violation of the Clayton Act. That inquiry is reserved for the administrative proceeding." *IQVIA*, 2024 WL 81232, at *9.

"Courts assess section 7 claims challenging horizontal mergers under a burden-shifting framework." *Id.* at *10. In the merits proceeding—*i.e.*, the administrative proceeding—the plaintiff first "must make out a prima facie case that the merger is anticompetitive." *Id.* "If it does so, the burden shifts to the defendant to produce evidence rebutting that prima facie case." *Id.* "[T]he more compelling the prima facie case, the more evidence the defendant must present to rebut it successfully." *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 725 (D.C. Cir. 2001). If the defendant succeeds, "the burden of production shifts back to the Government and merges with the ultimate burden of persuasion, which is incumbent on the Government at all times." *IQVIA*, 2024 WL 81232, at *10 (quoting *FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 337 (3d Cir. 2016)).

Under Section 13(b), this Court's task is simply to determine the FTC's likelihood of

success under this burden-shifting framework, and "at this preliminary phase [the FTC] just has to raise substantial doubts about a transaction." *Whole Foods Mkt.*, 548 F.3d at 1036. Because "the scope of the Section 13(b) inquiry is necessarily limited and narrow," *IQVIA*, 2024 WL 81232, at *9 (quoting *FTC v. Meta Platforms, Inc.*, No. 22 Civ. 04325 (EJD), 2022 WL 16637996, at *5 (N.D. Cal. Nov. 2, 2022)), the Court need not "resolve the conflicts in the evidence, compare concentration ratios and effects on competition in other cases, or undertake an extensive analysis of the antitrust issues." *FTC v. Warner Commc'ns Inc.*, 742 F.2d 1156, 1164 (9th Cir. 1984) (citing *Lancaster Colony*, 434 F. Supp. at 1094, 1096); *see also IQVIA*, 2024 WL 81232, at *9. "[D]oubts are to be resolved against the transaction." *FTC v. Elders Grain, Inc.*, 868 F.2d 901, 906 (7th Cir. 1989).

Here, the FTC is likely to succeed at the administrative hearing in proving that the effect of the Proposed Acquisition may be substantially to lessen competition or to tend to create a monopoly in violation of Section 7 of the Clayton Act. Although the standard at this preliminary stage requires only that the FTC raise "serious questions about the antitrust merits," the evidence indicates that the Proposed Acquisition is in fact likely to lessen competition on two separate bases. *First*, it will consolidate three of the largest "accessible luxury" handbag brands in the United States—including the top two (Coach and Michael Kors) by far—leading to undue concentration and a presumption of illegality. *See United States v. Phila. Nat'l Bank*, 374 U.S. 321, 363 (1963); 2023 U.S. Dep't of Justice and FTC Merger Guidelines (hereinafter, the "Merger Guidelines") at § 2.1.[28] *Second*, independent of any market-concentration analysis, it

---

[28] The Merger Guidelines outline the principal analytical techniques, practices, and enforcement policy to be applied with respect to mergers and acquisitions under the antitrust laws. The Merger Guidelines apply in FTC administrative proceedings and are persuasive authority in federal court. *E.g.*, *IQVIA*, 2024 WL 81232, at *25, n.19.

will eliminate fierce competition between Coach, Kate Spade, and Michael Kors. *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 61 (D.D.C. 2015) ("a merger that eliminates head-to-head competition between close competitors can result in a substantial lessening of competition"); *accord IQVIA*, 2024 WL 81323, at *40; Merger Guidelines at § 2.2 ("an analysis of the existing competition between the merging firms can demonstrate that a merger threatens competitive harm independent from an analysis of market shares"). The Proposed Acquisition also builds on Tapestry's decade-long pattern and strategy of serial acquisitions. *See Credit Bureau Reps., Inc. v. Retail Credit Co.,* 358 F. Supp. 780, 794 (S.D. Tex. 1971); Merger Guidelines at § 2.8.[29]

### A. The Proposed Acquisition Is Presumptively Unlawful Because It Significantly Increases Market Concentration.

The FTC can meet its prima facie burden by showing that the Proposed Acquisition is presumptively unlawful because it will lead to undue concentration in a relevant market. *IQVIA*, 2024 WL 81232, at *37 ("The high post-merger levels of market concentration alone would be sufficient for the FTC to state a prima facie case."); *see also* Merger Guidelines at § 2.1. Under Supreme Court precedent, "a merger which produces a firm controlling an undue percentage share of the relevant market, and results in a significant increase in the concentration of firms in that market is so inherently likely to lessen competition substantially that it must be enjoined in the absence of evidence clearly showing that the merger is not likely to have such anticompetitive effects." *Phila. Nat'l Bank*, 374 U.S. at 363. Here, the Proposed Acquisition easily satisfies the thresholds for a presumption of illegality, leading to a combined market share of well over 50 percent in the sale of "accessible luxury" handbags in the United States.

---

[29] PX0010 (███████████████████████) at 107; PX1152 (Tapestry) at 001; PX1737 (Tapestry) at 004; PX1175 (Tapestry) at 004; PX8110 (Tapestry) at 046.

1.   **"Accessible Luxury" Handbags in the United States Is a Relevant Market.**

"Market definition has two components: the relevant product market and the relevant geographic market." *IQVIA*, 2024 WL 81232, at \*11. With the Clayton Act, Congress prescribed a pragmatic, factual approach and the government is not required to define a market by "metes and bounds." *United States v. Pabst Brewing Co.,* 384 U.S. 546, 549 (1966). Commercial realities reflecting competition between the merging parties can inform market definition. *See FTC v. Staples, Inc*., 190 F. Supp. 3d 100, 124 (D.D.C. 2016); Merger Guidelines § 4.3 ("Direct evidence of substantial competition between the merging parties can demonstrate that a relevant market exists in which the merger may substantially lessen competition and can be sufficient to identify the line of commerce and section of the country affected by a merger, even if the metes and bounds of the market are only broadly characterized.").

"The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *United States v. Brown Shoe Co*., 370 U.S. 294, 325 (1962). "In evaluating reasonable interchangeability, 'the mere fact that a firm may be termed a competitor in the overall marketplace does not necessarily require that it be included in the relevant product market for antitrust purposes.'" *IQVIA*, 2024 WL 81232, at \*24 (quoting *Sysco*, 113 F. Supp. 3d at 26). Indeed, as the Supreme Court has recognized, within a broader market, "well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes." *Brown Shoe*, 370 U.S. at 325; *see also United States v. Alum. Co. of Am.*, 377 U.S. 271, 275 (1964) (while aluminum and insulated copper conductors could be analyzed as a "single product market" that "does not preclude their division for purposes of [Section 7] into separate submarkets"). "[T]he viability of such additional markets does not render the one identified by the government unusable." *IQVIA*, 2024 WL 81232, at \*24 (quoting *United States v.*

*Bertelsmann SE & Co.*, 646 F. Supp. 3d 1, 28 (D.D.C. 2022)).

At the Section 13(b) stage, "it is 'not necessary at this point' for the FTC to *prove* the existence of the [relevant] market." *IQVIA*, 2024 WL 81232, at *24 (quoting *Whole Foods*, 548 F.3d at 1041 (opinion of Brown, J.)) (emphasis in original). Moreover, the Court need not adopt the FTC's proposed market definition to find a merger violates the antitrust laws. *United States v. Mfrs. Hanover Trust Co.*, 240 F. Supp. 867, 923, 955 (S.D.N.Y. 1965) (rejecting proposed market definition yet permanently enjoining merger because "elimination of substantial competition previously existing between the parties . . . establishes a reasonable probability of a substantial lessening of competition"); *Whole Foods*, 548 F.3d at 1036 n.1 ("a merger between two close competitors can sometimes raise antitrust concerns due to unilateral effects in highly differentiated markets. In such a situation, it might not be necessary to understand the market definition to conclude a preliminary injunction should issue") (citation omitted).

