Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# FORM 10-K

**(Mark One)**

☒   **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended April 2, 2022**
**or**

☐   **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____
**Commission file number 001-35368**

## CAPRI
### HOLDINGS LIMITED

**(Exact Name of Registrant as Specified in Its Charter)**

| **British Virgin Islands** | **N/A** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**33 Kingsway**
**London, United Kingdom**
**WC2B 6UF**
(Address of Principal Executive Offices)
**Registrant's telephone number, including area code: 44 207 632 8600**
**Securities registered pursuant to Section 12(b) of the Act:**

| <u>Title of Each Class</u> | <u>Trading Symbol(s)</u> | <u>Name of Each Exchange on which Registered</u> |
|---|---|---|
| Ordinary Shares, no par value | CPRI | New York Stock Exchange |

**Securities registered pursuant to Section 12(g) of the Act: None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. ☒ Yes ☐ No

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. ☐ Yes ☒ No

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 ☒ Yes ☐ No during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of ☒ Yes ☐ No Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act. (Check one):

| | | | |
|---|---|---|---|
| Large accelerated filer | ☒ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☒

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). ☐ Yes ☒ No

The aggregate market value of the registrant's voting and non-voting ordinary shares held by non-affiliates of the registrant was $7,510,364,310 as of September 24, 2021, the last business day of the registrant's most recently completed second fiscal quarter based on the closing price of the ordinary shares on the New York Stock Exchange.

As of May 24, 2022, Capri Holdings Limited had 142,809,964 ordinary shares outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE**

The information required by Part III of this report, to the extent not set forth herein, is incorporated by reference from the Registrant's definitive Proxy Statement, which will be filed in June 2022, for the 2022 Annual Meeting of the Shareholders.

PX7096-002

Table of Contents

## TABLE OF CONTENTS

**Page**

### PART I

| | | |
|---|---|---|
| Item 1 | Business | 6 |
| Item 1A | Risk Factors | 18 |
| Item 1B | Unresolved Staff Comments | 34 |
| Item 2 | Properties | 34 |
| Item 3 | Legal Proceedings | 34 |
| Item 4 | Mine Safety Disclosures | 35 |

### PART II

| | | |
|---|---|---|
| Item 5 | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 36 |
| Item 6 | Selected Financial Data | 38 |
| Item 7 | Management's Discussion and Analysis of Financial Condition and Results of Operations | 40 |
| Item 7A | Quantitative and Qualitative Disclosures About Market Risk | 59 |
| Item 8 | Financial Statements and Supplementary Data | 61 |
| Item 9 | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 61 |
| Item 9A | Controls and Procedures | 61 |
| Item 9B | Other Information | 62 |

### PART III

| | | |
|---|---|---|
| Item 10 | Directors, Executive Officers and Corporate Governance | 63 |
| Item 11 | Executive Compensation | 63 |
| Item 12 | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 63 |
| Item 13 | Certain Relationships and Related Transactions and Director Independence | 63 |
| Item 14 | Principal Accounting Fees and Services | 63 |

### PART IV

| | | |
|---|---|---|
| Item 15 | Exhibits and Financial Statement Schedules | 64 |

2

PX7096-003

Table of Contents

## NOTE REGARDING FORWARD-LOOKING STATEMENTS

This Annual Report on Form 10-K, including documents incorporated herein by reference, contains statements which are, or may be deemed to be, "forward-looking statements." Forward-looking statements are prospective in nature and are not based on historical facts, but rather on current expectations and projections of the management of Capri Holdings Limited (the "Company") about future events. All statements other than statements of historical facts included in this Annual Report on Form 10-K, including documents incorporated herein by reference, may be forward-looking statements. Forward-looking statements include information concerning the Company's goals, future plans and strategies, including with respect to environmental, social and governance ("ESG") goals, initiatives and ambitions as well as the Company's possible or assumed future results of operations, including descriptions of its business strategy. Without limitation, any statements preceded or followed by or that include the words "plans", "believes", "expects", "intends", "will", "should", "could", "would", "may", "anticipates", "might" or similar words or phrases, are forward-looking statements. These forward-looking statements are not guarantees of future financial performance. Such forward-looking statements involve known and unknown risks and uncertainties that could significantly affect expected results and are based on certain key assumptions, which could cause actual results to differ materially from those projected or implied in any forward-looking statements. These risks, uncertainties and other factors include the impact of the COVID-19 pandemic, levels of cash flow and future availability of credit, compliance with restrictive covenants under the Company's credit agreement, the Company's ability to integrate successfully and to achieve anticipated benefits of any acquisition and to successfully execute our growth strategies; the risk of disruptions to the Company's businesses; risks associated with operating in international markets and our global sourcing activities, including disruptions or delays in manufacturing or shipments; the risk of cybersecurity threats and privacy of data security breaches; the negative effects of events on the market price of the Company's ordinary shares and its operating results; significant transaction costs; unknown liabilities; the risk of litigation and/or regulatory actions related to the Company's businesses; fluctuations in demand for the Company's products; levels of indebtedness (including the indebtedness incurred in connection with acquisitions); the timing and scope of future share repurchases, which may be made in open market or privately negotiated transactions, and are subject to market conditions, applicable legal requirements, trading restrictions under the Company's insider trading policy and other relevant factors, and which share repurchases may be suspended or discontinued at any time, the level of other investing activities and uses of cash; changes in consumer traffic and retail trends; high consumer debt levels, recession and inflationary pressures; loss of market share and industry competition; fluctuations in the capital markets; fluctuations in interest and exchange rates; the occurrence of unforeseen epidemics and pandemics, disasters or catastrophes; extreme weather conditions and natural disasters; political or economic instability in principal markets; adverse outcomes in litigation; and general, local and global economic, political, business and market conditions including acts of war and other geopolitical conflicts; as well as those risks set forth in the Company's filings with the U.S. Securities and Exchange Commission (the "SEC"), including in this Annual Report on Form 10-K, particularly under "Item 1A. Risk Factors" and in "Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations." The Company disclaims any obligation to update or revise any forward-looking statements contained herein other than in accordance with legal and regulatory obligations.

## SUMMARY OF RISKS AFFECTING OUR BUSINESS

Our business is subject to numerous risks. The following summary highlights some of the risks you should consider with respect to our business and prospects. This summary is not complete and the risks summarized below are not the only risks we face. You should review and consider carefully the risks and uncertainties described in more detail in this "Risk Factors" section of this Annual Report on Form 10-K which includes a more complete discussion of the risks summarized below as well as a discussion of other risks related to our business and an investment in our ordinary shares. Risks are listed in the categories where they primarily apply, but other categories may also apply.

Risks Related to Macroeconomic Conditions
- the COVID-19 pandemic may continue to have a material adverse effect on our business and results of operations;
- the accessories, footwear and apparel industries are heavily influenced by general macroeconomic cycles that affect consumer spending and a prolonged period of depressed consumer spending could have a material adverse effect on our business, results of operations and financial condition.

Risks Related to Our Business
- we face risks associated with operating globally and our strategy to continue to expand internationally;
- our business is subject to risks inherent in global sourcing activities, including disruptions or delays in manufacturing or shipments;
- our retail stores are heavily dependent on the ability and desire of consumers to travel and shop and a decline in consumer traffic could have a negative effect on our comparable store sales and store profitability resulting in

3

Table of Contents

impairment charges, which could have a material adverse effect on our business, results of operations and financial condition;

- recent changes in our executive management team, the departure of key employees or our failure to attract and retain qualified personnel could have a material adverse effect on our business;

- the long-term growth of our business depends on the successful execution of our strategic initiatives;

- if we are unable to effectively execute our e-commerce business and provide a reliable digital experience for our customers, our reputation and operating results may be harmed;

- we may not be able to respond to changing fashion and retail trends in a timely manner, which could have a material adverse effect on our brands, business, results of operations and financial condition;

- increased scrutiny from investors and others regarding our corporate social responsibility initiatives, including environmental, social and other matters of significance relating to sustainability, could result in additional costs or risks and adversely impact our reputation;

- our wholesale business could suffer as a result of consolidations, liquidations, restructurings and other ownership changes;

- acquisitions may not achieve intended benefits and may not be successfully integrated;

- the markets in which we operate are highly competitive, both within North America and internationally, and increased competition based on a number of factors could cause our profitability and/or gross margins to decline;

- our business is subject to risks associated with importing products, and the imposition of additional duties, tariffs or trade restrictions could have a material adverse effect on our business, results of operations and financial condition;

- we are subject to risks associated with leasing retail space subject to long-term and non-cancelable leases. We may be unable to renew leases at the end of their terms. If we close a leased retail space, we remain obligated under the applicable lease;

- we are dependent on a limited number of distribution facilities. If one or more of our distribution facilities experiences operational difficulties or becomes inoperable, it could have a material adverse effect on our business, results of operations and financial condition;

- fluctuations in our tax obligations and changes in tax laws, treaties and regulations may have a material adverse impact on our future effective tax rates and results of operations;

- our business is exposed to foreign currency exchange rate fluctuations;

- our current and future licensing and joint venture arrangements may not be successful and may make us susceptible to the actions of third parties over whom we have limited control;

- increases in the cost of raw materials could increase our production costs and cause our operating results and financial condition to suffer;

- we primarily use foreign manufacturing contractors and independent third-party agents to source our finished goods;

- as we outsource functions, we will become more dependent on the third parties performing these functions;

- our business is susceptible to the risks associated with climate change and other environmental impacts which could negatively affect our business and operations; and

- our industry is subject to significant pricing pressure caused by many factors which may cause our profitability and gross margins in the future to be materially lower than our expectations.

Risks Related to Information Technology and Data Security
- privacy breaches and other cyber security risks related to our business could negatively affect our reputation, credibility and business; and

- a material delay or disruption in our information technology systems or e-commerce websites or our failure or inability to upgrade our information technology systems precisely and efficiently could have a material adverse effect on our business, results of operations and financial condition.

Risks Related to Legal and Regulatory
- if we fail to comply with labor laws or collective bargaining agreements, or if our independent manufacturing contractors fail to use acceptable, ethical business practices, our business and reputation could suffer;

- we may be unable to protect our trademarks, copyrights and other intellectual property rights, and others may allege that we infringe upon their intellectual property rights;

- we self-insure certain risks and may be impacted by unfavorable claims experience; and

Table of Contents

- we are subject to various proceedings, lawsuits, disputes, and claims in the ordinary course of business which could have an adverse impact on our business, financial condition, and results of operations;

Risks Related to Our Debt
- we have incurred a substantial amount of indebtedness, which could adversely affect our financial condition and restrict our ability to incur additional indebtedness or engage in additional transactions; and
- we may be unable to meet financial covenants in our indebtedness agreements which could result in an event of default and restrictive covenants in such agreements may restrict our ability to pursue our business strategies.

Risks Related to Our Ordinary Shares
- our share price may periodically fluctuate based on the accuracy of our earnings guidance or other forward-looking statements regarding our financial performance;
- failure to maintain adequate financial and management processes and controls could lead to errors in our financial reporting, which could harm our business and cause a decline in the price of our ordinary shares;
- provisions in our organizational documents may delay or prevent our acquisition by a third party;
- rights of shareholders under British Virgin Islands law differ from those under United States law, and, accordingly, our shareholders may have fewer protections;
- the laws of the British Virgin Islands provide limited protection for minority shareholders, so minority shareholders will have limited or no recourse if they are dissatisfied with the conduct of our affairs;
- it may be difficult to enforce judgments against us or our executive officers and directors in jurisdictions outside the United States; and
- British Virgin Islands companies may not be able to initiate shareholder derivative actions, thereby depriving shareholders of one avenue to protect their interests.

5

Table of Contents

**PART I**

*Unless the context requires otherwise, references in this Annual Report on Form 10-K to "Capri", "we", "us", "our", "the Company", "our Company" and "our business" refer to Capri Holdings Limited and its consolidated subsidiaries. References to our stores, retail stores and retail segment include all of our full-price retail stores (including concessions), our e-commerce websites and outlet stores. The Company utilizes a 52 to 53 week fiscal year and the term "Fiscal Year" or "Fiscal" refers to that 52-week or 53-week period. The fiscal year ending on April 2, 2022 ("Fiscal 2022") contains 53 weeks and the fiscal years ending on March 27, 2021 and March 28, 2020 ("Fiscal 2021" and "Fiscal 2020", respectively) contain 52 weeks. The Company's Fiscal 2023 is a 52-week period ending April 1, 2023. Some differences in the numbers in the tables and text throughout this annual report may exist due to rounding.*

**Item 1. Business**

**Our Company**

Capri Holdings Limited ("Capri") is a global fashion luxury group, consisting of iconic brands that are industry leaders in design, style and craftsmanship, led by a world-class management team and renowned designers. Our brands cover the full spectrum of fashion luxury categories including women's and men's accessories, footwear and ready-to-wear as well as wearable technology, watches, jewelry, eyewear and a full line of fragrance products. Our goal is to continue to extend the global reach of our brands while ensuring that they maintain their independence and exclusive DNA.

**Our Brands**

**Versace**

Our Versace brand has long been recognized as one of the world's leading international fashion design houses and is synonymous with Italian glamour and style. Founded in 1978 in Milan, Versace is known for its iconic and unmistakable style and unparalleled craftsmanship. Over the past several decades, the House of Versace has grown globally from its roots in haute couture, expanding into the design, manufacturing, distribution and retailing of accessories, ready-to-wear, footwear, eyewear, watches, jewelry, fragrance and home furnishings businesses. Versace's design team is led by Donatella Versace, who has been the brand's Artistic Director for over 20 years. Versace distributes its products through a worldwide distribution network, which includes boutiques in some of the world's most glamorous cities, its e-commerce sites, as well as through the most prestigious department and specialty stores worldwide.

**Jimmy Choo**

Our Jimmy Choo brand offers a distinctive, glamorous and fashion-forward product range, enabling it to develop into a leading global luxury accessories brand, whose core product offering is women's luxury shoes, complemented by accessories, including handbags, small leather goods, jewelry, scarves and belts, as well as men's luxury shoes and accessory business. In addition, certain categories, such as fragrance and eyewear, are produced under licensing agreements. Jimmy Choo's design team is led by Sandra Choi, who has been the Creative Director for the brand since its inception in 1996. Jimmy Choo products are unique, instinctively seductive and chic. The brand offers classic and timeless luxury products, as well as innovative products that are intended to set and lead fashion trends. Jimmy Choo is represented through its global store network, its e-commerce sites, as well as through the most prestigious department and specialty stores worldwide.

**Michael Kors**

Our Michael Kors brand was launched over 40 years ago by Michael Kors, a world-renowned designer, whose vision has taken the Company from its beginnings as an American luxury sportswear house to a global accessories, footwear and ready-to-wear company with a global distribution network that has presence in over 100 countries through Company-operated retail stores and e-commerce sites, leading department stores, specialty stores and select licensing partners. Michael Kors is a highly recognized luxury fashion brand in the Americas and Europe with growing brand awareness in other international markets. Michael Kors features distinctive designs, materials and craftsmanship with a jet-set aesthetic that combines stylish elegance and a sporty attitude. Michael Kors offers three primary collections: the Michael Kors Collection luxury line, the MICHAEL Michael Kors accessible luxury line and the Michael Kors Mens line. The Michael Kors Collection establishes the aesthetic authority of the entire brand and is carried by select retail stores, our e-commerce sites, as well as in the finest luxury department stores in the world. MICHAEL Michael Kors has a strong focus on accessories, in addition to offering footwear and ready-to-wear, and addresses the significant demand opportunity in accessible luxury goods. We have also been developing our

6

Table of Contents

men's business in recognition of the significant opportunity afforded by the Michael Kors brand's established fashion authority and the expanding men's market. Taken together, our Michael Kors collections target a broad customer base while retaining our premium luxury image.

**Our Segments**

We operate in three reportable segments as follows:

- <u>Versace</u> — accounted for approximately 19% of our total revenue in Fiscal 2022 and includes worldwide sales of Versace products through 209 retail stores (including concessions) and e-commerce sites, through 803 wholesale doors (including multi-brand stores), as well as through product and geographic licensing arrangements.

- <u>Jimmy Choo</u> — accounted for approximately 11% of our total revenue in Fiscal 2022 and includes worldwide sales of Jimmy Choo products through 237 retail stores (including concessions) and e-commerce sites, through 446 wholesale doors (including multi-brand stores), as well as through product and geographic licensing arrangements.

- <u>Michael Kors</u> — accounted for approximately 70% of our total revenue in Fiscal 2022 and includes worldwide sales of Michael Kors products through 825 retail stores (including concessions) and e-commerce sites, through 2,742 wholesale doors, as well as through product and geographic licensing arrangements.

In addition to these reportable segments, we have certain corporate costs that are not directly attributable to our brands and, therefore, are not allocated to segments. Such costs primarily include certain administrative, corporate occupancy, shared service and information systems expenses, including Enterprise Resource Planning ("ERP") system implementation costs and Capri transformation program costs. In addition, certain other costs are not allocated to segments, including restructuring and other charges, impairment costs, COVID-19 related charges, charitable donations and the war in Ukraine. The segment structure is consistent with how our chief operating decision maker plans and allocates resources, manages the business and assesses performance. All intercompany revenues are eliminated in consolidation and are not reviewed when evaluating segment performance. For additional financial information regarding our segments and corporate unallocated expenses, see Note 19 to the accompanying consolidated financial statements for additional information.

**Industry**

We operate in the global personal luxury goods industry. Through 2019, the personal luxury goods market grew at a mid-single digit rate over the past 20 years, with more recent growth driven by stronger Chinese demand from both international and local consumers and demographic and socioeconomic shifts resulting in younger consumers purchasing more luxury goods. Then, in 2020, due to the impact of the COVID-19 crisis, the personal luxury goods market declined 22%. According to *Bain\**, the personal luxury goods market returned to 2019 levels in 2021, and the market is predicted to increase at a 10% compound annual growth rate between 2020 and 2025. Future growth will be driven by e-commerce, Chinese consumers and younger generations. By 2025, Bain studies estimate that approximately 30% of personal luxury goods sales will occur online, Chinese consumers will represent nearly half of total global personal luxury goods sales and Gen Z and Gen Y combined will make up at least two-thirds of the market. As the personal luxury goods market continues to evolve, Capri is committed to creating engaging luxury experiences globally. In our view, increased customer engagement and tailoring merchandise to customer shopping and communication preferences are key to growing market share. We believe that our innovative and luxurious product offerings and customer engagement initiatives across all three brands position us to capitalize on the continued growth of the global personal luxury goods industry.

\*     Bain – Altagamma Luxury Goods Worldwide Market Study, Fall 2021 (November 11, 2021). These studies were prepared by Bain & Company and Altagamma and can be obtained free of charge or at a nominal cost by contacting Bain & Company's media contacts at aliza.medina@bain.com or dan.pinkney@bain.com. While we believe that each of these studies and publications is reliable, we have not independently verified market and industry data from third-party sources.

**Geographic Information**

We generate revenue globally through our three reportable segments, as described above. We sell our Versace, Jimmy Choo and Michael Kors products through retail and wholesale channels in three principal geographic markets: the Americas (United States, Canada and Latin America), EMEA (Europe, Middle East and Africa) and Asia (Asia and Oceania). We also have wholesale arrangements pursuant to which we sell products to geographic licensees. In addition, we have licensing agreements through which we license to third parties the use of our Versace, Jimmy Choo and Michael Kors brand names and trademarks, certain production rights and sales and/or distribution rights with respect to our brands.

PX7096-008

Table of Contents

The following table details our revenue by segment and geographic location (in millions):

|  | Fiscal Years Ended | | |
|  | April 2, 2022 | March 27, 2021 | March 28, 2020 |
| --- | ---: | ---: | ---: |
| Versace revenue - the Americas | $ 408 | $ 201 | $ 186 |
| Versace revenue - EMEA | 425 | 276 | 420 |
| Versace revenue - Asia | 255 | 241 | 237 |
| **Total Versace revenue** | **1,088** | **718** | **843** |
| Jimmy Choo revenue - the Americas | 175 | 102 | 107 |
| Jimmy Choo revenue - EMEA | 229 | 146 | 282 |
| Jimmy Choo revenue - Asia | 209 | 170 | 166 |
| **Total Jimmy Choo revenue** | **613** | **418** | **555** |
| Michael Kors revenue - the Americas | 2,627 | 1,869 | 2,822 |
| Michael Kors revenue - EMEA | 835 | 607 | 821 |
| Michael Kors revenue - Asia | 491 | 448 | 510 |
| **Total Michael Kors revenue** | **3,953** | **2,924** | **4,153** |
|  |  |  |  |
| Total revenue - the Americas | 3,210 | 2,172 | 3,115 |
| Total revenue - EMEA | 1,489 | 1,029 | 1,523 |
| Total revenue - Asia | 955 | 859 | 913 |
| **Total revenue** | **$ 5,654** | **$ 4,060** | **$ 5,551** |

## Competitive Strengths

We believe that the following strengths differentiate us from our competitors:

**Global Fashion Luxury Group Led by a World-Class Management Team and Renowned Designers**. We are a global fashion luxury group, consisting of three iconic brands defined by fashion luxury products with a reputation for world-class design and innovation. The design leadership of our founder-designers Donatella Versace, Sandra Choi and Michael Kors is a unique advantage that we possess. Our founder-led design teams are supported by our senior management team with extensive experience across a broad range of disciplines in the retail industry, including design, sales, marketing, public relations, merchandising, real estate, supply chain and finance. With an average of 25 years of experience in the retail industry, including at a number of public companies, and an average of 19 years experience with our brands, our senior management team has strong creative and operational experience and a successful track record.

For over 20 years, Donatella Versace has been the Artistic Director, molding Versace's iconic style. A true visionary with an intuition for how to blend fashion, design and culture, Donatella continues to honor the rich and storied Versace heritage founded in 1978, while constantly evolving and adapting the luxury house to ensure the brand's continued relevance. Donatella's most recent collections for Versace are a testament to her bold and fearless design vision that celebrate Versace's Italian heritage and unapologetic glamour. Versace designs have been worn by the world's most famous celebrities and most sought-after super models.

Jimmy Choo's design team is led by Sandra Choi, who has been the Creative Director for the Jimmy Choo brand since its inception in 1996. Jimmy Choo products are glamourous and daring. The Jimmy Choo brand offers classic and timeless luxury products, as well as innovative products that are intended to set and lead fashion trends. Jimmy Choo's products have a strong red carpet presence and are often worn by global celebrities.

The Michael Kors brand was launched over 40 years ago by Michael Kors, a world-renowned designer, who is responsible for conceptualizing and directing the design of our Michael Kors brand products. We believe that the Michael Kors brand name has become synonymous with luxurious fashion that is timeless and elegant, expressed through the brand's sophisticated accessories and ready-to-wear collections. Each of our Michael Kors brand collections exemplifies the jet-set lifestyle and features high quality designs, materials and craftsmanship. Michael Kors has received a number of awards, which

PX7096-009

Table of Contents

recognize the contribution he and his team have made to the fashion industry and our Company. Some of the most widely recognized global trendsetters and celebrities wear our Michael Kors brand collections.

**Expertise in the Accessories Category.** We have strong group expertise in accessories. The strength of our Michael Kors luxury collection and our accessible luxury MICHAEL Michael Kors line have allowed us to expand our brand awareness and position Michael Kors as one of the leading global luxury brands in the accessories product categories. Capitalizing on the success of our accessories product category, we continue to further develop the accessories businesses for Jimmy Choo and Versace, bringing our accessories expertise, including our product category knowledge, our merchandising best practices and our substantial group buying power to these brands. Our goal is to increase Versace's women's and men's accessories penetration from 20% of revenues in Fiscal 2022 to 50% of Versace's revenues over time and to increase Jimmy Choo's women's accessories penetration from approximately 20% of revenues in Fiscal 2022 to 30% of Jimmy Choo's revenues over the next few years and to 50% over time.

**Exceptional Retail Store Footprint.** Versace operates in three primary retail formats: boutiques, outlet and e-commerce. We operated 209 Versace retail stores as of April 2, 2022 in some of the most fashionable cities and the most sought-after shopping destinations around the world. During Fiscal 2022, we completed renovations at approximately 50% of our Versace retail stores to incorporate our new store design and will continue with these renovations in Fiscal 2023. Versace's products are distributed worldwide through a global network of highly specialized stores, which average approximately 1,800 square feet. In addition, we operate Versace e-commerce sites in the United States, certain parts of Europe and China (covering 85 countries worldwide).

We operated 237 Jimmy Choo retail stores as of April 2, 2022, in some of the most premier locations worldwide. Jimmy Choo retail stores, comprised of full-price stores and outlets, average approximately 1,400 square feet. In addition, we operate Jimmy Choo e-commerce sites in the United States, certain parts of Europe, Japan and China.

We operated 825 Michael Kors stores as of April 2, 2022 with four primary retail store formats: collection stores, lifestyle stores, outlet stores and e-commerce sites. Michael Kors collection stores are located in some of the world's most prestigious shopping areas and average approximately 2,900 square feet in size. The Michael Kors lifestyle stores are located in some of the world's most frequented metropolitan shopping locations and leading regional shopping centers, and average approximately 2,700 square feet in size. We also extend our reach to additional consumer groups through our outlet stores, which average approximately 4,400 square feet in size. In addition, we also operate Michael Kors e-commerce sites in North America, China, Japan, South Korea, certain parts of Europe, the Middle East, Africa and Oceania.

**World-class Omni and CRM Capabilities.** We have omni-channel capabilities from best-in-class digital platforms to state-of-the-art distribution facilities globally, which we leverage across businesses. As part of our plan to continue to implement omni-channel capabilities throughout our businesses, we have begun leveraging our distribution centers globally to serve multiple brands.

**Strong Relationships with Premier Department Stores.** We partner with leading wholesale customers, such as Macy's, Saks Fifth Avenue, Bloomingdale's and Holt Renfrew in North America, as well as Harrods, Harvey Nichols, Printemps, Selfridges and Galeries Lafayette in Europe. These relationships enable us to access large numbers of our key consumers in a targeted manner. Our "shop-in-shops" have specially trained staff, as well as customized fixtures, wall casings, decorative items, flooring and provide department store consumers with a more personalized shopping experience than traditional retail department store configurations. We have engaged with our wholesale customers on various initiatives and have continued to enter into supply chain partnerships designed to increase the speed at which our luxury fashion products reach the ultimate consumer. We plan to increase Versace's and Jimmy Choo's presence in certain luxury department stores, and for Michael Kors, we continue to optimize deliveries with the intent to drive more full-price sell-through in the wholesale channel.

## Business Strategy

Our goal is to continue to create long-term shareholder value by increasing our revenue and profits and strengthening our global brands. We also believe that sound environmental and social policies are both ethically correct and fiscally responsible. To that end, we are committed to improving the way we work in order to better the world in which we live. We plan to achieve our business strategy by focusing on the following strategic initiatives:

**Leverage group expertise and capabilities.** We will continue to leverage our group expertise in accessories and footwear to fuel growth across our portfolio of brands, implementing the best practices from our Michael Kors core accessories business to our Versace and Jimmy Choo brands. We will also continue to prioritize the development of our e-commerce

PX7096-010

Table of Contents

platforms and omni-channel capabilities for our brands, leveraging our broad expertise and capabilities in this area. We see a number of opportunities to create long-term operational synergies as we combine our global competencies and footprint. These synergies will be primarily focused on opportunities in our supply chain, information systems, back office support and manufacturing.

**Continue to increase our presence in Asia.** We plan to continue to diversify our group's global footprint with an emphasis on the Asia market, where we believe each of our three brands continue to have the potential to significantly grow market share in the region.

**Integrate Versace and continue to build on the brand's luxury image.** We plan to grow the Versace business to at least $2 billion in revenues over time. To achieve this goal, we plan to build on Versace's iconic brand codes - Virtus, La Medusa and La Greca. Additionally, we will capitalize on Versace's high brand awareness through bold and engaging consumer communication. We also plan to expand and elevate Versace's distribution by accelerating e-commerce and omni-channel capabilities, increasing our global retail footprint to 300 retail stores and continuing to renovate the remainder of the store fleet. Finally, we plan to leverage our group's expertise to expand Versace's women's and men's accessories to 50% of the brand's revenues over time, while maintaining Versace's authoritative presence in women's and men's ready-to-wear.

**Continue to execute on our strategies to grow the Jimmy Choo brand.** We plan to continue to implement our growth strategies for Jimmy Choo with a goal of reaching $1 billion in revenues over time. Our overarching strategy is rooted in reinforcing the brand's glamorous DNA through consumer experience and communications, as well as through product – from formal to casual, across accessories and footwear. Additionally, we plan to expand Jimmy Choo's distribution by accelerating e-commerce and omni-channel developments and increasing our global retail footprint to 300 retail stores in the most fashionable shopping destinations around the world. We also have a significant opportunity to increase women's accessories to approximately 50% of Jimmy Choo's revenue over time by expanding the breadth of new collections. At the same time, we plan to continue to grow footwear sales by capitalizing on the success of glamour while expanding our fashion active and casual offerings.

**Continue to leverage the strength of our Michael Kors brand, which remains the foundation for our fashion luxury group.** Our goal is to continue to elevate Michael Kors to become a stronger and more profitable brand. We are capitalizing on high brand awareness and consumer engagement by embracing Michael Kors jet set heritage through a modern lens. Expanding our highly recognizable Signature pattern across all product categories remains a core growth strategy and our goal is to increase penetration to approximately 50% of our overall product assortments. In accessories, we continue to refresh and celebrate brand icons while evolving Signature styles with newness. Additionally, we plan to grow our men's business by leading with accessories and maximizing our Signature brand codes. Our strategy to enhance customer experience by expanding our omni-channel capabilities also remains a key priority. Finally, we plan to double Michael Kors revenue in Asia over time.

**Execute on our corporate social responsibility strategy.** We believe that the success of our company is directly linked to the sustainability of the world around us. In April 2020, we shared Capri's group-wide, global corporate social responsibility (CSR) strategy, set around the environmental and social sustainability opportunities and challenges most important to our company and its stakeholders. Within each of our strategy's three foundational pillars – Our World, Our Community, Our Philanthropy – are key CSR focus areas that guide our work in support of the United Nations Sustainable Development Goals (SDGs). Over the past year, we continued to improve the way we work in order to better the world in which we live. Our key sustainability goals, our plans for getting there, and an update on the progress we have made can be found in our annual CSR report located at www.capriholdings.com/responsibility. The content on this website and the content in our CSR reports are not incorporated by reference into this Annual Report on Form 10-K or in any other report or document we file with the SEC.

PX7096-011

Table of Contents

## Collections and Products

Our total revenue by major product category is as follows (in millions):

| | | Fiscal Years Ended | | | | |
| | April 2, 2022 | % of Total | March 27, 2021 | % of Total | March 28, 2020 | % of Total |
|---|---|---|---|---|---|---|
| Accessories | $ 2,901 | 51.3% | $ 2,158 | 53.2% | $ 2,933 | 52.8% |
| Footwear | 1,208 | 21.4% | 796 | 19.6% | 1,100 | 19.8% |
| Apparel | 1,027 | 18.2% | 720 | 17.7% | 1,069 | 19.3% |
| Licensed product | 241 | 4.3% | 185 | 4.6% | 222 | 4.0% |
| Licensing revenue | 212 | 3.7% | 155 | 3.8% | 201 | 3.6% |
| Other | 65 | 1.1% | 46 | 1.1% | 26 | 0.5% |
| Total revenue | $ 5,654 | | $ 4,060 | | $ 5,551 | |

### Versace

Versace is one of the leading international fashion design houses, representing the brand's creative vision through a wide range of products. From haute-couture, to ready-to-wear, footwear, accessories and home decor, Versace delivers a unique lifestyle that welcomes customers in its elegant yet glamorous universe. Generally, Versace's haute couture retails up to $250,000, ready-to-wear retails from $220 to $17,000, accessories retail from $55 to $3,900 and footwear retails from $300 to $4,100.

Certain product categories, such as Versace Jeans Couture, eyewear, fragrances, jewelry, watches and home furnishings, are produced under product licensing agreements. Swinger SA is the exclusive licensee for Versace Jeans Couture, Luxottica is the exclusive licensee for Versace eyewear, EuroItalia is the exclusive licensee for Versace fragrances, Vertime is the exclusive licensee for Versace watches and Poltrona Frau is the exclusive licensee for Versace home furnishings. Generally, Versace Jeans Couture retail from $45 to $2,000, Versace eyewear retails from $240 to $500, Versace fragrances retail from $50 to $400, Versace watches retail from $480 to $3,500 and Versace home furnishings, which include a variety of products, generally retails from $990 to $100,000.

### Jimmy Choo

Jimmy Choo is a leading global luxury accessories brand and offers a distinctive, glamorous and fashion-forward product range, whose core product offerings are women's luxury shoes, complemented by accessories, including handbags, small leather goods, jewelry, scarves and belts, as well as a men's luxury shoes and accessories business. Generally, Jimmy Choo women's and men's luxury shoes retail from $400 to $5,500 and accessories retail from $200 to $4,500.

Certain product categories, such as Jimmy Choo fragrance and eyewear, are produced under product licensing agreements. Interparfums SA is the exclusive licensee for Jimmy Choo fragrances and Safilo SpA is the exclusive licensee for Jimmy Choo eyewear. Generally, Jimmy Choo eyewear retails from $200 to $550 and Jimmy Choo fragrances retail from $80 to $220.

### Michael Kors

Michael Kors has three primary collections that offer accessories, footwear and apparel: Michael Kors Collection, MICHAEL Michael Kors and Michael Kors Mens. The three primary collections and licensed products are offered through our own Michael Kors retail stores and e-commerce businesses, in department stores around the world and by our exclusive licensees to wholesale customers in addition to select retailers. The Michael Kors Collection is a sophisticated designer collection for women based on a philosophy of essential luxury and pragmatic glamour and includes accessories, primarily handbags and small leather goods, ready-to-wear and footwear. Generally, the Michael Kors Collection women's handbags and small leather goods retail from $300 to $6,000, footwear retails from $300 to $1,500 and ready-to-wear retails from $400 to $7,500. MICHAEL Michael Kors is the accessible luxury collection and offers women's accessories, primarily handbags and small leather goods, as well as footwear and apparel and is carried in all of the Michael Kors lifestyle stores and leading department stores around the world. MICHAEL Michael Kors offers handbags designed to meet the fashion and functional requirements of our broad and diverse consumer base. Generally, MICHAEL Michael Kors handbags retail from $200 to $750, small leather goods retail from $50 to $250, footwear retails from $50 to $300 and apparel retails from $75 to $700. Michael Kors Mens is an innovative collection of men's ready-to-wear, accessories and footwear with a modern American style.

11

Table of Contents

Michael Kors Mens apparel generally retails from $50 to $1,000, men's accessories generally retail from $50 to $800 and men's footwear generally retails from $150 to $400.

Certain product categories, including watches, jewelry, eyewear and fragrance, are produced under product licensing agreements. Fossil is our exclusive licensee for Michael Kors watches and jewelry, including our Michael Kors ACCESS smartwatches and our fine jewelry line. Luxottica is our exclusive licensee for Michael Kors distinctive eyewear inspired by our collections. Estee Lauder has historically been Michael Kors exclusive women's and men's fragrance licensee. The Company is transitioning its fragrance business to EuroItalia during Fiscal 2023. Generally, Michael Kors fashion watches retail from $200 to $600, Michael Kors ACCESS smartwatches retail from $250 to $450, Michael Kors jewelry retails from $50 to $500, Michael Kors eyewear retails from $100 to $350 and Michael Kors fragrance and related products generally retail from $30 to $150.

**Advertising and Marketing**

Our marketing and advertising programs are designed to build brand awareness for each of our luxury houses as well as highlight our product offerings. We use a 360-degree marketing strategy for each of our brands to deliver a consistent message across each brand's advertising communications, social media, celebrity dressing, special events and direct marketing activities at a national, regional and local level. Our campaigns are increasingly being executed through digital and social media platforms to drive further engagement with younger consumers.

Our brands introduce their new collections annually with fashion shows and other fashion events. These fashion events, in addition to celebrity red carpet dressing moments, generate extensive domestic and international media and social media coverage. The Versace and Michael Kors semi-annual runway shows and Jimmy Choo celebrity placements generate extensive media coverage. Jimmy Choo is also the leading brand in editorial coverage for women's luxury shoes globally.

We believe our renowned brand founders, as well as our high-profile brand ambassadors and well-known social media influencers across our marketing programs help expand brand awareness and drive cultural relevance.

In Fiscal 2022, we recognized approximately $329 million in advertising and marketing expenses globally. We engage in a wide range of integrated marketing programs across various marketing channels, including but not limited to email marketing, print advertising, outdoor advertising, digital marketing, social media, public relations outreach, visual merchandising and partnership marketing, in an effort to engage our existing and potential customer base and ultimately stimulate sales in a consumer-preferred shopping venue.

Our growing e-commerce businesses provide us with an opportunity to increase the size of our customer database and to communicate with our consumers to increase online and physical store sales, as well as to continue to build global brand awareness for our brands. We are continuously improving the functionalities and features on our e-commerce sites to create innovative ways to keep our brands at the forefront of consumers' minds by offering a broad selection of products, including accessories, apparel and footwear. Since e-commerce growth is critical to our overall growth strategy, we plan to accelerate Versace's and Jimmy Choo's e-commerce and omni-channel development and we are also in the process of re-platforming our brands' e-commerce sites to expand our global capabilities. See Item 1A. "Risk Factors" — "If we are unable to effectively execute our e-commerce business and provide a reliable digital experience for our customers, our reputation and operating results may be harmed."

**Manufacturing and Sourcing**

We generally contract for the purchase of finished goods principally with independent third-party manufacturing contractors, whereby the manufacturing contractor is generally responsible for the entire manufacturing process, including the purchase of piece goods and trim for our Jimmy Choo and Michael Kors brands. For the Versace brand, some of the piece goods and trim are separately purchased by Versace and provided to the manufacturers, and some are sourced directly by the manufacturers, as further described below.

Versace has a centrally managed production model for the majority of its products, and buys raw materials and components for these products. All raw materials arrive in a central warehouse in Novara, Italy and are distributed to independent third-party manufacturing contractors after the quality control process is complete. The vast majority of Versace's production is located in Italy. The remaining production occurs elsewhere in Europe and a small portion is produced in Asia or North Africa.

PX7096-013

Table of Contents

Jimmy Choo products are manufactured by independent third-party manufacturing contractors and our Italian atelier and shoe manufacturer. Most of Jimmy Choo's products are produced by specialists in Italy, supported by other factories across Europe, with a small portion produced in Asia. Jimmy Choo has a product development facility in Florence. In addition to purchasing finished goods, Jimmy Choo also purchases raw materials for both product development and manufacturing purposes.

Michael Kors contracts for the purchase of finished goods principally with independent third-party manufacturing contractors that are generally responsible for the entire manufacturing process, including the purchase of piece goods and trim. Product manufacturing for the Michael Kors brand is allocated among third-party manufacturing contractors based on their capabilities, the availability of production capacity, pricing and delivery. For certain product categories, Michael Kors also has relationships with various agents who source finished goods with numerous manufacturing contractors on its behalf. This multi-supplier strategy provides specialized skills, scalability, flexibility and speed to market, as well as diversifies risk. In Fiscal 2022 and Fiscal 2021, one third-party buying agent sourced approximately 24% of Michael Kors finished goods purchases, based on unit volume. Michael Kors' largest manufacturing contractor, who produces its products in Asia and who Michael Kors has worked with for approximately 20 years, accounted for the production of approximately 17% of its finished products, based on dollar volume in Fiscal 2022. Nearly all of our Michael Kors products were produced in Asia in Fiscal 2022.

The manufacturing contractors for our brands operate under the close supervision of our global manufacturing divisions and buying agents located in North America, Europe and Asia. All products are produced according to our specifications. Production staff monitors manufacturing at supplier facilities in order to correct problems prior to shipment of the final product. Quality assurance is focused on as early as possible in the production process, allowing merchandise to be received at the distribution facilities and shipped to customers with minimal interruption. See "Import Restrictions and Other Governmental Regulations" and Item 1A. "Risk Factors" — "We primarily use foreign manufacturing contractors and independent third-party agents to source our finished goods, which poses legal, regulatory, political and economic risks to our business operations."

Our future manufacturing and sourcing strategy includes purchasing luxury manufacturing facilities in Italy to support all of our brands, pursuing manufacturing synergies across brands and securing capacity and improving our expertise in development and delivery. While the fashion design process will remain independently managed by each of our brands, we believe that in-sourcing luxury manufacturing capacity will create synergies and support expansion for our global fashion luxury group.

**Distribution**

Versace owns a central warehouse in Novara, Italy, managed by a third party, which acts as a global hub for Versace's primary operations. Versace also has a leased warehouse near Novara operated by the same third party, which serves as a distribution point for other Versace lines. From these warehouses, products are shipped to regional warehouses that are operated by third parties in New Jersey, Hong Kong, Mainland China and Japan, and supports the Versace retail and e-commerce businesses. E-commerce distribution for the United States market is conducted through third party providers in New Jersey. Versace's wholesale business is mainly serviced from three central warehouses located in Italy, the United States and Japan.

Jimmy Choo's primary distribution facility is our Company-owned and operated distribution facility in the Netherlands. From there, products are shipped to regional warehouses in the United States, Canada, Mainland China, Hong Kong, South Korea, Japan and United Arab Emirates, largely supporting the Jimmy Choo retail and e-commerce businesses. Shipments to wholesale customers globally are made from the Netherlands and the United States, with some further local fulfillment. All of the distribution facilities utilized by Jimmy Choo are operated by third parties and are shared with other unaffiliated businesses with the exception of our distribution facility in the Netherlands. This flexible method reinforces the speed and efficiency of the supply chain and allows the business to deliver Jimmy Choo product and collections to market rapidly and in line with the industry's fashion calendar.

Michael Kors primary distribution facility in the United States is a leased facility in Whittier, California, which is directly operated and services our Michael Kors retail stores, e-commerce site and wholesale operations in the United States. We also engage in omni-channel order fulfillment by filling online orders through our Michael Kors retail stores and through our click-and-collect service offerings. Our primary Michael Kors distribution facility in Europe is our Company-owned and operated distribution facility in the Netherlands, which supports our European operations for our Michael Kors brand, including our European e-commerce sites. We also have a regional Michael Kors distribution center in Canada, which is leased, as well as regional Michael Kors distribution centers in New Jersey, Mainland China, Hong Kong, Japan, South Korea and Taiwan, which are operated by third-parties.

13

PX7096-014

Table of Contents

**Intellectual Property**

We own VERSACE, JIMMY CHOO and MICHAEL KORS trademarks, as well as other material trademarks, copyrights, design and patent rights related to the production, marketing and distribution of our products, both in the United States and in other countries in which our products are principally sold. We also have applications pending for a variety of related trademarks, copyrights, designs and patents in various countries throughout the world. As the worldwide usage of our material trademarks, copyrights, designs and patents continue to expand, we continue to strategically apply to register them in key countries where they are used. We expect that our material intellectual property will remain in full force and effect for as long as we continue to use and renew them.

We aggressively police our intellectual property and pursue infringers both domestically and internationally. In addition, we pursue counterfeiters in the United States, Europe, the Middle East, Asia and elsewhere in the world in both online and offline channels, working with our network of customs authorities, law enforcement, legal representatives and brand specialists around the world as well as involvement with industry associations and anti-counterfeiting organizations.

**Information Systems**

Each of our three brands currently operates using their legacy systems for finance and accounting, supply chain, inventory control, point-of-sale transactions, store replenishment and other functions. Our long-term strategy includes consolidating certain systems across our brands over time to create operational efficiencies. During Fiscal 2020, we embarked on a multi-year ERP implementation to conform various processes onto one global system that would support certain finance, accounting and operational functions. The implementation of the ERP requires a significant investment in human and financial resources. As a result of COVID-19 and our need to significantly reduce our capital expenditures in order to protect our liquidity and cash flows, we temporarily suspended our ERP project. Certain phases of the project have resumed as of the fourth quarter of Fiscal 2021 and a portion of the system will go live in Fiscal 2023. See Item 1A. "Risk Factors" — "A material delay or disruption in our information technology systems or e-commerce websites or our failure or inability to upgrade our information technology systems precisely and efficiently could have a material adverse effect on our business, results of operations and financial condition."

**Human Capital Management**

At Capri Holdings, we strive to create workplaces where our employees and the workers across our supply chain thrive. Through our benefits packages, learning and development programs, focus on diversity and inclusion, wellness programs and supply chain empowerment initiatives, we continue to make significant investments in our Capri community.

**Governance and Oversight.** Our Board of Directors has delegated oversight of matters relating to human capital management, including compensation, learning and development and diversity and inclusion to our Compensation and Talent Committee. Our Compensation and Talent Committee receives regular updates on our talent development strategies and other applicable areas of human capital management.

**Employee Profile.** At the end of Fiscal 2022, 2021 and 2020, we had approximately 14,600, 13,800 and 17,000 total employees, respectively. As of April 2, 2022, we had approximately 9,700 full-time employees and approximately 4,900 part-time employees. Approximately 11,000 of our employees were engaged in retail selling and administrative positions and our remaining employees were engaged in other aspects of our business as of April 2, 2022. As of April 2, 2022, we have approximately 2,600 employees covered by collective bargaining agreements in certain European countries. We consider our relations with both our union and non-union employees to be good.

**Benefits and Compensation.** We maintain comprehensive benefits and compensation packages to attract, retain and recognize our employees. Our health and welfare benefit program is designed to provide a wide range of benefits to meet the health care, financial, work/life and mental wellbeing needs of eligible employees. Benefits include, among others, medical, dental and vision plans, life insurance, short and long-term disability coverage, retirement plans (with matching contributions where applicable), paid parental leave for all parents, gender reassignment coverage and fertility support benefits in the United States, and a wellness program focused on mental wellbeing, including several digital therapeutic programs to assist with therapy, anxiety and worry and sleep. We also offer employees paid time off, including to volunteer with select charitable organizations, to get the COVID-19 vaccine and to quarantine in accordance with government or health organization recommended quarantine guidelines (in addition to any COVID-19 mandated paid sick leave at the federal, state, or local level). Employees are also entitled to discounts on our merchandise.

PX7096-015

Table of Contents

**Learning and Development.** We honor our employees through our dedication to development. In 2022, we launched a new leadership development program for our mid-level management centered around the facets of Emotional Intelligence, to help our employees succeed in our changed and everchanging global environment. Additionally, we have implemented a new Learning Management System (LMS), which has allowed us to extend access to development resources to an even broader employee population. Dating back to the program's inception in 2015, a majority of our senior leaders have participated in an executive leadership development program offered in partnership with the Center for Creative Leadership, and more than 800 of our people managers have participated in leadership development programs. These programs are aimed at equipping our leaders with strategies to effectively navigate and drive change, and to build and strengthen cross-functional relationships. All full-time employees also participate in a formal performance review process annually, and receive annual trainings on important topics including compliance, ethics and integrity, respect in the workplace and information security as a part of our efforts to maintain a safe, positive and inclusive work environment.

To build on the diversity and inclusion trainings that we implemented in Fiscal 2021 to address unconscious bias, microaggressions and workplace diversity, sensitivity, and inclusion, in Fiscal 2022 we added Diversity & Inclusion training workshops for our senior leaders to attend live with peers across all functions of the organization.

**Diversity and Inclusion.** Diversity and inclusion are embedded in our DNA. We foster an inclusive environment where employees, vendors and customers of diverse backgrounds are respected, valued and celebrated. We are proud of our commitment to diversity, equality and inclusion, and will continue to advance these principles through meaningful short and long term actions across the globe. Our commitment to diversity and inclusion is supported by three pillars:

*Capri Culture* - Our commitment to diversity extends beyond representation. We aim to build an inclusive space where all employees have the opportunity to realize their full potential and excel, while contributing to our success in a meaningful way.

*Capri Talent* - Differences in ideas and experiences allow our Company to thrive. We are attracting, advancing and advocating for a workforce that reflects the diversity of the world around us.

*Capri Community* - Through diversity and inclusion comes understanding and strength. Our responsibility to promote equality is not just to those who work with us, but to our industry, the customers we serve and the communities around us.

In Fiscal 2022, we continued our commitment to fostering a diverse and inclusive workplace. We launched our Ambassador Program with 43 active members. Our Diversity and Inclusion ("D&I") ambassadors act as additional D&I champions that will help communicate, promote, and cascade D&I goals and initiatives to our Capri Community. In addition, we submitted data to the Human Rights Campaign's Corporate Equality Index, a United States benchmarking tool measuring policies, practices and benefits pertinent to LGBTQ+ employees, and scored an 90 out of 100 earning a Best Place to Work for LGBTQ+ Equality designation. We also signed the Black In Fashion Council's pledge to raise the percentage of Black employees in executive- and junior-level positions within our organization. Capri is also proud to partner with a wide array of organizations and pledges in furtherance of driving equality, including: The CEO Action for Diversity & Inclusion, Cristo Rey, Open To All, and Pride in Fashion. Finally, Capri launched its first employee resource group focused on the LGBTQ+ community within Capri, Pride@Capri.

Through The Capri Holdings Foundation for the Advancement in Diversity in Fashion, we are driving diversity, inclusion and equality throughout the fashion industry by working collaboratively with colleges and high schools to create meaningful opportunities in fashion for underrepresented communities. In Fiscal 2022, the Foundation announced an expansive new scholarship program in partnership with the Fashion Institute of Technology (FIT), Howard University, PENSOLE Academy and Central Saint Martins – University of the Arts London. Over the next four years, the Foundation will fund scholarships for nearly 100 students from historically underrepresented communities pursuing degrees in fashion and merchandising across these four educational institutions.

**Well-being and Safety.** Everyone working on behalf of our Company is entitled to work in a safe environment while maintaining their health and well-being. Capri's global safe workplace program, which includes employee traveler and emergency response alerts, raises awareness and provides safety resources tailored for workers in different work environments – from our distribution centers to our retail stores. In addition, as we continue to navigate the COVID-19 pandemic, we continue to prioritize the safety of our employees and our customers and to do our part to help stop the spread within our communities. We enhanced health and safety protocols at our retail stores, distribution centers and corporate offices, adhered to social distancing measures and provided contact-free shopping opportunities when safe to do so. As the landscape of this pandemic evolves, we continue to adapt and enforce safety protocols at our retail stores, distribution centers and corporate offices. The COVID-19 pandemic also changed the way we work with many of our corporate employees working remotely

15

Table of Contents

during the pandemic. While we have welcomed employees back to work, we continue to explore flexible work options and have implemented a hybrid working environment. Beyond the threat COVID-19 has posed to physical health and the way we work, we also recognize the significant impact the pandemic has had on our employees' overall well-being. We have significantly expanded our *Thrive* global wellness program, designed to inspire employees to improve their physical, emotional, and financial well-being.

**Supply Chain Empowerment.** Our community extends beyond our direct employees and our corporate social responsibility program drives us toward greater engagement with our suppliers. We are dedicated to conducting our operations throughout the world on principles of ethical business practice and recognition of the dignity of workers. Through our Code of Conduct for Business Partners and Factory Social Compliance Program, we partner with our suppliers on important human rights, health and safety, environmental and compliance issues. Capri is also signatory to the UN Women's Empowerment Principles, and partnered with the Fashion Makes Change campaign to support the empowerment and education of women in the fashion supply chain.

## Competition

We face intense competition in the product lines and markets in which we operate from both existing and new competitors. Our products compete with other branded products within their product category. In varying degrees, depending on the product category involved, we compete on the basis of style, price, customer service, quality, brand prestige and recognition, among others. In our wholesale business, we compete with numerous manufacturers, importers and distributors of products like ours for the limited space available for product display. Moreover, the general availability of manufacturing contractors allows new entrants easy access to the markets in which we compete, which may increase the number of our competitors and adversely affect our competitive position and our business. We believe, however, that we have significant competitive advantages because of the recognition of our brands and the acceptance of our brands by consumers. See Item 1A. "Risk Factors" — "The markets in which we operate are highly competitive, both within North America and internationally, and increased competition based on a number of factors could cause our profitability and/or gross margins to decline."

## Seasonality

We experience certain effects of seasonality with respect to our business. We generally experience greater sales during our third fiscal quarter, primarily driven by holiday season sales, and the lowest sales during our first fiscal quarter.

## Import Restrictions and Other Governmental Regulations

Virtually all of our imported products are subject to duties which may impact the costs of such products. In addition, countries to which we ship our products may impose safeguard quotas to limit the quantity of products that may be imported. We utilize free trade agreements and other supply chain initiatives in order to maximize efficiencies and cost savings relating to product importation. For example, we have historically received benefits from duty-free imports on certain products from certain countries pursuant to the United States. Generalized System of Preferences ("GSP") program. The GSP program expired on December 31, 2020. If the GSP program is not renewed or otherwise made retroactive, we will continue to experience significant additional duties and our gross margin will continue to be negatively impacted. Additionally, we are subject to government regulations relating to importation activities, including related to United States. Customs and Border Protection ("CBP") withhold release orders. The imposition of taxes, duties and quotas, the withdrawal from or material modification to trade agreements and/or if CBP detains shipments of our goods pursuant to a withhold release order could have a material adverse effect on our business, results of operations and financial condition. If additional tariffs or trade restrictions are implemented by the United States or other countries, the cost of our products could increase which could adversely affect our results of operations and financial condition. Additionally, we are subject to government regulations relating to product labeling, testing and safety. We maintain a global customs and product compliance organization to help manage our import and related regulatory activity.

## Corporate Social Responsibility ("CSR")

In April 2020, we shared Capri's group-wide, global CSR strategy, set around the environmental and social sustainability opportunities and challenges most important to our company and its stakeholders relating to environmental sustainability and climate change, human rights, diversity and inclusion, and philanthropy. Our CSR strategy is divided into three foundational pillars:

- **Our World** – We believe that the success of our Company is directly linked to the sustainability of the world around us. Our brands strive to create the highest quality luxury products with longevity and sustainability in

PX7096-017

Table of Contents

mind. We endeavor to operate responsibly in order to lower our impact on the planet.

• **Our Community** – We believe we have a responsibility to those who work with us. Our Company strives to create inclusive workplaces where all of our employees are empowered and respected. We are committed to creating meaningful opportunities for our diverse Capri community to grow.

• **Our Philanthropy** – Giving back is embedded in Capri's culture. We are dedicated to supporting and driving positive change in the communities where we live and work.

Within each of our three foundational pillars are key CSR focus areas that guide our work in support of the United Nations Sustainable Development Goals (SDGs).

Our sustainability governance model includes a multi-level structure to ensure our Board of Directors, executive management team and business leaders across our brands are aligned on the most important ESG risks and opportunities for Capri. The Board has delegated oversight of ESG activities to the Governance, Nominating and CSR Committee. On at least an annual basis, our sustainability goals and action plans are presented to the Governance, Nominating and CSR Committee for review and approval, along with CSR progress updates which are presented quarterly.

Additional information can be found at www.capriholdings.com/responsibility. The content on this website and the content in our CSR reports are not incorporated by reference into this Annual Report on Form 10-K or in any other report or document we file with the SEC.

**Available Information**

Our investor website can be accessed at www.capriholdings.com. The content of our website is not incorporated by reference into this Annual Report on Form 10-K. Our Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q and Current Reports on Form 8-K filed with or furnished to the SEC pursuant to Section 13(a) or Section 15(d) of the Securities Exchange Act of 1934, as amended, are available free of charge on our website under the caption "Financials" and then "SEC Filings" promptly after we electronically file such materials with, or furnish such materials to, the SEC. No information contained on our website is intended to be included as part of, or incorporated by reference into, this Annual Report on Form 10-K. Information relating to corporate governance at our Company, including our Corporate Governance Guidelines, our Code of Business Conduct and Ethics for all directors, officers, and employees, and information concerning our directors, Committees of the Board, including Committee charters, and transactions in Company securities by directors and executive officers, is available at our website under the captions "Governance" and "Financials" and then "SEC Filings." Paper copies of these filings and corporate governance documents are available to shareholders free of charge by written request to Investor Relations, Capri Holdings Limited, 33 Kingsway, London, United Kingdom, WC2B 6UF. Documents filed with the SEC are also available on the SEC's website at www.sec.gov.

17

PX7096-018

Table of Contents

### Item 1A. Risk Factors

You should carefully read this entire report, including, without limitation, the following risk factors and the section of this annual report entitled "Note Regarding Forward-Looking Statements." Any of the following factors could materially adversely affect our business, results of operations and financial condition. Additional risks and uncertainties not currently known to us or that we currently view as immaterial may also materially adversely affect our business, results of operations and financial condition. Risks are listed in the categories where they primarily apply, but other categories may also apply.

### Risks Related to Macroeconomic Conditions

***The COVID-19 pandemic may continue to have a material adverse effect on our business and results of operations.***

The ongoing COVID-19 pandemic has caused significant disruption to the global economy, consumer spending and behavior, tourism and to financial markets. While the overall COVID-19 situation appears to be improving, our business and operating results may be negatively impacted if the virus worsens or mutates, if vaccination efforts are unsuccessful and/or if regions or countries take further actions to contain the virus (including additional extended lock-downs and travel restrictions), among others. We continue to monitor the latest developments regarding the pandemic and have made certain assumptions about the pandemic for purposes of our business and operating results, including assumptions regarding the duration, severity and global macroeconomic impacts of the pandemic; however, the full extent of the impact of COVID-19 on our business and operating results will depend largely on future events outside of our control, including the duration and severity of the pandemic and the success of vaccination efforts, new information concerning the virus or variants of the virus, actions different states, regions or countries may take to contain the virus (including extended lock-downs and travel restrictions) and the economic impacts of the pandemic, including recent inflationary pressures, among others.

As a result of the COVID-19 pandemic, and in response to government orders and proactive decisions we have made to protect the health and safety of our employees, consumers and communities, at various points during the course of the pandemic, we temporarily closed almost all of our retail stores globally and furloughed all of our retail store employees in North America and many of our retail personnel elsewhere for an extended period of time. While most of our stores have reopened, we may face new, longer term store closure requirements and other operational restrictions with respect to some or all of our retail stores in the future. In addition, government restrictions and health and safety measures (including social distancing protocols) may prevent us from opening or limit our ability to fully operate in the ordinary course, which could materially impact our financial results. In addition, we have experienced scattered temporary store closings due to increased levels of retail associate absences and/or labor shortages. We also recently reopened our corporate offices and have implemented a hybrid work policy for many of our corporate employees and determined that some corporate functions may remain fully remote, which may also negatively affect productivity in, or otherwise result in disruptions to, parts of our business.

As a result of the impact of the ongoing COVID-19 pandemic, many of our wholesale customers have experienced, and may continue to experience, liquidity constraints or other financial difficulties, causing a reduction in the amount of merchandise purchased from us and our product licensing partners, an increase in order cancellations and/or the need to extend payment terms. Any or all of these measures could substantially reduce our revenue and have a material adverse effect on our profitability. In addition, these actions could lead to larger outstanding accounts receivable balances, delays in collection of accounts receivable, increased expenses associated with collection efforts, increases in credit losses and reduced cash flows.

Furthermore, the pandemic has impacted and continues to impact our supply chain partners, including factories that produce our product, the distribution centers that manage and ship our inventory, logistics providers and other service providers as well as the supply chains of our licensees. The current vessel container and other transportation shortages, labor shortages and port congestion globally, as well as disruptions in factory production in certain countries where we source our products has delayed, and is expected to continue to delay, inventory orders and impact product availability in our retail stores and through our e-commerce businesses as well as to our wholesale customers. As a result of these supply chain disruptions, our inventory levels and net revenue have been impacted and could continue to be impacted in future periods. We have also incurred, and expect to continue to incur, higher freight and other logistics costs, including increased carrier rates for ocean and air shipments, and the supply chain disruptions have caused us to increase our use of air freight with greater frequency than in the past. We are also experiencing negative impacts to the pricing of certain components of our products as a result of the ongoing COVID-19 pandemic. These higher costs have caused us to increase prices and we may need to increase prices further in the future. There can be no assurance that consumers will accept these price increases or that the price increases will be sufficient to offset our higher costs.

PX7096-019

Table of Contents

In addition, traffic to our retail stores (and department stores and other third-party retailers that sell our products) may be adversely affected by the ongoing COVID-19 pandemic. General macroeconomic conditions resulting from the COVID-19 pandemic, including impacts of a recession or inflationary pressures may negatively impact sales in our physical retail stores, through our e-commerce business and to third-party wholesale accounts. Any significant disruption in consumer traffic, consumer behavior and/or consumer spending at our retail stores, on our e-commerce sites and/or at third-party wholesale accounts following the pandemic would result in a decrease in sales and profits and otherwise materially impact our business and financial performance.

Any or all of the foregoing could have a material adverse effect on our business results and operations.

***The accessories, footwear and apparel industries are heavily influenced by general macroeconomic cycles that affect consumer spending and a prolonged period of depressed consumer spending could have a material adverse effect on our business, results of operations and financial condition.***

Our business is affected by global economic conditions and the related impact on levels of consumer spending worldwide. Factors that may negatively influence consumer spending include, but are not limited to, high levels of unemployment, pandemics (such as the ongoing COVID-19 pandemic), extreme weather conditions and natural disasters, high consumer debt levels, inflationary pressures, war and global geopolitical instability (including the current war in Ukraine and related economic and other sanctions levied by the United States, European Union and others), reductions in net worth based on market declines and uncertainty, home prices, fluctuating interest and foreign currency rates and credit availability, higher fuel and energy costs, fluctuating commodity prices, taxation, political conditions and general uncertainty regarding the overall future economic environment. Purchases of discretionary luxury items, such as the accessories, footwear and apparel that we produce, tend to decline when disposable income is lower or when there are recessions, inflationary pressures or other economic uncertainty. Reduced consumer confidence and adversely impacted consumer spending patterns due to deteriorating economic conditions or geopolitical instability in any of the regions in which we operate could reduce consumer confidence, negatively impact consumer spending patterns and adversely affect our sales and results of operations.

## Risks Related to Our Business

***We face risks associated with operating globally and our strategy to continue to expand internationally.***

We operate on a global basis, with approximately 47% of our total revenue from operations outside of the United States during Fiscal 2022. As a result, we are subject to the risks of doing business internationally, including:

- political or civil unrest, including protests and other civil disruption;
- unforeseen public health crises, such as pandemic and epidemic diseases, including the ongoing COVID-19 pandemic and any variants thereof;
- economic instability and unsettled regional and global conflicts (such as the current war in Ukraine), which may negatively affect consumer spending by foreign tourists and local consumers in the various regions where we operate;
- laws, regulations and policies of foreign governments (including sanctions and retaliatory actions by the United States, European Union and others);
- potential negative consequences from changes in taxation policies;
- natural disasters or other extreme weather events, including those attributed to climate change; and
- acts of terrorism, military actions or other conditions over which we have no control.

In addition, our current business strategies include pursuing selective international expansion in a number of countries around the world and through a number of channels. If our international expansion plans are unsuccessful, it could have a material adverse effect on our business, results of operations and financial condition. There are also some countries where we do not yet have significant operating experience, and in most of these countries we face established competitors with significantly more operating experience in those locations.

We also sell our products at varying retail price points based on geographic location that yield different gross profit margins and we achieve different operating profit margins, depending on geographic region, due to a variety of factors including product mix, store size, occupancy costs, labor costs and retail pricing. Changes in any one or more of these factors could result in lower revenues, increased costs, and negatively impact our business, results of operations and financial condition. Furthermore, consumer demand and behavior, as well as tastes and purchasing trends may differ in these countries

PX7096-020

Table of Contents

and, as a result, sales of our product may not be successful, or the gross margins on those sales may not be in line with those we currently anticipate.

There can be no assurance that any or all of these events will not have a material adverse effect on our business, results of operations and financial condition.

***Our business is subject to risks inherent in global sourcing activities, including disruptions or delays in manufacturing or shipments.***

As a company engaged in sourcing on a global scale, we are subject to the risks inherent in such activities, including, but not limited to:

- disease pandemics, epidemics and health-related concerns, including related to COVID-19 or variants thereof;
- political or labor instability, labor shortages (stemming from labor disputes or otherwise), or increases in costs of labor or production in countries where manufacturing contractors and suppliers are located;
- labor disputes or strikes at the location of the source of our goods and/or at ports of entry;
- disruptions, delays or reductions in shipments, including port delays and congestion, and/or capacity constraints on transportation of goods or at our factories due to COVID-19 or otherwise;
- significant increase in freight, shipping and other logistics costs, including as a result of disruptions at ports of entry;
- political or military conflict (such as the current war in Ukraine);
- heightened terrorism security concerns;
- a significant decrease in availability or an increase in the cost of raw materials or other limitations on our ability to use raw materials or goods produced in a country that is a major provider due to political, human rights, labor, environmental or other concerns;
- the migration and development of manufacturing contractors;
- product quality issues;
- imposition of regulations, quotas and safeguards relating to imports and our ability to adjust in a timely manner to changes in trade regulations;
- increases in the costs of fuel (including volatility in the price of oil), travel and transportation (including vessel and freight);
- imposition of duties, taxes and other charges on imports;
- significant fluctuation of the value of the United States dollar against foreign currencies;
- restrictions on transfers of funds out of countries where our foreign licensees are located;
- compliance by our independent manufacturers and suppliers with our Supplier Code of Conduct and other applicable compliance policies;
- compliance with United States laws regarding the identification and reporting on the use of "conflict minerals" sourced from the Democratic Republic of the Congo in the Company's products and the United States Foreign Corrupt Practices Act, U.K. Bribery Act and other global anti-corruption laws, as applicable; and
- regulation or prohibition of the transaction of business with specific individuals or entities and their affiliates or goods manufactured in certain regions, such as the listing of a person or entity as a SDN (Specially Designated Nationals and Blocked Persons) by the United States Department of the Treasury's Office of Foreign Assets Control and the issuance of withhold release orders by CBP.

Any of the foregoing could materially and adversely affect our ability to produce or deliver our products and, as a result, have a material adverse effect on our business, financial condition and results of operations.

***Our retail stores are heavily dependent on the ability and desire of consumers to travel and shop and a decline in consumer traffic could have a negative effect on our comparable store sales and store profitability resulting in impairment charges, which could have a material adverse effect on our business, results of operations and financial condition.***

Reduced travel resulting from economic conditions, fuel shortages, increased fuel prices, travel restrictions, travel concerns and other circumstances, including adverse weather conditions, disease pandemics (including COVID-19), epidemics and other health-related concerns, war, terrorist attacks or the perceived threat of war or terrorist attacks, or unsettled regional

PX7096-021

Table of Contents

and global conflicts (such as the current war in Ukraine) could have a material adverse effect on us, particularly if such events impact our customers' desire to travel to our retail stores.

In addition, other factors that could impact the success of our retail stores include: (i) the location of the mall or the location of a particular store within the mall; (ii) the other tenants occupying space at the mall; (iii) vacancies within the mall; (iv) stores and malls having to re-close due to personnel or customer illness or further government restrictions; (v) increased competition in areas where the malls are located; (vi) the amount of advertising and promotional dollars spent on attracting consumers to the malls; and (vii) a shift toward online shopping. A decline in consumer traffic could have a negative effect on our comparable store sales and/or average sales per square foot and store profitability. If our retail stores underperform due to declining consumer traffic or otherwise and our expected future cash flows of the related underlying retail store asset do not exceed such asset's carrying value, we may incur store impairment charges. A decline in future comparable store sales and/or store profitability or failure to meet market expectations or the occurrence of impairment charges relating to our retail store fleet could have a material adverse effect on our business, results of operations and financial condition.

***Recent changes in our executive management team, the departure of key employees or our failure to attract and retain qualified personnel could have a material adverse effect on our business.***

As we announced on March 7, 2022, Mr. Joshua Schulman, Chief Executive Officer of Michael Kors and expected successor Chief Executive Officer to Mr. John Idol at Capri Holdings, left the Company and Mr. Idol agreed to remain as Chairman and Chief Executive Officer. We depend on the services and management experience of executive officers who have substantial experience and expertise in our business as well as key employees involved in our design and marketing operations, including our creative officers for each of our brands, Ms. Donatella Versace, Ms. Sandra Choi and Mr. Michael Kors. Although we have entered into employment agreements with our executive officers and other key employees, we may not be able to retain the services of such individuals in the future, which may be disruptive to, or cause uncertainty in, our business and future strategic direction, particularly if we fail to ensure a smooth transition and effective transfer of knowledge. Any such disruption or uncertainty could generate a negative public perception and/or have a material adverse impact on our results of operations, financial condition, and the market price of our ordinary shares.

Competition for qualified personnel in the fashion industry is intense and turnover in the industry for retail associates is generally high and has only been exacerbated by the ongoing COVID-19 pandemic. Competitors may use aggressive tactics to recruit our employees. Our ability to attract, develop, motivate and retain employees is influenced by our ability to offer competitive compensation and benefits, employee morale, our reputation, recruitment by other employers, perceived internal opportunities, non-competition and non-solicitation agreements and macro unemployment rates. Additionally, our ability to meet our labor needs while also controlling costs is subject to external factors such as unemployment levels, prevailing wage rates, minimum wage legislation and overtime regulations. If we are unable to attract, develop, motivate and retain talented employees with the necessary skills and experience, or if changes to our organizational structure, operating results, or business model, including as a result of the ongoing COVID-19 pandemic, adversely affect morale, hiring and/or retention, we may not achieve our objectives and our results of operations could be adversely impacted.

***The long-term growth of our business depends on the successful execution of our strategic initiatives.***

As part of our long-term strategy, we intend to grow our market share and revenue through the following initiatives:

- trendsetting and innovative product offerings;
- increased brand engagement;
- optimizing customer experience;
- investing in technology; and
- expanding our global presence.

We also intend to support the growth of Versace and Jimmy Choo sales through retail store openings and further developing each brand's e-commerce and omni-channel presence, as well as expanding into the luxury accessories market. We cannot guarantee that we will be able to successfully execute on these strategic initiatives.

If we are unable to execute on our strategic initiatives, our business, results of operations and financial condition could be materially adversely affected.

PX7096-022

Table of Contents

***If we are unable to effectively execute our e-commerce business and provide a reliable digital experience for our customers, our reputation and operating results may be harmed.***

E-commerce is approximately 17% of our net revenues and has been our fastest growing business over the last several years, particularly in light of the ongoing COVID-19 pandemic. The success of our e-commerce business depends, in part, on third parties and factors over which we have limited control, including changing consumer preferences and buying trends relating to e-commerce usage, both domestically and abroad, and promotional or other advertising initiatives employed by our wholesale customers or other third parties on their e-commerce sites. Any failure on our part, or on the part of our third-party digital partners, to provide attractive, reliable, secure, efficient and user-friendly e-commerce platforms could negatively impact our consumers' shopping experience, resulting in reduced website traffic, reduced conversion, diminished loyalty to our brands and lost sales. In addition, if due to COVID-19, or otherwise, there is a change in consumer behavior such that customers shift to utilizing e-commerce more than, or even instead, of traditional brick-and-mortar stores, and we or our wholesale partners are unable to attract consumers who previously made in-store purchases to our digital commerce channels, our financial and operating results may be negatively affected.

The success of our business also depends on our ability to continue to develop and maintain a reliable digital experience for our customers. We strive to give our customers a seamless omni-channel experience both in stores and through digital technologies, such as computers, mobile phones, tablets and other devices. We also use social media to interact with our customers and enhance their shopping experience. Our inability to develop and continuously improve our digital brand engagement could negatively affect our ability to compete with other brands, which could adversely impact our business, results of operations and financial condition.

In addition, we must keep current with competitive technology trends, including the use of new or improved technology and services, creative user interfaces and other e-commerce marketing tools such as paid search and mobile applications, among others. Since e-commerce growth is critical to our overall growth strategy, we plan to accelerate Versace's and Jimmy Choo's e-commerce and omni-channel development and we are also in the process of re-platforming our brands' e-commerce sites to expand our global capabilities. Implementing new or improved digital systems, services or technologies, such as new or improved e-commerce platforms, may increase our costs, cause delays in or hinder our ability to continually deliver a reliable or seamless digital experience for our customers, or cause us not to succeed in increasing sales or attracting consumers. For example, it is possible that consumers may not sign up for our loyalty program at anticipated rates if they do not find the features and benefits compelling or if they are unable to seamlessly navigate the digital experience we offer, which, in turn, may cause us not to realize the benefits that we anticipate from these programs. Our failure to successfully respond to these risks and uncertainties might adversely affect the sales in our e-commerce business, as well as damage our reputation and brands.

Additionally, the success of our e-commerce business and the satisfaction of our consumers depend on their timely receipt of our products. The efficient flow of our products requires that our company-operated and third-party operated distribution facilities have adequate capacity to support the current level of e-commerce operations as well as any anticipated increased levels that may follow from the growth of our e-commerce business. The current vessel container and other transportation shortages, labor shortages and port congestion globally, as well as disruptions in factory production in certain countries where we source our products has delayed, and is expected to continue to delay, inventory orders and impact product availability in our channels, including our e-commerce sites, and have resulted in increased freight and logistics costs. As a result of these supply chain challenges, our inventory levels and net revenue have been impacted and could continue to be impacted in future periods. Continued shortages of inventory, disruptions or delays, significantly higher costs and longer lead times for distributing our products to our consumers could result in customer dissatisfaction, and any of these issues could have an adverse effect on our business and harm our reputation.

***We may not be able to respond to changing fashion and retail trends in a timely manner, which could have a material adverse effect on our brands, business, results of operations and financial condition.***

The accessories, footwear and apparel industries have historically been subject to rapidly changing fashion trends and consumer preferences. We believe that our success is largely dependent on the images of our brands and ability to anticipate and respond promptly to changing consumer demands and fashion trends in the design, styling, production, merchandising and pricing of products. Any misstep in product quality or design, executive leadership, customer services, unfavorable publicity or excessive product discounting could negatively affect the image or our brands with our customers. If we do not correctly gauge consumer needs and fashion trends and respond appropriately, consumers may not purchase our products and our brand names and the images of our brands may be impaired. Even if we react appropriately to changes in fashion trends and consumer preferences, consumers may consider our brands to be outdated or associate our brands with styles that are no longer popular or trend-setting. We have also recently begun to increase the price of our products. There can be no guarantee that consumers will

PX7096-023

Table of Contents

accept these price increases. Any of these outcomes could have a material adverse effect on our brands, business, results of operations and financial condition.

***Increased scrutiny from investors and others regarding our corporate social responsibility initiatives, including environmental, social and other matters of significance relating to sustainability, could result in additional costs or risks and adversely impact our reputation.***

Investor advocacy groups, certain institutional investors, investment funds, other market participants, shareholders and customers have increasingly focused on ESG or "sustainability" practices of companies. These parties have placed increased importance on the implications of the social cost of their investments. If our ESG practices do not meet investor or other industry stakeholder expectations and standards, which continue to evolve, our brand, reputation and customer and employee retention may be negatively impacted. Any sustainability report that we publish or other sustainability disclosure we make may include our policies and practices on a variety of social and ethical matters, including corporate governance, environmental compliance, employee health and safety practices, human capital management, product quality, supply chain management and workforce inclusion and diversity. It is possible that stakeholders may not be satisfied with our ESG practices or the speed of adoption. We could also incur additional costs and require additional resources to monitor, report and comply with various ESG practices and various legal, legislative and regulatory requirements. Also, our failure, or perceived failure, to meet the standards included in any sustainability disclosure could negatively impact our reputation, employee retention and the willingness of our customers and suppliers to do business with us.

***Our wholesale business could suffer as a result of consolidations, liquidations, restructurings and other ownership changes.***

As a result of the ongoing COVID-19 pandemic, many of our wholesale customers have experienced, and may continue to experience, liquidity constraints or other financial difficulties, causing a reduction in the amount of merchandise purchased from us and our product licensing partners, an increase in order cancellations and/or the need to extend payment terms. Any or all of these measures could substantially reduce our revenue and have a material adverse effect on our profitability. In addition, these actions could lead to larger outstanding accounts receivable balances, delays in collection of accounts receivable, increased expenses associated with collection efforts, increase in excess inventory, increases in credit losses and reduced cash flows.

The retail industry has experienced a great deal of consolidation and other ownership changes over the past several years and a number of wholesale accounts were forced to file bankruptcy or undergo restructurings due to the impact of COVID-19 on their business. We expect that the risk of consolidation, bankruptcy, restructurings or reorganizations by department stores and other retailers will continue to exist for the foreseeable future. This could result in store closings by our wholesale customers, which would decrease the number of stores carrying our products, while the remaining stores may purchase a smaller amount of our products and/or may reduce the retail floor space designated for our brands. In addition, such consolidation, bankruptcy or other changes with respect to our wholesale customers could decrease our opportunities in the market, increase our reliance on a smaller number of large wholesale customers and decrease our negotiating strength with our wholesale customers, which could have a material adverse effect on our business, results of operations and financial condition.

Additionally, certain of our wholesale customers, particularly those located in the United States, have become highly promotional and have aggressively marked down their merchandise. We expect that such markdowns may continue to be exacerbated because of the impact of COVID-19. Such promotional activity could negatively impact our business.

***Acquisitions may not achieve intended benefits and may not be successfully integrated.***

Our acquisitions of Versace and Jimmy Choo or any other entity that we may acquire may not perform as well as initially expected, which could have a material adverse effect on our results of operations and financial condition. In addition, we are required to test goodwill, brand and any other intangible assets acquired as a result of acquisitions for impairment. For Fiscal 2021 and Fiscal 2020, the carrying value of goodwill and brand intangible value for Jimmy Choo exceeded its respective related fair value, requiring us to record impairment charges for the difference of $163 million and $351 million, respectively.

In addition, we may not be able to successfully integrate acquired businesses into our own business, or achieve any expected cost savings or synergies from such integration or we may determine to limit the integration of our brands. In addition to the overarching and continued challenges resulting from the ongoing COVID-19 pandemic, the potential difficulties that we may face that could cause the results of our acquisitions to not be in line with our expectations include, among others:

- failure to implement our business plan for the combined business or to achieve anticipated revenue or profitability targets;

23

Table of Contents

- delays or difficulties in completing the integration of acquired companies or assets;
- higher than expected costs, lower than expected cost savings and/or a need to allocate resources to manage unexpected operating difficulties;
- unanticipated issues in integrating logistics, information and other systems;
- unanticipated changes in applicable laws and regulations;
- retaining key customers, suppliers and employees;
- operating risks inherent in the acquired business and our business;
- diversion of the attention and resources of management and resource constraints;
- retaining and obtaining required regulatory approvals, licenses and permits;
- unanticipated changes in the combined business due to potential divestitures or other requirements imposed by antitrust regulators;
- assumption of liabilities not identified in due diligence or other unanticipated issues, expenses and liabilities; and
- the impact on our internal controls and compliance with the requirements under the Sarbanes-Oxley Act of 2002.

Additionally, Jimmy Choo outsources its information technology, accounting and other back office activities to a third-party service provider. There are risks of relying on a third-party provider to perform these services, which may include experiencing operational challenges and incurring increased expenses, which may result in a material adverse effect on our business, results of operations and financial condition.

***The markets in which we operate are highly competitive, both within North America and internationally, and increased competition based on a number of factors could cause our profitability and/or gross margins to decline.***

Our brands face intense competition from other accessories, footwear and apparel producers and retailers, including, primarily European and American international luxury brands. In addition, we face competition through third party distribution channels that sell our merchandise, such as e-commerce, department stores and specialty stores. Competition is based on a number of factors, including, without limitation, the following:

- anticipating and responding to changing consumer demands in a timely manner;
- establishing and maintaining favorable brand name recognition;
- determining and maintaining product quality;
- retaining key employees;
- maintaining and growing market share;
- developing quality and differentiated products that appeal to consumers;
- establishing and maintaining acceptable relationships with retail customers;
- pricing products appropriately;
- providing appropriate service and support to retailers;
- optimizing retail and supply chain capabilities;
- determining size and location of retail and department store selling space; and
- protecting intellectual property.

In addition, some of our competitors may be significantly larger and more diversified than us and may have significantly greater financial, technological, manufacturing, sales, marketing and distribution resources than we do. Their capabilities in these areas may enable them to better withstand periodic downturns in the accessories, footwear and apparel industries (including those related to the ongoing COVID-19 pandemic and/or recent inflationary pressures), compete more effectively on the basis of price and production and more quickly develop new products. The general availability of manufacturing contractors and agents also allows new entrants easy access to the markets in which we compete, which may increase the number of our competitors and adversely affect our competitive position and our business. Any increased competition, or our failure to adequately address any of these competitive factors, could result in reduced revenues, which could adversely affect our business, results of operations and financial condition.

Competition, along with other factors such as consolidation, changes in consumer spending patterns and a highly promotional retail selling environment, could also result in significant pricing pressure. These factors may cause us to reduce our sales prices to our wholesale customers and retail consumers, which could cause our gross margins to decline if we are unable to appropriately manage inventory levels and/or otherwise offset price reductions with comparable reductions in our

PX7096-025

Table of Contents

operating costs. If our sales prices decline and we fail to sufficiently reduce our product costs or operating expenses, our profitability may decline, which could have a material adverse effect on our business, results of operations and financial condition.

***Our business is subject to risks associated with importing products, and the imposition of additional duties, tariffs or trade restrictions could have a material adverse effect on our business, results of operations and financial condition.***

There are risks inherent to importing our products. Virtually all of our imported products are subject to duties which may impact the cost of such products. In addition, countries to which we ship our products may impose safeguard quotas to limit the quantity of products that may be imported. We rely on free trade agreements and other supply chain initiatives in order to maximize efficiencies relating to product importation. For example, we have historically received benefits from duty-free imports on certain products from certain countries pursuant to the United States Generalized System of Preferences ("GSP") program. The GSP program expired on December 31, 2020. If the GSP program is not renewed or otherwise made retroactive, we will continue to experience significant additional duties and our gross margin will continue to be negatively impacted. Additionally, we are subject to government regulations relating to importation activities, including related to CBP withhold release orders. The imposition of taxes, duties and quotas, the withdrawal from or material modification to trade agreements, and/or if CBP detains shipments of our goods pursuant to a withhold release order could have a material adverse effect on our business, results of operations and financial condition. If additional tariffs or trade restrictions are implemented by the United States or other countries, the cost of our products could increase which could adversely affect our business.

***We are subject to risks associated with leasing retail space subject to long-term and non-cancelable leases. We may be unable to renew leases at the end of their terms. If we close a leased retail space, we remain obligated under the applicable lease.***

We do not own any of our retail store facilities, but instead lease all of our stores under operating leases. Our leases generally have terms of up to 10 years, generally require a fixed annual base rent and some require the payment of additional percentage rent if store sales exceed a negotiated amount. Certain of our European stores also require initial investments in the form of key money to secure prime locations, which may be paid to landlords or existing lessees. Generally, our leases are "net" leases, which require us to pay all of the costs of insurance, taxes, maintenance and utilities. We generally cannot cancel these leases or withhold payments at our option, and payments under these operating leases account for a significant portion of our operating costs. For example, as of April 2, 2022, we were party to operating leases associated with our retail stores that we operate directly throughout the globe, as well as other global corporate facilities, requiring future minimum lease payments aggregating to $1.6 billion through Fiscal 2027 and approximately $426 million thereafter through Fiscal 2044. Our substantial operating lease obligations could have a material adverse effect on our business, results of operations and financial condition.

In certain cases, as we have done in the past, we may determine that it is no longer economical to operate a retail store subject to a lease or we may seek to generally downsize, consolidate, reposition, relocate or close some of our real estate locations. In such cases, we may be required to negotiate a lease exit with the applicable landlord or remain obligated under the applicable lease for, among other things, payment of the base rent for the balance of the lease term. For example, in connection with the impact of the ongoing COVID-19 pandemic and our Retail Fleet Optimization Plan, we have negotiated with some landlords on certain lease terminations. In some instances, we may be unable to close an underperforming retail store due to continuous operation clauses in our lease agreements. In addition, as each of our leases expire, we may be unable to negotiate renewals, either on commercially acceptable terms or at all, which could cause us to close retail stores in desirable locations. Our inability to secure desirable retail space or favorable lease terms could impact our ability to grow. Likewise, our obligation to continue making lease payments in respect of leases for closed retail spaces could have a material adverse effect on our business, financial condition and results of operations.

Additionally, due to the volatile economic environment, it may be difficult to determine the fair market value of real estate properties when we are deciding whether to enter into leases or renew expiring leases. This may impact our ability to manage the profitability of our store locations, or cause impairments of our lease right-of-use assets if market values decline, any of which could have a material adverse effect on our financial condition or results of operations.

***We are dependent on a limited number of distribution facilities. If one or more of our distribution facilities experience operational difficulties or becomes inoperable, it could have a material adverse effect on our business, results of operations and financial condition.***

We operate a limited number of distribution facilities. Our ability to meet the needs of our own retail stores and e-commerce sites, as well as our wholesale customers, depends on the proper and uninterrupted operation of these distribution facilities. If any of these distribution facilities were to shut down or otherwise become inoperable or inaccessible for any reason

PX7096-026

Table of Contents

(including due to the ongoing COVID-19 pandemic), we could suffer a substantial loss of inventory and/or disruptions of deliveries to our customers. In addition, we could incur significantly higher costs and longer lead times associated with the distribution of our products during the time it takes to reopen or replace the damaged, inoperable or otherwise inaccessible facility. Any of the foregoing factors could result in decreased sales and have a material adverse effect on our business, results of operations and financial condition.

To support the growth of our business, we also use third-party logistics centers that are responsible for distribution, warehousing and fulfillment services on our behalf. Significant disruptions at these facilities could have a material adverse impact on our business. Because our direct and third-party fulfillment centers include automated and computer-controlled equipment, they are susceptible to risks including power interruptions, hardware and system failures, software viruses, security breaches and other technological and operational disruptions and of which could cause shipping delays or otherwise adversely affect our business.

***Fluctuations in our tax obligations and changes in tax laws, treaties and regulations may have a material adverse impact on our future effective tax rates and results of operations.***

Our subsidiaries are subject to taxation in the United States and various foreign jurisdictions, with the applicable tax rates varying by jurisdiction. As a result, our overall effective tax rate is affected by the proportion of earnings from the various tax jurisdictions. We record tax expense based on our estimates of taxable income and required reserves for uncertain tax positions in multiple tax jurisdictions. At any time, there are multiple tax years that are subject to examinations by various taxing authorities. The ultimate resolution of these audits and negotiations with taxing authorities may result in a settlement amount that differs from our original estimate. Any proposed or future changes in tax laws, treaties and regulations or interpretations where we operate could have a material adverse effect on our effective tax rates, results of operations and financial condition.

We and our subsidiaries are also engaged in a number of intercompany transactions. Although we believe that these transactions reflect arm's-length terms and that proper transfer pricing documentation is in place, the transfer prices and conditions may be scrutinized by local tax authorities, which could result in additional tax liabilities.

On October 5, 2015, the Organization for Economic Co-operation and Development ("OECD"), an international association of thirty four countries, including the United States and United Kingdom., released the final reports from its Base Erosion and Profit Shifting ("BEPS") Action Plans. The BEPS recommendations covered a number of issues, including country-by-country reporting, permanent establishment rules, transfer pricing rules and tax treaties. Future tax reform resulting from this development may result in changes to long-standing tax principles, which could adversely affect our effective tax rate and/or result in higher cash tax liabilities. In late 2021, the OECD published model legislation and the EU issued a draft directive related to the global minimum tax ("Pillar Two Model Rules"). The directive is to be considered by member countries in calendar 2022 and if approved, could become effective as early as calendar 2023. The enactment of the Pillar Two Model Rules in jurisdictions where we have operations may have a material impact on our global transfer pricing arrangements and a materially adverse impact on our tax provision, cash tax liability and effective tax rate.

***Our business is exposed to foreign currency exchange rate fluctuations.***

Our results of operations for our international subsidiaries are exposed to foreign exchange rate fluctuations as the financial results of the applicable subsidiaries are translated from the local currency into United States dollar during financial statement consolidation. If the United States dollar strengthens against foreign currencies, the translation of these foreign currency denominated transactions could impact our consolidated results of operations. In addition, we have intercompany notes amongst certain of our non-United States subsidiaries, which may be denominated in a currency other than the local currency of a particular reporting entity. As a result of using a currency other than the functional currency of the related subsidiary, results of these operations may be adversely affected during times of significant fluctuation between the functional currency of that subsidiary and the denomination currency of the note. We continuously monitor our foreign currency exposure and hedge a portion of our foreign subsidiaries' foreign currency-denominated inventory purchases to minimize the impact of changes in foreign currency exchange rates. However, we cannot fully anticipate all of our foreign currency exposures and cannot ensure that these hedges will fully offset the impact of foreign currency exchange rate fluctuations. We also use fixed-to-fixed cross currency swap agreements to hedge our net investments in foreign operations against future volatility in the exchange rates between the United States dollar and these foreign currencies. As a result, we are exposed to the risk that counterparties to derivative contracts will fail to meet their contractual obligations.

As a result of operating retail stores and concessions in various countries outside of the United States, we are also exposed to market risk from fluctuations in foreign currency exchange rates, primarily the Euro, the British Pound, the Chinese Renminbi, the Japanese Yen, the Korean Won and the Canadian dollar, among others. A substantial weakening of foreign

PX7096-027

Table of Contents

currencies against the United States dollar could require us to raise our retail prices or reduce our profit margins in various locations outside of the United States. In addition, our sales and profitability could be negatively impacted if consumers in those markets were unwilling to purchase our products at increased prices.

***Our current and future licensing and joint venture arrangements may not be successful and may make us susceptible to the actions of third parties over whom we have limited control.***

We have entered into a select number of product licensing agreements with companies that produce and sell, under our trademarks, products requiring specialized expertise. We have also entered into a number of select licensing agreements pursuant to which we have granted third parties certain rights to distribute and sell our products in certain geographical areas and have a number of joint ventures. In the future, we may enter into additional licensing and/or joint venture arrangements. Although we take steps to carefully select our partners, such arrangements may not be successful. Our partners may fail to fulfill their obligations under these agreements or have interests that differ from or conflict with our own, such as the timing of new store openings, the pricing of our products and the offering of competitive products. In addition, the risks applicable to the business of our partners may be different than the risks applicable to our business, including risks associated with each such partner's ability to:

- obtain capital;
- exercise operational and financial control over its business;
- manage its labor relations;
- maintain relationships with suppliers;
- manage its credit and bankruptcy risks which may be exacerbated by the impact of COVID-19; and
- maintain customer relationships.

In addition, the geographic areas subject to our licensing agreements could be impacted by geopolitical risks. Any of the foregoing risks, or the inability of any of our partners to successfully market our products or otherwise conduct its business, may result in loss of revenue and competitive harm to our operations in regions or product categories where we have entered into such licensing arrangements.

We rely on our partners to preserve the value of our brands. Although we attempt to protect our brands through, among other things, approval rights over store location and design, product design, production quality, merchandising, distribution, advertising and promotion of our stores and products, we may not be able to control the use by our partners of our brand. The misuse of our brand by a licensing or joint venture partner could have a material adverse effect on our business, results of operations and financial condition.

***Increases in the cost of raw materials could increase our production costs and cause our operating results and financial condition to suffer.***

Our business is subject to volatility of costs related to certain raw materials used in the manufacturing of our products, including inflationary pressure. The costs of raw materials used in our products are affected by, among other things, weather, consumer demand, speculation on the commodities market, the relative valuations and fluctuations of the currencies of producer versus consumer countries and other factors that are generally unpredictable and beyond our control. We are not always successful in our efforts to protect our business from the volatility of the market price of raw materials and our business can be materially affected by dramatic movements in prices of raw materials which have resulted, and are expected to continue to result, in increased pricing pressures and pressure on our margins. We may not be able to implement price increases that fully mitigate the impact of these higher costs and/or any such price increases could have an adverse impact on consumer demand for our products. In addition, our costs may be impacted by sanction tariffs and customs trade orders which could also impact sourcing and availability of raw materials used by our suppliers in the manufacturing of certain of our products. Manufacturing labor costs are also subject to volatility based on local and global economic conditions. Increases in commodity prices, tariffs, sanctions, customs trade orders and/or manufacturing labor costs could increase our production costs and negatively impact our revenues, results of operations and financial condition.

***We primarily use foreign manufacturing contractors and independent third-party agents to source our finished goods.***

Our products are primarily produced by, and purchased or procured from, independent manufacturing contractors located mainly in Asia and Europe. A manufacturing contractor's failure to ship products to us in a timely manner or to meet the required quality standards could cause us to miss the delivery date requirements of our customers for those items. The failure to

27

Table of Contents

make timely deliveries may cause customers to cancel orders, refuse to accept deliveries or demand reduced prices, any of which could have a material adverse effect on us.

We do not have written agreements with any of our third-party manufacturing contractors. As a result, any single manufacturing contractor could unilaterally terminate its relationship with us at any time. For example, in Fiscal 2022, Michael Kors' largest manufacturing contractor, who produces its products in Asia and who Michael Kors has worked with for over ten years, accounted for the production of 17% of our finished products, based on dollar volume. Our inability to promptly replace manufacturing contractors that terminate their relationships with us or cease to provide high quality products in a timely and cost-efficient manner could have a material adverse effect on our business, results of operations and financial condition and impact the cost and availability of our goods.

Michael Kors uses third-party agents to source finished goods with numerous manufacturing contractors on its behalf. Any single agent could unilaterally terminate its relationship with Michael Kors at any time. In Fiscal 2022, Michael Kors' largest third-party agent, whose primary place of business is Hong Kong and who Michael Kors has worked with for over ten years, sourced approximately 24% of its purchases of finished goods, based on unit volume. Our inability to promptly replace agents that terminate their relationships with us or cease to provide high quality service in a timely and cost-efficient manner could have a material adverse effect on our business, results of operations and financial condition.

***As we outsource functions, we will become more dependent on the third parties performing these functions.***

We look for opportunities to cost effectively enhance capability of business services. While we believe we conduct appropriate due diligence before entering into agreements with these third parties, the failure of any of these third parties to provide the expected services, provide them on a timely basis or to provide them at the prices we expect could disrupt or harm our business. Any significant interruption in the operations of these service providers, over which we have no control, could also have an adverse effect on our business. Furthermore, we may be unable to provide these services or implement substitute arrangements on a timely and cost-effective basis on terms favorable to us.

***Our business is susceptible to the risks associated with climate change and other environmental impacts which could negatively affect our business and operations.***

Our retail stores, distribution centers and manufacturing facilities, including those operated by third-parties, are subject to risks relating to climate change and other environmental impacts from our operations. For example, the physical effects of climate change, such as severe weather events, natural disasters and/or significant changes in climate patterns as well as our carbon emissions and our business' overall impact on the environment could subject us to reputational, market and/or regulatory risks. Climate change and other environmental concerns may cause social and economic disruptions in the places where we operate, including disruptions to our supply chain and to local infrastructure and transportation systems which could limit material availability and quality, impact our ability to ship and deliver product and prevent access to our physical locations. These events could also adversely affect the economy and negatively impact consumer confidence and discretionary spending. Concern over climate change may result in new or additional legal, legislative and regulatory requirements to reduce or mitigate the effects of climate change on the environment which may result in increased administrative costs. There is also increased focus, including by investors, customers, and other stakeholders, on climate change and other sustainability matters. In April 2020, we announced a global strategy to achieve significant, measurable goals across a range of important environmental and social sustainability issues, including, material sourcing, reducing greenhouse gas emissions and converting to renewal energy, responsible water use and waste reduction. We may not be successful in attaining our goals, and even if we meet our commitments, there remains a significant risk that climate change and other environmental events could negatively impact our operations.

***Our industry is subject to significant pricing pressure caused by many factors which may cause our profitability and gross margins in the future to be materially lower than our expectations.***

Our industry is subject to significant pricing pressure caused by many factors, including the impact of the ongoing COVID-19 pandemic and recent inflationary pressure on the economy and consumer discretionary spending, higher freight costs, intense competition and a highly promotional environment, fragmentation in the retail industry, pressure from retailers to reduce the costs of products, wholesale demands for allowances, incentives and other forms of economic support for our partners, changes in consumer behavior, fashion trends, pricing, the timing of the release of new merchandise and promotional events, changes in our merchandise mix, the success of marketing programs and weather and other environmental conditions. These factors may cause our profitability and gross margins in the future to be materially lower than in recent periods and our expectations, which could have a material adverse effect on our business, results of operations and financial condition. We may be faced with significant excess inventories (due to the impact of the ongoing COVID-19 pandemic, supply chain disruptions or

PX7096-029

Table of Contents

otherwise), and in the future, if we misjudge the market for our products, we may have excess inventories for some products and missed opportunities for other products. We may be forced to rely on markdowns or promotional sales to dispose of excess and slow-moving inventory, which also may negatively impact our gross margin and profitability.

### Risks Related to Information Technology and Data Security

***Privacy breaches and other cyber security risks related to our business could negatively affect our reputation, credibility and business.***

We are dependent on information technology ("IT") systems and networks for a significant portion of our direct-to-consumer sales, including our e-commerce sites and retail business credit card transaction authorization and processing. We are responsible for storing data relating to our customers and employees and also rely on third party vendors for the storage, processing and transmission of personal and Company information. Consumers, lawmakers and consumer advocates alike are increasingly concerned over the security of personal information transmitted over the Internet, consumer identity theft and privacy and the retail industry, in particular, has been the target of many recent cyber-attacks. In addition to taking the necessary precautions ourselves, we generally require that third-party service providers implement reasonable security measures to protect our employees' and customers' identity and privacy. We do not, however, control these third-party service providers and cannot guarantee the elimination of electronic or physical computer break-ins or security breaches in the future. Cyber security breaches, including physical or electronic break-ins, security breaches due to employee error or misconduct, attacks by "hackers," phishing scams, malicious software programs such as viruses and malware, and other breaches outside of our control, could result in unauthorized access or damage to our IT systems and the IT systems of our third party service providers. Despite our efforts and the efforts of our third-party service providers to secure our and their IT systems, attacks on these systems do occur from time to time. As the techniques used to obtain unauthorized access to IT systems become more varied and sophisticated (as cybercriminals are finding new ways to launch their attacks) and if the occurrence of such security breaches becomes more frequent, we and our third-party service providers may be unable to adequately anticipate these techniques and implement appropriate preventative measures. While we maintain cyber risk insurance to provide some coverage for certain risks associated with cyber security incidents, there is no assurance that such insurance would cover all or a significant portion of the costs or consequences associated with a cyber security incident. A significant breach of customer, employee or Company data could damage our reputation, our relationship with customers and our brands, and could result in lost sales, sizable fines, significant breach-notification and other costs and lawsuits, as well as adversely affect our results of operations. We may also incur additional costs in the future related to the implementation of additional security measures to protect against new or enhanced data security and privacy threats, or to comply with current and new state, federal and international laws governing the unauthorized disclosure of confidential information which are continuously being enacted and proposed, such as the General Data Protection Regulation in the EU, the California Consumer Privacy Act, the Virginia Consumer Data Protection Act and the Colorado Privacy Act (CPA) in the United States and the Personal Information Protection Law in China, as well as increased cyber security protection costs such as organizational changes, deploying additional personnel and protection technologies, training employees, engaging third party experts and consultants and lost revenues resulting from unauthorized use of proprietary information.

***A material delay or disruption in our information technology systems or e-commerce websites or our failure or inability to upgrade our information technology systems precisely and efficiently could have a material adverse effect on our business, results of operations and financial condition.***

We rely extensively on our IT systems to track inventory, manage our supply chain, record and process transactions, manage customer communications, summarize results and manage our business. The failure of our IT systems to operate properly or effectively, problems with transitioning to upgraded or replacement systems, or difficulty in or failure to implement new systems, could adversely affect our business. We also operate a number of e-commerce websites throughout the world. Our IT systems and e-commerce websites may be subject to damage and/or interruption from power outages, computer, network and telecommunications failures, malicious software, such as viruses and malware, attacks by "hackers", security breaches, usage errors or misconduct by our employees and bad acts by our customers and website visitors which could materially adversely affect our business.

We are undergoing a multi-year ERP implementation. The implementation of the ERP will require a significant investment in human and financial resources. Implementing new systems also carries substantial risk, including failure to operate as designed, failure to properly integrate with other systems, potential loss of data or information, cost overruns, implementation delays and disruption of operations. Third-party vendors are also relied upon to design, program, maintain and service our ERP implementation program. Any failures of these vendors to properly deliver their services could similarly have a material adverse effect on our business. In addition, any disruptions or malfunctions affecting our ERP implementation plan could cause critical information upon which we rely to be delayed, defective, corrupted, inadequate, inaccessible or lost or

29

Table of Contents

otherwise cause delays or disruptions to our operations, and we may have to make significant investments to fix or replace impacted systems.

## Risks Related to Legal and Regulatory

*If we fail to comply with labor laws or collective bargaining agreements, or if our independent manufacturing contractors fail to use acceptable, ethical business practices, our business and reputation could suffer.*

We are subject to labor laws governing relationships with employees, including minimum wage requirements, overtime, working conditions and citizenship requirements. We are also subject to collective bargaining agreements with respect to employees in certain European countries. Compliance with these laws and regulations, as well as collective bargaining agreements, may lead to increased costs and operational complexity and may increase our exposure to governmental investigations or litigation.

We require our independent manufacturing contractors to operate in compliance with applicable laws, rules and regulations regarding working conditions, employment practices and environmental compliance, as well as our Supplier Code of Conduct and other compliance policies under our Factory Social Compliance Program. Our staff and third parties we retain for such purposes periodically visit and monitor the operations of our independent manufacturing contractors to determine compliance. However, we generally do not control these manufacturing contractors or suppliers or their labor, environmental or other business practices. The violation of labor, environmental or other laws by an independent manufacturer or supplier, or divergence of an independent manufacturer's or supplier's labor practices from those generally accepted as ethical or appropriate or that violate our Supplier Code of Conduct, could interrupt or otherwise disrupt the shipment of our products, harm our trademarks or damage our reputation. Further, we could be prohibited from importing goods by governmental authorities. The occurrence of any of these events could materially adversely affect our business, financial condition and results of operations.

*We may be unable to protect our trademarks, copyrights and other intellectual property rights, and others may allege that we infringe upon their intellectual property rights.*

Our VERSACE, JIMMY CHOO and MICHAEL KORS trademarks, as well as other material trademarks, copyrights and design and patent rights related to the production, marketing and distribution of our products, are important to our success and our competitive position. We are susceptible to others imitating our products and infringing our intellectual property rights in the Americas, EMEA, Asia and elsewhere in the world in both online and offline channels. Our brands enjoy significant worldwide consumer recognition and the generally higher pricing of our products creates additional incentive for counterfeiters to infringe on our brands. We work with customs authorities, law enforcement, legal representatives and brand specialists globally in an effort to prevent the sale of counterfeit products, but we cannot guarantee the extent to which our efforts to prevent counterfeiting of our brands and other intellectual property infringement will be successful. Such counterfeiting and other intellectual property infringement could dilute our brands and otherwise harm our reputation and business.

Our trademark and other intellectual property applications may fail to result in registered trademarks or other intellectual property or to provide the scope of coverage sought, and others may seek to invalidate our trademarks, copyrights or other intellectual property or block sales of our products as an alleged violation of their trademarks and/or intellectual property rights. In addition, others may assert rights in, or ownership of, trademarks, copyrights and/or other intellectual property rights of ours or in trademarks, copyrights or other intellectual property that are similar to ours or that we license, and we may not be able to successfully resolve these types of conflicts to our satisfaction. In some cases, other intellectual property owners may have prior rights to our trademarks or similar trademarks or intellectual property. Furthermore, the laws of certain foreign countries may not protect trademarks, copyrights and/or other intellectual property rights to the same extent as the laws of the United States or the European Union.

From time to time, in the ordinary course of our business, we become involved in opposition and cancellation proceedings with respect to trademarks or other intellectual property similar to some of our brands. Any litigation or dispute involving the scope or enforceability of our intellectual property rights or any allegation that we infringe upon the intellectual property rights of others could be costly and time-consuming and, if determined adversely to us, could result in harm to our competitive position.

*We self-insure certain risks and may be impacted by unfavorable claims experience.*

We use a combination of insurance and self-insurance programs, including a wholly-owned captive insurance entity, to provide for the potential liabilities for certain risks including, employee health-care benefits, workers' compensation, employer

30

Table of Contents

liability, general liability, marine transport and inventory, property damage, cyber risk and business interruption. Claims are difficult to predict and may be volatile. Any adverse claims experience could have a material adverse effect on our results of operations, financial condition and cash flows.

***We are subject to various proceedings, lawsuits, disputes and claims in the ordinary course of business which could have an adverse impact on our business, financial condition and results of operations.***

We are a global company and are subject to various proceedings, lawsuits, disputes and claims throughout the world in the ordinary course of business. These claims could include commercial, intellectual property, employment, customer and data privacy claims, as well as class action lawsuits. Typically, these claims raise complex factual and legal issues and are subject to uncertainties. Plaintiffs may seek unspecified damages and/or injunctive or other equitable relief. Our potential liability may be covered in part by our insurance policies, but we may not always have adequate insurance to defend all claims. An unfavorable outcome in any proceeding, lawsuit, dispute or claim may have an adverse impact on our business, financial condition and results of operations.

## Risks Related to Our Debt

***We have incurred a substantial amount of indebtedness, which could adversely affect our financial condition and restrict our ability to incur additional indebtedness or engage in additional transactions.***

As of April 2, 2022, our consolidated indebtedness was approximately $1.2 billion, net of debt issuance costs. Our total borrowings as of April 2, 2022 primarily relate to senior notes of $450 million, term loans of $497 million and revolving credit facility of $175 million. Our ability to make payments on and to refinance our debt obligations and to fund planned capital expenditures depends on our ability to generate cash from our operations. This, to a certain extent, is subject to general economic, financial, competitive, legislative, regulatory and other factors that are beyond our control. Our substantial level of indebtedness could have negative consequences to our business and we cannot guarantee that our business will generate sufficient cash flow from our operations or that future borrowings will be available to us in an amount sufficient to enable us to make payments of our debt, fund other liquidity needs, make necessary capital expenditures or pursue certain business opportunities. Our financial results, our substantial indebtedness and our credit ratings could adversely affect the availability and terms of our financing and negatively impact our ability to enter into new financing arrangements in the future.

In addition, our ability to access the credit and capital markets in the future as a source of funding, and the borrowing costs associated with such financing, is dependent upon market conditions and our credit rating and outlook. We are currently rated investment grade by two of the Company's three credit rating agencies. If our investment rating is downgraded in the future, it could result in reduced access to the credit and capital markets, more restrictive covenants in future financial documents and higher interest costs and potentially increased lease or hedging costs.

***We may be unable to meet financial covenants in our indebtedness agreements which could result in an event of default and restrictive covenants in such agreements may restrict our ability to pursue our business strategies.***

The terms of our indebtedness contain affirmative and negative covenants that impose operating and financial restrictions on us and may restrict our ability to engage in future business opportunities or pursue our strategies. The Company's 2018 Credit Facility requires us to maintain a quarterly maximum permitted net leverage ratio of no greater than 4.0 to 1.0. The 2018 Credit Facility and the Indenture governing our senior notes contain certain restrictive covenants, including restrictions on our ability to:

- incur additional indebtedness and guarantee indebtedness;
- pay dividends or make other distributions or repurchase or redeem capital stock;
- make loans and investments, including acquisitions;
- sell assets;
- incur liens;
- enter into transactions with affiliates; and
- consolidate, merge or sell all or substantially all of our assets

which collectively may limit our ability to engage in acts that may be in our long-term best interest.

A breach of the covenants or restrictions under the documents that govern our indebtedness could result in an event of default under the applicable indebtedness. Such a default may allow creditors to accelerate the related debt and may result in the

31

Table of Contents

acceleration of any other debt to which a cross-acceleration or cross-default provision applies. In addition, an event of default under the credit agreement governing our 2018 Credit Facility would permit the lenders under our 2018 Credit Facility to terminate all commitments to extend further credit under that facility. In the event our lenders or noteholders accelerate the repayment of our borrowings, we and our subsidiaries may not have sufficient assets to repay that indebtedness. As a result of these restrictions, we may be:

- limited in how we conduct our business;

- unable to raise additional debt or equity financing to operate during general economic or business downturns, including as a result of the ongoing COVID-19 pandemic and recent inflationary pressures and possible recession; or

- unable to compete effectively or to take advantage of new business opportunities.

### Risks Related to Our Ordinary Shares

***Our share price may periodically fluctuate based on the accuracy of our earnings guidance or other forward-looking statements regarding our financial performance.***

Our business and long-range planning process is designed to maximize our long-term growth and profitability and not to achieve an earnings target in any particular fiscal quarter. We believe that this longer-term focus is in the best interests of our Company and our shareholders. At the same time, however, we recognize that it is helpful to provide investors with guidance as to our forecast of total revenue, earnings per share and other financial metrics or projections. While we generally expect to provide updates to our financial guidance when we report our results each fiscal quarter, we do not have any responsibility to update any of our forward-looking statements at such times or otherwise. In addition, any longer-term guidance that we provide is based on goals that we believe, at the time guidance is given, are reasonably attainable for growth and performance over a number of years. However, such long-range targets are more difficult to predict than our current quarter and fiscal year expectations. If, or when, we announce actual results that differ from those that have been predicted by us, outside investment analysts, or others, our share price could be adversely affected. Investors who rely on these predictions when making investment decisions with respect to our securities do so at their own risk. We take no responsibility for any losses suffered as a result of such changes in our share price.

We periodically return value to shareholders through our share repurchase program. Investors may have an expectation that we will repurchase all shares available under our share repurchase program. The market price of our securities could be adversely affected if our share repurchase activity differs from investors' expectations or if our share repurchase program were to terminate.

***Failure to maintain adequate financial and management processes and controls could lead to errors in our financial reporting, which could harm our business and cause a decline in the price of our ordinary shares.***

As a public company, we are required to document and test our internal controls over financial reporting pursuant to Section 404 of the Sarbanes-Oxley Act. If our management is unable to certify the effectiveness of our internal controls or if our independent registered public accounting firm cannot render an opinion on the effectiveness of our internal control over financial reporting, or if material weaknesses in our internal controls are identified, we could be subject to regulatory scrutiny and a loss of public confidence, which could have an adverse effect on our business and cause a decline in the price of our ordinary shares.

***Provisions in our organizational documents may delay or prevent our acquisition by a third party.***

Our Memorandum and Articles of Association (together, as amended from time to time, our "Memorandum and Articles") contain several provisions that may make it more difficult or expensive for a third party to acquire control of us without the approval of our board of directors. These provisions may delay, prevent or deter a merger, acquisition, tender offer, proxy contest or other transaction that might otherwise result in our shareholders receiving a premium over the market price for their ordinary shares. These provisions include, among others:

- our board of directors' ability to amend the Memorandum and Articles to create and issue, from time to time, one or more classes of preference shares and, with respect to each such class, to fix the terms thereof by resolution;

- provisions relating to the multiple classes and three-year terms of directors, the manner of election of directors, removal of directors and the appointment of directors upon an increase in the number of directors or vacancy on our board of directors;

- restrictions on the ability of shareholders to call meetings and bring proposals before meetings;

PX7096-033

Table of Contents

- elimination of the ability of shareholders to act by written consent; and
- the requirement of the affirmative vote of 75% of the shares entitled to vote to amend certain provisions of our Memorandum and Articles.

These provisions of our Memorandum and Articles could discourage potential takeover attempts and reduce the price that investors might be willing to pay for our ordinary shares in the future, which could reduce the market price of our ordinary shares.

***Rights of shareholders under British Virgin Islands law differ from those under United States law, and, accordingly, our shareholders may have fewer protections.***

Our corporate affairs are governed by our Memorandum and Articles, the BVI Business Companies Act, 2004 (as amended, the "BVI Act") and the common law of the British Virgin Islands. The rights of shareholders to take legal action against our directors, actions by minority shareholders and the fiduciary responsibilities of our directors under British Virgin Islands law are to a large extent governed by the common law of the British Virgin Islands and by the BVI Act. The common law of the British Virgin Islands is derived in part from comparatively limited judicial precedent in the British Virgin Islands as well as from English common law, which has persuasive, but not binding, authority on a court in the British Virgin Islands. The rights of our shareholders and the fiduciary responsibilities of our directors under British Virgin Islands law are not as clearly established as they would be under statutes or judicial precedents in some jurisdictions in the United States. In particular, the British Virgin Islands has a less developed body of securities laws as compared to the United States, and some states (such as Delaware) have more fully developed and judicially interpreted bodies of corporate law. As a result of the foregoing, holders of our ordinary shares may have more difficulty in protecting their interests through actions against our management, directors or major shareholders than they would as shareholders of a United States company.

***The laws of the British Virgin Islands provide limited protection for minority shareholders, so minority shareholders will have limited or no recourse if they are dissatisfied with the conduct of our affairs.***

Under the laws of the British Virgin Islands, there is limited statutory law for the protection of minority shareholders other than the provisions of the BVI Act dealing with shareholder remedies. The principal protection under statutory law is that shareholders may bring an action to enforce the constituent documents of a British Virgin Islands company and are entitled to have the affairs of the Company conducted in accordance with the BVI Act and the memorandum and articles of association of the Company. As such, if those who control the Company have persistently disregarded the requirements of the BVI Act or the provisions of the Company's memorandum and articles of association, then the courts will likely grant relief. Generally, the areas in which the courts will intervene are the following: (i) an act complained of which is outside the scope of the authorized business or is illegal or not capable of ratification by the majority; (ii) acts that constitute fraud on the minority where the wrongdoers control the Company; (iii) acts that infringe on the personal rights of the shareholders, such as the right to vote; and (iv) acts where the Company has not complied with provisions requiring approval of a special or extraordinary majority of shareholders, which are more limited than the rights afforded to minority shareholders under the laws of many states in the United States.

***It may be difficult to enforce judgments against us or our executive officers and directors in jurisdictions outside the United States.***

Under our Memorandum and Articles, we may indemnify and hold our directors harmless against all claims and suits brought against them, subject to limited exceptions. Furthermore, to the extent allowed by law, the rights and obligations among or between us, any of our current or former directors, officers and employees and any current or former shareholder will be governed exclusively by the laws of the British Virgin Islands and subject to the jurisdiction of the British Virgin Islands courts, unless those rights or obligations do not relate to or arise out of their capacities as such. Although there is doubt as to whether United States' courts would enforce these provisions in an action brought in the United States under United States securities laws, these provisions could make judgments obtained outside of the British Virgin Islands more difficult to enforce against our assets in the British Virgin Islands or jurisdictions that would apply British Virgin Islands law.

***British Virgin Islands companies may not be able to initiate shareholder derivative actions, thereby depriving shareholders of one avenue to protect their interests.***

British Virgin Islands companies may not have standing to initiate a shareholder derivative action in a federal court of the United States. The circumstances in which any such action may be brought, and the procedures and defenses that may be available in respect of any such action, may result in the rights of shareholders of a British Virgin Islands' company being more

33

Table of Contents

limited than those of shareholders of a company organized in the United States. Accordingly, shareholders may have fewer alternatives available to them if they believe that corporate wrongdoing has occurred. The British Virgin Islands courts are also unlikely to recognize or enforce judgments of courts in the United States based on certain liability provisions of United States securities law or to impose liabilities, in original actions brought in the British Virgin Islands, based on certain liability provisions of the United States securities laws that are penal in nature. There is no statutory recognition in the British Virgin Islands of judgments obtained in the United States, although the courts of the British Virgin Islands will generally recognize and enforce the non-penal judgment of a foreign court of competent jurisdiction without retrial on the merits. This means that even if shareholders were to sue us successfully, they may not be able to recover anything to make up for the losses suffered.

**Item 1B.    Unresolved Staff Comments**

    None.

**Item 2.    Properties**

    The following table sets forth the location, use and size of our significant distribution and corporate facilities as of April 2, 2022, all of which are leased with the exception of our distribution center in the Netherlands, our central warehouse in Italy and luxury shoe factory in Italy, which are owned. The leases expire at various times through Fiscal 2044, subject to renewal options.

| Location | Use | Approximate Square Footage |
|---|---|---|
| Whittier, CA | Michael Kors United States Distribution Center | 1,181,000 |
| Venlo, Netherlands | Michael Kors and Jimmy Choo European Distribution Center | 1,096,000 |
| New York, NY | Michael Kors, Versace and Jimmy Choo United States Corporate Offices | 284,000 |
| Montreal, Quebec | Michael Kors Canadian Corporate Office and Distribution Center | 150,000 |
| Novara, Italy | Versace European Distribution Center | 109,000 |
| Milan, Italy | Versace Corporate Offices | 90,000 |
| Milan, Italy | Versace Showroom | 54,000 |
| Novara, Italy | Versace Manufacturing and Distribution Center | 46,000 |
| East Rutherford, NJ | Michael Kors United States Corporate Offices | 43,000 |
| Pistoia, Italy | Capri Luxury Shoe Factory | 41,000 |
| Milan, Italy | Michael Kors Regional Corporate Office and Showroom | 25,000 |
| Shangai, China | Michael Kors, Versace and Jimmy Choo Regional Corporate Offices | 25,000 |
| London, England | Jimmy Choo Corporate Offices | 24,000 |
| Manno, Switzerland | Michael Kors European Corporate Offices | 18,000 |
| London, England | Capri Corporate Headquarters and Michael Kors Regional Corporate Office | 18,000 |

    As of April 2, 2022, we also occupied 1,271 leased retail stores worldwide (including concessions). We consider our properties to be in good condition and believe that our facilities are adequate for our operations and provide sufficient capacity to meet our anticipated requirements.

    Other than the land and building for our Michael Kors and Jimmy Choo European distribution center in the Netherlands, our Versace central warehouse in Italy and our Capri luxury shoe factory in Italy, property and equipment related to our stores (e.g. leasehold improvements, fixtures, etc.) and computer equipment, we did not own any material property as of April 2, 2022.

**Item 3.    Legal Proceedings**

    We are involved in various routine legal proceedings incident to the ordinary course of our business. We believe that the outcome of all pending legal proceedings in the aggregate will not have a material adverse effect on our business, results of operations and financial condition.

PX7096-035

Table of Contents

**Item 4.   Mine Safety Disclosures**

None.

PX7096-036

Table of Contents

PART II

**Item 5.    Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities**

**Market Information**

Our ordinary shares trade on the NYSE under the symbol "CPRI". At April 2, 2022, there were 142,806,269 ordinary shares outstanding, and the closing price of our ordinary shares was $50.99. Also as of that date, we had approximately 127 ordinary shareholders of record.

**Share Performance Graph**

The line graph below compares the cumulative total shareholder return on our ordinary shares with the Standard & Poor's ("S&P") 500 Stock Index and the S&P 500 Apparel, Accessories & Luxury Goods Index for the five-year period from March 31, 2017 through April 1, 2022, the last business day of our fiscal year. The graph below assumes an investment of $100 made at the close of trading on March 31, 2017, in our ordinary shares and each of the indices presented. All values assume reinvestment of the full amount of all dividends, if any, into additional shares of the same class of equity securities at the frequency with which dividends are paid on such securities during the applicable time period.



**Issuer Purchases of Equity Securities**

During the first quarter of Fiscal 2022, we reinstated our $500 million share repurchase program, which was previously suspended during the first quarter of Fiscal 2021 in response to the impact of the COVID-19 pandemic and the provisions of the Second Amendment of the 2018 Credit Facility. Subsequently, on November 3, 2021, we announced that our Board of Directors terminated the Company's existing $500 million share repurchase program (the "Prior Plan"), which had $250 million of availability remaining at the time, and authorized a new share repurchase program (the "Fiscal 2022 Plan") pursuant to which we may, from time to time, repurchase up to $1.0 billion of our outstanding ordinary shares within a period of two years from the effective date of the program. We also have in place a "withhold to cover" repurchase program, which allows us to withhold ordinary shares from certain executive officers and directors to satisfy minimum tax withholding obligations relating to the vesting of their restricted share awards.

On June 1, 2022, we announced that our Board of Directors has terminated our Fiscal 2022 Plan, with $500 million of availability remaining, and authorized a new share repurchase program pursuant to which we may, from time to time, repurchase up to $1.0 billion of our outstanding ordinary shares within period of two years from the effective date of the program. Share repurchases may be made in open market or privately negotiated transactions, subject to market conditions,

PX7096-037

Table of Contents

applicable legal requirements, trading restrictions under our insider trading policy and other relevant factors. The program may be suspended or discontinued at any time.

The following table provides information regarding our ordinary share repurchases during the three months ended April 2, 2022:

| | Total Number of Shares | | Average Price Paid per Share | | Total Number of Shares (or Units) Purchased as Part of Publicly Announced Plans or Programs | | Maximum Number (or Approximated Dollar Value) of Shares (or Units) That May Yet Be Purchased Under the Plans or Programs (in millions) |
|---|---|---|---|---|---|---|---|
| December 26, 2021 – January 22, 2022 | — | $ | — | | — | $ | 800 |
| January 23, 2022 – February 19, 2022 | 943,978 | $ | 66.40 | | 943,978 | $ | 737 |
| February 20, 2022 – April 2, 2022 | 4,146,860 | $ | 57.36 | | 4,136,319 | $ | 500 |
| | 5,090,838 | | | | 5,080,297 | | |

37

PX7096-038

Table of Contents

**Item 6.   Selected Financial Data**

The following table sets forth selected historical consolidated financial and other data for Capri Holdings Limited and its consolidated subsidiaries for the periods presented. The statement of operations data for Fiscal 2022, Fiscal 2021 and Fiscal 2020 and the balance sheet data as of the end of Fiscal 2022 and Fiscal 2021 have been derived from our audited consolidated financial statements included elsewhere in this report. The statement of operations data for Fiscal 2019 and Fiscal 2018 and the balance sheet data as of the end of Fiscal 2020, Fiscal 2019 and Fiscal 2018 have been derived from our prior audited consolidated financial statements, which are not included in this report.

The selected historical consolidated financial data below should be read in conjunction with "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our financial statements and the related notes included in this annual report.

| | Fiscal Years Ended | | | | |
| | April 2, 2022 | March 27, 2021 | March 28, 2020 | March 30, 2019 | March 31, 2018 |
| | (data presented in millions, except for shares and per share data) | | | | |
| **Statement of Operations Data:** | | | | | |
| Total revenue | $ 5,654 | $ 4,060 | $ 5,551 | $ 5,238 | $ 4,719 |
| Cost of goods sold | 1,910 | 1,463 | 2,280 | 2,058 | 1,860 |
| Gross profit | 3,744 | 2,597 | 3,271 | 3,180 | 2,859 |
| Selling, general and administrative expenses | 2,533 | 2,018 | 2,464 | 2,075 | 1,767 |
| Depreciation and amortization | 193 | 212 | 249 | 225 | 208 |
| Impairment of assets | 73 | 316 | 708 | 21 | 33 |
| Restructuring and other charges | 42 | 32 | 42 | 124 | 102 |
| Total operating expenses | 2,841 | 2,578 | 3,463 | 2,445 | 2,110 |
| Income (loss) from operations | 903 | 19 | (192) | 735 | 749 |
| Other income | (2) | (7) | (6) | (4) | (2) |
| Interest (income) expense, net | (18) | 43 | 18 | 38 | 22 |
| Foreign currency loss (gain) | 8 | (20) | 11 | 80 | (13) |
| Income (loss) before provision for income taxes | 915 | 3 | (215) | 621 | 742 |
| Provision for income taxes | 92 | 66 | 10 | 79 | 150 |
| Net income (loss) | 823 | (63) | (225) | 542 | 592 |
| Less: Net income (loss) attributable to noncontrolling interest | 1 | (1) | (2) | (1) | — |
| Net income (loss) attributable to Capri | $ 822 | $ (62) | $ (223) | $ 543 | $ 592 |
| | | | | | |
| Weighted average ordinary shares outstanding: | | | | | |
| Basic | 149,724,675 | 150,453,568 | 150,714,598 | 149,765,468 | 152,283,586 |
| Diluted | 152,497,907 | 150,453,568 | 150,714,598 | 151,614,350 | 155,102,885 |
| Net income (loss) per ordinary share attributable to Capri: | | | | | |
| Basic | $ 5.49 | $ (0.41) | $ (1.48) | $ 3.62 | $ 3.89 |
| Diluted | $ 5.39 | $ (0.41) | $ (1.48) | $ 3.58 | $ 3.82 |

38

Table of Contents

| | Fiscal Years Ended | | | | |
|---|---|---|---|---|---|
| | April 2, 2022 | March 27, 2021 | March 28, 2020 | March 30, 2019 | March 31, 2018 |
| | **(data presented in millions, except for share and store data)** | | | | |
| **Operating Data:** | | | | | |
| Retail stores, including concessions, end of period | 1,271 | 1,257 | 1,271 | 1,249 | 1,011 |
| **Balance Sheet Data:** | | | | | |
| Working capital | $ 325 | $ (75) | $ 493 | $ 187 | $ 302 |
| Total assets | $ 7,480 | $ 7,481 | $ 7,946 | $ 6,650 | $ 4,059 |
| Short-term debt | $ 29 | $ 123 | $ 167 | $ 630 | $ 200 |
| Long-term debt | $ 1,131 | $ 1,219 | $ 2,012 | $ 1,936 | $ 675 |
| Shareholders' equity of Capri | $ 2,559 | $ 2,158 | $ 2,167 | $ 2,429 | $ 2,018 |
| Number of ordinary shares issued | 221,967,599 | 219,222,937 | 217,320,010 | 216,050,939 | 210,991,091 |

39

Table of Contents

**ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

*The following Management's Discussion and Analysis ("MD&A") of our Financial Condition and Results of Operations should be read in conjunction with the consolidated financial statements and notes thereto included as part of this Annual Report on Form 10-K. Forward-looking statements are prospective in nature and are not based on historical facts, but rather on current expectations and projections of the management of the Company about future events, and are therefore subject to risks and uncertainties which could cause actual results to differ materially from the future results expressed or implied by the forward-looking statements. All statements other than statements of historical facts included herein, may be forward-looking statements. Forward-looking statements include information concerning the Company's goals, future plans and strategies, including with respect to ESG goals, initiatives and ambitions as well as the Company's possible or assumed future results of operations, including descriptions of its business strategy. Without limitation, any statements preceded or followed by or that include the words "plans", "believes", "expects", "intends", "will", "should", "could", "would", "may", "anticipates", "might" or similar words or phrases, are forward-looking statements. These forward-looking statements are not guarantees of future financial performance. Such forward-looking statements involve known and unknown risks and uncertainties that could significantly affect expected results and are based on certain key assumptions, which could cause actual results to differ materially from those projected or implied in any forward-looking statements. These risks, uncertainties and other factors include the effect of the COVID-19 pandemic and its potential material and significant impact on the Company's future financial and operational results if retail stores are forced to close again and the pandemic is prolonged, including that our estimates could materially differ if the severity of the COVID-19 situation worsens, or if there are further supply chain disruptions, including additional production delays and increased costs, the length and severity of such outbreak across the globe and the pace of recovery following the COVID-19 pandemic, levels of cash flow and future availability of credit, compliance with restrictive covenants under the Company's credit agreement, the Company's ability to integrate successfully and to achieve anticipated benefits of any acquisition and to successfully execute our growth strategies; the risk of disruptions to the Company's businesses; risks associated with operating in international markets and our global sourcing activities; the risk of cybersecurity threats and privacy or data security breaches; the negative effects of events on the market price of the Company's ordinary shares and its operating results; significant transaction costs; unknown liabilities; the risk of litigation and/or regulatory actions related to the Company's businesses; fluctuations in demand for the Company's products; levels of indebtedness (including the indebtedness incurred in connection with acquisitions); the timing and scope of future share buybacks, which may be made in open market or privately negotiated transactions, and are subject to market conditions, applicable legal requirements, trading restrictions under the Company's insider trading policy and other relevant factors, and such share repurchases may be suspended or discontinued at any time, the level of other investing activities and uses of cash; changes in consumer traffic and retail trends; higher consumer debt levels, recession and inflationary pressures, loss of market share and industry competition; fluctuations in the capital markets; fluctuations in interest and exchange rates; the occurrence of unforeseen epidemics and pandemics, disasters or catastrophes; extreme weather conditions and natural disasters; political or economic instability in principal markets; adverse outcomes in litigation; and general, local and global economic, political, business and market conditions including acts of war and other geopolitical conflicts, as well as those risks set forth in the Company's filings with the U.S. Securities and Exchange Commission, including in this Annual Report on Form 10-K, particularly under "Item 1A. Risk Factors".*

**Overview**

*Our Business*

Capri Holdings Limited is a global fashion luxury group, consisting of iconic brands that are industry leaders in design, style and craftsmanship, led by a world-class management team and renowned designers. Our brands cover the full spectrum of fashion luxury categories, including women's and men's accessories, footwear and ready-to-wear, as well as wearable technology, watches, jewelry, eyewear and a full line of fragrance products. Our goal is to continue to extend the global reach of our brands while ensuring that they maintain their independence and exclusive DNA.

Our Versace brand has long been recognized as one of the world's leading international fashion design houses and is synonymous with Italian glamour and style. Founded in 1978 in Milan, Versace is known for its iconic and unmistakable style and unparalleled craftsmanship. Over the past several decades, the House of Versace has grown globally from its roots in haute couture, expanding into the design, manufacturing, distribution and retailing of accessories, ready-to-wear, footwear, eyewear, watches, jewelry, fragrance and home furnishings businesses. Versace's design team is led by Donatella Versace, who has been the brand's Artistic Director for over 20 years. Versace distributes its products through a worldwide distribution network, which includes boutiques in some of the world's most glamorous cities, its e-commerce sites, as well as through the most prestigious department and specialty stores worldwide.

PX7096-041

Table of Contents

Our Jimmy Choo brand offers a distinctive, glamorous and fashion-forward product range, enabling it to develop into a leading global luxury accessories brand, whose core product offering is women's luxury shoes, complemented by accessories, including handbags, small leather goods, jewelry, scarves and belts, as well as a growing men's luxury shoe and accessory business. In addition, certain categories, such as fragrances and eyewear are produced under licensing agreements. Jimmy Choo's design team is led by Sandra Choi, who has been the Creative Director for the brand since its inception in 1996. Jimmy Choo products are unique, instinctively seductive and chic. The brand offers classic and timeless luxury products, as well as innovative products that are intended to set and lead fashion trends. Jimmy Choo is represented through its global store network, its e-commerce sites, as well as through the most prestigious department and specialty stores worldwide.

Our Michael Kors brand was launched 40 years ago by Michael Kors, a world-renowned designer, whose vision has taken the Company from its beginnings as an American luxury sportswear house to a global accessories, footwear and ready-to-wear company with a global distribution network that has presence in over 100 countries through Company-operated retail stores and e-commerce sites, leading department stores, specialty stores and select licensing partners. Michael Kors is a highly recognized luxury fashion brand in the Americas and Europe with growing brand awareness in other international markets. Michael Kors features distinctive designs, materials and craftsmanship with a jet-set aesthetic that combines stylish elegance and a sporty attitude. Michael Kors offers three primary collections: the Michael Kors Collection luxury line, the MICHAEL Michael Kors accessible luxury line and the Michael Kors Mens line. The Michael Kors Collection establishes the aesthetic authority of the entire brand and is carried by select retail stores, our e-commerce sites, as well as in the finest luxury department stores in the world. MICHAEL Michael Kors has a strong focus on accessories, in addition to offering footwear and ready-to-wear, and addresses the significant demand opportunity in accessible luxury goods. We have also been developing our men's business in recognition of the significant opportunity afforded by the Michael Kors brand's established fashion authority and the expanding men's market. Taken together, our Michael Kors collections target a broad customer base while retaining our premium luxury image.

### Certain Factors Affecting Financial Condition and Results of Operations

*COVID-19 Pandemic.* The ongoing COVID-19 pandemic has caused significant disruption to the global economy, consumer spending and behavior, tourism and to financial markets. While the overall COVID-19 situation appears to be improving, our business and operating results may be negatively impacted if the virus worsens or mutates, if vaccination efforts are unsuccessful and/or if regions or countries take further actions to contain the virus (including additional extended lock-downs and travel restrictions), among others. We continue to monitor the latest developments regarding the pandemic and have made certain assumptions about the pandemic for purposes of our business and operating results, including assumptions regarding the duration, severity and global macroeconomic impacts of the pandemic; however, the full extent of the impact of COVID-19 on our business and operating results will depend largely on future events outside of our control, including the duration and severity of the pandemic and the success of vaccination efforts, new information concerning the virus or variants of the virus, actions different states, regions or countries may take to contain the virus (including extended lock-downs and travel restrictions) and the economic impacts of the pandemic, including recent inflationary pressures, among others. See Item 1A. "Risk Factors" — "The COVID-19 pandemic may continue to have a material adverse effect on our business and results of operations." for additional discussion regarding risks to our business associated with the COVID-19 pandemic.

*Channel shift, macroeconomic factors and demand for our accessories and related merchandise.* Our performance is affected by trends in the luxury goods industry, global consumer spending, macroeconomic factors, overall levels of consumer travel and spending on discretionary items as well as shifts in demographics and changes in lifestyle preferences. Through 2019, the personal luxury goods market grew at a mid-single digit rate over the past 20 years, with more recent growth driven by stronger Chinese demand from both international and local consumers and demographic and socioeconomic shifts resulting in younger consumers purchasing more luxury goods. However, in 2020, due to the impact of the COVID-19 crisis, the personal luxury goods market declined 23%. Market studies indicate that the personal luxury goods market returned to 2019 levels in 2021, and the market is predicted to increase at a 10% compound annual growth rate between 2020 and 2025. Future growth is expected to be driven by e-commerce, Chinese consumers and younger generations. As the personal luxury goods market continues to evolve, Capri is committed to creating engaging luxury experiences globally. In our view, increased customer engagement and tailoring merchandise to customer shopping and communication preferences are key to growing market share.

We also continue to adjust our retail operating strategy to the changing business environment. We have finalized the planned store closures under the Capri Retail Store Optimization Program as of the end of Fiscal 2022. As of April 2, 2022, we closed a total of 167 stores and recorded total net restructuring charges of $14 million relating to the plan. We recorded net restructuring charges of $9 million and $5 million during Fiscal 2022 and Fiscal 2021, respectively, relating to the plan. See Item 9B - Other Information for additional information. Collectively, we continue to anticipate ongoing savings as a result of the store closures and lower depreciation associated with the impairment charges being recorded.

PX7096-042

Table of Contents

*Foreign currency fluctuation.* Our consolidated operations are impacted by the relationships between our reporting currency, the United States dollar, and those of our non-United States subsidiaries whose functional/local currency is other than the United States dollar, primarily the Euro, the British Pound, the Chinese Renminbi, the Japanese Yen, the Korean Won and the Canadian dollar, among others. We continue to expect volatility in the global foreign currency exchange rates, which may have a negative impact on the reported results of certain of our non-United States subsidiaries in the future, when translated to the United States dollar.

*Disruptions or delays in shipping and distribution and other supply chain constraints.* We have been experiencing global logistics challenges, including delays as a result of port congestion, vessel availability, container shortages and temporary factory closures which are expected to continue for Fiscal 2023. Our freight costs have increased as carrier rates for ocean and air shipments have increased significantly, and the supply chain disruptions have caused us to increase our use of air freight with greater frequency than in the past. Any future disruptions in our shipping and distribution network, including impacts on our supply chain due to temporary closures of our manufacturing partners and shipping and fulfillment constraints, could have a negative impact on our results of operations. See Item 1A. "Risk Factors" — "We primarily use foreign manufacturing contractors and independent third-party agents to source our finished goods and our business is subject to risks inherent in global sourcing activities, including disruptions or delays in manufacturing or shipments." for additional discussion.

*Costs of manufacturing, tariffs and import regulations.* Our industry is subject to volatility in costs related to certain raw materials used in the manufacturing of our products. This volatility applies primarily to costs driven by commodity prices, which can increase or decrease dramatically over a short period of time. In addition, our costs may be impacted by sanction tariffs imposed on our products due to changes in trade terms. For example, we have historically received benefits from duty-free imports on certain products from certain countries pursuant to the GSP program. The GSP program expired on December 31, 2020. If the GSP program is not renewed or otherwise made retroactive, we will continue to experience significant additional duties and our gross margin will continue to be negatively impacted. Additionally, we are subject to government import regulations, including CBP withhold release orders. The imposition of taxes, duties and quotas, the withdrawal from or material modification to trade agreements and/or if CBP detains shipments of our goods pursuant to a withhold release order could have a material adverse effect on our business, results of operations and financial condition. If additional tariffs or trade restrictions are implemented by the United States or other countries, the cost of our products could increase which could adversely affect our business. In addition, commodity prices and tariffs may have an impact on our revenues, results of operations and cash flows. We use commercially reasonable efforts to mitigate these effects by sourcing our products as efficiently as possible and diversifying the countries where we produce. In addition, manufacturing labor costs are also subject to degrees of volatility based on local and global economic conditions. We use commercially reasonable efforts to source from localities that suit our manufacturing standards and result in more favorable labor driven costs to our product.

## Segment Information

We operate in three reportable segments, which are as follows:

### Versace

We generate revenue through the sale of Versace luxury accessories, ready-to-wear and footwear through directly operated Versace boutiques throughout North America (United States and Canada), certain parts of EMEA (Europe, Middle East and Africa) and certain parts of Asia (Asia and Oceania), as well as through Versace outlet stores and e-commerce sites. In addition, revenue is generated through wholesale sales to distribution partners (including geographic licensing arrangements), multi-brand department stores and specialty stores worldwide, as well as through product license agreements in connection with the manufacturing and sale of products, including jeans, fragrances, watches, jewelry, eyewear and home furnishings.

### Jimmy Choo

We generate revenue through the sale of Jimmy Choo luxury goods through directly operated Jimmy Choo retail and outlet stores throughout the Americas (United States, Canada and Latin America), certain parts of EMEA and certain parts of Asia, through our e-commerce sites, as well as through wholesale sales of luxury goods to distribution partners (including geographic licensing arrangements that allow third parties to use the Jimmy Choo tradename in connection with retail and/or wholesale sales of Jimmy Choo branded products in specific geographic regions), multi-brand department stores and specialty stores worldwide. In addition, revenue is generated through product licensing agreements, which allow third parties to use the Jimmy Choo brand name and trademarks in connection with the manufacturing and sale of products, including fragrances and eyewear.

PX7096-043

Table of Contents

*Michael Kors*

We generate revenue through the sale of Michael Kors products through four primary Michael Kors retail store formats: "Collection" stores, "Lifestyle" stores (including concessions), outlet stores and e-commerce, through which we sell our products, as well as licensed products bearing our name, directly to consumers throughout the Americas, certain parts of EMEA and certain parts of Asia. Our Michael Kors e-commerce business includes e-commerce sites in the United States, Canada and EMEA and Asia. We also sell Michael Kors products directly to department stores, primarily located across the Americas and EMEA, to specialty stores and travel retail shops in the Americas, Europe and Asia, and to our geographic licensees in certain parts of EMEA, Asia and Brazil. In addition, revenue is generated through product and geographic licensing arrangements, which allow third parties to use the Michael Kors brand name and trademarks in connection with the manufacturing and sale of products, including watches, jewelry, fragrances and eyewear, as well as through geographic licensing arrangements, which allow third parties to use the Michael Kors tradename in connection with the retail and/or wholesale sales of our Michael Kors branded products in specific geographic regions.

*Unallocated Corporate Expenses*

In addition to the reportable segments discussed above, we have certain corporate costs that are not directly attributable to our brands and, therefore, are not allocated to segments. Such costs primarily include certain administrative, corporate occupancy, shared service and information systems expenses, including ERP system implementation costs and Capri transformation program costs. In addition, certain other costs are not allocated to segments, including restructuring and other charges, impairment costs, COVID-19 related charges, charitable donations and the war in Ukraine. The segment structure is consistent with how our chief operating decision maker plans and allocates resources, manages the business and assesses performance. The following table presents our total revenue and income (loss) from operations by segment for Fiscal 2022, Fiscal 2021 and Fiscal 2020 (in millions):

| | | Fiscal Years Ended | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | April 2, 2022 | | March 27, 2021 | | March 28, 2020 |
| **Total revenue:** | | | | | | |
|     Versace | $ | 1,088 | $ | 718 | $ | 843 |
|     Jimmy Choo | | 613 | | 418 | | 555 |
|     Michael Kors | | 3,953 | | 2,924 | | 4,153 |
| **Total revenue** | $ | 5,654 | $ | 4,060 | $ | 5,551 |
| | | | | | | |
| **Income (loss) from operations:** | | | | | | |
|     Versace | $ | 185 | $ | 21 | $ | (8) |
|     Jimmy Choo | | 13 | | (55) | | (13) |
|     Michael Kors | | 1,005 | | 595 | | 850 |
| Total segment income from operations | | 1,203 | | 561 | | 829 |
| **Less:**   Corporate expenses | | (190) | | (152) | | (152) |
|     Impairment of assets [1] | | (73) | | (316) | | (708) |
|     COVID-19 related charges [2] | | 14 | | (42) | | (119) |
|     Impact of war in Ukraine [3] | | (9) | | — | | — |
|     Restructuring and other charges | | (42) | | (32) | | (42) |
| **Total income (loss) from operations** | $ | 903 | $ | 19 | $ | (192) |

[1]  Impairment of assets during Fiscal 2022 includes $50 million, $19 million and $4 million of impairment charges related to the Michael Kors, Versace and Jimmy Choo reportable segments, respectively. Impairment of assets during Fiscal 2021 includes $191 million, $91 million and $34 million of impairment charges related to the Jimmy Choo, Michael Kors and Versace reportable segments, respectively. Impairment of assets during Fiscal 2020 includes $434 million, $187 million and $87 million of impairment charges related to the Jimmy Choo, Michael Kors and Versace reportable segments, respectively.

[2]  COVID-19 related charges during Fiscal 2022 primarily include net inventory credits of $16 million as a result of better than expected sell-through and severance expense of $2 million, respectively. Net inventory credits during

PX7096-044

Table of Contents

Fiscal 2022 is change of estimate from better than expected sell-through. COVID-19 related charges during Fiscal 2021, primarily include net inventory credits and severance expense of $10 million and $24 million, respectively. COVID-19 related charges during Fiscal 2020, primarily include additional inventory reserves and credit losses of $92 million and $25 million, respectively. Inventory related costs are recorded within costs of goods sold and severance expense and credit losses are recorded within selling, general and administrative expenses in the consolidated statements of operations and comprehensive income (loss).

(3)    These charges primarily relate to incremental credit losses and inventory reserves which are a direct impact of the war in Ukraine. Credit losses are recorded within selling, general and administrative expenses and inventory related costs are recorded within costs of goods sold in the consolidated statements of operations and comprehensive income (loss).

The following table presents our global network of retail stores and wholesale doors:

|  | As of | | |
|---|---|---|---|
|  | April 2, 2022 | March 27, 2021 | March 28, 2020 |
| Number of full price retail stores (including concessions): | | | |
| Versace | 149 | 153 | 157 |
| Jimmy Choo | 181 | 176 | 179 |
| Michael Kors | 524 | 529 | 568 |
|  | 854 | 858 | 904 |
| Number of outlet stores: | | | |
| Versace | 60 | 57 | 49 |
| Jimmy Choo | 56 | 51 | 47 |
| Michael Kors | 301 | 291 | 271 |
|  | 417 | 399 | 367 |
| Total number of retail stores | 1,271 | 1,257 | 1,271 |
| Total number of wholesale doors: | | | |
| Versace | 803 | 868 | 824 |
| Jimmy Choo | 446 | 450 | 554 |
| Michael Kors | 2,742 | 2,852 | 2,982 |
|  | 3,991 | 4,170 | 4,360 |

The following table presents our retail stores by geographic location:

|  | As of April 2, 2022 | | | As of March 27, 2021 | | |
|---|---|---|---|---|---|---|
|  | Versace | Jimmy Choo | Michael Kors | Versace | Jimmy Choo | Michael Kors |
| Store count by region: | | | | | | |
| The Americas | 39 | 45 | 334 | 34 | 44 | 353 |
| EMEA | 55 | 73 | 176 | 57 | 74 | 176 |
| Asia | 115 | 119 | 315 | 119 | 109 | 291 |
|  | 209 | 237 | 825 | 210 | 227 | 820 |

44

PX7096-045

Table of Contents

***Key Performance Indicators and Statistics***

We use a number of key indicators of operating results to evaluate our performance, including the following (dollars in millions):

| | Fiscal Years Ended | | |
| --- | --- | --- | --- |
| | April 2, 2022 | March 27, 2021 | March 28, 2020 |
| Total revenue | $ 5,654 | $ 4,060 | $ 5,551 |
| Gross profit as a percent of total revenue | 66.2 % | 64.0 % | 58.9 % |
| Income (loss) from operations | $ 903 | $ 19 | $ (192) |
| Income (loss) from operations as a percent of total revenue | 16.0 % | 0.5 % | (3.5)% |

**Critical Accounting Policies and Estimates**

The preparation of financial statements in conformity with accounting principles generally accepted in the United States ("U.S. GAAP") requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements, as well as the reported amounts of revenue and expenses during the reporting period. Critical accounting policies are those that are the most important to the portrayal of our results of operations and financial condition and that require our most difficult, subjective and complex judgments to make estimates about the effect of matters that are inherently uncertain. In applying such policies, we must use certain assumptions that are based on our informed judgments, assessments of probability and best estimates. Estimates, by their nature, are subjective and are based on analysis of available information, including current and historical factors and the experience and judgment of management. We evaluate our assumptions and estimates on an ongoing basis. While our significant accounting policies are detailed in Note 2 to the accompanying financial statements, our critical accounting policies are discussed below and include revenue recognition, inventories, long-lived assets, goodwill and other indefinite-lived intangible assets, share-based compensation, derivatives and income taxes.

***Revenue Recognition***

Revenue is recognized when control of the promised goods or services is transferred to our customers in an amount that reflects the consideration we expect to be entitled to in exchange for goods or services. We recognize retail store revenue when control of the product is transferred at the point of sale at our owned stores, including concessions. Revenue from sales through our e-commerce sites is recognized at the time of delivery to the customer, reduced by an estimate of returns. Wholesale revenue is recognized net of estimates for sales returns, discounts, markdowns and allowances, after merchandise is shipped and control of the underlying product is transferred to our wholesale customers. To arrive at net sales for retail, gross sales are reduced by actual customer returns, as well as by a provision for estimated future customer returns, which is based on management's review of historical and current customer returns. The amounts reserved for retail sales returns were $22 million, $20 million and $12 million at April 2, 2022, March 27, 2021 and March 28, 2020, respectively. Net sales for wholesale equals gross sales, reduced by provisions for estimated future returns based on current expectations, as well as trade discounts, markdowns, allowances, operational chargebacks, and certain cooperative selling expenses. Total sales reserves for wholesale were $70 million, $78 million and $154 million at April 2, 2022, March 27, 2021 and March 28, 2020, respectively. These estimates are based on such factors as historical trends, actual and forecasted performance and market conditions, which are reviewed by management on a quarterly basis. Our historical estimates of these costs were not materially different from actual results.

Royalty revenue generated from product licenses, which includes contributions for advertising, is based on reported sales of licensed products bearing our tradenames at rates specified in the license agreements. These agreements are also subject to contractual minimum levels. Royalty revenue generated by geographic licensing agreements is recognized as it is earned under the licensing agreements based on reported sales of licensees applicable to specified periods, as outlined in the agreements. These agreements allow for the use of our tradenames to sell our branded products in specific geographic regions.

***Inventories***

Our inventory costs include amounts paid to independent manufacturers, plus duties and freight to bring the goods to the Company's warehouses, as well as shipments to stores. The combined total of raw materials and work in process inventory recorded on our consolidated balance sheets as of April 2, 2022 and March 27, 2021 were $31 million and $28 million, respectively. We continuously evaluate the composition of our inventory and make adjustments when the cost of inventory is

PX7096-046

Table of Contents

not expected to be fully recoverable. The net realizable value of our inventory is estimated based on historical experience, current and forecasted demand and market conditions. In addition, reserves for inventory losses are estimated based on historical experience and inventory counts. Our inventory reserves are estimates, which could vary significantly from actual results if future economic conditions, customer demand or competition differ from expectations. Our historical estimates of these adjustments have not differed materially from actual results.

*Long-lived Assets*

We evaluate all long-lived assets, including operating lease right-of-use assets, property and equipment and definite-lived intangible assets, for impairment whenever events or changes in circumstances indicate that the carrying amount of any such asset may not be recoverable. For the purposes of impairment testing, we group long-lived assets at the lowest level of identifiable cash flow. Our leasehold improvements are typically amortized over the life of the store lease, including reasonably assured renewals and our shop-in-shops are amortized over a useful life of three to five years. Our impairment testing is based on our best estimate of the future operating cash flows. If the sum of our estimated undiscounted future cash flows associated with the asset is less than the asset's carrying value, we would recognize an impairment charge, which is measured as the amount by which the carrying value exceeds the fair value of the asset. The fair values determined by management require significant judgment and include certain assumptions regarding future sales and expense growth rates, discount rates and estimates of real estate market fair values. As such, these estimates may differ from actual results and are affected by future market and economic conditions.

During Fiscal 2022, Fiscal 2021 and Fiscal 2020, we recorded impairment charges of $83 million, $158 million and $357 million, respectively, which were primarily related to operating lease right-of-use assets and fixed assets of our retail store locations. Please refer to Note 7 and Note 13 of the accompanying consolidated financial statements for additional information.

*Goodwill and Other Indefinite-lived Intangible Assets*

We record intangible assets based on their fair value on the date of acquisition. Goodwill is recorded as the difference between the fair value of the purchase consideration and the fair value of the net identifiable tangible and intangible assets acquired. The brand intangible assets recorded in connection with the acquisitions of Versace and Jimmy Choo were determined to be indefinite-lived intangible assets, which are not subject to amortization. We perform an impairment assessment of goodwill, as well as the Versace brand and Jimmy Choo brand intangible assets on an annual basis, or whenever impairment indicators exist. In the absence of any impairment indicators, goodwill, the Versace brand and the Jimmy Choo brand are assessed for impairment during the fourth quarter of each fiscal year. Judgments regarding the existence of impairment indicators are based on market conditions and operational performance of the business.

We may assess our goodwill and our brand indefinite-lived intangible assets for impairment initially using a qualitative approach to determine whether it is more likely than not that the fair value of these assets is greater than their carrying value. When performing a qualitative test, we assess various factors including industry and market conditions, macroeconomic conditions and performance of our businesses. If the results of the qualitative assessment indicate that it is more likely than not that our goodwill and other indefinite-lived intangible assets are impaired, a quantitative impairment analysis is performed to determine if impairment is required. We may also elect to perform a quantitative analysis of goodwill and our indefinite-lived intangible assets initially rather than using a qualitative approach.

The impairment testing for goodwill is performed at the reporting unit level. We use industry accepted valuation models and set criteria that are reviewed and approved by various levels of management and, in certain instances, we engage independent third-party valuation specialists for assistance. To determine the fair value of a reporting unit, we use a combination of the income and market approaches, when applicable. We believe the blended use of both models, when applicable, compensates for the inherent risk associated with either model if used on a stand-alone basis, and this combination is indicative of the factors a market participant would consider when performing a similar valuation. If the fair value of a reporting unit exceeds the related carrying value, the reporting unit's goodwill is considered not to be impaired and no further testing is performed. If the carrying value of a reporting unit exceeds its fair value, an impairment loss is recorded for the difference. These valuations are affected by certain estimates, including future revenue growth rates, future operating expense growth rates, gross margins and discount rates. Future events could cause us to conclude that impairment indicators exist and goodwill may be impaired.

46

Table of Contents

When performing a quantitative impairment assessment of our brand intangible assets, the fair value of the Versace and the Jimmy Choo brands is estimated using a discounted cash flow analysis based on the "relief from royalty" method, assuming that a third party would be willing to pay a royalty in lieu of ownership for this intangible asset. This approach is dependent on many factors, including estimates of future revenue growth rates, royalty rates and discount rates. Actual future results may differ from these estimates. An impairment loss is recognized when the estimated fair value of the brand intangible assets is less than its carrying amount.

During the fourth quarter of Fiscal 2022, we performed our annual goodwill and indefinite-lived intangible assets impairment analysis. Based on qualitative impairment assessment of the Michael Kors reporting units, we concluded that it is more likely than not that the fair value of the Michael Kors reporting units exceeded its carrying value and, therefore, was not impaired. We elected to perform quantitative impairment analyses for the Versace and Jimmy Choo reporting units, using a combination of income and market approaches to estimate the fair values of reporting units. We also elected to perform an impairment analysis for the Versace and Jimmy Choo brand intangible assets using an income approach to estimate the fair values. Based on the results of these assessment, we concluded that the fair values of the Versace and Jimmy Choo reporting units and the brand intangible assets exceeded the related carrying amounts and no impairment was required.

In Fiscal 2021, we recorded a goodwill impairment charge of $94 million related to the Jimmy Choo wholesale and Jimmy Choo licensing reporting units and $69 million impairment charge related to the Jimmy Choo brand intangible assets during Fiscal 2021. We recorded a goodwill impairment charge of $171 million related to the Jimmy Choo retail and Jimmy Choo licensing reporting units and $180 million impairment charge related to the Jimmy Choo brand intangible assets during Fiscal 2020. The impairment charges were recorded within impairment of assets on our consolidated statement of operations and comprehensive income (loss) for the fiscal years ended March 27, 2021 and March 28, 2020. See Note 8 to the accompanying financial statements for information relating to the annual impairment analysis performed during the fourth quarters of Fiscal 2022, Fiscal 2021 and Fiscal 2020.

It is possible that our conclusions regarding impairment or recoverability of goodwill or other indefinite intangible assets could change in future periods if, for example, (i) our businesses do not perform as projected, (ii) overall economic conditions in future years vary from current assumptions, (iii) business conditions or strategies change from our current assumptions, (iv) discount rates change, (v) market multiples change or (vi) the identification of our reporting units change, among other factors. Such changes could result in a future impairment charge of goodwill or other indefinite intangible assets.

***Share-based Compensation***

We grant share-based awards to certain of our employees and directors. The grant date fair value of share options is calculated using the Black-Scholes option pricing model, which requires us to use subjective assumptions. The closing market price at the grant date is used to determine the grant date fair value of restricted stock units ("RSUs") and performance-based RSUs. These values are recognized as expense over the requisite service period, net of estimated forfeitures, based on expected attainment of pre-established performance goals for performance grants, or the passage of time for those grants which have only time-based vesting requirements. Compensation expense for performance-based RSUs is recognized over the employees' requisite service period when attainment of the performance goals is deemed probable, which involves judgment as to achievement of certain performance metrics.

We use our own historical experience in determining the expected holding period and volatility of our time-based share option awards. Determining the grant date fair value of share-based awards requires considerable judgment, including estimating expected volatility, expected term, risk-free rate and forfeitures. If factors change and we employ different assumptions, the fair value of future awards and resulting share-based compensation expense may differ significantly from what we have estimated in the past.

***Derivative Financial Instruments***

***Forward Foreign Currency Exchange Contracts***

We use forward foreign currency exchange contracts to manage our exposure to fluctuations in foreign currency for certain transactions. We, in our normal course of business, enter into transactions with foreign suppliers and seeks to minimize risks related to these transactions. We employ these contracts to hedge the our cash flows, as they relate to foreign currency transactions. Certain of these contracts are designated as hedges for accounting purposes, while others remain undesignated. All of our derivative instruments are recorded in our consolidated balance sheets at fair value on a gross basis, regardless of their hedge designation.

PX7096-048

Table of Contents

We designate certain contracts related to the purchase of inventory that qualify for hedge accounting as cash flow hedges. Formal hedge documentation is prepared for all derivative instruments designated as hedges, including a description of the hedged item and the hedging instrument and the risk being hedged. The changes in the fair value for contracts designated as cash flow hedges is recorded in equity as a component of accumulated other comprehensive income until the hedged item affects earnings. When the inventory related to forecasted inventory purchases that are being hedged is sold to a third party, the gains or losses deferred in accumulated other comprehensive income are recognized within cost of goods sold. The Company uses regression analysis to assess effectiveness of derivative instruments that are designated as hedges, which compares the change in the fair value of the derivative instrument to the change in the related hedged item. If the hedge is no longer expected to be highly effective in the future, future changes in the fair value are recognized in earnings. For those contracts that are not designated as hedges, changes in the fair value are recorded to foreign currency (gain) loss in our consolidated statements of operations and comprehensive income (loss). We classify cash flows relating to our forward foreign currency exchange contracts related to purchases of inventory consistently with the classification of the hedged item within cash flows from operating activities.

We are exposed to the risk that counterparties to derivative contracts will fail to meet their contractual obligations. In order to mitigate counterparty credit risk, we only enter into contracts with carefully selected financial institutions based upon their credit ratings and certain other financial factors, adhering to established limits for credit exposure. The aforementioned forward contracts generally have a term of no more than 12 months. The period of these contracts is directly related to the foreign transaction they are intended to hedge.

*Net Investment Hedges*

We also use fixed-to-fixed cross currency swap agreements to hedge our net investments in foreign operations against future volatility in the exchange rates between the United States dollar and the associated foreign currencies. We have elected the spot method of designating these contracts under ASU 2017-12, *"Derivatives and Hedging (Topic 815): Targeted Improvements to Accounting for Hedging Activities",* and have designated these contracts as net investment hedges. The net gain or loss on the net investment hedge is reported within foreign currency translation gains and losses ("CTA"), as a component of accumulated other comprehensive income on our consolidated balance sheets. Interest accruals and coupon payments are recognized directly in interest (income) expense, net, in our consolidated statements of operations and comprehensive income (loss). Upon discontinuation of a hedge, all previously recognized amounts remain in CTA until the net investment is sold, diluted or liquidated.

We are exposed to the risk that counterparties to derivative contracts will fail to meet their contractual obligations. In order to mitigate counterparty credit risk, we only enter into contracts with carefully selected financial institutions based upon their credit ratings and certain other financial factors, adhering to established limits for credit exposure.

During the fourth quarter of Fiscal 2020, we terminated all of our net investment hedges related to our Euro-denominated subsidiaries. The early termination of these hedges resulted in the receipt of $296 million in cash during the fourth quarter of Fiscal 2020. During Fiscal 2021, the Company resumed its normal hedging program and entered into multiple fixed-to-fixed cross-currency swap agreements to hedge its net investment in Euro-denominated and Japanese Yen-denominated subsidiaries against future volatility in the exchange rate between the United States dollar and these currencies. During Fiscal 2021, the Company entered into multiple fixed-to-fixed cross-currency swap agreements with aggregate notional amounts of $4 billion to hedge its net investment in Euro-denominated subsidiaries and $194 million to hedge its net investment in Japanese Yen-denominated subsidiaries against future volatility in the exchange rates between the United States dollar and these currencies.

During the first quarter of Fiscal 2022, we modified multiple fixed-to-fixed cross-currency swap agreements with aggregate notional amounts of $2.875 billion to hedge its net investment in Euro denominated subsidiaries. Due to an other-than-insignificant financing element for certain of the first quarter modifications, net interest cash inflows of $31 million during Fiscal 2022 related to these contracts are classified as financing activities in our consolidated statements of cash flows.

During the third and fourth quarter of Fiscal 2022, we modified multiple fixed-to-fixed cross-currency swap agreements with aggregate notional amounts of $1.5 billion and $2.475 billion, respectively. The modification of these hedges resulted in the receipt of $59 million and $130 million in cash during the third and fourth quarter of Fiscal 2022, respectively. These amounts are classified within investing activities in our consolidated statements of cash flows.

*Interest Rate Swap Agreements*

We also use interest rate swap agreements to hedge the variability of our cash flows resulting from floating interest rates on our borrowings. When an interest rate swap agreement qualifies for hedge accounting as a cash flow hedge, the changes in

PX7096-049

Table of Contents

the fair value are recorded in equity as a component of accumulated other comprehensive income and are reclassified into interest (income) expense, net, in the same period during which the hedged transactions affect earnings.

During the third quarter of Fiscal 2022, we terminated our only interest rate swap. As a result, we recognized a $1 million gain within interest (income) expense, net, within our consolidated statements of operations and comprehensive income (loss).

*Income Taxes*

Deferred income tax assets and liabilities reflect temporary differences between the tax basis and financial reporting basis of our assets and liabilities and are determined using the tax rates and laws in effect for the periods in which the differences are expected to reverse. We periodically assess the realizability of deferred tax assets and the adequacy of deferred tax liabilities, based on the results of local, state, federal or foreign statutory tax audits or our own estimates and judgments.

Realization of deferred tax assets associated with net operating loss and tax credit carryforwards is dependent upon generating sufficient taxable income prior to their expiration in the applicable tax jurisdiction. We periodically review the recoverability of our deferred tax assets and provide valuation allowances as deemed necessary to reduce deferred tax assets to amounts that more-likely-than-not will be realized. This determination involves considerable judgment and our management considers many factors when assessing the likelihood of future realization of deferred tax assets, including recent earnings results within various taxing jurisdictions, expectations of future taxable income, the carryforward periods remaining and other factors. Changes in the required valuation allowance are recorded in income in the period such determination is made. Deferred tax assets could be reduced in the future if our estimates of taxable income during the carryforward period are significantly reduced or alternative tax strategies are no longer viable.

We recognize the impact of an uncertain income tax position taken on our income tax returns at the largest amount that is more-likely-than-not to be sustained upon audit by the relevant taxing authority. The effect of an uncertain income tax position will not be taken into account if the position has less than a 50% likelihood of being sustained. Our tax positions are analyzed periodically (at least quarterly) and adjustments are made as events occur that warrant adjustments to those positions. We record interest and penalties payable to relevant tax authorities as income tax expense.

In response to the COVID-19 pandemic, local governments enacted, or are in the process of enacting, measures to provide aid and economic stimulus to companies. On March 27, 2020, the United States government enacted the Coronavirus Aid, Relief and Economic Security Act (the "CARES Act"), which includes various tax provisions aimed at providing economic relief. We realized a slight favorable cash flow impact in Fiscal 2021 as a result of the deferral of income tax payments under the CARES Act and other local government relief initiatives. We also considered the significant adverse impact of COVID-19 on our business in assessing the realizability of our deferred tax assets. Based on this assessment, we determined that valuation allowances of approximately $65 million were needed against a portion of our non-United States deferred tax assets in Fiscal 2020 which increased to $95 million in Fiscal 2021 and during Fiscal 2022 decreased to $36 million. We will continue to monitor the impacts of COVID-19 on our ability to realize our deferred tax assets and on the tax provision. Another provision of the CARES Act applicable to us is the modification to allow for a five-year carryback of net operating losses. We recognized a $13 million benefit from a net operating loss ("NOL") carryback claim in Fiscal 2021, which represented our provisional estimate at that time. During Fiscal 2022, we finalized our accounting for the carryback and recognized an additional $43 million income tax benefit.

*New Accounting Pronouncements*

Please refer to Note 2 to the accompanying consolidated financial statements for detailed information relating to recently adopted and recently issued accounting pronouncements and the associated impacts.

PX7096-050

Table of Contents

**Results of Operations**

A discussion regarding our results of operations for Fiscal 2022 compared to Fiscal 2021 is presented below. A discussion regarding our results of operations for Fiscal 2021 compared to Fiscal 2020 can be found under Item 7 in our Annual Report on Form 10-K for the year ended March 27, 2021, filed with the SEC on May 26, 2021, which is available on the SEC's website at www.sec.gov and our investor website at www.capriholdings.com.

*Comparison of Fiscal 2022 with Fiscal 2021*

The following table details the results of our operations for Fiscal 2022 and Fiscal 2021 and expresses the relationship of certain line items to total revenue as a percentage (dollars in millions):

| | Fiscal Years Ended | | | | % of Total Revenue for Fiscal 2022 | % of Total Revenue for Fiscal 2021 |
| | April 2, 2022 | March 27, 2021 | $ Change | % Change | | |
|---|---|---|---|---|---|---|
| **Statements of Operations Data:** | | | | | | |
| Total revenue | $ 5,654 | $ 4,060 | $ 1,594 | 39.3 % | | |
| Cost of goods sold | 1,910 | 1,463 | 447 | 30.6 % | 33.8 % | 36.0 % |
| Gross profit | 3,744 | 2,597 | 1,147 | 44.2 % | 66.2 % | 64.0 % |
| Selling, general and administrative expenses | 2,533 | 2,018 | 515 | 25.5 % | 44.8 % | 49.7 % |
| Depreciation and amortization | 193 | 212 | (19) | (9.0)% | 3.4 % | 5.2 % |
| Impairment of assets | 73 | 316 | (243) | (76.9)% | 1.3 % | 7.8 % |
| Restructuring and other charges | 42 | 32 | 10 | 31.3 % | 0.7 % | 0.8 % |
| Total operating expenses | 2,841 | 2,578 | 263 | 10.2 % | 50.2 % | 63.5 % |
| Income from operations | 903 | 19 | 884 | NM | 16.0 % | 0.5 % |
| Other income, net | (2) | (7) | 5 | 71.4 % | — % | (0.2)% |
| Interest (income) expense, net | (18) | 43 | (61) | NM | (0.3)% | 1.1 % |
| Foreign currency loss (gain) | 8 | (20) | 28 | NM | 0.1 % | (0.5)% |
| Income before provision for income taxes | 915 | 3 | 912 | NM | 16.2 % | 0.1 % |
| Provision for income taxes | 92 | 66 | 26 | 39.4 % | 1.6 % | 1.6 % |
| Net income (loss) | 823 | (63) | 886 | NM | | |
| Less: Net income (loss) attributable to noncontrolling interests | 1 | (1) | 2 | NM | | |
| Net income (loss) attributable to Capri | $ 822 | $ (62) | $ 884 | NM | | |

NM Not meaningful

*Total Revenue*

Total revenue increased $1.594 billion, or 39.3%, to $5.654 billion for Fiscal 2022, compared to $4.060 billion for Fiscal 2021, which included net favorable foreign currency effects of $25 million primarily related to the strengthening of the British Pound against the United States dollar in Fiscal 2022, as compared to Fiscal 2021. On a constant currency basis, our total revenue increased $1.569 billion, or 38.6%. The increase is attributable to the continued recovery from the COVID-19 pandemic. In the prior fiscal year, the Company experienced widespread, temporary store closures and a significant decline in store traffic. Fiscal 2022 also included approximately $70 million of incremental revenue attributable to the inclusion of the 53rd week.

*Gross Profit*

Gross profit increased $1.147 billion, or 44.2%, to $3.744 billion during Fiscal 2022, compared to $2.597 billion for Fiscal 2021, which included net favorable foreign currency effects of $5 million. Gross profit as a percentage of total revenue increased 220 basis points to 66.2% during Fiscal 2022, compared to 64.0% during Fiscal 2021. The increase in gross profit margin was primarily attributable to a higher average unit price and lower promotional activity, partially offset by increases in supply chain costs and unfavorable channel mix.

PX7096-051

Table of Contents

*Total Operating Expenses*

Total operating expenses increased $263 million, or 10.2%, to $2.841 billion during Fiscal 2022, compared to $2.578 billion for Fiscal 2021. Our operating expenses included a net unfavorable foreign currency impact of approximately $2 million. Total operating expenses as a percentage of total revenue decreased to 50.2% in Fiscal 2022, compared to 63.5% in Fiscal 2021. The components that comprise total operating expenses are detailed below.

*Selling, General and Administrative Expenses*

Selling, general and administrative expenses increased $515 million, or 25.5%, to $2.533 billion during Fiscal 2022, compared to $2.018 billion for Fiscal 2021, primarily due to increased retail store, e-commerce, corporate and marketing expenses during Fiscal 2022.

Selling, general and administrative expenses as a percentage of total revenue decreased to 44.8% during Fiscal 2022, compared to 49.7% for Fiscal 2021, primarily due to leveraging of operating expenses as a result of higher revenue.

Unallocated corporate expenses, which are included within selling, general and administrative expenses discussed above, but are not directly attributable to a reportable segment, increased $38 million, or 25.0%, to $190 million for Fiscal 2022, compared to $152 million for Fiscal 2021, primarily due to an increase in professional fees related to the ERP system implementation and Capri transformation projects and an increase in compensation expense.

*Depreciation and Amortization*

Depreciation and amortization decreased $19 million, or 9.0%, to $193 million during Fiscal 2022, compared to $212 million for Fiscal 2021. The decrease in depreciation and amortization expense was primarily attributable to lower depreciation due to lower capital expenditures in Fiscal 2022 and Fiscal 2021. Depreciation and amortization decreased to 3.4% as a percentage of total revenue during Fiscal 2022, compared to 5.2% for Fiscal 2021 primarily due to higher revenues during Fiscal 2022.

*Impairment of Assets*

During Fiscal 2022, we recognized asset impairment charges of $73 million, primarily related to the impairment of operating lease right-of-use assets. During Fiscal 2021, we recognized asset impairment charges of approximately $316 million, primarily related to the impairment of Jimmy Choo goodwill and its brand intangible assets, as well as the impairment of operating lease right-of-use assets (see Note 13 to the accompanying consolidated financial statements for additional information).

*Restructuring and Other Charges*

During Fiscal 2022, we recognized restructuring and other charges of $42 million, which included other costs of $33 million, primarily related to equity awards associated with the acquisition of Versace and severance for an executive officer and $9 million related to our Capri Retail Store Optimization Program (see Note 10 to the accompanying consolidated financial statements for additional information).

During Fiscal 2021, we recognized restructuring and other charges of $32 million, which included other costs of $27 million, primarily related to equity awards associated with the acquisition of Versace and the closure of certain corporate locations and $5 million related to our Capri Retail Store Optimization Program.

*Income from Operations*

As a result of the foregoing, income from operations increased $884 million to $903 million during Fiscal 2022, compared to $19 million for Fiscal 2021. Income from operations as a percentage of total revenue increased to 16.0% in Fiscal 2022, compared to 0.5% in Fiscal 2021. See *Segment Information* above for a reconciliation of our segment operating income to total operating income.

PX7096-052

Table of Contents

*Interest (Income) Expense, net*

During Fiscal 2022, we recognized $18 million of interest income compared to $43 million of interest expense during Fiscal 2021. The $61 million improvement in interest (income) expense, net, is primarily due to an increase of interest income from higher average notional amounts outstanding on our net investment hedges in the current year and a decrease in interest expense attributable to lower average borrowings outstanding (see Note 11 and Note 14 to the accompanying consolidated financial statements for additional information).

*Foreign Currency (Gain) Loss*

During Fiscal 2022 and Fiscal 2021, we recognized a net foreign currency loss of $8 million and a net foreign currency gain of $20 million, respectively, primarily attributable to the remeasurement of intercompany loans with certain of our subsidiaries.

*Provision for Income Taxes*

During Fiscal 2022, we recognized $92 million of income tax expense on pre-tax income of $915 million compared with $66 million of income tax expense on a pre-tax income of $3 million for Fiscal 2021. Our effective tax rate for Fiscal 2022 was significantly lower than our effective tax rate in Fiscal 2021, and not a meaningful or comparable metric, primarily due to the relationship between our income tax expense and minimal pre-tax income in the prior year as compared to the current year. The Fiscal 2022 income tax expense was higher than Fiscal 2021 primarily due to the increase in pre-tax income and increases in uncertain tax positions during Fiscal 2022. The increase was partially offset by a release of a valuation allowance in certain European subsidiaries, the impact of recently enacted tax legislation in Italy which allowed the Company to reduce its deferred tax liabilities, as well as a more favorable effect of our global financing activities during Fiscal 2022 compared to Fiscal 2021. As a result, the effect that discrete tax amounts have on the effective income tax rate during the year is not comparable. See Note 17 to the accompanying consolidated financial statements for additional information.

The global financing activities are related to our previously disclosed 2014 move of our principal executive office from Hong Kong to the U.K. and decision to become a U.K. tax resident. In connection with this decision, we funded our international growth strategy through intercompany debt financing arrangements between certain of our United States, United Kingdom and Hungarian subsidiaries. Accordingly, due to the difference in the statutory income tax rates between these jurisdictions, we realized a lower effective tax rate on consolidated pre-tax income.

Our effective tax rate may fluctuate from time to time due to the effects of changes in United States state and local taxes and tax rates in foreign jurisdictions. In addition, factors such as the geographic mix of earnings, enacted tax legislation and the results of various global tax strategies, may also impact our effective tax rate in future periods.

*Net Income (Loss) Attributable to Noncontrolling Interest*

During Fiscal 2022, we recorded net income attributable to noncontrolling interest of $1 million and during Fiscal 2021, we recorded a net loss of $1 million, attributable to the noncontrolling interest in our joint ventures. These amounts represent the share of income (loss) that is not attributable to the Company.

*Net Income (Loss) Attributable to Capri*

As a result of the foregoing, during Fiscal 2022 our net income attributable to Capri increased $884 million to $822 million, compared to a net loss of $62 million for Fiscal 2021.

PX7096-053

Table of Contents

**Segment Information**

*Versace*

| | Fiscal Years Ended | | | % Change | |
| --- | --- | --- | --- | --- | --- |
| | April 2, 2022 | March 27, 2021 | $ Change | As Reported | Constant Currency |
| Revenues | $ 1,088 | $ 718 | $ 370 | 51.5 % | 52.8 % |
| Income from operations | 185 | 21 | 164 | NM | |
| Operating margin | 17.0 % | 2.9 % | | | |

NM Not meaningful

*Revenues*

Versace revenues increased $370 million, or 51.5%, to $1.088 billion for Fiscal 2022, compared to $718 million for Fiscal 2021, which included unfavorable foreign currency effects of $9 million. On a constant currency basis, revenue increased $379 million, or 52.8%, primarily attributable to the continued recovery from the COVID-19 pandemic. In the prior fiscal year, the Company experienced widespread, temporary store closures and a significant decline in store traffic.

*Income from Operations*

During Fiscal 2022, Versace recorded income from operations of $185 million compared to $21 million for Fiscal 2021. Operating margin increased from 2.9% for Fiscal 2021 to 17.0% for Fiscal 2022, primarily due to a higher average unit price and leveraging of operating expenses due to higher revenue.

*Jimmy Choo*

| | Fiscal Years Ended | | | % Change | |
| --- | --- | --- | --- | --- | --- |
| | April 2, 2022 | March 27, 2021 | $ Change | As Reported | Constant Currency |
| Revenues | $ 613 | $ 418 | $ 195 | 46.7 % | 40.4 % |
| Income (loss) from operations | 13 | (55) | 68 | NM | |
| Operating margin | 2.1 % | (13.2)% | | | |

NM Not meaningful

*Revenues*

Jimmy Choo revenues increased $195 million, or 46.7%, to $613 million for Fiscal 2022, compared to $418 million for Fiscal 2021, which included favorable foreign currency effects of $26 million. On a constant currency basis, revenue increased $169 million, or 40.4%, primarily attributable to the continued recovery from the COVID-19 pandemic. In the prior fiscal year, the Company experienced widespread, temporary store closures and a significant decline in store traffic. Fiscal 2022 also included incremental revenue attributable to the inclusion of the 53rd week.

*Income (Loss) from Operations*

During Fiscal 2022, Jimmy Choo recorded income from operations of $13 million compared to a loss from operations of $55 million for Fiscal 2021. Operating margin improved from (13.2)% for Fiscal 2021 to 2.1% for Fiscal 2022, primarily due to a higher average unit price and leveraging of operating expenses due to higher revenue.

PX7096-054

Table of Contents

***Michael Kors***

| | Fiscal Years Ended | | | % Change | |
| --- | --- | --- | --- | --- | --- |
| | April 2, 2022 | March 27, 2021 | $ Change | As Reported | Constant Currency |
| Revenues | $ 3,953 | $ 2,924 | $ 1,029 | 35.2 % | 34.9 % |
| Income from operations | 1,005 | 595 | 410 | 68.9 % | |
| Operating margin | 25.4 % | 20.3 % | | | |

*Revenues*

Michael Kors revenues increased $1.029 billion, or 35.2%, to $3.953 billion for Fiscal 2022, compared to $2.924 billion for Fiscal 2021, which included favorable foreign currency effects of $8 million. On a constant currency basis, revenue increased $1.021 billion, or 34.9%, primarily attributable to the continued recovery from the COVID-19 pandemic. In the prior fiscal year, the Company experienced widespread, temporary store closures and a significant decline in store traffic. Fiscal 2022 also included incremental revenue attributable to the inclusion of the 53rd week.

*Income from Operations*

During Fiscal 2022, Michael Kors recorded income from operations of $1.005 billion compared to $595 million for Fiscal 2021. Operating margin increased from 20.3% for Fiscal 2021 to 25.4% for Fiscal 2022, primarily due to a higher average unit price and leveraging of operating expenses due to higher revenue, partially offset by increases in supply chain costs.

54

Table of Contents

## Liquidity and Capital Resources

Our primary sources of liquidity are the cash flows generated from our operations, along with borrowings available under our credit facilities (see below discussion regarding "Revolving Credit Facilities") and available cash and cash equivalents. Our primary use of this liquidity is to fund the ongoing cash requirements, including our working capital needs and capital investments in our business, debt repayments, acquisitions, returns of capital, including share repurchases and other corporate activities. We believe that the cash generated from our operations, together with borrowings available under our revolving credit facilities and available cash and cash equivalents, will be sufficient to meet our working capital needs for the next 12 months and beyond, including investments made and expenses incurred in connection with our store growth plans, investments in corporate and distribution facilities, continued systems development, e-commerce and marketing initiatives. We spent $131 million on capital expenditures during Fiscal 2022 and expect to spend approximately $300 million during Fiscal 2023. This anticipated increase reflects continued expenditures related to our retail operations (including e-commerce), ERP system implementation and Capri transformation programs. The majority of the Fiscal 2022 expenditures related to our retail operations (including e-commerce) and our corporate offices.

The following table sets forth key indicators of our liquidity and capital resources (in millions):

| | As of | | | |
| | April 2, 2022 | | March 27, 2021 | |
|---|---|---|---|---|
| **Balance Sheet Data:** | | | | |
| Cash and cash equivalents | $ | 169 | $ | 232 |
| Working capital | $ | 325 | $ | (75) |
| Total assets | $ | 7,480 | $ | 7,481 |
| Short-term debt | $ | 29 | $ | 123 |
| Long-term debt | $ | 1,131 | $ | 1,219 |

| | Fiscal Years Ended | | | | | |
| | April 2, 2022 | | March 27, 2021 | | March 28, 2020 | |
|---|---|---|---|---|---|---|
| **Cash flows provided by (used in):** | | | | | | |
| Operating activities | $ | 704 | $ | 624 | $ | 859 |
| Investing activities | | 58 | | (124) | | 62 |
| Financing activities | | (800) | | (870) | | (497) |
| Effect of exchange rate changes | | (24) | | 12 | | (4) |
| **Net (decrease) increase in cash, cash equivalents and restricted cash** | $ | (62) | $ | (358) | $ | 420 |

### Cash Provided by Operating Activities

Cash provided by operating activities increased $80 million to $704 million during Fiscal 2022, as compared to $624 million for Fiscal 2021, which was due to an increase in our net income after non-cash adjustments, partially offset by decreases related to changes in our working capital. The decreases related to the changes in our working capital are primarily attributable to an increase in our inventory levels and fluctuations in the timing of payments and receipts when compared to the prior year.

Cash provided by operating activities decreased $235 million to $624 million during Fiscal 2021, as compared to $859 million for Fiscal 2020, which was due to a decrease in our net income after non-cash adjustments, primarily driven by a decrease in impairments and a decrease in net loss, partially offset by increases related to changes in our working capital, primarily attributable to fluctuations in the timing of payments and receipts due to the impact of COVID-19.

### Cash Provided by (Used in) Investing Activities

Net cash provided by investing activities was $58 million during Fiscal 2022, as compared to net cash used in investing activities of $124 million during Fiscal 2021. The $182 million increase in cash provided by investing activities was primarily attributable to $189 million cash received on the settlement of certain net investment hedges during Fiscal 2022.

PX7096-056

Table of Contents

Net cash used in investing activities was $124 million during Fiscal 2021, as compared to net cash provided by investing activities of $62 million during Fiscal 2020. The $186 million increase in cash used in investing activities was primarily attributable to a $298 million settlement of net investment hedges during Fiscal 2020, partially offset by a $112 million decrease in capital expenditures compared to Fiscal 2020.

### *Cash Used in Financing Activities*

Net cash used in financing activities was $800 million during Fiscal 2022, as compared to $870 million during Fiscal 2021. The decrease in cash used by financing activities of $70 million was primarily due to a decrease in net debt repayments of $681 million, higher cash proceeds from other financing activities and employee option exercises, partially offset by an increase of $660 million in cash payments to repurchase our ordinary shares during Fiscal 2022.

Net cash used in financing activities was $870 million during Fiscal 2021, as compared to $497 million during Fiscal 2020. The increase in cash used by financing activities of $373 million was primarily due to an increase in net debt repayments of $474 million, partially offset by a decrease of $101 million in cash payments to repurchase our ordinary shares during Fiscal 2021.

56

Table of Contents

**Debt Facilities**

The following table presents a summary of the Company's borrowing capacity and amounts outstanding as of April 2, 2022 and March 27, 2021 (dollars in millions):

| | | Fiscal Years Ended | | |
|---|---|---|---|---|
| | | April 2, 2022 | | March 27, 2021 |
| **Senior Secured Revolving Credit Facility:** | | | | |
| *Revolving Credit Facility (excluding up to a $500 million accordion feature)* [1] | | | | |
| Total Availability | $ | 1,000 | $ | 1,000 |
| Borrowings outstanding [2] | | **175** | | — |
| Letter of credit outstanding | | 21 | | 27 |
| Remaining availability | $ | 804 | $ | 973 |
| | | | | |
| *Term Loan Facility ($1.6 billion)* | | | | |
| Borrowings Outstanding, net of debt issuance costs [2] | $ | **495** | $ | **865** |
| Remaining availability | $ | — | $ | — |
| | | | | |
| *364 Credit Facility ($230 million)* | | | | |
| Total availability | $ | — | $ | 230 |
| Remaining availability | $ | — | $ | 230 |
| | | | | |
| *Senior Notes due 2024* | | | | |
| Borrowings Outstanding, net of debt issuance costs and discount amortization [2] | $ | **448** | $ | **447** |
| | | | | |
| *Other Borrowings* [3] | $ | **42** | $ | **21** |
| | | | | |
| **Hong Kong Uncommitted Credit Facility:** | | | | |
| Total availability (80 million and 100 million Hong Kong Dollar) [4] | $ | 10 | $ | 13 |
| Borrowings outstanding | | — | | — |
| Remaining availability (80 million and 100 million Hong Kong Dollar) | $ | 10 | $ | 13 |
| | | | | |
| **China Uncommitted Credit Facility:** | | | | |
| Total availability (45 million and 100 million Chinese Yuan) [4] | $ | 7 | $ | 15 |
| Borrowings outstanding | | — | $ | — |
| Remaining availability (45 million and 100 million Chinese Yuan) | $ | 7 | $ | 15 |
| | | | | |
| **Japan Credit Facility:** | | | | |
| Total availability (1.0 billion Japanese Yen) | $ | 8 | $ | 9 |
| Borrowings outstanding (0.0 billion and 1.0 billion Japanese Yen) [5] | | — | | 9 |
| Remaining availability (1.0 billion and 0.0 billion Japanese Yen) | $ | 8 | $ | — |
| | | | | |
| **Versace Uncommitted Credit Facility:** | | | | |
| Total availability (48 million and 57 million Euro) [4] | $ | 52 | $ | 67 |
| Borrowings outstanding (0 million Euro) | | — | | — |
| Remaining availability (48 million and 57 million Euro) | $ | 52 | $ | 67 |
| | | | | |
| **Total borrowings outstanding** [1] | $ | **1,160** | $ | **1,342** |
| Total remaining availability | $ | 881 | $ | 1,298 |

[1] The financial covenant in our 2018 Credit Facility requiring us to maintain a ratio of the sum of total indebtedness plus the capitalized amount of all operating lease obligations for the last four fiscal quarters to Consolidated EBITDAR of no greater than 3.75 to 1 was previously waived through the fiscal quarter ending June 26, 2021. We terminated the waiver period effective May 26, 2021. Effective as of that date, the Company was required to comply with the quarterly maximum net leverage ratio test of 4.00 to 1.0. As of April 2, 2022 and March 27, 2021, we were

PX7096-058

Table of Contents

in compliance with all covenants related to our agreements then in effect governing our debt.

(2)  As of April 2, 2022, all amounts are recorded as long-term debt in our consolidated balance sheets. As of March 27, 2021, all amounts were recorded as long-term debt, except for the current portion of $97 million outstanding under the 2018 Term Loan Facility, which was recorded within short-term debt in our consolidated balance sheets.

(3)  The balance as of April 2, 2022 consists of $21 million related to our supplier finance program recorded within short-term debt in our consolidated balance sheets, $18 million related to the sale of certain Versace tax receivables, with $8 million and $10 million, respectively, recorded within short-term debt and long-term debt in our consolidated balance sheets and $3 million of other loans recorded as long-term debt in our consolidated balance sheets. The balance as of March 27, 2021 consists of $17 million related to our supplier finance program recorded within short term debt in our consolidated balance sheets and $4 million of other loans recorded as long-term debt in our consolidated balance sheets.

(4)  The balance as of April 2, 2022 represents the total availability of the credit facility, which excludes bank guarantees.

(5)  Recorded as short-term debt in our consolidated balance sheets as of March 27, 2021.

We believe that our 2018 Credit Facility is adequately diversified with no undue concentration in any one financial institution. As of April 2, 2022, there were 25 financial institutions participating in the facility, with none maintaining a maximum commitment percentage in excess of 10%. We have no reason to believe that the participating institutions will be unable to fulfill their obligations to provide financing in accordance with the terms of the 2018 Credit Facility.

See Note 11 in the accompanying consolidated financial statements for detailed information relating to our credit facilities and debt obligations.

**Share Repurchase Program**

The following table presents our treasury share repurchases during the fiscal years ended April 2, 2022 and March 27, 2021 (dollars in millions):

|  | Fiscal Years Ended | |
|---|---|---|
|  | April 2, 2022 | March 27, 2021 |
| Cost of shares repurchased under share repurchase program | $ 650 | $ — |
| Fair value of shares withheld to cover tax obligations for vested restricted share awards | 11 | 1 |
| Total cost of treasury shares repurchased | $ 661 | $ 1 |
|  |  |  |
| Shares repurchased under share repurchase program | 11,014,541 | — |
| Shares withheld to cover tax withholding obligations | 203,863 | 48,528 |
|  | 11,218,404 | 48,528 |

During the first quarter of Fiscal 2021, the Company suspended its $500 million share-repurchase program in response to the continued impact of the COVID-19 pandemic. See Note 15 in the accompanying financial statements for additional information.

On November 3, 2021, we announced that our Board of Directors had terminated our existing $500 million share repurchase program (the "Prior Plan"), with $250 million of availability remaining, and authorized a new share repurchase program (the "Fiscal 2022 Plan") pursuant to which we may, from time to time, repurchase up to $1.0 billion of our outstanding ordinary shares within a period of two years from the effective date of the program. As of April 2, 2022, the remaining availability under the Fiscal 2022 Plan was $500 million. Share repurchases may be made in open market or privately negotiated transactions, subject to market conditions, applicable legal requirements, trading transactions under our insider trading policy and other relevant factors. The program may be suspended or discontinued at any time.

On June 1, 2022, we announced that its Board of Directors has terminated our Fiscal 2022 Plan, with $500 million of availability remaining, and authorized a new share repurchase program pursuant to which we may, from time to time, repurchase up to $1.0 billion of our outstanding ordinary shares within period of two years from the effective date of the program. Share repurchases may be made in open market or privately negotiated transactions, subject to market conditions, applicable legal requirements, trading restrictions under our insider trading policy and other relevant factors. The program may be suspended or discontinued at any time.

PX7096-059

Table of Contents

See Note 15 and Note 20 to the accompanying consolidated financial statements for additional information.

**Contractual Obligations and Commercial Commitments**

As of April 2, 2022, our contractual obligations and commercial commitments were as follows (in millions):

| Fiscal Years | Fiscal 2023 | Fiscal 2024-2025 | Fiscal 2026-2027 | Fiscal 2028 and thereafter | Total |
|---|---|---|---|---|---|
| Operating leases | $ 482 | $ 734 | $ 422 | $ 426 | $ 2,064 |
| Interest, net [1] | — | — | — | — | — |
| Inventory purchase obligations | 1,016 | — | — | — | 1,016 |
| Other commitments | 77 | 26 | 5 | — | 108 |
| Short-term debt | 29 | — | — | — | 29 |
| Long-term debt | — | 1,135 | — | — | 1,135 |
| Total | $ 1,604 | $ 1,895 | $ 427 | $ 426 | $ 4,352 |

[1]  Beginning in Fiscal 2023, we will be in an interest income position, therefore we would not have interest expense obligations due through the above periods.

*Operating lease obligations* represent equipment leases and the minimum lease rental payments due under non-cancelable operating leases for our real estate locations globally. In addition to the above amounts, we are typically required to pay real estate taxes, contingent rent based on sales volume and other occupancy costs relating to leased properties for our retail stores.

*Interest, net* represents the estimated net interest expense associated with our term loan based on the current interest rate and interest from our interest rate swap. It also includes the estimated net interest income from our net investment hedges.

*Inventory purchase obligations* represent contractual obligations for future purchases of inventory.

*Other commitments* include non-cancelable contractual obligations related to marketing and advertising agreements, information technology agreements and supply agreements.

The above table excludes current liabilities (other than short-term debt and short-term operating lease liabilities) recorded as of April 2, 2022, as these items will be paid within one year, and non-current liabilities that have no cash outflows associated with them (e.g., deferred taxes).

**Off-Balance Sheet Arrangements**

We have not created, and are not party to, any special-purpose or off-balance sheet entities for the purpose of raising capital, incurring debt or operating our business. In addition to the commitments in the above table, our off-balance sheet commitments relating to our outstanding letters of credit were $36 million at April 2, 2022, including $15 million in letters of credit issued outside of the 2018 Credit Facility. In addition, as of April 2, 2022, bank guarantees of approximately $30 million were supported by our various credit facilities. We do not have any other off-balance sheet arrangements or relationships with entities that are not consolidated into our financial statements that have or are reasonably likely to have a material current or future effect on our financial condition, changes in financial condition, revenues, expenses, results of operations, liquidity, capital expenditures or capital resources.

**Item 7A.   Quantitative and Qualitative Disclosures about Market Risk**

We are exposed to certain market risks during the normal course of our business, such as risk arising from fluctuations in foreign currency exchange rates, as well as fluctuations in interest rates. In order to manage these risks, we employ certain strategies to mitigate the effect of these fluctuations. We enter into foreign currency forward contracts to manage our foreign currency exposure to the fluctuations of certain foreign currencies. The use of these instruments primarily helps to manage our exposure to our foreign purchase commitments and better control our product costs. We do not use derivatives for trading or speculative purposes.

PX7096-060

Table of Contents

### Foreign Currency Exchange Risk

*Forward Foreign Currency Exchange Contracts*

We are exposed to risks on certain purchase commitments to foreign suppliers based on the value of our purchasing subsidiaries' local currency relative to the currency requirement of the supplier on the date of the commitment. As such, we enter into forward currency exchange contracts that generally mature in 12 months or less and are consistent with the related purchase commitments, to manage our exposure to the changes in the value of the Euro and the Canadian dollar. These contracts are recorded at fair value in our consolidated balance sheets as either an asset or liability, and are derivative contracts to hedge cash flow risks. Certain of these contracts are designated as hedges for hedge accounting purposes, while other contracts are not designated as hedges for accounting purposes. Accordingly, the changes in the fair value of the majority of these contracts at the balance sheet date are recorded in our equity as a component of accumulated other comprehensive income, and upon maturity (settlement) are recorded in, or reclassified into, our cost of goods sold or operating expenses, in our consolidated statements of operations and comprehensive income (loss), as applicable to the transactions for which the forward currency exchange contracts were established.

We perform a sensitivity analysis on our forward currency contracts, both designated and not designated as hedges for accounting purposes, to determine the effects of fluctuations in foreign currency exchange rates. For this sensitivity analysis, we assume a hypothetical change in United States dollar against foreign exchange rates. Based on all foreign currency exchange contracts outstanding as of April 2, 2022, a 10% appreciation or devaluation of the United States dollar compared to the level of foreign currency exchange rates for currencies under contract as of April 2, 2022, would result in a potential net increase and decrease upon settlement of approximately $15 million in the fair value of these contracts.

*Net Investment Hedges*

We are exposed to adverse foreign currency exchange rate movements related to our net investment hedges. As of April 2, 2022, we have multiple fixed to fixed cross-currency swap agreements with aggregate notional amounts of $4 billion to hedge our net investment in Euro-denominated subsidiaries and $194 million to hedge our net investments in Japanese Yen-denominated subsidiaries against future volatility in the exchange rates between the United States dollar and this currency. Under the term of these contracts, we will exchange the semi-annual fixed rate payments on United States denominated debt for fixed rate payments of 0% to 3.565% in Euros and 0% to 3.408% in Japanese Yen. Based on the net investment hedges outstanding as of April 2, 2022, a 10% appreciation or devaluation of the United States dollar compared to the level of foreign currency exchange rates for currencies under contract as of April 2, 2022, would result in a potential net increase or decrease upon settlement of approximately $432 million in the fair value of this contract, which include mandatory early termination dates between August 2025 and February 2026, while the remaining contracts have maturity dates between March 2024 and February 2051. In addition, certain other contracts are supported by a credit support annex ("CSA") which provides for collateral exchange with the earliest effective date being November 2023. If the outstanding position of a contract exceeds a certain threshold governed by the aforementioned CSA's, either party is required to post cash collateral.

### Interest Rate Risk

We are exposed to interest rate risk in relation to borrowings outstanding under our 2018 Term Loan Facility, our Credit Facility, our Hong Kong Credit Facility, our Japan Credit Facility and our Versace Credit Facilities. Our 2018 Term Loan Facility carries interest at a rate that is based on LIBOR. Our 2018 Credit Facility carries interest rates that are tied to LIBOR and the prime rate, among other institutional lending rates (depending on the particular origination of borrowing), as further described in Note 11 to the accompanying consolidated financial statements. Our Hong Kong Credit Facility carries interest at a rate that is tied to the Hong Kong Interbank Offered Rate. Our China Credit Facility carries interest at a rate that is tied to the People's Bank of China's Benchmark lending rate. Our Japan Credit Facility carries interest at a rate posted by the Mitsubishi UFJ Financial Group. Our Versace Credit Facility carries interest at a rate set by the bank on the date of borrowing that is tied to the European Central Bank. Therefore, our consolidated statements of operations and comprehensive income (loss) and cash flows are exposed to changes in those interest rates. At April 2, 2022, we had $175 million borrowings outstanding under our Revolving Credit Facility, $495 million, net of debt issuance costs, outstanding under our 2018 Term Loan Facility and no borrowings outstanding under our Versace Credit Facilities. At March 27, 2021, we had no borrowings outstanding under our Revolving Credit Facility, $865 million, net of debt issuance costs, outstanding under our 2018 Term Loan Facility and no borrowings outstanding under our Versace Credit Facility. These balances are not indicative of future balances that may be outstanding under our revolving credit facilities that may be subject to fluctuations in interest rates. Any increases in the applicable interest rate(s) would cause an increase to the interest expense relative to any outstanding balance at that date.

PX7096-061

Table of Contents

*Credit Risk*

As of April 2, 2022, our $450 million Senior Notes, due in 2024, bear interest at a fixed rate equal to 4.500% per year, payable semi-annually. Our Senior Notes interest rate payable may be subject to adjustments from time to time if either Moody's or S&P (or a substitute rating agency), downgrades (or downgrades and subsequently upgrades) the credit rating assigned to the Senior Notes. See Note 20 to the accompanying consolidated financial statements for additional information.

### Item 8.    Financial Statements and Supplementary Data

See "Item 15. Exhibits and Financial Statement Schedules" for a listing of the consolidated financial statements and supplementary data included in this report.

### Item 9.    Changes in and Disagreements with Accountants on Accounting and Financial Disclosure

Not applicable.

### Item 9A.    Controls and Procedures

*Disclosure Controls and Procedures*

We carried out an evaluation, under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, our principal executive officer and principal financial officer, respectively, of the design and operation of our disclosure controls and procedures (as such term is defined in Rules 13a - 15(e) and 15(d) - 15(e) under the Securities and Exchange Act of 1934, as amended, (the "Exchange Act")) as of April 2, 2022. Based on the evaluation, the Chief Executive Officer and Chief Financial Officer concluded that disclosure controls and procedures are effective as of April 2, 2022.

*Management's Report on Internal Control over Financial Reporting*

Our management is responsible for establishing and maintaining adequate internal control over financial reporting (as defined under the Exchange Act Rule 13a-15 (f)) to provide reasonable assurance regarding the reliability of financial reporting and that the consolidated financial statements have been prepared in accordance with U.S. GAAP. Such internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets; (ii) provide reasonable assurance (A) that transactions are recorded as necessary to permit preparation of financial statements in accordance with U.S. GAAP and that receipts and expenditures of the Company are being made only in accordance with authorizations of management and directors; and (B) regarding prevention or timely detection of unauthorized acquisition, use or disposition of our assets that could have a material effect on the financial statements.

Our management assessed the effectiveness of our internal control over financial reporting as of April 2, 2022. In making this assessment, it used the criteria set forth in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO), the 2013 Framework. Based on this assessment, management has determined that, as of April 2, 2022, our internal control over financial reporting is effective based on those criteria.

The Company's internal control over financial reporting as of April 2, 2022, as well as the consolidated financial statements, have been audited by Ernst & Young LLP, an independent registered public accounting firm, as stated in their report which appears herein.

*Changes in Internal Control over Financial Reporting*

Except as discussed below, there have been no changes in our internal control over financial reporting during the three months ended April 2, 2022, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

We are currently undertaking a major, multi-year ERP implementation to upgrade our information technology platforms and systems worldwide. The implementation is occurring in phases over multiple years. We have launched the Michael Kors Finance functionality on the ERP system in North America in the first quarter of Fiscal 2023.

PX7096-062

Table of Contents

As a result of this multi-year implementation, we expect certain changes to our processes and procedures, which in turn, could result in changes to our internal control over financial reporting. While we expect this implementation to strengthen our internal control over financial reporting by automating certain manual processes and standardizing business processes and reporting across our organization, we will continue to evaluate and monitor our internal control over financial reporting as processes and procedures in the affected areas evolve. See Item 1A. "Risk Factors" — "A material delay or disruption in our information technology systems or e-commerce websites or our failure or inability to upgrade our information technology systems precisely and efficiently could have a material adverse effect on our business, results of operations and financial condition."

**Item 9B.   Other Information**

As previously announced, the Board of Directors of the Company approved a retail store optimization program (the "Capri Retail Store Optimization Program") to improve the profitability of its retail store fleet. During the fourth quarter of Fiscal 2022, the Company completed its plan to close certain retail stores as a part of Capri Retail Store Optimization Program. The Company closed a total of 167 of its retail stores, with 66 and 101 stores having closed during Fiscal 2022 and Fiscal 2021, respectively. Net restructuring charges recorded in connection with the Capri Retail Store Optimization Program was $14 million, of which $9 million and $5 million was recorded during Fiscal 2022 and Fiscal 2021, respectively. Net restructuring charges recorded in connection with the Capri Retail Store Optimization Program were $3 million during the three months ended April 2, 2022.

This disclosure is intended to satisfy the requirements of Item 2.05 of Form 8-K.

PX7096-063

Table of Contents

**Part III**

**Item 10.**   *Directors, Executive Officers and Corporate Governance*

Information with respect to this Item is included in the Company's Proxy Statement to be filed in June 2022, which is incorporated herein by reference.


**Item 11.**   *Executive Compensation*

Information with respect to this Item is included in the Company's Proxy Statement to be filed in June 2022, which is incorporated herein by reference.


**Item 12.**   *Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters*

The following table sets forth information as of April 2, 2022 regarding compensation plans under which the Company's equity securities are authorized for issuance:

**Equity Compensation Plan Information**

| Plan category | (a) Number of securities to be issued upon exercise of outstanding options, warrants and rights | (b) Weighted-average exercise price of outstanding options, warrants and rights [2] | (c) Number of securities remaining available for future issuance under equity compensation plans (excluding securities reflected in column (a)) |
|---|---|---|---|
| Equity compensation plans approved by security holders [1] | 4,393,340 | $ 39.96 | 4,062,239 |
| Equity compensation plans not approved by security holders | — | $ — | — |
| **Total** | 4,393,340 | $ 39.96 | 4,062,239 |

[1]   Reflects share options and restricted stock units issued under the Company's Amended and Restated Omnibus Incentive Plan.

[2]   Represents the weighted average exercise price of outstanding share awards only.


**Item 13.**   *Certain Relationships, Related Transactions and Director Independence*

Information with respect to this Item is included in the Company's Proxy Statement to be filed in June 2022, which is incorporated herein by reference.


**Item 14.**   *Principal Accountant Fees and Services*

Information with respect to this Item is included in the Company's Proxy Statement to be filed in June 2022, which is incorporated herein by reference.

PX7096-064

Table of Contents

## PART IV

**Item 15.**    *Exhibits and Financial Statement Schedules*

(a)    The following documents are filed as part of this annual report on Form 10-K:

1.    The following consolidated financial statements listed below are filed as a separate section of this Annual Report on Form 10-K:

Report of Independent Registered Public Accounting Firm - Ernst & Young LLP (PCAOB ID No. 42).

Consolidated Balance Sheets as of April 2, 2022 and March 27, 2021.

Consolidated Statements of Operations and Comprehensive Income (Loss) for the fiscal years ended April 2, 2022, March 27, 2021 and March 28, 2020.

Consolidated Statements of Shareholders' Equity for the fiscal years ended April 2, 2022, March 27, 2021 and March 28, 2020.

Consolidated Statements of Cash Flows for the fiscal years ended April 2, 2022, March 27, 2021 and March 28, 2020.

Notes to Consolidated Financial Statements for the fiscal years ended April 2, 2022, March 27, 2021 and March 28, 2020.

2.    Exhibits:

## EXHIBIT INDEX

| Exhibit No. | Document Description |
|---|---|
| 2.1 | Stock Purchase Agreement, dated as of September 24, 2018, by and among Allegra Donata Versace Beck, Donatella Versace, Santo Versace, Borgo Luxembourg S.A R.L., Blackstone GPV Capital Partners (Mauritius) VI-D FDI Ltd., Blackstone GPV Tactical Partners (Mauritius)-N Ltd. and Capri Holdings Limited (f/k/a Michael Kors Holdings Limited) (included as Exhibit 2.1 to the Company's Current Report on Form 8-K (File No. 001-35368), filed on September 25, 2018 and incorporated herein by reference). |
| 3.1 | Amended and Restated Memorandum and Articles of Association of Capri Holdings Limited (included as Exhibit 3.1 to the Company's Current Report on Form 8-K filed on December 31, 2018 and incorporated herein by reference). |
| 4.1 | Specimen of Ordinary Share Certificate of Capri Holdings Limited (included as Exhibit 4.1 to the Company's Annual Report on Form 10-K for the fiscal year ended March 30, 2019 (File No. 001-35368), filed on May 29, 2019 and incorporated herein by reference). |
| 4.2 | Shareholders Agreement, dated as of July 11, 2011, among Michael Kors Holdings Limited and certain shareholders of Michael Kors Holdings Limited (included as Exhibit 10.2 to the Company's Registration Statement on Form F-1, as amended (File No. 333-178282), filed on December 2, 2011 and incorporated herein by reference). |
| 4.3 | Indenture, dated as of October 20, 2017, by and among Michael Kors (USA), Inc., Michael Kors Holdings Limited, the subsidiary guarantors party thereto and U.S. Bank National Association, as trustee (included as Exhibit 4.1 to the Company's Current Report on Form 8-K (File No. 001-35368), filed on October 20, 2017 and incorporated herein by reference). |
| 10.1 | Second Amendment, dated as of June 25, 2020, to the Third Amended and Restated Credit Agreement dated as of November 15, 2018 among Capri Holdings Limited, Michael Kors (USA), Inc., the foreign subsidiary borrowers party thereto, the guarantors party thereto, the financial institutions party thereto as lenders and issuing banks and JPMorgan Chase Bank, N.A., as administrative agent (included as Exhibit 10.1 to the Company's Current Report on Form 8-K (File No. 001-35368), filed on July 1, 2020 and incorporated herein by reference). |
| 10.2 | Form of Indemnification Agreement between Michael Kors Holdings Limited and its directors and executive officers (included as Exhibit 10.5 to the Company's Registration Statement on Form F-1, as amended (File No. 333-178282), filed on December 2, 2011 and incorporated herein by reference). |
| 10.3 | Amended and Restated Michael Kors (USA), Inc. Stock Option Plan (included as Exhibit 10.4 to the Company's Registration Statement on Form F-1, as amended (File No. 333-178282), filed on December 2, 2011 and incorporated herein by reference). |
| 10.4 | Amendment No. 1 to the Amended and Restated Michael Kors (USA), Inc. Share Option Plan (included as Exhibit 4.9 to the Company's Annual Report on Form 20-F for the fiscal year ended March 31, 2012, filed on June 12, 2012 and incorporated herein by reference). |

PX7096-065

Table of Contents

| Exhibit No. | Document Description |
|---|---|
| 10.5 | Capri Holdings Limited Second Amended and Restated Omnibus Incentive Plan (included as Annex A to the Company's Definitive Proxy Statement on Schedule 14A (File No. 001-35368), filed on July 22, 2020 and incorporated herein by reference). |
| 10.6 | Fifth Amended and Restated Employment Agreement, dated as of March 7, 2022, by and among Michael Kors (USA), Inc., Capri Holdings Limited and John D. Idol. |
| 10.7 | Executive Bonus Program (included as Exhibit 10.1 to the Company's Quarterly Report on Form 10-Q for the fiscal quarter ended June 29, 2013 filed on August 8, 2013 and incorporated herein by reference). |
| 10.8 | Form of Employee Non-Qualified Option Award Agreement (included as Exhibit 10.15 to the Company's Annual Report on Form 10-K for the fiscal year ended March 28, 2015, filed on May 27, 2015 and incorporated herein by reference). |
| 10.9 | Form of Employee Restricted Stock Unit Award Agreement (included as Exhibit 10.16 to the Company's Annual Report on Form 10-K for the fiscal year ended March 28, 2015, filed on May 27, 2015 and incorporated herein by reference). |
| 10.10 | Form of Performance-Based Restricted Stock Unit Award Agreement (included as Exhibit 10.17 to the Company's Annual Report on Form 10-K for the fiscal year ended March 28, 2015, filed on May 27, 2015 and incorporated herein by reference). |
| 10.11 | Form of Independent Director Restricted Stock Unit Award Agreement (included as Exhibit 10.18 to the Company's Annual Report on Form 10-K for the fiscal year ended March 28, 2015, filed on May 27, 2015 and incorporated herein by reference). |
| 10.12 | Aircraft Time Sharing Agreement, dated November 24, 2014, by and between Michael Kors (USA), Inc. and John Idol (included as Exhibit 10.19 to the Company's Annual Report on Form 10-K for the fiscal year ended March 28, 2015, filed on May 27, 2015 and incorporated herein by reference). |
| 10.13 | Employment Agreement, dated as of April 17, 2017, by and among Michael Kors (USA), Inc., Michael Kors Holdings Limited and Thomas J. Edwards, Jr. (included as Exhibit 10.19 to the Company's Annual Report on Form 10-K for the fiscal year ended April 1, 2017, filed on May 31, 2017 and incorporated herein by reference). |
| 10.14 | Capri Holdings Limited Deferred Compensation Plan (included as Exhibit 10.1 to the Company's Current Report on Form 8-K (File No. 001.35368), filed on November 14, 2019 and incorporated herein by reference). |
| 10.15 | Employment Agreement between Michael Kors (USA), Inc. and Krista McDonough made as of October 1, 2016 (included as Exhibit 10.18 to the Company's Annual Report on Form 10-K for the fiscal year ended March 28, 2020 (File No 001-35368), filed on July 8, 2020 and incorporated herein by reference). |
| 10.16 | Employment Agreement, dated as of March 30, 2020, by and among Capri Holdings Limited, Michael Kors (USA), Inc. and Daniel Purefoy (included as Exhibit 10.16 to the Company's Annual Report on Form 10-K for the fiscal year ended March 27, 2021, filed on May 26, 2021 and incorporated herein by reference). |
| 10.17 | Employment Agreement, dated as of August 24, 2021, by and among Capri Holdings Limited, Michael Kors (USA), Inc. and Joshua Schulman (included as Exhibit 10.2 to the Company's Quarterly Report on Form 10-Q for the fiscal quarter ended September 25, 2021 filed on November 3, 2021 and incorporated herein by reference). |
| 10.18 | Separation Agreement ("Agreement"), by and between Joshua Schulman, Capri Holdings Limited ("Capri"), and Michael Kors (USA), Inc., dated March 7, 2022. |
| 10.19 | Employment Agreement, effective as of June 1, 2021, by and among Capri Holdings Limited, Michael Kors (USA), Inc. and Jenna Hendricks. |
| 10.20 | Suspension of Rights Agreement, dated as of September 23, 2021, to the Third Amended and Restated Credit Agreement, dated as of November 15, 2018 among, Michael Kors (USA), Inc., Capri Holdings Limited, the Foreign Subsidiary Borrowers party to the Credit Agreement, JPMorgan Chase Bank, N.A., as Administrative Agent, the Lenders thereto and the other parties party thereto (included as Exhibit 10.3 to the Company's Quarterly Report on Form 10-Q for the fiscal quarter ended September 25, 2021 filed on November 3, 2021 and incorporated herein by reference). |
| 21.1 | List of subsidiaries of Capri Holdings Limited. |
| 23.2 | Consent of Ernst & Young LLP. |
| 31.1 | Certification of Chief Executive Officer pursuant to Section 302 of Sarbanes Oxley Act of 2002. |
| 31.2 | Certification of Chief Financial Officer pursuant to Section 302 of Sarbanes Oxley Act of 2002. |
| 32.1 | Certification of Chief Executive Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 32.2 | Certification of Chief Financial Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 101.1 | Interactive Data Files. |

PX7096-066

Table of Contents

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

Date: June 1, 2022

<table>
<tr><td colspan="2">CAPRI HOLDINGS LIMITED</td></tr>
<tr><td>By:</td><td>/s/ John D. Idol</td></tr>
<tr><td>Name:</td><td>John D. Idol</td></tr>
<tr><td>Title:</td><td>Chairman & Chief Executive Officer</td></tr>
</table>

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

<table>
<tr><td>By:</td><td>/s/ John D. Idol<br>John D. Idol</td><td>Chairman, Chief Executive Officer and Director (Principal Executive Officer)</td><td>June 1, 2022</td></tr>
<tr><td>By:</td><td>/s/ Thomas J. Edwards, Jr.<br>Thomas J. Edwards Jr.</td><td>Chief Financial Officer and Chief Operating Officer (Principal Financial and Accounting Officer)</td><td>June 1, 2022</td></tr>
<tr><td>By:</td><td>/s/ Marilyn Crouther<br>Marilyn Crouther</td><td>Director</td><td>June 1, 2022</td></tr>
<tr><td>By:</td><td>/s/ Robin Freestone<br>Robin Freestone</td><td>Director</td><td>June 1, 2022</td></tr>
<tr><td>By:</td><td>/s/ Judy Gibbons<br>Judy Gibbons</td><td>Director</td><td>June 1, 2022</td></tr>
<tr><td>By:</td><td>/s/ Ann Korologos<br>Ann Korologos</td><td>Director</td><td>June 1, 2022</td></tr>
<tr><td>By:</td><td>/s/ Stephen F. Reitman<br>Stephen F. Reitman</td><td>Director</td><td>June 1, 2022</td></tr>
<tr><td>By:</td><td>/s/ Jane Thompson<br>Jane Thompson</td><td>Director</td><td>June 1, 2022</td></tr>
<tr><td>By:</td><td>/s/ Jean Tomlin<br>Jean Tomlin</td><td>Director</td><td>June 1, 2022</td></tr>
</table>

PX7096-067

Table of Contents

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Shareholders and Board of Directors of Capri Holdings Limited

**Opinion on the Financial Statements**

We have audited the accompanying consolidated balance sheets of Capri Holdings Limited and subsidiaries ("the Company") as of April 2, 2022 and March 27, 2021, and the related consolidated statements of operations and comprehensive income (loss), shareholders' equity and cash flows for each of the three years in the period ended April 2, 2022, and the related notes (collectively referred to as the "consolidated financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company at April 2, 2022 and March 27, 2021, and the results of its operations and its cash flow for each of the three years in the period ended April 2, 2022, in conformity with the U.S. generally accepted accounting principles.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the Company's internal control over financial reporting as of April 2, 2022, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework) and our report dated June 1, 2022 expressed an unqualified opinion thereon.

**Basis for Opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

**Critical Audit Matters**

The critical audit matters communicated below are matters arising from the current period audit of the financial statements that were communicated or required to be communicated to the audit committee and that: (1) relate to accounts or disclosures that are material to the financial statements and (2) involved our especially challenging, subjective or complex judgments. The communication of critical audit matters does not alter in any way our opinion on the consolidated financial statements, taken as a whole, and we are not, by communicating the critical audit matters below, providing separate opinions on the critical audit matters or on the accounts or disclosures to which they relate.

### Valuation of Goodwill and Indefinite-lived Intangible Assets

*Description of the Matter*    At April 2, 2022, the Company's goodwill and indefinite-lived intangible assets, consisting of brand names, totaled $1.4 billion and $1.2 billion, respectively. As discussed in Note 2 to the consolidated financial statements, goodwill and indefinite-lived intangible assets are assessed for impairment on an annual basis, or whenever impairment indicators exist. Auditing the Company's annual impairment assessments was complex and highly judgmental due to the significant estimation required in determining the fair value of the reporting units for goodwill and the fair value of indefinite-lived brand name intangible assets. In particular, the fair value estimates were sensitive to significant assumptions, such as changes in the discount rate, revenue growth rate, margin and royalty rates, which are affected by expectations about future market or economic conditions.

67

PX7096-068

Table of Contents

| | |
|---|---|
| *How We Addressed the Matter in Our Audit* | We obtained an understanding, evaluated the design and tested the operating effectiveness of controls over the Company's goodwill and indefinite-lived intangible assets impairment review process, including controls over management's review of the significant assumptions described above. |
| | To test the estimated fair value of the Company's reporting units and indefinite-lived intangible assets, we performed audit procedures that included, among others, assessing the valuation methodologies and testing the significant assumptions discussed above and the completeness and accuracy of the underlying data used by the Company in its analyses. We compared the significant assumptions used by management to current industry and economic trends and evaluated whether changes to the Company's business environment would affect the significant assumptions. For example, we compared the royalty rates used in estimating the fair value of certain indefinite-lived brand name intangible assets to current industry licensing agreements. We assessed the historical accuracy of management's estimates and performed sensitivity analyses of the significant assumptions to evaluate the changes in the fair value of the reporting units and indefinite-lived brand name intangible assets that would result from changes in the assumptions. We also involved our internal valuation specialists to assist in our evaluation of the significant assumptions and methodologies used by the Company in developing the fair value estimates. In addition, we tested management's reconciliation of the fair value of the reporting units to the market capitalization of the Company. |

### Impairment of Retail Store Long-Lived assets

| | |
|---|---|
| *Description of the Matter* | As discussed in Note 2 to the consolidated financial statements, the Company evaluates its long-lived assets, which primarily include property and equipment and operating lease right-of-use assets at retail stores, for impairment whenever events or changes in circumstances indicate that the carrying amounts of such assets may not be recoverable. During the year ended April 2, 2022, the Company recognized an impairment charge of $83 million related to the long-lived assets. |
| | Auditing the Company's impairment assessment of retail store long-lived assets was complex and highly judgmental due to the significant estimation required in determining the future cash flows used to assess recoverability of each retail store long-lived asset group (undiscounted) and determining the fair value (discounted). The significant assumptions used include estimated future cash flows directly related to the future operation of the stores (including sales and expense growth rates) and the discount rate used to determine fair value. Significant assumptions used in determining the fair value of certain operating lease right-of-use assets include the current market rent and discount rate for the remaining lease term of the related stores. These assumptions are subjective in nature and are affected by expectations about future market or economic conditions. |
| *How We Addressed the Matter in Our Audit* | We obtained an understanding, evaluated the design and tested the operating effectiveness of controls over the retail store long-lived assets impairment process, including, determining the undiscounted future cash flows of the stores and the fair value of the long-lived assets (including those related to operating leases) for the stores that were deemed to be impaired. We also tested controls over management's review of the significant assumptions described above. |
| | Our testing of the Company's impairment measurement included, among other procedures, evaluating the significant assumptions and operating data used to calculate the estimated future cash flows and to determine the fair value of the store long lived asset groups. For a sample of retail stores, we tested the completeness and accuracy of the data used by the Company in its analyses and we compared the significant assumptions used to determine the forecasted cash flows to historical results of the retail stores, current industry and economic trends and inquired of the Company's executives to understand the business initiatives supporting the assumptions in the future cash flows. We involved our internal valuation specialists to assist in evaluating the fair value of certain operating lease right-of-use assets, which included assessing the estimated market rental rates of these leases by comparing them to rental rates for comparable leases and evaluating the applied discount rate. |

/s/ ERNST & YOUNG LLP

We have served as the Company's auditor since 2014.
New York, New York
June 1, 2022

PX7096-069

Table of Contents

### REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Shareholders and Board of Directors of Capri Holdings Limited

**Opinion on Internal Control over Financial Reporting**

We have audited Capri Holdings Limited and subsidiaries' internal control over financial reporting as of April 2, 2022, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework) (the COSO criteria). In our opinion, Capri Holdings Limited and subsidiaries ("the Company") maintained, in all material respects, effective internal control over financial reporting as of April 2, 2022, based on the COSO criteria.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the consolidated balance sheets of the Company as of April 2, 2022 and March 27, 2021, the related consolidated statements of operations and comprehensive income (loss), shareholders' equity and cash flows for each of the three years in the period ended April 2, 2022, and the related notes and our report dated June 1, 2022 expressed an unqualified opinion thereon.

**Basis for Opinion**

The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting included in the accompanying Management's Report on Internal Control over Financial Reporting. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects.

Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

**Definition and Limitations of Internal Control over Financial Reporting**

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ ERNST & YOUNG LLP

New York, New York
June 1, 2022

PX7096-070

Table of Contents

**CAPRI HOLDINGS LIMITED AND SUBSIDIARIES**
**CONSOLIDATED BALANCE SHEETS**
**(In millions, except share data)**

| | April 2, 2022 | March 27, 2021 |
|---|---|---|
| **Assets** | | |
| Current assets | | |
| Cash and cash equivalents | $ 169 | $ 232 |
| Receivables, net | 434 | 373 |
| Inventories, net | 1,096 | 736 |
| Prepaid expenses and other current assets | 192 | 205 |
| Total current assets | 1,891 | 1,546 |
| Property and equipment, net | 476 | 485 |
| Operating lease right-of-use assets | 1,358 | 1,504 |
| Intangible assets, net | 1,847 | 1,992 |
| Goodwill | 1,418 | 1,498 |
| Deferred tax assets | 240 | 278 |
| Other assets | 250 | 178 |
| Total assets | $ 7,480 | $ 7,481 |
| **Liabilities and Shareholders' Equity** | | |
| Current liabilities | | |
| Accounts payable | $ 555 | $ 512 |
| Accrued payroll and payroll related expenses | 165 | 116 |
| Accrued income taxes | 52 | 126 |
| Short-term operating lease liabilities | 414 | 447 |
| Short-term debt | 29 | 123 |
| Accrued expenses and other current liabilities | 351 | 297 |
| Total current liabilities | 1,566 | 1,621 |
| Long-term operating lease liabilities | 1,467 | 1,657 |
| Deferred tax liabilities | 432 | 397 |
| Long-term debt | 1,131 | 1,219 |
| Other long-term liabilities | 326 | 430 |
| Total liabilities | 4,922 | 5,324 |
| Commitments and contingencies | | |
| Shareholders' equity | | |
| Ordinary shares, no par value; 650,000,000 shares authorized; 221,967,599 shares issued and 142,806,269 outstanding at April 2, 2022; 219,222,937 shares issued and 151,280,011 outstanding at March 27, 2021 | — | — |
| Treasury shares, at cost (79,161,330 shares at April 2, 2022 and 67,942,926 shares at March 27, 2021) | (3,987) | (3,326) |
| Additional paid-in capital | 1,260 | 1,158 |
| Accumulated other comprehensive income | 194 | 56 |
| Retained earnings | 5,092 | 4,270 |
| Total shareholders' equity of Capri | 2,559 | 2,158 |
| Noncontrolling interest | (1) | (1) |
| Total shareholders' equity | 2,558 | 2,157 |
| Total liabilities and shareholders' equity | $ 7,480 | $ 7,481 |

See accompanying notes to consolidated financial statements.

PX7096-071

Table of Contents

**CAPRI HOLDINGS LIMITED AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF OPERATIONS AND COMPREHENSIVE INCOME (LOSS)**
**(In millions, except share and per share data)**

|  | Fiscal Years Ended | | |
|---|---|---|---|
|  | April 2, 2022 | March 27, 2021 | March 28, 2020 |
| Total revenue | $ 5,654 | $ 4,060 | $ 5,551 |
| Cost of goods sold | 1,910 | 1,463 | 2,280 |
| Gross profit | 3,744 | 2,597 | 3,271 |
| Selling, general and administrative expenses | 2,533 | 2,018 | 2,464 |
| Depreciation and amortization | 193 | 212 | 249 |
| Impairment of assets | 73 | 316 | 708 |
| Restructuring and other charges | 42 | 32 | 42 |
| Total operating expenses | 2,841 | 2,578 | 3,463 |
| Income (loss) from operations | 903 | 19 | (192) |
| Other income, net | (2) | (7) | (6) |
| Interest (income) expense, net | (18) | 43 | 18 |
| Foreign currency loss (gain) | 8 | (20) | 11 |
| Income (loss) before provision for income taxes | 915 | 3 | (215) |
| Provision for income taxes | 92 | 66 | 10 |
| Net income (loss) | 823 | (63) | (225) |
| Less: Net income (loss) attributable to noncontrolling interest | 1 | (1) | (2) |
| Net income (loss) attributable to Capri | $ 822 | $ (62) | $ (223) |
|  |  |  |  |
| Weighted average ordinary shares outstanding: |  |  |  |
| Basic | 149,724,675 | 150,453,568 | 150,714,598 |
| Diluted | 152,497,907 | 150,453,568 | 150,714,598 |
| Net income (loss) per ordinary share attributable to Capri: |  |  |  |
| Basic | $ 5.49 | $ (0.41) | $ (1.48) |
| Diluted | $ 5.39 | $ (0.41) | $ (1.48) |
|  |  |  |  |
| Statements of Comprehensive Income (Loss): |  |  |  |
| Net income (loss) | $ 823 | $ (63) | $ (225) |
| Foreign currency translation adjustments | 127 | (15) | 145 |
| Net gain (loss) on derivatives | 10 | (4) | (4) |
| Comprehensive income (loss) | 960 | (82) | (84) |
| Less: Net income (loss) attributable to noncontrolling interest | 1 | (1) | (2) |
| Less: Foreign currency translation adjustments attributable to noncontrolling interest | (1) | — | — |
| Comprehensive income (loss) attributable to Capri | $ 960 | $ (81) | $ (82) |

See accompanying notes to consolidated financial statements.

71

PX7096-072

[Table of Contents](#)

## CAPRI HOLDINGS LIMITED AND SUBSIDIARIES
## CONSOLIDATED STATEMENTS OF SHAREHOLDERS' EQUITY
### (in millions, except share data which is in thousands)

| | Ordinary Shares | | Additional Paid-in Capital | Treasury Shares | | Accumulated Other Comprehensive Income (Loss) | Retained Earnings | Total Equity of Capri | Non-controlling Interests | Total Equity |
|---|---|---|---|---|---|---|---|---|---|---|
| | Shares | Amounts | | Shares | Amounts | | | | | |
| **Balance at March 30, 2019, as previously reported** | 216,051 | $ — | $ 1,011 | (65,119) | $ (3,223) | $ (66) | $ 4,707 | $ 2,429 | $ 3 | $ 2,432 |
| Adoption of accounting standard (ASU 2106-02) | — | — | — | — | — | — | (152) | (152) | — | (152) |
| **Balance as of March 30, 2019** | 216,051 | — | 1,011 | (65,119) | (3,223) | (66) | 4,555 | 2,277 | 3 | 2,280 |
| Net loss | — | — | — | — | — | — | (223) | (223) | (2) | (225) |
| Other comprehensive income | — | — | — | — | — | 141 | — | 141 | — | 141 |
| Total comprehensive loss | — | — | — | — | — | — | — | (82) | (2) | (84) |
| Vesting of restricted awards, net of forfeitures | 1,262 | — | — | — | — | — | — | — | — | — |
| Exercise of employee share options | 7 | — | — | — | — | — | — | — | — | — |
| Share based compensation expense | — | — | 70 | — | — | — | — | 70 | — | 70 |
| Repurchase of ordinary shares | — | — | — | (2,775) | (102) | — | — | (102) | — | (102) |
| Adjustment of redeemable non-controlling interests to redemption value | — | — | 4 | — | — | — | — | 4 | $ — | 4 |
| **Balance as of March 28, 2020** | 217,320 | — | 1,085 | (67,894) | (3,325) | 75 | 4,332 | 2,167 | 1 | 2,168 |
| Net loss | — | — | — | — | — | — | (62) | (62) | (1) | (63) |
| Other comprehensive loss | — | — | — | — | — | (19) | — | (19) | — | (19) |
| Total comprehensive loss | — | — | — | — | — | — | — | (81) | (1) | (82) |
| Vesting of restricted awards, net of forfeitures | 1,456 | — | — | — | — | — | — | — | — | — |
| Exercise of employee share options | 447 | — | 3 | — | — | — | — | 3 | — | 3 |
| Share based compensation expense | — | — | 70 | — | — | — | — | 70 | — | 70 |
| Repurchase of ordinary shares | — | — | — | (49) | (1) | — | — | (1) | — | (1) |
| Other | — | — | — | — | — | — | — | — | (1) | (1) |
| **Balance at March 27, 2021** | 219,223 | — | 1,158 | (67,943) | (3,326) | $ 56 | 4,270 | 2,158 | (1) | 2,157 |
| Net income | — | — | — | — | — | — | 822 | 822 | 1 | 823 |
| Other comprehensive income (loss) | — | — | — | — | — | 138 | — | 138 | (1) | 137 |
| Total comprehensive income | — | — | — | — | — | — | — | 960 | — | 960 |
| Vesting of restricted awards, net of forfeitures | 2,336 | — | — | — | — | — | — | — | — | — |
| Exercise of employee share options | 408 | — | 17 | — | — | — | — | 17 | — | 17 |
| Share based compensation expense | — | — | 85 | — | — | — | — | 85 | — | 85 |
| Repurchase of ordinary shares | — | — | — | (11,218) | (661) | — | — | (661) | — | (661) |
| **Balance at April 2, 2022** | 221,967 | $ — | $ 1,260 | (79,161) | $ (3,987) | $ 194 | $ 5,092 | $ 2,559 | $ (1) | $ 2,558 |

See accompanying notes to consolidated financial statements.

PX7096-073

Table of Contents

**CAPRI HOLDINGS LIMITED AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(In millions)**

| | Fiscal Years Ended | | |
|---|---|---|---|
| | April 2, 2022 | March 27, 2021 | March 28, 2020 |
| **Cash flows from operating activities** | | | |
| Net income (loss) | $ 823 | $ (63) | $ (225) |
| Adjustments to reconcile net income (loss) to net cash provided by operating activities: | | | |
| Depreciation and amortization | 193 | 212 | 249 |
| Share-based compensation expense | 85 | 71 | 70 |
| Impairment of assets | 83 | 316 | 708 |
| Credit losses | 7 | (3) | 29 |
| Deferred income taxes | (57) | (70) | (73) |
| Changes to lease related balances, net | (142) | (112) | (55) |
| Amortization of deferred financing costs | 6 | 6 | 8 |
| Tax (benefit) deficit on exercise of share options | (4) | 4 | 2 |
| Foreign currency (gains) losses | — | (15) | 11 |
| Other non-cash charges | 1 | — | 3 |
| Change in assets and liabilities: | | | |
| Receivables, net | (78) | (52) | 42 |
| Inventories, net | (386) | 145 | 115 |
| Prepaid expenses and other current assets | 14 | (31) | 20 |
| Accounts payable | 69 | 50 | 63 |
| Accrued expenses and other current liabilities | 30 | 153 | (95) |
| Other long-term assets and liabilities | 60 | 13 | (13) |
| Net cash provided by operating activities | 704 | 624 | 859 |
| **Cash flows from investing activities** | | | |
| Capital expenditures | (131) | (111) | (223) |
| Cash paid for asset/business acquisitions, net of cash acquired | — | (13) | (13) |
| Settlement of net investment hedges | 189 | — | 298 |
| Net cash provided by (used in) investing activities | 58 | (124) | 62 |
| **Cash flows from financing activities** | | | |
| Debt borrowings | 945 | 2,443 | 2,282 |
| Debt repayments | (1,132) | (3,311) | (2,676) |
| Debt issuance costs | — | (4) | (1) |
| Repurchase of ordinary shares | (661) | (1) | (102) |
| Exercise of employee share options | 17 | 3 | — |
| Other financing activities | 31 | — | — |
| Net cash used in financing activities | (800) | (870) | (497) |
| Effect of exchange rate changes on cash and cash equivalents | (24) | 12 | (4) |
| **Net (decrease) increase in cash, cash equivalents and restricted cash** | (62) | (358) | 420 |
| Beginning of period | 234 | 592 | 172 |
| End of period | $ 172 | $ 234 | $ 592 |
| **Supplemental disclosures of cash flow information** | | | |
| Cash paid for interest | $ 37 | $ 52 | $ 80 |
| Cash paid for income taxes | $ 43 | $ 45 | $ 98 |
| **Supplemental disclosure of non-cash investing and financing activities** | | | |
| Accrued capital expenditures | $ 39 | $ 17 | $ 30 |

See accompanying notes to consolidated financial statements.

PX7096-074

Table of Contents

**CAPRI HOLDINGS LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

## 1. Business and Basis of Presentation

The Company was incorporated in the British Virgin Islands on December 13, 2002 as Michael Kors Holdings Limited and changed its name to Capri Holdings Limited ("Capri," and together with its subsidiaries, the "Company") on December 31, 2018. The Company is a holding company that owns brands that are leading designers, marketers, distributors and retailers of branded women's and men's accessories, apparel and footwear bearing the Versace, Jimmy Choo and Michael Kors tradenames and related trademarks and logos. The Company operates in three reportable segments: Versace, Jimmy Choo and Michael Kors. See Note 19 for additional information.

The consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States ("U.S. GAAP") and include the accounts of the Company and its wholly-owned or controlled subsidiaries. All significant intercompany balances and transactions have been eliminated in consolidation. The Company consolidates the results of its Versace business on a one-month lag, as consistent with prior periods.

The Company utilizes a 52 to 53 week fiscal year, and the term "Fiscal Year" or "Fiscal" refers to that 52-week or 53-week period. The fiscal years ending on March 27, 2021 and March 28, 2020 ("Fiscal 2021" and "Fiscal 2020", respectively) contain 52 weeks, whereas the fiscal year ending April 2, 2022 ("Fiscal 2022") contain 53 weeks. The Company's Fiscal 2023 is a 52-week period ending April 1, 2023.

## 2. Summary of Significant Accounting Policies

### Use of Estimates

The preparation of financial statements in accordance with U.S. GAAP requires management to use judgment and make estimates that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. The level of uncertainty in estimates and assumptions increases with the length of time until the underlying transactions are completed. The most significant assumptions and estimates involved in preparing the financial statements include allowances for customer deductions, sales returns, sales discounts, credit losses, estimates of inventory net realizable value, the valuation of share-based compensation, the valuation of deferred taxes, goodwill, intangible assets, operating lease right-of-use assets and property and equipment, along with the estimated useful lives assigned to these assets. Actual results could differ from those estimates.

### Seasonality

The Company experiences certain effects of seasonality with respect to its business. The Company generally experiences greater sales during its third fiscal quarter, primarily driven by holiday season sales, and the lowest sales during its first fiscal quarter.

### Revenue Recognition

The Company accounts for contracts with its customers when there is approval and commitment from both parties, the rights of the parties and payment terms have been identified, the contract has commercial substance and collectability of consideration is probable. Revenue is recognized when control of the promised goods or services is transferred to the Company's customers in an amount that reflects the consideration the Company expects to be entitled to in exchange for goods or services. The Company recognizes retail store revenues when control of the product is transferred at the point of sale at Company owned stores, including concessions, net of estimated returns. Revenue from sales through the Company's e-commerce sites is recognized at the time of delivery to the customer, reduced by an estimate of returns. Wholesale revenue is recognized net of estimates for sales returns, discounts, markdowns and allowances, after merchandise is shipped and control of the underlying product is transferred to the Company's wholesale customers. To arrive at net sales for retail revenue, gross sales are reduced by actual customer returns as well as by a provision for estimated future customer returns, which is based on management's review of historical and future customer return expectations. Sales taxes collected from retail customers are presented on a net basis and, as such, are excluded from revenue. To arrive at net sales for wholesale revenue, gross sales are reduced by provisions for estimated future returns, based on current expectations, as well as trade discounts, markdowns,

74

PX7096-075

Table of Contents

allowances, operational chargebacks, and certain cooperative selling expenses. These estimates are based on such factors as historical trends, actual and forecasted performance and current market conditions, which are reviewed by management on a quarterly basis.

The following table details the activity and balances of the Company's sales reserves for the fiscal years ended April 2, 2022, March 27, 2021, and March 28, 2020 (in millions):

| | Balance Beginning of Year | Amounts Charged to Revenue | Write-offs Against Reserves | Balance at Year End |
|---|---|---|---|---|
| Total Sales Reserves: | | | | |
| Fiscal Year Ended April 2, 2022 | $ 98 | $ 333 | $ (339) | $ 92 |
| Fiscal Year Ended March 27, 2021 | 166 | 313 | (381) | 98 |
| Fiscal Year Ended March 28, 2020 | 127 | 497 | (458) | 166 |

Royalty revenue generated from product licenses, which includes contributions for advertising, is based on reported sales of licensed products bearing the Company's trademarks at rates specified in the license agreements. These agreements are also subject to contractual minimum levels. Royalty revenue generated by geographic licensing agreements is recognized as it is earned under the licensing agreements based on reported sales of licensees applicable to specified periods, as outlined in the agreements. These agreements allow for the use of the Company's tradenames to sell its branded products in specific geographic regions.

**Loyalty Program**

The Company offers a loyalty program, which allows its Michael Kors United States customers to earn points on qualifying purchases toward monetary and non-monetary rewards, which may be redeemed for purchases at Michael Kors retail stores and e-commerce sites. The Company defers a portion of the initial sales transaction based on the estimated relative fair value of the benefits based on projected timing of future redemptions and historical activity. These amounts include estimated "breakage" for points that are not expected to be redeemed. The contract liability, net of an estimated "breakage," is recorded within accrued expenses and other current liabilities in the Company's consolidated balance sheets and is expected to be recognized within the next 12 months. See Note 3 for additional information.

*Advertising and Marketing Costs*

Advertising and marketing costs are generally expensed when the advertisement is first exhibited and are recorded in selling, general and administrative expenses in the Company's consolidated statements of operations and comprehensive income (loss). Advertising and marketing expense was $329 million, $137 million and $201 million in Fiscal 2022, Fiscal 2021 and Fiscal 2020, respectively.

Cooperative advertising expense, which represents the Company's participation in advertising expenses of its wholesale customers, is reflected as a reduction to revenue. Expenses related to cooperative advertising for Fiscal 2022, Fiscal 2021 and Fiscal 2020, were $4 million, $3 million and $7 million, respectively.

*Shipping and Handling*

Freight-in expenses are recorded as part of cost of goods sold, along with product costs and other costs to acquire inventory. The costs of preparing products for sale, including warehousing expenses, are included in selling, general and administrative expenses in the Company's consolidated statements of operations and comprehensive income (loss). Selling, general and administrative expenses also include the costs of shipping products to the Company's e-commerce customers. Shipping and handling costs included within selling, general and administrative expenses in the Company's consolidated statements of operations and comprehensive income (loss) were $236 million, $160 million and $157 million for Fiscal 2022, Fiscal 2021 and Fiscal 2020, respectively. Shipping and handling costs charged to customers are included in total revenue.

*COVID-19 Related Government Assistance and Subsidies*

During Fiscal 2022 and Fiscal 2021, the Company recorded $10 million and $37 million, respectively, related to government assistance and subsidies. There was no government assistance or subsidies recorded in Fiscal 2020. These amounts mostly relate to rent support and payroll expense and were recorded as a reduction of selling, general and administrative expenses.

PX7096-076

Table of Contents

*Cash, Cash Equivalents and Restricted Cash*

All highly liquid investments with original maturities of three months or less are considered to be cash equivalents. Included in the Company's cash and cash equivalents as of April 2, 2022 and March 27, 2021 are credit card receivables of $18 million and $25 million, respectively, which generally settle within two to three business days.

A reconciliation of cash, cash equivalents and restricted cash as of April 2, 2022 and March 27, 2021 from the consolidated balance sheets to the consolidated statements of cash flows is as follows:

| | Fiscal Years Ended | | | |
| --- | --- | --- | --- | --- |
| | | April 2, 2022 | | March 27, 2021 |
| Reconciliation of cash, cash equivalents and restricted cash | | | | |
| Cash and cash equivalents | $ | 169 | $ | 232 |
| Restricted cash included within prepaid expenses and other current assets | | 3 | | 2 |
| **Total cash, cash equivalents and restricted cash shown in the consolidated statements of cash flows** | $ | 172 | $ | 234 |

*Inventories*

Inventories primarily consist of finished goods with the exception of raw materials and work in process inventory. The combined total of raw materials and work in process inventory recorded on the Company's consolidated balance sheets as of April 2, 2022 and March 27, 2021 were $31 million and $28 million, respectively. Inventories are stated at the lower of cost or net realizable value. Cost is determined using the weighted-average cost method. Costs include amounts paid to independent manufacturers, plus duties and freight to bring the goods to the Company's warehouses, as well as shipments to stores. The Company continuously evaluates the composition of its inventory and makes adjustments when the cost of inventory is not expected to be fully recoverable. The net realizable value of the Company's inventory is estimated based on historical experience, current and forecasted demand and other market conditions. In addition, reserves for inventory losses are estimated based on historical experience and physical inventory counts. The Company's inventory reserves are estimates, which could vary significantly from actual results if future economic conditions, customer demand or competition differ from expectations. Our historical estimates of these adjustments have not differed materially from actual results.

*Store Pre-opening Costs*

Costs associated with the opening of new retail stores and start up activities, are expensed as incurred.

*Property and Equipment*

Property and equipment is stated at cost less accumulated depreciation and amortization (carrying value). Depreciation is recorded on a straight-line basis over the expected remaining useful lives of the related assets. Equipment, furniture and fixtures are depreciated over five to seven years, computer hardware and software are depreciated over three to five years. The Company's share of the cost of constructing in-store shop displays within its wholesale customers' floor-space ("shop-in-shops"), which is paid directly to third-party suppliers, is capitalized as property and equipment and is generally amortized over a useful life of three to five years. Leasehold improvements are amortized using the straight-line method over the shorter of the estimated remaining useful lives of the related assets or the remaining lease term, including highly probable renewal periods. The Company includes all depreciation and amortization expense as a component of total operating expenses, as the underlying long-lived assets are not directly or indirectly related to bringing the Company's products to their existing location and condition. Maintenance and repairs are charged to expense in the year incurred.

The Company capitalizes, in property and equipment, direct costs incurred during the application development stage and the implementation stage for developing, purchasing or otherwise acquiring software for its internal use. These costs are amortized over the estimated useful lives of the software, generally five years, except for ERP systems which has an estimated useful life of ten years. All costs incurred during the preliminary project stage, including project scoping and identification and testing of alternatives, are expensed as incurred.

PX7096-077

Table of Contents

*Definite-lived Intangible Assets*

The Company's definite-lived intangible assets consist of trademarks and customer relationships which are stated at cost less accumulated amortization. The Company's customer relationships are amortized over five to eighteen years. Reacquired rights recorded in connection with the acquisition of Michael Kors (HK) Limited and Subsidiaries ("MKHKL") are amortized through March 31, 2041, the original expiration date of the Michael Kors license agreement in the Greater China region. The trademark for the Michael Kors brand is amortized over twenty years.

*Long-lived Assets*

The Company evaluates all long-lived assets, including operating lease right-of-use assets, property and equipment and definite-lived intangible assets, for impairment whenever events or changes in circumstances indicate that the carrying amount of any such asset may not be recoverable. For the purposes of impairment testing, the Company groups long-lived assets at the lowest level of identifiable cash flow. Leasehold improvements are typically amortized over the term of the store lease, including reasonably assured renewals and the shop-in-shops are amortized over a useful life of three to five years. The Company's impairment testing is based on its best estimate of the future operating cash flows. If the sum of our estimated undiscounted future cash flows associated with the asset is less than the asset's carrying value, the Company would recognize an impairment charge, which is measured as the amount by which the carrying value exceeds the fair value of the asset. The fair values determined by management require significant judgment and include certain assumptions regarding future sales and expense growth rates, discount rates and estimates of real estate market fair values. As such, these estimates may differ from actual results and are affected by future market and economic conditions.

During Fiscal 2022, Fiscal 2021 and Fiscal 2020, the Company recorded impairment charges of $83 million, $158 million and $357 million, respectively, which were primarily related to operating lease right-of-use assets and fixed assets of our retail store locations. Please refer to Note 7 and Note 13 for additional information.

*Goodwill and Other Indefinite-lived Intangible Assets*

The Company records intangible assets based on their fair value on the date of acquisition. Goodwill is recorded as the difference between the fair value of the purchase consideration and the fair value of the net identifiable tangible and intangible assets acquired. The brand intangible assets recorded in connection with the acquisitions of Versace and Jimmy Choo were determined to be indefinite-lived intangible assets, which are not subject to amortization. The Company performs an impairment assessment of goodwill, as well as the Versace brand and Jimmy Choo brand intangible assets on an annual basis, or whenever impairment indicators exist. In the absence of any impairment indicators, goodwill, for the Versace brand and the Jimmy Choo brand are assessed for impairment during the fourth quarter of each fiscal year. Judgments regarding the existence of impairment indicators are based on market conditions and operational performance of the business.

The Company may assess its goodwill and its brand intangible assets for impairment initially using a qualitative approach to determine whether it is more likely than not that the fair value of these assets is greater than their carrying value. When performing a qualitative test, the Company assesses various factors, including industry and market conditions, macroeconomic conditions and performance of its businesses. If the results of the qualitative assessment indicate that it is more likely than not that our goodwill and other indefinite-lived intangible assets are impaired, a quantitative impairment analysis is performed to determine if impairment is required. The Company may also elect to perform a quantitative analysis of goodwill and its indefinite-lived intangible assets initially rather than using a qualitative approach.

The impairment testing for goodwill is performed at the reporting unit level. The Company uses industry accepted valuation models and set criteria that are reviewed and approved by various levels of management and, in certain instances, it engages independent third-party valuation specialists. To determine the fair value of a reporting unit, the Company uses a combination of the income and market approaches, when applicable. The Company believes the blended use of both models, when applicable, compensates for the inherent risk associated with either model if used on a stand-alone basis, and this combination is indicative of the factors a market participant would consider when performing a similar valuation. If the fair value of a reporting unit exceeds the related carrying value, the reporting unit's goodwill is considered not to be impaired and no further testing is performed. If the carrying value of a reporting unit exceeds its fair value, an impairment loss is recorded for the difference. These valuations are affected by certain estimates, including future revenue growth rates, future operating expense growth rates, gross margins and discount rates. Future events could cause us to conclude that impairment indicators exist and goodwill may be impaired.

PX7096-078

Table of Contents

When performing a quantitative impairment assessment of our brand intangible assets, the fair value of the Versace and the Jimmy Choo brands is estimated using a discounted cash flow analysis based on the "relief from royalty" method, assuming that a third party would be willing to pay a royalty in lieu of ownership for this intangible asset. This approach is dependent on many factors, including estimates of future revenue growth rates, royalty rates and discount rates. Actual future results may differ from these estimates. An impairment loss is recognized when the estimated fair value of the brand intangible assets is less than its carrying amount.

During the fourth quarter of Fiscal 2022, the Company performed its annual goodwill and indefinite-lived intangible assets impairment analysis for each brand. Based on qualitative impairment assessment of the Michael Kors reporting units, the Company concluded that it is more likely than not that the fair value of the Michael Kors reporting units exceeded its carrying value and, therefore, was not impaired. The Company elected to perform quantitative impairment analyses for the Versace and Jimmy Choo reporting units, using a combination of income and market approaches to estimate the fair values of reporting units. The Company also elected to perform an impairment analysis for the Versace and Jimmy Choo brand intangible assets using an income approach to estimate the fair values. Based on the results of these assessments, the Company concluded that the fair values of the Jimmy Choo and Versace reporting units and the brand intangible assets exceeded the related carrying amounts and no impairment was required.

In Fiscal 2021, the Company recorded impairment charges of $94 million related to the Jimmy Choo retail and Jimmy Choo licensing reporting units and $69 million related to the Jimmy Choo brand intangible assets. The Company recorded impairment charges of $171 million related to the Jimmy Choo retail and Jimmy Choo licensing reporting units and $180 million related to the Jimmy Choo brand intangible assets during Fiscal 2020. The impairment charges were recorded within impairment of assets on our consolidated statement of operations and comprehensive income (loss) for the fiscal years ended March 27, 2021 and March 28, 2020. See Note 8 for information relating to the Company's annual impairment analysis performed during the fourth quarter of Fiscal 2022, Fiscal 2021 and Fiscal 2020.

It is possible that the Company's conclusions regarding impairment or recoverability of goodwill or other indefinite intangible assets could change in future periods if, for example, (i) the Company's businesses do not perform as projected, (ii) overall economic conditions in future years vary from current assumptions, (iii) business conditions or strategies change from our current assumptions, (iv) discount rates change, (v) market multiples change or (vi) the identification of the Company's reporting units change, among other factors. Such changes could result in a future impairment charge of goodwill or other indefinite-lived intangible assets.

*Insurance*

The Company uses a combination of insurance and self-insurance programs, including a wholly-owned captive insurance entity, to provide for the potential liabilities for certain risks, including workers' compensation and employee-related health care benefits. The Company also maintains stop-loss coverage with third-party insurers to limit its exposure arising from claims. Self-insurance claims filed and claims incurred but not reported are accrued based upon management's estimates of the discounted cost for self-insured claims incurred using actuarial assumptions, historical loss experience, actual payroll and other data. Although the Company believes that it can reasonably estimate losses related to these claims, actual results could differ from these estimates.

The Company also maintains other types of customary business insurance policies, including general liability, directors and officers, marine transport and inventory and business interruption insurance. Insurance recoveries represent gain contingencies and are recorded upon actual settlement with the insurance carrier.

*Share-based Compensation*

The Company grants share-based awards to certain employees and directors of the Company. The grant date fair value of share options is calculated using the Black-Scholes option pricing model. The Company uses its own historical experience in determining the expected holding period and volatility of its time-based share option awards. The risk-free interest rate is derived from the zero-coupon United States ("U.S.") Treasury Strips yield curve based on the grant's estimated holding period. Determining the grant date fair value of share-based awards requires considerable judgment, including estimating expected volatility, expected term and risk-free rate. If factors change and the Company employs different assumptions, the fair value of future awards and the resulting share-based compensation expense may differ significantly from what the Company has estimated in the past.

The closing market price of the Company's shares on the date of grant is used to determine the grant date fair value of restricted shares, time-based restricted stock units ("RSUs") and performance-based RSUs. These fair values are recognized as

78

Table of Contents

expense over the requisite service period, net of estimated forfeitures, based on expected attainment of pre-established performance goals for performance grants, or the passage of time for those grants which have only time-based vesting requirements.

*Foreign Currency Translation and Transactions*

The financial statements of the majority of the Company's foreign subsidiaries are measured using the local currency as the functional currency. The Company's functional currency is the United States Dollar ("USD") for Capri and its United States based subsidiaries. Assets and liabilities are translated using period-end exchange rates, while revenues and expenses are translated using average exchange rates over the reporting period. The resulting translation adjustments are recorded separately in shareholders' equity as a component of accumulated other comprehensive income. Foreign currency income and losses resulting from the re-measuring of transactions denominated in a currency other than the functional currency of a particular entity are included in foreign currency (gain) loss on the Company's consolidated statements of operations and comprehensive income (loss).

*Derivative Financial Instruments*

**Forward Foreign Currency Exchange Contracts**

The Company uses forward currency exchange contracts to manage its exposure to fluctuations in foreign currency for certain transactions. The Company, in its normal course of business, enters into transactions with foreign suppliers and seeks to minimize risks related to these transactions. The Company employs these forward currency contracts to hedge the Company's cash flows, as they relate to foreign currency transactions. Certain of these contracts are designated as hedges for accounting purposes, while others remain undesignated. All of the Company's derivative instruments are recorded in the Company's consolidated balance sheets at fair value on a gross basis, regardless of their hedge designation.

The Company designates certain contracts related to the purchase of inventory that qualify for hedge accounting as cash flow hedges. Formal hedge documentation is prepared for all derivative instruments designated as hedges, including a description of the hedged item and the hedging instrument and the risk being hedged. The changes in the fair value for contracts designated as cash flow hedges is recorded in equity as a component of accumulated other comprehensive income until the hedged item affects earnings. When the inventory related to forecasted inventory purchases that are being hedged is sold to a third party, the gains or losses deferred in accumulated other comprehensive income are recognized within cost of goods sold. The Company uses regression analysis to assess effectiveness of derivative instruments that are designated as hedges, which compares the change in the fair value of the derivative instrument to the change in the related hedged item. If the hedge is no longer expected to be highly effective in the future, future changes in the fair value are recognized in earnings. For those contracts that are not designated as hedges, changes in the fair value are recorded to foreign currency (gain) loss in the Company's consolidated statements of operations and comprehensive income (loss). The Company classifies cash flows relating to its forward foreign currency exchange contracts related to purchase of inventory consistently with the classification of the hedged item, within cash flows from operating activities.

The Company is exposed to the risk that counterparties to derivative contracts will fail to meet their contractual obligations. In order to mitigate counterparty credit risk, the Company only enters into contracts with carefully selected financial institutions based upon their credit ratings and certain other financial factors, adhering to established limits for credit exposure. The aforementioned forward contracts generally have a term of no more than 12 months. The period of these contracts is directly related to the foreign transaction they are intended to hedge.

**Net Investment Hedges**

The Company also uses fixed-to-fixed cross currency swap agreements to hedge its net investments in foreign operations against future volatility in the exchange rates between its United States dollar and these foreign currencies. The Company has elected the spot method of designating these contracts under ASU 2017-12, "*Derivatives and Hedging (Topic 815): Targeted Improvements to Accounting for Hedging Activities,*" and has designated these contracts as net investment hedges. The net gain or (loss) on the net investment hedge is reported within foreign currency translation gains and losses ("CTA"), as a component of accumulated other comprehensive income on the Company's consolidated balance sheets. Interest accruals and coupon payments are recognized directly in interest expense in the Company's consolidated statements of operations and comprehensive income (loss). Upon discontinuation of a hedge, all previously recognized amounts remain in CTA until the net investment is sold, diluted or liquidated.

79

Table of Contents

During the fourth quarter of Fiscal 2020, the Company terminated all of its net investment hedges related to its Euro-denominated subsidiaries. The early termination of these hedges resulted in the Company receiving $296 million in cash during the fourth quarter of Fiscal 2020. During Fiscal 2021, the Company resumed its normal hedging program and entered into multiple fixed-to-fixed cross-currency swap agreements to hedge its net investment in Euro-denominated and Japanese Yen-denominated subsidiaries against future volatility in the exchange rate between the United States dollar and these currencies. As of April 2, 2022, the Company had multiple fixed-to-fixed cross-currency swap agreements with aggregate notional amounts of $4 billion to hedge its net investment in Euro-denominated subsidiaries and $194 million to hedge its net investment in Japanese Yen-denominated subsidiaries against future volatility in the exchange rates between the United States dollar and these currencies.

**Interest Rate Swap Agreements**

The Company also uses interest rate swap agreements to hedge the variability of its cash flows resulting from floating interest rates on the Company's borrowings. When an interest rate swap agreement qualifies for hedge accounting as a cash flow hedge, the changes in the fair value are recorded in equity as a component of accumulated other comprehensive income and are reclassified into interest expense in the same period during which the hedged transactions affect earnings.

During the third quarter of Fiscal 2022, the Company terminated its only interest rate swap. As a result, the Company recognized a $1 million gain within interest (income) expense, net, in the Company's consolidated statements of operations and comprehensive income (loss).

*Income Taxes*

Deferred income tax assets and liabilities provide for temporary differences between the tax bases and financial reporting bases of the Company's assets and liabilities using the tax rates and laws in effect for the periods in which the differences are expected to reverse. The Company periodically assesses the realizability of deferred tax assets and the adequacy of deferred tax liabilities, based on the results of local, state, federal or foreign statutory tax audits or estimates and judgments used.

Realization of deferred tax assets associated with net operating loss and tax credit carryforwards is dependent upon generating sufficient taxable income prior to their expiration in the applicable tax jurisdiction. The Company periodically reviews the recoverability of its deferred tax assets and provides valuation allowances, as deemed necessary, to reduce deferred tax assets to amounts that more-likely-than-not will be realized. The Company's management considers many factors when assessing the likelihood of future realization of deferred tax assets, including recent earnings within various taxing jurisdictions, expectations of future taxable income, the carryforward periods remaining and other factors. Changes in the required valuation allowance are recorded in income in the period such determination is made. Deferred tax assets could be reduced in the future if the Company's estimates of taxable income during the carryforward period are significantly reduced or alternative tax strategies are no longer viable.

The Company recognizes the impact of an uncertain income tax position taken on its income tax returns at the largest amount that is more-likely-than-not to be sustained upon audit by the relevant taxing authority. An uncertain income tax position will be recognized if it has less than a 50% likelihood of being sustained. The tax positions are analyzed periodically (at least quarterly) and adjustments are made as events occur that warrant adjustments for those positions. The Company records interest expense and penalties payable to relevant tax authorities as income tax expense.

*Leases*

On March 31, 2019, the Company adopted ASU 2016-02, "Leases (Topic 842)," which requires lessees to recognize a lease liability and a right-of-use asset on the balance sheet for all leases, except certain short-term leases. The Company adopted the new standard recognizing a cumulative-effect adjustment to the opening balance of retained earnings in the period of adoption without restating the comparative prior year periods.

The Company leases retail stores, office space and warehouse space under operating lease agreements that expire at various dates through September 2043. The Company's leases generally have terms of up to ten years, generally require a fixed annual rent and may require the payment of additional rent if store sales exceed a negotiated amount. Although most of the Company's equipment is owned, the Company has limited equipment leases that expire on various dates through January 2026. The Company acts as sublessor in certain leasing arrangements, primarily related to closed stores under its restructuring initiatives, as defined in Note 10. Fixed sublease payments received are recognized on a straight-line basis over the sublease term. The Company determines the sublease term based on the date it provides possession to the subtenant through the expiration date of the sublease.

PX7096-081

Table of Contents

The Company recognizes operating lease right-of-use assets and lease liabilities at lease commencement date, based on the present value of fixed lease payments over the expected lease term. The Company uses its incremental borrowing rates to determine the present value of fixed lease payments based on the information available at the lease commencement date, as the rate implicit in the lease is not readily determinable for the Company's leases. The Company's incremental borrowing rates are based on the term of the leases, the economic environment of the leases and reflect the expected interest rate it would incur to borrow on a secured basis. Certain leases include one or more renewal options, generally for the same period as the initial term of the lease. The exercise of lease renewal options is generally at the Company's sole discretion and as such, the Company typically determines that exercise of these renewal options is not reasonably certain. As a result, the Company generally does not include the renewal option period in the expected lease term and the associated lease payments are not included in the measurement of the operating lease right-of-use asset and lease liability. Certain leases also contain termination options with an associated penalty. Generally, the Company is reasonably certain not to exercise these options and as such, they are not included in the determination of the expected lease term. The Company recognizes operating lease expense on a straight-line basis over the lease term.

Leases with an initial lease term of 12 months or less are not recorded on the balance sheet. The Company recognizes lease expense for its short-term leases on a straight-line basis over the lease term.

The Company's leases generally provide for payments of non-lease components, such as common area maintenance, real estate taxes and other costs associated with the leased property. The Company accounts for lease and non-lease components of its real estate leases together as a single lease component and, as such, includes fixed payments of non-lease components in the measurement of the operating lease right-of-use assets and lease liabilities for its real estate leases. Variable lease payments, such as percentage rentals based on location sales, periodic adjustments for inflation, reimbursement of real estate taxes, any variable common area maintenance and any other variable costs associated with the leased property, are expensed as incurred as variable lease costs and are not recorded on the balance sheet. The Company's lease agreements do not contain any material residual value guarantees or material restrictions or covenants.

### Debt Issuance Costs and Unamortized Discounts

The Company defers debt issuance costs directly associated with acquiring third party financing. These debt issuance costs and any discounts on issued debt are amortized on a straight-line basis, which approximates the effective interest method, as interest expense over the term of the related indebtedness. Deferred financing fees associated with the Company's Revolving Credit Facilities are primarily recorded within other assets in the Company's consolidated balance sheets. Deferred financing fees and unamortized discounts associated with the Company's other borrowings are primarily recorded as an offset to long-term debt in the Company's consolidated balance sheets. See Note 11 for additional information.

### Net Income (Loss) per Share

The Company's basic net income (loss) per ordinary share is calculated by dividing net income (loss) by the weighted average number of ordinary shares outstanding during the period. Diluted net income (loss) per ordinary share reflects the potential dilution that would occur if share option grants or any other potentially dilutive instruments, including restricted shares and RSUs, were exercised or converted into ordinary shares. These potentially dilutive securities are included in diluted shares to the extent they are dilutive under the treasury stock method for the applicable periods. Performance-based RSUs are included in diluted shares if the related performance conditions are considered satisfied as of the end of the reporting period and to the extent they are dilutive under the treasury stock method.

81

PX7096-082

Table of Contents

The components of the calculation of basic net income (loss) per ordinary share and diluted net income (loss) per ordinary share are as follows (in millions, except share and per share data):

|  | Fiscal Years Ended | | |
| --- | --- | --- | --- |
|  | April 2, 2022 | March 27, 2021 | March 28, 2020 |
| **Numerator:** | | | |
| Net income (loss) attributable to Capri | $ 822 | $ (62) | $ (223) |
| **Denominator:** | | | |
| Basic weighted average shares | 149,724,675 | 150,453,568 | 150,714,598 |
| Weighted average dilutive share equivalents: | | | |
| Share options and restricted stock units, and performance restricted stock units | 2,773,232 | — | — |
| Diluted weighted average shares | 152,497,907 | 150,453,568 | 150,714,598 |
| Basic net income (loss) per share [1] | $ 5.49 | $ (0.41) | $ (1.48) |
| Diluted net income (loss) per share [1] | $ 5.39 | $ (0.41) | $ (1.48) |

[1]    Basic and diluted net income (loss) per share are calculated using unrounded numbers.

Share equivalents of 360,378 shares, 3,658,959 shares and 3,752,560 shares, for Fiscal 2022, Fiscal 2021 and Fiscal 2020, respectively, have been excluded from the above calculation due to their anti-dilutive effect.

Diluted net loss per share attributable to Capri for Fiscal 2021 and Fiscal 2020 excluded all potentially dilutive securities because there was a net loss attributable to Capri for the period and, as such, the inclusion of these securities would have been anti-dilutive.

*Noncontrolling Interest*

The Company has an ownership interest in the Michael Kors Latin American joint venture, MK (Panama) Holdings, S.A. and subsidiaries of 75%, an ownership interest in the Jimmy Choo EMEA joint venture JC Gulf Trading LLC of 49%, an ownership interest in the Jimmy Choo Macau joint venture J. Choo (Macau) Co. Limited of 70% and a 50% ownership interest in J. Choo Russia J.V. Limited and its subsidiary.

*Recently Adopted Accounting Pronouncements*

**Government Assistance Disclosures**

In November 2021, the Financial Accounting Standards Board ("FASB") issued ASU 2021-10, "Disclosures by Business Entities about Government Assistance", which requires all businesses provide annual disclosures about transactions with a government that are accounted for by applying a grant or contribution accounting model by analogy. These disclosures include providing the nature of the transactions and the related accounting policy used to account for the transactions, the amounts and financial statement line items impacted by these transactions, and the significant terms and conditions of these transactions, including commitments and contingencies related to such transactions. ASU 2021-10 is effective for the Company beginning in its Fiscal 2023 with early adoption permitted. The Company early adopted ASU 2021-10 during the third quarter of Fiscal 2022 and will continue to utilize the grant accounting model.

*Recently Issued Accounting Pronouncements*

The Company has considered all new accounting pronouncements and, other than the recent pronouncements discussed below, have concluded that there are no new pronouncements that may have a material impact on the Company's results of operations, financial condition or cash flows based on current information.

**Reference Rate Reform**

In March 2020, the Financial Accounting Standards Board issued ASU 2020-04, "Facilitation of the Effects of Reference Rate Reform on Financial Reporting" and in January 2021, issued ASU 2021-01, "Reference Rate Reform: Scope". Both of these updates aim to ease the potential burden in accounting for reference rate reform. These updates provide optional

PX7096-083

Table of Contents

expedients and exceptions, if certain criteria are met, for applying accounting principles generally accepted in the United States to contract modifications, hedging relationships and other transactions affected by the expected market transition from the London Interbank Offered Rate ("LIBOR") and other interbank offered rates to alternative reference rates, such as the Secured Overnight Financing Rate ("SOFR"). The amendments were effective upon issuance and allow companies to adopt the amendments on a prospective basis through December 31, 2022. The Company has not applied this ASU to any contract modifications or new hedging relationships in the current year. As of April 2, 2022, the Company's outstanding borrowings under the 2018 Term Loan Facility of $495 million and the total availability of $1 billion under the 2018 Revolving Credit Facility are both indexed to LIBOR. As such, these agreements are likely to be impacted by these ASUs upon adoption.

## 3. Revenue Recognition

The Company accounts for contracts with its customers when there is approval and commitment from both parties, the rights of the parties and payment terms have been identified, the contract has commercial substance and collectability of consideration is probable. Revenue is recognized when control of the promised goods or services is transferred to the Company's customers in an amount that reflects the consideration the Company expects to be entitled to in exchange for goods or services.

The Company sells its products through three primary channels of distribution: retail, wholesale and licensing. Within the retail and wholesale channels, substantially all of the Company's revenues consist of sales of products that represent a single performance obligation, where control transfers at a point in time to the customer. For licensing arrangements, royalty and advertising revenue is recognized over time based on access provided to the Company's brands.

The Company has chosen to apply the practical expedient allowing it not to disclose the amount of the transaction price allocated to the remaining performance obligations that have an expected duration of 12 months or less.

*Retail*

The Company generates sales through directly operated stores and e-commerce throughout the Americas (United States, Canada and Latin America), EMEA (Europe, Middle East and Africa) and certain parts of Asia (Asia and Oceania). Retail revenue is recognized when control of the product is transferred at the point of sale at Company owned stores, including concessions. For e-commerce transactions, control is transferred and revenue is recognized when products are delivered to the customer, net of estimated returns. To arrive at net sales for retail, gross sales are reduced by actual customer returns, as well as by a provision for estimated future customer returns.

Sales tax collected from retail customers are presented on a net basis and, as such, are excluded from revenue. Shipping and handling costs that are billed to customers are included in net sales, with the related costs recorded in cost of goods sold. Shipping and handling costs that are not billed to customers are accounted for as fulfillment costs.

*Gift Cards.* The Company sells gift cards that can be redeemed for merchandise, resulting in a contract liability upon issuance. Revenue is recognized when the gift card is redeemed or upon "breakage" for the estimated portion of gift cards that are not expected to be redeemed. "Breakage" revenue is calculated under the proportional redemption methodology, which considers the historical patterns of redemption in jurisdictions where the Company is not required to remit the value of the unredeemed gift cards as unclaimed property. The Company anticipates that substantially all of its outstanding gift cards will be redeemed within the next 12 months. The contract liability related to gift cards, net of estimated "breakage," was $13 million and $12 million as of April 2, 2022 and March 27, 2021, respectively, and is included in accrued expenses and other current liabilities in the Company's consolidated balance sheets.

*Loyalty Program.* The Company offers a loyalty program, which allows its Michael Kors United States customers to earn points on qualifying purchases toward monetary and non-monetary rewards, which may be redeemed for purchases at Michael Kors retail stores and e-commerce sites. The Company defers a portion of the initial sales transaction based on the estimated relative fair value of the benefits based on projected timing of future redemptions and historical activity. These amounts include estimated "breakage" for points that are not expected to be redeemed.

*Wholesale*

The Company's products are sold primarily to major department stores, specialty stores and travel retail shops throughout the Americas, EMEA and Asia. The Company also has arrangements where its products are sold to geographic licensees in certain parts of EMEA, Asia and South America. Wholesale revenue is recognized net of estimates for sales

PX7096-084

Table of Contents

returns, discounts, markdowns and allowances, when merchandise is shipped and control of the underlying product is transferred to the Company's wholesale customers. To arrive at net sales for wholesale, gross sales are reduced by provisions for estimated future returns, as well as trade discounts, markdowns, allowances, operational chargebacks and certain cooperative selling expenses. These estimates are developed based on historical trends, actual and forecasted performance and market conditions, and are reviewed by management on a quarterly basis. Unfulfilled, non-cancelable purchase orders for products from wholesale customers (including the Company's geographic licensees) are expected to be fulfilled within the next 12 months.

*Licensing*

The Company provides its third-party licensees with the right to access its Versace, Jimmy Choo and Michael Kors trademarks under product and geographic licensing arrangements. Under product licensing arrangements, the Company allows third parties to manufacture and sell luxury goods, including watches and jewelry, fragrances, eyewear and home furnishings, using the Company's trademarks. Under geographic licensing arrangements, third party licensees receive the right to distribute and sell products bearing the Company's trademarks in retail and/or wholesale channels within certain geographical areas, including Brazil, the Middle East, Eastern Europe, South Africa and certain parts of Asia.

The Company recognizes royalty revenue and advertising contributions based on the percentage of sales made by the licensees. Advertising contributions are received to support the Company's branded advertising and marketing campaigns and are viewed as part of a single performance obligation with the right to access the Company's trademarks. Royalty revenue generated from licenses, which includes contributions for advertising, may be subject to contractual minimum levels, as defined in the contract. Such minimums are generally fixed annually, based on the previous year's sales. Licensing revenue is based on reported current period sales of licensed products at rates that are specified in the license agreements for contracts that are expected to exceed the related guaranteed minimums. If the Company expects the minimum guaranteed amounts to exceed amounts calculated based on actual sales, the guaranteed minimums are recognized ratably over the contractual year to which they relate. Generally, the Company's guaranteed minimum royalty amounts due from licensees relate to contractual periods that do not exceed 12 months, however, some of our guaranteed minimums for Versace are multi-year based. As of April 2, 2022, contractually guaranteed minimum fees from the Company's license agreements expected to be recognized as revenue during future periods were as follows (in millions):

|  | Contractually Guaranteed Minimum Fees |
|---|---|
| Fiscal 2023 | $ 29 |
| Fiscal 2024 | 26 |
| Fiscal 2025 | 23 |
| Fiscal 2026 | 23 |
| Fiscal 2027 | 22 |
| Fiscal 2028 and thereafter | 48 |
| **Total** | $ 171 |

*Sales Returns*

For the sale of goods with a right of return, the Company recognizes revenue for the consideration to which it expects to be entitled and a refund liability for the amount it expects to refund to its customers within accrued expenses and other current liabilities. The refund liability is estimated based on management's review of historical and current customer returns for its retail and wholesale customers, estimated future returns, adjusted for non-resalable products. The Company also considers its product strategies, as well as the financial condition of its customers, store closings by wholesale customers, changes in the retail environment and other macroeconomic factors. The Company recognizes an asset with a corresponding adjustment to cost of sales for the right to recover the products from its retail and wholesale customers. The refund liability recorded as of April 2, 2022 and March 27, 2021 was $52 million and $46 million, respectively, and the related asset for the right to recover returned product as of April 2, 2022 and March 27, 2021 was $15 million and $14 million, respectively.

*Contract Balances*

The Company's contract liabilities are recorded within accrued expenses and other current liabilities and other long-term liabilities in its consolidated balance sheets depending on the short- or long-term nature of the payments to be recognized. The

84

Table of Contents

Company's contract liabilities primarily consist of gift card liabilities, advanced payments from product licensees and loyalty program liabilities. Total contract liabilities were $30 million and $18 million as of April 2, 2022 and March 27, 2021, respectively. During Fiscal 2022 and Fiscal 2021, the Company recognized $10 million and $9 million in revenue, respectively, relating to contract liabilities that existed at March 27, 2021 and March 28, 2020, respectively. There were no material contract assets recorded as of April 2, 2022 and March 27, 2021.

There were no changes in historical variable consideration estimates that were materially different from actual results.

***Disaggregation of Revenue***

The following table presents the Company's segment revenues disaggregated by geographic location (in millions):

| | Fiscal Years Ended | | |
| --- | --- | --- | --- |
| | April 2, 2022 | March 27, 2021 | March 28, 2020 |
| Versace revenue - the Americas | $ 408 | $ 201 | $ 186 |
| Versace revenue - EMEA | 425 | 276 | 420 |
| Versace revenue - Asia | 255 | 241 | 237 |
| **Total Versace revenue** | **1,088** | **718** | **843** |
| Jimmy Choo revenue - the Americas | 175 | 102 | 107 |
| Jimmy Choo revenue - EMEA | 229 | 146 | 282 |
| Jimmy Choo revenue - Asia | 209 | 170 | 166 |
| **Total Jimmy Choo revenue** | **613** | **418** | **555** |
| Michael Kors revenue - the Americas | 2,627 | 1,869 | 2,822 |
| Michael Kors revenue - EMEA | 835 | 607 | 821 |
| Michael Kors revenue - Asia | 491 | 448 | 510 |
| **Total Michael Kors revenue** | **3,953** | **2,924** | **4,153** |
| Total revenue - the Americas | 3,210 | 2,172 | 3,115 |
| Total revenue - EMEA | 1,489 | 1,029 | 1,523 |
| Total revenue - Asia | 955 | 859 | 913 |
| **Total revenue** | $ **5,654** | $ **4,060** | $ **5,551** |

85

Table of Contents

## 4. Leases

The following table presents the Company's supplemental balance sheets information related to leases (in millions):

| | Balance Sheet Location | April 2, 2022 | | March 27, 2021 | |
|---|---|---|---|---|---|
| **Assets** | | | | | |
| Operating leases | Operating lease right-of-use assets | $ | 1,358 | $ | 1,504 |
| | | | | | |
| **Liabilities** | | | | | |
| Current: | | | | | |
| Operating leases | Short-term portion of operating lease liabilities | $ | 414 | $ | 447 |
| Non-current: | | | | | |
| Operating leases | Long-term portion of operating lease liabilities | $ | 1,467 | $ | 1,657 |

The components of net lease costs for the fiscal year ended April 2, 2022 and March 27, 2021 were as follows (in millions):

| | Consolidated Statement of Operations and Comprehensive Income (Loss) Location | April 2, 2022 | | March 27, 2021 | |
|---|---|---|---|---|---|
| Operating lease cost | Selling, general and administrative expenses | $ | 410 | $ | 432 |
| Variable lease cost [1] | Selling, general and administrative expenses | | 135 | | 69 |
| Short-term lease cost | Selling, general and administrative expenses | | 16 | | 15 |
| Sublease income [2] | Restructuring and other charges | | (5) | | (4) |
| Sublease income | Selling, general and administrative expenses | | (3) | | (2) |
| **Total lease cost, net** | | $ | 553 | $ | 510 |

[1] The Company elected to account for rent concessions negotiated in connection with COVID-19 as if it were contemplated as part of the existing contract and these concessions are recorded as variable lease expense. As of the fiscal year ended April 2, 2022 and March 27, 2021, rent concessions due to COVID-19 were $15 million and $52 million, respectively.

[2] The Company recorded sublease income related to certain leases in connection with the Capri Retail Store Optimization plan.

The following table presents the Company's supplemental cash flow information related to leases (in millions):

| | April 2, 2022 | | March 27, 2021 | |
|---|---|---|---|---|
| Cash paid for amounts included in the measurement of lease liabilities: | | | | |
| Operating cash flows used in operating leases | $ | 543 | $ | 488 |
| Non-cash transactions: | | | | |
| Lease assets obtained in exchange for new lease liabilities | | 332 | | 348 |
| Rent concessions due to COVID-19 | | 15 | | 52 |

PX7096-087

Table of Contents

The following tables summarizes the weighted average remaining lease term and weighted average discount rate related to the Company's operating lease right-of-use assets and lease liabilities recorded on the balance sheets as of April 2, 2022 and March 27, 2021:

|  | April 2, 2022 | March 27, 2021 |
|---|---|---|
| Operating leases: | | |
| Weighted average remaining lease term (years) | 6.0 | 6.2 |
| Weighted average discount rate | 3.1 % | 3.1 % |

At April 2, 2022, the future minimum lease payments under the terms of these noncancelable operating lease agreements are as follows (in millions):

|  | April 2, 2022 |
|---|---|
| Fiscal 2023 | $ 482 |
| Fiscal 2024 | 409 |
| Fiscal 2025 | 325 |
| Fiscal 2026 | 248 |
| Fiscal 2027 | 174 |
| Thereafter | 426 |
| Total lease payments | 2,064 |
| Less: interest | (183) |
| **Total lease liabilities** | $ 1,881 |

At April 2, 2022, the future minimum sublease income under the terms of these noncancelable operating lease agreements are as follows (in millions):

|  | April 2, 2022 |
|---|---|
| Fiscal 2023 | $ 7 |
| Fiscal 2024 | 6 |
| Fiscal 2025 | 6 |
| Fiscal 2026 | 4 |
| Fiscal 2027 | 4 |
| Thereafter | 10 |
| **Total sublease income** | $ 37 |

Additionally, the Company had approximately $49 million and $23 million of future payment obligations related to executed lease agreements for which the related lease has not yet commenced as of April 2, 2022 and March 27, 2021, respectively.

See Note 2 for additional information on the Company's accounting policies related to leases.

PX7096-088

Table of Contents

**5. Receivables, net**

Receivables, net consist of (in millions):

|  | April 2, 2022 | March 27, 2021 |
|---|---|---|
| Trade receivables [(1)] | $ 461 | $ 412 |
| Receivables due from licensees | 17 | 20 |
|  | 478 | 432 |
| Less: allowances | (44) | (59) |
| **Total receivables, net** | $ 434 | $ 373 |

[(1)]    As of April 2, 2022 and March 27, 2021, $83 million and $81 million, respectively, of trade receivables were insured.

Receivables are presented net of allowances for discounts, markdowns, operational chargebacks and credit losses. Discounts are based on open invoices where trade discounts have been extended to customers. Markdowns are based on wholesale customers' sales performance, seasonal negotiations with customers, historical deduction trends and an evaluation of current market conditions. Operational chargebacks are based on deductions taken by customers, net of expected recoveries. Such provisions, and related recoveries, are reflected in revenues.

The Company's allowance for credit losses is determined through analysis of periodic aging of receivables and assessments of collectability based on an evaluation of historic and anticipated trends, the financial condition of the Company's customers and the impact of general economic conditions. The past due status of a receivable is based on its contractual terms. Amounts deemed uncollectible are written off against the allowance when it is probable the amounts will not be recovered. Allowance for credit losses was $10 million and $25 million as of April 2, 2022 and March 27, 2021, respectively, including the impact related to COVID-19. The Company had credit loss of $7 million, $(3) million and $29 million, respectively, for Fiscal 2022, Fiscal 2021 and Fiscal 2020.

**6. Concentration of Credit Risk, Major Customers and Suppliers**

Financial instruments that subject the Company to concentration of credit risk are cash and cash equivalents and receivables. As part of its ongoing procedures, the Company monitors its concentration of deposits with various financial institutions in order to avoid any undue exposure. The Company mitigates its risk by depositing cash and cash equivalents in major financial institutions. The Company also mitigates its credit risk by obtaining insurance coverage for a portion of its receivables (see Note 5). No individual customer accounted for 10% or more of the Company's total revenues during Fiscal 2022, Fiscal 2021 or Fiscal 2020.

The Company contracts for the purchase of finished goods principally with independent third-party contractors, whereby the contractor is generally responsible for all manufacturing processes. Although the Company does not have any long-term agreements with any of its manufacturing contractors, the Company believes it has mutually satisfactory relationships with them. The Company allocates product manufacturing among agents and contractors based on their capabilities, the availability of production capacity, quality, pricing and delivery. The inability of certain contractors to provide needed services on a timely basis could adversely affect the Company's operations and financial condition. For Fiscal 2022, Fiscal 2021 and Fiscal 2020, one contractor accounted for approximately 17%, 18% and 20%, respectively, of the Company's total finished goods purchases, based on dollar volume.

The Company also has relationships with various agents who source finished goods with numerous contractors on behalf of its Michael Kors brand. For Fiscal 2022, Fiscal 2021 and Fiscal 2020, one agent sourced approximately 24%, 26% and 26%, respectively, of Michael Kors finished goods, based on unit volume.

PX7096-089

Table of Contents

**7. Property and Equipment, net**

Property and equipment, net, consists of (in millions):

| | April 2, 2022 | March 27, 2021 |
|---|---|---|
| Leasehold improvements | $    575 | $    737 |
| Furniture and fixtures | 218 | 350 |
| Computer equipment and software | 212 | 359 |
| Equipment | 81 | 139 |
| Building | 48 | 51 |
| In-store shops | 47 | 53 |
| Land | 19 | 20 |
| **Total property and equipment, gross** [1] | 1,200 | 1,709 |
| Less: accumulated depreciation and amortization [1] | (790) | (1,271) |
| Subtotal | 410 | 438 |
| Construction-in-progress | 66 | 47 |
| **Total property and equipment, net** | $    476 | $    485 |

---

[1]  During the fiscal year ended April 2, 2022, the Company wrote off $552 million of fully depreciated assets and related accumulated depreciation for assets which were no longer in service.

Depreciation and amortization of property and equipment for the fiscal years ended April 2, 2022, March 27, 2021, and March 28, 2020 totaled $144 million, $165 million and $200 million, respectively. During Fiscal 2022, Fiscal 2021 and Fiscal 2020, the Company recorded property and equipment impairment charges of $7 million, $23 million and $77 million, respectively, primarily related to the Company's retail store locations. See Note 13 for additional information.

**8. Intangible Assets and Goodwill**

The following table details the carrying values of the Company's intangible assets other than goodwill (in millions):

| | April 2, 2022 | | | March 27, 2021 | | |
|---|---|---|---|---|---|---|
| | Gross Carrying Amount | Accumulated Amortization | Net Carrying Amount | Gross Carrying Amount | Accumulated Amortization | Net Carry Amount |
| ***Definite-lived intangible assets:*** | | | | | | |
| Reacquired rights | $    400 | $    94 | $    306 | $    400 | $    77 | $    323 |
| Trademarks | 23 | 22 | 1 | 23 | 21 | 2 |
| Customer relationships | 414 | 112 | 302 | 437 | 86 | 351 |
| **Total definite-lived intangible assets** | 837 | 228 | 609 | 860 | 184 | 676 |
| ***Indefinite-lived intangible assets:*** | | | | | | |
| Jimmy Choo brand [1] | 570 | 249 | 321 | 587 | 249 | 338 |
| Versace brand [1] | 917 | — | 917 | 978 | — | 978 |
| **Total indefinite-lived intangible assets** | 1,487 | 249 | 1,238 | 1,565 | 249 | 1,316 |
| Total intangible assets, excluding goodwill | $    2,324 | $    477 | $    1,847 | $    2,425 | $    433 | $    1,992 |

---

[1]  The year-over-year change in net carrying amount reflects foreign currency translation for the fiscal year ended April 2, 2022. As of April 2, 2022, the Company had accumulated impairment charges of $249 million related to the Jimmy Choo brand intangible assets.

89

Table of Contents

Reacquired rights relate to the Company's reacquisition of the rights to use the Michael Kors trademarks and to import, sell, advertise and promote certain of its products in the previously licensed territories in the Greater China region and are being amortized through March 31, 2041, the expiration date of the former licensing agreement. The trademarks relate to the Michael Kors brand name and are amortized over twenty years. Customer relationships are generally amortized over five to eighteen years. Amortization expense for the Company's definite-lived intangibles was $49 million, $47 million and $49 million, respectively, for each of the fiscal years ended April 2, 2022, March 27, 2021 and March 28, 2020.

Indefinite-lived intangible assets other than goodwill included the Versace and Jimmy Choo brands, which were recorded in connection with the acquisitions of Versace and Jimmy Choo, and have an indefinite life due to being essential to the Company's ability to operate the Versace and Jimmy Choo businesses for the foreseeable future.

Estimated amortization expense for each of the next five years is as follows (in millions):

| | | |
|---|---|---|
| Fiscal 2023 | $ | 45 |
| Fiscal 2024 | | 45 |
| Fiscal 2025 | | 45 |
| Fiscal 2026 | | 45 |
| Fiscal 2027 | | 45 |
| Fiscal 2028 and thereafter | | 384 |
| **Total** | $ | 609 |

The future amortization expense above reflects weighted-average estimated remaining useful lives of nineteen years for reacquired rights, one year for trademarks and eleven years for customer relationships.

The following table details the changes in goodwill for each of the Company's reportable segments (in millions):

| | Versace | Jimmy Choo | Michael Kors | Total |
|---|---|---|---|---|
| Balance at March 28, 2020 | 881 | 487 | 120 | $ 1,488 |
| Impairment charges [1] | — | (94) | — | (94) |
| Foreign currency translation | 52 | 52 | — | 104 |
| Balance at March 27, 2021 | 933 | 445 | 120 | 1,498 |
| Foreign currency translation | (59) | (21) | — | (80) |
| Balance at April 2, 2022 | $ 874 | $ 424 | $ 120 | $ 1,418 |

[1]    The Company recorded impairment charges of $94 million during Fiscal 2021 related to the Jimmy Choo wholesale and licensing reporting units.

The Company's goodwill and the Versace and Jimmy Choo brands are not subject to amortization but are evaluated for impairment annually in the last quarter of each fiscal year, or whenever impairment indicators exist. During the fourth quarter of Fiscal 2022, the Company performed its annual goodwill and indefinite-lived intangible assets impairment analysis. The Company performed its goodwill impairment assessment for its Michael Kors reporting units using a qualitative assessment. Based on the results of the Company's qualitative impairment assessment, the Company concluded that it is more likely than not that the fair value of the Michael Kors' reporting units exceeded their carrying value and, therefore, were not impaired.

The Company performed its annual goodwill and indefinite-lived intangible assets impairment analysis for both the Versace and Jimmy Choo reporting units, using a combination of income and market approaches to estimate the fair value of each brands' reporting units. The Company also elected to perform an impairment analysis for both the Versace and Jimmy Choo brand indefinite-lived intangible assets using an income approach to estimate the fair values. Based on the results of these assessments, the Company determined there was no impairment for the Jimmy Choo and Versace reporting units or brand intangible assets, as the fair values of the reporting units and the brand intangible assets exceeded the related carrying amounts.

PX7096-091

Table of Contents

In Fiscal 2021, the Company recorded goodwill impairment charges of $94 million related to the Jimmy Choo Wholesale and Jimmy Choo Licensing reporting units and impairment charges of $69 million related to the Jimmy Choo brand intangible assets. In Fiscal 2020, the Company recorded goodwill impairment charges of $171 million related to the Jimmy Choo Retail and Jimmy Choo Licensing reporting units and impairment charges of $180 million related to the Jimmy Choo brand intangible assets. The impairment charges were recorded within impairment of assets on our consolidated statement of operations and comprehensive income (loss) for the fiscal years ended March 27, 2021 and March 28, 2020. See Note 13 for additional information.

**9. Current Assets and Current Liabilities**

Prepaid expenses and other current assets consist of the following (in millions):

| | April 2, 2022 | | March 27, 2021 |
|---|---|---|---|
| Prepaid taxes | $ | 86 | $ | 133 |
| Other accounts receivables | | 17 | | 13 |
| Prepaid contracts | | 15 | | 11 |
| Interest receivable related to net investment hedges | | 13 | | 12 |
| Other | | 61 | | 36 |
| **Total prepaid expenses and other current assets** | $ | 192 | $ | 205 |

Accrued expenses and other current liabilities consist of the following (in millions):

| | April 2, 2022 | | March 27, 2021 |
|---|---|---|---|
| Other taxes payable | $ | 61 | $ | 46 |
| Return liabilities | | 52 | | 46 |
| Accrued capital expenditures | | 39 | | 17 |
| Accrued advertising and marketing | | 21 | | 11 |
| Accrued rent [1] | | 20 | | 20 |
| Gift and retail store credits | | 17 | | 12 |
| Professional services | | 15 | | 13 |
| Accrued litigation | | 13 | | 12 |
| Accrued purchases and samples | | 11 | | 8 |
| Accrued interest | | 10 | | 10 |
| Charitable donations [2] | | 10 | | 20 |
| Restructuring liability | | 1 | | 9 |
| Other | | 81 | | 73 |
| **Total accrued expenses and other current liabilities** | $ | 351 | $ | 297 |

[1] The accrued rent balance relates to variable lease payments.

[2] The charitable donations balance relates to a $10 million unconditional pledge to The Versace Foundation as of April 2, 2022 and a $20 million unconditional pledge to The Capri Holdings Foundation for the Advancement of Diversity in Fashion as of March 27, 2021 which was funded during the second quarter ended September 25, 2021.

**10. Restructuring and Other Charges**

*Capri Retail Store Optimization Program*

During Fiscal 2022, the Company completed its plan to close certain retail stores as a part of Capri Retail Store Optimization Program. The Company closed a total of 167 of its retail stores, with 66 and 101 stores having closed during Fiscal 2022 and Fiscal 2021, respectively. Net restructuring charges recorded in connection with the Capri Retail Store Optimization Program was $14 million, of which $9 million and $5 million was recorded during Fiscal 2022 and Fiscal 2021,

PX7096-092

Table of Contents

respectively. The below table presents a roll forward of the Company's restructuring liability related to its Capri Retail Store Optimization Program (in millions):

| | Severance and benefit costs | Lease-related and other costs | Total |
|---|---|---|---|
| Balance at March 27, 2021 | $ — | $ 3 | $ 3 |
| Additions charged to expense [1] | 1 | 3 | 4 |
| Payments | (1) | (5) | (6) |
| Balance at April 2, 2022 | $ — | $ 1 | $ 1 |

[1] Excludes $10 million of impairment charges related to operating lease right-of-use assets partially offset by a net credit of $5 million related to gains on certain lease terminations during Fiscal 2022.

*Other Restructuring Charges*

In addition to the restructuring charges related to the Capri Retail Store Optimization Plan, the Company incurred charges of $15 million primarily relating to severance for an executive officer and the closure of certain corporate locations during Fiscal 2022.

In addition to the restructuring charges related to the Capri Retail Store Optimization Plan, the Company incurred charges of $8 million primarily relating to the closure of certain corporate locations during Fiscal 2021.

*Other Costs*

The Company recorded costs of $18 million and $19 million during Fiscal 2022 and Fiscal 2021, respectively, for equity awards associated with the acquisition of Versace.

**11. Debt Obligations**

The following table presents the Company's debt obligations (in millions):

| | April 2, 2022 | March 27, 2021 |
|---|---|---|
| Term Loan | $ 497 | $ 870 |
| Senior Notes due 2024 | 450 | 450 |
| Revolving Credit Facility | 175 | — |
| Other | 42 | 30 |
| **Total debt** | 1,164 | 1,350 |
| Less: Unamortized debt issuance costs | 3 | 7 |
| Less: Unamortized discount on senior notes | 1 | 1 |
| **Total carrying value of debt** | 1,160 | 1,342 |
| Less: Short-term debt | 29 | 123 |
| **Total long-term debt** | $ 1,131 | $ 1,219 |

***Senior Revolving Credit Facility***

The Company's credit facility (the "2018 Credit Facility") provides for a $1 billion revolving credit facility (the "Revolving Credit Facility"), which may be denominated in United States dollars. The Revolving Credit Facility also provides sub-facilities for the issuance of letters of credit of up to $75 million and swing loans of up to $75 million. The 2018 Credit Facility also provides for a $1.6 billion term loan facility (the "2018 Term Loan Facility"). The 2018 Term Loan Facility is divided into two tranches, with the second tranche maturing in December 2023, which requires a quarterly payment of $24 million. As of March 27, 2021, the Company has fully paid off the first tranche of the 2018 Term Loan Facility.

Borrowings under the Revolving Credit Facility bear interest, at the Company's option, for loans denominated in United States dollars, an alternate base rate, which is the greatest of: (a) the prime rate publicly announced from time to time by JPMorgan Chase, (b) the greater of the federal funds effective rate and the Federal Reserve Bank of New York overnight bank funding rate and zero, plus 50 basis points, and (c) the greater of the one-month London Interbank Offered Rate adjusted for

PX7096-093

Table of Contents

statutory reserve requirements for Eurocurrency liabilities ("Adjusted LIBOR") and zero, plus 100 basis points, in each case, plus an applicable margin based on the Company's public debt ratings;

Borrowings under the 2018 Term Loan Facility bear interest, at the Company's option, at (a) the alternate base rate plus an applicable margin based on the Company's public debt ratings; or (b) the greater of Adjusted LIBOR for the applicable interest period and zero, plus an applicable margin based on the Company's public debt ratings.

On June 25, 2020, the Company entered into the second amendment (the "Second Amendment") to its third amended and restated 2018 Credit Facility, dated as of November 15, 2018, with, among others, JPMorgan Chase Bank, N.A., as administrative agent (the "Administrative Agent").

Pursuant to the Second Amendment, the financial covenant in the Company's 2018 Credit Facility required it to maintain a ratio of the sum of total indebtedness plus the capitalized amount of all operating lease obligations for the last four fiscal quarters to Consolidated EBITDAR of no greater than 3.75 to 1.0 had been waived through the fiscal quarter ending June 26, 2021.

In addition, the Second Amendment added a new $230 million revolving line of credit with a maturity date of June 24, 2021 (the "364 Day Facility").

The Second Amendment also permitted certain working capital facilities between the Company or any of its subsidiaries with a lender or an affiliate of a lender under the 2018 Credit Facility to be guaranteed under the 2018 Credit Facility guarantees and certain supply chain financings with, and up to $50 million outstanding principal amount of bilateral letters of credit and bilateral bank guarantees issued by a lender or an affiliate of a lender to be guaranteed and secured under the 2018 Credit Facility guarantees and collateral documents. The Second Amendment, among other things, also temporarily suspended the quarterly maximum leverage ratio covenant and imposed a minimum liquidity test during the period from June 25, 2020 until the earlier of (x) the date on which the Company delivers its financial statements for the fiscal quarter ending June 26, 2021 and (y) the date on which the Company certifies that its net leverage ratio as of the last day of the most recently ended fiscal quarter was no greater than 4.00 to 1.00 (the "Applicable Period").

On May 20, 2021, the Company determined it no longer desired to maintain this additional line of credit and consequently delivered a notice to the Administrative Agent terminating the 364 Day Facility, and the 364 Day Facility terminated on May 25, 2021. The remainder of the 2018 Credit Facility remains in full force and effect.

On May 26, 2021 (the "Election Date"), the Company delivered to the Administrative Agent the certificate required to terminate the Applicable Period. Effective as of the Election Date, the Company will be required to comply with the quarterly maximum net leverage ratio test of 4.00 to 1.00.

On September 23, 2021, the Company agreed to suspend its rights to borrow in all non-United States dollar (i.e. Pounds Sterling, Euro, Swiss Francs and Japanese Yen) currency LIBOR rate tenors under the 2018 Credit Facility after December 31, 2021 given that non-United States dollar LIBOR will no longer be published after that date.

The Revolving Credit Facility also provides for an annual administration fee and a commitment fee equal to 0.10% to 0.25% per annum, based on the Company's public debt ratings, applied to the average daily unused amount of the Revolving Credit Facility. The 2018 Term Loan Facility provides for a commitment fee equal to 0.10% to 0.25% per annum, based on the Company's public debt ratings, applied to the undrawn amount of the 2018 Term Loan Facility, from January 6, 2019 until the term loans are fully drawn or the commitments under the 2018 Term Loan Facility terminate or expire. Loans under the 2018 Credit Facility may be repaid and commitments may be terminated or reduced by the borrowers without premium or penalty other than the customary breakage costs with respect to loans bearing interest based on Adjusted LIBOR or the Canadian Dollar Offered Rate.

As per the reinstatement election date of May 27, 2021, the Company will be required to comply with the quarterly maximum net leverage ratio test of 4.00 to 1.00. Such leverage ratio is calculated based on the ratio of consolidated total indebtedness plus the capitalized amount of all operating lease liabilities presented on our consolidated balance sheets to Consolidated EBITDAR (as defined below) for the last four consecutive fiscal quarters. Consolidated EBITDAR is defined as consolidated net income plus income tax expense, net interest expense, depreciation and amortization expense, consolidated rent expense and other non-cash charges, subject to certain additions and deductions. The 2018 Credit Facility also includes covenants that limit additional indebtedness, guarantees, liens, acquisitions and other investments and cash dividends that are customary for financings of this type. As of April 2, 2022 and the date these financial statements were issued, the Company was in compliance with all covenants related to the 2018 Credit Facility.

PX7096-094

Table of Contents

The 2018 Credit Facility contains events of default customary for financings of this type, including, but not limited to, payment of defaults, material inaccuracy of representations and warranties, covenant defaults, cross-defaults to certain indebtedness, certain events of bankruptcy or insolvency, certain events under The Employee Retirement Income Security Act, material judgments, actual or asserted failure of any guaranty supporting the 2018 Credit Facility to be in full force and effect, and changes of control. If such an event of default occurs, the lenders under the 2018 Credit Facility would be entitled to take various actions, including, but not limited to, terminating the commitments and accelerating amounts outstanding under the 2018 Credit Facility, subject to "certain funds" limitations in connection with the transaction governing the 2018 Term Loan Facility.

As of April 2, 2022, the Company had $175 million of borrowings outstanding under the Revolving Credit Facility, which were recorded within long-term debt in its consolidated balance sheets. As of March 27, 2021, the Company had no borrowings outstanding under the Revolving Credit Facility. In addition, stand-by letters of credit of $21 million and $27 million were outstanding as of April 2, 2022 and March 27, 2021, respectively. At April 2, 2022 and March 27, 2021, the amount available for future borrowings under the Revolving Credit Facility were $804 million and $973 million, respectively.

As of March 27, 2021, the Company had $230 million available for future borrowings under the 364 Day Facility, which was terminated as of May 25, 2021.

As of April 2, 2022, the carrying values of borrowings outstanding under the 2018 Term Loan Facility were $495 million, net of debt issuance costs of $2 million, which was all recorded within long-term debt in its consolidated balance sheets due to prepayments made on the Term Loan during Fiscal 2022. As of March 27, 2021, the carrying values of borrowings outstanding under the 2018 Term Loan Facility were $865 million, net of debt issuance costs of $5 million, $97 million of which was recorded within short-term debt while $768 million was recorded within long-term debt in the Company's consolidated balance sheets.

***Senior Notes***

On October 20, 2017, Michael Kors (USA), Inc. (the "Issuer"), the Company's wholly owned subsidiary, completed its offering of $450 million aggregate principal amount senior notes due in 2024 (the "Senior Notes"), pursuant to an exemption from registration under the Securities Act of 1933, as amended. The Senior Notes were issued under an indenture dated October 20, 2017, among the Issuer, the Company, the subsidiary guarantors party thereto and U.S. Bank National Association, as trustee (the "Indenture"). The Senior Notes were issued to finance a portion of the Company's acquisition of Jimmy Choo and certain related refinancing transactions.

As of April 2, 2022, the Senior Notes bear interest at a rate of 4.500% per year, subject to adjustments from time to time if either Moody's or S&P (or a substitute rating agency therefore) downgrades (or downgrades and subsequently upgrades) the credit rating assigned to the Senior Notes. Interest on the Senior Notes is payable semi-annually on May 1 and November 1 of each year, beginning on May 1, 2018. See Note 20 for additional information.

The Senior Notes are unsecured and are guaranteed by the Company and its existing and future subsidiaries that guarantee or are borrowers under the 2018 Credit Facility (subject to certain exceptions, including subsidiaries organized in China). The Senior Notes may be redeemed at the Company's option at any time in whole or in part at a price equal to 100% of the principal amount, plus accrued and unpaid interest, plus a "make-whole" amount calculated at the applicable Treasury Rate plus 30 basis points.

The Senior Notes rank equally in right of payment with all of the Issuer's and guarantors' existing and future senior unsecured indebtedness, senior in right of payment to any future subordinated indebtedness, effectively subordinated in right of payment to any of the Company's subsidiaries' obligations and any of the Company's secured obligations, to the extent of the assets securing such obligations.

The Indenture contains covenants, including those that limit the Company's ability to create certain liens and enter into certain sale and leaseback transactions. In the event of a "Change of Control Triggering Event," as defined in the Indenture, the Issuer will be required to make an offer to repurchase the Senior Notes at a repurchase price in cash equal to 101% of the aggregate principal amount of the Senior Notes being repurchased plus any unpaid interest. These covenants are subject to important limitations and exceptions, as per the Indenture.

As of April 2, 2022 and March 27, 2021, the carrying value of the Senior Notes was $448 million and $447 million, respectively, net of issuance costs and unamortized discount, which were recorded within long-term debt in the Company's consolidated balance sheets.

94

Table of Contents

### Supplier Financing Program

During the third quarter of Fiscal 2021, the Company began offering a supplier financing program to certain suppliers as the Company continues to identify opportunities to improve liquidity. This program enables suppliers, at their sole discretion, to sell their receivables (i.e., the Company's payment obligations to suppliers) to a financial institution on a non-recourse basis in order to be paid earlier than current payment terms provide. The Company's obligations, including the amount due and scheduled payment dates, are not impacted by a suppliers' decision to participate in this program. The Company does not reimburse suppliers for any costs they incur to participate in the program and their participation is voluntary. The amount outstanding under this program as of April 2, 2022 and March 27, 2021 was $21 million and $17 million, respectively and is presented as short-term debt in the Company's consolidated balance sheets.

### Japan Credit Facility

In Fiscal 2021, the Company's subsidiary in Japan renewed a short term credit facility ("Japan Credit Facility") with Mitsubishi UFJ Financial Group ("MUFJ"), which may be used to fund general working capital needs of Michael Kors Japan K.K., subject to the bank's discretion. The Japan Credit Facility is in effect through November 2022. The Japan Credit Facility provides Michael Kors Japan K.K. with a revolving credit line of up to ¥1.0 billion (approximately $8 million). The Japan Credit Facility bears interest at a rate posted by the Bank plus 0.300% two business days prior to the date of borrowing or the date of interest renewal. As of April 2, 2022 the Company had no borrowings outstanding under the Japan Credit Facility and $9 million borrowings outstanding as of March 27, 2021, which were recorded within short-term debt in the Company's consolidated balance sheets.

### Hong Kong Credit Facility

In May 2020, the Company's Hong Kong subsidiary, MKHKL, renewed its uncommitted credit facility ("HK Credit Facility") with HSBC, which may be used to fund general working capital needs of MKHKL through January 2023 subject to the bank's discretion. The HK Credit Facility provides MKHKL with a revolving line of credit of up to 100 million Hong Kong dollar (approximately $13 million), which includes bank guarantees of up to 20 million HKD (approximately $3 million). Borrowings under the HK Credit Facility must be made in increments of at least 5 million Hong Kong dollar and bear interest at the Hong Kong Interbank Offered Rate ("HIBOR") plus 200 basis points. As of April 2, 2022 and March 27, 2021, there were no borrowings outstanding under the HK Credit Facility. As of April 2, 2022, bank guarantees supported by this facility were 1 million Hong Kong dollar (less than $1 million).

### China Credit Facility

In January 2019, the Company's subsidiary in China, MKTSCL, entered into a short-term credit facility ("China Credit Facility") with HSBC, which may be used to fund general working capital needs, not to exceed 12 months. The China Credit Facility is in effect through October 2022. The China Credit Facility provides MKTSCL with a Revolving Loan Facility of up to RMB 65 million (approximately $10 million), which includes a revolving loan of RMB 35 million (approximately $5 million), an overdraft facility with a credit line of RMB 10 million (approximately $2 million) and a non-financial bank guarantee facility of RMB 20 million (approximately $3 million) or its equivalent in another currency, at lender's discretion. Borrowings under the China Credit Facility bear interest at plus 0.42% of the applicable People's Bank of China's benchmark lending rate at the time of borrowing. As of April 2, 2022 and March 27, 2021, the Company had no borrowings outstanding under the China Credit Facility.

### Versace Facilities

During the first quarter of Fiscal 2022, the Company's subsidiary, Versace, entered into an agreement with Banco BPM Banking Group ("the Bank") to sell certain tax receivables to the Bank in exchange for cash. The arrangement was determined to be a financing arrangement because the de-recognition criteria for the receivables was not met at the time of the cash receipt from the Bank. As of April 2, 2022, the outstanding balance was $18 million, with $8 million and $10 million recorded within short-term debt and long-term debt in the Company's consolidated balance sheets, respectively.

In June 2019, the Company's subsidiary, Versace, entered into two uncommitted short-term credit facilities, one with Unicredit and the other with Intesa ("Versace Credit Facilities"), which may be used for general working capital needs of Versace. The Versace Credit Facilities provide Versace with a swing line of credit of up to €32 million (approximately $35 million), with interest set by the bank on the date of borrowing. As of April 2, 2022 and March 27, 2021, there were no borrowings outstanding under the Versace Credit Facility.

PX7096-096

Table of Contents

In November 2018, Versace entered into an overdraft facility ("Versace Overdraft Facility"), which may be used for general working capital needs of Versace. The overdraft facility provided Versace with a line of credit of up to €5 million (approximately $6 million). During the second quarter of Fiscal 2022, the Versace Overdraft Facility was terminated. As of March 27, 2021, there were no borrowings outstanding under the Versace Overdraft Facility.

In January 2018, Versace entered into an uncommitted short-term credit facility ("Versace Credit Facility"), which may be used for general working capital needs of Versace. The Versace Credit Facility provides Versace with a swing line of credit of up to €20 million (approximately $22 million), which includes a bank guarantee of €4 million (approximately $5 million), with interest set by the bank on the date of borrowing. As of April 2, 2022, bank guarantees outstanding under this facility were €3 million (approximately $3 million). As of April 2, 2022 and March 27, 2021, there were no borrowings outstanding under the Versace Credit Facility.

## 12. Commitments and Contingencies

### Commitments

The Company has issued stand-by letters of credit to guarantee certain of its retail and corporate operating lease commitments, aggregating $36 million at April 2, 2022, including $21 million in letters of credit issued under the Revolving Credit Facility.

### Other Commitments

As of April 2, 2022, the Company also has other contractual commitments aggregating $2.288 billion, which consist of inventory purchase commitments of $1.016 billion, debt obligations of $1.164 billion and other contractual obligations of $108 million, which primarily relate to the Company's marketing and advertising obligations, information technology agreements and supply agreements.

### Long-term Employment Contract

The Company has an employment agreement with the Chief Creative Officer of the Michael Kors brand that provides for continuous employment through the date of the officer's death or permanent disability at an annual salary of $1 million. In addition to salary, the agreement provides for an annual bonus and other employee related benefits.

### Contingencies

In the ordinary course of business, the Company is party to various legal proceedings and claims. Although the outcome of such items cannot be determined with certainty, the Company does not believe that the outcome of all pending legal proceedings in the aggregate will have a material adverse effect on its cash flow, results of operations or financial position.

## 13. Fair Value Measurements

Financial assets and liabilities are measured at fair value using the three-level valuation hierarchy for disclosure of fair value measurements. The determination of the applicable level within the hierarchy of a particular asset or liability depends on the inputs used in the valuation as of the measurement date, notably the extent to which the inputs are market-based (observable) or internally derived (unobservable). Observable inputs are inputs that market participants would use in pricing the asset or liability based on market data obtained from independent sources. Unobservable inputs are inputs based on a company's own assumptions about market participant assumptions based on the best information available in the circumstances. The hierarchy is broken down into three levels based on the reliability of inputs as follows:

Level 1 – Valuations based on quoted prices in active markets for identical assets or liabilities that a company has the ability to access at the measurement date.

Level 2 – Valuations based on quoted prices for similar assets or liabilities in active markets or quoted prices for identical assets or liabilities in inactive markets, inputs other than quoted prices that are observable for the asset or liability and inputs derived principally from or corroborated by observable market data.

Level 3 – Valuations based on inputs that are unobservable and significant to the overall fair value measurement.

Table of Contents

At April 2, 2022 and March 27, 2021, the fair values of the Company's derivative contracts, were determined using broker quotations, which were calculations derived from observable market information: the applicable currency rates at the balance sheet date and those forward rates particular to the contract at inception. The Company makes no adjustments to these broker obtained quotes or prices, but assesses the credit risk of the counterparty and would adjust the provided valuations for counterparty credit risk when appropriate. The fair values of the forward contracts are included in prepaid expenses and other current assets, and in accrued expenses and other current liabilities in the consolidated balance sheets, depending on whether they represent assets or liabilities of the Company. The fair values of net investment hedges and interest rate swaps are included in other assets, and in other long-term liabilities in the consolidated balance sheets, depending on whether they represent assets or liabilities of the Company. See Note 14 for further detail.

All contracts are measured and recorded at fair value on a recurring basis and are categorized in Level 2 of the fair value hierarchy, as shown in the following table (in millions):

| | Fair value at April 2, 2022, using: | | | Fair value at March 27, 2021, using: | | |
|---|---|---|---|---|---|---|
| | Quoted prices in active markets for identical assets (Level 1) | Significant other observable inputs (Level 2) | Significant unobservable inputs (Level 3) | Quoted prices in active markets for identical assets (Level 1) | Significant other observable inputs (Level 2) | Significant unobservable inputs (Level 3) |
| **Derivative assets:** | | | | | | |
| Forward foreign currency exchange contracts | $        — | $         4 | $        — | $        — | $         2 | $        — |
| Net investment hedges | — | 44 | — | — | 3 | — |
| Undesignated derivative contracts | — | 4 | — | — | — | — |
| **Total derivative assets** | $        — | $        52 | $        — | $        — | $         5 | $        — |
| | | | | | | |
| **Derivative liabilities:** | | | | | | |
| Forward foreign currency exchange contracts | $        — | $        — | $        — | $        — | $         1 | $        — |
| Net investment hedges | — | 37 | — | — | 263 | — |
| Interest rate swaps | — | — | — | — | 1 | — |
| **Total derivative liabilities** | $        — | $        37 | $        — | $        — | $       265 | $        — |

The Company's long-term debt obligations are recorded in its consolidated balance sheets at carrying values, which may differ from the related fair values. The fair value of the Company's long-term debt is estimated using external pricing data, including any available quoted market prices and based on other debt instruments with similar characteristics. Borrowings under revolving credit agreements, if outstanding, are recorded at carrying value, which approximates fair value due to the frequent nature of such borrowings and repayments. See Note 11 for detailed information related to carrying values of the Company's outstanding debt. The following table summarizes the carrying values and estimated fair values of the Company's short- and long-term debt, based on Level 2 measurements (in millions):

| | April 2, 2022 | | March 27, 2021 | |
|---|---|---|---|---|
| | Carrying Value | Estimated Fair Value | Carrying Value | Estimated Fair Value |
| Senior Notes due 2024 | $        448 | $        451 | $        447 | $        470 |
| Term Loan | $        495 | $        490 | $        865 | $        866 |
| Revolving Credit Facilities | $        175 | $        175 | $        — | $        — |

The Company's cash and cash equivalents, accounts receivable and accounts payable, are recorded at carrying value, which approximates fair value.

PX7096-098

Table of Contents

**Non-Financial Assets and Liabilities**

The Company's non-financial assets include goodwill, intangible assets, operating lease right-of-use assets and property and equipment. Such assets are reported at their carrying values and are not subject to recurring fair value measurements. The Company's goodwill and its indefinite-lived intangible assets (Versace and Jimmy Choo brands) are assessed for impairment at least annually, while its other long-lived assets, including operating lease right-of-use assets, property and equipment and definite-lived intangible assets, are assessed for impairment whenever events or changes in circumstances indicate that the carrying amount of any such asset may not be recoverable. The Company determines the fair values of these assets based on Level 3 measurements using the Company's best estimates of the amount and timing of future discounted cash flows, based on historical experience, market conditions, current trends and performance expectations.

The following table details the carrying values and fair values of the Company's assets that have been impaired (in millions):

| | Carrying Value Prior to Impairment | | Fair Value | | Impairment Charge [1] | |
|---|---|---|---|---|---|---|
| **Fiscal 2022:** | | | | | | |
| Operating Lease Right-of-Use Assets | $ | 209 | $ | 133 | $ | 76 |
| Property and Equipment | | 12 | | 5 | | 7 |
| **Total** | $ | 221 | $ | 138 | $ | 83 |
| | | | | | | |
| **Fiscal 2021:** | | | | | | |
| Operating Lease Right-of-Use Assets | $ | 326 | $ | 191 | $ | 135 |
| Goodwill | | 319 | | 225 | | 94 |
| Brands | | 407 | | 338 | | 69 |
| Property and Equipment | | 30 | | 7 | | 23 |
| **Total** | $ | 1,082 | $ | 761 | $ | 321 |
| | | | | | | |
| **Fiscal 2020:** | | | | | | |
| Operating Lease Right-of-Use Assets | $ | 717 | $ | 437 | $ | 280 |
| Brands | | 547 | | 367 | | 180 |
| Goodwill | | 474 | | 303 | | 171 |
| Property and Equipment | | 105 | | 28 | | 77 |
| **Total** | $ | 1,843 | $ | 1,135 | $ | 708 |

[1] Includes $10 million and $5 million of impairment charges that were recorded within restructuring and other charges related to the Capri Retail Store Optimization Program during Fiscal 2022 and Fiscal 2021, respectively.

There were no impairment charges related to goodwill or indefinite-lived intangible assets in Fiscal 2022.

**14. Derivative Financial Instruments**

*Forward Foreign Currency Exchange Contracts*

The Company uses forward foreign currency exchange contracts to manage its exposure to fluctuations in foreign currency for certain of its transactions. The Company, in its normal course of business, enters into transactions with foreign suppliers and seeks to minimize risks related to certain forecasted inventory purchases by using forward foreign currency exchange contracts. The Company only enters into derivative instruments with highly credit-rated counterparties. The Company does not enter into derivative contracts for trading or speculative purposes.

PX7096-099

Table of Contents

*Net Investment Hedges*

During the first quarter of Fiscal 2022, the Company modified multiple fixed-to-fixed cross-currency swap agreements with aggregate notional amounts of $2.875 billion to hedge its net investment in Euro denominated subsidiaries. Due to an other-than-insignificant financing element for certain of these modifications, $31 million of net interest cash receipts during Fiscal 2022 related to these contracts were classified as financing activities in the Company's consolidated statements of cash flows.

During the third and fourth quarter of Fiscal 2022, the Company modified multiple fixed-to-fixed cross-currency swap agreements with aggregate notional amounts of $1.5 billion and $2.475 billion, respectively. The modification of these hedges resulted in the Company receiving $59 million and $130 million in cash during the third and fourth quarter of Fiscal 2022, respectively. These amounts are classified within investing activities in the Company's consolidated statements of cash flows.

As of April 2, 2022, the Company had multiple fixed-to-fixed cross-currency swap agreements with aggregate notional amounts of $4 billion to hedge its net investment in Euro-denominated subsidiaries and $194 million to hedge its net investment in Japanese Yen-denominated subsidiaries against future volatility in the exchange rates between the United States dollar and these currencies. Under the term of these contracts, the Company will exchange the semi-annual fixed rate payments on United States denominated debt for fixed rate payments of 0% to 3.565% in Euros and 0% to 3.408% in Japanese Yen. Certain of these contracts include mandatory early termination dates between August 2025 and February 2026, while the remaining contracts have maturity dates between March 2024 and February 2051. These contracts have been designated as net investment hedges. Certain of these contracts are supported by a credit support annex ("CSA") which provides for collateral exchange with the earliest effective date being May 2024. If the outstanding position of a contract exceeds a certain threshold governed by the aforementioned CSA's, either party is required to post cash collateral.

When a cross-currency swap is used as a hedging instrument in a net investment hedge assessed under the spot method, the cross-currency basis spread is excluded from the assessment of hedge effectiveness and is recognized as a reduction in interest expense in the Company's consolidated statements of operations and comprehensive income (loss). Accordingly, the Company recorded interest income of $63 million, $16 million and $71 million, respectively, during Fiscal 2022, Fiscal 2021 and Fiscal 2020.

*Interest Rate Swap*

The Company had an interest rate swap with an initial notional amount of $500 million that would have decreased to $350 million in April 2022. The swap was designated as a cash flow hedge to mitigate the impact of adverse interest rate fluctuations for a portion of the Company's variable-rate debt equal to the notional amount of the swap. The interest rate converted the one-month Adjusted LIBOR interest rate on these borrowings to a fixed interest rate of 0.237% through the date of termination.

During the third quarter of Fiscal 2022, the Company terminated its only interest rate swap. As a result, the Company recognized a $1 million gain within interest (income) expense, net, within the Company's consolidated statements of operations and comprehensive income (loss).

When an interest rate swap agreement qualifies for hedge accounting as a cash flow hedge, the changes in the fair value are recorded in equity as a component of accumulated other comprehensive income and are reclassified into interest expense in the same period during which the hedged transactions affect earnings. During Fiscal 2022 and Fiscal 2021, the Company recorded an immaterial amount of interest expense related to this agreement.

PX7096-100

Table of Contents

The following table details the fair value of the Company's derivative contracts, which are recorded on a gross basis in the consolidated balance sheets as of April 2, 2022 and March 27, 2021 (in millions):

| | Notional Amounts | | Assets | | Liabilities | |
| | April 2, 2022 | March 27, 2021 | April 2, 2022 | March 27, 2021 | April 2, 2022 | March 27, 2021 |
|---|---|---|---|---|---|---|
| Designated forward foreign currency exchange contracts | $ 119 | $ 155 | $ 4 (1) | $ 2 (1) | $ — (2) | $ 1 |
| Designated net investment hedge | 4,194 | 3,194 | 44 (3) | 3 (3) | 37 (4) | 263 |
| Designated interest rate swap | — | 500 | — | — | — (4) | 1 |
| Total designated hedges | 4,313 | 3,849 | 48 | 5 | 37 | 265 |
| Undesignated derivative contracts (5) | 38 | 13 | 4 | — | — | — |
| **Total** | $ 4,351 | $ 3,862 | $ 52 | $ 5 | $ 37 | $ 265 |

(1) Recorded within prepaid expenses and other current assets in the Company's consolidated balance sheets.
(2) Recorded within accrued expenses and other current liabilities in the Company's consolidated balance sheets.
(3) Recorded within other assets in the Company's consolidated balance sheets.
(4) Recorded within other long-term liabilities in the Company's consolidated balance sheets.
(5) Primarily includes undesignated hedges of inventory purchases.

The Company records and presents the fair values of all of its derivative assets and liabilities in its consolidated balance sheets on a gross basis, as shown in the above table. However, if the Company were to offset and record the asset and liability balances for its derivative instruments on a net basis in accordance with the terms of its master netting arrangements, which provide for the right to set-off amounts for similar transactions denominated in the same currencies and with the same banks, the resulting impact as of April 2, 2022 and March 27, 2021 would be as follows (in millions):

| | Forward Currency Exchange Contracts | | Net Investment Hedges | | Interest Rate Swap | |
| | April 2, 2022 | March 27, 2021 | April 2, 2022 | March 27, 2021 | April 2, 2022 | March 27, 2021 |
|---|---|---|---|---|---|---|
| Assets subject to master netting arrangements | $ 8 | $ 2 | $ 44 | $ 3 | $ — | $ — |
| Liabilities subject to master netting arrangements | $ — | $ 1 | $ 37 | $ 263 | $ — | $ 1 |
| Derivative assets, net | $ 8 | $ 1 | $ 42 | $ 3 | $ — | $ — |
| Derivative liabilities, net | $ — | $ — | $ 35 | $ 263 | $ — | $ 1 |

Currently, the Company's master netting arrangements do not require cash collateral to be pledged by the Company or its counterparties.

Changes in the fair value of the Company's forward foreign currency exchange contracts that are designated as accounting hedges are recorded in equity as a component of accumulated other comprehensive income, and are reclassified from accumulated other comprehensive income into earnings when the items underlying the hedged transactions are recognized into earnings, as a component of cost of goods sold within the Company's consolidated statements of operations and comprehensive income (loss). The net gain or loss on net investment hedges are reported within foreign currency translation gains and losses ("CTA") as a component of accumulated other comprehensive income on the Company's consolidated balance sheets. Upon discontinuation of the hedge, such amounts remain in CTA until the related net investment is sold or liquidated. Changes in the fair value of the Company's interest rate swaps that are designated as accounting hedges are recorded in equity as a component of accumulated other comprehensive income and are reclassified from accumulated other comprehensive income into earnings when the items underlying the hedged transactions are recognized into earnings, as a component of interest expense within the Company's consolidated statements of operations and comprehensive income (loss).

100

Table of Contents

The following table summarizes the pre-tax impact of the gains and losses on the Company's designated forward foreign currency exchange contracts, net investment hedges and interest rate swaps (in millions):

| | Fiscal Year Ended April 2, 2022 | Fiscal Year Ended March 27, 2021 | Fiscal Year Ended March 28, 2020 |
|---|---|---|---|
| | Pre-Tax Gains Recognized in OCI | Pre-Tax Losses Recognized in OCI | Pre-Tax Gains Recognized in OCI |
| Designated forward foreign currency exchange contracts | $ 11 | $ (2) | $ 6 |
| Designated net investment hedges | $ 435 | $ (263) | $ 264 |
| Designated interest rate swaps | $ — | $ (1) | $ — |

The following tables summarize the impact of the gains and losses within the consolidated statements of operations and comprehensive income (loss) related to the designated forward foreign currency exchange contracts (in millions):

| | Fiscal Year Ended | | | |
|---|---|---|---|---|
| | Pre-Tax Losses (Gains) Reclassified from Accumulated OCI | | | |
| | April 2, 2022 | March 27, 2021 | March 28, 2020 | Location of Losses (Gains) Recognized |
| Designated forward currency exchange contracts | $ 1 | $ (2) | $ (10) | Cost of goods sold |

The Company expects that substantially all of the amounts recorded in accumulated other comprehensive income for its forward foreign currency exchange contracts will be reclassified into earnings during the next 12 months, based upon the timing of inventory purchases and turnover.

*Undesignated Hedges*

During Fiscal 2022 and Fiscal 2021, a gain of $2 million and a loss of $1 million, respectively, were recognized within foreign currency (gain) loss in the Company's consolidated statements of operations and comprehensive income (loss) as a result of the changes in the fair value of undesignated forward foreign currency exchange contracts. During Fiscal 2020, the Company recognized an immaterial amount of net gains.

## 15. Shareholders' Equity

### *Share Repurchase Program*

During the first quarter of Fiscal 2022, the Company reinstated its $500 million share-repurchase program, which was previously suspended during the first quarter of Fiscal 2021 in response to the impact of the COVID-19 pandemic and the provisions of the Second Amendment of the 2018 Credit Facility. Subsequently, on November 3, 2021, the Company announced that its Board of Directors had terminated the Company's existing $500 million share repurchase program (the "Prior Plan"), which had $250 million of availability remaining at the time, and authorized a new share repurchase program (the "Fiscal 2022 Plan") pursuant to which the Company may, from time to time, repurchase up to $1.0 billion of its outstanding ordinary shares within a period of two years from the effective date of the program.

During Fiscal 2022, the Company purchased 11,014,541 shares with a fair value of $650 million through open market transactions. During Fiscal 2021, the Company did not purchase any shares through open market transactions. As of April 2, 2022, the remaining availability under the Company's share repurchase program was $500 million. Share repurchases may be made in open market or privately negotiated transactions, subject to market conditions, applicable legal requirements, trading transactions under the Company's insider trading policy and other relevant factors. The program may be suspended or discontinued at any time.

PX7096-102

Table of Contents

The Company also has in place a "withhold to cover" repurchase program, which allows the Company to withhold ordinary shares from certain executive officers and directors to satisfy minimum tax withholding obligations relating to the vesting of their restricted share awards. During Fiscal 2022 and Fiscal 2021, the Company withheld 203,863 shares and 48,528 shares, respectively, with a fair value of $11 million and $1 million, respectively, in satisfaction of minimum tax withholding obligations relating to the vesting of restricted share awards.

### Accumulated Other Comprehensive Income

The following table details changes in the components of accumulated other comprehensive income ("AOCI"), net of taxes, for Fiscal 2022, Fiscal 2021 and Fiscal 2020 (in millions):

| | Foreign Currency Translation Income (Loss) [1] | Net Income (Loss) on Derivatives [2] | Other Comprehensive Income (Loss) Attributable to Capri |
|---|---|---|---|
| Balance at March 30, 2019 | $ (73) | $ 7 | $ (66) |
| Other comprehensive income before reclassifications | 145 | 5 | 150 |
| Less: amounts reclassified from AOCI to earnings | — | 9 | 9 |
| Other comprehensive income (loss), net of tax | 145 | (4) | 141 |
| Balance at March 28, 2020 | 72 | 3 | 75 |
| Other comprehensive loss before reclassifications | (15) | (2) | (17) |
| Less: amounts reclassified from AOCI to earnings | — | 2 | 2 |
| Other comprehensive loss, net of tax | (15) | (4) | (19) |
| Balance at March 27, 2021 | 57 | (1) | 56 |
| Other comprehensive income before reclassifications | 127 | 10 | 137 |
| Less: amounts reclassified from AOCI to earnings | — | (1) | (1) |
| Other comprehensive income, net of tax | 127 | 11 | 138 |
| Balance at April 2, 2022 | $ 184 | $ 10 | $ 194 |

[1]    Foreign currency translation adjustments for Fiscal 2022 primarily include a $321 million gain, net of taxes of $114 million, primarily relating to the Company's net investment hedges, and a net $210 million translation loss. Foreign currency translation adjustments for Fiscal 2021 include a $199 million loss, net of taxes of $63 million, primarily relating to the Company's net investment hedges, a net $189 million translation gain and a net loss of $8 million on intra-entity transactions that are of a long-term investment nature. Foreign currency translation gains for Fiscal 2020 include a $219 million gain, net of taxes of $45 million, relating to the Company's net investment hedges, a $60 million translation loss relating to the Jimmy Choo business, a $10 million translation loss relating to the Versace business and a net gain of $6 million, on intra-entity transactions that are of a long-term investment nature.

[2]    Reclassified amounts relate to the Company's forward foreign currency exchange contracts for inventory purchases and are recorded within cost of goods sold in the Company's consolidated statements of operations and comprehensive income (loss). All tax effects were not material for the periods presented.

### 16. Share-Based Compensation

The Company grants equity awards to certain employees and directors of the Company at the discretion of the Company's Compensation and Talent Committee. The Company has two equity plans which includes one stock option plan adopted in Fiscal 2008 (as amended and restated, the "2008 Plan"), and an Omnibus Incentive Plan adopted in the third fiscal quarter of Fiscal 2012 and amended and restated with shareholder approval in May 2015 and again in June 2020 (the "Incentive Plan"). The 2008 Plan only provided for grants of share options and was authorized to issue up to 23,980,823 ordinary shares. As of April 2, 2022, there were no shares available to grant equity awards under the 2008 Plan. The Incentive Plan allows for grants of share options, restricted shares and restricted stock units ("RSUs"), and other equity awards, and authorizes a total issuance of up to 18,846,000 ordinary shares. At April 2, 2022, there were 4,062,239 ordinary shares available for future grants of equity awards under the Incentive Plan. Option grants issued from the 2008 Plan generally expire ten years from the grant

PX7096-103

Table of Contents

date, and those issued under the Incentive Plan generally expire seven years from the grant date. See Note 20 for additional information.

### Share Options

Share options are generally exercisable at the fair market value on the date of grant and vest on a pro-rata basis over a four year service period. The following table summarizes the share options activity during Fiscal 2022, and information about options outstanding at April 2, 2022:

| | Number of Options | | Weighted Average Exercise price | Weighted Average Remaining Contractual Life (years) | | Aggregate Intrinsic Value (in millions) |
|---|---|---|---|---|---|---|
| Outstanding at March 27, 2021 | 1,150,260 | $ | 63.42 | | | |
| Granted | — | $ | — | | | |
| Exercised | (408,638) | $ | 41.48 | | | |
| Canceled/forfeited | (386,174) | $ | 92.05 | | | |
| Outstanding at April 2, 2022 | 355,448 | $ | 57.54 | 2.00 | $ | 1 |
| Vested or expected to vest at April 2, 2022 | 355,448 | $ | 57.54 | 2.00 | | |
| Vested and exercisable at April 2, 2022 | 308,494 | $ | 56.02 | 1.82 | $ | 1 |

There were 46,954 unvested options and 308,494 vested options outstanding at April 2, 2022. The total intrinsic value of options exercised during Fiscal 2022 and Fiscal 2021 was $7 million and $10 million, respectively. The cash received from options exercised during Fiscal 2022 and Fiscal 2021 was $17 million and $3 million, respectively. As of April 2, 2022, the remaining unrecognized share-based compensation expense for unvested share options was less than $1 million, which is expected to be recognized over the related weighted-average period of approximately 0.2 years.

There were no options granted during Fiscal 2022, Fiscal 2021 or Fiscal 2020.

### Restricted Awards

The Company grants RSUs at the fair market value on the grant date. The expense related to RSUs is based on the closing market price of the Company's shares on the date of grant and is recognized ratably over the vesting period, net of expected forfeitures.

The Company grants two types of RSUs: time-based RSUs and performance-based RSUs. Time-based RSUs generally vest in full on the first anniversary of the date of grant for our independent directors, or in equal increments on each of the third or fourth anniversaries of the date of grant (unless the employee is retirement-eligible). Performance-based RSUs generally vest in full on the second or third anniversary of the date of grant, subject to the employee's continued employment during the vesting period and only if certain pre-established cumulative performance targets are met. Expense related to performance-based RSUs is recognized ratably over the performance period, net of forfeitures, based on the probability of attainment of the related performance targets. The potential number of shares that may be earned ranges from 0%, if the minimum level of performance is not attained, to 150%, if the level of performance is at or above the predetermined maximum achievement level.

103

Table of Contents

The following table summarizes the RSU activity during Fiscal 2022:

| | Service-based | | Performance-based | |
| --- | --- | --- | --- | --- |
| | Number of Restricted Stock Units | Weighted Average Grant Date Fair Value | Number of Restricted Stock Units | Weighted Average Grant Date Fair Value |
| Unvested at March 27, 2021 | 4,895,517 | $ 29.91 | 581,659 | $ 49.17 |
| Granted | 1,729,215 | $ 55.27 | — | $ — |
| Change due to performance conditions, net | — | $ — | 26,109 | $ 7.82 |
| Vested | (2,327,165) | $ 33.58 | (347,561) | $ 56.49 |
| Canceled/forfeited | (469,867) | $ 33.85 | (50,015) | $ 39.36 |
| Unvested at April 2, 2022 | 3,827,700 | $ 38.65 | 210,192 | $ 34.25 |

The total fair value of service-based RSUs vested during Fiscal 2022, Fiscal 2021 and Fiscal 2020 was $78 million, $56 million and $56 million, respectively. The total fair value of performance-based RSUs vested during Fiscal 2022, Fiscal 2021 and Fiscal 2020 was $18 million, $6 million and $3 million, respectively. As of April 2, 2022, the remaining unrecognized share-based compensation expense for unvested service-based and performance-based RSU grants was $77 million and $1 million, respectively, which is expected to be recognized over the related weighted-average periods of approximately 1.9 years and 1.3 years, respectively.

### Share-Based Compensation Expense

The following table summarizes compensation expense attributable to share-based compensation for Fiscal 2022, Fiscal 2021 and Fiscal 2020 (in millions):

| | Fiscal Years Ended | | |
| --- | --- | --- | --- |
| | April 2, 2022 | March 27, 2021 | March 28, 2020 |
| Share-based compensation expense | $ 85 | $ 70 | $ 70 |
| Tax benefits related to share-based compensation expense | $ 14 | $ 12 | $ 7 |

Forfeitures are estimated at the time of grant and revised, if necessary, in subsequent periods if actual forfeitures differ from those estimates. The Company estimates forfeitures based on its historical forfeiture rates. The estimated value of future forfeitures for equity awards as of April 2, 2022 is $25 million.

## 17. Taxes

The Company is a United Kingdom tax resident and is incorporated in the British Virgin Islands. Capri's subsidiaries are subject to taxation in the United States and various other foreign jurisdictions, which are aggregated in the "Non-United States" information captioned below.

Income (loss) before provision for income taxes consisted of the following (in millions):

| | Fiscal Years Ended | | |
| --- | --- | --- | --- |
| | April 2, 2022 | March 27, 2021 | March 28, 2020 |
| United States | $ 247 | $ (56) | $ (28) |
| Non-United States | 668 | 59 | (187) |
| Total income (loss) before provision for income taxes | $ 915 | $ 3 | $ (215) |

Table of Contents

The provision for income taxes was as follows (in millions):

| | Fiscal Years Ended | | |
| | April 2, 2022 | March 27, 2021 | March 28, 2020 |
|---|---|---|---|
| **Current** | | | |
| United States - Federal | $ 36 | $ 35 | $ 4 [1] |
| United States - State | 16 | 20 | 19 |
| Non-United States | 98 | 81 | 60 |
| Total current | 150 | 136 | 83 |
| **Deferred** | | | |
| United States - Federal | 24 [2] | (37) | (22) |
| United States - State | 7 | (4) | (3) |
| Non-United States | (89) [3] | (29) | (48) |
| Total deferred | (58) | (70) | (73) |
| **Total provision for income taxes** | $ 92 | $ 66 | $ 10 |

---

[1] Includes a $35 million current tax benefit due to a release of income tax reserves in the United States.

[2] Impact of United States tax accounting method change filed during Fiscal 2022 with respect to cost capitalization.

[3] Includes an Italian valuation allowance reversal during Fiscal 2022.

The Company's provision for income taxes for the years ended April 2, 2022, March 27, 2021 and March 28, 2020 was different from the amount computed by applying the statutory U.K. income tax rates to the underlying income (loss) before provision for income taxes as a result of the following (amounts in millions):

| | Fiscal Years Ended | | | | | |
| | April 2, 2022 | | March 27, 2021 | | March 28, 2020 | |
| | Amount | % [1] | Amount | % [1] | Amount | % [1] |
|---|---|---|---|---|---|---|
| Provision for income taxes at the U.K. statutory tax rate | $ 174 | 19.0 % | $ 1 | 19.0 % | $ (41) | 19.0 % |
| Effect of changes in valuation allowances on deferred tax assets | (67) | (7.3)% | 24 | 955.7 % | 67 | (30.9)% [2] |
| Effects of global financing arrangements | (56) | (6.1)% | (24) | (953.4)% | (41) | 21.7 % [3] |
| Brand tax basis step-up | (46) | (5.0)% | — | — % | — | — % |
| CARES Act tax loss carryback | (43) | (4.6)% | — | — % | — | — % |
| Liability for uncertain tax positions | 91 | 9.9 % | 11 | 414.2 % | (12) | 5.7 % |
| Tax rate change impact on deferred items | 21 | 2.1 % | 9 | 351.3 % | — | — % |
| State and local income taxes, net of federal benefit | 12 | 1.3 % | 5 | 201.5 % | 4 | (1.9)% |
| Differences in tax effects on foreign income | 10 | 1.1 % | 13 | 522.4 % | (7) | 1.2 % |
| Withholding tax | 5 | 0.6 % | 4 | 165.0 % | 3 | (1.6)% |
| Share based compensation | 3 | 0.4 % | 6 | 247.7 % | 9 | (4.2)% |
| Non-deductible goodwill impairment | — | — % | 18 | 700.2 % [4] | 32 | (15.1)% [4] |
| Other | (12) | (1.3)% | (1) | (33.1)% [5] | (4) | 1.4 % |
| **Effective tax rate** | $ 92 | 10.1 % | $ 66 | 2,590.5 % | $ 10 | (4.7)% |

---

[1] Tax rates are calculated using unrounded numbers.

[2] Mainly attributable to valuation allowances established on a portion of non-United States deferred tax assets.

[3] Mainly attributable to pre-tax loss position in Fiscal 2020.

[4] Attributable to goodwill impairment charges related to Jimmy Choo reporting units in Fiscal 2021 and Fiscal 2020.

[5] Primarily relates to individually immaterial United States and foreign permanent adjustments.

PX7096-106

Table of Contents

Significant components of the Company's deferred tax assets (liabilities) consist of the following (in millions):

| | Fiscal Years Ended | | | |
|---|---|---|---|---|
| | April 2, 2022 | | March 27, 2021 | |
| **Deferred tax assets** | | | | |
| Operating lease liabilities | $ | 465 | $ | 501 |
| Net operating loss carryforwards | | 108 | | 139 |
| Depreciation | | 53 | | 54 |
| Sales allowances | | 34 | | 50 |
| Inventories | | 26 | | 25 |
| Accrued interest | | 20 | | 44 |
| Stock compensation | | 7 | | 12 |
| Payroll related accruals | | 3 | | 3 |
| Derivative financial instruments | | — | | 32 |
| Other | | 46 | | 42 |
| **Total deferred tax assets** | | **762** | | **902** |
| Valuation allowance | | (92) [1] | | (159) |
| **Net deferred tax assets** | | **670** | | **743** |
| | | | | |
| **Deferred tax liabilities** | | | | |
| Goodwill and intangibles | | (449) [2] | | (495) |
| Operating lease right-of-use-assets | | (340) | | (367) |
| Derivative financial instruments | | (73) | | — |
| **Total deferred tax liabilities** | | **(862)** | | **(862)** |
| **Net deferred tax liabilities** | $ | **(192)** | $ | **(119)** |

[1] Includes an Italian valuation allowance reversal during Fiscal 2022.
[2] Includes a reversal of a Italian brand intangible deferred tax liability.

The Company maintains valuation allowances on deferred tax assets applicable to subsidiaries in jurisdictions for which separate income tax returns are filed and where realization of the related deferred tax assets from future profitable operations is not reasonably assured. The valuation allowance decreased $67 million in Fiscal 2022, and increased $24 million and $94 million in Fiscal 2021 and Fiscal 2020, respectively. In certain jurisdictions, the Company increased the valuation allowance by $34 million, $56 million and $113 million and released valuation allowances of $101 million, $32 million and $19 million in Fiscal 2022, Fiscal 2021 and Fiscal 2020, respectively.

As of April 2, 2022, the Company had non-United States and United States net operating loss carryforwards of $463 million, a portion of which will begin to expire in Fiscal 2023.

As of April 2, 2022 and March 27, 2021, the Company had liabilities related to its uncertain tax positions, including accrued interest, of $221 million and $121 million, respectively, which are included in other long-term liabilities in the Company's consolidated balance sheets.

PX7096-107

[Table of Contents]

The total amount of unrecognized tax benefits that, if recognized, would impact the effective tax rate was $206 million, $92 million and $82 million as of April 2, 2022, March 27, 2021 and March 28, 2020, respectively. A reconciliation of the beginning and ending amounts of unrecognized tax benefits, excluding accrued interest, for Fiscal 2022, Fiscal 2021 and Fiscal 2020, are presented below (in millions):

| | Fiscal Years Ended | | | | | |
|---|---|---|---|---|---|---|
| | April 2, 2022 | | March 27, 2021 | | March 28, 2020 | |
| Unrecognized tax benefits beginning balance | $ | 107 | $ | 99 | $ | 192 |
| Additions related to prior period tax positions | | 105 [(1)] | | 12 | | 29 |
| Additions related to current period tax positions | | 29 [(2)] | | 9 | | 4 |
| Decreases related to audit settlements | | (13) [(3)] | | (6) | | (24) [(3)] |
| Decreases in prior period positions due to lapses in statute of limitations | | (3) | | (4) | | (3) |
| Decreases related to prior period tax positions | | (4) | | (3) | | (99) [(4)] |
| **Unrecognized tax benefits ending balance** | $ | 221 | $ | 107 | $ | 99 |

[(1)]   Primarily relates to incremental reserves in North America and Europe.
[(2)]   Primarily relates to European tax reserves established in Fiscal 2022.
[(3)]   Primarily relates to the effective settlement of a United States audit.
[(4)]   Primarily relates to releases of North American and European tax reserves.

The Company classifies interest and penalties related to unrecognized tax benefits as components of the provision for income taxes. Interest and penalties recognized in the consolidated statements of operations and comprehensive income (loss) for Fiscal 2022, Fiscal 2021 and Fiscal 2020 was $28 million, $15 million and $11 million, respectively.

The total amount of unrecognized tax benefits relating to the Company's tax positions is subject to change based on future events including, but not limited to, the settlement of ongoing tax audits and assessments and the expiration of applicable statutes of limitations. The Company anticipates that the balance of gross unrecognized tax benefits, excluding interest and penalties, will be reduced by $52 million during the next 12 months, primarily due to the anticipated settlement of tax examinations as well as statute of limitation expirations. However, the outcomes and timing of such events are highly uncertain and changes in the occurrence, expected outcomes and timing of such events could cause the Company's current estimate to change materially in the future.

The Company files income tax returns in the United States and in various foreign, state and local jurisdictions. Most examinations have been completed by tax authorities or the statute of limitations has expired for United States federal, foreign, state and local income tax returns filed by the Company for years through Fiscal 2016.

Prior to the enactment of the Tax Cuts and Jobs Act ("Tax Act"), the Company's undistributed foreign earnings were considered permanently reinvested and, as such, United States federal and state income taxes were not previously recorded on these earnings. As a result of the Tax Act, substantially all of the Company's earnings in foreign subsidiaries generated prior to the enactment of the Tax Act were deemed to have been repatriated. It remains the Company's intent to either reinvest indefinitely substantially all of its foreign earnings outside of the United States or repatriate them tax neutrally. However, if future earnings are repatriated, the potential exists that the Company may be required to accrue and pay additional taxes, including any applicable foreign withholding tax and income taxes. It is not practicable to estimate the amount of tax that might be payable if these earnings were repatriated due to the complexities associated with the hypothetical calculation.

***Cares Act***

On March 27, 2020, the Coronavirus Aid, Relief and Economic Security Act ("CARES Act") was signed into law in response to the COVID-19 pandemic. The CARES Act contains numerous income tax provisions, such as refundable payroll tax credits, deferral of the employer portion of certain payroll taxes, net operating loss carrybacks, modifications to net interest deduction limitations and technical corrections to tax depreciation methods for qualified improvement property. The CARES Act requires the Company to make significant judgments and estimates in the interpretation of the law and in the calculation of the provision for income taxes. However, additional guidance may be issued by the Internal Revenue Service ("IRS"), the Department of the Treasury or other governing body that may significantly differ from our interpretation of the law, which may

PX7096-108

Table of Contents

result in a material effect on our business, cash flow, results of operations, or financial conditions.

## 18. Retirement Plans

The Company maintains defined contribution retirement plans for its employees, who generally become eligible to participate after three months of service. Features of these plans allow participants to contribute a percentage of their compensation, up to statutory limits depending upon the country in which the employee resides, and provide for mandatory and/or discretionary matching contributions by the Company, which vary by country. During Fiscal 2022, Fiscal 2021, and Fiscal 2020, the Company recognized expenses of approximately $16 million, $20 million and $12 million, respectively, related to these retirement plans.

## 19. Segment Information

The Company operates its business through three operating segments — Versace, Jimmy Choo and Michael Kors, which are based on its business activities and organization. The reportable segments are segments of the Company for which separate financial information is available and for which operating results are evaluated regularly by the Company's chief operating decision maker ("CODM") in deciding how to allocate resources, as well as in assessing performance. The primary key performance indicators are revenue and operating income for each segment. The Company's reportable segments represent components of the business that offer similar merchandise, customer experience and sales/marketing strategies.

The Company's three reportable segments are as follows:

- Versace — segment includes revenue generated through the sale of Versace luxury ready-to-wear, accessories and footwear through directly operated Versace boutiques throughout the Americas, certain parts of EMEA and certain parts of Asia, as well as through Versace outlet stores and e-commerce sites. In addition, revenue is generated through wholesale sales to distribution partners (including geographic licensing arrangements that allow third parties to use the Versace trademarks in connection with retail and/or wholesale sales of Versace branded products in specific geographic regions), multi-brand department stores and specialty stores worldwide, as well as through product license agreements in connection with the manufacturing and sale of jeans, fragrances, watches, jewelry, eyewear and home furnishings.

- Jimmy Choo — segment includes revenue generated through the sale of Jimmy Choo luxury footwear, handbags and small leather goods through directly operated Jimmy Choo retail and outlet stores throughout the Americas, certain parts of EMEA and certain parts of Asia, through its e-commerce sites, as well as through wholesale sales of luxury goods to distribution partners (including geographic licensing arrangements that allow third parties to use the Jimmy Choo trademarks in connection with retail and/or wholesale sales of Jimmy Choo branded products in specific geographic regions), multi-brand department stores and specialty stores worldwide. In addition, revenue is generated through product licensing agreements, which allow third parties to use the Jimmy Choo brand name and trademarks in connection with the manufacturing and sale of fragrances and eyewear.

- Michael Kors — segment includes revenue generated through the sale of Michael Kors products through four primary Michael Kors retail store formats: "Collection" stores, "Lifestyle" stores (including concessions), outlet stores and e-commerce sites, through which the Company sells Michael Kors products, as well as licensed products bearing the Michael Kors name, directly to consumers throughout the Americas, certain parts of EMEA and certain parts of Asia. The Company also sells Michael Kors products directly to department stores, primarily located across the Americas and Europe, to specialty stores and travel retail shops, and to its geographic licensees. In addition, revenue is generated through product and geographic licensing arrangements, which allow third parties to use the Michael Kors brand name and trademarks in connection with the manufacturing and sale of products, including watches, jewelry, fragrances and eyewear.

In addition to these reportable segments, the Company has certain corporate costs that are not directly attributable to its brands and, therefore, are not allocated to its segments. Such costs primarily include certain administrative, corporate occupancy, shared service and information systems expenses, including enterprise resource planning system implementation costs and Capri transformation program costs. In addition, certain other costs are not allocated to segments, including restructuring and other charges, impairment costs, COVID-19 related charges, charitable donations and the war in Ukraine. The segment structure is consistent with how the Company's CODM plans and allocates resources, manages the business and assesses performance. All intercompany revenues are eliminated in consolidation and are not reviewed when evaluating

PX7096-109

Table of Contents

segment performance.

The following table presents the key performance information of the Company's reportable segments (in millions):

| | Fiscal Years Ended | | | | | |
|---|---|---|---|---|---|---|
| | April 2, 2022 | | March 27, 2021 | | March 28, 2020 | |
| **Total revenue:** | | | | | | |
| Versace | $ | 1,088 | $ | 718 | $ | 843 |
| Jimmy Choo | | 613 | | 418 | | 555 |
| Michael Kors | | 3,953 | | 2,924 | | 4,153 |
| **Total revenue** | $ | 5,654 | $ | 4,060 | $ | 5,551 |
| | | | | | | |
| **Income (loss) from operations:** | | | | | | |
| Versace | $ | 185 | $ | 21 | $ | (8) |
| Jimmy Choo | | 13 | | (55) | | (13) |
| Michael Kors | | 1,005 | | 595 | | 850 |
| **Total segment income from operations** | | 1,203 | | 561 | | 829 |
| Less: Corporate expenses | | (190) | | (152) | | (152) |
| Impairment of assets [1] | | (73) | | (316) | | (708) |
| COVID-19 related charges [2] | | 14 | | (42) | | (119) |
| Impact of war in Ukraine [3] | | (9) | | — | | — |
| Restructuring and other charges | | (42) | | (32) | | (42) |
| **Total income (loss) from operations** | $ | 903 | $ | 19 | $ | (192) |

[1] Impairment of assets during Fiscal 2022 include $50 million, $19 million and $4 million of impairment charges related to the Michael Kors, Versace and Jimmy Choo reportable segments, respectively. Impairment of assets during Fiscal 2021 includes $191 million, $91 million and $34 million of impairment charges related to the Jimmy Choo, Michael Kors and Versace reportable segments, respectively. Impairment of assets during Fiscal 2020 includes $434 million, $187 million and $87 million of impairment charges related to the Jimmy Choo, Michael Kors and Versace reportable segments, respectively.

[2] COVID-19 related charges during Fiscal 2022 primarily include net inventory credits of $16 million as a result of better than expected sell-through and severance expense of $2 million, respectively. Net inventory credits during Fiscal 2022 reflected a change in estimate resulting from better than expected sell-through. COVID-19 related charges during Fiscal 2021, primarily include net inventory reserves and severance expense of $10 million and $24 million, respectively. COVID-19 related charges during Fiscal 2020, primarily include additional inventory reserves and credit losses of $92 million and $25 million, respectively. Inventory related costs are recorded within costs of goods sold and severance expense and credit losses are recorded within selling, general and administrative expenses in the consolidated statements of operations and comprehensive income (loss).

[3] These charges primarily relate to incremental credit losses and inventory reserves which are a direct impact of the war in Ukraine. Credit losses are recorded within selling, general and administrative expenses and inventory related costs are recorded within costs of goods sold in the consolidated statements of operations and comprehensive income (loss).

Table of Contents

Depreciation and amortization expense for each segment are as follows (in millions):

| | Fiscal Years Ended | | |
| | April 2, 2022 | March 27, 2021 | March 28, 2020 |
| --- | --- | --- | --- |
| **Depreciation and amortization:** | | | |
| Versace | $ 52 | $ 54 | $ 61 |
| Jimmy Choo | 31 | 31 | 33 |
| Michael Kors | 110 | 127 | 155 |
| **Total depreciation and amortization** | $ 193 | $ 212 | $ 249 |

See Note 8 for the Company's goodwill by reportable segment.

Total revenue (based on country of origin) and long-lived assets by geographic location are as follows (in millions):

| | Fiscal Years Ended | | |
| | April 2, 2022 | March 27, 2021 | March 28, 2020 |
| --- | --- | --- | --- |
| **Revenue:** | | | |
| The Americas [1] | $ 3,210 | $ 2,172 | $ 3,115 |
| EMEA | 1,489 | 1,029 | 1,523 |
| Asia | 955 | 859 | 913 |
| **Total revenue** | $ 5,654 | $ 4,060 | $ 5,551 |

| | As of | | |
| | April 2, 2022 | March 27, 2021 | March 28, 2020 |
| --- | --- | --- | --- |
| **Long-lived assets:** | | | |
| The Americas [1] | $ 450 | $ 1,001 | $ 1,132 |
| EMEA | 2,156 | 2,384 | 2,432 |
| Asia | 1,075 | 596 | 608 |
| **Total long-lived assets** | $ 3,681 | $ 3,981 | $ 4,172 |

[1] Net revenues earned in the United States during Fiscal 2022, Fiscal 2021 and Fiscal 2020 were $2.989 billion, $2.016 billion and $2.898 billion, respectively. Long-lived assets located in the United States as of April 2, 2022, March 27, 2021 and March 28, 2020 were $858 million, $942 million and $1.060 billion, respectively.

As of April 2, 2022, the Company's total long-lived assets on its consolidated balance sheet were $3.681 billion, of which, $1.633 billion related to Versace, $1.404 billion related to Michael Kors and $644 million related to Jimmy Choo.

Total revenue by major product category are as follows (in millions):

| | Fiscal Years Ended | | | | | |
| | April 2, 2022 | % of Total | March 27, 2021 | % of Total | March 28, 2020 | % of Total |
| --- | --- | --- | --- | --- | --- | --- |
| Accessories | $ 2,901 | 51.3 % | $ 2,158 | 53.2 % | $ 2,933 | 52.8 % |
| Footwear | 1,208 | 21.4 % | 796 | 19.6 % | 1,100 | 19.8 % |
| Apparel | 1,027 | 18.2 % | 720 | 17.7 % | 1,069 | 19.3 % |
| Licensed product | 241 | 4.3 % | 185 | 4.6 % | 222 | 4.0 % |
| Licensing revenue | 212 | 3.7 % | 155 | 3.8 % | 201 | 3.6 % |
| Other | 65 | 1.1 % | 46 | 1.1 % | 26 | 0.5 % |
| **Total revenue** | $ 5,654 | | $ 4,060 | | $ 5,551 | |

PX7096-111

Table of Contents

**20. Subsequent Events**

*Release of Collateral Related to the 2018 Credit Facility*

On April 2, 2022, the Company's senior long-term, unsecured debt was upgraded to investment grade by two of the three specified rating agencies for two consecutive full fiscal quarters, meeting the criteria for the release of the collateral securing the Company's obligations under the 2018 Credit Facility.

On April 3, 2022, the Company notified the Administrative Agent under its 2018 Credit Facility that it had met the conditions for the release of the collateral securing the Company's obligations under the 2018 Credit Facility. The collateral, which consists of substantially all of the assets and certain registered intellectual property of the Company and certain of its subsidiaries, was released effective April 3, 2022. See Note 11 for additional details regarding the Company's Credit Facility.

*Net Investment Hedges*

During the first quarter of Fiscal 2023, the Company modified multiple fixed-to-fixed cross-currency swap agreements with aggregate notional amounts of $1 billion to hedge its net investment in Euro denominated subsidiaries and Japanese-Yen denominated subsidiaries. The modification of these hedges resulted in the Company receiving $59 million in cash during the first quarter of Fiscal 2023. These contracts have been designated as net investment hedges.

*Senior Notes Credit Rating Upgrade*

On April 21, 2022, Moody's Investor Services upgraded the Company's credit rating to Baa1 from Baa2 in relation to the Company's senior unsecured notes. As a result, as of May 1, 2022 the Senior Notes now bear interest at a fixed rate equal to 4.25% per year, payable semi-annually. See Note 11 for additional details regarding the Company's Senior Notes.

*Share Repurchase Program*

On June 1, 2022, the Company announced that its Board of Directors has terminated the Company's existing $1.0 billion share repurchase program, with $500 million of availability remaining, and authorized a new share repurchase program pursuant to which the Company may, from time to time, repurchase up to $1.0 billion of its outstanding ordinary shares within a period of two years from the effective date of the program. Share repurchases may be made in open market or privately negotiated transactions, subject to market conditions, applicable legal requirements, trading restrictions under the Company's insider trading policy and other relevant factors. The program may be suspended or discontinued at any time.

PX7096-112

**Exhibit 10.6**

## FIFTH AMENDED AND RESTATED
## EMPLOYMENT AGREEMENT

This FIFTH AMENDED AND RESTATED EMPLOYMENT AGREEMENT (this "Agreement"), effective as of March 7, 2022 (the "Effective Date"), by and among **CAPRI HOLDINGS LIMITED**, a British Virgin Islands corporation having its principal executive office in London, United Kingdom ("Capri"), **MICHAEL KORS (USA), INC.**, a Delaware corporation having its principal executive office in New York County, New York (the "Company" and, together with Capri, the "Company Parties"), and **JOHN D. IDOL** ("Executive"). The Company Parties and Executive may be referred to in this Agreement collectively as the "parties."

WHEREAS, the Company Parties have previously entered into that certain Fourth Amended and Restated Employment Agreement with the Executive, effective as of August 24, 2021 (the "Restated Employment Agreement"); and

WHEREAS, the parties desire to amend and restate the Restated Employment Agreement in accordance with the terms and provisions herein contained.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, the parties hereto hereby agree as follows:

1.    Employment.

(a)    Term / Employment. The Company Parties agree to continue to employ Executive, and the Executive agrees to continue to be employed by the Company Parties on the terms and subject to the conditions contained herein. This Agreement shall continue until terminated in accordance with Section 6 hereof (the "Term"). Executive acknowledges and agrees that the Company Parties will be his sole employers in respect of the services contemplated by this Agreement, and the Company Parties will provide all payments and benefits to Executive under this Agreement.

(b)    Position and Duties.

(i)    Chairman and Chief Executive Officer. Executive will continue to serve as Chairman and Chief Executive Officer of Capri (the "Chairman and CEO"). As the Chairman and CEO, Executive shall have general authority over the business of Capri and shall manage the day-to-day operations of Capri; provided, however, that Executive understands and agrees that the Board of Directors of Capri (the "Board") will be responsible for setting overall strategic goals of Capri and its subsidiaries (including, without limitation, the Company) and advising Executive with respect thereto. Executive will report only to the Board, and, subject to any existing contractual obligations of Capri and its subsidiaries, all other executives of Capri and its subsidiaries shall report to Executive, unless Executive determines otherwise. While Chairman and CEO, Executive shall devote substantially all of his full business time and attention and his best efforts to the performance of his duties; provided, however, that Executive may engage in charitable, educational, civic and religious activities and may participate as an investor, officer or director or otherwise manage passive personal investments owned by or for the benefit of Executive or members of his immediate family, but only to the extent such activities and service are permitted under Section 8(c) of this Agreement and do not interfere with the performance of Executive's duties and responsibilities hereunder. At the request of Capri, for the period during which Executive is the Chairman and CEO, Executive further agrees, without additional compensation, to act as an officer and/or director of subsidiaries of Capri in addition to the Company. At

the direction of Capri, any rights and obligations of the Company hereunder may be assigned, in whole or in part, to such subsidiaries; provided that the Company Parties obligations with respect to compensation and benefits, including, without limitation, Base Salary (as defined below), shall remain the Company Parties' obligations, unless Executive consents in writing to such assignment, which such consent shall not be unreasonably withheld or delayed.

(ii)    Board Membership. During Executive's employment hereunder, each of the Company Parties shall use its best efforts to cause Executive to be elected or appointed, as the case may be, to the position of Chairman of the Board. Executive agrees that upon termination of his employment hereunder for any reason, he shall resign immediately from the Board as well as from any officerships and/or other directorships with any subsidiaries of Capri.

2.    Salary. Executive's Base Salary shall be as follows: (i) for the fiscal year ending April 2, 2022 ("Fiscal 2022"), US$1,215,000 per year; and (ii) for the fiscal year ending April 1, 2023 ("Fiscal 2023") and thereafter, $1,350,000 per year. Except as otherwise set forth in the last sentence of this Section 2, the Base Salary shall be payable by the Company to Executive in accordance with the Company's customary payroll practices in effect from time to time. The Base Salary shall be subject to possible increases at the sole discretion of the Board (or appropriate committee thereof, including the Compensation and Talent Committee of the Board (the "Compensation Committee")); provided, however, that in no event shall Executive's Base Salary during the Term be reduced below the Base Salary set forth herein or otherwise reduced after any increase except with Executive's written consent. A portion of Executive's Base Salary equal to one-fourth (1/4) of the annual retainer paid to Capri's independent directors together with meeting fees payable to the independent directors for the applicable quarter shall be payable to Executive by Capri on a quarterly basis at the same time such retainer and meeting payments are paid to the independent directors of Capri. For the avoidance of doubt, this is not additional Base Salary or other compensation for Executive but merely an allocation of Base Salary from the Company employer to Capri for services performed by Executive as a director of Capri. The term "Base Salary" as utilized in this Agreement shall refer to Executive's annual base salary as then in effect.

3.    Annual Cash Incentive.

(a)    Cash Incentive. Executive shall be eligible to earn the annual cash incentive payments described in this Section 3 in accordance with, and subject to, the terms and conditions of, Capri's then existing executive cash incentive program which is a component of the Capri Holdings Limited Second Amended and Restated Omnibus Incentive Plan (as the same may be amended or modified by Capri or its subsidiaries from time to time in their sole discretion, subject to shareholder approval if required, the "Incentive Plan"). The annual cash incentive payment (the "Annual Cash Incentive") shall be a percentage of Executive's Base Salary with incentive levels set at 0% for performance below established thresholds and (i) for Fiscal 2022, a maximum bonus opportunity of 400% with a target bonus of 300%; and (ii) for Fiscal 2023 and thereafter, a maximum bonus opportunity of 400% with a target bonus of 200%. Executive's actual Annual Cash Incentive will be interpolated based on the actual level of attainment with performance components, measures and target values established by the Capri Board of Directors (or appropriate committee thereof). Such incentive levels may be increased by the Capri Board (or appropriate committee thereof, including the Compensation Committee) for any fiscal year in its sole discretion

2

but shall not be decreased below the incentive levels set forth in this Agreement without the written consent of Executive.

(b)  <u>Performance Goals</u>. The Annual Cash Incentive shall be based upon the achievement of performance goals established by the Board (or appropriate committee thereof, including the Compensation Committee) over a performance period also established by the Board (or appropriate committee thereof, including the Compensation Committee). The Board (or appropriate committee thereof, including the Compensation Committee) may base such performance goals upon such appropriate criteria as they may determine. Executive must be employed by the Company on the date that the Annual Cash Incentive is actually paid which shall be the same date that annual cash incentives are paid to other senior executives of the Company. The Board (or appropriate committee thereof, including the Compensation Committee) must certify the level of the attainment of the applicable performance goal for the performance period and the amount of the Annual Cash Incentive payable to Executive with respect to such performance period. Once certified, the Cash Incentive will be paid to Executive reasonably promptly and in no event later than June 30 next following the last day of the applicable performance period.

(c)  <u>Clawback</u>. Notwithstanding the foregoing, if the Board (or appropriate committee thereof, including the Compensation Committee) determines that Executive was overpaid, in whole or in part, as a result of a restatement of the reported financial or operating results of Capri due to material non-compliance with financial reporting requirements (unless due to a change in accounting policy or applicable law), the Company Parties shall be entitled to recover or cancel the difference between (i) any Annual Cash Incentive payment that was based on having met or exceeded performance targets and (ii) the Annual Cash Incentive payment that would have been paid to or earned by Executive had the actual payment or accrual been calculated based on the accurate data or restated results, as applicable (the "<u>Overpayment</u>"). If the Compensation Committee determines that there has been an Overpayment, the Company Parties shall be entitled to demand that Executive reimburse the Company for the Overpayment. To the extent Executive does not make reimbursement of the Overpayment, the Company Parties shall have the right to enforce the repayment through the reduction of future salary or the reduction or cancellation of outstanding and future incentive compensation and/or to pursue all other available legal remedies in law or in equity. The Board (or appropriate committee thereof, including the Compensation Committee) may make determinations of Overpayment at any time through the end of the third (3rd) fiscal year following the year for which the performance evaluation was inaccurate; <u>provided</u>, that if steps have been taken within such period to restate Capri's financial or operating results, the time period shall be extended until such restatement is completed.

4.  <u>Equity Compensation</u>.

(a)  <u>Share-Based Awards</u>. Executive shall be eligible, in the discretion of the Board (or appropriate committee thereof, including the Compensation Committee), for share option awards, restricted share unit awards and other share-based awards on an annual basis at the same time equity grants are awarded to the other senior executives, and shall be made pursuant to the equity incentive plan generally applicable to eligible employees of the Company (currently the Incentive Plan), in accordance with, and subject to, the terms and conditions of the Incentive Plan as the same may be amended or modified by Capri in its sole discretion (subject to shareholder approval if required) and the applicable equity award agreement. Such eligibility is not a guarantee of participation in or of the receipt of any award, payment or

3

other compensation under the Incentive Plan or any other incentive or benefit plans or programs. The Board (or appropriate committee thereof, including the Compensation Committee) shall determine all terms of participation (including, without limitation, the size and type of any award, payment or other compensation and the timing and conditions of receipt thereof by Executive).

   (b) <u>Effect of Termination</u>. Upon termination of employment (the "<u>Termination Date</u>") for any reason, and in accordance with the terms and conditions of the Incentive Plan and/or any applicable equity award agreement, any share-based equity awards that have become vested and/or exercisable prior to the Termination Date shall remain vested and/or exercisable after the Termination Date and all unvested equity shall continue to vest on the vesting schedule set forth in the applicable equity award agreement because Executive is retirement eligible under the Incentive Plan. Notwithstanding anything to the contrary in the Incentive Plan and/or any applicable equity award agreement, in the event Executive is terminated for Cause (as hereinafter defined) any equity awards that have already become vested and/or exercisable prior to the Termination Date shall not be forfeited.

   5. <u>Employee Benefits</u>. During the Term, Executive shall be entitled to participate in any and all Company employee benefit plans and programs which generally are made available to senior executives of the Company, in accordance with, and subject to, the terms and conditions of such plans and programs (including, without limitation, any eligibility limitations) as they may be amended or modified by the Company from time to time in its sole discretion. In addition, the Company shall reimburse Executive for all reasonable and necessary expenses (including the cost of first class air travel). Executive shall also be entitled to the following additional benefits:

   (a) <u>Life Insurance</u>. The Company shall pay the premiums, up to a maximum of US$50,000 per annum, for the US$5,000,000 whole life insurance policy presently maintained by Executive.

   (b) <u>Vacation</u>. Executive shall not accrue any vacation, but shall be entitled to take unlimited vacation during the term of this Agreement so long as the vacation time does not interfere with the Executive's ability to complete his obligations hereunder.

   (c) <u>Transportation</u>. The Company shall provide Executive with an automobile and driver for transportation to and from the Company's offices and for other business purposes. Such automobile shall be a Mercedes-Benz S-Class or an automobile at least substantially equivalent in price thereto.

   (d) <u>Corporate Aircraft</u>. Executive shall be entitled to use of the corporate aircraft in accordance with the Aircraft Time Sharing Agreement, dated November 24, 2014, between Executive and the Company.

   6. <u>Termination of Employment</u>.

   (a) <u>Death and Total Disability</u>. Executive's employment under this Agreement shall terminate immediately upon his death or Total Disability (as defined below). For purposes of this Agreement, the term "<u>Total Disability</u>" shall mean any mental or physical condition that: (i) prevents Executive from reasonably discharging his services and employment duties hereunder; (ii) is attested to in writing by a physician who is licensed to practice in the State of New York and is mutually acceptable to Executive and the Company Parties (or, if the Executive and the

4

Company Parties are unable to mutually agree on a physician, the Board may select a physician who is a chairman of a department of medicine at a university-affiliated hospital in the City of New York); and (iii) continues, for any one or related condition, during any period of six (6) consecutive months or for a period aggregating six (6) months in any twelve (12) month period. Total Disability shall be deemed to have occurred on the last day of such applicable six (6) month period.

(b)    <u>Cause</u>. The Company Parties shall at all times, upon written notice to Executive given at least ten (10) days prior to the Termination Date, have the right to terminate this Agreement and the employment of Executive hereunder for Cause (as defined below); <u>provided</u>, <u>however</u>, that prior to such termination taking effect, Executive shall have been given an opportunity to meet with the Board, and a majority of the Board shall have thereafter voted to terminate Executive's employment.

For purposes of this Agreement, the term "<u>Cause</u>" means the occurrence of any one of the following events: (i) Executive's gross negligence, willful misconduct or dishonesty in performing his duties hereunder; (ii) Executive's conviction of a felony (other than a felony involving a traffic violation); (iii) Executive's commission of a felony involving a fraud or other business crime against Capri or any of its subsidiaries; or (iv) Executive's breach of any of the covenants set forth in Section 8 hereof; <u>provided</u> that, if such breach is curable, Executive shall have an opportunity to correct such breach within thirty (30) days after written notice by the Company to Executive thereof.

(c)    <u>Executive Termination Without Good Reason</u>. Executive agrees that he shall not terminate his employment with the Company Parties for any reason other than Good Reason without giving the Company Parties at least six (6) months' prior written notice of the effective date of such termination. Executive acknowledges that the Company Parties retain the right to waive the notice requirement, in whole or in part, and accelerate the effective date of Executive's termination. If the Company elects to waive the notice requirement, in whole or in part, the Company shall have no further obligations to Executive under this Agreement other than to make the payments specified in Section 7(a). After Executive provides a notice of termination, the Company may, but shall not be obligated to, provide Executive with work to do and the Company may, in its discretion, in respect of all or part of an unexpired notice period, (i) require Executive to comply with such conditions as it may specify in relation to attending at, or remaining away from, the Company's places of business, or (ii) withdraw any powers vested in, or duties assigned to, Executive. For purposes of a notice of termination given pursuant to this Section 6(c), the Termination Date shall be the last day of the applicable notice period, unless the Company elects to waive the notice requirement as set forth herein.

For purposes of this Agreement, "<u>Good Reason</u>" means and shall be deemed to exist if: (i) Executive is assigned duties or responsibilities that are inconsistent in any material respect with the scope of the duties or responsibilities of his title or position, as set forth in this Agreement; (ii) the Company or Capri fails to perform substantially any material term of this Agreement, and, if such failure is curable, fails to correct such failure within thirty (30) days after written notice by Executive to the Company or Capri, as applicable; (iii) Executive's office is relocated more than fifty (50) miles from its location immediately prior to such relocation; (iv) the Company or Capri fails to have this Agreement assumed by a successor following a Change in Control (as defined in the Incentive Plan); (v) Executive's duties or responsibilities are significantly reduced, except with respect to any corporate action initiated or recommended by Executive and approved by the Board (including any succession planning initiated and

5

recommended by Executive); (vi) Executive is involuntarily removed from the Board and the Company Board (other than in connection with a termination of employment for Cause, voluntary termination without Good Reason, death or Total Disability); or (vii) subject to the proviso set forth in the third sentence of Section 1(b) above, the Board is managing the day-to-day operations of the Company and, after receipt of written notice from Executive to such effect (and sufficient time to cease such involvement), the Board continues to do so.

(c)    <u>Executive Termination for Good Reason</u>. Executive may terminate his employment hereunder for Good Reason (and this Agreement shall accordingly terminate) by providing written notice of his intention to terminate, and specifying the circumstances relating thereto, to the Board within thirty (30) days following the occurrence of any of the events specified above as constituting Good Reason and at least ten (10) days prior to the Termination Date.

7.    <u>Consequences of Termination or Breach</u>.

(a)    <u>Termination Due to Death or Total Disability, for Cause, or Without Good Reason</u>. If Executive's employment under this Agreement is terminated under Sections 6(a) or 6(b) hereunder, or Executive terminates his employment for any reason other than Good Reason, Executive shall not thereafter be entitled to receive any compensation and benefits under this Agreement other than for (i) Base Salary earned but not yet paid prior to the Termination Date (to be paid in accordance with the Company's normal payroll practices), (ii) vested equity in accordance with Section 4(b) and continued vesting for being retirement eligible in accordance with the Incentive Plan, (iii) reimbursement of any expenses pursuant to Section 5(e) incurred prior to the Termination Date, and (iv) any Annual Cash Incentive with respect to any performance period that was completed prior to Executive's termination from employment but which has not yet been paid (with such Annual Cash Incentive to be paid at such time as it would have otherwise been paid to Executive hereunder had his employment not been terminated and such Annual Cash Incentive amount shall be subject to certification by the Board (or appropriate committee thereof, including the Compensation Committee) as described in Section 3 of this Agreement (collectively, the "<u>Accrued Obligations</u>"), <u>plus</u>, in the case of termination due to death or Total Disability only, the Pro Rata Cash Incentive Payment (as defined in Section 7(b) below) and, in the case of death only, proceeds from the life insurance policy referenced in Section 5(b). If Executive's employment under this Agreement is terminated by the Company for Cause, Executive shall not thereafter be entitled to receive any compensation and benefits under this Agreement other than for the Accrued Obligations set forth in clauses (i) through (iv) above.

(b)    <u>Termination Without Cause or With Good Reason</u>. If Executive's employment under this Agreement is terminated by the Company Parties without Cause (which right the Company shall have at any time and for any reason during the Term) and other than for the reasons provided for in Section 6(a) above, or Executive terminates his employment for Good Reason, the sole obligations of the Company Parties to Executive shall be: (i) to make the payments described in Section 7(a) for Accrued Obligations, (ii) to make the Pro Rata Cash Incentive Payment and (iii) to pay to Executive in a single lump sum payment, within thirty (30) days from the Termination Date, a separation payment equal to two (2) times (A) Executive's Base Salary and (B) the Annual Cash Incentive paid or payable to Executive pursuant to Section 3(a) with respect to Capri's last full fiscal year ended prior to the Termination Date (collectively, the "<u>Separation Payments</u>"). For purposes of this Agreement, "<u>Pro Rata Cash Incentive Payment</u>" shall mean an amount representing the amount of the

6

Annual Cash Incentive payable for the fiscal year in which the Termination Date occurs, based on actual performance over the course of the applicable performance period, assuming Executive's employment had not been terminated hereunder, multiplied by a fraction, the numerator of which is the number of days Executive was employed hereunder during the applicable performance period and the denominator of which is the full number of days in the applicable performance period. Executive acknowledges and agrees that in the event the Company Parties terminate Executive's employment without Cause and other than for the reasons provided for in Sections 6(a) or 6(b) or Executive terminates his employment for Good Reason, Executive's sole remedy shall be to receive the payments specified in this Section 7(b). In connection with the Separation Payments or any other separation payment made hereunder, Executive agrees to deliver a fully executed separation agreement and release (that is not subject to revocation) of claims against the Company Parties and their respective affiliates satisfactory in form and content to the Company's counsel.

(c)     <u>No Duty to Mitigate</u>. Executive shall not be required to mitigate the amount of any damages that Executive may incur or other payments to be made to Executive hereunder as a result of any termination or expiration of this Agreement, nor shall any payments to Executive be reduced by any other payments Executive may receive, except as may otherwise be set forth herein.

8.     <u>Restrictive Covenants and Confidentiality</u>.

(a)     <u>No-Hire</u>. During the two (2) year period following the Termination Date, Executive shall not employ or retain (or participate in or arrange for the employment or retention of) any person who was employed or retained by the Company Parties or any of their respective parents, subsidiaries or affiliates within the one (1) year period immediately preceding such employment or retention.

(b)     <u>Confidentiality</u>. Recognizing that the knowledge, information and relationship with customers, suppliers and agents, and the knowledge of the Company Entities and their respective parents', subsidiaries' and affiliates' business methods, systems, plans and policies, which Executive shall hereafter establish, receive or obtain as an employee of the Company Parties or any such parent, subsidiary or affiliate, are valuable and unique assets of the businesses of the Company Parties and their respective parents, subsidiaries and affiliates, Executive agrees that, during and after the Term hereunder, he shall not (otherwise than pursuant to his duties hereunder) disclose, without the prior written approval of the Board acting upon the advice of counsel, any such knowledge or information pertaining to the Company Parties or any of their respective parents, subsidiaries and affiliates, their business, personnel or policies, to any person, firm, corporation or other entity, for any reason or purpose whatsoever. The provisions of this Section 8(b) shall not apply to information which is or shall become generally known to the public or the trade (except by reason of Executive's breach of his obligations hereunder), information which is or shall become available in trade or other publications and information which Executive is required to disclose by law or an order of a court of competent jurisdiction. If Executive is required by law or a court order to disclose such information, he shall notify the Company Parties of such requirement and provide the Company Parties an opportunity (if the Company so elects) to contest such law or court order. Executive agrees that all tangible materials containing confidential information, whether created by Executive or others which shall come into Executive's custody or possession during Executive's employment shall be and is the exclusive property of the Company Parties or their respective parents, subsidiaries and affiliates. Upon termination of Executive's employment for any reason whatsoever, Executive shall immediately surrender to the Company Parties all

7

confidential information and property of the Company Parties and their respective parents, subsidiaries or affiliates in Executive's possession.

(c)    Non-Compete. Executive agrees that during the Term, Executive will not engage in, or carry on, directly or indirectly, either for himself or as an officer or director of a corporation or as an employee, agent, associate, or consultant of any person, partnership, business or corporation, any Competitive Business (as defined below); provided, that Executive may own ten percent (10%) or less in a Competitive Business; so long as Executive is a passive investor and does not manage (whether as a director, officer or otherwise) or exercise influence or control over such business. For purposes of this Agreement, "Competitive Business" shall mean any of the companies set forth in Annex A to this Agreement.

9.    Injunction. It is recognized and hereby acknowledged by the parties hereto that a breach or violation by Executive of any of the covenants or agreements contained in Section 9 of this Agreement may cause irreparable harm and damage to the Company Parties or their respective parents, subsidiaries or affiliates, the monetary amount of which may be virtually impossible to ascertain. Therefore, Executive recognizes and hereby agrees that the Company Parties and their respective parents, subsidiaries and affiliates shall be entitled to an injunction from any court of competent jurisdiction enjoining and restraining any breach or violation of any or all of the covenants and agreements contained in Section 9 of this Agreement by Executive and/or his employees, associates, partners or agents, or entities controlled by one or more of them, either directly or indirectly, and that such right to injunction shall be cumulative and in addition to whatever other rights or remedies the Company Parties and their respective parents, subsidiaries or affiliates may possess.

10.    Indemnification. To the extent permitted by law and the Company Parties by-laws or other governing documents, the Company Parties will indemnify Executive with respect to any claims made against him as an officer, director or employee of the Company Parties or any subsidiary of either of the Company Parties, except for acts taken in bad faith or in breach of his duty of loyalty to the Company Parties or such subsidiary. During the Term and for as long thereafter as is practicable, Executive shall be covered under a directors and officers liability insurance policy with coverage limits in amounts no less than that which the Company Parties currently maintain as of the date of this Agreement.

11.    Taxes. All payments to be made to and on behalf of Executive under this Agreement will be subject to required withholding of federal, state and local income and employment taxes, and to related record reporting requirements, including, with respect to the retainer and meeting payments referred to in the last sentence of Section 3, applicable U.K. statutory reductions.

12.    Executive's Representations; No Delegation. Executive hereby represents and warrants that he is not precluded, by any agreement to which he is a party or to which he is subject, from executing and delivering this Agreement, and that this Agreement and his performance of the duties and responsibilities set forth herein does not violate any such agreement. Executive shall indemnify and hold harmless the Company Parties and their respective parents, subsidiaries and affiliates and their respective officers, directors, employees, agents and advisors for any liabilities, losses and costs (including reasonable attorney's fees) arising from any breach or alleged breach of the foregoing representation and warranty. Executive shall not delegate his employment obligations under this Agreement to any other person.

8

13. <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of New York applicable to agreements made and to be performed in that state, without regard to its conflict of laws provisions.

14. <u>Entire Agreement; Amendment</u>. This Agreement supersedes all prior agreements between the parties with respect to its subject matter (except for any long-term incentive awards agreements entered into between Capri and Executive), is intended (with the documents referred to herein) as a complete and exclusive statement of the terms of the agreement between the parties with respect thereto and may be amended only by a writing signed by all parties hereto.

15. <u>Notices</u>. Any notice or other communication made or given in connection with this Agreement shall be in writing and shall be deemed to have been duly given when delivered by hand, by facsimile transmission, by a nationally recognized overnight delivery service or mailed by registered mail, return receipt requested, to a party at his or its address set forth below or at such other address as a party may specify by notice to the others:

If to Capri:

33 Kingsway
London WC2B 6UF
United Kingdom
Attention: Corporate Secretary
If to the Company:

11 West 42nd Street
New York, NY 10036
Fax: 646-354-4901
Attention: General Counsel


If to Executive:
At the home address on file with the Company
Fax: 516-365-6872

or to such other addresses as either party hereto may from time to time specify to the other. Any notice given as aforesaid shall be deemed received upon actual delivery.

16. <u>Assignment</u>. Except as otherwise provided in this Section 16 and Section 1(d), this Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective heirs, representatives, successors and assigns. This Agreement shall not be assignable by Executive and shall be assignable by the Company Parties, in whole or in part, only (i) to Capri or any of its subsidiaries and (ii) subject to compliance with Section 1(d).

17. <u>Severability</u>. The invalidity of any one or more of the words, phrases, sentences, clauses or sections contained in this Agreement shall not affect the enforceability of the remaining portions of this Agreement, or any part thereof, all of which are inserted conditionally on their being valid in law, and, in the event that any one or more of the words, phrases, sentences, clauses or sections contained in this

9

Agreement shall be declared invalid, this Agreement shall be construed as if such invalid word or words, phrase or phrases, sentence or sentences, clause or clauses, or section or sections had not been inserted.

18.     Waiver. The failure of any party to insist upon strict adherence to any term or condition of this Agreement on any occasion shall not be considered a waiver or deprive that party of the right thereafter to insist upon strict adherence to that term or any other term of this Agreement. Any waiver must be in writing.

19.     Section Headings. The section headings contained in this Agreement are for reference purpose only and shall not affect in any way the meaning or interpretation of this Agreement.

20.     Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be considered an original, but all of which together shall constitute the same instrument.

21.     Arbitration. Any dispute or claim between the parties hereto arising out of, or in connection with, this Agreement and/or Executive's employment shall become a matter for arbitration; provided, however, that Executive acknowledges and agrees that in the event of any alleged violation of Section 9 hereof, the Company Parties and any of their respective parents, subsidiaries and affiliates shall be entitled to obtain from any court in the State of New York, temporary, preliminary or permanent injunctive relief as well as damages, which rights shall be in addition to any other rights or remedies to which it may be entitled. The arbitration shall take place in New York City and shall be before a neutral arbitrator in accordance with the Commercial Rules of the American Arbitration Association; provided, however, that to the extent such arbitration involves any allegation(s) of a violation of any law, rule or regulation which prohibits discrimination in employment, the arbitrator shall apply the National Rules for the Resolution of Employment Disputes (as modified) of the American Arbitration Association then existing in determining the damages, if any, to be awarded and the allocation of costs and attorneys' fees between or among the parties. The decision or award of the arbitrator shall be final and binding upon the parties hereto. The parties shall abide by all awards recorded in such arbitration proceedings, and all such awards may be entered and executed upon in any court having jurisdiction over the party against whom or which enforcement of such award is sought.

10

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement as of March 7, 2022.

**CAPRI HOLDINGS LIMITED**

By: _____/s/ Jenna Hendricks_____
Name: Jenna Hendricks
Title: Senior Vice President, Chief People Officer

**MICHAEL KORS (USA), INC.**

By: _____/s/ Jenna Hendricks_____
Name: Jenna Hendricks
Title: Senior Vice President, Chief People Officer

**JOHN D. IDOL**

/s/ John D. Idol

11

**ANNEX A**

**Competitors**

Burberry Group PLC
Chanel
Christian Louboutin
Compagnie Financière Richemont SA (including, but not limited to, Azzedine Alaïa, Cartier, Chloé, Lancel, Montblanc, Piaget and Van Cleef & Arpels)
Dolce & Gabana
Hermes International
Hugo Boss
Kering (including, but not limited to, Gucci, Bottega Veneta, Yves Saint Laurent, Alexander McQueen, Balenciaga and Stella McCartney)
LVMH Moet Hennessy Louis Vuitton SA (including, but not limited to, Celine, Christian Dior, Fendi, Givenchy, Marc Jacobs, Louis Vuitton and Tiffany)
PVH Corp. and its affiliated brands (including, but not limited to, Calvin Klein and Tommy Hilfiger)
Prada Group (including, but not limited to, Prada and Miu Miu)
Ralph Lauren Corporation
Salvatore Ferragamo
Tapestry (including Coach, Kate Spade and Stuart Weitzman)
Tod's Group
Tory Burch LLC
Tumi Holdings, Inc.
Valentino S.P.A.
V.F. Corporation

12

PX7096-124

**Exhibit 10.18**

## <u>SEPARATION AGREEMENT</u>

This Separation Agreement ("<u>Agreement</u>"), by and between Joshua Schulman ("<u>Executive</u>" or "<u>you</u>"), Capri Holdings Limited ("<u>Capri</u>"), and Michael Kors (USA), Inc. ("<u>Michael Kors</u>", and together with Capri and all of its affiliates, the "<u>Company</u>").

RECITALS

**WHEREAS,** Executive is Chief Executive of Officer of Michael Kors;

**WHEREAS,** Executive executed the Employment Agreement, effective August 24, 2021, with the Company (the "<u>Employment Agreement</u>");

**WHEREAS,** Executive executed the Restricted Share Unit Award Agreement under the Capri Holdings Limited Second Amended and Restated Omnibus Incentive Plan (the "<u>Equity Incentive Plan</u>") on or about September 1, 2021 (the "<u>Equity Agreement</u>"); and

**WHEREAS,** Executive and the Company have determined to terminate their employment relationship.

**NOW, THEREFORE,** in consideration of the covenants and agreements set forth herein and for other good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereto covenant and agree as follows as of the Effective Date (as defined below).

1.    <u>Separation of Service</u>. <u>Separation of Service</u>. Beginning on March 7, 2022 (the "<u>Separation Date</u>"), Executive shall be placed on an administrative leave through the end of day on September 2, 2022 (the "<u>Termination Date</u>") (the Separation Date through the Termination Date is hereinafter referred to as the "<u>Garden Leave Period</u>"). During the Garden Leave Period, you shall not be required to come into the office or to provide services to the Company, nor shall you have any further obligations to the Company, other than as expressly provided herein. As of the Separation Date, neither you nor the Company shall represent that you are an employee, officer, agent or representative of the Company for any purpose. Executive agrees to promptly execute such documents as the Company may request to effectuate such cessation of service as of the Separation Date. Except as otherwise set forth in paragraphs 2 and 4 below, the Separation Date shall be the termination date of your employment for purposes of participation in and coverage under all benefit plans and programs sponsored by or through any "Company Entities" (as defined in paragraph 6 hereof), including but not limited to the Company's 401(k) Plan, group medical and dental plans, life insurance, accidental death and dismemberment insurance, short- and long-term disability insurance and the annual cash incentive plan, except that you shall be entitled to continuation of health benefits pursuant to COBRA. Executive will be entitled to receive benefits, which are vested and accrued prior to the Separation Date pursuant to the employee benefit plans of the Company. The Termination Date shall be the termination date of your employment for purposes of the Equity Incentive Plan For the avoidance of doubt, following execution of this Agreement, you shall be entitled to receive 20% of your RSU grant, on a date not later than September 2, 2022, notwithstanding any event prior to such date other than your breach of the Restricted Covenants.

2.    <u>Payment</u>. Provided that Executive timely executes this Agreement in accordance
with paragraph 20, and does not revoke this Agreement within the period specified in paragraph 20, then subject to the terms and conditions of this Agreement, including Executive's continued compliance with paragraphs 8 and 10 of this Agreement, Michael Kors will pay the Executive the severance payments to which Executive is entitled pursuant to the Employment Agreement which consistent of the following:

(a)    Continued payment of Executive's base salary (at a rate of $1,300,000) for a period of two (2) years, commencing on the Separation Date and ending on March 6, 2024 (the "<u>Severance Payment End Date</u>"), totaling $2,600,000 (the "<u>Severance Period Salary Continuation</u>");

(b)    Payment equivalent to two (2) years of Executive's target annual cash incentive (using a base salary of $1,300,000), totaling $5,200,000 (the "<u>Severance Period Annual Bonus</u>");

(c)    Payment of $700,000 as a guaranteed annual cash incentive for fiscal 2022 (the "<u>Guaranteed FY 22 Bonus</u>"); and

(d)    An additional payment, if any, based on actual Company performance for fiscal 2022, to the extent actual Company performance results in a cash incentive payment for fiscal 2022 in excess of the Guaranteed FY 22 Bonus, and pro-rated to reflect 28 weeks out of 53 weeks of service which reflects the portion of fiscal year 2022 that Executive was actually employed by the Company (the "<u>Pro Rata FY 22 Bonus</u>"). For the avoidance of doubt, the Pro Rata FY 22 Bonus will only be paid if annual cash incentives are paid to similarly situated Executives under the Company's annual cash incentive plan, and should the Company elect, in its sole discretion, to not pay out annual cash incentives to its executive officers under the Company's annual cash incentive plan in respect of fiscal 2022, Executive shall not be entitled to any Pro Rata FY 22 Bonus. Along with payment, the Company will provide Executive with the metrics which are used for calculation of bonus for him and all executives similarly situated.

All payments to be made or provided to Executive under this Agreement will be subject to all applicable tax withholding as required by applicable federal, state and local withholding tax laws. The payments received in this paragraph 2 are adequate and sufficient for entering into this Agreement and include benefits to which Executive is not otherwise entitled.

3.    <u>Payment Timing</u>. Provided that Executive timely executes this Agreement in accordance with paragraph 20, and does not revoke this Agreement within the period specified in paragraph 20, then subject to the terms and conditions of this Agreement, including Executive's continued compliance with paragraphs 8 and 10 of this Agreement, the payments described in paragraph 2 shall be paid as follows:

(a)    the sum of the Severance Period Salary Continuation and Severance Period Annual Bonus will be paid to Executive in substantially equal installments on the Company's normal payroll schedule beginning on the Company's first normal payroll date occurring after the Separation Date and ending on the Company's normal payroll date that includes the Severance Payment End Date; and

(b)    the Guaranteed FY 22 Bonus and the Pro Rata FY 22 Bonus (if payable) will be paid to Executive at the time such bonuses are otherwise paid to actively employed similarly situated senior executives of the Company.

4.    <u>Equity Awards</u>. Executive's outstanding equity awards pursuant to the Equity Agreement will continue to vest during the Garden Leave Period. The equity awards pursuant to the Equity Agreement will remain subject in all respects to the terms, conditions and restrictions of the Equity Agreement and the Incentive Plan, including, without limitation, the payment, restrictive covenant and forfeiture provisions contained therein; provided that, in the event of a conflict between the restrictive covenant provisions in the Equity Agreement and the Employment Agreement, the restrictive covenants in the Employment Agreement (which are

PX7096-126

expressly incorporated into this Agreement) shall prevail. All portions of the equity awards that are not eligible to become vested during the Garden Leave Period shall be forfeited immediately following the last day of the Garden Leave Period.  Executive shall not be entitled to receive any new equity compensation awards on or after the Separation Date.

5.    <u>Acknowledgment</u>. You acknowledge and agree that the payments provided pursuant to paragraph 2 of this Agreement: (i) is in full discharge of any and all liabilities and obligations of all Company Entities to you, monetarily or with respect to employee benefits or otherwise, including but not limited to any and all obligations arising under any alleged written or oral employment agreement, policy, plan or procedure of the Company and/or any alleged understanding or arrangement between you and the Company; and (ii) is in addition to any payment, benefit, or other thing of value to which you might otherwise be entitled under any policy, plan or procedure of the Company and/or any agreement between you and the Company. You further acknowledge and agree that you are not and will not be due any additional compensation or severance, including, but not limited to, compensation for unpaid salary (except for amounts unpaid and owing for your employment with the Company prior to the Separation Date). Notwithstanding the foregoing, the Company shall reimburse you for appropriate expenses incurred by you during your employment (and not previously reimbursed) promptly after you submit appropriate documentation with respect thereto. You acknowledge that, effective January 1, 2022, the Company ceased providing accrual and payout of vacation days to its employees and any accrued and unused vacation days prior to such date were cancelled without payment on December 31, 2021. Accordingly, the Company does not owe you any further payments with respect to accrued but unused vacation days.

6.    <u>General Release</u>. (a) In consideration for the payments to be provided to you pursuant to paragraph 2 above, and for other valuable consideration as set forth in the Agreement, you, for yourself and for your heirs, executors, administrators, trustees, legal representatives and assigns (hereinafter referred to collectively as "<u>Releasors</u>"), forever release and discharge the Company and its past, present and future parent entities, subsidiaries, divisions, affiliates and related business entities, successors and assigns, assets, employee benefit and/or pension plans or funds (including qualified and non-qualified plans or funds), and any of its or their respective past, present and/or future directors, officers, fiduciaries, agents, trustees, administrators, employees, insurers, attorneys and assigns, acting on behalf of the Company or in connection with Company business (collectively, the "<u>Company Entities</u>") from any and all claims, demands, causes of action, fees and liabilities of any kind whatsoever (upon any legal or equitable theory, whether contractual, common-law, statutory, federal, state, local, or otherwise), whether known or unknown, which you ever had, now have, or may have against any of the Company Entities by reason of any act, omission, transaction, practice, plan, policy, procedure, conduct, occurrence, or other matter related to your employment or the termination thereof up to and including the date on which you sign this Agreement.

(b)    Without limiting the generality of the foregoing, this Agreement is intended to and shall release the Company Entities from any and all claims, whether known or unknown, which Releasors ever had, now have, or may have against the Companies Entities arising out of your employment and/or your separation from that employment, including, but not limited to, any claim under: (i) the Age Discrimination in Employment Act, as amended by the Older Workers Benefit Protection Act, (ii) Title VII of the Civil Rights Act of 1964 or under the Civil Rights Act of 1991, (iii) the Americans with Disabilities Act; (iv) the Employee Retirement Income Security Act of 1974 (excluding claims for accrued, vested benefits under any employee benefit or pension plan of the Company Entities subject to the terms and conditions of such plan and applicable law), (v) the Family and Medical Leave Act, (vi) 42 USC §§ 1981-86, (vii) the Equal Pay Act, (viii) the Sarbanes-Oxley Act of 2002, (ix) Section 922 of the Dodd-Frank Act, (x) the Federal False Claims Act, the New York State Human Rights Law; (xi) the New York City Administrative Code; (xii) the New York Labor Law; (xiii) the New York Minimum Wage

PX7096-127

Act; (xiv) the statutory provisions regarding retaliation/discrimination under the New York Worker's Compensation Law; and (xv) the New York City Earned Sick Time Act, as all of those statutes may have been amended. Without limiting the generality of the foregoing, this Agreement is also intended to and shall release the Company Entities from any and all claims, whether known or unknown, which Releasors ever had, now have, or may have against the Companies Entities, whether based on federal, state, or local law, statutory or decisional, arising out of your employment, the termination of such employment, and/or any of the events relating directly or indirectly to or surrounding the termination of that employment, including, but not limited to, any claims for wrongful or retaliatory discharge, breach of contract (express, implied or otherwise), breach of the covenant of good faith and fair dealing, detrimental reliance, interference with contractual relations or any prospective business advantage, defamation, slander or libel, invasion of privacy, intentional and negligent infliction of emotional distress, false imprisonment, compensatory or punitive damages, any claims for attorneys' fees, costs, disbursements and/or the like, any claims for wages, bonuses, or other benefits, and any claims for negligence or intentional tort, arising up to and including the date on which you sign this Agreement.

(c)     Nothing in this Agreement prevents you from providing truthful information to any governmental entity, nor does it interfere with your right to file a charge with or participate in any investigation or proceeding conducted by the Department of Labor, the National Labor Relations Board, the Occupational Safety and Health Administration, the Equal Employment Opportunity Commission or a state or local fair employment practices agency. Nevertheless, you acknowledge and agree that you hereby waive any right to seek or to share in any relief, monetary or otherwise, relating to any claim released herein whether such claim was initiated by you or not.

(d)     The Company hereby releases the Releasors from any and all claims, demands, causes of action, fees and liabilities of any kind whatsoever (upon any legal or equitable theory, whether contractual, common-law, statutory, federal, state, local, or otherwise), whether known or unknown, which the Company Entities ever had, now have, or may have against the Releasors, directly or indirectly, by reason of any act, omission, conduct, occurrence, or other matter related to your employment or the termination thereof and/or any of the events relating directly or indirectly to or surrounding the termination of that employment up to and including the date on which the Company signs this Agreement.

7.     <u>No Prior or Pending Proceedings</u>. Each of you and the Company Entities, respectively, acknowledge and agree that you/they have not commenced, maintained, prosecuted or participated in any action, suit, charge, grievance, complaint or proceeding of any kind against the other in any court or before any administrative or investigative body or agency and/or that you/they are hereby withdrawing with prejudice any such complaints, charges, or actions that you/they may have filed against the other. You and the Company Entities further acknowledge and agree, respectively, that by virtue of the foregoing, you/they have waived all relief available to you/them (including without limitation, monetary damages, equitable relief and reinstatement) under any of the claims and/or causes of action waived in paragraphs above.

8.     <u>Non-Disparagement</u>. (a)(i) Executive agrees not to disparage the Company or any of its directors, officers, employees, agents, representatives or licensees ("<u>Restricted Parties</u>") and not to publish or make any disparaging statement that is reasonably foreseeable to become public with respect to the Restricted Parties; and (ii) each of Capri and Michael Kors agree that it shall not disparage, and it shall not authorize or permit any director or "executive officer" (as defined in Rule 3b-7 of the U.S. Securities Exchange Act of 1934, as amended (the "<u>SEC Officers</u>")) or any of their direct reports to disparage, Executive, nor shall Capri or Michael Kors make, or authorize or permit any such persons to make, any statement that is reasonably foreseeable to become public with respect to Executive. The obligations of Capri and Michael

Schulman Agr    Page 4    03/07/2022

Kors under this paragraph shall be limited to the direct or indirect actions of its directors and SEC Officers and their direct reports during the period in which they are providing services to or employed by the Company or receiving any post-termination benefits from the Company.

(b) Nothing in this paragraph or this Agreement shall preclude you from providing truthful information about your employment as may be required by law in response to a subpoena or court order or to a government agency in connection with any investigation it is conducting or may conduct or limit your rights not waived as described in paragraph 6. Additionally, for the avoidance of doubt, nothing in this Agreement shall preclude you from generally describing your work responsibilities at the Company in connection with seeking future employment.

9.  <u>Cooperation in Litigation</u>. (a) You agree that you will cooperate with the Company and/or the Company Entities and its or their respective counsel in connection with any investigation, administrative proceeding or litigation relating to any matter that occurred during your employment in which you were involved or of which you have knowledge, provided you shall not be compelled to prejudice your own interests.

(b) You agree that, in the event you are subpoenaed by any person or entity (including, but not limited to, any government agency) to give testimony (in a deposition, court proceeding or otherwise) which in any way relates to your employment by the Company and/or the Company Entities, you will give prompt notice of such request to the Company's Senior Vice President, General Counsel and Chief Sustainability Officer at 11 West 42nd Street, New York, New York, 10036. However, no notice shall be required if you are prohibited from providing such notice by law or to the extent such notice would be deemed to interfere with or chill your rights not waived in paragraph 6(c).

10.  <u>Confidential Information; Non-Solicitation; Non-Compete</u>. The restrictive covenants set forth in Section 6(a) through (c) inclusive (the "<u>Restrictive Covenants</u>") of the Employment Agreement shall continue to apply for the applicable period commencing with the Separation Date and shall be deemed made a part hereof as if set forth herein in full, except that the Company agrees that the last day of the Restricted Period under the non-compete in Section 6(c) shall be the Termination Date. In the event of a breach by Executive of the Restrictive Covenants, the remedy provision in Section 6(f) of the Employment Agreement shall apply.

11.  <u>Return of Company Property</u>. You represent that, except as may otherwise be agreed, you have returned (or will return) to the Company all property belonging to the Company and/or the Company Entities, including but not limited to laptop, cell phone, keys, card access to the building and office floors, phone card, computer user name and password, disks and/or voicemail code. You further represent that you have paid all personal charges that may have been made on any Company credit card and submitted accurate expense reports with appropriate documentation of all business expenses through the Separation Date. You further acknowledge and agree that the Company shall have no obligation to make the payments referred to in paragraph 2 above unless and until you have returned all Company property as set forth above, paid all outstanding personal charges on any Company credit card, as well as all business-related expenses for which the Company has previously reimbursed you, and submitted your final expense report and documentation for all charges as set forth above.

12.  <u>Severability</u>. If any provision of this Agreement is held by a court of competent jurisdiction to be illegal, void or unenforceable, such provision shall have no effect; however, the remaining provisions shall be enforced to the maximum extent possible. Further, if a court should determine that any portion of this Agreement is overbroad or unreasonable, such provision shall be given effect to the maximum extent possible by narrowing or enforcing in part that aspect of the provision found overbroad or unreasonable. In the event the release set forth in

Schulman Agr    Page 5    03/07/2022

paragraph 6 of this Agreement may be held to be invalid or unenforceable, you will, at the Company's request, execute a new release that is valid and enforceable to effectuate the purposes of this Agreement. Additionally, you agree that if you breach the terms of paragraphs 6, 7, 8, 9, 10 and/or 11, it shall constitute a material breach of this Agreement as to which the Company Entities may seek all relief available under the law.

13.    <u>Non-Admission</u>. This Agreement and compliance with this Agreement is not intended, and shall not be construed, as an admission that any of the Company Entities has violated any federal, state or local law (statutory or decisional), ordinance or regulation, breached any contract or committed any wrong whatsoever against you. nor is it intended, and shall not be construed as, an admission by you that you have violated any federal, state or local law (statutory or decisional), ordinance or regulation, breached any contract or committed any wrong whatsoever.

14.    <u>Interpretation</u>. Should any provision of this Agreement require interpretation or construction, it is agreed by the parties that the entity interpreting or constructing this Agreement shall not apply a presumption against one party by reason of the rule of construction that a document is to be construed more strictly against the party who prepared the document.

15.    <u>Binding Agreement</u>. This Agreement is binding upon, and shall inure to the benefit of, the parties and their respective heirs, executors, administrators, successors and assigns.

16.    <u>Choice of Law</u>. This Agreement shall be construed and enforced in accordance with the laws of the State of New York without regard to the principles of conflicts of law.

17.    <u>Entire Agreement</u>. You understand that this Agreement constitutes the complete understanding between the Company and you, and, supersedes any and all agreements, understandings, and discussions, whether written or oral, between you and any of the Company Entities. No other promises or agreements shall be binding unless in writing and signed by both the Company and you after the Separation Date.

18.    <u>Knowing and Voluntary Agreement</u>. You acknowledge that you: (a) have carefully read this Agreement in its entirety; (b) have had an opportunity to consider it for at least twenty-one (21) days; (c) are hereby advised by the Company in writing to consult with an attorney of your choice in connection with this Agreement; (d) fully understand the significance of all of the terms and conditions of this Agreement and have discussed them with your independent legal counsel, or have had a reasonable opportunity to do so; (e) have had answered to your satisfaction by your independent legal counsel any questions you have asked with regard to the meaning and significance of any of the provisions of this Agreement; and (f) are signing this Agreement voluntarily and of your own free will and agree to abide by all the terms and conditions contained herein.

19.    <u>No Assignment of Claims</u>. You hereby expressly warrant and represent that you are the owner of all claims released by you herein, that you have not assigned or transferred or purported to have assigned or transferred voluntarily or by operation of law or otherwise any of the claims released by you herein or any portion thereof. You further agree that you will defend, indemnify and hold harmless the Company and/or any and all of the Company Entities from any and all claims so assigned or transferred.

20.    <u>Effective Date</u>. You understand that you will have at least twenty-one (21) days from the date of receipt of this Agreement to consider the terms and conditions of this Agreement. You may accept this Agreement by signing it and returning it to Krista A. McDonough, Senior Vice President, General Counsel and Chief Sustainability Officer at 11

Schulman Agr    Page 6    03/07/2022

West 42nd Street, New York, NY 10036 on or before 21 days after delivery. After executing this Agreement, you shall have seven (7) days (the "Revocation Period") to revoke this Agreement by indicating your desire to do so in writing delivered to the Company's General Counsel and Chief Sustainability Officer at the address set forth above by no later than 5:00 p.m. on the seventh (7th) day after the date you sign this Agreement. The effective date of this Agreement shall be the eighth (8th) day after you sign the Agreement. If the last day of the Revocation Period falls on a Saturday, Sunday or holiday, the last day of the Revocation Period will be deemed to be the next business day. In the event you do not accept this Agreement as set forth above, or in the event you revoke this Agreement during the Revocation Period, this Agreement, including but not limited to the obligation of the Company to provide the payments referred to in paragraph 2 above, shall be deemed automatically null and void.

*[Intentionally left blank]*

PX7096-131

**IN WITNESS WHEREOF**, the parties hereto have executed and delivered this Agreement.

Joshua Schulman
Date: March 7, 2022

Signature: /s/ Joshua Schulman_____

Capri Holdings Limited
Date: March 7, 2022

By: /s John D. Idol_____
Name: John D. Idol
Title: Chairman and Chief Executive Officer

Michael Kors (USA), Inc.
Date: March 7, 2022

By: /s John D. Idol_____
Name: John D. Idol
Title: Authorized Officer

Schulman Agr    Page 8    03/07/2022

**Exhibit 10.19**

**EMPLOYMENT AGREEMENT**

EMPLOYMENT AGREEMENT (this "Agreement") between Capri Holdings Limited ("Capri"), Michael Kors (USA), Inc. (the "Company") and Jenna Hendricks ("Executive").

WHEREAS, the parties desire to enter into this Agreement to reflect their mutual agreements with respect to the employment of Executive by the Company.

NOW, THEREFORE, in consideration of the mutual covenants, warranties and undertakings herein contained, the parties hereto agree as follows:

1.     Term. Executive shall assume her new duties and position with the Company as set forth in paragraph 2 below as of June 1, 2021 (the "Promotion Date"), and her employment shall continue in that capacity until terminated in accordance with Section 4 hereof (the "Term"), subject to the terms and provisions of this Agreement.

2.     Position and Duties. Executive shall be employed during the Term as Senior Vice President, Chief People Officer (the "Position"). Executive acknowledges and agrees that the Company will be her sole employer under this Agreement and the Company will provide all payments and benefits to Executive under this Agreement. Executive shall report directly to the Chief Executive Officer of Capri. Executive shall perform such duties and services as are commensurate with Executive's position and such other duties and services as are from time to time reasonably assigned to Executive by the Chief Executive Officer of Capri. Except for vacation, holiday, personal and sick days in accordance with this Agreement and the Company's policies for comparable senior executives, Executive shall devote her full business time during the Term to providing services to the Company and its affiliates; provided, that Executive may serve on one or more public, private or non-profit boards with the prior written consent of the Chief Executive Officer and the General Counsel (in each instance), which consent may be withheld or delayed in the Company's sole discretion. Executive acknowledges that her role will require travel for business purposes (both internationally and domestically).

3.     Compensation.

(a)     Base Salary. Executive's base salary shall be at the rate of $500,000 per year (as then in effect, the "Base Salary"). The Base Salary shall be payable in substantially equal installments on a semi-monthly basis less applicable withholdings and deductions in accordance with the normal payroll practices of the Company.

(b)     Periodic Review of Compensation. On an annual basis during the Term, but without any obligation to increase or otherwise change the compensation provisions of this Agreement, the Company agrees to undertake a review of the performance by Executive of her duties under this Agreement and of the efforts that she has undertaken for and on behalf of the Company.

(c)     Annual Cash Incentive. With respect to each full fiscal year of the Company during the Term, Executive shall be eligible to participate in the Capri Annual Cash Incentive Plan (as the same may be amended, modified, replaced or

terminated, the "Cash Plan") (which is a component of the Second Amended and Restated Capri Holdings Limited Omnibus Incentive Plan (as the same may be amended, modified, replaced or terminated, the "Incentive Plan" and, together with the Cash Plan, the "Plans"). Annual cash incentives will be based on a fixed percentage of Executive's Base Salary with the incentive levels set at 50% target – 100% maximum. Executive's actual annual cash incentive may range from 0% of Base Salary for performance below established thresholds to 100% of Base Salary for maximum performance (interpolated based on the actual level of attainment) with performance components, measures and target values established by the Capri Board of Directors (or appropriate committee thereof). All annual cash incentive payments are subject to the terms and conditions of the Cash Plan, as the same may be amended, modified, replaced or terminated from time to time, including, unless otherwise expressly stated in the Cash Plan, that you be employed by the Company on the date the annual cash incentive is actually paid to similarly situated executives. Executive acknowledges that if she resigns (other than for Good Reason) or is terminated for Cause prior to the date the annual cash incentive is actually paid to similarly situated executives she is not entitled to receive the annual cash incentive payment for the applicable fiscal year.

(d)    Benefits. During the Term, Executive shall be entitled to participate in the benefit plans and programs, including, without limitation, medical, dental, life insurance, disability insurance and 401(k), that the Company provides generally to comparable senior executives in accordance with, and subject to, the terms and conditions of such plans and programs (including, without limitation, any eligibility limitations) as they may be modified by the Company from time to time in its sole discretion.

(e)    Travel/Expense Reimbursement. The Company shall reimburse Executive for the ordinary and necessary business expenses incurred by her in the performance of her duties in accordance with the Company's policies and procedures. To the extent Executive travels in connection with her duties hereunder, the Company agrees to pay the cost of such travel or to reimburse Executive if she has incurred any such costs, it being understood and agreed that (i) all air travel shall be in (A) coach class for domestic travel other than coast-to-coast, which shall be business class, and (B) business class for international travel, and (ii) such costs shall otherwise be incurred in accordance with the Company's policies and procedures. The Company shall reimburse Executive for all other ordinary and necessary business expenses incurred by her in the performance of her duties in accordance with the Company's policies and procedures.

(f)    Equity-Based Compensation.

(i)    Annual Grant. In accordance with the Capri annual performance review cycle, on an annual basis at the same time as awarded to other senior executives similarly situated, Executive shall be eligible to receive a discretionary long-term incentive award under the Incentive Plan in form and amount, if any, to be determined in Capri's sole discretion in accordance with, and subject to the terms and conditions of, such Incentive Plan. Such award may be in the form of share options, time-based restricted share units, performance-based restricted share units, other share-based awards or any combination of the foregoing as determined by the Capri Board of Directors (or appropriate committee thereof). Annual long-term incentive awards are discretionary and Capri shall be under no obligation to grant equity to the Executive in any fiscal year. On June 15, 2021, Executive shall receive an equity grant

2

valued at approximately $1,500,000 based on the closing price of CPRI ordinary shares on the New York Stock Exchange on the date of grant in accordance with, and subject to, the terms and conditions of the Incentive Plan, and the applicable award agreement. Such equity grant shall be comprised 100% of time-based RSUs that will vest in equal installments over three (3) years on each anniversary of the grant date.

(ii)    <u>Effect of Termination</u>. Except in the case of the termination of Executive for Cause (as defined in Section 4(b) below), in which case any equity incentive awards granted to Executive under the Incentive Plan shall be forfeited and immediately terminated (whether or not vested and/or exercisable), any such equity incentive awards that have become vested and/or exercisable prior to the last day Executive is employed by the Company (the "<u>Termination Date</u>") shall remain vested and/or exercisable after the Termination Date, and the treatment of the long-term incentive awards upon termination shall otherwise be governed by the Incentive Plan and the applicable award agreement.

(g)    <u>Taxes</u>. All payments to be made to and on behalf of Executive under this Agreement will be subject to required withholding of federal, state and local income and employment taxes, and to related reporting requirements.

(h)    <u>Vacations</u>. Executive shall be entitled to a total of four (4) weeks (or twenty (20) days) of paid vacation during each calendar year during the Term (which shall accrue in accordance with the Company's vacation policy); provided, however, that such vacations shall be taken by Executive at such times as will not interfere with the performance by Executive of her duties hereunder.

(i)    <u>Clothing Allowance</u>. The Company shall provide Executive with a $10,000 clothing allowance (pro rated from the Promotion Date) for each fiscal year during the Term, which may be used by Executive to purchase product manufactured by Capri's brands personal orders for Executive's personal use only at the applicable discount off wholesale (if any) offered to all eligible employees. Such clothing allowance shall be fully utilized by Executive in each fiscal year otherwise any remaining amount available for use shall be forfeited at the end of such fiscal year. In addition, Executive shall receive an additional one-time clothing allowance in the amount of $15,000 for Executive's personal use at any time during the Term. The clothing allowance is a taxable benefit for Executive.

4.    <u>Termination of Employment</u>.

(a)    <u>Death and Disability</u>. Executive's employment under this Agreement shall terminate automatically upon her death. The Company may terminate Executive's employment under this Agreement if Executive is unable to perform substantially all of the duties required hereunder due to illness or incapacity for a period of at least ninety (90) days (whether or not consecutive) in any period of three hundred and sixty five (365) consecutive days.

(b)    <u>Cause</u>. The Company may terminate Executive's employment under this Agreement at any time with Cause. For purposes of this Agreement, "Cause" means the occurrence of any of the following events: (i) a material breach by Executive of her obligations under this Agreement that Executive has failed to cure (as determined by the Company acting in good faith) within thirty (30) days following written notice of such breach from Capri to Executive; (ii) insubordination or a refusal by Executive to perform her duties under this Agreement that continues for at least five (5) days after written notice from Capri to Executive; (iii) Executive's gross

3

negligence, willful misconduct or dishonesty in performing her duties hereunder or with respect to Capri or any of its affiliates or licensees, or any of their respective businesses, assets or employees; (iv) the commission by Executive of a fraud or theft against Capri or any of its affiliates or licensees or her conviction for the commission of, or aiding or abetting, a felony or of a fraud or a crime involving moral turpitude or a business crime; or (v) the possession or use by Executive of illegal drugs or prohibited substances, the excessive drinking of alcoholic beverages on a recurring basis which impairs Executive's ability to perform her duties under this Agreement, or the appearance during hours of employment on a recurring basis of being under the influence of such drugs, substances or alcohol.

(c)    <u>Executive Termination Without Good Reason</u>. Executive agrees that she shall not terminate her employment for any reason other than Good Reason (as defined in Section 5(a)) without giving Capri at least ninety (90) days prior written notice of the effective date of such termination. Executive acknowledges that Capri retains the right to waive the notice requirement, in whole or in part, and accelerate the effective date of Executive's termination. If Capri elects to waive the notice requirement, in whole or in part, neither Capri nor the Company shall have no further obligations to Executive under this Agreement other than to make the payments specified in Section 5(a). After Executive provides a notice of termination, Capri may, but shall not be obligated to, provide Executive with work to do and Capri may, in its discretion, in respect of all or part of an unexpired notice period, (i) require Executive to comply with such conditions as it may specify in relation to attending at, or remaining away from, Capri's places of business, or (ii) withdraw any powers vested in, or duties assigned to, Executive. For purposes of a notice of termination given pursuant to this Section 4(c), the Termination Date shall be the last day of the ninety (90) day notice period, unless Capri elects to waive the notice requirement as set forth herein.

(d)    <u>Employee At-Will</u>. Either the Company or Executive shall have the right to terminate the employment relationship at any time, for any reason, without or with Cause (as defined below) subject to the provisions of Section 5.

5.    <u>Consequences of Termination or Breach</u>.

(a)    <u>Death or Disability; Termination for Cause or Without Good Reason</u>. If Executive's employment under this Agreement is terminated under Section 4(a), 4(b) or Executive terminates her employment for any reason other than for Good Reason (as defined below), Executive shall not thereafter be entitled to receive any compensation or benefits under this Agreement, other than (i) Base Salary earned but not yet paid prior to the Termination Date, (ii) reimbursement of any expenses pursuant to Section 3(e) incurred prior to the Termination Date and (iii) vested equity in accordance with Section 3(f)(iii). For purposes of this Agreement, "<u>Good Reason</u>" means (x) the significant reduction of Executive's duties or responsibilities relating to the Position, except with respect to any action initiated or recommended by Executive and approved by Capri, or (y) a material breach by the Company of its obligations under this Agreement, in each case, that it has failed to cure (as determined by Capri acting in good faith) within thirty (30) days following written notice of such diminution of duties or material breach from Executive to Capri.

(b)    <u>Termination Without Cause or With Good Reason</u>. If Executive's employment under this Agreement is terminated by the Company without Cause (which Capri and the Company shall have the right to do with or without Cause at any time during the Term) or Executive terminates her employment for Good Reason,

4

the sole obligations of Capri and the Company to Executive shall be (i) to make the payments described in clauses (i) through (iii) (inclusive) of Section 5(a), (ii) if Executive is terminated between April 1st and June 15th of any fiscal year, to pay by no later than June 30th following the Termination Date, any annual cash incentive actually earned by Executive pursuant to the Cash Plan, and (iii) subject to Executive providing the Company with the release and separation agreement described below, to provide continuation of Executive's then current Base Salary and medical, dental and insurance benefits by the Company for a one (1) year period commencing with the Termination Date, which amount shall be payable in substantially equal installments in accordance with the normal payroll practices of the Company and shall be offset by any compensation and benefits that Executive receives from other employment (including self-employment) during such payment period. Executive agrees to promptly notify Capri upon her obtaining other employment or commencing self-employment during the severance period and to provide Capri with complete information regarding her compensation thereunder. Capri and the Company's obligation to provide the payments referred to in this Section 5(b) shall be contingent upon (A) Executive having delivered to Capri a fully executed separation agreement and release (that is not subject to revocation) of claims against Capri and its affiliates and their respective directors, officers, employees, agents and representatives satisfactory in form and content to Capri's counsel, and (B) Executive's continued compliance with her obligations under Section 6 of this Agreement. Executive acknowledges and agrees that in the event the Company terminates Executive's employment without Cause or Executive terminates her employment for Good Reason, (1) Executive's sole remedy against Capri and the Company shall be to receive the payments specified in this Section 5(b) and (2) if Executive does not execute the separation agreement and release described above, Executive shall have no remedy with respect to such termination.

6.      <u>Certain Covenants and Representations</u>.

(a)      <u>Confidentiality</u>. Executive acknowledges that in the course of her employment by the Company, Executive will receive and or be in possession of confidential information of Capri and its affiliates, including, but not limited to, information relating to their financial affairs, business methods, strategic plans, marketing plans, product and styling development plans, pricing, products, vendors, suppliers, manufacturers, licensees, computer programs and software, and personal information regarding personnel of Capri and its subsidiaries (collectively, "<u>Confidential Information</u>"). Confidential Information shall not include information that is: (i) generally known or available to the public; (ii) independently known, obtained, conceived or developed by Executive without access to or knowledge of related information provided by Capri or its subsidiaries or obtained in connection with Executive's efforts on behalf of Capri, (iii) used or disclosed with the prior written approval of Capri or (iv) made available by Capri to the public. Executive agrees that she will not, without the prior written consent of Capri, during the Term or thereafter, disclose or make use of any Confidential Information, except as may be required by law or in the course of Executive's employment hereunder or in order to enforce her rights under this Agreement. Executive agrees that all tangible materials containing Confidential Information, whether created by Executive or others which shall come into Executive's custody or possession during Executive's employment shall be and is the exclusive property of the Company. Upon termination of Executive's employment for any reason whatsoever, Executive shall immediately surrender to Capri all Confidential Information and property of Capri and its affiliates in Executive's possession.

(b)      <u>No Hiring</u>. During the two-year period immediately following the Termination Date, Executive shall not employ or retain (or participate in or arrange

5

for the employment or retention of) any person who was employed or retained by Capri or any of its affiliates within the one (1) year period immediately preceding such employment or retention.

(c)    <u>Non-Disparagement</u>. During the Term and thereafter, Executive agrees not to disparage Capri or any of its affiliates or any of their respective directors, officers, employees, agents, representatives or licensees and not to publish or make any statement that is reasonably foreseeable to become public with respect to any of such entities or persons. Capri and the Company likewise agree not to disparage executive or publish or make any statement that is reasonably foreseeable to become public with respect to Executive without Executive's prior written consent, excluding statements required to be made about Executive in any Capri filing under U.S. securities laws or stock exchange rules and regulations.

(d)    <u>Copyrights, Inventions, etc</u>. Any interest in patents, patent applications, inventions, technological innovations, copyrights, copyrightable works, developments, discoveries, designs, concepts, ideas and processes ("<u>Such Inventions</u>") that Executive now or hereafter during the Term may own, acquire or develop either individually or with others relating to the fields in which Capri or any of its affiliates may then be engaged or contemplate being engaged shall belong to Capri or such affiliate and forthwith upon request of Capri, Executive shall execute all such assignments and other documents (including applications for patents, copyrights, trademarks and assignments thereof) and take all such other action as Capri may reasonably request in order to assign to and vest in Capri or its affiliates all of Executive's right, title and interest (including, without limitation, waivers to moral rights) in and to Such Inventions throughout the world, free and clear of liens, mortgages, security interests, pledges, charges and encumbrances. Executive acknowledges and agrees that (i) all copyrightable works created by Executive as an employee will be "works made for hire" on behalf of the Capri and its affiliates and that Capri and its affiliates shall have all rights therein in perpetuity throughout the world and (ii) to the extent that any such works do not qualify as works made for hire, Executive irrevocably assigns and transfers to Capri and its affiliates all worldwide right, title and interest in and to such works. Executive hereby appoints any officer of the Company as Executive's duly authorized attorney-in-fact to execute, file, prosecute and protect Such Inventions before any governmental agency, court or authority. If for any reason Capri or its affiliates do not own any Such Invention, Capri and its affiliates shall have the exclusive and royalty-free right to use in their businesses, and to make products therefrom, Such Invention as well as any improvements or know-how related thereto.

(e)    <u>Remedy for Breach and Modification</u>. Executive acknowledges that the foregoing provisions of this Section 6 are reasonable and necessary for the protection of Capri and its affiliates, and that they will be materially and irrevocably damaged if these provisions are not specifically enforced. Accordingly, Executive agrees that, in addition to any other relief or remedies available to Capri and its affiliates, they shall be entitled to seek an appropriate injunctive or other equitable remedy for the purposes of restraining Executive from any actual or threatened breach of or otherwise enforcing these provisions and no bond or security will be required in connection therewith. If any provision of this Section 6 is deemed invalid or unenforceable, such provision shall be deemed modified and limited to the extent necessary to make it valid and enforceable.

6

7.    <u>Miscellaneous</u>.

(a)    <u>Representations</u>. Capri, the Company and Executive each represents and warrants that (i) it has full power and authority to execute and deliver this Agreement and to perform its respective obligations hereunder and (ii) this Agreement constitutes the legal, valid and binding obligation of such party and is enforceable against it in accordance with its terms. In addition, Executive represents and warrants that the entering into and performance of this Agreement by her will not be in violation of any other agreement to which Executive is a party.

(b)    <u>Notices</u>. Any notice or other communication made or given in connection with this Agreement shall be in writing and shall be deemed to have been duly given when delivered by hand, by facsimile transmission, by email, by a nationally recognized overnight delivery service or mailed by certified mail, return receipt requested, to Executive or to the Company at the addresses set forth below or at such other address as Executive or the Company may specify by notice to the other:

To Capri and/or the Company:

11 West 42nd Street
New York, New York 10036
Attention: Chairman and Chief Executive Officer

With a copy to:

Capri Holdings Limited / Michael Kors (USA), Inc.
11 West 42nd Street
New York, New York 10036
Attention: SVP, General Counsel

To Executive: at her home address on file with the Company or to such other address as may be provided by such notice.

(c)    <u>Entire Agreement; Amendment</u>. This Agreement supersedes all prior agreements between the parties with respect to its subject matter, except that this Agreement does not cancel or supersede the Plans (or the applicable long-term incentive award agreements). This Agreement is intended (with any documents referred to herein) as a complete and exclusive statement of the terms of the agreement between the parties with respect thereto and may be amended only by a writing signed by both parties hereto.

(d)    <u>Waiver</u>. The failure of any party to insist upon strict adherence to any term or condition of this Agreement on any occasion shall not be considered a waiver or deprive that party of the right thereafter to insist upon strict adherence to that term or any other term of this Agreement. Any waiver must be in a writing signed by the party to be charged with such waiver.

(e)    <u>Assignment</u>. Except as otherwise provided in this Section 7(e), this Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective heirs, representatives, successors and assigns. This Agreement shall not be assignable by Executive and shall be assignable by Capri and the Company only to its affiliates; <u>provided</u>, <u>however</u>, that any assignment by the Company shall not, without the written consent of Executive, relieve Capri or the Company of its obligations hereunder.

7

(f)      <u>Counterparts</u>. This Agreement may be executed in two or more counterparts, each of which shall be considered an original, but all of which together shall constitute the same instrument.

(g)      <u>Captions</u>. The captions in this Agreement are for convenience of reference only and shall not be given any effect in the interpretation of the Agreement.

(h)      <u>Governing Law</u>. this Agreement shall be governed by the laws of the State of New York applicable to agreements made and to be performed in that State, without regard to its conflict of laws principles.

(i)      <u>Arbitration</u>. Any dispute or claim between the parties hereto arising out of, or, in connection with this Agreement, shall, upon written request of either party, become a matter for arbitration; provided, however, that Executive acknowledges that in the event of any violation of Section 6 hereof, Capri and the Company shall be entitled to obtain from any court in the State of New York, temporary, preliminary or permanent injunctive relief as well as damages, which rights shall be in addition to any other rights or remedies to which it may be entitled. The arbitration shall be before a neutral arbitrator in accordance with the Commercial Arbitration Rules of the American Arbitration Association and take place in New York City. Each party shall bear its own fees, costs and disbursements in such proceeding. The decision or award of the arbitrator shall be final and binding upon the parties hereto. The parties shall abide by all awards recorded in such arbitration proceedings, and all such awards may be entered and executed upon in any court having jurisdiction over the party against whom or which enforcement of such award is sought.

(j)      <u>Section 409A</u>. It is intended that this Agreement will comply with Internal Revenue Code Section 409A and any regulations and guidelines issued thereunder (collectively "Section 409A") to the extent this Agreement is subject thereto. It is the Parties' good faith belief that any payments or benefits provided to Executive pursuant to this Agreement fall within an exception to Section 409A. To the extent that this Agreement provides for any payments to be made in installments, each such installment shall be deemed to be a separate payment for purposes of Section 409A.  If an amendment to this Agreement is necessary in order for it to comply with Section 409A, the Parties agree to negotiate in good faith to amend this Agreement in a manner that preserves the original intent of the Parties to the extent reasonably possible.

[Intentionally left blank]

8

IN WITNESS WHEREOF, the parties have executed this Agreement effective as of June 1, 2021.

CAPRI HOLDINGS LIMITED

By: /s/ John D. Idol
Name: John D. Idol
Title: Chairman and Chief Executive Officer


MICHAEL KORS (USA), INC.


By: /s/ John D. Idol
Name: John D. Idol
Title: Chairman and Chief Executive Officer


/s/ Jenna Hendricks
Jenna Hendricks

9

Exhibit 21.1

## LIST OF SUBSIDIARIES OF CAPRI HOLDINGS LIMITED

| Entity Name | Jurisdiction of Formation |
|---|---|
| Alberto Gozzi S.r.l. | Italy |
| Aruba MK Retail N.V. | Aruba |
| Capri (Australia) Pty Ltd | Australia |
| Capri Finance Hong Kong Limited | Hong Kong, China |
| Capri Finance Malta Limited | Malta |
| Capri (Hungary) Holdings Kft | Hungary |
| Capri Insurance Guernsey Limited | Guernsey |
| Capri Operations Limited | British Virgin Islands |
| Capri (Switzerland) GmbH | Switzerland |
| Capri (Switzerland) Holdings GmbH | Switzerland |
| Capri USA Holdings LLC | Delaware |
| Capri USA Intermediate LLC | Delaware |
| Choo Luxury Holdings Limited | United Kingdom |
| Choo USD Finance Limited | United Kingdom |
| Creek Apartments Limited | U.A.E. |
| FRANCHOO S.A.S | France |
| Gianni Versace S.r.l. | Italy |
| GIVI Holding S.r.l. | Italy |
| G. Versace Hellas S.A. | Greece |
| ITACHOO S.r.l. | Italy |
| JC Gulf Trading LLC | U.A.E. |
| J. Choo (Asia) Limited | Hong Kong, China |
| J. Choo (Austria) GmbH | Austria |
| J. Choo (Belgium) BVBA | Belgium |
| J. Choo Canada Inc. | Canada |
| J. Choo Czech, s.r.o. | Czech Republic |
| J. Choo Denmark ApS | Denmark |
| J Choo Florida, Inc. | Delaware |
| J Choo Germany GmbH | Germany |
| J. Choo Hungary Kft | Hungary |
| J. Choo Japan JV Limited | United Kingdom |
| J. Choo Limited | United Kingdom |
| J. Choo (Macau) Co., Limited | Macau, China |
| J. Choo Netherlands B.V. | Netherlands |
| J. Choo Norway AS | Norway |
| J. Choo Portugal, Unipessoal LDA | Portugal |
| J. Choo RUS L.L.C. | Russia |
| J. Choo Russia JV Limited | United Kingdom |
| J. Choo Sweden AB | Sweden |
| J Choo (Switzerland) AG | Switzerland |
| J. Choo (Thailand) Co., Ltd. | Thailand |
| J Choo USA, Inc. | Delaware |
| JC ME Trading DWC L.L.C. | U.A.E. free zone |
| JC Services ME DMCC L.L.C. | U.A.E. free zone |
| Jimmy Choo Florence S.r.l. | Italy |
| Jimmy Choo Group Limited | United Kingdom |
| Jimmy Choo Hong Kong Limited | Hong Kong, China |
| Jimmy Choo Korea Limited | South Korea |
| Jimmy Choo (Malaysia) Sdn. Bhd | Malaysia |
| Jimmy Choo (Shanghai) Trading Co. Limited | China |
| Jimmy Choo (Singapore) Pte. Limited | Singapore |

PX7096-143

| Entity Name | Jurisdiction of Formation |
| --- | --- |
| JIMMY CHOO SPAIN S.L.U. | Spain |
| Jimmy Choo Tokyo K.K. | Japan |
| Michael Kors (Austria) GmbH | Austria |
| Michael Kors Aviation, L.L.C. | Delaware |
| Michael Kors Belgium BV | Belgium |
| Michael Kors (Bucharest Store) S.R.L. | Romania |
| Michael Kors (Canada) Holdings Ltd. | Canada |
| Michael Kors Columbia SAS | Columbia |
| Michael Kors (Czech Republic) s.r.o. | Czech Republic |
| Michael Kors (Denmark) ApS | Denmark |
| Michael Kors Do Brasil Comercio De Accesorios E Vestuario Ltda. | Brazil |
| Michael Kors (Europe) B.V. | Netherlands |
| Michael Kors (France) SAS | France |
| Michael Kors (Germany) GmbH | Germany |
| Michael Kors (HK) Limited | Hong Kong, China |
| Michael Kors (Hungary) Kft. | Hungary |
| Michael Kors (Ireland) Limited | Ireland |
| Michael Kors Italy S.R.L. Con Socio Unico | Italy |
| Michael Kors Japan, LLC | Japan |
| Michael Kors Korea Yuhan Hoesa | South Korea |
| Michael Kors (Latvia) SIA | Latvia |
| Michael Kors Limited | Hong Kong, China |
| Michael Kors, L.L.C. | Delaware |
| Michael Kors (Luxembourg) Retail S.à r.l. | Luxembourg |
| Michael Kors (Netherlands) B.V. | Netherlands |
| Michael Kors (Panama) Holdings, Inc. | Panama |
| Michael Kors (Poland) Sp. z o.o. | Poland |
| Michael Kors (Portugal) Lda. | Portugal |
| Michael Kors Retail, Inc. | Delaware |
| Michael Kors Spain, S.L.U. | Spain |
| Michael Kors Stores (California), LLC | Delaware |
| Michael Kors Stores, L.L.C. | New York |
| Michael Kors (Sweden) AB | Sweden |
| Michael Kors (Switzerland) GmbH | Switzerland |
| Michael Kors (Switzerland) Holdings GmbH | Switzerland |
| Michael Kors (Switzerland) International GmbH | Switzerland |
| Michael Kors (Switzerland) Retail GmbH | Switzerland |
| Michael Kors Trading (Shanghai) Company Limited | China |
| Michael Kors (UK) Limited | United Kingdom |
| Michael Kors (USA) Holdings, Inc. | Delaware |
| Michael Kors (USA), Inc. | Delaware |
| Michael Kors Virginia, L.L.C. | Virginia |
| MK Chile SpA | Chile |
| MK Holetown (Barbados) Inc. | Barbados |
| MKJC Limited | British Virgin Islands |
| MK Operations E-zone Curacao N.V. | Curaçao |
| MK (Panama) Operations, Inc. | Panama |
| MK Panama Retail, S.A. | Panama |
| MK Retail Operation CR S.A. | Costa Rica |
| MK Retail (SXM) N.V. | St. Maarten |
| MK (Shanghai) Commercial Trading Company Limited | China |
| UAB Michael Kors (Lithuania) | Lithuania |
| Versace Asia Pacific Limited | Hong Kong, China |

PX7096-144

Versace Australia Pty Limited                                                      Australia

| Entity Name | Jurisdiction of Formation |
|---|---|
| Versace Austria GmbH | Austria |
| Versace Belgique SA | Belgium |
| Versace Canada, Inc. | Canada |
| Versace China Limited | China |
| Versace Czech s.r.o. | Czech Republic |
| Versace Deutschland GmbH | Germany |
| Versace Do Brasil Importação e Distribuição de Produtos de Vestuário e Acessórios Ltda. | Brazil |
| Versace España, S.A.U. | Spain |
| Versace France S.A. | France |
| Versace Japan Co., Ltd. | Japan |
| Versace Korea Co., Ltd. | South Korea |
| Versace Macau Limited | Macau, China |
| Versace Malaysia Sdn. Bhd. | Malaysia |
| Versace Monte-Carlo S.A.M. | Principality of Monaco |
| Versace Shangai Limited | China |
| Versace Singapore Pte. Ltd. | Singapore |
| Versace Suisse SA | Switzerland |
| Versace Taiwan Co., Limited | Taiwan, China |
| Versace (Thailand) Co., Ltd. | Thailand |
| Versace U.K. PLC | United Kingdom |
| Versace USA, Inc. | New York |

**Exhibit 23.2**

**Consent of Independent Registered Public Accounting Firm**

We consent to the incorporation by reference in the Registration Statement on Form S-8 (Nos. 333-178486, 333-249023 and 333-234699) pertaining to the Amended and Restated Omnibus Incentive Plan, Second Amended and Restated Omnibus Incentive Plan and the Deferred Compensation Plan of Capri Holdings Limited and subsidiaries of our reports dated June 1, 2022 with respect to the consolidated financial statements and the effectiveness of internal control over financial reporting of Capri Holdings Limited and subsidiaries, included in this Annual Report (Form 10-K) for the year ended April 2, 2022.

/s/ ERNST & YOUNG LLP

New York, New York
June 1, 2022

**Exhibit 31.1**

## CERTIFICATIONS

I, John D. Idol, certify that:

1. I have reviewed this Form 10-K of Capri Holdings Limited;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and we have:

   a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent function):

   a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: June 1, 2022

By:        /s/ John D. Idol
                John D. Idol
                *Chief Executive Officer*

**Exhibit 31.2**

**CERTIFICATIONS**

I, Thomas J. Edwards, Jr., certify that:

1.  I have reviewed this Form 10-K of Capri Holdings Limited;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and we have:

    a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent function):

    a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: June 1, 2022

By:     /s/ Thomas J. Edwards, Jr.
_____
            Thomas J. Edwards, Jr
            *Chief Financial Officer*

**Exhibit 32.1**

**CERTIFICATION PURSUANT TO 18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with this annual report on Form 10-K of Capri Holdings Limited (the "Company") for the year ended April 2, 2022 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, John D. Idol, Chief Executive Officer of the Company, hereby certify pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

(i)   The Report fully complies with the requirements of Section 13(a) or Section 15(d) of the Securities Exchange Act of 1934, as amended; and

(ii)  The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of Capri Holdings Limited.

Date: June 1, 2022

/s/ John D. Idol
_____
*John D. Idol*
*Chief Executive Officer*
*(Principal Executive Officer)*

The foregoing certification is being furnished solely pursuant to 18 U.S.C. Section 1350 and is not being filed as part of this Report.

**Exhibit 32.2**

**CERTIFICATION PURSUANT TO 18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with this annual report on Form 10-K of Capri Holdings Limited (the "Company") for the year ended April 2, 2022 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Thomas J. Edwards, Jr., Chief Financial Officer of the Company, hereby certify pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

(i)   The Report fully complies with the requirements of Section 13(a) or Section 15(d) of the Securities Exchange Act of 1934, as amended; and

(ii)  The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of Capri Holdings Limited.

Date: June 1, 2022

/s/ Thomas J. Edwards, Jr.

*Thomas J. Edwards, Jr.*
*Chief Financial Officer*
*(Principal Financial Officer)*

The foregoing certification is being furnished solely pursuant to 18 U.S.C. Section 1350 and is not being filed as part of this Report.