







PX7098-002

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## FORM 10-K

**(Mark One)**

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended April 1, 2023**
or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____
**Commission file number 001-35368**

## CAPRI
### HOLDINGS LIMITED

**(Exact Name of Registrant as Specified in Its Charter)**

| British Virgin Islands | N/A |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**90 Whitfield Street**
**2nd Floor**
**London, United Kingdom**
**W1T 4EZ**
(Address of Principal Executive Offices)

**Registrant's telephone number, including area code: 44 207 632 8600**
**Securities registered pursuant to Section 12(b) of the Act:**

| Title of Each Class | Trading Symbol(s) | Name of Each Exchange on which Registered |
|---|---|---|
| Ordinary Shares, no par value | CPRI | New York Stock Exchange |

**Securities registered pursuant to Section 12(g) of the Act: None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. ☒ Yes ☐ No

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. ☐ Yes ☒ No

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. ☒ Yes ☐ No

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). ☒ Yes ☐ No

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act. (Check one):

| | | | |
|---|---|---|---|
| Large accelerated filer | ☒ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☒

If securities are registered pursuant to Section 12(b) of the Act, indicate by check mark whether the financial statements of the registrant included in the filing reflect the correction of an error to previously issued financial statements. ☐

Indicate by check mark whether any of those error corrections are restatements that required a recovery analysis of incentive-based compensation received by any of the registrant's executive officers during the relevant recovery period pursuant to §240.10D-1(b). ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). ☐ Yes ☒ No

The aggregate market value of the registrant's voting and non-voting ordinary shares held by non-affiliates of the registrant was $4,869,769,555 as of September 30, 2022, the last business day of the registrant's most recently completed second fiscal quarter based on the closing price of the ordinary shares on the New York Stock Exchange.

As of May 24, 2023, Capri Holdings Limited had 117,377,367 ordinary shares outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE**

The information required by Part III of this report, to the extent not set forth herein, is incorporated by reference from the Registrant's definitive Proxy Statement, which will be filed in June 2023, for the 2023 Annual Meeting of the Shareholders.

**TABLE OF CONTENTS**

| | | Page |
|---|---|---|

**PART I**

| Item 1 | Business | 7 |
|---|---|---|
| Item 1A | Risk Factors | 19 |
| Item 1B | Unresolved Staff Comments | 34 |
| Item 2 | Properties | 35 |
| Item 3 | Legal Proceedings | 35 |
| Item 4 | Mine Safety Disclosures | 35 |

**PART II**

| Item 5 | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 36 |
|---|---|---|
| Item 6 | [Reserved] | 37 |
| Item 7 | Management's Discussion and Analysis of Financial Condition and Results of Operations | 38 |
| Item 7A | Quantitative and Qualitative Disclosures About Market Risk | 59 |
| Item 8 | Financial Statements and Supplementary Data | 60 |
| Item 9 | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 60 |
| Item 9A | Controls and Procedures | 61 |
| Item 9B | Other Information | 61 |
| Item 9C | Disclosure Regarding Foreign Jurisdictions that Prevent Inspections | 62 |

**PART III**

| Item 10 | Directors, Executive Officers and Corporate Governance | 63 |
|---|---|---|
| Item 11 | Executive Compensation | 63 |
| Item 12 | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 63 |
| Item 13 | Certain Relationships and Related Transactions and Director Independence | 63 |
| Item 14 | Principal Accounting Fees and Services | 63 |

**PART IV**

| Item 15 | Exhibits and Financial Statement Schedules | 64 |
|---|---|---|

PX7098-005

## NOTE REGARDING FORWARD-LOOKING STATEMENTS

This Annual Report on Form 10-K, including documents incorporated herein by reference, contains statements which are, or may be deemed to be, "forward-looking statements." Forward-looking statements are prospective in nature and are not based on historical facts, but rather on current expectations and projections of the management of Capri Holdings Limited (the "Company") about future events. All statements other than statements of historical facts included in this Annual Report on Form 10-K, including documents incorporated herein by reference, may be forward-looking statements. Forward-looking statements include information concerning the Company's goals, future plans and strategies, including with respect to environmental, social and governance ("ESG") goals, initiatives and ambitions as well as the Company's possible or assumed future results of operations, including descriptions of its business strategy. Without limitation, any statements preceded or followed by or that include the words "plans", "believes", "expects", "intends", "will", "should", "could", "would", "may", "anticipates", "might" or similar words or phrases, are forward-looking statements. These forward-looking statements are not guarantees of future financial performance. Such forward-looking statements involve known and unknown risks and uncertainties that could significantly affect expected results and are based on certain key assumptions, which could cause actual results to differ materially from those projected or implied in any forward-looking statements. These risks, uncertainties and other factors include changes in consumer traffic and retail trends; high consumer debt levels, recession and inflationary pressures; loss of market share and industry competition; the impact of the COVID-19 pandemic, levels of cash flow and future availability of credit, compliance with restrictive covenants under the Company's credit agreement, the Company's ability to integrate successfully and to achieve anticipated benefits of any acquisition and to successfully execute our growth strategies; the risk of disruptions to the Company's businesses; risks associated with operating in international markets and our global sourcing activities, including disruptions or delays in manufacturing or shipments; the risk of cybersecurity threats and data security breaches; the negative effects of events on the market price of the Company's ordinary shares and its operating results; significant transaction costs; unknown liabilities; the risk of litigation and/or regulatory actions related to the Company's businesses; fluctuations in demand for the Company's products; levels of indebtedness (including the indebtedness incurred in connection with acquisitions); the timing and scope of future share buybacks, which may be made in open market or privately negotiated transactions, and are subject to market conditions, applicable legal requirements, trading restrictions under the Company's insider trading policy and other relevant factors, and which share repurchases may be suspended or discontinued at any time, the level of other investing activities and uses of cash; fluctuations in the capital markets; fluctuations in interest and exchange rates; the occurrence of unforeseen epidemics and pandemics, disasters or catastrophes; extreme weather conditions and natural disasters; political or economic instability in principal markets; adverse outcomes in litigation; and general, local and global economic, political, business and market conditions including acts of war and other geopolitical conflicts; as well as those risks set forth in the Company's filings with the U.S. Securities and Exchange Commission (the "SEC"), including in this Annual Report on Form 10-K, particularly under "Item 1A. Risk Factors" and in "Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations." The Company disclaims any obligation to update or revise any forward-looking statements contained herein other than in accordance with legal and regulatory obligations.

## SUMMARY OF RISKS AFFECTING OUR BUSINESS

Our business is subject to numerous risks. The following summary highlights some of the risks you should consider with respect to our business and prospects. This summary is not complete and the risks summarized below are not the only risks we face. You should review and consider carefully the risks and uncertainties described in more detail in this "Risk Factors" section of this Annual Report on Form 10-K which includes a more complete discussion of the risks summarized below as well as a discussion of other risks related to our business and an investment in our ordinary shares. Risks are listed in the categories where they primarily apply, but other categories may also apply.

Risks Related to Macroeconomic Conditions
- the accessories, footwear and apparel industries are heavily influenced by general macroeconomic cycles that affect consumer spending and a prolonged period of depressed consumer spending could have a material adverse effect on our business, results of operations and financial condition; and
- the COVID-19 pandemic may continue to adversely affect our business and results of operations.

Risks Related to Our Business
- we may not be able to respond to changing fashion and retail trends in a timely manner, which could have a material adverse effect on our brands, business, results of operations and financial condition;
- the markets in which we operate are highly competitive, both within North America and internationally, and increased competition based on a number of factors could cause our profitability and/or gross margins to decline;
- our business could suffer as a result of reductions in our wholesale channel and/or consolidations, liquidations, restructurings and other ownership changes of our wholesale partners;
- we face risks associated with operating globally;

4

- our retail stores are heavily dependent on the ability and desire of consumers to travel and shop, and a decline in consumer traffic could have a negative effect on our comparable store sales and store profitability resulting in impairment charges, which could have a material adverse effect on our business, results of operations and financial condition;
- if we are unable to effectively execute our e-commerce business and provide a reliable digital experience for our customers, our reputation and operating results may be harmed;
- the departure of key employees or our failure to attract and retain qualified personnel could have a material adverse effect on our business;
- our business is subject to risks inherent in global sourcing activities, including disruptions or delays in manufacturing or shipments;
- our business may be subject to increased costs and a decline in profitability as a result of increasing pressure on margins if we misjudge the demand for our products;
- the long-term growth of our business depends on the successful execution of our strategic initiatives;
- our current and future licensing and joint venture arrangements may not be successful and may make us susceptible to the actions of third-parties over whom we have limited control;
- acquisitions may not achieve intended benefits and may not be successfully integrated;
- we are subject to risks associated with leasing retail space subject to long-term and non-cancelable leases. We may be unable to renew leases at the end of their terms. If we close a leased retail space, we remain obligated under the applicable lease;
- we are dependent on a limited number of distribution facilities. If one or more of our distribution facilities experiences operational difficulties or becomes inoperable, it could have a material adverse effect on our business, results of operations and financial condition;
- we are dependent on third-parties to perform certain outsourced functions;
- increases in the cost of raw materials could increase our production costs and cause our operating results and financial condition to suffer;
- we primarily use foreign manufacturing contractors and independent third-party agents to source our finished goods; and
- our business is exposed to foreign currency exchange rate fluctuations.

Risks Related to Information Technology and Data Security
- privacy breaches and other cyber security risks related to our business could negatively affect our reputation, credibility and business; and
- a material delay or disruption in our information technology systems or e-commerce websites or our failure or inability to upgrade our information technology systems precisely and efficiently could have a material adverse effect on our business, results of operations and financial condition.

Risks Related to Environmental, Social and Governance Issues
- increased scrutiny from investors and others regarding our corporate social responsibility initiatives, including environmental, social and other matters of significance relating to sustainability, and changing regulatory requirements around ESG could result in additional costs or risks and adversely impact our reputation; and
- our business is susceptible to the risks associated with climate change and other environmental impacts which could negatively affect our business and operations.

Risks Related to Tax, Legal and Regulatory Matters
- our business is subject to risks associated with importing products, and the imposition of additional duties, tariffs or trade restrictions could have a material adverse effect on our business, results of operations and financial condition;
- fluctuations in our tax obligations and changes in tax laws, treaties and regulations may have a material adverse impact on our future effective tax rates and results of operations;
- if we fail to comply with labor laws or collective bargaining agreements, or if our independent manufacturing contractors fail to use acceptable, ethical business practices, our business and reputation could suffer;
- we may be unable to protect our trademarks, copyrights and other intellectual property rights, and others may allege that we infringe upon their intellectual property rights;
- we self-insure certain risks and may be impacted by unfavorable claims experience; and
- we are subject to various proceedings, lawsuits, disputes, and claims in the ordinary course of business which could have an adverse impact on our business, financial condition, and results of operations;

PX7098-007

Risks Related to Our Debt

- we have incurred a substantial amount of indebtedness, which could adversely affect our financial condition and restrict our ability to incur additional indebtedness or engage in additional transactions;

- we may be unable to meet financial covenants in our indebtedness agreements which could result in an event of default and restrictive covenants in such agreements may restrict our ability to pursue our business strategies; and

- if one or more of our counterparty financial institutions default on their obligations to us, we may incur significant losses or our financial liquidity could be adversely impacted.

Risks Related to Our Ordinary Shares

- our share price may periodically fluctuate based on the accuracy of our earnings guidance or other forward-looking statements regarding our financial performance;

- if we are unable to conduct share repurchases at expected levels, our share price could be adversely affected;

- failure to maintain adequate financial and management processes and controls could lead to errors in our financial reporting, which could harm our business and cause a decline in the price of our ordinary shares;

- provisions in our organizational documents may delay or prevent our acquisition by a third-party;

- rights of shareholders under British Virgin Islands law differ from those under United States law, and, accordingly, our shareholders may have fewer protections;

- the laws of the British Virgin Islands provide limited protection for minority shareholders, so minority shareholders will have limited or no recourse if they are dissatisfied with the conduct of our affairs;

- it may be difficult to enforce judgments against us or our executive officers and directors in jurisdictions outside the United States; and

- British Virgin Islands companies may not be able to initiate shareholder derivative actions, thereby depriving shareholders of one avenue to protect their interests.

PX7098-008

## PART I

*Unless the context requires otherwise, references in this Annual Report on Form 10-K to "Capri", "we", "us", "our", "the Company", "our Company" and "our business" refer to Capri Holdings Limited and its consolidated subsidiaries. References to our stores, retail stores and retail segment include all of our full-price retail stores (including concessions), our e-commerce websites and outlet stores. The Company utilizes a 52 to 53 week fiscal year and the term "Fiscal Year" or "Fiscal" refers to that 52-week or 53-week period. The fiscal years ending on April 1, 2023 and March 27, 2021 ("Fiscal 2023" and "Fiscal 2021", respectively) contain 52 weeks and the fiscal year ending on April 2, 2022 ("Fiscal 2022") contains 53 weeks. The Company's Fiscal 2024 is a 52-week period ending March 30, 2024. Some differences in the numbers in the tables and text throughout this annual report may exist due to rounding.*

**Item 1. Business**

**Our Company**

Capri Holdings Limited ("Capri") is a global fashion luxury group consisting of iconic, founder-led brands Versace, Jimmy Choo and Michael Kors. Our commitment to glamorous style and craftsmanship is at the heart of each of our luxury brands. We have built our reputation on designing exceptional, innovative products that cover the full spectrum of fashion luxury categories. Our strength lies in the unique DNA and heritage of each of our brands, the diversity and passion of our people and our dedication to the clients and communities we serve.
.

**Our Brands**

**Versace**

Our Versace brand has long been recognized as one of the world's leading international fashion design houses and is synonymous with Italian glamour and style. Founded in 1978 in Milan, Versace is known for its iconic and unmistakable style and unparalleled craftsmanship. Over the past several decades, the House of Versace has grown globally from its roots in haute couture, expanding into the design, manufacturing, distribution and retailing of accessories, ready-to-wear, footwear, eyewear, watches, jewelry, fragrance and home furnishings businesses. Versace's design team is led by Donatella Versace, who has been the brand's Artistic Director for over 20 years. Versace distributes its products through a worldwide distribution network, which includes boutiques in some of the world's most glamorous cities, its e-commerce sites, as well as through the most prestigious department and specialty stores worldwide.

**Jimmy Choo**

Our Jimmy Choo brand offers a distinctive, glamorous and fashion-forward product range, enabling it to develop into a leading global luxury accessories brand, whose core product offering is women's luxury shoes, complemented by accessories, including handbags, small leather goods, jewelry, scarves and belts, as well as men's luxury shoes and accessories business. In addition, certain categories, such as fragrance and eyewear, are produced under licensing agreements. Jimmy Choo's design team is led by Sandra Choi, who has been the Creative Director for the brand since its inception in 1996. Jimmy Choo products are unique, instinctively seductive and chic. The brand offers classic and timeless luxury products, as well as innovative products that are intended to set and lead fashion trends. Jimmy Choo is represented through its global store network, its e-commerce sites, as well as through the most prestigious department and specialty stores worldwide.

**Michael Kors**

Our Michael Kors brand was launched over 40 years ago by Michael Kors, a world-renowned designer, whose vision has taken the Company from its beginnings as an American luxury sportswear house to a global accessories, footwear and ready-to-wear company with a global distribution network that has presence in over 100 countries through Company-operated retail stores and e-commerce sites, leading department stores, specialty stores and select licensing partners. Michael Kors is a highly recognized luxury fashion brand in the Americas and Europe with growing brand awareness in other international markets. Michael Kors features distinctive designs, materials and craftsmanship with a jet-set aesthetic that combines stylish elegance and a sporty attitude. Michael Kors offers three primary collections: the Michael Kors Collection luxury line, the MICHAEL Michael Kors accessible luxury line and the Michael Kors Mens line. The Michael Kors Collection establishes the aesthetic authority of the entire brand and is carried by select retail stores, our e-commerce sites, as well as in the finest luxury department stores in the world. MICHAEL Michael Kors has a strong focus on accessories, in addition to offering footwear and

PX7098-009

ready-to-wear, and addresses the significant demand opportunity in accessible luxury goods. We have also been developing our men's business in recognition of the significant opportunity afforded by the Michael Kors brand's established fashion authority and the expanding men's market. Taken together, our Michael Kors collections target a broad customer base while retaining our premium luxury image.

## Our Segments

We operate in three reportable segments as follows:

- Versace — accounted for approximately 20% of our total revenue in Fiscal 2023 and includes worldwide sales of Versace products through 223 retail stores (including concessions) and e-commerce sites, through 744 wholesale doors (including multi-brand stores), as well as through product and geographic licensing arrangements.

- Jimmy Choo — accounted for approximately 11% of our total revenue in Fiscal 2023 and includes worldwide sales of Jimmy Choo products through 237 retail stores (including concessions) and e-commerce sites, through 527 wholesale doors (including multi-brand stores), as well as through product and geographic licensing arrangements.

- Michael Kors — accounted for approximately 69% of our total revenue in Fiscal 2023 and includes worldwide sales of Michael Kors products through 812 retail stores (including concessions) and e-commerce sites, through 2,843 wholesale doors, as well as through product and geographic licensing arrangements.

In addition to these reportable segments, we have certain corporate costs that are not directly attributable to our brands and, therefore, are not allocated to segments. Such costs primarily include certain administrative, corporate occupancy, shared service and information systems expenses, including Enterprise Resource Planning ("ERP") system implementation costs and Capri transformation program costs. In addition, certain other costs are not allocated to segments, including restructuring and other charges and COVID-19 related charges. The segment structure is consistent with how our chief operating decision maker plans and allocates resources, manages the business and assesses performance. All intercompany revenues are eliminated in consolidation and are not reviewed when evaluating segment performance. For additional financial information regarding our segments and corporate unallocated expenses, see Note 19 to the accompanying consolidated financial statements for additional information.

## Industry

We operate in the global personal luxury goods industry. Through 2019, the personal luxury goods market grew at a mid-single digit rate over the past 20 years, with more recent growth driven by stronger Chinese demand from both international and local consumers and demographic and socioeconomic shifts resulting in younger consumers purchasing more luxury goods. Then, in 2020, due to the impact of the COVID-19 crisis, the personal luxury goods market declined 22%. According to Bain*, the personal luxury goods market returned to 2019 levels in 2021, and grew 15% in constant exchange rates in 2022. The market is predicted to increase at a 5-7% compound annual growth rate between 2022 and 2030. Future growth will be driven by e-commerce, Chinese consumers and younger generations. By 2030, Bain studies estimate that over 30% of personal luxury goods sales will occur online, Chinese consumers will represent approximately 40% of total global personal luxury goods sales and Gen Z and Alpha combined will make up at least one-third of the market. As the personal luxury goods market continues to evolve, Capri is committed to designing exceptional, innovative products that cover the full spectrum of fashion luxury categories. In our view, increased customer engagement and tailoring merchandise to customer shopping and communication preferences are key to growing market share. We believe that our innovative and luxurious product offerings and customer engagement initiatives across all three brands position us to capitalize on the continued growth of the global personal luxury goods industry.

* Bain – Altagamma Luxury Goods Worldwide Market Study, Fall 2022 (November 15, 2022). These studies were prepared by Bain & Company and Altagamma and can be obtained free of charge or at a nominal cost by contacting Bain & Company's media contacts. While we believe that each of these studies and publications is reliable, we have not independently verified market and industry data from third-party sources.

## Geographic Information

We generate revenue globally through our three reportable segments, as described above. We sell our Versace, Jimmy Choo and Michael Kors products through retail and wholesale channels in three principal geographic markets: the Americas (United States, Canada and Latin America), EMEA (Europe, Middle East and Africa) and Asia (Asia and Oceania). We also have wholesale arrangements pursuant to which we sell products to geographic licensees. In addition, we have licensing

PX7098-010

agreements through which we license to third-parties the use of our Versace, Jimmy Choo and Michael Kors brand names and trademarks, certain production rights and sales and/or distribution rights with respect to our brands.

The following table details our revenue by segment and geographic location (in millions):

| | Fiscal Years Ended | | | | | |
| | April 1, 2023 | | April 2, 2022 | | March 27, 2021 | |
|---|---|---|---|---|---|---|
| Versace revenue - the Americas | $ | 408 | $ | 408 | $ | 201 |
| Versace revenue - EMEA | | 468 | | 425 | | 276 |
| Versace revenue - Asia | | 230 | | 255 | | 241 |
| **Total Versace revenue** | | **1,106** | | **1,088** | | **718** |
| Jimmy Choo revenue - the Americas | | 196 | | 175 | | 102 |
| Jimmy Choo revenue - EMEA | | 255 | | 229 | | 146 |
| Jimmy Choo revenue - Asia | | 182 | | 209 | | 170 |
| **Total Jimmy Choo revenue** | | **633** | | **613** | | **418** |
| Michael Kors revenue - the Americas | | 2,616 | | 2,627 | | 1,869 |
| Michael Kors revenue - EMEA | | 819 | | 835 | | 607 |
| Michael Kors revenue - Asia | | 445 | | 491 | | 448 |
| **Total Michael Kors revenue** | | **3,880** | | **3,953** | | **2,924** |
| | | | | | | |
| Total revenue - the Americas | | 3,220 | | 3,210 | | 2,172 |
| Total revenue - EMEA | | 1,542 | | 1,489 | | 1,029 |
| Total revenue - Asia | | 857 | | 955 | | 859 |
| **Total revenue** | $ | **5,619** | $ | **5,654** | $ | **4,060** |

## Competitive Strengths

We believe that the following strengths differentiate us from our competitors:

**Global Fashion Luxury Group Led by a World-Class Management Team and Renowned Designers**. We are a global fashion luxury group, consisting of three iconic brands defined by fashion luxury products with a reputation for world-class design and innovation. The design leadership of our founder-designers Donatella Versace, Sandra Choi and Michael Kors is a unique advantage that we possess. Our founder-led design teams are supported by our senior management team with extensive experience across a broad range of disciplines in the retail industry, including design, sales, marketing, public relations, merchandising, real estate, supply chain and finance. With an average of 26 years of experience in the retail industry, including at a number of public companies, and an average of 19 years of experience with our brands, our senior management team has strong creative and operational experience and a successful track record.

For over 20 years, Donatella Versace has been the Artistic Director, molding Versace's iconic style. A true visionary with an intuition for how to blend fashion, design and culture, Donatella continues to honor the rich and storied Versace heritage founded in 1978, while constantly evolving and adapting the luxury house to ensure the brand's continued relevance. Donatella's most recent collections for Versace are a testament to her bold and fearless design vision that celebrate Versace's Italian heritage and unapologetic glamour. Versace designs have been worn by the world's most famous celebrities and most sought-after super models.

Jimmy Choo's design team is led by Sandra Choi, who has been the Creative Director for the Jimmy Choo brand since its inception in 1996. Jimmy Choo products are glamourous and daring. The Jimmy Choo brand offers classic and timeless luxury products, as well as innovative products that are intended to set and lead fashion trends. Jimmy Choo's products have a strong red carpet presence and are often worn by global celebrities.

The Michael Kors brand was launched over 40 years ago by Michael Kors, a world-renowned designer, who is responsible for conceptualizing and directing the design of our Michael Kors brand products. We believe that the Michael Kors

PX7098-011

brand name has become synonymous with luxurious fashion that is timeless and elegant, expressed through the brand's sophisticated accessories and ready-to-wear collections. Each of our Michael Kors brand collections exemplifies the jet-set lifestyle and features high quality designs, materials and craftsmanship. Michael Kors has received a number of awards, which recognize the contribution he and his team have made to the fashion industry and our Company. Some of the most widely recognized global trendsetters and celebrities wear our Michael Kors brand collections.

**Expertise in the Accessories Category.** We have strong group expertise in accessories. The strength of our Michael Kors luxury collection and our accessible luxury MICHAEL Michael Kors line have allowed us to expand our brand awareness and position Michael Kors as one of the leading global luxury brands in the accessories product categories. Capitalizing on the success of our accessories product category, we continue to further develop the accessories businesses for Jimmy Choo and Versace, bringing our accessories expertise, including our product category knowledge, our merchandising best practices and our substantial group buying power to these brands. Our goal is to increase Versace's women's and men's accessories penetration from 20% of revenues in Fiscal 2023 to 50% of Versace's revenues over time and to increase Jimmy Choo's women's accessories penetration from approximately 20% of revenues in Fiscal 2023 to 30% of Jimmy Choo's revenues over the next few years and to 50% over time.

**Exceptional Retail Store Footprint.** Versace operates in three primary retail formats: boutiques, outlet and e-commerce. We operated 223 Versace retail stores as of April 1, 2023 in some of the most fashionable cities and the most sought-after shopping destinations around the world. During Fiscal 2022, we completed renovations at approximately 50% of our Versace retail stores to incorporate our new store design and have continued with these renovations in Fiscal 2023. Versace's products are distributed worldwide through a global network of highly specialized stores, which average approximately 2,900 gross square feet. In addition, we operate Versace e-commerce sites in the United States, Europe and China (covering 90 countries worldwide).

We operated 237 Jimmy Choo retail stores as of April 1, 2023, in some of the most premier locations worldwide. Jimmy Choo retail stores, comprised of full-price stores and outlets, average approximately 1,400 gross square feet. In addition, we operate Jimmy Choo e-commerce sites in the United States, certain parts of Europe, Japan, China, Australia and Korea.

We operated 812 Michael Kors stores as of April 1, 2023 with four primary retail store formats: collection stores, lifestyle stores, outlet stores and e-commerce sites. Michael Kors collection stores are located in some of the world's most prestigious shopping areas and average approximately 2,900 gross square feet in size. The Michael Kors lifestyle stores are located in some of the world's most frequented metropolitan shopping locations and leading regional shopping centers, and average approximately 2,800 gross square feet in size. We also extend our reach to additional consumer groups through our outlet stores, which average approximately 4,500 gross square feet in size. In addition, we also operate Michael Kors e-commerce sites in North America, China, Japan, South Korea, certain parts of Europe, the Middle East, Africa, Asia Pacific and Oceania.

**World-class Omni and CRM Capabilities.** We have omni-channel capabilities from best-in-class digital platforms to state-of-the-art distribution facilities globally, which we leverage across businesses. As part of our plan to continue to implement omni-channel capabilities throughout our businesses, we have begun leveraging our distribution centers globally to serve multiple brands.

**Strong Relationships with Premier Department Stores**. We partner with leading wholesale customers, such as Macy's, Saks Fifth Avenue, Bloomingdale's and Holt Renfrew in North America, as well as Harrods, Harvey Nichols, Printemps, Selfridges and Galeries Lafayette in Europe. These relationships enable us to access large numbers of our key consumers in a targeted manner. Our "shop-in-shops" have specially trained staff, as well as customized fixtures, wall casings, decorative items, flooring and provide department store consumers with a more personalized shopping experience than traditional retail department store configurations. We have engaged with our wholesale customers on various initiatives and have continued to enter into supply chain partnerships designed to increase the speed at which our luxury fashion products reach the ultimate consumer. We plan to increase Versace's and Jimmy Choo's presence in certain luxury department stores, and for Michael Kors, we continue to optimize deliveries with the intent to drive more full-price sell-through in the wholesale channel.

## Business Strategy

Our goal is to continue to create long-term shareholder value by increasing our revenue and profits and strengthening our global brands. We also believe that sound environmental and social policies are both ethically correct and fiscally responsible. To that end, we are committed to improving the way we work in order to better the world in which we live. We plan to achieve our business strategy by focusing on the following strategic initiatives:

PX7098-012

**Leverage group expertise and capabilities.** We will continue to leverage our group expertise in accessories and footwear to fuel growth across our portfolio of brands, implementing the best practices from our Michael Kors core accessories business to our Versace and Jimmy Choo brands. We will also continue to prioritize the development of our e-commerce platforms and omni-channel capabilities for our brands, leveraging our broad expertise and capabilities in this area. We see a number of opportunities to create long-term operational synergies as we combine our global competencies and footprint. These synergies will be primarily focused on opportunities in our supply chain, information systems, back office support and manufacturing.

**Continue to increase our presence in Asia.** We plan to continue to diversify our group's global footprint with an emphasis on the Asia market, where we believe each of our three brands continue to have the potential to significantly grow market share in the region.

**Continue to execute our strategies to grow Versace.** We plan to grow the Versace business to at least $2 billion in revenues over time. To achieve this goal, we plan to build on Versace's iconic brand codes - Virtus, La Medusa and La Greca. Additionally, we will capitalize on Versace's high brand awareness through bold and engaging consumer communication. We also plan to expand and elevate Versace's distribution by accelerating e-commerce and omni-channel capabilities, increasing our global retail footprint to 300 retail stores and continuing to renovate the remainder of the store fleet. Finally, we plan to leverage our group's expertise to expand Versace's women's and men's accessories to 50% of the brand's revenues over time, while maintaining Versace's authoritative presence in women's and men's ready-to-wear.

**Continue to execute on our strategies to grow Jimmy Choo.** We plan to continue to implement our growth strategies for Jimmy Choo with a goal of reaching $1 billion in revenues over time. Our overarching strategy is rooted in reinforcing the brand's glamorous DNA through consumer experience and communications, as well as through product – from formal to casual, across accessories and footwear. Additionally, we plan to expand Jimmy Choo's distribution by accelerating e-commerce and omni-channel developments and increasing our global retail footprint to 300 retail stores in the most fashionable shopping destinations around the world. We also have a significant opportunity to increase women's accessories to approximately 50% of Jimmy Choo's revenue over time by expanding the breadth of new collections. At the same time, we plan to continue to grow footwear sales by capitalizing on the success of glamour while expanding our fashion active and casual offerings.

**Continue to leverage the strength of Michael Kors, which remains the foundation for our fashion luxury group.** Our goal is to continue to elevate Michael Kors to become a stronger and more profitable brand. We are capitalizing on high brand awareness and consumer engagement by embracing Michael Kors jet set heritage through a modern lens. Reinforcing our highly recognizable brand codes including the MK Signature pattern and MK hardware across all product categories remains a core growth strategy. In accessories, we continue to refresh and celebrate brand icons while evolving styles with newness. Additionally, we plan to grow our men's business by leading with accessories and maximizing our brand codes. Our strategy to enhance customer experience by expanding our omni-channel capabilities also remains a key priority. Finally, we plan to double Michael Kors revenue in Asia over time.

**Execute on our corporate social responsibility strategy.** We strive to foster a future where both people and the planet are cared for, and we believe that ethical business practices and giving back are critical to our success. Our corporate social responsibility (CSR) strategy focuses on four foundational pillars – Our Governance, Our World, Our Community and Our Philanthropy. We continue to take steps to advance our CSR strategy and to support the United Nations Sustainable Development Goals. Our key sustainability goals, our plans for getting there, and an update on the progress we have made can be found in our annual CSR report located at www.capriholdings.com/responsibility. The content on this website and the content in our CSR reports are not incorporated by reference into this Annual Report on Form 10-K or in any other report or document we file with the SEC.

PX7098-013

**Collections and Products**

Our total revenue by major product category is as follows (in millions):

| | Fiscal Years Ended | | | | | |
| | April 1, 2023 | % of Total | April 2, 2022 | % of Total | March 27, 2021 | % of Total |
|---|---|---|---|---|---|---|
| Accessories | $ 2,826 | 50.3% | $ 2,901 | 51.3% | $ 2,158 | 53.2% |
| Footwear | 1,217 | 21.7% | 1,208 | 21.4% | 796 | 19.6% |
| Apparel | 1,107 | 19.7% | 1,027 | 18.2% | 720 | 17.7% |
| Licensed product | 222 | 4.0% | 241 | 4.3% | 185 | 4.6% |
| Licensing revenue | 211 | 3.8% | 212 | 3.7% | 155 | 3.8% |
| Other | 36 | 0.5% | 65 | 1.1% | 46 | 1.1% |
| Total revenue | $ 5,619 | | $ 5,654 | | $ 4,060 | |

### Versace

Versace is one of the leading international fashion design houses, representing the brand's creative vision through a wide range of products. From haute-couture to ready-to-wear, footwear, accessories and home decor, Versace delivers a unique lifestyle that welcomes customers in its elegant yet glamorous universe. Generally, Versace's haute couture retails up to $250,000, ready-to-wear retails from $400 to $23,000, accessories retail from $100 to $6,100 and footwear retail from $400 to $3,300.

Certain product categories, such as Versace Jeans Couture, eyewear, fragrances, jewelry, watches and home furnishings, are produced under product licensing agreements. Swinger SA is the exclusive licensee for Versace Jeans Couture, Luxottica is the exclusive licensee for Versace eyewear, EuroItalia is the exclusive licensee for Versace fragrances, Vertime is the exclusive licensee for Versace watches and Poltrona Frau is the exclusive licensee for Versace home furnishings. Generally, Versace Jeans Couture retail from $45 to $1,500, Versace eyewear retails from $110 to $500, Versace fragrances retail from $38 to $400, Versace watches retail from $420 to $4,000 and Versace home furnishings, which include a variety of products, generally retail from $850 to $100,000.

### Jimmy Choo

Jimmy Choo is a leading global luxury accessories brand and offers a distinctive, glamorous and fashion-forward product range, whose core product offerings are women's luxury shoes, complemented by accessories, including handbags, small leather goods, jewelry, scarves and belts, as well as a men's luxury shoes and accessories business. Generally, Jimmy Choo women's and men's luxury shoes retail from $500 to $5,000 and accessories retail from $200 to $4,500.

Certain product categories, such as Jimmy Choo fragrance and eyewear, are produced under product licensing agreements. Interparfums SA is the exclusive licensee for Jimmy Choo fragrances and makeup and Safilo SpA is the exclusive licensee for Jimmy Choo eyewear. Generally, Jimmy Choo eyewear retail from $250 to $500 and Jimmy Choo fragrances and beauty retail from $50 to $220.

### Michael Kors

Michael Kors has three primary collections that offer accessories, footwear and apparel: Michael Kors Collection, MICHAEL Michael Kors and Michael Kors Mens. The three primary collections and licensed products are offered through our own Michael Kors retail stores and e-commerce businesses, in department stores around the world and by our exclusive licensees to wholesale customers, in addition to select retailers. The Michael Kors Collection is a sophisticated designer collection for women based on a philosophy of essential luxury and pragmatic glamour and includes accessories, primarily handbags and small leather goods, ready-to-wear and footwear. Generally, the Michael Kors Collection women's handbags and small leather goods retail from $300 to $4,000, footwear retails from $300 to $1,500 and ready-to-wear retails from $400 to $9,000. MICHAEL Michael Kors is the accessible luxury collection and offers women's accessories, primarily handbags and small leather goods, as well as footwear and apparel and is carried in all of the Michael Kors lifestyle stores and leading department stores around the world. MICHAEL Michael Kors offers handbags designed to meet the fashion and functional requirements of our broad and diverse consumer base. Generally, MICHAEL Michael Kors handbags retail from $200 to $750, small leather goods retail from $50 to $250, footwear retails from $50 to $300 and apparel retails from $75 to $700. Michael Kors Mens is an innovative collection of men's ready-to-wear, accessories and footwear with a modern American style.

PX7098-014

Michael Kors Mens apparel generally retails from $50 to $1,000, men's accessories generally retail from $50 to $800 and men's footwear generally retails from $150 to $400.

Certain product categories, including watches, jewelry, eyewear and fragrance, are produced under product licensing agreements. Fossil is our exclusive licensee for Michael Kors watches and jewelry, including our Michael Kors ACCESS smartwatches and our fine jewelry line. Luxottica is our exclusive licensee for Michael Kors distinctive eyewear inspired by our collections. The Company transitioned its fragrance business to EuroItalia during Fiscal 2023. Generally, Michael Kors fashion watches retail from $200 to $600, Michael Kors ACCESS smartwatches retail from $250 to $450, Michael Kors jewelry retails from $50 to $500, Michael Kors eyewear retails from $100 to $350 and Michael Kors fragrance and related products generally retail from $30 to $150.

### Advertising and Marketing

Our marketing and advertising programs are designed to build brand awareness for each of our luxury houses as well as highlight our product offerings. We use a 360-degree marketing strategy for each of our brands to deliver a consistent message across each brand's advertising communications, social media, celebrity dressing, special events and direct marketing activities at a national, regional and local level. Our campaigns are increasingly being executed through digital and social media platforms to drive further engagement with younger consumers.

Our brands introduce their new collections annually with fashion shows and other fashion events. These fashion events, in addition to celebrity red carpet dressing moments, generate extensive domestic and international media and social media coverage. The Versace and Michael Kors semi-annual runway shows and Jimmy Choo celebrity placements generate extensive media coverage. Jimmy Choo is also the leading brand in editorial coverage for women's luxury shoes globally.

We believe our renowned brand founders, as well as our high-profile brand ambassadors and well-known social media influencers across our marketing programs help expand brand awareness and drive cultural relevance.

In Fiscal 2023, we recognized approximately $374 million in advertising and marketing expenses globally. We engage in a wide range of integrated marketing programs across various marketing channels, including but not limited to email marketing, print advertising, outdoor advertising, digital marketing, social media, public relations outreach, visual merchandising and partnership marketing, in an effort to engage our existing and potential customer base and ultimately stimulate sales in a consumer-preferred shopping venue.

Our growing e-commerce businesses provide us with an opportunity to increase the size of our customer database and to communicate with our consumers to increase online and physical store sales, as well as to continue to build global brand awareness for our brands. We are continuously improving the functionalities and features on our e-commerce sites to create innovative ways to keep our brands at the forefront of consumers' minds by offering a broad selection of products, including accessories, apparel and footwear. Since e-commerce growth is critical to our overall growth strategy, we plan to accelerate Versace's and Jimmy Choo's e-commerce and omni-channel development and we are also in the process of re-platforming our brands' e-commerce sites to expand our global capabilities. See Item 1A. "Risk Factors" — "If we are unable to effectively execute our e-commerce business and provide a reliable digital experience for our customers, our reputation and operating results may be harmed."

### Manufacturing and Sourcing

We generally contract for the purchase of finished goods principally with independent third-party manufacturing contractors, whereby the manufacturing contractor is generally responsible for the entire manufacturing process, including the purchase of piece goods and trim for our Jimmy Choo and Michael Kors brands. For the Versace brand, some of the piece goods and trim are separately purchased by Versace and provided to the manufacturers, and some are sourced directly by the manufacturers, as further described below.

Versace has a centrally managed production model for the majority of its products, and buys raw materials and components for these products. All raw materials arrive in a central warehouse in Novara, Italy and are distributed to independent third-party manufacturing contractors after the quality control process is complete. The vast majority of Versace's production is located in Italy. The remaining production occurs elsewhere in Europe and a small portion is produced in Asia or North Africa.

Jimmy Choo products are manufactured by independent third-party manufacturing contractors and our Italian atelier and shoe manufacturer. Most of Jimmy Choo's products are produced by specialists in Italy, supported by other factories across

PX7098-015

Europe, with a small portion produced in Asia. Jimmy Choo has a product development facility in Florence. In addition to purchasing finished goods, Jimmy Choo also purchases raw materials for both product development and manufacturing purposes.

Michael Kors contracts for the purchase of finished goods principally with independent third-party manufacturing contractors that are generally responsible for the entire manufacturing process, including the purchase of piece goods and trim. Product manufacturing for the Michael Kors brand is allocated among third-party manufacturing contractors based on their capabilities, the availability of production capacity, pricing and delivery. For certain product categories, Michael Kors also has relationships with various agents who source finished goods with numerous manufacturing contractors on its behalf. This multi-supplier strategy provides specialized skills, scalability, flexibility and speed to market, as well as diversifies risk. In Fiscal 2023 and Fiscal 2022, one third-party buying agent sourced approximately 15% and 14%, respectively, of Michael Kors finished goods purchases, based on dollar volume. Michael Kors' largest manufacturing contractor, who produces its products in Asia and who Michael Kors has worked with for approximately 20 years, accounted for the production of approximately 15% of its finished products, based on dollar volume in Fiscal 2023. Nearly all of our Michael Kors products were produced in Asia in Fiscal 2023.

The manufacturing contractors for our brands operate under the close supervision of our global manufacturing divisions and buying agents located in North America, Europe and Asia. All products are produced according to our specifications. Production staff monitors manufacturing at supplier facilities in order to correct problems prior to shipment of the final product. Quality assurance is focused on as early as possible in the production process, allowing merchandise to be received at the distribution facilities and shipped to customers with minimal interruption. See "Import Restrictions and Other Governmental Regulations" and Item 1A. "Risk Factors" — "We primarily use foreign manufacturing contractors and independent third-party agents to source our finished goods, which poses legal, regulatory, political and economic risks to our business operations."

Our future manufacturing and sourcing strategy includes purchasing luxury manufacturing facilities in Italy to support all of our brands, pursuing manufacturing synergies across brands and securing capacity and improving our expertise in development and delivery. While the fashion design process will remain independently managed by each of our brands, we believe that in-sourcing luxury manufacturing capacity will create synergies and support expansion for our global fashion luxury group.

**Distribution**

Versace owns a central warehouse in Novara, Italy, managed by a third-party, which acts as a global hub for Versace's primary operations. Versace also has a leased warehouse near Novara operated by the same third-party, which serves as a distribution point for other Versace lines. From these warehouses, products are shipped to regional warehouses that are operated by third-parties in New Jersey, Hong Kong, Mainland China and Japan, and supports the Versace retail and e-commerce businesses. E-commerce distribution for the United States market is conducted through third-party providers in New Jersey. Versace's wholesale business is mainly serviced from three central warehouses located in Italy, the United States and Japan.

Jimmy Choo's primary distribution facility is our Company-owned and operated distribution facility in the Netherlands. From there, products are shipped to regional warehouses in the United States, Canada, Mainland China, Hong Kong, South Korea, Japan and United Arab Emirates, largely supporting the Jimmy Choo retail and e-commerce businesses. Shipments to wholesale customers globally are made from the Netherlands and the United States, with some further local fulfillment. All of the distribution facilities utilized by Jimmy Choo are operated by third-parties and are shared with other unaffiliated businesses with the exception of our distribution facility in the Netherlands. This flexible method reinforces the speed and efficiency of the supply chain and allows the business to deliver Jimmy Choo product and collections to market rapidly and in line with the industry's fashion calendar.

Michael Kors' primary distribution facility in the United States is a leased facility in Whittier, California, which is directly operated and services our Michael Kors retail stores, e-commerce site and wholesale operations in the United States. We also engage in omni-channel order fulfillment by filling online orders through our Michael Kors retail stores and through our click-and-collect service offerings. Our primary Michael Kors distribution facility in Europe is our Company-owned and operated distribution facility in the Netherlands, which supports our European operations for our Michael Kors brand, including our European e-commerce sites. We also have a regional Michael Kors distribution center in Canada, which is leased, as well as regional Michael Kors distribution centers in New Jersey, Mainland China, Hong Kong, Japan, South Korea and Taiwan, which are operated by third-parties.

PX7098-016

**Intellectual Property**

We own VERSACE, JIMMY CHOO and MICHAEL KORS trademarks, as well as other material trademarks, copyrights, design and patent rights related to the production, marketing and distribution of our products, both in the United States and in other countries in which our products are principally sold. We also have applications pending for a variety of related trademarks, copyrights, designs and patents in various countries throughout the world. As the worldwide usage of our material trademarks, copyrights, designs and patents continue to expand, we continue to strategically apply to register them in key countries where they are used. We expect that our material intellectual property will remain in full force and effect for as long as we continue to use and renew them.

We aggressively police our intellectual property and pursue infringers both domestically and internationally. In addition, we pursue counterfeiters in the United States, Europe, the Middle East, Asia and elsewhere in the world in both online and offline channels, working with our network of customs authorities, law enforcement, legal representatives and brand specialists around the world as well as involvement with industry associations and anti-counterfeiting organizations.

**Information Systems**

Each of our three brands currently operate using certain legacy systems for finance and accounting, supply chain, inventory control, point-of-sale transactions, store replenishment and other functions. Our long-term strategy includes consolidating certain systems across our brands over time to create operational efficiencies. During Fiscal 2020, we embarked on a multi-year ERP implementation to conform various processes onto one global system that would support certain finance, accounting and operational functions. The implementation of the ERP requires a significant investment in human and financial resources. As a result of COVID-19 and our need to significantly reduce our capital expenditures, we temporarily suspended our ERP project. Certain phases of the project have resumed as of the fourth quarter of Fiscal 2021 and portions of our global ERP system are live in Fiscal 2023.  See Item 1A. "Risk Factors" — "A material delay or disruption in our information technology systems or e-commerce websites or our failure or inability to upgrade our information technology systems precisely and efficiently could have a material adverse effect on our business, results of operations and financial condition."

**Human Capital Management**

At Capri Holdings, we strive to create workplaces where our employees and the workers across our supply chain thrive. Through our benefits and compensation packages, learning and development programs, focus on diversity and inclusion, employee engagement, wellness and safety programs and supply chain empowerment initiatives, we continue to make significant investments in our Capri community.

**Governance and Oversight.** Our Board of Directors has delegated oversight of matters relating to human capital management, including compensation, learning and development and diversity and inclusion to our Compensation and Talent Committee. Our Compensation and Talent Committee receives regular updates on our talent development strategies and other applicable areas of human capital management.

**Employee Profile.** At the end of Fiscal 2023, 2022 and 2021, we had approximately 15,500, 14,600 and 13,800 total employees, respectively. As of April 1, 2023, we had approximately 10,400 full-time employees and approximately 5,100 part-time employees. Approximately 11,500 of our employees were engaged in retail selling and administrative positions and our remaining employees were engaged in other aspects of our business as of April 1, 2023. As of April 1, 2023, we have approximately 2,900 employees covered by collective bargaining agreements in certain European countries. We consider our relations with both our union and non-union employees to be good.

**Benefits and Compensation.** We maintain comprehensive benefits and compensation packages to attract, retain and recognize our employees. Our health and welfare benefit program is designed to provide a wide range of benefits to meet the health care, financial, work/life and mental wellbeing needs of eligible employees. Benefits include, among others, medical, dental and vision plans, life insurance, short and long-term disability coverage, retirement plans (with matching contributions where applicable), paid parental leave for all parents, gender reassignment coverage and fertility support benefits in the United States, and a wellness program focused on mental wellbeing, including several digital therapeutic programs to assist with therapy, anxiety and worry and sleep. We also offer employees paid time off, including to volunteer with select charitable organization. Employees are also entitled to discounts on our merchandise.

**Learning and Development.** We honor our employees through our dedication to development and believe that enabling opportunity means ensuring our teams have the skills they need to build fulfilling careers with us. We promote employee performance with personalized development plans and by providing individualized feedback at regular intervals throughout the

15

year, and all employees participant in a formal performance review process annually. We continue to refresh our learning and development programming by offering targeted skill-building for employees at all stages of their career. During Fiscal 2023, we launched our first learning management system, Capri FLEX, and we continue to offer quality training touchpoints to employees throughout our global organization, including programs around compliance, ethics and integrity, promoting respect in the workplace, global cybersecurity practices, and supply chain transparency as well as a mandatory three-party diversity and inclusion ("D&I") curriculum. We also deployed a new leadership development program focused on building and understanding emotional intelligence in our leaders.

**Diversity and Inclusion.**  Diversity and inclusion are embedded in our DNA. We foster an inclusive environment where employees, vendors and customers of diverse backgrounds are respected, valued and celebrated. We are proud of our commitment to diversity, equality and inclusion, and will continue to advance these principles through meaningful short and long term actions across the globe.

Our commitment to diversity and inclusion is supported by three pillars:

*Capri Culture* - Our commitment to diversity extends beyond representation. We aim to build an inclusive space where all employees have the opportunity to realize their full potential and excel, while contributing to our success in a meaningful way.

*Capri Talent* - Differences in ideas and experiences allow our Company to thrive. We are attracting, advancing and advocating for a workforce that reflects the diversity of the world around us.

*Capri Community* - Through diversity and inclusion comes understanding and strength. Our responsibility to promote equality is not just to those who work with us, but to our industry, the customers we serve and the communities around us.

We have a Global Diversity & Inclusion Council comprised of diverse leaders across all brands and regions. The Global D&I Council works closely with senior leadership to ensure alignment of short-and long-term diversity and inclusion goals with Capri's overall business strategy, provides governance and oversight on diversity and inclusion efforts across our brands, and promotes company-wide communication on progress. We have a number of employee resource groups ("ERGs") to provide support for those employees who self-identify with a particular group, including Pride@Capri, BOLD@Capri", Black Organizers, Leaders and Doers, an Asian and Pacific Islander ERG and a women's network ERG, and we utilize global D&I listening sessions, regular D&I newsletters and communications and keynote speakers to further embed inclusion in our workplace. We are committed to recruiting, developing and retaining passionate, skilled and diverse talent. We launched a new mentorship program during the fiscal year and we educate recruiters and hiring managers to mitigate the impact of unconscious bias during the interview process. We are also a proud partner with a wide array of organizations and pledges in furtherance of driving equality and have a received a number of awards and accolades in the area of D&I.

Through The Capri Holdings Foundation for the Advancement in Diversity in Fashion, we are also driving diversity, inclusion and equality throughout the fashion industry by working collaboratively with colleges and high schools to create meaningful opportunities in fashion for underrepresented communities through scholarship programs in partnership with the Fashion Institute of Technology (FIT), Howard University, PENSOLE Academy and Central Saint Martins – University of the Arts London. Over the next few years, the Foundation will fund scholarships for nearly 100 students from historically underrepresented communities pursuing degrees in fashion and merchandising across these four educational institutions.

**Employee Engagement, Well-being and Safety**. Enhancing our employee experience has always been an integral part of our strategy and checking in with one another is a key part of our employee engagement program. We believe two-way communication, feedback and continuous improvement drive progress within our group and our brands. In Fiscal 2023, we expanded our employee listening approach and surveyed all global employees to better understand our company's strengths and opportunities, and to ensure that the Capri employee experience is both highly engaging and inclusive. We are proud to have been certified in the U.S. as a Great Place to Work® in 2022 – an accolade that we believe is a testament to our culture of empowerment, inclusion and growth. Michael Kors was also recently certified as a Great Place to Work® in the U.K.

Everyone working on behalf of our Company is entitled to work in a safe environment while maintaining their health and well-being. Capri's global safe workplace program, which includes employee traveler and emergency response alerts, raises awareness and provides safety resources tailored for workers in different work environments – from our distribution centers to our retail stores. Throughout the fiscal year, we continued to assess evolving health and safety guidance related to COVID-19 and tailored our practices and protocols for different workplaces. We also provided a range of resources and benefits to our employees throughout the pandemic, from remote and flexible workplace arrangements to grocery deliveries during lock-down and expanded mental health benefits through our *Thrive* global wellness program, designed to inspire employees to improve

PX7098-018

their physical, emotional and financial well-being. While we have welcomed employees back to work, we continue to explore flexible work options and have implemented a hybrid working environment.

**Supply Chain Empowerment.** Our community extends beyond our direct employees and our corporate social responsibility program drives us toward greater engagement with our suppliers. We are dedicated to conducting our operations throughout the world on principles of ethical business practice and recognition of the dignity of workers. Through our Code of Conduct for Business Partners and Factory Social Compliance Program, we partner with our suppliers on important human rights, health and safety, environmental and compliance issues. Our goal is to establish and implement supply chain empowerment programs for key supply chain partners in line with the UN Framework for Corporate Action on Workplace Women's Health and Empowerment by 2025. We are also signatory to the UN Women's Empowerment Principles, we partnered with the Fashion Makes Change campaign to support the empowerment and education of women in the fashion supply chain, and we recently joined Empower@Work, a platform that serves to catalyze collective action at scale for the benefit of the women workers and gender equality in global supply chains. Beginning in 2023, we are committed to implementing workplace trainings at strategic partner facilities and leveraging the organization's industry-wide and data-driven solutions to positively impact a greater number of women workers within our value chain.

## Competition

We face intense competition in the product lines and markets in which we operate from both existing and new competitors. Our products compete with other branded products within their product category. In varying degrees, depending on the product category involved, we compete on the basis of style, price, customer service, quality, brand prestige and recognition, among others. In our wholesale business, we compete with numerous manufacturers, importers and distributors of products like ours for the limited space available for product display. Moreover, the general availability of manufacturing contractors allows new entrants easy access to the markets in which we compete, which may increase the number of our competitors and adversely affect our competitive position and our business. We believe, however, that we have significant competitive advantages because of the recognition of our brands and the acceptance of our brands by consumers. See Item 1A. "Risk Factors" — "The markets in which we operate are highly competitive, both within North America and internationally, and increased competition based on a number of factors could cause our profitability and/or gross margins to decline."

## Seasonality

We experience certain effects of seasonality with respect to our business. We generally experience greater sales during our third fiscal quarter, primarily driven by holiday season sales, and the lowest sales during our first fiscal quarter.

## Import Restrictions and Other Governmental Regulations

Virtually all of our imported products are subject to duties which may impact the costs of such products. In addition, countries to which we ship our products may impose safeguard quotas to limit the quantity of products that may be imported. We utilize free trade agreements and other supply chain initiatives in order to maximize efficiencies and cost savings relating to product importation. For example, we have historically received benefits from duty-free imports on certain products from certain countries pursuant to the United States. Generalized System of Preferences ("GSP") program. The GSP program expired on December 31, 2020. If the GSP program is not renewed or otherwise made retroactive, we will continue to experience significant additional duties and our gross margin will continue to be negatively impacted. Additionally, we are subject to government regulations relating to importation activities, including the United States. Customs and Border Protection ("CBP") withhold release orders. The imposition of taxes, duties and quotas, the withdrawal from or material modification to trade agreements and/or if CBP detains shipments of our goods pursuant to a withhold release order could have a material adverse effect on our business, results of operations and financial condition. If additional tariffs or trade restrictions are implemented by the United States or other countries, the cost of our products could increase which could adversely affect our results of operations and financial condition. Additionally, we are subject to government regulations relating to product labeling, testing and safety. We maintain a global customs and product compliance organization to help manage our import and related regulatory activity.

## Corporate Social Responsibility ("CSR")

Our CSR strategy focuses on four foundational pillars:

- **Our Governance** – We believe responsible business practices start from the top, and we recognize the increasing importance of ESG matters to our business and our stakeholders. Our sustainability governance model ensures our

PX7098-019

Board of Directors, executive team and brands are aligned on the most important sustainability risks and opportunities for Capri.

•   **Our World** – We believe that the success of our Company is directly linked to the sustainability of the world around us. Our brands strive to create the highest quality luxury products with longevity and sustainability in mind. We endeavor to operate responsibly in order to lower our impact on the planet and to promote industry-wide environmental change.

•   **Our Community** – We believe we have a responsibility to those who work with us. Our Company strives to create inclusive workplaces where all of our employees are empowered and respected. We are committed to creating meaningful opportunities for our diverse Capri community to grow.

•   **Our Philanthropy** – Giving back is embedded in Capri's culture. We remain steadfast in our commitment to support our philanthropic partners and to drive positive change in the communities where we live and work.

Within each of our four foundational pillars are key CSR focus areas that guide our work in support of the United Nations Sustainable Development Goals (SDGs).

We believe responsible business practices start from the top. Our sustainability governance model includes a multi-level structure to ensure our Board of Directors, executive management team and business leaders across our brands are aligned on the most important environmental, social and governance ("ESG") risks and opportunities for Capri. The Board has delegated oversight of ESG activities to the Governance, Nominating and CSR Committee (the "Governance Committee"). On at least an annual basis, our sustainability goals and action plans are presented to the Governance Committee for review and approval, along with CSR progress updates which are generally presented quarterly. The full Board of Directors regularly receives ESG updates from the Governance Committee and reviews our annual CSR reporting. The Board's Audit Committee also assesses ESG risks as part of its overall enterprise risk management review, and the Board's Compensation and Talent Committee considers performance against individualized ESG goals in making executive compensation decisions.

In fiscal 2023, we conducted our latest materiality assessment with the goal of identifying and prioritizing the most relevant ESG topics to our business and our stakeholders. The results of this materiality assessment helped to reinforce our CSR strategy and inform our reporting. We are committed to regular public reporting of our ESG risks and opportunities and the progress we are making toward our CSR goals.

Additional information can be found at www.capriholdings.com/responsibility. The content on this website and the content in our CSR reports are not incorporated by reference into this Annual Report on Form 10-K or in any other report or document we file with the SEC.

**Available Information**

Our investor website can be accessed at www.capriholdings.com. The content of our website is not incorporated by reference into this Annual Report on Form 10-K. Our Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q and Current Reports on Form 8-K filed with or furnished to the SEC pursuant to Section 13(a) or Section 15(d) of the Securities Exchange Act of 1934, as amended, are available free of charge on our website under the caption "Financials" and then "SEC Filings" promptly after we electronically file such materials with, or furnish such materials to, the SEC. No information contained on our website is intended to be included as part of, or incorporated by reference into, this Annual Report on Form 10-K. Information relating to corporate governance at our Company, including our Corporate Governance Guidelines, our Code of Business Conduct and Ethics for all directors, officers, and employees, and information concerning our directors, Committees of the Board, including Committee charters, and transactions in Company securities by directors and executive officers, is available at our website under the captions "Governance" and "Financials" and then "SEC Filings." Paper copies of these filings and corporate governance documents are available to shareholders free of charge by written request to Investor Relations, Capri Holdings Limited, 90 Whitfield Street, 2nd Floor, London, United Kingdom, W1T 4EZ. Documents filed with the SEC are also available on the SEC's website at www.sec.gov.

PX7098-020

**Item 1A. Risk Factors**

You should carefully read this entire report, including, without limitation, the following risk factors and the section of this annual report entitled "Note Regarding Forward-Looking Statements." Any of the following factors could materially adversely affect our business, results of operations and financial condition. Additional risks and uncertainties not currently known to us or that we currently view as immaterial may also materially adversely affect our business, results of operations and financial condition. Risks are listed in the categories where they primarily apply, but other categories may also apply.

## Risks Related to Macroeconomic Conditions

***The accessories, footwear and apparel industries are heavily influenced by general macroeconomic cycles that affect consumer spending and a prolonged period of depressed consumer spending could have a material adverse effect on our business, results of operations and financial condition.***

Global economic conditions and the related impact on levels of consumer spending worldwide have impacted, and are likely to continue to impact, our business and the accessories, footwear and apparel industry overall. Inflation, rising interest rates, higher fuel and energy costs and commodity prices, reductions in net worth based on market declines and uncertainty, home prices, credit availability and consumer debt levels, concerns of a global banking crisis, political instability due to war or other geopolitical factors and other macroeconomic pressures and general uncertainty regarding the overall future economic environment have led to recession fears and are creating a challenging retail environment. Purchases of discretionary luxury items, such as the accessories, footwear and apparel that we produce, tend to decline when disposable income is lower or when there are recessions, inflationary pressures or other economic uncertainty. Other factors that could depress consumer spending include extreme weather conditions and natural disasters, pandemics (like COVID-19), high levels of unemployment, fluctuating foreign currency rates and increased taxation. Reduced consumer confidence and adversely impacted consumer spending patterns in any of the regions in which we operate could adversely affect our business, results of operations and financial condition.

***The COVID-19 pandemic may continue to adversely affect our business and results of operations.***

The COVID-19 pandemic caused significant disruption to the global economy, consumer spending and behavior, tourism and to financial markets and negatively impacted our business. While the overall COVID-19 situation appears to be improving, our business and operating results may be negatively impacted by COVID-19 again in the future if the virus worsens or if regions or countries where we operate reinstate extended lock-downs and/or implement travel restrictions. Long term store closure requirements and/or other operational restrictions placed on our business or the business of our wholesale customers or supply chain partners as a result of COVID-19 could materially impact or disrupt our business and limit our ability to fully operate in the ordinary course, which could materially impact our financial results.

## Risks Related to Our Business

***We may not be able to respond to changing fashion and retail trends in a timely manner, which could have a material adverse effect on our brands, business, results of operations and financial condition.***

The accessories, footwear and apparel industries have historically been subject to rapidly changing fashion trends and consumer preferences. We believe that our success is largely dependent on the images of our brands and ability to anticipate and respond promptly to changing consumer demands and fashion trends in the design, styling, sustainability production, merchandising and pricing of products. Any misstep in product quality or design, executive leadership, customer services, unfavorable publicity or excessive product discounting could negatively affect the image or our brands with our customers. If we do not correctly gauge consumer needs and fashion trends and respond appropriately, consumers may not purchase our products and our brand names and the images of our brands may be impaired. Even if we react appropriately to changes in fashion trends and consumer preferences, consumers may consider our brands to be outdated or associate our brands with styles that are no longer popular or trend-setting. We have also increased the price of our products. There can be no guarantee that consumers will accept these price increases. Any of these outcomes could have a material adverse effect on our brands, business, results of operations and financial condition.

PX7098-021

*The markets in which we operate are highly competitive, both within North America and internationally, and increased competition based on a number of factors could cause our profitability and/or gross margins to decline.*

Our brands face intense competition from other accessories, footwear and apparel producers and retailers, including, primarily European and American international luxury brands. In addition, we face competition through third-party distribution channels that sell our merchandise, such as e-commerce, department stores and specialty stores. Competition is based on a number of factors, including, without limitation, the following:

- anticipating and responding to changing consumer demands in a timely manner;
- establishing and maintaining favorable brand name recognition;
- determining and maintaining product quality;
- retaining key employees;
- maintaining and growing market share;
- developing quality and differentiated products that appeal to consumers;
- establishing and maintaining acceptable relationships with retail customers;
- pricing products appropriately;
- providing appropriate service and support to retailers;
- optimizing retail and supply chain capabilities;
- determining size and location of retail and department store selling space; and
- protecting intellectual property.

In addition, some of our competitors may be significantly larger and more diversified than us and may have significantly greater financial, technological, manufacturing, sales, marketing and distribution resources than we do. Their capabilities in these areas may enable them to better withstand periodic downturns in the accessories, footwear and apparel industries (including as a result of recent inflationary pressures and other macroeconomic factors), compete more effectively on the basis of price and production and more quickly develop new products. The general availability of manufacturing contractors and agents also allows new entrants easy access to the markets in which we compete, which may increase the number of our competitors and adversely affect our competitive position and our business. Any increased competition, or our failure to adequately address any of these competitive factors, could result in reduced revenues, which could adversely affect our business, results of operations and financial condition.

Competition, along with other factors such as consolidation, changes in consumer spending patterns and a highly promotional retail selling environment, could also result in significant pricing pressure. These factors may cause us to reduce our sales prices to our wholesale customers and retail consumers, which could cause our gross margins to decline if we are unable to appropriately manage inventory levels and/or otherwise offset price reductions with comparable reductions in our operating costs. If our sales prices decline and we fail to sufficiently reduce our product costs or operating expenses, our profitability may decline, which could have a material adverse effect on our business, results of operations and financial condition.

*Our business could suffer as a result of reductions in our wholesale channel and/or consolidations, liquidations, restructurings and other ownership changes by our wholesale partners.*

We have experienced and may continue to experience a decline in sales in our wholesale channel. Reductions in the amount of merchandise purchased from us by our wholesale partners or an increase in order cancellations by our wholesale partners could further reduce our revenues and have a material adverse effect on our profitability. In addition, many of our wholesale customers have experienced, and may continue to experience, liquidity constraints or other financial difficulties. These challenges could lead to the need to extend payment terms, larger outstanding accounts receivable balances, delays in collection of accounts receivable, increased expenses associated with collection efforts, increases in excess inventory, increases in credit losses and reduced cash flows.

The retail industry has also experienced a great deal of consolidation and other ownership changes over the past several years and a number of wholesale accounts were forced to file bankruptcy or undergo restructurings. We expect that the risk of consolidation, bankruptcy, restructurings or reorganizations by department stores and other retailers will continue to exist for the foreseeable future. This could result in store closings by our wholesale customers, which would decrease the number of stores carrying our products, while the remaining stores may purchase a smaller amount of our products and/or may reduce the retail floor space designated for our brands. In addition, such consolidation, bankruptcy or other changes with respect to our

PX7098-022

wholesale customers could decrease our opportunities in the market, increase our reliance on a smaller number of large wholesale customers and decrease our negotiating strength with our wholesale customers, which could have a material adverse effect on our business, results of operations and financial condition.

Additionally, certain of our wholesale customers, particularly those located in the United States, have become highly promotional and have aggressively marked down their merchandise. We expect that such markdowns may continue to be exacerbated because of the current macroeconomic environment. Such promotional activity could negatively impact our business.

***We face risks associated with operating globally.***

We operate on a global basis, with approximately 47% of our total revenue from operations outside of the United States during Fiscal 2023. As a result, we are subject to the risks of doing business internationally, including:

- political or civil unrest, including protests and other civil disruption;
- unforeseen public health crises, such as pandemic and epidemic diseases, including COVID-19 and any variants thereof;
- economic instability and unsettled regional and global conflicts (such as the current war in Ukraine), which may negatively affect consumer spending by foreign tourists and local consumers in the various regions where we operate;
- laws, regulations and policies of foreign governments (including sanctions and retaliatory actions by the United States, European Union and others);
- potential negative consequences from changes in taxation policies;
- natural disasters or other extreme weather events, including those attributed to climate change; and
- acts of terrorism, military actions or other conditions over which we have no control.

In addition, we pursue selective international expansion in a number of countries around the world and through a number of channels. If our international expansion plans are unsuccessful, it could have a material adverse effect on our business, results of operations and financial condition. There are also some countries where we do not yet have significant operating experience, and in most of these countries we face established competitors with significantly more operating experience in those locations.

We also sell our products at varying retail price points based on geographic location that yield different gross profit margins and we achieve different operating profit margins, depending on geographic region, due to a variety of factors including product mix, store size, occupancy costs, labor costs and retail pricing. Changes in any one or more of these factors could result in lower revenues, increased costs, and negatively impact our business, results of operations and financial condition. Furthermore, consumer demand and behavior, as well as tastes and purchasing trends may differ in these countries and, as a result, sales of our product may not be successful, or the gross margins on those sales may not be in line with those we currently anticipate.

There can be no assurance that any or all of these events will not have a material adverse effect on our business, results of operations and financial condition.

***Our retail stores are heavily dependent on the ability and desire of consumers to travel and shop and a decline in consumer traffic could have a negative effect on our comparable store sales and store profitability resulting in impairment charges, which could have a material adverse effect on our business, results of operations and financial condition.***

Reduced travel resulting from economic conditions (including a recession or inflationary pressures), fuel shortages, increased fuel prices, travel restrictions, travel concerns and other circumstances, including adverse weather conditions, disease pandemics (including COVID-19), epidemics and other health-related concerns, war, terrorist attacks or the perceived threat of war or terrorist attacks, or unsettled regional and global conflicts (such as the current war in Ukraine) could have a material adverse effect on us, particularly if such events impact our customers' desire to travel to our retail stores.

In addition, other factors that could impact consumer traffic at our retail stores include: (i) the location of the mall or the location of a particular store within the mall; (ii) the other tenants occupying space at the mall; (iii) vacancies or extended store closures within the mall; (iv) increased competition in areas where the malls are located; (v) the amount of advertising and promotional dollars spent on attracting consumers to the malls; and (vi) a shift toward online shopping. A decline in consumer

PX7098-023

traffic could have a negative effect on our comparable store sales and/or average sales per square foot and store profitability. If our retail stores underperform due to declining consumer traffic or otherwise and our expected future cash flows of the related underlying retail store asset do not exceed such asset's carrying value, we may incur store impairment charges. A decline in future comparable store sales and/or store profitability or failure to meet market expectations or the occurrence of impairment charges relating to our retail store fleet could have a material adverse effect on our business, results of operations and financial condition.

***If we are unable to effectively execute our e-commerce business strategy and provide a reliable digital experience for our customers, our reputation and operating results may be harmed.***

E-commerce represents approximately 18% of our net revenues and has been our fastest growing business over the last several years. The success of our e-commerce business depends, in part, on third-parties and factors over which we have limited control, including changing consumer preferences and buying trends relating to e-commerce usage, both domestically and abroad, and promotional or other advertising initiatives employed by our wholesale customers or other third-parties on their e-commerce sites. Any failure on our part, or on the part of our third-party digital partners, to provide attractive, reliable, secure, efficient and user-friendly e-commerce platforms could negatively impact our consumers' shopping experience, resulting in reduced website traffic, reduced conversion, diminished loyalty to our brands and lost sales. In addition, if there is a change in consumer behavior such that customers shift to utilizing e-commerce more than, or even instead, of traditional brick-and-mortar stores, and we or our wholesale partners are unable to attract consumers who previously made in-store purchases to our digital commerce channels, our financial and operating results may be negatively affected.

The success of our business also depends on our ability to continue to develop and maintain a reliable digital experience for our customers. We strive to give our customers a seamless omni-channel experience both in stores and through digital technologies, such as computers, mobile phones, tablets and other devices. We also use social media to interact with our customers and enhance their shopping experience. Our inability to develop and continuously improve our digital brand engagement could negatively affect our ability to compete with other brands, which could adversely impact our business, results of operations and financial condition.

In addition, we must keep current with competitive technology trends, including the use of new or improved technology and services, creative user interfaces and other e-commerce marketing tools such as paid search and mobile applications, among others. Since e-commerce growth is critical to our overall growth strategy, we plan to accelerate our e-commerce and omni-channel development and we are also in the process of re-platforming our brands' e-commerce sites to expand our global capabilities. Implementing new or improved digital systems, services or technologies, such as new or improved e-commerce platforms, may increase our costs, cause delays in or hinder our ability to continually deliver a reliable or seamless digital experience for our customers, or cause us not to succeed in increasing sales or attracting consumers. Our failure to successfully respond to these risks and uncertainties might adversely affect the sales in our e-commerce business, as well as damage our reputation and brands.

Additionally, the success of our e-commerce business and the satisfaction of our consumers depend on their timely receipt of our products. The efficient flow of our products requires that our company-operated and third-party operated distribution facilities have adequate capacity to support the current level of e-commerce operations as well as any anticipated increased levels that may follow from the growth of our e-commerce business. Transportation shortages, labor shortages and port congestion as well as disruptions in factory production in certain countries where we source our products may delay inventory orders and impact product availability in our channels, including our e-commerce sites, which could result in customer dissatisfaction, and have an adverse effect on our business and harm our reputation.

***The departure of key employees or our failure to attract and retain qualified personnel could have a material adverse effect on our business.***

We depend on the services and management experience of executive officers who have substantial experience and expertise in our business as well as key employees involved in our design and marketing operations, including our creative officers for each of our brands, Ms. Donatella Versace, Ms. Sandra Choi and Mr. Michael Kors. Although we have entered into employment agreements with our executive officers and other key employees, we may not be able to retain the services of such individuals in the future, which may be disruptive to, or cause uncertainty in, our business and future strategic direction, particularly if we fail to ensure a smooth transition and effective transfer of knowledge. Any such disruption or uncertainty could generate a negative public perception and/or have a material adverse impact on our results of operations, financial condition, and the market price of our ordinary shares.

PX7098-024

Competition for qualified personnel in the fashion industry is intense and turnover in the industry for retail associates is generally high. Competitors may use aggressive tactics to recruit our employees. Our ability to attract, develop, motivate and retain employees is influenced by our ability to offer competitive compensation and benefits, employee morale, our reputation, recruitment by other employers, perceived internal opportunities, non-competition and non-solicitation agreements and macro unemployment rates. Additionally, our ability to meet our labor needs while also controlling costs is subject to external factors such as unemployment levels, prevailing wage rates, minimum wage legislation and overtime regulations. If we are unable to attract, develop, motivate and retain talented employees with the necessary skills and experience, or if changes to our organizational structure, operating results or business model adversely affect morale, hiring and/or retention, we may not achieve our objectives and our results of operations could be adversely impacted.

***Our business is subject to risks inherent in global sourcing activities, including disruptions or delays in manufacturing or shipments.***

As a company engaged in sourcing on a global scale, we are subject to the risks inherent in such activities, including, but not limited to:

- disease pandemics, epidemics and health-related concerns, including related to COVID-19 or variants thereof;
- political or labor instability, labor shortages (stemming from labor disputes or otherwise), or increases in costs of labor or production in countries where manufacturing contractors and suppliers are located;
- labor disputes or strikes at the location of the source of our goods and/or at ports of entry;
- disruptions, delays or reductions in shipments, including port delays and congestion, and/or capacity constraints on transportation of goods or at our factories due to COVID-19 or otherwise;
- significant increase in freight, shipping and other logistics costs, including as a result of disruptions at ports of entry;
- political or military conflict (such as the current war in Ukraine);
- heightened terrorism security concerns;
- a significant decrease in availability or an increase in the cost of raw materials, including sustainable materials, or other limitations on our ability to use raw materials or goods produced in a country that is a major provider due to political, human rights, labor, environmental or other concerns;
- the migration and development of manufacturing contractors;
- product quality issues;
- imposition of regulations, quotas and safeguards relating to imports and our ability to adjust in a timely manner to changes in trade regulations;
- increases in the costs of fuel (including volatility in the price of oil), travel and transportation (including vessel and freight);
- imposition of duties, taxes and other charges on imports;
- significant fluctuation of the value of the United States dollar against foreign currencies;
- restrictions on transfers of funds out of countries where our foreign licensees are located;
- compliance by our independent manufacturers and suppliers with our Supplier Code of Conduct and other applicable compliance policies;
- compliance with United States laws regarding the identification and reporting on the use of "conflict minerals" sourced from the Democratic Republic of the Congo in the Company's products and the United States Foreign Corrupt Practices Act, U.K. Bribery Act and other global anti-corruption laws, as applicable; and
- regulation or prohibition of the transaction of business with specific individuals or entities and their affiliates or goods manufactured in certain regions, such as the listing of a person or entity as a SDN (Specially Designated Nationals and Blocked Persons) by the United States Department of the Treasury's Office of Foreign Assets Control and the issuance of withhold release orders by CBP.

Any of the foregoing could materially and adversely affect our ability to produce or deliver our products and, as a result, have a material adverse effect on our business, financial condition and results of operations.

PX7098-025

***Our business may be subject to increased costs and a decline in profitability as a result of increasing pressure on margins if we misjudge the demand for our products.***

Our industry is subject to significant pricing pressure caused by many factors, including intense competition and a highly promotional environment, fragmentation in the retail industry, pressure from retailers to reduce the costs of products, and changes in consumer spending patterns. If we misjudge the market for our products or demand for our products is impacted by other factors, such as inflationary pressures, political instability or COVID-19, we may be faced with significant excess inventories for some products and missed opportunities for other products. We have in the past been, and may in the future be, forced to rely on donation, markdowns, promotional sales or other write-offs, to dispose of excess, slow-moving inventory, which may negatively impact our gross margin, overall profitability and efficacy of our brands. In addition, increases in our costs, such as raw materials, labor or freight, could negatively impact our gross margin, and we may not be able to offset such cost increases through pricing measures or other means.

***The long-term growth of our business depends on the successful execution of our strategic initiatives.***

As part of our long-term strategy, we intend to grow our market share and revenue through the following initiatives:

- trendsetting and innovative product offerings;
- increased brand engagement;
- optimizing customer experience;
- investing in technology; and
- expanding our global presence.

We also intend to support the growth of Versace and Jimmy Choo sales through retail store openings and further developing each brand's e-commerce and omni-channel presence, as well as expanding into the luxury accessories market. We cannot guarantee that we will be able to successfully execute on these strategic initiatives.

If we are unable to execute on our strategic initiatives, our business, results of operations and financial condition could be materially adversely affected.

***Our current and future licensing and joint venture arrangements may not be successful and may make us susceptible to the actions of third-parties over whom we have limited control.***

We have entered into a select number of product licensing agreements with companies that produce and sell, under our trademarks, products requiring specialized expertise. We have also entered into a number of select licensing agreements pursuant to which we have granted third-parties certain rights to distribute and sell our products in certain geographical areas and have a number of joint ventures. In the future, we may enter into additional licensing and/or joint venture arrangements. Although we take steps to carefully select our partners, such arrangements may not be successful. Our partners may fail to fulfill their obligations under these agreements or have interests that differ from or conflict with our own, such as the timing of new store openings, the pricing of our products and the offering of competitive products. In addition, the risks applicable to the business of our partners may be different than the risks applicable to our business, including risks associated with each such partner's ability to:

- obtain capital;
- exercise operational and financial control over its business;
- manage its labor relations;
- maintain relationships with suppliers;
- manage its credit and bankruptcy risks; and
- maintain customer relationships.

In addition, the geographic areas subject to our licensing agreements could be impacted by geopolitical risks. Any of the foregoing risks, or the inability of any of our partners to successfully market our products or otherwise conduct its business, may result in loss of revenue and competitive harm to our operations in regions or product categories where we have entered into such licensing arrangements.

PX7098-026

We rely on our partners to preserve the value of our brands. Although we attempt to protect our brands through, among other things, approval rights over store location and design, product design, production quality, packaging, merchandising, distribution, advertising and promotion of our stores and products, we may not be able to control the use by our partners of our brand. The misuse of our brand by a licensing or joint venture partner could have a material adverse effect on our business, results of operations and financial condition.

***Acquisitions may not achieve intended benefits and may not be successfully integrated.***

One component of our growth strategy has historically been acquisitions. Acquisitions are not currently contemplated in the Company's capital allocation priorities, however, we may in the future evaluate and consider other strategic investments or acquisitions. Acquisitions involve various inherent risks and the benefits, cost savings and synergies sought may not be realized. The potential difficulties that we may face that could cause the results of our acquisitions to not be in line with our expectations include, among others:

- failure to implement our business plan for the combined business or to achieve anticipated revenue or profitability targets;
- delays or difficulties in completing the integration of acquired companies or assets;
- higher than expected costs, lower than expected cost savings and/or a need to allocate resources to manage unexpected operating difficulties;
- unanticipated issues in integrating logistics, information and other systems;
- unanticipated changes in applicable laws and regulations;
- retaining key customers, suppliers and employees;
- operating risks inherent in the acquired business and our business;
- diversion of the attention and resources of management and resource constraints;
- retaining and obtaining required regulatory approvals, licenses and permits;
- unanticipated changes in the combined business due to potential divestitures or other requirements imposed by antitrust regulators;
- assumption of liabilities not identified in due diligence or other unanticipated issues, expenses and liabilities; and
- the impact on our internal controls and compliance with the requirements under the Sarbanes-Oxley Act of 2002.

We are required to test goodwill and indefinite-lived intangible assets acquired as a result of acquisitions for impairment at least annually. For Fiscal 2023, the carrying value of certain Jimmy Choo reporting units and brand indefinite-lived intangible assets exceeded its respective fair values requiring us to record impairment charges of $106 million. Please refer to Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations for additional information.

***We are subject to risks associated with leasing retail space subject to long-term and non-cancelable leases. We may be unable to renew leases at the end of their terms. If we close a leased retail space, we remain obligated under the applicable lease.***

We do not own any of our retail store facilities, but instead lease all of our stores under operating leases. Our leases generally have terms of up to 10 years, generally require a fixed annual base rent and some require the payment of additional percentage rent if store sales exceed a negotiated amount. Certain of our European stores also require initial investments in the form of key money to secure prime locations, which may be paid to landlords or existing lessees. Generally, our leases are "net" leases, which require us to pay all of the costs of insurance, taxes, maintenance and utilities. We generally cannot cancel these leases or withhold payments at our option, and payments under these operating leases account for a significant portion of our operating costs. For example, as of April 1, 2023, we were party to operating leases associated with our retail stores that we operate directly throughout the globe, as well as other global corporate facilities, requiring future minimum lease payments aggregating to $1.5 billion through Fiscal 2028 and approximately $427 million thereafter through Fiscal 2044. Our substantial operating lease obligations could have a material adverse effect on our business, results of operations and financial condition.

In certain cases, as we have done in the past, we may determine that it is no longer economical to operate a retail store subject to a lease or we may seek to generally downsize, consolidate, reposition, relocate or close some of our real estate locations. In such cases, we may be required to negotiate a lease exit with the applicable landlord or remain obligated under the applicable lease for, among other things, payment of the base rent for the balance of the lease term. In some instances, we may be unable to close an underperforming retail store due to continuous operation clauses in our lease agreements. In addition, as

PX7098-027

each of our leases expire, we may be unable to negotiate renewals, either on commercially acceptable terms or at all, which could cause us to close retail stores in desirable locations. Our inability to secure desirable retail space or favorable lease terms could impact our ability to grow. Likewise, our obligation to continue making lease payments with respect to leases for closed retail spaces could have a material adverse effect on our business, financial condition and results of operations.

Additionally, due to the volatile economic environment, it may be difficult to determine the fair market value of real estate properties when we are deciding whether to enter into leases or renew expiring leases. This may impact our ability to manage the profitability of our store locations, or cause impairments of our lease right-of-use assets if market values decline, any of which could have a material adverse effect on our financial condition or results of operations.

***We are dependent on a limited number of distribution facilities. If one or more of our distribution facilities experience operational difficulties or becomes inoperable, it could have a material adverse effect on our business, results of operations and financial condition.***

We operate a limited number of distribution facilities. Our ability to meet the needs of our own retail stores and e-commerce sites, as well as our wholesale customers, depends on the proper and uninterrupted operation of these distribution facilities. If any of these distribution facilities were to shut down or otherwise become inoperable or inaccessible for any reason (including due to COVID-19), we could suffer a substantial loss of inventory and/or disruptions of deliveries to our customers. In addition, we could incur significantly higher costs and longer lead times associated with the distribution of our products during the time it takes to reopen or replace the damaged, inoperable or otherwise inaccessible facility. Any of the foregoing factors could result in decreased sales and have a material adverse effect on our business, results of operations and financial condition.

To support the growth of our business, we also use third-party logistics centers that are responsible for distribution, warehousing and fulfillment services on our behalf. Significant disruptions at these facilities could have a material adverse impact on our business. Because our direct and third-party fulfillment centers include automated and computer-controlled equipment, they are susceptible to risks including power interruptions, hardware and system failures, software viruses, security breaches and other technological and operational disruptions and of which could cause shipping delays or otherwise adversely affect our business.

***We are dependent on third-parties to perform certain outsourced functions.***

We are increasingly looking for opportunities to cost effectively enhance capability of business services, which includes outsourcing certain functions. While we believe we conduct appropriate due diligence before entering into agreements with these third-party service providers, the failure of any of these third-parties to provide the expected services, provide them on a timely basis or to provide them at the prices we expect could disrupt or harm our business. Any significant interruption in the operations of these outsource service providers, including as a result of changes in social, political, and economic conditions, and those resulting from military conflicts or other hostilities, that result in the disruptions of business where these outsource providers are located, could also have an adverse effect on our business. Furthermore, we may be unable to provide these services ourselves in the future or implement substitute arrangements on a timely and cost-effective basis on terms favorable to us.

***Increases in the cost of raw materials could increase our production costs and cause our operating results and financial condition to suffer.***

Our business is subject to volatility of costs related to certain raw materials used in the manufacturing of our products, including inflationary pressure. The costs of raw materials used in our products are affected by, among other things, weather, consumer demand, speculation on the commodities market, the relative valuations and fluctuations of the currencies of producer versus consumer countries and other factors that are generally unpredictable and beyond our control. We are not always successful in our efforts to protect our business from the volatility of the market price of raw materials and our business can be materially affected by dramatic movements in prices of raw materials which have resulted, and are expected to continue to result, in increased pricing pressures and pressure on our margins. We may not be able to implement price increases that fully mitigate the impact of these higher costs and/or any such price increases could have an adverse impact on consumer demand for our products. In addition, our costs may be impacted by sanction tariffs and customs trade orders which could also impact sourcing and availability of raw materials used by our suppliers in the manufacturing of certain of our products. Manufacturing labor costs are also subject to volatility based on local and global economic conditions. Increases in commodity prices, tariffs, sanctions, customs trade orders and/or manufacturing labor costs could increase our production costs and negatively impact our revenues, results of operations and financial condition.

PX7098-028

*We primarily use foreign manufacturing contractors and independent third-party agents to source our finished goods.*

Our products are primarily produced by, and purchased or procured from, independent manufacturing contractors, and in some cases third-party sourcing agents, located mainly in Asia and Europe. A manufacturing contractor's failure to ship products to us in a timely manner or to meet the required quality standards could cause us to miss the delivery date requirements of our customers for those items. The failure to make timely deliveries may cause customers to cancel orders, refuse to accept deliveries or demand reduced prices, any of which could have a material adverse effect on us.

We do not have long-term agreements with any of our third-party manufacturing contractors or third-party sourcing agents. As a result, any single manufacturing contractor or sourcing agent could unilaterally terminate its relationship with us at any time. Our inability to promptly replace manufacturing contractors or third-party sourcing agents that terminate their relationships with us or cease to provide high quality products in a timely and cost-efficient manner could have a material adverse effect on our business, results of operations and financial condition and impact the cost and availability of our goods.

*Our business is exposed to foreign currency exchange rate fluctuations.*

Our results of operations for our international subsidiaries are exposed to foreign exchange rate fluctuations as the financial results of the applicable subsidiaries are translated from the local currency into United States dollar during financial statement consolidation. If the United States dollar strengthens against foreign currencies, the translation of these foreign currency denominated transactions could impact our consolidated results of operations. In addition, we have intercompany notes amongst certain of our non-United States subsidiaries, which may be denominated in a currency other than the functional currency of a particular reporting entity. As a result of using a currency other than the functional currency of the related subsidiary, results of these operations may be adversely affected during times of significant fluctuation between the functional currency of that subsidiary and the denomination currency of the note. We continuously monitor our foreign currency exposure and hedge a portion of our foreign subsidiaries' foreign currency-denominated inventory purchases to minimize the impact of changes in foreign currency exchange rates. However, we cannot fully anticipate all of our foreign currency exposures and cannot ensure that these hedges will fully offset the impact of foreign currency exchange rate fluctuations. We use forward foreign exchange contracts and cross-currency swap contracts to hedge material exposure to adverse changes in foreign currency exchange rates. However, no hedging strategy can completely insulate us from foreign exchange risk.

In addition, because we operate retail stores and concessions in various countries outside of the United States, we are also exposed to market risk from fluctuations in foreign currency exchange rates, primarily the Euro, the British Pound, the Chinese Renminbi, the Japanese Yen, the Korean Won and the Canadian dollar, among others. A substantial weakening of foreign currencies against the United States dollar could require us to raise our retail prices or reduce our profit margins in various locations outside of the United States. In addition, our sales and profitability could be negatively impacted if consumers in those markets were unwilling to purchase our products at increased prices.

## Risks Related to Information Technology and Data Security

*Privacy breaches and other cyber security risks related to our business could negatively affect our reputation, credibility and business.*

We are dependent on information technology ("IT") systems and networks for a significant portion of our direct-to-consumer sales, including our e-commerce sites and retail business credit card transaction authorization and processing. We are responsible for storing data relating to our customers and employees and also rely on third-party vendors for the storage, processing and transmission of personal and Company information. Consumers, lawmakers and consumer advocates alike are increasingly concerned over the security of personal information transmitted over the Internet, consumer identity theft and privacy and the retail industry, in particular, has been the target of many recent cyber-attacks. In addition to taking the necessary precautions ourselves, we generally require that third-party service providers implement reasonable security measures to protect our employees' and customers' identity and privacy. We do not, however, control these third-party service providers and cannot guarantee the elimination of electronic or physical computer break-ins or security breaches in the future. Cyber security breaches, including physical or electronic break-ins, security breaches due to employee error or misconduct, attacks by "hackers," phishing scams, malicious software programs such as viruses and malware, and other breaches outside of our control, could result in unauthorized access or damage to our IT systems and the IT systems of our third-party service providers. Despite our efforts and the efforts of our third-party service providers to secure our and their IT systems, attacks on these systems do occur from time to time. As the techniques used to obtain unauthorized access to IT systems become more varied and sophisticated (as cybercriminals are finding new ways to launch their attacks) and if the occurrence of such security breaches becomes more frequent, we and our third-party service providers may be unable to adequately anticipate these

27

techniques and implement appropriate preventative measures. While we maintain cyber risk insurance to provide some coverage for certain risks associated with cyber security incidents, there is no assurance that such insurance would cover all or a significant portion of the costs or consequences associated with a cyber security incident. A significant breach of customer, employee or Company data could damage our reputation, our relationship with customers and our brands, and could result in lost sales, sizable fines, significant breach-notifications and other costs and lawsuits, as well as adversely affect our results of operations.

Additionally, we may incur increased costs and experience a significant strain on our resources to account for implementation of additional required security measures and technologies to protect personal data and confidential information or to comply with current and new state, federal and international laws governing the unauthorized disclosure of confidential information which are continuously being enacted and proposed, such as the General Data Protection Regulation in the EU, various consumer privacy and data privacy and protection acts in the United States, including, but not limited to, the American Data Privacy and Protection Act, the California Consumer Privacy Act and the California Privacy Rights Act, the Virginia Consumer Data Protection Act, the Colorado Privacy Act, the Utah Consumer Privacy Act, the Connecticut Data Privacy Act and the Iowa Consumer Data Protection Act, and the Personal Information Protection Law in China.

Lastly, increased scrutiny by federal regulators (such as the FTC) and state attorney generals focused on the retail industry may lead to increased privacy and cyber security costs such as organizational changes, deploying additional personnel, acquiring and implementing enhanced privacy and security technologies on e-commerce sites, mandatory employee training for those handling customer and employee personal data, and engaging third-party experts and consultants, and the unauthorized use of proprietary information may lead to lost revenues.

***A material delay or disruption in our information technology systems or e-commerce websites or our failure or inability to upgrade our information technology systems precisely and efficiently could have a material adverse effect on our business, results of operations and financial condition.***

We rely extensively on our IT systems to track inventory, manage our supply chain, record and process transactions, manage customer communications, summarize results and manage our business. The failure of our IT systems to operate properly or effectively, problems with transitioning to upgraded or replacement systems, or difficulty in or failure to implement new systems, could adversely affect our business. We also operate a number of e-commerce websites throughout the world. Our IT systems and e-commerce websites may be subject to damage and/or interruption from power outages, computer, network and telecommunications failures, malicious software, such as viruses and malware, attacks by "hackers", security breaches, usage errors or misconduct by our employees and bad acts by our customers and website visitors which could materially adversely affect our business.

We are undergoing a multi-year Enterprise Resource Planning ("ERP") implementation. The implementation of the ERP will require a significant investment in human and financial resources. Implementing new systems also carries substantial risk, including failure to operate as designed, failure to properly integrate with other systems, potential loss of data or information, cost overruns, implementation delays and disruption of operations. Third-party vendors are also relied upon to design, program, maintain and service our ERP implementation program. Any failures of these vendors to properly deliver their services could similarly have a material adverse effect on our business. In addition, any disruptions or malfunctions affecting our ERP implementation plan could cause critical information upon which we rely to be delayed, defective, corrupted, inadequate, inaccessible or lost or otherwise cause delays or disruptions to our operations, and we may have to make significant investments to fix or replace impacted systems.

### Risks Related to Environmental, Social and Governance Issues

***Increased scrutiny from investors and others regarding our corporate social responsibility initiatives, including environmental, social and other matters of significance relating to sustainability, and changing regulatory requirements around ESG could result in additional costs or risks and adversely impact our reputation.***

Investor advocacy groups, certain institutional investors, investment funds, other market participants, shareholders, customers, employees and regulators have increasingly focused on ESG or "sustainability" practices of companies. We have a publicly announced global strategy to achieve significant, measurable goals across a range of important environmental and social sustainability issues, including, renewable energy, responsible material sourcing, water use and chemical management and waste reduction. We have also set science-based targets around greenhouse gas emissions (GHG) reductions. We rely on our supply chain partners to meet certain of our targets, including our GHG emissions reduction goals; however, our supply chain is complex and comprised of parties not within our control. It is possible that stakeholders may not be satisfied with our

PX7098-030

ESG targets, practices or the speed of adoption or that we may not be successful in achieving our goals on the timelines set or at all, which could negatively impact our brands, our reputation, and customer and employee retention.

In addition, many countries in which we and our suppliers operate have begun enacting new ESG and climate legislation and regulations. Such proposed regulations include expanded disclosure requirements regarding GHG emissions and other climate-related information, including independent auditors providing some level of attestation to the accuracy of such disclosures. Our ability to comply with any such new ESG and/or climate laws and regulations may lead to increased costs and operational complexity and/or we may be required to divert costs and resources in order to comply with ESG frameworks, and legal, legislative and regulatory requirements. Any failure on our part to comply with such ESG-related regulations could lead to adverse consumer actions and/or investment decisions by investors, as well as expose us to government enforcement action and/or private litigation.

***Our business is susceptible to the risks associated with climate change and other environmental impacts which could negatively affect our business and operations.***

Our business, including our retail, distribution and manufacturing operations, is susceptible to the risks associated with climate change and other environmental impacts. For example, the physical effects of climate change, such as severe weather events, natural disasters and/or significant changes in climate patterns may (i) cause potential disruptions to our retail stores, distribution centers and corporate facilities or those facilities of our wholesale customers, licensees or suppliers, (ii) adversely impact global supply chains, including the availability and cost of raw materials, (iii) negatively affect the ability of our manufacturers to fulfill our orders timely and/or to our specifications, (iv) cause shipping disruptions and/or (v) lead to higher freight costs. An increase in extreme weather conditions could also result in more frequent damage and/or closures of our stores and distribution centers (or facilities of our wholesale customers, licensees or suppliers), adversely impact retail traffic, consumer's disposable income levels or spending habits on discretionary items, or otherwise disrupt business operations in the communities in which we or our partners operate, any of which could result in lost sales or higher costs. In addition, concern over climate change may result in transitional risks such as new or additional legal, legislative and regulatory requirements to reduce or mitigate the effects of climate change on the environment which may result in increased operational and administrative compliance costs. These physical and transitional risks relating to climate could negatively affect our business and operations.

### Risks Related to Tax, Legal and Regulatory Matters

***Our business is subject to risks associated with importing products, and the imposition of additional duties, tariffs or trade restrictions could have a material adverse effect on our business, results of operations and financial condition.***

There are risks inherent to importing our products. Virtually all of our imported products are subject to duties which may impact the cost of such products. In addition, countries to which we ship our products may impose safeguard quotas to limit the quantity of products that may be imported. We rely on free trade agreements and other supply chain initiatives in order to maximize efficiencies relating to product importation. Additionally, we are subject to government regulations relating to importation activities, including related to CBP withhold release orders. The imposition of taxes, duties and quotas, the withdrawal from or material modification to trade agreements, and/or if CBP detains shipments of our goods pursuant to a withhold release order could have a material adverse effect on our business, results of operations and financial condition. If additional tariffs or trade restrictions are implemented by the United States or other countries, the cost of our products could increase which could adversely affect our business.

***Fluctuations in our tax obligations and changes in tax laws, treaties and regulations may have a material adverse impact on our future effective tax rates and results of operations.***

The Company and our subsidiaries are subject to taxation in the United States and various foreign jurisdictions, with the applicable tax rates varying by jurisdiction. As a result, our overall effective tax rate is affected by the proportion of earnings from the various tax jurisdictions. We record tax expense based on our estimates of taxable income and required reserves for uncertain tax positions in multiple tax jurisdictions. At any time, there are multiple tax years that are subject to examinations by various taxing authorities. The ultimate resolution of these audits and negotiations with taxing authorities may result in a settlement amount that differs from our original estimate. Any proposed or future changes in tax laws, treaties and regulations or interpretations where we operate could have a material adverse effect on our effective tax rates, results of operations and financial condition.

PX7098-031

We and our subsidiaries are also engaged in a number of intercompany transactions. Although we believe that these transactions reflect arm's-length terms and that proper transfer pricing documentation is in place, the transfer prices and conditions may be scrutinized by local tax authorities which could result in additional tax liabilities.

On October 5, 2015, the Organization for Economic Co-operation and Development ("OECD"), an international association of 34 countries, including the United States and United Kingdom, released the final reports from its Base Erosion and Profit Shifting ("BEPS") Action Plans. The BEPS recommendations covered a number of issues, including country-by-country reporting, permanent establishment rules, transfer pricing rules and tax treaties. Future tax reform resulting from this development may result in changes to long-standing tax principles, which could adversely affect our effective tax rate and/or result in higher cash tax liabilities. The Organization for Economic Cooperation and Development, the European Union and other countries (including countries in which we operate) have committed to enacting substantial changes to numerous long-standing tax principles impacting how large multinational enterprises are taxed in an effort to limit perceived base erosion and profit shifting incentives. In particular, the OECD's Pillar Two initiative introduces a 15% global minimum tax applied on a country-by-country basis, for which many jurisdictions have now committed to an effective enactment date starting January 1, 2024. If these proposals are implemented in any jurisdictions in which we operate, they could negatively impact our effective tax rate as well as increase the tax compliance and reporting costs related to such requirements.

***If we fail to comply with labor laws or collective bargaining agreements, or if our independent manufacturing contractors fail to use acceptable, ethical business practices, our business and reputation could suffer.***

We are subject to labor laws governing relationships with employees, including minimum wage requirements, overtime, working conditions and citizenship requirements. We are also subject to collective bargaining agreements with respect to employees in certain European countries. Compliance with these laws and regulations, as well as collective bargaining agreements, may lead to increased costs and operational complexity and may increase our exposure to governmental investigations or litigation.

We require our independent manufacturing contractors to operate in compliance with applicable laws, rules and regulations regarding working conditions, employment practices and environmental compliance, as well as our Supplier Code of Conduct and other compliance policies under our Factory Social and Environmental Compliance Program. Our staff and third-parties we retain for such purposes periodically visit and monitor the operations of our independent manufacturing contractors to determine compliance. However, we generally do not control these manufacturing contractors or suppliers or their labor, environmental or other business practices. The violation of labor, environmental or other laws by an independent manufacturer or supplier, or divergence of an independent manufacturer's or supplier's labor practices from those generally accepted as ethical or appropriate or that violate our Supplier Code of Conduct, could interrupt or otherwise disrupt the shipment of our products, harm our trademarks or damage our reputation. Further, we could be prohibited from importing goods by governmental authorities. The occurrence of any of these events could materially adversely affect our business, financial condition and results of operations.

***We may be unable to protect our trademarks, copyrights and other intellectual property rights, and others may allege that we infringe upon their intellectual property rights.***

Our VERSACE, JIMMY CHOO and MICHAEL KORS trademarks, as well as other material trademarks, copyrights and design and patent rights related to the production, marketing and distribution of our products, are important to our success and our competitive position. We are susceptible to others imitating our products and infringing on our intellectual property rights in the Americas, EMEA, Asia and elsewhere in the world in both online and offline channels. Our brands enjoy significant worldwide consumer recognition and the generally higher pricing of our products creates additional incentive for counterfeiters to infringe on our brands. We work with customs authorities, law enforcement, legal representatives and brand specialists globally in an effort to prevent the sale of counterfeit products, but we cannot guarantee the extent to which our efforts to prevent counterfeiting of our brands and other intellectual property infringement will be successful. Such counterfeiting and other intellectual property infringement could dilute our brands and otherwise harm our reputation and business.

Our trademark and other intellectual property applications may fail to result in registered trademarks or other intellectual property or to provide the scope of coverage sought, and others may seek to invalidate our trademarks, copyrights or other intellectual property or block sales of our products as an alleged violation of their trademarks and/or intellectual property rights. In addition, others may assert rights in, or ownership of, trademarks, copyrights and/or other intellectual property rights of ours or in trademarks, copyrights or other intellectual property that are similar to ours or that we license, and we may not be able to successfully resolve these types of conflicts to our satisfaction. In some cases, other intellectual property owners may have prior rights to our trademarks or similar trademarks or intellectual property. Furthermore, the laws of certain foreign countries may

PX7098-032

not protect trademarks, copyrights and/or other intellectual property rights to the same extent as the laws of the United States or the European Union.

From time to time, in the ordinary course of our business, we become involved in opposition and cancellation proceedings with respect to trademarks or other intellectual property similar to some of our brands. Any litigation or dispute involving the scope or enforceability of our intellectual property rights or any allegation that we infringe upon the intellectual property rights of others could be costly and time-consuming and, if determined adversely to us, could result in harm to our competitive position.

***We self-insure certain risks and may be impacted by unfavorable claims experience.***

We use a combination of insurance and self-insurance programs, including a wholly-owned captive insurance entity, to provide for the potential liabilities for certain risks including, employee health-care benefits, workers' compensation, employer liability, general liability, marine transport and inventory, property damage, cyber risk and business interruption. Claims are difficult to predict and may be volatile. Any adverse claims experience could have a material adverse effect on our results of operations, financial condition and cash flows.

***We are subject to various proceedings, lawsuits, disputes and claims in the ordinary course of business which could have an adverse impact on our business, financial condition and results of operations.***

We are a global company and are subject to various proceedings, lawsuits, disputes and claims throughout the world in the ordinary course of business. These claims could include commercial, intellectual property, employment, customer and data privacy claims, as well as class action lawsuits. Typically, these claims raise complex factual and legal issues and are subject to uncertainties. Plaintiffs may seek unspecified damages and/or injunctive or other equitable relief. Our potential liability may be covered in part by our insurance policies, but we may not always have adequate insurance to defend all claims. An unfavorable outcome in any proceeding, lawsuit, dispute or claim may have an adverse impact on our business, financial condition and results of operations.

## Risks Related to Our Debt

***We have incurred a substantial amount of indebtedness, which could adversely affect our financial condition and restrict our ability to incur additional indebtedness or engage in additional transactions.***

As of April 1, 2023, our consolidated indebtedness was approximately $1.8 billion. Our total borrowings as of April 1, 2023 primarily relate to our revolving credit facility of $874 million, Versace term loan of $488 million and senior notes of $450 million. Our ability to make payments on and refinance our debt obligations and to fund planned capital expenditures depends on our ability to generate cash from our operations. This, to a certain extent, is subject to general economic, financial, competitive, legislative, regulatory and other factors that are beyond our control. Our substantial level of indebtedness could have negative consequences to our business and we cannot guarantee that our business will generate sufficient cash flow from our operations or that future borrowings will be available to us in an amount sufficient to enable us to make payments of our debt, fund other liquidity needs, make necessary capital expenditures or pursue certain business opportunities. Our financial results, our substantial indebtedness and our credit ratings could adversely affect the availability and terms of our financing and negatively impact our ability to enter into new financing arrangements in the future.

In addition, our ability to access credit and capital markets in the future as a source of funding, and the borrowing costs associated with such financing, is dependent upon market conditions and our credit rating and outlook. We are currently rated investment grade by two of the Company's three credit rating agencies. If our investment rating is downgraded in the future, it could result in reduced access to the credit and capital markets, more restrictive covenants in future financial documents and higher interest costs and potentially increased lease or hedging costs.

***We may be unable to meet financial covenants in our indebtedness agreements which could result in an event of default and restrictive covenants in such agreements may restrict our ability to pursue our business strategies.***

The terms of our indebtedness contain affirmative and negative covenants that impose operating and financial restrictions on us and may restrict our ability to engage in future business opportunities or pursue our strategies. The Company's 2022 Credit Facility and the 2022 Versace Credit Facility (of which the Company provides a parent guarantee) requires us to maintain a quarterly maximum permitted net leverage ratio of no greater than 4.0 to 1.0. The 2022 Credit Facility, the 2022

PX7098-033

Versace Credit Facility and the Indenture governing our senior notes also contain certain restrictive covenants, including restrictions on our and certain of our subsidiaries ability to:

- incur additional indebtedness and guarantee indebtedness;
- pay dividends or make other distributions or repurchase or redeem capital stock;
- make loans and investments, including acquisitions;
- sell assets;
- incur liens;
- enter into transactions with affiliates; and
- consolidate, merge or sell all or substantially all of our assets

which collectively may limit our ability to engage in acts that may be in our long-term best interest.

A breach of the covenants or restrictions under the documents that govern our indebtedness could result in an event of default under the applicable indebtedness. Such a default may allow creditors to accelerate the related debt and may result in the acceleration of any other debt to which a cross-acceleration or cross-default provision applies. In addition, an event of default under the credit agreement governing our 2022 Credit Facility or the Versace 2022 Credit Facility would permit the lenders under our those credit facilities to terminate all commitments to extend further credit under such facility. In the event our lenders or noteholders accelerate the repayment of our borrowings, we and our subsidiaries may not have sufficient assets to repay that indebtedness. As a result of these restrictions, we may be:

- limited in how we conduct our business;
- unable to raise additional debt or equity financing to operate during general economic or business downturns, including during a recessions or other times of economic uncertainty; or
- unable to compete effectively or to take advantage of new business opportunities.

***If one or more of our counterparty financial institutions default on their obligations to us, we may incur significant losses or our financial liquidity could be adversely impacted.***

As part of our hedging activities, we enter into transactions involving derivative financial instruments, including fixed-to-fixed cross-currency swaps to hedge our net investments in foreign operations against future volatility in the exchange rates between the United States dollar and foreign currencies, with various financial institutions. In addition, we have significant amounts of cash, cash equivalents and other investments on deposit or in accounts with banks or other financial institutions in the United States and abroad. We also rely on borrowings under our revolving credit facilities, under which we had $694 million of borrowing capacity as of April 1, 2023. We rely on that borrowing capacity to fund our operations. As a result, we are exposed to the risk of default by, or failure of, counterparty financial institutions to meet their contractual obligations to us. This risk may be heightened during economic downturns and periods of uncertainty in the financial markets. If one of our counterparties were to become insolvent or file for bankruptcy, our ability to borrow funds or recover losses incurred as a result of a default or our assets that are deposited or held in accounts with such counterparty may be limited by the counterparty's liquidity or the applicable laws governing the insolvency or bankruptcy proceedings. In the event of default or failure of one or more of our counterparties, we could incur significant losses or our financial liquidity could be adversely impacted, which could negatively impact our results of operations and financial condition.

### Risks Related to Our Ordinary Shares

***Our share price may periodically fluctuate based on the accuracy of our earnings guidance or other forward-looking statements regarding our financial performance.***

Our business and long-range planning process is designed to maximize our long-term growth and profitability and not to achieve an earnings target in any particular fiscal quarter. We believe that this longer-term focus is in the best interests of our Company and our shareholders. At the same time, however, we recognize that it is helpful to provide investors with guidance as to our forecast of total revenue, earnings per share and other financial metrics or projections. While we generally expect to provide updates to our financial guidance when we report our results each fiscal quarter, we do not have any responsibility to update any of our forward-looking statements at such times or otherwise. In addition, any longer-term guidance that we provide is based on goals that we believe, at the time guidance is given, are reasonably attainable for growth and performance over a number of years. However, such long-range targets are more difficult to predict than our current quarter and fiscal year

PX7098-034

expectations. If, or when, we announce actual results that differ from those that have been predicted by us, outside investment analysts, or others, our share price could be adversely affected. Investors who rely on these predictions when making investment decisions with respect to our securities do so at their own risk. We take no responsibility for any losses suffered as a result of such changes in our share price.

***If we are unable to conduct share repurchases at expected levels, our share price could be adversely affected.***

We periodically return value to shareholders through our share repurchase program. On November 9, 2022, the Company announced that its Board of Directors approved the Existing Share Repurchase Plan which permits the Company to repurchase up to $1 billion of its outstanding ordinary shares over two years in open market or privately negotiated transactions and/or pursuant to Rule 10b5-1 trading plans, subject to market conditions, applicable legal requirements, trading restrictions under the Company's insider trading policy and other relevant factors. The program may be suspended or discontinued at any time. Our ability to conduct share repurchases depends on our ability to generate sufficient cash flows from operations in the future which may be limited by economic, financial, competitive and other factors that are beyond our control. The Existing Share Repurchase Plan may also be suspended or discontinued at any time. Investors may have an expectation that we will repurchase all shares available under our Existing Share Repurchase Plan. The market price of our ordinary shares could be adversely affected if our share repurchase activity differs from investors' expectations or if our share repurchase activity were to terminate.

***Failure to maintain adequate financial and management processes and controls could lead to errors in our financial reporting, which could harm our business and cause a decline in the price of our ordinary shares.***

As an SEC registrant, we are required to document and test our internal controls over financial reporting pursuant to Section 404 of the Sarbanes-Oxley Act. If our management is unable to certify the effectiveness of our internal controls or if our independent registered public accounting firm cannot render an opinion on the effectiveness of our internal control over financial reporting, or if material weaknesses in our internal controls are identified, we could be subject to regulatory scrutiny and a loss of public confidence, which could have an adverse effect on our business and cause a decline in the price of our ordinary shares.

***Provisions in our organizational documents may delay or prevent our acquisition by a third-party.***

Our Memorandum and Articles of Association (together, as amended from time to time, our "Memorandum and Articles") contain several provisions that may make it more difficult or expensive for a third-party to acquire control of us without the approval of our board of directors. These provisions may delay, prevent or deter a merger, acquisition, tender offer, proxy contest or other transaction that might otherwise result in our shareholders receiving a premium over the market price for their ordinary shares. These provisions include, among others:

- our board of directors' ability to amend the Memorandum and Articles to create and issue, from time to time, one or more classes of preference shares and, with respect to each such class, to fix the terms thereof by resolution;
- provisions relating to the multiple classes and three-year terms of directors, the manner of election of directors, removal of directors and the appointment of directors upon an increase in the number of directors or vacancy on our board of directors;
- restrictions on the ability of shareholders to call meetings and bring proposals before meetings;
- elimination of the ability of shareholders to act by written consent; and
- the requirement of the affirmative vote of 75% of the shares entitled to vote to amend certain provisions of our Memorandum and Articles.

These provisions of our Memorandum and Articles could discourage potential takeover attempts and reduce the price that investors might be willing to pay for our ordinary shares in the future, which could reduce the market price of our ordinary shares.

***Rights of shareholders under British Virgin Islands law differ from those under United States law, and, accordingly, our shareholders may have fewer protections.***

Our corporate affairs are governed by our Memorandum and Articles, the BVI Business Companies Act (Revised Edition 2020) (as amended) (the "BVI Act") and the common law of the British Virgin Islands. The rights of shareholders to take legal action against our directors, actions by minority shareholders and the fiduciary responsibilities of our directors under British

PX7098-035

Virgin Islands law are to a large extent governed by the common law of the British Virgin Islands and by the BVI Act. The common law of the British Virgin Islands is derived in part from comparatively limited judicial precedent in the British Virgin Islands as well as from English common law, which has persuasive, but not binding, authority on a court in the British Virgin Islands. The rights of our shareholders and the fiduciary responsibilities of our directors under British Virgin Islands law are not as clearly established as they would be under statutes or judicial precedents in some jurisdictions in the United States. In particular, the British Virgin Islands has a less developed body of securities laws as compared to the United States, and some states (such as Delaware) have more fully developed and judicially interpreted bodies of corporate law. As a result of the foregoing, holders of our ordinary shares may have more difficulty in protecting their interests through actions against our management, directors or major shareholders than they would as shareholders of a United States company.

***The laws of the British Virgin Islands provide limited protection for minority shareholders, so minority shareholders will have limited or no recourse if they are dissatisfied with the conduct of our affairs.***

Under the laws of the British Virgin Islands, there is limited statutory law for the protection of minority shareholders other than the provisions of the BVI Act dealing with shareholder remedies. The principal protection under statutory law is that shareholders may bring an action to enforce the constituent documents of a British Virgin Islands company and are entitled to have the affairs of the Company conducted in accordance with the BVI Act and the memorandum and articles of association of the Company. As such, if those who control the Company have persistently disregarded the requirements of the BVI Act or the provisions of the Company's memorandum and articles of association, then the courts will likely grant relief. Generally, the areas in which the courts will intervene are the following: (i) an act complained of which is outside the scope of the authorized business or is illegal or not capable of ratification by the majority; (ii) acts that constitute fraud on the minority where the wrongdoers control the Company; (iii) acts that infringe on the personal rights of the shareholders, such as the right to vote; and (iv) acts where the Company has not complied with provisions requiring approval of a special or extraordinary majority of shareholders, which are more limited than the rights afforded to minority shareholders under the laws of many states in the United States.

***It may be difficult to enforce judgments against us or our executive officers and directors in jurisdictions outside the United States.***

Under our Memorandum and Articles, we may indemnify and hold our directors harmless against all claims and suits brought against them, subject to limited exceptions. Furthermore, to the extent allowed by law, the rights and obligations among or between us, any of our current or former directors, officers and employees and any current or former shareholder will be governed exclusively by the laws of the British Virgin Islands and subject to the jurisdiction of the British Virgin Islands courts, unless those rights or obligations do not relate to or arise out of their capacities as such. Although there is doubt as to whether United States' courts would enforce these provisions in an action brought in the United States under United States securities laws, these provisions could make judgments obtained outside of the British Virgin Islands more difficult to enforce against our assets in the British Virgin Islands or jurisdictions that would apply British Virgin Islands law.

***British Virgin Islands companies may not be able to initiate shareholder derivative actions, thereby depriving shareholders of one avenue to protect their interests.***

British Virgin Islands companies may not have standing to initiate a shareholder derivative action in a federal court of the United States. The circumstances in which any such action may be brought, and the procedures and defenses that may be available in respect of any such action, may result in the rights of shareholders of a British Virgin Islands' company being more limited than those of shareholders of a company organized in the United States. Accordingly, shareholders may have fewer alternatives available to them if they believe that corporate wrongdoing has occurred. The British Virgin Islands courts are also unlikely to recognize or enforce judgments of courts in the United States based on certain liability provisions of United States securities law or to impose liabilities, in original actions brought in the British Virgin Islands, based on certain liability provisions of the United States securities laws that are penal in nature. There is no statutory recognition in the British Virgin Islands of judgments obtained in the United States, although the courts of the British Virgin Islands will generally recognize and enforce the non-penal judgment of a foreign court of competent jurisdiction without retrial on the merits. This means that even if shareholders were to sue us successfully, they may not be able to recover anything to make up for the losses suffered.

**Item 1B.   Unresolved Staff Comments**

None.

PX7098-036

**Item 2.    Properties**

The following table sets forth the location, use and size of our significant distribution and corporate facilities as of April 1, 2023, all of which are leased with the exception of our distribution center in the Netherlands, our central warehouse in Italy and luxury shoe factory in Italy, which are owned. The leases expire at various times through Fiscal 2044, subject to renewal options.

| Location | Use | Approximate Square Footage |
|---|---|---|
| Whittier, CA | Michael Kors United States Distribution Center | 1,181,000 |
| Venlo, Netherlands | Michael Kors and Jimmy Choo European Distribution Center | 1,096,000 |
| New York, NY | Michael Kors, Versace and Jimmy Choo United States Corporate Offices | 211,000 |
| Montreal, Quebec | Michael Kors and Jimmy Choo Canada Corporate Offices and Distribution Center | 150,000 |
| Novara, Italy | Versace European Distribution Center | 109,000 |
| Milan, Italy | Versace Corporate Offices | 90,000 |
| Milan, Italy | Versace Showroom | 54,000 |
| Novara, Italy | Versace Manufacturing and Distribution Center | 46,000 |
| Pistoia, Italy | Capri Luxury Shoe Factory | 41,000 |
| East Rutherford, NJ | Michael Kors United States Corporate Offices | 31,000 |
| Milan, Italy | Michael Kors Regional Corporate Office and Showroom | 25,000 |
| Shanghai, China | Michael Kors, Versace and Jimmy Choo Regional Corporate Offices | 25,000 |
| London, England | Jimmy Choo Corporate Offices | 24,000 |
| London, England | Capri Corporate Headquarters and Michael Kors Regional Corporate Office | 19,000 |
| Manno, Switzerland | Michael Kors European Corporate Offices | 18,000 |

As of April 1, 2023, we also occupied 1,272 leased retail stores worldwide (including concessions). We consider our properties to be in good condition and believe that our facilities are adequate for our operations and provide sufficient capacity to meet our anticipated requirements.

Other than the land and building for our Michael Kors and Jimmy Choo European distribution center in the Netherlands, our Versace central warehouse in Italy and our Capri luxury shoe factory in Italy, property and equipment related to our stores (e.g. leasehold improvements, fixtures, etc.) and computer equipment, we did not own any material property as of April 1, 2023.

**Item 3.    Legal Proceedings**

We are involved in various routine legal proceedings incident to the ordinary course of our business. We believe that the outcome of all pending legal proceedings, in the aggregate, will not have a material adverse effect on our business, results of operations and financial condition.

**Item 4.    Mine Safety Disclosures**

None.

PX7098-037

**PART II**

**Item 5.    Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities**

**Market Information**

Our ordinary shares trade on the NYSE under the symbol "CPRI". At April 1, 2023, there were 117,347,045 ordinary shares outstanding, and the closing price of our ordinary shares was $47.00. Also as of that date, we had approximately 133 ordinary shareholders of record.

**Share Performance Graph**

The line graph below compares the cumulative total shareholder return on our ordinary shares with the Standard & Poor's ("S&P") 500 Stock Index and the S&P 500 Apparel, Accessories & Luxury Goods Index for the five-year period from March 29, 2018 through March 31, 2023, the last business day of our fiscal year. The graph below assumes an investment of $100 made at the close of trading on March 29, 2018, in our ordinary shares and each of the indices presented. All values assume reinvestment of the full amount of all dividends, if any, into additional shares of the same class of equity securities at the frequency with which dividends are paid on such securities during the applicable time period.



**Issuer Purchases of Equity Securities**

On June 1, 2022, the Board of Directors terminated our Fiscal 2022 Plan, with $500 million of availability remaining, and authorized a new share repurchase program pursuant to which we may, from time to time, repurchase up to $1.0 billion of our outstanding ordinary shares within period of two years from the effective date of the program.

On November 9, 2022, the Company announced that its Board of Directors approved a new share repurchase program of up to $1 billion of its outstanding ordinary shares, providing additional capacity to return cash to shareholders over the longer term. This new two-year program replaced the Company's existing $1 billion share repurchase program which had $250 million of availability remaining.

Share repurchases may be made in open market or privately negotiated transactions and/or pursuant to Rule 10b5-1 trading plans, subject to market conditions, applicable legal requirements, trading restrictions under the Company's insider trading policy and other relevant factors. The program may be suspended or discontinued at any time.

PX7098-038

The following table provides information regarding our ordinary share repurchases during the three months ended April 1, 2023:

| | Total Number of Shares | Average Price Paid per Share | Total Number of Shares Purchased as Part of Publicly Announced Programs | Remaining Dollar Value of Shares That May Be Purchased Under the Programs (in millions) |
|---|---|---|---|---|
| January 1, 2023 – January 28, 2023 | 604 | $ 64.64 | — | $ 800 |
| January 29, 2023 – February 25, 2023 | 3,288,564 | $ 50.17 | 3,288,564 | 635 |
| February 26, 2023 – April 1, 2023 | 5,146,526 | $ 45.66 | 5,146,526 | $ 400 |
| | 8,435,694 | | 8,435,090 | |

**Item 6.    [Reserved]**

PX7098-039

**ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

**Overview**

*Our Business*

Capri Holdings Limited is a global fashion luxury group consisting of iconic, founder-led brands Versace, Jimmy Choo and Michael Kors. Our commitment to glamorous style and craftsmanship is at the heart of each of our luxury brands. We have built our reputation on designing exceptional, innovative products that cover the full spectrum of fashion luxury categories. Our strength lies in the unique DNA and heritage of each of our brands, the diversity and passion of our people and our dedication to the clients and communities we serve.

Our Versace brand has long been recognized as one of the world's leading international fashion design houses and is synonymous with Italian glamour and style. Founded in 1978 in Milan, Versace is known for its iconic and unmistakable style and unparalleled craftsmanship. Over the past several decades, the House of Versace has grown globally from its roots in haute couture, expanding into the design, manufacturing, distribution and retailing of accessories, ready-to-wear, footwear, eyewear, watches, jewelry, fragrance and home furnishings. Versace's design team is led by Donatella Versace, who has been the brand's Artistic Director for over 20 years. Versace distributes its products through a worldwide distribution network, which includes boutiques in some of the world's most glamorous cities, its e-commerce sites, as well as through the most prestigious department and specialty stores worldwide.

Our Jimmy Choo brand offers a distinctive, glamorous and fashion-forward product range, enabling it to develop into a leading global luxury accessory brand, whose core product offering is women's luxury shoes, complemented by accessories, including handbags, small leather goods, jewelry, scarves and belts, as well as a growing men's luxury shoe and accessory business. In addition, certain categories, such as fragrances and eyewear are produced under licensing agreements. Jimmy Choo's design team is led by Sandra Choi, who has been the Creative Director for the brand awareness in other international markets. Choo products are unique, instinctively seductive and chic. The brand offers classic and timeless luxury products, as well as innovative products that are intended to set and lead fashion trends. Jimmy Choo is represented through its global store network, its e-commerce sites, as well as through the most prestigious department and specialty stores worldwide.

Our Michael Kors brand was launched over 40 years ago by Michael Kors, a world-renowned designer, whose vision has taken the Company from its beginnings as an American luxury sportswear house to a global accessories, footwear and ready-to-wear company with a global distribution network that has presence in over 100 countries through Company-operated retail stores and e-commerce sites, leading department stores, specialty stores and select licensing partners. Michael Kors is a highly recognized luxury fashion brand in the Americas and Europe with growing brand awareness in other international markets. Michael Kors features distinctive designs, materials and craftsmanship with a jet-set aesthetic that combines stylish elegance and a sporty attitude. Michael Kors offers three primary collections: the Michael Kors Collection luxury line, the MICHAEL Michael Kors accessible luxury line and the Michael Kors Mens line. The Michael Kors Collection establishes the aesthetic authority of the entire brand and is carried by select retail stores, our e-commerce sites, as well as in the finest luxury department stores in the world. MICHAEL Michael Kors has a strong focus on accessories, in addition to offering footwear and ready-to-wear, and addresses the significant demand opportunity in accessible luxury goods. We have also been developing our men's business in recognition of the significant opportunity afforded by the Michael Kors brand's established fashion authority and the expanding men's market. Taken together, our Michael Kors collections target a broad customer base while retaining our premium luxury image.

PX7098-040

*Certain Factors Affecting Financial Condition and Results of Operations*

    *Macroeconomic conditions and inflationary pressures.* Global economic conditions and the related impact on levels of consumer spending worldwide impacted our business in Fiscal 2023, and are likely to continue to impact our business and the accessories, footwear and apparel industry overall for the foreseeable future. Inflation, rising interest rates, higher fuel and energy costs and commodity prices, reductions in net worth based on market declines and uncertainty, home prices, credit availability and consumer debt levels, concerns of a global banking crisis, political instability due to war or other geopolitical factors and other macroeconomic pressures and general uncertainty regarding the overall future economic environment have led to recession fears and created a challenging retail environment, particularly in the second half of Fiscal 2023, which is expected to continue in the near term. Purchases of discretionary luxury items, such as the accessories, footwear and apparel that we produce, tend to decline when disposable income is lower or when there are recessions, inflationary pressures or other economic uncertainty which could negatively affect our financial condition and results of operations.

    *COVID-19 pandemic.* The Company's performance during Fiscal 2023 was adversely impacted due to lockdowns in certain regions, most notably in Greater China, as a result of an increase in infections due to variants of COVID-19. These lockdowns resulted in store closures and an overall decline in demand in the region. While the situation seems to be improving, infection rates and government restrictions may continue to persist in Greater China or elsewhere.

    *Luxury goods trends and demand for our accessories and related merchandise.* Our performance is affected by trends in the luxury goods industry, global consumer spending, macroeconomic factors, overall levels of consumer travel and spending on discretionary items as well as shifts in demographics and changes in lifestyle preferences. Through 2019, the personal luxury goods market grew at a mid-single digit rate over the past 20 years, with more recent growth driven by stronger Chinese demand from both international and local consumers and demographic and socioeconomic shifts resulting in younger consumers purchasing more luxury goods. However, in 2020, due to the impact of the COVID-19 crisis, the personal luxury goods market declined 23%. Market studies indicate that the personal luxury goods market returned to 2019 levels in 2021, and the market is predicted to increase at a 10% compound annual growth rate between 2020 and 2025. Future growth is expected to be driven by e-commerce, Chinese consumers and younger generations; however, growth may be limited by concerns over inflation, the possibility of a global recession, foreign currency volatility or worsening economic conditions.

    *Foreign currency fluctuation.* Our consolidated operations are impacted by the relationships between our reporting currency, the United States dollar, and those of our non-United States subsidiaries whose functional/local currency is other than the United States dollar, primarily the Euro, the British Pound, the Chinese Renminbi, the Japanese Yen, the Korean Won and the Canadian dollar, among others. We continue to expect volatility in the global foreign currency exchange rates, which may have a negative impact on the reported results of certain of our non-United States subsidiaries in the future, when translated to the United States dollar.

    *Disruptions or delays in shipping and distribution and other supply chain constraints.* Any disruptions in our shipping and distribution network, including port congestion, vessel availability, container shortages and temporary factory closures, could have a negative impact on our results of operations. See Item 1A. "Risk Factors" — "We primarily use foreign manufacturing contractors and independent third-party agents to source our finished goods" and "Our business is subject to risks inherent in global sourcing activities, including disruptions or delays in manufacturing or shipments" for additional discussion.

    *Costs of manufacturing, tariffs and import regulations.* Our industry is subject to volatility in costs related to certain raw materials used in the manufacturing of our products. This volatility applies primarily to costs driven by commodity prices, which can increase or decrease dramatically over a short period of time. In addition, our costs may be impacted by sanction tariffs imposed on our products due to changes in trade terms. We rely on free trade agreements and other supply chain initiatives in order to maximize efficiencies relating to product importation. We are also subject to government import regulations, including CBP withhold release orders. The imposition of taxes, duties and quotas, the withdrawal from or material modification to trade agreements and/or if CBP detains shipments of our goods pursuant to a withhold release order could have a material adverse effect on our business, results of operations and financial condition. If additional tariffs or trade restrictions are implemented by the United States or other countries, the cost of our products could increase which could adversely affect our business. In addition, commodity prices and tariffs may have an impact on our revenues, results of operations and cash flows. We use commercially reasonable efforts to mitigate these effects by sourcing our products as efficiently as possible and diversifying the countries where we produce. In addition, manufacturing labor costs are also subject to degrees of volatility based on local and global economic conditions. We use commercially reasonable efforts to source from localities that suit our manufacturing standards and result in more favorable labor driven costs of our product.

PX7098-041

*Segment Information*

We operate in three reportable segments, which are as follows:

*Versace*

We generate revenue through the sale of Versace luxury accessories, ready-to-wear and footwear through directly operated Versace boutiques throughout North America (United States and Canada), certain parts of EMEA (Europe, Middle East and Africa) and certain parts of Asia (Asia and Oceania), as well as through Versace outlet stores and e-commerce sites. In addition, revenue is generated through wholesale sales to distribution partners (including geographic licensing arrangements), multi-brand department stores and specialty stores worldwide, as well as through product license agreements in connection with the manufacturing and sale of products, including jeans, fragrances, watches, jewelry, eyewear and home furnishings.

*Jimmy Choo*

We generate revenue through the sale of Jimmy Choo luxury goods through directly operated Jimmy Choo retail and outlet stores throughout the Americas (United States, Canada and Latin America), certain parts of EMEA and certain parts of Asia, through our e-commerce sites, as well as through wholesale sales of luxury goods to distribution partners (including geographic licensing arrangements that allow third-parties to use the Jimmy Choo tradename in connection with retail and/or wholesale sales of Jimmy Choo branded products in specific geographic regions), multi-brand department stores and specialty stores worldwide. In addition, revenue is generated through product licensing agreements, which allow third-parties to use the Jimmy Choo brand name and trademarks in connection with the manufacturing and sale of products, including fragrances and eyewear.

*Michael Kors*

We generate revenue through the sale of Michael Kors products through four primary Michael Kors retail store formats: "Collection" stores, "Lifestyle" stores (including concessions), outlet stores and e-commerce, through which we sell our products, as well as licensed products bearing our name, directly to consumers throughout the Americas, certain parts of EMEA and certain parts of Asia. Our Michael Kors e-commerce business includes e-commerce sites in the United States, Canada, EMEA and Asia. We also sell Michael Kors products directly to department stores, primarily located across the Americas and EMEA, to specialty stores and travel retail shops in the Americas, Europe and Asia, and to our geographic licensees in certain parts of EMEA, Asia and Brazil. In addition, revenue is generated through product and geographic licensing arrangements, which allow third-parties to use the Michael Kors brand name and trademarks in connection with the manufacturing and sale of products, including watches, jewelry, fragrances and eyewear, as well as through geographic licensing arrangements, which allow third-parties to use the Michael Kors tradename in connection with the retail and/or wholesale sales of our Michael Kors branded products in specific geographic regions.

*Unallocated Corporate Expenses*

In addition to the reportable segments discussed above, we have certain corporate costs that are not directly attributable to our brands and, therefore, are not allocated to segments. Such costs primarily include certain administrative, corporate occupancy, shared service and information systems expenses, including system implementation costs and Capri transformation program costs. In addition, certain other costs are not allocated to segments, including restructuring and other charges, impairment costs, COVID-19 related charges and the war in Ukraine. The segment structure is consistent with how our chief operating decision maker plans and allocates resources, manages the business and assesses performance. The following table presents our total revenue and income (loss) from operations by segment for Fiscal 2023, Fiscal 2022 and Fiscal 2021 (in millions):

PX7098-042

| | Fiscal Years Ended | | |
|---|---|---|---|
| | April 1, 2023 | April 2, 2022 | March 27, 2021 |
| **Total revenue:** | | | |
| Versace | $ 1,106 | $ 1,088 | $ 718 |
| Jimmy Choo | 633 | 613 | 418 |
| Michael Kors | 3,880 | 3,953 | 2,924 |
| **Total revenue** | $ 5,619 | $ 5,654 | $ 4,060 |
| | | | |
| **Income (loss) from operations:** | | | |
| Versace | $ 152 | $ 185 | $ 21 |
| Jimmy Choo | 38 | 13 | (55) |
| Michael Kors | 868 | 1,005 | 595 |
| Total segment income from operations | 1,058 | 1,203 | 561 |
| **Less:** Corporate expenses | (233) | (190) | (152) |
| Impairment of assets [1] | (142) | (73) | (316) |
| COVID-19 related charges [2] | 9 | 14 | (42) |
| Impact of war in Ukraine [3] | 3 | (9) | — |
| Restructuring and other charges | (16) | (42) | (32) |
| **Total income from operations** | $ 679 | $ 903 | $ 19 |

[1]  Impairment of assets during Fiscal 2023 includes $110 million, $30 million, and $2 million of impairment charges related to the Jimmy Choo, Michael Kors and Versace reportable segments, respectively. Impairment of assets during Fiscal 2022 includes $50 million, $19 million and $4 million of impairment charges related to the Michael Kors, Versace and Jimmy Choo reportable segments, respectively. Impairment of assets during Fiscal 2021 includes $191 million, $91 million and $34 million of impairment charges related to the Jimmy Choo, Michael Kors and Versace reportable segments, respectively.

[2]  COVID-19 related charges during Fiscal 2023, primarily include net inventory credits of $9 million. COVID-19 related charges during Fiscal 2022, primarily include net inventory credits and severance expense of $16 million and $2 million, respectively. COVID-19 related charges during Fiscal 2021, primarily include net inventory reserves and severance expense of $10 million and $24 million, respectively. Inventory related costs are recorded within costs of goods sold and severance expense and credit losses are recorded within selling, general and administrative expenses in the consolidated statements of operations and comprehensive income (loss).

[3]  These charges primarily relate to incremental credit losses and inventory reserves which are a direct impact of the war in Ukraine. Credit losses are recorded within selling, general and administrative expenses and inventory related costs are recorded within costs of goods sold in the consolidated statements of operations and comprehensive income (loss).

PX7098-043

The following table presents our global network of retail stores and wholesale doors:

| | As of | | |
| --- | --- | --- | --- |
| | April 1, 2023 | April 2, 2022 | March 27, 2021 |
| Number of full price retail stores (including concessions): | | | |
| Versace | 160 | 149 | 153 |
| Jimmy Choo | 182 | 181 | 176 |
| Michael Kors | 508 | 524 | 529 |
| | 850 | 854 | 858 |
| Number of outlet stores: | | | |
| Versace | 63 | 60 | 57 |
| Jimmy Choo | 55 | 56 | 51 |
| Michael Kors | 304 | 301 | 291 |
| | 422 | 417 | 399 |
| Total number of retail stores | 1,272 | 1,271 | 1,257 |
| Total number of wholesale doors: | | | |
| Versace | 744 | 803 | 868 |
| Jimmy Choo | 527 | 446 | 450 |
| Michael Kors | 2,843 | 2,742 | 2,852 |
| | 4,114 | 3,991 | 4,170 |

The following table presents our retail stores by geographic location:

| | As of April 1, 2023 | | | As of April 2, 2022 | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Versace | Jimmy Choo | Michael Kors | Versace | Jimmy Choo | Michael Kors |
| Store count by region: | | | | | | |
| The Americas | 42 | 43 | 319 | 39 | 45 | 334 |
| EMEA | 58 | 70 | 173 | 55 | 73 | 176 |
| Asia | 123 | 124 | 320 | 115 | 119 | 315 |
| | 223 | 237 | 812 | 209 | 237 | 825 |

PX7098-044

*Key Performance Indicators and Statistics*

We use a number of key indicators of operating results to evaluate our performance, including the following (dollars in millions):

| | Fiscal Years Ended | | | | | |
|---|---|---|---|---|---|---|
| | April 1, 2023 | | April 2, 2022 | | March 27, 2021 | |
| Total revenue | $ | 5,619 | $ | 5,654 | $ | 4,060 |
| Gross profit as a percent of total revenue | | 66.3 % | | 66.2 % | | 64.0 % |
| Income from operations | $ | 679 | $ | 903 | $ | 19 |
| Income from operations as a percent of total revenue | | 12.1 % | | 16.0 % | | 0.5 % |

## Critical Accounting Policies and Estimates

The preparation of financial statements in conformity with accounting principles generally accepted in the United States ("U.S. GAAP") requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements, as well as the reported amounts of revenue and expenses during the reporting period. Critical accounting policies are those that are the most important to the portrayal of our results of operations and financial condition and that require our most difficult, subjective and complex judgments to make estimates about the effect of matters that are inherently uncertain. In applying such policies, we must use certain assumptions that are based on our informed judgments, assessments of probability and best estimates. Estimates, by their nature, are subjective and are based on analysis of available information, including current and historical factors and the experience and judgment of management. We evaluate our assumptions and estimates on an ongoing basis. While our significant accounting policies are detailed in Note 2 to the accompanying financial statements, our critical accounting policies are discussed below and include revenue recognition, inventories, long-lived assets, goodwill and other indefinite-lived intangible assets, share-based compensation, derivatives and income taxes.

### *Revenue Recognition*

Revenue is recognized when control of the promised goods or services is transferred to our customers in an amount that reflects the consideration we expect to be entitled to in exchange for goods or services. We recognize retail store revenue when control of the product is transferred at the point of sale at our owned stores, including concessions. Revenue from sales through our e-commerce sites is recognized at the time of delivery to the customer, reduced by an estimate of returns. Wholesale revenue is recognized net of estimates for sales returns, discounts, markdowns and allowances, after merchandise is shipped and control of the underlying product is transferred to our wholesale customers. To arrive at net sales for retail, gross sales are reduced by actual customer returns, as well as by a provision for estimated future customer returns, which is based on management's review of historical and current customer returns. The amounts reserved for retail sales returns were $22 million, $22 million and $20 million at April 1, 2023, April 2, 2022 and March 27, 2021, respectively. Net sales for wholesale equals gross sales, reduced by provisions for estimated future returns based on current expectations, as well as trade discounts, markdowns, allowances, operational chargebacks, and certain cooperative selling expenses. Total sales reserves for wholesale were $73 million, $70 million and $78 million at April 1, 2023, April 2, 2022 and March 27, 2021, respectively. These estimates are based on such factors as historical trends, actual and forecasted performance and market conditions, which are reviewed by management on a quarterly basis. Our historical estimates of these costs were not materially different from actual results.

Royalty revenue generated from product licenses, which includes contributions for advertising, is based on reported sales of licensed products bearing our tradenames at rates specified in the license agreements. These agreements are also subject to contractual minimum levels. Royalty revenue generated by geographic licensing agreements is recognized as it is earned under the licensing agreements based on reported sales of licensees applicable to specified periods, as outlined in the agreements. These agreements allow for the use of our tradenames to sell our branded products in specific geographic regions.

### *Inventories*

Our inventory costs include amounts paid to independent manufacturers, plus duties and freight to bring the goods to the Company's warehouses, as well as shipments to stores. The combined total of raw materials and work in process recorded on our consolidated balance sheets as of April 1, 2023 and April 2, 2022 were $47 million and $31 million, respectively. We continuously evaluate the composition of our inventory and make adjustments when the cost of inventory is not expected to be

PX7098-045

fully recoverable. The net realizable value of our inventory is estimated based on historical experience, current and forecasted demand and market conditions. In addition, reserves for inventory losses are estimated based on historical experience and inventory counts. Our inventory reserves are estimates, which could vary significantly from actual results if future economic conditions, customer demand or competition differ from expectations. Our historical estimates of these adjustments have not differed materially from actual results.

### Long-lived Assets

We evaluate all long-lived assets, including operating lease right-of-use assets, property and equipment and definite-lived intangible assets, for impairment whenever events or changes in circumstances indicate that the carrying amount of any such asset may not be recoverable. For the purposes of impairment testing, we group long-lived assets at the lowest level of identifiable cash flow. Our leasehold improvements are typically amortized over the life of the store lease, including reasonably assured renewals and our shop-in-shops are amortized over a useful life of three to five years. Our impairment testing is based on our best estimate of the future operating cash flows. If the sum of our estimated undiscounted future cash flows associated with the asset is less than the asset's carrying value, we would recognize an impairment charge, which is measured as the amount by which the carrying value exceeds the fair value of the asset. The fair values determined by management require significant judgment and include certain assumptions regarding future sales and expense growth rates, discount rates and estimates of real estate market fair values. As such, these estimates may differ from actual results and are affected by future market and economic conditions.

During Fiscal 2023, Fiscal 2022 and Fiscal 2021, we recorded impairment charges of $36 million, $83 million and $158 million, respectively, which were primarily related to operating lease right-of-use assets and fixed assets of our retail store locations. Please refer to Note 7 and Note 13 of the accompanying consolidated financial statements for additional information.

### Goodwill and Other Indefinite-lived Intangible Assets

We record intangible assets based on their fair value on the date of acquisition. Goodwill is recorded as the difference between the fair value of the purchase consideration and the fair value of the net identifiable tangible and intangible assets acquired. The brand intangible assets recorded in connection with the acquisitions of Versace and Jimmy Choo were determined to be indefinite-lived intangible assets, which are not subject to amortization. We perform an impairment assessment of goodwill, as well as the Versace brand and Jimmy Choo brand intangible assets on an annual basis, or whenever impairment indicators exist. In the absence of any impairment indicators, goodwill, the Versace brand and the Jimmy Choo brand are assessed for impairment during the fourth quarter of each fiscal year. Judgments regarding the existence of impairment indicators are based on market conditions and operational performance of the business.

We may assess our goodwill and our brand indefinite-lived intangible assets for impairment initially using a qualitative approach to determine whether it is more likely than not that the fair value of these assets is greater than their carrying value. When performing a qualitative test, we assess various factors including industry and market conditions, macroeconomic conditions and performance of our businesses. If the results of the qualitative assessment indicate that it is more likely than not that our goodwill and other indefinite-lived intangible assets are impaired, a quantitative impairment analysis is performed to determine if impairment is required. We may also elect to perform a quantitative analysis of goodwill and our indefinite-lived intangible assets initially rather than using a qualitative approach.

The impairment testing for goodwill is performed at the reporting unit level. We use industry accepted valuation models and set criteria that are reviewed and approved by various levels of management and, in certain instances, we engage independent third-party valuation specialists for assistance. To determine the fair value of a reporting unit, we use a combination of the income and market approaches, when applicable. We believe the blended use of both models, when applicable, compensates for the inherent risk associated with either model if used on a stand-alone basis, and this combination is indicative of the factors a market participant would consider when performing a similar valuation. If the fair value of a reporting unit exceeds the related carrying value, the reporting unit's goodwill is considered not to be impaired and no further testing is performed. If the carrying value of a reporting unit exceeds its fair value, an impairment loss is recorded for the difference. These valuations are affected by certain estimates, including future revenue growth rates, future operating expense growth rates, gross margins and discount rates. Future events could cause us to conclude that impairment indicators exist and goodwill may be impaired.

When performing a quantitative impairment assessment of our brand intangible assets, the fair value of the Versace and the Jimmy Choo brands is estimated using a discounted cash flow analysis based on the "relief from royalty" method, assuming that a third-party would be willing to pay a royalty in lieu of ownership for this intangible asset. This approach is dependent on many factors, including estimates of future revenue growth rates, royalty rates and discount rates. Actual future results may

PX7098-046

differ from these estimates. An impairment loss is recognized when the estimated fair value of the brand intangible assets is less than its carrying amount.

During the fourth quarter of Fiscal 2023, we performed our annual goodwill and indefinite-lived intangible assets impairment analysis. Based on a qualitative impairment assessment of the Michael Kors reporting units, we concluded that it is more likely than not that the fair value of the Michael Kors reporting units exceeded its carrying value and, therefore, was not impaired. We elected to perform quantitative impairment analyses for the Versace and Jimmy Choo reporting units, using a combination of income and market approaches to estimate the fair values of reporting units. We also elected to perform a quantitative impairment analysis for the Versace and Jimmy Choo brand intangible assets using an income approach to estimate the fair values.

Based on the results of these assessments, the Company determined there was no impairment for the Jimmy Choo Licensing reporting unit goodwill as its fair value is significantly higher than its carrying value and no impairment for the Wholesale brand intangible asset as its approximate fair value was equal to its carrying value. Further, the Company determined that there was no impairment for the Versace reporting units goodwill as their fair values significantly exceeded the carrying values and its Retail and Wholesale brand intangible assets fair value exceeded its carrying value by approximately 10% and 5%, respectively.

The Company further concluded that the fair value of the Jimmy Choo Retail and Wholesale reporting units goodwill, along with the Jimmy Choo Retail brand indefinite-lived intangible assets, did not exceed their related carrying amounts. The resulting impairment charges were primarily related to a higher discount rate in the current year driven by higher risk-free rates. Accordingly, the Company recorded impairment charges of $82 million related to the Jimmy Choo Retail and Wholesale reporting units goodwill and $24 million related to the Jimmy Choo Retail brand intangible assets during Fiscal 2023. The impairment charges were recorded within impairment of assets on our consolidated statement of operations and comprehensive income (loss) for the fiscal year ended April 1, 2023.

In Fiscal 2022, the Company did not incur any impairment charges. In Fiscal 2021, we recorded a goodwill impairment charge of $94 million related to the Jimmy Choo wholesale and Jimmy Choo licensing reporting units and $69 million impairment charge related to the Jimmy Choo brand intangible assets during Fiscal 2021. The impairment charges were recorded within impairment of assets on our consolidated statement of operations and comprehensive income (loss) for the fiscal year ended March 27, 2021. See Note 8 to the accompanying financial statements for information relating to the annual impairment analysis performed during the fourth quarters of Fiscal 2023, Fiscal 2022 and Fiscal 2021.

It is possible that our conclusions regarding impairment or recoverability of goodwill or other indefinite intangible assets could change in future periods if, for example, (i) our businesses do not perform as projected, (ii) overall economic conditions in future years vary from current assumptions, (iii) business conditions or strategies change from our current assumptions, (iv) discount rates change, (v) market multiples change or (vi) the identification of our reporting units change, among other factors. Such changes could result in a future impairment charge of goodwill or other indefinite intangible assets.

### *Share-based Compensation*

We grant share-based awards to certain of our employees and directors. The grant date fair value of share options is calculated using the Black-Scholes option pricing model, which requires us to use subjective assumptions. The closing market price at the grant date is used to determine the grant date fair value of restricted stock units ("RSUs") and performance-based RSUs. These values are recognized as expense over the requisite service period, net of estimated forfeitures, based on expected attainment of pre-established performance goals for performance grants, or the passage of time for those grants which have only time-based vesting requirements. Compensation expense for performance-based RSUs is recognized over the employees' requisite service period when attainment of the performance goals is deemed probable, which involves judgment as to achievement of certain performance metrics.

We use our own historical experience in determining the expected holding period and volatility of our time-based share option awards. Determining the grant date fair value of share-based awards requires considerable judgment, including estimating expected volatility, expected term, risk-free rate and forfeitures. If factors change and we employ different assumptions, the fair value of future awards and resulting share-based compensation expense may differ significantly from what we have estimated in the past.

PX7098-047

*Derivative Financial Instruments*

### Forward Foreign Currency Exchange Contracts

We use forward foreign currency exchange contracts to manage our exposure to fluctuations in foreign currency for certain transactions. We, in our normal course of business, enter into transactions with foreign suppliers and seek to minimize risks related to these transactions. We employ these contracts to hedge our cash flows, as they relate to foreign currency transactions. Certain of these contracts are designated as hedges for accounting purposes, while others remain undesignated. All of our derivative instruments are recorded in our consolidated balance sheets at fair value on a gross basis, regardless of their hedge designation.

We designate certain contracts related to the purchase of inventory that qualify for hedge accounting as cash flow hedges. Formal hedge documentation is prepared for all derivative instruments designated as hedges, including a description of the hedged item and the hedging instrument and the risk being hedged. The changes in the fair value for contracts designated as cash flow hedges is recorded in equity as a component of accumulated other comprehensive income until the hedged item affects earnings. When the inventory related to forecasted inventory purchases that are being hedged is sold to a third-party, the gains or losses deferred in accumulated other comprehensive income are recognized within cost of goods sold. The Company uses regression analysis to assess effectiveness of derivative instruments that are designated as hedges, which compares the change in the fair value of the derivative instrument to the change in the related hedged item. If the hedge is no longer expected to be highly effective in the future, future changes in the fair value are recognized in earnings. For those contracts that are not designated as hedges, changes in the fair value are recorded to foreign currency loss (gain) in our consolidated statements of operations and comprehensive income (loss). We classify cash flows relating to our forward foreign currency exchange contracts related to purchases of inventory consistently with the classification of the hedged item within cash flows from operating activities.

We are exposed to the risk that counterparties to derivative contracts will fail to meet their contractual obligations. In order to mitigate counterparty credit risk, we only enter into contracts with carefully selected financial institutions based upon their credit ratings and certain other financial factors, adhering to established limits for credit exposure. The aforementioned forward contracts generally have a term of no more than 12 months. The period of these contracts is directly related to the foreign transaction they are intended to hedge.

### Net Investment Hedges

We also use fixed-to-fixed cross currency swap agreements to hedge our net investments in foreign operations against future volatility in the exchange rates between different currencies. We have elected the spot method of designating these contracts under ASU 2017-12, *"Derivatives and Hedging (Topic 815): Targeted Improvements to Accounting for Hedging Activities"*, and have designated these contracts as net investment hedges. The net gain or loss on the net investment hedge is reported within foreign currency translation gains and losses ("CTA"), as a component of accumulated other comprehensive income on our consolidated balance sheets. Interest accruals and coupon payments are recognized directly in interest expense (income), net, in our consolidated statements of operations and comprehensive income (loss). Upon discontinuation of a hedge, all previously recognized amounts remain in CTA until the net investment is sold, diluted or liquidated.

We are exposed to the risk that counterparties to derivative contracts will fail to meet their contractual obligations. In order to mitigate counterparty credit risk, we only enter into contracts with carefully selected financial institutions based upon their credit ratings and certain other financial factors, adhering to established limits for credit exposure.

During Fiscal 2021, the Company resumed its normal hedging program and entered into multiple fixed-to-fixed cross-currency swap agreements to hedge its net investment in Euro-denominated and Japanese Yen-denominated subsidiaries against future volatility in the exchange rate between the United States dollar and these currencies. During Fiscal 2021, the Company entered into multiple fixed-to-fixed cross-currency swap agreements with aggregate notional amounts of $4 billion to hedge its net investment in Euro-denominated subsidiaries and $194 million to hedge its net investment in Japanese Yen-denominated subsidiaries against future volatility in the exchange rates between the United States dollar and these currencies.

During the first quarter of Fiscal 2022, the Company modified multiple fixed-to-fixed cross-currency swap agreements with aggregate notional amounts of $2.875 billion to hedge its net investment in Euro denominated subsidiaries. Due to an other-than-insignificant financing element for certain of the first quarter modifications, net interest cash inflows of $31 million during Fiscal 2022 related to these contracts are classified as financing activities in our consolidated statements of cash flows.

46

PX7098-048

During the third and fourth quarter of Fiscal 2022, we modified multiple fixed-to-fixed cross-currency swap agreements with aggregate notional amounts of $1.5 billion and $2.475 billion, respectively. The modification of these hedges resulted in the receipt of $59 million and $130 million in cash during the third and fourth quarter of Fiscal 2022, respectively. These amounts are classified within investing activities in our consolidated statements of cash flows.

During the first quarter of Fiscal 2023, the Company modified multiple fixed-to-fixed cross-currency swap agreements with aggregate notional amounts of $1.094 billion to hedge its net investment, of which $900 million was in Euro denominated subsidiaries and $194 million was in Japanese Yen denominated subsidiaries. The modification of these swaps resulted in the Company receiving $66 million in cash during the first quarter of Fiscal 2023. These contracts have been designated as net investment hedges.

As of July 2, 2022, the Company had multiple fixed-to-fixed cross-currency swap agreements with aggregate notional amounts of $4 billion to hedge its net investment in Euro denominated subsidiaries (the "Euro Net Investment Hedges") and $194 million to hedge its net investment in Japanese Yen denominated subsidiaries (the "Japanese Yen Net Investment Hedges"). During the month of July 2022, the Euro Net Investment Hedges with aggregate notional amounts of $4 billion outstanding as of July 2, 2022 were terminated resulting in the Company receiving $237 million in cash.

During the second quarter of Fiscal 2023, the Company also entered into, and subsequently terminated, additional Euro Net Investment Hedges with aggregate notional amounts of $4 billion. The termination of these contracts resulted in the Company receiving an additional $100 million in cash.

During the second quarter of Fiscal 2023, the Company also modified certain Japanese Yen Net Investment Hedges with notional amounts of $100 million. The modification of these hedges resulted in the Company receiving $6 million in cash during the second quarter of Fiscal 2023. The Company entered into additional Japanese Yen Net Investment Hedges with notional amount of $100 million. These contracts have been designated as net investment hedges.

During the second quarter of Fiscal 2023, the Company received a total of $343 million from the termination of its Euro Net Investment Hedges and the modification of its Japanese Yen Net Investment Hedges.

During the third quarter of Fiscal 2023, the Company entered into multiple fixed-to-fixed cross-currency swap agreements with aggregate notional amounts of €1 billion (approximately $1.07 billion) to hedge its net investment in GBP denominated subsidiaries (the "GBP/EUR Net Investment Hedges"). Under the terms of these contracts, the Company will exchange the semi-annual fixed rate payments on GBP denominated debt for fixed rate payments of 0% in Euro. These contracts have maturity dates between November 2024 and November 2027 and are designated as net investment hedges.

As of April 1, 2023, the Company had Japanese Yen Net Investment Hedges with aggregate notional amounts of $294 million. Under the terms of these contracts, the Company will exchange the semi-annual fixed rate payments on United States denominated debt for fixed rate payments of 0% to 2.665% in Japanese Yen. These contracts have maturity dates between May 2027 and February 2051 and are designated as net investment hedges.

Certain of these contracts are supported by a credit support annex ("CSA") which provides for collateral exchange with the earliest effective date being September 2027. If the outstanding position of a contract exceeds a certain threshold governed by the aforementioned CSA's, either party is required to post cash collateral.

When a cross-currency swap is used as a hedging instrument in a net investment hedge assessed under the spot method, the cross-currency basis spread is excluded from the assessment of hedge effectiveness and is recognized as a reduction in interest expense (income) in the Company's consolidated statements of operations and comprehensive income (loss). Accordingly, the Company recorded interest income of $38 million, $63 million and $16 million, respectively, during Fiscal 2023, Fiscal 2022 and Fiscal 2021.

PX7098-049

**Fair Value Hedges**

The Company is exposed to transaction risk from foreign currency exchange rate fluctuations with respect to various cross-currency intercompany loans. This primarily includes exposure to exchange rate fluctuations in the Euro and British Pound which will impact earnings on a consolidated basis. To manage the exchange rate risk related to these balances, during the fourth quarter of Fiscal 2023 the Company entered into fair value cross-currency swap agreements to hedge its exposure in GBP denominated subsidiaries (the "GBP Fair Value Hedge") on a Euro denominated intercompany loan. As of April 1, 2023, the total notional values of outstanding fair value cross-currency swaps related to these loans were €1 billion (approximately $1.08 billion). Under the term of these contracts, the Company will exchange the semi-annual fixed rate payments on GBP denominated debt for fixed rate payments of 0% in Euro. These contracts have maturity dates between March 2025 and March 2026 and are designated as fair value hedges.

When a cross-currency swap is designated as a fair value hedge and qualifies as highly effective, the fair value hedge will be recorded at fair value each period on the Company's consolidated balance sheets, with the difference resulting from the changes in the spot rate at hedge inception to the current period recognized in foreign currency loss (gain) on the Company's consolidated statements of operations and comprehensive income (loss), which will offset the earnings impact of the original transaction being hedged for. Accordingly, the Company recorded a foreign currency gain of $4 million during Fiscal 2023.

*Income Taxes*

Deferred income tax assets and liabilities reflect temporary differences between the tax basis and financial reporting basis of our assets and liabilities and are determined using the tax rates and laws in effect for the periods in which the differences are expected to reverse. We periodically assess the realizability of deferred tax assets and the adequacy of deferred tax liabilities, based on the results of local, state, federal or foreign statutory tax audits or our own estimates and judgments.

Realization of deferred tax assets associated with net operating loss and tax credit carryforwards is dependent upon generating sufficient taxable income prior to their expiration in the applicable tax jurisdiction. We periodically review the recoverability of our deferred tax assets and provide valuation allowances as deemed necessary to reduce deferred tax assets to amounts that more-likely-than-not will be realized. This determination involves considerable judgment and our management considers many factors when assessing the likelihood of future realization of deferred tax assets, including recent earnings results within various taxing jurisdictions, expectations of future taxable income, the carryforward periods remaining and other factors. Changes in the required valuation allowance are recorded in income in the period such determination is made. Deferred tax assets could be reduced in the future if our estimates of taxable income during the carryforward period are significantly reduced or alternative tax strategies are no longer viable.

We recognize the impact of an uncertain income tax position taken on our income tax returns at the largest amount that is more-likely-than-not to be sustained upon audit by the relevant taxing authority. The effect of an uncertain income tax position will not be taken into account if the position has less than a 50% likelihood of being sustained. Our tax positions are analyzed periodically (at least quarterly) and adjustments are made as events occur that warrant adjustments to those positions. We record interest and penalties payable to relevant tax authorities as income tax expense.

*New Accounting Pronouncements*

Please refer to Note 2 to the accompanying consolidated financial statements for detailed information relating to recently adopted and recently issued accounting pronouncements and the associated impacts.

PX7098-050

**Results of Operations**

A discussion regarding our results of operations for Fiscal 2023 compared to Fiscal 2022 is presented below. A discussion regarding our results of operations for Fiscal 2022 compared to Fiscal 2021 can be found under Item 7 in our Annual Report on Form 10-K for the year ended April 2, 2022, filed with the SEC on June 1, 2022, which is available on the SEC's website at www.sec.gov and our investor website at www.capriholdings.com.

***Comparison of Fiscal 2023 with Fiscal 2022***

The following table details the results of our operations for Fiscal 2023 and Fiscal 2022 and expresses the relationship of certain line items to total revenue as a percentage (dollars in millions):

| | Fiscal Years Ended | | | | % of Total Revenue for Fiscal 2023 | % of Total Revenue for Fiscal 2022 |
| | April 1, 2023 | April 2, 2022 | $ Change | % Change | | |
|---|---|---|---|---|---|---|
| **Statements of Operations Data:** | | | | | | |
| Total revenue | $ 5,619 | $ 5,654 | $ (35) | (0.6)% | | |
| Cost of goods sold | 1,895 | 1,910 | (15) | (0.8)% | 33.7 % | 33.8 % |
| Gross profit | 3,724 | 3,744 | (20) | (0.5)% | 66.3 % | 66.2 % |
| Selling, general and administrative expenses | 2,708 | 2,533 | 175 | 6.9 % | 48.2 % | 44.8 % |
| Depreciation and amortization | 179 | 193 | (14) | (7.3)% | 3.2 % | 3.4 % |
| Impairment of assets | 142 | 73 | 69 | 94.5 % | 2.5 % | 1.3 % |
| Restructuring and other charges | 16 | 42 | (26) | (61.9)% | 0.3 % | 0.7 % |
| Total operating expenses | 3,045 | 2,841 | 204 | 7.2 % | 54.2 % | 50.2 % |
| Income from operations | 679 | 903 | (224) | (24.8)% | 12.1 % | 16.0 % |
| Other income, net | (3) | (2) | (1) | (50.0)% | (0.1)% | — % |
| Interest expense (income), net | 24 | (18) | 42 | NM | 0.4 % | (0.3)% |
| Foreign currency loss | 10 | 8 | 2 | 25.0 % | 0.2 % | 0.1 % |
| Income before provision for income taxes | 648 | 915 | (267) | (29.2)% | 11.5 % | 16.2 % |
| Provision for income taxes | 29 | 92 | (63) | (68.5)% | 0.5 % | 1.6 % |
| Net income | 619 | 823 | (204) | (24.8)% | | |
| Less: Net income attributable to noncontrolling interests | 3 | 1 | 2 | NM | | |
| Net income attributable to Capri | $ 616 | $ 822 | $ (206) | (25.1)% | | |

NM   Not meaningful

*Total Revenue*

Total revenue decreased $35.0 million, or 0.6%, to $5.619 billion for Fiscal 2023, compared to $5.654 billion for Fiscal 2022, which included net unfavorable foreign currency effects of $333 million as a result of the strengthening of the U.S. dollar compared to all major currencies in which we operate in Fiscal 2023, as compared to Fiscal 2022. On a constant currency basis, our total revenue increased $298.0 million, or 5.3%. The increase is attributable to increased retail revenues in the Americas and increased retail and wholesale in EMEA, partially offset by decreased revenues in Greater China due to COVID-19 related disruptions for each of our brands and approximately $70 million of revenue attributable to the 53rd week in Fiscal 2022.

*Gross Profit*

Gross profit decreased $20.0 million, or 0.5%, to $3.724 billion during Fiscal 2023, compared to $3.744 billion for Fiscal 2022, which included net unfavorable foreign currency effects of $230 million. Gross profit as a percentage of total revenue increased 10 basis points to 66.3% during Fiscal 2023, compared to 66.2% during Fiscal 2022. The increase in gross profit margin was primarily attributable to a higher average unit price, partially offset by unfavorable regional sales mix.

PX7098-051

*Total Operating Expenses*

Total operating expenses increased $204 million, or 7.2%, to $3.045 billion during Fiscal 2023, compared to $2.841 billion for Fiscal 2022. Our operating expenses included a net favorable foreign currency impact of approximately $198 million. Total operating expenses as a percentage of total revenue increased to 54.2% in Fiscal 2023, compared to 50.2% in Fiscal 2022. The components that comprise total operating expenses are detailed below.

*Selling, General and Administrative Expenses*

Selling, general and administrative expenses increased $175 million, or 6.9%, to $2.708 billion during Fiscal 2023, compared to $2.533 billion for Fiscal 2022. As a percentage of total revenue, selling, general and administrative expenses increased to 48.2% during Fiscal 2023, compared to 44.8% for Fiscal 2022, primarily due to increased marketing and unallocated corporate expenses and deleverage of operating expenses on lower revenue for Fiscal 2023.

Unallocated corporate expenses, which are included within selling, general and administrative expenses discussed above, but are not directly attributable to a reportable segment, increased $43 million, or 22.6%, to $233 million for Fiscal 2023, compared to $190 million for Fiscal 2022, primarily due to an increase in professional fees and information technology costs related to the ongoing ERP system implementation and Capri transformation projects.

*Depreciation and Amortization*

Depreciation and amortization decreased $14 million, or 7.3%, to $179 million during Fiscal 2023, compared to $193 million for Fiscal 2022. Depreciation and amortization decreased to 3.2% as a percentage of total revenue during Fiscal 2023, compared to 3.4% for Fiscal 2022. The decrease in depreciation and amortization expense was primarily attributable to lower depreciation due to lower capital expenditures in Fiscal 2022 and Fiscal 2021.

*Impairment of Assets*

During Fiscal 2023, we recognized asset impairment charges of $142 million, primarily related to the impairment of the Jimmy Choo Retail and Wholesale reporting units goodwill and Jimmy Choo brand intangible assets, as well as the impairment of certain operating lease right-of-use assets. During Fiscal 2022, we recognized asset impairment charges of approximately $73 million, primarily related to the impairment of operating lease right-of-use assets (see Note 13 to the accompanying consolidated financial statements for additional information).

*Restructuring and Other Charges*

During Fiscal 2023, we recognized restructuring and other charges of $16 million, primarily relating to equity awards associated with the acquisition of Versace (see Note 10 to the accompanying consolidated financial statements for additional information).

During Fiscal 2022, we recognized restructuring and other charges of $42 million, which included other costs of $33 million, primarily related to equity awards associated with the acquisition of Versace and severance for an executive officer and $9 million related to our Capri Retail Store Optimization Program.

*Income from Operations*

As a result of the foregoing, income from operations decreased $224 million to $679 million during Fiscal 2023, compared to $903 million for Fiscal 2022. Income from operations as a percentage of total revenue decreased to 12.1% in Fiscal 2023, compared to 16.0% in Fiscal 2022. See *Segment Information* above for a reconciliation of our segment operating income to total operating income.

PX7098-052

*Interest Expense (Income), net*

During Fiscal 2023, we recognized $24 million of interest expense compared to $18 million of interest income during Fiscal 2022. The $42 million increase in interest expense (income), net, is primarily due to higher effective interest rates on our outstanding debt, higher average borrowings outstanding and lower interest income from our net investment hedges, partially offset by higher interest income earned on our cash and cash equivalents (see Note 11 and Note 14 to the accompanying consolidated financial statements for additional information).

*Foreign Currency Loss*

During Fiscal 2023 and Fiscal 2022, we recognized a net foreign currency loss of $10 million and $8 million, respectively, primarily attributable to the remeasurement of intercompany loans with certain of our subsidiaries.

*Provision for Income Taxes*

During Fiscal 2023, we recognized $29 million of income tax expense on pre-tax income of $648 million compared with $92 million of income tax expense on a pre-tax income of $915 million for Fiscal 2022. Our effective tax rate for Fiscal 2023 was lower than our effective tax rate in Fiscal 2022 primarily due to decreases in uncertain tax positions as well as a more favorable effect of our global financing activities during Fiscal 2023 as compared to Fiscal 2022. In addition, in Fiscal 2022, the Company recognized a benefit from the impact of enacted tax legislation in Italy which allowed the Company to reduce its deferred tax liabilities as well as a United States net operating loss ("NOL") benefit realized which was not recurring in Fiscal 2023.

The global financing activities are related to our previously disclosed 2014 move of our principal executive office from Hong Kong to the U.K. and decision to become a U.K. tax resident. In connection with this decision, we funded our international growth strategy through intercompany debt financing arrangements between certain of our United States, United Kingdom and Hungarian subsidiaries. Accordingly, due to the difference in the statutory income tax rates between these jurisdictions, we realized a lower effective tax rate on consolidated pre-tax income.

Our effective tax rate may fluctuate from time to time due to the effects of changes in United States state and local taxes and tax rates in foreign jurisdictions. In addition, factors such as the geographic mix of earnings, enacted tax legislation and the results of various global tax strategies, may also impact our effective tax rate in future periods.

*Net Income Attributable to Capri*

As a result of the foregoing, during Fiscal 2023 our net income attributable to Capri decreased $206 million to $616 million, compared to net income of $822 million for Fiscal 2022.

PX7098-053

**Segment Information**

*Versace*

| | Fiscal Years Ended | | | % Change | |
| | April 1, 2023 | April 2, 2022 | $ Change | As Reported | Constant Currency |
|---|---|---|---|---|---|
| Revenues | $ 1,106 | $ 1,088 | $ 18 | 1.7 % | 13.8 % |
| Income from operations | $ 152 | $ 185 | $ (33) | (17.8)% | |
| Operating margin | 13.7 % | 17.0 % | | | |

*Revenues*

Versace revenues increased $18 million, or 1.7%, to $1.106 billion for Fiscal 2023, compared to $1.088 billion for Fiscal 2022, which included unfavorable foreign currency effects of $132 million. On a constant currency basis, revenue increased $150 million, or 13.8%, primarily attributable to increased retail revenue in the Americas and EMEA and wholesale shipments in EMEA, partially offset by decreased revenues in Greater China due to COVID-19 related disruptions.

*Income from Operations*

During Fiscal 2023, Versace recorded income from operations of $152 million compared to $185 million for Fiscal 2022. Operating margin decreased from 17.0% for Fiscal 2022 to 13.7% for Fiscal 2023, primarily due to increased retail store costs from a higher store count and increased employee costs.

*Jimmy Choo*

| | Fiscal Years Ended | | | % Change | |
| | April 1, 2023 | April 2, 2022 | $ Change | As Reported | Constant Currency |
|---|---|---|---|---|---|
| Revenues | $ 633 | $ 613 | $ 20 | 3.3 % | 11.4 % |
| Income from operations | $ 38 | $ 13 | $ 25 | NM | |
| Operating margin | 6.0 % | 2.1 % | | | |

NM   Not meaningful

*Revenues*

Jimmy Choo revenues increased $20 million, or 3.3%, to $633 million for Fiscal 2023, compared to $613 million for Fiscal 2022, which included unfavorable foreign currency effects of $50 million. On a constant currency basis, revenue increased $70 million, or 11.4%, primarily attributable to increased revenue in the Americas and EMEA and increased licensing revenue, partially offset by decreased revenue in Greater China due to the impact of COVID-19 related disruptions.

*Income from Operations*

During Fiscal 2023, Jimmy Choo recorded income from operations of $38 million compared to $13 million for Fiscal 2022. Operating margin increased from 2.1% for Fiscal 2022 to 6.0% for Fiscal 2023, primarily due to a higher average unit price and leveraging of operating expenses on higher revenue.

PX7098-054

*Michael Kors*

| | Fiscal Years Ended | | | % Change | |
| | April 1, 2023 | April 2, 2022 | $ Change | As Reported | Constant Currency |
|---|---|---|---|---|---|
| Revenues | $ 3,880 | $ 3,953 | $ (73) | (1.8)% | 2.0 % |
| Income from operations | $ 868 | $ 1,005 | $ (137) | (13.6)% | |
| Operating margin | 22.4 % | 25.4 % | | | |

*Revenues*

Michael Kors revenues decreased $73 million, or 1.8%, to $3.880 billion for Fiscal 2023, compared to $3.953 billion for Fiscal 2022, which included unfavorable foreign currency effects of $151 million. On a constant currency basis, revenue increased $78 million, or 2.0%, primarily attributable to increased retail revenue in the Americas, partially offset by decreased revenue in Greater China due to the impact of COVID-19 related disruptions.

*Income from Operations*

During Fiscal 2023, Michael Kors recorded income from operations of $868 million compared to $1.005 billion for Fiscal 2022. Operating margin decreased from 25.4% for Fiscal 2022 to 22.4% for Fiscal 2023, primarily due to increased marketing investments and deleveraging of operating expenses on lower revenue.

PX7098-055

**Liquidity and Capital Resources**

Our primary sources of liquidity are the cash flows generated from our operations, along with borrowings available under our credit facilities (see below discussion regarding "Revolving Credit Facilities") and available cash and cash equivalents. Our primary use of this liquidity is to fund the ongoing cash requirements, including our working capital needs and capital investments in our business, debt repayments, acquisitions, returns of capital, including share repurchases and other corporate activities. We believe that the cash generated from our operations, together with borrowings available under our revolving credit facilities and available cash and cash equivalents, will be sufficient to meet our working capital needs for the next 12 months and beyond, including investments made and expenses incurred in connection with our store growth plans, investments in corporate and distribution facilities, continued IT system development, e-commerce and marketing initiatives. We spent $226 million on capital expenditures during Fiscal 2023 and expect to spend approximately $260 million during Fiscal 2024. This anticipated increase reflects continued expenditures related to our retail operations (including e-commerce), ERP system implementation and Capri transformation programs. The majority of the Fiscal 2023 expenditures related to our retail operations (including e-commerce), ERP system implementation and Capri transformation programs.

The Capri transformation program represents a multi-year, multi-project initiative extending through Fiscal 2026 intended to improve the operating effectiveness and efficiency of our organization by creating best in class shared platforms across our brands and by expanding our digital capabilities. These initiatives cover multiple aspects of our operations including supply chain, marketing, omni-channel customer experience, e-commerce, data analytics and IT infrastructure. Over the next three fiscal years, we expect expenditures up to $220 million related to these efforts.

The Company is also in progress with a multi-year ERP implementation which includes accounting, finance and wholesale and retail inventory solutions in order to create standardized finance IT applications across our organization. This ERP implementation will continue through Fiscal 2026 and we expect expenditures up to $170 million over the next three fiscal years.

The following table sets forth key indicators of our liquidity and capital resources (in millions):

| | As of | | | |
|---|---|---|---|---|
| | | April 1, 2023 | | April 2, 2022 |
| **Balance Sheet Data:** | | | | |
| Cash and cash equivalents | $ | 249 | $ | 169 |
| Working capital | $ | 420 | $ | 325 |
| Total assets | $ | 7,295 | $ | 7,480 |
| Short-term debt | $ | 5 | $ | 29 |
| Long-term debt | $ | 1,822 | $ | 1,131 |

| | Fiscal Years Ended | | | | | |
|---|---|---|---|---|---|---|
| | | April 1, 2023 | | April 2, 2022 | | March 27, 2021 |
| **Cash flows provided by (used in):** | | | | | | |
| Operating activities | $ | 771 | $ | 704 | $ | 624 |
| Investing activities | | 183 | | 58 | | (124) |
| Financing activities | | (776) | | (800) | | (870) |
| Effect of exchange rate changes | | (94) | | (24) | | 12 |
| **Net increase (decrease) in cash, cash equivalents and restricted cash** | $ | 84 | $ | (62) | $ | (358) |

*Cash Provided by Operating Activities*

Cash provided by operating activities increased $67 million to $771 million during Fiscal 2023, as compared to $704 million for Fiscal 2022, which was as a result of the improvement in our working capital partially offset by a decrease in our net income after non-cash adjustments compared to prior year. The changes in our working capital were primarily due to the stabilization of inventory levels compared to prior year.

PX7098-056

Cash provided by operating activities increased $80 million to $704 million during Fiscal 2022, as compared to $624 million for Fiscal 2021, which was due to an increase in our net income after non-cash adjustments, partially offset by decreases related to changes in our working capital. The decreases related to the changes in our working capital are primarily attributable to an increase in our inventory levels and fluctuations in the timing of payments and receipts when compared to the prior year.

### *Cash Provided by (Used in) Investing Activities*

Net cash provided by investing activities was $183 million during Fiscal 2023, as compared to $58 million during Fiscal 2022. The $125 million increase in cash provided by investing activities was primarily attributable to higher cash received on the settlement of net investment hedges of $220 million during Fiscal 2023, partially offset by higher capital expenditures of $95 million compared to prior year due to ERP system implementations, increased Corporate investments related to Capri transformation programs and increased investments in our retail stores.

Net cash provided by investing activities was $58 million during Fiscal 2022, as compared to net cash used in investing activities of $124 million during Fiscal 2021. The $182 million increase in cash provided by investing activities was primarily attributable to a $189 million cash received on the settlement of certain net investment hedges during Fiscal 2022.

### *Cash Used in Financing Activities*

Net cash used in financing activities was $776 million during Fiscal 2023, as compared to $800 million during Fiscal 2022. The decrease in cash used by financing activities of $24 million was primarily due to an increase in net debt borrowings of $774 million, partially offset by a $703 million increase in cash payments to repurchase our ordinary shares.

Net cash used in financing activities was $800 million during Fiscal 2022, as compared to $870 million during Fiscal 2021. The decrease in cash used by financing activities of $70 million was primarily due to a decrease in net debt repayments of $681 million, higher cash proceeds from other financing activities and employee option exercises, partially offset by an increase of $660 million in cash payments to repurchase our ordinary shares during Fiscal 2022.

PX7098-057

**Debt Facilities**

The following table presents a summary of the Company's borrowing capacity and amounts outstanding as of April 1, 2023 and April 2, 2022 (dollars in millions):

| | Fiscal Years Ended | | | |
| --- | --- | --- | --- | --- |
| | April 1, 2023 | | April 2, 2022 | |
| **Revolving Credit Facility (excluding up to a $500 million accordion feature)** [1] | | | | |
| Total Availability | $ | 1,500 | $ | 1,000 |
| Borrowings outstanding [2] | | **874** | | **175** |
| Letter of credit outstanding | | 3 | | 21 |
| Remaining availability | $ | 623 | $ | 804 |
| **Versace Term Loan (450 Million Euro)** | | | | |
| Borrowings outstanding, net of debt issuance costs [3] | $ | **487** | $ | **—** |
| **Senior Notes due 2024** | | | | |
| Borrowings Outstanding, net of debt issuance costs and discount amortization [2] | $ | **449** | $ | **448** |
| **2018 Term Loan ($1.6 billion)** | | | | |
| Borrowings Outstanding, net of debt issuance costs [4] | $ | **—** | $ | **495** |
| **Other Borrowings** [5] | $ | **17** | $ | **42** |
| **Hong Kong Uncommitted Credit Facility:** | | | | |
| Total availability (70 million and 80 million Hong Kong Dollar) [6] | $ | 9 | $ | 10 |
| Borrowings outstanding | | — | | — |
| Remaining availability (70 million and 80 million Hong Kong Dollar) | $ | 9 | $ | 10 |
| **China Uncommitted Credit Facility:** | | | | |
| Total availability (75 million and 45 million Chinese Yuan) [6] | $ | 11 | $ | 7 |
| Borrowings outstanding | | — | | — |
| Remaining availability (75 million and 45 million Chinese Yuan) | $ | 11 | $ | 7 |
| **Japan Credit Facility:** | | | | |
| Total availability (1.0 billion Japanese Yen) | $ | 8 | $ | 8 |
| Borrowings outstanding | | — | | — |
| Remaining availability (1.0 billion Japanese Yen) | $ | 8 | $ | 8 |
| **Versace Uncommitted Credit Facility:** | | | | |
| Total availability (40 million and 48 million Euro) [6] | $ | 43 | $ | 52 |
| Borrowings outstanding | | — | | — |
| Remaining availability (40 million and 48 million Euro) | $ | 43 | $ | 52 |
| **Total borrowings outstanding** [1] | $ | **1,827** | $ | **1,160** |
| Total remaining availability | $ | 694 | $ | 881 |

---

[1] The financial covenant in our 2022 Credit Facility requires us to comply with the quarterly maximum net leverage ratio test of 4.00 to 1.0. As of April 1, 2023 and April 2, 2022, we were in compliance with all covenants related to our agreements then in effect governing our debt. See Note 11 to the accompanying consolidated financial statements for additional information.

[2] As of April 1, 2023 and April 2, 2022, all amounts are recorded as long-term debt in our consolidated balance sheets.

PX7098-058

(3) On December 5, 2022, Gianni Versace S.r.l., our wholly owned subsidiary, entered into a credit facility, which provided a senior unsecured term loan in an aggregate principal amount of €450 million (approximately $488 million). As of April 1, 2023, all amounts are recorded as long-term debt in our consolidated balance sheets.

(4) As of April 1, 2023, we no longer had an outstanding balance under the 2018 Term Loan as it was repaid. As of April 2, 2022, all amounts are recorded as long-term debt in our consolidated balance sheets.

(5) The balance as of April 1, 2023 consists of primarily $4 million related to our supplier finance program recorded within short-term debt in our consolidated balance sheets and $11 million related to the sale of certain Versace tax receivables, with $1 million and $10 million recorded within short-term debt and long-term debt, respectively, in our consolidated balance sheets. The balance as of April 2, 2022 consists of $21 million related to our supplier finance program recorded within short term debt in our consolidated balance sheets, $18 million related to the sale of certain Versace tax receivables, with $8 million and $10 million recorded within short-term debt and long-term debt, respectively, in our consolidated balance sheets and $3 million of other loans recorded as long-term debt in our consolidated balance sheets.

(6) The balance as of April 1, 2023 represents the total availability of the credit facility, which excludes bank guarantees.

We believe that our 2022 Credit Facility is adequately diversified with no undue concentration in any one financial institution. As of April 1, 2023, there were 17 financial institutions participating in the facility, with none maintaining a maximum commitment percentage in excess of 10%. We have no reason to believe that the participating institutions will be unable to fulfill their obligations to provide financing in accordance with the terms of the 2022 Credit Facility.

See Note 11 in the accompanying consolidated financial statements for detailed information relating to our credit facilities and debt obligations.

### Share Repurchase Program

The following table presents our treasury share repurchases during the fiscal years ended April 1, 2023 and April 2, 2022 (dollars in millions):

| | Fiscal Years Ended | |
| --- | --- | --- |
| | April 1, 2023 | April 2, 2022 |
| Cost of shares repurchased under share repurchase program | $ 1,350 | $ 650 |
| Fair value of shares withheld to cover tax obligations for vested restricted share awards | 14 | 11 |
| Total cost of treasury shares repurchased | $ 1,364 | $ 661 |
| | | |
| Shares repurchased under share repurchase program | 27,356,549 | 11,014,541 |
| Shares withheld to cover tax withholding obligations | 301,326 | 203,863 |
| | 27,657,875 | 11,218,404 |

During the first quarter of Fiscal 2022, the Company reinstated its $500 million share-repurchase program, which was previously suspended during the first quarter of Fiscal 2021 in response to the impact of the COVID-19 pandemic and the provisions of the Second Amendment of the 2018 Credit Facility. Subsequently, on November 3, 2021, the Company announced that its Board of Directors had terminated the Company's existing $500 million share repurchase program (the "Prior Plan"), which had $250 million of availability remaining at the time, and authorized a new share repurchase program (the "Fiscal 2022 Plan") pursuant to which the Company was permitted, from time to time, to repurchase up to $1.0 billion of its outstanding ordinary shares within a period of two years from the effective date of the program.

On June 1, 2022, the Board of Directors terminated our Fiscal 2022 Plan, with $400 million of availability remaining, and authorized a new share repurchase program (the "Fiscal 2023 Plan") pursuant to which we may, from time to time, repurchase up to $1.0 billion of our outstanding ordinary shares within period of two years from the effective date of the program.

On November 9, 2022, the Company announced that its Board of Directors approved a new share repurchase program (the "Existing Share Repurchase Plan") of up to $1 billion of its outstanding ordinary shares, providing additional capacity to return cash to shareholders over the longer term. This new two-year program replaced the Fiscal 2023 Plan which had

PX7098-059

$250 million of availability remaining. As of April 1, 2023, the remaining availability under the Company's share repurchase program was $400 million.

Share repurchases may be made in open market or privately negotiated transactions and/or pursuant to Rule 10b5-1 trading plans, subject to market conditions, applicable legal requirements, trading restrictions under the Company's insider trading policy and other relevant factors. The program may be suspended or discontinued at any time.

See Note 15 to the accompanying consolidated financial statements for additional information.

**Contractual Obligations and Commercial Commitments**

As of April 1, 2023, our contractual obligations and commercial commitments were as follows (in millions):

| Fiscal Years | Fiscal 2024 | | Fiscal 2025-2026 | | Fiscal 2027-2028 | | Fiscal 2029 and thereafter | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|
| Operating leases | $ | 473 | $ | 681 | $ | 381 | $ | 427 | $ | 1,962 |
| Interest, net [1] | | 16 | | 11 | | — | | — | | 27 |
| Inventory purchase obligations | | 775 | | — | | — | | — | | 775 |
| Other commitments | | 89 | | 32 | | 4 | | — | | 125 |
| Short-term debt | | 5 | | — | | — | | — | | 5 |
| Long-term debt | | — | | 450 | | 1,374 | | — | | 1,824 |
| **Total** | **$** | **1,358** | **$** | **1,174** | **$** | **1,759** | **$** | **427** | **$** | **4,718** |

[1] Beginning in Fiscal 2027, we expect to be in an interest income position, therefore we would not expect to have net interest expense obligations through the above periods.

*Operating lease obligations* represent equipment leases and the minimum lease rental payments due under non-cancelable operating leases for our real estate locations globally. In addition to the above amounts, we are typically required to pay real estate taxes, contingent rent based on sales volume and other occupancy costs relating to leased properties for our retail stores.

*Interest, net* represents the estimated net interest expense associated with our term loan based on the current interest rate. It also includes the estimated net interest income from our net investment hedges and fair value hedges.

*Inventory purchase obligations* represent contractual obligations for future purchases of inventory.

*Other commitments* include non-cancelable contractual obligations related to marketing and advertising agreements, information technology agreements and supply agreements.

The above table excludes current liabilities (other than short-term debt and short-term operating lease liabilities) recorded as of April 1, 2023, as these items will be paid within one year, and non-current liabilities that have no cash outflows associated with them (e.g., deferred taxes).

**Off-Balance Sheet Arrangements**

We have not created, and are not party to, any special-purpose or off-balance sheet entities for the purpose of raising capital, incurring debt or operating our business. In addition to the commitments in the above table, our off-balance sheet commitments relating to our outstanding letters of credit were $35 million at April 1, 2023, including $32 million in letters of credit issued outside of the 2022 Credit Facility. In addition, as of April 1, 2023, bank guarantees of approximately $36 million were supported by our various credit facilities. We do not have any other off-balance sheet arrangements or relationships with entities that are not consolidated into our financial statements that have or are reasonably likely to have a material current or future effect on our financial condition, changes in financial condition, revenues, expenses, results of operations, liquidity, capital expenditures or capital resources.

PX7098-060

**Item 7A.    Quantitative and Qualitative Disclosures about Market Risk**

We are exposed to certain market risks during the normal course of our business, such as risk arising from fluctuations in foreign currency exchange rates, as well as fluctuations in interest rates. In order to manage these risks, we employ certain strategies to mitigate the effect of these fluctuations. We enter into foreign currency forward contracts to manage our foreign currency exposure to the fluctuations of certain foreign currencies. The use of these instruments primarily helps to manage our exposure to our foreign purchase commitments and better control our product costs. We do not use derivatives for trading or speculative purposes.

***Foreign Currency Exchange Risk***

*Forward Foreign Currency Exchange Contracts*

We are exposed to risks on certain purchase commitments to foreign suppliers based on the value of our purchasing subsidiaries' local currency relative to the currency requirement of the supplier on the date of the commitment. As such, we enter into forward foreign currency exchange contracts that generally mature in 12 months or less and are consistent with the related purchase commitments, to manage our exposure to the changes in the value of the Euro and the Canadian Dollar. These contracts are recorded at fair value in our consolidated balance sheets as either an asset or liability, and are derivative contracts to hedge cash flow risks. Certain of these contracts are designated as hedges for hedge accounting purposes, while certain of these contracts are not designated as hedges for accounting purposes. Accordingly, the changes in the fair value of the majority of these contracts at the balance sheet date are recorded in equity as a component of accumulated other comprehensive income, and upon maturity (settlement) are recorded in, or reclassified into, our cost of goods sold or operating expenses, in our consolidated statements of operations and comprehensive income (loss), as applicable to the transactions for which the forward foreign currency exchange contracts were established.

There were no forward foreign currency exchange contracts outstanding as of April 1, 2023 and as a result we were not required to perform a sensitivity analysis on such contracts.

*Net Investment Hedges*

We are exposed to adverse foreign currency exchange rate movements related to our net investment hedges. As of April 1, 2023, we have multiple fixed to fixed cross-currency swap agreements with aggregate notional amounts of $294 million to hedge our net investments in Japanese Yen-denominated subsidiaries against future volatility in the exchange rates between the United States dollar and the Japanese Yen. Under the term of these contracts, we will exchange the semi-annual fixed rate payments on United States denominated debt for fixed rate payments of 0% to 2.665% in Japanese Yen. Based on the net investment hedges outstanding as of April 1, 2023, a 10% appreciation or devaluation of the U.S. Dollar compared to the level of foreign currency exchange rates for currencies under contract as of April 1, 2023, would result in a net increase or decrease, respectively, of approximately $40 million in the fair value of these contracts. These contracts have maturity dates between November 2024 and February 2051. In addition, certain other contracts are supported by a credit support annex ("CSA") which provides for collateral exchange with the earliest effective date being September 2027. If the outstanding position of a contract exceeds a certain threshold governed by the aforementioned CSA's, either party is required to post cash collateral.

As of April 1, 2023, we have multiple fixed to fixed cross-currency swap agreements with aggregate notional amounts of €1 billion (approximately $1.07 billion) to hedge our net investments in Euro denominated subsidiaries against future volatility in exchange rates between the Euro and British pound. Under the term of these contracts, we will exchange the semi-annual fixed rate payments on GBP denominated debt for fixed rate payments of 0% in Euro. Based on the net investment hedges outstanding as of April 1, 2023, a 10% appreciation or devaluation of the British pound compared to the level of foreign currency exchange rates for currencies under contract as of April 1, 2023, would result in a net increase or decrease, respectively, of approximately £80 million (approximately $99 million) in the fair value of these contracts. These contracts have maturity dates between November 2024 and November 2027.

*Fair Value Hedges*

We are exposed to transaction risk from foreign currency exchange rate fluctuations with respect to various cross-currency intercompany loans which will impact earnings on a consolidated basis. To manage the exchange rate risk related to these balances, we enter into fair value forward cross-currency swap agreements to hedge its exposure in GBP denominated subsidiaries on a Euro denominated intercompany loan. As of April 1, 2023, the total notional values of outstanding fair value cross-currency swaps related to these loans were €1 billion (approximately $1.08 billion). Based on the fair value hedges outstanding as of April 1, 2023, a 10% appreciation or devaluation  of the British pound compared to the level of foreign

PX7098-061

currency exchange rates for currencies under contract as of April 1, 2023, would result in a net increase or decrease, respectively, of approximately £82 million (approximately $101 million) in the fair value of these contracts. These contracts have maturity dates between March 2025 and March 2026.

*Interest Rate Risk*

We are exposed to interest rate risk in relation to borrowings outstanding under our 2022 Credit Facility, our Versace Term Loan, our Hong Kong Credit Facility, our Japan Credit Facility, and our Uncommitted Versace Credit Facilities. Our 2022 Credit Facility carries interest rates that are tied to the prime rate and other institutional lending rates (depending on the particular origination of borrowing), as further described in Note 11 to the accompanying consolidated financial statements. Our Versace Term Loan carries interest rates that are tied to EURIBOR. Our Hong Kong Credit Facility carries interest at a rate that is tied to the Hong Kong Interbank Offered Rate. Our China Credit Facility carries interest at a rate that is tied to the People's Bank of China's Benchmark lending rate. Our Japan Credit Facility carries interest at a rate posted by the Mitsubishi UFJ Financial Group. Our Uncommitted Versace Credit Facilities carries interest at a rate set by the bank on the date of borrowing that is tied to the European Central Bank. Therefore, our consolidated statements of operations and comprehensive income (loss) and cash flows are exposed to changes in those interest rates. At April 1, 2023, we had $874 million borrowings outstanding under our 2022 Credit Facility, $487 million, outstanding, net of debt issuance costs, under our Versace Term Loan and no borrowings outstanding under all other Credit Facilities, as further described in Note 11 to the accompanying consolidated financial statements. At April 2, 2022, we had $175 million borrowings outstanding under our Revolving Credit Facility, $495 million, net of debt issuance costs, outstanding under our 2018 Term Loan Facility and no borrowings outstanding under our Versace Credit Facility. These balances are not indicative of future balances that may be outstanding under our revolving credit facilities that may be subject to fluctuations in interest rates. Any increases in the applicable interest rate(s) would cause an increase to the interest expense relative to any outstanding balance at that date.

*Credit Risk*

As of April 1, 2023, our $450 million Senior Notes, due in 2024, bear interest at a fixed rate equal to 4.250% per year, payable semi-annually. Our Senior Notes interest rate payable may be subject to adjustments from time to time if either Moody's or S&P (or a substitute rating agency), downgrades (or downgrades and subsequently upgrades) the credit rating assigned to the Senior Notes.

**Item 8.    Financial Statements and Supplementary Data**

See "Item 15. Exhibits and Financial Statement Schedules" for a listing of the consolidated financial statements and supplementary data included in this report.

**Item 9.    Changes in and Disagreements with Accountants on Accounting and Financial Disclosure**

Not applicable.

PX7098-062

**Item 9A.    Controls and Procedures**

*Disclosure Controls and Procedures*

We carried out an evaluation, under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, our principal executive officer and principal financial officer, respectively, of the design and operation of our disclosure controls and procedures (as such term is defined in Rules 13a - 15(e) and 15(d) - 15(e) under the Securities and Exchange Act of 1934, as amended, (the "Exchange Act")) as of April 1, 2023. Based on the evaluation, the Chief Executive Officer and Chief Financial Officer concluded that disclosure controls and procedures are effective as of April 1, 2023.

*Management's Report on Internal Control over Financial Reporting*

Our management is responsible for establishing and maintaining adequate internal control over financial reporting (as defined under the Exchange Act Rule 13a-15 (f)) to provide reasonable assurance regarding the reliability of financial reporting and that the consolidated financial statements have been prepared in accordance with U.S. GAAP. Such internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets; (ii) provide reasonable assurance (A) that transactions are recorded as necessary to permit preparation of financial statements in accordance with U.S. GAAP and that receipts and expenditures of the Company are being made only in accordance with authorizations of management and directors; and (B) regarding prevention or timely detection of unauthorized acquisition, use or disposition of our assets that could have a material effect on the financial statements.

Our management assessed the effectiveness of our internal control over financial reporting as of April 1, 2023. In making this assessment, it used the criteria set forth in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO), the 2013 Framework. Based on this assessment, management has determined that, as of April 1, 2023, our internal control over financial reporting is effective based on those criteria.

The Company's internal control over financial reporting as of April 1, 2023, as well as the consolidated financial statements, have been audited by Ernst & Young LLP, an independent registered public accounting firm, as stated in their report which appears herein.

*Changes in Internal Control over Financial Reporting*

Except as discussed below, there have been no changes in our internal control over financial reporting during the three months ended April 1, 2023, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

We are currently undertaking a major, multi-year ERP implementation to upgrade our information technology platforms and systems worldwide. The implementation is occurring in phases over several years. We have launched the finance functionality of the ERP system in certain regions starting in Fiscal 2023.

As a result of this multi-year implementation, we expect certain changes to our processes and procedures, which in turn, could result in changes to our internal control over financial reporting. While we expect this implementation to strengthen our internal control over financial reporting by automating certain manual processes and standardizing business processes and reporting across our organization, we will continue to evaluate and monitor our internal control over financial reporting as processes and procedures in the affected areas evolve. See Item 1A. "Risk Factors" — "A material delay or disruption in our information technology systems or e-commerce websites or our failure or inability to upgrade our information technology systems precisely and efficiently could have a material adverse effect on our business, results of operations and financial condition.*"

**Item 9B.    Other Information**

*Amendment to Amended and Restated Memorandum and Articles of Association*

The Board of Directors of the Company approved an amendment to clauses 2 and 3 of the Company's amended and restated Memorandum and Articles of Association (the "Amendment to the Memorandum"), effective May 24, 2023, reflecting a change of the Company's registered agent and registered office from Vistra Corporate Services Centre to Conyers Trust

PX7098-063

Company (BVI) Limited.  A copy of the Amendment to the Memorandum is attached as Exhibit 3.2 to this Annual Report on Form 10-K and incorporated herein by reference.

This disclosure is intended to satisfy the requirements of Item 5.03 of Form 8-K.

***Compensatory Arrangements of Certain Officers***

On May 30, 2023, the Company and Michael Kors (USA), Inc. (together with the Company, the "Company Parties") entered into an amended and restated employment agreement with each of Thomas J. Edwards, Jr., Jenna A. Hendricks and Krista A. McDonough (the "Employment Agreements").  The material changes to the Employment Agreements from the executive officers' prior employment agreements include: (i) providing that upon a termination of employment by the Company Parties without "cause" (and other than by reason of death or disability) or by the executive officer for "good reason", in addition to the existing severance entitlements under the prior employment agreement, the executive officer would be entitled to a pro rata annual cash incentive award for the year in which the date of termination occurs based on the actual level of performance; (ii) updating the definitions of "cause" and "good reason"; and (iii) updating the restrictive covenants to reflect the most current such covenants used in the equity awards under the Company's Third Amended and Restated Omnibus Incentive Plan.

In addition, on May 30, 2023, each of Mr. Edwards and Msmes. Hendricks and McDonough entered into a Change in Control Continuity Agreement with the Company (the "CIC Agreements"), which provides for an initial two-year term that will renew automatically for additional years commencing on the first anniversary of the effective date and each annual anniversary thereafter, unless notice of nonrenewal is provided.  The payments and benefits provided under the CIC Agreements are "double trigger" and are not payable upon a termination of the executive officer's employment for "cause," by a resignation by an executive officer without "good reason" or any termination of an executive officer's employment prior to a "change in control" of the Company.  Defined terms referenced in this description of the CIC Agreements have the meaning given to them in such agreements.

The severance protections under the CIC Agreements become effective on a change in control of the Company and remain in effect for a two-year protected period thereafter.  During such two-year period, the executive officer would generally be entitled to compensation and benefits consistent with those applicable prior to the change in control, and if the executive officer's employment is terminated by the Company without cause (and other than by reason of death or disability) or by the executive officer for good reason, the executive officer would be entitled to receive the following payments and benefits, subject to an effective release of claims against the Company and its affiliates:  (i) an amount equal to two times the sum of the executive officer's annual base salary and target annual cash incentive; (ii) a prorated target bonus for the portion of the Company's fiscal year elapsed prior to the date of termination; (iii) a payment equal to the cost of the monthly COBRA premiums for group health care plan coverage for a period of 24 months; and (iv) outplacement services up to a maximum cost of $25,000.  If the executive officer's employment is terminated during the protected period following a change in control due to death or disability, the executive officer would not be entitled to the benefits described above, but would be entitled to receive a prorated bonus based on the executive officer's target annual bonus opportunity and death or disability benefits not less than those provided prior to the change in control.  The payments and benefits under the CIC Agreements will be reduced to the extent that they would be subject to an excise tax under Sections 280G and 4999 of the Internal Revenue Code of 1986, as amended, unless the executive officer would be better off on an after-tax basis receiving all such payments and benefits and paying his or her own excise tax.  The CIC Agreements do not provide for an excise tax gross-up and include perpetual confidentiality and non-disparagement covenants, and non-solicitation covenants that apply while the executive officer is employed and for two years thereafter.

The foregoing summary is qualified in its entirety by reference to the Employment Agreements and the CIC Agreements, copies of which are filed herewith as Exhibits 10.11, 10.13, 10.16, 10.21, 10.22 and 10.23 and incorporated herein by reference.

This disclosure is intended to satisfy the requirements of Item 5.02(e) of Form 8-K.

**Item 9C.   Disclosure Regarding Foreign Jurisdictions that Prevent Inspections**

Not applicable.

PX7098-064

Part III

**Item 10.     Directors, Executive Officers and Corporate Governance**

Information with respect to this Item is included in the Company's Proxy Statement to be filed in June 2023, which is incorporated herein by reference.

**Item 11.     Executive Compensation**

Information with respect to this Item is included in the Company's Proxy Statement to be filed in June 2023, which is incorporated herein by reference.

**Item 12.     Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters**

The following table sets forth information as of April 1, 2023 regarding compensation plans under which the Company's equity securities are authorized for issuance:

**Equity Compensation Plan Information**

| Plan category | (a) Number of securities to be issued upon exercise of outstanding options, warrants and rights | (b) Weighted-average exercise price of outstanding options, warrants and rights [2] | (c) Number of securities remaining available for future issuance under equity compensation plans (excluding securities reflected in column (a)) |
|---|---|---|---|
| Equity compensation plans approved by security holders [1] | 3,576,840 | $ 43.98 | 6,169,920 |
| Equity compensation plans not approved by security holders | — | $ — | — |
| Total | 3,576,840 | $ 43.98 | 6,169,920 |

[1]   Reflects share options and restricted stock units issued under the Company's Third Amended and Restated Omnibus Incentive Plan (or predecessor plan).

[2]   Represents the weighted average exercise price of outstanding share awards only.

**Item 13.     Certain Relationships, Related Transactions and Director Independence**

Information with respect to this Item is included in the Company's Proxy Statement to be filed in June 2023, which is incorporated herein by reference.

**Item 14.     Principal Accountant Fees and Services**

Information with respect to this Item is included in the Company's Proxy Statement to be filed in June 2023, which is incorporated herein by reference.

PX7098-065

## PART IV

**Item 15.**    *Exhibits and Financial Statement Schedules*

(a)    The following documents are filed as part of this annual report on Form 10-K:

    1.    The following consolidated financial statements listed below are filed as a separate section of this Annual Report on Form 10-K:

        Report of Independent Registered Public Accounting Firm - Ernst & Young LLP (PCAOB ID No. 42).

        Consolidated Balance Sheets as of April 1, 2023 and April 2, 2022.

        Consolidated Statements of Operations and Comprehensive Income (Loss) for the fiscal years ended April 1, 2023, April 2, 2022 and March 27, 2021.

        Consolidated Statements of Shareholders' Equity for the fiscal years ended April 1, 2023, April 2, 2022 and March 27, 2021.

        Consolidated Statements of Cash Flows for the fiscal years ended April 1, 2023, April 2, 2022 and March 27, 2021.

        Notes to Consolidated Financial Statements for the fiscal years ended April 1, 2023, April 2, 2022 and March 27, 2021.

    2.    Exhibits:

## EXHIBIT INDEX

| Exhibit No. | Document Description |
| --- | --- |
| 2.1 | Stock Purchase Agreement, dated as of September 24, 2018, by and among Allegra Donata Versace Beck, Donatella Versace, Santo Versace, Borgo Luxembourg S.A R.L., Blackstone GPV Capital Partners (Mauritius) VI-D FDI Ltd., Blackstone GPV Tactical Partners (Mauritius)-N Ltd. and Capri Holdings Limited (f/k/a Michael Kors Holdings Limited) (included as Exhibit 2.1 to the Company's Current Report on Form 8-K (File No. 001-35368), filed on September 25, 2018 and incorporated herein by reference). |
| 3.1 | Amended and Restated Memorandum and Articles of Association of Capri Holdings Limited (included as Exhibit 3.1 to the Company's Current Report on Form 8-K filed on December 31, 2018 and incorporated herein by reference). |
| 3.2 | Amendment to Amended and Restated Memorandum and Articles of Association of Capri Holdings, effective May 24, 2023. |
| 4.1 | Specimen of Ordinary Share Certificate of Capri Holdings Limited (included as Exhibit 4.1 to the Company's Annual Report on Form 10-K for the fiscal year ended March 30, 2019 (File No. 001-35368), filed on May 29, 2019 and incorporated herein by reference). |
| 4.2 | Indenture, dated as of October 20, 2017, by and among Michael Kors (USA), Inc., Michael Kors Holdings Limited, the subsidiary guarantors party thereto and U.S. Bank National Association, as trustee (included as Exhibit 4.1 to the Company's Current Report on Form 8-K (File No. 001-35368), filed on October 20, 2017 and incorporated herein by reference). |
| 10.1 | Second Amendment, dated as of June 25, 2020, to the Third Amended and Restated Credit Agreement dated as of November 15, 2018 among Capri Holdings Limited, Michael Kors (USA), Inc., the foreign subsidiary borrowers party thereto, the guarantors party thereto, the financial institutions party thereto as lenders and issuing banks and JPMorgan Chase Bank, N.A., as administrative agent (included as Exhibit 10.1 to the Company's Current Report on Form 8-K (File No. 001-35368), filed on July 1, 2020 and incorporated herein by reference). |
| 10.2 | Form of Indemnification Agreement between Michael Kors Holdings Limited and its directors and executive officers (included as Exhibit 10.5 to the Company's Registration Statement on Form F-1, as amended (File No. 333-178282), filed on December 2, 2011 and incorporated herein by reference). |
| 10.3 | Capri Holdings Limited Third Amended and Restated Omnibus Incentive Plan (included as Annex B to the Company's Definitive Proxy Statement on Schedule 14A (File No. 001-35368), filed on June 16, 2022 and incorporated herein by reference). |
| 10.4 | Fifth Amended and Restated Employment Agreement, dated as of March 7, 2022, by and among Michael Kors (USA), Inc., Capri Holdings Limited and John D. Idol (included as Exhibit 10.6 to the Company's Annual Report on Form 10-K for the fiscal year ended April 2, 2022 (File No. 001-35368), filed on June 1, 2022 and incorporated herein by reference). |
| 10.5 | Executive Bonus Program (included as Exhibit 10.1 to the Company's Quarterly Report on Form 10-Q for the fiscal quarter ended June 29, 2013 filed on August 8, 2013 and incorporated herein by reference). |

PX7098-066

| Exhibit No. | Document Description |
|---|---|

10.6    Form of Employee Non-Qualified Option Award Agreement (included as Exhibit 10.15 to the Company's Annual Report on Form 10-K for the fiscal year ended March 28, 2015, filed on May 27, 2015 and incorporated herein by reference).

10.7    Form of Employee Restricted Stock Unit Award Agreement (included as Exhibit 10.16 to the Company's Annual Report on Form 10-K for the fiscal year ended March 28, 2015, filed on May 27, 2015 and incorporated herein by reference).

10.8    Form of Performance-Based Restricted Stock Unit Award Agreement (included as Exhibit 10.17 to the Company's Annual Report on Form 10-K for the fiscal year ended March 28, 2015, filed on May 27, 2015 and incorporated herein by reference).

10.9    Form of Independent Director Restricted Stock Unit Award Agreement (included as Exhibit 10.18 to the Company's Annual Report on Form 10-K for the fiscal year ended March 28, 2015, filed on May 27, 2015 and incorporated herein by reference).

10.10    Aircraft Time Sharing Agreement, effective as of December 20, 2022, by and between Michael Kors (USA), Inc. and John Idol (included as Exhibit 10.3 to the Company's Quarterly Report on Form 10-Q for the fiscal quarter ended December 31, 2022, filed on February 8, 2023 and incorporated herein by reference).

10.11    Amended and Restated Employment Agreement by and among Capri Holdings Limited, Michael Kors (USA), Inc. and Thomas J. Edwards, Jr., dated as of May 30, 2023.

10.12    Capri Holdings Limited Deferred Compensation Plan (included as Exhibit 10.1 to the Company's Current Report on Form 8-K (File No. 001.35368), filed on November 14, 2019 and incorporated herein by reference).

10.13    Amended and Restated Employment Agreement by and among Capri Holdings Limited, Michael Kors (USA), Inc. and Krista A. McDonough, dated as of May 30, 2023.

10.14    Employment Agreement, dated as of March 30, 2020, by and among Capri Holdings Limited, Michael Kors (USA), Inc. and Daniel Purefoy (included as Exhibit 10.16 to the Company's Annual Report on Form 10-K for the fiscal year ended March 27, 2021, filed on May 26, 2021 and incorporated herein by reference).

10.15    Employment Agreement dated January 23, 2023, by and between Michael Kors (USA), Inc. and Cedric Wilmotte.

10.16    Amended and Restated Employment Agreement by and among Capri Holdings Limited, Michael Kors (USA), Inc. and Jenna Hendricks, dated as of May 30, 2023.

10.17    Suspension of Rights Agreement, dated as of September 23, 2021, to the Third Amended and Restated Credit Agreement, dated as of November 15, 2018 among, Michael Kors (USA), Inc., Capri Holdings Limited, the Foreign Subsidiary Borrowers party to the Credit Agreement, JPMorgan Chase Bank, N.A., as Administrative Agent, the Lenders thereto and the other parties party thereto (included as Exhibit 10.3 to the Company's Quarterly Report on Form 10-Q for the fiscal quarter ended September 25, 2021 filed on November 3, 2021 and incorporated herein by reference).

10.18    Revolving Credit Agreement, dated as of July 1, 2022 among Capri Holdings Limited, Michael Kors (USA), Inc., the foreign subsidiary borrowers party thereto, the guarantors party thereto, the financial institutions party thereto as lenders and issuing banks and JPMorgan Chase Bank, N.A., as administrative agent (included as Exhibit 10.1 to the Company's Current Report on Form 8-K (File No. 001-35368), filed on July 1, 2022 and incorporated herein by reference).

10.19    Term Facility Agreement by and among Gianni Versace S.r.l., as borrower, Intesa Sanpaolo S.p.A., Banca Nazionale Del Lavoro S.p.A. and UniCredit S.p.A., as arrangers and lenders, and Intesa Sanpaolo S.p.A., as agent, dated as of December 5, 2022 (included as Exhibit 10.1 to the Company's Current Report on Form 8-K (File No. 001-35368), filed on December 6, 2022 and incorporated herein by reference).

10.20    Parent Company Guarantee by and among Capri Holdings Limited, as guarantor, Banca Nazionale del Lavoro S.p.A., Intesa Sanpaolo S.p.A. and UniCredit S.p.A., dated as of December 5, 2022 (included as Exhibit 10.2 to the Company's Current Report on Form 8-K (File No. 001-35368), filed on December 6, 2022 and incorporated herein by reference).

10.21    Change in Control Continuity Agreement by and between Capri Holdings Limited and Thomas J. Edwards, Jr., dated as of May 30, 2023.

10.22    Change in Control Continuity Agreement by and between Capri Holdings Limited and Jenna Hendricks, dated as of May 30, 2023.

10.23    Change in Control Continuity Agreement by and between Capri Holdings Limited and Krista A. McDonough, dated as of May 30, 2023.

21.1    List of subsidiaries of Capri Holdings Limited.

23.2    Consent of Ernst & Young LLP.

31.1    Certification of Chief Executive Officer pursuant to Section 302 of Sarbanes Oxley Act of 2002.

31.2    Certification of Chief Financial Officer pursuant to Section 302 of Sarbanes Oxley Act of 2002.

PX7098-067

| Exhibit No. | Document Description |
|---|---|
| 32.1 | Certification of Chief Executive Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 32.2 | Certification of Chief Financial Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 101.1 | Interactive Data Files. |

PX7098-068

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

Date: May 31, 2023

CAPRI HOLDINGS LIMITED

By:      /s/ John D. Idol
Name:    John D. Idol
Title:   Chairman & Chief Executive Officer

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| By: | /s/ John D. Idol | Chairman, Chief Executive Officer and Director (Principal Executive Officer) | May 31, 2023 |
| | John D. Idol | | |
| By: | /s/ Thomas J. Edwards, Jr. | Chief Financial Officer and Chief Operating Officer (Principal Financial and Accounting Officer) | May 31, 2023 |
| | Thomas J. Edwards Jr. | | |
| By: | /s/ Marilyn Crouther | Director | May 31, 2023 |
| | Marilyn Crouther | | |
| By: | /s/ Robin Freestone | Director | May 31, 2023 |
| | Robin Freestone | | |
| By: | /s/ Judy Gibbons | Director | May 31, 2023 |
| | Judy Gibbons | | |
| By: | /s/ Mahesh Madhavan | Director | May 31, 2023 |
| | Mahesh Madhavan | | |
| By: | /s/ Stephen F. Reitman | Director | May 31, 2023 |
| | Stephen F. Reitman | | |
| By: | /s/ Jane Thompson | Director | May 31, 2023 |
| | Jane Thompson | | |
| By: | /s/ Jean Tomlin | Director | May 31, 2023 |
| | Jean Tomlin | | |

PX7098-069

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Shareholders and Board of Directors of Capri Holdings Limited

**Opinion on the Financial Statements**

We have audited the accompanying consolidated balance sheets of Capri Holdings Limited and subsidiaries ("the Company") as of April 1, 2023 and April 2, 2022, and the related consolidated statements of operations and comprehensive income (loss), shareholders' equity and cash flows for each of the three years in the period ended April 1, 2023, and the related notes (collectively referred to as the "consolidated financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company at April 1, 2023 and April 2, 2022, and the results of its operations and its cash flow for each of the three years in the period ended April 1, 2023, in conformity with the U.S. generally accepted accounting principles.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the Company's internal control over financial reporting as of April 1, 2023, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework) and our report dated May 31, 2023 expressed an unqualified opinion thereon.

**Basis for Opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

**Critical Audit Matters**

The critical audit matters communicated below are matters arising from the current period audit of the financial statements that were communicated or required to be communicated to the audit committee and that: (1) relate to accounts or disclosures that are material to the financial statements and (2) involved our especially challenging, subjective or complex judgments. The communication of critical audit matters does not alter in any way our opinion on the consolidated financial statements, taken as a whole, and we are not, by communicating the critical audit matters below, providing separate opinions on the critical audit matters or on the accounts or disclosures to which they relate.

#### *Valuation of Goodwill and Indefinite-lived Intangible Assets*

*Description of the Matter*   At April 1, 2023, the Company's goodwill and indefinite-lived intangible assets, consisting of brand names, totaled $1.3 billion and $1.2 billion, respectively. As discussed in Note 2 to the consolidated financial statements, goodwill and indefinite-lived intangible assets are assessed for impairment on an annual basis, or whenever impairment indicators exist. As a result of the Company's 2023 annual impairment test, the Company recorded a goodwill impairment charge of $82 million associated with its Jimmy Choo Retail and Wholesale reporting units. The Company also recognized an impairment charge of $24 million associated with the Jimmy Choo indefinite-lived retail brand name intangible asset.

Auditing the Company's annual impairment assessments was complex and highly judgmental due to the significant estimation required in determining the fair value of the reporting units for goodwill and the fair value of indefinite-lived brand name intangible assets. In particular, the fair value estimates were sensitive to significant assumptions, such as changes in the discount rate, revenue growth rate, margin and royalty rates, which are affected by expectations about future market or economic conditions.

PX7098-070

| | |
|---|---|
| *How We Addressed the Matter in Our Audit* | We obtained an understanding, evaluated the design and tested the operating effectiveness of controls over the Company's goodwill and indefinite-lived intangible assets impairment review process, including controls over management's review of the significant assumptions described above. |

To test the estimated fair value of the Company's reporting units and indefinite-lived intangible assets, we performed audit procedures that included, among others, assessing the valuation methodologies and testing the significant assumptions discussed above and the completeness and accuracy of the underlying data used by the Company in its analyses. We compared the significant assumptions used by management to current industry and economic trends and evaluated whether changes to the Company's business environment would affect the significant assumptions. For example, we compared the royalty rates used in estimating the fair value of certain indefinite-lived brand name intangible assets to current industry licensing agreements. We assessed the historical accuracy of management's estimates and performed sensitivity analyses of the significant assumptions to evaluate the changes in the fair value of the reporting units and indefinite-lived brand name intangible assets that would result from changes in the assumptions. We also involved our internal valuation specialists to assist in our evaluation of the significant assumptions and methodologies used by the Company in developing the fair value estimates. In addition, we tested management's reconciliation of the fair value of the reporting units to the market capitalization of the Company.

### Impairment of Retail Store Long-Lived assets

| | |
|---|---|
| *Description of the Matter* | As discussed in Note 2 to the consolidated financial statements, the Company evaluates its long-lived assets, which primarily include property, plant, and equipment and operating lease right-of-use assets at retail stores, for impairment whenever events or changes in circumstances indicate that the carrying amounts of such assets may not be recoverable. During the year ended April 1, 2023, the Company recognized an impairment charge of $36 million related to its long-lived assets. |

Auditing the Company's impairment assessment of retail store long-lived assets was complex and highly judgmental due to the significant estimation required in determining the future cash flows used to assess recoverability of each retail store long-lived asset group (undiscounted) and determining the fair value (discounted). The significant assumptions used include estimated future cash flows directly related to the future operation of the stores (including sales and expense growth rates) and the discount rate used to determine fair value. Significant assumptions used in determining the fair value of certain operating lease right-of-use assets include the current market rent and discount rate for the remaining lease term of the related stores. These assumptions are subjective in nature and are affected by expectations about future market or economic conditions.

| | |
|---|---|
| *How We Addressed the Matter in Our Audit* | We obtained an understanding, evaluated the design and tested the operating effectiveness of controls over the retail store long-lived assets impairment process, including, determining the undiscounted future cash flows of the stores and the fair value of the long-lived assets (including those related to operating leases) for the stores that were deemed to be impaired. We also tested controls over management's review of the significant assumptions described above. |

Our testing of the Company's impairment measurement included, among other procedures, evaluating the significant assumptions and operating data used to calculate the estimated future cash flows and to determine the fair value of the store long lived asset groups. For a sample of retail stores, we tested the completeness and accuracy of the data used by the Company in its analyses and we compared the significant assumptions used to determine the forecasted cash flows to historical results of the retail stores, current industry and economic trends and inquired of the Company's executives to understand the business initiatives supporting the assumptions in the future cash flows. We involved our internal valuation specialists to assist in evaluating the fair value of certain operating lease right-of-use assets, which included assessing the estimated market rental rates of these leases by comparing them to rental rates for comparable leases and evaluating the applied discount rate.

/s/ ERNST & YOUNG LLP

We have served as the Company's auditor since 2014.
New York, New York
May 31, 2023

PX7098-071

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Shareholders and Board of Directors of Capri Holdings Limited

**Opinion on Internal Control over Financial Reporting**

We have audited Capri Holdings Limited and subsidiaries' internal control over financial reporting as of April 1, 2023, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework) (the COSO criteria). In our opinion, Capri Holdings Limited and subsidiaries (the Company) maintained, in all material respects, effective internal control over financial reporting as of April 1, 2023, based on the COSO criteria.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the consolidated balance sheets of the Company as of April 1, 2023 and April 2, 2022, the related consolidated statements of operations and comprehensive income (loss), shareholders' equity and cash flows for each of the three years in the period ended April 1, 2023, and the related notes and our report dated May 31, 2023 expressed an unqualified opinion thereon.

**Basis for Opinion**

The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting included in the accompanying Management's Report on Internal Control over Financial Reporting. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects.

Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

**Definition and Limitations of Internal Control over Financial Reporting**

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ ERNST & YOUNG LLP

New York, New York
May 31, 2023

PX7098-072

**CAPRI HOLDINGS LIMITED AND SUBSIDIARIES**
**CONSOLIDATED BALANCE SHEETS**
**(In millions, except share data)**

| | April 1, 2023 | April 2, 2022 |
|---|---|---|
| **Assets** | | |
| Current assets | | |
| Cash and cash equivalents | $ 249 | $ 169 |
| Receivables, net | 369 | 434 |
| Inventories, net | 1,057 | 1,096 |
| Prepaid expenses and other current assets | 195 | 192 |
| Total current assets | 1,870 | 1,891 |
| Property and equipment, net | 552 | 476 |
| Operating lease right-of-use assets | 1,330 | 1,358 |
| Intangible assets, net | 1,728 | 1,847 |
| Goodwill | 1,293 | 1,418 |
| Deferred tax assets | 296 | 240 |
| Other assets | 226 | 250 |
| Total assets | $ 7,295 | $ 7,480 |
| **Liabilities and Shareholders' Equity** | | |
| Current liabilities | | |
| Accounts payable | $ 475 | $ 555 |
| Accrued payroll and payroll related expenses | 154 | 165 |
| Accrued income taxes | 73 | 52 |
| Short-term operating lease liabilities | 429 | 414 |
| Short-term debt | 5 | 29 |
| Accrued expenses and other current liabilities | 314 | 351 |
| Total current liabilities | 1,450 | 1,566 |
| Long-term operating lease liabilities | 1,348 | 1,467 |
| Deferred tax liabilities | 508 | 432 |
| Long-term debt | 1,822 | 1,131 |
| Other long-term liabilities | 318 | 326 |
| Total liabilities | 5,446 | 4,922 |
| Commitments and contingencies | | |
| Shareholders' equity | | |
| Ordinary shares, no par value; 650,000,000 shares authorized; 224,166,250 shares issued and 117,347,045 outstanding at April 1, 2023; 221,967,599 shares issued and 142,806,269 outstanding at April 2, 2022 | — | — |
| Treasury shares, at cost (106,819,205 shares at April 1, 2023 and 79,161,330 shares at April 2, 2022) | (5,351) | (3,987) |
| Additional paid-in capital | 1,344 | 1,260 |
| Accumulated other comprehensive income | 147 | 194 |
| Retained earnings | 5,708 | 5,092 |
| Total shareholders' equity of Capri | 1,848 | 2,559 |
| Noncontrolling interest | 1 | (1) |
| Total shareholders' equity | 1,849 | 2,558 |
| Total liabilities and shareholders' equity | $ 7,295 | $ 7,480 |

See accompanying notes to consolidated financial statements.

PX7098-073

**CAPRI HOLDINGS LIMITED AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF OPERATIONS AND COMPREHENSIVE INCOME (LOSS)**
**(In millions, except share and per share data)**

| | | Fiscal Years Ended | | | | |
|---|---|---|---|---|---|---|
| | | April 1, 2023 | | April 2, 2022 | | March 27, 2021 |
| Total revenue | $ | 5,619 | $ | 5,654 | $ | 4,060 |
| Cost of goods sold | | 1,895 | | 1,910 | | 1,463 |
| Gross profit | | 3,724 | | 3,744 | | 2,597 |
| Selling, general and administrative expenses | | 2,708 | | 2,533 | | 2,018 |
| Depreciation and amortization | | 179 | | 193 | | 212 |
| Impairment of assets | | 142 | | 73 | | 316 |
| Restructuring and other charges | | 16 | | 42 | | 32 |
| Total operating expenses | | 3,045 | | 2,841 | | 2,578 |
| Income from operations | | 679 | | 903 | | 19 |
| Other income, net | | (3) | | (2) | | (7) |
| Interest expense (income), net | | 24 | | (18) | | 43 |
| Foreign currency loss (gain) | | 10 | | 8 | | (20) |
| Income before provision for income taxes | | 648 | | 915 | | 3 |
| Provision for income taxes | | 29 | | 92 | | 66 |
| Net income (loss) | | 619 | | 823 | | (63) |
| Less: Net income (loss) attributable to noncontrolling interest | | 3 | | 1 | | (1) |
| Net income (loss) attributable to Capri | $ | 616 | $ | 822 | $ | (62) |
| | | | | | | |
| Weighted average ordinary shares outstanding: | | | | | | |
| Basic | | 132,532,009 | | 149,724,675 | | 150,453,568 |
| Diluted | | 134,002,480 | | 152,497,907 | | 150,453,568 |
| Net income (loss) per ordinary share attributable to Capri: | | | | | | |
| Basic | $ | 4.65 | $ | 5.49 | $ | (0.41) |
| Diluted | $ | 4.60 | $ | 5.39 | $ | (0.41) |
| | | | | | | |
| Statements of Comprehensive Income (Loss): | | | | | | |
| Net income (loss) | $ | 619 | $ | 823 | $ | (63) |
| Foreign currency translation adjustments | | (41) | | 127 | | (15) |
| Net (loss) gain on derivatives | | (6) | | 10 | | (4) |
| Comprehensive income (loss) | | 572 | | 960 | | (82) |
| Less: Net income (loss) attributable to noncontrolling interest | | 3 | | 1 | | (1) |
| Less: Foreign currency translation adjustments attributable to noncontrolling interest | | — | | (1) | | — |
| Comprehensive income (loss) attributable to Capri | $ | 569 | $ | 960 | $ | (81) |

See accompanying notes to consolidated financial statements.

PX7098-074

**CAPRI HOLDINGS LIMITED AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF SHAREHOLDERS' EQUITY**
**(in millions, except share data which is in thousands)**

| | Ordinary Shares | | Additional Paid-in Capital | Treasury Shares | | Accumulated Other Comprehensive Income (Loss) | Retained Earnings | Total Equity of Capri | Non-controlling Interests | Total Equity |
|---|---|---|---|---|---|---|---|---|---|---|
| | Shares | Amounts | | Shares | Amounts | | | | | |
| **Balance as of March 28, 2020** | 217,320 | $ — | $ 1,085 | (67,894) | $ (3,325) | $ 75 | $ 4,332 | $ 2,167 | $ 1 | $ 2,168 |
| Net loss | — | — | — | — | — | — | (62) | (62) | (1) | (63) |
| Other comprehensive loss | — | — | — | — | — | (19) | — | (19) | — | (19) |
| Total comprehensive loss | — | — | — | — | — | — | — | (81) | (1) | (82) |
| Vesting of restricted awards, net of forfeitures | 1,456 | — | — | — | — | — | — | — | — | — |
| Exercise of employee share options | 447 | — | 3 | — | — | — | — | 3 | — | 3 |
| Share based compensation expense | — | — | 70 | — | — | — | — | 70 | — | 70 |
| Repurchase of ordinary shares | — | — | — | (49) | (1) | — | — | (1) | — | (1) |
| Other | — | — | — | — | — | — | — | — | (1) | (1) |
| **Balance as of March 27, 2021** | 219,223 | — | 1,158 | (67,943) | (3,326) | 56 | 4,270 | 2,158 | (1) | 2,157 |
| Net income | — | — | — | — | — | — | 822 | 822 | 1 | 823 |
| Other comprehensive income (loss) | — | — | — | — | — | 138 | — | 138 | (1) | 137 |
| Total comprehensive income | — | — | — | — | — | — | — | 960 | — | 960 |
| Vesting of restricted awards, net of forfeitures | 2,336 | — | — | — | — | — | — | — | — | — |
| Exercise of employee share options | 408 | — | 17 | — | — | — | — | 17 | — | 17 |
| Share based compensation expense | — | — | 85 | — | — | — | — | 85 | — | 85 |
| Repurchase of ordinary shares | — | — | — | (11,218) | (661) | — | — | (661) | — | (661) |
| **Balance as of April 2, 2022** | 221,967 | — | 1,260 | (79,161) | (3,987) | 194 | 5,092 | 2,559 | (1) | 2,558 |
| Net income | — | — | — | — | — | — | 616 | 616 | 3 | 619 |
| Other comprehensive loss | — | — | — | — | — | (47) | — | (47) | — | (47) |
| Total comprehensive income | — | — | — | — | — | — | — | 569 | 3 | 572 |
| Vesting of restricted awards, net of forfeitures | 2,078 | — | — | — | — | — | — | — | — | — |
| Exercise of employee share options | 121 | — | 6 | — | — | — | — | 6 | — | 6 |
| Share based compensation expense | — | — | 78 | — | — | — | — | 78 | — | 78 |
| Repurchase of ordinary shares | — | — | — | (27,658) | (1,364) | — | — | (1,364) | — | (1,364) |
| Other | — | — | — | — | — | — | — | — | (1) | (1) |
| **Balance at April 1, 2023** | 224,166 | — | 1,344 | (106,819) | $ (5,351) | $ 147 | $ 5,708 | $ 1,848 | $ 1 | $ 1,849 |

See accompanying notes to consolidated financial statements.

PX7098-075

**CAPRI HOLDINGS LIMITED AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(In millions)**

| | Fiscal Years Ended | | |
|---|---|---|---|
| | April 1, 2023 | April 2, 2022 | March 27, 2021 |
| **Cash flows from operating activities** | | | |
| Net income (loss) | $ 619 | $ 823 | $ (63) |
| Adjustments to reconcile net income (loss) to net cash provided by operating activities: | | | |
| Depreciation and amortization | 179 | 193 | 212 |
| Share-based compensation expense | 78 | 85 | 71 |
| Impairment of assets | 142 | 83 | 316 |
| Deferred income taxes | (101) | (57) | (70) |
| Changes to lease related balances, net | (99) | (142) | (112) |
| Foreign currency losses (gains) | 28 | — | (15) |
| Other non-cash charges | 7 | 10 | 7 |
| Change in assets and liabilities: | | | |
| Receivables, net | 50 | (78) | (52) |
| Inventories, net | 13 | (386) | 145 |
| Prepaid expenses and other current assets | (8) | 14 | (31) |
| Accounts payable | (100) | 69 | 50 |
| Accrued expenses and other current liabilities | (9) | 30 | 153 |
| Other long-term assets and liabilities | (28) | 60 | 13 |
| Net cash provided by operating activities | 771 | 704 | 624 |
| **Cash flows from investing activities** | | | |
| Capital expenditures | (226) | (131) | (111) |
| Cash paid for asset/business acquisitions, net of cash acquired | — | — | (13) |
| Settlement of net investment hedges | 409 | 189 | — |
| Net cash provided by (used in) investing activities | 183 | 58 | (124) |
| **Cash flows from financing activities** | | | |
| Debt borrowings | 4,061 | 945 | 2,443 |
| Debt repayments | (3,474) | (1,132) | (3,311) |
| Debt issuance costs | (5) | — | (4) |
| Repurchase of ordinary shares | (1,364) | (661) | (1) |
| Exercise of employee share options | 6 | 17 | 3 |
| Other financing activities | — | 31 | — |
| Net cash used in financing activities | (776) | (800) | (870) |
| Effect of exchange rate changes on cash and cash equivalents | (94) | (24) | 12 |
| **Net increase (decrease) in cash, cash equivalents and restricted cash** | 84 | (62) | (358) |
| Beginning of period | 172 | 234 | 592 |
| End of period | $ 256 | $ 172 | $ 234 |
| **Supplemental disclosures of cash flow information** | | | |
| Cash paid for interest | $ 58 | $ 37 | $ 52 |
| Cash paid for income taxes | $ 133 | $ 43 | $ 45 |
| **Supplemental disclosure of non-cash investing and financing activities** | | | |
| Accrued capital expenditures | $ 33 | $ 39 | $ 17 |

See accompanying notes to consolidated financial statements.

PX7098-076

CAPRI HOLDINGS LIMITED AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**1. Business and Basis of Presentation**

The Company was incorporated in the British Virgin Islands on December 13, 2002 as Michael Kors Holdings Limited and changed its name to Capri Holdings Limited ("Capri," and together with its subsidiaries, the "Company") on December 31, 2018. The Company is a holding company that owns brands that are leading designers, marketers, distributors and retailers of branded women's and men's accessories, apparel and footwear bearing the Versace, Jimmy Choo and Michael Kors tradenames and related trademarks and logos. The Company operates in three reportable segments: Versace, Jimmy Choo and Michael Kors. See Note 19 for additional information.

The consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States ("U.S. GAAP") and include the accounts of the Company and its wholly-owned or controlled subsidiaries. All significant intercompany balances and transactions have been eliminated in consolidation. The Company consolidates the results of its Versace business on a one-month lag, as consistent with prior periods.

The Company utilizes a 52- to 53-week fiscal year, and the term "Fiscal Year" or "Fiscal" refers to that 52-week or 53-week period. The fiscal years ending on April 1, 2023 and March 27, 2021 ("Fiscal 2023" and "Fiscal 2021", respectively) contain 52 weeks, whereas the fiscal year ending April 2, 2022 ("Fiscal 2022") contains 53 weeks. The Company's Fiscal 2024 is a 52-week period ending March 30, 2024.

**2. Summary of Significant Accounting Policies**

*Use of Estimates*

The preparation of financial statements in accordance with U.S. GAAP requires management to use judgment and make estimates that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. The level of uncertainty in estimates and assumptions increases with the length of time until the underlying transactions are completed. The most significant assumptions and estimates involved in preparing the financial statements include allowances for customer deductions, sales returns, sales discounts, credit losses, estimates of inventory net realizable value, the valuation of share-based compensation, the valuation of deferred taxes, goodwill, intangible assets, operating lease right-of-use assets and property and equipment, along with the estimated useful lives assigned to these assets. Actual results could differ from those estimates.

*Seasonality*

The Company experiences certain effects of seasonality with respect to its business. The Company generally experiences greater sales during its third fiscal quarter, primarily driven by holiday season sales, and the lowest sales during its first fiscal quarter.

*Revenue Recognition*

The Company accounts for contracts with its customers when there is approval and commitment from both parties, the rights of the parties and payment terms have been identified, the contract has commercial substance and collectability of consideration is probable. Revenue is recognized when control of the promised goods or services is transferred to the Company's customers in an amount that reflects the consideration the Company expects to be entitled to in exchange for goods or services. The Company recognizes retail store revenues when control of the product is transferred at the point of sale at Company owned stores, including concessions, net of estimated returns. Revenue from sales through the Company's e-commerce sites is recognized at the time of delivery to the customer, reduced by an estimate of returns. Wholesale revenue is recognized net of estimates for sales returns, discounts, markdowns and allowances, after merchandise is shipped and control of the underlying product is transferred to the Company's wholesale customers. To arrive at net sales for retail revenue, gross sales are reduced by actual customer returns as well as by a provision for estimated future customer returns, which is based on management's review of historical and future customer return expectations. Sales taxes collected from retail customers are presented on a net basis and, as such, are excluded from revenue. To arrive at net sales for wholesale revenue, gross sales are reduced by provisions for estimated future returns, based on current expectations, as well as trade discounts, markdowns,

75

allowances, operational chargebacks, and certain cooperative selling expenses. These estimates are based on such factors as historical trends, actual and forecasted performance and current market conditions, which are reviewed by management on a quarterly basis.

The following table details the activity and balances of the Company's sales reserves for the fiscal years ended April 1, 2023, April 2, 2022, and March 27, 2021 (in millions):

|  | Balance Beginning of Year | Amounts Charged to Revenue | Write-offs Against Reserves | Balance at Year End |
|---|---|---|---|---|
| Total Sales Reserves: | | | | |
| Fiscal Year Ended April 1, 2023 | $ 92 | $ 400 | $ (397) | $ 95 |
| Fiscal Year Ended April 2, 2022 | 98 | 333 | (339) | 92 |
| Fiscal Year Ended March 27, 2021 | 166 | 313 | (381) | 98 |

Royalty revenue generated from product licenses, which includes contributions for advertising, is based on reported sales of licensed products bearing the Company's trademarks at rates specified in the license agreements. These agreements are also subject to contractual minimum levels. Royalty revenue generated by geographic licensing agreements is recognized as it is earned under the licensing agreements based on reported sales of licensees applicable to specified periods, as outlined in the agreements. These agreements allow for the use of the Company's tradenames to sell its branded products in specific geographic regions.

**Loyalty Program**

The Company offers a loyalty program, which allows its Michael Kors United States customers to earn points on qualifying purchases toward monetary and non-monetary rewards, which may be redeemed for purchases at Michael Kors retail stores and e-commerce sites. The Company defers a portion of the initial sales transaction based on the estimated relative fair value of the benefits based on projected timing of future redemptions and historical activity. These amounts include estimated "breakage" for points that are not expected to be redeemed. The contract liability, net of an estimated "breakage," is recorded within accrued expenses and other current liabilities in the Company's consolidated balance sheets and is expected to be recognized within the next 12 months. See Note 3 for additional information.

*Advertising and Marketing Costs*

Advertising and marketing costs are generally expensed when the advertisement is first exhibited and are recorded in selling, general and administrative expenses in the Company's consolidated statements of operations and comprehensive income (loss). Advertising and marketing expense was $374 million, $329 million and $137 million in Fiscal 2023, Fiscal 2022 and Fiscal 2021, respectively.

Cooperative advertising expense, which represents the Company's participation in advertising expenses of its wholesale customers, is reflected as a reduction to revenue. Expenses related to cooperative advertising for Fiscal 2023, Fiscal 2022 and Fiscal 2021, were $9 million, $4 million and $3 million, respectively.

*Shipping and Handling*

Inbound freight expenses are recorded as part of cost of goods sold, along with product costs and other costs to acquire inventory. The costs of preparing products for sale, including warehousing expenses, are included in selling, general and administrative expenses in the Company's consolidated statements of operations and comprehensive income (loss). Outbound freight expenses are recorded as part of selling, general and administrative expenses and include the costs of shipping products to the Company's e-commerce customers. Shipping and handling costs included within selling, general and administrative expenses in the Company's consolidated statements of operations and comprehensive income (loss) were $270 million, $236 million and $160 million for Fiscal 2023, Fiscal 2022 and Fiscal 2021, respectively. Shipping and handling costs charged to customers are included in total revenue.

*COVID-19 Related Government Assistance and Subsidies*

During Fiscal 2023, Fiscal 2022 and Fiscal 2021, the Company recorded $6 million, $10 million and $37 million, respectively, related to government assistance and subsidies. These amounts mostly relate to rent support and payroll expense and were recorded as a reduction of selling, general and administrative expenses.

PX7098-078

*Cash, Cash Equivalents and Restricted Cash*

All highly liquid investments with original maturities of three months or less are considered to be cash equivalents. Included in the Company's cash and cash equivalents as of April 1, 2023 and April 2, 2022 are credit card receivables of $22 million and $18 million, respectively, which generally settle within two to three business days.

A reconciliation of cash, cash equivalents and restricted cash as of April 1, 2023 and April 2, 2022 from the consolidated balance sheets to the consolidated statements of cash flows is as follows:

|  | Fiscal Years Ended | | | |
|  | April 1, 2023 | | April 2, 2022 | |
| Reconciliation of cash, cash equivalents and restricted cash |  |  |  |  |
| Cash and cash equivalents | $ | 249 | $ | 169 |
| Restricted cash included within prepaid expenses and other current assets |  | 7 |  | 3 |
| **Total cash, cash equivalents and restricted cash shown in the consolidated statements of cash flows** | $ | 256 | $ | 172 |

*Inventories*

Inventories primarily consist of finished goods with the exception of raw materials and work in process. The combined total of raw materials and work in process recorded on the Company's consolidated balance sheets as of April 1, 2023 and April 2, 2022 were $47 million and $31 million, respectively. Inventories are stated at the lower of cost or net realizable value. Cost is determined using the weighted-average cost method. Costs include amounts paid to independent manufacturers, plus duties and freight to bring the goods to the Company's warehouses, as well as shipments to stores. The Company continuously evaluates the composition of its inventory and makes adjustments when the cost of inventory is not expected to be fully recoverable. The net realizable value of the Company's inventory is estimated based on historical experience, current and forecasted demand and other market conditions. In addition, reserves for inventory losses are estimated based on historical experience and physical inventory counts. The Company's inventory reserves are estimates, which could vary significantly from actual results if future economic conditions, customer demand or competition differ from expectations. Our historical estimates of these adjustments have not differed materially from actual results.

*Store Pre-opening Costs*

Costs associated with the opening of new retail stores and start up activities are expensed as incurred.

*Property and Equipment*

Property and equipment is stated at cost less accumulated depreciation and amortization (carrying value). Depreciation is recorded on a straight-line basis over the expected remaining useful lives of the related assets. Equipment, furniture and fixtures are depreciated over five to seven years, computer hardware and software are depreciated over three to five years. The Company's share of the cost of constructing in-store shop displays within its wholesale customers' floor-space ("shop-in-shops"), which is paid directly to third-party suppliers, is capitalized as property and equipment and is generally amortized over a useful life of three to five years. Leasehold improvements are amortized using the straight-line method over the shorter of the estimated remaining useful lives of the related assets or the remaining lease term, including highly probable renewal periods. Maintenance and repairs are charged to expense in the year incurred.

The Company capitalizes, in property and equipment, direct costs incurred during the application development stage and the implementation stage for developing, purchasing or otherwise acquiring software for its internal use. These costs are amortized over the estimated useful lives of the software, generally five years, except for ERP systems which has an estimated useful life of ten years. All costs incurred during the preliminary project stage, including project scoping and identification and testing of alternatives, are expensed as incurred.

PX7098-079

*Definite-lived Intangible Assets*

The Company's definite-lived intangible assets consist of trademarks and customer relationships which are stated at cost less accumulated amortization. The Company's customer relationships are amortized over five to eighteen years. Reacquired rights recorded in connection with the acquisition of Michael Kors (HK) Limited and Subsidiaries ("MKHKL") are amortized through March 31, 2041, the original expiration date of the Michael Kors license agreement in the Greater China region. The trademark for the Michael Kors brand is amortized over twenty years.

*Long-lived Assets*

The Company evaluates all long-lived assets, including operating lease right-of-use assets, property and equipment and definite-lived intangible assets, for impairment whenever events or changes in circumstances indicate that the carrying amount of any such asset may not be recoverable. For the purposes of impairment testing, the Company groups long-lived assets at the lowest level of identifiable cash flow. Leasehold improvements are typically amortized over the term of the store lease, including reasonably assured renewals and the shop-in-shops are amortized over a useful life of three to five years. The Company's impairment testing is based on its best estimate of the future operating cash flows. If the sum of our estimated undiscounted future cash flows associated with the asset is less than the asset's carrying value, the Company would recognize an impairment charge, which is measured as the amount by which the carrying value exceeds the fair value of the asset. The fair values determined by management require significant judgment and include certain assumptions regarding future sales and expense growth rates, discount rates and estimates of real estate market fair values. As such, these estimates may differ from actual results and are affected by future market and economic conditions.

During Fiscal 2023, Fiscal 2022 and Fiscal 2021, the Company recorded impairment charges of $36 million, $83 million and $158 million, respectively, which were primarily related to operating lease right-of-use assets and fixed assets of our retail store locations. Please refer to Note 7 and Note 13 for additional information.

*Goodwill and Other Indefinite-lived Intangible Assets*

The Company records intangible assets based on their fair value on the date of acquisition. Goodwill is recorded as the difference between the fair value of the purchase consideration and the fair value of the net identifiable tangible and intangible assets acquired. The brand intangible assets recorded in connection with the acquisitions of Versace and Jimmy Choo were determined to be indefinite-lived intangible assets, which are not subject to amortization. The Company performs an impairment assessment of goodwill, as well as the Versace brand and Jimmy Choo brand intangible assets on an annual basis, or whenever impairment indicators exist. In the absence of any impairment indicators, goodwill, for the Versace brand and the Jimmy Choo brand are assessed for impairment during the fourth quarter of each fiscal year. Judgments regarding the existence of impairment indicators are based on market conditions and operational performance of the business.

The Company may assess its goodwill and its brand intangible assets for impairment initially using a qualitative approach to determine whether it is more likely than not that the fair value of these assets is greater than their carrying value. When performing a qualitative test, the Company assesses various factors, including industry and market conditions, macroeconomic conditions and performance of its businesses. If the results of the qualitative assessment indicate that it is more likely than not that our goodwill and other indefinite-lived intangible assets are impaired, a quantitative impairment analysis is performed to determine if impairment is required. The Company may also elect to perform a quantitative analysis of goodwill and its indefinite-lived intangible assets initially rather than using a qualitative approach.

The impairment testing for goodwill is performed at the reporting unit level. The Company uses industry accepted valuation models and set criteria that are reviewed and approved by various levels of management and, in certain instances, it engages independent third-party valuation specialists. To determine the fair value of a reporting unit, the Company uses a combination of the income and market approaches, when applicable. The Company believes the blended use of both models, when applicable, compensates for the inherent risk associated with either model if used on a stand-alone basis, and this combination is indicative of the factors a market participant would consider when performing a similar valuation. If the fair value of a reporting unit exceeds the related carrying value, the reporting unit's goodwill is considered not to be impaired and no further testing is performed. If the carrying value of a reporting unit exceeds its fair value, an impairment loss is recorded for the difference. These valuations are affected by certain estimates, including future revenue growth rates, future operating expense growth rates, gross margins and discount rates. Future events could cause us to conclude that impairment indicators exist and goodwill may be impaired.

PX7098-080

When performing a quantitative impairment assessment of our brand intangible assets, the fair value of the Versace and the Jimmy Choo brands is estimated using a discounted cash flow analysis based on the "relief from royalty" method, assuming that a third-party would be willing to pay a royalty in lieu of ownership for this intangible asset. This approach is dependent on many factors, including estimates of future revenue growth rates, royalty rates and discount rates. Actual future results may differ from these estimates. An impairment loss is recognized when the estimated fair value of the brand intangible assets is less than its carrying amount.

During the fourth quarter of Fiscal 2023, the Company performed its annual goodwill and indefinite-lived intangible assets impairment analysis for each brand. Based on a qualitative impairment assessment of the Michael Kors reporting units, the Company concluded that it is more likely than not that the fair value of the Michael Kors reporting units exceeded its carrying value and, therefore, was not impaired.

The Company elected to perform quantitative impairment analyses for the Versace and Jimmy Choo reporting units, using a combination of income and market approaches to estimate the fair values of reporting units. The Company also elected to perform a quantitative impairment analysis for the Versace and Jimmy Choo brand intangible assets using an income approach to estimate the fair values. The Company performed its annual goodwill and indefinite-lived intangible assets impairment analysis for the Versace and Jimmy Choo reporting units, using a combination of income and market approaches to estimate the fair value of each brands' reporting units. The Company also elected to perform a quantitative impairment analysis for both the Versace and Jimmy Choo brand indefinite-lived intangible assets using an income approach to estimate the fair values. Based on the results of these assessments, the Company determined there was no impairment for the Jimmy Choo licensing reporting unit and Jimmy Choo wholesale brand indefinite-lived intangible asset and Versace reporting units or brand intangible assets, as the fair values of the reporting units and the brand indefinite-lived intangible assets exceeded the related carrying amounts.

However, the Company concluded that the fair value of the Jimmy Choo retail and wholesale reporting units goodwill, along with the Jimmy Choo retail brand indefinite-lived intangible assets, did not exceed their related carrying amounts. The resulting impairment charges were primarily related to a higher discount rate in the current year driven by higher risk-free rates. Accordingly, the Company recorded impairment charges of $82 million related to the Jimmy Choo retail and wholesale reporting units goodwill and $24 million related to the Jimmy Choo retail brand intangible assets during Fiscal 2023. The impairment charges were recorded within impairment of assets on our consolidated statement of operations and comprehensive income (loss) for the fiscal year ended April 1, 2023.

In Fiscal 2022, the Company did not incur any impairment charges. In Fiscal 2021, the Company recorded impairment charges of $94 million related to the Jimmy Choo retail and Jimmy Choo licensing reporting units and $69 million related to the Jimmy Choo brand intangible assets. The impairment charges were recorded within impairment of assets on our consolidated statement of operations and comprehensive income (loss) for the fiscal year ended March 27, 2021. See Note 8 for information relating to the Company's annual impairment analysis performed during the fourth quarter of Fiscal 2023, Fiscal 2022 and Fiscal 2021.

It is possible that the Company's conclusions regarding impairment or recoverability of goodwill or other indefinite-lived intangible assets could change in future periods if, for example, (i) the Company's businesses do not perform as projected, (ii) overall economic conditions in future years vary from current assumptions, (iii) business conditions or strategies change from our current assumptions, (iv) discount rates change, (v) market multiples change or (vi) the identification of the Company's reporting units change, among other factors. Such changes could result in a future impairment charge of goodwill or other indefinite-lived intangible assets.

### *Insurance*

The Company uses a combination of insurance and self-insurance programs, including a wholly-owned captive insurance entity, to provide for the potential liabilities for certain risks, including workers' compensation and employee-related health care benefits. The Company also maintains stop-loss coverage with third-party insurers to limit its exposure arising from certain claims. Self-insurance claims filed and claims incurred but not reported are accrued based upon management's estimates of the discounted cost for self-insured claims incurred using actuarial assumptions, historical loss experience, actual payroll and other data. Although the Company believes that it can reasonably estimate losses related to these claims, actual results could differ from these estimates.

The Company also maintains other types of customary business insurance policies, including general liability, directors and officers, marine transport and inventory and business interruption insurance. Insurance recoveries represent gain contingencies and are recorded upon actual settlement with the insurance carrier.

PX7098-081

*Share-based Compensation*

The Company grants share-based awards to certain employees and directors of the Company. The grant date fair value of share options is calculated using the Black-Scholes option pricing model. The Company uses its own historical experience in determining the expected holding period and volatility of its time-based share option awards. The risk-free interest rate is derived from the zero-coupon United States ("U.S.") Treasury Strips yield curve based on the grant's estimated holding period. Determining the grant date fair value of share-based awards requires considerable judgment, including estimating expected volatility, expected term and risk-free rate. If factors change and the Company employs different assumptions, the fair value of future awards and the resulting share-based compensation expense may differ significantly from what the Company has estimated in the past.

The closing market price of the Company's shares on the date of grant is used to determine the grant date fair value of restricted shares, time-based restricted stock units ("RSUs") and performance-based RSUs. These fair values are recognized as expense over the requisite service period, net of estimated forfeitures, based on expected attainment of pre-established performance goals for performance grants, or the passage of time for those grants which have only time-based vesting requirements.

*Foreign Currency Translation and Transactions*

The financial statements of the majority of the Company's foreign subsidiaries are measured using the local currency as the functional currency. The Company's functional currency is the United States Dollar ("USD") for Capri and its United States based subsidiaries. Assets and liabilities are translated using period-end exchange rates, while revenues and expenses are translated using average exchange rates over the reporting period. The resulting translation adjustments are recorded separately in shareholders' equity as a component of accumulated other comprehensive income. Foreign currency income and losses resulting from the re-measuring of transactions denominated in a currency other than the functional currency of a particular entity are included in foreign currency loss (gain) on the Company's consolidated statements of operations and comprehensive income (loss).

*Derivative Financial Instruments*

**Forward Foreign Currency Exchange Contracts**

The Company uses forward foreign currency exchange contracts to manage its exposure to fluctuations in foreign currencies for certain transactions. The Company, in its normal course of business, enters into transactions with foreign suppliers and seeks to minimize risks related to these transactions. The Company employs these forward contracts to hedge the Company's cash flows, as they relate to transactions denominated in foreign currencies. Certain of these contracts are designated as hedges for accounting purposes, while others remain undesignated. All of the Company's derivative instruments are recorded in the Company's consolidated balance sheets at fair value on a gross basis, regardless of their hedge designation.

The Company designates certain contracts related to the purchase of inventory that qualify for hedge accounting as cash flow hedges. Formal hedge documentation is prepared for all derivative instruments designated as hedges, including a description of the hedged transaction, the hedging instrument and the risk being hedged. The changes in the fair value for contracts designated as cash flow hedges are recorded in equity as a component of accumulated other comprehensive income until the hedged item affects earnings. When the inventory related to forecasted inventory purchases that are being hedged is sold to a third-party, the gains or losses deferred in accumulated other comprehensive income are recognized within cost of goods sold. The Company uses regression analysis to assess effectiveness of derivative instruments that are designated as hedges, which compares the change in the fair value of the derivative instrument to the change in the related hedged item. If the hedge is no longer expected to be highly effective, future changes in the fair value are recognized in earnings. For those contracts that are not designated as hedges, changes in the fair value are recorded to foreign currency loss (gain) in the Company's consolidated statements of operations and comprehensive income (loss). The Company classifies cash flows relating to its forward foreign currency exchange contracts related to purchase of inventory consistently with the classification of the hedged item, within cash flows from operating activities.

The Company is exposed to the risk that counterparties to derivative contracts will fail to meet their contractual obligations. In order to mitigate counterparty credit risk, the Company only enters into contracts with carefully selected financial institutions based upon their credit ratings and certain other financial factors, adhering to established limits for credit exposure. The aforementioned forward contracts generally have a term of no more than 12 months. The period of these contracts is directly related to the transactions they are intended to hedge.

PX7098-082

**Net Investment Hedges**

The Company also uses fixed-to-fixed cross currency swap agreements to hedge its net investments in foreign operations against future volatility in the exchange rates between different currencies. The Company has elected the spot method of designating these contracts under ASU 2017-12, *"Derivatives and Hedging (Topic 815): Targeted Improvements to Accounting for Hedging Activities,"* and has designated these contracts as net investment hedges. The net gain or loss on the net investment hedge is reported within foreign currency translation income (loss) ("CTA"), as a component of accumulated other comprehensive income on the Company's consolidated balance sheets. Interest accruals and coupon payments are recognized directly in interest expense (income), net in the Company's consolidated statements of operations and comprehensive income (loss). Upon discontinuation of a hedge, all previously recognized amounts remain in CTA until the net investment is sold, diluted or liquidated.

**Fair Value Hedges**

When a cross-currency swap is designated as a fair value hedge and qualifies as highly effective, the fair value hedge will be recorded at fair value each period on the Company's consolidated balance sheets, with the difference resulting from the changes in the spot rate recognized in foreign currency loss (gain) on the Company's consolidated statements of operations and comprehensive income (loss), which will offset the earnings impact of the original transaction being hedged for.

*Income Taxes*

Deferred income tax assets and liabilities provide for temporary differences between the tax bases and financial reporting bases of the Company's assets and liabilities using the tax rates and laws in effect for the periods in which the differences are expected to reverse. The Company periodically assesses the realizability of deferred tax assets and the adequacy of deferred tax liabilities, based on the results of local, state, federal or foreign statutory tax audits or estimates and judgments used.

Realization of deferred tax assets associated with net operating loss and tax credit carryforwards are dependent upon generating sufficient taxable income prior to their expiration in the applicable tax jurisdiction. The Company periodically reviews the recoverability of its deferred tax assets and provides valuation allowances, as deemed necessary, to reduce deferred tax assets to amounts that more-likely-than-not will be realized. The Company's management considers many factors when assessing the likelihood of future realization of deferred tax assets, including recent earnings within various taxing jurisdictions, expectations of future taxable income, the carryforward periods remaining and other factors. Changes in the required valuation allowance are recorded in income in the period such determination is made. Deferred tax assets could be reduced in the future if the Company's estimates of taxable income during the carryforward period are significantly reduced or alternative tax strategies are no longer viable.

The Company recognizes the impact of an uncertain income tax position taken on its income tax returns at the largest amount that is more-likely-than-not to be sustained upon audit by the relevant taxing authority. An uncertain income tax position will be recognized if it has less than a 50% likelihood of being sustained. The tax positions are analyzed periodically (at least quarterly) and adjustments are made as events occur that warrant adjustments for those positions. The Company records interest expense and penalties payable to relevant tax authorities as income tax expense.

*Leases*

On March 31, 2019, the Company adopted ASU 2016-02, "Leases (Topic 842)," which requires lessees to recognize a lease liability and a right-of-use asset on the balance sheet for all leases, except certain short-term leases. The Company adopted the new standard recognizing a cumulative-effect adjustment to the opening balance of retained earnings in the period of adoption without restating the comparative prior year periods.

The Company leases retail stores, office space and warehouse space under operating lease agreements that expire at various dates through September 2043. The Company's leases generally have terms of up to ten years, generally require fixed rent payments and may require the payment of additional rent if store sales exceed a negotiated amount. Although most of the Company's equipment is owned, the Company has limited equipment leases that expire on various dates through August 2027. The Company acts as sublessor in certain leasing arrangements, primarily related to closed stores under its restructuring initiatives, as defined in Note 10. Fixed sublease payments received are recognized on a straight-line basis over the sublease term. The Company determines the sublease term based on the date it provides possession to the subtenant through the expiration date of the sublease.

PX7098-083

The Company recognizes operating lease right-of-use assets and lease liabilities at lease commencement date, based on the present value of fixed lease payments over the expected lease term. The Company uses its incremental borrowing rates to determine the present value of fixed lease payments based on the information available at the lease commencement date, as the rate implicit in the lease is not readily determinable for the Company's leases. The Company's incremental borrowing rates are based on the term of the leases, the economic environment of the leases and reflect the expected interest rate it would incur to borrow on a secured basis. Certain leases include one or more renewal options, generally for the same period as the initial term of the lease. The exercise of lease renewal options is generally at the Company's sole discretion and as such, the Company typically determines that exercise of these renewal options is not reasonably certain. As a result, the Company generally does not include the renewal option period in the expected lease term and the associated lease payments are not included in the measurement of the operating lease right-of-use asset and lease liability. Certain leases also contain termination options with an associated penalty. Generally, the Company is reasonably certain not to exercise these options and as such, they are not included in the determination of the expected lease term. The Company recognizes operating lease expense on a straight-line basis over the lease term.

Leases with an initial lease term of 12 months or less are not recorded on the balance sheet. The Company recognizes lease expense for its short-term leases on a straight-line basis over the lease term.

The Company's leases generally provide for payments of non-lease components, such as common area maintenance, real estate taxes and other costs associated with the leased property. The Company accounts for lease and non-lease components of its real estate leases together as a single lease component and, as such, includes fixed payments of non-lease components in the measurement of the operating lease right-of-use assets and lease liabilities for its real estate leases. Variable lease payments, such as percentage rentals based on location sales, periodic adjustments for inflation, reimbursement of real estate taxes, any variable common area maintenance and any other variable costs associated with the leased property, are expensed as incurred as variable lease costs and are not recorded on the balance sheet. The Company's lease agreements do not contain any material residual value guarantees or material restrictions or covenants.

### *Debt Issuance Costs and Unamortized Discounts*

The Company defers debt issuance costs directly associated with acquiring third-party financing. These debt issuance costs and any discounts on issued debt are amortized on a straight-line basis, which approximates the effective interest method, as interest expense over the term of the related indebtedness. Deferred financing fees associated with the Company's Revolving Credit Facilities are primarily recorded within other assets in the Company's consolidated balance sheets. Deferred financing fees and unamortized discounts associated with the Company's other borrowings are primarily recorded as an offset to long-term debt in the Company's consolidated balance sheets. See Note 11 for additional information.

### *Net Income (Loss) per Share*

The Company's basic net income (loss) per ordinary share is calculated by dividing net income (loss) by the weighted average number of ordinary shares outstanding during the period. Diluted net income (loss) per ordinary share reflects the potential dilution that would occur if RSUs or any other potentially dilutive instruments, including share option grants, were converted or exercised into ordinary shares. These potentially dilutive securities are included in diluted shares to the extent they are dilutive under the treasury stock method for the applicable periods. Performance-based RSUs are included in diluted shares if the related performance conditions are considered satisfied as of the end of the reporting period and to the extent they are dilutive under the treasury stock method.

PX7098-084

The components of the calculation of basic net income (loss) per ordinary share and diluted net income (loss) per ordinary share are as follows (in millions, except share and per share data):

| | Fiscal Years Ended | | |
|---|---|---|---|
| | April 1, 2023 | April 2, 2022 | March 27, 2021 |
| **Numerator:** | | | |
| Net income (loss) attributable to Capri | $ 616 | $ 822 | $ (62) |
| **Denominator:** | | | |
| Basic weighted average shares | 132,532,009 | 149,724,675 | 150,453,568 |
| Weighted average dilutive share equivalents: | | | |
| Share options, restricted stock units, and performance restricted stock units | 1,470,471 | 2,773,232 | — |
| Diluted weighted average shares | 134,002,480 | 152,497,907 | 150,453,568 |
| Basic net income (loss) per share [1] | $ 4.65 | $ 5.49 | $ (0.41) |
| Diluted net income (loss) per share [1] | $ 4.60 | $ 5.39 | $ (0.41) |

[1]  Basic and diluted net income (loss) per share are calculated using unrounded numbers.

Share equivalents of 457,722 shares, 360,378 shares and 3,658,959 shares, for Fiscal 2023, Fiscal 2022 and Fiscal 2021, respectively, have been excluded from the above calculation due to their anti-dilutive effect.

Diluted net loss per share attributable to Capri for Fiscal 2021 excluded all potentially dilutive securities because there was a net loss attributable to Capri for the period and, as such, the inclusion of these securities would have been anti-dilutive.

*Noncontrolling Interest*

The Company has an ownership interest in the Michael Kors Latin American joint venture, MK (Panama) Holdings, S.A. and subsidiaries of 75%, an ownership interest in the Jimmy Choo EMEA joint venture JC Gulf Trading LLC of 49% and an ownership interest in the Jimmy Choo Macau joint venture J. Choo (Macau) Co. Limited of 70%.

*Recently Adopted Accounting Pronouncements*

**Government Assistance Disclosures**

In November 2021, the Financial Accounting Standards Board ("FASB") issued ASU 2021-10, "Disclosures by Business Entities about Government Assistance", which requires all businesses provide annual disclosures about transactions with a government that are accounted for by applying a grant or contribution accounting model by analogy. These disclosures include providing the nature of the transactions and the related accounting policy used to account for the transactions, the amounts and financial statement line items impacted by these transactions, and the significant terms and conditions of these transactions, including commitments and contingencies related to such transactions. ASU 2021-10 is effective for the Company beginning in its Fiscal 2023 with early adoption permitted. The Company early adopted ASU 2021-10 during the third quarter of Fiscal 2022 and will continue to utilize the grant accounting model.

*Recently Issued Accounting Pronouncements*

The Company has considered all new accounting pronouncements and, other than the recent pronouncements discussed below, have concluded that there are no new pronouncements that may have a material impact on the Company's results of operations, financial condition or cash flows based on current information.

PX7098-085

**Supplier Finance Programs**

In September 2022, the FASB issued ASU 2022-04, "Disclosure of Supplier Finance Program Obligations" which makes a number of changes. The amendments require a buyer in a supplier finance program to disclose sufficient information about the program to allow a user of financial statements to understand the program's nature, activity during the period, changes from period to period and potential magnitude. The amendments in this update are effective for fiscal years beginning after December 15, 2022, including interim periods within those fiscal years, except for the amendment on roll forward information, which is effective for fiscal years beginning after December 15, 2023. Early adoption is permitted. The Company is currently evaluating the impact of adopting this standard on the Company's disclosures.

### 3. Revenue Recognition

The Company accounts for contracts with its customers when there is approval and commitment from both parties, the rights of the parties and payment terms have been identified, the contract has commercial substance and collectability of consideration is probable. Revenue is recognized when control of the promised goods or services is transferred to the Company's customers in an amount that reflects the consideration the Company expects to be entitled to in exchange for goods or services.

The Company sells its products through three primary channels of distribution: retail, wholesale and licensing. Within the retail and wholesale channels, substantially all of the Company's revenues consist of sales of products that represent a single performance obligation, where control transfers at a point in time to the customer. For licensing arrangements, royalty and advertising revenue is recognized over time based on access provided to the Company's brands.

The Company has chosen to apply the practical expedient allowing it not to disclose the amount of the transaction price allocated to the remaining performance obligations that have an expected duration of 12 months or less.

#### Retail

The Company generates sales through directly operated stores and e-commerce sites throughout the Americas (United States, Canada and Latin America), certain parts of EMEA (Europe, Middle East and Africa) and certain parts of Asia (Asia and Oceania). Retail revenue is recognized when control of the product is transferred at the point of sale at Company owned stores, including concessions. For e-commerce transactions, control is transferred and revenue is recognized when products are delivered to the customer. To arrive at net sales for retail, gross sales are reduced by actual customer returns, as well as by a provision for estimated future customer returns.

Sales tax collected from retail customers are presented on a net basis and, as such, are excluded from revenue. Shipping and handling costs that are billed to customers are included in net sales, with the related costs recorded in cost of goods sold. Shipping and handling costs that are not billed to customers are accounted for as fulfillment costs.

*Gift Cards.* The Company sells gift cards that can be redeemed for merchandise, resulting in a contract liability upon issuance. Revenue is recognized when the gift card is redeemed or upon "breakage" for the estimated portion of gift cards that are not expected to be redeemed. "Breakage" revenue is calculated under the proportional redemption methodology, which considers the historical patterns of redemption in jurisdictions where the Company is not required to remit the value of the unredeemed gift cards as unclaimed property. The Company anticipates that substantially all of its outstanding gift cards will be redeemed within the next 12 months. The contract liability related to gift cards, net of estimated "breakage," was $14 million and $13 million as of April 1, 2023 and April 2, 2022, respectively, and is included in accrued expenses and other current liabilities in the Company's consolidated balance sheets.

*Loyalty Program.* The Company offers a loyalty program, which allows its Michael Kors United States customers to earn points on qualifying purchases toward monetary and non-monetary rewards, which may be redeemed for purchases at Michael Kors retail stores and e-commerce sites. The Company defers a portion of the initial sales transaction based on the estimated relative fair value of the benefits based on projected timing of future redemptions and historical activity. These amounts include estimated "breakage" for points that are not expected to be redeemed.

#### Wholesale

The Company's products are sold primarily to major department stores, specialty stores and travel retail shops throughout the Americas, EMEA and Asia. The Company also has arrangements where its products are sold to geographic

PX7098-086

licensees in certain parts of EMEA, Asia and South America. Wholesale revenue is recognized net of estimates for sales returns, discounts, markdowns and allowances, when merchandise is shipped and control of the underlying product is transferred to the Company's wholesale customers. To arrive at net sales for wholesale, gross sales are reduced by provisions for estimated future returns, as well as trade discounts, markdowns, allowances, operational chargebacks and certain cooperative selling expenses. These estimates are developed based on historical trends, actual and forecasted performance and market conditions, and are reviewed by management on a quarterly basis. Unfulfilled, non-cancelable purchase orders for products from wholesale customers (including the Company's geographic licensees) are expected to be fulfilled within the next 12 months.

*Licensing*

The Company provides its third-party licensees with the right to access its Versace, Jimmy Choo and Michael Kors trademarks under product and geographic licensing arrangements. Under product licensing arrangements, the Company allows third-parties to manufacture and sell luxury goods, including watches and jewelry, fragrances, eyewear and home furnishings, using the Company's trademarks. Under geographic licensing arrangements, third-party licensees receive the right to distribute and sell products bearing the Company's trademarks in retail and/or wholesale channels within certain geographical areas, including Brazil, the Middle East, Eastern Europe, South Africa and certain parts of Asia.

The Company recognizes royalty revenue and advertising contributions based on the percentage of sales made by the licensees. Advertising contributions are received to support the Company's branded advertising and marketing campaigns and are viewed as part of a single performance obligation with the right to access the Company's trademarks. Royalty revenue generated from licenses, which includes contributions for advertising, may be subject to contractual minimum levels, as defined in the contract. Such minimums are generally fixed annually, based on the previous year's sales. Licensing revenue is based on reported current period sales of licensed products at rates that are specified in the license agreements for contracts that are expected to exceed the related guaranteed minimums. If the Company expects the minimum guaranteed amounts to exceed amounts calculated based on actual sales, the guaranteed minimums are recognized ratably over the contractual year to which they relate. Generally, the Company's guaranteed minimum royalty amounts due from licensees relate to contractual periods that do not exceed 12 months, however, some of our guaranteed minimums for Versace are multi-year based. As of April 1, 2023, contractually guaranteed minimum fees from the Company's license agreements expected to be recognized as revenue during future periods were as follows (in millions):

|  | Contractually Guaranteed Minimum Fees |
| --- | --- |
| Fiscal 2024 | $        33 |
| Fiscal 2025 | 33 |
| Fiscal 2026 | 30 |
| Fiscal 2027 | 25 |
| Fiscal 2028 | 18 |
| Fiscal 2029 and thereafter | 29 |
| **Total** | $        168 |

*Sales Returns*

For the sale of goods with a right of return, the Company recognizes revenue for the consideration for which it expects to be entitled and a refund liability for the amount it expects to refund to its customers within accrued expenses and other current liabilities. The refund liability is estimated based on management's review of historical and current customer returns for its retail and wholesale customers, estimated future returns, adjusted for non-resalable products. The Company also considers its product strategies, as well as the financial condition of its customers, store closings by wholesale customers, changes in the retail environment and other macroeconomic factors. The Company recognizes an asset with a corresponding adjustment to cost of sales for the right to recover the products from its retail and wholesale customers. The refund liability recorded as of April 1, 2023 and April 2, 2022 was $54 million and $52 million, respectively, and the related asset for the right to recover returned product as of April 1, 2023 and April 2, 2022 was $17 million and $15 million, respectively.

PX7098-087

*Contract Balances*

The Company's contract liabilities are recorded within accrued expenses and other current liabilities and other long-term liabilities in its consolidated balance sheets depending on the short- or long-term nature of the payments to be recognized. The Company's contract liabilities primarily consist of gift card liabilities, advanced payments from product licensees and loyalty program liabilities. Total contract liabilities were $36 million and $30 million as of April 1, 2023 and April 2, 2022, respectively. During Fiscal 2023 and Fiscal 2022, the Company recognized $13 million and $10 million in revenue, respectively, relating to contract liabilities that existed at April 2, 2022 and March 27, 2021, respectively. There were no material contract assets recorded as of April 1, 2023 and April 2, 2022.

There were no changes in historical variable consideration estimates that were materially different from actual results.

*Disaggregation of Revenue*

The following table presents the Company's segment revenues disaggregated by geographic location (in millions):

| | Fiscal Years Ended | | | | | |
|---|---|---|---|---|---|---|
| | April 1, 2023 | | April 2, 2022 | | March 27, 2021 | |
| Versace revenue - the Americas | $ | 408 | $ | 408 | $ | 201 |
| Versace revenue - EMEA | | 468 | | 425 | | 276 |
| Versace revenue - Asia | | 230 | | 255 | | 241 |
| **Total Versace revenue** | | **1,106** | | **1,088** | | **718** |
| Jimmy Choo revenue - the Americas | | 196 | | 175 | | 102 |
| Jimmy Choo revenue - EMEA | | 255 | | 229 | | 146 |
| Jimmy Choo revenue - Asia | | 182 | | 209 | | 170 |
| **Total Jimmy Choo revenue** | | **633** | | **613** | | **418** |
| Michael Kors revenue - the Americas | | 2,616 | | 2,627 | | 1,869 |
| Michael Kors revenue - EMEA | | 819 | | 835 | | 607 |
| Michael Kors revenue - Asia | | 445 | | 491 | | 448 |
| **Total Michael Kors revenue** | | **3,880** | | **3,953** | | **2,924** |
| | | | | | | |
| Total revenue - the Americas | | 3,220 | | 3,210 | | 2,172 |
| Total revenue - EMEA | | 1,542 | | 1,489 | | 1,029 |
| Total revenue - Asia | | 857 | | 955 | | 859 |
| **Total revenue** | $ | **5,619** | $ | **5,654** | $ | **4,060** |

PX7098-088

**4. Leases**

The following table presents the Company's supplemental balance sheets information related to leases (in millions):

| | Balance Sheet Location | April 1, 2023 | April 2, 2022 |
|---|---|---|---|
| **Assets** | | | |
| Operating leases | Operating lease right-of-use assets | $ 1,330 | $ 1,358 |
| | | | |
| **Liabilities** | | | |
| Current: | | | |
| Operating leases | Short-term portion of operating lease liabilities | $ 429 | $ 414 |
| Non-current: | | | |
| Operating leases | Long-term portion of operating lease liabilities | $ 1,348 | $ 1,467 |

The components of net lease costs for the fiscal year ended April 1, 2023 and April 2, 2022 were as follows (in millions):

| | Consolidated Statement of Operations and Comprehensive Income (Loss) Location | April 1, 2023 | April 2, 2022 |
|---|---|---|---|
| Operating lease cost | Selling, general and administrative expenses | $ 405 | $ 410 |
| Variable lease cost [1] | Selling, general and administrative expenses | 170 | 135 |
| Short-term lease cost | Selling, general and administrative expenses | 8 | 16 |
| Sublease income | Selling, general and administrative expenses | (9) | (3) |
| Sublease income [2] | Restructuring and other charges | — | (5) |
| **Total lease cost, net** | | $ 574 | $ 553 |

[1]  The Company elected to account for rent concessions negotiated in connection with COVID-19 as if it were contemplated as part of the existing contract and these concessions are recorded as variable lease expense. As of the fiscal year ended April 1, 2023 and April 2, 2022, rent concessions due to COVID-19 were $14 million and $15 million, respectively.

[2]  The Company recorded sublease income related to certain leases in connection with the Capri Retail Store Optimization plan.

The following table presents the Company's supplemental cash flow information related to leases (in millions):

| | April 1, 2023 | April 2, 2022 |
|---|---|---|
| Cash paid for amounts included in the measurement of lease liabilities: | | |
| Operating cash flows used in operating leases | $ 501 | $ 543 |
| Non-cash transactions: | | |
| Lease assets obtained in exchange for new lease liabilities | 344 | 332 |
| Rent concessions due to COVID-19 | 14 | 15 |

PX7098-089

The following tables summarizes the weighted average remaining lease term and weighted average discount rate related to the Company's operating lease right-of-use assets and lease liabilities recorded on the balance sheets as of April 1, 2023 and April 2, 2022:

|  | April 1, 2023 | April 2, 2022 |
|---|---|---|
| Operating leases: | | |
| Weighted average remaining lease term (years) | 5.9 | 6.0 |
| Weighted average discount rate | 3.3 % | 3.1 % |

At April 1, 2023, the future minimum lease payments under the terms of these noncancelable operating lease agreements are as follows (in millions):

|  | April 1, 2023 |
|---|---|
| Fiscal 2024 | $ 473 |
| Fiscal 2025 | 384 |
| Fiscal 2026 | 297 |
| Fiscal 2027 | 212 |
| Fiscal 2028 | 169 |
| Thereafter | 427 |
| Total lease payments | 1,962 |
| Less: interest | (185) |
| **Total lease liabilities** | $ 1,777 |

At April 1, 2023, the future minimum sublease income under the terms of these noncancelable operating lease agreements are as follows (in millions):

|  | April 1, 2023 |
|---|---|
| Fiscal 2024 | $ 8 |
| Fiscal 2025 | 7 |
| Fiscal 2026 | 5 |
| Fiscal 2027 | 4 |
| Fiscal 2028 | 4 |
| Thereafter | 8 |
| **Total sublease income** | $ 36 |

Additionally, the Company had approximately $139 million and $49 million of future payment obligations related to executed lease agreements for which the related lease has not yet commenced as of April 1, 2023 and April 2, 2022, respectively.

See Note 2 for additional information on the Company's accounting policies related to leases.

PX7098-090

**5. Receivables, net**

Receivables, net consist of (in millions):

| | April 1, 2023 | | April 2, 2022 | |
|---|---|---|---|---|
| Trade receivables [1] | $ | 412 | $ | 461 |
| Receivables due from licensees | | 14 | | 17 |
| | | 426 | | 478 |
| Less: allowances | | (57) | | (44) |
| **Total receivables, net** | $ | 369 | $ | 434 |

[1]  As of April 1, 2023 and April 2, 2022, $96 million and $83 million, respectively, of trade receivables were insured.

Receivables are presented net of allowances for discounts, markdowns, operational chargebacks and credit losses. Discounts are based on open invoices where trade discounts have been extended to customers. Markdowns are based on wholesale customers' sales performance, seasonal negotiations with customers, historical deduction trends and an evaluation of current market conditions. Operational chargebacks are based on deductions taken by customers, net of expected recoveries. Such provisions, and related recoveries, are reflected in revenues.

The Company's allowance for credit losses is determined through analysis of periodic aging of receivables and assessments of collectability based on an evaluation of historic and anticipated trends, the financial condition of the Company's customers and the impact of general economic conditions. The past due status of a receivable is based on its contractual terms. Amounts deemed uncollectible are written off against the allowance when it is probable the amounts will not be recovered. Allowance for credit losses was $8 million and $10 million as of April 1, 2023 and April 2, 2022, respectively. The Company had credit losses of $5 million, $7 million and $(3) million, respectively, for Fiscal 2023, Fiscal 2022 and Fiscal 2021.

**6. Concentration of Credit Risk, Major Customers and Suppliers**

Financial instruments that subject the Company to concentration of credit risk are cash and cash equivalents and receivables. As part of its ongoing procedures, the Company monitors its concentration of deposits with various financial institutions in order to avoid any undue exposure. The Company mitigates its risk by depositing cash and cash equivalents in major financial institutions. The Company also mitigates its credit risk by obtaining insurance coverage for a portion of its receivables (see Note 5). No individual customer accounted for 10% or more of the Company's total revenues during Fiscal 2023, Fiscal 2022 or Fiscal 2021.

The Company contracts for the purchase of finished goods principally with independent third-party contractors, whereby the contractor is generally responsible for all manufacturing processes. Although the Company does not have any long-term agreements with any of its manufacturing contractors, the Company believes it has mutually satisfactory relationships with them. The Company allocates product manufacturing among agents and contractors based on their capabilities, the availability of production capacity, quality, pricing and delivery. The inability of certain contractors to provide needed services on a timely basis could adversely affect the Company's operations and financial condition. For Fiscal 2023, Fiscal 2022 and Fiscal 2021, one contractor accounted for approximately 15%, 17% and 18%, respectively, of the Company's total finished goods purchases, based on dollar volume.

The Company also has relationships with various agents who source finished goods with numerous contractors on behalf of its Michael Kors brand. For Fiscal 2023, Fiscal 2022 and Fiscal 2021, one agent sourced approximately 15%, 14% and 15%, respectively, of Michael Kors finished goods, based on dollar volume.

PX7098-091

**7. Property and Equipment, net**

Property and equipment, net, consists of (in millions):

| | April 1, 2023 | April 2, 2022 |
|---|---|---|
| Leasehold improvements | $ 577 | $ 575 |
| Computer equipment and software | 237 | 212 |
| Furniture and fixtures | 216 | 218 |
| Equipment | 106 | 81 |
| Building | 48 | 48 |
| In-store shops | 44 | 47 |
| Land | 18 | 19 |
| **Total property and equipment, gross** | 1,246 | 1,200 |
| Less: accumulated depreciation and amortization | (784) | (790) |
| Subtotal | 462 | 410 |
| Construction-in-progress | 90 | 66 |
| **Total property and equipment, net** | $ 552 | $ 476 |

Depreciation and amortization of property and equipment for the fiscal years ended April 1, 2023, April 2, 2022, and March 27, 2021 totaled $135 million, $144 million and $165 million, respectively. During Fiscal 2023, Fiscal 2022 and Fiscal 2021, the Company recorded property and equipment impairment charges of $3 million, $7 million and $23 million, respectively, primarily related to the Company's retail store locations. See Note 13 for additional information.

**8. Intangible Assets and Goodwill**

The following table details the carrying values of the Company's intangible assets other than goodwill (in millions):

| | April 1, 2023 | | | April 2, 2022 | | |
|---|---|---|---|---|---|---|
| | Gross Carrying Amount | Accumulated Amortization/ Impairment | Net Carrying Amount | Gross Carrying Amount | Accumulated Amortization/ Impairment | Net Carry Amount |
| *Definite-lived intangible assets:* | | | | | | |
| Reacquired rights | $ 400 | $ 109 | $ 291 | $ 400 | $ 94 | $ 306 |
| Trademarks | 23 | 23 | — | 23 | 22 | 1 |
| Customer relationships | 397 | 136 | 261 | 414 | 112 | 302 |
| **Total definite-lived intangible assets** | 820 | 268 | 552 | 837 | 228 | 609 |
| *Indefinite-lived intangible assets:* | | | | | | |
| Jimmy Choo brand [1] | 550 | 273 | 277 | 570 | 249 | 321 |
| Versace brand [2] | 899 | — | 899 | 917 | — | 917 |
| **Total indefinite-lived intangible assets** | 1,449 | 273 | 1,176 | 1,487 | 249 | 1,238 |
| Total intangible assets, excluding goodwill | $ 2,269 | $ 541 | $ 1,728 | $ 2,324 | $ 477 | $ 1,847 |

[1] The year-over-year change in net carrying amount reflects an impairment charge of $24 million and foreign currency translation of $20 million for the fiscal year ended April 1, 2023. There was no impairment charge for the fiscal year ended April 2, 2022.

[2] The year-over-year change in net carrying amount reflects foreign currency translation for the fiscal year ended April 1, 2023.

PX7098-092

Reacquired rights relate to the Company's reacquisition of the rights to use the Michael Kors trademarks and to import, sell, advertise and promote certain of its products in the previously licensed territories in the Greater China region and are being amortized through March 31, 2041, the expiration date of the former licensing agreement. The trademarks relate to the Michael Kors brand name and are amortized over twenty years. Customer relationships are generally amortized over five to eighteen years. Amortization expense for the Company's definite-lived intangibles was $44 million, $49 million and $47 million, respectively, for each of the fiscal years ended April 1, 2023, April 2, 2022 and March 27, 2021.

Indefinite-lived intangible assets other than goodwill included the Versace and Jimmy Choo brands, which were recorded in connection with the acquisitions of Versace and Jimmy Choo, and have an indefinite life as they are essential to the Company's ability to operate the Versace and Jimmy Choo businesses for the foreseeable future.

Estimated amortization expense for each of the next five years is as follows (in millions):

| | | |
|---|---|---|
| Fiscal 2024 | $ | 44 |
| Fiscal 2025 | | 44 |
| Fiscal 2026 | | 44 |
| Fiscal 2027 | | 44 |
| Fiscal 2028 | | 43 |
| Fiscal 2029 and thereafter | | 333 |
| **Total** | $ | 552 |

The future amortization expense above reflects weighted-average estimated remaining useful lives of eighteen years for reacquired rights and ten years for customer relationships.

The following table details the changes in goodwill for each of the Company's reportable segments (in millions):

| | Versace | Jimmy Choo | Michael Kors | Total |
|---|---|---|---|---|
| Balance at March 27, 2021 | $ 933 | $ 445 | $ 120 | $ 1,498 |
| Foreign currency translation | (59) | (21) | — | (80) |
| Balance at April 2, 2022 | 874 | 424 | 120 | 1,418 |
| Impairment charges[1] | — | (82) | — | (82) |
| Foreign currency translation | (17) | (26) | — | (43) |
| Balance at April 1, 2023 | $ 857 | $ 316 | $ 120 | $ 1,293 |

[1]     The Company recorded impairment charges of $82 million during Fiscal 2023 related to the Jimmy Choo retail and wholesale reporting units. As of April 1, 2023, the Company had accumulated impairment charges of $347 million related to Jimmy Choo reporting units.

The Company's goodwill and the Versace and Jimmy Choo brands are not subject to amortization but are evaluated for impairment annually in the last quarter of each fiscal year, or whenever impairment indicators exist. During the fourth quarter of Fiscal 2023, the Company performed its annual goodwill and indefinite-lived intangible assets impairment analysis. The Company performed its goodwill impairment assessment for its Michael Kors reporting units using a qualitative assessment. Based on the results of the Company's qualitative impairment assessment, the Company concluded that it is more likely than not that the fair value of the Michael Kors' reporting units exceeded their carrying value and, therefore, were not impaired.

The Company performed its annual goodwill and indefinite-lived intangible assets impairment analysis for both the Versace and Jimmy Choo reporting units, using a combination of income and market approaches to estimate the fair value of each brands' reporting units. The Company also elected to perform an impairment analysis for both the Versace and Jimmy Choo brand indefinite-lived intangible assets using an income approach to estimate the fair values. Based on the results of these assessments, the Company determined there was no impairment for the Jimmy Choo Licensing reporting unit goodwill or Wholesale brand intangible assets and Versace reporting units goodwill or brand intangible assets, as the fair values of the reporting units and the brand intangible assets exceeded the related carrying amounts.

PX7098-093

However, the Company concluded that the fair value of the Jimmy Choo Retail and Wholesale reporting units goodwill, along with the Jimmy Choo Retail brand indefinite-lived intangible assets did not exceed their related carrying amounts. These impairment charges were primarily related to a higher discount rate in the current year driven by higher risk-free rates. Accordingly, the Company recorded goodwill impairment charges of $82 million related to the Jimmy Choo Retail and Wholesale reporting units and $24 million related to the Jimmy Choo Retail brand intangible assets during Fiscal 2023. The impairment charges were recorded within impairment of assets on our consolidated statement of operations and comprehensive income (loss) for the fiscal year ended April 1, 2023.

In Fiscal 2022, the Company did not incur any impairment charges. In Fiscal 2021, the Company recorded goodwill impairment charges of $94 million related to the Jimmy Choo Wholesale and Jimmy Choo Licensing reporting units and impairment charges of $69 million related to the Jimmy Choo brand intangible assets. The impairment charges were recorded within impairment of assets on our consolidated statement of operations and comprehensive income (loss) for the fiscal year ended March 27, 2021. See Note 13 for additional information.

## 9. Current Assets and Current Liabilities

Prepaid expenses and other current assets consist of the following (in millions):

|  | April 1, 2023 | | April 2, 2022 | |
|---|---|---|---|---|
| Prepaid taxes | $ | 105 | $ | 86 |
| Prepaid contracts | | 22 | | 15 |
| Interest receivable related to hedges | | 10 | | 13 |
| Other accounts receivables | | 10 | | 17 |
| Other | | 48 | | 61 |
| **Total prepaid expenses and other current assets** | $ | 195 | $ | 192 |

Accrued expenses and other current liabilities consist of the following (in millions):

|  | April 1, 2023 | | April 2, 2022 | |
|---|---|---|---|---|
| Return liabilities | $ | 54 | $ | 52 |
| Accrued capital expenditures | | 33 | | 39 |
| Other taxes payable | | 32 | | 61 |
| Accrued advertising and marketing | | 26 | | 21 |
| Accrued rent [1] | | 18 | | 20 |
| Advance royalties | | 18 | | 7 |
| Accrued interest | | 16 | | 10 |
| Gift and retail store credits | | 14 | | 17 |
| Professional services | | 14 | | 15 |
| Accrued litigation | | 12 | | 13 |
| Accrued purchases and samples | | 8 | | 11 |
| Charitable donations [2] | | — | | 10 |
| Other | | 69 | | 75 |
| **Total accrued expenses and other current liabilities** | $ | 314 | $ | 351 |

---

[1]   The accrued rent balance relates to variable lease payments.
[2]   The charitable donations balance relates to a $10 million unconditional pledge to The Versace Foundation as of April 2, 2022 which was funded during the third quarter ended December 31, 2022.

PX7098-094

**10. Restructuring and Other Charges**

*Restructuring Charges - Capri Retail Store Optimization Program*

During Fiscal 2022, the Company completed its plan to close certain retail stores as part of its Capri Retail Store Optimization Program.

The Company closed a total of 167 stores, with 66 and 101 stores closed during Fiscal 2022 and Fiscal 2021, respectively. Net restructuring charges recorded in connection with the Capri Retail Store Optimization Program was $14 million, of which $9 million and $5 million was recorded during Fiscal 2022 and Fiscal 2021, respectively.

*Other Charges*

During Fiscal 2023, the Company recorded costs of $16 million primarily relating to equity awards associated with the acquisition of Versace. During Fiscal 2022 the Company recorded costs of $33 million, primarily relating to equity awards associated with the acquisition of Versace, severance related to an executive officer and the closure of certain corporate locations. During Fiscal 2021, the Company recorded costs of $27 million, primarily relating to equity awards associated with the acquisition of Versace and the closure of certain corporate locations.

**11. Debt Obligations**

The following table presents the Company's debt obligations (in millions):

| | April 1, 2023 | | April 2, 2022 | |
|---|---|---|---|---|
| Revolving Credit Facilities | $ | 874 | $ | 175 |
| Versace Term Loan | | 488 | | — |
| Senior Notes due 2024 | | 450 | | 450 |
| 2018 Term Loan | | — | | 497 |
| Other | | 17 | | 42 |
| **Total debt** | | 1,829 | | 1,164 |
| Less: Unamortized debt issuance costs | | 2 | | 3 |
| Less: Unamortized discount on senior notes | | — | | 1 |
| **Total carrying value of debt** | | 1,827 | | 1,160 |
| Less: Short-term debt | | 5 | | 29 |
| **Total long-term debt** | $ | 1,822 | $ | 1,131 |

***Senior Revolving Credit Facility***

On July 1, 2022, the Company entered into a revolving credit facility (the "2022 Credit Facility") with, among others, JPMorgan Chase Bank, N.A. ("JPMorgan Chase"), as administrative agent (the "Administrative Agent"), which refinanced its existing senior unsecured revolving credit facility. The Company, a U.S. subsidiary of the Company, a Canadian subsidiary of the Company, a Dutch subsidiary of the Company and a Swiss subsidiary of the Company are the borrowers under the 2022 Credit Facility, and the borrowers and certain subsidiaries of the Company provide unsecured guaranties of the 2022 Credit Facility. The 2022 Credit Facility replaced the third amended and restated senior unsecured credit facility, dated as of November 15, 2018 (the "2018 Credit Facility").

The 2022 Credit Facility provides for a $1.5 billion revolving credit facility (the "2022 Revolving Credit Facility"), which may be denominated in U.S. Dollars and other currencies, including Euros, Canadian Dollars, Pounds Sterling, Japanese Yen and Swiss Francs. The 2022 Revolving Credit Facility also includes sub-facilities for the issuance of letters of credit of up to $125 million and swing line loans at the Administrative Agent's discretion of up to $100 million. The Company has the ability to expand its borrowing availability under the 2022 Credit Facility in the form of increased revolving commitments or one or more tranches of term loans by up to an additional $500 million, subject to the agreement of the participating lenders and certain other customary conditions.

PX7098-095

Borrowings under the 2022 Credit Facility bear interest, at the Company's option, at the following rates:

- For loans denominated in U.S. Dollars, (A) an alternate base rate, which is the greatest of (a) the prime rate publicly announced from time to time by JPMorgan Chase, (b) the greater of the federal funds effective rate and the Federal Reserve Bank of New York overnight bank funding rate and zero, plus 50 basis points, and (c) the greater of term Secured Overnight Financing Rate ("SOFR") for an interest period of one month plus 10 basis points and zero, plus 100 basis points, (B) the greater of term SOFR for the applicable interest period plus 10 basis points ("Adjusted Term SOFR") and zero or (C) the greater of daily simple SOFR plus 10 basis points and zero;
- For loans denominated in Pounds Sterling, the greater of Secured Overnight Index Average ("SONIA") and zero;
- For loans denominated in Swiss Francs, the greater of Swiss Average Rate Overnight ("SARON") and zero;
- For loans denominated in Euro, the greater of Euro Interbank Offer Rate ("EURIBOR") for the applicable interest period adjusted for statutory reserve requirements ("Adjusted EURIBOR Rate") and zero;
- For loans denominated in Canadian Dollars, the greater of the rate applicable to Canadian Dollar Canadian banker's acceptances quoted on Reuters for the applicable interest period adjusted for statutory reserve requirements ("Adjusted CDOR Rate") and zero; and
- For loans denominated in Japanese Yen, the greater of Tokyo Interbank Offer Rate ("TIBOR") for the applicable interest period adjusted for statutory reserve requirements ("Adjusted TIBOR Rate") and zero; in each case, plus an applicable margin based on the Company's public debt ratings and/or net leverage ratio.

The 2022 Credit Facility provides for an annual administration fee and a commitment fee equal to 7.5 basis points to 17.5 basis points per annum, which was 15.0 basis points as of April 1, 2023. The fees are based on the Company's public debt ratings and/or net leverage ratio, applied to the average daily unused amount of the 2022 Credit Facility.

Loans under the 2022 Credit Facility may be prepaid and commitments may be terminated or reduced by the borrowers without premium or penalty other than customary "breakage" costs with respect to loans bearing interest based upon Adjusted Term SOFR, the Adjusted EURIBOR Rate, the Adjusted CDOR Rate and the Adjusted TIBOR Rate.

The 2022 Credit Facility requires the Company to maintain a net leverage ratio as of the end of each fiscal quarter of no greater than 4.0 to 1.0. Such net leverage ratio is calculated as the ratio of the sum of total indebtedness as of the date of the measurement plus the capitalized amount of all operating lease obligations, minus unrestricted cash and cash equivalents not to exceed $200 million, to Consolidated EBITDAR for the last four consecutive fiscal quarters. Consolidated EBITDAR is defined as consolidated net income plus provision for taxes based on income, profits or capital, net interest expense, depreciation and amortization expense, consolidated rent expense and other non-cash losses, charge and expenses, subject to certain additions and deductions. The 2022 Credit Facility also includes covenants that limit additional indebtedness, liens, acquisitions and other investments, restricted payments and affiliate transactions.

The 2022 Credit Facility also contains events of default customary for financings of this type, including, but not limited to, payment defaults, material inaccuracy of representations and warranties, covenant defaults, cross-defaults to certain indebtedness, certain events of bankruptcy or insolvency, certain events under the Employee Retirement Income Security Act, material judgments, actual or asserted failure of any guaranty supporting the 2022 Credit Facility to be in full force and effect, and changes of control. If such an event of default occurs and is continuing, the lenders under the 2022 Credit Facility would be entitled to take various actions, including, but not limited to, terminating the commitments and accelerating amounts outstanding under the 2022 Credit Facility.

As of April 1, 2023, the Company had $874 million of borrowings outstanding under the 2022 Revolving Credit Facility. The Company had $175 million of borrowings outstanding under revolver in the 2018 Credit Facility as of April 2, 2022. In addition, stand-by letters of credit of $3 million and $21 million were outstanding as of April 1, 2023 and April 2, 2022, respectively. At April 1, 2023, the amount available for future borrowings under the 2022 Revolving Credit Facility was $623 million. The amount available for future borrowings under the revolver in the 2018 Credit Facility was $804 million as of April 2, 2022.

As of April 1, 2023, the Company no longer had an outstanding balance related to the 2018 Term Loan. As of April 2, 2022, the carrying value of the 2018 Term Loan was $495 million, which was recorded within long-term debt in the Company's consolidated balance sheets.

The Company had $6 million and $3 million of deferred financing fees related to Revolving Credit Facilities as of April 1, 2023 and April 2, 2022, respectively, and are recorded within other assets in the Company's consolidated balance sheets. As of April 2, 2022, the Company had $2 million of deferred financing fees related to the 2018 Term Loan, which are recorded within long-term debt in the Company's consolidated balance sheets.

94

*Versace Term Loan*

On December 5, 2022, Gianni Versace S.r.l., a wholly owned subsidiary of Capri Holdings Limited, entered into a credit facility with Intesa Sanpaolo S.p.A., Banco Nazionale del Lavoro S.p.A., and UniCredit S.p.A., as arrangers and lenders, and Intesa Sanpaolo S.p.A., as agent, which provides a senior unsecured term loan (the "Versace Term Loan") in an aggregate principal amount of €450 million (approximately $488 million). The Versace Term Loan is not subject to amortization and matures on December 5, 2025. The Company provides an unsecured guaranty of the Versace Term Loan.

The Versace Term Loan bears interest at a rate per annum equal to the greater of EURIBOR for the applicable interest period and zero, plus a margin of 1.35%.

The Versace Term Loan may be prepaid without premium or penalty other than customary "breakage" costs. The Versace Term Loan requires the Company to maintain a net leverage ratio as of the end of each fiscal quarter of no greater than 4.0 to 1.0. Such net leverage ratio is calculated as the ratio of the sum of total indebtedness as of the date of the measurement plus the capitalized amount of all operating lease obligations, minus unrestricted cash and cash equivalents not to exceed $200 million, to Consolidated EBITDAR for the last four consecutive fiscal quarters. Consolidated EBITDAR is defined as consolidated net income plus provision for taxes based on income, profits or capital, net interest expense, depreciation and amortization expense, consolidated rent expense and other non-cash losses, charge and expenses, subject to certain additions and deductions. The Versace Term Loan also includes covenants that limit additional financial indebtedness, liens, acquisitions, loans and guarantees, restricted payments and mergers of GIVI Holding S.r.l., Gianni Versace S.r.l. and their respective subsidiaries.

The Versace Term Loan contains events of default customary for financings of this type, including, but not limited to payment defaults, material inaccuracy of representations and warranties, covenant defaults, cross-defaults to material financial indebtedness, certain events of bankruptcy or insolvency, illegality or repudiation of any loan document under the Versace Term Loan or any failure thereof to be in full force and effect, and changes of control. If such an event of default occurs and is continuing, the lenders under the Versace Term Loan would be entitled to take various actions, including, but not limited to, accelerating amounts outstanding under the Versace Term Loan.

As of April 1, 2023, the carrying value of the Versace Term Loan was $487 million, net of $1 million of deferred financing fees, which was recorded within long-term debt in the Company's consolidated balance sheets.

As of April 1, 2023, and the date these financial statements were issued, the Company was in compliance with all covenants related to the 2022 Credit Facility and the Versace Term Loan.

*Senior Notes*

On October 20, 2017, Michael Kors (USA), Inc. (the "Issuer"), the Company's wholly owned subsidiary, completed its offering of $450 million aggregate principal amount senior notes due in 2024 (the "Senior Notes"), pursuant to an exemption from registration under the Securities Act of 1933, as amended. The Senior Notes were issued under an indenture dated October 20, 2017, among the Issuer, the Company, the subsidiary guarantors party thereto and U.S. Bank National Association, as trustee (the "Indenture"). The Senior Notes were issued to finance a portion of the Company's acquisition of Jimmy Choo and certain related refinancing transactions.

As of April 1, 2023, the Senior Notes bear interest at a rate of 4.250% per year, subject to adjustments from time to time if either Moody's or S&P (or a substitute rating agency therefore) downgrades (or downgrades and subsequently upgrades) the credit rating assigned to the Senior Notes. Interest on the Senior Notes is payable semi-annually on May 1 and November 1 of each year, beginning on May 1, 2018.

The Senior Notes are unsecured and are guaranteed by the Company and its existing and future subsidiaries that guarantee or are borrowers under the 2022 Credit Facility (subject to certain exceptions, including subsidiaries organized in China). The Senior Notes may be redeemed at the Company's option at any time in whole or in part at a price equal to 100% of the principal amount, plus accrued and unpaid interest, plus a "make-whole" amount calculated at the applicable Treasury Rate plus 30 basis points.

The Senior Notes rank equally in right of payment with all of the Issuer's and guarantors' existing and future senior unsecured indebtedness, senior in right of payment to any future subordinated indebtedness, effectively subordinated in right of payment to any of the Company's subsidiaries' obligations and any of the Company's secured obligations, to the extent of the assets securing such obligations.

PX7098-097

The Indenture contains covenants, including those that limit the Company's ability to create certain liens and enter into certain sale and leaseback transactions. In the event of a "Change of Control Triggering Event," as defined in the Indenture, the Issuer will be required to make an offer to repurchase the Senior Notes at a repurchase price in cash equal to 101% of the aggregate principal amount of the Senior Notes being repurchased plus any unpaid interest. These covenants are subject to important limitations and exceptions, as per the Indenture.

As of April 1, 2023 and April 2, 2022, the carrying value of the Senior Notes was $449 million and $448 million, respectively, net of issuance costs and unamortized discount of $1 million and $2 million, respectively, which were recorded within long-term debt in the Company's consolidated balance sheets.

### Supplier Financing Program

During Fiscal 2021, the Company began offering a supplier financing program to certain suppliers as the Company continues to identify opportunities to improve liquidity. This program enables suppliers, at their sole discretion, to sell their receivables (i.e., the Company's payment obligations to suppliers) to a financial institution on a non-recourse basis in order to be paid earlier than current payment terms provide. The Company's obligations, including the amount due and scheduled payment dates, are not impacted by a suppliers' decision to participate in this program. The Company does not reimburse suppliers for any costs they incur to participate in the program and their participation is voluntary. The amount outstanding under this program as of April 1, 2023 and April 2, 2022 was $4 million and $21 million, respectively and is presented as short-term debt in the Company's consolidated balance sheets.

### Japan Credit Facility

As of April 1, 2023, the Company's subsidiary in Japan had a short term credit facility ("Japan Credit Facility") with Mitsubishi UFJ Financial Group ("MUFJ"), which may be used to fund general working capital needs of Michael Kors Japan K.K., subject to the bank's discretion. The Japan Credit Facility is in effect until the Company's decides to terminate the revolving line of credit. The Japan Credit Facility provides Michael Kors Japan K.K. with a revolving credit line of up to ¥1.0 billion (approximately $8 million). The Japan Credit Facility bears interest at a rate posted by the Bank plus 0.300% two business days prior to the date of borrowing or the date of interest renewal. As of April 1, 2023 and April 2, 2022, there were no borrowings outstanding under the Japan Credit Facility.

### Hong Kong Credit Facilities

As of April 1, 2023, the Company's Hong Kong subsidiary, Michael Kors (HK) Limited and Subsidiaries ("MKHKL"), had an uncommitted credit facility ("HK HSBC Credit Facility") with HSBC Bank ("HSBC"), which may be used to fund general working capital needs of MKHKL through January 2024 subject to HSBC's discretion. The HK Credit Facility provides MKHKL with a revolving line of credit of up to 50 million Hong Kong dollars (approximately $6 million), which includes bank guarantees of up to 20 million Hong Kong dollars (approximately $3 million). Borrowings under the HK HSBC Credit Facility must be made in increments of at least 5 million Hong Kong dollars and bear interest at the Hong Kong Interbank Offered Rate ("HIBOR") plus 200 basis points. As of April 1, 2023 and April 2, 2022, there were no borrowings outstanding under the HK HSBC Credit Facility. As of April 1, 2023, bank guarantees supported by this facility were 4 million Hong Kong dollars (approximately $1 million).

As of April 1, 2023, the Company's Hong Kong subsidiary, MKHKL, had a short-term credit facility ("HK SCB Credit Facility") with Standard Charter Bank ("SCB"), which may be used to fund general working capital needs, not to exceed 12 months. The HK SCB Credit Facility is in effect through January 2024. The HK SCB Credit Facility provides MKHKL with a revolving loan of up to 20 million Hong Kong dollars (approximately $3 million). Borrowings under the HK SCB Credit Facility bear interest at 1.5% per annum at the time of borrowing. As of April 1, 2023, the Company had no borrowings outstanding under the HK SCB Credit Facility.

### China Credit Facilities

As of April 1, 2023, the Company's subsidiary in China, Michael Kors Trading (Shanghai) Company Limited ("MKTSCL"), had a short-term credit facility ("China HSBC Credit Facility") with HSBC, which may be used to fund general working capital needs, not to exceed 12 months. The China Credit Facility is in effect through January 2024. The China HSBC Credit Facility provides MKTSCL with a Revolving Loan Facility of up to RMB 65 million (approximately $9 million), which includes a revolving loan of RMB 35 million (approximately $5 million), an overdraft facility with a credit line of RMB 10 million (approximately $1 million) and a non-financial bank guarantee facility of RMB 20 million (approximately $3 million) or its equivalent in another currency, at lender's discretion. Borrowings under the China HSBC Credit Facility bear interest at

96

plus 0.42% of the applicable People's Bank of China's benchmark lending rate at the time of borrowing. As of April 1, 2023 and April 2, 2022, the Company had no borrowings outstanding under the China HSBC Credit Facility.

As of April 1, 2023, the Company's subsidiary in China, MKTSCL, had a short-term credit facility ("China SCB Credit Facility") with SCB, which may be used to fund general working capital needs, not to exceed 12 months. The China SCB Credit Facility is in effect through April 2024. The China SCB Credit Facility provides MKTSCL with a Revolving Loan Facility of up to RMB 30 million (approximately $4 million), which includes a revolving loan of RMB 20 million (approximately $3 million) and a bank guarantee with a sublimit of the revolving loan of RMB 10 million (approximately $1 million). Borrowings under the China SCB Credit Facility bear interest at plus 0.15% of the applicable People's Bank of China's benchmark lending rate at the time of borrowing. As of April 1, 2023 and April 2, 2022, the Company had no borrowings outstanding under the China SCB Credit Facility.

### Versace Facilities

During Fiscal 2022, the Company's subsidiary, GIVI Holding S.r.l. ("GIVI"), entered into an agreement with Banco BPM Banking Group ("the Bank") to sell certain tax receivables to the Bank in exchange for cash. The arrangement was determined to be a financing arrangement because the de-recognition criteria for the receivables was not met at the time of the cash receipt from the Bank. As of April 1, 2023, the outstanding balance was $11 million, with $1 million and $10 million recorded within short-term debt and long-term debt, respectively, in the Company's consolidated balance sheets, respectively.

As of April 1, 2023, the Company's subsidiary, Gianni Versace S.r.l. ("Versace"), had two uncommitted short-term credit facilities, one with Unicredit and the other with Intesa ("Versace Credit Facilities"), which may be used for general working capital needs of Versace. The Versace Credit Facilities are in effect until Unicredit or Intesa decides to terminate the credit facilities. The Versace Credit Facilities provide Versace with a swing line of credit of up to €25 million (approximately $27 million), with interest set by Unicredit or Intesa on the date of borrowing. As of April 1, 2023 and April 2, 2022, there were no borrowings outstanding under the Versace Credit Facility.

As of April 1, 2023, Versace had an uncommitted short-term credit facility with BNP Paribas ("Versace BNP Credit Facility"), which may be used for general working capital needs of Versace. The Versace BNP Credit Facility is in effect until BNP Paribas decides to terminate the credit facility. The Versace BNP Credit Facility provides Versace with a swing line of credit of up to €20 million (approximately $22 million), which includes a bank guarantee of €5 million (approximately $5 million), with interest set by BNP Paribas on the date of borrowing. As of April 1, 2023, bank guarantees outstanding under this facility were €4 million (approximately $4 million). As of April 1, 2023 and April 2, 2022, there were no borrowings outstanding under the Versace BNP Credit Facility.

## 12. Commitments and Contingencies

### Commitments

The Company has issued stand-by letters of credit to guarantee certain of its retail and corporate operating lease commitments, aggregating $35 million at April 1, 2023, including $3 million in letters of credit issued under the Revolving Credit Facility.

### Other Commitments

As of April 1, 2023, the Company also has other contractual commitments aggregating $2.729 billion, which consist of inventory purchase commitments of $775 million, debt obligations of $1.829 billion and other contractual obligations of $125 million, which primarily relate to the Company's marketing and advertising obligations, information technology agreements and supply agreements.

### Long-term Employment Contract

The Company has an employment agreement with the Chief Creative Officer of the Michael Kors brand that provides for continuous employment through the date of the officer's death or permanent disability at an annual salary of $1 million. In addition to salary, the agreement provides for an annual bonus and other employee related benefits.

PX7098-099

*Contingencies*

In the ordinary course of business, the Company is party to various legal proceedings and claims. Although the outcome of such items cannot be determined with certainty, the Company does not believe that the outcome of all pending legal proceedings in the aggregate will have a material adverse effect on its cash flow, results of operations or financial position.

## 13. Fair Value Measurements

Financial assets and liabilities are measured at fair value using the three-level valuation hierarchy for disclosure of fair value measurements. The determination of the applicable level within the hierarchy of a particular asset or liability depends on the inputs used in the valuation as of the measurement date, notably the extent to which the inputs are market-based (observable) or internally derived (unobservable). Observable inputs are inputs that market participants would use in pricing the asset or liability based on market data obtained from independent sources. Unobservable inputs are inputs based on a company's own assumptions about market participant assumptions based on the best information available in the circumstances. The hierarchy is broken down into three levels based on the reliability of inputs as follows:

Level 1 – Valuations based on quoted prices in active markets for identical assets or liabilities that a company has the ability to access at the measurement date.

Level 2 – Valuations based on quoted prices for similar assets or liabilities in active markets or quoted prices for identical assets or liabilities in inactive markets, inputs other than quoted prices that are observable for the asset or liability and inputs derived principally from or corroborated by observable market data.

Level 3 – Valuations based on inputs that are unobservable and significant to the overall fair value measurement.

At April 1, 2023 and April 2, 2022, the fair value of the Company's derivative contracts were determined using broker quotations which were calculations derived from observable market information: the applicable currency rates at the balance sheet date and those forward rates particular to the contract at inception. The Company makes no adjustments to these broker obtained quotes or prices, but assesses the credit risk of the counterparty and would adjust the provided valuations for counterparty credit risk when appropriate. The fair values of the forward contracts are included in prepaid expenses and other current assets, and in accrued expenses and other current liabilities in the consolidated balance sheets, depending on whether they represent assets or liabilities of the Company. The fair values of net investment hedges and fair value hedges are included in other assets, and in other long-term liabilities in the consolidated balance sheets, depending on whether they represent assets or liabilities of the Company. See Note 14 for further detail.

PX7098-100

All contracts are measured and recorded at fair value on a recurring basis and are categorized in Level 2 of the fair value hierarchy, as shown in the following table (in millions):

| | Fair value at April 1, 2023, using: | | | Fair value at April 2, 2022, using: | | |
|---|---|---|---|---|---|---|
| | Quoted prices in active markets for identical assets (Level 1) | Significant other observable inputs (Level 2) | Significant unobservable inputs (Level 3) | Quoted prices in active markets for identical assets (Level 1) | Significant other observable inputs (Level 2) | Significant unobservable inputs (Level 3) |
| **Derivative assets:** | | | | | | |
| Forward foreign currency exchange contracts | $ — | $ — | $ — | $ — | $ 4 | $ — |
| Net investment hedges | — | 1 | — | — | 44 | — |
| Undesignated derivative contracts | — | — | — | — | 4 | — |
| **Total derivative assets** | $ — | $ 1 | $ — | $ — | $ 52 | $ — |
| | | | | | | |
| **Derivative liabilities:** | | | | | | |
| Forward foreign currency exchange contracts | $ — | $ — | $ — | $ — | $ — | $ — |
| Net investment hedges | — | 36 | — | — | 37 | — |
| Fair value hedges | — | 3 | — | — | — | — |
| **Total derivative liabilities** | $ — | $ 39 | $ — | $ — | $ 37 | $ — |

The Company's long-term debt obligations are recorded in its consolidated balance sheets at carrying values, which may differ from the related fair values. The fair value of the Company's long-term debt is estimated using external pricing data, including any available quoted market prices and based on other debt instruments with similar characteristics. Borrowings under revolving credit agreements, if outstanding, are recorded at carrying value, which approximates fair value due to the frequent nature of such borrowings and repayments. See Note 11 for detailed information related to carrying values of the Company's outstanding debt. The following table summarizes the carrying values and estimated fair values of the Company's short- and long-term debt, based on Level 2 measurements (in millions):

| | April 1, 2023 | | April 2, 2022 | |
|---|---|---|---|---|
| | Carrying Value | Estimated Fair Value | Carrying Value | Estimated Fair Value |
| Revolving Credit Facilities | $ 874 | $ 874 | $ 175 | $ 175 |
| Versace Term Loan | $ 487 | $ 481 | $ — | $ — |
| Senior Notes due 2024 | $ 449 | $ 435 | $ 448 | $ 451 |
| 2018 Term Loan | $ — | $ — | $ 495 | $ 490 |

The Company's cash and cash equivalents, accounts receivable and accounts payable, are recorded at carrying value, which approximates fair value.

**Non-Financial Assets and Liabilities**

The Company's non-financial assets include goodwill, intangible assets, operating lease right-of-use assets and property and equipment. Such assets are reported at their carrying values and are not subject to recurring fair value measurements. The Company's goodwill and its indefinite-lived intangible assets (Versace and Jimmy Choo brands) are assessed for impairment at least annually, while its other long-lived assets, including operating lease right-of-use assets, property and equipment and definite-lived intangible assets, are assessed for impairment whenever events or changes in circumstances indicate that the carrying amount of any such asset may not be recoverable. The Company determines the fair values of these assets based on Level 3 measurements using the Company's best estimates of the amount and timing of future discounted cash flows, based on historical experience, market conditions, current trends and performance expectations. See Note 2 for additional information.

PX7098-101

The following table details the carrying values and fair values of the Company's assets that have been impaired (in millions):

| | Carrying Value Prior to Impairment | | Fair Value | | Impairment Charge [1] | |
|---|---|---|---|---|---|---|
| **Fiscal 2023:** | | | | | | |
| Goodwill | $ | 681 | $ | 599 | $ | 82 |
| Operating Lease Right-of-Use Assets | | 100 | | 67 | | 33 |
| Brands | | 224 | | 200 | | 24 |
| Property and Equipment | | 4 | | 1 | | 3 |
| **Total** | $ | 1,009 | $ | 867 | $ | 142 |
| | | | | | | |
| **Fiscal 2022:** | | | | | | |
| Operating Lease Right-of-Use Assets | $ | 209 | $ | 133 | $ | 76 |
| Property and Equipment | | 12 | | 5 | | 7 |
| **Total** | $ | 221 | $ | 138 | $ | 83 |
| | | | | | | |
| **Fiscal 2021:** | | | | | | |
| Operating Lease Right-of-Use Assets | $ | 326 | $ | 191 | $ | 135 |
| Goodwill | | 319 | | 225 | | 94 |
| Brands | | 407 | | 338 | | 69 |
| Property and Equipment | | 30 | | 7 | | 23 |
| **Total** | $ | 1,082 | $ | 761 | $ | 321 |

[1] Includes $10 million and $5 million of impairment charges that were recorded within restructuring and other charges related to the Capri Retail Store Optimization Program during Fiscal 2022 and Fiscal 2021, respectively.

There were no impairment charges related to goodwill or indefinite-lived intangible assets in Fiscal 2022.

## 14. Derivative Financial Instruments

*Forward Foreign Currency Exchange Contracts*

The Company uses forward foreign currency exchange contracts to manage its exposure to fluctuations in foreign currencies for certain of its transactions. The Company, in its normal course of business, enters into transactions with foreign suppliers and seeks to minimize risks related to certain forecasted inventory purchases by using forward foreign currency exchange contracts. The Company only enters into derivative instruments with highly credit-rated counterparties. The Company does not enter into derivative contracts for trading or speculative purposes.

*Net Investment Hedges*

During the first quarter of Fiscal 2023, the Company modified multiple fixed-to-fixed cross-currency swap agreements with aggregate notional amounts of $1.094 billion to hedge its net investment, of which $900 million was in Euro denominated subsidiaries and $194 million was in Japanese Yen denominated subsidiaries. The modification of these swaps resulted in the Company receiving $66 million in cash during the first quarter of Fiscal 2023. These contracts have been designated as net investment hedges.

As of July 2, 2022, the Company had multiple fixed-to-fixed cross-currency swap agreements with aggregate notional amounts of $4 billion to hedge its net investment in Euro denominated subsidiaries (the "Euro Net Investment Hedges") and $194 million to hedge its net investment in Japanese Yen denominated subsidiaries (the "Japanese Yen Net Investment Hedges"). During the month of July 2022, the Euro Net Investment Hedges with aggregate notional amounts of $4 billion outstanding as of July 2, 2022 were terminated resulting in the Company receiving $237 million in cash.

PX7098-102

During the second quarter of Fiscal 2023, the Company also entered into, and subsequently terminated, additional Euro Net Investment Hedges with aggregate notional amounts of $4 billion. The termination of these contracts resulted in the Company receiving an additional $100 million in cash.

During the second quarter of Fiscal 2023, the Company also modified certain Japanese Yen Net Investment Hedges with notional amounts of $100 million. The modification of these hedges resulted in the Company receiving $6 million in cash during the second quarter of Fiscal 2023. The Company entered into additional Japanese Net Investment Hedges with notional amount of $100 million. These contracts have been designated as net investment hedges.

During the second quarter of Fiscal 2023, the Company received a total of $343 million from the termination of its Euro Net Investment Hedges and the modification of its Japanese Yen Net Investment Hedges.

During the third quarter of Fiscal 2023, the Company entered into multiple fixed-to-fixed cross-currency swap agreements with aggregate notional amounts of €1 billion (approximately $1.07 billion) to hedge its net investment in GBP denominated subsidiaries (the "GBP/EUR Net Investment Hedges"). Under the terms of these contracts, the Company will exchange the semi-annual fixed rate payments on GBP denominated debt for fixed rate payments of 0% in Euro. These contracts have maturity dates between November 2024 and November 2027 and are designated as net investment hedges.

As of April 1, 2023, the Company had Japanese Yen Net Investment Hedges with aggregate notional amounts of $294 million. Under the terms of these contracts, the Company will exchange the semi-annual fixed rate payments on United States denominated debt for fixed rate payments of 0% to 2.665% in Japanese Yen. These contracts have maturity dates between May 2027 and February 2051 and are designated as net investment hedges.

Certain of these contracts are supported by a credit support annex ("CSA") which provides for collateral exchange with the earliest effective date being September 2027. If the outstanding position of a contract exceeds a certain threshold governed by the aforementioned CSA's, either party is required to post cash collateral.

When a cross-currency swap is used as a hedging instrument in a net investment hedge assessed under the spot method, the cross-currency basis spread is excluded from the assessment of hedge effectiveness and is recognized as a reduction in interest expense (income) in the Company's consolidated statements of operations and comprehensive income (loss). Accordingly, the Company recorded interest income of $38 million, $63 million and $16 million, respectively, during Fiscal 2023, Fiscal 2022 and Fiscal 2021.

*Fair Value Hedges*

The Company is exposed to transaction risk from foreign currency exchange rate fluctuations with respect to various cross-currency intercompany loans which will impact earnings on a consolidated basis. To manage the exchange rate risk related to these balances, during the fourth quarter of Fiscal 2023, the Company entered into fair value cross-currency swap agreements to hedge its exposure in GBP denominated subsidiaries (the "GBP Fair Value Hedge") on a Euro denominated intercompany loan. As of April 1, 2023, the total notional values of outstanding fair value cross-currency swaps related to these loans were €1 billion (approximately $1.08 billion). Under the term of these contracts, the Company will exchange the semi-annual fixed rate payments on GBP denominated debt for fixed rate payments of 0% in Euro. These contracts have maturity dates between March 2025 and March 2026 and are designated as fair value hedges.

When a cross-currency swap is designated as a fair value hedge and qualifies as highly effective, the fair value hedge will be recorded at fair value each period on the Company's consolidated balance sheets, with the difference resulting from the changes in the spot rate recognized in foreign currency loss (gain) on the Company's consolidated statements of operations and comprehensive income (loss), which will offset the earnings impact of the underlying transaction being hedged. Accordingly, the Company recorded a foreign currency gain of $4 million during Fiscal 2023.

PX7098-103

The following table details the fair value of the Company's derivative contracts, which are recorded on a gross basis in the consolidated balance sheets as of April 1, 2023 and April 2, 2022 (in millions):

| | Notional Amounts | | Fair Values | | | | | |
| | | | Assets | | Liabilities | | | |
| | April 1, 2023 | April 2, 2022 | April 1, 2023 | April 2, 2022 | | April 1, 2023 | | April 2, 2022 |
|---|---|---|---|---|---|---|---|---|
| Designated forward foreign currency exchange contracts | $ — | $ 119 | $ — | $ 4 [1] | $ — | | $ — | |
| Designated net investment hedges | 1,378 | 4,194 | 1 [2] | 44 [2] | 36 [3] | | 37 | |
| Designated fair value hedges | 1,084 | — | — | — | 3 [3] | | — | |
| Total designated hedges | 2,462 | 4,313 | 1 | 48 | 39 | | 37 | |
| Undesignated derivative contracts [4] | — | 38 | — | 4 | — | | — | |
| **Total** | $ 2,462 | $ 4,351 | $ 1 | $ 52 | $ 39 | | $ 37 | |

[1]  Recorded within prepaid expenses and other current assets in the Company's consolidated balance sheets.
[2]  Recorded within other assets in the Company's consolidated balance sheets.
[3]  Recorded within other long-term liabilities in the Company's consolidated balance sheets.
[4]  Primarily includes undesignated hedges of inventory purchases.

The Company records and presents the fair values of all of its derivative assets and liabilities in its consolidated balance sheets on a gross basis, as shown in the above table. However, if the Company were to offset and record the asset and liability balances for its derivative instruments on a net basis in accordance with the terms of its master netting arrangements, which provide for the right to set-off amounts for similar transactions denominated in the same currencies and with the same banks, the resulting impact as of April 1, 2023 and April 2, 2022 would be as follows (in millions):

| | Forward Currency Exchange Contracts | | Net Investment Hedges | | Fair Value Hedges | |
| | April 1, 2023 | April 2, 2022 | April 1, 2023 | April 2, 2022 | April 1, 2023 | April 2, 2022 |
|---|---|---|---|---|---|---|
| Assets subject to master netting arrangements | $ — | $ 8 | $ 1 | $ 44 | $ — | $ — |
| Liabilities subject to master netting arrangements | $ — | $ — | $ 36 | $ 37 | $ 3 | $ — |
| Derivative assets, net | $ — | $ 8 | $ 1 | $ 42 | $ — | $ — |
| Derivative liabilities, net | $ — | $ — | $ 36 | $ 35 | $ 3 | $ — |

Currently, the Company's master netting arrangements do not require cash collateral to be pledged by the Company or its counterparties.

Changes in the fair value of the Company's forward foreign currency exchange contracts that are designated as accounting hedges are recorded in equity as a component of accumulated other comprehensive income, and are reclassified from accumulated other comprehensive income into earnings when the items underlying the hedged transactions are recognized into earnings, as a component of cost of goods sold within the Company's consolidated statements of operations and comprehensive income (loss). The net gain or loss on net investment hedges are reported within foreign currency translation gains and losses ("CTA") as a component of accumulated other comprehensive income on the Company's consolidated balance sheets. Upon discontinuation of the hedge, such amounts remain in CTA until the related net investment is sold or liquidated. The net gain or loss on cross-currency swap contracts designated as fair value hedges and associated with cross-currency intercompany loans are recognized within foreign currency loss (gain) on the Company's consolidated statements of operations and comprehensive income (loss) generally in the period in which the related balances being hedged are revalued.

PX7098-104

The following table summarizes the pre-tax impact of the gains and losses on the Company's designated forward foreign currency exchange contracts, net investment hedges and interest rate swaps (in millions):

| | Fiscal Year Ended April 1, 2023 | | Fiscal Year Ended April 2, 2022 | | Fiscal Year Ended March 27, 2021 | |
| | Pre-Tax Gains/ (Losses) Recognized in OCI | | Pre-Tax Gains Recognized in OCI | | Pre-Tax (Losses) Recognized in OCI | |
|---|---|---|---|---|---|---|
| Designated forward foreign currency exchange contracts | $ | 8 | $ | 11 | $ | (2) |
| Designated net investment hedges | $ | 338 | $ | 435 | $ | (263) |
| Designated fair value hedges | $ | (6) | $ | — | $ | — |
| Designated interest rate swaps | $ | — | $ | — | $ | (1) |

The following tables summarize the impact of the gains and losses within the consolidated statements of operations and comprehensive income (loss) related to the designated forward foreign currency exchange contracts (in millions):

| | Fiscal Year Ended | | | |
| | Pre-Tax (Gains) Losses Reclassified from Accumulated OCI | | | |
| | April 1, 2023 | April 2, 2022 | March 27, 2021 | Location of (Gains) Losses Recognized |
|---|---|---|---|---|
| Designated forward foreign currency exchange contracts | $ (14) | $ 1 | $ (2) | Cost of goods sold |

The Company expects that substantially all of the amounts recorded in accumulated other comprehensive income for its forward foreign currency exchange contracts will be reclassified into earnings during the next 12 months, based upon the timing of inventory purchases and turnover.

*Undesignated Hedges*

During Fiscal 2023, Fiscal 2022 and Fiscal 2021, a gain of $2 million, a gain of $2 million and a loss of $1 million, respectively, were recognized within foreign currency loss (gain) in the Company's consolidated statements of operations and comprehensive income (loss) as a result of the changes in the fair value of undesignated forward foreign currency exchange contracts.

## 15. Shareholders' Equity

### Share Repurchase Program

During the first quarter of Fiscal 2022, the Company reinstated its $500 million share-repurchase program, which was previously suspended during the first quarter of Fiscal 2021 in response to the impact of the COVID-19 pandemic and the provisions of the Second Amendment of the 2018 Credit Facility. Subsequently, on November 3, 2021, the Company announced that its Board of Directors had terminated the Company's existing $500 million share repurchase program (the "Prior Plan"), which had $250 million of availability remaining at the time, and authorized a new share repurchase program (the "Fiscal 2022 Plan") pursuant to which the Company was permitted, from time to time, to repurchase up to $1.0 billion of its outstanding ordinary shares within a period of two years from the effective date of the program.

On June 1, 2022, the Board of Directors terminated the Fiscal 2022 Plan, with $500 million of availability remaining, and authorized a new share repurchase program (the "Fiscal 2023 Plan") pursuant to which the Company was permitted, from time to time, to repurchase up to $1.0 billion of its outstanding ordinary shares within a period of two years from the effective date of the program.

On November 9, 2022, the Company announced that its Board of Directors approved a new share repurchase program (the "Existing Share Repurchase Plan") of up to $1 billion of its outstanding ordinary shares, providing additional capacity to

PX7098-105

return cash to shareholders over the longer term. This new two-year program replaced the Fiscal 2023 Plan which had $250 million of availability remaining. Share repurchases may be made in open market or privately negotiated transactions and/or pursuant to Rule 10b5-1 trading plans, subject to market conditions, applicable legal requirements, trading restrictions under the Company's insider trading policy and other relevant factors. The program may be suspended or discontinued at any time.

During Fiscal 2023, the Company purchased 27,356,549 shares with a fair value of $1.350 billion through open market transactions. During Fiscal 2022, the Company purchased 11,014,541 shares with a fair value of $650 million through open market transactions. As of April 1, 2023, the remaining availability under the Company's existing share repurchase program was $400 million.

The Company also has in place a "withhold to cover" repurchase program, which allows the Company to withhold ordinary shares from certain employees and directors to satisfy minimum tax withholding obligations relating to the vesting of their restricted share awards. During Fiscal 2023 and Fiscal 2022, the Company withheld 301,326 shares and 203,863 shares, respectively, with a fair value of $14 million and $11 million, respectively, in satisfaction of minimum tax withholding obligations relating to the vesting of restricted share awards.

### *Accumulated Other Comprehensive Income*

The following table details changes in the components of accumulated other comprehensive income ("AOCI"), net of taxes, for Fiscal 2023, Fiscal 2022 and Fiscal 2021 (in millions):

| | Foreign Currency Translation Income (Loss) [1] | Net Gain (Loss) on Derivatives [2] | Other Comprehensive Income (Loss) Attributable to Capri |
|---|---|---|---|
| Balance at March 28, 2020 | $ 72 | $ 3 | $ 75 |
| Other comprehensive loss before reclassifications | (15) | (2) | (17) |
| Less: amounts reclassified from AOCI to earnings | — | 2 | 2 |
| Other comprehensive loss, net of tax | (15) | (4) | (19) |
| Balance at March 27, 2021 | 57 | (1) | 56 |
| Other comprehensive income before reclassifications | 127 | 10 | 137 |
| Less: amounts reclassified from AOCI to earnings | — | (1) | (1) |
| Other comprehensive income, net of tax | 127 | 11 | 138 |
| Balance at April 2, 2022 | 184 | 10 | 194 |
| Other comprehensive (loss) income before reclassifications | (41) | 8 | (33) |
| Less: amounts reclassified from AOCI to earnings | — | 14 | 14 |
| Other comprehensive loss, net of tax | (41) | (6) | (47) |
| Balance at April 1, 2023 | $ 143 | $ 4 | $ 147 |

---

[1] Foreign currency translation adjustments for Fiscal 2023 primarily include a net $266 million translation loss, partially offset by a $224 million gain, net of taxes of $114 million, primarily relating to the Company's net investment hedges. Foreign currency translation adjustments for Fiscal 2022 include a $321 million gain, net of taxes of $114 million, primarily relating to the Company's net investment hedges, and a net $210 million translation loss. Foreign currency translation gains for Fiscal 2021 include a $199 million loss, net of taxes of $63 million, primarily relating to the Company's net investment hedges, a net $189 million translation gain and a net loss of $8 million on intra-entity transactions that are of a long-term investment nature.

[2] Reclassified amounts relate to the Company's forward foreign currency exchange contracts for inventory purchases and are recorded within cost of goods sold in the Company's consolidated statements of operations and comprehensive income (loss). All tax effects were not material for the periods presented.

PX7098-106

**16. Share-Based Compensation**

The Company grants equity awards to certain employees and directors of the Company at the discretion of the Company's Compensation and Talent Committee. The Company has two equity plans which includes one stock option plan adopted in Fiscal 2008 (as amended and restated, the "2008 Plan"), and an Omnibus Incentive Plan adopted in the third fiscal quarter of Fiscal 2012 and amended and restated with shareholder approval in May 2015 and again in June 2020 (the "Incentive Plan"). The 2008 Plan only provided for grants of share options and was authorized to issue up to 23,980,823 ordinary shares. As of April 1, 2023, there were no shares available to grant equity awards under the 2008 Plan. The Incentive Plan allows for grants of share options, restricted shares and restricted stock units ("RSUs"), and other equity awards, and authorizes a total issuance of up to 22,471,000 ordinary shares after amendments in August 2022. At April 1, 2023, there were 6,169,920 ordinary shares available for future grants of equity awards under the Incentive Plan. Option grants issued from the 2008 Plan generally expire ten years from the grant date, and those issued under the Incentive Plan generally expire seven years from the grant date.

### Share Options

Share options are generally granted with exercise prices equal to the fair market value on the date of grant. Generally, options vest on a pro-rata basis over a four year service period. The following table summarizes the share options activity during Fiscal 2023, and information about options outstanding at April 1, 2023:

|  | Number of Options | | Weighted Average Exercise price | Weighted Average Remaining Contractual Life (years) | | Aggregate Intrinsic Value (in millions) |
|---|---|---|---|---|---|---|
| Outstanding at April 2, 2022 | 355,448 | $ | 57.54 | | | |
| Granted | — | $ | — | | | |
| Exercised | (120,873) | $ | 46.13 | | | |
| Canceled/forfeited | (4,900) | $ | 67.52 | | | |
| Outstanding at April 1, 2023 | 229,675 | $ | 63.33 | 1.84 | $ | 0.1 |
| Vested or expected to vest at April 1, 2023 | 229,675 | $ | 63.33 | 1.84 | | |
| Vested and exercisable at April 1, 2023 | 229,675 | $ | 63.33 | 1.84 | $ | 0.1 |

There were no unvested options and 229,675 vested options outstanding at April 1, 2023. The total intrinsic value of options exercised during Fiscal 2023 and Fiscal 2022 was $0.2 million and $7 million, respectively. The cash received from options exercised during Fiscal 2023 and Fiscal 2022 was $6 million and $17 million, respectively. As of April 1, 2023, there was no remaining unrecognized share-based compensation expense for unvested share options.

There were no options granted during Fiscal 2023, Fiscal 2022 or Fiscal 2021.

### Restricted Awards

The Company grants RSUs at the fair market value on the grant date. The expense related to RSUs is based on the closing market price of the Company's shares on the date of grant and is recognized ratably over the vesting period, net of expected forfeitures.

The Company grants two types of RSUs: time-based RSUs and performance-based RSUs. Time-based RSUs generally vest in full on the first anniversary of the date of grant for our independent directors, or in equal increments on each of the third or fourth anniversaries of the date of grant (unless the employee is retirement-eligible). Performance-based RSUs generally vest in full on the second or third anniversary of the date of grant, subject to the employee's continued employment during the vesting period and only if certain pre-established cumulative performance targets are met. Expense related to performance-based RSUs is recognized ratably over the performance period, net of forfeitures, based on the probability of attainment of the related performance targets. The potential number of shares that may be earned ranges from 0%, if the minimum level of performance is not attained, to 200%, if the level of performance is at or above the predetermined maximum achievement level.

PX7098-107

The following table summarizes the RSU activity during Fiscal 2023:

| | Service-based | | Performance-based | |
| | Number of Restricted Stock Units | Weighted Average Grant Date Fair Value | Number of Restricted Stock Units | Weighted Average Grant Date Fair Value |
|---|---|---|---|---|
| Unvested at April 2, 2022 | 3,827,700 | $ 38.65 | 210,192 | $ 34.25 |
| Granted | 1,790,501 | $ 48.31 | 152,921 | $ 47.41 |
| Change due to performance conditions, net | — | $ — | — | $ — |
| Vested | (2,015,072) | $ 39.81 | (197,874) | $ 33.86 |
| Canceled/forfeited | (421,203) | $ 45.50 | — | $ — |
| Unvested at April 1, 2023 | 3,181,926 | $ 42.44 | 165,239 | $ 46.90 |

The total fair value of service-based RSUs vested during Fiscal 2023, Fiscal 2022 and Fiscal 2021 was $56 million, $78 million and $56 million, respectively. The total fair value of performance-based RSUs vested during Fiscal 2023, Fiscal 2022 and Fiscal 2021 was $7 million, $18 million and $6 million, respectively. As of April 1, 2023, the remaining unrecognized share-based compensation expense for unvested service-based and performance-based RSU grants was $78 million and $5 million, respectively, which is expected to be recognized over the related weighted-average periods of approximately 2.0 years and 2.2 years, respectively.

***Share-Based Compensation Expense***

The following table summarizes compensation expense attributable to share-based compensation for Fiscal 2023, Fiscal 2022 and Fiscal 2021 (in millions):

| | Fiscal Years Ended | | |
| | April 1, 2023 | April 2, 2022 | March 27, 2021 |
|---|---|---|---|
| Share-based compensation expense | $ 78 | $ 85 | $ 70 |
| Tax benefits related to share-based compensation expense | $ 8 | $ 14 | $ 12 |

Forfeitures are estimated at the time of grant and revised, if necessary, in subsequent periods if actual forfeitures differ from those estimates. The Company estimates forfeitures based on its historical forfeiture rates. The estimated value of future forfeitures for equity awards as of April 1, 2023 is $11 million.

## 17. Taxes

The Company is a United Kingdom tax resident and is incorporated in the British Virgin Islands. Capri's subsidiaries are subject to taxation in the United States and various other foreign jurisdictions are aggregated in the "Non-United States" information captioned below.

Income (loss) before provision for income taxes consisted of the following (in millions):

| | Fiscal Years Ended | | |
| | April 1, 2023 | April 2, 2022 | March 27, 2021 |
|---|---|---|---|
| United States | $ 85 | $ 247 | $ (56) |
| Non-United States | 563 | 668 | 59 |
| **Total income before provision for income taxes** | $ 648 | $ 915 | $ 3 |

PX7098-108

The provision for income taxes was as follows (in millions):

| | Fiscal Years Ended | | | | | |
|---|---|---|---|---|---|---|
| | April 1, 2023 | | April 2, 2022 | | March 27, 2021 | |
| **Current** | | | | | | |
| United States - Federal | $ | 62 | $ | 36 | $ | 35 |
| United States - State | | 22 | | 16 | | 20 |
| Non-United States | | 46 [1] | | 98 | | 81 |
| Total current provision for income taxes | | 130 | | 150 | | 136 |
| **Deferred** | | | | | | |
| United States - Federal | | (40) | | 24 [2] | | (37) |
| United States - State | | (6) | | 7 | | (4) |
| Non-United States | | (55) | | (89) [3] | | (29) |
| Total deferred provision for income taxes | | (101) | | (58) | | (70) |
| **Total provision for income taxes** | $ | 29 | $ | 92 | $ | 66 |

[1] Primarily relates to the remeasurement of an Asia income tax reserve.

[2] Reflects the impact of a United States tax accounting method change with respect to cost capitalization.

[3] Includes an Italian valuation allowance reversal during Fiscal 2022.

The Company's provision for income taxes for the years ended April 1, 2023, April 2, 2022 and March 27, 2021 was different from the amount computed by applying the statutory U.K. income tax rates to the underlying income before provision for income taxes as a result of the following (amounts in millions):

| | Fiscal Years Ended | | | | | |
|---|---|---|---|---|---|---|
| | April 1, 2023 | | April 2, 2022 | | March 27, 2021 | |
| | Amount | % [1] | Amount | % [1] | Amount | % [1] |
| Provision for income taxes at the U.K. statutory tax rate | $ 123 | 19.0 % | $ 174 | 19.0 % | 1 | 19.0 % |
| Effects of global financing arrangements [2] | (78) | (12.1)% | (61) | (6.7)% | (24) | (953.4)% |
| Effect of changes in valuation allowances on deferred tax assets | (37) | (5.8)% | (67) | (7.3)% | 24 | 955.7 % |
| Liability for uncertain tax positions | (3) | (0.4)% | 91 | 9.9 % | 11 | 414.2 % |
| Differences in tax effects on foreign income | (1) | (0.2)% | 10 | 1.1 % | 13 | 522.4 % |
| Non-deductible goodwill impairment | 15 | 2.4 % [3] | — | — % | 18 | 700.2 % [3] |
| State and local income taxes, net of federal benefit | 10 | 1.5 % | 12 | 1.3 % | 5 | 201.5 % |
| Share based compensation | 6 | 0.9 % | 3 | 0.4 % | 6 | 247.7 % |
| Withholding tax | 3 | 0.5 % | 5 | 0.6 % | 4 | 165.0 % |
| Brand tax basis step-up | — | — % | (46) | (5.0)% | — | — % |
| CARES Act tax loss carryback | — | — % | (43) | (4.6)% | — | — % |
| Tax rate change impact on deferred items | — | — % | 21 | 2.1 % | 9 | 351.3 % |
| Other [4] | (9) | (1.3)% | (7) | (0.7)% | (1) | (33.1)% |
| **Effective tax rate** | $ 29 | 4.5 % | $ 92 | 10.1 % | $ 66 | 2,590.5 % |

[1] Tax rates are calculated using unrounded numbers.

[2] Includes the tax related impacts of hedge terminations in conjunction with global financing arrangements.

[3] Attributable to goodwill impairment charges related to Jimmy Choo reporting units in Fiscal 2023 and Fiscal 2021.

[4] Primarily relates to individually immaterial United States and foreign permanent adjustments.

PX7098-109

Significant components of the Company's deferred tax assets (liabilities) consist of the following (in millions):

| | Fiscal Years Ended | |
| --- | --- | --- |
| | April 1, 2023 | April 2, 2022 |
| **Deferred tax assets** | | |
| Operating lease liabilities | $ 442 | $ 465 |
| Net operating loss carryforwards | 115 | 108 |
| Accrued interest | 70 | 20 |
| Depreciation | 61 | 53 |
| Sales allowances | 38 | 34 |
| Inventories | 21 | 26 |
| Stock compensation | 6 | 7 |
| Payroll related accruals | 3 | 3 |
| Other | 29 | 46 |
| **Total deferred tax assets** | **785** | **762** |
| Valuation allowance | (52) [1] | (92) [2] |
| **Net deferred tax assets** | **733** | **670** |
| | | |
| **Deferred tax liabilities** | | |
| Goodwill and intangibles | (420) | (449) [3] |
| Operating lease right-of-use-assets | (339) | (340) |
| Derivative financial instruments | (186) | (73) |
| **Total deferred tax liabilities** | **(945)** | **(862)** |
| **Net deferred tax liabilities** | **$ (212)** | **$ (192)** |

[1] Includes a U.K. valuation allowance reversal during Fiscal 2023.
[2] Includes an Italian valuation allowance reversal during Fiscal 2022.
[3] Includes a reversal of an Italian brand intangible deferred tax liability.

The Company maintains valuation allowances on deferred tax assets applicable to subsidiaries in jurisdictions for which separate income tax returns are filed and where realization of the related deferred tax assets from future profitable operations is not reasonably assured. The valuation allowance decreased $40 million and $67 million in Fiscal 2023 and Fiscal 2022, respectively, and increased $24 million in Fiscal 2021. In certain jurisdictions, the Company increased the valuation allowance by $6 million, $34 million and $56 million and released valuation allowances of $46 million, $101 million and $32 million in Fiscal 2023, Fiscal 2022 and Fiscal 2021, respectively.

As of April 1, 2023, the Company had non-United States and United States net operating loss carryforwards of $581 million, a portion of which will begin to expire in Fiscal 2024.

As of April 1, 2023 and April 2, 2022, the Company had liabilities related to its uncertain tax positions, including accrued interest, of $194 million and $221 million, respectively, which are included in other long-term liabilities in the Company's consolidated balance sheets.

PX7098-110

The total amount of unrecognized tax benefits that, if recognized, would impact the effective tax rate was $178 million, $206 million and $92 million as of April 1, 2023, April 2, 2022 and March 27, 2021, respectively. A reconciliation of the beginning and ending amounts of unrecognized tax benefits, excluding accrued interest, for Fiscal 2023, Fiscal 2022 and Fiscal 2021, are presented below (in millions):

| | Fiscal Years Ended | | | | | |
|---|---|---|---|---|---|---|
| | April 1, 2023 | | April 2, 2022 | | March 27, 2021 | |
| Unrecognized tax benefits beginning balance | $ | 221 | $ | 107 | $ | 99 |
| Additions related to prior period tax positions | | 12 [1] | | 105 [1] | | 12 |
| Additions related to current period tax positions | | 14 [2] | | 29 | | 9 |
| Decreases related to audit settlements | | (2) | | (13) | | (6) |
| Decreases in prior period positions due to lapses in statute of limitations | | (3) | | (3) | | (4) |
| Decreases related to prior period tax positions | | (42) [3] | | (4) | | (3) |
| **Unrecognized tax benefits ending balance** | $ | 200 | $ | 221 | $ | 107 |

[1]   Primarily relates to incremental reserves in North America and Europe.
[2]   Primarily relates to North American and European tax reserves established in Fiscal 2023.
[3]   Primarily relates to Asia tax reserves.

The Company classifies interest and penalties related to unrecognized tax benefits as components of the provision for income taxes. Interest and penalties recognized in the consolidated statements of operations and comprehensive income (loss) for Fiscal 2023, Fiscal 2022 and Fiscal 2021 was $42 million, $28 million and $15 million, respectively.

The total amount of unrecognized tax benefits relating to the Company's tax positions is subject to change based on future events including, but not limited to, the settlement of ongoing tax audits and assessments and the expiration of applicable statutes of limitations. The Company anticipates that the balance of gross unrecognized tax benefits, excluding interest and penalties, will be reduced by $85 million during the next 12 months, primarily due to the anticipated settlement of tax examinations as well as statute of limitation expirations. However, the outcomes and timing of such events are highly uncertain and changes in the occurrence, expected outcomes and timing of such events could cause the Company's current estimate to change materially in the future.

The Company files income tax returns in the United States and in various foreign, state and local jurisdictions. Most examinations have been completed by tax authorities or the statute of limitations has expired for United States federal, foreign, state and local income tax returns filed by the Company for years through Fiscal 2017.

Prior to the enactment of the Tax Cuts and Jobs Act ("Tax Act"), the Company's undistributed foreign earnings were considered permanently reinvested and, as such, United States federal and state income taxes were not previously recorded on these earnings. As a result of the Tax Act, substantially all of the Company's earnings in foreign subsidiaries generated prior to the enactment of the Tax Act were deemed to have been repatriated. It remains the Company's intent to either reinvest indefinitely substantially all of its foreign earnings outside of the United States or repatriate them tax neutrally. However, if future earnings are repatriated, the potential exists that the Company may be required to accrue and pay additional taxes, including any applicable foreign withholding tax and income taxes. It is not practicable to estimate the amount of tax that might be payable if these earnings were repatriated due to the complexities associated with the hypothetical calculation.

## 18. Retirement Plans

The Company maintains defined contribution retirement plans for its employees, who generally become eligible to participate after three months of service. Features of these plans allow participants to contribute a percentage of their compensation, up to statutory limits depending upon the country in which the employee resides, and provide for mandatory and/or discretionary matching contributions by the Company, which vary by country. During Fiscal 2023, Fiscal 2022, and Fiscal 2021, the Company recognized expenses of approximately $17 million, $16 million and $20 million, respectively, related to these retirement plans.

PX7098-111

**19. Segment Information**

The Company operates its business through three operating segments — Versace, Jimmy Choo and Michael Kors, which are based on its business activities and organization. The reportable segments are segments of the Company for which separate financial information is available and for which operating results are evaluated regularly by the Company's chief operating decision maker ("CODM") in deciding how to allocate resources, as well as in assessing performance. The primary key performance indicators are revenue and operating income for each segment. The Company's reportable segments represent components of the business that offer similar merchandise, customer experience and sales/marketing strategies.

The Company's three reportable segments are as follows:

• Versace — segment includes revenue generated through the sale of Versace luxury ready-to-wear, accessories and footwear through directly operated Versace boutiques throughout the Americas, certain parts of EMEA and certain parts of Asia, as well as through Versace outlet stores and e-commerce sites. In addition, revenue is generated through wholesale sales to distribution partners (including geographic licensing arrangements that allow third-parties to use the Versace trademarks in connection with retail and/or wholesale sales of Versace branded products in specific geographic regions), multi-brand department stores and specialty stores worldwide, as well as through product license agreements in connection with the manufacturing and sale of jeans, fragrances, watches, jewelry, eyewear and home furnishings.

• Jimmy Choo — segment includes revenue generated through the sale of Jimmy Choo luxury footwear, handbags and small leather goods through directly operated Jimmy Choo retail and outlet stores throughout the Americas, certain parts of EMEA and certain parts of Asia, through its e-commerce sites, as well as through wholesale sales of luxury goods to distribution partners (including geographic licensing arrangements that allow third-parties to use the Jimmy Choo trademarks in connection with retail and/or wholesale sales of Jimmy Choo branded products in specific geographic regions), multi-brand department stores and specialty stores worldwide. In addition, revenue is generated through product licensing agreements, which allow third-parties to use the Jimmy Choo brand name and trademarks in connection with the manufacturing and sale of fragrances and eyewear.

• Michael Kors — segment includes revenue generated through the sale of Michael Kors products through four primary Michael Kors retail store formats: "Collection" stores, "Lifestyle" stores (including concessions), outlet stores and e-commerce sites, through which the Company sells Michael Kors products, as well as licensed products bearing the Michael Kors name, directly to consumers throughout the Americas, certain parts of EMEA and certain parts of Asia. The Company also sells Michael Kors products directly to department stores, primarily located across the Americas and Europe, to specialty stores and travel retail shops, and to its geographic licensees. In addition, revenue is generated through product and geographic licensing arrangements, which allow third-parties to use the Michael Kors brand name and trademarks in connection with the manufacturing and sale of products, including watches, jewelry, fragrances and eyewear.

In addition to these reportable segments, the Company has certain corporate costs that are not directly attributable to its brands and, therefore, are not allocated to its segments. Such costs primarily include certain administrative, corporate occupancy, shared service and information systems expenses, including enterprise resource planning system implementation costs and Capri transformation program costs. In addition, certain other costs are not allocated to segments, including restructuring and other charges, impairment costs, COVID-19 related charges and the war in Ukraine. The segment structure is consistent with how the Company's CODM plans and allocates resources, manages the business and assesses performance. All intercompany revenues are eliminated in consolidation and are not reviewed when evaluating segment performance.

PX7098-112

The following table presents the key performance information of the Company's reportable segments (in millions):

| | Fiscal Years Ended | | |
| | April 1,<br>2023 | April 2,<br>2022 | March 27,<br>2021 |
|---|---|---|---|
| **Total revenue:** | | | |
| Versace | $ 1,106 | $ 1,088 | $ 718 |
| Jimmy Choo | 633 | 613 | 418 |
| Michael Kors | 3,880 | 3,953 | 2,924 |
| **Total revenue** | $ 5,619 | $ 5,654 | $ 4,060 |
| | | | |
| **Income (loss) from operations:** | | | |
| Versace | $ 152 | $ 185 | $ 21 |
| Jimmy Choo | 38 | 13 | (55) |
| Michael Kors | 868 | 1,005 | 595 |
| **Total segment income from operations** | 1,058 | 1,203 | 561 |
| Less: Corporate expenses | (233) | (190) | (152) |
| Impairment of assets [1] | (142) | (73) | (316) |
| COVID-19 related charges [2] | 9 | 14 | (42) |
| Impact of war in Ukraine [3] | 3 | (9) | — |
| Restructuring and other charges | (16) | (42) | (32) |
| **Total income from operations** | $ 679 | $ 903 | $ 19 |

[1] Impairment of assets during Fiscal 2023 include $110 million, $30 million and $2 million of impairment charges related to the Jimmy Choo, Michael Kors and Versace reportable segments, respectively. Impairment of assets during Fiscal 2022 includes $50 million, $19 million and $4 million of impairment charges related to the Michael Kors, Versace and Jimmy Choo reportable segments, respectively. Impairment of assets during Fiscal 2021 includes $191 million, $91 million and $34 million of impairment charges related to the Jimmy Choo, Michael Kors and Versace reportable segments, respectively.

[2] COVID-19 related charges during Fiscal 2023, primarily include net inventory credits of $9 million. COVID-19 related charges during Fiscal 2022, primarily include net inventory credits and severance expense of $16 million and $2 million, respectively. COVID-19 related charges during Fiscal 2021, primarily include net inventory reserves and severance expense of $10 million and $24 million, respectively. Inventory related costs are recorded within costs of goods sold and severance expense and credit losses are recorded within selling, general and administrative expenses in the consolidated statements of operations and comprehensive income (loss).

[3] These charges primarily relate to incremental credit losses and inventory reserves which are a direct impact of the war in Ukraine. Credit losses are recorded within selling, general and administrative expenses and inventory related costs are recorded within costs of goods sold in the consolidated statements of operations and comprehensive income (loss).

Depreciation and amortization expense for each segment are as follows (in millions):

| | Fiscal Years Ended | | |
| | April 1,<br>2023 | April 2,<br>2022 | March 27,<br>2021 |
|---|---|---|---|
| **Depreciation and amortization:** | | | |
| Versace | $ 51 | $ 52 | $ 54 |
| Jimmy Choo | 29 | 31 | 31 |
| Michael Kors | 95 | 110 | 127 |
| Corporate | 4 | — | — |
| **Total depreciation and amortization** | $ 179 | $ 193 | $ 212 |

See Note 8 for the Company's goodwill by reportable segment.

PX7098-113

Total revenue (based on country of origin) and long-lived assets by geographic location are as follows (in millions):

| | Fiscal Years Ended | | |
| | April 1, 2023 | April 2, 2022 | March 27, 2021 |
|---|---|---|---|
| **Revenue:** | | | |
| The Americas [(1)] | $ 3,220 | $ 3,210 | $ 2,172 |
| EMEA | 1,542 | 1,489 | 1,029 |
| Asia | 857 | 955 | 859 |
| **Total revenue** | $ 5,619 | $ 5,654 | $ 4,060 |

| | As of | | |
| | April 1, 2023 | April 2, 2022 | March 27, 2021 |
|---|---|---|---|
| **Long-lived assets:** | | | |
| The Americas [(1)] | $ 882 | $ 908 | $ 1,001 |
| EMEA | 2,129 | 2,156 | 2,384 |
| Asia | 599 | 617 | 596 |
| **Total long-lived assets** | $ 3,610 | $ 3,681 | $ 3,981 |

[(1)]  Net revenues earned in the United States during Fiscal 2023, Fiscal 2022 and Fiscal 2021 were $2.951 billion, $2.989 billion and $2.016 billion, respectively. Long-lived assets located in the United States as of April 1, 2023, April 2, 2022 and March 27, 2021 were $826 million, $858 million and $942 million, respectively.

As of April 1, 2023, the Company's total long-lived assets on its consolidated balance sheet were $3.610 billion, of which, $1.691 billion related to Versace, $1.333 billion related to Michael Kors and $586 million related to Jimmy Choo.

Total revenue by major product category are as follows (in millions):

| | Fiscal Years Ended | | | | | |
| | April 1, 2023 | % of Total | April 2, 2022 | % of Total | March 27, 2021 | % of Total |
|---|---|---|---|---|---|---|
| Accessories | $ 2,826 | 50.3 % | $ 2,901 | 51.3 % | $ 2,158 | 53.2 % |
| Footwear | 1,217 | 21.7 % | 1,208 | 21.4 % | 796 | 19.6 % |
| Apparel | 1,107 | 19.7 % | 1,027 | 18.2 % | 720 | 17.7 % |
| Licensed product | 222 | 4.0 % | 241 | 4.3 % | 185 | 4.6 % |
| Licensing revenue | 211 | 3.8 % | 212 | 3.7 % | 155 | 3.8 % |
| Other | 36 | 0.5 % | 65 | 1.1 % | 46 | 1.1 % |
| **Total revenue** | $ 5,619 | | $ 5,654 | | $ 4,060 | |

PX7098-114

**20. Subsequent Events**

*Net Investment Hedges*

During the first quarter of Fiscal 2024, the Company entered into multiple fixed-to-fixed cross-currency swap agreements with aggregate notional amounts of $1.250 billion to hedge its net investment in CHF denominated subsidiaries. Under the terms of these contracts, the Company will exchange the semi-annual fixed rate payments on CHF denominated debt for fixed rate payments in United States dollars. These contracts have maturity dates between September 2024 and July 2026 and are designated as net investment hedges.

*Float-to-Float Hedges*

During the first quarter of Fiscal 2024, the Company entered into multiple float-to-float cross-currency swap agreements with aggregate notional amounts of $1 billion to hedge its net investment in Euro denominated subsidiaries. The company will be making Euro floating rate payments in exchange for receiving United States dollar floating rate amounts over the life of the agreement. These contracts have maturity dates between May 2028 and August 2030.

PX7098-115

**Exhibit 3.2**

### CERTIFIED RESOLUTIONS
### OF
### Capri Holdings Limited
(the "Company")

We, Conyers Trust Company (BVI) Limited, the Registered Agent of the Company**, DO HEREBY CERTIFY** that the following are true and correct extracts from the Minutes of the Board of Directors of the Company dated the May 23, 2023, and based upon the documentation provided to us by the Board of Directors, the resolutions contained therein are in full force and effect as at the date hereof:

"**RESOLVED** that:

1. the registered agent of the Company be and is hereby changed to Conyers Trust Company (BVI) Limited, Commerce House, Wickhams Cay 1, P.O. Box 3140, Road Town, Tortola, British Virgin Islands, VG1110;

2. the registered office of the Company be and is hereby changed to Commerce House, Wickhams Cay 1, P.O. Box 3140, Road Town, Tortola, British Virgin Islands, VG1110;

3. clauses 2 and 3 of the Company's memorandum of association (the "**Memorandum**") are amended and restated as follows effective May 24, 2023:

    **REGISTERED OFFICE**

    "2.    The registered office is located at Commerce House, Wickhams Cay 1, P.O. Box 3140, Road Town, Tortola, British Virgin Islands, VG1110, or such other address as the directors may from time to time determine.

    **REGISTERED AGENT**

    3.    The registered agent is Conyers Trust Company (BVI) Limited, Commerce House, Wickhams Cay 1, P.O. Box 3140, Road Town, Tortola, British Virgin Islands, VG1110, or such other registered agent as the directors may from time to time determine. "

4. Conyers Trust Company (BVI) Limited be and is hereby authorised and directed to make all necessary filings with the Registrar in respect of the above resolution, including making the filings required by section 13(1)(b) of the BVI Business Companies Act; and

5. Vistra be and is hereby authorised and directed to transfer all the books and records of the Company to Conyers Trust Company (BVI) Limited."

Dated this 24th day of May, 2023

/s/ Andrew Swapp
For and on behalf of
**Conyers Trust Company (BVI) Limited**
Registered Agent of
**Capri Holdings Limited**

Exhibit 10.11

## AMENDED AND RESTATED EMPLOYMENT AGREEMENT

AMENDED AND RESTATED EMPLOYMENT AGREEMENT (this "Agreement"), by and among Capri Holdings Limited, a British Virgin Islands corporation having its principal executive office in London, United Kingdom ("Capri"), Michael Kors (USA), Inc., a Delaware corporation having its principal executive office in New York County, New York (the "Company" and, together with Capri, the "Company Parties") and Thomas J. Edwards, Jr. ("Executive"). Capri, the Company and Executive may be referred to in this Agreement collectively as the "parties."

WHEREAS, the Company Parties have previously entered into that certain Employment Agreement with Executive, effective as of April 17, 2017 (the "Prior Agreement"); and

WHEREAS, the parties desire to amend and restate the Prior Agreement in accordance with the terms and provisions herein contained.

NOW, THEREFORE, in consideration of the mutual covenants, warranties and undertakings herein contained, the parties hereto agree as follows:

1.    Term.  The Company Parties agree to continue to employ Executive, and Executive agrees to continue to be employed by the Company Parties on the terms and subject to the conditions contained herein.  This Agreement shall continue until terminated in accordance with Section 4 hereof (the "Term"), subject to the terms and provisions of this Agreement.

2.    Position and Duties.  Executive shall be employed during the Term as Executive Vice President, Chief Financial Officer and Chief Operating Officer (the "Position") and shall be based in East Rutherford, NJ spending time in New York, NY as necessary.  Executive acknowledges and agrees that the Company Parties will be Executive's sole employers in respect of the services contemplated by this Agreement and the Company Parties will provide all payments and benefits to Executive under this Agreement.  Executive shall report directly to the Chief Executive Officer of Capri. Executive shall perform such duties and services as are commensurate with Executive's position and such other duties and services as are from time to time reasonably assigned to Executive by the Chief Executive Officer of Capri.  Except for holiday and paid time off (including personal and sick days) in accordance with this Agreement and the Company's policies for comparable senior executives, Executive shall devote Executive's full business time during the Term to providing services to the Company Parties; provided that Executive may serve on one or more public, private or non-profit boards with the prior written consent of the Chief Executive Officer and the General Counsel (in each instance), which consent may be withheld or delayed in the Company's sole discretion.  Executive acknowledges that Executive's role will require travel for business purposes (both internationally and domestically).

3.    Compensation.

(a)    Base Salary.  Executive's base salary shall be at the rate of $800,000 per year (as then in effect, the "Base Salary").  The Base Salary shall be payable in substantially equal installments on a semimonthly basis less applicable withholdings and deductions in accordance with the normal payroll practices of the Company.

(b)    <u>Periodic Review of Compensation</u>.  On an annual basis during the Term, but without any obligation to increase or otherwise change the compensation provisions of this Agreement, the Company agrees to undertake a review of the performance by Executive of Executive's duties under this Agreement and of the efforts that Executive has undertaken for and on behalf of the Company Parties.

(c)    <u>Annual Cash Incentive</u>.  With respect to each full fiscal year of the Company during the Term, Executive shall be eligible to participate in the Capri Annual Cash Incentive Plan (as the same may be amended, modified, replaced or terminated, the "<u>Cash Plan</u>") (which is a component of the Third Amended and Restated Capri Holdings Limited Omnibus Incentive Plan (as the same may be amended, modified, replaced or terminated, the "<u>Incentive Plan</u>" and, together with the Cash Plan, the "<u>Plans</u>")).  Annual cash incentives will be based on a fixed percentage of Executive's Base Salary with the incentive levels set at 100% target – 200% maximum].  Executive's actual annual cash incentive may range from 0% of Base Salary for performance below established thresholds to 200% of Base Salary for maximum performance (interpolated based on the actual level of attainment) with performance components, measures and target values established by the Capri Board of Directors (or appropriate committee thereof).  All annual cash incentive payments are subject to the terms and conditions of the Cash Plan, as the same may be amended, modified, replaced or terminated from time to time, including, unless otherwise expressly stated in the Cash Plan or in this Agreement, that Executive be employed by the Company Parties on the date the annual cash incentive is actually paid to similarly situated executives.  Executive acknowledges that if Executive resigns (other than for Good Reason) or is terminated for Cause prior to the date the annual cash incentive is actually paid to similarly situated executives, Executive is not entitled to receive the annual cash incentive payment for the applicable fiscal year.

(d)    <u>Benefits</u>.  During the Term, Executive shall be entitled to participate in the benefit plans and programs, including, without limitation, medical, dental, life insurance, disability insurance and 401(k), that the Company provides generally to comparable senior executives in accordance with, and subject to, the terms and conditions of such plans and programs (including, without limitation, any eligibility limitations) as they may be modified by the Company from time to time in its sole discretion.

(e)    <u>Travel/Expense Reimbursement</u>.  The Company shall reimburse Executive for the ordinary and necessary business expenses incurred by Executive in the performance of Executive's duties in accordance with the Company's policies and procedures.  To the extent that Executive travels in connection with Executive's duties hereunder, the Company agrees to pay the cost of such travel or to reimburse Executive if Executive has incurred any such costs, it being understood and agreed that (i) all air travel shall be in (A) coach class for domestic travel other than coast-to-coast, which shall be business class, and (B) business class for international travel, and (ii) such costs shall otherwise be incurred in accordance with the Company's policies and procedures.  The Company shall reimburse Executive for all other ordinary and necessary business expenses incurred by Executive in the performance of Executive's duties in accordance with the Company's policies and procedures.

(f)    <u>Equity-Based Compensation</u>.

(i)    <u>Annual Grant</u>.  In accordance with the Capri annual performance review cycle, on an annual basis at the same time as awarded to other senior executives similarly situated, Executive shall be eligible to receive a

2

discretionary long-term incentive award under the Incentive Plan in form and amount, if any, to be determined in Capri's sole discretion in accordance with, and subject to the terms and conditions of, such Incentive Plan. Such award may be in the form of share options, time-based restricted share units, performance-based restricted share units, other share-based awards or any combination of the foregoing as determined by the Capri Board of Directors (or appropriate committee thereof). Annual long-term incentive awards are discretionary and Capri shall be under no obligation to grant equity to Executive in any fiscal year.

(ii)    Effect of Termination. Except in the case of the termination of Executive for Cause (as defined in Section 4(b) below), in which case any equity incentive awards granted to Executive under the Incentive Plan shall be forfeited and immediately terminated (whether or not vested and/or exercisable), any such equity incentive awards that have become vested and/or exercisable prior to the last day Executive is employed by the Company Parties (the "Termination Date") shall remain vested and/or exercisable after the Termination Date, and the treatment of the equity and other long-term incentive awards upon termination shall otherwise be governed by the Incentive Plan and the applicable award agreement.

(g)    Taxes. All payments to be made to and on behalf of Executive under this Agreement will be subject to required withholding of federal, state and local income and employment taxes, and to related reporting requirements.

(h)    Paid Time Off. Executive shall be entitled to a total of twenty-five (25) days of paid time off during each calendar year during the Term (which shall accrue in accordance with the Company's paid time off policy); provided, however, that such paid time off shall be taken by Executive at such times as will not interfere with the performance by Executive of Executive's duties hereunder.

4.    Termination of Employment.

(a)    Death and Disability. Executive's employment under this Agreement shall terminate automatically upon Executive's death. The Company Parties may terminate Executive's employment under this Agreement due to Executive's disability if Executive is unable to perform substantially all of the duties required hereunder due to illness or incapacity for a period of at least ninety (90) days (whether or not consecutive) in any period of three hundred and sixty five (365) consecutive days.

(b)    Cause. The Company Parties may terminate Executive's employment under this Agreement at any time for Cause. For purposes of this Agreement, "Cause" means the occurrence of any of the following events: (i) Executive's gross negligence, willful misconduct or dishonesty in performing Executive's duties hereunder; (ii) Executive's conviction of a felony (other than a felony involving a traffic violation); (iii) Executive's commission of a felony involving a fraud or other business crime against the Company Parties; or (iv) Executive's material breach of any of the covenants set forth in Section 6 hereof; provided that, if such breach is curable, Executive shall have an opportunity to correct such breach within thirty (30) days after written notice by the Company to Executive thereof.

(c)    Executive Termination Without Good Reason. Executive agrees that Executive shall not terminate Executive's employment for any reason other than Good Reason (as defined in Section 5(a)) without giving the Company Parties at least ninety (90) days prior written notice of the effective date of such termination. Executive

3

acknowledges that the Company Parties retain the right to waive the notice requirement, in whole or in part, and accelerate the effective date of Executive's termination. If the Company Parties elect to waive the notice requirement, in whole or in part, the Company Parties shall have no further obligations to Executive under this Agreement other than to make the payments specified in Section 5(a). After Executive provides a notice of termination, the Company Parties may, but shall not be obligated to, provide Executive with work to do and the Company Parties may, in their discretion, in respect of all or part of an unexpired notice period, (i) require Executive to comply with such conditions as it may specify in relation to attending at, or remaining away from, the Company Parties' places of business, or (ii) withdraw any powers vested in, or duties assigned to, Executive. For purposes of a notice of termination given pursuant to this Section 4(c), the Termination Date shall be the last day of the ninety (90)-day notice period, unless the Company Parties elect to waive the notice requirement as set forth herein.

(d)    Employee At-Will. Either the Company Parties or Executive shall have the right to terminate the employment relationship at any time, for any reason, without or for Cause (as defined in Section 4(b)) subject to the provisions of Section 5.

(e)    Resignation from Other Positions.    Upon the termination of Executive's employment for any reason, Executive shall be deemed to have resigned, without any further action by Executive, from any and all officer and director positions that Executive, immediately prior to such termination, (i) held with the Company Parties and (ii) held with any other entities at the direction of, or as a result of Executive's affiliation with, the Company Parties. If for any reason this Section 4(e) is deemed to be insufficient to effectuate such resignations, then Executive shall, upon the Company Parties' request, execute any documents or instruments that the Company Parties may deem necessary or desirable to effectuate such resignations.

5.    Consequences of Termination or Breach.

(a)    Death or Disability; Termination for Cause or Without Good Reason. If Executive's employment under this Agreement is terminated under Section 4(a), 4(b), or Executive terminates Executive's employment without Good Reason, Executive shall not thereafter be entitled to receive any compensation or benefits under this Agreement, other than (i) Base Salary earned but not yet paid prior to the Termination Date, (ii) reimbursement of any expenses pursuant to Section 3(e) incurred prior to the Termination Date, and (iii) vested equity incentive awards in accordance with Section 3(f)(ii). For purposes of this Agreement, "Good Reason" means (A) the significant reduction of Executive's duties or responsibilities relating to the Position, except with respect to any action initiated or recommended by Executive and approved by Capri, (B) the assignment to Executive of duties or responsibilities that are inconsistent in any material respect with the scope of the duties or responsibilities of the Position, (C) a reduction in Base Salary, (D) Executive's office is relocated more than fifty (50) miles from its location immediately prior to such relocation, or (E) a material breach by the Company Parties of their obligations under this Agreement, in each case, that the Company Parties have failed to cure (as determined by Capri acting in good faith) within thirty (30) days following written notice from Executive to Capri sent within sixty (60) days of the initial existence of such condition becoming known (or should have become known to them), and Executive terminates employment within thirty (30) days of the expiration of such cure period.

(b)    Termination Without Cause or With Good Reason. If Executive's employment under this Agreement is terminated by the Company Parties without Cause

4

(which the Company Parties shall have the right to do with or without Cause at any time during the Term) or Executive terminates Executive's employment for Good Reason, the sole obligations of the Company Parties to Executive shall be (i) to make the payments described in clauses (i) through (iii) (inclusive) of Section 5(a), (ii) to the extent not paid as of the Termination Date, to pay by no later than June 30th following the Termination Date, any annual cash incentive actually earned by Executive pursuant to the Cash Plan with respect to the completed fiscal year immediately preceding the fiscal year in which the Termination Date occurs, and (iii) subject to Executive providing the Company with the release and separation agreement described below, (A) to provide continuation of Executive's then current Base Salary for a one (1)-year period commencing with the Termination Date, which amount shall be payable in substantially equal installments in accordance with the normal payroll practices of the Company; provided, however, that if Executive's Base Salary exceeds the sum of (x) the amount under the separation pay exception under Treas. Reg. § 1.409A-1(b)(9)(iii) as in effect on the Termination Date (i.e., $660,000 for 2023) and (y) the amount that qualifies for the "short-term deferral" exception under Section 409A of the Internal Revenue Code of 1986, as amended (the "Code") as of the Termination Date, the amount equal to such excess shall be paid to Executive in a single lump sum on the first payroll date following the date on which the release and separation agreement becomes effective, (B) to provide continuation of medical, dental and vision benefits by the Company for a one (1)-year period commencing on the Termination Date, with the employee portion of the cost of such benefits to be payable by Executive by reducing such amount from the Base Salary payable to Executive under the preceding clause (A) (unless Executive otherwise elects), and (C) to pay to Executive a prorated annual cash incentive under the Cash Plan for the year in which the Termination Date occurs, with such amount to be equal to the product of (x) the amount determined by the Capri Board of Directors (or appropriate committee thereof) in respect of such performance period and (y) a fraction, the numerator of which is the number of days in the current fiscal year through (and including) the Termination Date, and the denominator of which is the number of days in such fiscal year, which amount shall be paid on the date on which the Company otherwise pays annual cash incentives to senior executives of the Company for such fiscal year (other than any portion of such annual cash incentive that was deferred, which portion shall instead be paid in accordance with the applicable deferral arrangement and any election thereunder). The Company Parties' obligation to provide the payments and provide the benefits referred to in the preceding clause (iii) shall be contingent upon (A) Executive having delivered to Capri a fully executed separation agreement and release of claims (that is not revoked within the time period set forth in such release) against the Company Parties and their respective directors, officers, employees, agents and representatives satisfactory in form and content to Capri's counsel, and (B) Executive's continued compliance with Executive's obligations under Section 6 of this Agreement. Executive acknowledges and agrees that in the event the Company Parties terminate Executive's employment without Cause or Executive terminates Executive's employment for Good Reason, (1) Executive's sole remedy against the Company Parties shall be to receive the payments and benefits specified in this Section 5(b), and (2) if Executive does not execute or revokes the separation agreement and release described above, Executive shall have no remedy with respect to such termination.

6.    Certain Covenants and Representations.

(a)    Confidentiality.  Executive shall not disclose to any unauthorized person or entity or use for Executive's own purposes any Confidential Information without the prior written consent of the Company Parties, unless and to the extent that the Confidential Information becomes generally known to and available for use by the

5

public other than as a result of Executive's acts or omissions in violation of this Agreement; provided, however, that if Executive receives a request to disclose Confidential Information pursuant to a deposition, interrogation, request for information or documents in legal proceedings, subpoena, civil investigative demand, governmental or regulatory process or similar process, (i) Executive shall promptly notify in writing the Company Parties, and consult with and assist the Company Parties in seeking a protective order or request for other appropriate remedy, (ii) in the event that such protective order or remedy is not obtained, or if the Company Parties waive compliance with the terms hereof, Executive shall disclose only that portion of the Confidential Information that, based on the written advice of Executive's legal counsel, is legally required to be disclosed and shall exercise reasonable best efforts to provide that the receiving person or entity shall agree to treat such Confidential Information as confidential to the extent possible (and permitted under applicable law) in respect of the applicable proceeding or process, and (iii) the Company Parties shall be given an opportunity to review the Confidential Information prior to disclosure thereof.  For purposes of this Agreement, "Confidential Information" means information, observations and data concerning the business or affairs of the Company Parties, including, without limitation, all business information (whether or not in written form) that relates to the Company Parties or their customers, suppliers or contractors or any other third parties in respect of which the Company Parties have a business relationship or owe a duty of confidentiality, or their respective businesses or products, and which is not known to the public generally other than as a result of Executive's breach of this Agreement, including, but not limited to:  technical information or reports; formulas; trade secrets; unwritten knowledge and "know-how"; operating instructions; training manuals; customer lists; customer buying records and habits; product sales records and documents, and product development, marketing and sales strategies; market surveys; marketing plans; profitability analyses; product cost; long-range plans; information relating to pricing, competitive strategies and new product development; information relating to any forms of compensation or other personnel-related information; contracts; and supplier lists.  Confidential Information will not include such information known to Executive prior to Executive's involvement with the Company Parties or information rightfully obtained from a third party (other than pursuant to a breach by Executive of this Agreement).  References in Section 6 to the "Company Parties" shall include their respective parents, subsidiaries and affiliates unless the context clearly indicates otherwise.

(b)     Employee Non-Solicit.  During the Term and during the two-year period following the Termination Date, Executive shall not knowingly perform any action, activity or course of conduct that is substantially detrimental to the business or business reputations of the Company Parties, including (i) soliciting, recruiting or hiring (or attempting to solicit, recruit or hire) any employees of the Company Parties or any persons who have worked for the Company Parties during the 12-month period immediately preceding such solicitation, recruitment or hiring or attempt thereof; (ii) intentionally interfering with the relationship of the Company Parties with any person or entity who or which is employed by or otherwise engaged to perform services for, or any customer, client, supplier, licensee, licensor or other business relation of, the Company Parties; or (iii) assisting any person or entity in any way to do, or attempt to do, anything prohibited by the immediately preceding clause (i) or (ii).

(c)     Non-Disparagement.  During the Term and thereafter, Executive agrees not to disparage the Company Parties or any of their respective directors, officers, employees, agents, representatives or licensees and not to publish or make any statement that is reasonably foreseeable to become public with respect to any of such entities or persons.  The Company Parties likewise agree to instruct their executive

PX7098-123

officers and directors not to disparage Executive or publish or make any statement that is reasonably foreseeable to become public with respect to Executive without Executive's prior written consent, excluding statements required to be made about Executive in any Capri filing under U.S. securities laws or stock exchange rules and regulations.

(d)    <u>Copyrights, Inventions, etc</u>.    Any interest in patents, patent applications, inventions, technological innovations, copyrights, copyrightable works, developments, discoveries, designs, concepts, ideas and processes ("<u>Such Inventions</u>") that Executive now or hereafter during the Term may own, acquire or develop either individually or with others relating to the fields in which the Company Parties may then be engaged or contemplate being engaged shall belong to the Company Parties and forthwith upon request of the Company Parties, Executive shall execute all such assignments and other documents (including applications for patents, copyrights, trademarks and assignments thereof) and take all such other action as the Company Parties may reasonably request to assign to and vest in the Company Parties all of Executive's right, title and interest (including, without limitation, waivers to moral rights) in and to Such Inventions throughout the world, free and clear of liens, mortgages, security interests, pledges, charges and encumbrances.   Executive acknowledges and agrees that (i) all copyrightable works created by Executive as an employee will be "works made for hire" on behalf of the Company Parties and that the Company Parties shall have all rights therein in perpetuity throughout the world, and (ii) to the extent that any such works do not qualify as works made for hire, Executive irrevocably assigns and transfers to the Company Parties all worldwide right, title and interest in and to such works.   Executive hereby appoints any officer of the Company Parties as Executive's duly authorized attorney-in-fact to execute, file, prosecute and protect Such Inventions before any governmental agency, court or authority.   If for any reason the Company Parties do not own any Such Invention, the Company Parties shall have the exclusive and royalty-free right to use in their businesses, and to make products therefrom, Such Invention as well as any improvements or know-how related thereto.

(e)    <u>Remedy for Breach and Modification</u>.   Executive acknowledges that the foregoing provisions of this <u>Section 6</u> are reasonable and necessary for the protection of the Company Parties, and that they will be materially and irrevocably damaged if these provisions are not specifically enforced.   Accordingly, Executive agrees that, in addition to any other relief or remedies available to the Company Parties, they shall be entitled to seek an appropriate injunctive or other equitable remedy for the purposes of restraining Executive from any actual or threatened breach of or otherwise enforcing these provisions and no bond or security will be required in connection therewith.   If any provision of this <u>Section 6</u> is deemed invalid or unenforceable, such provision shall be deemed modified and limited to the extent necessary to make it valid and enforceable.

7.    <u>Miscellaneous</u>.

(a)    <u>Representations</u>.    The Company Parties and Executive each represents and warrants that (i) it has full power and authority to execute and deliver this Agreement and to perform its respective obligations hereunder and (ii) this Agreement constitutes the legal, valid and binding obligation of such party and is enforceable against it in accordance with its terms.   In addition, Executive represents and warrants that the entering into and performance of this Agreement by Executive will not be in violation of any other agreement to which Executive is a party.

PX7098-124

(b)     <u>Notices</u>.   Any notice or other communication made or given in connection with this Agreement shall be in writing and shall be deemed to have been duly given when delivered by hand, by facsimile transmission, by email, by a nationally recognized overnight delivery service or mailed by certified mail, return receipt requested, to Executive or to the Company Parties at the addresses set forth below or at such other address as Executive or the Company Parties may specify by notice to the other:

> To Capri and/or the Company:
>
> 11 West 42nd Street
> New York, New York  10036
> Attention:  Chairman and Chief Executive Officer
>
> With a copy to:
>
> Capri Holdings Limited / Michael Kors (USA), Inc.
> 11 West 42nd Street
> New York, New York  10036
> Attention:  SVP, General Counsel
>
> To Executive:  at Executive's home address on file with the Company or to such other address as may be provided by such notice.

(c)     <u>Entire Agreement; Amendment</u>.   This Agreement supersedes all prior agreements (including the Prior Agreement) between the parties with respect to its subject matter, except that this Agreement does not cancel or supersede the Plans (or the applicable long-term incentive award agreements).   This Agreement is intended (with any documents referred to herein) as a complete and exclusive statement of the terms of the agreement between the parties with respect thereto and may be amended only by a writing signed by both parties hereto.

(d)     <u>Waiver</u>.   The failure of any party to insist upon strict adherence to any term or condition of this Agreement on any occasion shall not be considered a waiver or deprive that party of the right thereafter to insist upon strict adherence to that term or any other term of this Agreement.  Any waiver must be in a writing signed by the party to be charged with such waiver.

(e)     <u>Assignment</u>.   Except as otherwise provided in this <u>Section 7(e)</u>, this Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective heirs, representatives, successors and assigns.  This Agreement shall not be assignable by Executive and shall be assignable by the Company Parties only to their respective parents, subsidiaries and affiliates; <u>provided</u>, <u>however</u>, that any assignment by the Company Parties shall not, without the written consent of Executive, relieve the Company Parties of their obligations hereunder.

(f)     <u>Counterparts</u>.   This Agreement may be executed in two or more counterparts, each of which shall be considered an original, but all of which together shall constitute the same instrument.

(g)     <u>Captions</u>.   The captions in this Agreement are for convenience of reference only and shall not be given any effect in the interpretation of the Agreement.

PX7098-125

(h)    <u>Governing Law</u>.  This Agreement shall be governed by the laws of the State of New York applicable to agreements made and to be performed in that State, without regard to its conflict of laws principles.

(i)    <u>Arbitration</u>.  Any dispute or claim between the parties hereto arising out of, or, in connection with this Agreement, shall, upon written request of either party, become a matter for arbitration; <u>provided</u>, <u>however</u>, that Executive acknowledges that in the event of any violation of <u>Section 6</u> hereof, the Company Parties shall be entitled to obtain from any court in the State of New York, temporary, preliminary or permanent injunctive relief as well as damages, which rights shall be in addition to any other rights or remedies to which it may be entitled.  The arbitration shall be before a neutral arbitrator in accordance with the Commercial Arbitration Rules of the American Arbitration Association and take place in New York City.  Each party shall bear its own fees, costs and disbursements in such proceeding.  The decision or award of the arbitrator shall be final and binding upon the parties hereto.  The parties shall abide by all awards recorded in such arbitration proceedings, and all such awards may be entered and executed upon in any court having jurisdiction over the party against whom or which enforcement of such award is sought.

(j)    <u>Indemnification</u>.  To the extent permitted by law and the Company Parties' by-laws or other governing documents, the Company Parties will indemnify Executive with respect to any claims made against him as an officer or employee of the Company Parties or any subsidiary of either of the Company Parties, except for acts taken in bad faith or in breach of Executive's duty of loyalty to the Company Parties or such subsidiary.  During the Term and for as long thereafter as is practicable, Executive shall be covered under a directors' and officers' liability insurance policy with coverage limits in amounts no less than that which the Company Parties currently maintain as of the date of this Agreement.  This Agreement does not alter or amend the individual indemnification agreement between Executive and Capri in effect as of the date hereof.

(k)    <u>Section 409A</u>.

(i)    <u>General</u>.  It is intended that payments and benefits made or provided under this Agreement shall not result in penalty taxes or accelerated taxation pursuant to Section 409A of the Code.  Any payments that qualify for the "short-term deferral" exception, the separation pay exception or another exception under Section 409A of the Code shall be paid under the applicable exception.  For purposes of the limitations on nonqualified deferred compensation under Section 409A of the Code, each payment of compensation under this Agreement shall be treated as a separate payment of compensation.  All payments to be made upon a termination of employment under this Agreement may only be made upon a "separation from service" under Section 409A of the Code to the extent necessary in order to avoid the imposition of penalty taxes on Executive pursuant to Section 409A of the Code.  In no event may Executive, directly or indirectly, designate the calendar year of any payment under this Agreement, and to the extent required by Section 409A of the Code, any payment that may be paid in more than one taxable year shall be paid in the later taxable year.

(ii)    <u>Reimbursements and In-Kind Benefits</u>.  Notwithstanding anything to the contrary in this Agreement, all reimbursements and in-kind benefits provided under this Agreement that are subject to Section 409A of the Code shall be made in accordance with the requirements of Section 409A of the Code, including, where applicable, the requirement that (A) any reimbursement is

PX7098-126

for expenses incurred during Executive's lifetime (or during a shorter period of time specified in this Agreement); (B) the amount of expenses eligible for reimbursement, or in-kind benefits provided, during a calendar year may not affect the expenses eligible for reimbursement, or in-kind benefits to be provided, in any other calendar year; (C) the reimbursement of an eligible expense will be made no later than the last day of the calendar year following the year in which the expense is incurred; and (D) the right to reimbursement or in-kind benefits is not subject to liquidation or exchange for another benefit.

(iii)    Delay of Payments.  Notwithstanding any other provision of this Agreement to the contrary, if Executive is considered a "specified employee" for purposes of Section 409A of the Code (as determined in accordance with the methodology established by the Company Parties as in effect on the Date of Termination), any payment that constitutes nonqualified deferred compensation within the meaning of Section 409A of the Code that is otherwise due to Executive under this Agreement during the six-month period immediately following Executive's separation from service on account of Executive's separation from service shall instead be paid, on the first business day of the seventh month following Executive's separation from service (the "Delayed Payment Date"), to the extent necessary to prevent the imposition of tax penalties on Executive under Section 409A of the Code.  If Executive dies during the postponement period, the amounts and entitlements delayed on account of Section 409A of the Code shall be paid to the personal representative of Executive's estate on the first to occur of the Delayed Payment Date or thirty (30) calendar days after the date of Executive's death.

(l)    No Mitigation.  Executive shall not be required seek other employment or take any other action to mitigate the amount of any damages that Executive may incur or other payments to be made to Executive hereunder, nor shall any payments to Executive hereunder be reduced by any other payments Executive may receive whether or not Executive obtains other employment.

10

[Intentionally left blank]

11

PX7098-128

IN WITNESS WHEREOF, the parties have executed this Agreement effective as of May 30, 2023.


CAPRI HOLDINGS LIMITED


By:  /s/ John D. Idol
        Name:John D. Idol
        Title:Chairman and Chief Executive Officer


MICHAEL KORS (USA), INC.


By:  /s/ John D. Idol
        Name:John D. Idol
        Title: Chairman and Chief Executive Officer


/s/ Thomas J. Edwards, Jr.
Name: Thomas J. Edwards, Jr.

**Exhibit 10.13**

## AMENDED AND RESTATED EMPLOYMENT AGREEMENT

AMENDED AND RESTATED EMPLOYMENT AGREEMENT (this "Agreement"), by and among Capri Holdings Limited, a British Virgin Islands corporation having its principal executive office in London, United Kingdom ("Capri"), Michael Kors (USA), Inc., a Delaware corporation having its principal executive office in New York County, New York (the "Company" and, together with Capri, the "Company Parties") and Krista A. McDonough ("Executive"). Capri, the Company and Executive may be referred to in this Agreement collectively as the "parties."

WHEREAS, the Company Parties have previously entered into that certain Employment Agreement with Executive, effective as of October 1, 2016 (the "Prior Agreement"); and

WHEREAS, the parties desire to amend and restate the Prior Agreement in accordance with the terms and provisions herein contained.

NOW, THEREFORE, in consideration of the mutual covenants, warranties and undertakings herein contained, the parties hereto agree as follows:

1.    Term. The Company Parties agree to continue to employ Executive, and Executive agrees to continue to be employed by the Company Parties on the terms and subject to the conditions contained herein. This Agreement shall continue until terminated in accordance with Section 4 hereof (the "Term"), subject to the terms and provisions of this Agreement.

2.    Position and Duties. Executive shall be employed during the Term as Senior Vice President, General Counsel and Chief Sustainability Officer (the "Position"). Executive acknowledges and agrees that the Company Parties will be Executive's sole employers in respect of the services contemplated by this Agreement and the Company Parties will provide all payments and benefits to Executive under this Agreement. Executive shall report directly to the Chief Executive Officer of Capri. Executive shall perform such duties and services as are commensurate with Executive's position and such other duties and services as are from time to time reasonably assigned to Executive by the Chief Executive Officer of Capri. Except for holiday and paid time off (including personal and sick days) in accordance with this Agreement and the Company's policies for comparable senior executives, Executive shall devote Executive's full business time during the Term to providing services to the Company Parties; provided that Executive may serve on one or more public, private or non-profit boards with the prior written consent of the Chief Executive Officer, which consent may be withheld or delayed in the Company's sole discretion. Executive acknowledges that Executive's role will require travel for business purposes (both internationally and domestically).

3.    Compensation.

(a)    Base Salary. Executive's base salary shall be at the rate of $550,000 per year (as then in effect, the "Base Salary"). The Base Salary shall be payable in substantially equal installments on a semimonthly basis less applicable withholdings and deductions in accordance with the normal payroll practices of the Company.

(b)    _Periodic Review of Compensation_.  On an annual basis during the Term, but without any obligation to increase or otherwise change the compensation provisions of this Agreement, the Company agrees to undertake a review of the performance by Executive of Executive's duties under this Agreement and of the efforts that Executive has undertaken for and on behalf of the Company Parties.

(c)    _Annual Cash Incentive_.  With respect to each full fiscal year of the Company during the Term, Executive shall be eligible to participate in the Capri Annual Cash Incentive Plan (as the same may be amended, modified, replaced or terminated, the "_Cash Plan_") (which is a component of the Third Amended and Restated Capri Holdings Limited Omnibus Incentive Plan (as the same may be amended, modified, replaced or terminated, the "_Incentive Plan_" and, together with the Cash Plan, the "_Plans_")).  Annual cash incentives will be based on a fixed percentage of Executive's Base Salary with the incentive levels set at 50% target – 100% maximum.  Executive's actual annual cash incentive may range from 0% of Base Salary for performance below established thresholds to 100% of Base Salary for maximum performance (interpolated based on the actual level of attainment) with performance components, measures and target values established by the Capri Board of Directors (or appropriate committee thereof).  All annual cash incentive payments are subject to the terms and conditions of the Cash Plan, as the same may be amended, modified, replaced or terminated from time to time, including, unless otherwise expressly stated in the Cash Plan or in this Agreement, that Executive be employed by the Company Parties on the date the annual cash incentive is actually paid to similarly situated executives.  Executive acknowledges that if Executive resigns (other than for Good Reason) or is terminated for Cause prior to the date the annual cash incentive is actually paid to similarly situated executives, Executive is not entitled to receive the annual cash incentive payment for the applicable fiscal year.

(d)    _Benefits_.  During the Term, Executive shall be entitled to participate in the benefit plans and programs, including, without limitation, medical, dental, life insurance, disability insurance and 401(k), that the Company provides generally to comparable senior executives in accordance with, and subject to, the terms and conditions of such plans and programs (including, without limitation, any eligibility limitations) as they may be modified by the Company from time to time in its sole discretion.

(e)    _Travel/Expense Reimbursement_.  The Company shall reimburse Executive for the ordinary and necessary business expenses incurred by Executive in the performance of Executive's duties in accordance with the Company's policies and procedures.  To the extent that Executive travels in connection with Executive's duties hereunder, the Company agrees to pay the cost of such travel or to reimburse Executive if Executive has incurred any such costs, it being understood and agreed that (i) all air travel shall be in (A) coach class for domestic travel other than coast-to-coast, which shall be business class, and (B) business class for international travel, and (ii) such costs shall otherwise be incurred in accordance with the Company's policies and procedures.  The Company shall reimburse Executive for all other ordinary and necessary business expenses incurred by Executive in the performance of Executive's duties in accordance with the Company's policies and procedures.

(f)    _Equity-Based Compensation_.

(i)    _Annual Grant_.  In accordance with the Capri annual performance review cycle, on an annual basis at the same time as awarded to other senior executives similarly situated, Executive shall be eligible to receive a

2

discretionary long-term incentive award under the Incentive Plan in form and amount, if any, to be determined in Capri's sole discretion in accordance with, and subject to the terms and conditions of, such Incentive Plan.  Such award may be in the form of share options, time-based restricted share units, performance-based restricted share units, other share-based awards or any combination of the foregoing as determined by the Capri Board of Directors (or appropriate committee thereof).  Annual long-term incentive awards are discretionary and Capri shall be under no obligation to grant equity to Executive in any fiscal year.

(ii)    Effect of Termination.  Except in the case of the termination of Executive for Cause (as defined in Section 4(b) below), in which case any equity incentive awards granted to Executive under the Incentive Plan shall be forfeited and immediately terminated (whether or not vested and/or exercisable), any such equity incentive awards that have become vested and/or exercisable prior to the last day Executive is employed by the Company Parties (the "Termination Date") shall remain vested and/or exercisable after the Termination Date, and the treatment of the equity and other long-term incentive awards upon termination shall otherwise be governed by the Incentive Plan and the applicable award agreement.

(g)    Taxes.  All payments to be made to and on behalf of Executive under this Agreement will be subject to required withholding of federal, state and local income and employment taxes, and to related reporting requirements.

(h)    Paid Time Off.  Executive shall be entitled to a total of twenty-five (25) days of paid time off during each calendar year during the Term (which shall accrue in accordance with the Company's paid time off policy); provided, however, that such paid time off shall be taken by Executive at such times as will not interfere with the performance by Executive of Executive's duties hereunder.

4.    Termination of Employment.

(a)    Death and Disability.    Executive's employment under this Agreement shall terminate automatically upon Executive's death.  The Company Parties may terminate Executive's employment under this Agreement due to Executive's disability if Executive is unable to perform substantially all of the duties required hereunder due to illness or incapacity for a period of at least ninety (90) days (whether or not consecutive) in any period of three hundred and sixty five (365) consecutive days.

(b)    Cause.    The Company Parties may terminate Executive's employment under this Agreement at any time for Cause.  For purposes of this Agreement, "Cause" means the occurrence of any of the following events:  (i) Executive's gross negligence, willful misconduct or dishonesty in performing Executive's duties hereunder; (ii) Executive's conviction of a felony (other than a felony involving a traffic violation); (iii) Executive's commission of a felony involving a fraud or other business crime against the Company Parties; or (iv) Executive's material breach of any of the covenants set forth in Section 6 hereof; provided that, if such breach is curable, Executive shall have an opportunity to correct such breach within thirty (30) days after written notice by the Company to Executive thereof.

(c)    Executive Termination Without Good Reason.  Executive agrees that Executive shall not terminate Executive's employment for any reason other than Good Reason (as defined in Section 5(a)) without giving the Company Parties at least ninety (90) days prior written notice of the effective date of such termination.  Executive

3

acknowledges that the Company Parties retain the right to waive the notice requirement, in whole or in part, and accelerate the effective date of Executive's termination. If the Company Parties elect to waive the notice requirement, in whole or in part, the Company Parties shall have no further obligations to Executive under this Agreement other than to make the payments specified in Section 5(a). After Executive provides a notice of termination, the Company Parties may, but shall not be obligated to, provide Executive with work to do and the Company Parties may, in their discretion, in respect of all or part of an unexpired notice period, (i) require Executive to comply with such conditions as it may specify in relation to attending at, or remaining away from, the Company Parties' places of business, or (ii) withdraw any powers vested in, or duties assigned to, Executive. For purposes of a notice of termination given pursuant to this Section 4(c), the Termination Date shall be the last day of the ninety (90)-day notice period, unless the Company Parties elect to waive the notice requirement as set forth herein.

(d)    Employee At-Will. Either the Company Parties or Executive shall have the right to terminate the employment relationship at any time, for any reason, without or for Cause (as defined in Section 4(b)) subject to the provisions of Section 5.

(e)    Resignation from Other Positions. Upon the termination of Executive's employment for any reason, Executive shall be deemed to have resigned, without any further action by Executive, from any and all officer and director positions that Executive, immediately prior to such termination, (i) held with the Company Parties and (ii) held with any other entities at the direction of, or as a result of Executive's affiliation with, the Company Parties. If for any reason this Section 4(e) is deemed to be insufficient to effectuate such resignations, then Executive shall, upon the Company Parties' request, execute any documents or instruments that the Company Parties may deem necessary or desirable to effectuate such resignations.

5.    Consequences of Termination or Breach.

(a)    Death or Disability; Termination for Cause or Without Good Reason. If Executive's employment under this Agreement is terminated under Section 4(a), 4(b), or Executive terminates Executive's employment without Good Reason, Executive shall not thereafter be entitled to receive any compensation or benefits under this Agreement, other than (i) Base Salary earned but not yet paid prior to the Termination Date, (ii) reimbursement of any expenses pursuant to Section 3(e) incurred prior to the Termination Date, and (iii) vested equity incentive awards in accordance with Section 3(f)(ii). For purposes of this Agreement, "Good Reason" means (A) the significant reduction of Executive's duties or responsibilities relating to the Position, except with respect to any action initiated or recommended by Executive and approved by Capri, (B) the assignment to Executive of duties or responsibilities that are inconsistent in any material respect with the scope of the duties or responsibilities of the Position, (C) a reduction in Base Salary, (D) Executive's office is relocated more than fifty (50) miles from its location immediately prior to such relocation, or (E) a material breach by the Company Parties of their obligations under this Agreement, in each case, that the Company Parties have failed to cure (as determined by Capri acting in good faith) within thirty (30) days following written notice from Executive to Capri sent within sixty (60) days of the initial existence of such condition becoming known (or should have become known to them), and Executive terminates employment within thirty (30) days of the expiration of such cure period.

(b)    Termination Without Cause or With Good Reason. If Executive's employment under this Agreement is terminated by the Company Parties without Cause

4

(which the Company Parties shall have the right to do with or without Cause at any time during the Term) or Executive terminates Executive's employment for Good Reason, the sole obligations of the Company Parties to Executive shall be (i) to make the payments described in clauses (i) through (iii) (inclusive) of Section 5(a), (ii) to the extent not paid as of the Termination Date, to pay by no later than June 30th following the Termination Date, any annual cash incentive actually earned by Executive pursuant to the Cash Plan with respect to the completed fiscal year immediately preceding the fiscal year in which the Termination Date occurs, and (iii) subject to Executive providing the Company with the release and separation agreement described below, (A) to provide continuation of Executive's then current Base Salary for a one (1)-year period commencing with the Termination Date, which amount shall be payable in substantially equal installments in accordance with the normal payroll practices of the Company; provided, however, that if Executive's Base Salary exceeds the sum of (x) the amount under the separation pay exception under Treas. Reg. § 1.409A-1(b)(9)(iii) as in effect on the Termination Date (i.e., $660,000 for 2023) and (y) the amount that qualifies for the "short-term deferral" exception under Section 409A of the Internal Revenue Code of 1986, as amended (the "Code") as of the Termination Date, the amount equal to such excess shall be paid to Executive in a single lump sum on the first payroll date following the date on which the release and separation agreement becomes effective, (B) to provide continuation of medical, dental and vision benefits by the Company for a one (1)-year period commencing on the Termination Date, with the employee portion of the cost of such benefits to be payable by Executive by reducing such amount from the Base Salary payable to Executive under the preceding clause (A) (unless Executive otherwise elects), and (C) to pay to Executive a prorated annual cash incentive under the Cash Plan for the year in which the Termination Date occurs, with such amount to be equal to the product of (x) the amount determined by the Capri Board of Directors (or appropriate committee thereof) in respect of such performance period and (y) a fraction, the numerator of which is the number of days in the current fiscal year through (and including) the Termination Date, and the denominator of which is the number of days in such fiscal year, which amount shall be paid on the date on which the Company otherwise pays annual cash incentives to senior executives of the Company for such fiscal year (other than any portion of such annual cash incentive that was deferred, which portion shall instead be paid in accordance with the applicable deferral arrangement and any election thereunder). The Company Parties' obligation to provide the payments and provide the benefits referred to in the preceding clause (iii) shall be contingent upon (A) Executive having delivered to Capri a fully executed separation agreement and release of claims (that is not revoked within the time period set forth in such release) against the Company Parties and their respective directors, officers, employees, agents and representatives satisfactory in form and content to Capri's counsel, and (B) Executive's continued compliance with Executive's obligations under Section 6 of this Agreement. Executive acknowledges and agrees that in the event the Company Parties terminate Executive's employment without Cause or Executive terminates Executive's employment for Good Reason, (1) Executive's sole remedy against the Company Parties shall be to receive the payments and benefits specified in this Section 5(b), and (2) if Executive does not execute or revokes the separation agreement and release described above, Executive shall have no remedy with respect to such termination.

6.     Certain Covenants and Representations.

(a)     Confidentiality.  Executive shall not disclose to any unauthorized person or entity or use for Executive's own purposes any Confidential Information without the prior written consent of the Company Parties, unless and to the extent that the Confidential Information becomes generally known to and available for use by the

PX7098-134

public other than as a result of Executive's acts or omissions in violation of this Agreement; provided, however, that if Executive receives a request to disclose Confidential Information pursuant to a deposition, interrogation, request for information or documents in legal proceedings, subpoena, civil investigative demand, governmental or regulatory process or similar process, (i) Executive shall promptly notify in writing the Company Parties, and consult with and assist the Company Parties in seeking a protective order or request for other appropriate remedy, (ii) in the event that such protective order or remedy is not obtained, or if the Company Parties waive compliance with the terms hereof, Executive shall disclose only that portion of the Confidential Information that, based on the written advice of Executive's legal counsel, is legally required to be disclosed and shall exercise reasonable best efforts to provide that the receiving person or entity shall agree to treat such Confidential Information as confidential to the extent possible (and permitted under applicable law) in respect of the applicable proceeding or process, and (iii) the Company Parties shall be given an opportunity to review the Confidential Information prior to disclosure thereof.    For purposes of this Agreement, "Confidential Information" means information, observations and data concerning the business or affairs of the Company Parties, including, without limitation, all business information (whether or not in written form) that relates to the Company Parties or their customers, suppliers or contractors or any other third parties in respect of which the Company Parties have a business relationship or owe a duty of confidentiality, or their respective businesses or products, and which is not known to the public generally other than as a result of Executive's breach of this Agreement, including, but not limited to:  technical information or reports; formulas; trade secrets; unwritten knowledge and "know-how"; operating instructions; training manuals; customer lists; customer buying records and habits; product sales records and documents, and product development, marketing and sales strategies; market surveys; marketing plans; profitability analyses; product cost; long-range plans; information relating to pricing, competitive strategies and new product development; information relating to any forms of compensation or other personnel-related information; contracts; and supplier lists.  Confidential Information will not include such information known to Executive prior to Executive's involvement with the Company Parties or information rightfully obtained from a third party (other than pursuant to a breach by Executive of this Agreement).  References in Section 6 to the "Company Parties" shall include their respective parents, subsidiaries and affiliates unless the context clearly indicates otherwise.

　　　　(b)    Employee Non-Solicit.  During the Term and during the two-year period following the Termination Date, Executive shall not knowingly perform any action, activity or course of conduct that is substantially detrimental to the business or business reputations of the Company Parties, including (i) soliciting, recruiting or hiring (or attempting to solicit, recruit or hire) any employees of the Company Parties or any persons who have worked for the Company Parties during the 12-month period immediately preceding such solicitation, recruitment or hiring or attempt thereof; (ii) intentionally interfering with the relationship of the Company Parties with any person or entity who or which is employed by or otherwise engaged to perform services for, or any customer, client, supplier, licensee, licensor or other business relation of, the Company Parties; or (iii) assisting any person or entity in any way to do, or attempt to do, anything prohibited by the immediately preceding clause (i) or (ii).

　　　　(c)    Non-Disparagement.  During the Term and thereafter, Executive agrees not to disparage the Company Parties or any of their respective directors, officers, employees, agents, representatives or licensees and not to publish or make any statement that is reasonably foreseeable to become public with respect to any of such entities or persons.  The Company Parties likewise agree to instruct their executive

6

officers and directors not to disparage Executive or publish or make any statement that is reasonably foreseeable to become public with respect to Executive without Executive's prior written consent, excluding statements required to be made about Executive in any Capri filing under U.S. securities laws or stock exchange rules and regulations.

(d)    <u>Copyrights, Inventions, etc</u>.    Any interest in patents, patent applications, inventions, technological innovations, copyrights, copyrightable works, developments, discoveries, designs, concepts, ideas and processes ("<u>Such Inventions</u>") that Executive now or hereafter during the Term may own, acquire or develop either individually or with others relating to the fields in which the Company Parties may then be engaged or contemplate being engaged shall belong to the Company Parties and forthwith upon request of the Company Parties, Executive shall execute all such assignments and other documents (including applications for patents, copyrights, trademarks and assignments thereof) and take all such other action as the Company Parties may reasonably request to assign to and vest in the Company Parties all of Executive's right, title and interest (including, without limitation, waivers to moral rights) in and to Such Inventions throughout the world, free and clear of liens, mortgages, security interests, pledges, charges and encumbrances. Executive acknowledges and agrees that (i) all copyrightable works created by Executive as an employee will be "works made for hire" on behalf of the Company Parties and that the Company Parties shall have all rights therein in perpetuity throughout the world, and (ii) to the extent that any such works do not qualify as works made for hire, Executive irrevocably assigns and transfers to the Company Parties all worldwide right, title and interest in and to such works.    Executive hereby appoints any officer of the Company Parties as Executive's duly authorized attorney-in-fact to execute, file, prosecute and protect Such Inventions before any governmental agency, court or authority.    If for any reason the Company Parties do not own any Such Invention, the Company Parties shall have the exclusive and royalty-free right to use in their businesses, and to make products therefrom, Such Invention as well as any improvements or know-how related thereto.

(e)    <u>Remedy for Breach and Modification</u>.    Executive acknowledges that the foregoing provisions of this <u>Section 6</u> are reasonable and necessary for the protection of the Company Parties, and that they will be materially and irrevocably damaged if these provisions are not specifically enforced.    Accordingly, Executive agrees that, in addition to any other relief or remedies available to the Company Parties, they shall be entitled to seek an appropriate injunctive or other equitable remedy for the purposes of restraining Executive from any actual or threatened breach of or otherwise enforcing these provisions and no bond or security will be required in connection therewith.    If any provision of this <u>Section 6</u> is deemed invalid or unenforceable, such provision shall be deemed modified and limited to the extent necessary to make it valid and enforceable.

7.    <u>Miscellaneous</u>.

(a)    <u>Representations</u>.    The Company Parties and Executive each represents and warrants that (i) it has full power and authority to execute and deliver this Agreement and to perform its respective obligations hereunder and (ii) this Agreement constitutes the legal, valid and binding obligation of such party and is enforceable against it in accordance with its terms.    In addition, Executive represents and warrants that the entering into and performance of this Agreement by Executive will not be in violation of any other agreement to which Executive is a party.

PX7098-136

(b)    Notices.  Any notice or other communication made or given in connection with this Agreement shall be in writing and shall be deemed to have been duly given when delivered by hand, by facsimile transmission, by email, by a nationally recognized overnight delivery service or mailed by certified mail, return receipt requested, to Executive or to the Company Parties at the addresses set forth below or at such other address as Executive or the Company Parties may specify by notice to the other:

> To Capri and/or the Company:
>
> 11 West 42nd Street
> New York, New York  10036
> Attention:  Chairman and Chief Executive Officer
>
> With a copy to:
>
> Capri Holdings Limited / Michael Kors (USA), Inc.
> 11 West 42nd Street
> New York, New York  10036
> Attention:  SVP, Chief People Officer
>
> To Executive:  at Executive's home address on file with the Company or to such other address as may be provided by such notice.

(c)    Entire Agreement; Amendment.  This Agreement supersedes all prior agreements (including the Prior Agreement) between the parties with respect to its subject matter, except that this Agreement does not cancel or supersede the Plans (or the applicable long-term incentive award agreements).  This Agreement is intended (with any documents referred to herein) as a complete and exclusive statement of the terms of the agreement between the parties with respect thereto and may be amended only by a writing signed by both parties hereto.

(d)    Waiver.  The failure of any party to insist upon strict adherence to any term or condition of this Agreement on any occasion shall not be considered a waiver or deprive that party of the right thereafter to insist upon strict adherence to that term or any other term of this Agreement.  Any waiver must be in a writing signed by the party to be charged with such waiver.

(e)    Assignment.  Except as otherwise provided in this Section 7(e), this Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective heirs, representatives, successors and assigns.  This Agreement shall not be assignable by Executive and shall be assignable by the Company Parties only to their respective parents, subsidiaries and affiliates; provided, however, that any assignment by the Company Parties shall not, without the written consent of Executive, relieve the Company Parties of their obligations hereunder.

(f)    Counterparts.  This Agreement may be executed in two or more counterparts, each of which shall be considered an original, but all of which together shall constitute the same instrument.

(g)    Captions.  The captions in this Agreement are for convenience of reference only and shall not be given any effect in the interpretation of the Agreement.

PX7098-137

(h)  <u>Governing Law</u>.  This Agreement shall be governed by the laws of the State of New York applicable to agreements made and to be performed in that State, without regard to its conflict of laws principles.

(i)  <u>Arbitration</u>.  Any dispute or claim between the parties hereto arising out of, or, in connection with this Agreement, shall, upon written request of either party, become a matter for arbitration; <u>provided</u>, <u>however</u>, that Executive acknowledges that in the event of any violation of <u>Section 6</u> hereof, the Company Parties shall be entitled to obtain from any court in the State of New York, temporary, preliminary or permanent injunctive relief as well as damages, which rights shall be in addition to any other rights or remedies to which it may be entitled.  The arbitration shall be before a neutral arbitrator in accordance with the Commercial Arbitration Rules of the American Arbitration Association and take place in New York City.  Each party shall bear its own fees, costs and disbursements in such proceeding.  The decision or award of the arbitrator shall be final and binding upon the parties hereto.  The parties shall abide by all awards recorded in such arbitration proceedings, and all such awards may be entered and executed upon in any court having jurisdiction over the party against whom or which enforcement of such award is sought.

(j)  <u>Indemnification</u>.  To the extent permitted by law and the Company Parties' by-laws or other governing documents, the Company Parties will indemnify Executive with respect to any claims made against her as an officer or employee of the Company Parties or any subsidiary of either of the Company Parties, except for acts taken in bad faith or in breach of Executive's duty of loyalty to the Company Parties or such subsidiary.  During the Term and for as long thereafter as is practicable, Executive shall be covered under a directors' and officers' liability insurance policy with coverage limits in amounts no less than that which the Company Parties currently maintain as of the date of this Agreement.  This Agreement does not alter or amend the individual indemnification agreement between Executive and Capri in effect as of the date hereof.

(k)  <u>Section 409A</u>.

(i)  <u>General</u>.  It is intended that payments and benefits made or provided under this Agreement shall not result in penalty taxes or accelerated taxation pursuant to Section 409A of the Code.  Any payments that qualify for the "short-term deferral" exception, the separation pay exception or another exception under Section 409A of the Code shall be paid under the applicable exception.  For purposes of the limitations on nonqualified deferred compensation under Section 409A of the Code, each payment of compensation under this Agreement shall be treated as a separate payment of compensation.  All payments to be made upon a termination of employment under this Agreement may only be made upon a "separation from service" under Section 409A of the Code to the extent necessary in order to avoid the imposition of penalty taxes on Executive pursuant to Section 409A of the Code.  In no event may Executive, directly or indirectly, designate the calendar year of any payment under this Agreement, and to the extent required by Section 409A of the Code, any payment that may be paid in more than one taxable year shall be paid in the later taxable year.

(ii)  <u>Reimbursements and In-Kind Benefits</u>.  Notwithstanding anything to the contrary in this Agreement, all reimbursements and in-kind benefits provided under this Agreement that are subject to Section 409A of the Code shall be made in accordance with the requirements of Section 409A of the Code, including, where applicable, the requirement that (A) any reimbursement is

9

for expenses incurred during Executive's lifetime (or during a shorter period of time specified in this Agreement); (B) the amount of expenses eligible for reimbursement, or in-kind benefits provided, during a calendar year may not affect the expenses eligible for reimbursement, or in-kind benefits to be provided, in any other calendar year; (C) the reimbursement of an eligible expense will be made no later than the last day of the calendar year following the year in which the expense is incurred; and (D) the right to reimbursement or in-kind benefits is not subject to liquidation or exchange for another benefit.

(iii)    Delay of Payments.  Notwithstanding any other provision of this Agreement to the contrary, if Executive is considered a "specified employee" for purposes of Section 409A of the Code (as determined in accordance with the methodology established by the Company Parties as in effect on the Date of Termination), any payment that constitutes nonqualified deferred compensation within the meaning of Section 409A of the Code that is otherwise due to Executive under this Agreement during the six-month period immediately following Executive's separation from service on account of Executive's separation from service shall instead be paid, on the first business day of the seventh month following Executive's separation from service (the "Delayed Payment Date"), to the extent necessary to prevent the imposition of tax penalties on Executive under Section 409A of the Code.  If Executive dies during the postponement period, the amounts and entitlements delayed on account of Section 409A of the Code shall be paid to the personal representative of Executive's estate on the first to occur of the Delayed Payment Date or thirty (30) calendar days after the date of Executive's death.

(l)    No Mitigation.  Executive shall not be required seek other employment or take any other action to mitigate the amount of any damages that Executive may incur or other payments to be made to Executive hereunder, nor shall any payments to Executive hereunder be reduced by any other payments Executive may receive whether or not Executive obtains other employment.

10

[Intentionally left blank]

PX7098-140

IN WITNESS WHEREOF, the parties have executed this Agreement effective as of May 30, 2023.


CAPRI HOLDINGS LIMITED


By:  /s/ John D. Idol
     Name: John D. Idol
     Title: Chairman and Chief Executive Officer


MICHAEL KORS (USA), INC.


By:  /s/ John D. Idol
     Name: John D. Idol
     Title: Chairman and Chief Executive Officer


 /s/ Krista A. McDonough
 Krista A. McDonough

**Exhibit 10.15**

## EMPLOYMENT AGREEMENT

EMPLOYMENT AGREEMENT (this "Agreement") between Michael Kors (USA), Inc. (the "Company") and Cedric Wilmotte ("Executive").

WHEREAS, the parties desire to enter into this Agreement to reflect their mutual agreements with respect to the employment of Executive by the Company.

NOW, THEREFORE, in consideration of the mutual covenants, warranties and undertakings herein contained, the parties hereto agree as follows:

1.    Term.  The employment of Executive with the Company under this Agreement shall commence on April 3, 2023 (the "Commencement Date"), and his employment shall continue until terminated in accordance with Section 5 hereof (the "Term"), subject to the terms and provisions of this Agreement.

2.    Position and Duties.

(a)    Executive shall be employed during the Term as Chief Executive Officer, Michael Kors (the "Position") reporting directly to the Chief Executive Officer of Capri Holdings Limited ("Capri CEO"), and, subject to Section 3, shall be based in New York, New York. Subject to Section 3, Executive shall maintain a primary residence in the New York City metropolitan area during the Term.  Executive acknowledges and agrees that the Company will be his sole employer under this Agreement and the Company will provide all payments and benefits to Executive under this Agreement. At the direction of the Company, any rights and obligations of the Company hereunder may be assigned, in whole or in part, to such subsidiaries or affiliates; provided, that the Company's obligations with respect to compensation and benefits shall remain the Company's obligations, unless Executive consents in writing to such assignment, which such consent shall not be unreasonably withheld.

(b)    Executive shall perform such duties and services as are commensurate with Executive's Position and such other duties and services as are from time to time reasonably assigned to Executive by the Capri CEO.  Except for vacation, holiday, personal and sick days in accordance with this Agreement and the Company's policies for comparable senior executives, Executive shall devote his full business time during the Term to providing services to the Company and its affiliates. At the request of the Company, Executive further agrees, without additional compensation, to act as an officer or director of subsidiaries or affiliates of the Company. Notwithstanding the foregoing and anything to the contrary contained in this Agreement, nothing in this Section 2(b) shall be construed to prevent Executive from (a) engaging in charitable or community affairs; (b) investing, without limitation as to the amount of ownership interest, in any business which does not directly compete with the Company, so long as Executive does not exercise control over such business; or (c) acquiring, receiving, or purchasing, solely for investment purposes, securities of any entity  which are traded on a national securities exchange so long as Executive is not a controlling person of, or a member of a group that controls such entity and does not, directly or indirectly, own 5% or more of any class of securities of such entity.

3.    Work Visa.    Executive's employment with the Company in the United States is contingent upon his obtaining and maintaining an appropriate visa to work in the United States, which cannot be guaranteed. The Company will sponsor

Executive for an appropriate visa and will pay all legal and filing fees and reimburse him for his reasonable and documented out-of-pocket expenses associated with the application, issuance and renewal of such visa.

4.     <u>Compensation</u>.

(a)     <u>Base Salary</u>.  Executive's base salary shall be at the rate of $1,000,000 per year (as then in effect, the "<u>Base Salary</u>").  The Base Salary shall be payable in substantially equal installments on a semi-monthly basis less applicable withholdings and deductions in accordance with the normal payroll practices of the Company.

(b)     <u>Periodic Review of Compensation</u>.  On an annual basis during the Term, but without any obligation to increase or otherwise change the compensation provisions of this Agreement, the Company agrees to undertake a review of the performance by Executive of his duties under this Agreement and of the efforts that he has undertaken for and on behalf of the Company.

(c)     <u>Annual Cash Incentive</u>.

(i)     With respect to each full fiscal year of the Company during the Term, Executive shall be eligible to participate in the Capri Holdings Limited ("<u>Capri</u>") Annual Cash Incentive Plan (as the same may be amended, modified, replaced or terminated, the "<u>Cash Incentive Plan</u>") (which is a component of the Third Amended and Restated Capri Holdings Limited Omnibus Incentive Plan (as the same may be amended, modified, replaced or terminated, the "<u>Omnibus Incentive Plan</u>" and, together with the Cash Incentive Plan, the "<u>Incentive Plans</u>").  On an annual basis, cash payments made pursuant to the Cash Incentive Plan will be based on a fixed percentage of Executive's Base Salary with the incentive levels set at 100% target – 200% maximum.  Executive's actual annual cash payment pursuant to the Cash Incentive Plan may range from 0% of Base Salary for performance below established thresholds to 200% of Base Salary for maximum performance (interpolated based on the actual level of attainment) with performance components, measures and target values established by the Capri Board of Directors (or appropriate committee thereof).

(ii)     Notwithstanding the generality of the foregoing, for the fiscal year beginning on April 2, 2023 and ending on March 30, 2024 ("<u>Fiscal '24</u>"), the Company's payment to Executive pursuant to the Cash Incentive Plan shall be guaranteed at 200% of Executive's Base Salary (pro-rated from the Commencement Date if the Commencement Date occurs after the first day of Fiscal '24) (the "<u>Guaranteed Cash Incentive</u>"). The Guaranteed Cash Incentive shall be paid to Executive as follows: (a) $1,000,000 in the first pay period following the Commencement Date (the "<u>First GCI Payment</u>") and (b) $1,000,000 on June 30, 2024 or such earlier date as the Fiscal '24 payment under the Cash Incentive Plan is actually paid to other similarly situated executives (the "<u>Second GCI Payment</u>"), in each case less applicable withholdings and deductions in accordance with the normal payroll practices of the Company.  In the event that Executive resigns (other than for Good Reason (as defined in Section 6(a) below)) or is terminated for Cause (as defined in Section 5(b) below) on or before the date that is twelve (12) months following the Commencement Date, Executive shall promptly repay the Company for the full amount of the First GCI Payment.  In order to receive the Second GCI Payment, Executive must be employed by the Company on the date that the Fiscal '24 payment under the Cash

2

Incentive Plan is actually paid to other similarly situated executives, unless Executive is terminated by the Company without Cause or resigns for Good Reason in which case the Second GCI Payment shall be payable pursuant to the provisions of Section 6(b).

(iii)    All annual payments made pursuant to the Cash Incentive Plan, including the Guaranteed Cash Incentive, are subject to the terms and conditions of the Cash Incentive Plan, as the same may be amended, modified, replaced or terminated from time to time, including, unless otherwise expressly stated in the Cash Incentive Plan, that Executive be employed by the Company on the date the payment made pursuant to the Cash Incentive Plan is actually paid to similarly situated executives of the Company, or in the case of the Guaranteed Cash Incentive, that Executive be employed by the Company on the date it is due to be paid. Executive expressly acknowledges that if he resigns (other than for Good Reason) or is terminated for Cause prior to the date that payment made pursuant to the Cash Incentive Plan is actually made to similarly situated executives of the Company, or in the case of the Guaranteed Cash Incentive, the date that it is due to be paid, Executive is not entitled to receive payment under the Cash Incentive Plan for the applicable fiscal year.

(d)    <u>Benefits</u>.    During the Term, Executive shall be entitled to participate in the benefit plans and programs, including, without limitation, medical, dental, life insurance, disability insurance and 401(k), that the Company provides generally to comparable senior executives in accordance with, and subject to, the terms and conditions of such plans and programs (including, without limitation, any eligibility limitations) as they may be modified by the Company from time to time in its sole discretion.

(e)    <u>Travel/Expense Reimbursement</u>.    Executive shall be expected to travel both within and outside the United States as reasonably necessary in connection with the business of the Company, its subsidiaries and affiliates. The Company agrees to pay the cost of such travel or to reimburse Executive if he has incurred any such costs, it being understood and agreed that the class of travel and such other travel costs and expenses shall otherwise be incurred by Executive in accordance with the Company's travel and expense reimbursement policies and procedures as in effect from time to time and as applicable to other similarly situated executives. The Company shall reimburse Executive for all other ordinary and necessary business expenses incurred by him in the performance of his duties in accordance with the Company's expense reimbursement policies and procedures as in effect from time to time.

(f)    <u>Equity-Based Compensation</u>.

(i)    <u>Annual Equity Grant</u>. In accordance with the Capri annual performance review cycle, on an annual basis at the same time as awarded to other senior executives similarly situated, Executive shall be eligible to receive a discretionary long-term incentive award under the Omnibus Incentive Plan in form and amount, if any, to be determined in Capri's sole discretion in accordance with, and subject to the terms and conditions of, such Omnibus Incentive Plan.  Such award may be in the form of share options, time-based or performance-based restricted share units ("<u>RSUs</u>"),  other share-based awards or any combination of the foregoing as determined by the Capri Board of Directors (or appropriate committee thereof). Annual long-term incentive awards are discretionary and Capri shall be under no obligation to grant equity to the Executive in any fiscal year.

3

(ii)     <u>New Hire Equity Grant</u>.     Notwithstanding the generality of the foregoing, on June 15, 2023, Executive shall receive from Capri an equity grant valued at approximately $3,500,000 based on the closing price of CPRI ordinary shares on the New York Stock Exchange on the date of grant in accordance with, and subject to, the terms and conditions of the Omnibus Incentive Plan, and the applicable award agreement. Such equity grant shall be comprised 100% of time-based RSUs of Capri that will vest in equal installments over three (3) years on each anniversary of the grant date.

(iii)     <u>Effect of Termination</u>.     If Executive's employment is terminated for any reason, any equity incentive awards that have become vested and/or exercisable prior to the last day Executive is employed by the Company (the "<u>Termination Date</u>"), including but not limited to those set forth in Section 4(f)(i) and (f)(ii) herein, shall remain vested and/or exercisable at Executive's election after the Termination Date, and the treatment of the unvested long-term incentive awards upon termination shall otherwise be governed by the Omnibus Incentive Plan and the applicable award agreement. Notwithstanding anything to the contrary in the Omnibus Incentive Plan and/or any applicable equity award agreement, in the event Executive is terminated for Cause (as defined in Section 5(b) below), any equity awards that have already become vested and/or exercisable prior to the Termination Date (regardless of whether or not related to this Agreement or any prior employment at Capri or any of its subsidiaries) shall not be forfeited; provided, that the Company retains the right to enforce clawback, forfeiture or similar requirements under the Omnibus Incentive Plan and the applicable equity incentive award agreement in the event of a material accounting restatement that reduces the amount payable in respect of any equity incentive award that would have been earned had the financial results been properly reported or if Executive violates any of the restrictive covenants set forth in the applicable award agreement.

(g)     <u>Taxes</u>.     All payments to be made to and on behalf of Executive under this Agreement will be subject to required withholding of federal, state and local income and employment taxes, and to related reporting requirements.

(h)     <u>Vacations / Holidays / Time Off</u>.     Executive shall be entitled to a total of five (5) business weeks (or twenty-five (25) days) of paid vacation during each calendar year during the Term (which shall accrue in accordance with the Company's vacation policy) ("<u>Vacation</u>"); provided, however, that such Vacation shall be taken by Executive at such times as will not interfere with the performance by Executive of his duties hereunder. Executive shall also be entitled to paid time off ("<u>PTO</u>") for company holidays and other PTO as generally provided by the Company to similarly situated executives in accordance with the plans, practices and programs of the Company, and which are subject to change from time-to-time in the sole discretion of the Company.

(i)     <u>Tax Preparation</u>. During the Term, the Company shall pay directly or reimburse Executive for reasonable and documented professional tax preparation expenses incurred by Executive in connection with the preparation of Executive's personal U.S. income tax returns for calendar years 2023 and 2024 (the "<u>Professional Tax Preparation Expenses</u>") up to $25,000 in each such calendar year. The Professional Tax Preparation Expenses shall be a taxable benefit for Executive.

4

5.     <u>Termination of Employment</u>.

(a)     <u>Death and Disability</u>.  Executive's employment under this Agreement shall terminate automatically upon his death.  The Company may terminate Executive's employment under this Agreement if Executive is unable to perform substantially all of the duties required hereunder due to illness or incapacity for a period of at least ninety (90) consecutive days or for a period aggregating six (6) months (whether or not consecutive) in any period of three hundred and sixty five (365) consecutive days.

(b)     <u>Cause</u>.     The Company may terminate Executive's employment under this Agreement at any time with Cause.   For purposes of this Agreement, "Cause" means the occurrence of any of the following events:  (i) a material breach by Executive of his obligations under this Agreement (including an unreasonable refusal by Executive to substantially perform his duties under Section 2 of this Agreement) that Executive has failed to cure (as determined by the Company acting in good faith) within thirty (30) days following written notice of such breach from the Company to Executive; (ii) Executive's gross negligence, willful misconduct or fraud in performing Executive's duties hereunder or with respect to the Company or any of its affiliates; or (iii) Executive's indictment of, or plea of nolo contendere to, a felony. For purposes of subsection (ii) of this Section 5(b), no act, or failure to act, on Executive's part shall be deemed "willful" unless done, or omitted to be done, in violation of applicable law or other than in good faith and without a reasonable belief that Executive's act, or failure to act, was in the best interests of the Company.

(c)     <u>Executive Termination Without Good Reason</u>.     Executive agrees that he shall not terminate his employment for any reason other than Good Reason (as defined in Section 6(a)) without giving the Company at least six (6) months prior written notice of the effective date of such termination. Executive acknowledges that the Company retains the right to waive the notice requirement, in whole or in part, and accelerate the effective date of Executive's termination without any obligation to make a payment to Executive for the notice period or any portion thereof. If the Company elects to waive the notice requirement, in whole or in part, the Company shall not have any further obligations to Executive under this Agreement other than to make the payments specified in Section 6(a). After Executive provides a notice of termination, the Company may, but shall not be obligated to, provide Executive with work to do commensurate with the Position, and the Company may, in its discretion, in respect of all or part of an unexpired notice period, (i) require Executive to comply with such conditions as it may specify in relation to attending at, or remaining away from, the places of business of the Company or its affiliates or subsidiaries, or (ii) withdraw any powers vested in, or duties assigned to, Executive. For purposes of a notice of termination given pursuant to this Section 5(c), the Termination Date shall be the last day of the six (6) month notice period, unless the Company elects to waive the notice requirement as set forth herein.

(d)     <u>Employee At-Will</u>.  Either the Company or Executive shall have the right to terminate the employment relationship at any time, for any reason, without or with Cause (as defined below) subject to the provisions of Section 6.

6.     <u>Consequences of Termination or Breach</u>.

5

(a)    <u>Death or Disability; Termination for Cause or Without Good Reason</u>.  If Executive's employment under this Agreement is terminated under section 5(a) or 5(b) or Executive terminates his employment for any reason other than for Good Reason (as defined below), Executive shall not thereafter be entitled to receive any compensation or benefits under this Agreement, other than (i) Base Salary earned but not yet paid prior to the Termination Date; (ii) reimbursement of any expenses pursuant to Section 4(e) incurred prior to the Termination Date; (iii) vested equity in accordance with Section 4(f)(iii); (iv) accrued benefits pursuant to Section 4(d); and (v) the cash equivalent of any accrued, but unused, Vacation (the "<u>Accrued Obligations</u>").   For purposes of this Agreement, "<u>Good Reason</u>" means (A) the elimination of the Position or any other action by the Company that significantly reduces or materially interferes with Executive's duties, responsibilities or authority to a level inconsistent with industry standard practice as it relates to the Position, excluding isolated, insubstantial or inadvertent action by the Company not taken in bad faith; (B) a material breach by the Company of its obligations under this Agreement; (C) a change in Executive's title as CEO of Michael Kors or a change in reporting such that Executive no longer reports to the Capri CEO (or, if no Capri CEO, then the interim Capri CEO); (D) Executive's involuntary relocation to an office more than fifty (50) miles outside of New York City; or (E) in the event of a "change of control" (as defined in the Omnibus Incentive Plan), failure of the surviving entity to assume in writing the Company's obligations set forth in this Agreement.  In all instances set forth under subclauses (A) through  (E) (inclusive) hereunder, written notice from Executive to the Capri CEO setting forth the specific basis of the alleged conduct constituting Good Reason is required within thirty (30) days following the later of (x) the occurrence; or (y) the date Executive becomes aware of such conduct. The Company shall have thirty (30) days after said written notice to cure such noncompliance, and if not cured, termination by Executive for Good Reason shall only be effective ten (10) days after the expiration of the cure period.

(b)    <u>Termination Without Cause or With Good Reason</u>.    If Executive's employment under this Agreement is terminated by the Company without Cause (which the Company shall have the right to do with or without Cause at any time during the Term subject to the provisions of this Section 6) or Executive terminates his employment for Good Reason, then the sole obligations of the Company to Executive shall be (i) for the Accrued Obligations, with any applicable cash payments to be paid to Executive in a single lump sum within fifteen (15) days of the Termination Date, and (ii) subject to Executive providing the Company with the release and separation agreement described below, to provide continuation of Executive's then current Base Salary and medical, dental and insurance benefits by the Company for a one (1) year period commencing on the Termination Date, which amounts shall be payable in substantially equal installments in accordance with the normal payroll practices of the Company, plus (x) the Guaranteed Cash Incentive (to the extent any portion of the Guaranteed Cash Incentive has not actually been paid to Executive) and (y) beginning with fiscal year 2025 and thereafter, a cash payment equal to Executive's target annual cash incentive payment pursuant to the Cash Incentive Plan for the fiscal year in which the Termination Date occurs pro rated from the first day of the fiscal year in which the Termination Date occurs up to and including the Termination Date.  Executive shall not be required to mitigate damages or the amount of any payment provided for under this Agreement by seeking other employment or otherwise after the Termination Date, and any amounts earned by Executive following the Termination Date, including but not limited to, from self-employment, as a common law employee or otherwise, shall not reduce the amount of any payment otherwise payable to Executive by the Company hereunder. The Company's obligation to provide the payments referred to in this Section 6(b) shall be

6

contingent upon (A) Executive having delivered to the Company a fully executed separation agreement and release (that is not subject to revocation) of claims against the Company and its affiliates and subsidiaries and their respective directors, officers, employees, agents and representatives satisfactory in form and content to the Company's counsel, and (B) Executive's continued compliance with his obligations under Section 7 of this Agreement.  Executive acknowledges and agrees that in the event the Company terminates Executive's employment without Cause or Executive terminates his employment for Good Reason, Executive's sole remedy against the Company shall be to receive the payments specified in this Section 6(b).

7.    Certain Covenants and Representations.

(a)    Confidentiality.  Executive acknowledges that in the course of his employment by the Company, Executive will receive and or be in possession of confidential information of the Company and its affiliates and subsidiaries, including, but not limited to, information relating to their financial affairs, business methods, strategic plans, marketing plans, product and styling development plans, pricing, products, vendors, suppliers, manufacturers, licensees, computer programs and software, and personal information regarding personnel of the Company and its affiliates and subsidiaries (collectively, "Confidential Information").  Confidential Information shall not include information that is: (i) generally known or available to the public; (ii) independently known, obtained, conceived or developed by Executive without access to or knowledge of related information provided by the Company or its affiliates or subsidiaries or obtained in connection with Executive's efforts on behalf of the Company, (iii) used or disclosed with the prior written approval of the Company or (iv) made available by the Company to the public.  Executive agrees that he will not, without the prior written consent of the Company, during the Term or thereafter, disclose or make use of any Confidential Information, except as may be required by law or in the course of Executive's employment hereunder or in order to enforce his rights under this Agreement.  Executive agrees that all tangible materials containing Confidential Information, whether created by Executive or others which shall come into Executive's custody or possession during Executive's employment shall be and is the exclusive property of the Company.  Upon termination of Executive's employment for any reason whatsoever, Executive shall immediately surrender to the Company all Confidential Information and property of the Company and its affiliates and subsidiaries in Executive's possession.

(b)    No Hiring.  During the two-year period immediately following the Termination Date, Executive shall not employ or retain (or participate in or arrange for the employment or retention of) any person who was employed or retained by the Company or any of its affiliates or subsidiaries within the one (1) year period immediately preceding such employment or retention.

(c)    Non-Disparagement.    During the Term and thereafter, Executive agrees not to disparage the Company or any of its affiliates or subsidiaries or any of their respective directors, officers, employees, agents, representatives or licensees and not to publish or make any statement that is reasonably foreseeable to become public with respect to any of such entities or persons. The Company likewise agrees not to disparage executive or publish or make any statement that is reasonably foreseeable to become public with respect to Executive without Executive's prior written consent, excluding statements required to be made about Executive in any Capri filing under U.S. securities laws or stock exchange rules and regulations.

7

(d)     <u>Copyrights, Inventions, etc</u>.  Any interest in patents, patent applications, inventions, technological innovations, copyrights, copyrightable works, developments, discoveries, designs, concepts, ideas and processes ("<u>Such Inventions</u>") that Executive now or hereafter during the Term may own, acquire or develop either individually or with others relating to the fields in which the Company or any of its affiliates or subsidiaries may then be engaged or contemplate being engaged shall belong to the Company or such affiliate or subsidiary and forthwith upon request of the Company, Executive shall execute all such assignments and other documents (including applications for patents, copyrights, trademarks and assignments thereof) and take all such other action as the Company may reasonably request in order to assign to and vest in the Company or its affiliates or subsidiaries all of Executive's right, title and interest (including, without limitation, waivers to moral rights) in and to Such Inventions throughout the world, free and clear of liens, mortgages, security interests, pledges, charges and encumbrances.     Executive acknowledges and agrees that (i) all copyrightable works created by Executive as an employee will be "works made for hire" on behalf of the Company and its affiliates and subsidiaries and that the Company and its affiliates and subsidiaries shall have all rights therein in perpetuity throughout the world and (ii) to the extent that any such works do not qualify as works made for hire, Executive irrevocably assigns and transfers to the Company or its applicable affiliate or subsidiary all worldwide right, title and interest in and to such works.  Executive hereby appoints any officer of the Company as Executive's duly authorized attorney-in-fact to execute, file, prosecute and protect Such Inventions before any governmental agency, court or authority.  If for any reason the Company or its affiliates and subsidiaries do not own any Such Invention, the Company and its affiliates and subsidiaries shall have the exclusive and royalty-free right to use in their businesses, and to make products therefrom, Such Invention as well as any improvements or know-how related thereto.

(e)     <u>Remedy for Breach and Modification</u>.     Executive acknowledges that the foregoing provisions of this Section 7 are reasonable and necessary for the protection of the Company and its affiliates and subsidiaries, and that they will be materially and irrevocably damaged if these provisions are not specifically enforced.  Accordingly, Executive agrees that, in addition to any other relief or remedies available to the Company and its affiliates and subsidiaries, they shall be entitled to seek an appropriate injunctive or other equitable remedy for the purposes of restraining Executive from any actual or threatened breach of or otherwise enforcing these provisions and no bond or security will be required in connection therewith.  If any provision of this Section 7 is deemed invalid or unenforceable, such provision shall be deemed modified and limited to the extent necessary to make it valid and enforceable.

8.     <u>Indemnity</u>. During Executive's employment with the Company, and at any time thereafter, the Company shall indemnify Executive and hold Executive and Executive's heirs and representative's harmless, to the maximum extent permitted by law and the Company's by-laws and incorporation documents, against all damages, costs, liabilities, losses and expenses, including reasonable attorneys' fees, as a result of any claim or proceeding, or threatened claim or proceeding, against Executive that arises out of or relates to Executive's services as an officer, director or employee, as the case may be, of the Company, or Executive's service in any such capacity or similar capacity with any affiliate or subsidiary of the Company. Unless prohibited by applicable law or the Company's by-laws or incorporation documents, the Company shall advance expenses incurred by Executive or Executive's heirs or representatives in connection with any claim or proceeding, or threatened claim or proceeding, permitted to be indemnified pursuant to this Section 8.  Executive or his heirs or representatives shall

8

qualify for advances to the fullest extent permitted by applicable law and the Company's by-laws and incorporation documents solely (i) upon the execution and delivery to the Company of an undertaking providing that Executive or his heirs or representatives, as the case may be, undertakes to repay the advance to the extent that it is ultimately determined, by a final judicial decision of a court of competent jurisdiction from which there is no further right to appeal that Executive or his heirs and representatives is not entitled to indemnification pursuant to Section 8 of this Agreement and (ii) after receipt by the Company of a statement requesting such advances, together with a reasonably detailed written explanation of the basis therefor and a redacted  itemization of legal fees and disbursements in reasonable detail, from time to time, provided that such written explanation or redacted itemization of legal fees does not violate, destroy, or in any manner jeopardize Executive's attorney-client privilege or otherwise expose Executive to any additional liability. If the Company is obligated to indemnify Executive or his heirs or representatives hereunder, then the Company shall be entitled to assume the defense of such civil proceeding.  The Company shall be entitled to assume the defense of any criminal proceeding only with Executive's written consent.  During the Term and for a period of three years thereafter, Executive shall be covered under a directors and officers liability insurance policy with coverage limits in amounts no less than that which the Company currently maintains as of the date of this Agreement for similarly situated executives of the Company. The provisions of this Section 8 shall survive termination of this Agreement.

9.    <u>Miscellaneous.</u>

(a)    <u>Representations</u>.    The Company and Executive each represents and warrants that (i) it has full power and authority to execute and deliver this Agreement and to perform its respective obligations hereunder and (ii) this Agreement constitutes the legal, valid and binding obligation of such party and is enforceable against it in accordance with its terms.  In addition, Executive represents and warrants that the entering into and performance of this Agreement by his will not be in violation of any other agreement to which Executive is a party.

(b)    <u>Notices</u>.  Any notice or other communication made or given in connection with this Agreement shall be in writing and shall be deemed to have been duly given when delivered by hand, by facsimile transmission, by email, by a nationally recognized overnight delivery service or mailed by certified mail, return receipt requested, to Executive or to the Company at the addresses set forth below or at such other address as Executive or the Company may specify by notice to the other:

To the Company:

11 West 42nd Street
New York, New York 10036
Attention:  Chairman and Chief Executive Officer of Capri Holdings

With a copy to:

Capri Holdings Limited / Michael Kors (USA), Inc.
11 West 42nd Street
New York, New York 10036

9

Attention: SVP, General Counsel

To Executive: at his home address on file with the Company or to such other address as may be provided by such notice with a copy sent simultaneously and in like manner to:

Oved & Oved LLP
401 Greenwich Street
New York, New York 10013
Attention: Terrence A. Oved, Esq.

(c)    <u>Entire Agreement; Amendment</u>.  This Agreement supersedes all prior agreements between the parties with respect to its subject matter, except that this Agreement does not cancel or supersede the Plans (or the applicable long-term incentive award agreements). This Agreement is intended (with any documents referred to herein) as a complete and exclusive statement of the terms of the agreement between the parties with respect thereto and may be amended only by a writing signed by both parties hereto.

(d)    <u>Waiver</u>.    The failure of any party to insist upon strict adherence to any term or condition of this Agreement on any occasion shall not be considered a waiver or deprive that party of the right thereafter to insist upon strict adherence to that term or any other term of this Agreement.  Any waiver must be in a writing signed by the party to be charged with such waiver.

(e)    <u>Assignment</u>.  Except as otherwise provided in this Section 8(e), this Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective heirs, representatives, successors and assigns.  This Agreement shall not be assignable by Executive and shall be assignable by the Company only to its affiliates or subsidiaries; <u>provided</u>, <u>however</u>, that any assignment by the Company shall not, without the written consent of Executive, relieve the Company of its obligations hereunder.

(f)    <u>Counterparts</u>.  This Agreement may be executed in two or more counterparts, each of which shall be considered an original, but all of which together shall constitute the same instrument.

(g)    <u>Captions</u>.    The captions in this Agreement are for convenience of reference only and shall not be given any effect in the interpretation of the Agreement.

(h)    <u>Governing Law</u>.  This Agreement shall be governed by the laws of the State of New York applicable to agreements made and to be performed in that State, without regard to its conflict of laws principles.

(i)    <u>Arbitration</u>.  Any dispute or claim between the parties hereto arising out of, or, in connection with this Agreement, shall, upon written request of either party, become a matter for arbitration; provided, however, that Executive acknowledges that in the event of any violation of Section 7 hereof, the Company shall be entitled to obtain from any court in the State of New York, temporary, preliminary or permanent injunctive relief as well as damages, which rights shall be in addition to any other rights or remedies to which it may be entitled.  The arbitration shall be before a neutral

10

arbitrator in accordance with the Commercial Arbitration Rules of the American Arbitration Association and take place in New York City. Each party shall bear its own fees, costs and disbursements in such proceeding. The decision or award of the arbitrator shall be final and binding upon the parties hereto. The parties shall abide by all awards recorded in such arbitration proceedings, and all such awards may be entered and executed upon in any court having jurisdiction over the party against whom or which enforcement of such award is sought.

(j)    <u>Section 409A</u>.  It is the parties' good faith belief that any payments or benefits provided to Executive pursuant to this Agreement fall within an exception to Internal Revenue Code Section 409A ("<u>Section 409A</u>").  Notwithstanding the foregoing or anything to the contrary contained in this Agreement, it is intended that this Agreement will comply with Section 409A and any regulations and guidelines issued thereunder, to the extent this Agreement is subject thereto.  As such, all provisions herein, or incorporated by reference, shall be construed and interpreted to comply with Section 409A and to avoid any penalty under Section 409A.  If an amendment to this Agreement is necessary in order for it to comply with Section 409A, the parties agree to negotiate in good faith to amend this Agreement in a manner that complies with Section 409A and, to the extent reasonably possible, preserves the original intent of the parties. If any payment or benefit under this Agreement cannot be provided or made at the time specified herein without incurring a penalty under Section 409A, then such benefit or payment shall be provided in full at the earliest time thereafter when such penalty will not be imposed.  Any amount payable under this Agreement that constitutes "deferred compensation" subject to Section 409A shall be paid at the time provided under this Agreement or such other time as permitted under Section 409A.  All payments to be made upon a termination of employment under this Agreement that are "deferred compensation" may only be made upon a "separation from service" under Section 409A. To the extent that this Agreement provides for any payments to be made in installments, each such installment shall be deemed to be a separate payment for purposes of Section 409A.  Neither the Company nor the Executive shall have the right to accelerate or defer the delivery of any such payments or benefits except to the extent specifically permitted or required by Section 409A of the Code.  All in-kind benefits provided and expenses eligible for reimbursement under this Agreement shall be provided by the Company or incurred by Executive during the time periods set forth in this Agreement and shall otherwise be made or provided in accordance with the requirements of Section 409A to the extent that such reimbursements are subject to Section 409A.  All reimbursements for expenses paid pursuant to this Agreement that constitute taxable income to Executive shall be paid as soon as administratively practicable upon receipt of supporting documentation from Executive and in no event shall such reimbursable expenses be paid later than the end of the calendar year following the calendar year in which Executive incurs such expense or pays such related tax unless such payment is due to Executive's failure to timely submit expense reports. Unless otherwise permitted by Section 409A, the right to reimbursement benefits under this Agreement shall not be subject to liquidation or exchange for another benefit and the amount of expense eligible for reimbursement provided during any taxable year shall not affect the expenses eligible for reimbursement or in-kind benefits provided, respectively, in any other taxable year.

(k)    <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one instrument. Execution and delivery of this Agreement by facsimile, .pdf or other electronic signature shall be legal, valid and binding for all purposes.

11

[Intentionally left blank]

12

PX7098-153

IN WITNESS WHEREOF, the parties have executed this Agreement as of January 23, 2023.

MICHAEL KORS (USA), INC.

By: /s/ John D. Idol
    Name: John D. Idol
    Title:   Chairman and Chief Executive Officer

/s/ Cedric Wilmotte

_____
Cedric Wilmotte

13

Exhibit 10.16

**AMENDED AND RESTATED EMPLOYMENT AGREEMENT**

AMENDED AND RESTATED EMPLOYMENT AGREEMENT (this "Agreement"), by and among Capri Holdings Limited, a British Virgin Islands corporation having its principal executive office in London, United Kingdom ("Capri"), Michael Kors (USA), Inc., a Delaware corporation having its principal executive office in New York County, New York (the "Company" and, together with Capri, the "Company Parties") and Jenna A. Hendricks ("Executive"). Capri, the Company and Executive may be referred to in this Agreement collectively as the "parties."

WHEREAS, the Company Parties have previously entered into that certain Employment Agreement with Executive, effective as of June 1, 2021 (the "Prior Agreement"); and

WHEREAS, the parties desire to amend and restate the Prior Agreement in accordance with the terms and provisions herein contained.

NOW, THEREFORE, in consideration of the mutual covenants, warranties and undertakings herein contained, the parties hereto agree as follows:

1.    Term. The Company Parties agree to continue to employ Executive, and Executive agrees to continue to be employed by the Company Parties on the terms and subject to the conditions contained herein. This Agreement shall continue until terminated in accordance with Section 4 hereof (the "Term"), subject to the terms and provisions of this Agreement.

2.    Position and Duties. Executive shall be employed during the Term as Senior Vice President, Chief People Officer (the "Position"). Executive acknowledges and agrees that the Company Parties will be Executive's sole employers in respect of the services contemplated by this Agreement and the Company Parties will provide all payments and benefits to Executive under this Agreement. Executive shall report directly to the Chief Executive Officer of Capri. Executive shall perform such duties and services as are commensurate with Executive's position and such other duties and services as are from time to time reasonably assigned to Executive by the Chief Executive Officer of Capri. Except for holiday and paid time off (including personal and sick days) in accordance with this Agreement and the Company's policies for comparable senior executives, Executive shall devote Executive's full business time during the Term to providing services to the Company Parties; provided that Executive may serve on one or more public, private or non-profit boards with the prior written consent of the Chief Executive Officer and the General Counsel (in each instance), which consent may be withheld or delayed in the Company's sole discretion. Executive acknowledges that Executive's role will require travel for business purposes (both internationally and domestically).

3.    Compensation.

(a)    Base Salary. Executive's base salary shall be at the rate of $500,000 per year (as then in effect, the "Base Salary"). The Base Salary shall be payable in substantially equal installments on a semimonthly basis less applicable withholdings and deductions in accordance with the normal payroll practices of the Company.

(b)    <u>Periodic Review of Compensation</u>.  On an annual basis during the Term, but without any obligation to increase or otherwise change the compensation provisions of this Agreement, the Company agrees to undertake a review of the performance by Executive of Executive's duties under this Agreement and of the efforts that Executive has undertaken for and on behalf of the Company Parties.

(c)    <u>Annual Cash Incentive</u>.  With respect to each full fiscal year of the Company during the Term, Executive shall be eligible to participate in the Capri Annual Cash Incentive Plan (as the same may be amended, modified, replaced or terminated, the "<u>Cash Plan</u>") (which is a component of the Third Amended and Restated Capri Holdings Limited Omnibus Incentive Plan (as the same may be amended, modified, replaced or terminated, the "<u>Incentive Plan</u>" and, together with the Cash Plan, the "<u>Plans</u>")).  Annual cash incentives will be based on a fixed percentage of Executive's Base Salary with the incentive levels set at 50% target – 100% maximum.  Executive's actual annual cash incentive may range from 0% of Base Salary for performance below established thresholds to 100% of Base Salary for maximum performance (interpolated based on the actual level of attainment) with performance components, measures and target values established by the Capri Board of Directors (or appropriate committee thereof).  All annual cash incentive payments are subject to the terms and conditions of the Cash Plan, as the same may be amended, modified, replaced or terminated from time to time, including, unless otherwise expressly stated in the Cash Plan or in this Agreement, that Executive be employed by the Company Parties on the date the annual cash incentive is actually paid to similarly situated executives.  Executive acknowledges that if Executive resigns (other than for Good Reason) or is terminated for Cause prior to the date the annual cash incentive is actually paid to similarly situated executives, Executive is not entitled to receive the annual cash incentive payment for the applicable fiscal year.

(d)    <u>Benefits</u>.  During the Term, Executive shall be entitled to participate in the benefit plans and programs, including, without limitation, medical, dental, life insurance, disability insurance and 401(k), that the Company provides generally to comparable senior executives in accordance with, and subject to, the terms and conditions of such plans and programs (including, without limitation, any eligibility limitations) as they may be modified by the Company from time to time in its sole discretion.

(e)    <u>Travel/Expense Reimbursement</u>.  The Company shall reimburse Executive for the ordinary and necessary business expenses incurred by Executive in the performance of Executive's duties in accordance with the Company's policies and procedures.  To the extent that Executive travels in connection with Executive's duties hereunder, the Company agrees to pay the cost of such travel or to reimburse Executive if Executive has incurred any such costs, it being understood and agreed that (i) all air travel shall be in (A) coach class for domestic travel other than coast-to-coast, which shall be business class, and (B) business class for international travel, and (ii) such costs shall otherwise be incurred in accordance with the Company's policies and procedures.  The Company shall reimburse Executive for all other ordinary and necessary business expenses incurred by Executive in the performance of Executive's duties in accordance with the Company's policies and procedures.

(f)    <u>Equity-Based Compensation</u>.

(i)    <u>Annual Grant</u>.  In accordance with the Capri annual performance review cycle, on an annual basis at the same time as awarded to other senior executives similarly situated, Executive shall be eligible to receive a

PX7098-156

discretionary long-term incentive award under the Incentive Plan in form and amount, if any, to be determined in Capri's sole discretion in accordance with, and subject to the terms and conditions of, such Incentive Plan.  Such award may be in the form of share options, time-based restricted share units, performance-based restricted share units, other share-based awards or any combination of the foregoing as determined by the Capri Board of Directors (or appropriate committee thereof).  Annual long-term incentive awards are discretionary and Capri shall be under no obligation to grant equity to Executive in any fiscal year.

(ii)    Effect of Termination.  Except in the case of the termination of Executive for Cause (as defined in Section 4(b) below), in which case any equity incentive awards granted to Executive under the Incentive Plan shall be forfeited and immediately terminated (whether or not vested and/or exercisable), any such equity incentive awards that have become vested and/or exercisable prior to the last day Executive is employed by the Company Parties (the "Termination Date") shall remain vested and/or exercisable after the Termination Date, and the treatment of the equity and other long-term incentive awards upon termination shall otherwise be governed by the Incentive Plan and the applicable award agreement.

(g)    Taxes.  All payments to be made to and on behalf of Executive under this Agreement will be subject to required withholding of federal, state and local income and employment taxes, and to related reporting requirements.

(h)    Paid Time Off.  Executive shall be entitled to a total of twenty-five (25) days of paid time off during each calendar year during the Term (which shall accrue in accordance with the Company's paid time off policy); provided, however, that such paid time off shall be taken by Executive at such times as will not interfere with the performance by Executive of Executive's duties hereunder.

(i)    Clothing Allowance.  The Company shall provide Executive with a $10,000 clothing allowance for each fiscal year during the Term, which may be used by Executive to purchase product manufactured by Capri's brands personal orders for Executive's personal use only at the applicable discount off wholesale (if any) offered to all eligible employees.  Such clothing allowance shall be fully utilized by Executive in each fiscal year otherwise any remaining amount available for use shall be forfeited at the end of such fiscal year.  This clothing allowance is in addition to the one-time clothing allowance in the amount of $15,000 (less any amounts used by Executive since June 1, 2021) for Executive's personal use at any time during the Term pursuant to the Prior Agreement.  The clothing allowance is a taxable benefit for Executive.

4.    Termination of Employment.

(a)    Death and Disability.  Executive's employment under this Agreement shall terminate automatically upon Executive's death.  The Company Parties may terminate Executive's employment under this Agreement due to Executive's disability if Executive is unable to perform substantially all of the duties required hereunder due to illness or incapacity for a period of at least ninety (90) days (whether or not consecutive) in any period of three hundred and sixty five (365) consecutive days.

(b)    Cause.  The Company Parties may terminate Executive's employment under this Agreement at any time for Cause.  For purposes of this Agreement, "Cause" means the occurrence of any of the following events:    (i) Executive's gross negligence, willful misconduct or dishonesty in performing Executive's

3

duties hereunder; (ii) Executive's conviction of a felony (other than a felony involving a traffic violation); (iii) Executive's commission of a felony involving a fraud or other business crime against the Company Parties; or (iv) Executive's material breach of any of the covenants set forth in <u>Section 0</u> hereof; <u>provided</u> that, if such breach is curable, Executive shall have an opportunity to correct such breach within thirty (30) days after written notice by the Company to Executive thereof.

(c)    <u>Executive Termination Without Good Reason</u>.    Executive agrees that Executive shall not terminate Executive's employment for any reason other than Good Reason (as defined in <u>Section 5(a)</u>) without giving the Company Parties at least ninety (90) days prior written notice of the effective date of such termination.    Executive acknowledges that the Company Parties retain the right to waive the notice requirement, in whole or in part, and accelerate the effective date of Executive's termination.    If the Company Parties elect to waive the notice requirement, in whole or in part, the Company Parties shall have no further obligations to Executive under this Agreement other than to make the payments specified in <u>Section 5(a)</u>.    After Executive provides a notice of termination, the Company Parties may, but shall not be obligated to, provide Executive with work to do and the Company Parties may, in their discretion, in respect of all or part of an unexpired notice period, (i) require Executive to comply with such conditions as it may specify in relation to attending at, or remaining away from, the Company Parties' places of business, or (ii) withdraw any powers vested in, or duties assigned to, Executive.    For purposes of a notice of termination given pursuant to this <u>Section 4(c)</u>, the Termination Date shall be the last day of the ninety (90)-day notice period, unless the Company Parties elect to waive the notice requirement as set forth herein.

(d)    <u>Employee At-Will</u>.    Either the Company Parties or Executive shall have the right to terminate the employment relationship at any time, for any reason, without or for Cause (as defined in <u>Section 4(b)</u>) subject to the provisions of <u>Section 5</u>.

(e)    <u>Resignation from Other Positions</u>.    Upon the termination of Executive's employment for any reason, Executive shall be deemed to have resigned, without any further action by Executive, from any and all officer and director positions that Executive, immediately prior to such termination, (i) held with the Company Parties and (ii) held with any other entities at the direction of, or as a result of Executive's affiliation with, the Company Parties.    If for any reason this <u>Section 4(e)</u> is deemed to be insufficient to effectuate such resignations, then Executive shall, upon the Company Parties' request, execute any documents or instruments that the Company Parties may deem necessary or desirable to effectuate such resignations.

5.    <u>Consequences of Termination or Breach</u>.

(a)    <u>Death or Disability; Termination for Cause or Without Good Reason</u>. If Executive's employment under this Agreement is terminated under <u>Section 4(a)</u>, 4(b), or Executive terminates Executive's employment without Good Reason, Executive shall not thereafter be entitled to receive any compensation or benefits under this Agreement, other than (i) Base Salary earned but not yet paid prior to the Termination Date, (ii) reimbursement of any expenses pursuant to <u>Section 3(e)</u> incurred prior to the Termination Date, and (iii) vested equity incentive awards in accordance with <u>Section 3(f)(ii)</u>.    For purposes of this Agreement, "<u>Good Reason</u>" means (A) the significant reduction of Executive's duties or responsibilities relating to the Position, except with respect to any action initiated or recommended by Executive and approved by Capri, (B) the assignment to Executive of duties or responsibilities that are inconsistent in any material respect with the scope of the duties or responsibilities of the

4

Position, (C) a reduction in Base Salary, (D) Executive's office is relocated more than fifty (50) miles from its location immediately prior to such relocation, or (E) a material breach by the Company Parties of their obligations under this Agreement, in each case, that the Company Parties have failed to cure (as determined by Capri acting in good faith) within thirty (30) days following written notice from Executive to Capri sent within sixty (60) days of the initial existence of such condition becoming known (or should have become known to them), and Executive terminates employment within thirty (30) days of the expiration of such cure period.

(b)      Termination Without Cause or With Good Reason.  If Executive's employment under this Agreement is terminated by the Company Parties without Cause (which the Company Parties shall have the right to do with or without Cause at any time during the Term) or Executive terminates Executive's employment for Good Reason, the sole obligations of the Company Parties to Executive shall be (i) to make the payments described in clauses (i) through (iii) (inclusive) of Section 5(a), (ii) to the extent not paid as of the Termination Date, to pay by no later than June 30th following the Termination Date, any annual cash incentive actually earned by Executive pursuant to the Cash Plan with respect to the completed fiscal year immediately preceding the fiscal year in which the Termination Date occurs, and (iii) subject to Executive providing the Company with the release and separation agreement described below, (A) to provide continuation of Executive's then current Base Salary for a one (1)-year period commencing with the Termination Date, which amount shall be payable in substantially equal installments in accordance with the normal payroll practices of the Company; provided, however, that if Executive's Base Salary exceeds the sum of (x) the amount under the separation pay exception under Treas. Reg. § 1.409A-1(b)(9)(iii) as in effect on the Termination Date (i.e., $660,000 for 2023) and (y) the amount that qualifies for the "short-term deferral" exception under Section 409A of the Internal Revenue Code of 1986, as amended (the "Code") as of the Termination Date, the amount equal to such excess shall be paid to Executive in a single lump sum on the first payroll date following the date on which the release and separation agreement becomes effective, (B) to provide continuation of medical, dental and vision benefits by the Company for a one (1)-year period commencing on the Termination Date, with the employee portion of the cost of such benefits to be payable by Executive by reducing such amount from the Base Salary payable to Executive under the preceding clause (A) (unless Executive otherwise elects), and (C) to pay to Executive a prorated annual cash incentive under the Cash Plan for the year in which the Termination Date occurs, with such amount to be equal to the product of (x) the amount determined by the Capri Board of Directors (or appropriate committee thereof) in respect of such performance period and (y) a fraction, the numerator of which is the number of days in the current fiscal year through (and including) the Termination Date, and the denominator of which is the number of days in such fiscal year, which amount shall be paid on the date on which the Company otherwise pays annual cash incentives to senior executives of the Company for such fiscal year (other than any portion of such annual cash incentive that was deferred, which portion shall instead be paid in accordance with the applicable deferral arrangement and any election thereunder).  The Company Parties' obligation to provide the payments and provide the benefits referred to in the preceding clause (iii) shall be contingent upon (A) Executive having delivered to Capri a fully executed separation agreement and release of claims (that is not revoked within the time period set forth in such release) against the Company Parties and their respective directors, officers, employees, agents and representatives satisfactory in form and content to Capri's counsel, and (B) Executive's continued compliance with Executive's obligations under Section 0 of this Agreement.  Executive acknowledges and agrees that in the event the Company Parties terminate Executive's employment without Cause or Executive terminates Executive's employment for Good Reason, (1) Executive's sole remedy

5

against the Company Parties shall be to receive the payments and benefits specified in this <u>Section 5(b)</u>, and (2) if Executive does not execute or revokes the separation agreement and release described above, Executive shall have no remedy with respect to such termination.

6.    <u>Certain Covenants and Representations</u>.

(a)    <u>Confidentiality</u>.  Executive shall not disclose to any unauthorized person or entity or use for Executive's own purposes any Confidential Information without the prior written consent of the Company Parties, unless and to the extent that the Confidential Information becomes generally known to and available for use by the public other than as a result of Executive's acts or omissions in violation of this Agreement; provided, however, that if Executive receives a request to disclose Confidential Information pursuant to a deposition, interrogation, request for information or documents in legal proceedings, subpoena, civil investigative demand, governmental or regulatory process or similar process, (i) Executive shall promptly notify in writing the Company Parties, and consult with and assist the Company Parties in seeking a protective order or request for other appropriate remedy, (ii) in the event that such protective order or remedy is not obtained, or if the Company Parties waive compliance with the terms hereof, Executive shall disclose only that portion of the Confidential Information that, based on the written advice of Executive's legal counsel, is legally required to be disclosed and shall exercise reasonable best efforts to provide that the receiving person or entity shall agree to treat such Confidential Information as confidential to the extent possible (and permitted under applicable law) in respect of the applicable proceeding or process, and (iii) the Company Parties shall be given an opportunity to review the Confidential Information prior to disclosure thereof.  For purposes of this Agreement, "<u>Confidential Information</u>" means information, observations and data concerning the business or affairs of the Company Parties, including, without limitation, all business information (whether or not in written form) that relates to the Company Parties or their customers, suppliers or contractors or any other third parties in respect of which the Company Parties have a business relationship or owe a duty of confidentiality, or their respective businesses or products, and which is not known to the public generally other than as a result of Executive's breach of this Agreement, including, but not limited to:  technical information or reports; formulas; trade secrets; unwritten knowledge and "know-how"; operating instructions; training manuals; customer lists; customer buying records and habits; product sales records and documents, and product development, marketing and sales strategies; market surveys; marketing plans; profitability analyses; product cost; long-range plans; information relating to pricing, competitive strategies and new product development; information relating to any forms of compensation or other personnel-related information; contracts; and supplier lists.  Confidential Information will not include such information known to Executive prior to Executive's involvement with the Company Parties or information rightfully obtained from a third party (other than pursuant to a breach by Executive of this Agreement).  References in Section 6 to the "Company Parties" shall include their respective parents, subsidiaries and affiliates unless the context clearly indicates otherwise.

(b)    <u>Employee Non-Solicit</u>.  During the Term and during the two-year period following the Termination Date, Executive shall not knowingly perform any action, activity or course of conduct that is substantially detrimental to the business or business reputations of the Company Parties, including (i) soliciting, recruiting or hiring (or attempting to solicit, recruit or hire) any employees of the Company Parties or any persons who have worked for the Company Parties during the 12-month period immediately preceding such solicitation, recruitment or hiring or attempt thereof; (ii)

6

intentionally interfering with the relationship of the Company Parties with any person or entity who or which is employed by or otherwise engaged to perform services for, or any customer, client, supplier, licensee, licensor or other business relation of, the Company Parties; or (iii) assisting any person or entity in any way to do, or attempt to do, anything prohibited by the immediately preceding clause (i) or (ii).

(c) <u>Non-Disparagement</u>.  During the Term and thereafter, Executive agrees not to disparage the Company Parties or any of their respective directors, officers, employees, agents, representatives or licensees and not to publish or make any statement that is reasonably foreseeable to become public with respect to any of such entities or persons. The Company Parties likewise agree to instruct their executive officers and directors not to disparage Executive or publish or make any statement that is reasonably foreseeable to become public with respect to Executive without Executive's prior written consent, excluding statements required to be made about Executive in any Capri filing under U.S. securities laws or stock exchange rules and regulations.

(d) <u>Copyrights, Inventions, etc</u>.  Any interest in patents, patent applications, inventions, technological innovations, copyrights, copyrightable works, developments, discoveries, designs, concepts, ideas and processes ("<u>Such Inventions</u>") that Executive now or hereafter during the Term may own, acquire or develop either individually or with others relating to the fields in which the Company Parties may then be engaged or contemplate being engaged shall belong to the Company Parties and forthwith upon request of the Company Parties, Executive shall execute all such assignments and other documents (including applications for patents, copyrights, trademarks and assignments thereof) and take all such other action as the Company Parties may reasonably request to assign to and vest in the Company Parties all of Executive's right, title and interest (including, without limitation, waivers to moral rights) in and to Such Inventions throughout the world, free and clear of liens, mortgages, security interests, pledges, charges and encumbrances.  Executive acknowledges and agrees that (i) all copyrightable works created by Executive as an employee will be "works made for hire" on behalf of the Company Parties and that the Company Parties shall have all rights therein in perpetuity throughout the world, and (ii) to the extent that any such works do not qualify as works made for hire, Executive irrevocably assigns and transfers to the Company Parties all worldwide right, title and interest in and to such works.  Executive hereby appoints any officer of the Company Parties as Executive's duly authorized attorney-in-fact to execute, file, prosecute and protect Such Inventions before any governmental agency, court or authority.  If for any reason the Company Parties do not own any Such Invention, the Company Parties shall have the exclusive and royalty-free right to use in their businesses, and to make products therefrom, Such Invention as well as any improvements or know-how related thereto.

(e) <u>Remedy for Breach and Modification</u>.  Executive acknowledges that the foregoing provisions of this <u>Section 0</u> are reasonable and necessary for the protection of the Company Parties, and that they will be materially and irrevocably damaged if these provisions are not specifically enforced.  Accordingly, Executive agrees that, in addition to any other relief or remedies available to the Company Parties, they shall be entitled to seek an appropriate injunctive or other equitable remedy for the purposes of restraining Executive from any actual or threatened breach of or otherwise enforcing these provisions and no bond or security will be required in connection therewith.  If any provision of this <u>Section 0</u> is deemed invalid or unenforceable, such provision shall be deemed modified and limited to the extent necessary to make it valid and enforceable.

PX7098-161

7.  Miscellaneous.

(a)  Representations.  The Company Parties and Executive each represents and warrants that (i) it has full power and authority to execute and deliver this Agreement and to perform its respective obligations hereunder and (ii) this Agreement constitutes the legal, valid and binding obligation of such party and is enforceable against it in accordance with its terms.  In addition, Executive represents and warrants that the entering into and performance of this Agreement by Executive will not be in violation of any other agreement to which Executive is a party.

(b)  Notices.  Any notice or other communication made or given in connection with this Agreement shall be in writing and shall be deemed to have been duly given when delivered by hand, by facsimile transmission, by email, by a nationally recognized overnight delivery service or mailed by certified mail, return receipt requested, to Executive or to the Company Parties at the addresses set forth below or at such other address as Executive or the Company Parties may specify by notice to the other:

> To Capri and/or the Company:
>
> 11 West 42nd Street
> New York, New York  10036
> Attention:  Chairman and Chief Executive Officer
>
> With a copy to:
>
> Capri Holdings Limited / Michael Kors (USA), Inc.
> 11 West 42nd Street
> New York, New York  10036
> Attention:  SVP, General Counsel
>
> To Executive:  at Executive's home address on file with the Company or to such other address as may be provided by such notice.

(c)  Entire Agreement; Amendment.  This Agreement supersedes all prior agreements (including the Prior Agreement) between the parties with respect to its subject matter, except that this Agreement does not cancel or supersede the Plans (or the applicable long-term incentive award agreements).  This Agreement is intended (with any documents referred to herein) as a complete and exclusive statement of the terms of the agreement between the parties with respect thereto and may be amended only by a writing signed by both parties hereto.

(d)  Waiver.  The failure of any party to insist upon strict adherence to any term or condition of this Agreement on any occasion shall not be considered a waiver or deprive that party of the right thereafter to insist upon strict adherence to that term or any other term of this Agreement.  Any waiver must be in a writing signed by the party to be charged with such waiver.

(e)  Assignment.  Except as otherwise provided in this Section 7(e), this Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective heirs, representatives, successors and assigns. This Agreement shall not be assignable by Executive and shall be assignable by the Company Parties only to their respective parents, subsidiaries and affiliates; provided, however, that any assignment

8

by the Company Parties shall not, without the written consent of Executive, relieve the Company Parties of their obligations hereunder.

(f)    Counterparts.  This Agreement may be executed in two or more counterparts, each of which shall be considered an original, but all of which together shall constitute the same instrument.

(g)    Captions.  The captions in this Agreement are for convenience of reference only and shall not be given any effect in the interpretation of the Agreement.

(h)    Governing Law.  This Agreement shall be governed by the laws of the State of New York applicable to agreements made and to be performed in that State, without regard to its conflict of laws principles.

(i)    Arbitration.  Any dispute or claim between the parties hereto arising out of, or, in connection with this Agreement, shall, upon written request of either party, become a matter for arbitration; provided, however, that Executive acknowledges that in the event of any violation of Section 0 hereof, the Company Parties shall be entitled to obtain from any court in the State of New York, temporary, preliminary or permanent injunctive relief as well as damages, which rights shall be in addition to any other rights or remedies to which it may be entitled.  The arbitration shall be before a neutral arbitrator in accordance with the Commercial Arbitration Rules of the American Arbitration Association and take place in New York City.  Each party shall bear its own fees, costs and disbursements in such proceeding.  The decision or award of the arbitrator shall be final and binding upon the parties hereto.  The parties shall abide by all awards recorded in such arbitration proceedings, and all such awards may be entered and executed upon in any court having jurisdiction over the party against whom or which enforcement of such award is sought.

(j)    Indemnification.  To the extent permitted by law and the Company Parties' by-laws or other governing documents, the Company Parties will indemnify Executive with respect to any claims made against her as an officer or employee of the Company Parties or any subsidiary of either of the Company Parties, except for acts taken in bad faith or in breach of Executive's duty of loyalty to the Company Parties or such subsidiary.  During the Term and for as long thereafter as is practicable, Executive shall be covered under a directors' and officers' liability insurance policy with coverage limits in amounts no less than that which the Company Parties currently maintain as of the date of this Agreement.  This Agreement does not alter or amend the individual indemnification agreement between Executive and Capri in effect as of the date hereof.

(k)    Section 409A.

(i)    General.  It is intended that payments and benefits made or provided under this Agreement shall not result in penalty taxes or accelerated taxation pursuant to Section 409A of the Code.  Any payments that qualify for the "short-term deferral" exception, the separation pay exception or another exception under Section 409A of the Code shall be paid under the applicable exception.   For purposes of the limitations on nonqualified deferred compensation under Section 409A of the Code, each payment of compensation under this Agreement shall be treated as a separate payment of compensation. All payments to be made upon a termination of employment under this Agreement may only be made upon a "separation from service" under Section 409A of the Code to the extent necessary in order to avoid the imposition of penalty taxes on Executive pursuant to Section 409A of the Code.  In no event

9

may Executive, directly or indirectly, designate the calendar year of any payment under this Agreement, and to the extent required by Section 409A of the Code, any payment that may be paid in more than one taxable year shall be paid in the later taxable year.

(ii)     <u>Reimbursements and In-Kind Benefits</u>.     Notwithstanding anything to the contrary in this Agreement, all reimbursements and in-kind benefits provided under this Agreement that are subject to Section 409A of the Code shall be made in accordance with the requirements of Section 409A of the Code, including, where applicable, the requirement that (A) any reimbursement is for expenses incurred during Executive's lifetime (or during a shorter period of time specified in this Agreement); (B) the amount of expenses eligible for reimbursement, or in-kind benefits provided, during a calendar year may not affect the expenses eligible for reimbursement, or in-kind benefits to be provided, in any other calendar year; (C) the reimbursement of an eligible expense will be made no later than the last day of the calendar year following the year in which the expense is incurred; and (D) the right to reimbursement or in-kind benefits is not subject to liquidation or exchange for another benefit.

(iii)     <u>Delay of Payments</u>.     Notwithstanding any other provision of this Agreement to the contrary, if Executive is considered a "specified employee" for purposes of Section 409A of the Code (as determined in accordance with the methodology established by the Company Parties as in effect on the Date of Termination), any payment that constitutes nonqualified deferred compensation within the meaning of Section 409A of the Code that is otherwise due to Executive under this Agreement during the six-month period immediately following Executive's separation from service on account of Executive's separation from service shall instead be paid, on the first business day of the seventh month following Executive's separation from service (the "<u>Delayed Payment Date</u>"), to the extent necessary to prevent the imposition of tax penalties on Executive under Section 409A of the Code.  If Executive dies during the postponement period, the amounts and entitlements delayed on account of Section 409A of the Code shall be paid to the personal representative of Executive's estate on the first to occur of the Delayed Payment Date or thirty (30) calendar days after the date of Executive's death.

(l)     <u>No Mitigation</u>.     Executive shall not be required seek other employment or take any other action to mitigate the amount of any damages that Executive may incur or other payments to be made to Executive hereunder, nor shall any payments to Executive hereunder be reduced by any other payments Executive may receive whether or not Executive obtains other employment.

10

[Intentionally left blank]

PX7098-165

IN WITNESS WHEREOF, the parties have executed this Agreement effective as of May 30, 2023.


CAPRI HOLDINGS LIMITED


By: /s/ John D. Idol
   Name: John D. Idol
   Title: Chairman and Chief Executive Officer


MICHAEL KORS (USA), INC.


By: /s/ John D. Idol
   Name: John D. Idol
   Title: Chairman and Chief Executive Officer


/s/ Jenna A. Hendricks
   Jenna A. Hendricks

**Exhibit 10.21**

## CAPRI HOLDINGS LIMITED

## CHANGE IN CONTROL CONTINUITY AGREEMENT

**THIS CHANGE IN CONTROL CONTINUITY AGREEMENT** (this "**Agreement**") is made and entered into, as of May 30, 2023, by and between Capri Holdings Limited, a British Virgin Islands business company limited by shares (the "**Company**") and Thomas J. Edwards, Jr. ("**Executive**").

**WHEREAS**, the Board of Directors of the Company (the "**Board**") has determined that it is in the best interests of the Company and its shareholders to assure that the Company will have the continued dedication of Executive, notwithstanding the possibility, threat or occurrence of a Change in Control (as defined below); and

**WHEREAS**, the Board believes it is imperative to diminish the inevitable distraction of Executive by virtue of the personal uncertainties and risks created by a pending or threatened Change in Control and to encourage Executive's full attention and dedication to the Company currently and in the event of any threatened or pending Change in Control, and to provide Executive with compensation and benefits arrangements upon a Change in Control that ensure that the compensation and benefits expectations of Executive will be satisfied and that are competitive with those of other corporations.

**NOW**, **THEREFORE**, in order to accomplish the foregoing objectives and in consideration of the mutual promises contained herein and other good and valuable consideration, the receipt and sufficiency of which are acknowledged, the parties agree as follows:

1.   **Certain Definitions**.

(a)    "**Affiliate**" shall mean an entity controlled by, controlling or under common control with another entity.

(b)    "**Change in Control**" shall mean:

(i)    An acquisition by any individual, entity or group (within the meaning of Section 13(d)(3) or 14(d)(2) of the Securities Exchange Act of 1934, as amended, or any successor thereto (the "**Exchange Act**")) (a "**Person**") of beneficial ownership (within the meaning of Rule 13d-3 promulgated under the Exchange Act) of 30% or more of either (1) the then outstanding shares of ordinary shares of the Company (the "**Outstanding Company Ordinary Shares**") or (2) the combined voting power of the then outstanding voting securities of the Company entitled to vote generally in the election of directors (the "**Outstanding Company Voting Securities**"); provided, however, that for purposes of this subsection (i), the following acquisitions shall not constitute a Change in Control:  (A) any acquisition directly from the Company; (B) any acquisition by the Company; (C) any acquisition by any employee benefit plan (or related trust) sponsored or maintained by the Company or any entity controlled by the Company; or (D) any acquisition by any entity pursuant to a transaction that complies with clauses (A), (B) and (C) of subsection (iii) of this Section 1(b);

(ii)    A change in the composition of the Board such that the individuals who, as of the date of this Agreement, constitute the Board (the "**Incumbent Board**") cease for any reason to constitute at least a majority of the Board; provided, however, that, any individual who becomes a member of the Board subsequent to the date

of this Agreement whose election, or nomination for election by the Company's shareholders, was approved by a vote of at least a majority of those individuals who are members of the Board and who were also members of the Incumbent Board (or deemed to be such pursuant to this proviso) shall be considered as though such individual were a member of the Incumbent Board; provided, further, that any such individual whose initial assumption of office occurs as a result of either an actual or threatened election contest with respect to the election or removal of directors or other actual or threatened solicitation of proxies or consents by or on behalf of a Person other than the Board shall not be considered as a member of the Incumbent Board;

(iii)    The consummation of a reorganization, merger, statutory share exchange or consolidation or similar transaction involving the Company or any of its subsidiaries or sale or other disposition of all or substantially all of the assets of the Company, or the acquisition of assets or securities of another entity by the Company or any of its subsidiaries (a "**Business Combination**"), in each case, unless, following such Business Combination: (A) all or substantially all of the individuals and entities who were the beneficial owners, respectively, of the Outstanding Company Ordinary Shares and Outstanding Company Voting Securities immediately prior to such Business Combination beneficially own, directly or indirectly, more than 50% of, respectively, the then outstanding shares of ordinary shares (or, for a noncorporate entity, equivalent securities) and the combined voting power of the then outstanding voting securities entitled to vote generally in the election of directors (or, for a noncorporate entity, equivalent securities), as the case may be, of the entity resulting from such Business Combination (including an entity that, as a result of such transaction, owns the Company or all or substantially all of the Company's assets either directly or through one or more subsidiaries) in substantially the same proportions as their ownership, immediately prior to such Business Combination of the Outstanding Company Ordinary Shares and Outstanding Company Voting Securities, as the case may be; (B) no Person (excluding any entity resulting from such Business Combination or any employee benefit plan (or related trust) of the Company or such entity resulting from such Business Combination) beneficially owns, directly or indirectly, 30% or more of, respectively, the then outstanding shares of ordinary shares (or, for a noncorporate entity, equivalent securities) of the entity resulting from such Business Combination or the combined voting power of the then outstanding voting securities of such entity except to the extent that such ownership existed prior to the Business Combination; and (C) at least a majority of the members of the board of directors (or, for a noncorporate entity, equivalent body or committee) of the entity resulting from such Business Combination were members of the Board at the time of the execution of the initial agreement, or of the action of the Board, providing for such Business Combination; or

(iv)    The approval by the shareholders of the Company of a complete liquidation or dissolution of the Company.

(c)    "**Change in Control Period**" shall mean the period commencing on the date hereof and ending on the second anniversary of the date hereof; provided, however, that commencing on the date one year after the date hereof, and on each annual anniversary of such date (such date and each annual anniversary thereof shall be hereinafter referred to as the "Renewal Date"), unless previously terminated, the Change in Control Period shall be automatically extended so as to terminate two years from such Renewal Date, unless at least 60 days prior to the Renewal Date the Company shall give notice to Executive that the Change in Control Period shall not be so extended.

(d)    "**Code**" shall mean the Internal Revenue Code of 1986, as amended.

2

(e)    "**CIC Effective Date**" shall mean the first date during the Change in Control Period on which a Change in Control occurs.

2.    **Employment Period**.  The Company hereby agrees to continue Executive in its employ, and Executive hereby agrees to remain in the employ of the Company subject to the terms and conditions of this Agreement, for the period commencing on the CIC Effective Date and ending on the second anniversary of such date (the "**Employment Period**").    The Employment Period shall terminate upon Executive's termination of employment for any reason.

3.    **Terms of Employment**.

(a)    **Position and Duties**.    (i)    During the Employment Period, (A) Executive's position (including status, offices, titles and reporting requirements), authority, duties and responsibilities shall be at least commensurate in all respects with the most significant of those held, exercised and assigned to Executive at any time during the 120-day period immediately preceding the CIC Effective Date and (B) Executive's services shall be performed at the location where Executive was employed immediately preceding the CIC Effective Date or any office or location less than 50 miles from such location.

(i)    During the Employment Period, and excluding any periods of vacation and sick leave to which Executive is entitled, Executive agrees to devote reasonable attention and time during normal business hours to the business and affairs of the Company and, to the extent necessary to discharge the responsibilities assigned to Executive hereunder, to use Executive's reasonable best efforts to perform faithfully and efficiently such responsibilities.  During the Employment Period it shall not be a violation of this Agreement for Executive to (A) serve on corporate, civic or charitable boards or committees, (B) deliver lectures, fulfill speaking engagements or teach at educational institutions and (C) manage personal investments, so long as such activities do not significantly interfere with the performance of Executive's responsibilities as an employee of the Company in accordance with this Agreement.  It is expressly understood and agreed that to the extent that any such activities have been conducted by Executive prior to the CIC Effective Date, the continued conduct of such activities (or the conduct of activities similar in nature and scope thereto) subsequent to the CIC Effective Date shall not thereafter be deemed to interfere with the performance of Executive's responsibilities to the Company.

(b)    **Compensation**.

(i)    **Base Salary**.  During the Employment Period, Executive shall receive an annual base salary ("**Annual Base Salary**"), that shall be paid at an annual rate, at least equal to 12 *multiplied by* the highest monthly base salary paid or payable, including any base salary that has been earned but deferred, to Executive by the Company and its Affiliates in respect of the 12-month period immediately preceding the month in which the CIC Effective Date occurs.  The Annual Base Salary shall be paid at such intervals as the Company pays executive salaries generally.    During the Employment Period, the Annual Base Salary shall be periodically reviewed for increase consistent with, and on a basis no less favorable than that applicable to, other peer executives of the Company and its Affiliates, but in no event shall such review and adjustment occur more than 12 months after the last salary increase awarded to Executive prior to the CIC Effective Date and thereafter at least annually.  Any increase in Annual Base Salary shall not serve to limit or reduce any other obligation to Executive under this Agreement.  Annual Base Salary shall not be reduced after any such increase and the

3

term Annual Base Salary as utilized in this Agreement shall refer to Annual Base Salary as so increased.

(ii) **Annual Bonus**. In addition to Annual Base Salary, Executive shall be eligible, for each fiscal year ending during the Employment Period, for an annual bonus (the "**Annual Bonus**") in cash with a target annual bonus opportunity at least equal to the target annual bonus opportunity for which Executive was eligible as of immediately prior to the CIC Effective Date (the amount equal to such target annual bonus opportunity referred to herein as the "**Target Annual Bonus**"), with the actual earned Annual Bonus, if any, to be determined on a basis no less favorable than that applicable to other peer executives of the Company and its Affiliates. Each such Annual Bonus shall be paid no later than two and a half months after the end of the fiscal year for which the Annual Bonus is awarded, unless Executive shall elect to defer the receipt of such Annual Bonus pursuant to an arrangement that meets the requirements of Section 409A of the Code.

(iii) **Long Term Incentive Awards**. During the Employment Period, Executive shall be entitled to participate in all long-term equity- and cash-based incentive plans and programs applicable generally to other peer executives of the Company and its Affiliates. For each fiscal year ending during the Employment Period, Executive shall be awarded annual long-term incentive awards (the "**Annual LTI Award**") in respect of the ordinary shares of the Company (or the ultimate parent entity of the Company) or cash incentive awards, in each case on the same basis as other peer executives of the Company, at least equal to the target Annual LTI Award opportunity to which Executive was eligible as of immediately prior to the CIC Effective Date or, if more favorable to Executive, the target Annual LTI Award opportunity provided generally at any time after the CIC Effective Date to other peer executives of the Company and its Affiliates (the "**Target LTI Award Opportunity**"). The terms and conditions of the awards granted in respect of such Annual LTI Awards shall be no less favorable, in the aggregate, than the most favorable of those provided by the Company and its Affiliates for the awards granted to Executive under such plans and programs as in effect at any time during the 120-day period immediately preceding the CIC Effective Date or, if more favorable to Executive, those provided generally at any time after the CIC Effective Date to other peer executives of the Company and its Affiliates.

(iv) **Savings and Retirement Plans**. During the Employment Period, Executive shall be entitled to participate in all savings and retirement plans, practices, policies and programs applicable generally to other peer executives of the Company and its Affiliates, but in no event shall such plans, practices, policies and programs provide Executive with savings opportunities and retirement benefit opportunities, in each case, less favorable, in the aggregate, than the most favorable of those provided by the Company and its Affiliates for Executive under such plans, practices, policies and programs as in effect at any time during the 120-day period immediately preceding the CIC Effective Date or, if more favorable to Executive, those provided generally at any time after the CIC Effective Date to other peer executives of the Company and its Affiliates.

(v) **Welfare and Insurance Benefit Plans**. During the Employment Period, Executive and/or Executive's dependents, as the case may be, shall be eligible for participation in and shall receive all benefits under welfare and insurance benefit plans, practices, policies and programs provided by the Company and its Affiliates (including medical, prescription, dental, disability, salary continuance, employee life, group life, accidental death and travel accident insurance plans and programs) ("**Company Welfare Benefit Plans**") to the extent applicable generally to

4

other peer executives of the Company and its Affiliates, but in no event shall such Company Welfare Benefit Plans provide Executive with benefits that are less favorable, in the aggregate, than the most favorable of such plans, practices, policies and programs in effect for Executive at any time during the 120-day period immediately preceding the CIC Effective Date or, if more favorable to Executive, those provided generally at any time after the CIC Effective Date.

(vi)    **Expenses**.  During the Employment Period, Executive shall be entitled to receive prompt reimbursement for all reasonable expenses incurred by Executive in accordance with the most favorable policies, practices and procedures of the Company and its Affiliates in effect for Executive at any time during the 120-day period immediately preceding the CIC Effective Date or, if more favorable to Executive, as in effect generally at any time thereafter with respect to other peer executives of the Company and its Affiliates.

(vii)    **Fringe Benefits**.    During the Employment Period, Executive shall be entitled to fringe benefits, including any clothing allowance and merchandise discount, as applicable to Executive and in accordance with the most favorable plans, practices, programs and policies of the Company and its Affiliates in effect for Executive at any time during the 120-day period immediately preceding the CIC Effective Date or, if more favorable to Executive, as in effect generally at any time thereafter with respect to other peer executives of the Company and its Affiliates.

(viii)    **Paid Time Off or Vacation**.    During the Employment Period, Executive shall be entitled to paid time off or paid vacation, in each case in accordance with the most favorable plans, policies, programs and practices of the Company and its Affiliates as in effect for Executive at any time during the 365-day period immediately preceding the CIC Effective Date or, if more favorable to Executive, as in effect generally at any time thereafter with respect to other peer executives of the Company and its Affiliates.

4.    **Termination of Employment**.

(a)    **Death or Disability**.  Executive's employment shall terminate automatically upon Executive's death during the Employment Period.  If the Company determines in good faith that the Disability of Executive has occurred during the Employment Period (pursuant to the definition of Disability set forth below), it may give to Executive written notice in accordance with Section 11(b) of its intention to terminate Executive's employment.  In such event, Executive's employment with the Company shall terminate effective on the 30th day after receipt of such notice by Executive (the "**Disability Date**"), provided, that within the 30 days after such receipt, Executive shall not have returned to full-time performance of Executive's duties.  For purposes of this Agreement, "**Disability**" shall mean the absence of Executive from Executive's duties with the Company on a full-time basis for 180 consecutive business days (or for 180 business days in any consecutive 365 days) as a result of incapacity due to mental or physical illness that is determined to be total and permanent by a physician selected by the Company or its insurers and acceptable to Executive or Executive's legal representative.

(b)    **Cause**.  The Company may terminate Executive's employment during the Employment Period with or without Cause.  For purposes of this Agreement, "**Cause**" shall mean:

5

(i)    Executive's gross negligence, willful misconduct or dishonesty in performing his duties to the Company;

(ii)    Executive's conviction of a felony (other than a felony involving a traffic violation);

(iii)    Executive's commission of a felony involving a fraud or other business crime against the Company or any of its subsidiaries; or

(iv)    Executive's material breach of any of the covenants set forth in Section 9 hereof; provided that, if any such breach is curable, Executive shall have an opportunity to correct such breach within 30 days after written notice by the Company to Executive thereof.

For purposes of this provision, no act or failure to act, on the part of Executive, shall be considered "willful" unless it is done, or omitted to be done, by Executive in bad faith or without reasonable belief that Executive's action or omission was in the best interests of the Company and its Affiliates.  Any act, or failure to act, based upon authority given pursuant to a resolution duly adopted by the Board, or if the Company is not the ultimate parent entity of the Company and is not publicly traded, the board of directors (or, for a non-corporate entity, equivalent governing body) of the ultimate parent of the Company (the "**Applicable Board**") or upon the instructions of the Chief Executive Officer of the Company or a senior officer of the Company and its Affiliates or based upon the advice of counsel for the Company and its Affiliates shall be conclusively presumed to be done, or omitted to be done, by Executive in good faith and in the best interests of the Company and its Affiliates.  The cessation of employment of Executive shall not be deemed to be for Cause unless and until there shall have been delivered to Executive a copy of a resolution duly adopted by the affirmative vote of not less than a majority of the entire membership of the Applicable Board at a meeting of the Applicable Board called and held for such purpose after reasonable notice is provided to Executive and Executive is given an opportunity, together with counsel for Executive, to be heard before the Applicable Board, finding that, in the good faith opinion of the Applicable Board, Executive is guilty of conduct that constitutes Cause.

(c)    **Good Reason**.  Executive's employment may be terminated during the Employment Period by Executive for Good Reason or by Executive voluntarily without Good Reason.  "**Good Reason**" means actions taken by the Company resulting in a material negative change in the employment relationship.  For these purposes, a "material negative change in the employment relationship" shall include:

(i)    the assignment to Executive of duties or responsibilities that are inconsistent in any material respect with Executive's position (including status, offices, titles and reporting requirements), authority, duties or responsibilities as contemplated by Section 3(a), or a material diminution in Executive's position (including status, offices, titles and reporting requirements), authority, duties or responsibilities as contemplated by Section 3(a) or a material diminution in the budget over which Executive retains authority;

(ii)    a material diminution in the authorities, duties or responsibilities of the person to whom Executive is required to report, including a requirement that Executive report to an officer other than the Chief Executive Officer of the Company (or, if the Company is not the ultimate parent entity of the Company and is not publicly traded, the Chief Executive Officer of the ultimate parent of the Company);

6

PX7098-172

(iii)    the failure to provide, in all material respects, any element of the compensation and benefits required to be provided to Executive in accordance with any of the provisions of Section 3(b), including any decrease in Executive's Annual Base Salary;

(iv)    the Company's requiring Executive to be based at any office or location other than as provided in Section 3(a)(i)(B) resulting in a material increase in Executive's commute to and from Executive's primary residence (for this purpose an increase in Executive's commute by 50 miles or more shall be deemed material); or

(v)    any other action or inaction that constitutes a material breach by the Company of this Agreement, including any failure by the Company to comply with and satisfy Section 10(c).

In order to invoke a termination for Good Reason, Executive shall provide written notice to the Company of the existence of one or more of the conditions described in clauses (i) through (v) within 90 days following Executive's knowledge of the initial existence of such condition or conditions, specifying in reasonable detail the conditions constituting Good Reason, and the Company shall have 30 days following receipt of such written notice (the "**Cure Period**") during which it may remedy the condition.  In the event that the Company fails to remedy the condition constituting Good Reason during the applicable Cure Period, Executive's "separation from service" (within the meaning of Section 409A of the Code) must occur, if at all, within two years following the initial existence of such condition or conditions in order for such termination as a result of such condition to constitute a termination for Good Reason.

(d)    **Incapacity or Death**.  Executive's mental or physical incapacity following the occurrence of an event described above in clauses (i) through (v) of Section 4(c) shall not affect Executive's ability to terminate employment for Good Reason, and Executive's death following delivery of a Notice of Termination for Good Reason shall not affect the entitlement of the estate of Executive to severance payments or benefits provided hereunder upon a termination of employment for Good Reason.

(e)    **Notice of Termination**.  Any termination of employment by the Company for Cause, or by Executive for Good Reason, shall be communicated by Notice of Termination to the other party hereto given in accordance with Section 11(b).  For purposes of this Agreement, a "**Notice of Termination**" means a written notice that (i) indicates the specific termination provision in this Agreement relied upon, (ii) to the extent applicable, sets forth in reasonable detail the facts and circumstances claimed to provide a basis for termination of Executive's employment under the provision so indicated and (iii) if the Date of Termination (as defined below) is other than the date of receipt of such notice, specifies the Date of Termination (which date shall be not more than 30 days after the giving of such notice) (subject to the Company's right to cure in the case of a resignation for Good Reason).  The failure by Executive or the Company to set forth in the Notice of Termination any fact or circumstance that contributes to a showing of Good Reason or Cause shall not waive any right of Executive or the Company, respectively, hereunder or preclude Executive or the Company, respectively, from asserting such fact or circumstance in enforcing Executive's or the Company's rights hereunder.

(f)    **Date of Termination**.  "**Date of Termination**" means (i) if Executive's employment is terminated by the Company for Cause, or by Executive for Good Reason, the date of receipt of the Notice of Termination or any later date specified

7

therein, as the case may be, (ii) if Executive's employment is terminated by the Company other than for Cause or Disability, the date on which the Company notifies Executive of such termination, (iii) if Executive resigns without Good Reason, the date on which Executive notifies the Company of such termination and (iv) if Executive's employment is terminated by reason of death or Disability, the date of death of Executive or the Disability Date, as the case may be.

5.        **Obligations of the Company Upon Termination**.

(a)        **By the Company Other Than for Cause, Death or Disability; By Executive for Good Reason**.  If, during the Employment Period, the Company shall terminate Executive's employment other than for Cause, Death or Disability or Executive shall terminate employment for Good Reason:

(i)        subject to Section 11(k), the Company shall pay to Executive in a lump sum in cash as soon as reasonably practicable (and no later than 30 days) after the Date of Termination equal to the aggregate of the following amounts:

(A)        the sum of (I) Executive's Annual Base Salary through the Date of Termination to the extent not theretofore paid; (II) Executive's business expenses that are reimbursable pursuant to Section 3(b)(v) but have not been reimbursed by the Company as of the Date of Termination; (III) Executive's Annual Bonus for the fiscal year immediately preceding the fiscal year in which the Date of Termination occurs, if such bonus has been determined but not paid as of the Date of Termination; (IV) any accrued vacation pay or other paid time off to the extent required by any policy in effect prior to the CIC Effective Date or, if more favorable to Executive, at any time thereafter, or otherwise payable under applicable law, and not theretofore paid (the sum of the amounts described in subclauses (I), (II), (III) and (IV), the "**Accrued Obligations**"); provided, that notwithstanding the foregoing, if Executive has made an irrevocable election under any deferred compensation arrangement subject to Section 409A of the Code to defer any portion of the Annual Base Salary or the Annual Bonus described in clause (I) or (III), then for all purposes of this Section 5 (including Sections 5(b) through 5(d)), such deferral election, and the terms of the applicable arrangement shall apply to the same portion of the amount described in such clause (I) or (III), and such portion shall not be considered as part of the "Accrued Obligations" but shall instead be an "Other Benefit" (as defined below);

(B)        an amount equal to the product of (I) the Target Annual Bonus and (II) a fraction, the numerator of which is the number of days in the current fiscal year through the Date of Termination, and the denominator of which is 365 (the "**Pro Rata Bonus**"); and

(C)        the amount equal to the product of (I) two (2) and (II) the sum of (x) Executive's Annual Base Salary and (y) the Target Annual Bonus;

(i)        the Company shall pay to Executive an amount equal to the product of (A) the monthly premiums for coverage under the Company's or and its Affiliates' health care plans for purposes of continuation coverage under Section 4980B of the Code with respect to the maximum level of coverage in effect for Executive and

8

his spouse and dependents as of immediately prior to the Date of Termination, and (B) 24;

        (ii)      the Company shall, at its sole expense as incurred, provide Executive with outplacement services the scope and provider of which shall be selected by Executive in Executive's sole discretion, but the cost thereof shall not exceed $25,000; <u>provided</u>, that such outplacement benefits shall end not later than the last day of the second calendar year that begins after the Date of Termination; and

        (iii)      except as otherwise set forth in the last sentence of Section 6, to the extent not theretofore paid or provided, the Company shall timely pay or provide to Executive any other amounts or benefits required to be paid or provided or that Executive is eligible to receive under any plan, program, policy or practice or contract or agreement of the Company and its Affiliates, including the vesting, settlement or exercisability of any equity or equity-based awards granted to Executive in accordance with the terms of the plan and award agreements applicable upon a termination of employment by the Company other than for Cause or for Good Reason (for the avoidance of doubt, as such terms are defined herein), including the vesting of awards pursuant to Section 11.2 of the Third Amended and Restated Capri Holdings Limited Omnibus Incentive Plan or the similar provisions of any predecessor or successor plans) and any rights under the Company's Deferred Compensation Plan (such other amounts and benefits shall be hereinafter referred to as the "**Other Benefits**") in accordance with the terms of the underlying plans or agreements.

        The Company's obligations to pay or provide the payments and benefits set forth in Sections 5(a)(i)(B), 5(a)(i)(C), 5(a)(ii) and 5(a)(iii) of this Agreement shall be subject to Executive's execution, delivery to the Company and non-revocation of a release of claims substantially in the form attached hereto as <u>Exhibit A</u>.

        (b)    **Death**.  If Executive's employment is terminated by reason of Executive's death during the Employment Period, the Company shall provide Executive's estate or beneficiaries with the Accrued Obligations and the Pro Rata Bonus and the timely payment or delivery of the Other Benefits, and shall have no other severance obligations under this Agreement. The Accrued Obligations (subject to the proviso set forth in Section 5(a)(i)(A) to the extent applicable) and the Pro Rata Bonus shall be paid to Executive's estate or beneficiary, as applicable, in a lump sum in cash as soon as reasonably practicable (and no later than 30 days) after the Date of Termination. With respect to the provision of the Other Benefits, the term "Other Benefits" as utilized in this Section 5(b) shall include, and Executive's estate and/or beneficiaries shall be entitled to receive, benefits at least equal to the most favorable benefits provided by the Company and its Affiliates to the estates and beneficiaries of other peer executives of the Company and such Affiliates under such plans, programs, practices and policies relating to death benefits, if any, as in effect with respect to other peer executives and their beneficiaries at any time during the 120-day period immediately preceding the CIC Effective Date or, if more favorable to Executive's estate and/or Executive's beneficiaries, as in effect on the date of Executive's death with respect to other peer executives of the Company and its Affiliates and their beneficiaries.

        (c)    **Disability**.  If Executive's employment is terminated by reason of Executive's Disability during the Employment Period, the Company shall provide Executive with the Accrued Obligations and the Pro Rata Bonus and the timely payment or delivery of the Other Benefits in accordance with the terms of the underlying plans or agreements, and shall have no other severance obligations under this Agreement. The Accrued Obligations (subject to the proviso set forth in Section 5(a)(i)(A) to the extent

PX7098-175

applicable) and the Pro Rata Bonus shall be paid to Executive in a lump sum in cash as soon as reasonably practicable (and no later than 30 days) after the Date of Termination. With respect to the provision of the Other Benefits, the term "Other Benefits" as utilized in this Section 5(c) shall include, and Executive shall be entitled after the Disability Date to receive, without limitation, disability and other benefits (either pursuant to a plan, program, practice or policy or an individual arrangement) at least equal to the most favorable of those generally provided by the Company and its Affiliates to disabled executives and/or their dependents in accordance with such plans, programs, practices and policies relating to disability, if any, as in effect generally with respect to other peer executives and their dependents at any time during the 120-day period immediately preceding the CIC Effective Date or, if more favorable to Executive and/or Executive's dependents, as in effect at any time thereafter generally with respect to other peer executives of the Company and its Affiliates and their dependents.

(d)    **Cause; Other Than for Good Reason**.    If Executive's employment is terminated for Cause during the Employment Period, the Company shall provide Executive with Executive's Annual Base Salary (subject to the proviso set forth in Section 5(a)(i)(A) to the extent applicable) through the Date of Termination, and the timely payment or delivery of the Other Benefits, and shall have no other severance obligations under this Agreement.    If Executive voluntarily terminates employment during the Employment Period, excluding a termination for Good Reason, the Company shall provide Executive with the Accrued Obligations and the timely payment or delivery of the Other Benefits and shall have no other severance obligations under this Agreement. In such case, all the Accrued Obligations (subject to the proviso set forth in Section 5(a)(i)(A) to the extent applicable) shall be paid to Executive in a lump sum in cash as soon as reasonably practicable (and no later than 30 days) after the Date of Termination.

6.    **Non-Exclusivity of Rights**.    Nothing in this Agreement shall prevent or limit Executive's continuing or future participation in any plan, program, policy or practice provided by the Company or any of its Affiliates and for which Executive may qualify, nor, subject to Section 11(h), shall anything herein limit or otherwise affect such rights as Executive may have under any other contract or agreement with the Company or its Affiliates.    Amounts that are vested benefits or that Executive is otherwise entitled to receive under any plan, policy, practice or program of or any contract or agreement with the Company or any of its Affiliates at or subsequent to the Date of Termination shall be payable in accordance with such plan, policy, practice or program or contract or agreement except as explicitly modified by this Agreement. Without limiting the generality of the foregoing, Executive's resignation under this Agreement with or without Good Reason shall in no way affect Executive's ability to terminate employment by reason of Executive's "retirement" under any compensation and benefits plans, programs or arrangements of the Company or its Affiliates, including any retirement or pension plans or arrangements or to be eligible to receive benefits under any compensation or benefit plans, programs or arrangements of the Company or any of its Affiliates, including any retirement or pension plan or arrangement of the Company or any of its Affiliates or substitute plans adopted by the Company or its successors, and any termination that otherwise qualifies as Good Reason shall be treated as such even if it is also a "retirement" for purposes of any such plan.    Notwithstanding the foregoing, if Executive receives payments and benefits pursuant to Section 5(a) of this Agreement, Executive shall not be entitled to any severance pay or benefits under any severance plan, program or policy of the Company and its Affiliates, unless otherwise specifically provided therein in a specific reference to this Agreement.

7.    **No Mitigation or Offset; Legal Fees**.

10

(a)     **No Mitigation or Offset**.  The Company's obligation to make the payments provided for in this Agreement and otherwise to perform its obligations hereunder shall not be affected by any set-off, counterclaim, recoupment, defense or other claim, right or action that the Company may have against Executive or others.  In no event shall Executive be obligated to seek other employment or take any other action by way of mitigation of the amounts payable to Executive under any of the provisions of this Agreement and such amounts shall not be reduced whether or not Executive obtains other employment.

(b)     **Legal Fees**.  The Company agrees to pay as incurred (within 10 days following the Company's receipt of an invoice from Executive), at any time from the CIC Effective Date through Executive's remaining lifetime (or, if longer, through the 20th anniversary of the CIC Effective Date) to the full extent permitted by law, all legal fees and expenses that Executive may reasonably incur as a result of any contest (regardless of the outcome thereof) by the Company, Executive or others of the validity or enforceability of, or liability under, any provision of this Agreement or any guarantee of performance thereof whether such contest is between the Company and Executive or between either of them and any third party (including as a result of any contest by Executive about the amount of any payment pursuant to this Agreement), plus in each case interest on any delayed payment at the applicable federal rate provided for in Section 7872(f)(2)(A) of the Code ("**Interest**") determined as of the date such legal fees and expenses were incurred.

## 8.     **Treatment of Certain Payments**.

(a)     Anything in the Agreement to the contrary notwithstanding, in the event the Accounting Firm (as defined below) shall determine that receipt of all Payments (as defined below) would subject Executive to the excise tax under Section 4999 of the Code, the Accounting Firm shall determine whether to reduce any of the Payments paid or payable pursuant to the Agreement (the "**Agreement Payments**") so that the Parachute Value (as defined below) of all Payments, in the aggregate, equals the Safe Harbor Amount (as defined below).  The Agreement Payments shall be so reduced only if the Accounting Firm determines that Executive would have a greater Net After-Tax Receipt (as defined below) of aggregate Payments if the Agreement Payments were so reduced.  If the Accounting Firm determines that Executive would not have a greater Net After-Tax Receipt of aggregate Payments if the Agreement Payments were so reduced, Executive shall receive all Agreement Payments to which Executive is entitled hereunder.

(b)     If the Accounting Firm determines that aggregate Agreement Payments should be reduced so that the Parachute Value of all Payments, in the aggregate, equals the Safe Harbor Amount, the Company shall promptly give Executive notice to that effect and a copy of the detailed calculation thereof.  All determinations made by the Accounting Firm under this Section 8 shall be binding upon the Company and Executive and shall be made as soon as reasonably practicable and in no event later than 15 days following the Date of Termination.  For purposes of reducing the Agreement Payments so that the Parachute Value of all Payments, in the aggregate, equals the Safe Harbor Amount, only amounts payable under the Agreement (and no other Payments) shall be reduced.  The reduction of the amounts payable hereunder, if applicable, shall be made by reducing the payments and benefits under the following sections in the following order:  (i) cash payments that may not be valued under Treas. Reg. § 1.280G-1, Q&A-24(c) ("**24(c)**"), (ii) equity-based payments that may not be valued under 24(c), (iii) cash payments that may be valued under 24(c), (iv) equity-based payments that may be valued under 24(c) and (v) other types of benefits.  With respect to each category of the foregoing, such reduction shall occur first with respect to amounts that are not

11

"deferred compensation" within the meaning of Section 409A of the Code and next with respect to payments that are deferred compensation, in each case, beginning with payments or benefits that are to be paid the farthest in time from the Accounting Firm's determination.  All fees and expenses of the Accounting Firm shall be borne solely by the Company.

(c)    To the extent requested by Executive, the Company shall cooperate with Executive in good faith in valuing, and the Accounting Firm shall take into account the value of, services provided or to be provided by Executive (including Executive's agreeing to refrain from performing services pursuant to a covenant not to compete or similar covenant, before, on or after the date of a change in ownership or control of the Company (within the meaning of Q&A-2(b) of the final regulations under Section 280G of the Code), such that payments in respect of such services may be considered reasonable compensation within the meaning of Q&A-9 and Q&A-40 to Q&A-44 of the final regulations under Section 280G of the Code and/or exempt from the definition of the term "parachute payment" within the meaning of Q&A-2(a) of the final regulations under Section 280G of the Code in accordance with Q&A-5(a) of the final regulations under Section 280G of the Code.

(d)    The following terms shall have the following meanings for purposes of this Section 8:

(i)    "**Accounting Firm**" shall mean a nationally recognized certified public accounting firm or other professional organization that is a certified public accounting firm recognized as an expert in determinations and calculations for purposes of Section 280G of the Code that is selected by the Company prior to a Change in Control for purposes of making the applicable determinations hereunder and is reasonably acceptable to Executive, which firm shall not, without Executive's consent, be a firm serving as accountant or auditor for the individual, entity or group effecting the Change in Control.

(ii)    "**Net After-Tax Receipt**" shall mean the present value (as determined in accordance with Sections 280G(b)(2)(A)(ii) and 280G(d)(4) of the Code) of a Payment net of all taxes imposed on Executive with respect thereto under Sections 1 and 4999 of the Code and under applicable state and local laws, determined by applying the highest marginal rate under Section 1 of the Code and under state and local laws which applied to Executive's taxable income for the immediately preceding taxable year, or such other rate(s) as the Accounting Firm determines to be likely to apply to Executive in the relevant tax year(s).

(iii)    "**Parachute Value**" of a Payment shall mean the present value as of the date of the change of control for purposes of Section 280G of the Code of the portion of such Payment that constitutes a "parachute payment" under Section 280G(b)(2) of the Code, as determined by the Accounting Firm for purposes of determining whether and to what extent the excise tax under Section 4999 of the Code will apply to such Payment.

(iv)    "**Payment**" shall mean any payment or distribution in the nature of compensation (within the meaning of Section 280G(b)(2) of the Code) to or for the benefit of Executive, whether paid or payable pursuant to the Agreement or otherwise.

(v)    "**Safe Harbor Amount**" shall mean 2.99 *multiplied by* Executive's "base amount," within the meaning of Section 280G(b)(3) of the Code.

12

(e)     The provisions of this Section 8 shall survive the expiration of the Agreement.

9.     **Restrictive Covenants.**

(a)     **Confidential Information**.  Executive shall not disclose to any unauthorized person or entity or use for Executive's own purposes any Confidential Information without the prior written consent of the Company, unless and to the extent that the Confidential Information becomes generally known to and available for use by the public other than as a result of Executive's acts or omissions in violation of this Agreement; <u>provided</u>, <u>however</u>, that if Executive receives a request to disclose Confidential Information pursuant to a deposition, interrogation, request for information or documents in legal proceedings, subpoena, civil investigative demand, governmental or regulatory process or similar process, (i) Executive shall promptly notify in writing the Company, and consult with and assist the Company in seeking a protective order or request for other appropriate remedy, (ii) in the event that such protective order or remedy is not obtained, or if the Company waives compliance with the terms hereof, Executive shall disclose only that portion of the Confidential Information which, based on the written advice of Executive's legal counsel, is legally required to be disclosed and shall exercise reasonable best efforts to provide that the receiving person or entity shall agree to treat such Confidential Information as confidential to the extent possible (and permitted under applicable law) in respect of the applicable proceeding or process and (iii) the Company shall be given an opportunity to review the Confidential Information prior to disclosure thereof. For purposes of this Agreement, "**Confidential Information**" means information, observations and data concerning the business or affairs of the Company and its Affiliates, including, without limitation, all business information (whether or not in written form) which relates to the Company or its Affiliates, or their customers, suppliers or contractors or any other third parties in respect of which the Company or its Affiliates has a business relationship or owes a duty of confidentiality, or their respective businesses or products, and which is not known to the public generally other than as a result of Executive's breach of this Agreement, including but not limited to: technical information or reports; formulas; trade secrets; unwritten knowledge and "know-how"; operating instructions; training manuals; customer lists; customer buying records and habits; product sales records and documents, and product development, marketing and sales strategies; market surveys; marketing plans; profitability analyses; product cost; long-range plans; information relating to pricing, competitive strategies and new product development; information relating to any forms of compensation or other personnel-related information; contracts; and supplier lists. Confidential Information will not include such information known to Executive prior to Executive's involvement with the Company or its Affiliates or information rightfully obtained from a third party (other than pursuant to a breach by Executive of this Agreement).  Nothing in this Agreement shall impair Executive's right under the whistleblower provisions of any applicable federal law or regulation or, for the avoidance of doubt, limit Executive's right to receive an award for the information provided to any government authority under such law or regulation.

(b)     **No Hiring**.  During the Employment Period and during the two-year period following termination of employment or service, Executive shall not knowingly perform any action, activity or course of conduct which is substantially detrimental to the businesses or business reputations of the Company or any of its Affiliates, including (i) soliciting, recruiting or hiring (or attempting to solicit, recruit or hire) any employees of the Company or any of its Affiliates or any persons who have worked for the Company or of its Affiliates during the 12-month period immediately preceding such solicitation, recruitment or hiring or attempt thereof; (ii) intentionally

13

interfering with the relationship of the Company or any of its Affiliates with any person or entity who or which is employed by or otherwise engaged to perform services for, or any customer, client, supplier, licensee, licensor or other business relation of, the Company or any of its Affiliates; or (iii) assisting any person or entity in any way to do, or attempt to do, anything prohibited by the immediately preceding clauses (i) or (ii).

(c)    **Non-Disparagement**.    During the Employment Period and thereafter, Executive agrees not to disparage the Company or any of its Affiliates or any of their respective directors, officers, employees, agents, representatives or licensees and not to publish or make any statement that is reasonably foreseeable to become public with respect to any of such entities or persons.  The Company likewise agrees not to disparage Executive or publish or make any statement that is reasonably foreseeable to become public with respect to Executive without Executive's prior written consent, excluding statements required to be made about Executive in any Company filing under U.S. securities laws or stock exchange rules and regulations.

(d)    **Remedies;  Modification;  Interpretation**.    Executive acknowledges that the injury that would be suffered by the Company as a result of a breach in any material respect of the provisions of Section 9 of this Agreement would be irreparable and that an award of monetary damages to the Company for such a breach would be an inadequate remedy.  Consequently, the Company will have the right, in addition to any other rights it may have, to obtain injunctive relief to restrain any breach or threatened breach or otherwise to specifically enforce any provision of this Agreement, and the Company will not be obligated to post bond or other security in seeking such relief.  In no event shall an asserted violation of the provisions of this Section 9 constitute a basis for deferring or withholding any amounts otherwise payable to Executive under this Agreement, but the Company otherwise shall be entitled to all other remedies that may be available to it at law or in equity.  Executive acknowledges that the foregoing provisions of this Section 9 are reasonable and necessary for the protection of the Company and its Affiliates, and that they will be materially and irrevocably damaged if these provisions are not specifically enforced.  Accordingly, Executive agrees that, in addition to any other relief or remedies available to the Company and its Affiliates, they shall be entitled to seek an appropriate injunctive or other equitable remedy for the purposes of restraining Executive from any actual or threatened breach of or otherwise enforcing these provisions and no bond or security will be required in connection therewith.  If any provision of this Section 9 is deemed invalid or unenforceable, such provision shall be deemed modified and limited to the extent necessary to make it valid and enforceable.  For purposes of this Section 9, references to the "Company" and "Affiliates" shall refer to the Company and the Company's Affiliates as of the date immediately prior to the CIC Effective Date.

10.    **Successors**.

(a)    This Agreement is personal to Executive and without the prior written consent of the Company shall not be assignable by Executive other than by will or the laws of descent and distribution.  This Agreement shall inure to the benefit of and be enforceable by Executive's legal representatives.

(b)    This Agreement shall inure to the benefit of and be binding upon the Company and its successors and assigns.  Except as provided in Section 10(c), without the prior written consent of Executive, this Agreement shall not be assignable by the Company.

PX7098-180

(c)      The Company will require any successor (whether direct or indirect, by purchase, merger, consolidation or otherwise) to all or substantially all of the business and/or assets of the Company to assume expressly and agree to perform this Agreement in the same manner and to the same extent that the Company would be required to perform it if no such succession had taken place.  As used in this Agreement, "Company" shall mean the Company as hereinbefore defined and any successor to its business and/or assets as aforesaid which assumes and agrees to perform this Agreement by operation of law, or otherwise.

11.    **Miscellaneous**.

(a)      **Governing Law and Dispute Resolution**.  This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without reference to principles of conflict of laws.  The parties irrevocably submit to the jurisdiction of any state or federal court sitting in or for the State of New York with respect to any dispute arising out of or relating to this Agreement, and each party irrevocably agrees that all claims in respect of such dispute or proceeding shall be heard and determined in such courts.  The parties hereby irrevocably waive, to the fullest extent permitted by law, any objection that they may now or hereafter have to the venue of any dispute arising out of or relating to this Agreement or the transactions contemplated hereby brought in such court or any defense of inconvenient forum for the maintenance of such dispute or proceeding.  Each party agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  THE PARTIES HEREBY WAIVE A TRIAL BY JURY IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT OR ASSERTED BY EITHER OF THE PARTIES HERETO AGAINST THE OTHER ON ANY MATTERS WHATSOEVER ARISING OUT OF OR IN ANY WAY RELATED TO THIS AGREEMENT.

(b)      **Notices**.  All notices and other communications hereunder shall be in writing and shall be given by hand delivery to the other party or by registered or certified mail, return receipt requested, postage prepaid, addressed as follows:

If to Executive:  To the most recent address on file with the Company.

If to the Company:

Capri Holdings Limited
11 West 42nd Street
New York, NY 1036
Attention:  SVP, General Counsel

or to such other address as either party shall have furnished to the other in writing in accordance herewith.  Notice and communications shall be effective when actually received by the addressee.

(c)      **Invalidity**.  If any term or provision of this Agreement or the application thereof to any person or circumstance shall to any extent be invalid or unenforceable, the remainder of this Agreement or the application of such term or provision to persons or circumstances other than those to which it is invalid or unenforceable shall not be affected thereby, and each term and provision of this Agreement shall be valid and be enforced to the fullest extent permitted by law.

15

(d)    **Survivorship**.  Upon the expiration or other termination of this Agreement or Executive's employment, the respective rights and obligations of the parties hereto shall survive to the extent necessary to carry out the intentions of the parties under this Agreement.

(e)    **Section Headings; Construction**.  The section headings used in this Agreement are included solely for convenience and shall not affect, or be used in connection with, the interpretation hereof.  For purposes of this Agreement, the term "including" shall mean "including, without limitation."

(f)    **Counterparts**.  This Agreement may be executed in several counterparts, each of which shall be deemed to be an original but all of which together shall constitute one and the same instrument.

(g)    **Amendments; Waiver**.  No provision of this Agreement shall be modified or amended except by an instrument in writing duly executed by the parties hereto.  Executive's or the Company's failure to insist upon strict compliance with any provision hereof or any other provision of this Agreement or the failure to assert any right Executive or the Company may have hereunder, including the right of Executive to terminate employment for Good Reason pursuant to Section 4(c)(i)-(v), shall not be deemed to be a waiver of such provision or right or any other provision or right of this Agreement.

(h)    **At-Will Employment**.  Executive and the Company acknowledge that, except as may otherwise be provided under any other written agreement between Executive and the Company, the employment of Executive by the Company is "at will" and, subject to Section 1(e) of this Agreement, prior to the CIC Effective Date, Executive's employment may be terminated by either Executive or the Company at any time prior to the CIC Effective Date, in which case Executive shall have no further rights under this Agreement.  From and after the CIC Effective Date, except as specifically provided herein, this Agreement shall supersede any other employment agreement between the parties.  For the avoidance of doubt, prior to the CIC Effective Date, any other employment agreement between the parties shall continue to govern the relationship between the parties.

(i)    **Entire Agreement**.  This Agreement constitutes the entire agreement of the parties hereto in respect of the terms and conditions of Executive's employment with the Company and its Affiliates, including Executive's severance entitlements, and, as of the CIC Effective Date, supersedes and cancels in their entirety all prior understandings, agreements and commitments, whether written or oral, relating to the terms and conditions of employment between Executive, on the one hand, and the Company or its Affiliates, on the other hand, including the Amended and Restated Employment Agreement between Executive and the Company dated as of the date hereof.  For the avoidance of doubt, this Agreement does not limit the terms of any benefit plans (including equity award agreements) of the Company or its Affiliates that are applicable to Executive, except to the extent that the terms of this Agreement are more favorable to Executive.  From and after the CIC Effective Date, the obligations of Executive under Section 9 shall be the exclusive restrictive covenants to which Executive is bound and any other restrictive covenants set forth in any agreement between Executive and the Company or its Affiliates, including any equity award agreement shall be void and of no force and effect.

16

PX7098-182

(j)    **Tax Withholding**.    The Company may withhold from any amounts payable under this Agreement such Federal, state, local or foreign taxes as shall be required to be withheld pursuant to any applicable law or regulation.

(k)    **Section 409A**.

(i)    **General**.  It is intended that payments and benefits made or provided under this Agreement shall not result in penalty taxes or accelerated taxation pursuant to Section 409A of the Code.  Any payments that qualify for the "short-term deferral" exception, the separation pay exception or another exception under Section 409A of the Code shall be paid under the applicable exception.  For purposes of the limitations on nonqualified deferred compensation under Section 409A of the Code, each payment of compensation under this Agreement shall be treated as a separate payment of compensation.  All payments to be made upon a termination of employment under this Agreement may only be made upon a "separation from service" under Section 409A of the Code to the extent necessary in order to avoid the imposition of penalty taxes on Executive pursuant to Section 409A of the Code.  In no event may Executive, directly or indirectly, designate the calendar year of any payment under this Agreement, and to the extent required by Section 409A of the Code, any payment that may be paid in more than one taxable year shall be paid in the later taxable year.  Notwithstanding any other provision of this Agreement to the contrary, solely for the purpose of determining the timing of payment or distribution of any compensation or benefit that constitutes "nonqualified deferred compensation" within the meaning of Section 409A of the Code (and not the right to vest in or be entitled to receive any such payment or benefit) that may only be made or changed (including a change in the form of payment) upon an event described in Section 409A(a)(2)(A)(v) of the Code and the regulations thereunder, such payment shall only be made or timing or form changed if the Change in Control also constitutes an event described in Section 409A(a)(2)(A)(v) of the Code.

(ii)    **Reimbursements and In-Kind Benefits**.  Notwithstanding anything to the contrary in this Agreement, all reimbursements and in-kind benefits provided under this Agreement that are subject to Section 409A of the Code shall be made in accordance with the requirements of Section 409A of the Code, including, where applicable, the requirement that (A) any reimbursement is for expenses incurred during Executive's lifetime (or during a shorter period of time specified in this Agreement); (B) the amount of expenses eligible for reimbursement, or in-kind benefits provided, during a calendar year may not affect the expenses eligible for reimbursement, or in-kind benefits to be provided, in any other calendar year; (C) the reimbursement of an eligible expense will be made no later than the last day of the calendar year following the year in which the expense is incurred; and (D) the right to reimbursement or in-kind benefits is not subject to liquidation or exchange for another benefit.

(iii)    **Delay of Payments**.  Notwithstanding any other provision of this Agreement to the contrary, if Executive is considered a "specified employee" for purposes of Section 409A of the Code (as determined in accordance with the methodology established by the Company and its Affiliates as in effect on the Date of Termination), any payment that constitutes nonqualified deferred compensation within the meaning of Section 409A of the Code that is otherwise due to Executive under this Agreement during the six-month period immediately following Executive's separation from service on account of Executive's separation from service shall instead be paid, with Interest (based on the rate in effect for the month in which Executive's separation from service occurs), on the first business day of the seventh month following Executive's separation from service (the "**Delayed Payment Date**"), to the extent necessary to prevent the imposition of tax penalties on Executive under Section 409A of the Code.  If

PX7098-183

Executive dies during the postponement period, the amounts and entitlements delayed on account of Section 409A of the Code shall be paid to the personal representative of Executive's estate on the first to occur of the Delayed Payment Date or 30 calendar days after the date of Executive's death.

(l)    **Indemnification**.  The Company shall indemnify Executive and hold him harmless to the fullest extent permitted by law and under the charter and bylaws of the Company (including the advancement of expenses) against, and with respect to, any and all actions, suits, proceedings, claims, demands, judgments, costs, expenses (including reasonable attorney fees), losses and damages resulting from Executive's good faith performance of Executive's duties and obligations with the Company and its Affiliates.  During the Employment Period and for as long thereafter as is practicable, Executive shall be covered under a directors' and officers' liability insurance policy with coverage limits in amounts no less than, and with terms and conditions no less favorable than, that or those maintained by the Company as of immediately prior to the CIC Effective Date. In addition, any individual indemnification agreement between Executive and the Company in effect immediately prior to the CIC Effective Date shall continue in full force and effect in accordance with its terms.

*[Signature Page Follows]*

18

PX7098-184

**IN WITNESS WHEREOF**, Executive has hereunto set Executive's hand and, pursuant to the authorization from the Board, the Company has caused this Agreement to be executed in its name on its behalf, all as of the day and year first above written.


EXECUTIVE:


/s/ Thomas J. Edwards, Jr.
Thomas J. Edwards, Jr.


COMPANY:


By: /s/ John D. Idol
John D. Idol
Chairman and Chief Executive Officer
Capri Holdings Limited

*[Change in Control Continuity Agreement Signature Page]*

THIS GENERAL RELEASE OF CLAIMS (this "**Release**") is entered into between [___] ("**Executive**") and Capri Holdings Limited (the "**Company**") as of [**DATE**]. The entering into and non-revocation of this Release is a condition to Executive's right to receive the severance payments and benefits under Sections 5(a)(i)(B), 5(a)(i)(C), 5(a)(ii) and 5(a)(iii) of Executive's Change in Control Continuity Agreement, dated as of [●], 2023 (the "**CIC Continuity Agreement**"). Capitalized terms used in this Release that are not otherwise defined shall have the meanings set forth in the CIC Continuity Agreement.

Accordingly, Executive and the Company agree as follows:

1.    General Release.

(a)    In consideration for the payments to be provided to Executive pursuant to Sections 5(a)(i)(B), 5(a)(i)(C), 5(a)(ii) and 5(a)(iii) of the CIC Continuity Agreement, Executive, for himself and for Executive's heirs, executors, administrators, trustees, legal representatives and assigns (hereinafter referred to collectively as "**Releasors**"), forever releases and discharges the Company and its past, present and future parent entities, subsidiaries, divisions, affiliates and related business entities, successors and assigns, assets, employee benefit and/or pension plans or funds (including qualified and non-qualified plans or funds), and any of its or their respective past, present and/or future directors, officers, fiduciaries, agents, trustees, administrators, employees, insurers, attorneys and assigns, acting on behalf of the Company or in connection with Company business (collectively, the "**Company Entities**") from any and all claims, demands, causes of action, fees and liabilities of any kind whatsoever (upon any legal or equitable theory, whether contractual, common-law, statutory, federal, state, local, or otherwise), whether known or unknown, which Executive ever had, now have, or may have against any of the Company Entities by reason of any act, omission, transaction, practice, plan, policy, procedure, conduct, occurrence, or other matter related to Executive's employment or the termination thereof up to and including the date on which Executive signs this Release.

(b)    Without limiting the generality of the foregoing, this Release is intended to and shall release the Company Entities from any and all claims, whether known or unknown, which Releasors ever had, now have, or may have against the Company Entities arising out of Executive's employment and/or Executive's separation from that employment, including, but not limited to, any claim under: (i) the Age Discrimination in Employment Act, as amended by the Older Workers Benefit Protection Act, (ii) Title VII of the Civil Rights Act of 1964 or under the Civil Rights Act of 1991, (iii) the Americans with Disabilities Act; (iv) the Employee Retirement Income Security Act of 1974 (excluding claims for accrued, vested benefits under any employee benefit or pension plan of the Company Entities subject to the terms and conditions of such plan and applicable law), (v) the Family and Medical Leave Act, (vi) 42 USC §§ 1981-86, (vii) the Equal Pay Act, (viii) the Sarbanes-Oxley Act of 2002, (ix) Section 922 of the Dodd-Frank Act, (x) the Federal False Claims Act, the New York State Human Rights Law; (xi) the New York City Administrative Code; (xii) the New York Labor Law; (xiii) the New York Minimum Wage Act; (xiv) the statutory provisions regarding retaliation/ discrimination under the New York Worker's Compensation Law; and (xv) the New York City Earned Sick Time Act, as all of those statutes may have been amended. Without limiting the generality of the foregoing, this Release is also intended to and shall release the Company Entities from any and all claims, whether known or unknown, which Releasors ever had, now have, or may have against the Company Entities, whether based on federal, state, or local law, statutory or decisional, arising out of Executive's employment, the termination of such employment, and/or any of the events relating

directly or indirectly to or surrounding the termination of that employment, including, but not limited to, any claims for wrongful or retaliatory discharge, breach of contract (express, implied or otherwise), breach of the covenant of good faith and fair dealing, detrimental reliance, interference with contractual relations or any prospective business advantage, defamation, slander or libel, invasion of privacy, intentional and negligent infliction of emotional distress, false imprisonment, compensatory or punitive damages, any claims for attorneys' fees, costs, disbursements and/or the like, any claims for wages, bonuses, or other benefits, and any claims for negligence or intentional tort, arising up to and including the date on which Executive signs this Release.

(c)    Nothing in this Release prevents Executive from providing truthful information to any governmental entity, nor does it interfere with Executive's right to file a charge with or participate in any investigation or proceeding conducted by the Department of Labor, the National Labor Relations Board, the Occupational Safety and Health Administration, the Equal Employment Opportunity Commission or a state or local fair employment practices agency. Nevertheless, Executive acknowledges and agrees that Executive hereby waives any right to seek or to share in any relief, monetary or otherwise, relating to any claim released herein whether such claim was initiated by Executive or not. In addition, nothing in this Release shall impair Executive's right under the whistleblower provisions of any applicable federal law or regulation or, for the avoidance of doubt, limit Executive's right to receive an award for the information provided to any government authority under such law or regulation.

(d)    Notwithstanding the foregoing, this Release shall not release the Company from: (i) any obligations under the CIC Continuity Agreement or Executive's right to enforce the terms of the CIC Continuity Agreement; (ii) any obligations regarding any rights of Executive as a current or former officer, director or employee of the Company or its affiliates to indemnification under the terms of the CIC Continuity Agreement, the Company's bylaws or charter or any insurance policy or other agreement under which Executive is entitled to indemnification or directors' and officers' liability coverage; (iii) any claims or causes of action that cannot legally be waived, including, but not limited to, any claim for earned but unpaid wages, workers' compensation benefits, unemployment benefits, and vested 401(k) benefits; (iv) any claims that may arise in the future from events or actions occurring after the date on which Executive signs this Release; and (v) any claims as the holder or beneficial owner of securities (or other rights relating to securities, including equity awards) of the Company or its affiliates. By signing this Release, Executive represents that Executive has not commenced or joined in any claim, charge, action or proceeding whatsoever against the Company or any of the Company Entities arising out of or relating to any of the matters set forth in this paragraph.

2.    <u>Acknowledgement</u>.    Executive acknowledges and agrees that the provisions in <u>Section 9</u> of the CIC Continuity Agreement shall remain in full force and effect in accordance with the terms of the CIC Continuity Agreement.

3.    <u>Not an Admission</u>.    This Release is not intended, and shall not be construed, as an admission that any of the Company Entities has violated any federal, state or local law (statutory or decisional), ordinance or regulation, breached any contract or committed any wrong whatsoever against Executive. nor is it intended, and shall not be construed as, an admission by Executive that Executive has violated any federal, state or local law (statutory or decisional), ordinance or regulation, breached any contract or committed any wrong whatsoever.

A-2

4.    Entire Agreement.  This Release constitutes the entire agreement between the parties with respect to the subject matter of this Release.  No amendment to this Release shall be binding upon either party unless in writing and signed by or on behalf of such party.

5.    Severability.    Should any provision of this Release be declared or determined by any court to be illegal, invalid or unenforceable, the validity of the remaining parts, terms or provisions shall not be affected, and each remaining part, term or provision shall be legal, valid and enforceable to the fullest extent permitted by law, and any illegal, invalid or unenforceable part, term or provision shall be deemed not to be a part of this Release.

6.    Jurisdiction/Choice of Law/Waiver of Jury Trial.  Executive agrees that the provisions of this Release shall be construed in accordance with the internal laws of the State of New York, without regard to the conflict of law provisions of any state.  Both parties hereby waive any right to a jury trial.

7.    Knowing and Voluntary Agreement.  Executive acknowledges that Executive:

(a)    has carefully read this Release in its entirety;

(b)    has had an opportunity to consider it for at least twenty-one (21) days to consider the actual terms of this Release;

(c)    is hereby advised by the Company in writing to consult with an attorney of Executive's choice in connection with this Release;

(d)    fully understands the significance of all of the terms and conditions of this Release and has discussed them with Executive's independent legal counsel, or has had a reasonable opportunity to do so;

(e)    has had answered to Executive's satisfaction by Executive's independent legal counsel any questions Executive has asked with regard to the meaning and significance of any of the provisions of this Agreement; and

(f)    is signing this Agreement voluntarily and of Executive's own free will and agrees to abide by all the terms and conditions contained herein.

8.    Effectiveness.  Executive understands that Executive will have at least twenty-one (21) days from the date of receipt of this Release to consider the terms and conditions of this Release. Executive may accept this Release by signing it and returning it to:

> Capri Holdings Limited
> 11 West 42nd Street
> New York, NY 1036
> Attention:  SVP, General Counsel

on or before 21 days after delivery. After executing this Release, Executive shall have seven (7) days (the "**Revocation Period**") to revoke this Release by indicating Executive's desire to do so in writing delivered to the Company's SVP, General Counsel at the address set forth above by no later than 5:00 p.m. on the seventh (7th) day after the date Executive signs this Release. The effective date of this Release shall be the

PX7098-188

eighth (8th) day after Executive signs the Release. If the last day of the Revocation Period falls on a Saturday, Sunday or holiday, the last day of the Revocation Period will be deemed to be the next business day. In the event Executive does not accept this Release as set forth above, or in the event Executive revokes this Release during the Revocation Period, this Release shall be deemed automatically null and void.

*PLEASE READ THIS RELEASE CAREFULLY. IT CONTAINS A GENERAL RELEASE OF ALL KNOWN AND UNKNOWN CLAIMS ARISING OUT OF EXECUTIVE'S EMPLOYMENT.*

Executive has read this Release and is fully aware of the legal effects of this Release. Executive has chosen to execute this Release freely, without reliance upon any promises or representations made by the Company other than those contained in this Release and understands that Executive will receive the payments and benefits provided under the CIC Continuity Agreement as set forth on Schedule I, less any applicable tax withholdings, in accordance with the terms of the CIC Continuity Agreement following the date on which this Release becomes irrevocable as described above.

Dated: _____

EXECUTIVE

_____

A-4

**SCHEDULE I
SEVERANCE BENEFITS**

| Payment or Benefit | Amount | Payment Timing |
|---|---|---|
| **Accrued Obligations (not subject to Release)** | $[●] (Annual Base Salary)<br><br>$[●] (Unpaid Annual Bonus)<br><br>$[●] (Accrued Vacation)<br><br>$[●] (Unreimbursed Expenses) | |
| **Pro Rata Bonus** | **$[●]** | |
| **Severance Payment** | **$[●]** | |
| **Welfare Benefits Payment** | **$[●]** | |
| **Outplacement** | Up to $25,000 | |
| **Other Benefits (not subject to Release)** | [To be specified as applicable] | |

**Exhibit 10.22**

**CAPRI HOLDINGS LIMITED**

**CHANGE IN CONTROL CONTINUITY AGREEMENT**

       **THIS CHANGE IN CONTROL CONTINUITY AGREEMENT** (this "**Agreement**") is made and entered into, as of May 30, 2023, by and between Capri Holdings Limited, a British Virgin Islands business company limited by shares (the "**Company**") and Jenna A. Hendricks ("**Executive**").

       **WHEREAS**, the Board of Directors of the Company (the "**Board**") has determined that it is in the best interests of the Company and its shareholders to assure that the Company will have the continued dedication of Executive, notwithstanding the possibility, threat or occurrence of a Change in Control (as defined below); and

       **WHEREAS**, the Board believes it is imperative to diminish the inevitable distraction of Executive by virtue of the personal uncertainties and risks created by a pending or threatened Change in Control and to encourage Executive's full attention and dedication to the Company currently and in the event of any threatened or pending Change in Control, and to provide Executive with compensation and benefits arrangements upon a Change in Control that ensure that the compensation and benefits expectations of Executive will be satisfied and that are competitive with those of other corporations.

       **NOW**, **THEREFORE**, in order to accomplish the foregoing objectives and in consideration of the mutual promises contained herein and other good and valuable consideration, the receipt and sufficiency of which are acknowledged, the parties agree as follows:

       1.    **Certain Definitions**.

       (a)    "**Affiliate**" shall mean an entity controlled by, controlling or under common control with another entity.

       (b)    "**Change in Control**" shall mean:

       (i)    An acquisition by any individual, entity or group (within the meaning of Section 13(d)(3) or 14(d)(2) of the Securities Exchange Act of 1934, as amended, or any successor thereto (the "**Exchange Act**")) (a "**Person**") of beneficial ownership (within the meaning of Rule 13d-3 promulgated under the Exchange Act) of 30% or more of either (1) the then outstanding shares of ordinary shares of the Company (the "**Outstanding Company Ordinary Shares**") or (2) the combined voting power of the then outstanding voting securities of the Company entitled to vote generally in the election of directors (the "**Outstanding Company Voting Securities**"); provided, however, that for purposes of this subsection (i), the following acquisitions shall not constitute a Change in Control:  (A) any acquisition directly from the Company; (B) any acquisition by the Company; (C) any acquisition by any employee benefit plan (or related trust) sponsored or maintained by the Company or any entity controlled by the Company; or (D) any acquisition by any entity pursuant to a transaction that complies with clauses (A), (B) and (C) of subsection (iii) of this Section 1(b);

       (ii)    A change in the composition of the Board such that the individuals who, as of the date of this Agreement, constitute the Board (the "**Incumbent Board**") cease for any reason to constitute at least a majority of the Board; provided, however, that, any individual who becomes a member of the Board subsequent to the date

of this Agreement whose election, or nomination for election by the Company's shareholders, was approved by a vote of at least a majority of those individuals who are members of the Board and who were also members of the Incumbent Board (or deemed to be such pursuant to this proviso) shall be considered as though such individual were a member of the Incumbent Board; provided, further, that any such individual whose initial assumption of office occurs as a result of either an actual or threatened election contest with respect to the election or removal of directors or other actual or threatened solicitation of proxies or consents by or on behalf of a Person other than the Board shall not be considered as a member of the Incumbent Board;

(iii)    The consummation of a reorganization, merger, statutory share exchange or consolidation or similar transaction involving the Company or any of its subsidiaries or sale or other disposition of all or substantially all of the assets of the Company, or the acquisition of assets or securities of another entity by the Company or any of its subsidiaries (a "**Business Combination**"), in each case, unless, following such Business Combination:  (A) all or substantially all of the individuals and entities who were the beneficial owners, respectively, of the Outstanding Company Ordinary Shares and Outstanding Company Voting Securities immediately prior to such Business Combination beneficially own, directly or indirectly, more than 50% of, respectively, the then outstanding shares of ordinary shares (or, for a noncorporate entity, equivalent securities) and the combined voting power of the then outstanding voting securities entitled to vote generally in the election of directors (or, for a noncorporate entity, equivalent securities), as the case may be, of the entity resulting from such Business Combination (including an entity that, as a result of such transaction, owns the Company or all or substantially all of the Company's assets either directly or through one or more subsidiaries) in substantially the same proportions as their ownership, immediately prior to such Business Combination of the Outstanding Company Ordinary Shares and Outstanding Company Voting Securities, as the case may be; (B) no Person (excluding any entity resulting from such Business Combination or any employee benefit plan (or related trust) of the Company or such entity resulting from such Business Combination) beneficially owns, directly or indirectly, 30% or more of, respectively, the then outstanding shares of ordinary shares (or, for a noncorporate entity, equivalent securities) of the entity resulting from such Business Combination or the combined voting power of the then outstanding voting securities of such entity except to the extent that such ownership existed prior to the Business Combination; and (C) at least a majority of the members of the board of directors (or, for a noncorporate entity, equivalent body or committee) of the entity resulting from such Business Combination were members of the Board at the time of the execution of the initial agreement, or of the action of the Board, providing for such Business Combination; or

(iv)    The approval by the shareholders of the Company of a complete liquidation or dissolution of the Company.

(c)    "**Change in Control Period**" shall mean the period commencing on the date hereof and ending on the second anniversary of the date hereof; provided, however, that commencing on the date one year after the date hereof, and on each annual anniversary of such date (such date and each annual anniversary thereof shall be hereinafter referred to as the "Renewal Date"), unless previously terminated, the Change in Control Period shall be automatically extended so as to terminate two years from such Renewal Date, unless at least 60 days prior to the Renewal Date the Company shall give notice to Executive that the Change in Control Period shall not be so extended.

(d)    "**Code**" shall mean the Internal Revenue Code of 1986, as amended.

2

(e)    "**CIC Effective Date**" shall mean the first date during the Change in Control Period on which a Change in Control occurs.

2.    **Employment Period**.  The Company hereby agrees to continue Executive in its employ, and Executive hereby agrees to remain in the employ of the Company subject to the terms and conditions of this Agreement, for the period commencing on the CIC Effective Date and ending on the second anniversary of such date (the "**Employment Period**").   The Employment Period shall terminate upon Executive's termination of employment for any reason.

3.    **Terms of Employment**.

(a)    **Position and Duties**.   (i)    During the Employment Period, (A) Executive's position (including status, offices, titles and reporting requirements), authority, duties and responsibilities shall be at least commensurate in all respects with the most significant of those held, exercised and assigned to Executive at any time during the 120-day period immediately preceding the CIC Effective Date and (B) Executive's services shall be performed at the location where Executive was employed immediately preceding the CIC Effective Date or any office or location less than 50 miles from such location.

(i)    During the Employment Period, and excluding any periods of vacation and sick leave to which Executive is entitled, Executive agrees to devote reasonable attention and time during normal business hours to the business and affairs of the Company and, to the extent necessary to discharge the responsibilities assigned to Executive hereunder, to use Executive's reasonable best efforts to perform faithfully and efficiently such responsibilities.  During the Employment Period it shall not be a violation of this Agreement for Executive to (A) serve on corporate, civic or charitable boards or committees, (B) deliver lectures, fulfill speaking engagements or teach at educational institutions and (C) manage personal investments, so long as such activities do not significantly interfere with the performance of Executive's responsibilities as an employee of the Company in accordance with this Agreement.  It is expressly understood and agreed that to the extent that any such activities have been conducted by Executive prior to the CIC Effective Date, the continued conduct of such activities (or the conduct of activities similar in nature and scope thereto) subsequent to the CIC Effective Date shall not thereafter be deemed to interfere with the performance of Executive's responsibilities to the Company.

(b)    **Compensation**.

(i)    **Base Salary**.  During the Employment Period, Executive shall receive an annual base salary ("**Annual Base Salary**"), that shall be paid at an annual rate, at least equal to 12 *multiplied by* the highest monthly base salary paid or payable, including any base salary that has been earned but deferred, to Executive by the Company and its Affiliates in respect of the 12-month period immediately preceding the month in which the CIC Effective Date occurs.  The Annual Base Salary shall be paid at such intervals as the Company pays executive salaries generally.   During the Employment Period, the Annual Base Salary shall be periodically reviewed for increase consistent with, and on a basis no less favorable than that applicable to, other peer executives of the Company and its Affiliates, but in no event shall such review and adjustment occur more than 12 months after the last salary increase awarded to Executive prior to the CIC Effective Date and thereafter at least annually.  Any increase in Annual Base Salary shall not serve to limit or reduce any other obligation to Executive under this Agreement.  Annual Base Salary shall not be reduced after any such increase and the

3

term Annual Base Salary as utilized in this Agreement shall refer to Annual Base Salary as so increased.

(ii)    **Annual Bonus**.    In addition to Annual Base Salary, Executive shall be eligible, for each fiscal year ending during the Employment Period, for an annual bonus (the "**Annual Bonus**") in cash with a target annual bonus opportunity at least equal to the target annual bonus opportunity for which Executive was eligible as of immediately prior to the CIC Effective Date (the amount equal to such target annual bonus opportunity referred to herein as the "**Target Annual Bonus**"), with the actual earned Annual Bonus, if any, to be determined on a basis no less favorable than that applicable to other peer executives of the Company and its Affiliates.  Each such Annual Bonus shall be paid no later than two and a half months after the end of the fiscal year for which the Annual Bonus is awarded, unless Executive shall elect to defer the receipt of such Annual Bonus pursuant to an arrangement that meets the requirements of Section 409A of the Code.

(iii)    **Long Term Incentive Awards**.    During the Employment Period, Executive shall be entitled to participate in all long-term equity- and cash-based incentive plans and programs applicable generally to other peer executives of the Company and its Affiliates.  For each fiscal year ending during the Employment Period, Executive shall be awarded annual long-term incentive awards (the "**Annual LTI Award**") in respect of the ordinary shares of the Company (or the ultimate parent entity of the Company) or cash incentive awards, in each case on the same basis as other peer executives of the Company, at least equal to the target Annual LTI Award opportunity to which Executive was eligible as of immediately prior to the CIC Effective Date or, if more favorable to Executive, the target Annual LTI Award opportunity provided generally at any time after the CIC Effective Date to other peer executives of the Company and its Affiliates (the "**Target LTI Award Opportunity**").  The terms and conditions of the awards granted in respect of such Annual LTI Awards shall be no less favorable, in the aggregate, than the most favorable of those provided by the Company and its Affiliates for the awards granted to Executive under such plans and programs as in effect at any time during the 120-day period immediately preceding the CIC Effective Date or, if more favorable to Executive, those provided generally at any time after the CIC Effective Date to other peer executives of the Company and its Affiliates.

(iv)    **Savings and Retirement Plans**.    During the Employment Period, Executive shall be entitled to participate in all savings and retirement plans, practices, policies and programs applicable generally to other peer executives of the Company and its Affiliates, but in no event shall such plans, practices, policies and programs provide Executive with savings opportunities and retirement benefit opportunities, in each case, less favorable, in the aggregate, than the most favorable of those provided by the Company and its Affiliates for Executive under such plans, practices, policies and programs as in effect at any time during the 120-day period immediately preceding the CIC Effective Date or, if more favorable to Executive, those provided generally at any time after the CIC Effective Date to other peer executives of the Company and its Affiliates.

(v)    **Welfare and Insurance Benefit Plans**.    During the Employment Period, Executive and/or Executive's dependents, as the case may be, shall be eligible for participation in and shall receive all benefits under welfare and insurance benefit plans, practices, policies and programs provided by the Company and its Affiliates (including medical, prescription, dental, disability, salary continuance, employee life, group life, accidental death and travel accident insurance plans and programs) ("**Company Welfare Benefit Plans**") to the extent applicable generally to

4

other peer executives of the Company and its Affiliates, but in no event shall such Company Welfare Benefit Plans provide Executive with benefits that are less favorable, in the aggregate, than the most favorable of such plans, practices, policies and programs in effect for Executive at any time during the 120-day period immediately preceding the CIC Effective Date or, if more favorable to Executive, those provided generally at any time after the CIC Effective Date.

(vi)    **Expenses**.  During the Employment Period, Executive shall be entitled to receive prompt reimbursement for all reasonable expenses incurred by Executive in accordance with the most favorable policies, practices and procedures of the Company and its Affiliates in effect for Executive at any time during the 120-day period immediately preceding the CIC Effective Date or, if more favorable to Executive, as in effect generally at any time thereafter with respect to other peer executives of the Company and its Affiliates.

(vii)    **Fringe Benefits**.    During the Employment Period, Executive shall be entitled to fringe benefits, including any clothing allowance and merchandise discount, as applicable to Executive and in accordance with the most favorable plans, practices, programs and policies of the Company and its Affiliates in effect for Executive at any time during the 120-day period immediately preceding the CIC Effective Date or, if more favorable to Executive, as in effect generally at any time thereafter with respect to other peer executives of the Company and its Affiliates.

(viii)    **Paid Time Off or Vacation**.  During the Employment Period, Executive shall be entitled to paid time off or paid vacation, in each case in accordance with the most favorable plans, policies, programs and practices of the Company and its Affiliates as in effect for Executive at any time during the 365-day period immediately preceding the CIC Effective Date or, if more favorable to Executive, as in effect generally at any time thereafter with respect to other peer executives of the Company and its Affiliates.

4.    **Termination of Employment**.

(a)    **Death or Disability**.  Executive's employment shall terminate automatically upon Executive's death during the Employment Period.  If the Company determines in good faith that the Disability of Executive has occurred during the Employment Period (pursuant to the definition of Disability set forth below), it may give to Executive written notice in accordance with Section 11(b) of its intention to terminate Executive's employment.  In such event, Executive's employment with the Company shall terminate effective on the 30th day after receipt of such notice by Executive (the "**Disability Date**"), provided, that within the 30 days after such receipt, Executive shall not have returned to full-time performance of Executive's duties.  For purposes of this Agreement, "**Disability**" shall mean the absence of Executive from Executive's duties with the Company on a full-time basis for 180 consecutive business days (or for 180 business days in any consecutive 365 days) as a result of incapacity due to mental or physical illness that is determined to be total and permanent by a physician selected by the Company or its insurers and acceptable to Executive or Executive's legal representative.

(b)    **Cause**.  The Company may terminate Executive's employment during the Employment Period with or without Cause.  For purposes of this Agreement, "**Cause**" shall mean:

5

(i)    Executive's gross negligence, willful misconduct or dishonesty in performing her duties to the Company;

(ii)    Executive's conviction of a felony (other than a felony involving a traffic violation);

(iii)    Executive's commission of a felony involving a fraud or other business crime against the Company or any of its subsidiaries; or

(iv)    Executive's material breach of any of the covenants set forth in Section 9 hereof; provided that, if any such breach is curable, Executive shall have an opportunity to correct such breach within 30 days after written notice by the Company to Executive thereof.

For purposes of this provision, no act or failure to act, on the part of Executive, shall be considered "willful" unless it is done, or omitted to be done, by Executive in bad faith or without reasonable belief that Executive's action or omission was in the best interests of the Company and its Affiliates.  Any act, or failure to act, based upon authority given pursuant to a resolution duly adopted by the Board, or if the Company is not the ultimate parent entity of the Company and is not publicly traded, the board of directors (or, for a non-corporate entity, equivalent governing body) of the ultimate parent of the Company (the "**Applicable Board**") or upon the instructions of the Chief Executive Officer of the Company or a senior officer of the Company and its Affiliates or based upon the advice of counsel for the Company and its Affiliates shall be conclusively presumed to be done, or omitted to be done, by Executive in good faith and in the best interests of the Company and its Affiliates.  The cessation of employment of Executive shall not be deemed to be for Cause unless and until there shall have been delivered to Executive a copy of a resolution duly adopted by the affirmative vote of not less than a majority of the entire membership of the Applicable Board at a meeting of the Applicable Board called and held for such purpose after reasonable notice is provided to Executive and Executive is given an opportunity, together with counsel for Executive, to be heard before the Applicable Board, finding that, in the good faith opinion of the Applicable Board, Executive is guilty of conduct that constitutes Cause.

(c)    **Good Reason**.  Executive's employment may be terminated during the Employment Period by Executive for Good Reason or by Executive voluntarily without Good Reason.  "**Good Reason**" means actions taken by the Company resulting in a material negative change in the employment relationship.  For these purposes, a "material negative change in the employment relationship" shall include:

(i)    the assignment to Executive of duties or responsibilities that are inconsistent in any material respect with Executive's position (including status, offices, titles and reporting requirements), authority, duties or responsibilities as contemplated by Section 3(a), or a material diminution in Executive's position (including status, offices, titles and reporting requirements), authority, duties or responsibilities as contemplated by Section 3(a) or a material diminution in the budget over which Executive retains authority;

(ii)    a material diminution in the authorities, duties or responsibilities of the person to whom Executive is required to report, including a requirement that Executive report to an officer other than the Chief Executive Officer of the Company (or, if the Company is not the ultimate parent entity of the Company and is not publicly traded, the Chief Executive Officer of the ultimate parent of the Company);

6

(iii)    the failure to provide, in all material respects, any element of the compensation and benefits required to be provided to Executive in accordance with any of the provisions of Section 3(b), including any decrease in Executive's Annual Base Salary;

(iv)    the Company's requiring Executive to be based at any office or location other than as provided in Section 3(a)(i)(B) resulting in a material increase in Executive's commute to and from Executive's primary residence (for this purpose an increase in Executive's commute by 50 miles or more shall be deemed material); or

(v)    any other action or inaction that constitutes a material breach by the Company of this Agreement, including any failure by the Company to comply with and satisfy Section 10(c).

In order to invoke a termination for Good Reason, Executive shall provide written notice to the Company of the existence of one or more of the conditions described in clauses (i) through (v) within 90 days following Executive's knowledge of the initial existence of such condition or conditions, specifying in reasonable detail the conditions constituting Good Reason, and the Company shall have 30 days following receipt of such written notice (the "**Cure Period**") during which it may remedy the condition.  In the event that the Company fails to remedy the condition constituting Good Reason during the applicable Cure Period, Executive's "separation from service" (within the meaning of Section 409A of the Code) must occur, if at all, within two years following the initial existence of such condition or conditions in order for such termination as a result of such condition to constitute a termination for Good Reason.

(d)    **Incapacity or Death**.  Executive's mental or physical incapacity following the occurrence of an event described above in clauses (i) through (v) of Section 4(c) shall not affect Executive's ability to terminate employment for Good Reason, and Executive's death following delivery of a Notice of Termination for Good Reason shall not affect the entitlement of the estate of Executive to severance payments or benefits provided hereunder upon a termination of employment for Good Reason.

(e)    **Notice of Termination**.  Any termination of employment by the Company for Cause, or by Executive for Good Reason, shall be communicated by Notice of Termination to the other party hereto given in accordance with Section 11(b).  For purposes of this Agreement, a "**Notice of Termination**" means a written notice that (i) indicates the specific termination provision in this Agreement relied upon, (ii) to the extent applicable, sets forth in reasonable detail the facts and circumstances claimed to provide a basis for termination of Executive's employment under the provision so indicated and (iii) if the Date of Termination (as defined below) is other than the date of receipt of such notice, specifies the Date of Termination (which date shall be not more than 30 days after the giving of such notice) (subject to the Company's right to cure in the case of a resignation for Good Reason).  The failure by Executive or the Company to set forth in the Notice of Termination any fact or circumstance that contributes to a showing of Good Reason or Cause shall not waive any right of Executive or the Company, respectively, hereunder or preclude Executive or the Company, respectively, from asserting such fact or circumstance in enforcing Executive's or the Company's rights hereunder.

(f)    **Date of Termination**.  "**Date of Termination**" means (i) if Executive's employment is terminated by the Company for Cause, or by Executive for Good Reason, the date of receipt of the Notice of Termination or any later date specified

7

therein, as the case may be, (ii) if Executive's employment is terminated by the Company other than for Cause or Disability, the date on which the Company notifies Executive of such termination, (iii) if Executive resigns without Good Reason, the date on which Executive notifies the Company of such termination and (iv) if Executive's employment is terminated by reason of death or Disability, the date of death of Executive or the Disability Date, as the case may be.

    5.    **Obligations of the Company Upon Termination**.

    (a)    **By the Company Other Than for Cause, Death or Disability; By Executive for Good Reason**.  If, during the Employment Period, the Company shall terminate Executive's employment other than for Cause, Death or Disability or Executive shall terminate employment for Good Reason:

    (i)    subject to Section 11(k), the Company shall pay to Executive in a lump sum in cash as soon as reasonably practicable (and no later than 30 days) after the Date of Termination equal to the aggregate of the following amounts:

    (A)    the sum of (I) Executive's Annual Base Salary through the Date of Termination to the extent not theretofore paid; (II) Executive's business expenses that are reimbursable pursuant to Section 3(b)(v) but have not been reimbursed by the Company as of the Date of Termination; (III) Executive's Annual Bonus for the fiscal year immediately preceding the fiscal year in which the Date of Termination occurs, if such bonus has been determined but not paid as of the Date of Termination; (IV) any accrued vacation pay or other paid time off to the extent required by any policy in effect prior to the CIC Effective Date or, if more favorable to Executive, at any time thereafter, or otherwise payable under applicable law, and not theretofore paid (the sum of the amounts described in subclauses (I), (II), (III) and (IV), the "**Accrued Obligations**"); provided, that notwithstanding the foregoing, if Executive has made an irrevocable election under any deferred compensation arrangement subject to Section 409A of the Code to defer any portion of the Annual Base Salary or the Annual Bonus described in clause (I) or (III), then for all purposes of this Section 5 (including Sections 5(b) through 5(d)), such deferral election, and the terms of the applicable arrangement shall apply to the same portion of the amount described in such clause (I) or (III), and such portion shall not be considered as part of the "Accrued Obligations" but shall instead be an "Other Benefit" (as defined below);

    (B)    an amount equal to the product of (I) the Target Annual Bonus and (II) a fraction, the numerator of which is the number of days in the current fiscal year through the Date of Termination, and the denominator of which is 365 (the "**Pro Rata Bonus**"); and

    (C)    the amount equal to the product of (I) two (2) and (II) the sum of (x) Executive's Annual Base Salary and (y) the Target Annual Bonus;

    (i)    the Company shall pay to Executive an amount equal to the product of (A) the monthly premiums for coverage under the Company's or and its Affiliates' health care plans for purposes of continuation coverage under Section 4980B of the Code with respect to the maximum level of coverage in effect for Executive and

her spouse and dependents as of immediately prior to the Date of Termination, and (B) 24;

       (ii)     the Company shall, at its sole expense as incurred, provide Executive with outplacement services the scope and provider of which shall be selected by Executive in Executive's sole discretion, but the cost thereof shall not exceed $25,000; <u>provided</u>, that such outplacement benefits shall end not later than the last day of the second calendar year that begins after the Date of Termination; and

       (iii)     except as otherwise set forth in the last sentence of Section 6, to the extent not theretofore paid or provided, the Company shall timely pay or provide to Executive any other amounts or benefits required to be paid or provided or that Executive is eligible to receive under any plan, program, policy or practice or contract or agreement of the Company and its Affiliates, including the vesting, settlement or exercisability of any equity or equity-based awards granted to Executive in accordance with the terms of the plan and award agreements applicable upon a termination of employment by the Company other than for Cause or for Good Reason (for the avoidance of doubt, as such terms are defined herein), including the vesting of awards pursuant to Section 11.2 of the Third Amended and Restated Capri Holdings Limited Omnibus Incentive Plan or the similar provisions of any predecessor or successor plans) and any rights under the Company's Deferred Compensation Plan (such other amounts and benefits shall be hereinafter referred to as the "**Other Benefits**") in accordance with the terms of the underlying plans or agreements.

The Company's obligations to pay or provide the payments and benefits set forth in Sections 5(a)(i)(B), 5(a)(i)(C), 5(a)(ii) and 5(a)(iii) of this Agreement shall be subject to Executive's execution, delivery to the Company and non-revocation of a release of claims substantially in the form attached hereto as Exhibit A.

       (b)     **Death**.  If Executive's employment is terminated by reason of Executive's death during the Employment Period, the Company shall provide Executive's estate or beneficiaries with the Accrued Obligations and the Pro Rata Bonus and the timely payment or delivery of the Other Benefits, and shall have no other severance obligations under this Agreement.  The Accrued Obligations (subject to the proviso set forth in Section 5(a)(i)(A) to the extent applicable) and the Pro Rata Bonus shall be paid to Executive's estate or beneficiary, as applicable, in a lump sum in cash as soon as reasonably practicable (and no later than 30 days) after the Date of Termination. With respect to the provision of the Other Benefits, the term "Other Benefits" as utilized in this Section 5(b) shall include, and Executive's estate and/or beneficiaries shall be entitled to receive, benefits at least equal to the most favorable benefits provided by the Company and its Affiliates to the estates and beneficiaries of other peer executives of the Company and such Affiliates under such plans, programs, practices and policies relating to death benefits, if any, as in effect with respect to other peer executives and their beneficiaries at any time during the 120-day period immediately preceding the CIC Effective Date or, if more favorable to Executive's estate and/or Executive's beneficiaries, as in effect on the date of Executive's death with respect to other peer executives of the Company and its Affiliates and their beneficiaries.

       (c)     **Disability**.  If Executive's employment is terminated by reason of Executive's Disability during the Employment Period, the Company shall provide Executive with the Accrued Obligations and the Pro Rata Bonus and the timely payment or delivery of the Other Benefits in accordance with the terms of the underlying plans or agreements, and shall have no other severance obligations under this Agreement.  The Accrued Obligations (subject to the proviso set forth in Section 5(a)(i)(A) to the extent

9

applicable) and the Pro Rata Bonus shall be paid to Executive in a lump sum in cash as soon as reasonably practicable (and no later than 30 days) after the Date of Termination. With respect to the provision of the Other Benefits, the term "Other Benefits" as utilized in this Section 5(c) shall include, and Executive shall be entitled after the Disability Date to receive, without limitation, disability and other benefits (either pursuant to a plan, program, practice or policy or an individual arrangement) at least equal to the most favorable of those generally provided by the Company and its Affiliates to disabled executives and/or their dependents in accordance with such plans, programs, practices and policies relating to disability, if any, as in effect generally with respect to other peer executives and their dependents at any time during the 120-day period immediately preceding the CIC Effective Date or, if more favorable to Executive and/or Executive's dependents, as in effect at any time thereafter generally with respect to other peer executives of the Company and its Affiliates and their dependents.

(d)    **Cause; Other Than for Good Reason**.    If Executive's employment is terminated for Cause during the Employment Period, the Company shall provide Executive with Executive's Annual Base Salary (subject to the proviso set forth in Section 5(a)(i)(A) to the extent applicable) through the Date of Termination, and the timely payment or delivery of the Other Benefits, and shall have no other severance obligations under this Agreement.    If Executive voluntarily terminates employment during the Employment Period, excluding a termination for Good Reason, the Company shall provide Executive with the Accrued Obligations and the timely payment or delivery of the Other Benefits and shall have no other severance obligations under this Agreement. In such case, all the Accrued Obligations (subject to the proviso set forth in Section 5(a)(i)(A) to the extent applicable) shall be paid to Executive in a lump sum in cash as soon as reasonably practicable (and no later than 30 days) after the Date of Termination.

6.    **Non-Exclusivity of Rights**.    Nothing in this Agreement shall prevent or limit Executive's continuing or future participation in any plan, program, policy or practice provided by the Company or any of its Affiliates and for which Executive may qualify, nor, subject to Section 11(h), shall anything herein limit or otherwise affect such rights as Executive may have under any other contract or agreement with the Company or its Affiliates.    Amounts that are vested benefits or that Executive is otherwise entitled to receive under any plan, policy, practice or program of or any contract or agreement with the Company or any of its Affiliates at or subsequent to the Date of Termination shall be payable in accordance with such plan, policy, practice or program or contract or agreement except as explicitly modified by this Agreement. Without limiting the generality of the foregoing, Executive's resignation under this Agreement with or without Good Reason shall in no way affect Executive's ability to terminate employment by reason of Executive's "retirement" under any compensation and benefits plans, programs or arrangements of the Company or its Affiliates, including any retirement or pension plans or arrangements or to be eligible to receive benefits under any compensation or benefit plans, programs or arrangements of the Company or any of its Affiliates, including any retirement or pension plan or arrangement of the Company or any of its Affiliates or substitute plans adopted by the Company or its successors, and any termination that otherwise qualifies as Good Reason shall be treated as such even if it is also a "retirement" for purposes of any such plan.    Notwithstanding the foregoing, if Executive receives payments and benefits pursuant to Section 5(a) of this Agreement, Executive shall not be entitled to any severance pay or benefits under any severance plan, program or policy of the Company and its Affiliates, unless otherwise specifically provided therein in a specific reference to this Agreement.

7.    **No Mitigation or Offset; Legal Fees**.

PX7098-200

(a)    **No Mitigation or Offset**.  The Company's obligation to make the payments provided for in this Agreement and otherwise to perform its obligations hereunder shall not be affected by any set-off, counterclaim, recoupment, defense or other claim, right or action that the Company may have against Executive or others.  In no event shall Executive be obligated to seek other employment or take any other action by way of mitigation of the amounts payable to Executive under any of the provisions of this Agreement and such amounts shall not be reduced whether or not Executive obtains other employment.

(b)    **Legal Fees**.  The Company agrees to pay as incurred (within 10 days following the Company's receipt of an invoice from Executive), at any time from the CIC Effective Date through Executive's remaining lifetime (or, if longer, through the 20th anniversary of the CIC Effective Date) to the full extent permitted by law, all legal fees and expenses that Executive may reasonably incur as a result of any contest (regardless of the outcome thereof) by the Company, Executive or others of the validity or enforceability of, or liability under, any provision of this Agreement or any guarantee of performance thereof whether such contest is between the Company and Executive or between either of them and any third party (including as a result of any contest by Executive about the amount of any payment pursuant to this Agreement), plus in each case interest on any delayed payment at the applicable federal rate provided for in Section 7872(f)(2)(A) of the Code ("**Interest**") determined as of the date such legal fees and expenses were incurred.

8.    **Treatment of Certain Payments**.

(a)    Anything in the Agreement to the contrary notwithstanding, in the event the Accounting Firm (as defined below) shall determine that receipt of all Payments (as defined below) would subject Executive to the excise tax under Section 4999 of the Code, the Accounting Firm shall determine whether to reduce any of the Payments paid or payable pursuant to the Agreement (the "**Agreement Payments**") so that the Parachute Value (as defined below) of all Payments, in the aggregate, equals the Safe Harbor Amount (as defined below).  The Agreement Payments shall be so reduced only if the Accounting Firm determines that Executive would have a greater Net After-Tax Receipt (as defined below) of aggregate Payments if the Agreement Payments were so reduced.  If the Accounting Firm determines that Executive would not have a greater Net After-Tax Receipt of aggregate Payments if the Agreement Payments were so reduced, Executive shall receive all Agreement Payments to which Executive is entitled hereunder.

(b)    If the Accounting Firm determines that aggregate Agreement Payments should be reduced so that the Parachute Value of all Payments, in the aggregate, equals the Safe Harbor Amount, the Company shall promptly give Executive notice to that effect and a copy of the detailed calculation thereof.  All determinations made by the Accounting Firm under this Section 8 shall be binding upon the Company and Executive and shall be made as soon as reasonably practicable and in no event later than 15 days following the Date of Termination.  For purposes of reducing the Agreement Payments so that the Parachute Value of all Payments, in the aggregate, equals the Safe Harbor Amount, only amounts payable under the Agreement (and no other Payments) shall be reduced.  The reduction of the amounts payable hereunder, if applicable, shall be made by reducing the payments and benefits under the following sections in the following order:  (i) cash payments that may not be valued under Treas. Reg. § 1.280G-1, Q&A-24(c) ("**24(c)**"), (ii) equity-based payments that may not be valued under 24(c), (iii) cash payments that may be valued under 24(c), (iv) equity-based payments that may be valued under 24(c) and (v) other types of benefits.  With respect to each category of the foregoing, such reduction shall occur first with respect to amounts that are not

11

"deferred compensation" within the meaning of Section 409A of the Code and next with respect to payments that are deferred compensation, in each case, beginning with payments or benefits that are to be paid the farthest in time from the Accounting Firm's determination. All fees and expenses of the Accounting Firm shall be borne solely by the Company.

(c)     To the extent requested by Executive, the Company shall cooperate with Executive in good faith in valuing, and the Accounting Firm shall take into account the value of, services provided or to be provided by Executive (including Executive's agreeing to refrain from performing services pursuant to a covenant not to compete or similar covenant, before, on or after the date of a change in ownership or control of the Company (within the meaning of Q&A-2(b) of the final regulations under Section 280G of the Code), such that payments in respect of such services may be considered reasonable compensation within the meaning of Q&A-9 and Q&A-40 to Q&A-44 of the final regulations under Section 280G of the Code and/or exempt from the definition of the term "parachute payment" within the meaning of Q&A-2(a) of the final regulations under Section 280G of the Code in accordance with Q&A-5(a) of the final regulations under Section 280G of the Code.

(d)     The following terms shall have the following meanings for purposes of this Section 8:

(i)     "**Accounting Firm**" shall mean a nationally recognized certified public accounting firm or other professional organization that is a certified public accounting firm recognized as an expert in determinations and calculations for purposes of Section 280G of the Code that is selected by the Company prior to a Change in Control for purposes of making the applicable determinations hereunder and is reasonably acceptable to Executive, which firm shall not, without Executive's consent, be a firm serving as accountant or auditor for the individual, entity or group effecting the Change in Control.

(ii)     "**Net After-Tax Receipt**" shall mean the present value (as determined in accordance with Sections 280G(b)(2)(A)(ii) and 280G(d)(4) of the Code) of a Payment net of all taxes imposed on Executive with respect thereto under Sections 1 and 4999 of the Code and under applicable state and local laws, determined by applying the highest marginal rate under Section 1 of the Code and under state and local laws which applied to Executive's taxable income for the immediately preceding taxable year, or such other rate(s) as the Accounting Firm determines to be likely to apply to Executive in the relevant tax year(s).

(iii)     "**Parachute Value**" of a Payment shall mean the present value as of the date of the change of control for purposes of Section 280G of the Code of the portion of such Payment that constitutes a "parachute payment" under Section 280G(b)(2) of the Code, as determined by the Accounting Firm for purposes of determining whether and to what extent the excise tax under Section 4999 of the Code will apply to such Payment.

(iv)     "**Payment**" shall mean any payment or distribution in the nature of compensation (within the meaning of Section 280G(b)(2) of the Code) to or for the benefit of Executive, whether paid or payable pursuant to the Agreement or otherwise.

(v)     "**Safe Harbor Amount**" shall mean 2.99 *multiplied by* Executive's "base amount," within the meaning of Section 280G(b)(3) of the Code.

12

(e)     The provisions of this Section 8 shall survive the expiration of the Agreement.

9.     **Restrictive Covenants.**

(a)     **Confidential Information**.  Executive shall not disclose to any unauthorized person or entity or use for Executive's own purposes any Confidential Information without the prior written consent of the Company, unless and to the extent that the Confidential Information becomes generally known to and available for use by the public other than as a result of Executive's acts or omissions in violation of this Agreement; <u>provided</u>, <u>however</u>, that if Executive receives a request to disclose Confidential Information pursuant to a deposition, interrogation, request for information or documents in legal proceedings, subpoena, civil investigative demand, governmental or regulatory process or similar process, (i) Executive shall promptly notify in writing the Company, and consult with and assist the Company in seeking a protective order or request for other appropriate remedy, (ii) in the event that such protective order or remedy is not obtained, or if the Company waives compliance with the terms hereof, Executive shall disclose only that portion of the Confidential Information which, based on the written advice of Executive's legal counsel, is legally required to be disclosed and shall exercise reasonable best efforts to provide that the receiving person or entity shall agree to treat such Confidential Information as confidential to the extent possible (and permitted under applicable law) in respect of the applicable proceeding or process and (iii) the Company shall be given an opportunity to review the Confidential Information prior to disclosure thereof. For purposes of this Agreement, "**Confidential Information**" means information, observations and data concerning the business or affairs of the Company and its Affiliates, including, without limitation, all business information (whether or not in written form) which relates to the Company or its Affiliates, or their customers, suppliers or contractors or any other third parties in respect of which the Company or its Affiliates has a business relationship or owes a duty of confidentiality, or their respective businesses or products, and which is not known to the public generally other than as a result of Executive's breach of this Agreement, including but not limited to: technical information or reports; formulas; trade secrets; unwritten knowledge and "know-how"; operating instructions; training manuals; customer lists; customer buying records and habits; product sales records and documents, and product development, marketing and sales strategies; market surveys; marketing plans; profitability analyses; product cost; long-range plans; information relating to pricing, competitive strategies and new product development; information relating to any forms of compensation or other personnel-related information; contracts; and supplier lists. Confidential Information will not include such information known to Executive prior to Executive's involvement with the Company or its Affiliates or information rightfully obtained from a third party (other than pursuant to a breach by Executive of this Agreement).  Nothing in this Agreement shall impair Executive's right under the whistleblower provisions of any applicable federal law or regulation or, for the avoidance of doubt, limit Executive's right to receive an award for the information provided to any government authority under such law or regulation.

(b)     **No Hiring**.  During the Employment Period and during the two-year period following termination of employment or service, Executive shall not knowingly perform any action, activity or course of conduct which is substantially detrimental to the businesses or business reputations of the Company or any of its Affiliates, including (i) soliciting, recruiting or hiring (or attempting to solicit, recruit or hire) any employees of the Company or any of its Affiliates or any persons who have worked for the Company or of its Affiliates during the 12-month period immediately preceding such solicitation, recruitment or hiring or attempt thereof; (ii) intentionally

13

interfering with the relationship of the Company or any of its Affiliates with any person or entity who or which is employed by or otherwise engaged to perform services for, or any customer, client, supplier, licensee, licensor or other business relation of, the Company or any of its Affiliates; or (iii) assisting any person or entity in any way to do, or attempt to do, anything prohibited by the immediately preceding clauses (i) or (ii).

(c)    **Non-Disparagement**.    During the Employment Period and thereafter, Executive agrees not to disparage the Company or any of its Affiliates or any of their respective directors, officers, employees, agents, representatives or licensees and not to publish or make any statement that is reasonably foreseeable to become public with respect to any of such entities or persons.  The Company likewise agrees not to disparage Executive or publish or make any statement that is reasonably foreseeable to become public with respect to Executive without Executive's prior written consent, excluding statements required to be made about Executive in any Company filing under U.S. securities laws or stock exchange rules and regulations.

(d)    **Remedies;  Modification;  Interpretation**.    Executive acknowledges that the injury that would be suffered by the Company as a result of a breach in any material respect of the provisions of Section 9 of this Agreement would be irreparable and that an award of monetary damages to the Company for such a breach would be an inadequate remedy.  Consequently, the Company will have the right, in addition to any other rights it may have, to obtain injunctive relief to restrain any breach or threatened breach or otherwise to specifically enforce any provision of this Agreement, and the Company will not be obligated to post bond or other security in seeking such relief.  In no event shall an asserted violation of the provisions of this Section 9 constitute a basis for deferring or withholding any amounts otherwise payable to Executive under this Agreement, but the Company otherwise shall be entitled to all other remedies that may be available to it at law or in equity.  Executive acknowledges that the foregoing provisions of this Section 9 are reasonable and necessary for the protection of the Company and its Affiliates, and that they will be materially and irrevocably damaged if these provisions are not specifically enforced.  Accordingly, Executive agrees that, in addition to any other relief or remedies available to the Company and its Affiliates, they shall be entitled to seek an appropriate injunctive or other equitable remedy for the purposes of restraining Executive from any actual or threatened breach of or otherwise enforcing these provisions and no bond or security will be required in connection therewith.  If any provision of this Section 9 is deemed invalid or unenforceable, such provision shall be deemed modified and limited to the extent necessary to make it valid and enforceable.  For purposes of this Section 9, references to the "Company" and "Affiliates" shall refer to the Company and the Company's Affiliates as of the date immediately prior to the CIC Effective Date.

10.    **Successors**.

(a)    This Agreement is personal to Executive and without the prior written consent of the Company shall not be assignable by Executive other than by will or the laws of descent and distribution.  This Agreement shall inure to the benefit of and be enforceable by Executive's legal representatives.

(b)    This Agreement shall inure to the benefit of and be binding upon the Company and its successors and assigns.  Except as provided in Section 10(c), without the prior written consent of Executive, this Agreement shall not be assignable by the Company.

PX7098-204

(c)      The Company will require any successor (whether direct or indirect, by purchase, merger, consolidation or otherwise) to all or substantially all of the business and/or assets of the Company to assume expressly and agree to perform this Agreement in the same manner and to the same extent that the Company would be required to perform it if no such succession had taken place.  As used in this Agreement, "Company" shall mean the Company as hereinbefore defined and any successor to its business and/or assets as aforesaid which assumes and agrees to perform this Agreement by operation of law, or otherwise.

11.     **Miscellaneous**.

(a)      **Governing Law and Dispute Resolution**.  This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without reference to principles of conflict of laws.  The parties irrevocably submit to the jurisdiction of any state or federal court sitting in or for the State of New York with respect to any dispute arising out of or relating to this Agreement, and each party irrevocably agrees that all claims in respect of such dispute or proceeding shall be heard and determined in such courts.  The parties hereby irrevocably waive, to the fullest extent permitted by law, any objection that they may now or hereafter have to the venue of any dispute arising out of or relating to this Agreement or the transactions contemplated hereby brought in such court or any defense of inconvenient forum for the maintenance of such dispute or proceeding.  Each party agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  THE PARTIES HEREBY WAIVE A TRIAL BY JURY IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT OR ASSERTED BY EITHER OF THE PARTIES HERETO AGAINST THE OTHER ON ANY MATTERS WHATSOEVER ARISING OUT OF OR IN ANY WAY RELATED TO THIS AGREEMENT.

(b)      **Notices**.  All notices and other communications hereunder shall be in writing and shall be given by hand delivery to the other party or by registered or certified mail, return receipt requested, postage prepaid, addressed as follows:

If to Executive:  To the most recent address on file with the Company.

If to the Company:

Capri Holdings Limited
11 West 42nd Street
New York, NY 1036
Attention:  SVP, General Counsel

or to such other address as either party shall have furnished to the other in writing in accordance herewith.  Notice and communications shall be effective when actually received by the addressee.

(c)      **Invalidity**.  If any term or provision of this Agreement or the application thereof to any person or circumstance shall to any extent be invalid or unenforceable, the remainder of this Agreement or the application of such term or provision to persons or circumstances other than those to which it is invalid or unenforceable shall not be affected thereby, and each term and provision of this Agreement shall be valid and be enforced to the fullest extent permitted by law.

15

(d)    **Survivorship**.  Upon the expiration or other termination of this Agreement or Executive's employment, the respective rights and obligations of the parties hereto shall survive to the extent necessary to carry out the intentions of the parties under this Agreement.

(e)    **Section Headings; Construction**.  The section headings used in this Agreement are included solely for convenience and shall not affect, or be used in connection with, the interpretation hereof.  For purposes of this Agreement, the term "including" shall mean "including, without limitation."

(f)    **Counterparts**.  This Agreement may be executed in several counterparts, each of which shall be deemed to be an original but all of which together shall constitute one and the same instrument.

(g)    **Amendments; Waiver**.  No provision of this Agreement shall be modified or amended except by an instrument in writing duly executed by the parties hereto.  Executive's or the Company's failure to insist upon strict compliance with any provision hereof or any other provision of this Agreement or the failure to assert any right Executive or the Company may have hereunder, including the right of Executive to terminate employment for Good Reason pursuant to Section 4(c)(i)-(v), shall not be deemed to be a waiver of such provision or right or any other provision or right of this Agreement.

(h)    **At-Will Employment**.  Executive and the Company acknowledge that, except as may otherwise be provided under any other written agreement between Executive and the Company, the employment of Executive by the Company is "at will" and, subject to Section 1(e) of this Agreement, prior to the CIC Effective Date, Executive's employment may be terminated by either Executive or the Company at any time prior to the CIC Effective Date, in which case Executive shall have no further rights under this Agreement.  From and after the CIC Effective Date, except as specifically provided herein, this Agreement shall supersede any other employment agreement between the parties.  For the avoidance of doubt, prior to the CIC Effective Date, any other employment agreement between the parties shall continue to govern the relationship between the parties.

(i)    **Entire Agreement**.  This Agreement constitutes the entire agreement of the parties hereto in respect of the terms and conditions of Executive's employment with the Company and its Affiliates, including Executive's severance entitlements, and, as of the CIC Effective Date, supersedes and cancels in their entirety all prior understandings, agreements and commitments, whether written or oral, relating to the terms and conditions of employment between Executive, on the one hand, and the Company or its Affiliates, on the other hand, including the Amended and Restated Employment Agreement between Executive and the Company dated as of the date hereof.  For the avoidance of doubt, this Agreement does not limit the terms of any benefit plans (including equity award agreements) of the Company or its Affiliates that are applicable to Executive, except to the extent that the terms of this Agreement are more favorable to Executive.  From and after the CIC Effective Date, the obligations of Executive under Section 9 shall be the exclusive restrictive covenants to which Executive is bound and any other restrictive covenants set forth in any agreement between Executive and the Company or its Affiliates, including any equity award agreement shall be void and of no force and effect.

PX7098-206

(j)    **Tax Withholding**.    The Company may withhold from any amounts payable under this Agreement such Federal, state, local or foreign taxes as shall be required to be withheld pursuant to any applicable law or regulation.

(k)    **Section 409A**.

(i)    **General**.  It is intended that payments and benefits made or provided under this Agreement shall not result in penalty taxes or accelerated taxation pursuant to Section 409A of the Code.  Any payments that qualify for the "short-term deferral" exception, the separation pay exception or another exception under Section 409A of the Code shall be paid under the applicable exception.  For purposes of the limitations on nonqualified deferred compensation under Section 409A of the Code, each payment of compensation under this Agreement shall be treated as a separate payment of compensation.  All payments to be made upon a termination of employment under this Agreement may only be made upon a "separation from service" under Section 409A of the Code to the extent necessary in order to avoid the imposition of penalty taxes on Executive pursuant to Section 409A of the Code.  In no event may Executive, directly or indirectly, designate the calendar year of any payment under this Agreement, and to the extent required by Section 409A of the Code, any payment that may be paid in more than one taxable year shall be paid in the later taxable year.  Notwithstanding any other provision of this Agreement to the contrary, solely for the purpose of determining the timing of payment or distribution of any compensation or benefit that constitutes "nonqualified deferred compensation" within the meaning of Section 409A of the Code (and not the right to vest in or be entitled to receive any such payment or benefit) that may only be made or changed (including a change in the form of payment) upon an event described in Section 409A(a)(2)(A)(v) of the Code and the regulations thereunder, such payment shall only be made or timing or form changed if the Change in Control also constitutes an event described in Section 409A(a)(2)(A)(v) of the Code.

(ii)    **Reimbursements and In-Kind Benefits**.  Notwithstanding anything to the contrary in this Agreement, all reimbursements and in-kind benefits provided under this Agreement that are subject to Section 409A of the Code shall be made in accordance with the requirements of Section 409A of the Code, including, where applicable, the requirement that (A) any reimbursement is for expenses incurred during Executive's lifetime (or during a shorter period of time specified in this Agreement); (B) the amount of expenses eligible for reimbursement, or in-kind benefits provided, during a calendar year may not affect the expenses eligible for reimbursement, or in-kind benefits to be provided, in any other calendar year; (C) the reimbursement of an eligible expense will be made no later than the last day of the calendar year following the year in which the expense is incurred; and (D) the right to reimbursement or in-kind benefits is not subject to liquidation or exchange for another benefit.

(iii)    **Delay of Payments**.  Notwithstanding any other provision of this Agreement to the contrary, if Executive is considered a "specified employee" for purposes of Section 409A of the Code (as determined in accordance with the methodology established by the Company and its Affiliates as in effect on the Date of Termination), any payment that constitutes nonqualified deferred compensation within the meaning of Section 409A of the Code that is otherwise due to Executive under this Agreement during the six-month period immediately following Executive's separation from service on account of Executive's separation from service shall instead be paid, with Interest (based on the rate in effect for the month in which Executive's separation from service occurs), on the first business day of the seventh month following Executive's separation from service (the "**Delayed Payment Date**"), to the extent necessary to prevent the imposition of tax penalties on Executive under Section 409A of the Code.  If

17

Executive dies during the postponement period, the amounts and entitlements delayed on account of Section 409A of the Code shall be paid to the personal representative of Executive's estate on the first to occur of the Delayed Payment Date or 30 calendar days after the date of Executive's death.

(l)    **Indemnification**.  The Company shall indemnify Executive and hold her harmless to the fullest extent permitted by law and under the charter and bylaws of the Company (including the advancement of expenses) against, and with respect to, any and all actions, suits, proceedings, claims, demands, judgments, costs, expenses (including reasonable attorney fees), losses and damages resulting from Executive's good faith performance of Executive's duties and obligations with the Company and its Affiliates.   During the Employment Period and for as long thereafter as is practicable, Executive shall be covered under a directors' and officers' liability insurance policy with coverage limits in amounts no less than, and with terms and conditions no less favorable than, that or those maintained by the Company as of immediately prior to the CIC Effective Date. In addition, any individual indemnification agreement between Executive and the Company in effect immediately prior to the CIC Effective Date shall continue in full force and effect in accordance with its terms.

*[Signature Page Follows]*

18

**IN WITNESS WHEREOF**, Executive has hereunto set Executive's hand and, pursuant to the authorization from the Board, the Company has caused this Agreement to be executed in its name on its behalf, all as of the day and year first above written.

EXECUTIVE:

/s/ Jenna A. Hendricks
Jenna A. Hendricks

COMPANY:

By: /s/ John D. Idol
John D. Idol
Chairman and Chief Executive Officer
Capri Holdings Limited

*[Change in Control Continuity Agreement Signature Page]*

PX7098-209

THIS GENERAL RELEASE OF CLAIMS (this "**Release**") is entered into between [___] ("**Executive**") and Capri Holdings Limited (the "**Company**") as of [**DATE**]. The entering into and non-revocation of this Release is a condition to Executive's right to receive the severance payments and benefits under Sections 5(a)(i)(B), 5(a)(i)(C), 5(a)(ii) and 5(a)(iii) of Executive's Change in Control Continuity Agreement, dated as of [●], 2023 (the "**CIC Continuity Agreement**"). Capitalized terms used in this Release that are not otherwise defined shall have the meanings set forth in the CIC Continuity Agreement.

Accordingly, Executive and the Company agree as follows:

1.    <u>General Release</u>.

(a)    In consideration for the payments to be provided to Executive pursuant to Sections 5(a)(i)(B), 5(a)(i)(C), 5(a)(ii) and 5(a)(iii) of the CIC Continuity Agreement, Executive, for herself and for Executive's heirs, executors, administrators, trustees, legal representatives and assigns (hereinafter referred to collectively as "**Releasors**"), forever releases and discharges the Company and its past, present and future parent entities, subsidiaries, divisions, affiliates and related business entities, successors and assigns, assets, employee benefit and/or pension plans or funds (including qualified and non-qualified plans or funds), and any of its or their respective past, present and/or future directors, officers, fiduciaries, agents, trustees, administrators, employees, insurers, attorneys and assigns, acting on behalf of the Company or in connection with Company business (collectively, the "**Company Entities**") from any and all claims, demands, causes of action, fees and liabilities of any kind whatsoever (upon any legal or equitable theory, whether contractual, common-law, statutory, federal, state, local, or otherwise), whether known or unknown, which Executive ever had, now have, or may have against any of the Company Entities by reason of any act, omission, transaction, practice, plan, policy, procedure, conduct, occurrence, or other matter related to Executive's employment or the termination thereof up to and including the date on which Executive signs this Release.

(b)    Without limiting the generality of the foregoing, this Release is intended to and shall release the Company Entities from any and all claims, whether known or unknown, which Releasors ever had, now have, or may have against the Company Entities arising out of Executive's employment and/or Executive's separation from that employment, including, but not limited to, any claim under: (i) the Age Discrimination in Employment Act, as amended by the Older Workers Benefit Protection Act, (ii) Title VII of the Civil Rights Act of 1964 or under the Civil Rights Act of 1991, (iii) the Americans with Disabilities Act; (iv) the Employee Retirement Income Security Act of 1974 (excluding claims for accrued, vested benefits under any employee benefit or pension plan of the Company Entities subject to the terms and conditions of such plan and applicable law), (v) the Family and Medical Leave Act, (vi) 42 USC §§ 1981-86, (vii) the Equal Pay Act, (viii) the Sarbanes-Oxley Act of 2002, (ix) Section 922 of the Dodd-Frank Act, (x) the Federal False Claims Act, the New York State Human Rights Law; (xi) the New York City Administrative Code; (xii) the New York Labor Law; (xiii) the New York Minimum Wage Act; (xiv) the statutory provisions regarding retaliation/discrimination under the New York Worker's Compensation Law; and (xv) the New York City Earned Sick Time Act, as all of those statutes may have been amended. Without limiting the generality of the foregoing, this Release is also intended to and shall release the Company Entities from any and all claims, whether known or unknown, which Releasors ever had, now have, or may have against the Company Entities, whether based on federal, state, or local law, statutory or decisional, arising out of Executive's employment, the termination of such employment, and/or any of the events relating

directly or indirectly to or surrounding the termination of that employment, including, but not limited to, any claims for wrongful or retaliatory discharge, breach of contract (express, implied or otherwise), breach of the covenant of good faith and fair dealing, detrimental reliance, interference with contractual relations or any prospective business advantage, defamation, slander or libel, invasion of privacy, intentional and negligent infliction of emotional distress, false imprisonment, compensatory or punitive damages, any claims for attorneys' fees, costs, disbursements and/or the like, any claims for wages, bonuses, or other benefits, and any claims for negligence or intentional tort, arising up to and including the date on which Executive signs this Release.

(c)     Nothing in this Release prevents Executive from providing truthful information to any governmental entity, nor does it interfere with Executive's right to file a charge with or participate in any investigation or proceeding conducted by the Department of Labor, the National Labor Relations Board, the Occupational Safety and Health Administration, the Equal Employment Opportunity Commission or a state or local fair employment practices agency.  Nevertheless, Executive acknowledges and agrees that Executive hereby waives any right to seek or to share in any relief, monetary or otherwise, relating to any claim released herein whether such claim was initiated by Executive or not.  In addition, nothing in this Release shall impair Executive's right under the whistleblower provisions of any applicable federal law or regulation or, for the avoidance of doubt, limit Executive's right to receive an award for the information provided to any government authority under such law or regulation.

(d)     Notwithstanding the foregoing, this Release shall not release the Company from:  (i) any obligations under the CIC Continuity Agreement or Executive's right to enforce the terms of the CIC Continuity Agreement; (ii) any obligations regarding any rights of Executive as a current or former officer, director or employee of the Company or its affiliates to indemnification under the terms of the CIC Continuity Agreement, the Company's bylaws or charter or any insurance policy or other agreement under which Executive is entitled to indemnification or directors' and officers' liability coverage; (iii) any claims or causes of action that cannot legally be waived, including, but not limited to, any claim for earned but unpaid wages, workers' compensation benefits, unemployment benefits, and vested 401(k) benefits; (iv) any claims that may arise in the future from events or actions occurring after the date on which Executive signs this Release; and (v) any claims as the holder or beneficial owner of securities (or other rights relating to securities, including equity awards) of the Company or its affiliates.  By signing this Release, Executive represents that Executive has not commenced or joined in any claim, charge, action or proceeding whatsoever against the Company or any of the Company Entities arising out of or relating to any of the matters set forth in this paragraph.

2.     <u>Acknowledgement</u>.     Executive acknowledges and agrees that the provisions in <u>Section 9</u> of the CIC Continuity Agreement shall remain in full force and effect in accordance with the terms of the CIC Continuity Agreement.

3.     <u>Not an Admission</u>.    This Release is not intended, and shall not be construed, as an admission that any of the Company Entities has violated any federal, state or local law (statutory or decisional), ordinance or regulation, breached any contract or committed any wrong whatsoever against Executive. nor is it intended, and shall not be construed as, an admission by Executive that Executive has violated any federal, state or local law (statutory or decisional), ordinance or regulation, breached any contract or committed any wrong whatsoever.

A-2

4.    <u>Entire Agreement</u>.  This Release constitutes the entire agreement between the parties with respect to the subject matter of this Release.  No amendment to this Release shall be binding upon either party unless in writing and signed by or on behalf of such party.

5.    <u>Severability</u>.    Should any provision of this Release be declared or determined by any court to be illegal, invalid or unenforceable, the validity of the remaining parts, terms or provisions shall not be affected, and each remaining part, term or provision shall be legal, valid and enforceable to the fullest extent permitted by law, and any illegal, invalid or unenforceable part, term or provision shall be deemed not to be a part of this Release.

6.    <u>Jurisdiction/Choice of Law/Waiver of Jury Trial</u>.  Executive agrees that the provisions of this Release shall be construed in accordance with the internal laws of the State of New York, without regard to the conflict of law provisions of any state.  Both parties hereby waive any right to a jury trial.

7.    <u>Knowing and Voluntary Agreement</u>.  Executive acknowledges that Executive:

(a)    has carefully read this Release in its entirety;

(b)    has had an opportunity to consider it for at least twenty-one (21) days to consider the actual terms of this Release;

(c)    is hereby advised by the Company in writing to consult with an attorney of Executive's choice in connection with this Release;

(d)    fully understands the significance of all of the terms and conditions of this Release and has discussed them with Executive's independent legal counsel, or has had a reasonable opportunity to do so;

(e)    has had answered to Executive's satisfaction by Executive's independent legal counsel any questions Executive has asked with regard to the meaning and significance of any of the provisions of this Agreement; and

(f)    is signing this Agreement voluntarily and of Executive's own free will and agrees to abide by all the terms and conditions contained herein.

8.    <u>Effectiveness</u>.  Executive understands that Executive will have at least twenty-one (21) days from the date of receipt of this Release to consider the terms and conditions of this Release. Executive may accept this Release by signing it and returning it to:

> Capri Holdings Limited
> 11 West 42nd Street
> New York, NY 1036
> <u>Attention</u>:  SVP, General Counsel

on or before 21 days after delivery. After executing this Release, Executive shall have seven (7) days (the "**Revocation Period**") to revoke this Release by indicating Executive's desire to do so in writing delivered to the Company's SVP, General Counsel at the address set forth above by no later than 5:00 p.m. on the seventh (7th) day after the date Executive signs this Release. The effective date of this Release shall be the

eighth (8th) day after Executive signs the Release. If the last day of the Revocation Period falls on a Saturday, Sunday or holiday, the last day of the Revocation Period will be deemed to be the next business day. In the event Executive does not accept this Release as set forth above, or in the event Executive revokes this Release during the Revocation Period, this Release shall be deemed automatically null and void.

*PLEASE READ THIS RELEASE CAREFULLY. IT CONTAINS A GENERAL RELEASE OF ALL KNOWN AND UNKNOWN CLAIMS ARISING OUT OF EXECUTIVE'S EMPLOYMENT.*

Executive has read this Release and is fully aware of the legal effects of this Release. Executive has chosen to execute this Release freely, without reliance upon any promises or representations made by the Company other than those contained in this Release and understands that Executive will receive the payments and benefits provided under the CIC Continuity Agreement as set forth on <u>Schedule I</u>, less any applicable tax withholdings, in accordance with the terms of the CIC Continuity Agreement following the date on which this Release becomes irrevocable as described above.


Dated: _____


EXECUTIVE


_____

PX7098-213

**SCHEDULE I**
**SEVERANCE BENEFITS**

| Payment or Benefit | Amount | Payment Timing |
|---|---|---|
| **Accrued Obligations (not subject to Release)** | $[●] (Annual Base Salary)<br><br>$[●] (Unpaid Annual Bonus)<br><br>$[●] (Accrued Vacation)<br><br>$[●] (Unreimbursed Expenses) | |
| **Pro Rata Bonus** | **$[●]** | |
| **Severance Payment** | **$[●]** | |
| **Welfare Benefits Payment** | **$[●]** | |
| **Outplacement** | Up to $25,000 | |
| **Other Benefits (not subject to Release)** | [To be specified as applicable] | |

Exhibit 10.23

## CAPRI HOLDINGS LIMITED

### CHANGE IN CONTROL CONTINUITY AGREEMENT

**THIS CHANGE IN CONTROL CONTINUITY AGREEMENT** (this "**Agreement**") is made and entered into, as of May 30, 2023, by and between Capri Holdings Limited, a British Virgin Islands business company limited by shares (the "**Company**") and Krista A. McDonough ("**Executive**").

**WHEREAS**, the Board of Directors of the Company (the "**Board**") has determined that it is in the best interests of the Company and its shareholders to assure that the Company will have the continued dedication of Executive, notwithstanding the possibility, threat or occurrence of a Change in Control (as defined below); and

**WHEREAS**, the Board believes it is imperative to diminish the inevitable distraction of Executive by virtue of the personal uncertainties and risks created by a pending or threatened Change in Control and to encourage Executive's full attention and dedication to the Company currently and in the event of any threatened or pending Change in Control, and to provide Executive with compensation and benefits arrangements upon a Change in Control that ensure that the compensation and benefits expectations of Executive will be satisfied and that are competitive with those of other corporations.

**NOW**, **THEREFORE**, in order to accomplish the foregoing objectives and in consideration of the mutual promises contained herein and other good and valuable consideration, the receipt and sufficiency of which are acknowledged, the parties agree as follows.

1. **Certain Definitions**.

(a) "**Affiliate**" shall mean an entity controlled by, controlling or under common control with another entity.

(b) "**Change in Control**" shall mean:

(i) An acquisition by any individual, entity or group (within the meaning of Section 13(d)(3) or 14(d)(2) of the Securities Exchange Act of 1934, as amended, or any successor thereto (the "**Exchange Act**")) (a "**Person**") of beneficial ownership (within the meaning of Rule 13d-3 promulgated under the Exchange Act) of 30% or more of either (1) the then outstanding shares of ordinary shares of the Company (the "**Outstanding Company Ordinary Shares**") or (2) the combined voting power of the then outstanding voting securities of the Company entitled to vote generally in the election of directors (the "**Outstanding Company Voting Securities**"); provided, however, that for purposes of this subsection (i), the following acquisitions shall not constitute a Change in Control:  (A) any acquisition directly from the Company; (B) any acquisition by the Company; (C) any acquisition by any employee benefit plan (or related trust) sponsored or maintained by the Company or any entity controlled by the Company; or (D) any acquisition by any entity pursuant to a transaction that complies with clauses (A), (B) and (C) of subsection (iii) of this Section 1(b);

(ii) A change in the composition of the Board such that the individuals who, as of the date of this Agreement, constitute the Board (the "**Incumbent Board**") cease for any reason to constitute at least a majority of the Board; provided, however, that, any individual who becomes a member of the Board subsequent to the date

of this Agreement whose election, or nomination for election by the Company's shareholders, was approved by a vote of at least a majority of those individuals who are members of the Board and who were also members of the Incumbent Board (or deemed to be such pursuant to this proviso) shall be considered as though such individual were a member of the Incumbent Board; provided, further, that any such individual whose initial assumption of office occurs as a result of either an actual or threatened election contest with respect to the election or removal of directors or other actual or threatened solicitation of proxies or consents by or on behalf of a Person other than the Board shall not be considered as a member of the Incumbent Board;

   (iii) The consummation of a reorganization, merger, statutory share exchange or consolidation or similar transaction involving the Company or any of its subsidiaries or sale or other disposition of all or substantially all of the assets of the Company, or the acquisition of assets or securities of another entity by the Company or any of its subsidiaries (a "**Business Combination**"), in each case, unless, following such Business Combination: (A) all or substantially all of the individuals and entities who were the beneficial owners, respectively, of the Outstanding Company Ordinary Shares and Outstanding Company Voting Securities immediately prior to such Business Combination beneficially own, directly or indirectly, more than 50% of, respectively, the then outstanding shares of ordinary shares (or, for a noncorporate entity, equivalent securities) and the combined voting power of the then outstanding voting securities entitled to vote generally in the election of directors (or, for a noncorporate entity, equivalent securities), as the case may be, of the entity resulting from such Business Combination (including an entity that, as a result of such transaction, owns the Company or all or substantially all of the Company's assets either directly or through one or more subsidiaries) in substantially the same proportions as their ownership, immediately prior to such Business Combination of the Outstanding Company Ordinary Shares and Outstanding Company Voting Securities, as the case may be; (B) no Person (excluding any entity resulting from such Business Combination or any employee benefit plan (or related trust) of the Company or such entity resulting from such Business Combination) beneficially owns, directly or indirectly, 30% or more of, respectively, the then outstanding shares of ordinary shares (or, for a noncorporate entity, equivalent securities) of the entity resulting from such Business Combination or the combined voting power of the then outstanding voting securities of such entity except to the extent that such ownership existed prior to the Business Combination; and (C) at least a majority of the members of the board of directors (or, for a noncorporate entity, equivalent body or committee) of the entity resulting from such Business Combination were members of the Board at the time of the execution of the initial agreement, or of the action of the Board, providing for such Business Combination; or

   (iv) The approval by the shareholders of the Company of a complete liquidation or dissolution of the Company.

  (c) "**Change in Control Period**" shall mean the period commencing on the date hereof and ending on the second anniversary of the date hereof; provided, however, that commencing on the date one year after the date hereof, and on each annual anniversary of such date (such date and each annual anniversary thereof shall be hereinafter referred to as the "Renewal Date"), unless previously terminated, the Change in Control Period shall be automatically extended so as to terminate two years from such Renewal Date, unless at least 60 days prior to the Renewal Date the Company shall give notice to Executive that the Change in Control Period shall not be so extended.

  (d) "**Code**" shall mean the Internal Revenue Code of 1986, as amended.

(e)    "**CIC Effective Date**" shall mean the first date during the Change in Control Period on which a Change in Control occurs.

2.    **Employment Period**.  The Company hereby agrees to continue Executive in its employ, and Executive hereby agrees to remain in the employ of the Company subject to the terms and conditions of this Agreement, for the period commencing on the CIC Effective Date and ending on the second anniversary of such date (the "**Employment Period**").  The Employment Period shall terminate upon Executive's termination of employment for any reason.

3.    **Terms of Employment**.

(a)    **Position and Duties**.  (i)    During the Employment Period, (A) Executive's position (including status, offices, titles and reporting requirements), authority, duties and responsibilities shall be at least commensurate in all respects with the most significant of those held, exercised and assigned to Executive at any time during the 120-day period immediately preceding the CIC Effective Date and (B) Executive's services shall be performed at the location where Executive was employed immediately preceding the CIC Effective Date or any office or location less than 50 miles from such location.

(i)    During the Employment Period, and excluding any periods of vacation and sick leave to which Executive is entitled, Executive agrees to devote reasonable attention and time during normal business hours to the business and affairs of the Company and, to the extent necessary to discharge the responsibilities assigned to Executive hereunder, to use Executive's reasonable best efforts to perform faithfully and efficiently such responsibilities.  During the Employment Period it shall not be a violation of this Agreement for Executive to (A) serve on corporate, civic or charitable boards or committees, (B) deliver lectures, fulfill speaking engagements or teach at educational institutions and (C) manage personal investments, so long as such activities do not significantly interfere with the performance of Executive's responsibilities as an employee of the Company in accordance with this Agreement.  It is expressly understood and agreed that to the extent that any such activities have been conducted by Executive prior to the CIC Effective Date, the continued conduct of such activities (or the conduct of activities similar in nature and scope thereto) subsequent to the CIC Effective Date shall not thereafter be deemed to interfere with the performance of Executive's responsibilities to the Company.

(b)    **Compensation**.

(i)    **Base Salary**.  During the Employment Period, Executive shall receive an annual base salary ("**Annual Base Salary**"), that shall be paid at an annual rate, at least equal to 12 *multiplied by* the highest monthly base salary paid or payable, including any base salary that has been earned but deferred, to Executive by the Company and its Affiliates in respect of the 12-month period immediately preceding the month in which the CIC Effective Date occurs.  The Annual Base Salary shall be paid at such intervals as the Company pays executive salaries generally.  During the Employment Period, the Annual Base Salary shall be periodically reviewed for increase consistent with, and on a basis no less favorable than that applicable to, other peer executives of the Company and its Affiliates, but in no event shall such review and adjustment occur more than 12 months after the last salary increase awarded to Executive prior to the CIC Effective Date and thereafter at least annually.  Any increase in Annual Base Salary shall not serve to limit or reduce any other obligation to Executive under this Agreement.  Annual Base Salary shall not be reduced after any such increase and the

3

term Annual Base Salary as utilized in this Agreement shall refer to Annual Base Salary as so increased.

(ii)    **Annual Bonus**.    In addition to Annual Base Salary, Executive shall be eligible, for each fiscal year ending during the Employment Period, for an annual bonus (the "**Annual Bonus**") in cash with a target annual bonus opportunity at least equal to the target annual bonus opportunity for which Executive was eligible as of immediately prior to the CIC Effective Date (the amount equal to such target annual bonus opportunity referred to herein as the "**Target Annual Bonus**"), with the actual earned Annual Bonus, if any, to be determined on a basis no less favorable than that applicable to other peer executives of the Company and its Affiliates.  Each such Annual Bonus shall be paid no later than two and a half months after the end of the fiscal year for which the Annual Bonus is awarded, unless Executive shall elect to defer the receipt of such Annual Bonus pursuant to an arrangement that meets the requirements of Section 409A of the Code.

(iii)    **Long Term Incentive Awards**.    During the Employment Period, Executive shall be entitled to participate in all long-term equity- and cash-based incentive plans and programs applicable generally to other peer executives of the Company and its Affiliates.  For each fiscal year ending during the Employment Period, Executive shall be awarded annual long-term incentive awards (the "**Annual LTI Award**") in respect of the ordinary shares of the Company (or the ultimate parent entity of the Company) or cash incentive awards, in each case on the same basis as other peer executives of the Company, at least equal to the target Annual LTI Award opportunity to which Executive was eligible as of immediately prior to the CIC Effective Date or, if more favorable to Executive, the target Annual LTI Award opportunity provided generally at any time after the CIC Effective Date to other peer executives of the Company and its Affiliates (the "**Target LTI Award Opportunity**").  The terms and conditions of the awards granted in respect of such Annual LTI Awards shall be no less favorable, in the aggregate, than the most favorable of those provided by the Company and its Affiliates for the awards granted to Executive under such plans and programs as in effect at any time during the 120-day period immediately preceding the CIC Effective Date or, if more favorable to Executive, those provided generally at any time after the CIC Effective Date to other peer executives of the Company and its Affiliates.

(iv)    **Savings and Retirement Plans**.    During the Employment Period, Executive shall be entitled to participate in all savings and retirement plans, practices, policies and programs applicable generally to other peer executives of the Company and its Affiliates, but in no event shall such plans, practices, policies and programs provide Executive with savings opportunities and retirement benefit opportunities, in each case, less favorable, in the aggregate, than the most favorable of those provided by the Company and its Affiliates for Executive under such plans, practices, policies and programs as in effect at any time during the 120-day period immediately preceding the CIC Effective Date or, if more favorable to Executive, those provided generally at any time after the CIC Effective Date to other peer executives of the Company and its Affiliates.

(v)    **Welfare and Insurance Benefit Plans**.    During the Employment Period, Executive and/or Executive's dependents, as the case may be, shall be eligible for participation in and shall receive all benefits under welfare and insurance benefit plans, practices, policies and programs provided by the Company and its Affiliates (including medical, prescription, dental, disability, salary continuance, employee life, group life, accidental death and travel accident insurance plans and programs) ("**Company Welfare Benefit Plans**") to the extent applicable generally to

4

other peer executives of the Company and its Affiliates, but in no event shall such Company Welfare Benefit Plans provide Executive with benefits that are less favorable, in the aggregate, than the most favorable of such plans, practices, policies and programs in effect for Executive at any time during the 120-day period immediately preceding the CIC Effective Date or, if more favorable to Executive, those provided generally at any time after the CIC Effective Date.

(vi)    **Expenses**.  During the Employment Period, Executive shall be entitled to receive prompt reimbursement for all reasonable expenses incurred by Executive in accordance with the most favorable policies, practices and procedures of the Company and its Affiliates in effect for Executive at any time during the 120-day period immediately preceding the CIC Effective Date or, if more favorable to Executive, as in effect generally at any time thereafter with respect to other peer executives of the Company and its Affiliates.

(vii)    **Fringe Benefits**.    During the Employment Period, Executive shall be entitled to fringe benefits, including any clothing allowance and merchandise discount, as applicable to Executive and in accordance with the most favorable plans, practices, practices, programs and policies of the Company and its Affiliates in effect for Executive at any time during the 120-day period immediately preceding the CIC Effective Date or, if more favorable to Executive, as in effect generally at any time thereafter with respect to other peer executives of the Company and its Affiliates.

(viii)    **Paid Time Off or Vacation**.    During the Employment Period, Executive shall be entitled to paid time off or paid vacation, in each case in accordance with the most favorable plans, policies, programs and practices of the Company and its Affiliates as in effect for Executive at any time during the 365-day period immediately preceding the CIC Effective Date or, if more favorable to Executive, as in effect generally at any time thereafter with respect to other peer executives of the Company and its Affiliates.

4.    **Termination of Employment**.

(a)    **Death or Disability**.    Executive's employment shall terminate automatically upon Executive's death during the Employment Period.  If the Company determines in good faith that the Disability of Executive has occurred during the Employment Period (pursuant to the definition of Disability set forth below), it may give to Executive written notice in accordance with Section 11(b) of its intention to terminate Executive's employment.  In such event, Executive's employment with the Company shall terminate effective on the 30th day after receipt of such notice by Executive (the "**Disability Date**"), <u>provided</u>, that within the 30 days after such receipt, Executive shall not have returned to full-time performance of Executive's duties.  For purposes of this Agreement, "**Disability**" shall mean the absence of Executive from Executive's duties with the Company on a full-time basis for 180 consecutive business days (or for 180 business days in any consecutive 365 days) as a result of incapacity due to mental or physical illness that is determined to be total and permanent by a physician selected by the Company or its insurers and acceptable to Executive or Executive's legal representative.

(b)    **Cause**.    The Company may terminate Executive's employment during the Employment Period with or without Cause.  For purposes of this Agreement, "**Cause**" shall mean:

5

(i)    Executive's gross negligence, willful misconduct or dishonesty in performing her duties to the Company;

(ii)    Executive's conviction of a felony (other than a felony involving a traffic violation);

(iii)    Executive's commission of a felony involving a fraud or other business crime against the Company or any of its subsidiaries; or

(iv)    Executive's material breach of any of the covenants set forth in Section 9 hereof; provided that, if any such breach is curable, Executive shall have an opportunity to correct such breach within 30 days after written notice by the Company to Executive thereof.

For purposes of this provision, no act or failure to act, on the part of Executive, shall be considered "willful" unless it is done, or omitted to be done, by Executive in bad faith or without reasonable belief that Executive's action or omission was in the best interests of the Company and its Affiliates.  Any act, or failure to act, based upon authority given pursuant to a resolution duly adopted by the Board, or if the Company is not the ultimate parent entity of the Company and is not publicly traded, the board of directors (or, for a non-corporate entity, equivalent governing body) of the ultimate parent of the Company (the "**Applicable Board**") or upon the instructions of the Chief Executive Officer of the Company or a senior officer of the Company and its Affiliates or based upon the advice of counsel for the Company and its Affiliates shall be conclusively presumed to be done, or omitted to be done, by Executive in good faith and in the best interests of the Company and its Affiliates.  The cessation of employment of Executive shall not be deemed to be for Cause unless and until there shall have been delivered to Executive a copy of a resolution duly adopted by the affirmative vote of not less than a majority of the entire membership of the Applicable Board at a meeting of the Applicable Board called and held for such purpose after reasonable notice is provided to Executive and Executive is given an opportunity, together with counsel for Executive, to be heard before the Applicable Board, finding that, in the good faith opinion of the Applicable Board, Executive is guilty of conduct that constitutes Cause.

(c)    **Good Reason**.  Executive's employment may be terminated during the Employment Period by Executive for Good Reason or by Executive voluntarily without Good Reason.  "**Good Reason**" means actions taken by the Company resulting in a material negative change in the employment relationship.  For these purposes, a "material negative change in the employment relationship" shall include:

(i)    the assignment to Executive of duties or responsibilities that are inconsistent in any material respect with Executive's position (including status, offices, titles and reporting requirements), authority, duties or responsibilities as contemplated by Section 3(a), or a material diminution in Executive's position (including status, offices, titles and reporting requirements), authority, duties or responsibilities as contemplated by Section 3(a) or a material diminution in the budget over which Executive retains authority;

(ii)    a material diminution in the authorities, duties or responsibilities of the person to whom Executive is required to report, including a requirement that Executive report to an officer other than the Chief Executive Officer of the Company (or, if the Company is not the ultimate parent entity of the Company and is not publicly traded, the Chief Executive Officer of the ultimate parent of the Company);

6

(iii)    the failure to provide, in all material respects, any element of the compensation and benefits required to be provided to Executive in accordance with any of the provisions of Section 3(b), including any decrease in Executive's Annual Base Salary;

(iv)    the Company's requiring Executive to be based at any office or location other than as provided in Section 3(a)(i)(B) resulting in a material increase in Executive's commute to and from Executive's primary residence (for this purpose an increase in Executive's commute by 50 miles or more shall be deemed material); or

(v)    any other action or inaction that constitutes a material breach by the Company of this Agreement, including any failure by the Company to comply with and satisfy Section 10(c).

In order to invoke a termination for Good Reason, Executive shall provide written notice to the Company of the existence of one or more of the conditions described in clauses (i) through (v) within 90 days following Executive's knowledge of the initial existence of such condition or conditions, specifying in reasonable detail the conditions constituting Good Reason, and the Company shall have 30 days following receipt of such written notice (the "**Cure Period**") during which it may remedy the condition.  In the event that the Company fails to remedy the condition constituting Good Reason during the applicable Cure Period, Executive's "separation from service" (within the meaning of Section 409A of the Code) must occur, if at all, within two years following the initial existence of such condition or conditions in order for such termination as a result of such condition to constitute a termination for Good Reason.

(d)    **Incapacity or Death**.  Executive's mental or physical incapacity following the occurrence of an event described above in clauses (i) through (v) of Section 4(c) shall not affect Executive's ability to terminate employment for Good Reason, and Executive's death following delivery of a Notice of Termination for Good Reason shall not affect the entitlement of the estate of Executive to severance payments or benefits provided hereunder upon a termination of employment for Good Reason.

(e)    **Notice of Termination**.  Any termination of employment by the Company for Cause, or by Executive for Good Reason, shall be communicated by Notice of Termination to the other party hereto given in accordance with Section 11(b).  For purposes of this Agreement, a "**Notice of Termination**" means a written notice that (i) indicates the specific termination provision in this Agreement relied upon, (ii) to the extent applicable, sets forth in reasonable detail the facts and circumstances claimed to provide a basis for termination of Executive's employment under the provision so indicated and (iii) if the Date of Termination (as defined below) is other than the date of receipt of such notice, specifies the Date of Termination (which date shall be not more than 30 days after the giving of such notice) (subject to the Company's right to cure in the case of a resignation for Good Reason).  The failure by Executive or the Company to set forth in the Notice of Termination any fact or circumstance that contributes to a showing of Good Reason or Cause shall not waive any right of Executive or the Company, respectively, hereunder or preclude Executive or the Company, respectively, from asserting such fact or circumstance in enforcing Executive's or the Company's rights hereunder.

(f)    **Date of Termination**.  "**Date of Termination**" means (i) if Executive's employment is terminated by the Company for Cause, or by Executive for Good Reason, the date of receipt of the Notice of Termination or any later date specified

7

therein, as the case may be, (ii) if Executive's employment is terminated by the Company other than for Cause or Disability, the date on which the Company notifies Executive of such termination, (iii) if Executive resigns without Good Reason, the date on which Executive notifies the Company of such termination and (iv) if Executive's employment is terminated by reason of death or Disability, the date of death of Executive or the Disability Date, as the case may be.

5.    **Obligations of the Company Upon Termination**.

(a)    **By the Company Other Than for Cause, Death or Disability; By Executive for Good Reason**.  If, during the Employment Period, the Company shall terminate Executive's employment other than for Cause, Death or Disability or Executive shall terminate employment for Good Reason:

(i)    subject to Section 11(k), the Company shall pay to Executive in a lump sum in cash as soon as reasonably practicable (and no later than 30 days) after the Date of Termination equal to the aggregate of the following amounts:

(A)    the sum of (I) Executive's Annual Base Salary through the Date of Termination to the extent not theretofore paid; (II) Executive's business expenses that are reimbursable pursuant to Section 3(b)(v) but have not been reimbursed by the Company as of the Date of Termination; (III) Executive's Annual Bonus for the fiscal year immediately preceding the fiscal year in which the Date of Termination occurs, if such bonus has been determined but not paid as of the Date of Termination; (IV) any accrued vacation pay or other paid time off to the extent required by any policy in effect prior to the CIC Effective Date or, if more favorable to Executive, at any time thereafter, or otherwise payable under applicable law, and not theretofore paid (the sum of the amounts described in subclauses (I), (II), (III) and (IV), the "**Accrued Obligations**"); provided, that notwithstanding the foregoing, if Executive has made an irrevocable election under any deferred compensation arrangement subject to Section 409A of the Code to defer any portion of the Annual Base Salary or the Annual Bonus described in clause (I) or (III), then for all purposes of this Section 5 (including Sections 5(b) through 5(d)), such deferral election, and the terms of the applicable arrangement shall apply to the same portion of the amount described in such clause (I) or (III), and such portion shall not be considered as part of the "Accrued Obligations" but shall instead be an "Other Benefit" (as defined below);

(B)    an amount equal to the product of (I) the Target Annual Bonus and (II) a fraction, the numerator of which is the number of days in the current fiscal year through the Date of Termination, and the denominator of which is 365 (the "**Pro Rata Bonus**"); and

(C)    the amount equal to the product of (I) two (2) and (II) the sum of (x) Executive's Annual Base Salary and (y) the Target Annual Bonus;

(i)    the Company shall pay to Executive an amount equal to the product of (A) the monthly premiums for coverage under the Company's or and its Affiliates' health care plans for purposes of continuation coverage under Section 4980B of the Code with respect to the maximum level of coverage in effect for Executive and

8

her spouse and dependents as of immediately prior to the Date of Termination, and (B) 24;

(ii)    the Company shall, at its sole expense as incurred, provide Executive with outplacement services the scope and provider of which shall be selected by Executive in Executive's sole discretion, but the cost thereof shall not exceed $25,000; provided, that such outplacement benefits shall end not later than the last day of the second calendar year that begins after the Date of Termination; and

(iii)    except as otherwise set forth in the last sentence of Section 6, to the extent not theretofore paid or provided, the Company shall timely pay or provide to Executive any other amounts or benefits required to be paid or provided or that Executive is eligible to receive under any plan, program, policy or practice or contract or agreement of the Company and its Affiliates, including the vesting, settlement or exercisability of any equity or equity-based awards granted to Executive in accordance with the terms of the plan and award agreements applicable upon a termination of employment by the Company other than for Cause or for Good Reason (for the avoidance of doubt, as such terms are defined herein), including the vesting of awards pursuant to Section 11.2 of the Third Amended and Restated Capri Holdings Limited Omnibus Incentive Plan or the similar provisions of any predecessor or successor plans) and any rights under the Company's Deferred Compensation Plan (such other amounts and benefits shall be hereinafter referred to as the "**Other Benefits**") in accordance with the terms of the underlying plans or agreements.

The Company's obligations to pay or provide the payments and benefits set forth in Sections 5(a)(i)(B), 5(a)(i)(C), 5(a)(ii) and 5(a)(iii) of this Agreement shall be subject to Executive's execution, delivery to the Company and non-revocation of a release of claims substantially in the form attached hereto as Exhibit A.

(b)    **Death**.  If Executive's employment is terminated by reason of Executive's death during the Employment Period, the Company shall provide Executive's estate or beneficiaries with the Accrued Obligations and the Pro Rata Bonus and the timely payment or delivery of the Other Benefits, and shall have no other severance obligations under this Agreement.  The Accrued Obligations (subject to the proviso set forth in Section 5(a)(i)(A) to the extent applicable) and the Pro Rata Bonus shall be paid to Executive's estate or beneficiary, as applicable, in a lump sum in cash as soon as reasonably practicable (and no later than 30 days) after the Date of Termination. With respect to the provision of the Other Benefits, the term "Other Benefits" as utilized in this Section 5(b) shall include, and Executive's estate and/or beneficiaries shall be entitled to receive, benefits at least equal to the most favorable benefits provided by the Company and its Affiliates to the estates and beneficiaries of other peer executives of the Company and such Affiliates under such plans, programs, practices and policies relating to death benefits, if any, as in effect with respect to other peer executives and their beneficiaries at any time during the 120-day period immediately preceding the CIC Effective Date or, if more favorable to Executive's estate and/or Executive's beneficiaries, as in effect on the date of Executive's death with respect to other peer executives of the Company and its Affiliates and their beneficiaries.

(c)    **Disability**.  If Executive's employment is terminated by reason of Executive's Disability during the Employment Period, the Company shall provide Executive with the Accrued Obligations and the Pro Rata Bonus and the timely payment or delivery of the Other Benefits in accordance with the terms of the underlying plans or agreements, and shall have no other severance obligations under this Agreement.  The Accrued Obligations (subject to the proviso set forth in Section 5(a)(i)(A) to the extent

9

applicable) and the Pro Rata Bonus shall be paid to Executive in a lump sum in cash as soon as reasonably practicable (and no later than 30 days) after the Date of Termination. With respect to the provision of the Other Benefits, the term "Other Benefits" as utilized in this Section 5(c) shall include, and Executive shall be entitled after the Disability Date to receive, without limitation, disability and other benefits (either pursuant to a plan, program, practice or policy or an individual arrangement) at least equal to the most favorable of those generally provided by the Company and its Affiliates to disabled executives and/or their dependents in accordance with such plans, programs, practices and policies relating to disability, if any, as in effect generally with respect to other peer executives and their dependents at any time during the 120-day period immediately preceding the CIC Effective Date or, if more favorable to Executive and/or Executive's dependents, as in effect at any time thereafter generally with respect to other peer executives of the Company and its Affiliates and their dependents.

(d)    **Cause; Other Than for Good Reason**.    If Executive's employment is terminated for Cause during the Employment Period, the Company shall provide Executive with Executive's Annual Base Salary (subject to the proviso set forth in Section 5(a)(i)(A) to the extent applicable) through the Date of Termination, and the timely payment or delivery of the Other Benefits, and shall have no other severance obligations under this Agreement.    If Executive voluntarily terminates employment during the Employment Period, excluding a termination for Good Reason, the Company shall provide Executive with the Accrued Obligations and the timely payment or delivery of the Other Benefits and shall have no other severance obligations under this Agreement. In such case, all the Accrued Obligations (subject to the proviso set forth in Section 5(a)(i)(A) to the extent applicable) shall be paid to Executive in a lump sum in cash as soon as reasonably practicable (and no later than 30 days) after the Date of Termination.

6.    **Non-Exclusivity of Rights**.    Nothing in this Agreement shall prevent or limit Executive's continuing or future participation in any plan, program, policy or practice provided by the Company or any of its Affiliates and for which Executive may qualify, nor, subject to Section 11(h), shall anything herein limit or otherwise affect such rights as Executive may have under any other contract or agreement with the Company or its Affiliates.  Amounts that are vested benefits or that Executive is otherwise entitled to receive under any plan, policy, practice or program of or any contract or agreement with the Company or any of its Affiliates at or subsequent to the Date of Termination shall be payable in accordance with such plan, policy, practice or program or contract or agreement except as explicitly modified by this Agreement. Without limiting the generality of the foregoing, Executive's resignation under this Agreement with or without Good Reason shall in no way affect Executive's ability to terminate employment by reason of Executive's "retirement" under any compensation and benefits plans, programs or arrangements of the Company or its Affiliates, including any retirement or pension plans or arrangements or to be eligible to receive benefits under any compensation or benefit plans, programs or arrangements of the Company or any of its Affiliates, including any retirement or pension plan or arrangement of the Company or any of its Affiliates or substitute plans adopted by the Company or its successors, and any termination that otherwise qualifies as Good Reason shall be treated as such even if it is also a "retirement" for purposes of any such plan.  Notwithstanding the foregoing, if Executive receives payments and benefits pursuant to Section 5(a) of this Agreement, Executive shall not be entitled to any severance pay or benefits under any severance plan, program or policy of the Company and its Affiliates, unless otherwise specifically provided therein in a specific reference to this Agreement.

7.    **No Mitigation or Offset; Legal Fees**.

(a)  **No Mitigation or Offset**.  The Company's obligation to make the payments provided for in this Agreement and otherwise to perform its obligations hereunder shall not be affected by any set-off, counterclaim, recoupment, defense or other claim, right or action that the Company may have against Executive or others.  In no event shall Executive be obligated to seek other employment or take any other action by way of mitigation of the amounts payable to Executive under any of the provisions of this Agreement and such amounts shall not be reduced whether or not Executive obtains other employment.

(b)  **Legal Fees**.  The Company agrees to pay as incurred (within 10 days following the Company's receipt of an invoice from Executive), at any time from the CIC Effective Date through Executive's remaining lifetime (or, if longer, through the 20th anniversary of the CIC Effective Date) to the full extent permitted by law, all legal fees and expenses that Executive may reasonably incur as a result of any contest (regardless of the outcome thereof) by the Company, Executive or others of the validity or enforceability of, or liability under, any provision of this Agreement or any guarantee of performance thereof whether such contest is between the Company and Executive or between either of them and any third party (including as a result of any contest by Executive about the amount of any payment pursuant to this Agreement), plus in each case interest on any delayed payment at the applicable federal rate provided for in Section 7872(f)(2)(A) of the Code ("**Interest**") determined as of the date such legal fees and expenses were incurred.

8.    **Treatment of Certain Payments**.

(a)  Anything in the Agreement to the contrary notwithstanding, in the event the Accounting Firm (as defined below) shall determine that receipt of all Payments (as defined below) would subject Executive to the excise tax under Section 4999 of the Code, the Accounting Firm shall determine whether to reduce any of the Payments paid or payable pursuant to the Agreement (the "**Agreement Payments**") so that the Parachute Value (as defined below) of all Payments, in the aggregate, equals the Safe Harbor Amount (as defined below).  The Agreement Payments shall be so reduced only if the Accounting Firm determines that Executive would have a greater Net After-Tax Receipt (as defined below) of aggregate Payments if the Agreement Payments were so reduced.  If the Accounting Firm determines that Executive would not have a greater Net After-Tax Receipt of aggregate Payments if the Agreement Payments were so reduced, Executive shall receive all Agreement Payments to which Executive is entitled hereunder.

(b)  If the Accounting Firm determines that aggregate Agreement Payments should be reduced so that the Parachute Value of all Payments, in the aggregate, equals the Safe Harbor Amount, the Company shall promptly give Executive notice to that effect and a copy of the detailed calculation thereof.  All determinations made by the Accounting Firm under this Section 8 shall be binding upon the Company and Executive and shall be made as soon as reasonably practicable and in no event later than 15 days following the Date of Termination.  For purposes of reducing the Agreement Payments so that the Parachute Value of all Payments, in the aggregate, equals the Safe Harbor Amount, only amounts payable under the Agreement (and no other Payments) shall be reduced.  The reduction of the amounts payable hereunder, if applicable, shall be made by reducing the payments and benefits under the following sections in the following order:  (i) cash payments that may not be valued under Treas. Reg. § 1.280G-1, Q&A-24(c) ("**24(c)**"), (ii) equity-based payments that may not be valued under 24(c), (iii) cash payments that may be valued under 24(c), (iv) equity-based payments that may be valued under 24(c) and (v) other types of benefits.  With respect to each category of the foregoing, such reduction shall occur first with respect to amounts that are not

11

"deferred compensation" within the meaning of Section 409A of the Code and next with respect to payments that are deferred compensation, in each case, beginning with payments or benefits that are to be paid the farthest in time from the Accounting Firm's determination.  All fees and expenses of the Accounting Firm shall be borne solely by the Company.

(c)    To the extent requested by Executive, the Company shall cooperate with Executive in good faith in valuing, and the Accounting Firm shall take into account the value of, services provided or to be provided by Executive (including Executive's agreeing to refrain from performing services pursuant to a covenant not to compete or similar covenant, before, on or after the date of a change in ownership or control of the Company (within the meaning of Q&A-2(b) of the final regulations under Section 280G of the Code), such that payments in respect of such services may be considered reasonable compensation within the meaning of Q&A-9 and Q&A-40 to Q&A-44 of the final regulations under Section 280G of the Code and/or exempt from the definition of the term "parachute payment" within the meaning of Q&A-2(a) of the final regulations under Section 280G of the Code in accordance with Q&A-5(a) of the final regulations under Section 280G of the Code.

(d)    The following terms shall have the following meanings for purposes of this Section 8:

(i)    "**Accounting Firm**" shall mean a nationally recognized certified public accounting firm or other professional organization that is a certified public accounting firm recognized as an expert in determinations and calculations for purposes of Section 280G of the Code that is selected by the Company prior to a Change in Control for purposes of making the applicable determinations hereunder and is reasonably acceptable to Executive, which firm shall not, without Executive's consent, be a firm serving as accountant or auditor for the individual, entity or group effecting the Change in Control.

(ii)    "**Net After-Tax Receipt**" shall mean the present value (as determined in accordance with Sections 280G(b)(2)(A)(ii) and 280G(d)(4) of the Code) of a Payment net of all taxes imposed on Executive with respect thereto under Sections 1 and 4999 of the Code and under applicable state and local laws, determined by applying the highest marginal rate under Section 1 of the Code and under state and local laws which applied to Executive's taxable income for the immediately preceding taxable year, or such other rate(s) as the Accounting Firm determines to be likely to apply to Executive in the relevant tax year(s).

(iii)    "**Parachute Value**" of a Payment shall mean the present value as of the date of the change of control for purposes of Section 280G of the Code of the portion of such Payment that constitutes a "parachute payment" under Section 280G(b)(2) of the Code, as determined by the Accounting Firm for purposes of determining whether and to what extent the excise tax under Section 4999 of the Code will apply to such Payment.

(iv)    "**Payment**" shall mean any payment or distribution in the nature of compensation (within the meaning of Section 280G(b)(2) of the Code) to or for the benefit of Executive, whether paid or payable pursuant to the Agreement or otherwise.

(v)    "**Safe Harbor Amount**" shall mean 2.99 *multiplied by* Executive's "base amount," within the meaning of Section 280G(b)(3) of the Code.

PX7098-226

(e)    The provisions of this Section 8 shall survive the expiration of the Agreement.

9.    **Restrictive Covenants.**

(a)    **Confidential Information**.  Executive shall not disclose to any unauthorized person or entity or use for Executive's own purposes any Confidential Information without the prior written consent of the Company, unless and to the extent that the Confidential Information becomes generally known to and available for use by the public other than as a result of Executive's acts or omissions in violation of this Agreement; provided, however, that if Executive receives a request to disclose Confidential Information pursuant to a deposition, interrogation, request for information or documents in legal proceedings, subpoena, civil investigative demand, governmental or regulatory process or similar process, (i) Executive shall promptly notify in writing the Company, and consult with and assist the Company in seeking a protective order or request for other appropriate remedy, (ii) in the event that such protective order or remedy is not obtained, or if the Company waives compliance with the terms hereof, Executive shall disclose only that portion of the Confidential Information which, based on the written advice of Executive's legal counsel, is legally required to be disclosed and shall exercise reasonable best efforts to provide that the receiving person or entity shall agree to treat such Confidential Information as confidential to the extent possible (and permitted under applicable law) in respect of the applicable proceeding or process and (iii) the Company shall be given an opportunity to review the Confidential Information prior to disclosure thereof. For purposes of this Agreement, "**Confidential Information**" means information, observations and data concerning the business or affairs of the Company and its Affiliates, including, without limitation, all business information (whether or not in written form) which relates to the Company or its Affiliates, or their customers, suppliers or contractors or any other third parties in respect of which the Company or its Affiliates has a business relationship or owes a duty of confidentiality, or their respective businesses or products, and which is not known to the public generally other than as a result of Executive's breach of this Agreement, including but not limited to: technical information or reports; formulas; trade secrets; unwritten knowledge and "know-how"; operating instructions; training manuals; customer lists; customer buying records and habits; product sales records and documents, and product development, marketing and sales strategies; market surveys; marketing plans; profitability analyses; product cost; long-range plans; information relating to pricing, competitive strategies and new product development; information relating to any forms of compensation or other personnel-related information; contracts; and supplier lists. Confidential Information will not include such information known to Executive prior to Executive's involvement with the Company or its Affiliates or information rightfully obtained from a third party (other than pursuant to a breach by Executive of this Agreement).  Nothing in this Agreement shall impair Executive's right under the whistleblower provisions of any applicable federal law or regulation or, for the avoidance of doubt, limit Executive's right to receive an award for the information provided to any government authority under such law or regulation.

(b)    **No Hiring**.  During the Employment Period and during the two-year period following termination of employment or service, Executive shall not knowingly perform any action, activity or course of conduct which is substantially detrimental to the businesses or business reputations of the Company or any of its Affiliates, including (i) soliciting, recruiting or hiring (or attempting to solicit, recruit or hire) any employees of the Company or any of its Affiliates or any persons who have worked for the Company or of its Affiliates during the 12-month period immediately preceding such solicitation, recruitment or hiring or attempt thereof; (ii) intentionally

13

interfering with the relationship of the Company or any of its Affiliates with any person or entity who or which is employed by or otherwise engaged to perform services for, or any customer, client, supplier, licensee, licensor or other business relation of, the Company or any of its Affiliates; or (iii) assisting any person or entity in any way to do, or attempt to do, anything prohibited by the immediately preceding clauses (i) or (ii).

(c)    **Non-Disparagement**.    During the Employment Period and thereafter, Executive agrees not to disparage the Company or any of its Affiliates or any of their respective directors, officers, employees, agents, representatives or licensees and not to publish or make any statement that is reasonably foreseeable to become public with respect to any of such entities or persons.  The Company likewise agrees not to disparage Executive or publish or make any statement that is reasonably foreseeable to become public with respect to Executive without Executive's prior written consent, excluding statements required to be made about Executive in any Company filing under U.S. securities laws or stock exchange rules and regulations.

(d)    **Remedies; Modification; Interpretation**.    Executive acknowledges that the injury that would be suffered by the Company as a result of a breach in any material respect of the provisions of Section 9 of this Agreement would be irreparable and that an award of monetary damages to the Company for such a breach would be an inadequate remedy.  Consequently, the Company will have the right, in addition to any other rights it may have, to obtain injunctive relief to restrain any breach or threatened breach or otherwise to specifically enforce any provision of this Agreement, and the Company will not be obligated to post bond or other security in seeking such relief.  In no event shall an asserted violation of the provisions of this Section 9 constitute a basis for deferring or withholding any amounts otherwise payable to Executive under this Agreement, but the Company otherwise shall be entitled to all other remedies that may be available to it at law or in equity.  Executive acknowledges that the foregoing provisions of this Section 9 are reasonable and necessary for the protection of the Company and its Affiliates, and that they will be materially and irrevocably damaged if these provisions are not specifically enforced.  Accordingly, Executive agrees that, in addition to any other relief or remedies available to the Company and its Affiliates, they shall be entitled to seek an appropriate injunctive or other equitable remedy for the purposes of restraining Executive from any actual or threatened breach of or otherwise enforcing these provisions and no bond or security will be required in connection therewith.  If any provision of this Section 9 is deemed invalid or unenforceable, such provision shall be deemed modified and limited to the extent necessary to make it valid and enforceable.  For purposes of this Section 9, references to the "Company" and "Affiliates" shall refer to the Company and the Company's Affiliates as of the date immediately prior to the CIC Effective Date.

10.    **Successors**.

(a)    This Agreement is personal to Executive and without the prior written consent of the Company shall not be assignable by Executive other than by will or the laws of descent and distribution.  This Agreement shall inure to the benefit of and be enforceable by Executive's legal representatives.

(b)    This Agreement shall inure to the benefit of and be binding upon the Company and its successors and assigns.  Except as provided in Section 10(c), without the prior written consent of Executive, this Agreement shall not be assignable by the Company.

14

(c)    The Company will require any successor (whether direct or indirect, by purchase, merger, consolidation or otherwise) to all or substantially all of the business and/or assets of the Company to assume expressly and agree to perform this Agreement in the same manner and to the same extent that the Company would be required to perform it if no such succession had taken place.  As used in this Agreement, "Company" shall mean the Company as hereinbefore defined and any successor to its business and/or assets as aforesaid which assumes and agrees to perform this Agreement by operation of law, or otherwise.

11.    **Miscellaneous**.

(a)    **Governing Law and Dispute Resolution**.  This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without reference to principles of conflict of laws.  The parties irrevocably submit to the jurisdiction of any state or federal court sitting in or for the State of New York with respect to any dispute arising out of or relating to this Agreement, and each party irrevocably agrees that all claims in respect of such dispute or proceeding shall be heard and determined in such courts.  The parties hereby irrevocably waive, to the fullest extent permitted by law, any objection that they may now or hereafter have to the venue of any dispute arising out of or relating to this Agreement or the transactions contemplated hereby brought in such court or any defense of inconvenient forum for the maintenance of such dispute or proceeding.  Each party agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  THE PARTIES HEREBY WAIVE A TRIAL BY JURY IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT OR ASSERTED BY EITHER OF THE PARTIES HERETO AGAINST THE OTHER ON ANY MATTERS WHATSOEVER ARISING OUT OF OR IN ANY WAY RELATED TO THIS AGREEMENT.

(b)    **Notices**.  All notices and other communications hereunder shall be in writing and shall be given by hand delivery to the other party or by registered or certified mail, return receipt requested, postage prepaid, addressed as follows:

If to Executive:  To the most recent address on file with the Company.

If to the Company:

Capri Holdings Limited
11 West 42nd Street
New York, NY 1036
Attention:  SVP, Chief People Officer

or to such other address as either party shall have furnished to the other in writing in accordance herewith.  Notice and communications shall be effective when actually received by the addressee.

(c)    **Invalidity**.  If any term or provision of this Agreement or the application thereof to any person or circumstance shall to any extent be invalid or unenforceable, the remainder of this Agreement or the application of such term or provision to persons or circumstances other than those to which it is invalid or unenforceable shall not be affected thereby, and each term and provision of this Agreement shall be valid and be enforced to the fullest extent permitted by law.

15

(d) **Survivorship**.  Upon the expiration or other termination of this Agreement or Executive's employment, the respective rights and obligations of the parties hereto shall survive to the extent necessary to carry out the intentions of the parties under this Agreement.

(e) **Section Headings; Construction**.  The section headings used in this Agreement are included solely for convenience and shall not affect, or be used in connection with, the interpretation hereof.  For purposes of this Agreement, the term "including" shall mean "including, without limitation."

(f) **Counterparts**.  This Agreement may be executed in several counterparts, each of which shall be deemed to be an original but all of which together shall constitute one and the same instrument.

(g) **Amendments; Waiver**.  No provision of this Agreement shall be modified or amended except by an instrument in writing duly executed by the parties hereto.  Executive's or the Company's failure to insist upon strict compliance with any provision hereof or any other provision of this Agreement or the failure to assert any right Executive or the Company may have hereunder, including the right of Executive to terminate employment for Good Reason pursuant to Section 4(c)(i)-(v), shall not be deemed to be a waiver of such provision or right or any other provision or right of this Agreement.

(h) **At-Will Employment**.  Executive and the Company acknowledge that, except as may otherwise be provided under any other written agreement between Executive and the Company, the employment of Executive by the Company is "at will" and, subject to Section 1(e) of this Agreement, prior to the CIC Effective Date, Executive's employment may be terminated by either Executive or the Company at any time prior to the CIC Effective Date, in which case Executive shall have no further rights under this Agreement.  From and after the CIC Effective Date, except as specifically provided herein, this Agreement shall supersede any other employment agreement between the parties.  For the avoidance of doubt, prior to the CIC Effective Date, any other employment agreement between the parties shall continue to govern the relationship between the parties.

(i) **Entire Agreement**.  This Agreement constitutes the entire agreement of the parties hereto in respect of the terms and conditions of Executive's employment with the Company and its Affiliates, including Executive's severance entitlements, and, as of the CIC Effective Date, supersedes and cancels in their entirety all prior understandings, agreements and commitments, whether written or oral, relating to the terms and conditions of employment between Executive, on the one hand, and the Company or its Affiliates, on the other hand, including the Amended and Restated Employment Agreement between Executive and the Company dated as of the date hereof.  For the avoidance of doubt, this Agreement does not limit the terms of any benefit plans (including equity award agreements) of the Company or its Affiliates that are applicable to Executive, except to the extent that the terms of this Agreement are more favorable to Executive.  From and after the CIC Effective Date, the obligations of Executive under Section 9 shall be the exclusive restrictive covenants to which Executive is bound and any other restrictive covenants set forth in any agreement between Executive and the Company or its Affiliates, including any equity award agreement shall be void and of no force and effect.

(j)    **Tax Withholding**.    The Company may withhold from any amounts payable under this Agreement such Federal, state, local or foreign taxes as shall be required to be withheld pursuant to any applicable law or regulation.

(k)    **Section 409A**.

(i)    **General**.  It is intended that payments and benefits made or provided under this Agreement shall not result in penalty taxes or accelerated taxation pursuant to Section 409A of the Code.  Any payments that qualify for the "short-term deferral" exception, the separation pay exception or another exception under Section 409A of the Code shall be paid under the applicable exception.  For purposes of the limitations on nonqualified deferred compensation under Section 409A of the Code, each payment of compensation under this Agreement shall be treated as a separate payment of compensation.  All payments to be made upon a termination of employment under this Agreement may only be made upon a "separation from service" under Section 409A of the Code to the extent necessary in order to avoid the imposition of penalty taxes on Executive pursuant to Section 409A of the Code.  In no event may Executive, directly or indirectly, designate the calendar year of any payment under this Agreement, and to the extent required by Section 409A of the Code, any payment that may be paid in more than one taxable year shall be paid in the later taxable year.  Notwithstanding any other provision of this Agreement to the contrary, solely for the purpose of determining the timing of payment or distribution of any compensation or benefit that constitutes "nonqualified deferred compensation" within the meaning of Section 409A of the Code (and not the right to vest in or be entitled to receive any such payment or benefit) that may only be made or changed (including a change in the form of payment) upon an event described in Section 409A(a)(2)(A)(v) of the Code and the regulations thereunder, such payment shall only be made or timing or form changed if the Change in Control also constitutes an event described in Section 409A(a)(2)(A)(v) of the Code.

(ii)    **Reimbursements and In-Kind Benefits**.  Notwithstanding anything to the contrary in this Agreement, all reimbursements and in-kind benefits provided under this Agreement that are subject to Section 409A of the Code shall be made in accordance with the requirements of Section 409A of the Code, including, where applicable, the requirement that (A) any reimbursement is for expenses incurred during Executive's lifetime (or during a shorter period of time specified in this Agreement); (B) the amount of expenses eligible for reimbursement, or in-kind benefits provided, during a calendar year may not affect the expenses eligible for reimbursement, or in-kind benefits to be provided, in any other calendar year; (C) the reimbursement of an eligible expense will be made no later than the last day of the calendar year following the year in which the expense is incurred; and (D) the right to reimbursement or in-kind benefits is not subject to liquidation or exchange for another benefit.

(iii)    **Delay of Payments**.  Notwithstanding any other provision of this Agreement to the contrary, if Executive is considered a "specified employee" for purposes of Section 409A of the Code (as determined in accordance with the methodology established by the Company and its Affiliates as in effect on the Date of Termination), any payment that constitutes nonqualified deferred compensation within the meaning of Section 409A of the Code that is otherwise due to Executive under this Agreement during the six-month period immediately following Executive's separation from service on account of Executive's separation from service shall instead be paid, with Interest (based on the rate in effect for the month in which Executive's separation from service occurs), on the first business day of the seventh month following Executive's separation from service (the "**Delayed Payment Date**"), to the extent necessary to prevent the imposition of tax penalties on Executive under Section 409A of the Code.  If

17

Executive dies during the postponement period, the amounts and entitlements delayed on account of Section 409A of the Code shall be paid to the personal representative of Executive's estate on the first to occur of the Delayed Payment Date or 30 calendar days after the date of Executive's death.

(l)    **Indemnification**.  The Company shall indemnify Executive and hold her harmless to the fullest extent permitted by law and under the charter and bylaws of the Company (including the advancement of expenses) against, and with respect to, any and all actions, suits, proceedings, claims, demands, judgments, costs, expenses (including reasonable attorney fees), losses and damages resulting from Executive's good faith performance of Executive's duties and obligations with the Company and its Affiliates.  During the Employment Period and for as long thereafter as is practicable, Executive shall be covered under a directors' and officers' liability insurance policy with coverage limits in amounts no less than, and with terms and conditions no less favorable than, that or those maintained by the Company as of immediately prior to the CIC Effective Date. In addition, any individual indemnification agreement between Executive and the Company in effect immediately prior to the CIC Effective Date shall continue in full force and effect in accordance with its terms.

*[Signature Page Follows]*

18

**IN WITNESS WHEREOF**, Executive has hereunto set Executive's hand and, pursuant to the authorization from the Board, the Company has caused this Agreement to be executed in its name on its behalf, all as of the day and year first above written.

EXECUTIVE:

/s/ Krista A. McDonough
Jenna A. Hendricks

COMPANY:

By: /s/ John D. Idol
John D. Idol
Chairman and Chief Executive Officer
Capri Holdings Limited

*[Change in Control Continuity Agreement Signature Page]*

THIS GENERAL RELEASE OF CLAIMS (this "**Release**") is entered into between [___] ("**Executive**") and Capri Holdings Limited (the "**Company**") as of [**DATE**]. The entering into and non-revocation of this Release is a condition to Executive's right to receive the severance payments and benefits under Sections 5(a)(i)(B), 5(a)(i)(C), 5(a)(ii) and 5(a)(iii) of Executive's Change in Control Continuity Agreement, dated as of [●], 2023 (the "**CIC Continuity Agreement**"). Capitalized terms used in this Release that are not otherwise defined shall have the meanings set forth in the CIC Continuity Agreement.

Accordingly, Executive and the Company agree as follows:

1.      <u>General Release</u>.

(a)      In consideration for the payments to be provided to Executive pursuant to Sections 5(a)(i)(B), 5(a)(i)(C), 5(a)(ii) and 5(a)(iii) of the CIC Continuity Agreement, Executive, for herself and for Executive's heirs, executors, administrators, trustees, legal representatives and assigns (hereinafter referred to collectively as "**Releasors**"), forever releases and discharges the Company and its past, present and future parent entities, subsidiaries, divisions, affiliates and related business entities, successors and assigns, assets, employee benefit and/or pension plans or funds (including qualified and non-qualified plans or funds), and any of its or their respective past, present and/or future directors, officers, fiduciaries, agents, trustees, administrators, employees, insurers, attorneys and assigns, acting on behalf of the Company or in connection with Company business (collectively, the "**Company Entities**") from any and all claims, demands, causes of action, fees and liabilities of any kind whatsoever (upon any legal or equitable theory, whether contractual, common-law, statutory, federal, state, local, or otherwise), whether known or unknown, which Executive ever had, now have, or may have against any of the Company Entities by reason of any act, omission, transaction, practice, plan, policy, procedure, conduct, occurrence, or other matter related to Executive's employment or the termination thereof up to and including the date on which Executive signs this Release.

(b)      Without limiting the generality of the foregoing, this Release is intended to and shall release the Company Entities from any and all claims, whether known or unknown, which Releasors ever had, now have, or may have against the Company Entities arising out of Executive's employment and/or Executive's separation from that employment, including, but not limited to, any claim under: (i) the Age Discrimination in Employment Act, as amended by the Older Workers Benefit Protection Act, (ii) Title VII of the Civil Rights Act of 1964 or under the Civil Rights Act of 1991, (iii) the Americans with Disabilities Act; (iv) the Employee Retirement Income Security Act of 1974 (excluding claims for accrued, vested benefits under any employee benefit or pension plan of the Company Entities subject to the terms and conditions of such plan and applicable law), (v) the Family and Medical Leave Act, (vi) 42 USC §§ 1981-86, (vii) the Equal Pay Act, (viii) the Sarbanes-Oxley Act of 2002, (ix) Section 922 of the Dodd-Frank Act, (x) the Federal False Claims Act, the New York State Human Rights Law; (xi) the New York City Administrative Code; (xii) the New York Labor Law; (xiii) the New York Minimum Wage Act; (xiv) the statutory provisions regarding retaliation/ discrimination under the New York Worker's Compensation Law; and (xv) the New York City Earned Sick Time Act, as all of those statutes may have been amended. Without limiting the generality of the foregoing, this Release is also intended to and shall release the Company Entities from any and all claims, whether known or unknown, which Releasors ever had, now have, or may have against the Company Entities, whether based on federal, state, or local law, statutory or decisional, arising out of Executive's employment, the termination of such employment, and/or any of the events relating

directly or indirectly to or surrounding the termination of that employment, including, but not limited to, any claims for wrongful or retaliatory discharge, breach of contract (express, implied or otherwise), breach of the covenant of good faith and fair dealing, detrimental reliance, interference with contractual relations or any prospective business advantage, defamation, slander or libel, invasion of privacy, intentional and negligent infliction of emotional distress, false imprisonment, compensatory or punitive damages, any claims for attorneys' fees, costs, disbursements and/or the like, any claims for wages, bonuses, or other benefits, and any claims for negligence or intentional tort, arising up to and including the date on which Executive signs this Release.

(c)     Nothing in this Release prevents Executive from providing truthful information to any governmental entity, nor does it interfere with Executive's right to file a charge with or participate in any investigation or proceeding conducted by the Department of Labor, the National Labor Relations Board, the Occupational Safety and Health Administration, the Equal Employment Opportunity Commission or a state or local fair employment practices agency. Nevertheless, Executive acknowledges and agrees that Executive hereby waives any right to seek or to share in any relief, monetary or otherwise, relating to any claim released herein whether such claim was initiated by Executive or not. In addition, nothing in this Release shall impair Executive's right under the whistleblower provisions of any applicable federal law or regulation or, for the avoidance of doubt, limit Executive's right to receive an award for the information provided to any government authority under such law or regulation.

(d)     Notwithstanding the foregoing, this Release shall not release the Company from: (i) any obligations under the CIC Continuity Agreement or Executive's right to enforce the terms of the CIC Continuity Agreement; (ii) any obligations regarding any rights of Executive as a current or former officer, director or employee of the Company or its affiliates to indemnification under the terms of the CIC Continuity Agreement, the Company's bylaws or charter or any insurance policy or other agreement under which Executive is entitled to indemnification or directors' and officers' liability coverage; (iii) any claims or causes of action that cannot legally be waived, including, but not limited to, any claim for earned but unpaid wages, workers' compensation benefits, unemployment benefits, and vested 401(k) benefits; (iv) any claims that may arise in the future from events or actions occurring after the date on which Executive signs this Release; and (v) any claims as the holder or beneficial owner of securities (or other rights relating to securities, including equity awards) of the Company or its affiliates. By signing this Release, Executive represents that Executive has not commenced or joined in any claim, charge, action or proceeding whatsoever against the Company or any of the Company Entities arising out of or relating to any of the matters set forth in this paragraph.

2.     <u>Acknowledgement</u>.     Executive acknowledges and agrees that the provisions in <u>Section 9</u> of the CIC Continuity Agreement shall remain in full force and effect in accordance with the terms of the CIC Continuity Agreement.

3.     <u>Not an Admission</u>.     This Release is not intended, and shall not be construed, as an admission that any of the Company Entities has violated any federal, state or local law (statutory or decisional), ordinance or regulation, breached any contract or committed any wrong whatsoever against Executive. nor is it intended, and shall not be construed as, an admission by Executive that Executive has violated any federal, state or local law (statutory or decisional), ordinance or regulation, breached any contract or committed any wrong whatsoever.

PX7098-235

4.      Entire Agreement.  This Release constitutes the entire agreement between the parties with respect to the subject matter of this Release.  No amendment to this Release shall be binding upon either party unless in writing and signed by or on behalf of such party.

5.      Severability.    Should any provision of this Release be declared or determined by any court to be illegal, invalid or unenforceable, the validity of the remaining parts, terms or provisions shall not be affected, and each remaining part, term or provision shall be legal, valid and enforceable to the fullest extent permitted by law, and any illegal, invalid or unenforceable part, term or provision shall be deemed not to be a part of this Release.

6.      Jurisdiction/Choice of Law/Waiver of Jury Trial.  Executive agrees that the provisions of this Release shall be construed in accordance with the internal laws of the State of New York, without regard to the conflict of law provisions of any state.  Both parties hereby waive any right to a jury trial.

7.      Knowing and Voluntary Agreement.  Executive acknowledges that Executive:

        (a) has carefully read this Release in its entirety;

        (b)     has had an opportunity to consider it for at least twenty-one (21) days to consider the actual terms of this Release;

        (c)     is hereby advised by the Company in writing to consult with an attorney of Executive's choice in connection with this Release;

        (d)     fully understands the significance of all of the terms and conditions of this Release and has discussed them with Executive's independent legal counsel, or has had a reasonable opportunity to do so;

        (e)     has had answered to Executive's satisfaction by Executive's independent legal counsel any questions Executive has asked with regard to the meaning and significance of any of the provisions of this Agreement; and

        (f)     is signing this Agreement voluntarily and of Executive's own free will and agrees to abide by all the terms and conditions contained herein.

8.      Effectiveness.   Executive understands that Executive will have at least twenty-one (21) days from the date of receipt of this Release to consider the terms and conditions of this Release. Executive may accept this Release by signing it and returning it to:

            Capri Holdings Limited
            11 West 42nd Street
            New York, NY 1036
            Attention:  SVP, Chief People Officer

on or before 21 days after delivery. After executing this Release, Executive shall have seven (7) days (the "**Revocation Period**") to revoke this Release by indicating Executive's desire to do so in writing delivered to the Company's SVP, Chief People Officer at the address set forth above by no later than 5:00 p.m. on the seventh (7th) day after the date Executive signs this Release. The effective date of this Release shall be the

A-3

eighth (8th) day after Executive signs the Release. If the last day of the Revocation Period falls on a Saturday, Sunday or holiday, the last day of the Revocation Period will be deemed to be the next business day. In the event Executive does not accept this Release as set forth above, or in the event Executive revokes this Release during the Revocation Period, this Release shall be deemed automatically null and void.

*PLEASE READ THIS RELEASE CAREFULLY.  IT CONTAINS A GENERAL RELEASE OF ALL KNOWN AND UNKNOWN CLAIMS ARISING OUT OF EXECUTIVE'S EMPLOYMENT.*

Executive has read this Release and is fully aware of the legal effects of this Release.  Executive has chosen to execute this Release freely, without reliance upon any promises or representations made by the Company other than those contained in this Release and understands that Executive will receive the payments and benefits provided under the CIC Continuity Agreement as set forth on Schedule I, less any applicable tax withholdings, in accordance with the terms of the CIC Continuity Agreement following the date on which this Release becomes irrevocable as described above.

Dated: _____

EXECUTIVE

_____

A-4

### SCHEDULE I
### SEVERANCE BENEFITS

| Payment or Benefit | Amount | Payment Timing |
|---|---|---|
| **Accrued Obligations (not subject to Release)** | $[●] (Annual Base Salary)<br><br>$[●] (Unpaid Annual Bonus)<br><br>$[●] (Accrued Vacation)<br><br>$[●] (Unreimbursed Expenses) | |
| **Pro Rata Bonus** | **$[●]** | |
| **Severance Payment** | **$[●]** | |
| **Welfare Benefits Payment** | **$[●]** | |
| **Outplacement** | Up to $25,000 | |
| **Other Benefits (not subject to Release)** | [To be specified as applicable] | |

Exhibit 21.1

### LIST OF SUBSIDIARIES OF CAPRI HOLDINGS LIMITED

| Entity Name | Jurisdiction of Formation |
| --- | --- |
| Aruba MK Retail N.V. | Aruba |
| Capri (Australia) Pty Ltd | Australia |
| Capri Finance Hong Kong Limited | Hong Kong, China |
| Capri Finance Malta Limited | Malta |
| Capri Finance USA L.L.C. | Delaware |
| Capri Footwear Industries S.r.l. | Italy |
| Capri (Hungary) Holdings Kft | Hungary |
| Capri Insurance Delaware Limited | Delaware |
| Capri Insurance Guernsey Limited | Guernsey |
| Capri Luxury Finance Limited | United Kingdom |
| Capri Operations Limited | British Virgin Islands |
| Capri (Switzerland) GmbH | Switzerland |
| Capri (Switzerland) Holdings GmbH | Switzerland |
| Capri UK Holdings Limited | United Kingdom |
| Capri UK Intermediate Limited | United Kingdom |
| Capri UK Investments Limited | United Kingdom |
| Capri UK Ventures Limited | United Kingdom |
| Capri USA L.L.C. | Delaware |
| Capri USA Holdings LLC | Delaware |
| Capri USA Intermediate LLC | Delaware |
| Creek Apartments Limited | U.A.E. |
| FRANCHOO S.A.S | France |
| Gianni Versace S.r.l. | Italy |
| GIVI Holding S.r.l. | Italy |
| G. Versace Hellas S.A. | Greece |
| ITACHOO S.r.l. | Italy |
| JC Gulf Trading LLC | U.A.E. |
| J. Choo (Asia) Limited | Hong Kong, China |
| J. Choo Austria GmbH | Austria |
| J. Choo (Belgium) BVBA | Belgium |
| J. Choo Canada Inc. | Canada |
| J. Choo Czech, s.r.o. | Czech Republic |
| J. Choo Denmark ApS | Denmark |
| J Choo Florida, Inc. | Delaware |
| J Choo Germany GmbH | Germany |
| J. Choo Hungary Kft | Hungary |
| J. Choo Limited | United Kingdom |
| J. Choo (Macau) Co., Limited | Macau, China |
| J. Choo Netherlands B.V. | Netherlands |
| J. Choo Norway AS | Norway |
| J. Choo Portugal, Unipessoal LDA | Portugal |
| J. Choo RUS L.L.C. | Russia |
| J. Choo Russia JV Limited | United Kingdom |
| J. Choo Sweden AB | Sweden |
| J Choo (Switzerland) AG | Switzerland |
| J. Choo (Thailand) Co., Ltd. | Thailand |
| J Choo USA, Inc. | Delaware |
| JC ME Trading DWC L.L.C. | U.A.E. free zone |
| JC Services ME DMCC L.L.C. | U.A.E. free zone |
| Jimmy Choo Florence S.r.l. | Italy |
| Jimmy Choo Group Limited | United Kingdom |

| Entity Name | Jurisdiction of Formation |
|---|---|
| Jimmy Choo Hong Kong Limited | Hong Kong, China |
| Jimmy Choo Korea Limited | South Korea |
| Jimmy Choo (Malaysia) Sdn. Bhd | Malaysia |
| Jimmy Choo (Shanghai) Trading Co. Limited | China |
| Jimmy Choo (Singapore) Pte. Limited | Singapore |
| JIMMY CHOO SPAIN S.L.U. | Spain |
| Jimmy Choo Tokyo K.K. | Japan |
| Michael Kors (Austria) GmbH | Austria |
| Michael Kors Aviation, L.L.C. | Delaware |
| Michael Kors Belgium BV | Belgium |
| Michael Kors (Bucharest Store) S.R.L. | Romania |
| Michael Kors (Canada) Holdings Ltd. | Canada |
| Michael Kors Columbia SAS | Columbia |
| Michael Kors (Czech Republic) s.r.o. | Czech Republic |
| Michael Kors (Denmark) ApS | Denmark |
| Michael Kors Do Brasil Comercio De Accesorios E Vestuario Ltda. | Brazil |
| Michael Kors Dominicana S.A.S. | Dominican Republic |
| Michael Kors (Europe) B.V. | Netherlands |
| Michael Kors (France) SAS | France |
| Michael Kors (Germany) GmbH | Germany |
| Michael Kors (HK) Limited | Hong Kong, China |
| Michael Kors (Hungary) Kft. | Hungary |
| Michael Kors (Ireland) Limited | Ireland |
| Michael Kors Italy S.R.L. Con Socio Unico | Italy |
| Michael Kors Japan, LLC | Japan |
| Michael Kors Korea Yuhan Hoesa | South Korea |
| Michael Kors (Latvia) SIA | Latvia |
| Michael Kors Limited | Hong Kong, China |
| Michael Kors, L.L.C. | Delaware |
| Michael Kors (Luxembourg) Retail S.à r.l. | Luxembourg |
| Michael Kors (Netherlands) B.V. | Netherlands |
| Michael Kors (Panama) Holdings, Inc. | Panama |
| Michael Kors (Poland) Sp. z o.o. | Poland |
| Michael Kors (Portugal) Lda. | Portugal |
| Michael Kors Retail, Inc. | Delaware |
| Michael Kors Spain, S.L.U. | Spain |
| Michael Kors Stores (California), LLC | Delaware |
| Michael Kors Stores, L.L.C. | New York |
| Michael Kors (Sweden) AB | Sweden |
| Michael Kors (Switzerland) GmbH | Switzerland |
| Michael Kors (Switzerland) Holdings GmbH | Switzerland |
| Michael Kors (Switzerland) International GmbH | Switzerland |
| Michael Kors (Switzerland) Retail GmbH | Switzerland |
| Michael Kors Trading (Shanghai) Company Limited | China |
| Michael Kors (UK) Limited | United Kingdom |
| Michael Kors (USA) Holdings, Inc. | Delaware |
| Michael Kors (USA), Inc. | Delaware |
| Michael Kors Virginia, L.L.C. | Virginia |
| MK Chile SpA | Chile |
| MK Holetown (Barbados) Inc. | Barbados |
| MKJC Limited | British Virgin Islands |
| MK Operations E-zone Curacao N.V. | Curaçao |
| MK (Panama) Operations, Inc. | Panama |
| MK Panama Retail, S.A. | Panama |

| Entity Name | Jurisdiction of Formation |
|---|---|
| MK Retail Operation CR S.A. | Costa Rica |
| MK Retail (SXM) N.V. | St. Maarten |
| MK (Shanghai) Commercial Trading Company Limited | China |
| UAB Michael Kors (Lithuania) | Lithuania |
| Versace Asia Pacific Limited | Hong Kong, China |
| Versace Australia Pty Limited | Australia |
| Versace Austria GmbH | Austria |
| Versace Belgique SA | Belgium |
| Versace Canada, Inc. | Canada |
| Versace China Limited | China |
| Versace Czech s.r.o. | Czech Republic |
| Versace Deutschland GmbH | Germany |
| Versace Do Brasil Importação e Distribuição de Produtos de Vestuário e Acessórios Ltda. | Brazil |
| Versace España, S.A.U. | Spain |
| Versace España, S.A.U. – Sucursal em Portugal | Portugal |
| Versace France S.A. | France |
| Versace Japan Co., Ltd. | Japan |
| Versace Korea Co., Ltd. | South Korea |
| Versace Macau Limited | Macau, China |
| Versace Malaysia Sdn. Bhd. | Malaysia |
| Versace Monte-Carlo S.A.M. | Principality of Monaco |
| Versace Nederland | Netherlands |
| Versace Shanghai Limited | China |
| Versace Singapore Pte. Ltd. | Singapore |
| Versace Suisse SA | Switzerland |
| Versace Taiwan Co., Limited | Taiwan, China |
| Versace (Thailand) Co., Ltd. | Thailand |
| Versace U.K. Ltd. | United Kingdom |
| Versace USA, Inc. | New York |

Exhibit 23.2

**Consent of Independent Registered Public Accounting Firm**

We consent to the incorporation by reference in the Registration Statements on Form S-8 (Nos. 333-178486, 333-249023, 333-234699 and 333-266480) pertaining to the Amended and Restated Omnibus Incentive Plan, Second Amended and Restated Omnibus Incentive Plan, Deferred Compensation Plan, and Third Amended and Restated Omnibus Incentive Plan of Capri Holdings Limited and subsidiaries of our reports dated May 31, 2023 with respect to the consolidated financial statements and the effectiveness of internal control over financial reporting of Capri Holdings Limited and subsidiaries, included in this Annual Report (Form 10-K) for the year ended April 1, 2023.

/s/ ERNST & YOUNG LLP

New York, New York
May 31, 2023

**Exhibit 31.1**

## CERTIFICATIONS

I, John D. Idol, certify that:

1.  I have reviewed this Form 10-K of Capri Holdings Limited;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and we have:

    a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent function):

    a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: May 31, 2023

By:    /s/ John D. Idol
       ———————————————
       John D. Idol
       *Chief Executive Officer*

**Exhibit 31.2**

**CERTIFICATIONS**

I, Thomas J. Edwards, Jr., certify that:

1. I have reviewed this Form 10-K of Capri Holdings Limited;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and we have:

   a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent function):

   a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: May 31, 2023


By:    /s/ Thomas J. Edwards, Jr.
           Thomas J. Edwards, Jr
           *Chief Financial Officer*

**Exhibit 32.1**

**CERTIFICATION PURSUANT TO 18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with this annual report on Form 10-K of Capri Holdings Limited (the "Company") for the year ended April 1, 2023 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, John D. Idol, Chief Executive Officer of the Company, hereby certify pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

(i)   The Report fully complies with the requirements of Section 13(a) or Section 15(d) of the Securities Exchange Act of 1934, as amended; and

(ii)  The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of Capri Holdings Limited.

Date: May 31, 2023

/s/ John D. Idol

_John D. Idol_
_Chief Executive Officer_
_(Principal Executive Officer)_

The foregoing certification is being furnished solely pursuant to 18 U.S.C. Section 1350 and is not being filed as part of this Report.

**Exhibit 32.2**

## CERTIFICATION PURSUANT TO 18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

In connection with this annual report on Form 10-K of Capri Holdings Limited (the "Company") for the year ended April 1, 2023 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Thomas J. Edwards, Jr., Chief Financial Officer of the Company, hereby certify pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

(i) The Report fully complies with the requirements of Section 13(a) or Section 15(d) of the Securities Exchange Act of 1934, as amended; and

(ii) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of Capri Holdings Limited.

Date:  May 31, 2023

/s/ Thomas J. Edwards, Jr.
_____
*Thomas J. Edwards, Jr.*
*Chief Financial Officer*
*(Principal Financial Officer)*

The foregoing certification is being furnished solely pursuant to 18 U.S.C. Section 1350 and is not being filed as part of this Report.

PX7098-247

BRG1890L-0523-10K

PX7098-248