# EXHIBIT 64

1     Abby L. Dennis, DC Bar No. 994476
      Peggy Bayer Femenella, DC Bar No. 472770
2     Joshua Goodman, NY Bar (No Number)
      Jeanine Balbach, MD Bar (No Number)
3

4     Federal Trade Commission
      600 Pennsylvania Avenue, NW
      Washington, DC 20580
5     Tel: (202) 326-2381

6     *adennis@ftc.gov; pbayer@ftc.gov;*
      *jgoodman@ftc.gov; jbalbach@ftc.gov*
7

8     [Additional counsel identified on signature page in accordance with Local Rule 3-4(a)(1)]

9                **UNITED STATES DISTRICT COURT**
               **NORTHERN DISTRICT OF CALIFORNIA**
10                 **SAN JOSE DIVISION**

11

12

13     **FEDERAL TRADE COMMISSION**,

              Plaintiff,             Case No. 5:22-cv-04325-EJD

14                                         **PLAINTIFF FEDERAL TRADE**
            v.                           **COMMISSION'S MEMORANDUM OF**
15                                          **POINTS AND AUTHORITIES IN**
    **META PLATFORMS, INC., et al.**             **SUPPORT OF MOTION FOR A**
16                                          **PRELIMINARY INJUNCTION**
               Defendants.
17                                          **REDACTED VERSION OF DOCUMENT**
                                         **SOUGHT TO BE SEALED**
18

19

20

21

22

23

24

25

26

27

28

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that, on December 8, 2022, Plaintiff Federal Trade Commission ("FTC" or "Commission") shall move and hereby does move the Court for a preliminary injunction against Defendants Meta Platforms, Inc. ("Meta") and Within Unlimited, Inc. ("Within") pursuant to 15 U.S.C. § 53(b) and Civil L.R. 7-2. Plaintiff respectfully requests that this Court issue, prior to 8:59 p.m. Pacific Time on Saturday, December 31, 2022, a preliminary injunction that will preserve the status quo and prevent Meta and its subsidiaries from consummating its proposed acquisition of Within (the "Acquisition") while the Commission adjudicates whether the Acquisition is unlawful in an administrative proceeding. The Commission initiated the administrative proceeding regarding the legality of the Acquisition under antitrust law, pursuant to Sections 7 and 11 of the Clayton Act, 15 U.S.C. §§ 18, 21, and Section 5 of the FTC Act, 15 U.S.C. § 45, by filing an administrative complaint on August 11, 2022. The administrative trial will begin on January 19, 2023. Absent a preliminary injunction, Defendants have represented that they would be free to consummate the Acquisition after 11:59 p.m. Eastern Time (or 8:59 p.m. Pacific Time) on December 31, 2022.

The FTC's motion is based on this Notice of Motion; the Memorandum of Points and Authorities in Support filed concurrently; the declaration of Justin Epner and the attachments thereto; all other pleadings on file in this action; and any other written or oral argument that the FTC may present to the Court.

## ISSUE TO BE DECIDED

Whether the Court should grant a preliminary injunction to preserve the status quo and prevent Defendants from consummating the Acquisition until the Commission has had an opportunity to adjudicate the merger's legality in an administrative proceeding when (1) the Commission has found reason to believe that the proposed Acquisition may substantially lessen competition, or tend to create a monopoly, in one or more relevant markets; (2) the FTC is likely to succeed on the merits; and (3) the balance of the equities is in favor of the FTC.

# TABLE OF CONTENTS

NOTICE OF MOTION AND MOTION ............................................................................................. i

ISSUE TO BE DECIDED ............................................................................................................... i

MEMORANDUM OF POINTS AND AUTHORITIES ............................................................... 1

INTRODUCTION ............................................................................................................................ 1

I.      FACTUAL BACKGROUND .................................................................................... 3

II.     ARGUMENT ............................................................................................................. 10

        A.      The FTC Is Likely to Succeed on the Merits of Its Section 7 Challenge. ........... 11

                1.      The Relevant Market Is the Sale of VR Dedicated Fitness Apps in the United States. ..................................................................................................... 13

                2.      The Acquisition Poses a Reasonable Probability of Substantially Lessening Competition in the VR Dedicated Fitness App Market. ..................................... 16

                        a)      The VR Dedicated Fitness App Market Is Concentrated. ............................ 17

                        b)      It Is Reasonably Probable That Meta Would Enter the Market Through Other Means Absent the Acquisition, Leading to Procompetitive Effects. .... 18

                        c)      Within Reasonably Perceived Meta as a Potential Entrant, and Meta's Presence on the Edge of the Market Likely Benefits Competition. ............... 21

                3.      Defendants Cannot Rebut the FTC's Case. .................................................. 23

        B.      The Equities Support a Temporary Restraining Order ......................................... 24

CONCLUSION ............................................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**

*BOC Int'l Ltd. v. FTC*, 557 F.2d 24 (2d Cir. 1977) ........................................................ 19

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) ......................................... 13, 14, 16

*California v. Am. Stores Co.*, 872 F.2d 837 (9th Cir. 1989) ...................................... 11

*California v. Am. Stores Co.*, 495 U.S. 271 (1990) .................................................. 11

*Dang v. San Francisco Forty Niners*, 964 F. Supp. 2d 1097 (N.D. Cal. 2013) ........... 13

*FTC v. Affordable Media*, 179 F.3d 1228 (9th Cir. 1999) ......................................... 10

*FTC v. CCC Holdings Inc.*, 605 F. Supp. 2d 26 (D.D.C. 2009) ................................. 11

*FTC v. H.J. Heinz Co.*, 246 F.3d 708 (D.C. Cir. 2001) ................................... 11, 12, 24

*FTC v. Nat'l Tea Co.*, 603 F.2d 694 (8th Cir. 1979) ................................................. 11

*FTC v. Peabody Energy Corp.*, 492 F. Supp. 3d 865 (E.D. Mo. 2020) ...................... 24

*FTC v. Procter & Gamble Co.*, 386 U.S. 568 (1967) ................................................ 21

*FTC v. ProMedica Health Sys. Inc.*., 2011 WL 1219281 (N.D. Ohio Mar. 29, 2011) ........ 24

*FTC v. Staples Inc.*, 970 F. Supp. 1066 (D.D.C. 1997) ............................................. 16

*FTC v. Warner Commc'ns Inc.*, 742 F.2d 1156 (9th Cir. 1984) .......................... 10, 11, 23, 24

*FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028 (D.C. Cir. 2008) ........................... 11, 23

*Greyhound Computer Corp., Inc. v. Int'l Bus. Machines Corp.*,
   559 F.2d 488 (9th Cir. 1977) ............................................................................. 17

*Image Tech. Servs. v. Eastman Kodak*, 125 F.3d 1195 (9th Cir. 1997) ...................... 13

*In re Union Carbide Corp.*, 59 F.T.C. 614, 1961 WL 65409 (Sept. 25, 1961) ............ 17

*Klein v. Facebook, Inc.*, 580 F. Supp. 3d 743 (N.D. Cal. 2022) ............................... 13

*Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 414 F. Supp. 3d 1256 (N.D. Cal. 2019) ........ 17

*Phillips Petrol. Co. v. United States,* 418 U.S. 906 (1974) .................................. 12, 18

*St. Alphonsus Med. Ctr.-Nampa, Inc. v. St. Luke's Health Sys. Ltd.*, 778 F.3d 775
   (9th Cir. 2015) .................................................................................. 13, 17, 24

*Tenneco, Inc. v. FTC*, 689 F.2d 346 (2d Cir. 1982) .............................................. 16, 18

