# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

FEDERAL TRADE COMMISSION,

                Plaintiff,

     v.

TAPESTRY, INC.,

and

CAPRI HOLDINGS LIMITED,

                Defendants.

Civil Action No. 1:24-cv-03109 (JLR)

FILED UNDER SEAL

## DEFENDANTS TAPESTRY, INC. & CAPRI HOLDINGS LIMITED'S OPPOSITION TO THE FEDERAL TRADE COMMISSION'S MOTION FOR PRELIMINARY INJUNCTION

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................1

STATEMENT OF FACTS ..................................................................................................4

    A.    Consumers Face Handbag Choices Everywhere They Turn And They
Have Hundreds Of Choices In A Highly Competitive Marketplace ......................4

    B.    Tapestry Is Acquiring Capri Because It Sees Opportunity In All Three
Brands, Including Michael Kors, Which It Plans to Revitalize To Benefit
Consumers.............................................................................................................11

LEGAL STANDARDS .....................................................................................................12

ARGUMENT .....................................................................................................................15

I.    PLAINTIFF CANNOT CARRY ITS PRIMA FACIE BURDEN AS TO ITS
PROFFERED MARKETS.........................................................................................16

    A.    Plaintiff's "Accessible Luxury Handbag" Market Is Not Supported By The
Evidence Or A Proper Application Of The Hypothetical Monopolist Test..........16

        1.    The *Brown Shoe* Factors Do Not Support Plaintiff's Decision to
Limit Its Market To Handbags That Are "Accessible Luxury".................21

        2.    Dr. Smith's Economic Analyses In Defense Of Plaintiff's Case
Should Receive No Weight Because Of Incurable Flaws In His
Analyses ...................................................................................................28

    B.    Plaintiff Cannot Evade Market Definition Claiming The Transaction
Eliminates Head-to-Head Competition .................................................................32

II.    DEFENDANTS WILL SHOW THAT PLAINTIFF'S PRIMA FACIE CASE
INACCURATELY PREDICTS THE MERGER'S ANTICOMPETITIVE
EFFECTS ..................................................................................................................33

    A.    Plaintiff's Shares Overstate The Transaction's Likely Competitive Effects
Because Entry, Expansion and Repositioning Are Likely.....................................34

    B.    Tapestry's Emphasis On Brand Autonomy Will Ensure Competition
Among Coach, Kate Spade, And Michael Kors Continues ...................................36

    C.    The Transaction Rationale Is Procompetitive:  Tapestry Intends To
Improve Demand For Michael Kors Handbags And Drive Increased Sales ........37

III.   PLAINTIFF CANNOT CARRY ITS BURDEN TO SHOW THE
       TRANSACTION WILL HAVE SUBSTANTIAL ANTICOMPETITIVE
       EFFECTS IN ITS RELEVANT MARKETS ....................................................................38

IV.    PLAINTIFF FAILS TO SHOW A BALANCE OF EQUITIES IN ITS FAVOR.............39

## **TABLE OF AUTHORITIES**

**Page(s)**

### **CASES**

*Axon Enter., Inc. v. FTC*,
  598 U.S. 175 (2023)................................................................15

*Beatrice Foods Co. v. FTC*,
  540 F.2d 303 (7th Cir. 1976) .................................................27

*Brown Shoe Co. v. United States*,
  370 U.S. 294 (1962)..................................................17, 21, 27

*Chi. Bridge & Iron Co. N.V. v. FTC*,
  534 F.3d 410 (5th Cir. 2008) .................................................34

*City of New York v. Grp. Health Inc.*,
  649 F.3d 151 (2d Cir. 2011)....................................................17

*FTC v. Arch Coal*,
  329 F. Supp. 2d 109 (D.D.C. 2004) ...............................*passim*

*FTC v. Elders Grain, Inc.*,
  868 F.2d 901 (7th Cir. 1989) .................................................15

*FTC v. Freeman Hosp.*,
  69 F.3d 260 (8th Cir. 1985) ...................................................32

*FTC v. H.J. Heinz Co.*,
  246 F.3d 708 (D.C. Cir. 2001) ...............................................40

*FTC v. IQVIA Holdings, Inc.*,
  No. 23 CIV. 06188, 2023 WL 7152577 (S.D.N.Y. Oct. 31, 2023) ................................13, 33

*FTC v. Lancaster Colony Corp.*,
  434 F. Supp. 1088 (S.D.N.Y. 1977)...........................14, 15, 28

*FTC v. Meta Platforms, Inc.*,
  No. 5:22-cv-04325 (N.D. Cal. Oct. 31, 2022), ECF No. 164 .................................40

*FTC v. Sysco Corp.*,
  113 F. Supp. 3d 1 (D.D.C. 2015) ..............................24, 33, 39

*FTC v. Thomas Jefferson University*,
  505 F. Supp. 3d 522 (E.D. Pa. 2020) ........................31, 32, 33

*FTC v. Warner Commc'ns Inc.*,
  742 F.2d 1156 (9th Cir. 1984) ............................................................15

*FTC v. Weyerhaeuser Co.*,
  665 F.2d 1072 (D.C. Cir. 1981) ..........................................................39

*Geneva Pharm. Tech. v. Barr Labs., Inc.*,
  386 F.3d 485 (2d Cir. 2004) ...............................................................28

*In re Super Premium Ice Cream Litig.*,
  691 F. Supp. 1262 (N.D. Cal. 1988), *aff'd sub nom. Haagen-Dazs Co. v.*
  *Double Rainbow Gourmet Ice Creams, Inc.*, 895 F.2d 1417, 1990 WL 12148
  (9th Cir. 1990) ....................................................................................27

*Int'l Shoe Co. v. FTC*,
  280 U.S. 291 (1930) .......................................................................12, 38

*JBL Enterprises v. Jhirmack Enterprises, Inc.*,
  509 F. Supp. 357 (N.D. Cal. 1981) .....................................................27

*Murrow Furniture Galleries, Inc. v. Thomasville Furniture Indus., Inc.*,
  889 F.2d 524 (4th Cir. 1989) ..............................................................27

*New York v. Deutsche Telekom*,
  439 F. Supp. 3d 179 (S.D.N.Y. 2020) .................................................15

*Olin Corp. v. FTC*,
  986 F.2d 1295 (9th Cir. 1993) ............................................................33

*Reynolds Metals Co. v. F.T.C.*,
  309 F .2d 223 (D.C. Cir. 1962) ...........................................................28

*Riegel v. Medtronic, Inc.*,
  451 F.3d 104 (2d Cir. 2006) ...............................................................18

*Ron Tonkin Grand Turismo v. Fiat*,
  637 F.2d 1376 (9th Cir. 1981) ............................................................27

*Starbucks Corp. v. McKinney*,
  144 S. Ct. 1570 (2024) ........................................................................14

*United States v Bazaarvoice, Inc.*,
  No. 13-133-WHO, 2014 WL 203966 (N.D. Cal. Jan. 8, 2014) .............39

*United States v. Baker Hughes Inc.*,
  908 F.2d 981 (D.C. Cir. 1990) ..................................................... *passim*

*United States v. Booz Allen Hamilton Inc.*,
    No. CV CCB-22-1603, 2022 WL 9976035 (D. Md. Oct. 17, 2022) .....................................20

*United States v. E.I. du Pont de Nemours Co.*,
    353 U.S. 586 (1957).....................................................................................................................32

*United States v. Gen. Dynamics Corp.*,
    415 U.S. 486 (1974).....................................................................................................................37

*United States v. Gillette Co.*,
    828 F. Supp. 78 (D.D.C. 1993).....................................................................................................20

*United States v. H&R Block, Inc.*,
    833 F. Supp. 2d 36 (D.D.C. 2011)...........................................................................................30, 31

*United States v. Jos. Schlitz Brewing Co.*,
    253 F. Supp. 129 (N.D. Cal. 1966), *aff'd*, 385 U.S. 37 (1967).....................................................27

*United States v. Mfrs. Hanover Trust Co.*,
    240 F. Supp. 867 (S.D.N.Y. 1965) ..............................................................................................33

*United States v. Oracle Corp.*,
    331 F. Supp.2d 1098 (N.D. Cal. 2004) ...................................................................................17, 28

*United States v. Sabre Corp.*,
    452 F.Supp.3d 97 (D. Del. 2020)..................................................................................................38

*United States v. Siemens Corp.*,
    621 F.2d 499 (2d Cir. 1980)..........................................................................................................40

*United States v. U.S. Sugar Corp.*,
    No. CV 21-1644 (MN), 2022 WL 4544025 (D. Del. Sept. 28, 2022), *aff'd*, 73
    F.4th 197 (3d Cir. 2023)................................................................................................................20

*United States v. Waste Mgmt., Inc.*,
    743 F.2d 976 (2d Cir. 1984)..........................................................................................................34

*Winter v. NRDC*,
    555 U.S. 7 (2008)..........................................................................................................................13

*Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*,
    571 F.3d 206 (2d Cir. 2009)..........................................................................................................18

## STATUTES

15 U.S.C. § 18...................................................................................................................................12

15 U.S.C. § 53(b) ....................................................................................................................13, 14, 15

**TREATISES**

11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2948.3
(3d ed. 2013) ........................................................................................................14

**OTHER AUTHORITIES**

H.R. Rep. No. 624, 93d Cong., 1st Sess. 31 (1973)................................................13, 14

## <u>INTRODUCTION</u>

Plaintiff Federal Trade Commission's case is devoid of any focus on what matters most in an antitrust case: the options available to the consumer. That is a problem because merger analysis is supposed to examine how a proposed transaction will change consumer choice and whether it will leave consumers without reasonable alternatives, forcing them to pay higher prices. Plaintiff and its economic expert have built their case on theories and models that are completely divorced from the marketplace realities and that have nothing to do with the consumer. In Plaintiff's alternate universe, after the transaction closes, consumers shopping for a Michael Kors handbag priced at $295 will have to pay at least $383.50 because Tapestry will be able to jack up prices by as much as 30%, and consumers will be stuck paying that price. Why? Because, they say, the hundreds of handbag brands available online, in malls, at department stores, and the thousands of preowned bags splayed across the internet at all price points are not alternatives.

