# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

FEDERAL TRADE COMMISSION,

          Plaintiff,

    v.

TAPESTRY, INC.,

and

CAPRI HOLDINGS LIMITED,

          Defendants.

Civil Action No. 1:24-cv-03109-JLR

## DEFENDANTS TAPESTRY, INC. & CAPRI HOLDINGS LIMITED'S MEMORANDUM IN SUPPORT OF MOTION TO EXCLUDE DR. LOREN SMITH'S OPINIONS REGARDING AND RELYING ON HIS DIVERSION ANALYSIS

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

BACKGROUND ...............................................................................................................4

LEGAL STANDARD.........................................................................................................7

ARGUMENT ....................................................................................................................8

    A.    Dr. Smith's Reliance On The Tapestry Survey Questions Finds No Support In Legal Precedent...........................................................................9

    B.    Dr. Smith's Supposed Justifications for Relying on the Survey Data are Unpersuasive.................................................................................................11

    C.    Dr. Smith Has A History of Improperly Applying Diversion Ratios In Merger Litigations .......................................................................................13

    D.    The Results From Dr. Smith's Diversion Ratios Here Lead to Absurd Results ...........................................................................................................14

CONCLUSION..................................................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
  303 F.3d 256 (2d Cir. 2002).................................................................1, 8

*Brooks v. Outboard Marine Corp.*,
  234 F.3d 89 (2d Cir. 2000).......................................................................13

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993)..........................................................................7, 12, 13

*FTC. v. Arch Coal, Inc.*,
  329 F. Supp. 2d 109 (D.D.C. 2004).........................................................15

*FTC v. CCC Holdings Inc.*,
  605 F.Supp.2d 26 (D.D.C. 2009)..........................................................3, 11

*FTC v. Thomas Jefferson Univ.*,
  505 F. Supp. 3d 522 (E.D. Pa. 2020)..................................................3, 13, 14

*Gen. Elec. Co. v. Joiner*,
  522 U.S. 136 (1997).................................................................................1, 2

*Goebel v. Denver & Rio Grande W. R.R. Co.*,
  346 F.3d 987 (10th Cir. 2003)....................................................................8

*Heller v. Shaw Indus., Inc.*,
  167 F.3d 146 (3d Cir.1999)..........................................................................8

*Hollman v. Taser Int'l. Inc.*,
  928 F. Supp. 2d 657 (E.D.N.Y.2013) .......................................................13

*In re Am. Express Anti-Steering Rules Antitrust Litig.*,
  361 F. Supp. 3d 324 (E.D.N.Y. 2019) ......................................................15

*In re Paoli R.R. Yard PCB Litig.*,
  35 F.3d 717 (3d Cir. 1994)..........................................................................12

*Jensen v. Cablevision Sys. Corp.*,
  372 F. Supp. 3d 95 (E.D.N.Y. 2019) ........................................................13

*Lara v. Delta Int'l Machinery Corp.*,
  174 F. Supp. 3d 719 (E.D.N.Y 2019) .......................................................13

*Loctite Corp. v. National Starch and Chemical Corp.*,
    516 F. Supp. 190 (S.D.N.Y. 1981) ...............................................................................11, 12

*Malletier v. Dooney & Bourke, Inc.*,
    525 F. Supp. 2d 558 (S.D.N.Y. 2007)...........................................................................7

*Merisant Co. v. McNeil Nutritionals, LLC*,
    242 F.R.D. 315 (E.D. Pa. 2007)...................................................................................11

*Siharath v. Sandoz Pharms. Corp.*,
    131 F. Supp. 2d 1347 (N.D. Ga. 2001) ...................................................................12, 13

*United States v. Dentsply Intern., Inc.*,
    277 F.Supp.2d 387 (D. Del. 2003)............................................................................3, 11

*United States v. H&R Block Inc.*,
    833 F. Supp. 2d 36 (D.D.C. 2011) ...................................................................2, 4, 9, 10

*United States v.H&R Block*,
    No. 11-cv-00948-BAH (D.D.C. Aug. 24, 2011), ECF No. 67 ...........................2, 10

*UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*,
    949 F.3d 825 (3d Cir. 2020)........................................................................................8

*United States v. Williams*,
    506 F.3d 151 (2d Cir. 2007)........................................................................................8

