# EXHIBIT 1

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>*Plaintiff*,<br><br>v.<br><br>H&R BLOCK, INC.;<br>2SS HOLDINGS, INC.; and<br>TA IX L.P.,<br><br>*Defendants*. | Civil Action No. 11-00948 (BAH) |

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION *IN LIMINE* TO EXCLUDE THE 2011 LITIGATION SURVEY AND LIMIT DEFENDANTS' EXPERT REPORT**

# PUBLIC VERSION

Plaintiff, the United States of America, respectfully requests that this Court exclude from evidence a 2011 survey prepared by Defendants in anticipation of litigation and improperly relied on by Defendants' expert, Dr. Christine Siegwarth Meyer. To the extent Dr. Meyer relies upon the 2011 litigation survey, the United States moves that those portions of her report also be excluded as the product of unreliable principles and methods.

## PRELIMINARY STATEMENT

Surveys prepared in anticipation of litigation are inherently suspect, and the *Manual for Complex Litigation* cautions trial courts about admitting such surveys either directly or through the guise of expert testimony.[1] That caution is particularly appropriate in this case where Defendants' expert, Dr. Meyer, relies on a litigation survey to support her conclusion that pen-and-paper tax preparation competes with Defendants' digital do-it-yourself products. This conclusion, which is contrary to the admissions of Defendants' executives and defies common sense, appears to rest entirely on Dr. Meyer's interpretation of 2011 survey undertaken by Defendants in anticipation of litigation.

The 2011 survey itself consists of a collection of hearsay statements and would ordinarily be subject to exclusion for that reason, unless Defendants could show that the survey was subject to one of the hearsay exceptions. Experts, of course, may rely on otherwise inadmissible survey evidence, but only if the survey is of the type reasonably relied upon by experts in the field. Specifically, an expert may offer opinions based on survey evidence only if the "survey [was] conducted in accordance with generally accepted survey principles, and [if] the results [are] used

---

[1] One factor set forth by the Federal Judicial Center to determine whether a survey is sufficiently trustworthy is whether "the survey was conducted in anticipation of litigation and by persons connected with the parties or counsel or by persons aware of its purpose in litigation." *Manual for Complex Litigation* § 11.493 (4th ed. 2004); *see also Shell Trademark Mgmt. B.V. v. Warren Unilube, Inc.,* 765 F. Supp. 2d 884, 889-90 (S.D. Tex. 2011) (quoting *Manual for Complex Litigation* factors); *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 601 (S.D.N.Y. 2007) (quoting *Manual for Complex Litigation* factors); *Leelenau Wine Cellars, Ltd. v. Black & Red, Inc.*, 452 F. Supp. 2d 772, 778 (W.D. Mich. 2006) (citing *Manual for Complex Litigation* factors).

1

in a statistically correct way."² The 2011 survey does not meet this standard. Indeed, Dr. Meyer appears to have ignored all questions regarding survey methodology and focused her analysis entirely on the survey's flawed and biased results.³ She has, in fact, ignored her own view expressed prior to this litigation that "a survey must be carefully designed if it is to yield reliable and accurate data that are admissible as evidence,"⁴ and that that "surveys must surpass high standards if they are to yield data that are admissible in the courtroom."⁵

As the Government's survey expert, Dr. Ravi Dhar, explains in his expert report, the survey on which Dr. Meyer relies simply does not approach, let alone surpass, those high standards.⁶ The 2011 litigation survey methodology falls far short of the requirements of Federal Rules of Evidence 703 and 702 because: (1) it fails to ask a question relevant to this proceeding; (2) it suffers from extraordinary non-response bias, with response rates far below what courts have found necessary to establish reliability; and (3) the response options provided are leading and fail to discourage guessing.

## BACKGROUND

In preparation for this litigation, Defendants conducted a survey of TaxACT customers following the 2011 tax season (2011 litigation survey). The survey asked one primary question: "If you had become dissatisfied with TaxACT's price, functionality or quality, which products or services would you have considered using to prepare your federal taxes?"⁷ Survey respondents

---

² GX 624 (Diamond, *supra*, note 17, at 233–34) (quoting *Manual for Complex Litigation* § 2.712 (1982)).

