# EXHIBIT 4

Page 1

1      CONFIDENTIAL - LOREN K. SMITH, Ph.D.
2        UNITED STATES DISTRICT COURT
       SOUTHERN DISTRICT OF NEW YORK
3           INDEX NO. 1:24-cv-03109
4    FEDERAL TRADE                :
     COMMISSION,                   :
5          Plaintiff              :
                                   :
6            v.                    :
                                   :
7    Tapestry, Inc., and          :
     CAPRI HOLDINGS LIMITED,       :
8          Defendants.             :
     ----------------------- :
9
10     VIDEOTAPE DEPOSITION VIA ZOOM OF:
11          LOREN K. SMITH, Ph.D.
12         TUESDAY, AUGUST 20, 2024
13
14
15
16
17
18
19
20
21
22
23
24    REPORTED BY:
      SILVIA P. WAGE, CCR, CRR, RPR
25    JOB NO. 6860597

```
 1        CONFIDENTIAL - LOREN K. SMITH, Ph.D.
 2                MR. LOWDON:   Objection to
 3          form.
 4          A.     I'm not recalling that
 5     testimony, as I sit here right now.  I
 6     may have read it and just not -- and I'm
 7     just not recalling it now.  But if you
 8     want me to look at someone's testimony, I
 9     can do that.
10          Q.     If you don't recall having
11     seen it, we can move on from there.
12          You conducted a hypothetical
13     monopolist test in the course of your
14     work in this case, didn't you?
15          A.     I did, yes.
16          Q.     Your hypothetical monopolist
17     test used as one of its inputs the
18     diversion ratios that you calculated from
19     the 2021 and 2022 Kantar and Bain surveys
20     we've been talking about, right?
21          A.     That's correct.  The diversion
22     ratio estimates that are used in the
23     quantitative assessment of the
24     hypothetical monopolist test rely on the
25     surveys.
```

1      CONFIDENTIAL - LOREN K. SMITH, Ph.D.

2      case; is that right?

3           A.    I did.

4           Q.    And your merger simulation

5      model, also, relies on the diversion

6      ratios that you calculated from those

7      2021 and 2022 Bain and Kantar surveys,

8      right?

9           A.    Yeah, it relies on -- the

10     merger simulation relies on a number of

11     data points.  We can go -- I can just --

12     because it does rely on a large number,

13     I'd feel more comfortable if we looked at

14     the write up on that in the appendix.

15     But I believe the diversion ratios that

16     -- are one quantitative metric that goes

17     into -- yeah, they are, one quantitative

18     metric that goes into that merger

19     simulation.

20          Q.    Why don't we turn to

21     Paragraph 311 of your report.

22          A.    Yeah, I'm there.

23          Q.    And you describe diversion

24     ratios as one of the "key data points"

25     into your model, correct?

1      CONFIDENTIAL - LOREN K. SMITH, Ph.D.

2      certain metrics like prices and other

3      things at the silhouette level.  I don't

4      recall off the top of my head whether any

5      of that had anything to do with surveys,

6      but may not specifically.

7           But I have -- what I have seen

8      mostly with the surveys is about brand

9      consideration.

10          Q.     Yeah.

11          In fact, the name of the survey

12     within Tapestry is a "Brand Health

13     Tracker," isn't it?

14          A.     I've heard them refer to that

15     as that, yes.

16          Q.     Now, when we were talking

17     about a definition of a "diversion ratio,"

18     it talked about switching from one

19     product to another in response to a price

20     change.

21          Do you recall that?

22          A.     I do.

23          Q.     But the surveys that you

24     relied upon to calculate your diversion

25     ratios don't ask respondents what they

1      CONFIDENTIAL - LOREN K. SMITH, Ph.D.
2      would switch to in response to a price
3      increase, do they?
4          A.    Not explicitly.  Again, I
5      think it's -- I think there is information
6      in what they chose to buy and the brands
7      they considered alternatively on price.
8          They don't explicitly ask the
9      question, what would you do in response
10     to a price change.
11         Q.    Right.
12         They're not in the surveys asked
13     about switching at all, much less in
14     response to a price change, right?
15             MR. LOWDON:  Objection to
16         form.
17         A.    These are people who bought a
18     handbag.  They're asked, specifically,
19     what they were -- the other brands that
20     they considered when they bought that
21     handbag.  I think that's a useful proxy
22     for diversion ratio.
23         Implicitly it says something about
24     likely responses to price changes.  But
25     it doesn't explicitly say anything about

1    CONFIDENTIAL - LOREN K. SMITH, Ph.D.

2    changes in price.

3         Q.    Yeah.

4         When you say, "not explicitly," the

5    questions as written do not ask about

6    switching from one product to another or

7    about switching in response to a change

8    in price, correct?

9              MR. LOWDON:  Objection to

10         form.

11        A.    Again, I just think that it's

12   important to know that implicit in the

13   consideration is information on price and

14   brands they are considering when they

15   made a purchase, which is a useful proxy

16   of diversion.

17        So, implicitly, it would be

18   approximating the answer to the question

19   of what would you do in response to a

20   small price change.  It doesn't ask that

21   question directly.

22        Q.    Can you direct me to any

23   economic authority -- and, again, for

24   these purposes, I will include the Merger

25   Guidelines -- that says it is appropriate

1    CONFIDENTIAL - LOREN K. SMITH, Ph.D.

2    considerations at the time they made

3    their last purchase.

4         Your know that, right?

5         A.    Yes.   The question asked,

6    what other brands did they consider when

7    they made their last purchase.

8         Q.    And some of that data we know

9    goes back -- I guess, two of the four

10   surveys are from 2021, correct?

