**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

FEDERAL TRADE COMMISSION,

                    Plaintiff,

      v.

TAPESTRY, INC.,

      and

CAPRI HOLDINGS LIMITED.

                Defendants.

Case No. 1:24-cv-03109-JLR

**REDACTED VERSION**

## PLAINTIFF'S REPLY MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

I.    THE EVIDENCE RAISES "SERIOUS QUESTIONS" ABOUT THE TRANSACTION, WHICH IS ALL SECTION 13(B) REQUIRES. .................................. 1

II.    THE FTC HAS DEMONSTRATED A LIKELIHOOD OF SUCCESS. ......................... 3

    A.    Defendants Do Not Meaningfully Contest That Their Merger Will Eliminate Substantial Head-to-Head Competition. ................................................................... 3

    B.    The FTC Has Raised Serious Questions Concerning Undue Market Concentration in an "Accessible Luxury" Handbag Market. .................................. 4

        1.    The *Brown Shoe* Practical Indicia Demonstrate That "Accessible Luxury" Handbags Is a Relevant Product Market. .......................................... 5

        2.    Dr. Smith's Economic Analysis Confirms a Market of "Accessible Luxury" Handbags in Which the Merger Will Lead to Undue Concentration. ............ 12

            i.    Dr. Smith's HMT Analysis Is Conservative and Relies on Brands Identified by the Parties Themselves as "Accessible Luxury." .............. 12

            ii.    There Is Nothing Improper About Dr. Smith's Reliance on Survey Data. ...................................................................................................... 14

            iii.    Defendants' Remaining Arguments About the HMT Are Wrong as a Matter of Economics—and the Law. ...................................................... 15

III.    DEFENDANTS CANNOT REBUT THE FTC'S PRIMA FACIE CASE. .................... 17

IV.    THE FTC IS NOT REQUIRED TO SHOW THAT TAPESTRY WILL RAISE PRICES POST-ACQUISITION—BUT IT LIKELY WILL. .......................................... 19

V.    THE EQUITIES SUPPORT A PRELIMINARY INJUNCTION. .................................. 20

## TABLE OF AUTHORITIES

**Cases**

*Beatrice Foods Co. v. FTC*, 540 F.2d 303 (7th Cir. 1976) ............................................................ 9

*Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*,

    598 F.3d 30 (2d Cir. 2010) ........................................................................................................ 2

*City of New York v. Group Health Inc.*, 649 F.3d 151 (2d Cir. 2011) ............................................ 5

*Copperweld Corp. v. Ind. Tube Corp.,* 467 U.S. 752 (1984) ........................................................ 18

*FTC v. Crescent Publ'g. Grp., Inc*., 129 F. Supp. 2d 311 (S.D.N.Y. 2001) ................................... 2

*FTC v. Cuban Exch., Inc.*, 2012 WL 6800794 (E.D.N.Y. Dec. 19, 2012) ..................................... 2

*FTC v. Freeman Hosp.*, 69 F.3d 260 (8th Cir. 1995) ..................................................................... 2

*FTC v. IQVIA Holdings, Inc.*, No. 23 CIV 06188, 2024 WL 81232

    (S.D.N.Y. Jan. 8, 2024) .................................................................................................. *passim*

*FTC v. IQVIA Holdings, Inc.*, No. 23 CIV. 06188, 2023 WL 7152577

    (S.D.N.Y. Oct. 31, 2023) ........................................................................................................ 3

*FTC* v. *Lancaster Colony Corp.*, 434 F. Supp. 1088 (S.D.N.Y. 1977) ..................................... 2, 8

*FTC v. Meta Platforms Inc*., 654 F. Supp. 3d 892 (N.D. Cal. 2023) ...................................... 7, 15

*FTC v. Meta Platforms, Inc*., 2022 WL 16637996 (N.D. Cal. Nov. 2, 2022) ......................... 3, 20

*FTC v. Penn State Hershey Med. Ctr*., 838 F.3d 327 (3d Cir. 2016) .......................................... 20

*FTC v. Sanford Health*, 1:17-cv-133, 2017 WL 10810016 (D.N.D. Dec. 15, 2017),

    *aff'd by* 926 F.3d 959 (8th Cir. 2019) .................................................................................... 20

*FTC v. Staples, Inc.*, 190 F. Supp. 3d 100 (D.D.C. 2016) .................................................. 4, 8, 14

*FTC v. Surescripts, LLC*, 665 F. Supp. 3d 14 (D.D.C. 2023) ....................................................... 6

*FTC v. Swedish Match*, 131 F. Supp. 2d 151 (D.D.C. 2000) .................................................... 5, 6

*FTC v. Sysco Corp.*, 113 F. Supp. 3d 1 (D.D.C. 2015) ......................................................... *passim*

*FTC v. Univ. Health, Inc.*, 938 F.2d 1206 (11th Cir. 1991)..............................................2

*FTC v. Verity Int'l, Ltd.*, 194 F. Supp. 2d 270 (S.D.N.Y. 2002) ....................................2

*FTC v. Warner Commc'ns, Inc.*, 742 F.2d 1156 (9th Cir. 1984)......................................2

*FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028 (D.C. Cir. 2008) ...................... 2, 6, 8, 10

*FTC v. Wilh. Wilhelmsen Holding ASA*, 341 F. Supp. 3d 27 (D.D.C. 2018)...............................6

*FTC. v. Thomas Jefferson Univ.*, 505 F. Supp. 3d 522 (E.D. Pa. 2020)......................................15

*FuboTV Inc. v. The Walt Disney Co.*, 24-cv-1363 (MMG), 2024 WL 3842116

 (S.D.N.Y. Aug. 16, 2024) ......................................................................................... 3, 4

*Geneva Pharmas Tech. Corp. v. Barr Lab. Inc.*, 386 F.3d 485 (2d Cir. 2004) .............................9

*Hayden Pub. Co., v. Cox Broadcasting Corp.*, 730 F.2d 64 (2d Cir. 1984) ................................16

*Regeneron Pharmas., Inc. v. Novartis Pharma AG*, 96 F. 4th 327 (2d Cir. 2024)................ 15, 17

*Reynolds Metals Co. v. FTC*, 309 F.2d 223 (D.C. Cir. 1962)..........................................8

*St. Alphonsus Med. Ctr.–Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775

 (9th Cir. 2015)......................................................................................................19

*Starbucks Corp. v. McKinney*, 144 S. Ct. 1570 (2024)....................................................2

*United States v. Aluminum Co. of America*, 377 U.S. 271 (1964)..................................9

*United States v. Anthem*, 855 F.3d at 345 (D.C. Cir. 2017)..........................................19

*United States v. Anthem, Inc.*, 236 F. Supp. 3d 171 (D.D.C. 2017) ............................14

*United States v. AT&T*, 916 F.3d 1029 (D.C. Cir. 2019)......................................... 18, 19

*United States v. Bazaarvoice, Inc.*, No. 13-CV-00133-WHO, 2014 WL 203966

 (N.D. Cal. Jan. 8, 2014) ...........................................................................................1