Here, a relevant market is "accessible luxury" handbags sold in the United States—although, as explained below, this market is conservative, because, under the hypothetical monopolist test, Coach, Kate Spade, and Michael Kors handbags *by themselves* would constitute a relevant antitrust market.

### a. The *Brown Shoe* Practical Indicia Demonstrate That "Accessible Luxury" Handbags Is a Relevant Product Market.

In assessing relevant product markets, the Supreme Court has identified multiple "practical indicia," including "industry or public recognition of the [relevant market] as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Brown Shoe*, 370 U.S. at 325. "All the factors need not be satisfied for the Court to conclude that the FTC has identified a relevant market." *IQVIA*, 2024 WL 81232, at *13. Rather,

the indicia must be viewed in totality and not in isolation—one factor is not dispositive. *Beatrice Foods Co. v. FTC*, 540 F.2d 303, 308–09 (7th Cir. 1976) (the existence of only three indicia sufficient); *IQVIA*, 2024 WL 81232 at *13 ("[a]ll factors need not be satisfied for the Court to conclude the FTC has identified a relevant market"). Analysis of the *Brown Shoe* practical indicia shows that "accessible luxury" handbags constitute a relevant product market.

**Industry Recognition.** Industry participants, including Defendants, recognize "accessible luxury" as a distinct market. Over the last decade, and as recently as last year, Defendants have repeatedly referred to their Coach, Kate Spade, and Michael Kors brands as "accessible luxury" in statements to investors and in SEC filings.[30] Their ordinary-course documents are replete with references ████████████████████████████████

████████████████████[31] *See IQVIA*, 2024 WL 81232, at *20 ("Courts regularly consider ordinary course documents when defining the relevant market"). These analyses are prepared for the highest levels of each company, including their boards of directors,[32] and, ████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████[33] ████████████████████████████

---

[30] *E.g.*, PX2435 (Capri) at 005; PX2379 (Capri Earnings Call Q4 2023) at 011, 019; PX7105 (Tapestry 2023 Form 10-K) at 015; PX7104 (Tapestry 2022 Form 10-K) at 004, 005, 014, 024, 035, 069; PX7098 (Capri 2023 Form 10-K) at 009; PX7096 (Capri 2022 Form 10-K) at 007; PX7095 (Capri 2021 Form 10-K) at 007; PX7097 (Capri 2019 Form 10-K) at 006.
[31] *E.g.*, PX1387 (Tapestry) at 043; PX2124 (Capri) at 004-005; PX1536 (Tapestry) at 015; PX2394 (Capri) at 001, 005; PX2415 (Capri) at 002, 004-005, 009; PX2436 (Capri) at 012; PX1812 (Tapestry) at 068-72; PX2439 (Capri) at 004.
[32] *E.g.*, PX1379 (Tapestry) at 041, 049, 050; PX1244 (Tapestry) at 001; PX1730 (Tapestry) at 001-002; PX5019 (Crevoiserat (Tapestry) Dep.) at 146:7-149:11 ████████████████████

████████████████; PX2439 (Capri) at 004; PX2034 (Capri) at 007.
[33] *E.g.*, PX1306 (Tapestry) at 003; PX1503 (Tapestry) at 003.

██████████████████████████████████████████████████████████

██████████████████████[34] Defendants' repeated, and consistent, references to

"accessible luxury" echo those of other "accessible luxury" brands, including ████████

██████████████████████████[35] as well as suppliers, ████████████████

████████[36]

**Distinct Pricing.** Coach, Kate Spade, Michael Kors and other "accessible luxury"

handbag brands generally focus their offerings on an opening price point of $100 and rarely

approach or exceed $1,000, which Tapestry itself acknowledges as merely the "entry point" for

"luxury" handbag brands—or what the parties and industry participants also refer to as

"traditional European luxury," "true luxury," or "European luxury" (hereinafter "true luxury").[37]

*See Lancaster Colony*, 434 F. Supp at 1093 ("Plainly, low or moderately-priced glassware,

intended for everyday use, differs from fine glassware, sold at higher prices and marketed

through different channels"). ██████████████████████████████████

████████████████████████████████████████████████████████████

---

[34] PX2674 (Capri) at 006, 011 ████████████████████████; *see also* PX2436
(Capri) at 012 ██████████████████████████; PX2408 (Capri) at 008; PX2680
(Capri) at 006.
[35] *E.g.*, PX3201 (████████████) at 018; PX5026 (████████████████████) at 36:18-
36:25; PX4000 (██████████████████), ¶ 12 (████████████████████████
████████); PX5032 (████████████████) at 26:25-28:7 (████████████████
████████████████████████████████████); PX5046 (
████████████) at 19:11-20:17; PX3150 (████████████) at 002.
[36] PX7187 (Simone website) at 001; PX1096 (Tapestry) at 001; PX2030 (Capri) at 002; PX2052
(Capri) at 002; PX2158 (Capri) at 004; PX2159 (Capri) at 004; PX1096 (Tapestry) at 001;
PX2052 (Capri) at 002; PX2423 (Capri) (████████████) at 004.
[37] PX1379 (Tapestry) at 056; PX1296 (Tapestry) at 008; PX1431 (Tapestry) at 018 (Coach
"product portfolio starts at $100 as point of entry and does not exceed $1000 where luxury owns
the market"); PX5020 (Lifford (Tapestry) Dep.) at 126:9-126:19 ████████████████████
████████████████████████████████████████.



In statements to investors, Defendants have routinely acknowledged and touted this "white space" or "delta" between the price points of "accessible luxury" and "true luxury" handbags to demonstrate that there is room to raise prices without losing customers.[41] *See Geneva Pharm. Tech. Corp. v. Barr Labs Inc.*, 386 F.3d 485, 496-97 (2d Cir. 2004); *Reynolds Metals Co. v. FTC*, 309 F.2d 223, 229 (D.C. Cir. 1962) ("Such a difference in price as appears on this record must effectively preclude comparison, and inclusion in the same market, of products as between which the difference exists, at least for purposes of inquiry under Sec. 7 of the Clayton Act.").

"Accessible luxury" handbags also have distinct pricing in that they are characterized by a high degree of, and frequent, discounting and promotions, particularly around major shopping holidays.[42] Tapestry's Chief Financial and Operating Officer made clear that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[43]

---

[38] PX1296 (Tapestry) at 008.

[39] PX1296 (Tapestry) at 008.

[40] PX1723 (Tapestry) at 009; *see also* PX5024 (Roe (Tapestry) Dep.) at 215:17-215:23 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮); PX5035 (Fraser (Tapestry) Dep.) at 219:16-220:12.

[41] *E.g.*, PX7053 (Tapestry Q4 2022 Earnings Call Tr.) at 014; PX7045 (Tapestry Q3 2023 Earnings Call Tr) at 011; PX7054 (Tapestry Q4 2023 Earnings Call Tr.) at 012-013; PX7030 (Tapestry Q1 2024 Earnings Call Tr.) at 011; PX7138 at 011 (Capri Q4 2022 Earnings Call Tr).