*United States v. Bazaarvoice, Inc.*, 2014 WL 203966 (N.D. Cal. Jan. 8, 2014) .... ........16, 17, 23

*United States v. Black & Decker Mfg. Co.*, 430 F. Supp. 729 (D. Md. 1976) ............................ 22

*United States v. Falstaff Brewing Corp.*, 410 U.S. 526 (1973) ......................................... *passim*

*United States v. Marine Bancorp., Inc.*, 418 U.S. 602 (1974) .......................................... *passim*

*United States v. Phillips Petrol. Co.*, 367 F. Supp. 1226 (C.D. Cal. 1973) .......................... *passim*

*Yamaha Motor Co. Ltd. v. FTC*, 657 F.2d 971 (8th Cir. 1981) ................................ 12, 17, 18, 21

**Statutes**

15 U.S.C. § 18 ........................................................................................................ *passim*

15 U.S.C. § 21 ................................................................................................................. 3

15 U.S.C. § 45 ................................................................................................................. 3

15 U.S.C. § 53(b) ........................................................................................................ 3, 10

**Other Authorities**

U.S. Dep't of Justice & Fed. Trade Comm'n, Horizontal Merger Guidelines (2010) ........... 15, 17

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

### INTRODUCTION

3       On October 28, 2021, Mark Zuckerberg, founder, Chairman, CEO, and controlling

4   shareholder of the technology giant Facebook, Inc., made it clear to the world that building the

5   metaverse was a bet-the-company proposition: Facebook changed its name to "Meta Platforms"

6   with an ambitious, and far-reaching, goal "to bring the metaverse to life" by "moving beyond

7   2D screens toward immersive experiences," such as virtual reality ("VR"). PX932 (Meta) at 1,

8   3. Many, including Mr. Zuckerberg, believe the metaverse will be the ███████████████

9   ███████ (PX934 at 1) like personal computers and mobile phones before it. PX50 at 22; *see*

10  *also* PX951 at 1. And Meta is spending billions and billions of dollars to dominate the

11  metaverse through control of each level of the ecosystem: hardware (i.e., VR headsets),

12  software (i.e., VR applications or "apps"), and the platform and "app store" that connects VR

13  app developers and consumers. It is well on its way toward achieving this goal: Meta currently

14  owns the most popular VR headset *by far* (the Quest 2). PX50 (Zuckerberg (Meta) Dep. At 53,

15  60). It boasts the leading app store for VR (the Meta Quest Store). And Meta also owns many

16  leading VR apps distributed on that platform, including the popular Beat Saber app, which Meta

17  acquired by purchasing Beat Games studios in late 2019. PX116 (Meta) at 1.

18      Fitness is ███████████████████████ for VR. *E.g.*, PX102 at 52, PX239 at 4.

19  While the typical audience for VR is ███████████, VR apps intended to provide structured

20  physical exercise, which both Meta and Within refer to as "deliberate" or "dedicated" fitness

21  apps ("VR dedicated fitness apps"), ███████████████████████████ *See*, *e.g.*,

22  PX3 (Meta) at 44; PX3 (Meta) at 44; PX50 (Zuckerberg (Meta) Dep. At 168); PX55 (Verdu

23  (Meta) Dep. at 107-08); PX239 (Meta) at 4. Further, VR dedicated fitness apps ███████

24  ████████████████████████████ PX102 (Meta) at 7. Meta has long

25  believed that ██████████████████████████████████████████████

26  ██████████████████████ with Meta at its center. PX239 (Meta) at 1. Not surprisingly,

27  Mr. Zuckerberg was just one of several Meta executives who was ██████████████ (PX118

28

1   (Meta) at 1) and ██████████ (PX123 (Meta) at 1). *See also* PX55 (Verdu (Meta) Dep.

2   at 174-75) (Mr. Zuckerberg ███████████████████████████████████████████████

3   PX125 (Meta) at 3.

4          Given this enthusiasm for VR fitness at the highest levels of the company, Meta

5   ███████████████████████████████████████████████████ With billions of dollars

6   ear-marked for its metaverse endeavors, Meta certainly has the financial resources to build its

7   own VR apps, which it has successfully done multiple times. Moreover, Beat Saber already

8   employs similar mechanics to Within's Supernatural app, which Meta employees have referred

9   to as a ███████████ *E.g.*, PX 246 at 1. One of the stated rationales for Meta's Beat

10  Games acquisition was that Meta foresaw Beat Saber as ████████████████████████

11  ███████████ (PX342 (Meta) at 4); indeed, as early as ███████████████████████

12  ████████████████████████████████████ (PX249 (Meta) at 1). By the

13  spring of 2021, Meta was on the path to making that a reality, ███████████████████

14  ███████████████████████████████████████████

15  ███████ PX144 at 1; PX14 (10/14/2022 (Meta) Resp. & Objs. to Interrogatory No. 5) at 9.

16  As Michael Verdu, VP for VR Content, informed Mr. Zuckerberg in March 2021: ████████

17  ████████████████████████████████████████████████

18  ██████████████████████ PX118 (Meta) at 2. Mr. Zuckerberg replied: ██████

19  ████████████████████████████████████████████ *Id.* at 1.

20         That project was tabled, though, when Meta decided to enter the market the easy way—

21  by throwing its vast resources not at building a new product and competing on the merits, but by

22  simply acquiring the ████████ Supernatural, based on ████████████████████

23  ████████████████████ PX117 at 1 ████████████████████████████

24  ███████████████████████████████████████████████

25  ███████████████████████████████████████████████

26  PX579. On October 29, 2021, just one day after announcing its corporate name change, Meta

27  announced the Acquisition; the purchase price is a whopping ████████████████████

28

███████████████████████████████████████████ Within spent to develop Supernatural and build it into ██████████ VR dedicated fitness app. PX2 (Meta) at 1. If consummated, the Acquisition may substantially lessen competition, or tend to create a monopoly, by eliminating potential competition in the market for VR dedicated fitness apps (the "VR Dedicated Fitness App market"), where Meta is a potential entrant and exerts present competitive pressure, including on ██████████ Supernatural. Absent this proposed buyout of the ██████████, Meta would have continued to exert competitive pressure on the VR Dedicated Fitness App market from its position on the edge of that market, and there is a reasonable probability Meta would have entered the market through other means, leading to deconcentration and increased competition.

Having found reason to believe that the Acquisition violates Section 7 of the Clayton Act and Section 5 of the FTC Act, the Commission seeks a preliminary injunction in this Court under Section 13(b) of the Federal Trade Commission Act, 15 U.S.C. § 53(b), to prohibit consummation of the Acquisition until the conclusion of administrative proceedings—already underway, with a trial date of January 19, 2023—that will determine whether the Acquisition violates Section 7 of the Clayton Act, which prohibits mergers "the effect of [which] may be substantially to lessen competition, or to tend to create a monopoly," 15 U.S.C. § 18, and Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45. Preliminary relief will preserve the status quo, preserve the Commission's ability to effectively maintain Supernatural as an independent competitor, and stave off consumer harm pending the full administrative proceeding on the merits. Section 13(b) authorizes this Court to grant preliminary relief if, after considering the Commission's likelihood of success on the merits and weighing the equities, the Court determines that such relief would serve the public interest. 15 U.S.C. § 53(b). These criteria are amply satisfied here: the proposed Acquisition is likely to lessen competition substantially by eliminating potential competition in the market for VR dedicated fitness apps.

## I.   FACTUAL BACKGROUND

VR technology allows users to put on a VR headset, such as Meta's market-leading

Quest 2, ████████████████████████ PX50 (Zuckerberg (Meta) Dep. at 73-76). Users can then download specific apps, such as Within's Supernatural app, from an app store, like the Meta Quest Store for the Quest 2. VR allows users to be transported anywhere without leaving the comfort of their homes. As Mr. Zuckerberg has explained, "that's very different from every experience of technology that we've had before." PX931 at 4; PX557 (Meta) at 14.