The evidence will show that there is no handbag at any price remotely relevant to this case where consumers do not have dozens and dozens—if not hundreds—of substitutes available to them. If a brand seeks to raise price without raising value in the eyes of consumers, consumers will "defeat" that price increase by simply turning to one of those hundreds of choices available to them. This is how the real world operates. If the market operated the way Plaintiff posits, third parties would be up in arms expressing concerns that the transaction will harm them. But, over the last three months, Defendants obtained documents and data from 120 third parties and took 15 third-party depositions, and unlike in the government's typical merger challenge, *not a single third party expressed concern that the transaction will harm consumers. Not a single consumer. Not a single wholesaler. Not even a single handbag competitor.* The *only people* who have expressed a view that this transaction is problematic are Plaintiff and its expert.

For these reasons and others, Plaintiff cannot carry its burden under the well-established burden-shifting standard set forth in *United States v. Baker Hughes Inc.*, 908 F.2d 981 (D.C. Cir. 1990).  Plaintiff cannot meet its prima facie burden to establish a relevant antitrust market and that the transaction will result in undue concentration in that market.  Remarkably, after analyzing this transaction for a year, Plaintiff's lawyers and economist still cannot even agree on what that the relevant market is.  Plaintiff's complaint and pre-trial brief purport to define an "accessible luxury" market for handbags based on certain *Brown Shoe "*practical indicia" factors, including supposedly "distinct price points" in the range of $100-$1,000 (even though the majority of Kate Spade and Michael Kors handbags actually sell for less than $100), distinct customers (even though the documents Plaintiff relies upon show that customers at all incomes buy so-called "accessible luxury" bags, "luxury" handbags, and "mass market" handbags), and distinct production facilities (even though the evidence establishes that "accessible luxury brands" and "luxury" brands often manufacture in the same locations, and sometimes side-by-side).  Plaintiff does not limit its market on the basis of data sources, sales channels, or to new bags.

The analysis put forth by Plaintiff's economist, Dr. Loren Smith, could not be more different.  In his view, the market is defined not by what consumers demand, but instead hinges on whether a handbag is identified in a third-party subscription data source, NPD, as being a "bridge" or "contemporary" brand, *without regard to price*.  Dr. Smith never tested whether the brands in the categories contained in that third-party list satisfy the *Brown Shoe* factors Plaintiff relied upon in proposing its "accessible luxury" market.  Instead, he baldly uses those categories as a proxy for "accessible luxury" even though he has no idea how NPD arrived at its classifications.  He also ignores that NPD only includes brands sold through one of the limited number of wholesalers it tracks, and only includes new bags.  If NPD defines a brand as "bridge"

or "contemporary," Dr. Smith declares its bags as "accessible luxury handbags," regardless of where the bag is made, how much it costs, what it is made of, what it looks like, whether it is sold at discount, who its customers are, or how consumers perceive the bag. Dr. Smith ignores the voluminous third-party data, documents, and testimony that contradict his view of who competes: he delegates that choice to the NPD user guide and considers that task complete.

Dr. Smith then compounds those errors by purporting to validate his "accessible luxury handbag" market through a striking misapplication of an economic tool known as the Hypothetical Monopolist Test, or HMT. Dr. Smith builds his HMT on diversion ratios. Diversion ratios, he admits, are supposed to estimate the percentage of customers that would switch from one brand to another in the event of a price increase. But that is not how Dr. Smith built his diversion ratios. Instead, Dr. Smith relied on two old Tapestry surveys, ███████████████████████████ ████████████████████████████████████████████████████████. As discussed below, the law is clear that where surveys do not ask the necessary questions to get at consumer responses to price changes, they cannot be used to generate reliable diversion ratios. Neither Plaintiff nor its expert commissioned such surveys. This fundamental flaw in Dr. Smith's analysis leads to implausible results and is not a methodology that can reliably predict likely harm.

Against the backdrop of these deficiencies, Plaintiff offers an alternative approach to satisfy its threshold burden that is completely outside the established law. Plaintiff claims that this Court should be the first ever to hold that Plaintiff can meet its threshold burden without defining a relevant market, simply by showing the elimination of head-to-head competition between close competitors. This Court should reject Plaintiff's invitation to ignore Supreme Court precedent.

If a plaintiff establishes its prima facie case, the second prong of the *Baker Hughes* framework looks at whether the plaintiff's prima facie case "inaccurately predicts the transaction's

probable effect on competition." Here, Plaintiff's improperly derived market shares inaccurately predict the transaction's effect on future competition. Handbag competitors and industry experts will testify that entry barriers are low, new competitors routinely enter and succeed, and many incumbents have plans to expand or reposition. At the same time, Michael Kors handbag sales have fallen, and there is no proof to suggest that its share today is indicative of what it will be tomorrow. In recent years, the Michael Kors brand has lost its luster. Tapestry's turnaround plans will enhance the Michael Kors' brand's value and provide consumers a procompetitive benefit.

After Plaintiff's prima facie case is rebutted, under the third prong of the *Baker Hughes* analysis, Plaintiff bears the burden to demonstrate that the transaction is likely to substantially reduce competition in its relevant market. Plaintiff's pre-trial brief says nothing on this point, and Dr. Smith does nothing to aid the cause. Assuming that Coach and Kate Spade are the primary constraints on Michael Kors pricing today, Dr. Smith projects that once Tapestry closes the deal, it can automatically impose a price increase of as much as 30% (or more) on Michael Kors handbags. That is a fantasy. Michael Kors has lost share not because of Tapestry, but because of the intense competition that permeates the industry. Dr. Smith's dependence on the same faulty analysis that drives his HMT fails to carry Plaintiff's burden to show anticompetitive effects.

Plaintiff cannot carry its burden of proof and the Court should deny Plaintiff's request for a preliminary injunction.

## **STATEMENT OF FACTS**

### A.    **Consumers Face Handbag Choices Everywhere They Turn And They Have Hundreds Of Choices In A Highly Competitive Marketplace**

This case turns on how consumers choose and buy handbags, and the choices available to them. A persistent theme in Plaintiff's case is that Coach, Kate Spade, and Michael Kors are "close competitors." What Plaintiff appears to really be saying is that, *from Plaintiff's standpoint*, the

4

brands have similar sales channels, including footprints at outlets, brand longevity, and, as two public company competitors, have tracked each other's sales and data to report to their boards and investors. This focuses on the wrong question since it does not focus on consumers and consumer substitution occurring today and beyond. The consumer perspective is exemplified by what consumers see online, when visiting a mall, or visiting a Dillard's, Macy's, or other retail store. Today, consumers across the U.S. can purchase handbags from hundreds of different brands.[1]

First, consumers looking for a handbag can search online from their couch. Even if they are not actively searching, handbags may appear as advertisements on other websites they view, like Facebook, Instagram, TikTok, Google, and so on. Once online, prospective purchasers can buy handbags from brands' direct-to-consumer ("DTC") e-commerce websites, from brands' online outlet stores, from department stores online, from other online retailers like Amazon or Rue La La, or from online resale sellers like Poshmark and The RealReal.[2]

Second, consumers have myriad brick and mortar store options from multi-brand retailers like Dillard's and Nordstrom to single-brand retailers like Madewell and Cole Haan. While the specific brands and stores names may differ, this highly competitive landscape for the supply of handbags exists across the United States. And if the consumers are unsatisfied with their options— or want to do a simple price check—they can look at their phone while in the store to see if a handbag is available cheaper somewhere else or what the competition offers as an alternative.

The numerous shopping channels available to consumers are dwarfed only by the thousands of handbag designs and styles available for sale from many hundreds of brands with

---

[1] After investigating this transaction for nearly nine months, Plaintiff alleges national geographic market which Defendants accept for purposes of analysis.

[2] Ex. 1, Giberson Rep. ¶¶ 20-21. Since 2005, industry expert Giberson has been the President of the Accessories Council, a trade organization for fashion accessories (including handbags) with over 350 members.

offerings at every potential price point.[3]  Even after Dr. Smith artificially limits competitive options to the NPD "bridge" and "contemporary" categories, he still is left admitting 238 brands compete with the merging parties.[4]  There are hundreds more competitors, including brands that NPD doesn't track (such as trendy brands like Lululemon, Telfar, and Cuyana) and brands that NPD puts in the "better," "moderate," and "designer" buckets. ████████████

████████████████████████████████████

████████████████████████████

███████████████████████

████████████████████████████████[5] ████

████████████████████████████████████

████████████████████████[6] █████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

███████[7] █████████████████████████████

████████████████████████████████████

███████████████████████[8] ████████████

████████████████████████████████████

---

[3]  Ex. 1, Giberson Rep. ¶ 17-18.  *See generally* Ex. 2, Giberson Rep., App. C.

[4]  *See* Ex. 3, Smith Rep. 22, fn. 75; Ex. 4, DX-503 (134 brands in NPD "bridge"); Ex. 5, DX-504 (89 brands in NPD "contemporary").

[5] ████████████████████████

[6] ██████████████████████████

[7] █████████████████████████████████████

██████████████

[8] ██████████████████████████████████



Indeed, Plaintiff's revisionist attempt to describe who competes in the "accessible luxury" category defies common sense because it excludes competitors who are priced just below and above Defendants' handbags, and even brands priced the same. As Defendants' economic expert, Dr. Fiona Scott Morton, will testify (and Dr. Smith was forced to admit),[14] the majority of Michael

---



Ex. 17, Gennette Rep. ¶ 26 (Macy's grouped brands by customer "Lifestyles"). Jeff Gennette has spent over 40 years in the retail fashion business and recently retired as President, CEO, and Chairman of Macy's in early 2024.

[14] Dr. Fiona Scott Morton is a Professor of Economics at the Yale School of Management, where she has been on the faculty since 1999. Dr. Scott Morton previously served as the Deputy Assistant Attorney General for Economic Analysis (Chief Economist) at the Antitrust Division of the U.S. Department of Justice in 2011-2012.