*Zenith Elecs. Corp. v. WH-TV Broad. Corp.*,
    395 F.3d 416 (7th Cir. 2005) ......................................................................................8

## OTHER AUTHORITIES

Fed. R. Evid. 702 Advisory Committee Notes ...............................................................8

## INTRODUCTION

Antitrust merger challenges often rise or fall on the reliability of expert testimony. To warrant admissibility, "it is critical that an expert's analysis be reliable at every step." *Amorgianos v. Nat'l R.R. Passenger Corp*., 303 F.3d 256, 267 (2d Cir. 2002). When "there is simply too great an analytical gap between the data and the [expert] opinion proffered," Rule 702 mandates the exclusion of that testimony. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

In this matter, there is a yawning gap between the data the FTC's proffered expert, Dr. Loren Smith, relies upon, and the opinions he offers based on that data. Dr. Smith's opinion is that in response to an increase in the price of Coach, Kate Spade or Michael Kors handbags, high percentages of customers would "divert" to purchasing handbags of the other two brands. Diversion analyses are supposed to estimate what other products consumers would switch to in the face of a price increase. But Dr. Smith bases his opinion on data that has nothing at all to do with what products consumers would switch to, much less switch to in response to a price increase. Instead, Dr. Smith takes the results of certain 2021 and 2022 surveys Tapestry commissioned that asked a question about what other brands people "considered" when making a prior handbag purchase. Since 2022, Tapestry has not used that survey question because it found the results uninformative of customer behavior, but the more significant issue for these purposes is that the question is not one that has anything to do with diversion and, therefore, cannot be used to properly calculate diversion ratios.

Dr. Smith admits he is not a survey expert, and did no analysis whatsoever to determine (1) what it meant for consumers in the survey to "consider" a brand; (2) whether because a consumer "considered" a brand (much less multiple brands) that meant the consumer would switch to any given brand in the event of a price increase; and (3) whether the fact that a consumer "considered" a brand back in 2021 or 2022 is informative of what brand that consumer would

switch to *today* in response to a price increase.  Instead, he just takes the answers from those surveys and declares that "consideration" of a brand years ago is a "good proxy" for what a consumer today would switch to in the event of a price increase.  That is not how this is supposed to be done.  The Supreme Court has stated that exclusion is appropriate when "opinion evidence [] is connected to existing data only by the *ipse dixit* of the expert."  *Joiner*, 522 U.S. at 146.  Dr. Smith could have conducted his own survey to determine what consumers would do in response to a price increase.  He did not.  Having failed to do so, Dr. Smith cannot instead rely on a survey that did not ask about switching in response to a price increase and opine that its results are a proxy for his diversion analysis simply because it was the "best available" survey that already existed.

"A survey must ask the *right questions* in order to have evidentiary value," and when a "[survey] question does not reflect customer response to market changes at all [] its responses cannot be used as evidence of the diversion ratio."  Those statements are not from the parties, or even from a court.  Instead, they are the positions that the *government* took when it faced an expert in a merger hearing who sought to calculate diversion ratios based on a survey question that in no way asked about whether a customer would purchase a different product in the event of a price increase or other market changes.  *See* Ex. 1, Pl.'s Mem. of P. & A. in Supp. of Pl.'s Mot. in Limine at 5, *United States v. H&R Block*, No. 11-cv-00948-BAH (D.D.C. Aug. 24, 2011), ECF No. 67 ("*H&R Block* MIL").  In that case, the government argued that the court should preclude the merging parties' expert from testifying at the preliminary injunction hearing regarding diversion ratios on that basis.  While the court decided to hear the testimony in that case, it ultimately agreed with the government and ruled that "the shortcomings of these survey-derived diversion data are so substantial that the Court cannot rely on them."  *United States v. H&R Block Inc.*, 833 F. Supp. 2d 36, 63 (D.D.C. 2011).  The survey question here is even less connected to switching behavior

than the question the government in *H&R Block* argued needed to be excluded.  And Dr. Smith should know—he explicitly relies upon the *H&R Block* decision in his report.  Ex. 2, L. Smith Initial Report ("Smith Rep.") ¶ 102 n. 200, *see also id.*, Materials Relied Upon (unnumbered last page).[1]