³ *Compare* DX0364 (the document cited by Dr. Meyer, which excludes the survey questionnaire), *with* GX604 (Appendix 2 to a White Paper submitted by Defendants to the Department of Justice during its investigation of this transaction, which includes the survey questionnaire).

⁴ GX 622 (Christine Meyer, *Designing and Using Surveys to Define Relevant Markets*, *in* Economics of Antitrust: Complex Issues in a Dynamic Economy 101, 108 (Lawrence Wu, ed. 2007)).

⁵ *Id.*

⁶ *See* GX 623 (Expert Report of Dr. Dhar).

⁷ GX 604 at 7-8. Following the main question, respondents were asked to narrow their main question response(s) to a single response. *Id.*

2

were also asked screening questions to establish their membership in one of four groups: (1) those who paid to complete a federal and state return; (2) those who completed a free federal return and paid to complete a state return; (3) those who completed a paid federal return but did not complete a state return; and (4) those who completed a free federal return and did not complete a state return.[8]

The products offered as response options were limited and varied by group.[9] No group was provided a response option of "Don't Know" or "No Opinion." For each group, the provided options included only the name of the product and a price.[10] No response option included a description of the products' features, support services, or functionality.[11]

Defendants originally e-mailed surveys to 46,899 TaxACT clients and then sent a second e-mail to 24,898 addresses targeting those that purchased a paid federal product but did not purchase a state product.[12] The response rates for the four groups were: (1) 1.7% for free federal / no state filing; (2) 2.08% for free federal / paid state filing; (3) 0.6% for paid federal / no state filing; and (4) 2.45% for paid federal / paid state filing.[13]

## ARGUMENT

Defendants' 2011 litigation survey is incurably and fundamentally flawed and therefore sheds no light on any issue relevant to this proceeding. In summary, the 2011 litigation survey:

- fails to ask a question relevant to this proceeding;
- suffers from extraordinary non-response bias; and
- provides leading response options and fails to discourage guessing.

---

[8] *Id.*
[9] *Id.*
[10] *Id.*
[11] *Id.*
[12] *Id* at 2.
[13] *See id.* at 2, 7-8.

3

Thus, consistent with established caselaw, this Court should not permit Defendants to introduce the 2011 litigation survey for any purpose.[14] The 2011 litigation survey is inadmissible because the survey fails to qualify under Federal Rule of Evidence 703 as the sort of evidence reasonably relied upon by experts in the field.[15] Thus, Dr. Meyer's expert report should be limited because she has improperly extrapolated from and relied on an inadmissible survey in violation of Federal Rule of Evidence 702 and *Daubert* requirements that expert testimony be the result of scientific and reliable methodology.[16]

**I.     The 2011 Litigation Survey Sheds No Light on Any Relevant Issue**

Defendants' 2011 litigation survey, prepared for the purposes of this litigation, is deeply flawed in multiple respects. "Each flaw identified, by itself, contributes substantial concern that Dr. Meyer's interpretation of the 2011 litigation survey in unreliable. The cumulative effect of all these flaws is so egregious that the 2011 litigation survey . . . sheds no light on the likely consumer response to a price increase or similar change in non-price attributes."[17]

*A.    The 2011 Survey Fails to Ask a Relevant Question*

Defendants' 2011 litigation survey fails to ask a question relevant to this proceeding. Not surprisingly, Defendants mischaracterize the question posed to the TaxACT customers surveyed. Defendants assert that the survey studies "the behavior of customers in response to price changes," and that it seeks to answer "where TaxACT customers would go if TaxACT raised its prices or reduced its quality."[18] But this is not what the survey asked.[19] The 2011 litigation

---

[14] *See United States v. Dentsply Int'l, Inc.*, 277 F. Supp. 2d 387, 436 (D. Del. 2003).

[15] *See, e.g., Richardson v. Richardson–Merrell, Inc.*, 857 F.2d 823, 829–30 (D.C. Cir. 1988) (rejecting an expert's testimony under Rule 703 because the value of the evidence he relied on was methodologically flawed).