11        A.    Yeah, the surveys that I rely

12   on that have that question, which is a

13   good proxy for diversion, are from, as I

14   think we discussed earlier, 2021 through

15   2022.

16        Q.    Yeah, two of the four took

17   place in 2021, didn't they?

18        A.    That's right.

19        Q.    So the fact that a consumer

20   considered a brand when making its last

21   purchase doesn't mean that that consumer

22   would switch to that brand a year later

23   or more, in the event of a price increase

24   in the brand that it bought, does it?

25             MR. LOWDON:   Objection to

1      CONFIDENTIAL - LOREN K. SMITH, Ph.D.
2          form.
3          A.    I think it is an indication
4     of when they purchased a certain brand of
5     handbag what they considered when they
6     purchased it.  I don't have reason to
7     believe that if faced with the same
8     question a year later, the answer would
9     be different.
10         So I think it is information on
11    that question a year later and I don't
12    have reason to believe that the answer
13    would be different.
14         Q.    And, again, you don't know
15    whether, for example, if someone who
16    responded to the survey said they
17    considered Michael Kors at the time they
18    purchased Coach, whether they came away
19    from that experience, after considering
20    Michael Kors, deciding that they didn't
21    have a positive impression of Michael
22    Kors, do you?
23         A.    No, I have no reason to
24    believe they have a negative or -- it's
25    just the information that's in the survey

```
1       CONFIDENTIAL - LOREN K. SMITH, Ph.D.
2    is who they considered and that is
3    indicative of -- it's a good proxy for
4    diversion.  It's -- there's not more
5    information than that.
6         Q.    I agree, "there's not more
7    information than that."
8         So you don't know one way or the
9    other whether anybody had a positive or
10   negative impression about any other brand
11   that they listed as a brand survey in
12   response -- a brand considered, rather,
13   in response to these surveys, because the
14   survey never asked them that; isn't that
15   right?
16        A.    Not as a survey expert.
17   Logically, it would -- again, I think
18   it's indicative of a diversion ratio,
19   meaning, that I think that the -- what
20   they considered is a good proxy for what
21   their next best option was, yeah.
22        Q.    And, again, it doesn't in the
23   surveys ask them what they thought their
24   next best option was, it asked them for
25   the various brands that they considered
```

Page 253

1      CONFIDENTIAL - LOREN K. SMITH, Ph.D.
2      before they made the purchase that they
3      made.
4           We can agree on that, right, sir?
5                MR. LOWDON:  Objection to
6           form.
7           A.    I'm sorry, I'm going to need
8      that one read back.  Apologies.
9           Q.    Sure.
10          The surveys don't ask consumers
11     what they considered their next best
12     option.
13          It asks them for a list of all the
14     other brands that they considered when
15     they made their last handbag purchase;
16     isn't that right, sir?
17          A.    Right.  The information was
18     gathered in the ordinary course of
19     business for Tapestry for their use.
20     They asked about what are the brands they
21     considered and Tapestry, actually, uses
22     that information to put together things
23     like consideration sets, which indicate
24     they think that that information is
25     important to their consideration of their

```
 1      CONFIDENTIAL - LOREN K. SMITH, Ph.D.
 2      brand and competition their brand is
 3      facing.
 4           Q.    You used the present tense
 5      when you said that, sir, I noticed.
 6           In fact, you know that since 2022,
 7      the Brand Health Trackers no longer ask
 8      this question and Tapestry, in fact, no
 9      longer does what you just said in the
10      present tense it does; isn't that correct,
11      sir?
12           A.    Right.  Yeah, they removed
13      this question that is a good proxy for
14      diversion ratios in the more recent
15      surveys.
16           Q.    Now, again, if Tapestry
17      thought it was a such a good proxy for
18      diversion ratios, why would they have
19      stopped using it in June of 2022?
20                 MR. LOWDON:  Objection to
21           form.
22           A.    I don't know.  I'd be
23      speculating if I -- as to why they
24      switched the question.
25           Q.    And, certainly, we can agree
```

```
 1      CONFIDENTIAL - LOREN K. SMITH, Ph.D.
 2     that Tapestry never used the information
 3     from these surveys to do its own form of
 4     diversion analysis, right?
 5          A.    You know, I am not sure that
 6     in all of my time in doing competition
 7     economics in any industry that I've seen
 8     a company compute a diversion ratio.  The
 9     -- what they do by putting together
10     consideration sets and highlighting
11     certain brands as being in those
12     consideration sets, having charts that
13     show the three parties as each other's
14     top considered alternative is a
15     reflection of -- you know, it's about as
16     close as you see to diversion ratios in
17     the ordinary course business document, in
18     my experience.
19          Q.    And, again, you're not in
20     that course referring to any non-public
21     cases that you worked on that you can't
22     tell us about?
23          A.    I worked on -- I mean,
24     Counsel, I've -- my experience in merger
25     litigations is a very small fraction of
```

Page 347

1          CERTIFICATE OF REPORTER

2          I, SILVIA P. WAGE, CSR, CRR, RPR,

3     herby certify that the witness in the

4     foregoing deposition was by me duly sworn

5     to tell the whole truth, nothing but the

6     truth; said deposition was taken down in

7     shorthand by me, a disinterested person,

8     at the time and place therein stated.  The

9     testimony of said witness was thereafter

10    reduced to typewriting by computer under

11    my direction and supervision.  Before

12    completion of the deposition, review of

13    the transcript [X] was [ ] was not

14    requested.  If requested, any changes

15    made by the deponent (and provided to

16    the reporter) during the period allowed

17    are appended hereto.

18          I further certify that I am not of

19    counsel or attorney for either or any

20    of the parties to the said deposition,

21    nor in any way interested in the event

22    of this cause, and that I am not

23    related to any of the parties thereto.

24

25                                      8/21/24