*United States v. Bertelsmann SE & Co. KGaA*, 646 F. Supp. 3d 1 (D.D.C. 2022) ........ 8, 9, 17, 18

*United States v. Brown Shoe*, 370 U.S. 294 (1962) ................................................*passim*

*United States v. Gillette Co.*, 828 F. Supp. 78 (D.D.C. 1993) .......................................................... 9

*United States v. H&R Block, Inc.*, 833 F. Supp. 2d 36 (D.D.C. 2011) ...................... 14, 15, 17, 20

*United States v. Jos. Schlitz Brewing Co.*, 253. F. Supp. 129 (N.D. Cal. 1966)........................... 9

*United States v. Mfrs. Hanover Trust Co.*, 240 F. Supp. 867 (S.D.N.Y. 1965)............................ 3

*United States v. Phila. Nat'l Bank*, 374 U.S. 321 (1963) ........................................................... 13

*United States v. Sun & Sand Imports, Ltd.*, 725 F.2d 184 (2d Cir. 1984) ..................................... 2

*United States v. Visa, USA, Inc.*, 163 F. Supp. 2d 322 (S.D.N.Y 2001)...................................... 16

*United States v. Von's Grocery Co.*, 384 U.S. 270 (1966) .......................................................... 17

*United States. v. Sabre,* 452 F. Supp. 3d 97 (D. Del. 2020)*, vacated as moot by* 2020 WL

    4915824 (3d Cir. July 20, 2020) ............................................................................................. 20

**Statutes**

15 U.S.C. § 18............................................................................................................ 14, 15, 19, 20

15 U.S.C. § 53(b) ................................................................................................................. 1, 2, 20

**Other Authorities**

2023 U.S. Dep't of Justice and FTC Merger Guidelines.................................................. 14, 16, 17

H.R. Conf. Rep. 93-624 (1973)...................................................................................................... 2

This case is about the millions of Americans who will suffer harm—in the form of higher prices, fewer discounts and promotions, and reduced innovation, among others—because Tapestry surmises it can do a better job than Capri when it comes to helping customers "see the value of a Michael Kors handbag." Defs.' Opp. at 12. Tapestry's expertise is needed, Defendants say, to thwart a decline in sales of the Michael Kors brand that has led to "an overreliance on discounting." *Id.* at 11. But bolstering revenues and increasing prices is not procompetitive—and it is most certainly not when it comes at the expense of the lower- and middle-income women who comprise the majority of Coach, Kate Spade, and Michael Kors handbag customers.

No matter, according to Defendants: these products are "discretionary purchases" and "not a food staple to feed a family." *Id.*[1] But there is not any exemption from the antitrust laws for consumer goods. These products matter in the day-to-day lives of Americans, whom the FTC is tasked with protecting from anticompetitive mergers. In light of this Congressional mandate, Defendants' bold—and utterly unsupported—assertion about opinions of industry participants rings hollow: the antitrust laws are about "the protection of competition, not competitors." *United States v. Brown Shoe*, 370 U.S. 294, 320 (1962).[2] The evidence will show it is not the FTC ignoring "how the real world operates." Defs.' Opp. at 1. That would be Defendants, who disregard a mountain of evidence that points in only one direction: this merger is anticompetitive.

## I.    THE EVIDENCE RAISES "SERIOUS QUESTIONS" ABOUT THE TRANSACTION, WHICH IS ALL SECTION 13(B) REQUIRES.

Under Section 13(b), to demonstrate a likelihood of success on the merits, the FTC must raise "serious questions" that warrant thorough investigation in the first instance by the FTC.

---

[1] Defendants make this argument while reaping billions of dollars—in the United States alone (FTC Br. at 1)—from consumers who purchase their products to carry necessary everyday items.
[2] Even if this assertion had any basis, it would not matter. *E.g.*, *United States v. Bazaarvoice, Inc.*, No. 13-CV-00133-WHO, 2014 WL 203966, at *4 (N.D. Cal. Jan. 8, 2014).

*FTC v. IQVIA Holdings, Inc.*, No. 23 CIV 06188, 2024 WL 81232, at *9 (S.D.N.Y. Jan. 8, 2024);
*see also, e.g.*, *FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1035 (D.C. Cir. 2008); *FTC v.
Freeman Hosp.*, 69 F.3d 260, 267 (8th Cir. 1995); *FTC v. Warner Commc'ns, Inc.*, 742 F.2d
1156, 1162 (9th Cir. 1984); *FTC v. Univ. Health, Inc.*, 938 F.2d 1206, 1218 (11th Cir. 1991). The
FTC does not "water down" the law; nor did *IQVIA* get "offtrack." Defs.' Opp. at 13 & n.40.[3]

Defendants' *only* substantive basis to question the well-established legal standard is based
on *Starbucks Corp. v. McKinney*, 144 S. Ct. 1570, 1575-76 (2024)—a case about Section 10(j) of
the National Labor Relations Act. But that decision did not overturn five decades of precedent
that is specific to the FTC Act. Simply put, the statute at issue in *Starbucks* and Section 13(b) are
not the same—the text of the latter directs the Court to "consider[]" the FTC's likelihood of
success and weigh it with the equities to determine whether granting an injunction would be in
the public interest. 15 U.S.C. § 53(b). And Congress made plain its intent at the time Section
13(b) was adopted: "The intent is to maintain the statutory or 'public interest' standard . . . The
Conferees did not intend, nor do they consider it appropriate, to burden the Commission with the
requirements imposed by the traditional equity standard . . . ." H.R. Conf. Rep. 93-624, at *2533
(1973); *FTC* v. *Lancaster Colony Corp.*, 434 F. Supp. 1088, 1090 (S.D.N.Y. 1977). In any event,
even under the traditional equity standard in this Circuit, a moving party need only show
"sufficiently serious questions going to the merits to make them a fair ground for litigation."
*Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35

---

[3] The *IQVIA* decision cites to a wealth of Section 13(b) precedent. *IQVIA*, 2024 WL 81232, at
*7-9, *24-25. And *Lancaster* itself has been cited approvingly by many courts, including the
Second Circuit, *United States v. Sun & Sand Imports, Ltd.*, 725 F.2d 184, 188 (2d Cir. 1984); and
this district and the Eastern District. *FTC v. Verity Int'l, Ltd.*, 194 F. Supp. 2d 270, 281 nn.61-62
(S.D.N.Y. 2002); *FTC v. Crescent Publ'g. Grp., Inc.*, 129 F. Supp. 2d 311, 319 nn. 51-52
(S.D.N.Y. 2001); *FTC v. Cuban Exch., Inc.*, 2012 WL 6800794, at *1 (E.D.N.Y. Dec. 19, 2012).