[42] *See, e.g.*, PX1105 (Tapestry) at 003; PX2035 (Capri) at 012; PX5025 (Tao (Tapestry) Dep.) at 235:3-236:17; PX5002 (Crevoiserat (Tapestry) Corp. IH.) at 30:11-20; PX5026 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮) at 68:21-25; 70:13-70:24; PX7260 (Tory Burch website, July 3, 2024) (offering an additional 25% off sale items for a semiannual sale and 15% off your first order of $200+); PX5038 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮) at 98:7-99:2 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).

[43] PX5024 (Roe (Tapestry) Dep.) at 99:6-99:9.

**Peculiar Characteristics.**  "Accessible luxury" handbags boast high-quality materials (often leather) and elevated craftsmanship and construction. Tapestry has asserted that "high quality standards . . . are an integral part of our brands' identity."[44] Coach handbags may require more than 100 steps to make, including "up to 90 skilled artisans working together to assemble as many as 200 pieces."[45] Michael Kors states that its products offer ███████████████ ██████████[46]  Or, as ███████████████████████████████████████ accessible luxury "is a term used in the handbag industry to signify handbags that have high craftsmanship and quality and that look and feel expensive, but without a four-figure price tag."[47] ███████████████████████████████████████████ ████████████████████████████[48]

Notably, department stores group together "accessible luxury" handbag brands on their store floors based on these peculiar characteristics. For example, ████████████ ███████████████████████████████████████████ ███████████████████████████[49]██████████████ ███████████████████████████████████████████ ████████████[50]

**Unique Production Facilities.**  "Accessible luxury" handbags are typically made

---

[44] PX7105 (Tapestry 2023 Form 10-K) at 013.
[45] PX1262 (Tapestry) at 007; *see also* PX1085 (Tapestry) at 004 ██████████████ ███████████████████████).
[46] PX2058 (Capri) at 009, 030; *see also* PX2271 (Capri) at 008-009 (███████████ ███████████████████████████ )
[47] PX4000 (█████████████████████████), ¶ 12; PX3175 (███████████) at 002 (███ ███████████████████████).
[48] PX5058 (█████████████████████) at 13:21-15:8.
[49] PX5037 (█████████████████████) at 19:22-20:22, 33:10-34:20.
[50] PX5037 (█████████████████████) at 20:25-21:6, 21:22-22:24, 24:18-25:2, 25:17-25:22.

offshore in Asia by skilled artisans, which enables "accessible luxury" brands to produce quality

handbags ████████████—and thus to retail them at lower prices to consumers. Tapestry's CEO

Joanne Crevoiserat described it best when she told her subordinates ████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████[51] One key supplier for

"accessible luxury" handbags for ████████████████████████, as well as ████████

████████████████, is Asia-based Simone.[52] Simone touts its quality-assurance system and

craftsmanship of its artisans, which has enabled it to "grow concurrently with the emergence of

accessible luxury in the US market."[53] Industry consultants recognize the distinct nature of the

supply chain for "accessible luxury" handbags.[54]

    **Distinct Customers.** Coach and Michael Kors both characterize customers of their

brands as "lower income,"[55] and consumer research conducted by and on behalf of Defendants

---

[51] PX1704 (Tapestry) at 001; *see also* PX5019 (Crevoiserat (Tapestry) Dep.) at 178:22-180:5;
PX1731 (Tapestry) at 048 ██████████████████████████████████████████
████████████████████████████████; PX5036 (Charles (Tapestry) Dep.) at
104:5-21) ████████████████████████████████████████████████████████
████
[52] PX7187 (Simone website) at 001; PX5058 (████████████████████ Dep.) at 41:1-42:19
(████████████████████████████████████████████████
██████████████; PX3163 (████████████) at 002, 004.
██████████████████████████████████████ PX5036 (Charles (Tapestry) Dep.) at 220:18-
221:20; PX1788 (Tapestry) at 001.
[53] PX7187 (Simone website) at 001-002.
[54] PX1327 (Tapestry) at 004 ████████████████████████████████████
██████████████████; PX2254 (Capri) at 006 ██████████
[55] *E.g.*, PX2010 (Capri) at 009 ████████████████████████████████████
██████████████████████████████ PX1078 (Tapestry) at 001
███████████████████████████████████████

shows that half of the customers for Coach and Michael Kors have household income of less

than $75,000-$80,000 annually.[56] Kate Spade's income demographics are ████ [57] as are those

of the ████████████████████████ [58]

Testimony and documents presented to Capri's Board of Directors demonstrate that ███████



### b. "True Luxury" and Mass Market Handbags Are Not Reasonably Interchangeable with "Accessible Luxury" Handbags.

Other types of handbags do not share the same *Brown Shoe* practical indicia and are not

reasonably interchangeable with "accessible luxury" handbags. They are thus not part of the

relevant product market. *See IQVIA*, 2024 WL 81232, at *10.

**"True Luxury."**  With jaw-dropping prices at multiples of Defendants' offerings,[61] "true

luxury" handbags are not reasonable substitutes for "accessible luxury" handbags. In the words

of Coach's CEO and Brand President: "Gucci bags at $2000 is just not our customer in

---



[56] PX2257 (Capri) at 017 ████████████████████████████

████████████████ PX1379 (Tapestry) at 041 ████

████████████████████████████████████████

[57] PX1255 (Tapestry) at 048.
[58] PX2050 (Capri) at 022.
[59] PX2753 (Capri) at 043, 045; *see also* PX5011 (Kors (Capri) Dep.) at 34:1-14, 143:5-144:2.
[60] PX5058 ████████████████ Dep.) at 189:2-14.
[61] PX4002 ████████████████ ), ¶ 6 (

████████████ ); PX3309 ( ████ ) at 002, 010, 011 (

████████████████████ ); PX3120 (

████████████ ; PX5038 (

████████████████████████████ ; *see also* PX1536 (Tapestry)

at 015;  PX1723 (Tapestry) at 009; PX1296 (Tapestry) at 008.

N[orth]A[merica]."[62] The CEO and Brand President of Kate Spade put it more bluntly: "Bottom line, saying we're in the same market with true luxury is a joke. . . . Nobody says 'should I buy a LV [Louis Vuitton] bag or a Coach bag?'"[63]

Beyond price, other characteristics distinguish "accessible luxury" and "true luxury" handbags. While discounting is common among "accessible luxury" handbags, "true luxury" brands ███████████████████████████████[64] And, unlike "accessible luxury" brands, which offer their products in outlets and a range of department stores, "true luxury" aims for a more exclusive shopping experience with limited sales channels and few, if any, outlet stores.[65] What's more, "true luxury" handbags carry the imprimatur of the finest craftsmanship and are usually manufactured in Europe.[66] For example, █████████████████████ ██████████████████████████████████████████████████████ ███████████████████████████████████████████████ ████████████████████████████[67]  The "true luxury" consumer also has ███████████████████████████████████[68]

---

[62] PX1067 (Tapestry) at 001; PX5006 (Kahn (Tapestry) Dep.) at 118:1:21.
[63] PX1427 (Tapestry) at 001; PX5035 (Fraser (Tapestry) Dep.) at 204:2-7.
[64] *E.g.*, PX4002 █████████████████████
███████████████████████████████████ ); PX7062 (Wall Street
Journal, Luxury Stores Are Bursting With Unsold Stuff, Dec. 8, 2023) at 002; PX5038 (███
████████ ) at 59:2-8 (███████████████████████ ).
[65] *E.g.*, PX7083 (Louis Vuitton website) at 001 ("Louis Vuitton products are sold exclusively in
official Louis Vuitton stores, on the Louis Vuitton official website"); PX7275 (Hermes website)
at 001; PX4002 (████████████████████████████████
████████████████ .
[66] PX7093 (Louis Vuitton website) at 001 (Louis Vuitton "exclusively produced in our
workshops located in France, Spain, Italy and the United States."); PX4002 (██████████
████████ ), ¶ 3; PX7075 at 019 (Dior website) ("Dior's leather goods collections are made in
Europe."); PX7197 at 001 (Loewe handbags made in Madrid by "master artisans").
[67] PX4002 (███████████████████ ), ¶ 3.
[68] *E.g.*, PX2040 (Capri) at 008.