Meta has focused its future on the explosive potential of VR, investing heavily in the space. Although Meta is best known for its "Family of Apps"—Facebook, Instagram, Messenger, and WhatsApp—the company has committed substantial resources and billions of dollars to its metaverse business. PX50 (Zuckerberg (Meta) Dep. at 88-89, 229-32); *e.g.*, PX957 at 3-7. Indeed, from 2020 through March 2022, Meta spent almost **$25 billion** on its Reality Labs division, which develops Meta's VR products, and ████████████████████ ████████████████ PX50 (Zuckerberg (Meta) Dep.) at 89-91); PX900 at 2.

Meta is undeniably a titan of the modern tech industry. The company's revenues exceeded $117 billion in 2021. PX937 at 50-51. While Meta's Family of Apps continues to drive the company's profitability, Meta is well on its way to dominating what Mr. Zuckerberg sees as the next major computing platform: Meta owns the most popular VR headset, the Quest 2 (PX15 at ¶ 21 (Singer Report)), the leading VR app store for that headset (*id.* ¶¶ 22-24), and a plethora of leading VR content including the most popular app offered on the platform, the wildly successful rhythm game Beat Saber, which Meta acquired in 2019 for ████████ (PX116 at 1). A highly acquisitive company, Meta has purchased at least ███ VR app studios in the past ██████ including closing ███ VR studio acquisitions *after* announcing its proposed acquisition of Within. PX50 (Zuckerberg (Meta) Dep. at 61-66); Dkt. 84 (Meta's Answer) ¶¶ 3, 4, 34. And Meta has also built several successful VR apps and experiences in-house, including ██████████████████████ PX50 (Zuckerberg (Meta) Dep. at 95-96); PX56 (Carmack (Meta) Dep. at 88-89); PX55 (Verdu (Meta) Dep. at 83-84).

Founded in 2014, Within is a virtual and augmented reality company based in Los Angeles. Within's flagship product is Supernatural, a VR dedicated fitness app that offers over

1   800 fully immersive, trainer-led workouts set to music in various virtual settings from the

2   Galapagos Islands to the Great Wall of China. PX5 at 9. Customers access Supernatural's

3   offerings by paying a subscription fee of $18.99 per month or $179.99 per year. PX3 at 6.

4   ██████████████████████████████████ a category of VR apps referred to as

5   "dedicated" or "deliberate" fitness apps that offer users structured physical exercise.[1] Typical

6   characteristics of VR dedicated fitness apps include workouts designed by trainers or fitness

7   experts, gameplay designed to maximize exertion and physical movement for the purpose of

8   exercise, and classes or other active coaching. PX55 (Verdu (Meta) Dep.) at 23); PX53 (Pruett

9   Dep. (Meta) at 134-35); PX111. Unlike other at-home fitness products, VR dedicated fitness

10  apps are immersive in a virtual environment ████████████████████████ as

11  Within's co-founder and CEO explained, "working out in Supernatural feels like you're a

12  champion of a sport from the future. I love that and haven't felt that sense of athleticism ever on

13  a treadmill or an exercise bike." PX906 at 3-4. They also target users with ████████

14  ████████████████████████████████████████████████

15  ████████████████████ *E.g.*, PX529 (Meta) at 2-4; PX573 (Meta) at 2███

16  ████████████████████████████████████ PX557 (Meta)

17  at 154███████████████████████████████; PX15 at

18  ¶ 62, 68-69 (Singer Report). Launched in April 2020, Supernatural is now the ██████

─────────────────

19  ─────────────────

20  [1] *E.g.*, PX1 (June 6, 2022 Ltr. (Meta) at 5████████████████████

21  ████████████████████████████████████████████████

22  ████████████████████████████████████

23  ████████████████████; PX102 (Meta) at 56████████

24  ████████████████████; PX452 (Meta) at 2; PX557 (Meta) at 8

25  ████████████████████████████████; PX617

26  (Within) at 2; *see also* PX62 (Milk (Within) Dep. Rough at 62).

1  among VR dedicated fitness apps, boasting ████ of the market's revenues. PX15 at ¶ 75,

2  Table 2-A (Singer Report). Other VR dedicated fitness apps include FitXR, Holofit, VZFit, Les

3  Mills Body Combat and LiteBoxer, but Supernatural is ██████████. *Id.* at ¶¶ 75-78, Table 2-

4  A (Singer Report).

5       Meta has long recognized that good content—i.e., apps—drives sales of its Quest

6  headsets. The "north star" of its VR Content organization was ███████████

7  ████████████████████████████████████████████

8  ████████████████████████████████████████

9  ████████████████████████████████████████████

10 ███████████████████████████████ PX55 (Verdu (Meta) Dep. at

11 8-11); *see also e.g.*, PX162 (Meta) at 2; PX239 (Meta) at 1. As part of these efforts, Meta

12 recognized that ████████████████████████████████████████

13 ███████████████████████████ games, which were predominantly used by

14 ██████ *E.g.*, PX250 at 1; PX568 at 1; PX948 at 4. Fitness was identified as a priority use

15 case, in light of its ████████████████████ and its association with ██████████

16 ████████ *E.g.*, PX239 at 4 ████████████████████████████

17 ████████████████████████████████████ PX127

18 at 1; PX455 at 1; PX55 (Verdu (Meta) Dep. at 107-08); PX52 (Stojsavljevic (Meta) Dep. at

19 210-11). It also ██████████████ PX386 at 12; PX54 (Bosworth (Meta) Dep. at 115).

20       Recognizing this potential for VR fitness apps to ████████████████████████

21 ████████████████████████ Meta ████████████████████████

22 ████████████████████████ Among them, Meta

23 pursued ██████████████████ Beat Saber employs a slashing

24 mechanic, in which a player uses virtual swords to hit incoming targets timed to music—a

25 mechanic that Within later made the basis for Supernatural (PX53 (Pruett (Meta) Dep. at 194-

26 195); PX457 (Meta) at 3; PX657 (Within) at 1 (describing Supernatural as ████████████

27 ████████████████████████████████ PX62 (Milk

28

1     (Within) Dep. Rough at 62-64))—and a ██████████████████████████

2     ████████████████████████████████████████ PX162 (Meta) at 3. Thus,

3     not surprisingly, when Meta was weighing a bid to acquire Beat Games, it foresaw ████████

4     ████████████████████████████████ (PX342 (Meta) at 4) with the ████████

5     ████████████████████████ (PX162 (Meta) at 3; PX55 (Verdu (Meta) Dep. at 90)).

6     Indeed, from the time that Meta acquired Beat Games in late 2019, ████████████

7     ████████████████████████████ PX116 (Meta) at 4 ██████████

8     ██████████████████████████████████ ; PX250 (Meta) at 2

9     ████████████████████████████████████████

10     ████████████████████████████████████████

11     ████████████████████████ . As Verdu, sponsor for that deal, testified,

12     the acquisition ████████████████████████████████

13     ████████████████████████████████████████

14     ██████████████ PX 55 (Verdu (Meta) Dep. at 60, 63).