Kors and Kate Spade handbags sell for ███████████. Thus, if the price of a Michael Kors handbag was suddenly increased 30% (say from $95 to $123.50), consumers could choose a handbag from ████████████████████████████████, or one of many other brands that Plaintiff and Dr. Smith pejoratively label "mass market" because many of their handbags sell for ███████████.[15] Because these sellers are all labeled as "better" or "moderate" by NPD (or not tracked at all), Dr. Smith excludes them from his analysis. None of Dr. Smith's market shares consider these options available to consumers who previously bought a $95 Michael Kors handbag. Tapestry documents reflect this broad and intense competition.[16] ████████████



████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████[17] Plaintiff and Dr. Smith ignore them because NPD does not label them "bridge" or "contemporary."

Defendants' handbags also compete with higher priced bags, including those sold by European fashion house brands like Louis Vuitton, Prada, Chanel, Gucci, and Burberry. Again, although Plaintiff fails to mention it, the Kantar survey data that Dr. Smith relies upon shows that buyers of Coach handbags also considered buying handbags from Prada and Burberry.[18] ████

████████████████████████████████████████████████████

---

[15] ████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████

[16] ████████████████████████████████████████████████████
████████████████████████████████████████████████

[17] ████████████████████████████████

[18] Ex. 23, Scott Morton Rep. ¶ 282.

██████████████████████████[19]  Dr. Smith's decision to rely solely on NPD's bridge and contemporary buckets means that his market shares ignore this competition.

New brands are emerging every day.[20]  Examples of new brands over just the past few years include Telfar, Brandon Blackwood, Senreve, Staud, Veronica Beard, Kurt Geiger, and Lululemon.  New handbag companies can readily access third-party manufacturing, marketing, and distribution.  ███████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████"[21]  For contract manufacturing, there are factories all over the world with different capabilities available to work with new handbag companies, including Tivoli, in Italy and Incas International in India.[22]  There are also companies that help new entrants with "end-to-end" management services, covering everything from design to delivery.[23]

New handbag entrants do not need a brick and mortar store presence to succeed because they can grow sales through wholesale, online, and DTC channels.[24]  ███████████████████

██████████████████████████████████████████████[25] ████████████

█████████████████████████████████[26] ███████████████████████

---

[19]  ████████████████████████████████████████████████████

[20]  For example, a Vogue article from February 2023 catalogued 17 new and emerging brands with price points under $1000 including Anine Bing, Savette, Hereu, Aesther Ekme, By Far, Staud and others.  Ex. 25, Laura Jackson, "These 20 Contemporary Brands are Defining the New Era of It Bags," Vogue, February 2, 2023, available at https://www.vogue.com/article/emerging-handbag-brands.

[21]  ████████████████████████████████████████████

[22]  Ex. 1, Giberson Rep. ¶¶ 87-89.

[23]  Ex. 1, Giberson Rep. ¶ 94.

[24]  Ex. 17, Gennette Rep. ¶¶ 38-40, 54-56; Ex. 1, Giberson Rep. ¶¶ 97-99; █████████████████████████████████████████████████████

[25]  ██████████████████████████████████████

[26]  ████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████████[27]

On the flipside, companies focused on apparel—like Lululemon—can enter into handbags and succeed. ████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████.[28]

In an industry characterized by hundreds of competing brands and easy entry, suppliers must constantly innovate to stay relevant and top of mind for consumers.  With so many options, consumers are focused on value and will not pay more for a Coach, Kate Spade, Michael Kors, or any other brand handbag without seeing a corresponding increase in the value of the handbag.[29]

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████[30]  Industry experts Giberson and Gennette agree.[31]  This view is also shared by Defendants. ████████████████████████████████████

██████████████████████████████████████████████████████████

████.[32] ████████████████████████████████████████████████

---

[27] ████████████████████████████████████████████

[28] ████████████████████████████████████████████████████

[29] *See* Ex. 1, Giberson Rep. ¶¶ 76-77.

[30] ██████████████████████████████████████

[31] Ex. 1, Giberson Rep. ¶¶ 76-103; Ex. 17, Gennette Rep. ¶¶ 60-87.

[32] ██████████████████████████████████████████████



This evidence proves that this industry is the opposite of those normally the focus of government merger challenges.  First, this case involves fashion where consumer preferences and trends rule.  Second, the fashion industry involves discretionary purchases since most women already own more than one handbag—not a food staple needed to feed a family.  Third, successful merger challenges involve highly-concentrated markets—they do not feature hundreds of competitors selling similar products that consumers could turn to in the event of a price increases.

### B.    Tapestry Is Acquiring Capri Because It Sees Opportunity In All Three Brands, Including Michael Kors, Which It Plans To Revitalize

This transaction has never been about eliminating a competitor.  Tapestry is acquiring *three* iconic brands in Versace, Jimmy Choo, and Michael Kors so that it can bring its expertise in consumer engagement, data analytics, and marketing to them, while broadening the Tapestry portfolio, all to reach more consumers, more effectively, with products consumers want.  The entire purpose of the deal is to drive more sales and, in antitrust parlance, increase output.  Any suggestion to the contrary is without evidence, ignores all the testimony, and is a red herring.

As to Michael Kors specifically, the brand has faced decline.  Its sales peaked around 2015 and 2016 and have been going backwards ever since.  The brand's decline has resulted in an overreliance on discounting.

---

33

34

██████████████████████████████████████████████████.[35]  Michael Kors has not been delivering what consumers want, which means even as Michael Kors has attempted to increase handbag prices, this has only resulted in the brand having to raise discounts even more to sell its product.[36] ██████████████████████████████████████████[37]

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████[38]  In short, Tapestry will help customers see the value of a Michael Kors handbag. Tapestry previously revived the Coach brand by paying close attention to consumer characteristics and the emotions associated with the handbag purchases and will apply this same type of process and investment to Michael Kors.[39]  The transaction will increase demand for Capri's products, expand sales, and ultimately deliver the Capri brands, including Michael Kors, to more consumers. It is a procompetitive deal intended to create competition and benefit consumers.

## LEGAL STANDARDS

*Section 7 of the Clayton Act.*  Section 7 of the Clayton Act is the substantive law that governs this case.  15 U.S.C. § 18.  Ultimately the FTC must prove a violation of Section 7 to prevent Tapestry from owning Capri.  Section 7 only prohibits transactions if "the effect of such acquisition may be substantially to lessen competition."  15 U.S.C. § 18; *Int'l Shoe Co. v. FTC*,

---

[35] ████████████████████████████████████████████████████
████████████████████████████████████████████████████

[36] Ex. 23, Scott Morton Rep., Exhibit 16.

[37] █████████████████████████████████████████████████████
███████████████████████████████

[38] ████████████████████████████████████████

[39] Ex. 23, Scott Morton Rep. ¶ 298.

280 U.S. 291, 298 (1930) ("some lessening of competition, is not forbidden").  Plaintiff must prove "that the substantial lessening of competition will be 'sufficiently probable and imminent' to warrant relief." *FTC v. Arch Coal*, 329 F. Supp. 2d 109, 115 (D.D.C. 2004) (citations omitted).

    ***Section 13(b) of the Federal Trade Commission Act.***  "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. NRDC*, 555 U.S. 7, 24 (2008).  Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), governs Plaintiff's ability to seek a preliminary injunction here.  Congress gave only federal district courts, not the FTC, the power to enjoin a deal, with the expectation that the courts would "exercise independent judgment" before granting relief.  H.R. Rep. No. 624, 93d Cong., 1st Sess. 31 (1973).  Section 13(b) allows a court to grant the FTC a preliminary injunction only if the court finds the FTC has a "likelihood of ultimate success" in proving a Section 7 violation and after "weighing the equities."  15 U.S.C. § 53(b).

    As in most Section 13(b) cases, a principal debate for this trial is whether Plaintiff will be able to meet its burden to show it has a "likelihood of ultimate success" in proving Tapestry's acquisition of Capri violates Section 7.  Because the real-world facts are not on its side, from the start of this litigation, Plaintiff has repeatedly tried to water down the legal standard as much as possible.  Its brief does so in two ways, neither of which the law supports.

    ***First,*** citing *FTC v. IQVIA Holdings, Inc.*, No. 23 CIV. 06188, 2023 WL 7152577 (S.D.N.Y. Oct. 31, 2023), Plaintiff argues that when Congress wrote the words "likelihood of ultimate success" it did not mean what it said.  Instead, Plaintiff asks this Court to apply a standard found nowhere in Section 13(b) and only require it to "raise[] serious questions about the antitrust merits that warrant thorough investigation in the first instance by the FTC."[40]  Pl. Mot. For PI at

---

[40]  It is understandable why *IQVIA* got offtrack on the standard.  There is a dearth of authority on the Section 13(b) standard in the Second Circuit—primarily just a single district court case from

7.   That interpretation of Section 13(b) cannot be squared with the statute's text, has not been adopted by the Second Circuit, and is wrong under recent Supreme Court law.  A few months ago in *Starbucks Corp. v. McKinney*—a case Plaintiff neglects to cite—the Supreme Court confirmed that absent a contrary "clear command from Congress" (which Section 13(b) does not supply), a federal government agency must make a "clear showing" of a likelihood of success on the merits to obtain a preliminary injunction.  144 S. Ct. 1570, 1575-76 (2024) (holding that the "likelihood of success" standard means what it says and requires more than just showing that the agency's case poses a "substantial and not frivolous" question).  That is plainly the case here:  Section 13(b)'s text *requires* courts to assess Plaintiff "likelihood of ultimate success."  15 U.S.C. § 53(b).