This is not the first time the FTC and Dr. Smith have tried this gambit.  In 2020, the FTC retained Dr. Smith in another merger case—the only other merger case he has ever testified in.  There, as here, the FTC offered Dr. Smith's opinions regarding the relevant market, concentration, and competitive effects based on diversion ratios he calculated from data.  *See FTC v. Thomas Jefferson Univ.*, 505 F. Supp. 3d 522 (E.D. Pa. 2020).  The court held that the diversion ratios Dr. Smith calculated for the FTC did "not in and of themselves address, much less answer, the relevant antitrust question," *id.* at 543, and roundly criticized Dr. Smith's opinion on what consumers would do in response to a price increase based on his diversion ratios.

As Dr. Smith readily admits here, *the diversion ratios he calculated are the foundation of every quantitative analysis he proffers in this case*.  His diversion ratios are a key input into his hypothetical monopolist test by which he calculates the relevant market; his market share calculations that support his conclusion that the transaction would significantly increase concentration in the relevant market; his estimates of the upward pricing pressure that the transaction would cause; and his merger simulation which he uses to conclude that the parties would be incentivized to raise price post-acquisition.  It is the virus the infects Dr. Smith's entire

---

[1] The decision in *H&R Block* followed other antitrust cases brought by the government in which courts rejected attempts to use surveys that were inadequate for purposes of calculating diversion ratios, and excluded expert testimony based on unreliable surveys.  *FTC v. CCC Holdings Inc.*, 605 F. Supp. 2d 26, 70 (D.D.C. 2009); *United States v. Dentsply Intern., Inc.*, 277 F. Supp. 2d 387, 406 (D. Del. 2003), *rev'd on other grounds in United States v. Dentsply Intern., Inc.* 399 F.3d 181 (3d Cir. 2005).

.

report, and because it is wholly unreliable, Rule 702 precludes Dr. Smith from presenting or relying on it at the hearing.

## BACKGROUND

Dr. Smith, an economist retained by the FTC, is offering the opinions that (1) "accessible luxury handbags are relevant product market in which to analyze the competitive effects of the proposed merger," Smith Rep. ¶ 11; (2) the transaction would "significantly increase concentration" in that market, *id.* at ¶ 12; and (3) that the merger would cause a loss of competition between the parties and is likely to cause "significant anticompetitive harm," *id.* at ¶ 13.

Dr. Smith's opinions are flawed in many respects. As explained in Defendants' preliminary injunction opposition brief, he does not conduct any meaningful analysis of the "accessible luxury handbag" market that the FTC relied on in its complaint and will rely on at the hearing. ECF 159 at 18-19. Instead, he takes two lists of brands in one third-party data source and—*without any quantitative or qualitative analysis*—asserts those categories constitute the "accessible luxury handbag" market. Defendants are not basing this motion to exclude on those myriad flaws. Instead, this motion focuses on one underlying flaw critical to Dr. Smith's analysis: the use of surveys to calculate diversion when the surveys did not ask a question relevant to the issue of diversion. This is a flaw that other courts have found goes to the reliability of an expert's opinion, and that the government has argued warrants exclusion of an expert's opinion.

Diversion is a specific concept that "refers to a consumer's response to a measured increase in the price of a product. In other words, diversion measures to what extent consumers of a given product will switch (or be 'diverted') to other products in response to a price increase in the given product." *H&R Block, Inc.*, 833 F. Supp. 2d at 62. In this case, Dr. Smith acknowledges that "diversion is a measure of the percentage of customers switching from a given product in response to a small price increase" and that "[d]iversion ratios measure the extent to which the Parties'

4

brands are close substitutes for one another and thus indicate the significance of the competition that will be lost through the proposed merger."  Smith Rep. ¶¶ 102, 227.

Here, Dr. Smith conducts a hypothetical monopolist test ("HMT"), which examines what customers would do in response to a small, non-transitory increase in price, to determine the relevant market.  *Id.* at ¶ 101.  To demonstrate that his supposed "accessible luxury handbag" market satisfies the hypothetical monopolist test, Dr. Smith conducts an "aggregate diversion analysis" based on his calculation of "aggregate diversion ratios."  *Id.* at ¶¶ 102, 104.  In his report, Dr. Smith explains the economic logic behind using aggregate diversion ratios as part of a HMT. *Id.* at ¶ 103.  Defendants do not dispute that the HMT is a standard tool that, when implemented correctly, can be used to determine a relevant market.  Defendants also do not dispute that aggregate diversion ratios, when based on data that measures consumer switching in response to measured price changes, is an appropriate input into a HMT.  Here, however, Dr. Smith grounds his diversion ratio analysis on a wholly unreliable foundation, making his HMT and all analyses that incorporate his diversion ratios unreliable.