[16] *Daubert v. Merrell Dow Pharms. Co.*, 509 U.S. 579, 592-3 (1993).

[17] GX 623 (Expert Report of Dr. Dhar at ¶ 13).

[18] Defs.' Br. in Opp'n 15; *see also* Expert Report of Dr. Meyer at ¶ 50 (mischaracterizing the question as determining "to which products TaxACT's customers would switch if those customers were *displeased* with TaxACT because of price, quality or functionality") (emphasis added).

4

survey asked: "If you had become dissatisfied with TaxACT's price, functionality or quality, which of these products or services would you have considered using to prepare your federal taxes?"[20] Contrary to Dr. Meyer's assertion that "this survey is closer to the concept of a diversion ratio than are data on overall switching between products,"[21] the question it asked simply bears no relationship to diversion whatsoever.

A survey must ask the right questions in order to have evidentiary value.[22] Diversion, as Dr. Meyer notes, is a very specific concept, and encapsulates a measured customer reaction to a measured increase in price.[23] Fundamentally, diversion is precisely what the 2011 litigation survey does not measure. The question at issue in no way communicates that there has been any change at all to the TaxACT product.[24] As Plaintiff's survey expert Dr. Dhar notes, "the question, as phrased, most likely communicated to respondents to consider how they might respond if they were dissatisfied with the *current* price (or quality) of TaxACT product that they actually purchased."[25] Thus, the question does not reflect customer response to market changes at all and its responses cannot be used as evidence of the diversion ratio.[26]

Put another way, the survey poses the question by making "you" the subject of the sentence and asks for a response if "you" (the customer) "had become dissatisfied" with

---

[19] *See* GX604 at 7-8.

[20] *Id.*

[21] *See* Expert Report of Dr. Meyer at 20 n.85.

[22] *See* GX 624 (Shari Seidman Diamond, *Reference Guide on Survey Research*, in Federal Judicial Center, *Reference Manual on Scientific Evidence* 236–37 (2d ed. 2000)) ("One indication that a survey offers probative evidence is that it was designed to collect information relevant to the legal controversy.").

[23] *See* Expert Report of Dr. Meyer at ¶ 133 ("The diversion ratio measures the number of customers who switch to a competing [product] *as a percentage of those who leave the product as a result of price increase*.") (emphasis in original).

[24] *See* GX 604 at 7-8.

[25] GX 623 (Expert Report of Dr. Dhar at ¶ 15); *cf.* Meyer, *supra*, note 2, at 104 ("Depending on how the question is asked, the responses can systematically over- or understate real behavior in the face of an actual price change.").

[26] GX 623 (Expert Report of Dr. Dhar at ¶ 16).

5

TaxACT.[27] The natural reading of this construction is that, if the reader is to assume any change at all, it is a change to the subject of the sentence: "you" (the respondent). These changes could be for a wide variety of reasons, such as changed tax situation, changed financial situation, changed level of education, changed tastes and preferences, or anything else.[28]

Even if the Court were to accept Defendant's flawed interpretation that the survey question implies some kind of change to the product, the survey would still not measure diversion. While this might demonstrate switching, it does not show the customer switched because of a TaxACT price increase. Indeed, the question's "price, functionality or quality" formulation is vague and ambiguous. Surveys must pose clear and precise questions or their validity is threatened; ambiguities in a question lead to inaccurate data.[29] By combining three separate queries—anticipated action due to dissatisfaction with price, functionality, and quality—the survey makes it impossible to determine which factor singly or combined with others triggered that response. This is a critical failing because the reason for the dissatisfaction could significantly impact the response selected. That is, the respondent may answer differently depending on whether he or she assumes the dissatisfaction relates to price, functionality, or quality.[30]

---

[27] GX 604 at 7-8.

[28] *See also* GX 623 (Expert Report of Dr. Dhar at ¶¶ 14-15).