(2d Cir. 2010) (standard permits "a preliminary injunction in situations where it cannot determine with certainty that the moving party is more likely than not to prevail on the merits of the underlying claims, but where the costs outweigh the benefits of not granting the injunction.").[4]

## II.    THE FTC HAS DEMONSTRATED A LIKELIHOOD OF SUCCESS.

### A.    Defendants Do Not Meaningfully Contest That Their Merger Will Eliminate Substantial Head-to-Head Competition.

The FTC's opening brief details the wealth of evidence demonstrating the close and fierce competition between Coach, Michael Kors, and Kate Spade for the sale of handbags that will be eliminated if the Proposed Acquisition is allowed to proceed. FTC Br. at 23-29. This evidence alone satisfies the FTC's prima facie case. *See, e.g.*, *FuboTV Inc. v. The Walt Disney Co.*, 24-cv-1363 (MMG), 2024 WL 3842116, at *17, *29 (S.D.N.Y. Aug. 16, 2024) (granting preliminary injunction based on competitive effects, not market concentration); *IQVIA*, 2024 WL 81232, at *37, *40 ("It is sufficient to show, as the FTC has, that Defendants vigorously compete head-to-head and that this competition would be eliminated by the proposed transaction.").

Defendants have no answer to this evidence, and instead their sole response is to misconstrue the FTC as "radically" arguing a "novel position" that the FTC need not show competitive effects in a relevant market. Defs.' Opp. at 32-33. Defendants' assertion is incorrect. The FTC, of course, has pled, and will raise serious questions concerning, the substantial lessening of competition in a relevant market of "accessible luxury" handbags.[5] FTC Br. at 10-22. But the Court need not find a likelihood of success with respect to *that specific market* to conclude that the FTC has met its burden for *a relevant market*. *United States v. Mfrs. Hanover*

---

[4] Nor does the FTC "wrongly" argue the venue in which the likelihood of success is measured. Defs.' Opp. at 14. The only courts to address this exact issue have rejected Defendants' position. *FTC v. IQVIA Holdings, Inc.*, No. 23 CIV. 06188, 2023 WL 7152577, at *3-6 (S.D.N.Y. Oct. 31, 2023); *FTC v. Meta Platforms, Inc.*, 2022 WL 16637996, at *4-6 (N.D. Cal. Nov. 2, 2022).

[5] Defendants have conceded the relevant geographic market. Defs.' Opp. at 5 n.1.

*Trust Co.*, 240 F. Supp. 867, 923, 955 (S.D.N.Y. 1965) (enjoining merger based on elimination of competition even though the Government's proposed local market was "artificial" and the evidence instead showed a nationwide market); *see also FuboTV*, 2024 WL 3842116, at *24 (plaintiff likely to succeed on merits of Section 7 claim when "at least one of the . . . aspects of the JV will tend to produce anticompetitive effects in a relevant market.").

Here, there can be no serious dispute that Coach, Michael Kors, and Kate Spade compete directly in a relevant market. *See IQVIA*, 2024 WL 81232, at *20 n.17 ("substantial evidence" showing Defendants as "key competitors" provided "additional support for the market proposed by the FTC"); *FTC v. Staples, Inc.*, 190 F. Supp. 3d 100, 124 (D.D.C. 2016); PX6000 (Smith (FTC) Rep.) ¶ 258. Defendants have acknowledged to foreign regulators[6] and the ███████████ ██████████[7] that they compete in one or more relevant markets. The only dispute concerns the *contours* of those markets, which is an issue for market-concentration analysis—not competitive effects. *See, e.g.*, *FuboTV, Inc.*, 2024 WL 3842116, at *17, 29 (granting preliminary injunction based on competitive effects without "a comprehensive market analysis"). Any other approach would require the Court disregard voluminous records of head-to-head competition— which is precisely what Defendants would like the Court to do.

### B. The FTC Has Raised Serious Questions Concerning Undue Market Concentration in an "Accessible Luxury" Handbag Market.

Defendants do not dispute the overwhelming presumption of illegality based on market shares and HHIs. Instead, they argue that the FTC's proposed market is not properly defined. As

---

[6] PX1088 (Tapestry) at 003 (████████████████████████████ ████████████).
[7] *E.g.*, PX2048 (Capri) at 001, 003 ███████████ ████████████████████████████████████████████████); PX2438 (Capri) at 006 (████████████████████████████████████); PX2674 (Capri) at 006 (████████████████████████████); PX1306 (Tapestry) at 003.

detailed in the FTC's opening brief, Defendants recognize a distinct market for "accessible luxury" handbags: Their ordinary-course documents, including those at the highest levels of the company, are replete with references to, ███████████████████████████. Up until the announcement of their merger, their SEC filings acknowledged this distinct product segment. And even as recent as just two weeks ago, Tapestry's CEO was touting in an earnings call how Coach was "attainable" luxury.[8] Defendants simply decide to ignore this evidence, hinging their case instead on nit-picking the *Brown Shoe* factors, which they (incorrectly) argue cannot suffice to establish market definition without expert opinion; the misleading assertion that the FTC and its expert advance different markets;[9] and mischaracterizations of the FTC's expert's analyses.

> **1.  The *Brown Shoe* Practical Indicia Demonstrate That "Accessible Luxury" Handbags Is a Relevant Product Market.**

As the Supreme Court explained in *Brown Shoe*, the issue of market definition is about "reasonable interchangeability." 370 U.S. at 325. "In evaluating reasonable interchangeability, 'the mere fact that a firm may be termed a competitor in the overall marketplace does not necessarily require that it be included in the relevant product market for antitrust purposes.'" *IQVIA*, 2024 WL 81232, at *24 (quoting *Sysco*, 113 F. Supp. 3d at 26). And the inquiry does not look at all products that are interchangeable for any purpose—only "reasonably interchangeable" products. *See, e.g.*, *FTC v. Swedish Match*, 131 F. Supp. 2d 151, 158-59 (D.D.C. 2000).[10]

---

[8] PX7436 (Q4 2024 Tapestry Earnings Call) at 003.

[9] This argument is perplexing, given that, in the spirit of cooperation in discovery, the FTC supplied Defendants with "each Person You have included as a competitor of Coach, Michael Kors, and Kate Spade in the relevant antitrust market in your Complaint" on May 31, 2024, well before any response was due. Dkt. No. 110-4 at 10-11. Those brands are basically identical to those in Dr. Smith's analysis. PX6000 (Smith (FTC) Rep.) ¶ 185, Tbl. 7.

[10] Defendants argue that, in cases involving consumers, the relevant market must include "all products reasonably interchangeable for consumers for the same purposes." Defs.' Opp. at 17. The sole case they cite for this proposition does not involve consumers: the City of New York brought a claim on its own behalf. *City of New York v. Group Health Inc.*, 649 F.3d 151, 156 (2d Cir.

Moreover, the *Brown Shoe* indicia are "practical aids," not "talismanic" criteria "to be rigidly applied." *Swedish Match*, 131 F. Supp. 2d at 159. Moreover, they must be "viewed in totality" and not in isolation. *FTC v. Surescripts, LLC*, 665 F. Supp. 3d 14, 43 (D.D.C. 2023); *accord IQVIA*, 2024 WL 81232, at *13. As explained in the FTC's opening brief, these factors, viewed in totality, establish an "accessible luxury" handbag market.