**Mass-market.** Mass-market (or fast-fashion) handbags are similarly not reasonably interchangeable with "accessible luxury" handbags. Indeed, in filings with China's antitrust regulatory authority, Defendants admitted that even higher-end mass-market handbags were not substitutes for Defendants' offerings: "[H]igh-end mass market products also offer good quality and performance and are made with decent materials and manufacturing processes, [but] they are not on the same level as luxury products."[69] Similarly, Coach's CEO and Brand President testified, ███████████████████████████████████████████████████████

███████[70] And for good reason: Mass-market handbags are composed of inferior materials and retail at $100 or less.[71] For example, for mass-market brand Steve Madden—whose handbags are priced at $100 and under—"[t]he base material for the bulk of the handbags is PU"—or polyurethane—"non-leather-like material."[72] ████████████████████

███████████████████████████████████████████████████████

██████████████████████[73]

### c. The Relevant Geographic Market Is the United States.

The relevant geographic market is "the area to which consumers can practically turn for alternative sources of the product and in which the antitrust defendants face competition." *FTC v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34, 49 (D.D.C. 1998) (internal quotation marks omitted).

---

[69] PX2061 (Capri) at 004; *accord* PX1088 (Tapestry) at 003 (███████████████████████
████████████████████████████
[70] PX5003 (Kahn (Tapestry) Corp. IH) at 100:25-101:8.
[71] PX5040 (Tichner (Steve Madden) Dep.) at 24:22-25:5, 36:20-37:3; PX5026 (████████████
████████████████) 44:25-45:10 (████████████████████████████████
████████████████████████████████); PX5001 (Idol (Capri) IH)
at 163:20-164:17 (████████████████████████████████████████
████████████████████████████████); PX5006 (Kahn
(Tapestry) Dep.) at 184:22-185:5.
[72] PX5040 (Tichner (Steve Madden) Dep.) at 31:11-15, 36:20-37:3.
[73] PX5058 (██████████████████) Dep.) at 13:21-16:1.

The relevant geographic market here is the United States. Coach, Kate Spade, and Michael Kors set pricing for "accessible luxury" handbags, including MSRP and discounts, by region based on factors like currency, markup targets, and consumers' preferences and perceptions of brand value, and have U.S.-specific pricing.[74] Defendants' shipping practices, including limitations on U.S.-based customers ordering from non U.S.-facing online stores, also support that the geographic market is the United States.[75] Moreover, Defendants have U.S.-specific marketing and business strategies for their brands and handbags,[76] monitor U.S. prices and market shares for handbags,[77] and study U.S. customers, distinct from other regional customer bases.[78] And Tapestry itself has asserted that other potential geographic markets are ████████████████████████[79]

### d. Economic Analysis Confirms "Accessible Luxury" Handbags in the United States Is a Relevant Market.

In assessing the relevant market, the Government can also define a market using quantitative evidence of interchangeability derived from the hypothetical monopolist test ("HMT"). *E.g., IQVIA*, 2024 WL 81232, at *25-31. This test asks whether a hypothetical

---

[74] *E.g.*, PX0010 (████████████████████████) at 045-049; PX0006-(████████████████████) at 088-089; PX1431 (Tapestry) at 019; PX1296 (Tapestry) at 014, 026, 028; PX1767 (Tapestry) at 014, 018.

[75] *E.g.*, PX5009 (Walsh (Capri) Dep.) at 274:21-275:14 (██████████); PX7284 (Coach website) at 001; PX7168 (Michael Kors website) at 001; PX7109 (Michael Kors EU website) at 002; PX7285 (Coach UK website) at 001; PX5008 (Levine (Tapestry) Dep.) at 187:12-193:17 ███████████████████.

[76] *E.g.*, PX5044 (Parsons (Capri) Dep.) at 22:24-23:25(████████████); PX2014 (Capri) at 001-003; PX7030 (Q1 2024 Tapestry Earnings Call) at 004-005 (discussing different marketing campaigns for the United States and Europe).

[77] *E.g.*, PX1767 (Tapestry) at 010, 014; PX1224 (Tapestry) at 005, 006, 009; PX2436 (Capri) at 012; PX1783 (Tapestry) at 051; PX5010 (Rocha-Rinere (Tapestry) Dep.) at 168:20-169:4.

[78] *E.g.*, PX2036 (Capri) at 005; PX1069 (Tapestry) at 004.

[79] PX0026 (██████████████████████████) at 009.

monopolist of products within a candidate market could profitability impose a small but significant and non-transitory increase in price or other worsening of terms on at least one product in the set. *Id.* If the monopolist could do so, "then a relevant product market exists for antitrust purposes." *Id.*

As discussed in the expert report of Dr. Loren K. Smith, the market for "accessible luxury" handbags in the United States satisfies the hypothetical monopolist test.[80] To conduct the HMT, Dr. Smith first identified a candidate market comprised of brands identified as "accessible luxury" ██████████████████████████████████████████████████ ████████████████████████████████[81] Dr. Smith then conducted an aggregate diversion analysis, a common tool in market definition.[82] *See Sysco*, 113 F. Supp. 3d at 34-35 (describing aggregate diversion analysis). As Dr. Smith explained, "If the aggregate diversion is above a given threshold defined by a hypothetical price increase and the price-cost margins, then the candidate market is determined to be sufficiently broad to constitute a relevant market."[83] Here, Dr. Smith found that estimated aggregate diversion ratios from Coach, Kate Spade, and Michael Kors exceed the threshold aggregate diversion ratio "by a substantial amount, indicating that the broad candidate set of accessible luxury brands constitutes a relevant market."[84]

In fact, Dr. Smith's use ████████████████████████████████████████ was conservative for purposes of the HMT.[85] An alternative HMT analysis conducted by Dr. Smith[86] shows that a hypothetical monopolist who controlled only Coach, Kate Spade, and Michael

---

[80] PX6000 (Smith (FTC) Rep.) at ¶ 11 & § III.E.
[81] PX6000 (Smith (FTC) Rep.) at ¶¶ 50 & § III.B.1.b.
[82] PX6000 (Smith (FTC) Rep.) at § III.E.
[83] PX6000 (Smith (FTC) Rep.) at ¶ 102.
[84] PX6000 (Smith (FTC) Rep.) at ¶ 105
[85] PX6000 (Smith (FTC) Rep.) at ¶ 101.
[86] PX6000 (Smith (FTC) Rep.) at § V.B.2.b.