15         By April 2020, just four months after the Beat Games acquisition and the same month

16     that Supernatural launched, Meta released "FitBeat" into Beat Saber. PX119 (Meta) at 3. Enter

17     the COVID-19 pandemic when VR dedicated fitness apps surged in popularity. Within

18     launched its Supernatural app during this time, and already had approximately ██████ paying

19     subscribers within a year. PX384 (Meta) at 1. This explosion in VR dedicated fitness apps

20     naturally heightened Meta's longstanding interest in the space, and the company began ██

21     ████████████████████████████████████████ By February

22     2021, members of the VR Content organization recognized that ████████████████

23     ██████████████████████ PX189 (Meta). At that time, Rade Stojsavljevic, Director of 1st

24     Party Studios, was tasked with exploring ████████████████████████

25     ████████████████████████████████ *Id.*; *see also*

26     PX256 (Meta); PX527 (Meta) at 5; PX52 (Stojsavljevic (Meta) Dep. at 108, 112); *see generally*

27     PX121 (Meta); PX501 (Meta). Besides ████████████████████████

28

1 ███████████████████████████████████████████████████████

2 ████████████████████████████████████████████████████████

3 ███████████████████████████████ PX144 (Meta) at 1. ███████████

4 ███████████████████████████████ (PX527 (Meta) at 8), which it ultimately

5 purchased in 2022 (PX368 (Meta) at 5; PX59 (Hunt 30(b)(6) (Meta) Dep. at 50)).

6          On March 4, 2021, Mr. Verdu apprised Mr. Zuckerberg of Meta's internal efforts to

7 enter the VR Dedicated Fitness App market, explaining that ████████████████████████

8 ████████████████████████████████████████████████████████

9 to which Mr. Zuckerberg immediately responded: █████████████████████████

10 ████████████████████████████████████████████████

11 ████ PX118 (Meta) at 1-2. That same day, Messrs. Verdu and Stojsavljevic developed a

12 presentation entitled ████████████████████████████████████████████████

13 ████████████████████████████████████████████ PX527

14 (Meta) at 4. ██████████████ refers to Meta's ability to bring onboard any additional content

15 producers or fitness expertise required to build an app in-house. PX52 (Stojsavljevic (Meta)

16 Dep. at 122-23).  The presentation called ████████████████████████████

17 ████████████████████████████████████████████████

18 PX527 (Meta) at 5.

19          While Meta was developing paths to enter the VR Dedicated Fitness App market with its

20 own product, it also was considering entering the market through acquisition of one of the

21 existing firms in the market. Meta's initial interest was ████████████████████████

22 *E.g.*, PX118 (Meta) at 1-2; PX294 (Meta). One of the purported reasons to investigate the

23 acquisition route was because ████████████████████████████████████████████

24 ████ (PX179 (Meta) at 2)—but, as noted above, that problem could have been solved by █

25 ████████████████████████████████████████████████████

26 ██████████████████ which Meta has subsequently done. *Cf.* PX56 (Carmack (Meta) Dep. at

27 53-54).

28

1    Indeed, although the company had, by March 11, 2021, decided to ████████████

2    ████████████████████████████████████████ Meta was undertaking parallel efforts to █████

3    █████████████████████ PX179 (Meta) at 2. On March 15, 2021, Mr. Stojsavljevic

4    wrote that ████████████████████████████████████████████████████████████

5    ████████████████████████████████████████████████████████████

6    ████████████████████████████████████████████████████████████████

7    ████████████████████████████████ PX407 (Meta) at 1.

8    ████████████████████████████████████████████████████████████████

9    ████████████████████████████████████████████████████

10   ████████████████████████████████████████████████████████

11   PX411 (Meta) at 1. A month later, the team managing Beat Saber ███████████

12   ████████████████████████████████████████████████████████████████

13   ████████████████████████████████████████████████████████████████

14   PX458 (Meta) at 5.

15       Not surprisingly, given Meta's vast resources, the market's potential, and the similarity

16   between Beat Saber and Supernatural, ████████████████████████████████

17   ████████████████████████████████ PX615 (Within) at 8. ████████████████

18   ████████████████████████████████████████████████████████████

19   ██████████████████████ *E.g.*, PX605 (Within); PX615 (Within) at 89; PX621 (Within) at 2;

20   PX730 (Within); PX627 (Within).

21       But Meta's strategy for market entry quickly shifted when the ██████████████

22   ████████████████████████████████████████████████████

23   ████████████████████████████████ As Mr. Verdu, deal sponsor for the Within acquisition,

24   explained, ████████████████████████████████████████████████████

25   ████████████████████████████████████████████████

26   ████████████████████████████████████████ PX117 (Meta) at 1; *see also*

27   PX55 (Verdu (Meta) Dep. at 240-41, 257); PX579 (Meta) ████████████████████

28

1          ████████████████████████████████████████████████

2        ████ In a defensive move against fellow tech giant Apple, Meta scrapped its various plans for

3 innovation and instead elected to buy the ██████████ in a ████████ acquisition. PX4

4 (Meta) at 161. Meta feared that Apple would ████████████████████████████

5 ██████████████████████████████████████████ PX50

6 (Zuckerberg (Meta) Dep. at 154-55, 227); PX55 (Verdu (Meta) Dep. at 242-43). To date, Apple

7 has never marketed any VR headset (versus Meta's marketing of several different models over

8 nearly a decade) and has zero headset sales (versus ████████ units sold to consumers by

9 Meta). PX55 (Verdu (Meta) Dep. at 243-44). The ████████ purchase price for Within is

10 ████████ the amount of money raised in its entire existence, during which time it

11 developed Supernatural into the ████ng VR dedicated fitness app today. PX2 (Meta) at 1.

12 **II.     ARGUMENT**

13         The Acquisition may substantially lessen competition in the VR Dedicated Fitness App

14 market by eliminating both the procompetitive benefits that would have resulted from Meta's

15 entry into the market with its own product and the procompetitive influence Meta currently

16 exerts on market participants as a perceived entrant. Section 13(b) of the Federal Trade

17 Commission Act "allows a district court to grant the Commission a preliminary injunction

18 '[u]pon a proper showing that, weighing the equities and considering the Commission's

19 likelihood of ultimate success, such action would be in the public interest.'" *FTC v. Affordable*

20 *Media*, 179 F.3d 1228, 1233 (9th Cir. 1999) (quoting 15 U.S.C. § 53(b)). The statute "places a

21 lighter burden on the Commission than that imposed on private litigants by the traditional equity

22 standard." *FTC v. Warner Commc'ns Inc.*, 742 F.2d 1156, 1159 (9th Cir. 1984). "Under this

23 more lenient standard, 'a court must 1) determine the likelihood that the Commission will

24 ultimately succeed on the merits and 2) balance the equities.'" *Affordable Media*, 179 F.3d at

25 1233 (quoting *Warner*, 742 F.2d at 1160).

26         In weighing the equities under § 13(b), "public equities receive far greater weight."

27 *Warner Commc'ns*, 742 F.2d at 1165. These equities include effective enforcement of the

28

1   antitrust laws and ensuring the Commission's ability to obtain adequate relief if it ultimately

2   prevails on the merits. *Id.* Preliminary injunctions under § 13(b) "are meant to be readily

3   available to preserve the status quo while the FTC develops its ultimate case." *FTC v. Whole*

4   *Foods Mkt., Inc.*, 548 F.3d 1028, 1036 (D.C. Cir. 2008). Through this action, the FTC seeks a

5   preliminary injunction to preserve the status quo pending the full administrative proceeding on

6   the merits, which is already underway with trial scheduled to begin on January 19, 2023.