Contrary to Plaintiff's assertion, to assess whether Plaintiff can make a clear showing that it is likely to ultimately prevail in proving a Section 7 violation, the Court must consider "conflicts in the evidence" and "undertake an extensive analysis of the antitrust issues."  Pl. Mot. for PI, at 8 (citation omitted).  As *Starbucks* explains, before finding a likelihood of success, a district court "*must* evaluate"—not ignore—"any factual conflicts or difficult questions of law."  144 S. Ct. at 1578 (emphasis added).  The existence of a factual conflict or a hard legal question ultimately benefits *Defendants*, not Plaintiff, as it can "create sufficient doubt about the probability of [the FTC's] success" and "justify denying a preliminary injunction."  11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2948.3 (3d ed. 2013) (citing cases).

***Second,*** Plaintiff next wrongly argues that its likelihood of "ultimate" success is measured based on whether it will prevail in the FTC's own in-house "administrative hearing," rather than

---

the 1970s, *FTC v. Lancaster Colony Corp.*, 434 F. Supp. 1088 (S.D.N.Y. 1977).  *Lancaster Colony* was one of the first courts in the country to construe Section 13(b).  The "serious question" standard *Lancaster Colony* invented is found nowhere in the statute's text or its legislative history.  *See, e.g.*, H.R. Rep. No. 624, 93d Cong., 1st Sess. 31 (1973).  As discussed above, these cases are inconsistent with *Starbucks*, which the Supreme Court issued after *IQVIA.*

on whether it will ultimately succeed on appeal from that process in an Article III court. Pl. Mot. for PI, at 8. Section 13(b) requires an assessment of "ultimate success"—not "interim success"— and it also states that the preliminary injunction should last until "such complaint is dismissed by the Commission *or set aside by the court on review*." 15 U.S.C. § 53(b) (emphasis added). Even Plaintiff's cited authorities peg the success inquiry to a favorable "determination by the FTC in the first instance *and ultimately by the Court of Appeals*." *Lancaster*, 434 F. Supp. at 1091 (emphasis added); *see FTC v. Warner Commc'ns Inc.*, 742 F.2d 1156, 1162 (9th Cir. 1984) (same); *FTC v. Elders Grain, Inc.*, 868 F.2d 901, 903 (7th Cir. 1989) ("likelihood of success" contemplates "a full administrative proceeding before the FTC, followed by judicial review . . . in one of the courts of appeals"). No other approach makes sense when the FTC writes the rules and law that apply in its administrative proceedings and serves as prosecutor, judge, and jury.[41] To obtain a preliminary injunction, Plaintiff must therefore prove that it is likely to succeed in convincing *a federal court of appeals* that the transaction violates Section 7.

## ARGUMENT

The determination of whether Plaintiff can establish that it is likely to succeed on the merits of showing "that a substantial lessening of competition will be sufficiently probable and imminent to warrant relief," *Arch Coal*, 329 F. Supp. 2d at 115, operates through a three step burden-shifting standard laid out in *Baker Hughes*, 908 F.2d 981; *see also New York v. Deutsche Telekom*, 439 F. Supp. 3d 179, 206-07 (S.D.N.Y. 2020). Plaintiff bears the burden to establish a prima facie case

---

[41] Proof of the need for judicial review is confirmed by the FTC's track record: even though the FTC has lost multiple times in federal court, the outcome of the administrative litigation process is that the FTC always ultimately wins. *See Axon Enter., Inc. v. FTC*, 598 U.S. 175, 216 (2023) (Gorsuch, J., concurring) ("some say the FTC has not lost an in-house proceeding in 25 years"). This is hardly surprising: the FTC Commissioners who voted to sue to block the transaction in the first place are the same decision-makers who determine if the deal is anticompetitive at the end of the administrative process.

that (1) the merger is likely to result in substantial harm to competition in a relevant antitrust market and (2) that the merger will result in "undue concentration" in a properly defined market. *Baker Hughes*, 908 F.2d at 982-83. If Plaintiff fails to prove its prima facie case, its whole case fails. Otherwise, the case proceeds to step two, where Defendants must show that Plaintiff's "prima facie case inaccurately predicts the relevant transaction's probable effect on future competition." *Id*. at 991. If Defendants rebut Plaintiff's prima facie case, under step three, the burden shifts back to Plaintiff to prove that the merger will substantially lessen competition in its relevant market. *Id*. at 983. The ultimate burden of persuasion always rests with Plaintiff. *Id.*[42]

## I.    PLAINTIFF CANNOT CARRY ITS PRIMA FACIE BURDEN AS TO ITS PROFFERED MARKETS

Plaintiff fails at the first prong because it cannot carry its burden to show that it is likely to succeed in establishing relevant market under either of its two proffered theories. *First*, Plaintiff contends the evidence supports its contrived "accessible luxury market." *Second*, Plaintiff claims—without citation to any precedent—that this Court does not need to find proof of any relevant market because "eliminat[ing] of head-to-head competition between close competitors" is enough to carry its prima facie burden. Pl. Mot. for PI at 23. The first argument fails for a lack of proof, while the second argument fails as a matter of law. The Court should deny Plaintiff's motion because it cannot carry its burden as to market definition.

### A.    Plaintiff's "Accessible Luxury Handbag" Market Is Not Supported By The Evidence Or A Proper Application Of The Hypothetical Monopolist Test

Market definition is a "pragmatic" and "factual" exercise, "not a formal, legalistic one," which is designed to determine, from the consumers' perspective, the "area of effective

---

[42] The FTC is also unlikely to succeed because the FTC's administrative proceeding itself is unconstitutional in several respects, but Defendants will litigate those constitutional challenges in a separate forum.

competition," consistent with "the commercial realities of the industry." *Brown Shoe Co. v. United States*, 370 U.S. 294, 324, 336 (1962).  In a case like this one, where Plaintiff alleges **consumer** harm, "[t]he relevant market must be defined as all products reasonably interchangeable **by consumers** for the same purposes, because the ability of **consumers** to switch to a substitute restrains a firm's ability to raise prices above the competitive level." *City of New York v. Grp. Health Inc.*, 649 F.3d 151, 155 (2d Cir. 2011) (internal quotation marks and citations omitted) (emphasis added).  "Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient." *Id.* at 155 (internal quotation marks and citations omitted).[43]

On the eve of trial, Plaintiff and its expert still cannot align on *what an "accessible luxury handbag" is*, even though identifying what is in and out of the market is foundational to Plaintiff's case.  On the face of its pleadings and based on Plaintiff's representations to the Court,[44] "accessible luxury handbags" are handbags that fit within parameters of its application of the *Brown Shoe* factors and (1) feature "distinct prices" ranging loosely from $100-$1000; (2) are made in "off shore Asia," and (3) are crafted from "fine"—but not "the finest"—materials (whatever that means).  Plaintiff's *Brown Shoe* analysis, however, supplies a definition that is too

---

[43]  *See also Oracle*, 331 F. Supp. 2d at 1131-32 (N.D. Cal. 2004) (noting product markets are underinclusive if they fail to include all reasonably interchangeable products that constrain a defendant's pricing: the question is what customers could switch to in the event of a post-merger price increase).

[44]  Compl. at ¶¶ 3-4. 33, 39, 42; Ex. 37, Remote Oral Argument Tr. 32:13-23 (May 13, 2024) (THE COURT:  "[I]s the market defined based on competitors, pricing, customers, craftsmanship, or is it a combination of those things?" MS. DENNIS:  "It's a combination of those things, your Honor. That's how we define the market according to the *Brown Shoe* factors.  That's how the law says that we are allowed to define the market.").

vague to know what is in and out of the product market. Are handbags that sell at the same prices as Defendants' handbags in the market (regardless of whether they are outside of $100-$1000)? Are all handbags that are sold in the $100-$1000 price range in the market? Are handbags of the same quality materials but that sell for less than $100 in the market? What about preowned handbags that sell for under $1000? What about new designer bags that sell for less than $1000? What about a $1200 handbag that goes on sale for 20% off? Because Plaintiff's market lacks discernable parameters, there are not clear answers to these basic questions.

Dr. Smith's expert report does not shed any light on these issues. [45] Dr. Smith posits a different relevant market that is not tethered to *Brown Shoe* or the factual record built around the *Brown Shoe* factors at all. Indeed, Dr. Smith makes clear that his relevant market *is not defined based on price, functional interchangeability, materials, manufacturing location, what the industry thinks competes, or—most critically—what consumers view as substitutes*. Instead, Dr. Smith defines the market based on cuts from NPD data (NPD is a third-party data source derived from sales information for certain department stores, known as wholesalers, that tracks segments of retail sales in different industries and has no unique expertise in handbags). Specifically, he limits his analysis to the sales of those brands that NPD classifies in its "bridge" and "contemporary" tiers. As a result, Dr. Smith defines an "accessible luxury handbag" as limited to

---

[45] Dr. Smith's entire analysis is not based on sufficient data and does not reflect a reliable application of basic merger economic principles and methods of analysis. As discussed, all of Dr. Smith's quantitative analyses, including the HMT that he uses to conclude the relevant market, the shares he draws from that relevant market, and the competitive effects he posits will result from this transaction, flow from his faulty calculation of diversion ratios. As Defendants will present to the Court in a separate motion, Dr. Smith's opinions based on his diversion ratios should be excluded. *See Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 213–14 (2d Cir. 2009). Dr. Smith's decisions to remove certain categories of handbags and brands from his relevant market also warrants exclusion of his opinions. *Riegel v. Medtronic, Inc.*, 451 F.3d 104, 127 (2d Cir. 2006) ("An expert opinion requires some explanation as to how the expert came to his conclusion and what methodologies or evidence substantiate that conclusion.").

(1) brands that are tracked by NPD (meaning numerous brands like Cuyana, Louis Vuitton, Lululemon, and Telfar are not included); (2) brands sold through the wholesale channels that NPD tracks (meaning secondary sellers like Rue La La and Gilt Groupe are excluded); (3) brands that NPD calls "bridge" and "contemporary" buckets (meaning brands like Calvin Klein, DKNY, Burberry, and Yves Saint Laurent that are sold through NPD-tracked wholesale channels are excluded regardless of price, quality, or functionality); and (4) sales of new bags within these brands (meaning sales in department stores of preowned bags and sales through resellers like The RealReal, Poshmark, and eBay, are excluded regardless of price).