To calculate his diversion ratios, Dr. Smith located surveys that Tapestry commissioned in 2021 and 2022.  While there are a number of differences in how the surveys were conducted, Dr. Smith relies on a question in each that asked consumers who had purchased a handbag in the prior 12 months to identify other brands they "considered" buying.  *Id.* at ¶¶ 244, 247.  Dr. Smith takes the responses in those surveys and makes various unsubstantiated cuts to exclude certain results that are unhelpful to his cause.  *See* Ex. 3, Scott Morton Rep., Section V.B.  He then calculates what he proffers as his "diversion ratios," which are the percentage of customers that he opines would supposedly *switch* today from buying a bag from one of the merging parties' brands to another *if the price of one of those brands increased*.  Smith Rep.  ¶¶ 245, 301-02.  Dr. Smith

explicitly admits that he has no "opinions about the degree to which Tapestry's brand health tracker surveys conform to best practices in the field of surveys." *Id.* ¶ 222.

Dr. Smith admits that he has no idea whether a consumer that "considered" a brand in one of those surveys had a positive or negative view of that brand, since the surveys never asked any question that touches upon that issue. Ex. 4, Smith Tr. 251:14-252:21. Dr. Smith thus has no way of knowing whether a respondent who considered a brand *would actually buy that brand in the future if their first choice went up in price*. Dr. Smith acknowledges that the survey questions do not "explicitly say anything about changes in price." *Id.* at 227:11-228:2. (They do not implicitly say so, either.) Dr. Smith also makes clear that he has not done any analysis to determine whether the fact that a respondent indicated she considered a brand in 2021 or 2022 means that consumer would consider the same brands today.

Notwithstanding all of this, Dr. Smith opines that he does not "have reason to believe that the answer would be different" today, years later, *id.* at 251:11-13, even though this is a fashion industry where consumer preferences change frequently and many new brands enter or grow every year. Then, Dr. Smith baldly asserts that the 2021 and 2022 "other brands considered" survey responses equate to the rate at which consumers today would switch to alternative brands in response to a price increase. *Id.* at 227:11-228:2 ("These are people who bought a handbag. They're asked, specifically, what they were -- the other brands that they considered when they bought that handbag. I think that's a useful proxy for diversion ratio."). In other words, Dr. Smith opines that consumers saying in those surveys that Michael Kors was a brand they considered when they last bought a Coach bag means they would switch to Michael Kors today if Coach raised prices by a small amount (i.e., 5%).

When confronted at his deposition with questions regarding the limitations of the survey

6

data for purposes of calculating diversion, Dr. Smith dismissed those concerns, noting that Tapestry used the surveys in the "ordinary course" and thus viewed the "information important to their consideration of their brand and competition their brand is facing." *Id.* at 253:9-254:3. Dr. Smith, however, paradoxically finds it irrelevant that since 2022, Tapestry's Brand Health Trackers no longer ask consumers about the brands that they considered, and testimony from Tapestry is that they had that question removed because it was not helpful to their understanding of customer behavior. *Id.* at 254:4-15; Ex. 5, Yu Tr. 201:19-202:17.

Dr. Smith nonetheless relies on his diversion ratios for every quantitative analysis in his report. Specifically, he admits that his diversion analysis is one of two inputs into his HMT which he uses to define the relevant market in this case. Smith Rep. ¶¶ 102, 104; *see also* Smith Tr. 211:11-25 ("The diversion ratio estimates that are used in the quantitative assessment of the hypothetical monopolist test rely on the surveys."). Dr. Smith then uses his HMT-defined relevant market to calculate his market shares and concentration figures. Smith Rep. ¶ 181. Dr. Smith also uses his diversion ratios to calculate his estimate of the upward pricing pressure that would result from this transaction. *Id.* ¶ 227. And he uses his diversion ratios for his merger simulation, which is his analysis of the transaction's likely competitive effects. Smith Tr. at 217:4-19 ("I believe the diversion ratios that-- are one quantitative metric that goes into -- yeah, they are, one quantitative metric that goes into that merger simulation.").