[29] GX 624 (Diamond, *supra*, note 17, at 248) (recounting a survey in which consumers were asked what seemed to be a straightforward question, "What is the average number of days each week you have butter?"; the survey results were useless because it was not clear whether respondents included margarine (footnote omitted)); *see also* GX 622 (Meyer, *supra*, note 2, at 103) ("The instructions should be clear and not confusing.").

[30] See GX 623 (Expert Report of Dr. Dhar at ¶ 17).

*B. The 2011 Litigation Survey Suffers From Extraordinary Non-Response Bias*

Defendants' 2011 litigation survey is fatally flawed because of its extraordinary level of non-response bias. "The level of nonresponse in the 2011 Survey is extremely high (more than 98%)."[31] A respectable response rate is necessary to deem a survey reliable.[32]

A low response rate makes extrapolation of a survey's results to the preferences of a population inherently unreliable and inaccurate.[33] Indeed, while this Court took issue with a party's narrowly drawn universe for survey respondents in *CCC Holdings*, "even more unreliable" were the conclusions drawn from responses that comprised a tiny fraction of all relevant customers.[34] The Federal Judicial Center supports response rates of 90% or more as reliable, with response rates between 75% and 90% as "usually reliable" but requiring some check by the survey researcher on the representativeness of the response samples.[35] Below 75% warrants "greater scrutiny" for potential bias, and response rates below 50% indicate a survey "should be regarded with significant caution as a basis for precise quantitative statements from which the sample was drawn."[36] Even Dr. Meyer acknowledges that there should also be a "'sufficient' response rate."[37]

---

[31] *Id.* at ¶ 25.

[32] *See United States v. Dentsply Int'l, Inc.*, 277 F. Supp. 2d 387, 436 (D. Del. 2003) (dismissing a survey with a response rate of approximately 39%, nearly *twenty times* the response rate of Defendants' survey, for "not meet[ing] the necessary research standards" when, among other problems, there is a low response rate), *rev'd on other grounds*, 399 F.3d 181 (3d Cir. 2005); *see also Univ. of Kan. v. Sinks*, No. 06–2341-JAR, 2008 WL 755065, at *4 (D. Kan. Mar. 19, 2008) (noting that a 2.16% response rate is "by any standard . . . quite low" and that it was "extremely likely that [such a low response rate] exerted a bias on the results" (citation omitted)).

[33] *See FTC v. CCC Holdings, Inc.*, 605 F. Supp. 2d 26, 70 (D.D.C. 2009) (finding inability to project a study's conclusion to the entire market as "evidence of its unreliability").

[34] *Id.*; *see also Pro-Football, Inc. v. Harjo*, 284 F. Supp. 2d 96, 121 (D.D.C. 2003) (declining to extrapolate the results of a survey over an entire population because the survey's flaws meant there was no "scientific basis for the extrapolation").

[35] GX 624 (Diamond, *supra*, note 17, at 245).

[36] *Id.*; *see also, e.g.*, *Beacon Mut. Ins. Co. v. OneBeacon Ins. Corp.*, 376 F. Supp. 2d 251, 261 n.4 (D.R.I. 2006) (noting that the Guidelines for Statistical Surveys issued by the former U.S. Office of Statistical Standards provide that "in the case of probability samples, potential bias should receive greater scrutiny when [the] response rate drops

7

In contrast, Defendants' 2011 litigation survey response rates range (by respondent group) from 0.6% to 2.45%,[38] far below the 50% mark that merits "significant caution."[39] The abysmally poor response rate is a serious failing and is generally indicative of the survey's severely flawed execution and far too low to produce reliable results.[40]

Generally, non-response rates are important because non-respondents typically have preferences that differ from those who do respond, thus creating biased results.[41] Even Dr. Meyer acknowledges that a survey "should address nonresponse bias,"[42] which neither Dr. Meyer, Defendants, nor the firm that performed the survey have done.

Non-response bias concerns are especially acute here. Dr. Meyer principally relies on the 2011 litigation survey to contend that pen-and-paper should be included in any relevant product market.[43] But it is likely kind of people who may be more willing to switch to pen-and-paper are precisely the same kind of people who are likely overrepresented among respondents.[44] For example, non-respondents that choose not to respond because they are busy and have time constraints might be less likely to switch to pen-and-paper methods of doing tax returns and be

---

below 75%, and if the response rate drops below 50%, the survey should be regarded with significant caution."(citation omitted)).