**Industry Recognition.** Defendants characterize the market as "contrived" and "defy[ing] common sense." Defs.' Opp. at 7, 16. Defendants' ordinary-course documents, however, reflect a common understanding about the basic dimensions of an accessible luxury market. FTC Br. at 14–15. And other handbag brands ████████████████████████████████████████ ██████████████████████████████.[11] Even Macy's has described itself as "delivering fashion and affordable luxury"[12] and ████████████████████████████████ ███████████████████████████████████████████████████.[13] The fact that certain parties may use different nomenclature to describe this market does not affect the analysis. *See, e.g.*, *Whole Foods*, 548 F.3d at 1045; *IQVIA*, 2024 WL 81232, at *22; *FTC v. Wilh. Wilhelmsen Holding ASA*, 341 F. Supp. 3d 27, 52-53 (D.D.C. 2018).

Defendants attempt to minimize this evidence by contending that it reflects only that ████████████████████████████████████████ Defs.' Opp. at 7. Defendants themselves,

---

2011). The Second Circuit affirmed that a market definition depends on "*reasonable interchangeability.*" *Id.* at 156. *Brown Shoe* itself concerned consumer products. 370 U.S. at 326.

[11] *See, e.g.* PX5026 (████████████████████) at 43:21-44:51; PX3201 (███████████) at 018; PX5032 (████████████████) Dep. at 26:25-28:7 ████████████████████████████████████████ ████████████████████████ PX5058 (████████████████ Dep.) at 11:9-12:12 (█████████████ ████████████████████ ; PX5040 (Tichner (Steve Madden) Dep.) at 30:6-32:14; PX5046 (Thacker (Brahmin) Dep.) at 19:11-20:17; PX3150 (████████) at 002.

[12] PX7440 (Macy's 2016 Annual Report) at 109.

[13] PX5037 (████████████████) at 19:17-20:22, 21:22-24:16; 33:10-34:20.

however, have used "accessible luxury" in outward-facing statements for years, including in SEC filings and to their investors.[14] Other industry participants have likewise publicly acknowledged an "accessible luxury" market.[15] Defendants further contend that consumers and the public do not recognize a distinct market. Defs.' Opp. at 21. The evidence demonstrates otherwise.[16]

Indeed, Tapestry's ███████████████████████████████████████████████████

████████[17] and ████████████████████████████████████████████████

██████████████████████████[18] and ██████████████████████████████████—that is,

████████████████████████████████████████████████████████████████[19]

Finally, Defendants turn to statements of their ████████████████████████████████

████████████ But courts have long recognized that contemporaneous, ordinary-course documents are more persuasive than self-serving testimony, which is entitled to little weight. *E.g.*, *IQVIA*, 2024 WL 81232, at *39 ("the Court is more persuaded by the plain import of their contemporaneous statements as reflected in the documentary record than by Defendants' attempts to diminish the substantial evidence of head-to-head competition"); *FTC v. Meta Platforms Inc.*, 654 F. Supp. 3d 892, 937 (N.D. Cal. 2023) ("subjective corporate testimony is

---

[14] *E.g.*, PX2435 (Capri) at 005; PX2379 (Capri Earnings Call Q4 2023) at 011, 019; PX7105 (Tapestry 2023 Form 10-K) at 015; PX7104 (Tapestry 2022 Form 10-K) at 004, 005, 014, 024, 035, 069; PX7098 (Capri 2023 Form 10-K) at 009; PX7096 (Capri 2022 Form 10-K) at 007; PX7095 (Capri 2021 Form 10-K) at 007; PX7097 (Capri 2019 Form 10-K) at 006.
[15] PX7182 (Rebecca Minkoff website) at 001 (an "industry leader in accessible luxury handbags"); PX7187 (Simone website) at 001-002 ("accessible luxury in the US market").
[16] *See, e.g.*, PX1374 (Tapestry) at 001 (████████████████████████████████) ██████
████████████████████████████████████); PX1096 (Tapestry) at 001 ██████████████
███████████); PX2167 (Capri) at 023
(████████████████) PX2169 (Capri) at 017 (██████).
[17] PX1936 (Tapestry) at 027.
[18] PX1325 (Tapestry) at 042.
[19] PX1937 (Tapestry) at 003.

generally deemed self-serving and entitled to low weight.").

   ***Pricing.*** Defendants' arguments regarding distinct prices mischaracterize the FTC's case as well as demonstrate a fundamental misunderstanding of the caselaw.  After arguing that the FTC's complaint was so unclear that they could not answer it,[20] Defendants now claim that all along the FTC has alleged "'distinct price points' in the range of $100-$1000," arguing that these cutoffs cannot support a market in which there is "spectrum" of price. Defs.' Opp. at 2, 25-28. The FTC, however, does not need to argue—and has not—that its proposed market was based on specific price cutoffs.[21] *E.g., Whole Foods*, 546 F.3d at 1046 ("*Brown Shoe* lists 'distinct prices' as only one of a non-exhaustive list of seven 'practical indicia' that may be examined to determine whether a separate market exists"); *Lancaster.*, 434 F. Supp. at 1093 ("Plainly, low or moderately-priced glassware, intended for everyday use, differs from fine glassware, such as lead crystal, sold at higher prices and marketed through different channels."); *United States v. Bertelsmann SE & Co. KGaA*, 646 F. Supp. 3d 1, 25, 27 (D.D.C. 2022) ("the $250,000 cutoff is merely useful; it is not intended to be a rigid bright line, but rather is helpful '[f]or analytical purposes' to facilitate the assessment of anticompetitive effects." (quoting *FTC v. Staples, Inc*., 190 F. Supp. 3d 100, 118 & n.10 (D.D.C. 2016)); *Reynolds Metals Co. v. FTC*, 309 F.2d 223, 229 (D.C. Cir. 1962); *see also Sysco*, 113 F. Supp. 3d at 30.[22]

---

[20] Dkt. No. 74 (Def. Mem. In Support of Mot. For More Definite Statement) at 7–10.

[21] Evidence shows that "accessible luxury" handbags are almost always priced lower than true luxury handbags and higher than so-called mass market handbags. *See* PX6000 (Smith (FTC) Rep.). at ¶ 136, Tbl. 11; FTC Br. at 15-17 (describing distinct price levels and a unique approach to discounting). Defendants point to a few outliers, Defs.' Opp a 19, ignoring the general price range of nearly all bags sold these brands and misstating the record. *Compare* PX5038 (████████ ████ Dep.) at 52:14-53:4 (████████████████████████████████ ████████), *with* Defs.' Opp. at 26 (claiming Louis Vuitton offers handbags "below $1000").

[22] Defendants attempt to distinguish *Reynolds* on the basis that there were other *Brown Shoe* factors there, Defs. Opp. at 28 n.74, but that is of course true here too.