Kors brands would find it profitable to increase the price of Michael Kors handbags by ███

████████.[87] In other words, the Defendants' accessible luxury handbag brands *by themselves* satisfy the HMT, demonstrating the existence of a relevant product market that is limited to Coach, Kate Spade, and Micheal Kors handbags,[88] which is consistent with Defendants' ordinary-course documents that show they are closest competitors. *See* Section I.B.

### 2.  The Proposed Acquisition Will Lead to Undue Market Concentration.

Tapestry's Coach and Capri's Michael Kors brand are ████████ in the market for "accessible luxury" handbags in the United States, followed by ████████[89] Conservative estimates show that, post-merger, Tapestry and Capri would control ███ ███ of that market,[90] leading to significant increases in concentration that exceed the 30 percent threshold for presumptive illegality under controlling caselaw. *See Phila. Nat'l Bank*, 374 U.S. at 364 ("Without attempting to specify the smallest market share which would still be considered to threaten undue concentration, we are clear that 30% presents that threat"); *see also IQVIA*, 2024 WL 81232, at *34 ("the 30% threshold remains valid as a matter of law").

In addition to market shares, courts and agencies often employ a statistical measure known as the Herfindahl-Hirschman Index (HHI) to assess market concentration. *See, e.g., IQVIA*, 2024 WL 81232, at *34; *see also* Merger Guidelines at § 2.1. "The HHI is calculated by summing the squares of the individual firms' market shares." *IQVIA,* 2024 WL 81232 at *34 (quoting *Penn State*, 838 F.3d at 346). Under the 2023 Merger Guidelines, "Markets with an HHI greater than 1,800 are highly concentrated, and a change of more than 100 points is a significant increase" that satisfies the structural presumption for illegality. Merger Guidelines at

---

[87] PX6000 (Smith (FTC) Rep.) at ¶¶ 256-257.
[88] PX6000 (Smith (FTC) Rep.) at ¶ 258.
[89] PX6000 (Smith (FTC) Rep.) at ¶¶ 186, tbl. 7, 193.
[90] PX6000 (Smith (FTC) Rep.) at ¶ 186, tbl. 7.

§ 2.1. Here, the Proposed Acquisition would cause the HHI in the "accessible luxury" handbags market to increase by over ██████████ to an overall total exceeding ██████[91]—██ surpassing the HHI thresholds for illegality under the Merger Guidelines and existing caselaw. *See, e.g.*, *IQVIA*, 2024 WL 81232, at *34, *37 (████████████████████████████).

### B. The Acquisition Is Unlawful Regardless of Market Concentration Because It Will Eliminate Substantial Head-To-Head Competition.

The FTC can also meet its prima facie burden by demonstrating that the Proposed Acquisition will eliminate head-to-head competition between close competitors. *Sysco*, 113 F. Supp. 3d at 61 (collecting cases holding that "a merger that eliminates head-to-head competition between close competitors can result in a substantial lessening of competition"); *IQVIA*, 2024 WL 81232 at *37 (listing cases); *id.* at *40 ("It is sufficient to show, as the FTC has, that Defendants vigorously compete head-to-head and that this competition would be eliminated by the proposed transaction."). Independent of any market-concentration analysis, elimination of significant competition between major competitors may by "'itself constitute[] a violation of § 1 of the Sherman Act,' and, a fortiori, of the Clayton Act." *Mfrs. Hanover Trust Co.*, 240 F. Supp. at 950 (quoting *United States v. First Nat'l Bank & Tr. Co. of Lexington*, 376 U.S. 665, 671–72 (1964)); Merger Guidelines § 2.2. When conducting this analysis, "[c]ourts frequently rely on ordinary course documents and witness testimony illustrating that two merging parties view each other as strong competitors." *IQVIA*, 2024 WL 81232, at *37.

Coach, Kate Spade, and Michael Kors compete closely, and fiercely, in the sale of handbags in the United States. Tapestry and Capri recognize these brands are close competitors, so much so that Tapestry's documents show a concern for "cannibalization" between the Coach, Kate Spade, and Michael Kors brands post-acquisition and ██████████████████████████

---

[91] PX6000 (Smith (FTC) Rep.) at ¶ 186, tbl. 7.

████[92] For its part, Capri's documents are laced with analyses comparing Coach and Michael Kors, including on pricing and designs,[93] as well as consumer demographics.[94] Capri CEO and Chairman John Idol has referred to Coach as "[o]ur key competitor,"[95] while the President of Accessories and Footwear for Michael Kors has referred to Tapestry as ████████████████ ████████[96] There is good reason for Defendants to focus on each other: ████████████ ████████████████████████████████████████████████[97]

These brands compete vigorously on many dimensions, from pricing to design to marketing to shopping experience to retail labor to sustainability—all of which benefit consumers but will be lost if the Proposed Acquisition proceeds.

**Price and Discounts.** Examples abound in Defendants' documents of analyses tracking each other's prices for "accessible luxury" handbags.[98] Coach ████████████████

---

[92] PX1715 (Tapestry) at 010; PX1032 (Tapestry, Inc. 4(c)-23, Aug. 31, 2023) at 001 (████████████████████████████████████); PX1216 (Tapestry) at 004 (████████████████████████████; PX1939 (Tapestry) at 005-008; PX1144 (Tapestry) at 002 ████████████████████████████████████████; PX5019 (Crevoiserat (Tapestry) Dep.) at 130:17-131:14 (████████████████████████████).

[93] *E.g.,* PX2108 (Capri) at 003; PX2108 (Capri) at 003-013; PX2068 (Capri) at 002.

[94] PX2128 (Capri) at 006-007; PX2257 (Capri) at 016-018.

[95] PX2240 (Capri) at 001.

[96] PX2043 (Capri) at 002; PX5033 (Newman (Capri) Dep.) at 197:14-198:13.

[97] *E.g.,* PX1186 (Tapestry) at 015; PX1216 (Tapestry) at 004 ████████████████████████████████); PX2117 (Capri) at 019, 23-24, 26-27; PX2214 (Capri) at 022, 027, 029, 033; PX1265 (Tapestry) at 048-049.

[98] *E.g.,* PX1224 (Tapestry) at 005; PX1250 (Tapestry) at 017; PX2108 (Capri) at 003-012; PX2068 (Capri) at 002; PX2727 (Capri) at 003 (████████████████████████████); PX5009 (Walsh (Capri) Dep.) at 236:16-19 (████████████████████████████████████████).

████████████████████████████████[99] Mr. Idol himself has instructed his

subordinates to "align [Michael Kors] pricing with Coach pricing."[100] And when a marketing

email showed Coach leading "very sharp price points," Mr. Idol instructed his Michael Kors

subordinates: "We need to develop a strategy to compete with this. I don't love it but we have no

choice."[101] Similarly, Kate Spade ████████████████████████████████████████████

███████████████████████████████████████████████ [102]

Price competition between Coach, Kate Spade, and Michael Kors occurs beyond list

prices, however, as Defendants closely monitor, and often match, each other's discounts and

promotions, including for Mother's Day and members of the military.[103] In fact, Defendants—

and Wall Street[104]—have complained about the fierce discounting between these three brands, so

much so that Michael Kors' CEO wanted to show Capri's Board "examples of coach and kate

spade racing to the bottom on such promotions" so it could "see what we are up against."[105]

The Proposed Acquisition would eliminate this competition and result in significantly

higher prices and lower discounts for consumers. Indeed, ████████████████████████████

█████████████████████████████████████████████████████████████████████

---

[99] PX1783 (Tapestry) at 051 (████████████████████████); PX1536 (Tapestry) at 015 (████
██████████████); *see also* PX1124 (Tapestry) at 008.
[100] PX2091 (Capri) at 001; *see also* PX5000 (Idol (Capri) Corp. IH) 108:8-12 ████████████
█████████████████████████████████████████████████████; PX2047
(Capri) at 001-002.
[101] PX2075 (Capri) at 001-002.
[102] PX1223 (Tapestry) at 007.
[103] PX2622 (Capri); PX2101 (Capri) at 001; PX2105 (Capri) at 001; PX1133 (Tapestry) at 002;
PX1507 (Tapestry) at 1.
[104] PX1074 (Tapestry) at 006 ████████████████████████████████████████████
████████████████ .
[105] PX2097 (Capri) at 001.