7              **A.      The FTC Is Likely to Succeed on the Merits of Its Section 7 Challenge.**

8              In evaluating the FTC's likelihood of success on the merits to obtain a preliminary

9   injunction, the Ninth Circuit has explained that the "Commission meets its burden if it 'raise[s]

10  questions going to the merits so serious, substantial, difficult and doubtful as to make them fair

11  ground for thorough investigation, study, deliberation and determination by the FTC in the first

12  instance and ultimately by the Court of Appeals.'" *Warner Commc'ns*, 742 F.2d at 1162

13  (quoting *FTC v. Nat'l Tea Co.*, 603 F.2d 694, 698 (8th Cir. 1979)); *see also Whole Foods Mkt.*,

14  548 F.3d at 1036 ("[A]t this preliminary phase [the FTC] just has to raise substantial doubts

15  about a transaction. One may have such doubts without knowing exactly what arguments will

16  eventually prevail.").

17             Because the issue is a "narrow one," the court "do[es] not resolve the conflicts in the

18  evidence, compare concentration ratios and effects on competition in other cases, or undertake

19  an extensive analysis of the antitrust issues." *Warner Commc'ns*, 742 F.2d at 1164; *see also*

20  *California v. Am. Stores Co.*, 872 F.2d 837, 841 (9th Cir. 1989) ("At this stage, we do not

21  resolve conflicts in the evidence."), *rev'd on other grounds*, *California v. Am. Stores Co.*, 495

22  U.S. 271 (1990); *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 714 (D.C. Cir. 2001) (the FTC "is not

23  required to establish that the proposed merger would in fact violate Section 7"); *FTC v. CCC*

24  *Holdings Inc.*, 605 F. Supp. 2d 26, 67 (D.D.C. 2009) ("the district court's task is not 'to

25  determine whether the antitrust laws have been or are about to be violated. That adjudicatory

26  function is vested in the FTC in the first instance'" (quoting *Whole Foods Mkt.*, 548 F.3d at

27  1042 (Tatel, J., concurring)). Rather, this Court is required only to "measure the probability that,

28

1  after an administrative hearing . . . the Commission will succeed in proving that the effect of the

2  [proposed] merger 'may be substantially to lessen competition, or to tend to create a monopoly'

3  in violation of section 7." *H.J. Heinz*, 246 F.3d at 714 (quoting 15 U.S.C. § 18).

4          The Supreme Court has recognized that Section 7 of the Clayton Act prohibits the

5  elimination of potential competition as well as present competition. *E.g., United States v.*

6  *Falstaff Brewing Corp*., 410 U.S. 526, 531-32 (1973); *see also United States v. Marine*

7  *Bancorp., Inc*., 418 U.S. 602, 623-25 (1974). Courts have recognized two distinct types of

8  anticompetitive harm that can occur from mergers that eliminate potential competition in a

9  concentrated relevant market. First, a merger can lessen "actual potential competition," when it

10 eliminates a firm that is reasonably probable to enter the relevant market through alternative

11 means absent the illegal acquisition. *United States v. Phillips Petrol. Co.*, 367 F. Supp. 1226,

12 1233 (C.D. Cal. 1973), *aff'd, Phillips Petrol. Co. v. United States*, 418 U.S. 906 (1974); *see also*

13 *Yamaha Motor Co. Ltd. v. FTC*, 657 F.2d 971, 977-79 (8th Cir. 1981). Second, a merger can

14 lessen "perceived potential competition" when it eliminates "a potential competitor on the

15 fringe of the market with likely influence on existing competition." *Falstaff Brewing*, 410 U.S.

16 at 533-34. Where, as here, an acquisition eliminates both a perceived potential competitor and

17 an actual potential competitor, the "combination renders the anticompetitive consequences of

18 the acquisition even greater." *Phillips Petrol.*, 367 F. Supp. at 1234.

19         The Acquisition is likely to result in anticompetitive harm by lessening competition in

20 the VR Dedicated Fitness App market, where Within's Supernatural is the leading player in a

21 highly concentrated space. The proposed Acquisition will preclude Meta's reasonably probable

22 entry through alternative means, thereby denying consumers the benefit of adding another

23 effective competitor to the market. The proposed Acquisition will also eliminate the current

24 procompetitive influence on existing competition that Meta's threat of potential entry provides

25 from the edge of the market. Few firms are comparably situated to Meta with respect to entry

26 into the VR Dedicated Fitness App market, and new entry or expansion is unlikely to be

27 sufficient to offset the competitive harm of the proposed Acquisition.

28

1. **The Relevant Market Is the Sale of VR Dedicated Fitness Apps in the United States.**

"Determination of the relevant product and geographic markets is a necessary predicate deciding whether a merger contravenes the Clayton Act." *St. Alphonsus Med. Ctr.-Nampa, Inc. v. St. Luke's Health Sys. Ltd*., 778 F.3d 775, 783 (9th Cir. 2015). This is true whether the merger is alleged to have anticompetitive effects on existing competition or on potential competition. *Marine Bancorp.*, 418 U.S. at 618. In defining relevant product markets (a term of art in antitrust law), courts often evaluate "such practical indicia as industry or public recognition of the [relevant market] as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962); *accord Klein v. Facebook, Inc*., 580 F. Supp.3d 743, 766-67 (N.D. Cal. 2022); *Dang v. San Francisco Forty Niners*, 964 F. Supp. 2d 1097, 1107 (N.D. Cal. 2013).

"The relevant geographic market is the area of effective competition where buyers can turn for alternate sources of supply." *St. Alphonsus*, 778 F.3d at 784 (internal quotation marks omitted). The Ninth Circuit has emphasized that "what constitutes a relevant market is a factual determination" best suited for resolution on a well-developed record. *Klein*, 580 F. Supp.3d at 765 (quoting *Image Tech. Servs. v. Eastman Kodak*, 125 F.3d 1195, 1203 (9th Cir. 1997)).

Both the *Brown Shoe* practical indicia and the Hypothetical Monopolist Test ("HMT") demonstrate that VR dedicated fitness apps, like Within's Supernatural app, are an appropriate relevant product market in which to evaluate the Acquisition. VR dedicated fitness apps are designed so users can exercise through a structured physical workout in a virtual setting anywhere they choose to use their highly portable VR headset. Typical characteristics of VR dedicated fitness apps include workouts designed by trainers or fitness experts, gameplay designed to maximize exertion and physical movement for the purpose of exercise, calorie tracking, and classes or other active coaching. ███████████████████████████ ████████████████████████. In this way, VR dedicated fitness apps feature "peculiar

characteristics and uses" that distinguish them from other VR apps. *Brown Shoe*, 370 U.S. at 325. They are also distinct from other VR apps in other ways consistent with the *Brown Shoe* factors: They typically offer distinct prices as compared to other VR apps—specifically, a ████████████████████████████████████████ (PX627 (Within); PX3 (Meta) at 6; PX62 (Milk (Within) Dep. Rough at 41-43); PX15 at ¶ 39 (Singer Report); PX1 at 2 ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████████)—and their distinct customer base is differentiated from other apps in terms of both ████████████████████ (*e.g.*, PX239 (Meta) at 4; PX54 (Bosworth (Meta) Dep. at 89, 168, 220); PX50 (Zuckerberg (Meta) Dep. at 168); PX55 (Verdu (Meta) Dep. at 107-08); PX102 (Meta) at 56 ██████ ██████████████████████████. Thus, it is not surprising that ████████████████ ██████ a separate and distinct category of VR dedicated fitness apps. *See supra* at n.1.

Moreover, functional, technological, and price differences consistent with the *Brown Shoe* practical indicia also show that non-VR at-home smart fitness solutions and at-home exercise products are distinct from VR dedicated fitness apps. Unlike other at-home smart fitness solutions and exercise products, VR dedicated fitness apps enable users to exercise in fully immersive, 360-degree environments.[2] *E.g.* ████████████████████████ PX906 at 3-4 ("working out in Supernatural feels like you're a champion of a sport from the future. I love that and haven't felt that sense of athleticism ever on a treadmill or an exercise bike"). Also unlike other at-home smart fitness devices, VR headsets are fully portable and take up little space. ██████████████████████████████ ██████████████████████ They are also far less expensive; a Peloton smart bicycle costs

--------

[2] The fact that Meta considered ████████████████████████████ ██████████████████████ illustrates that VR and non-VR fitness experiences are distinct.