This leads to some bizarre outcomes.  A Calvin Klein bag that retails for the same price as a Michael Kors bag is out because it is characterized as "better" by NPD and not "bridge" or "contemporary."  A Lululemon or Telfar bag that is priced the same as a Kate Spade bag is out because NPD does not track Lululemon or Telfar.  A new Longchamp bag sold on Gilt and a Marc Jacobs bag sold at Rue La La are out because NPD does not track these channels.  And the numerous preowned Louis Vuitton Neverfull bags that are under $1000 are out regardless of channel because NPD does not track sales of bags that are not new.  This is all the case, notwithstanding that Plaintiff and Dr. Smith did no factual economic work to test whether (1) the "moderate," "better," and "designer," brands are substitutes with "bridge" and "contemporary" brands under *Brown Shoe,* the HMT or any other means; (2) Lululemon, Telfar, or the many other brands he excludes because they do not report to NPD are substitutes with the NPD "bridge" and "contemporary" brands under *Brown Shoe*, the HMT, or any other means; and (3) preowned and new handbags of similar prices are substitutes under *Brown Shoe*, the HMT or any other means. Similarly, Plaintiff and Dr. Smith did no work to understand *how* NPD characterizes handbags in the various "moderate," "better," "bridge," "contemporary," and "designer" categories.  Plaintiff

ultimately bases its entire case on NPD's categorizations, but it did not subpoena or depose NPD. "By defining the market so narrowly, the Government attempts to 'gerrymander its way to victory without due regard for market realities.'" *United States v. Booz Allen Hamilton Inc.*, No. CV CCB-22-1603, 2022 WL 9976035, at *10 (D. Md. Oct. 17, 2022) (citations omitted).

Plaintiff will be unable to succeed whether its or Dr. Smith's "accessible luxury handbag" market at trial. If Plaintiff pursues Dr. Smith's "accessible luxury handbag" version of the market tethered to *Brown Shoe*, it fails (1) due to an inability to prove a plausible relevant product market under *Brown Shoe* (as detailed below); and (2) because Plaintiff's market lacks any economic support, including the necessary market shares—Dr. Smith supplies no market shares beyond the "NPD bridge/contemporary" shares.

If Plaintiff pursues its "NPD bridge/contemporary handbag" market, neither Plaintiff nor Dr. Smith has done the factual and economic work needed to show that the decisions to exclude numerous brands, channels, and preowned bags are backed by *Brown Shoe*, the HMT, or any other analysis of consumer substitution patterns. On this basis alone, as in other cases, Plaintiff will be unable to carry its burden because there is a failure of proof on the dispositive question of why all of these sales were excluded from the market. *See United States v. Gillette Co.*, 828 F. Supp. 78, 83-84 (D.D.C. 1993) (finding that government "failed to demonstrate that premium fountain pens are not in competition with other premium writing instruments" and failed to establish its prima facie case); *United States v. U.S. Sugar Corp.*, No. CV 21-1644 (MN), 2022 WL 4544025, at *25 (D. Del. Sept. 28, 2022) (rejecting DOJ's overly narrow market where DOJ "failed to identify the relevant market for analyzing any proposed competitive injury" due to its failure to include substitutes), *aff'd*, 73 F.4th 197, 205 (3d Cir. 2023) (noting the government's effort to define the

relevant product market to exclude competitors was "irrelevant to consumer welfare" and "purely self-serving").[46]

### 1.    The *Brown Shoe* Factors Do Not Support Plaintiff's Decision To Limit Its Market To "Accessible Luxury" Handbags

Plaintiff defends its "accessible luxury" handbag market with reference to the *Brown Shoe* "practical indicia" factors. *Brown Shoe* holds that market definition must "correspond to the commercial realities of the industry," 370 U.S. at 336, and that the boundaries of a market "may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Id.* at 325. Plaintiff cannot carry its burden properly applying these factors.

***Industry or Public Recognition of a Separate Economic Entity.*** In *Brown Shoe*, the Court found it relevant that the "public" recognized differences between the distinct product markets for men's, women's, and children's shoes. *Id*. at 326. Plaintiff has not cited any evidence that *consumers* shop for "accessible luxury" handbags as a distinct product, much like they would shop for "women's shoes" (as distinct from "men's shoes"). Plaintiff nevertheless contends there is a well-recognized *industry* understanding of what "accessible luxury" means. That is wrong. ▮

---

[46] Plaintiff's repeated reliance on *IQVIA* and *Whole Foods* does not require a different outcome here. First, both cases were decided pre-*Starbucks* under a more deferential §13(b) standard. Second, after reviewing the facts in those cases, the court determined that there were not substitutes that customers viewed as reasonably interchangeable. The alternatives that the merging parties pointed to in *IQVIA* (generalized advertising as a substitute for programmatic advertising to healthcare professionals) and *Whole Foods* (generalized grocery stores as a substitute for grocery stores specializing in premium and organic foods) did not offer the depth and breadth of products and services that customers needed. Third, in both cases, three or fewer competitors would remain post-merger. The handbag industry is totally different from these cases: there are hundreds of functionally interchangeable handbags that customers can substitute to, which is why the FTC cannot model anticompetitive effects as it did in those cases.



***Product's Peculiar Characteristics and Uses.***  Plaintiff does not and cannot argue that there are *peculiar uses* for an "accessible luxury" handbag as distinct from a "mass market" or "luxury" handbag so instead it tries to manufacture vague and unmeasured distinctions related to *peculiar characteristics*.  Plaintiff claims that "accessible luxury handbags" "boast high quality materials (often leather) and elevated craftmanship and construction," Pl. Mot. for PI at 15, but that observation is not backed by the evidence and certainly does not support an ascertainable market.  Brands across the spectrum use a variety of non-leather materials (including nylon, canvas, and raffia) as well as leather.  Moreover, Defendants' handbags use the same types of leather and craftmanship as the higher and lower priced handbags against which they compete.[50] Similarly, Plaintiff has *no evidence* to differentiate Lululemon nylon from Tumi nylon from Prada nylon. ████████████████████████████████████████████████.[51]

---

[47] ████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████

[48] ████████████████████████████████████ Ex. 17, Gennette Rep. ¶¶ 26, 94-103; Ex. 1, Giberson Rep. ¶¶ 16(c), 22-28.

[49] ████████████████████████████████████████████████
████████████████████████████████████████████████
████████████

[50] Ex. 1, Giberson Rep. ¶¶ 60, 66-68; Ex. 41, ████████████████████████████

[51] ████████████████████████████████.  Tellingly, Lululemon is not tracked by NPD, which classifies Tumi as "contemporary" and Prada as "designer."

Plaintiff's claim that Macy's placement of Defendants' brands in a "designer" category is proof they are higher quality, Pl. Mot. for PI at 15, is misleading. ███████████████

████████████████████████████████████████████████████████████████

█████████████████████████████████████████████. [52] ████████████████████

██████████████████████████████████████████████ [53]   Kate Spade's groupings as ████████ and █████ confirm it does not have "peculiar characteristics."[54]

***Unique Production Facilities.***  Since its Complaint, Plaintiff has attempted to perpetuate a claim that "luxury" products are made in Europe, "mass market" products are made in China and "accessible luxury" products are made in "Asia"—or, as it now claims "off shore Asia," which results in higher quality than mass market.  But there are no consistent differences in where the brands Plaintiff categorizes as "luxury," "accessible luxury," and "mass market" manufacture handbags. ████████████████████████████████████████████. [55]



_____

[52] ████████████████████████████████████████████████
[53] ████████████████████████████████████
[54]  *See also* Ex. 17, Gennette Rep. at ¶¶ 94-103 (showing how retailers group brands Dr. Smith considers "accessible luxury," with "Better" and "Moderate" brands).
[55] ██████████████████████████████████
[56] ████████████████████████████████████████
[57] ██████████████████████████████████████
[58] ████████████████████████████████

███████████████████████ [59] ██████████████████████████████████████

████████████████████████████████████████████████████████ [60] Even brands

that Plaintiff deems "mass market," such as Zara, spread their production across three continents,

including Europe.[61]

*Distinct Customers.* Plaintiff cannot show that "accessible luxury handbags" have distinct

customers separate from "mass market" and "luxury" customers.[62] Defendants sell handbags to a

wide range of customers with varying levels of annual household income. ███████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████. [63] ████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

██████████████████████████ [64] There is also no support for the notion that the parties'

brands target customers within a specific income range. █████████████████████████████████

████████████████████████████████████████████████████████████████████████

---

[59] ██████████████████████████████████████████████████████████████████

[60] ████████████████████████████████████████████

[61] Ex. 48, Inditex (Zara) has suppliers and factories in Spain, Portugal, Morocco, Turkey, India, Bangladesh, Pakistan, Vietnam, China, and Cambodia. "Inditex Group Annual Report 2023," Inditex, available at https://static.inditex.com/annual_report_2023/en/Inditex_Group_Annual_Accounts_2023.pdf, at p. 287.

[62] Plaintiff did not define a market based on a targeted customer-type—*i.e.*, "the sale of accessible luxury handbags customers with a household income of less than $100,000." Plaintiff has done this in many other cases, but not here. *See, e.g.*, *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 39 (2015) (finding a market for "broadline distribution services sold to National Customers").

[63] ███████████████████████████████████████████████████

[64] ████████████████████████████████████████████████████████████████████



***Distinct Prices.***  Plaintiff also will not be able to carry its burden to show that "accessible luxury" handbags have distinct prices warranting a separate market between lower and higher-end products.  *On the low end*, Plaintiff tellingly does not even pay lip service in its brief to its claim that handbags priced below "accessible luxury" are sold at distinct prices.  Instead, Plaintiff contends the Parties "generally focus their offerings on an opening price point of $100."  Pl. Mot. for PI at 13.  This carefully worded sentence—focusing on "opening price points" rather than actual "point-of-sale price points"—is a red herring because *the majority of Kate Spade and Michael Kors handbags are sold below $100.*[68]  If Defendants routinely sell handbags below $100, then even if Plaintiff's claim of an "accessible luxury" market were valid, this case would be over



[68] *See* Ex. 23, Scott Morton Rep. (Aug. 7, 2024) at 81 (showing that in 2023, 63.6% of Michael Kors bags sold as a share of total units and 51.0% of Kate Spade bags as a share of total units was in the $50 to $100 range).

because the Defendants' brands would not properly be part of that market.  In any event, excluding bags priced below $100 from the relevant market artificially removes many competitors,[69] ███████████████████████████████████████████████.[70]  Plaintiff's expert rejects applying a price range to the "accessible luxury" market, further undermining the concept.