## LEGAL STANDARD

Courts serve as the "gatekeeper" of expert evidence. *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 561-62 (S.D.N.Y. 2007). A district court's task in assessing evidence proffered under Rule 702 is to determine whether the evidence "both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). The proponent of expert testimony "has the burden of establishing that the pertinent

7

admissibility requirements are met by a preponderance of the evidence." Fed. R. Evid. 702 advisory committee notes; *see also United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007).

An "expert must offer good reason to think that his approach produces an accurate estimate using professional methods." *Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 419 (7th Cir. 2005). "[A]ny step that renders the analysis unreliable . . . renders the expert's testimony inadmissible." *Goebel v. Denver & Rio Grande W. R.R. Co.*, 346 F.3d 987, 992 (10th Cir. 2003). "[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos*, 303 F.3d at 266. "[A] district court must examine the expert's conclusions in order to determine whether they could reliably follow from the facts known to the expert and the methodology used." *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 153 (3d Cir. 1999). Rule 702 applies whether the trier of fact is a judge or a jury. By using the term "trier of fact," rather than specifying judge or jury, Rule 702 does not distinguish between proceedings. *UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*, 949 F.3d 825 (3d Cir. 2020).

## ARGUMENT

Survey questions asking consumers to identify other brands they "considered" when they bought handbags do not provide a reliable basis for Dr. Smith to opine on the percentage of consumers who would switch to any given product if faced with a price increase on one of the merging parties' brands. Dr. Smith did not conduct any analysis before deciding to equate the two concepts, he just decreed it to be so. *See* Smith Tr. 226:23-227:10 (Smith admits that the survey questions he relied upon do "[n]ot explicitly" ask "respondents what they would switch to in response to a price increase"); *see also* Smith Rep. ¶ 247. And that years-old survey data is even less reliable as applied to consumer decisions today.

One need not have a Ph.D in economics to appreciate why consideration does not equal

8

diversion. The following example illustrates the problem. A customer could go into a store, consider buying a Michael Kors bag, ultimately determine that she hates the style of the Michael Kors bag and would never consider, let alone purchase, a Michael Kors bag in the future, and choose instead to purchase a Coach bag. But in Dr. Smith's world, because the customer *considered* Michael Kors two years ago, today, if faced with a price increase on Coach, that consumer would buy a Michael Kors bag. Dr. Smith admits that the survey question and responses simply do not permit him to know which customers actually liked the brands they considered and which did not. Smith Tr. 251:14-252:21. Nonetheless, Dr. Smith just insists, without citation to legal or economic authority, that the other-brands-considered surveys are a "good proxy" for future switching decisions in response to a price increase. *Id.* at 250:8-15.

### A. Dr. Smith's Reliance On The Tapestry Survey Questions Finds No Support In Legal Precedent

Dr. Smith's pronouncement that the survey questions here are a "good proxy" and among the most direct evidence he has seen informing diversion ratios strains credulity given his explicit reliance on *United States v. H&R Block* in his report. Smith Rep. ¶ 102 n.200; *see also id.*, Materials Relied Upon (unnumbered last page). In that case, which involved a merger between two electronic tax preparation companies, the parties' expert, like Dr. Smith here, sought to calculate diversion ratios for purposes of determining the relevant market based on results from a survey.[2] The question in that case asked "If you had become dissatisfied with TaxACT's price, functionality, or quality, which of these products or services would you have considered using to prepare your federal taxes?" 833 F. Supp. 2d at 69. Thus, unlike the question here, the question

---

[2] In the interest of transparency, one member of Tapestry's legal team was previously an attorney at the Department of Justice, and litigated *United States v. H&R Block* on behalf of the government.

relied upon by H&R Block's expert was at least aimed at understanding which products consumers *might switch to* if they became dissatisfied with their current option.