[37] GX 622 (Meyer, *supra*, note 2, at 103).

[38] GX 623 (Expert Report of Dr. Dhar at ¶ 24); *cf.* GX 604 at 2-4.

[39] *See* GX 624 (Diamond, *supra*, note 17, at 245).

[40] *See FTC v. CCC Holdings, Inc.*, 605 F. Supp. 2d 26, 70 (D.D.C. 2009) ("Drawing generalized conclusions about an extremely heterogeneous customer market based upon testimony from a small sample is not only unreliable, it is nearly impossible." (internal quotation marks omitted) (quoting *United States v. Oracle Corp.*, 331 F. Supp. 2d 1098, 1167 (N.D. Cal. 2004))).

[41] GX 624 (Diamond, *supra*, note 17, at 245).

[42] GX 622 (Meyer, *supra*, note 2, at 103).

[43] *See* Report of Dr. Meyer at ¶ 50.

[44] *Cf. United Parcel Serv., Inc. v. U.S. Postal Serv.*, 184 F.3d 827, 840 n.14 (D.C. Cir. 1999) (after observing that certain types of respondents has responded more frequently than others, stating that "the validity of a survey's results is undermined if the sample is not representative of the population it purports to represent.").

8

more likely to switch to TurboTax or H&R Block products if TaxACT was no longer suitable.[45] Simply put, Dr. Meyer relies on the 2011 litigation survey *because* it contains extraordinary non-response bias related to the very question Dr. Meyer is posing.

It is inconceivable that Defendants could hope to show that a response rate as low as 2% does not imbue the results with non-response bias, yet it would be their burden to do so if they oppose the Government's motion.[46] If they cannot, the survey remains fatally flawed; a survey that "suffers from non-response bias cannot be fixed by any other means than re-doing the entire survey."[47]

### C. The 2011 Litigation Survey Provides Only Closed-Ended, Leading Response Options and Fails to Discourage Guessing

Even if the 2011 litigation survey had asked a relevant question and had received a reasonable response rate, the survey would still be unreliable because of numerous other serious flaws.

#### 1. The 2011 Litigation Survey Asks Only Closed-Ended, Leading Questions.

Rather than beginning with open-ended questions regarding tax preparation alternatives, the 2011 litigation survey only asks a closed-ended question in which certain alternatives are provided.[48] The response options are severely flawed because they are not exhaustive and fail to take into account that some people may not switch even though they are dissatisfied.[49] More importantly, closed-ended questions are particularly ill-suited here because of the importance of brand in the digital do-it-yourself tax industry. By providing respondents with a list from which

---

[45] GX 624 (Diamond, *supra*, note 17, at 245) (noting that if lack of response was randomly distributed, "valid inferences about the population" as a whole could still be drawn, but remarking that "[t]he difficulty is that nonresponse often is not random").

[46] *United States v. Dentsply Int'l, Inc.*, 277 F. Supp. 2d 387, 437 (D. Del. 2003) ("It is incumbent upon the survey's proponent to prove that non-response bias does not exist where the response rate is below 70 percent.").

[47] *Id.*

[48] GX 604 at 7-8.

[49] GX 623 (Expert Report of Dr. Dhar at ¶¶ 18-19).

9

to choose, the survey hardly mirrors competition in the marketplace where the Big Three competitors spend millions of dollars annually to get their message in front of potential customers. In contrast, the 2011 litigation survey counterfactually de-emphasizes the significance of brand and the millions spent building and maintaining it.

The closed-ended questions are leading because the response options vary by respondent category.[50] That is, depending on the product a respondent stated he or she used in the prior year, a different set of response options was presented.[51] This construction is "highly leading"[52] and may suggest to certain customers "that they are supposed to be price sensitive and may make them more likely to select" the pen-and-paper option.[53] Such an approach is "not credible."[54]

### 2. The 2011 Litigation Survey Fails to Discourage Guessing

The 2011 litigation survey does not appropriately minimize the chance that some respondents might just be guessing, a failing that renders their responses questionable.[55] Surveys should explicitly mention that it is completely appropriate for respondents to have no opinion to a given question.[56] Likewise, a "Don't Know" option should also have been included so that respondents are not forced to choose an answer when that answer is inappropriate for them.[57]

---

[50] GX 604 at 7-8.