Defendants further contend that the FTC cannot define a market when there is "a spectrum of price and quality differences." Defs.' Opp. at 27. But there is not a continuous "spectrum" of prices here: as Defendants' executives continue to tell their investors and their Boards of Directors, there is ever-widening "white space" between "accessible luxury" and true luxury brands.[23] And even if there were a continuous spectrum, Defendants' argument rests on a misreading of *Brown Shoe*, which holds that a court need not divide a properly defined relevant antitrust market into more granular sub-markets once it finds harm in the broad market. *Id.* at 325-27.[24] The Court in no way concluded that a relevant market cannot be determined based on price and quality. *See, e.g.*, *Geneva Pharmas Tech. Corp. v. Barr Lab. Inc.*, 386 F.3d 485 at 497 (2d Cir. 2004) (finding that price differentials were "indicative of separate markets"); *United States v. Aluminum Co. of America*, 377 U.S. 271, 276 (1964); *United States v. Gillette Co.*, 828 F. Supp. 78, 83 (D.D.C. 1993); *Bertelsmann*, 646 F. Supp. 3d at 29 (rejecting that existence of a "spectrum of price or value" precluded a relevant market based in part on distinct pricing).

Without the law on their side, Defendants turn to misconstruing the evidence. They criticize a "carefully worded sentence" regarding entry price points in the FTC's opening brief. Defs.' Opp. at 25, but this language comes from Defendants' own Board documents.[25] And, without any support, Defendants claim that Dr. Smith ████████████████████████

---

[23] *E.g.*, PX1723 (Tapestry) at 009; PX7138 (Q4 2022 Capri Earnings Call) at 011; PX5020 (Lifford (Tapestry) Dep.) at 98:5-17, 102:3-12; PX5006 (Kahn (Tapestry) Dep. at 82:24-83:2) (discussing PX7054); PX7054 (Q4 2023 Tapestry Earnings Call) at 012; PX5035 (Fraser (Tapestry) Dep.) at 219:16-220:12, 223:17-224:8.

[24] *Accord Beatrice Foods Co. v. FTC*, 540 F.2d 303, 309-10 (7th Cir. 1976) (declining to subdivide a relevant market after finding defendants compete in a broader market); *United States v. Jos. Schlitz Brewing Co.*, 253. F. Supp. 129, 145-46 (N.D. Cal. 1966) (same).

[25] *E.g.*, PX1431 (Tapestry) at 018 (████████████████████████████████████████; PX5020 (Lifford (Tapestry) Dep.) at 126:9-19 (████████████████████████).

██████████████████████████████████████████████ Defs.' Opp. at 7-8. That is not

true—both with respect to actual selling prices and what Dr. Smith said (or did not say).[26]

    ***Distinct Customers.*** Defendants' argument that customers may ███████████

███████████████████████████ Def. Opp. at 8, 25, does not negate a finding of

distinct customers. *See, e.g., Whole Foods*, 548 F.3d at 1040-41 (cross-shopping consistent with

a group of core consumers); *IQVIA*, 2024 WL 81232, at **15-17 ("the fact that an agency might

shift money around during a campaign does not establish that these alternative channels are

substitutes"). They also ignore their unique "capab[ility] of serving a wide range of customers,

including classes of customers that the other channels cannot reach." *FTC v. Sysco Corp.*, 113 F.

Supp. 3d 1, 29 (D.D.C. 2015).[27]

    The evidence shows that most customers of Coach, Michael Kors, and Kate Spade are

"lower income" with under $75,000-$80,000 in annual household income,[28] ███████████

███████████████ [29] It is these Americans who will suffer the likely effects of this merger as

Tapestry rolls back Michael Kors' "overreliance on discounting." Defs.' Opp. at 11.

    ***Other* Brown Shoe *Factors.*** Citing only Michael Kors himself and one of their purported

experts, Defendants remarkably assert that their handbags use "the same types of leather and

---

[26] *See* PX6000 (Smith (FTC) Rep.) ¶ 266, Tbl. 11 (average pre-merger prices of handbags for Coach ($145), Kate Spade ($108), and Michael Kors ($103)). Dr. Smith's deposition, taken on the date Defendants' brief was submitted, likewise does not support this claim.

[27] *See* PX6000 (Smith (FTC) Rep.) at ¶¶ 12-16, Tbls. 1-3 (describing the hundreds of mainline and outlet stores operated by the parties); PX5019 (Crevoiserat (Tapestry) Dep.) at 10:1-8 (███████ ████████████████████); PX2132 (Capri) at 022; PX1129 (Tapestry) at 001; PX1160 (Tapestry) at 078; PX1862 (Tapestry) at 001.

[28] PX2128 (Capri) at 005-006; PX2257 (Capri) at 017; PX1379 (Tapestry) at 041; PX2674 (Capri) at 011; PX2010 (Capri) at 009 ████████████████████████████████████████ ████████████████████); PX1078 (Tapestry) at 001 (██████████████████████████████████████).

[29] PX2753 (Capri) at 043.

craftsmanship" as lower-priced handbags. Defs.' Opp. at 22. The cited testimony from Mr. Kors says no such thing, and he has recognized: ███████████████████████████

████████████████████████████████████[30] Nor is Defendants' assertion consistent with what they tell their Boards and investors,[31] or with the unsupported argument that consumers "will not pay more for a Coach, Kate Spade, Michael Kors, or any other brand handbag without seeing a corresponding increase in the value of the handbag." Defs.' Opp. at 10.

Defendants' arguments concerning the supply chain are in a similar vein: that there are "no consistent differences" in the manufacturing of handbags. Defs.' Opp. at 23. That is just not so, as evident by the very words of Tapestry's CEO: "███████████████████████████

████████████████████████████████████████████████

████████[32] This ████████████████████████████████████

████████████████████████████████████ That alone distinguishes

Defendants from true luxury brands like ████████████████████████████████████

████████████████████████████████████████████████[34]

---

[30] PX5011 (Kors (Capri) Dep.) at 99:8-13.
[31] *E.g.*, PX7105 (Tapestry 2023 Form 10-K) at 013 ("high quality standards . . . are an integral part of our brands' identity"); PX1431 (Tapestry) at 011 ██████████████████████████████; PX5020 (Pamela Lifford (Tapestry) Dep.) at 136:2-17 (████); *see also* PX5006 (Kahn (Tapestry) Dep. at 17:23-18:24 (████████████████████████████████).
[32] PX1704 (Tapestry) at 001; *accord* PX1731 (Tapestry) at 048; PX1327 (Tapestry) at 004 (████████████████████████████).
[33] *See* FTC Br. at 18 & n.52. Defendants contend that Tapestry has ██████████████ Defs.' Opp. at 24. But Tapestry ██████████ (PX 5036 (Charles (Tapestry) Dep. at 55:16-20), and the ██████████ *Id.* at 100:13-110:10.
[34] PX5038 (████ Dep.) at 44:21-45:7. ████████████████████ *Id.* at 46:22-48:11.

### 2. Dr. Smith's Economic Analysis Confirms a Market of "Accessible Luxury" Handbags in Which the Merger Will Lead to Undue Concentration.