███████████████████████████████████████████████████████

███████████████████████████████████████ [106] Other documents show

██████████████████████████████████████████████ [107] ██ ██████████

████████████████████████████████████████████████████

██████████████████████████████ [108] And an economic analysis conducted by Dr. Smith confirmed that the proposed merger likely will cause higher retail prices for Coach, Kate Spade, and Michael Kors handbags—to the tune of a ██████████ loss in consumer harm annually.[109]

**Design.** In addition to pricing, Coach, Michael Kors, and Kate Spade also compete head-to-head regarding the designs of their handbags, mimicking features and elements that they observe in each other's handbags. For example, ████████████████████████████████ ███████████████████████████████████████ [110] And Capri executives and design personnel ██████████████████████████████████████ [111]

        Capri CEO John Idol ███████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████ [112] Later that same summer, ██████████ Michael Kors' President of Accessories and Footwear █████████████████████████████████

───────────────────

[106] PX1216 (Tapestry) at 001, 017-018.
[107] PX5037 ██████████████████████████████████████████
[108] PX1723 (Tapestry) at 072; PX1200 (Tapestry) at 010.
[109] PX6000 (Smith (FTC) Rep.) at ¶ 266.
[110] PX1338 (Tapestry) at 015; PX1924 (Tapestry) at 011-013.
[111] PX2310 (Capri) at 003 (████████████████████████████████████████
████████████████████); PX5033 (Newman (Capri) Dep.) at 228:25-230:1; PX2308 (Capri) at 003, 008.
[112] PX2242 (Capri) at 001 ████████████████████████████████████████
████████████████████████); PX2243 (Capri) at 001 ███████
████████████████████████████████████████████).



**Marketing.** Coach, Kate Spade, and Michael Kors pay close each attention to each

other's marketing—and no detail is too small. In May 2023, Mr. Idol wrote to his team:

"Coach's creativity on these emails (outlet in particular) is killing us . . . our [Michael Kors]

backgrounds look cheap and uninspiring . . . They are just bland product photos with no

inspiration. Help!!! Fast!!!"[117] The year before Michael Kors' Group President of Retail

observed that Coach and Kate Spade were "going after market share by increasing frequency of

highly promotional emails which is fueling their growth and we see in the data, hurting us."[118]

Michael Kors' next step was clear: "We need to compete."[119] And competition between the

parties is particularly fierce in internet search advertising. Both Capri and Tapestry engage in

"conquesting" strategies designed to bid on each other's online search terms so that customers

---

[113] PX2419 (Capri) at 001.
[114] PX2346 (Capri) at 002.
[115] PX5033 (Newman (Capri) Dep.) at 112:3-113:22, 117:24-120:4; *see also* PX2350 (Capri) at
001-002 (███████████████████████████████████████████████████████

███████).
[116] PX2294 (Capri) at 001 ██████████████████████████████████████████████████
███████████████████████████ ; PX2183 (Capri) at 004-011 (████████████████
██████████████████████████████).
[117] PX2098 (Capri) at 001; *see also* PX5021 (Idol (Capri) Dep.) at 186:17-22; PX2103 (Capri) at
002.
[118] PX2066 (Capri) at 004.
[119] PX2012 (Capri) at 002; *see also* PX5017 (Bozeman (Capri) Dep.) at 90:13-91:5 (███████
████████████████████████████████████████████████).

looking for one will also be shown the other's website in search results.[120]

**Brick-and-Mortar Stores.** Although each rely on digital sales, the parties recognize the value of a strong brick-and-mortar presence.[121] As such, Coach, Kate Spade, and Michael Kors monitor each other's retail stores,[122] taking cues from other's store layouts, product display and assortments, and in-store marketing campaigns.[123] For example, when Michael Kors closed stores, Tapestry's CEO asked: "do we know where MK is closing stores? Feels like an opportunity to grab share if we can adjust marketing and if we have a presence in these areas."[124]

**Labor.** Both parties have recognized their retail employees as providing a "competitive advantage" in the sale of their "accessible luxury" handbags[125] and thus compete on this basis. Most notably, when Tapestry moved to $15/hour for its retail workers, Capri immediately took note, with Mr. Idol asking for a meeting to "understand the financial impact on taking the US MK store fleet full price and outlet to $15 per hour,"[126] and Michael Kors' VP of Stores lamenting: "It is official, Tapestry has announced a guaranteed $15 minimum wage. We are not

---

[120] PX5017 (Bozeman (Capri) Dep.) at 136:6-136:15 (⬛⬛⬛⬛⬛⬛); PX2100 (Capri) at 001; PX2085 (Capri) at 002; PX1157 (Tapestry) at 001; *see also* PX5010 (Rocha-Rinere (Tapestry) Dep.) at 234:14-17 (⬛⬛⬛⬛⬛⬛).

[121] PX5019 (Crevoiserat (Tapestry) Dep.) at 10:1-8 ⬛⬛⬛⬛⬛⬛⬛⬛; PX5006 (Kahn (Tapestry) Dep. at 29:15-21 ⬛⬛⬛⬛; PX2132 (Capri) at 022; PX1129 (Tapestry) at 001; PX1160 (Tapestry) at 078; PX1862 (Tapestry) at 001.

[122] *E.g.*, PX2092 (Capri) at 001; *see generally* PX1219 (Tapestry) at 003 (⬛⬛⬛⬛⬛⬛).

[123] *E.g.*, PX1118 (Tapestry) at 002-007; PX2072 (Capri) at 002-005; PX5034 (Resnick (Tapestry) Dep.) at 78:14-78:25.

[124] PX1703 (Tapestry) at 002.

[125] PX5019 (Crevoiserat (Tapestry) Dep.) at 26:6-26:7, 35:6-35:12, 37:8-19 (⬛⬛⬛⬛⬛⬛); PX1706 (Tapestry) at 009; PX1418 (Tapestry) at 001; PX1635 (Tapestry) at 003; PX2304 (Capri) at 002.

[126] PX2113 (Capri) at 001.

going to have a choice if we want to be staffed for Holiday!"[127] Less than two months later, Michael Kors announced plans to raise its minimum wage to $15 per hour.[128]

**Sustainability**. Defendants even compete on sustainability efforts: When Coach launched Coach "(Re)Loved," its handbag recycling program, Michael Kors soon responded with "Pre-Loved" for customers to consign their used handbags.[129] Tapestry took note of its copycat, with one executive calling Michael Kors "ankle biters" ███████████████████████ ███ "Kors is coming for Coach Reloved!," and another employee observing in response "they do know how to, rinse-repeat and repackage to the next level."[130]

\* \* \*

The FTC meets its prima facie case by showing that the Proposed Acquisition will squelch this longstanding, fierce head-to-head competition. Its elimination will likely lead to higher prices, fewer discounts and promotions, decreased innovation, and reduced wages.