1   over $1,000, with an additional $44 per month subscription cost, compared to the cost of a $399

2   Meta Quest 2 plus $18.99 per month for Supernatural. PX15 at ¶ 68 (Singer Report).

3          Meta's own documents show that VR dedicated fitness apps ████████████████

4   ████████████████████████████████████████████████████████████████████

5   ████████████████████████████████████ *E.g.*, PX529 (Meta) at 2-4; PX906 at 3-4;

6   PX908 at 1 ██████████████████████████████████████████████████████████

7   ██████████████████████████████████████████████████████████████

8   ████████████████████████ PX557 (Meta) at 14-16; PX60 (Paynter 30(b)(6) (Meta) Dep. at 41-

9   42).

10         Lastly, the VR Dedicated Fitness App market satisfies the HMT, further confirming it is

11  an appropriate relevant product market in which to evaluate the effects of the Acquisition. PX15

12  at ¶¶ 29-35, 49-69 (Singer Report). This test asks whether a hypothetical monopolist could

13  profitably impose at least a small but significant and nontransitory increase in price (SSNIP),

14  typically quantified at 5%, on a collection of products, including at least one product sold by

15  one of the merging firms. *See* Horizontal Merger Guidelines at § 4.1.2. Dr. Hal Singer, the

16  FTC's expert economist, conducted a consumer survey to evaluate how Supernatural users

17  would respond to a SSNIP on Supernatural and other VR Dedicated Fitness products. Dr.

18  Singer's survey showed that over 95% of Supernatural users would keep their Supernatural

19  subscriptions in response to a SSNIP on Supernatural or all VR dedicated fitness apps. PX15 at

20  ¶¶ 63-34, Table 1 (Singer Report). These results, combined with the ██████████████

21  ████████████████ indicate that a hypothetical monopolist could profitably impose a SSNIP on

22  VR dedicated fitness apps, and therefore that VR dedicated fitness apps constitute an

23  appropriate and relevant antitrust market. *Id.* ¶¶ 49-69.

24         The United States is an appropriate relevant geographic market in which to assess the

25  probable effects of the proposed Acquisition. The relevant geographic market is the region in

26  which "consumers can practically turn for alternative sources of the product and in which the

27  antitrust defendant faces competition." *FTC v. Staples Inc.*, 970 F. Supp. 1066, 1073 (D.D.C.

1    1997). As the Supreme Court has explained, the relevant geographic market must "correspond
2    to the commercial realities of the industry" as determined by a "pragmatic, factual, approach."
3    *Brown Shoe*, 370 U.S. at 336. While "technology knows no borders," the "area of effective
4    competition" is the United States because the "realities of selling" differ across national borders
5    including differences in regulatory regimes, intellectual property licensing, and availability. *See*
6    *United States v. Bazaarvoice, Inc.*, 2014 WL 203966, at *27, 68 (N.D. Cal. Jan. 8, 2014). ████
7    ███████████████████████████ Supernatural is currently available only in the U.S. and
8    Canada. PX54 (Bosworth (Meta) Dep. at 212); PX52 (Stojsavljevic (Meta) Dep. at 257); PX61
9    (Cibula 30(b)(6) (Within) Dep. at 71). Oculus Quest headsets also have a dynamic region lock,
10   such that a user's geolocation determines content availability and prices. PX969 at 1-2; PX52
11   (Stojsavljevic (Meta) Dep. at 68). Given these commercial realities, the United States is an
12   appropriate relevant geographic market in which to analyze the likely effects of the Acquisition.

13              **2.  The Acquisition Poses a Reasonable Probability of Substantially Lessening**
14                  **Competition in the VR Dedicated Fitness App Market.**

15             Section 7 of the Clayton Act prohibits transactions where "the effect of such acquisition
16   may be substantially to lessen competition, or tend to create a monopoly" regardless of whether
17   the competition eliminated is present or potential. *See, e.g.*, *Falstaff Brewing*, 410 U.S. at 527
18   n.1 (quoting 15 U.S.C. § 18); *see also Marine Bancorp.*, 418 U.S. at 623-25.

19             "The potential-competition doctrine has meaning only as applied to concentrated
20   markets." *Marine Bancorp.*, 418 U.S. at 630. The government can make a prima facie showing
21   that a market is concentrated based on market-share statistics alone. *Id.* at 631; *Tenneco, Inc. v.
22   FTC*, 689 F.2d 346, 352 (2d Cir. 1982) ("Four-firm concentration was over 90% and two-firm
23   concentration was over 77%. . . . This fact alone 'established a prima facie case that the . . .
24   market was a candidate for the potential-competition doctrine.'" (quoting *Marine Bancorp.*, 418
25   U.S. at 631)). For a theory of anticompetitive harm based on actual potential competition, the
26   government must additionally show that the merger would eliminate a firm that is reasonably
27   likely to enter the relevant market through alternative means. *Phillips Petrol.*, 367 F. Supp. at

28

1232-33; *see also Yamaha Motor*, 657 F.2d at 977-79. For perceived potential competition, the question is whether the merger would eliminate "a potential competitor on the fringe of the market with likely influence on existing competition." *Falstaff Brewing*, 410 U.S. at 533-34.

### a) The VR Dedicated Fitness App Market Is Concentrated.

The VR Dedicated Fitness App market more than satisfies the requirement of a concentrated market. A common metric for evaluating market concentration is the Herfindahl-Hirschman Index ("HHI"). *St. Alphonsus*, 778 F.3d at 786; *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 414 F. Supp. 3d 1256, 1263-64 (N.D. Cal. 2019). HHI figures are calculated by summing the squares of the market share of each market participant. Horizontal Merger Guidelines § 5.3. A market is considered "moderately concentrated" when the HHI exceeds 1500, and "highly concentrated" when the HHI exceeds 2500. *Id.*

The level of market concentration in the VR Dedicated Fitness App market greatly exceeds what is required for the potential competition doctrine to apply, with two applications— ▆▆▆▆▆▆▆▆▆▆ —claiming ▆ percent of the market's revenues. PX15 at ¶¶ 75-76, Table 2-A (Singer Report); *see also, e.g., Yamaha Motor*, 657 F.2d at 974 (top four firms accounted for 99 percent and top two for 85 percent); *Phillips Petrol.*, 367 F. Supp. at 1253 (top four accounted for 58 percent). The HHI for the VR Dedicated Fitness App market is currently *over* ▆▆ —well above the threshold for a market to be considered "highly concentrated" under the Horizontal Merger Guidelines. PX15 at ¶¶ 76 (Singer Report).[3]

---

[3] That the market may be an emerging one poised for rapid growth might make it particularly susceptible to antitrust harm. *Bazaarvoice*, 2014 WL 203966 at *76 ("[R]apid technological progress may provide a climate favorable to increased concentration of market power rather than the opposite.") (quoting *Greyhound Computer Corp., Inc. v. Int'l Bus. Machines Corp.*, 559 F.2d 488, 497 (9th Cir. 1977)); *In re Union Carbide Corp.*, 59 F.T.C. 614, 1961 WL 65409, at *35 (Sept. 25, 1961) ("Any lessening of competition is therefore doubly harmful in a new industry since its inevitable effect is to slow down the growth rate of the industry.").