On the *high end*, Plaintiff's claim of "distinct pricing" and distinct discounting practices is vacuous.  *Plaintiff does not cite a single piece of actual pricing data in its pre-trial brief to support its claim of "distinct prices."*  Plaintiff has not done the work to prove this point—nor can it:  the evidence will show that "accessible luxury" brands like Tory Burch, Khaite, and MCM (which NPD characterizes as "bridge" or "contemporary") sell products above $1000 and "luxury" brands like Burberry, Yves Saint Laurent, and Louis Vuitton all offer handbags below $1000, and these and others, including Bottega Veneta, Celine, and Gucci, sell discounted handbags at their outlet stores priced well below $1000.[71]  It will also show that many brands which Dr. Smith classifies as "accessible luxury" choose not to sell their handbags at discounts through discount wholesalers or outlets to avoid diluting their brand.  ███████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████[72]

---

[69]  Ex. 1, Giberson Rep., Exhibit C (listing another 97 brands that offer handbags with retail prices starting below $100).

[70]  ███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
████████████████████████████████████████████████

[71]  ████████████████████████████████████████ Ex. 2, Giberson Rep., Exhibit C (featuring sample of handbags from Balenciaga, Bottega Veneta, Burberry, Cartier, Celine, Chloe, Fendi, Ferragamo, LVMH, and others that are below $1000).

[72]  ██████████████████████████████████████████

In *Brown Shoe*, the Court rejected an argument that "medium-priced shoes" did not compete with "low-priced shoes," noting it "would be unrealistic" to conclude that "men's shoes selling below $8.99 are in a different product market from those selling above $9.00." *Brown Shoe*, 370 U.S. at 326. So too here: it is just as unrealistic to say that a $90 Calvin Klein does not compete with a $95 Michael Kors handbag, but that $95 Michael Kors handbag does compete with a $500 Tory Burch handbag. Yet that is exactly what Plaintiff asks this Court conclude. Citing *Brown Shoe*, courts have thus repeatedly observed that where, as here, pricing and quality varies on a spectrum, defining markets by "price variances or product quality variances" is "economically meaningless where the differences are actually a spectrum of price and quality differences." *In re Super Premium Ice Cream Litig.*, 691 F. Supp. 1262, 1268 (N.D. Cal. 1988), *aff'd sub nom. Haagen-Dazs Co. v. Double Rainbow Gourmet Ice Creams, Inc.*, 895 F.2d 1417 (Table), 1990 WL 12148 (9th Cir. 1990).[73]

This is especially the case in cases involving differentiated products (like handbags), in which competition occurs across dimensions other than price. *Haagen-Dazs*, 1990 WL 12148, at

---

[73] *See e.g., Murrow Furniture Galleries, Inc. v. Thomasville Furniture Indus., Inc.*, 889 F.2d 524, 528 (4th Cir. 1989) (rejecting a market definition of "name-brand" or "better branded" furniture); *Ron Tonkin Grand Turismo v. Fiat*, 637 F.2d 1376, 1379-80 (9th Cir. 1981) (affirming rejection of proposed market consisting only of Fiat cars in favor of "cars in general" because there was "nothing so special about a Fiat that a prospective purchaser will refuse to buy a Datsun or Chevette, no matter what the price of a Fiat"); *Beatrice Foods Co. v. FTC*, 540 F.2d 303, 310 (7th Cir. 1976) (rejecting submarkets of "professional" and "do-it-yourself" paint brushes and rollers where the "record does not support any contention that higher-priced brushes and rollers are particularly suitable for uses in which lower-priced articles are unacceptable" or "that lower-priced and higher-priced items are marketed and sold to distinct groups of customers."); *JBL Enterprises v. Jhirmack Enterprises, Inc.*, 509 F. Supp. 357, 369-76 (N.D. Cal. 1981) (rejecting a relevant submarket limited to sales of shampoo and conditioners through salons and other professional outlets in favor of one comprising the sales of all beauty products through all professional outlets); *United States v. Jos. Schlitz Brewing Co.*, 253 F. Supp. 129, 145-46 (N.D. Cal. 1966) (rejecting submarket of premium beers because "beer prices range over a wide spectrum" and thus there was "no rational way of choosing a point along this price spectrum"), *aff'd*, 385 U.S. 37 (1967).

*3 ("Courts have repeatedly rejected efforts to define markets by price variances or product quality variances" because "differentiated products face intense competition from other brands of the same product").  Handbags are the classic "differentiated product" and Plaintiff provides no reason to depart from this settled line of cases.[74]  *See generally, United States v. Oracle Corp.*, 331 F. Supp.2d 1098, 1123 (N.D. Cal. 2004) ("A presumption of anticompetitive effects from a combined share of 35% in a differentiated products market is unwarranted. Indeed, the opposite is likely true. To prevail on a differentiated products unilateral effects claim, a plaintiff must prove a relevant market in which the merging parties would have essentially a monopoly or dominant position.").

### 2.    Dr. Smith's Economic Analyses In Defense Of Plaintiff's Case Should Receive No Weight Because Of Incurable Flaws In His Analyses

Plaintiff argues that the hypothetical monopolist test ("HMT") conducted by Dr. Smith "confirms" that "accessible luxury" is an appropriate relevant market.  Pl. Mot. for PI at 20.[75]  Dr. Smith's HMT appears to be the only quantitative analysis Plaintiff will put forth in this case to support its market definition.  Based on our research, no court has ever found a party to have satisfied its burden to establish a relevant market for Section 7 purposes when that party's expert failed to properly conduct an HMT that supports it purported market definition.

---

[74] Plaintiff's cited cases are not to the contrary.  For example, in *Lancaster Colony*, the parties did not argue—and the court never addressed—whether glassware was priced on a spectrum, and the court held that low or moderately-priced glassware was in a different market than higher-priced and other forms of glassware primarily due to their "different use characteristics."  434 F. Supp. 1088, 1093 (S.D.N.Y. 1977).  Similarly, *Geneva Pharmaceuticals* did not involve products priced on a spectrum, and instead addressed pricing differences between two highly regulated pharmaceutical drugs. 386 F.3d 485, 496-97 (2d Cir. 2004).  *Reynolds Metals* likewise involved pricing that did not occur on a spectrum, and moreover, the court based its holding not only on evidence of distinct pricing, but also on distinct customers. 309 F.2d 223, 228-29 (D.C. Cir. 1962).

[75] As the FTC notes, the HMT looks to whether a hypothetical monopolist of the products within a candidate market could profitability impose a small but significant and non-transitory increase in price (generally 5% or 10%) or other worsening of terms.  Pl. Mot. for PI at 20-21.  If the hypothetical monopolist could profitably raise prices in the candidate market, then that market constitutes a relevant product market exists for antitrust purposes.  Pl. Mot. for PI at 20-21.

A threshold problem with Plaintiff's reliance on Dr. Smith's HMT as "confirmation" for its proposed "accessible luxury handbag" market, is that Dr. Smith did not run his HMT on the market that the Plaintiff identifies through its analysis of *Brown Shoe* factors.  Instead, Dr. Smith ran his HMT on his "NPD bridge/contemporary handbag" version of the market, meaning it is limited to brands that NPD designated as "bridge" and "contemporary."  Pl. Mot. for PI at 20.  This is problematic in several respects.  First, Plaintiff's claim that Defendants use NPD in the ordinary course as a basis for this decision is specious at best. ███████████████████████

████████████████████████████████████████████████████████

███████████████.[76]  Second, NPD did not qualify the brands "bridge" and "contemporary" as constituting "accessible luxury" brands, and neither Plaintiff nor Dr. Smith did *any inquiry* to understand how NPD makes its classifications.[77]  If NPD's classifications were so critical to Dr. Smith's analysis, one would expect the FTC to offer evidence of NPD's processes and choices, but Plaintiff never even sought a subpoena or deposition testimony.  Third and most troubling, neither Plaintiff nor Dr. Smith did *any analysis* as to whether the brands identified as "bridge" and "contemporary" by NPD were a relevant market under the *Brown Shoe* factors.  Any assertion that Dr. Smith's HMT confirms Plaintiff's "accessible luxury handbag" submarket is a non-sequitur.[78]

---

[76] ███████████████████████████████████████████████████████████

[77] Ex. 1, Giberson Rep. ¶¶ 29-30, 43-63; Ex. 17, Gennette Rep. ¶¶ 94-103.

[78] Dr. Smith defends his decision to treat NPD's listings of "bridge" and "contemporary" as constituting the brands in the "accessible luxury" market based on the fact that in a market sizing model, Tapestry identifies "bridge" and "contemporary" brands as "accessible luxury."  Pl. Mot. for PI at 21.  Nowhere in Tapestry's model does it ever reference an "accessible luxury" category, let alone assert that NPD's "bridge" and "contemporary" categories constitute an "accessible luxury" market.  Dr. Smith is relying on a stray sentence in a 2021 cover email transmitting the 2021 model.  That is not an acceptable basis for a serious economist to conclude that two unexplained groupings of brands in a third-party data source constitute an antitrust market.