The court nonetheless found the question not to be a reliable basis for calculating diversion ratios because it did not specifically ask what consumers would switch to *in the event of a price increase*. As the court noted "[m]ost fundamentally, the government points out that the phrasing of the survey question—which asks about dissatisfaction with 'TaxACT's price, functionality, or quality'—appears to ask a hypothetical question about switching, not diversion based solely on a price change. Since the phrasing of the survey question conflates customer concerns about price, functionality, or quality, the government argues that the survey cannot shed any light on customer reactions to price changes alone." *Id.* at 70. While the parties' expert, like Dr. Smith, opined that the question she was evaluating was a strong proxy for diversion, the court disagreed, and found that at best "the survey question [did] not come much closer to identifying diversion ratios than pure switching data does." *Id.*

The *H&R Block* case also is noteworthy for the government's position that the survey question was so uninformative on the question of diversion that the parties' expert should have been precluded at the preliminary injunction hearing from offering opinions based on that survey. As the government noted in its motion in limine, "ambiguities in a question lead to inaccurate data," and those ambiguities made it "impossible" to determine what decision a respondent would make in response to a price increase. *H&R Block* MIL at 6. The government's position in that case that if a "[survey] question does not reflect customer response to market changes at all [] its responses cannot be used as evidence of the diversion ratio," should carry no less weight here just because it is plaintiff's expert who is improperly relying on a survey that does that does not ask "the right questions." *Id.* at 5.

10

This is not the only time a court has rejected the FTC's attempt to have its expert rely on a survey for purposes of calculating diversion ratios when the survey was inadequate for those purposes.  In *FTC v. CCC Holdings, Inc.*, the court held that the FTC's expert's diversion ratios were unreliable because those "diversion ratios [we]re derived from a two-year old survey of thirty-one former CCC customers which notes that the results 'cannot be projected to the population as a whole due to the limited number of completes.'"  605 F. Supp. 2d at 70; *see also Dentsply*, 277 F. Supp. 2d at 453-54 (finding expert testimony in an antitrust case inadmissible when based on flawed surveys).  Other courts have also rejected reliance on prior-conducted surveys that posed general questions unrelated to, and as a result uninformative on, the issue involved in a litigation.  For example, in *Merisant Co. v. McNeil Nutritionals, LLC,* the court in a false advertising case granted a motion in limine to exclude a survey that posed a general question about whether an advertisement was misleading because the question made it "impossible for the Court to know upon what basis a certain portion of the respondents" arrived at their conclusions. 242 F.R.D. 315, 328 (E.D. Pa. 2007).  Similarly, in *Loctite Corp. v. National Starch and Chemical Corp.*, the court in an unfair competition case concerning the use of the term "super glue," rejected plaintiffs' attempt to use prior surveys that had not asked a question relevant to the case. 516 F. Supp. 190, 206 (S.D.N.Y. 1981) ("[N]one of these surveys, which were conducted prior to this litigation and for marketing purposes unrelated to this controversy, tested the single issue at hand here . . . .").

### B.    Dr. Smith's Supposed Justifications for Relying on the Survey Data are Unpersuasive

Based on his deposition, Defendants understand Dr. Smith justifies his reliance on the survey data because (1) survey data in general is a common tool used by economists; (2) Tapestry used and relied upon the survey results in the ordinary course of its business; (3) the survey data

was the best data available to Dr. Smith; and (4) Dr. Smith has no reason to assume the data does not reflect current market thinking. Each of these is unavailing.

*First*, just because Tapestry used the survey data for one purpose does not mean that data can be appropriately used by an expert for any and all purposes. Under Rule 702, "fit is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 743 (3d Cir. 1994) (citing *Daubert*, 509 U.S. at 591). "The study of the phases of the moon, for example, may provide valid scientific 'knowledge' about whether a certain night was dark, and if darkness is a fact in issue, the knowledge will assist the trier of fact. However (absent creditable grounds supporting such a link), evidence that the moon was full on a certain night will not assist the trier of fact in determining whether an individual was unusually likely to have behaved irrationally on that night." *Daubert*, 509 U.S. at 591.