[51] *Id.*

[52] Even if this approach were not leading, there is evidence that respondents may have inadvertently placed themselves in the wrong respondent category, thus presented with the "incorrect" response options. [Redacted]

[53] GX 623 (Expert Report of Dr. Dhar at ¶ 20).

[54] *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.*, 290 F.3d 578, 591 (3d Cir. 2002).

[55] *See, e.g.*, GX 624 (Diamond, *supra*, note 17, at 249–51).

[56] GX 623 (Expert Report of Dr. Dhar at ¶ 22); *see* GX 624 (Diamond, *supra*, note 17, at 250) ("The consequence of [offering a no opinion option] is substantial.").

[57] *See* GX 624 (Diamond, *supra*, note 17, at 250) (indicating that inclusion of an "explicit 'don't know' or 'no opinion' alternative commonly leads to a 20%–25% increase in the proportion of respondents selecting that response").

10

Courts have likewise held that "the reliability of the answers" to a survey is "undermine[d]" when respondents are not informed they have the option of responding don't know/no opinion.[58] In fact, as Dr. Dhar points out, Defendants' survey did not even provide explicit instruction *not* to guess, something he "see[s] in almost all surveys done for litigation."[59]

Dr. Meyer's scholarship suggests she agrees with Dr. Dhar's assessment, as Dr. Meyer notes that "how the questions are asked, the ordering of the questions, and the nature of the response categories all create cues that may unintentionally bias how respondents guess at their likely behavior."[60] This highlights another critical flaw in the 2011 litigation survey: respondents were not provided with any information about the products listed as switching responses besides the name of the product and its list price.[61] This flaw, coupled with respondents' likely unfamiliarity with many of the response option likely also led to guessing.[62]

## II. The Survey Cannot Form the Basis for Dr. Meyer's Opinion Under Rule 703 and Any Reliance on the Survey is Evidence of Unreliable Methodology that is Prohibited by Rule 702.

Surveys are collections of hearsay, so Defendants have sought to introduce the 2011 litigation survey's conclusions through the expert report of Dr. Meyer.[63] Defendants constructed the survey for the purposes of this litigation and failed to ensure that "the process was conducted

---

[58] *See, e.g.*, *Procter & Gamble Pharm. v. Hoffman-LaRoche Inc.*, No. 06-0034 (PAC), 2006 WL 2588002, at *23-24 (S.D.N.Y. Sept. 6, 2006) (citing cases).

[59] GX 623 (Expert Report of Dr. Dhar at ¶ 22).

[60] GX 622 (Meyer, *supra*, note 2, at 104).

[61] GX 604 at 7-8; *cf.* GX 622 (Meyer, *supra*, note 2, at 104) ("Questions involving hypothetical future choices are difficult for respondents, particularly if they are unfamiliar with the prices, products, or market under study.").

[62] *See* GX 623 (Expert Report of Dr. Dhar at ¶¶ 21-22).

[63] *See Ambrosini v. Labarraque* (*Ambrosini II*), 101 F.3d 129, 132 (D.C. Cir. 1996) (stating that Federal Rule of Evidence 703 "broadens the acceptable bases for expert testimony by allowing an expert to base an opinion on hearsay and other evidence not admissible in court" (quoting *Ambrosini v. Labarraque* (*Ambrosini I*), 966 F.2d at 1464 (D.C. Cir. 1992)).