Dr. Smith presented four distinct market definition analyses, all of which support a relevant market of "accessible luxury" handbags and are consistent with the FTC's complaint and the *Brown Shoe* factors: (1) an economic analysis of qualitative evidence;[35] (2) an aggregate diversion ratio analysis based on Tapestry ordinary-course surveys[36] and corroborated by econometric analyses;[37] (3) an upward pricing pressure analysis, which indicates Coach, Michael Kors, and Kate Spade could alone constitute a relevant market,[38] and (4) a merger simulation.[39]

Without citation, Defendants assert that Dr. Smith, in conducting his market-concentration analysis, excluded "the vast majority" of data supplied by market participants. Defs.' Opp. at 39. That is not so: Dr. Smith's analyses rely on Defendants' own margin and sales data, sales data available from third-party handbag brands, *and* NPD wholesale sales data.[40] Defendants' misrepresentations about the data on which Dr. Smith relied are just one of several incorrect assertions that they make about his analysis—and the law.

### i. Dr. Smith's HMT Analysis Is Conservative and Relies on Brands Identified by the Parties Themselves as "Accessible Luxury."

Dr. Smith's use of NPD's bridge and contemporary delineations to represent accessible luxury is a conservative approach that is consistent with the FTC's complaint, his market definition, and the qualitative evidence.[41] ████████████████████████████

---

[35] PX6000 (Smith (FTC) Rep.) Section III.A, B.
[36] PX6000 (Smith (FTC) Rep.) Section III.E.
[37] PX6000 (Smith (FTC) Rep.) at p. 129 & n. 448. In addition to his survey analysis, Dr. Smith conducted an econometric study of available sales data that is separate from the NPD data, and independently supports the high diversion ratios.
[38] PX6000 (Smith (FTC) Rep.) Section V.B.2; *see also id.* at ¶ 255, Tbl. 10.
[39] PX6000 (Smith (FTC) Rep.) Section V.B.2.c & Appendix III.
[40] PX6000 (Smith (FTC) Rep.) Section III.E, V.B.2 & Appendix II & III.
[41] PX6000 (Smith (FTC) Rep.) Section III.A & B.

12

████████████████████████████████████████████████████████████████[42]

Moreover, these categories include the brands identified by Defendants as the major players in

this space, including ████████████████████████████████████████████████████

████████████████████████████████████ and numerous other brands that are rarely if ever

mentioned in the ordinary-course documents, but share similar characteristics to Coach, Kate

Spade, and Michael Kors. Defendants have identified no brand that competes more closely with

these three brands than they do with each other and that, if included, has sufficient revenues to

meaningfully deconcentrate the relevant product market.[43]

Having identified a candidate set of brands for his HMT based on his economic analysis

of the qualitative evidence, Dr. Smith next conducted an aggregate diversion analysis as a

quantitative implementation of the HMT.[44] This analysis does not rely on NPD's sales data, and

instead looks at Defendants' own margin data and Tapestry's ordinary-course surveys, from

which Dr. Smith calculated estimated aggregate diversions of over 60 percent for Coach,

Michael Kors, and Kate Spade—well above the critical aggregate diversion ratio required to pass

the HMT of 17 percent.[45] Dr. Smith separately conducts an upward pricing pressure analysis,

also using Defendants' margin data and his survey-based diversions, which shows that the

proposed transaction would allow the combined firm to raise prices by an average of 18

---

[42] PX6000 (Smith (FTC) Rep.) Section III.B.1. *See, e.g.,* PX1334 (Tapestry) at 001 ("████
███████████████████████████████"). *See also, e.g.,* PX1328 (Tapestry) (████████████
████████████████████████████████████████████).
[43] PX6000 (Smith (FTC) Rep.) ¶ 186, Tbl. 7 (Coach, Kate Spade, and Michael Kors account for
58.7% of the accessible luxury handbag market); *see also United States v. Phila. Nat'l Bank*, 374
U.S. 321, 364 (1963) ("Without attempting to specify the smallest market share which would still
be considered to threaten undue concentration, we are clear that 30% presents that threat."); *see
also IQVIA*, 2024 WL 81232, at *34 ("the 30% threshold remains valid as a matter of law").
[44] PX6000 (Smith (FTC) Rep.) Section III.E.
[45] PX6000 (Smith (FTC) Rep.) ¶¶ 104-107, Tbl. 5.

percent—to the tune of over $300 million annually in consumer harm—well above the generally accepted 5 percent level used in the HMT.[46]

### ii. There Is Nothing Improper About Dr. Smith's Reliance on Survey Data.

Defendants next attack Dr. Smith by asserting that Tapestry's ordinary-course surveys are an inappropriate source of data for Dr. Smith to calculate estimated diversions.[47] While a diversion ratio is a measure of consumers' response to a price increase, diversion ratio estimates are often calculated from data sources that do not directly show price-response.[48] To estimate diversion, Dr. Smith analyzed the results of ███ Tapestry ordinary-course surveys designed and fielded by two different survey firms, which yielded very similar results.[49] Tapestry's corporate representative, Liz Harris, admitted under oath ██████████████████████████████ ███████████[50] and ███████████████████████████████████████ ██████████████████████[51] Moreover, Dr. Smith separately estimated diversions using an econometric analysis of available sales data, which also showed high diversions between Coach, Kate Spade, and Michael Kors, bolstering the reliability of his survey analysis.[52]

Defendants wrongly assert that the *H&R Block* case prohibits Dr. Smith from relying on Tapestry's ordinary-course surveys. Defs.' Opp. at 30. The court there concluded that the survey data at issue was a less reliable measure of diversion than the extensive actual switching data that

---

[46] PX6000 (Smith (FTC) Rep.) ¶¶ 249-258, 266, Tbl. 9; 2023 U.S. Dep't of Justice and FTC Merger Guidelines (hereinafter, the "Merger Guidelines"), ¶ 4.3.B.

[47] Defs.' Opp. at 30.

[48] *See, e.g., Sysco*, 113 F. Supp. 3d at 37 (relying on RFP/bidding data); *United States v. Anthem, Inc.*, 236 F. Supp. 3d 171, 217 (D.D.C. 2017) (same); *Staples*, 190 F. Supp. 3d at 131-32 (same); *see also* Merger Guidelines § 4.2.A (surveys are appropriate evidence of substitution).

[49] PX6000 (Smith (FTC) Rep.) at ¶ 246 & Fig. 35 (███), ¶ 248 & Fig. 36 (███).

[50] PX5028 (Harris (Tapestry) Corp. Dep.) 54:8-20 (████████████████).

[51] PX5028 (Harris (Tapestry) Corp. Dep.) at 18:16-20:12.