### C. Defendants Cannot Rebut the FTC's Prima Facie Case.

Under the Section 7 burden-shifting framework, once the FTC establishes a prima facie case, "the burden shifts to the defendant to produce evidence rebutting that prima facie case." *IQVIA*, 2024 WL 81232, at *10 (citing *Penn State*, 838 F.3d at 337). The recognized methods of rebutting a prima facie case are unavailable here.

### 1. Entry and Expansion Will Not Be Timely, Likely, or Sufficient.

To meet their burden, Defendants must demonstrate that any entry by new firms, or expansion by existing firms, will be "timely, likely, and sufficient in its magnitude, character,

---

[127] PX2299 (Capri) at 001.
[128] PX2119 (Capri) at 001.
[129] PX2070 (Capri) at 041; PX7234 (WWD, Michael Kors Pre-Loved) at 001.
[130] PX1278 (Tapestry) at 001; PX1970 (Tapestry) at 001; PX5048 (Colone (Tapestry) Dep. at 135:9-136:16 (████████████████████████████████████████████).

and scope to deter or counteract the competitive effects of concern" of the Proposed Acquisition. *IQVIA*, 2024 WL 81232, at *46; Merger Guidelines at § 3.2. They will not be able to do so: The enormous purchase price here belies any argument that entry and scale is easy—if it were, Tapestry could just create a new brand, or purchase a smaller one at a fraction of the cost.[131]

Defendants contend that Coach, Kate Spade, and Michael Kors compete with a host of other "accessible luxury" handbag brands. None of these brands, however, approach the size of Michael Kors—and thus will be able to replicate the loss of competition from the Proposed Acquisition. And for good reason: Coach, Kate Spade, and Michael Kors are household names in the United States, scoring as some of the most recognized brands in the fashion industry.[132] These types of brands do not appear overnight, and more importantly, are not easily scaled. *Chicago Bridge & Iron Co. N.V. v. FTC*, 534 F.3d 410, 431-32 (5th Cir. 2008) (entry has to be "of a sufficient scale  to compete on the same playing field as [the merged parties]") (cleaned up).[133] Even ███████████████████████████████████████████ ███████████ [134] ████████████████, which rose to popularity two decades ago with its "morning after bag," ████████████████████████████████████████████ ███████████████████████████████████████, it closed its brick-and-mortar stores and was sold ████████████ [135] And ████████████████████████████████████ ████████████████████████████████████████████████████████████████ [136]

---

[131] *See* PX4000 (████████████████████████████), ¶ 8 (███████████████████████ ██████).
[132] PX1265 (Tapestry) at 021; PX2117 (Capri) at 019-020.
[133] In fact, if entry and scale were so easy, it begs the question of Tapestry is forking over $8.5 billion to buy Capri—instead of a brand like Rebecca Minkoff, ████████████████████████ █████████ PX4000 (██████████████), ¶ 8.
[134] *See* PX5026 (██████████████████████████) at 78:19-87:16.
[135] PX4000 (██████████████████████████) ¶¶ 5-8.
[136] PX5032 (██████████████████████) at 20:25-21:24.

██████████████████████████████████████████ [137]

    Moreover, despite the rise of e-commerce, ████████████████████████████████

█████████████████████ [138] making it important to ████████████████████████ [139] Indeed,

Tapestry has found that consumers who shop its products in more than one sales channel spend

over two times than those who shop in just one.[140] It has also observed that "[i]n-store remains an

important touchpoint for consumers to interact with the product live" and that "[i]nteracting with

the product in a brick-and-mortar store is important to assess quality, comfort, and pushing a

product from 'love' to 'need.'"[141] Brick-and-mortar presence, however, is challenging and

costly[142]—especially when it comes to maintaining the hundreds of stores that Coach, Kate

Spade, and Michael Kors each have throughout the country.[143]

    Marketing and advertising are also costly, but necessary, to obtain the scale of Coach,

Kate Spade, and Michael Kors. Defendants invest millions of dollars across numerous

promotional channels[144] and have entire departments dedicated to creating promotional

advertisements, photoshoots, fashion shows, and marketing campaigns.[145] And this marketing

gives Defendants an edge: As Tapestry's Chief Financial and Operating Officer said, ████████

---

[137] PX5032 (████████████████████) at 32:9-15.

[138] PX1160 (Tapestry) at 078.

[139] PX1121 (Tapestry) at 048; PX5046 (███████████████) at 27:20-28:12 (████████████
████████████████████); PX1862 (Tapestry) at 001.

[140] PX7029 (Tapestry Earnings Call Q1 2023) at 003; PX5019 (Crevoiserat (Tapestry) Dep.) at
23:23-24:10, 24:11-27:12.

[141] PX1316 (Tapestry) at 006-007; *see also* PX5027 (Harris (Tapestry) Dep.) at 281:2-13
████████████████████████████████████████████).

[142] PX1109 (Tapestry) at 015-016.

[143] PX6000 (Smith (FTC) Rep.) ¶¶ 18, 20, 26.

[144] *E.g.,* PX1311 (Tapestry) at Sheet1; PX2725 (Capri) at 002.

[145] PX1310 (Tapestry) at 002; PX2561 (Capri) at 015; PX5011 (Kors (Capri) Dep.) at 24:24-
26:17; PX5022 (Wilmotte (Capri) Dep.) at 25:11-26:20.

███████████████████████████████████████████ [146] Coach has estimated it

will spend ██████████ in fiscal year 2024 for marketing ████████████████████

██████ [147] and Kate Spade's estimated marketing spend for fiscal year 2024 ████████

██████ [148] On the whole, Tapestry commits ██████████████████ to marketing.[149] For its

part, Michael Kors' expected spend on marketing in the United States for both fiscal year 2023

and 2024 was ████████████ [150] These figures ████████████████████████ [151]

   Defendants' treasure trove of consumer data is also a barrier to entry and scale.

Tapestry's consumer database boasts ████████████████████████████████ [152]

including what Tapestry's CEO described as a ██████████████████████████

████████████████████████████████████████████████████████

██████ [153] As Ms. Crevoiserat explained during an investor call regarding the Proposed

Acquisition, Tapestry's data platform "positions us to leverage our competitive advantages

across a broader portfolio of brands."[154] Tapestry's Chief Financial and Operating Officer said

████████████████████████████████████████████████████████

---

[146] PX5024 (Roe (Tapestry) Dep.) at 214:2-214:13.
[147] PX1727 (Tapestry) at 094.
[148] PX1727 (Tapestry) at 118.
[149] PX1485 (Tapestry) at 009; PX5027 (Harris (Tapestry) Dep.) at 152:5-154:3; *see also* PX5035 (Fraser (Tapestry) Dep.) at 174:8-17 (████████████████████████████████████ ██████).
[150] PX2725 (Capri) at 002; PX5044 (Parsons (Capri) Dep.) at 33:4-33:9.
[151] PX5032 (████████████████████) at 136:18-22 (████████████████████████ ██████████████████████████); PX5029 (████████████████████████) at 96:2-96:4 (██████████████████████████████████████████████).
[152] PX1201 (Tapestry) at 012.
[153] PX5002 (Crevoiserat (Tapestry) Corp. IH.) at 63:5-24; PX5035 (Fraser (Tapestry) Dep.) at 149:11-151:5 (████████████████████████████████████).
[154] PX7055 (Investor Call, Aug. 10, 2023) at 002, 008.