**b)  It Is Reasonably Probable That Meta Would Enter the Market Through**
**Other Means Absent the Acquisition, Leading to Procompetitive Effects.**

The Supreme Court has stated that "[t]wo essential preconditions must exist before it is possible to resolve whether the [actual potential competition] theory, if proved, establishes a violation of § 7": (1) the acquiring firm has "available feasible means" for entering the market and (2) "that those means offer a substantial likelihood of ultimately producing deconcentration of that market or other significant procompetitive effects." *Marine Bancorp.*, 418 U.S. at 633. Subsequent courts analyzing claims based on a theory of harm to actual potential competition have interpreted *Marine Bancorp.*[4] to require a showing that there is a reasonable probability the acquiring firm would have entered the market but for the proposed acquisition, and that its entry would have had pro-competitive effects. *E.g.*, *Yamaha Motor*, 657 F.2d at 977; *Tenneco*, 689 F.2d at 352; *see also Phillips Petrol.*, 367 F. Supp. at 1256-57.[5]

A firm "must be considered to be a significant potential entrant" "where credible objective evidence shows the basic economic facts of the acquiring company's overall size, resources, capability, and motivation with respect to entry into an adjacent attractive market involving a line of commerce in which the firm is already heavily engaged." *Phillips Petrol.*, 367 F. Supp. at 1239. Importantly, the inquiry focuses on *objective* evidence. *Id.* (subjective evidence, like testimony from company executives about their intentions, "while relevant and entitled to consideration, cannot be determinative in evaluating the legality of the acquisition under § 7. If strong objective evidence points to a contrary conclusion, the objective evidence must prevail"); *see also Falstaff Brewing*, 410 U.S. at 546 ("subjective evidence should be preferred only when the objective evidence is weak or contradictory.") (Marshall, J.,

---

[4] The majority in *Falstaff Brewing*, 410 U.S. at 537, and *Marine Bancorp.*, 418 U.S. at 625, 639, reserved the question of whether the antitrust laws proscribed mergers when the acquiring company could enter the market through means other than the acquisition.

[5] The *Phillips* decision issued in 1973, but the Supreme Court affirmed it after *Marine Bancorp.*

concurring). And the standard is one of reasonable probability given that "[u]nequivocal proof that an acquiring firm actually would have entered de novo but for a merger is rarely available." *Marine Bancorp.*, 418 U.S. at 624; *accord BOC Int'l Ltd. v. FTC*, 557 F.2d 24, 29 n.7 (2d Cir. 1977) ("In view of the ample express authority, including congressional authority, in favor of a reasonable probability standard . . . we decline to adopt any more stringent standard here.").

Objective evidence regarding Meta's "overall size, resources, capability, and motivation with respect to entry" demonstrate a reasonable probability that Meta would have entered the VR Dedicated Fitness App market but for the Acquisition. *See Phillips Petrol.*, 367 F. Supp. at 1239.  Meta is a massive technology company with ample resources to develop a VR dedicated fitness app on its own, either by creating a new app from scratch; by adding dedicated fitness features, like trainers and coaching, to an existing app like Beat Saber; or by acquiring a generalist studio that could supplement Meta's formidable first-party studios in creating such an app. Meta spent more than $10 billion dollars on Reality Labs in 2021 and ███████████ ██████████████████████ (PX50 (Zuckerberg (Meta) Dep. at 87-88)), and boasts more than ████ employees in its Reality Labs Division today (PX56 (Carmack (Meta) Dep. at 124)). Given these resources, it is not surprising that its Chief Technology Officer, Andrew Bosworth, █████████████████████████████████████████████████████████ ███████████████████████████████████. PX54 (Bosworth (Meta) Dep. at 210).

In addition to ample resources, Meta also has the capabilities to develop a VR dedicated fitness app. █████████████████████████████████████████████████████ █████████████████████████████████████████████████████████ The company has successfully developed its own VR applications, including the productivity app ██████████████████████████████████████████████████████████ (PX54 (Bosworth (Meta) Dep. at 203)), and the gaming app ████ ████████, among others. PX56 (Carmack (Meta) Dep. at 88); PX55 (Verdu (Meta) Dep. at 83-84); PX200 (Meta). Meta also produced and publicly released a ██████ fitness track for Beat Saber called "FitBeat," which encourages great physical movement as part of game play. PX52

1   (Stojsavljevic (Meta) Dep. at 190). Meta has also successfully developed certain features that

2   make the Oculus more appealing for fitness-focused users. For one, Meta developed Oculus

3   Move, a fitness tracker that Quest users can deploy to track their time spent moving and calories

4   burned across Quest apps. ███████████████████████ Additionally, Meta

5   recently began selling the Quest 2 Active Pack, geared towards fitness, which includes a

6   wipeable interface, wrist straps, and adjustable knuckle straps. PX968; *see also* PX916 at 5.

7        And Meta has the motivation to enter the VR Dedicated Fitness App market because VR

8   ███████████████████████████████████████

9   ████ *E.g.*, PX239 at 4; PX127 at 1; PX54 (Bosworth (Meta) Dep. at 89, 168, 187-88, 220);

10   PX50 (Zuckerberg (Meta) Dep. at 168-69, 201); PX55 (Verdu (Meta) Dep. at 107-08); PX52

11   (Stojsavljevic (Meta) Dep. at 210-11). Indeed, part of its rationale for acquiring Beat Games in

12   2019 was that it was ███████████████████ PX342 (Meta) at 2.

13        In addition to the aforementioned objective facts, evidence demonstrates that Meta itself

14   had the intentions to enter—and thus was reasonably probable entrant into—the VR Dedicated

15   Fitness App market. Indeed, prior to deciding to acquire the ████████, Supernatural, Meta

16   was in the midst of ████████████████ and exploring multiple paths to

17   entry. PX579 (Meta); *see also* PX117 (Meta). Those included ██████████████

18   ██████ (*e.g.*, PX179 (Meta) at 2), either through ████████████████

19   ████ (PX189 (Meta); PX256 (Meta); PX527 (Meta) at 5; PX52 (Stojsavljevic (Meta) Dep. at

20   108, 112); *see generally* PX121 (Meta); PX501 (Meta)), and/or by ████████████

21   ████████████████████████████████

22   ████████████████ PX144 (Meta); *see also* PX527 (Meta) at 4.

23   When apprised of these efforts, Mr. Zuckerberg exclaimed: ████████████

24   ██████████████████████████████████

25   ████████████████████████████

26   ████████████ PX56 (Carmack (Meta) Dep. at 155-56).

27        Meta's independent entry into the VR Dedicated Fitness App market—derailed by the

Acquisition—would have provided U.S. customers an innovative alternative likely to result in significant deconcentration and procompetitive benefits. *See, e.g.*, *Yamaha Motor*, 657 F.2d at 979 ("Any new entrant of Yamaha's stature would have had an obvious procompetitive effect leading to some deconcentration."). Given its unique advantages and capabilities, Meta's entry into the VR Dedicated Fitness App market would have offered a "substantial likelihood of ultimately producing deconcentration of that market or other significant procompetitive effects," *Marine Bancorp.*, 418 U.S. at 633, by introducing a strong, well-established new rival to Supernatural and FitXR. Even more so than the defendant in *Yamaha*, Meta is a "well-established international firm with considerable financial strength" ▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆ and "considerable marketing experience in the United States," *Yamaha*, 657 F.2d 979, such that its entry "would have had an obvious procompetitive effect" in the VR Dedicated Fitness App market. *See id.* This entry would increase consumer choice, increase innovation, spur additional competition to attract the best talent, and yield a host of other competitive benefits. By way of contrast, the Acquisition would simply swap an already "powerful acquiring firm" for the current ▆▆▆▆▆▆, potentially entrenching its existing position. *FTC v. Procter & Gamble Co.*, 386 U.S. 568, 578 (1967). Crucially, Meta's independent entry would add a new player to the mix while also maintaining the independent presence and competitive vitality of Supernatural, the ▆▆▆▆▆▆ VR dedicated fitness app to date. Consumers will lose the benefit of this competition if the Acquisition proceeds.