For the sake of argument only, even if Dr. Smith and Plaintiff are seeking to prove the same "accessible luxury handbag" market, Dr. Smith's HMT still does not support Plaintiff's "accessible luxury" market.    That is because, as Plaintiff acknowledges, Dr. Smith's conclusion that "accessible luxury" satisfies the hypothetical monopolist test is based on his calculation of aggregate diversion ratios.  Pl. Mot. for PI at 21; Ex. 3, Smith Rep. at ¶102.  As merger cases have explained, "diversion refers to a consumer's response to a measured increase in the price of a product.  In other words, diversion measures to what extent consumers of a given product will switch (or be 'diverted') to other products in response to a price increase in the given product." *United States v. H&R Block, Inc.*, 833 F. Supp. 2d 36, 62 (D.D.C. 2011).  However, *Dr. Smith never actually measured diversion*, which makes his ratios—and hence his HMT—completely unreliable.

While the concept of diversion ratios may appear complicated, the reason Dr. Smith's analysis cannot support his conclusions is simple.  Dr. Smith concluded that in response to an increase in price of Coach, Kate Spade or Michael Kors, customers would divert to the other two products in sufficient numbers that his candidate market passes his HMT.  Pl. Mot. for PI at 20, Ex. 3, Smith Rep ¶¶ 105-07.



.[79]  Ex. 3, Smith Rep. ¶¶ 106, 218-222.

. Ex. 3, Smith Rep. ¶¶ 301-02.

---

[79]

In *H&R Block*, the court rejected the parties' expert's attempt in a merger challenge to calculate diversion ratios and define the relevant market based on survey data that provided respondents with a pre-selected list of alternative options and only asked them about what products they would switch to if they became dissatisfied with their current tax preparation method.  833 F. Supp. 2d at 70-71.  Indeed, the government sought to exclude the analysis from the hearing, arguing that "a survey must ask the right question in order to have evidentiary value" and because the survey questions did "not reflect customer response to market changes at all [] its responses cannot be used as evidence of the diversion ratio."  Ex. 36, Pl.'s Mem. of P. & A. in Supp. of Pl.'s Mot. in Limine at 5, *H&R Block*, No. 11-cv-00948-BAH (D.D.C. Aug. 24, 2011), ECF No. 67.

Here, Dr. Smith's use of the survey is even more inappropriate, ██████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████  This obvious flaw, along with countless other methodological flaws, render his diversion ratio analysis and HMT meaningless.  *See* Scott Morton Rep. at Section V.B. Because all of Dr. Smith's other analyses, including his merger simulation, rely on this diversion analysis, they likewise cannot be relied upon.  *See* Scott Morton Rep. at Section VIII.E.

This is not the first time Dr. Smith has attempted to calculate diversion ratios to establish a relevant market in an antitrust merger case.  Dr. Smith was retained by the FTC once before, in *FTC v. Thomas Jefferson University*, 505 F. Supp. 3d 522 (E.D. Pa. 2020), which is the only other

merger challenge in which he ever testified.  In that case, the court reviewed and roundly criticized Dr. Smith's attempt to define a relevant market based on his diversion ratio analysis, noting, "Dr. Smith's diversion ratios imperfectly capture all the factors underlying patient 'choices' and insurer responses in the rehabilitation context."  *Id.* at 553-54.  Without economic support, the court held the FTC failed to properly define a relevant market, could not establish a likelihood of success on the merits, and denied the FTC's motion for a preliminary injunction.  *Id.* at 558.  Dr. Smith's diversion analysis is even more faulty, and requires the same outcome.[80]

### B. Plaintiff Cannot Evade Market Definition Claiming The Transaction Eliminates Head-to-Head Competition

Unable to establish a relevant market, Plaintiff radically argues that the elimination of "head-to-head competition between close competitors" provides an independent basis to block the transaction.  Coach, Kate Spade, and Michael Kors do not compete with each other any more "closely" than they do with many other brands, but regardless, that is not the law.  Plaintiff cites *no case* to support the proposition that it can evade market definition and obtain a preliminary injunction without proving a relevant market.  The Court should reject Plaintiff's request that it be the first.

As discussed *supra*, it is settled black letter law that as "necessary predicate" to a Section 7 claim, Plaintiff must show that a transaction is likely to substantially reduce competition *in a relevant market*.  *United States v. E.I. du Pont de Nemours Co.*, 353 U.S. 586, 593 (1957).  The fact that the Plaintiff is the FTC in a Section 13(b) action does not change the legal elements of a

---

[80]  Plaintiff also radically argues that Dr. Smith's analysis also shows that "the Defendants' accessible luxury handbag brands *by themselves* satisfy the HMT, demonstrating the existence of a relevant product market that is limited to Coach, Kate Spade, and Michael Kors handbags."  (Pl. Mot. for PI at 21-22).  This analysis is likewise based on Dr. Smith's diversion ratios and must be rejected for the same reasons noted above.  *See Arch Coal, Inc.*, 329 F. Supp. 2d at 121.

Section 7 claim. *See, e.g.*, *FTC v. Freeman Hosp.*, 69 F.3d 260, 268 (8th Cir. 1985); *Thomas Jefferson Univ.*, 505 F. Supp. 3d at 539 (in determining if the FTC has met its burden in a Section 13(b) merger challenge, "it is first necessary to determine the relevant geographic and product markets"). Every case Plaintiff cites to advance its novel position confirms that the law requires finding a relevant market before analyzing anticompetitive effects.[81] These cases provide no support for Plaintiff's claim that this Court can eschew market definition under step one. Plaintiff's citation to the recent aspirational policy announcement of the current administration in the recently published Horizontal Merger Guideline 2.2—which is in direct conflict with Supreme Court precedent—does not change the law.[82]

## II.   PLAINTIFF'S PRIMA FACIE CASE INACCURATELY PREDICTS THE MERGER'S ANTICOMPETITIVE EFFECTS

Plaintiff's failure to establish it prima facie case ends the analysis. But even if Plaintiff does meet its burden under the first prong, Defendants can rebut that case by demonstrating that the Government's prima facie case and "statistics on market share, market concentration, and market concentration trends inaccurately predicts the merger's probable effects on competition." *Baker Hughes*, 908 F.2d at 991 (cleaned up); *see id.* ("market share" does not always translate to "market power, which is the ultimate consideration" in whether a defendant can rebut a plaintiff's

---

[81] *See Sysco Corp.*, 113 F. Supp. 3d at 24 ("Merger analysis starts with defining the relevant market."); *IQVIA*, 2024 WL 81232, at *11 ("For the FTC to make out a prima facie case, it must define a relevant market . . . ."); *Whole Foods*, 548 F.3d at 1036 (rejecting the FTC's argument that "a market definition is not necessary in a § 7 case," noting that "the framework we have developed for a prima facie § 7 case rests on defining a market and showing undue concentration in [a relevant] market"); *United States v. Mfrs. Hanover Trust Co.*, 240 F. Supp. 867, 902 (S.D.N.Y. 1965) (holding that "proof of the competitive structure of each of them lie at the very threshold of the government's burden of proof" and defining relevant markets).

[82] No court has cited the 2023 Horizontal Merger Guidelines as persuasive authority. *Olin Corp. v. FTC*, 986 F.2d 1295, 1300 (9th Cir. 1993) ("Certainly the Guidelines are not binding on the courts, or for that matter, on the Commission." (citation omitted)).

prima facie showing).  The standard for the quantum of evidence defendants must produce to shift the burden back is relatively low particularly where, as here, the Plaintiff's prima facie case is weak.  *Arch Coal*, 329 F. Supp. 2d at 129 ("Certainly less of a showing is required from defendants to rebut a less-than-compelling prima facie case.").

### A.  Plaintiff's Shares Overstate The Transaction's Likely Competitive Effects Because Entry, Expansion and Repositioning Are Likely

Plaintiff's market share statistics overstate the transaction's potential competitive effects because competitors can (and already do) quickly enter, expand, and reposition.  These facts confirm that there is an "absence of significant barriers [to entry]" and—notwithstanding there is zero evidence of past or future supracompetitive pricing—Defendants "probably cannot maintain supracompetitive pricing for any length of time." *Baker Hughes*, 908 F.2d at 987.

Plaintiff's position has consistently been that entry must be of the size and scale *to replace Michael Kors' footprint today*.  Pl. Mot. at 30.  No authority supports this position.  Plaintiff's lone citation to *Chicago Bridge* makes clear that the question is whether remaining and potential competitors have the *collective ability* "to constrain supracompetitive prices." *Chi. Bridge & Iron Co. N.V. v. FTC*, 534 F.3d 410, 429 (5th Cir. 2008); *see also United States v. Waste Mgmt., Inc.*, 743 F.2d 976, 982-83 (2d Cir. 1984) (reversing finding of Section 7 liability based on potential for entry where firms had a combined 48.8% share of the relevant market, but where barriers to entry were sufficiently low such that easy of entry constrained every firm in the market).  The issue therefore is whether competitors exist *to collectively produce enough output to constrain price increases* and that, in turn, requires analyzing whether there are barriers to entering the market or scaling production to offset price increases.  Where, as here, such barriers do not exist, there is an adequate competitive constraint on the merged entity.

Here, entry is constant and relatively easy.[83]  DTC e-commerce platforms allow a designer to start a handbag brand with little to no infrastructure for manufacturing.[84]  ███████████ ████████████████████████████████████████████████████████.[85]

Moreover, most handbag producers rely on contract manufacturers to make their bags and these third-party manufacturers are readily available to new entrants.[86]  And wholesalers such as Macy's and Dillard's are incentivized to promote new entrants in their stores.[87]

Examples of entry and expansion abound.  ████████████████████████████████ ███████████████████████████████████████.[88] ████████████ ████████████████████████████████████████████████████████████████ ██████████████████.[89] ████████████████████████████████████████████ ██████████[90]████████████████████ ████████████████████████████████████████████████████████████████ █████████████████████████████[91]██████████████████████████

_____

[83] ████████████████████████████████████████████████████████
████████████████████
[84] ████████████████████████████████████████████████████████
████████████████████████████████
[85] ████████████████████████████████████████████████████████
██████
[86] Ex. 1, Giberson Rep. ¶¶ 86-95.
[87] Ex. 17, Gennette Rep. ¶¶ 40-59.
[88] ██████████████████████████████████████
[89] ████████████████████████████████
[90] ██████████████████████████████████
[91] ██████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████[92] There are countless more examples.[93]

### B.    Tapestry's Emphasis On Brand Autonomy Will Ensure Competition Among Coach, Kate Spade, And Michael Kors Continues

Plaintiff's market shares are also not indicative of an antitrust issue because Plaintiff's entire theory in challenging this transaction rests on a fallacy that, after the merger, Tapestry intends to *eliminate competition among Coach, Kate Spade, and Michael Kors,* including as to setting prices, discounting, product development, and wholesaler negotiations. That is not true. Tapestry has no incentive or plans to merge the brands, share pricing information between the brands, or to otherwise limit innovation. ████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████.[94] As such, Dr. Smith's market shares—

---

[92] ███████████████████████████████████████████
[93] ████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
███████
[94] ███████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████

which assume consolidation of the brands—"produce an inaccurate account of the merger's probable effects on competition in the relevant market," *Arch Coal*, 329 F. Supp. 2d at 116.