*Second*, Dr. Smith's position that he can rely upon the survey question because Tapestry supposedly found it to be useful for its business, Smith Tr. 253:9-254:3, is equally faulty. As Dr. Smith acknowledges, Tapestry never sought to use the surveys or indicated it was appropriate to use the surveys for the purposes of calculating diversion. *Id.* at 254:25-255:18; *see also Loctite*, 516 F. Supp. at 206. Moreover, Dr. Smith's reliance on the fact that Tapestry found the information in the survey useful is quite questionable since Dr. Smith acknowledges that since 2022 Tapestry no longer surveys that question, and the unrebutted testimony is that it stopped doing so because the information gleaned from that question was not useful to the company. *Id.* at 254:4-15; Yu Tr. 201:19-202:17.

*Third*, any notion that Dr. Smith is entitled to rely on the survey data because it was the best data available to him in the document production is baseless. Rule 702 simply does not

establish a "best efforts" test for an expert and his counsel.  *Siharath v. Sandoz Pharms. Corp.*, 131 F. Supp. 2d  1347, 1373 (N.D. Ga. 2001)  "*Daubert* demands reliable and relevant scientific opinion based upon reliable scientific methodology rather than mere "subjective belief or unsupported speculation."  *Id.*; *Jensen v. Cablevision Sys. Corp.*, 372 F. Supp. 3d 95, 111 (E.D.N.Y. 2019) ("While the focus of the Court's inquiry must remain on the methodology rather than the conclusions, the Court is not obligated to accept conclusions that do not flow from the facts . . . .").  The FTC  could have commissioned a proper survey that would have asked consumers questions that actually bore on the question on diversion.  Their choice not to do so does not provide them with a license to rely on data that is uninformative of switching behavior.  Were it otherwise, that would only incentivize the government not to do the work it should.

*Fourth*, Dr. Smith cannot simply bury his head in the sand and ignore obvious concerns regarding the reliability of the data that are the basis for his opinions because he claims he has no reason to believe the data is unreliable for his purposes.  "The burden of establishing the reliability of an expert's theories pursuant to the standards set forth in Federal Rule 702 and *Daubert* falls squarely with the proponent, who must establish reliability by a preponderance of the evidence." *Lara v. Delta Int'l Machinery Corp.*, 174 F. Supp. 3d 719, 734 (E.D.N.Y 2019) (citing *Hollman v. Taser Int'l. Inc.*, 928 F. Supp. 2d 657, 666 (E.D.N.Y.2013); *Daubert*, 509 U.S. at 592, n. 10). For that reason, an expert's "failure to test a theory . . . can justify a trial court's exclusion of the expert's testimony." *Brooks v. Outboard Marine Corp.*, 234 F.3d 89, 92 (2d Cir. 2000).

### C.    Dr. Smith Has A History of Improperly Applying Diversion Ratios In Merger Litigations

If permitted to testify, this would be the second time Dr. Smith testifies in a merger hearing. The first time he testified was several years ago.  In the 2020 case of *Thomas Jefferson*, Dr. Smith was likewise retained by the FTC to offer testimony regarding the relevant market and competitive

effects of a hospital transaction the FTC wanted enjoined. 505 F. Supp. 3d 522. As is the case here, Dr. Smith sought to rely on diversion ratios he calculated for purposes of his HMT and effects analyses. *See id*. at 541. The court in *Thomas Jefferson* reviewed Dr. Smith's diversion ratios and, while it recognized that the HMT was a standard and appropriate tool for determining the relevant market, noted that "market definition can rest on a mathematical equation only if the variables used in the equation reflect the market's commercial realities." *Id*. The court found that Dr. Smith's diversion ratios did not reflect "the commercial realities of a healthcare market with two-stage competition" and more specifically "imperfectly capture all the factors underlying patient 'choices' and insurer responses in the rehabilitation context." *Id*. at 541, 553-54. The court went on to note that the results of Dr. Smith's diversion ratio did "not in and of themselves address, much less answer, the relevant antitrust question, which is whether a hypothetical monopolist could profitably impose a SSNIP without insurance companies turning to providers outside the geographic markets." *Id*. at 543.

Of critical concern, the court in *Thomas Jefferson* also noted that Dr. Smith's diversion ratios were based on his "reliance, at face value, on what some of the insurers had to say" which was "misplaced and unsupported by the record as a whole." *Id*. at 544. Similar to what he did here, Dr. Smith merely adopted certain testimony in the record, and "acknowledged that he had not done any other analysis to conclude that there is a correlation between patients and insurers, explaining only that it was 'pretty basic economics.'" *Id*. Without economic support, the court held that the FTC failed to properly define a relevant market, could not establish a likelihood of success on the merits, and denied the FTC's motion for a preliminary injunction. *Id*. at 557-58.