11

so as to ensure objectivity."[64] Rule 703 allows experts to base their opinions upon otherwise inadmissible evidence, but does so only to the extent the evidence is of a type "reasonably relied upon" by other experts in the field.[65] The 2011 litigation survey fails this test, and is therefore inadmissible. To the extent Dr. Meyer relies on the survey, her testimony should be excluded under Federal Rule of Evidence 702 and *Daubert*.[66]

> A. The 2011 Litigation Survey is Inadmissible Because It Is So Unreliable that it Cannot Form a Basis for Dr. Meyer's Expert Testimony Because No Expert Would Reasonably Rely On It

Defendants' 2011 litigation survey is so deeply flawed that Dr. Meyer cannot reasonably rely on it. Federal Rule of Evidence 703 allows experts to testify about matters beyond their own personal observation, but the facts or data supporting their opinions must either be independently admissible or "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject."[67] Rule 703 thus directs the Court's attention "to the validity of the techniques employed."[68]

Rule 703 demands an inquiry into the *basis* for an expert's opinion; the Court "must know the basis for an expert's opinion before it can determine that the basis is not of a type reasonably relied on by experts in the field."[69] Dr. Meyer has admitted that, in her opinion, the 2011 litigation survey provides "direct evidence" of competition between digital DIY products

---

[64] *See Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 601 (S.D.N.Y. 2007) (quoting *Manual for Complex Litigation* § 11.493 (4th ed. 2004)).

[65] Fed. R. Evid. 703.

[66] Defendants have no other basis to introduce the 2011 litigation survey because Defendants contend that the responses constitute evidence of future behavior (not merely present mental impressions) so they are not "[t]hen existing mental, emotional, or physical condition[s]," Fed. R. Evid. 803(3), and the survey is so flawed that it is hardly the kind of evidence that has "circumstantial guarantees of trustworthiness" that are "equivalent" to those under Rules 803 or 804. *See* Fed. R. Evid. 807.

[67] Fed. R. Evid. 703.

[68] *See* Fed. R. Evid. 703 advisory committee's note to 1972 proposed rules (noting that looking to the validity of techniques offers "a more satisfactory basis for ruling upon the admissibility of public opinion poll evidence" than hearsay); *cf. Zippo Mfg. Co. v. Rogers Imports, Inc.*, 216 F. Supp. 670, 682 (S.D.N.Y. 1963) (Feinberg, J.) (holding that "the hearsay rule should not bar the admission of *properly conducted* public surveys" (emphasis added)).

[69] *Ambrosini I*, 966 F.2d at 1469.

12

and pen-and-paper and that it "sheds light" on diversion.[70]  Thus, the relevant issue for this Court's Rule 703 analysis is: "'[w]as the poll or survey conducted in accordance with generally accepted survey principles, and were the results used in a statistically correct way?'"[71]  As described in detail, above, the 2011 litigation survey was so poorly designed and executed—and received such a low response rate—that it is a completely invalid basis for Dr. Meyer's expert opinion.

A fatally flawed survey is such poor evidence that it is not of a type "reasonably relied upon" by experts.[72]  There is ample precedent in this Circuit for excluding a poorly-conducted survey on Rule 703 grounds.[73]  Similarly, Dr. Meyer's opinion that Digital DIY products compete with pen-and-paper depends on a severely methodologically flawed survey—a foundation that does not fit the requirements of Rule 703.  To be sure, the 2011 litigation survey also fails to meet and "surpass" Dr. Meyer's own "high standards" test.[74]

> B. *To the Extent Dr. Meyer's Opinion Relies on the 2011 Litigation Survey, it is Inadmissible*

Dr. Meyer's expert opinion, to the extent she relies on the 2011 litigation survey, is inadmissible because it is the product of unreliable principles and methods.  Rule 702 and the Supreme Court's *Daubert* opinion preclude the Court from admitting evidence that is either irrelevant or unreliable:

> [A] witness qualified as an expert . . . may testify . . . if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles

---

[70] Expert Report of Dr. Meyer at 20.

[71] GX 624 (Diamond, *supra*, note 17, at 233–34) (quoting *Manual for Complex Litigation* § 2.712 (1982)).

[72] *See Boyar v. Korean Air Lines Co.*, 954 F. Supp. 4, 7 (D.D.C. 1996) (noting that Rule 703 allows the Court to "determine whether the expert acted reasonably in making assumptions of fact upon which he would base his testimony").