[52] PX6000 (Smith (FTC) Rep.) at ¶ 248 & n. 448.

was available, and therefore relied on the actual switching data. *United States v. H&R Block, Inc.*, 833 F. Supp. 2d 36, 70-71 (D.D.C. 2011). In this case, Tapestry's ordinary-course surveys are the best available data to estimate diversions, and the survey results are corroborated by an analysis using sales data and qualitative evidence. Defendants quote out of context the *Thomas Jefferson University* case to suggest some problem with Dr. Smith's work. Defs.' Opp. at 32. The court there did not conclude that Dr. Smith's diversion analysis was unreliable or incorrectly performed. Rather, relying on qualitative evidence, the court determined that his patient-based diversions were not necessarily indicative of insurer behavior. *FTC. v. Thomas Jefferson Univ.*, 505 F. Supp. 3d 522, 554 (E.D. Pa. 2020). The qualitative evidence in this case is fully consistent with Dr. Smith's analysis and contrary to Defendants' and their experts' arguments.[53]

### iii. Defendants' Remaining Arguments About the HMT Are Wrong as a Matter of Economics—and the Law.

Finally, Defendants argue that "no court has ever found a party satisfied its burden to establish a relevant market for Section 7 purposes when that party's expert failed to properly conduct an HMT that supports it[sic] purported market definition." Defs.' Opp. at 28. Defendants, however, cite *FTC v. Meta Platforms, Inc.* (*id.* at 40 n.99), where "the Court base[d] its determination of the relevant product market on its *Brown Shoe* analysis . . . rather than the HMT." 654 F. Supp. 3d 892, 919-20 (N.D. Cal. 2023); *accord Regeneron Pharmas., Inc. v. Novartis Pharma AG*, 96 F. 4th 327, 340 (2d Cir. 2024) (discussing "legal frameworks such as the 'hypothetical monopolist' test *or* the *Brown Shoe* factors" (emphasis added)).

Defendants' other arguments about the HMT contradict basic antitrust economics. Quantitatively, the HMT is a function of two inputs: margins and diversions. Higher margins,

---

[53] *See* Section II.B.1., *supra.*

▮▮▮▮▮[54] mean lower diversions are necessary for a hypothetical monopolist to impose a SSNIPT (a 5-10% price increase) on a set of products.[55] Accordingly, Dr. Smith's finding that Coach, Kate Spade, and Michael Kors could constitute a relevant product market is not "radical[]," Defs.' Opp. at 32 n.80, but a function of ▮▮▮▮▮. This also means that Dr. Smith's market share calculations of bridge and contemporary brands underrepresents the competitive significance of Coach, Kate Spade, and Michael Kors, because it includes dozens of brands that do not meaningfully constrain these brands' competitive behavior.[56]

Defendants' argument that a large number of handbag brands compete for share of wallet renders anticompetitive harm unlikely, Defs.' Opp. at 6, 9, ignores that (1) that a relevant market need not include all substitutes,[57] and (2) "as a general rule, the process of defining the relevant product market requires consideration of cross-elasticity of demand," *Hayden Pub. Co., v. Cox Broadcasting Corp.*, 730 F.2d 64, 71 (2d Cir. 1984), which the diversion ratio represents.[58] Customers are not equally likely to divert to all brands, especially where products are highly differentiated.[59] Dr. Smith's diversion estimates confirm this, showing for example, that Coach and Michael Kors customers are more likely to switch to each other.[60]

Defendants also claim that Dr. Smith predicts post-merger Michael Kors would increase prices 30 percent, a price change so dramatic that Dr. Smith's analysis must be wrong. Defs.'

---

[54] PX6000 (Smith (FTC) Rep.) ¶ 105; Giberson (Defendants) Rep. ¶ 74.
[55] Merger Guidelines, § 4.3.C.
[56] Dr. Smith crosschecks his primary market-share calculation by determining shares based on ▮▮▮▮▮ (PX6000 (Smith (FTC) Rep.) at ¶¶ 299-300, Tbls.14, 15), ▮▮▮▮▮ PX5028 (Harris (Tapestry) Corp. Dep.) 94:9-95:3.
[57] *See, supra* II.B.1.
[58] Competition for share of wallet is not the correct economic analysis anyway. *See, e.g., United States v. Visa, USA, Inc.*, 163 F. Supp. 2d 322, 335-38 (S.D.N.Y 2001) (use of cash, checks, and debit cards does not preclude market for general purpose credit cards).
[59] PX6000 (Smith (FTC) Rep.) ¶ 47.
[60] PX6000 (Smith (FTC) Rep.) at Figures 35, 36.

Opp. at 1, 4, 8, 38, 19. But ███████████████████████████████████

████████████████████████████████████████████████[61] The upward pricing

pressure Tapestry will experience post-merger reflects short-term *incentives* to raise prices—the

relevant question under the HMT.[62] *See Regeneron,* 96 F.4th at 338-39.

## III.    DEFENDANTS CANNOT REBUT THE FTC'S PRIMA FACIE CASE.

*Entry and Scale.* Defendants claim that there are hundreds of competitors in the market,

asking the Court to ignore these brands' ability to scale to replace loss of competition. Courts

have repeatedly considered and rejected arguments that smaller or more specialized competitors

can substitute for larger ones, when those competitors "cannot and do not serve as wide an array

of customers" as the merging parties do. *Sysco,* 113 F. Supp. 3d at 29; *see also United States v.*

*Von's Grocery Co.*, 384 U.S. 270, 272-73 (1966) (thousands of independent grocery stores did

not undermine concerns about merger that would create the second largest chain in Los Angeles);

*Bertelsmann*, 646 F. Supp. 3d at 39-41 (finding a loss of competition where the merging parties

were the only two bidders in either 6 to 7 percent or 12 percent of book transactions).

Defendants contend that the FTC's "position has consistently been that entry must be of

the size and scale *to replace Michael Kors' footprint today.*" Defs.' Opp. at 34 (emphasis in

original). Not so. The FTC has argued that "any entry by new firms, or expansion by existing

firms, must be 'timely, likely, and sufficient in its magnitude, character, and scope to deter or

counteract the competitive effects of concern' of the Proposed Acquisition." FTC Br. at 29-30

(quoting *IQVIA*, 2024 WL 81232, at *46). Put differently, it must be sufficient "to fill the

competitive void" that would result from the merger. *H&R Block*, 833 F. Supp. 2d at 73.

Defendants cannot meet this burden. That is not surprising, given that Coach, Kate Spade, and

---

[61] PX1216 (Tapestry) at 018-019.
[62] Merger Guidelines, §§ 4.3.A.

Michael Kors are household names in the United States, scoring as some of the most recognized brands in the fashion industry.[63] And Tapestry itself has acknowledged that while technology may have resulted in lower barriers to entry, ███████████████████████████████ ███████████████████████████████[64] And the success of Lululemon's belt bag, ████████ ███████████████████[65] does not change that calculus: ████████████████████ ████████████████████████[66]

    ***Purported Brand Autonomy.*** Defendants' argument that market shares are not indicative of antitrust issues because post-merger they do not plan to eliminate competition among Coach, Kate Spade and Michael Kors is contrary to the law. As the Supreme Court has made clear, divisions within one company are viewed as a single actor under the antitrust laws. *Copperweld Corp. v. Ind. Tube Corp.,* 467 U.S. 752, 771-72 (1984). This is black-letter law. *Bertelsmann*, 646 F. Supp. 3d at 49-51 ("[c]ompanies with multiple divisions must be viewed as a single actor, and each division will act to pursue the common interests of the whole corporation." (quoting *United States v. AT&T*, 916 F.3d 1029, 1043 (D.C. Cir. 2019)). Their arguments are also contrary to basic principles of economics[67] and the evidence. Indeed, ████████████████████████ ████████████████████[68] And there is an entire Global Strategy & Consumer

---

[63] PX1265 (Tapestry) at 021; PX2117 (Capri) at 019-020.