███████████████████████████████████████████████[155] Capri likewise

maintains a database of ███████████████████████ in North America.[156]

## 2. Any Efficiencies Are Not Merger-Specific, Cognizable, or Verifiable.

As an initial matter, courts remain skeptical whether efficiencies are a viable defense.
*IQVIA*, 2024 WL 81232, at *49. Assuming *arguendo* that an efficiencies defense is available,
however, Defendants cannot overcome the "high bar" of showing "extraordinary efficiencies"
offset the Proposed Acquisition's anticompetitive effects. *Id.* (quoting *Heinz*, 246 F.3d at 720).
Nor will they be able to show that any efficiencies are merger-specific or verifiable, or flow from
an increase in competition. *See* Merger Guidelines at § 3.3; *IQVIA*, 2024 WL 81232, at *49.

Tapestry claims that the Proposed Acquisition "will result in procompetitive efficiencies"
by revitalizing "the declining Michael Kors brand." Dkt. 91 at ¶¶ 10, 15. This claim is so vague
that it cannot possibly be verifiable, it is not merger specific, and it does not flow from an
increase in competition. Michael Kors is already in the process ██████████████████████

███████████████████████[157] In fact, █████████████████████████████████████

██████████████████[158] This project █████████████████████████████████████████

█████████[159]

In addition, Tapestry executives ████████████████████████████████████

████████████[160] Tapestry has represented publicly and ████████████████ that the Proposed

---

[155] PX5024 (Roe (Tapestry) Dep.) at 179:18-180:6, 186:9-186:22 ██████████████████████
███████████████████████████████████████████████████).

[156] PX5009 (Walsh (Capri) Dep.) at 49:10-16.

[157] PX5022 (Wilmotte (Capri) Dep.) at 88:16-22, 89:7-90:22; *see, e.g.,* PX2561 (Capri) at 001,
009-011.

[158] PX5022 (Wilmotte (Capri) Dep.) at 161:15-162:25, 163:1-164:1, 170:21-173:7.

[159] PX5044 (Parsons (Capri) Dep.) at 169:9-25 ("I think we can transform the brand with or
without the merger."); PX5011 (Kors (Capri) Dep.) at 134:22-135:11.

[160] PX5024 (Roe (Tapestry) Dep.) at 120:8-120:16; PX5041 (Ryan (Tapestry) Dep.) at 27:19-
28:1 (████████████████████████████████████████)

Acquisition will yield efficiencies of over $200 million.[161] Yet Tapestry's Chief Financial and

Operating Officer ███████████████████████████████████████████████████████

███████████████████████████████████[162] Similarly,

Tapestry's SVP of Finance testified that the efficiencies calculation was ███████████

███████████████████████████████████████████████████████████

██████████████[163] These estimates cannot satisfy Defendants' burden.

## II.    The Equities Support a Preliminary Injunction.

The second step in determining whether to grant preliminary relief is to "weigh the

equities in order to decide whether enjoining the merger would be in the public interest." *IQVIA*,

2024 WL 81232, at *51 (quoting *Penn State,* 838 F.3d at 352). "The prevailing view is that,

although private equities may be considered, they are not to be afforded great weight." *Id.* at *52

(quoting *Penn State*, 838 F.3d at 352). "In other words, where the FTC has demonstrated a

likelihood of ultimate success, 'a countershowing of private equities alone would not suffice to

justify denial of a preliminary injunction barring the merger.'" *Id.* (quoting *Penn State,* 838 F.3d

at 352). "The principal public equity weighing in favor of issuance of preliminary [] relief is the

public interest in effective enforcement of the antitrust laws." *Heinz,* 246 F.3d at 726. "If the

acquisition is allowed to proceed but is later found to be violative of the antitrust laws,

divestiture will be required. At best, divestiture is a slow, cumbersome, difficult, disruptive, and

complex remedy." *Lancaster Colony,* 434 F. Supp. at 1096; *accord IQVIA*, 2024 WL 81232, at

*52; *Heinz*, 246 F.3d at 726 ("Section 13(b) itself embodies congressional recognition of the fact

---

[161] PX1765 (Tapestry) at 004-005; PX5024 (Roe (Tapestry) Dep.) at 113:11-17; PX1726
(Tapestry) at 165; PX5041 (Ryan (Tapestry) Dep.) at 54:7-12.
[162] PX5024 (Roe (Tapestry) Dep.) at 121:4-121:20, 122:21-123:11, 135:4-136:4 (████████████
██████████████)
[163] PX5041 (Ryan (Tapestry) Dep.) at 14:1-12, 43:21-44:8, 51:7-23, 64:8-18, 66:4-15.

that divestiture is an inadequate and unsatisfactory remedy in a merger case."). As such, "no court has denied a Section 13(b) motion for a preliminary injunction based on the weight of the equities where the FTC has demonstrated a likelihood of success on the merits." *FTC v. Peabody Energy Corp.*, 492 F. Supp. 3d 865, 918 (E.D. Mo. 2020) (citation omitted).

The equities clearly support entry of a preliminary injunction pending resolution of the administrative proceeding. Without preliminary relief, Defendants will be permitted to close the Proposed Acquisition and begin integrating the two companies immediately. *Id.* (Commission may face the "daunting and potentially impossible task" of "unscrambling the eggs" if merger ultimately deemed unlawful (quoting *Sysco*, 113 F. Supp. 3d at 87)). The loss from the elimination of substantial head-to-head competition between Coach, Kate Spade, and Michael Kors will be difficult, if not impossible, to reverse should Defendants consummate the Proposed Acquisition. In contrast, Defendants cannot establish harm merely from waiting for the administrative process, with a hearing set to begin on September 25, 2024, to play out. There is "no reason why, if the merger makes economic sense now, it would not be equally sensible to consummate the merger following an FTC adjudication on the merits that finds the merger lawful." *Penn State*, 838 F.3d at 353.

## CONCLUSION

For the reasons described above, the FTC respectfully requests that the Court grant the FTC's Motion for a Preliminary Injunction.

35

Dated: August 6, 2024

Respectfully submitted,

*S/ Abby L. Dennis*
Abby L. Dennis (*pro hac*)
DC Bar No. 994476
Federal Trade Commission
600 Pennsylvania Avenue, N.W.
Washington, DC 20580
Phone: 202-326-2494
Email: adennis@ftc.gov

Peggy Bayer Femenella (DC Bar No. 472770) (*pro hac*)
Nicole Lindquist (DC Bar No. 975593) (*pro hac*)
Laura Antonini (CA Bar No. 271658) (*pro hac*)
Brandon Boxbaum (DC Bar No. 1615988) (*pro hac*)
Peter Colwell (DC Bar No. 100287) (*pro hac*)
Kassandra DiPietro (MN Bar No. 0403547) (*pro hac*)
Frances Anne Johnson (MD Bar – No Number) (*pro hac*)
Sarah Kerman (DC Bar No. 90017957) (*pro hac*)
Andrew Lowdon (DC Bar No. 230095) (*pro hac*)
Danielle Quinn (NY Bar No. 5408943)
Blake Risenmay (WA Bar No. 52888) (*pro hac*)
Edmund Saw (DC Bar No. 1658446) (*pro hac*)
Victoria Sims (DC Bar No. 1006974) (*pro hac*)
Timothy Singer (DC Bar No. 1048769) (*pro hac*)

*Counsel for Plaintiff Federal Trade Commission*