### c) Within Reasonably Perceived Meta as a Potential Entrant, and Meta's Presence on the Edge of the Market Likely Benefits Competition.

The proposed Acquisition is also likely to substantially lessen competition through the elimination of Meta as a perceived potential competitor. The presence of such a firm on the edge of the relevant market can benefit competition within the relevant market. *See, e.g.*, *Phillips Petrol.*, 367 F. Supp. at 1233. Probabilistic proof of "likely influence" on existing competitors is sufficient; proof of "actual influence" is not necessary. *Falstaff Brewing*, 410 U.S. at 534 & n.13; *see also United States v. Black & Decker Mfg. Co.*, 430 F. Supp. 729, 773

(D. Md. 1976) ("the government need not introduce evidence of actual market response"). The "same facts" that a district court must assess in determining a Clayton Act violation based on actual potential competition are "probative of [a] violation of [§] 7 through loss of a procompetitive on-the-fringe influence." *Falstaff Brewing*, 410 U.S. at 534 n.13; *accord Phillips Petrol.*, 367 F. Supp. at 1255. Notably, in perceived potential competition case, a merger can lessen competition "even if it were assumed that the potential competitor would not actually have entered the market." *Phillips Petrol.*, 367 F. Supp. at 1234.

Here, ████████████████████████████████████████ ████████████████████████████—as "a potential competitor on the fringe of the market," and that this perceived entry had a "likely influence on existing competition." *Falstaff Brewing*, 410 U.S. at 534. ████████████████████████████████

████████████████████████████████████████ PX615 (Within) at 8. Other Within documents reveal that ████████████████████ ████████████████████████████████████ ██████████ PX619 (Within) at 4. Moreover, ████████████████████ ████████████████████████████████████ PX514 (Meta) at 2 ██████████████████████████████ ████████████████████████████████

Irrespective of Within's subjective beliefs, objective evidence further supports that it was reasonable for Within to perceive Meta as a potential entrant. *See Phillips Petrol.*, 367 F. Supp. at 1255. Meta's Beat Saber, the leading application ████████████████████, employs the same mechanics as Supernatural, and is widely recognized as providing incidental fitness benefits. *E.g.*, PX162 (Meta) at 3 ████████████████████████ ████████████████████████████████████ PX908 at 1, 5; PX905 at 7-8. Indeed, many users play Beat Saber for exercise. ████████████████████ ██████████████████████████████. Further, Meta took steps to expand Beat Saber into the dedicated fitness space by releasing "FitBeat" in April 2020, which introduced

1      █████████████████████████████████████ PX122 (Meta) at 3.

2         Meta's presence on the edge of the VR Dedicated Fitness App market provided

3 procompetitive benefits that will be eliminated if the Acquisition is consummated. ████████

4 ████████████████████████████████████████████████████

5 ████████████████████████████████████████████████

6 ██████████████████████████████████████████████

7                      PX621 (Within) at 2. ████████████

8 ████████████████████████████████████████████████████

9 ██████████████████████████████████████████████

10 ████████████████████████████████████████████████

11                          PX615 (Within) at 8-9.

12         In sum, Meta's position as a potential entrant on the edge of the market has a beneficial

13 effect on competition that will be lost if Meta acquires Within. This loss of perceived potential

14 competition, coupled with the loss of actual potential competition, "renders the anticompetitive

15 consequences of the acquisition even greater." *Phillips Petrol.*, 367 F. Supp. at 1234.

16         **3. Defendants Cannot Rebut the FTC's Case.**

17         As the discussion above explains, the Commission has met its burden by raising

18 "substantial doubts" about the Acquisition. *Whole Foods Mkt*, 548 F.3d at 1036; *accord Warner*

19 *Commc'ns*, 742 F.2d at 1162. Moreover, Defendants cannot demonstrate that entry will be

20 timely, likely, and sufficient, *see Bazaarvoice*, 2014 WL 203966, at *71, or that there are

21 cognizable merger-specific efficiencies, to prevent the Acquisition's anticompetitive effects.

22 The VR Dedicated Fitness App market is characterized by high barriers to entry. Building a

23 successful VR dedicated fitness app requires ████████████████████████████████

24 ████████████████████████████████████████████████████

25                 PX118 (Meta) at 1-2; PX56 (Carmack (Meta) Dep. at 19-20, 22-25).

26 ████████████████████████████████████████████████████

27 ████████████████████████████████████████████████████

28

1 ████████████████████████████████████████████████████████

2 ████████████████████████████████████████████████████████

3 ███████████████████████████████████

4       The "Supreme Court has never expressly approved an efficiencies defense to a § 7

5 claim," and the Ninth Circuit has stated that it "remain[s] skeptical about the efficiencies

6 defense in general and about its scope in particular." *St. Alphonsus*, 778 F.3d at 788-90. Indeed,

7 the FTC is aware of no court that has ever relied on efficiencies to rescue an unlawful

8 transaction. In any event, ███████████████████████████████████████████████

9 ████████████████████████████████████████████████████████

10 ███████████████████████████ PX54 (Bosworth (Meta) Dep. at 161).

11     **B.**     **The Equities Support a Temporary Restraining Order**

12       "The second step in deciding whether to grant a preliminary injunction is to balance the

13 equities." *Warner Commc'ns*, 742 F.2d at 1165. If the Commission has shown a likelihood of

14 success, "a countershowing of private equities alone does not justify denial of a preliminary

15 injunction." *Id.* The "principal public equity" favoring a preliminary injunction is "the public

16 interest in effective enforcement of the antitrust laws." *H.J. Heinz*, 246 F.3d at 726. Without

17 preliminary relief, the Commission may face the "daunting and potentially impossible task" of

18 "unscrambling the eggs" if the proposed Acquisition is ultimately deemed unlawful. *FTC v.*

19 *Peabody Energy Corp.*, 492 F. Supp. 3d 865, 918 (E.D. Mo. 2020*)*. As such, "[n]o court has

20 denied relief to the FTC in a 13(b) proceeding in which the FTC has demonstrated a likelihood

21 of success on the merits." *FTC v. ProMedica Health Sys. Inc.*., 2011 WL 1219281, at *60 (N.D.

22 Ohio Mar. 29, 2011). Here, the equities support entry of a preliminary injunction pending

23 resolution of the administrative proceedings. To protect interim competition and preserve the

24 FTC's ability to order effective relief, the equities call for a preliminary injunction.

25                     **CONCLUSION**

26       For the foregoing reasons, the FTC respectfully requests that the Court grant the FTC's

27 Motion for a Preliminary Injunction.

28

Dated:  October 31, 2022

Respectfully submitted,

*/s/ Abby L. Dennis*
Abby L. Dennis
Peggy Bayer Femenella
Joshua Goodman
Jeanine Balbach
Michael Barnett
E. Eric Elmore
Justin Epner
Sean D. Hughto
Frances Anne Johnson
Andrew Lowdon
Lincoln Mayer
Erika Meyers
Susan A. Musser
Adam Pergament
Kristian Rogers
Anthony R. Saunders
Timothy Singer
James H. Weingarten

Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, DC 20580
Tel: (202) 326-2381

Erika Wodinsky
90 7th Street, Suite 14-300
San Francisco, CA 94103
Tel: (415) 848-5190

*Counsel for Plaintiff Federal Trade*
*Commission*