C.    **The Transaction Rationale Is Procompetitive:  Tapestry Intends To Improve Demand For Michael Kors Handbags And Drive Increased Sales**

███████████████████████████████████████████████████

████████████████████████████████████.[95]  In analyzing the transaction's competitive effects, Plaintiff and Dr. Smith conduct a static analysis that presumes the sales of Michael Kors handbags remain stagnant.  There is no support for that assumption.[96]  Plaintiff's concentration statistics fail to accurately portray the merging company's weak competitive stature given the merged entity's declining competitive significance.  *United States v. Gen. Dynamics Corp.*, 415 U.S. 486, 497-98 (1974); *Baker Hughes*, 908 F.2d at 986.

███████████████████████████████████████████████████

████████████████████████████████████.[97]

Plaintiff attempts to foreclose this argument by arguing this evidence must meet the formal elements of an efficiencies defense to be considered by this Court.  Pl. Mot. for PI at 33-34.  That is incorrect.  Defendants' point here is not that the Court should clear the transaction on the basis of an efficiencies defense.  The question under the second prong of the burden-shifting inquiry is whether Defendants have met Plaintiff's prima facie case with evidence that suggests Plaintiff is

---

[95] ████████████████████████████████████████████

[96] ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████

[97] ████████████████████████

overstating the transaction's likely anticompetitive effects. Viewed through this lens, Defendants' position is that the evidence on the deal rationale combined with the other evidence discussed herein demonstrates such an overstatement. *See Baker Hughes*, 908 F.2d at 990-92.

## III. PLAINTIFF CANNOT CARRY ITS BURDEN TO PROVE SUBSTANTIAL ANTICOMPETITIVE EFFECTS IN ITS RELEVANT MARKETS

Plaintiff must prove that it is likely to prevail on the merits of its claim that the transaction is likely to have *substantial anticompetitive effects* in a relevant market; the elimination of some head-to-head competition and "some lessening of competition" is not sufficient under the law. *Int'l Shoe*, 280 U.S. at 298 (noting that Section 7 "deals only with such acquisitions as probably will result in lessening competition to a substantial degree"). This means Plaintiff must put forward a defensible, "forward-looking analysis" which proves that the acquirer likely will raise prices post-merger. *U.S. v. Sabre Corp.*, 452 F. Supp. 3d 97, 146 (2020).

Plaintiff's pre-trial brief says nothing on this issue. The lone economic evidence that Plaintiff appears to be relying on to support its claim is Dr. Smith's projection that the transaction will result in as much as a 30% price increase on Michael Kors handbags. Pl. Mot. for PI at 21. As trial will show, there are numerous errors with this projection. *First*, as noted above, Dr. Smith's projected price increases are based on his HMT analysis, which is founded on his faulty diversion ratios. And because of that, Dr. Smith cannot conclude it would be profitable for Michael Kors to raise price post-acquisition. Dr. Smith's attempt to salvage that analysis with his merger simulation model fares no better, since it likewise is reliant on his faulty diversion ratios.

*Second*, for Plaintiff's theory to be true, this Court must believe that Coach and Kate Spade are the primary constraints on Michael Kors pricing today. *There is no factual evidence to support that view.* Normally, when the government prevails in a case projecting a post-closing price increase, the record contains evidence showing that each merging party is unable to profitably raise

price currently due to competition from the other.[98]  That does not exist here.  The record similarly lacks the usual evidence of customers or competitors worried about post-closing conduct.

*Third*, given Plaintiff concedes there are 238 competitors even in its narrow market *and* has not put forward evidence to show these competitors cannot meet demand, it is factually implausible to suggest that Tapestry could acquire Michael Kors tomorrow, impose as much as a 30% mark-up, and consumers would accept that increase.  Consumers have hundreds of choices they can turn to if they do not want to pay the price that Defendants or any brand offers.

## IV.    PLAINTIFF FAILS TO SHOW A BALANCE OF EQUITIES IN ITS FAVOR

To determine whether to grant a preliminary injunction under section 13(b), a court must balance the equities.  *FTC v. Weyerhaeuser Co.*, 665 F.2d 1072, 1083 (D.C. Cir. 1981).  The kinds of equities that may be considered "[are] not qualified" by the statute.  *Id*.

The equities favor denying injunctive relief here.  Plaintiff has had a year to develop its case, but has remained blind to the evidence.  After a nine-month investigation, Plaintiff filed a lawsuit based on cherry-picked document excerpts and without deposing a single customer or competitor.  Plaintiff bases its market share calculations on assumptions made by NPD, but it refused to obtain discovery from NPD.  Faced with data and document productions from wholesalers and competitors, Dr. Smith excluded the vast majority of that data in his market share analysis.  And in a case where Plaintiff's economist relies entirely on a years-old survey that asks

---

[98]  *See, e.g.*, *United States v Bazaarvoice, Inc.*, No. 13-133-WHO, 2014 WL 203966, *54-55 (N.D. Cal. Jan. 8, 2014) (citing documents and data showing the merging parties competed head-to-head for opportunities); *Sysco Corp.*, 113 F. Supp. 3d at 61-65 (same).

the wrong questions to support both its market definition and its competitive effects analysis, Plaintiff chose not to conduct a proper consumer survey.[99]

Tapestry's acquisition will benefit Capri's customers and especially the current and future consumers of Michael Kors bands.  Tapestry will restore the brand's health, improve the value of Michael Kors handbags, and re-engage with the Michael Kors consumers to give them the Michael Kors handbags they want.  Because of the lengthy time required to go through the administrative litigation process, granting an injunction will necessarily kill the deal, robbing consumers of the procompetitive advantages resulting from this merger.  *See, e.g., Arch Coal*, 329 F. Supp. 2d at 160.  Where, as here, "the harm to defendants is great and there is little likelihood that consummation of the merger would jeopardize ultimate relief, the court clearly may deny injunctive relief." *United States v. Siemens Corp.*, 621 F.2d 499, 506 (2d Cir. 1980).[100]

## CONCLUSION

This Court should deny Plaintiff's request for a preliminary injunction.

---

[99] Plaintiff has conducted a survey when it wants to and, presumably, when the facts support its theory. *See, e.g.*, Ex. 64, Mem. of P. & A. in Supp. of Mot. for a Prelim. Inj. at 15, *FTC v. Meta Platforms, Inc.*, No. 5:22-cv-04325 (N.D. Cal. Oct. 31, 2022), ECF No. 164 (citing a consumer survey that the FTC's expert conducted).

[100] Contrary to Plaintiff's assertion (Pl. Mot. For PI at 34-35), Tapestry's acquisition of Capri does not implicate the "principal" "public equity consideration [that Congress had] in mind when it enacted section 13(b)," which is the need to maintain the pre-merger "status quo" so that the FTC can award effective relief if it succeeds on the merits.  *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 726 (D.C. Cir. 2001).  The typical concern that an acquirer will "scramble the eggs" that the FTC worries about post-closing does not exist here.  The evidence will show that Tapestry's practice with its acquisitions of Kate Spade and Stuart Weitzman has been to maintain them as separate, standalone businesses, which it will also do here.  Plaintiff can still seek to rescind the deal via its administrative litigation process if it proposes to do so; an injunction does not preclude it from going down that path.

Dated: August 20, 2024

Respectfully submitted,

_____

Alfred C. Pfeiffer (*pro hac vice*)
Christopher S. Yates (*pro hac vice*)
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Telephone: (415) 395-8240
Facsimile: (415) 395-8095
al.pfeiffer@lw.com
chris.yates@lw.com

Amanda P. Reeves (*pro hac vice*)
Ian R. Conner (*pro hac vice*)
Lindsey S. Champlin (*pro hac vice*)
Jennifer L. Giordano (*pro hac vice*)
David L. Johnson (*pro hac vice*)
Seung Wan (Andrew) Paik (*pro hac vice*)
Mary A. Casale (*pro hac vice*)
Christopher J. Brown (*pro hac vice*)
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
Telephone: (202) 637-2200
Facsimile: (202) 637-2201
amanda.reeves@lw.com
ian.conner@lw.com
lindsey.champlin@lw.com
jennifer.giordano@lw.com
david.johnson@lw.com
andrew.paik@lw.com
mary.casale@lw.com
chris.brown@lw.com

Lawrence E. Buterman
LATHAM & WAKINS LLP
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
Facsimile: (212) 751-4864
lawrence.buterman@lw.com

Sean M. Berkowitz (*pro hac vice*)

41

LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
Telephone: (312) 876-7700
Facsimile: (312) 993-9767
sean.berkowitz@lw.com

*Attorneys for Tapestry, Inc.*

*/s/ Jonathan Moses*
Jonathan M. Moses[101]
Elaine P. Golin
Adam L. Goodman
Karen Wong
Brittany A. Fish
51 West 52nd Street
New York, New York 10019
Telephone: (212) 403-1000
JMMoses@wlrk.com
EPGolin@wlrk.com
ALGoodman@wlrk.com
KWong@wlrk.com
BAFish@wlrk.com

*Attorneys for Capri Holdings Limited*

---

[101] Electronic signatures used with consent in accordance with Rule 8.5(b) of the Court's ECF Rules and Instructions.