**D.    The Results From Dr. Smith's Diversion Ratios Here Lead to Absurd Results**

Dr. Smith's diversion analysis is even more faulty than the one rejected in *Thomas*

*Jefferson.*  This is apparent from the facially implausible results that spring from his analyses. Based on his diversion ratios, Dr. Smith concludes that Coach, Kate Spade and Michael Kors *by themselves* constitute a proper relevant market.  In saying so,  Dr. Smith is necessarily opining that other third party handbags are not interchangeable with the parties' products.  *FTC. v. Arch Coal, Inc.*, 329 F. Supp. 2d 109, 121 (D.D.C. 2004) ("In order for 8800 Btu coal to be considered a separate relevant market, plaintiffs must show that 8800 Btu coal is not interchangeable with 8400 Btu coal").  In other words, Dr. Smith is opining that consumers have no reasonable alternatives to Coach, Kate Spade and Michael Kors.  That contention is absurd, as is Dr. Smith's conclusion that if Tapestry acquired Michael Kors today, tomorrow it could profitably raise Michael Kors' prices by as much as 30 percent across the board.  Pl.'s Mem. in. Supp. of Mot. for Preliminary Injunction at 21-22, ECF No. 122.  Again, one need not have a Ph.D. in economics to realize that any analysis suggesting Michael Kors prices could be increased by 30 percent overnight is not grounded in the real world.  And when an economic analysis like Dr. Smith's is so untethered to reality, it must be rejected.  *See*, *e.g.*, *In re Am. Express Anti-Steering Rules Antitrust Litig.*, 361 F. Supp. 3d 324, 344 (E.D.N.Y. 2019) (noting that "single-brand market allegations are usually rejected because they 'are consistently pled in a manner that lacks plausibility or is otherwise untethered to economic reality.").

## CONCLUSION

For the reasons noted above, Defendants respectfully request that Dr. Smith be precluded at the upcoming hearing from testifying regarding any opinions based on his diversion ratios.

Dated: August 26, 2024                          Respectfully submitted,

                                                */s/* Alfred C. Pfeiffer _____
                                                Alfred C. Pfeiffer (*pro hac vice*)
                                                Christopher S. Yates (*pro hac vice*)
                                                LATHAM & WATKINS LLP
                                                505 Montgomery Street, Suite 2000

San Francisco, CA 94111
Telephone: (415) 395-8240
Facsimile: (415) 395-8095
al.pfeiffer@lw.com
chris.yates@lw.com

Amanda P. Reeves (*pro hac vice*)
Ian R. Conner (*pro hac vice*)
Lindsey S. Champlin (*pro hac vice*)
Jennifer L. Giordano
David L. Johnson (*pro hac vice*)
Seung Wan (Andrew) Paik (*pro hac vice*)
Mary A. Casale (*pro hac vice*)
Christopher J. Brown (*pro hac vice*)
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
Telephone: (202) 637-2200
Facsimile: (202) 637-2201
amanda.reeves@lw.com
ian.conner@lw.com
lindsey.champlin@lw.com
jennifer.giordano@lw.com
david.johnson@lw.com
andrew.paik@lw.com
mary.casale@lw.com
chris.brown@lw.com

Lawrence E. Buterman
LATHAM & WAKINS LLP
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
Facsimile: (212) 751-4864
lawrence.buterman@lw.com

Sean M. Berkowitz (*pro hac vice*)
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
Telephone: (312) 876-7700
Facsimile: (312) 993-9767
sean.berkowitz@lw.com

*Attorneys for Tapestry, Inc.*

16

*/s/* Jonathan M. Moses
Jonathan M. Moses[3]
Elaine P. Golin
Adam L. Goodman
Karen Wong
Brittany A. Fish
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, New York 10019
Telephone: (212) 403-1000
JMMoses@wlrk.com
EPGolin@wlrk.com
ALGoodman@wlrk.com
KWong@wlrk.com
BAFish@wlrk.com

*Attorneys for Capri Holdings Limited*

---

[3] Electronic signatures used with consent in accordance with Rule 8.5(b) of the Court's ECF Rules and Instructions.