[73] *See, e.g., Richardson v. Richardson–Merrell, Inc.*, 857 F.2d 823, 829–30 (D.C. Cir. 1988) (rejecting an expert's testimony under Rule 703 because the value of the evidence he relied on was methodologically flawed and not clearly related to the issue before the court).

[74] *See* GX 622 (Meyer, *supra*, note 2, at 107).

13

and methods, and (3) the witness has applied the principles and methods reliably
to the facts of the case.

Fed. R. of Evid. Rule 702.[75] The *Daubert* opinion directs the Court to "determine first whether the expert's testimony is based on 'scientific knowledge'; and second, whether the testimony 'will assist the trier of fact to understand or determine a fact in issue.'"[76]

S*cientific* means "a grounding in the methods and procedures of science"; *knowledge* "connotes more than subjective belief or unsupported speculation."[77] Essentially, "[p]roposed testimony must be supported by appropriate validation."[78] Expert testimony that depends on entirely unreliable evidence that lacks a sound basis, is not the product of reliable principles and methods, and cannot possibly assist the trier of fact understand any fact or issue.[79]

As detailed in Part I, above, the 2011 litigation survey is so methodologically flawed that it cannot possibly provide the "appropriate validation" for Dr. Meyer's opinions.[80] The methodologically flawed 2011 litigation survey makes both the survey results and Dr. Meyer's supporting expert testimony relating to it "unreliable."[81] Thus, if the 2011 litigation survey is inadmissible, evidence based on the survey is likewise inadmissible because both lack the necessary "circumstantial guarantees of trustworthiness".[82] Accordingly, both the testimony

---

[75] *See also Daubert v. Merrell Dow Pharms. Co.*, 509 U.S. 579, 592-3 (1993) (requiring the Court to make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology can be applied to the facts in issue").

[76] *Ambrosini v. Labarraque* (*Ambrosini II*), 101 F.3d 129, 133 (D.C. Cir. 1996) (quoting *Daubert*, 509 U.S. at 592–93).

[77] *Daubert*, 509 U.S. at 590.

[78] *Ambrosini II*, 101 F.3d at 133 (internal quotation marks omitted) (quoting *Daubert*, 509 U.S. at 590).

[79] *Joy v. Bell Helicopter Textron, Inc.*, 999 F.2d 549, 568-570 (D.C. Cir. 1993).

[80] Expert Report of Dr. Meyer at ¶¶ 50-51, 83.

[81] *See Vail Assocs. v. Vend-Tel-Co., Ltd*, 516 F.3d 853, 864 n.8 (10th Cir. 2008); *see also* Daubert, 509 U.S. at 595 (a court should not focus on the expert's precise conclusion, but rather on the principles and the methodology employed in reaching those conclusions).

[82] *United States v. Dentsply Int'l, Inc.*, 277 F. Supp. 2d 387, 454 (D. Del. 2003) (noting that even if such a flawed survey "were admissible, the defects in survey design and execution would require the court as factfinder to give the survey no weight"); *see Pittsburgh Press Club v. United States*, 579 F.2d 751, 760 (3d Cir. 1978); *Vail Assocs.*, 516 F.3d at 864 n.8.

14

contained in ¶ 50 and the information contained in Table 2 of Dr. Meyer's expert report are inadmissible evidence. Dr. Meyer's references to, and discussion of, the 2011 litigation survey in ¶ 51 and ¶ 83 of her expert report are similarly inadmissible.

## CONCLUSION

For the foregoing reasons, Plaintiff United States respectfully requests that its motion *in limine* be granted.

Dated this 19th day of August, 2011.

Respectfully Submitted,

FOR PLAINTIFF UNITED STATES OF AMERICA


   /s/ Lawrence E. Buterman
Lawrence E. Buterman (D.C. Bar #998738)
Adam T. Severt
Trial Attorneys

U.S. Department of Justice
Antitrust Division
Networks and Technology Section
450 Fifth Street, NW
Washington, DC 20530
Telephone: (202) 307-6200
Facsimile: (202) 616-8544
lawrence.buterman@usdoj.gov

15