[64] PX8167 (Tapestry) at 007 ("████████████████████████████████████ ████████████████████████████████████████████████████ ").

[65] PX5052 (████████████████ Dep.) at 83:17-23.

[66] PX5052 (████████████████ Dep.) at 28:11-20; 98:13-99:1.

[67] Smith Reply Report, Section II.F.

[68] *See, e.g.*, PX8123 (Tapestry) at 001-002 (████████████████████████████ ████████████████████████); PX8130 (Tapestry) at 001 (████████████ ████████████); PX8124 (Tapestry) at 001-019 (same); PX1740 (Tapestry) at 006-007, 039, 061, 145 (████████████████████); PX1497 (Tapestry) at 001, 019-020 (████████████████████████).

Insights group and "Chief Growth Officer"[69] that work across the Tapestry brands.[70]

**Increased Sales.** Defendants do not contend that the merger would lead to any efficiencies, cost savings, or other benefits to consumers. Instead, they claim that the purpose of their merger is to "drive more sales." Defs.' Opp. at 11. That is not a cognizable defense. *St. Alphonsus Med. Ctr.–Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 792 (9th Cir. 2015) (Clayton Act does not excuse anticompetitive mergers "simply because the merged entity can improve its operations"). Defendants also assert that the deal will "increase output," but in the next breath concede that Michael Kors has plenty of product and must "raise discounts" to sell it. Defs.' Opp. at 12. In other words, this deal is not about increasing output—because no one can claim Michael Kors lacks capacity to produce handbags.[71] Instead, it is about ending "an overreliance on discounting." *Id.* at 11. Raising prices for Americans is hardly a procompetitive effect, although it will certainly benefit Defendants and their shareholders.[72]

## IV.   THE FTC IS NOT REQUIRED TO SHOW THAT TAPESTRY WILL RAISE PRICES POST-ACQUISITION—BUT IT LIKELY WILL.

Defendants argue that the FTC must provide a "forward-looking analysis" which "proves that the acquirer will raise prices post-merger." Defs.' Opp. at 38. That, however, is inconsistent with the caselaw. *E.g.*, *AT&T*, 916 F.3d at 1045 ("the court does not hold that quantitative evidence of price increase is required in order to prevail on a Section 7 challenge"); *United States v. Anthem*, 855 F.3d at 345, 361 (D.C. Cir. 2017) ("threat to innovation is anticompetitive

---

PX1271
(Tapestry) at 001; PX5035 (Fraser (Tapestry) Dep.) at 63:9-69:12.
[69] PX5053 (Seth (Tapestry) Dep.) at 8:13-8:19, 15:14-15:16, 23:17-23:23; *see also* PX1726 (Tapestry) at 024 (                                                                            ).
[70] PX5027 (Harris (Tapestry) Dep.) at 5:8-20.
[71] PX5036 (Charles (Tapestry) Dep.) at 205:23-206:15; PX1354 (Tapestry) at 004.
[72] PX1074 (Tapestry) at 006 ("                                                    ).

in its own right"); *FTC v. Sanford Health*, 1:17-cv-133, 2017 WL 10810016, at *7, *13 (D.N.D. Dec. 15, 2017), *aff'd by* 926 F.3d 959 (8th Cir. 2019); *H&R Block*, 833 F. Supp. 2d at 81 (analyzing whether "the acquiring firm will have the incentive to raise prices *or reduce quality* after the acquisition") (emphasis added). Even in *United States. v. Sabre*, a Section 7 merits proceeding and the only case to which Defendants cite for this proposition, the court concluded that the Government failed to prove the merger would harm competition by raising prices *or* by eliminating consumer choice. 452 F. Supp. 3d 97, 146 (D. Del. 2020), *vacated as moot by* 2020 WL 4915824 (3d Cir. July 20, 2020). Regardless, Defendants have conceded the merger is to stop a decline in Michael Kors that led to "an overreliance on discounting." Defs.' Opp. at 11.

## V.     THE EQUITIES SUPPORT A PRELIMINARY INJUNCTION.

Defendants claim that their merger will benefit "the current and future consumers of Michael Kors bands [sic]." Defs.' Opp. at 40. But the equities under Section 13(b) go to the "consequences resulting from the requested injunction"—not the merger itself. *Meta Platforms*, 2022 WL 16637996, at *6; *accord FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 353 (3d Cir. 2016). Defendants assert, without any support, that "granting an injunction will necessarily kill the deal," Defs.' Opp. at 40, but the closing date in their merger agreement automatically extends until February 10, 2025, and both Defendants are required to use "reasonable best efforts to defend or contest, including through litigation or other means . . . [challenges to] the consummation of the [merger]" up until that date.[73] That date itself is arbitrary and self-imposed. *Penn State Hershey*, 838 F.3d at 353 (there is "no reason why, if the merger makes economic sense now, it would not be equally sensible to consummate the merger following an FTC adjudication on the merits").

---

[73] PX1014 (Merger Agreement) at § 6.2(a), 053; § 8.1(d), 072.

Dated: August 27, 2024

Respectfully submitted,

*S/ Abby L. Dennis*
Abby L. Dennis (*pro hac*)
DC Bar No. 994476
Federal Trade Commission
600 Pennsylvania Avenue, N.W.
Washington, DC 20580
Phone: 202-326-2494
Email: adennis@ftc.gov

Peggy Bayer Femenella (DC Bar No. 472770)
(*pro hac*)
Nicole Lindquist (DC Bar No. 975593) (*pro hac*)
Laura Antonini (CA Bar No. 271658) (*pro hac*)
Brandon Boxbaum (DC Bar No. 1615988) (*pro hac*)
Peter Colwell (DC Bar No. 100287) (*pro hac*)
Kassandra DiPietro (MN Bar No. 0403547) (*pro hac*)
Sean Hughto (DC Bar No. 421224) (*pro hac*)
Frances Anne Johnson (MD Bar – No Number)
(*pro hac*)
Sarah Kerman (DC Bar No. 90017957) (*pro hac*)
Andrew Lowdon (DC Bar No. 230095) (*pro hac*)
Danielle Quinn (NY Bar No. 5408943)
Blake Risenmay (WA Bar No. 52888) (*pro hac*)
Edmund Saw (DC Bar No. 1658446) (*pro hac*)
Victoria Sims (DC Bar No. 1006974) (*pro hac*)
Timothy Singer (DC Bar No. 1048769) (*pro hac*)

*Counsel for Plaintiff Federal Trade Commission*