**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

FEDERAL TRADE COMMISSION,

                    Plaintiff,

       v.

TAPESTRY, INC.,

       and

CAPRI HOLDINGS LIMITED.

                    Defendants.

Case No. 1:24-cv-03109-JLR

**REDACTED VERSION**

<u>**PLAINTIFF FEDERAL TRADE COMMISSION'S PRE-HEARING PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**</u>

## TABLE OF CONTENTS

**THE FEDERAL TRADE COMMISSION'S PROPOSED FINDINGS OF FACT** .............. 1

I.    THE PARTIES AND THEIR PRODUCTS ................................................................... 1

    A.    Tapestry, Inc. ("Tapestry") ........................................................... 1

    B.    Capri Holdings Limited ("Capri") .......................................................... 2

    C.    Handbags .................................................................................................. 3

II.    THE PROPOSED ACQUISITION .................................................................... 3

III.    COACH COINS "ACCESSIBLE LUXURY" AND OTHERS FOLLOW SUIT ............ 5

IV.    "Accessible Luxury" Signifies a Distinct Set of Handbags, Marked by High Quality at Affordable Prices. ........................................................................................... 7

    A.    Pricing .................................................................................................... 7

    B.    Quality .................................................................................................... 9

    C.    Supply Chain .......................................................................................... 11

    D.    Other Characteristics of "Accessible Luxury" Handbags ...................... 12

V.    TAPESTRY AND CAPRI HAVE REPEATEDLY RECOGNIZED "ACCESSIBLE LUXURY" AS A DISTINCT MARKET TO INVESTORS AND THEIR BOARDS... 14

    A.    Defendants Have Long Acknowledged a Distinct Market for "Accessible Luxury" Handbags in Statements to Investors and Their Boards of Directors. .... 14

    B.    Investors and Wall Street Recognize a Market for "Accessible Luxury" Handbags. ............................................................................................... 15

    C.    A Horse by Any Other Name Is Still a Horse. ....................................... 15

VI.    OTHER TYPES OF HANDBAGS ARE NOT REASONABLE SUBSTITUTES ........ . 16

    A.    True Luxury Handbags ............................................................................ 16

    B.    Mass-Market Handbags ........................................................................... 19

VII.    COACH, KATE SPADE, AND MICHAEL KORS DOMINATE "ACCESSIBLE LUXURY" HANDBAGS IN THE UNITED STATES. .................................. 21

VIII.  TAPESTRY AND CAPRI—THROUGH THEIR COACH, KATE SPADE, AND
       MICHAEL KORS BRANDS—COMPETE HEAD-TO-HEAD IN THE SALE OF
       "ACCESSIBLE LUXURY" HANDBAGS. ................................................................. 22

       A.   Pricing and Discounts........................................................................... 23

       B.   Design.................................................................................................... 25

       C.   Marketing. ............................................................................................. 27

       D.   Brick-and-Mortar Stores........................................................................ 27

       E.   Labor. .................................................................................................... 28

       F.   Sustainability ........................................................................................ 29

IX.    TAPESTRY ANNOUNCES THE PROPOSED ACQUISITION IN AUGUST
       2023.................................................................................................................... 30

       A.   Tapestry Asserts that It Will "Revitalize" the Michael Kors Brand. ................... 30

X.     THERE ARE BARRIERS TO SCALE "ACCESSIBLE LUXURY" HANDBAGS...... 31

       A.   Building a Brand Takes Time. ................................................................ 31

       B.   Brick-and-Mortar Is a Barrier to Scale. ................................................ 31

       C.   Marketing and Advertising Is a Barrier to Scale. .................................. 32

       D.   Data Is a Barrier to Scale....................................................................... 33

**THE FEDERAL TRADE COMMISSION'S PROPOSED CONCLUSIONS OF LAW** .... 34

I.     THE FTC IS LIKELY TO SUCCEED IN THE MERITS PROCEEDING. ................... 37

       A.   The Proposed Acquisition is Presumptively Illegal and Likely to Cause
            Anticompetitive Effects in the Accessible Luxury Handbag Market.................... 37

            1.   "Accessible Luxury" Handbags Are a Relevant Product Market. .............. 38

                 a.   The Brown Shoe Practical Indicia Demonstrate That "Accessible
                      Luxury" Handbags Is a Relevant Product Market............................... 41

                 b.   "True Luxury" and Mass Market Handbags Are Not Reasonably
                      Interchangeable with "Accessible Luxury" Handbags........................ 43

                 c.   Economic Analysis Confirms "Accessible Luxury" Handbags in the
                      United States Is a Relevant Market. ................................................... 43

2.      The Proposed Acquisition Creates a Presumptively Illegal Increase in
        Concentration in the "Accessible Luxury" Handbag Product Market. ........ 45

B.      The Acquisition Is Unlawful Regardless of Market Concentration Because It
        Will Eliminate Substantial Head-To-Head Competition....................................... 46

C.      Defendants Cannot Rebut the FTC's Case............................................................ 47

        1.      Entry and Expansion Will Not Be Timely, Likely, or Sufficient to
                Counteract the Proposed Acquisition's Anticompetitive Effects................. 47

        2.      Any Benefits Are Not Merger-Specific, Cognizable, or Verifiable............. 48

II.     THE EQUITIES SUPPORT A PRELIMINARY INJUNCTION. ................................. 49

# TABLE OF AUTHORITIES

**Cases**

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) ............................................ *passim*

*Chicago Bridge & Iron Co. v. FTC*, 534 F.3d 410 (5th Cir. 2008) .............................. 48

*Copperweld Corp. v. Ind. Tube Corp.*, 467 U.S. 752 (1984) ........................................ 47

*Credit Bureau Reports, Inc. v. Retail Credit Co.,* 358 F. Supp. 780 (S.D. Tex. 1971) ............... 37

*F. & M. Schaefer Corp. v. C. Schmidt & Sons, Inc.*, 597 F.2d 814 (2d Cir. 1979) ..................... 35

*FTC v. Crescent Publ'g Grp., Inc.*, 129 F. Supp. 2d 311 (S.D.N.Y. 2001) .................................. 34

*FTC v. Elders Grain, Inc*., 868 F.2d 901 (7th Cir. 1989) (Posner, J.) .......................................... 36

*FTC v. H.J. Heinz Co.*, 246 F.3d 708 (D.C. Cir. 2001) .......................................................... 49, 50

*FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447 (1986)................................................................ 36

*FTC v. IQVIA Holdings, Inc.*, No. 23 Civ. 06188 (ER), 2023 WL 7152577

    (S.D.N.Y. Oct. 31, 2023) .................................................................................................... 34

*FTC v. IQVIA Holdings, Inc.*, No. 23 Civ. 06188 (ER), 2024 WL 81232

    (S.D.N.Y. Jan. 8, 2024)................................................................................................... *passim*

*FTC v. Lancaster Colony Corp.*, 434 F. Supp. 1088 (S.D.N.Y. 1977).................................. *passim*

*FTC v. Meta Platforms, Inc.*, 654 F. Supp. 3d 892 (N.D. Cal. 2023)........................................... 40

*FTC v. Meta Platforms, Inc*., No. 22 Civ. 04325 (EJD), 2022 WL 16637996

    (N.D. Cal. Nov. 2, 2022).............................................................................................. 34, 35, 49

*FTC v. Peabody Energy Corp.*, 492 F. Supp. 3d 865 (E.D. Mo. 2020)........................................ 49

*FTC v. Penn State Hershey Med. Ctr*., 838 F.3d 327 (3rd Cir. 2016) ...................... 36, 45, 49, 50

*FTC v. Staples, Inc.*, 190 F. Supp. 3d 100 (D.D.C. 2016) ............................................................ 47

*FTC v. Surescripts, LLC*, 665 F. Supp. 3d 14 (D.D.C. 2023)...................................................... 40

*FTC v. Swedish Match*, 131 F. Supp. 2d 151 (D.D.C. 2000).................................................... 39, 40

*FTC v. Sysco Corp.*, 113 F. Supp. 3d 1 (D.D.C. 2015)........................................................... *passim*

*FTC v. Univ. Health, Inc.*, 938 F.2d 1206 (11th Cir. 1991)...................................................... 35, 49

*FTC v. Warner Commc'ns, Inc.*, 742 F.2d 1156 (9th Cir. 1984)....................................................... 35

*FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028 (D.C. Cir. 2008) ............................. 35, 37, 38, 41

*FuboTV Inc. v. Walt Disney Co.*, No. 24-CV-01363 (MMG), 2024 WL 3842116

   (S.D.N.Y. Aug. 16, 2024) ......................................................................................... 37, 39, 46

*Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485 (2d Cir. 2004)...................... 40, 42

*Optronic Techs., Inc. v. Ningbo Sunny Elec. Co., Ltd.*, 20 F.4th 466 (9th Cir. 2021) ................. 40

*R.C. Bigelow, Inc. v. Unilever N.V.*, 867 F.2d 102 (2d Cir. 1989) ................................................ 39

*Regeneron Pharms., Inc. v. Novartis Pharma AG*, 96 F.4th 327 (2d Cir. 2024)......................... 40

*Reynolds Metals Co. v. FTC*, 309 F.2d 223 (D.C. Cir. 1962)........................................................ 42

*St. Alphonsus Med. Ctr.–Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775

   (9th Cir. 2015).......................................................................................................................... 49

*United States v. Aluminum Co. of Am.*, 377 U.S. 271 (1964) ....................................................... 39

*United States v. Anthem Inc.*, 236 F. Supp. 3d 171 (D.D.C. 2017) .............................................. 40

*United States v. Bertelsmann SE & Co.*, 646 F. Supp. 3d 1 (D.D.C. 2022) ................................ 39

*United States v. H&R Block, Inc.*, 833 F. Supp. 2d 36 (D.D.C. 2011) ........................................ 48

*United States v. Mfrs. Hanover Tr. Co.*, 240 F. Supp. 867 (S.D.N.Y. 1965) .............................. 46

*United States v. Phila. Nat'l Bank*, 374 U.S. 321 (1963) ................................................. 36, 37, 38

*United States v. Von's Grocery Co.*, 384 U.S. 270 (1966) ........................................................... 48

**Statutes**

15 U.S.C. § 18.......................................................................................................... 35, 36, 49

15 U.S.C. § 53(b) ................................................................................................... *passim*

## Other Authorities

2023 U.S. Dep't of Justice and FTC Merger Guidelines ........................................ *passim*

H.R. Rep. No. 93-624 (1973) (Conf. Rep.) .................................................................. 34

## THE FEDERAL TRADE COMMISSION'S PROPOSED FINDINGS OF FACT

## I.    THE PARTIES AND THEIR PRODUCTS

### A.    *Tapestry, Inc. ("Tapestry")*

1.      Defendant Tapestry is "a leading New York-based house of accessible luxury accessories and lifestyle brands." PX7104 (2022 Tapestry 10-K) at 4.

2.      In its fiscal year 2023, Tapestry generated over $6.6 billion in revenue, with gross margins of 71 percent. PX7105 (2023 Tapestry 10-K) at 39, 79. Tapestry's revenue-weighted profit margins for direct-to-consumer and wholesale sales of handbags—specifically, cross body bags, satchels, shoulder bags, and totes/shoppers (hereinafter "handbags") (PX6000 (Smith (FTC) Rep.) ¶¶ 30-31, 35)— are ■ percent for Coach and ■ percent for Kate Spade. *Id.* ¶ 104.

3.      Tapestry owns three brands: Coach, Kate Spade, and Stuart Weitzman, with the largest by far being Coach, which accounted for 74.5 percent of Tapestry's total net sales in fiscal year 2023. PX7105 (2023 Tapestry 10-K) at 5, 101.

4.      Founded in New York City in 1941, Coach sells handbags, small leather goods, footwear, accessories, ready-to-wear apparel, jewelry, eyewear, luggage, watches, and fragrances. *Id.* at 5, 11, 12. It operates 125 retail stores and 170 outlet stores in the U.S. in locations such as Iowa, Alabama, Nebraska, and New York. PX6000 (Smith (FTC) Rep.) at ¶ 18.

5.      Coach purchased Stuart Weitzman in 2015 and Kate Spade in 2017, afterward renaming itself Tapestry. PX7104 (2022 Tapestry 10-K) at 4; PX7149 (2015 Tapestry 8-K (Jan. 5, 2015)) at 2; PX7060 (Kate Spade Press Release) at 1.

6.      Kate Spade sells handbags, small leather goods, ready-to-wear apparel, footwear, and accessories (PX7105 (2023 Tapestry 10-K) at 8, 11-12), and operates almost 200 stores in the U.S. in locations such as Iowa, Alabama, and New York. PX6000 (Smith (FTC) Rep.) ¶ 20.

7.      Stuart Weitzman is predominantly a footwear brand (PX7105 (2023 Tapestry 10-K) at 9, 11), and has had several ███████████████████████████████. PX10 (Tapestry) at 91-92; PX6000 (Smith (FTC) Rep.) ¶ 22.

**B.  *Capri Holdings Limited ("Capri")***

8.      Capri is a global fashion firm headquartered in the United Kingdom, with offices in New York City. PX7098 (2023 Capri 10-K) at 37. In its fiscal year 2023, Capri generated approximately $5.6 billion in total global revenue, with gross margins of 66 percent. *Id.* at 011, 045. Capri owns three brands: Michael Kors, Jimmy Choo, and Versace. *Id.* at 9-10.

9.      The Michael Kors brand was launched in New York City in 1981 by the designer Michael Kors (*id.* at 9; PX5011 (Kors (Capri) Dep.) at 7:17-21; 14:5-9), who remains Chief Creative Officer of his brand four decades later. PX5011 (Kors (Capri) Dep.) at 249:21-25.

10.     Michael Kors "███████████████████████ by making ██████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ████████ PX2045 (Capri) at 7; PX5022 (Wilmotte (Capri) Dep.) at 139:16-140:14; 141:12-22.

11.     For Capri's fiscal year 2023, the Michael Kors brand accounted for approximately 69 percent of Capri's total revenues. PX7098 (2023 Capri 10-K) at 11.

12.     The Michael Kors brand operates almost 250 stores in the United States, in places such as Iowa, Missouri, Alabama, and Nebraska (PX6000 (Smith (FTC) Rep.) at ¶ 26), and has three lines: the Michael Kors Collection "luxury line"; the MICHAEL Michael Kors "accessible luxury line"; and Michael Kors Mens (PX7098 (2023 Capri 10-K) at 9).

13.     In filings with the Securities Exchange Commission ("SEC"), Capri has boasted its MICHAEL Michael Kors line (hereinafter "Michael Kors") "addresses the significant demand opportunity in accessible luxury goods." PX7098 (2023 Capri 10-K) at 9-10.

14.    Michael Kors revenue-weighted profit margins for direct-to-consumer and wholesales of handbags are ■ percent. PX6000 (Smith (FTC) Rep.) ¶ 104.

15.    Capri's predecessor, Michael Kors Holdings Limited, purchased the Jimmy Choo brand in 2017 and the Versace brand in 2018 (PX6000 (Smith (FTC) Rep. ¶ 23), after which it renamed itself Capri. PX7206 (2019 Capri 8-K (Aug. 8, 2018)) at 2.

16.    Capri has referred to Jimmy Choo and Versace as "luxury businesses" to the SEC (PX7099 (2023 Capri 14-A) at 5); and as ██████████████████████████ including as recently ███████████ PX2428 (Capri) 15, 18.

### C. *Handbags*

17.    As mentioned above, both Tapestry and Capri sell handbags, with their Coach, Kate Spade, and Michael Kors' brands boasting nearly $3 billion in combined sales in the United States in 2023 alone. PX6000 (Smith (FTC) Rep.) ¶ 186, tbl 7.

18.    Handbags generally refer to small to medium-sized bags used for carrying personal items and money and have handles or a strap and are designed to be held in the hand or worn over the shoulder. *Id.* at ¶ 30. They come in various styles, materials and sizes, and are differentiated based on factors such as price, quality, design, features, and branding. *Id.* at ¶ 31.

## II.    THE PROPOSED ACQUISITION

19.    On August 10, 2023, Tapestry and Capri signed an Agreement and Plan of Merger ("Merger Agreement"), whereby Tapestry agreed to acquire Capri for approximately $8.5 billion (the "Proposed Acquisition"). PX1014 (Merger Agreement) at 1, 7; PX7175 (Tapestry Press Release, Aug. 10, 2023) at 1.

20.    The closing date in the Merger Agreement automatically extends until February 10, 2025 (PX1014 (Merger Agreement) at § 8.1(d), 72), and both Tapestry and Capri are required to use "their reasonable best efforts to defend or contest, including through litigation or

other means, any objection to, or Actions challenging, the consummation of the [Proposed

Acquisition],” including through any appeal, up until the closing date. *Id.* at § 6.2(a), 53.

21.     The Proposed Acquisition would bring together two companies—and,

specifically, Tapestry’s Coach and Kate Spade brands on the one hand and Capri’s Michael Kors

brand on the other—that have long viewed themselves as each other’s “key”—if not “████████”—

competitor. *E.g.*, PX2240 (Capri) at 1 (“[o]ur key competitor ██████”); PX2043 (Capri) (██████

████████████); PX2423 (Capri) at 6 (████████████████████████

████████); PX1216 (Tapestry) at 4 (████████████████████████

████████████████████████).

22.     It would also bring together three of the biggest “accessible luxury” handbag

brands in the United States. PX1374 (Tapestry) at 1 (████████████████████

████) (████████████████████████████████

████████████████████████).

23.     Tapestry’s aim for the proposed acquisition of Michael Kors is that it would allow

Tapestry to “████████████████████████████████

████████ PX1216 (Tapestry) at 1, 17-18; *see also* Dkt. 159 at 11 (Tapestry’s acquisition of

Michael Kors will reverse the current “overreliance on discounting”).

24.     Tapestry also plans to ████████████████████████

████████████ PX1200 (Tapestry) at 10; PX1723 (Tapestry) at 72

(████████████████████████).

25.     The Proposed Acquisition builds on Tapestry’s pattern and strategy of pursuing

acquisitions. PX1301 (Tapestry) at 2; PX10 (Tapestry) at 107; PX1737 (Tapestry) at 4; PX1175

(Tapestry) at 4; PX1351 (Tapestry) at 46; PX5019 (Crevoiserat (Tapestry) Dep.) at 75:25-76:8.

26.     Tapestry sees the Proposed Acquisition as "set[ting] the table for [a] string of pearls[,] or smaller deals," PX1152 (Tapestry) at 1, in quest of its plan to become a "Premium Fashion Powerhouse." PX1737 (Tapestry) at 4; PX1175 (Tapestry) at 4.

## III.    COACH COINS "ACCESSIBLE LUXURY" AND OTHERS FOLLOW SUIT.

27.     Coined by Coach as part of its initial public offering, the term "accessible luxury" denotes a "quality well made product" produced at a lower cost and retailed at a fraction of the price of traditional European luxury. *E.g.*, PX1704 (Tapestry) at 1; PX5006 (Kahn (Tapestry) Dep.) at 31:2-32:11; PX1635 (Tapestry) at 6; PX1731 (Tapestry) at 48.

28.     As Coach's CEO and Brand President Todd Kahn put it in late 2022 when explaining to investors how Coach "invented Accessible Luxury": "It was the idea that you didn't have to spend an exorbitant amount of money to buy a high quality bag." PX1635 (Tapestry) at 6; PX5006 (Kahn (Tapestry) Dep.) at 31:2-32:11) (███████████████████ ███████████████████████████████████████████ ███████████); *accord* PX1431 (Tapestry) at 14 (███████████████████████████ ████████████████████████████████████████).

29.     Its rival Michael Kors thereafter adopted the term (along with equivalents like "affordable luxury") to describe a particular type of handbag product. *E.g.*, PX7098 (Capri 2023 10-K) at 9; PX7096 (Capri 2022 10-K) at 7; PX2439 (Capri) at 4; PX5021 (Idol (Capri) Dep.) at 107:19-108:2 (█████████████████████████████████████████ ███████████); PX2435 (Capri) at 5; PX7127 (Q4 2019 Capri Earnings Call) at 9; PX5000 (Idol (Capri) Corp. IH) at 86:12-87:4; PX2034 (Capri) at 7; PX2166 (Capri) at 3.

30.     Other industry participants have done the same:

31.     For ███████████████████ means ████████████████████████████ ████████████████ PX5046 (███████████) Dep.) at 19:25-20:10.

32.    ███████████ describes ███████████████████████ which

denotes ████████████████████████████████████████████

██████████████████████████████████████ PX5058

(███████████ Dep.) at 11:18-12:12; 13:9-17; *accord* PX7182 (███████████ website) at

1 ("industry leader in accessible luxury handbags"); PX4000 (███████████ Decl.) ¶ 12.

33.    ███████████ uses the term ███████ to describe its ███████████████

██████████████████ PX5026 (██████████████████) Dep.) at 34:2-14;

36:18-37:4; PX3202 (███████) at 6.

34.    ████████████████████████████████████████████

██████ PX3150 (███████) at 2; PX5032 (████████████████ Dep.) at 26:25-28:7.

35.    Tapestry and Capri recognize that, within this segment, Coach, Michael Kors, and

Kate Spade ██████████████████████████████████████ *E.g.*,

PX1723 (Tapestry) 9-10 (████████████████████████████████

██████████████████████████); PX1296 (Tapestry) at 8-9 (████);

PX1725 (Tapestry) at 5; PX5006 (Kahn (Tapestry) Dep.) at 96:9-98:3, 99:3-24, 104:5-106:3;

106:18-21 (discussing PX1536); PX2128 (Capri) at 3, 8-12 (████████████████████████

██████████████████████); PX2430 (Capri) at 16 (████).

36.    Other industry participants also widely acknowledge Coach and Michael Kors as

well as Kate Spade among the major competitors within "accessible luxury" handbag brands.

PX5046 (███████████ Dep.) at 19:25-20:23; PX5058 (███████████ Dep.) at 41:20-

42:19) (██████████████████████████████████); PX4000 (███████████

Decl.) ¶ 13; PX5038 Melwani (LVMH) Dep. 133:15-134:1-3 (███████████████████

██); PX3202 (███████████) at 6 (██████████████████████████████



); PX5026 (███████████████) Dep.) at 39:8-10, 40:30-5 (███████

███████████████████████████████████████); PX3150 (███

█████████████████████████████████████████).

## IV.  "ACCESSIBLE LUXURY" SIGNIFIES A DISTINCT SET OF HANDBAGS, MARKED BY HIGH QUALITY AT AFFORDABLE PRICES.

37.    "Accessible luxury" handbags boast a number of distinct characteristics, the chief

ones of which being affordable prices and quality, which in turn are the function of a unique

supply chain. *E.g.*, PX1704 (Tapestry) at 1 (██████████████████████

█████████████████████████████████████████████

███████); PX5019 (Crevoiserat (Tapestry) Dep.) at 178:22-180:5; PX1731 (Tapestry) at 48;

PX5036 (Charles (Tapestry) Dep.) at 94:18-95:18 (discussing PX1811); PX5006 (Kahn

(Tapestry) Dep.) at 54:4-56:1; 61:7-63:24, 86:6-87:1).

38.    Indeed, industry participants recognize affordable prices and quality as distinct

attributes for "accessible luxury" handbags. *E.g.*, PX5046 (████████████ Dep.) at 19:25-

20:23 (██████████████████████████; PX5058 (████████████ Dep.) at

11:18-12:12; 13:21-15:8 ██████████████████████████████

████████████████████████; PX4000 (████████ Decl.) ¶ 12

████████████████████████████).

39.    Other characteristics for "accessible luxury" include discounting and promotions

(including through outlets) and distinct customers. *Infra* Findings of Fact § IV.D.

### A. *Pricing*

40.    Coach, Kate Spade, and Michael Kors focus their handbag offerings on an entry

price point of $100 and rarely approach or exceed $1,000. *E.g.*, PX1296 (Tapestry) at 8-9;

PX1431 (Tapestry) at 18 (████████████████████████████



██████████████████████████████████████ ) & 19 (████████████████████████████

████████████████████████████████████ ); PX5006 (Kahn (Tapestry) Dep.) at 79:8-12 (████████

██████████████████████████████████ ); PX5020 (Lifford (Tapestry) Dep.) at

126:9-19 (████████████████████████████████████ ); PX1387 (Tapestry) at 28

(████████████████████████████████ ); PX5000 (Idol (Capri) Corp. IH) at 94:14-18 (██

████████████████████████████████████████ ); PX5035 (Fraser

(Tapestry) Dep.) at 204:2-7 (████████████████████████████████████████

████████ ); PX7098 (2023 Capri 10-K) at 14.

    41.    The same is true for other "accessible luxury" handbag brands. PX4000 (██

████████ Decl.) at ¶ 14 (████████████████████████████████████

████ ); PX3202 (████████████████ ) at 6

████████████████████████████████████████ ; PX5046 ████████████████████ Dep.) at

21:2-17 (████████████████████████████████████ ); PX5038 (████████████████

Dep.) at 118:4-9 (████████████████████████████████████████ ).

    42.    ████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████ PX1296 (Tapestry) at 9. ████████████████████████

████████████████████████████████████ *Id.*

    43.    Other Tapestry analyses shared with the company's highest levels regularly

highlight the wide gap in pricing between handbags offered by "accessible luxury" brands and

those offered by "luxury" brands—or what the parties and industry participants also refer to as

"traditional European luxury," "true luxury," or "European luxury" (hereinafter "true luxury");

PX5006 (Kahn (Tapestry) Dep. at 96:9-98:3, 99:3-24, 104:5-106:3; 106:18-21; PX1536
(Tapestry) at 15 (

███████████████); PX1542 (Tapestry) at 8 (██████); PX5027 (Harris (Tapestry) Dep.) at
156:5-161:10 (discussing PX1485 █████████████████); PX1723 (Tapestry) at 9;
PX1296 (Tapestry) at 9-10 (████████████████████████████

█████████████████████████████).

44.    In statements to investors, Defendants have routinely acknowledged this "white
space" or "delta" between the price points of "accessible luxury" and true luxury. *E.g.*, PX5006
(Kahn (Tapestry) Dep. at 54:4-56:1, 84:18-87:10; PX1635 (Tapestry) at 29; PX7053 (Tapestry
Q4 2022 Earnings Call) at 15; PX7045 (Tapestry Q3 2023 Earnings Call) at 11; PX7054
(Tapestry Q4 2023 Earnings Call Tr.) at 12; PX7030 (Tapestry Q1 2024 Earnings Call) at 11;
PX7138 (Capri Q4 2022 Earnings Call) at 11; PX7029 (Tapestry Q1 2023 Earnings Call) at 11
("when you talk about traditional luxury, the average price points are so materially different");
PX7044 (Tapestry Q3 2022 Earnings Call) at 10.

45.    This pricing gap with true luxury handbag brands has only been ████████
████████ *E.g.*, PX1723 (Tapestry) at 9; PX7138 (Capri Q4 2022 Earnings Call) at 11;
PX5006 (Kahn (Tapestry) Dep. at 82:24-83:2.

**B.  *Quality***

46.    "Accessible luxury" handbags boast high levels of craftsmanship and quality.
PX5006 (Kahn (Tapestry) Dep.) at 195:17-197:14 (████████████████████████

████████████████████); PX5000 (Idol (Capri) Corp. IH) at 223:13-9 ████████

████████████████████████████████████); PX7098 (2023 Capri 10-K) at 9 ("Michael Kors features distinctive designs,
materials, and craftsmanship"); PX1085 (Tapestry) at 4 (████████████████

9

███████████████████████████████████); PX5020 (Pamela Lifford (Tapestry)

Dep.) at 136:2-17 ("t████████████████████████████████████████

█████████████████████████"); PX1431 (Tapestry) at 12.

47.    As ███████████ put it: █████████████████████████████

████ PX5058 (█████████████ Dep.) at 13:21-15:8.

48.    Common features of "accessible luxury" handbags include the following:

49.    Craftsmanship by skilled artisans to bring together intricate designs. *E.g.*, PX5006

(Kahn (Tapestry) Dep.) at 195:17-196:12; PX5058 (███████████ Dep. at 13:21-15:8)

(█████████████████████████████████); PX5036 (Charles

(Tapestry) Dep.) at 59:15-60:4 (████████████████████████); PX1262

(Tapestry) at 7 (████████████████████████████████████

███████████████████████████████).

50.    Durability and solid construction ████████████████████ *E.g.*, PX5058

████████████ Dep.) at 13:21-15:8) (████████████████████████████

████████); PX5006 (Kahn (Tapestry) Dep.) at 17:23-8-18:24 (████████████████

████████████); PX5019 (Crevoiserat (Tapestry) Dep.) at 180:1-5 (█████████████

████████████████████████████████).

51.    Use of quality materials. *E.g.*, PX5058 (███████████ Dep.) at 13:21-15:8

(████████████████████); PX5006 (Kahn (Tapestry) Dep.) at 18:7-24 (████). Most

Michael Kors, Coach and Kate Spade handbags are made with leather. PX5002 (Crevoiserat

(Tapestry) Corp. IH) at 21:5-19; PX5006 (Kahn (Tapestry) Dep.) at 17:2-12; PX5000 (Idol

(Capri) Corp. IH) at 131:17-22; PX1727 (Tapestry) at 119, 121.

52.    Not surprisingly, Tapestry has boasted that "high quality standards . . . are an

integral part of our brands' identity." PX7105 (2023 Tapestry 10-K) at 13. And Michael Kors

has stated that ███████████████████████████████ PX2058 (Capri) at 9, 30.

### C. Supply Chain

53.    "Accessible luxury" brands typically outsource production of their handbags to

manufacturers in Southeast Asia. PX7105 (2023 Tapestry 10-K) at 13; PX7098 (2023 Capri 10-

K) at 16; PX5006 (Kahn (Tapestry) Dep.) at 188:11-17, 194:15-195:16; PX1636 (Tapestry) at 3;

PX5036 (Charles (Tapestry Dep.) at 55:2-10, 59:15-60:4; PX5026 (██████████████

Dep. at 35:7-14; PX5046 (████████████ Dep.) at 24:21-25:8.

54.    This manufacturing process enables "accessible luxury" brands to produce quality

handbags ████████—and thus to retail them at lower prices to consumers; as Tapestry CEO

Joanne Crevoiserat said ███████████████████████████████

███████████████████████████████████████████████

███████████████ PX1704 (Tapestry) at 1; *see also* PX5019 (Crevoiserat

(Tapestry) Dep.) at 178:22-180:5; PX1731 (Tapestry) at 48 (███████████████

███████████████████████████████████████████);

PX5036 (Charles (Tapestry) Dep. at 94:18-95:18 (discussing PX1811).

55.    Indeed, industry consultants recognize the distinct nature of the supply chain for

"accessible luxury" handbags. PX1327 (Tapestry) at 4 (███████████████████

███████████████████); PX6000 (Smith (FTC) Rep.) at ¶ 153.

56.    One key handbag supplier for ███████████████████ as well as

████████ and ██████████, is Asia-based ████. PX5036 (Charles (Tapestry) Dep.) at

63:6-13, 220:18-221:20 (███████████████████), 222:15-20; PX5000 (Idol

(Capri) Corp. IH) 318:4-15, 336:15-17; PX5058 (███████████ Dep.) at 41:1-4; 41:20-

42:19; PX3163 (██████) at 2, 4; PX1354 (Tapestry) at 6.

57.    ████████ is recognized as having ████████████████████████

████████████ PX5058 ████████████ Dep.) at 41:20-42:19 ████████████

████████████████████████████████████; PX1354 (Tapestry) at 7

████████████████████████████████

58.    Tapestry has considered acquiring a stake in ████████████████████

████████████████████ PX5036 (Charles (Tapestry) Dep.) at 220:18-221:20.

**D.  *Other Characteristics of "Accessible Luxury" Handbags***

59.    "Accessible luxury" handbags are also characterized by a high degree of, and

frequent, discounting and promotions, particularly around major shopping holidays. *E.g.*,

PX2128 (Capri) at 8-12 ████████████████████; PX5022 (Wilmotte (Capri) Dep.) at

66:20-67:22, 69:4-18; PX5002 (Crevoiserat (Tapestry) Corp. IH.) at 30:11-20; PX5026

████████████████ Dep.) at 68:21-25; PX5021 (Idol (Capri) Dep. at 176:9-17; 177:24-

178:16; PX6000 (Smith (FTC) Rep.) at ¶ 128.

60.    Indeed, Michael Kors brand President and CEO ████████████████

████████████████████████████. PX5022 (Wilmotte (Capri) Dep.) at

60:10-62:8; *see also* PX5011 (Kors (Capri) Dep.) at 143:5-144:23.

61.    As Tapestry's CEO put it when testifying on behalf of Kate Spade: ████████

████████████████ PX5002 (Crevoiserat (Tapestry) Corp. IH) 37:13-19.

62.    "Accessible luxury" handbags are also often sold in outlets, at lower prices than

those in full-price retail or department stores. PX5006 (Kahn (Tapestry) Dep.) at 186:22-187:7

████████████████████████████ PX5011 (Kors (Capri) Dep. at 143:5-

145:9 (discussing PX2321); PX2128 (Capri) at 3 ████████████████████████

████████████████████████████████████████

63.    All told, more than ████████████████████████████████████

███████. PX5008 (Levine (Tapestry) Dep.) at 146:21-147:22; PX1098 (Tapestry) at 10. And all ██████████████████████████████████████████████████████████████████████ ████████████████████████████████. PX2753 (Capri) at 43.

64.    This discounting in turn drives a distinct customer segment—one that is price sensitive and motivated by bargains—as indicated by ████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████. PX2753 (Capri) at 43.

65.    Customer demographics compiled by both the parties bear this out, as half of Coach and Michael Kors have annual household incomes of less than $75,000-$80,000. PX2128 (Capri) at 5-6; PX1186 (Tapestry) at 14; PX1740 (Tapestry) at 148; PX2674 (Capri) at 11; *accord* PX1078 (Tapestry) at 1 ████████████████████████████████████ ████████████████████████████.

66.    The demographics are similar for other "accessible luxury" brands like ████ ████████████████████████ PX2128 (Capri) at 5-6; PX2674 (Capri) at 11.

67.    As Defendants recognize, these customers are not purchasing $2,000 handbags. PX1067 (Tapestry) at 001 ("Gucci bags at $2000 is just not our customer in NA"); PX5006 (Kahn (Tapestry) Dep. at 118:1-21; PX1427 (Tapestry) at 2 ("Nobody says should I buy a LV [Louis Vuitton] bag or a Coach bag"); PX5035 (Fraser (Tapestry) Dep.) at 224:24-225:7.

68.    Kate Spade's own CEO and brand president ████████████████████████████ ████████████████████████████████. PX5035 (Fraser (Tapestry) at 204:2-7.

69.    For ████████████████ customer, ████████████████████████████████ ████████████████████████ PX5058 ████████████████ Dep.) at 189:2-14; *accord id.* at

11:18-12:12 ███████████████████████████████████████████████████ .

## V. TAPESTRY AND CAPRI HAVE REPEATEDLY RECOGNIZED "ACCESSIBLE LUXURY" AS A DISTINCT MARKET TO INVESTORS AND THEIR BOARDS.

### A. *Defendants Have Long Acknowledged a Distinct Market for "Accessible Luxury" Handbags in Statements to Investors and Their Boards of Directors.*

70.    Since Coach coined the phrase "accessible luxury" during its initial public offering, *see supra* Findings of Fact ¶ 27, Tapestry has repeatedly, and consistently, referred to its brands, including Coach and Kate Spade, as "accessible luxury" in SEC filings. *E.g.*, PX7105 (2023 Tapestry 10-K) at 015; PX7104 (2022 Tapestry 10-K) at 004.

71.    It has also done so in earnings calls, often times contrasting itself with true luxury. *E.g.*, PX7053 (Q4 2022 Tapestry Earnings Call) 13, 15; PX7044 (Q3 2022 Tapestry Earnings Call) at 10; PX7335 (Q4 2020 Tapestry Earnings Call) at 5; PX7035 (Q2 2022 Tapestry Earnings Call) at 12; PX7051 (Q4 2019 Tapestry Earnings Call) at 4; PX7342 (Q2 2019 Tapestry Earnings Call) at 12; PX7027 (Q1 2019 Tapestry Earnings Call) at 13.

72.    And Tapestry regularly describes ████████████████████████████ ████████████████ . PX1431 (Tapestry) at 12, 14 ████████████████████ ████████████████████ ); PX1723 (Tapestry) at 9; PX1725 (Tapestry) at 5; PX1104 (Tapestry) at 2; PX1730 (Tapestry) at 1 ██████████████████████ .

73.    Capri has similarly described the MICHAEL Michael Kors lines as "accessible luxury" in SEC filings. PX7157 (Dec. 30, 2023 Capri 10-Q) at 41; PX7098 (2023 Capri 10-K) at 9; PX7096 (2022 Capri 10-K) at 7; PX7095 (2021 Capri 10-K) at 7.

74.    Like Tapestry, Capri has told the investment community that Michael Kors is "accessible luxury," which is distinct from true luxury. PX2379 (Q4 2023 Capri Earnings Call) at 01, 19; PX7127 (Q4 2019 Capri Earnings Call) at 13.

75.    Similar to its representations to the SEC and investors, Capri discusses

"accessible luxury" ███████. PX2436 (Capri) at 12; PX2439 (Capri) at 4 ████████

████████████████████████; PX2166 (Capri) at 3 ████████████

**B.  *Investors and Wall Street Recognize a Market for "Accessible Luxury" Handbags.***

76.    Given the parties' long use of "accessible luxury" to describe Coach, Michael Kors, and Kate Spade in earnings calls and investor statements, ██████ recognize a distinct market of "accessible luxury" handbags, in which Coach and Michael Kors are close competitors. *E.g.*, PX2423 (Capri) ████████ at 4, 6 ████████████████

████████████████████████████████████████

████████████████████████████; PX2020 (Capri) at 6 ████████████████████████

████████████████████████.

77.    Indeed, ████████████████████████████████

████████████████. PX2423 (Capri) ████████ at 6.

78.    And Tapestry's ████████████ referred to the Proposed Transaction with Michael Kors as ████████████████████████

████████████████████ PX1715 (Tapestry) at 010; PX5019 (Crevoiserat (Tapestry) Dep.) at 101:20-102:5; 104:5-23.

79.    ████████████████████████ likewise recognize a distinct market for "accessible luxury" handbags. *E.g.*, PX1374 (Tapestry) at 001 ████████

████████████ ████████████████████████

████████████████████████.

**C.  *A Horse by Any Other Name Is Still a Horse.***

80.    On ████████, shortly after it started considering an acquisition of Capri, Tapestry stated it was ████████████████ PX1635 (Tapestry) at 6-77.

81. 

*Compare* PX1431 (Tapestry) at 12 ⬛⬛⬛, *with* PX1731 (Tapestry) at 23 ⬛⬛⬛.

82.    Nevertheless, Tapestry repeatedly continued to refer to its Coach and Kate Spade brands as "accessible luxury," including with its Board of Directors ⬛⬛⬛⬛⬛⬛⬛ ⬛⬛⬛⬛⬛⬛⬛ *E.g.*, PX1725 (Tapestry) at 5 ⬛⬛⬛; PX1723 (Tapestry) at 9-10 ⬛⬛⬛; PX1250 (Tapestry) at 7 ⬛⬛⬛. And Capri too continues to use the term to describe Michael Kors, including to its Board, ⬛⬛⬛⬛⬛⬛⬛. PX2430 (Capri) at 15 ⬛⬛⬛; PX2561 (Capri) at 23 ⬛⬛⬛⬛⬛⬛⬛ ⬛⬛⬛⬛⬛⬛⬛; PX2787 (Capri) at 1; *see also* PX2439 at 4 ⬛⬛⬛.

83.    Capri and Tapestry only dropped "accessible luxury" in their SEC filings after the FTC initiated this lawsuit in late April 2024. PX7261 (2024 Capri 10-K, filed May 29, 2024); PX7435 (2024 Tapestry 10-K, filed August 18, 2024).

## VI.    OTHER TYPES OF HANDBAGS ARE NOT REASONABLE SUBSTITUTES.

### A.  *True Luxury Handbags*

84.    The parties and other industry participants recognize "true luxury" as another category of handbags, distinct from "accessible luxury" handbags, and refer to these brands by terms such as "luxury," "pure luxury," "traditional luxury," "pinnacle luxury," and "European luxury." *E.g.*, PX5006 (Kahn (Tapestry) Dep.) at 62:18-62:20; PX5021 (Idol (Capri) Dep.) at 41:3-12, 73:9-75:12 ⬛⬛⬛; PX2435 (Capri) at 2 ⬛⬛⬛; PX2428 (Capri) at 3 ⬛⬛⬛; PX4000 ⬛⬛⬛⬛⬛⬛⬛ at ¶ 15 ⬛⬛⬛; PX4002 ⬛⬛⬛⬛⬛⬛⬛ Decl.) at ¶¶ 2,7 ⬛⬛⬛; PX5029 ⬛⬛⬛⬛⬛⬛⬛ at 119:18-120:16 ⬛⬛⬛⬛⬛⬛⬛; PX5046 ⬛⬛⬛⬛⬛⬛⬛ Dep.) at 21:19-24, 22:2-5 ⬛⬛⬛⬛⬛⬛⬛; PX5032 ⬛⬛⬛⬛⬛⬛⬛ Dep.) at 26:5-28:7 ⬛⬛⬛⬛⬛⬛⬛; PX5040 (Tichner (Steve Madden) Dep.) at 31:16-22,

32:1-8 ███████████; *see also, e.g.*, PX5020 (Lifford (Tapestry) Dep.) at 93:4-11 ██████████ ████████████████████████████; *see also supra* Findings of Fact ¶¶ 42-45.

85.    "True luxury" includes brands like Louis Vuitton, Prada, Gucci, Chanel, and Dior. *See infra* Findings of Fact ¶¶ 86, 88; PX4002 ████████ Decl.) at ¶¶ 1, 7 ███████████ ███████████████████████████████████████████████ ██████████████████████; PX4000 ███████████ Dec.) at ¶ 15 █████████ ██████████████████████████████; PX5029 ███████████ ██████ at 119:18-120:16 █████████████████████████████ ██████████████████; PX5046 ███████████████ Dep.) at 21:19-24, 22:2-5 ██████████████████████; PX5032 ████████████████ Dep.) at 27:20-24 █████████████████████████████████████████████ ██████.

86.    With jaw-dropping prices at multiples of Defendants' offerings, "luxury" handbags are not reasonable substitutes for "accessible luxury" handbags. PX1536 (Tapestry) at 15; PX1723 (Tapestry) at 9; PX1296 (Tapestry) at 8; PX1067 (Tapestry) at 1 ██████████ ██████████████████████████; *see also* PX5035 (Fraser (Tapestry) Dep.) at 224:24-225:7; PX1427 (Tapestry) at 2 ██████████████████████████████████████ ██████████; PX5020 (Lifford (Tapestry) Dep.) at 98:18-99:24 ██████████████ ██████████; PX5058 ███████████ Dep.) at 193:22-196:1 ██████████████ ████████████████████████████████████████████ █████████████████████████████████████████████; *id.* at 197:21-198:9, 213:12-214:6 ██████████████████████████████████████ ██████████; PX5038 ██████████████ Dep.) at 27:6-28:1, 30:9-21) █████████████

████████████████████████████████████████████████████ ;

PX4000 ████████ Decl.) at ¶ 15 ████████████████████

████████████████████████████████████████████

████████████████████████ ; PX6000 Smith (FTC) Rep.) at ¶¶ 101-08.

87.    The prices for true luxury handbags typically start at $1,000 and only go up from

there. *E.g.*, PX1431 (Tapestry) at 18 ████████████████████████████

████████████████████ ; PX5020 (Lifford (Tapestry) Dep.) at 126:9-126:19;

PX1296 (Tapestry) at 008 █████████████████████ .

88.    The price ranges of brands like Chanel, Prada, and Louis Vuitton are illustrative.

PX4002 ████████ Decl.), ¶ 6 ██████████ ; PX3309 ████ at 2, 10-11 ████████

████████████████████████ ; PX6000 (Smith (FTC) Rep.) at ¶ 145,

n.283; PX5038 ████████ Dep.) at 52:17-53:4 ████████████ .

89.    Moreover, these handbags carry the imprimatur of the finest materials and

craftsmanship and are usually manufactured in Europe. *E.g.*, PX5038 ████████████ Dep.)

at 46:22-51:1; PX4000 ████████ Decl.) at ¶ 15; PX4002 ████████ Decl.) at ¶ 3

████████████████████████ ; PX6000 (Smith (FTC) Rep.) at ¶ 153, n.296.

90.    For example, ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████ PX4002 ████████ Decl.), ¶ 3.

91.    What's more, true luxury handbag companies typically do not ████████████

████████████ . *E.g.*, PX5000 (Idol (Capri) Corp. IH) at 203:12-20 ████████████

████████████████████████ ; PX5038 ████████ Dep.) at 44:24-45:9.

92.    Other characteristics distinguish "accessible luxury" from "true luxury" handbags:

93.    While discounting is common among "accessible luxury" handbags, *see supra* Findings of Fact ¶¶ 59-64, true luxury brands typically ███████████. *E.g.*, PX4002 ███████ Decl.), ¶ 6 ███████████████████████████████████████ ████████████████████████; PX5038 ███████████████ Dep.) at 59:2-8 ███████████████.

94.    Unlike "accessible luxury" brands, which offer their products in outlets and a range of department stores, *see supra* Findings of Fact ¶¶ 62-63, true luxury brands aim for a more exclusive shopping experience with limited sales channels and few, if any, outlet stores. *E.g.*, PX5038 ███████████ Dep.) at 106:11-12 ████████████████████; PX7083 ███████████████ at 001 █████████████████████████████ ████████████████████████; PX4002 ███████ Decl.), ¶¶ 4-5 ████████████████████████████.

95.    The true luxury consumer also has a █████████████████████ than the "accessible luxury" customer.  PX2040 (Capri) at 8; *see also* PX5038 ███████████ Dep.) at 65:5-18, 66:1-18 ██████████████████████████████████.

### B.  *Mass-Market Handbags*

96.    Mass-market handbags are another category of handbags; industry participants sometimes also refer to mass market as "fast fashion" or "opening price point." *E.g.*, PX5040 (Tichner (Steve Madden) Dep.) at 26:8-21 ("It can be referred to as opening price point, moderate, trend, fashion."); PX5006 (Kahn (Tapestry) Dep.) at 183:25-185:5 ████████████; PX5022 (Wilmotte (Capri) Dep.) at 37:19-38:10 ██████████████████████; ███████████████████████; PX5058 ███████████████ Dep.) at 15:6-16:1 █████; ███████; PX5026 █████████████████ Dep.) at 47:11-18 ████████████ ██████████████████████████.

97.     Mass-market brands include Zara, H&M, Steve Madden, Nine West, Tommy Hilfiger, Guess, and private label brands. PX5040 (Tichner (Steve Madden) Dep.) at 32:22-33:6 ███████████████████████████████████████████████████████████████████ ███████████████████████; PX5022 (Wilmotte (Capri) Dep.) at 37:19-38:10 (██████████ █████; PX5058 █████████████████ Dep.) at 15:11-16:1 ██████████████████████.

98.     These types of handbags do not boast the same quality of materials and craftsmanship as "accessible luxury" handbags. PX5001 (Idol (Capri) IH) at 163:20-164:17 ███ ████████████████████████████████████; PX5040 (Tichner (Steve Madden) Dep. at 31:4-15) (primary differences include materials and price points; "handbags in the opening price point segment are . . . for all practical purposes, non-leather materials"); PX5058 ███████████ Dep.) at 13:21-16:1 █████████████████████████████████████████████████████████ ████████████████████████████; PX5003 (Kahn (Tapestry) Corp. IH) at 78:3-9 ██████████ ██████████████████████████.

99.     For example, for Steve Madden, "[t]he base material for the bulk of the handbags is PU"—or polyurethane—a "non-leather-like material." PX5040 (Tichner (Steve Madden) Dep.) at 31:4-15, 36:20-37:3; *accord* PX5046 ██████████████████ Dep.) at 22:22-24:7 ████████ ████████████████████████████; PX6000 (Smith (FTC) Dep.) at ¶ 158.

100.    Mass-market handbags also typically retail for under $100. PX5006 (Kahn (Tapestry) Dep.) at 183:25-185:5; PX5040 (Tichner (Steve Madden) Dep. at 24:22-25:5 ("bulk" of Steve Madden handbags suggested retail prices are "about a hundred dollars and under"); PX5046 ███████████████ Dep.) at 22:22-24:7; PX6000 (Smith (FTC) Rep.) at ¶¶ 158-161; *cf.* PX5026 ████████████████ Dep.) 44:25-45:10 ████████████████████████████████████ █████████████████████████████████████████████████████████████████████.

101.    Mass-market handbags are not a reasonable substitute for "accessible luxury" handbags; indeed, Coach doesn't ███████████████████████████████████████ ████████████████ PX5003 (Kahn (Tapestry) Corp. IH) at 100:25-101:8; *accord* PX5001 (Idol (Capri) IH) at 163:20-164:17 ███████████████████████████ .

102.    As Capri told China's State Administration for Market Regulation ("SAMR") while obtaining regulatory clearance for this deal there: "high-end mass-market products also offer good quality and performance and are made with decent materials and manufacturing processes, [but] they are not on the same level as luxury products." PX2061 (Capri) at 4.

103.    Tapestry similarly told SAMR: "personal luxury goods differ from mass-market goods and constitute a separate relevant product market." PX1088 (Tapestry) at 3.

## VII.    COACH, KATE SPADE, AND MICHAEL KORS DOMINATE "ACCESSIBLE LUXURY" HANDBAGS IN THE UNITED STATES.



104.    Tapestry's domestic revenues for "accessible luxury" handbags were ███████ ████████ . PX6000 (Smith (FTC) Rep.) at ¶ 186, Tbl. 7. Capri's domestic revenues for "accessible luxury" handbags were ███████████████ . *Id.* The next largest brands were ████ ████████████████████████████████████████████████████ ████████████████ . *Id.* No other brand had more than ███████████ of sales. *Id.*

105.    Tapestry has conducted ████████████████████████████████████ ████████████████████████████ . PX6000 (Smith (FTC) Rep.) at ¶¶ 64-69, 167.

106.    These analyses tracked an "accessible luxury" market comprised of the brands ████████████████████████████████████ . *Id.* at ¶¶ 67. 69 (citing PX1328 (Tapestry)).

107.    In 2023, ████████████████████████████████████████████████████ *Id.* at ¶ 49, *i.e.,* ████████████████████████████████████████████████

108.    Based on ██████ data produced by Tapestry, Capri, and non-parties, ████████████████

███████████████████████████████████████████████████████████

█████████████████████████████████. *Id.* at ¶ 186, tbl. 7.

109.    Kate Spade comprised ███████ of "accessible luxury" handbag sales in the United States in 2023, followed by ██████████████████████████, ████, respectively. *Id.* No one else comprised more than ████████. *Id.*

110.    For its part, ██████████████████████████████████████████████████████. *E.g.* PX2408 (Capri) at 8; PX2438 (Capri) at 6; PX2680 (Capri) at 6; PX6000 (Smith (FTC) Rep.) at ¶ 170.

111.    Under these analyses, Coach, Kate Spade, and Michael Kors comprised ████ ████ of the sales of "accessible luxury" leather goods in North America in 2022. PX2048 (Capri) at 8. Even among all "premium" brands, Coach, Kate Spade, and Michael Kors comprised more than ████████ of leather goods sales in North America in 2021. *Id.*

## VIII.    TAPESTRY AND CAPRI—THROUGH THEIR COACH, KATE SPADE, AND MICHAEL KORS BRANDS—COMPETE HEAD-TO-HEAD IN THE SALE OF "ACCESSIBLE LUXURY" HANDBAGS.

112.    As mentioned above, Tapestry and Capri recognize Coach, Michael Kors, and Kate Spade as close competitors. *See* Findings of Fact ¶ 21. Indeed, Tapestry's documents convey concern for "cannibalization" between the Coach, Kate Spade, and Michael Kors brands post-acquisition and a need to differentiate Michael Kors. PX1715 (Tapestry) at 10; PX1144 (Tapestry) at 2 ███████████████████████████████████████████████ ██████████████████████████████████████████████.

113.    Similarly, Capri's documents are laced with analyses comparing Michael Kors with its "key competitor" Coach, including on pricing and designs. *E.g.*, PX2240 (Capri) at 1; PX2108 (Capri) at 3-13; PX2128 (Capri) at 6-7.

114.    Defendants' own consumer research shows that consumers ████████████████

████████████████████████████. *E.g.*, PX1186 (Tapestry) at 15; PX1216 (Tapestry) at 004 █████████████████████████████████████████████████ ██████████████████████████; PX2117 (Capri) at 19, 23-24, 26-27; PX2214 (Capri) at 22, 27, 29, 33; PX1265 (Tapestry) at 22, 34-35.

115.    As discussed below, these brands compete vigorously on many dimensions, from pricing to design to marketing to shopping experience to retail labor to sustainability.

A.  *Pricing and Discounts.*

116.    Examples abound in Defendants' documents of analyses monitoring each other's prices for "accessible luxury" handbags. *E.g.*, PX1224 (Tapestry) at 5, 11; PX1250 (Tapestry) at 17; PX5035 (Fraser (Tapestry) Dep.) at 253:15-261:7; PX2108 (Capri) at 2-12.

117.    Coach routinely tracks, and compares its handbag prices with those for Michael Kors handbags. PX1783 (Tapestry) at 51 ██████████████████████; PX1536 (Tapestry) at 15██████████████████; *see also* PX1124 (Tapestry) at 8; PX1137 (Tapestry) at 1-2; PX1547 (Tapestry) at 1-2; PX8028 (Tapestry) at 1-2 ███████████████████████.

118.    For instance, when considering price increases in fiscal year 2023, Coach wrote that it would ██████████████████████████████████████████████████ ███████████████████████████████████ PX1546 (Tapestry) at 42; PX5008 (Levine (Tapestry) Dep.) at 50:8-53:10; *accord, e.g.*, PX1199 (Tapestry) at 18 ███████████████████████████████████████; PX1296 (Tapestry) at 8-9, 26, 33-39 ████████████████████████████████████████; PX1547 (Tapestry) at 2 ███████████████████████████████████ ██████████████████████████████████████████████████ █████████████████████████████████████████████ ██████████████████████████████████.

119.    Kate Spade also monitors, and prepares analyses concerning the prices for

Michael Kors handbags. *E.g.*, PX1223 (Tapestry) at 7 ██████████████████████

████████████████████; PX1495 (Tapestry) at 1; PX1404 (Tapestry) at 28-29, 45; PX1256

(Tapestry) at 5-6; PX1929 (Tapestry) at 1; PX8036 (Tapestry) at 18; PX5035 (Fraser (Tapestry)

Dep.) at 95:20-96:16, 98:7-99:10, 100:19-106:2, 112:18-116:24, 180:16-185:16, 231:1-239:10.

120.    Indeed, ████████████████████████████████████████████

████████████████████████████████████ PX1740 (Tapestry) at 42 ████████████

████████████████████████████████████████████████████████

████████████; PX5035 (Fraser (Tapestry) Dep.) at 129:21-132:7.

121.    For its part, Michael Kors has used ████████████████████████████

████████████████████████ *E.g.*, PX2727 (Capri) at 3. Testifying as the corporate

representative, Capri CEO John Idol admitted ████████████████████████████████

████████████████████ PX5000 (Idol (Capri) Corp. IH) 108:8-12 ████████████████

████████████████████████████████████████████████

████████████████████████████████████████

122.    And Mr. Idol has instructed Michael Kors executives to align Michael Kors

pricing with Coach. PX5000 (Idol (Capri) Corp. IH) 108:8-12; PX2047 (Capri) at 1-2; PX5033

(Newman (Capri) Dep.) at 144:14-145:15 (discussing PX2047).

123.    On another occasion, in response to a Coach marketing email that conveyed "very

sharp price points," Mr. Idol told Michael Kors executives to "develop a strategy to compete

with this. I don't love it but we have no choice." PX2075 (Capri) at 1-2.

124.    Price competition between Coach, Kate Spade, and Michael Kors occurs beyond

list prices, however, as Defendants closely monitor, and often match, each other's discounts and

promotions, including for Mother's Day and members of the military. *E.g.*, PX2101 (Capri) at 1;

PX2105 (Capri) at 1; PX1133 (Tapestry) at 2; PX1507 (Tapestry) at 1; PX1923 (Tapestry) at 1

██████████████████████████████████████████████; PX5035 (Fraser (Tapestry)

Dep.) at 122:7-125:11; PX1549 (Tapestry) at 1.

125.    For example, after ███████████████████████████

██████████████████████████████████████████████████

███████████████████████████ PX2105 (Capri) at 1.

126.    Competition with discounts is so fierce that investors complained about the fierce

discounting between these three brands. PX1074 (Tapestry) at 6 ████████████████

████████████████████████████████████████████████

██████████████████████████████

127.    And Michael Kors brand CEO Cedric Wilmotte wanted to show Capri's Board

███████████████████████████████████████ so it could ████

███████████████ PX2097 (Capri) at 1; *see also* PX2128 (Capri) at 8, 010 ██████

██████████████████████████████████████████████.

128.    Economic analysis confirmed that the Proposed Acquisition likely will cause

higher retail prices for Coach, Kate Spade, and Michael Kors handbags, potentially resulting in

████████████ in consumer harm annually. *See* PX6000 (Smith (FTC) Rep.) at ¶ 266.

**B.    *Design.***

129.    Coach, Michael Kors, and Kate Spade also compete regarding the designs of their

handbags, materials, and elements. *E.g.*, PX1338 (Tapestry) at 15; PX1924 (Tapestry) at 11-13;

PX5035 (Fraser (Tapestry) Dep. at 146:12-163:12.

130.    Indeed, Michael Kors executives have observed the ████████████████

████████████████████████████████████████████████

███████ PX2310 (Capri) at 3 ██████████████████████████████████

█████ ; PX2310 (Capri) at 2-3; PX5033 (Newman (Capri) Dep.) at 228:25-230:19.

131.    Similarly, Michael Kors monitors and compares Coach's product designs. *E.g.*, PX2108 (Capri) at 003-013.

132.    Capri CEO John Idol often takes inspiration from Coach designs, reviewing Coach e-mail blasts for ideas and advising his team to follow suit. *E.g.*, PX2419 (Capri) at 1; PX2401 (Capri) at 1; PX2416 (Capri) at 1; PX6000 (Smith (FTC) Rep.) at ¶ 207, n.385.

133.    For example, ████████████████████████████████
████████████████████████████████████████████████████
PX2242 (Capri) at 1 ████████████████████████████████████████
██████████████████████████████ ; PX2243 (Capri) at 1 ████████████████
████████████████████████████████████ .

134.    Later that same summer, ██████████████████████████
████████████████████████████████████████████████████
██████████████ PX2419 (Capri) at 1; PX5021 (Idol (Capri) Dep.) at 189:23-190:16.

135.    The very next day, that ██████████████████████████████
████████████████████████████████████████████████████
█ PX2346 (Capri) at 2; PX5033 (Newman (Capri) Dep.) at 105:1-15.

136.    Michael Kors ██████████████████████████████████ PX5033 (Newman (Capri) Dep.) at 112:3-113:22, 117:24-120:4; *see also* PX2350 (Capri) at 1-2 ████
████████████████████████████████████████████████████
██████████████████████████████████████████

137.    Mr. Idol has also instructed ██████████████████████████████



PX2294 (Capri) at 001

; PX2183 (Capri) at 1, 4-11

; PX5033 (Newman (Capri) Dep.) at 56:21-58:1, 73:13-75:5; 75:17-76:2.

138.    Within Tapestry, Coach and Kate Spade sometimes mimic each other's designs, leading to

PX1271 (Tapestry) at 1; PX5035 (Fraser) Tapestry Dep.) at 62:15-68:12.[1]

### C. *Marketing.*

139.    The three brands also pay close each attention to each other's marketing. For example, in May 2023, Capri CEO John Idol wrote to Michael Kors executives: "Coach's creativity on these emails (outlet in particular) is killing us . . . our [Michael Kors] backgrounds look cheap and uninspiring . . . They are just bland product photos with no inspiration. Help!!! Fast!!!" PX2098 (Capri) at 1.

### D. *Brick-and-Mortar Stores.*

140.    Although each rely on digital sales, the parties recognize the value of a strong

---

[1] This is just one example of how Tapestry's brands are not siloed, nor run independently, today. Indeed, just two months before this lawsuit was filed, Tapestry's CEO wrote a letter to the Tapestry Board

PX1726 (Tapestry) at 24-25.

brick-and-mortar presence. PX5019 (Crevoiserat (Tapestry) Dep.) at 10:1-8, 14:9-20; PX1710

(Tapestry) at 1; PX7029 (Q1 2023 Tapestry Earnings Call) at 2; PX1862 (Tapestry) at 1;

PX5006 (Kahn (Tapestry) Dep. at 29:15-21 ███████████████████████████████

██████; PX1862 (Tapestry) at 1; PX2132 (Capri) at 22.

141.    As such, Coach, Kate Spade, and Michael Kors monitor each other's retail stores.

*E.g.*, PX1219 (Tapestry) at 3-36; PX2105 (Capri) at 1; *see also* PX2338 (Capri) at 1.

142.    For example, when Michael Kors ████████, Tapestry's CEO asked: ██████

████████████████████████████████████████████████████████

████████████████████████████ PX1703 (Tapestry) at 2. In response,

Tapestry's Interim Chief Financial Officer ████████████████████████████████

████████████████████████████████████████████████████

██████ PX1813 (Tapestry) at 1; *see generally* PX1219 (Tapestry).

143.    Coach, Kate Spade, and Michael Kors also monitor each other's stores to take

cues regarding store layouts, product display and assortments, and in-store marketing campaigns.

*E.g.*, PX1118 (Tapestry) at 2-7; PX1127 (Tapestry) at 2; PX1547 (Tapestry) at 2; PX8028

(Tapestry) at 1-2; PX8025 (Tapestry) at 1); PX2105 (Capri) at 1; *see also* PX2338 (Capri) at 1.

**E. *Labor.***

144.    Both Tapestry and Capri have recognized their retail employees as providing a

"competitive advantage" in the sale of handbags. *E.g.*, PX5019 (Crevoiserat (Tapestry) Dep.) at

26:55-26:7, 35:6-35:12, 37:8-19; PX1706 (Tapestry) at 9 ██████████████████████████

████████████████████████████████████████████; PX1418 (Tapestry) at

1; PX1635 (Tapestry) at 3; PX2304 (Capri) at 2; PX5022 (Wilmotte (Capri) Dep.) at 21:5-23:5

████████████████████████████████████████████████████████

██████████████████████████

145.    In July 2021, Tapestry increased the minimum wage for these employees to $15 per hour. PX7250 (Press Release, Tapestry, *Tapestry Takes Action to Drive Positive Change for People Planet and Community* (July 28, 2021)) at 1; PX5019 (Crevoiserat (Tapestry) Dep.) at 41:4-6 ██████████████████████████████████████████████████; *see also* PX1411 (Tapestry) at 1.

146.    Michael Kors immediately took notice, with CEO John Idol instructing his subordinates to analyze increasing the minimum wage for Michael Kors employees to match. PX2113 (Capri) at 1. Less than two months later, Michael Kors announced that it would increase its minimum wage to $15 per hour. PX5021 (Idol (Capri) Dep.) at 211:20-23; Dkt. 92 at ¶ 9.

### F. *Sustainability*

147.    And Coach, Michael Kors, and Kate Spade compete on sustainability efforts.

148.    For example, when Coach launched Coach "(Re)Loved," its handbag recycling program, Michael Kors soon responded with "Pre-Loved" for customers to consign their used handbags. *See* PX5027 (Harris (Tapestry) Dep.) at 298:18-299:25; Dkt. No. 92 at ¶ 60.

149.    Tapestry took note of its copycat, with Tapestry SVP of Global Strategy & Consumer Insights Liz Harris calling Michael Kors "ankle biters" in two separate emails, saying that "Kors is coming for Coach Reloved!" PX1278 (Tapestry) at 1; PX1970 (Tapestry) at 1; *see also* PX1448 (Tapestry) at 1. Another employee observed: "they do know how to, rinse-repeat and repackage ." PX1278 (Tapestry) at 1.

150.    And in June 2021, 

PX2079 (Capri) at 20; PX2255 (Capri) at 001; PX6000 (Smith (FTC) Rep.) at ¶ 212, nn.395-96.

## IX.    TAPESTRY ANNOUNCES THE PROPOSED ACQUISITION IN AUGUST 2023.

151.    Tapestry announced its proposed acquisition of Capri on August 10, 2023, after
which the FTC began an investigation that ultimately culminated in a bipartisan 5-0 vote to
initiate administrative proceedings to determine the legality of the Proposed Acquisition.

### A.  *Tapestry Asserts that It Will "Revitalize" the Michael Kors Brand.*[2]

152.    Defendants asserted that one potential benefit of the proposed transaction is the
"revitalization" of Michael Kors. Dkt. No. 91 at ¶ 10; Dkt, No. 159 at 12.

153.    But Michael Kors remains a "very strong" brand that was profitable in both 2022
and 2023. PX7096 (2022 Capri 10-K) at 055; PX7098 (2023 Capri 10-K) at 055; PX5021 (Idol
(Capri) Dep.) at 233:20-23 ███████████████████████████████████████████
███████████████████████████████████████

154.    Michael Kors has also implemented ████████████████████████████
█████████████████████████ PX5021 (Idol (Capri) Dep.) at 102:22-104:13; PX5011
(Kors (Capri) Dep.) at 134:22-135:3, 179:15-21.

155.    This ██████████████████████████████████████████████████
██████████████████████████ (PX5022 (Wilmotte (Capri) Dep.) at 87:24-88:22,
90:23-91:10), and ██████████████████████████████████████
██████████████████████ *Id.* at 161:15-162:25.

156.    Moreover, it is speculative at best that, to the extent that Michael Kors is in need
of any revitalization, ████████████████████████████████████████████
█████████████████████████████████████████████ PX5035 (Fraser

---

[2] Defendants have conceded that this merger is not about efficiencies. Dkt. No. 159 at 37
(Defendants' position is "not that the Court should clear the transaction on the basis of an
efficiencies defense").

(Tapestry) Dep.) at 37:5-11; PX5003 (Kahn (Tapestry) Corp. IH) at 148:6-19.

**X.    THERE ARE BARRIERS TO SCALE "ACCESSIBLE LUXURY" HANDBAGS.**

**A.  *Building a Brand Takes Time.***

157.    Coach, Kate Spade, and Michael Kors are household names in the United States, scoring as some of the most recognized brands in the fashion industry. PX1265 (Tapestry) at 021 (cited by PX6000 (Smith Report) at ¶ 93); PX2117 (Capri) at 019-020.

158.    These types of brands do not appear overnight, and more importantly, are not easily scaled. PX5000 (Idol (Capri) Corp. IH) at 190:11-191:3.



159.    Brands like ▮▮▮▮▮ and ▮▮▮▮▮ talk about the years, and costs, it took to build up their brands. PX5058 (▮▮▮▮▮ Dep.) at 18:20-20:4; 22:9-19; PX5032 (▮▮▮▮▮ Dep.) at 20:4-22:4; 32:12-15.

160.    ▮▮▮▮▮ an "accessible luxury" handbag brand, ▮▮▮▮▮ ▮▮▮▮▮ PX5058 (▮▮▮▮▮ Dep.) at 13:9-17; 30:16-31:-16; 57:1-20, 58:14-19; PX4000 (▮▮▮▮▮ Decl.) ¶¶ 5-8. And, ▮▮▮▮▮ ▮▮▮▮▮ PX4000 (▮▮▮▮▮ Decl.) ¶¶ 5-8; PX5058 (▮▮▮▮▮ Dep.) at 62:21-66:5; 111:3-112:22.

161.    ▮▮▮▮▮ ▮▮▮▮▮ PX5058 (▮▮▮▮▮ Dep.) at 37:17-38:20. It ▮▮▮▮▮ *Id.* at 72:4-73:5.

162.    ▮▮▮▮▮ ▮▮▮▮▮ PX5032 (▮▮▮▮▮ Dep.) at 20:25-21:24, 32:9-15.

**B. *Brick-and-Mortar Is a Barrier to Scale.***

163.    Despite the rise of e-commerce, most handbags today ███████████████████,
making it important to have a brick-and-mortar presence. PX1121 (Tapestry) at 48; PX5046
(████████████████ Dep.) at 27:20-28:12 (███████████████████████████████
███████████████████); PX1862 (Tapestry) at 1; PX5058 (██████████████ Dep.) at 52:17-
53:21 █████████████████████████████████.

164.    Indeed, Tapestry has found that consumers who shop its products in multiple sales
channels (*i.e.*, digital and brick-and-mortar) spend over two times more than those who shop in
just one. PX7029 (Q1 2023 Tapestry Earnings Call) at 3; PX5019 (Crevoiserat (Tapestry) Dep.)
at 23:22-27:12. It has also observed that ███████████████████████████████
████████████████████████████████ and that ████████████████████████████
███████████████████████████████████████████████████████████████
██████ PX1316 (Tapestry) at 6-7; *accord* PX5027 (Harris (Tapestry) Dep.) at 281:2-13
██████████████████████████████████████████████████
███████████████████████████████████.

165.    But brick-and-mortar presence is challenging and costly. PX1109 (Tapestry) at
15-16; PX1727 (Tapestry) at 74 ████████████████; PX5058 (███████████████ Dep.) at 52:17-
53:21; PX4000 (██████████████ Decl.) at ¶ 8 ████████████████████████████. This is
especially true when it comes to maintaining the hundreds of stores that Coach, Kate Spade, and
Michael Kors each have throughout the country. PX6000 (Smith (FTC) Rep.) ¶¶ 18, 20, 26.

### C. Marketing and Advertising Is a Barrier to Scale.

166.    Defendants invest millions of dollars across numerous promotional channels. *E.g.*,
PX1727 (Tapestry) at 94 ██████████████████, 118 ████████████████████████; PX2725
(Capri) at 2; PX5035 (Fraser (Tapestry) Dep.) at 13:8-20, 15:6-21, 174:8-17 ████████████████
██████████████████████████████████████████████████████.

167.    On the whole, Tapestry commits ███████████████ to marketing. PX1485 (Tapestry) at 009; PX5027 (Harris (Tapestry) Dep.) at 152:5-154:3.

168.    For its part, Michael Kors' expected spend on marketing in the United States for both fiscal years ████████████████████. PX2725 (Capri) at 2 █████████████ ████████████████████████████; *see also* PX2561 (Capri) at 16 ██████ ███████████████████████████.

169.    These figures far eclipse the annual marketing spend of smaller brands. PX5032 (████████████ Dep.) at 136:18-22 █████████████████; PX5029 (██████ ████████ Dep.) at 95:12-13; 96:2-96:4 █████████████████; PX5050 (██████ ████████ Dep. at 87:21-24 █████████████████.

### D. Data Is a Barrier to Scale.

170.    Tapestry has ████████████████████████████████ ██████████████████████████████████████ resulting in a ██████ █████████████████████████████████ PX5002 (Crevoiserat (Tapestry) Corp. IH.) at 59:18-60:1; PX5003 (Kahn (Tapestry) Corp. IH) at 183:8-184:1; PX7336 (Q3 2024 Tapestry Earnings Call) at 2. Similarly, Capri has a database of information on ██████████ █████████████████████████████████ PX5000 (Idol (Capri) Corp. IH) at 134:24-137:18.

171.    Tapestry's CEO Joanne Crevoiserat has described the █████████████ ████████████████████████████████████████████████ █████████████████ PX5002 (Crevoiserat (Tapestry) Corp. IH.) at 63:5-24; PX5035 (Fraser (Tapestry) Dep.) at 149:11-151:5. As she explained during an investor call regarding the Proposed Acquisition, Tapestry's data platform "positions us to leverage our competitive advantages across a broader portfolio of brands." PX7055 at 2, 8; *see also, e.g.*,

PX5019 (Crevoiserat (Tapestry) Dep.) at 33:21-34:18 ███████████

████████████████████████████████████████████████████. Capri's

database also includes information ████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████ PX5000 (Idol (Capri) Corp. IH) at 137:1-138:10, 36:12-18.

## THE FEDERAL TRADE COMMISSION'S PROPOSED CONCLUSIONS OF LAW

1.      Section 13(b) of the FTC Act enables the FTC "to obtain a preliminary injunction
'upon a proper showing that, weighing the equities and considering the Commission's likelihood
of ultimate success, such action would be in the public interest.'" *FTC v. Crescent Publ'g Grp.,
Inc.*, 129 F. Supp. 2d 311, 319 (S.D.N.Y. 2001) (quoting 15 U.S.C. § 53(b)).

2.      When Section 13(b) was adopted, Congress made plain its intent "to maintain the
statutory or 'public interest' standard . . . The Conferees did not intend, nor do they consider it
appropriate, to burden the Commission with the requirements imposed by the traditional equity
standard . . . ." H.R. Rep. No. 93-624 (1973) (Conf. Rep.), *as reprinted in* 1973 U.S.C.C.A.N.
2523, 2533; *FTC v. Lancaster Colony Corp.*, 434 F. Supp. 1088, 1090 (S.D.N.Y. 1977).

3.      At this preliminary stage, courts "follow a two-step inquiry that asks (1) whether
the FTC has shown a likelihood of ultimate success on the merits in the administrative
proceeding, and (2) whether the equities weigh in favor of an injunction." *FTC v. IQVIA
Holdings, Inc.*, No. 23 Civ. 06188 (ER), 2024 WL 81232, at *7 (S.D.N.Y. Jan. 8, 2024).[3]

4.      The district court "must exercise its independent judgment to determine" if the
FTC has cleared that hurdle, but it "may not require the FTC to prove the merits of its case or to

---

[3] A "likelihood of ultimate of success on the merits" means at the administrative proceeding—
not a federal court of appeals. *FTC v. IQVIA Holdings, Inc.*, No. 23 Civ. 06188 (ER), 2023 WL
7152577, at *3-6 (S.D.N.Y. Oct. 31, 2023); *FTC v. Meta Platforms, Inc.*, No. 22 Civ. 04325
(EJD), 2022 WL 16637996, at *4-6 (N.D. Cal. Nov. 2, 2022).

establish a violation of the Clayton Act. That inquiry is reserved for the administrative proceeding." *Id.* at *9; *Lancaster*, 434 F. Supp. at 1091 ("Congress intended that on applications under Section 13(b), the district court be guided by preliminary and tentative findings of fact without attempting to resolve the underlying antitrust issues of fact.").

5.    The FTC satisfies this burden if it "raise[s] serious questions about the antitrust merits that warrant thorough investigation in the first instance by the FTC." *IQVIA*, 2024 WL 81232, at *9; *accord FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1035 (D.C. Cir. 2008); *FTC v. Warner Commc'ns, Inc.*, 742 F.2d 1156, 1162 (9th Cir. 1984); *FTC v. Univ. Health, Inc.*, 938 F.2d 1206, 1218 (11th Cir. 1991).

6.    Because "the scope of the Section 13(b) inquiry is necessarily limited and narrow," *IQVIA*, 2024 WL 81232, at *9 (quoting *Meta Platforms*, 2022 WL 16637996, at *5), the Court does not "resolve the conflicts in the evidence, compare concentration ratios and effects on competition in other cases, or undertake an extensive analysis of the antitrust issues." *FTC v. Warner Commc'ns, Inc.*, 742 F.2d 1156, 1164 (9th Cir. 1984) (citing *Lancaster*, 434 F. Supp. at 1094, 1096); *see also IQVIA*, 2024 WL 81232, at *9.

7.    Preliminary injunctions under Section 13(b) "are meant to be readily available to preserve the status quo." *Whole Foods*, 548 F.3d at 1036.

8.    In enacting Section 7 of the Clayton Act, 15 U.S.C. § 18, Congress meant to "arrest[] mergers at a time when the trend to a lessening of competition in a line of commerce was still in its incipiency." *F. & M. Schaefer Corp. v. C. Schmidt & Sons, Inc.*, 597 F.2d 814, 816 (2d Cir. 1979) (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 317 (1962)).

9.    This incipiency standard entails that "wherever possible, without doing violence to the legislative objectives underlying the antitrust laws, we should 'lighten the burden of

proof,' 'simplify the test of illegality' and 'dispense with elaborate proof of market structure, market behavior or probable anticompetitive effects.'" *Lancaster*, 434 F. Supp. at 1094 (citing, *inter alia*, *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 362-63 (1963)).

10.     Thus, even as to the ultimate merits "any 'doubts are to be resolved against the transaction.'" *FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 337 (3rd Cir. 2016) (quoting *FTC v. Elders Grain, Inc.*, 868 F.2d 901, 906 (7th Cir. 1989) (Posner, J.)).

11.     At the administrative merits proceeding, which will begin on September 25, 2024, the ultimate question is whether the effect of the acquisition "may be substantially to lessen competition, or to tend to create a monopoly, in any line of commerce in any section of the country" in violation of Section 7 of the Clayton Act. *IQVIA*, 2024 WL 81232, at *9 (quoting 15 U.S.C. § 18) (internal quotation marks omitted). An acquisition that violates Section 7, by definition, is a violation of Section 5 of the FTC Act. *See, e.g.*, *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 454 (1986); *Lancaster*, 434 F. Supp. at 1096.

12.     In that forthcoming proceeding, the administrative court will assess the Section 7 claims under a burden-shifting framework. *IQVIA*, 2024 WL 81232, at *10. The plaintiff must first establish its prima facie case or presumption of illegality, and then the burden shifts to defendants to produce evidence rebutting the prima facie case or countervailing procompetitive benefits. *Id.* at *10, 43. If Defendants fail to meet this burden, and the equities weigh in favor of the FTC, a preliminary injunction must issue. *Id.* at *45-46, 48-49, 53.

13.     The FTC has shown a likelihood of success on the merits of its Section 7 challenge in the administrative court, and the equities favor issuing a preliminary injunction. *First*, the Proposed Acquisition will consolidate three of the largest "accessible luxury" handbag brands in the United States—including the top two (Coach and Michael Kors) by far—leading to

undue concentration and a presumption of illegality. *See Phila. Nat'l Bank*, 374 U.S. at 363-64;

2023 U.S. Dep't of Justice and FTC Merger Guidelines § 2.1 (hereinafter, the "Merger

Guidelines"); *see infra* Conclusions of Law § I.A.[4]

14.     *Second*, independent of any market-concentration analysis, the Proposed

Acquisition will eliminate fierce competition between Coach, Kate Spade, and Michael Kors.

*See FuboTV Inc. v. Walt Disney Co*., No. 24-CV-01363 (MMG), 2024 WL 3842116, at *17, 29-

30 (S.D.N.Y. Aug. 16, 2024) (granting preliminary injunction based on competitive effects);

*accord* Merger Guidelines § 2.2 ("[A]n analysis of the existing competition between the merging

firms can demonstrate that a merger threatens competitive harm independent from an analysis of

market shares."); *see infra* Conclusions of Law § I.B.

15.     Moreover, the Proposed Acquisition also builds on Tapestry's decade-long pattern

and strategy of serial acquisitions. *See Credit Bureau Reports, Inc. v. Retail Credit Co.,* 358 F.

Supp. 780, 794 (S.D. Tex. 1971); Merger Guidelines § 2.8.

16.     The equities also "weigh in favor of injunctive relief 'to preserve the status quo

while the FTC develops its ultimate case.'" *IQVIA*, 2024 WL 81323, at *52 (quoting *Whole*

*Foods*, 548 F.3d at 1036 (opinion of Brown, J.)); *see infra* Conclusions of Law § II.

## I.    THE FTC IS LIKELY TO SUCCEED IN THE MERITS PROCEEDING.

### A.    *The Proposed Acquisition is Presumptively Illegal and Likely to Cause Anticompetitive Effects in the Accessible Luxury Handbag Market.*

17.     The FTC can meet its prima facie burden by showing that the Proposed

Acquisition is presumptively unlawful because it will lead to undue concentration in a relevant

market. *E.g.*, *IQVIA*, 2024 WL 81232, at *37 ("The high post-merger levels of market

---

[4] The Merger Guidelines outline the principal analytical techniques, practices, and enforcement policy to be applied with respect to mergers under the antitrust laws. The Merger Guidelines are persuasive authority in federal court. *E.g.*, *IQVIA*, 2024 WL 81232, at *25 n. 19.

concentration alone would be sufficient for the FTC to state a prima facie case.").

18.     Under Supreme Court precedent, "a merger which produces a firm controlling an undue percentage share of the relevant market, and results in a significant increase in the concentration of firms in that market is so inherently likely to lessen competition substantially that it must be enjoined in the absence of evidence clearly showing that the merger is not likely to have such anticompetitive effects." *Phila. Nat'l Bank*, 374 U.S. at 363 (citation omitted).

19.     Here, the Proposed Acquisition easily satisfies the thresholds for a presumption of illegality, leading to a combined market share of well over 50 percent in the sale of "accessible luxury" handbags in the United States.

### 1.  "Accessible Luxury" Handbags Are a Relevant Product Market.

20.     "The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe Co.*, 370 U.S. at 325.[5]

21.     In a Section 13(b) proceeding, however, it is "not necessary" for the FTC "to *prove* the existence of the [relevant product] market." *IQVIA*, 2024 WL 81232, at *24 (quoting *Whole Foods*, 548 F.3d at 1041 (opinion of Brown, J.)) (emphasis in original); *see also Whole Foods*, 548 F.3d at 1041 ("This is not to say *the FTC has in fact proved such a market, which is not necessary at this point*." (emphasis added)).  At the Section 13(b) stage, the FTC meets its burden if it simply "rais[es] some question of whether [the alleged market] is a well-defined market." *Whole Foods*, 548 F.3d at 1037.

22.     "In evaluating reasonable interchangeability, 'the mere fact that a firm may be termed a competitor in the overall marketplace does not necessarily require that it be included in

---

[5] Defendants concede the relevant geographic market is the United States. Dkt. No. 159 at 5 n.1.

the relevant product market for antitrust purposes.'" *IQVIA*, 2024 WL 81232, at *24 (quoting

*FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 26 (D.D.C. 2015)). And the inquiry does not look at all

products that are interchangeable for any purpose—only "reasonably interchangeable" products.

*E.g.*, *FTC v. Swedish Match*, 131 F. Supp. 2d 151, 158-59 (D.D.C. 2000).

23.    The Supreme Court has recognized that, within a broader market, "well-defined

submarkets may exist which, in themselves, constitute product markets for antitrust purposes."

*Brown Shoe*, 370 U.S. at 325 (citation omitted); *see also United States v. Aluminum Co. of Am.*,

377 U.S. 271, 275 (1964) (while aluminum and insulated copper conductors could be analyzed

as a "single product market," that "does not preclude their division for purposes of [Section 7]

into separate submarkets"). "[T]he viability of such additional markets does not render the one

identified by the government unusable." *IQVIA*, 2024 WL 81232, at *24 (quoting *United States*

*v. Bertelsmann SE & Co.*, 646 F. Supp. 3d 1, 28 (D.D.C. 2022).

24.    At any rate, arguments regarding the viability of such alternative markets are

beyond the scope of Section 13(b) preliminary injunction proceedings. *FuboTV*, 2024 WL

3842116, at *17 (granting preliminary injunction without "a comprehensive market analysis");

*cf. R.C. Bigelow, Inc. v. Unilever N.V.*, 867 F.2d 102, 110-11 (2d Cir. 1989) (market definition is

"a judgment to be made by the district court following a full trial on the merits").

25.    In assessing relevant product markets, the Supreme Court has identified multiple

"practical indicia," including "industry or public recognition of the [relevant market] as a

separate economic entity, the product's peculiar characteristics and uses, unique production

facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized

vendors." *Brown Shoe*, 370 U.S. at 325.

26.    The *Brown Shoe* indicia are "practical aids," not "talismanic" criteria "to be

rigidly applied." *Swedish Match*, 131 F. Supp. 2d at 159. Moreover, they must be "viewed in totality" and not in isolation. *FTC v. Surescripts, LLC*, 665 F. Supp. 3d 14, 43 (D.D.C. 2023); *accord IQVIA*, 2024 WL 81232, at *13 ("All the factors need not be satisfied for the Court to conclude that the FTC has identified a relevant market.") (citation omitted).

27.    In assessing the relevant market, courts "regularly consider ordinary course documents." *IQVIA*, 2024 WL 81232, at *20.

28.    In addition to qualitative evidence, the Government can also define a market using quantitative evidence of interchangeability derived from the hypothetical monopolist test ("HMT"). *E.g.*, *id.* at *25-31.

29.    There, however, is "no requirement to use any specific methodology in defining the relevant market." *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co., Ltd*., 20 F.4th 466, 482 (9th Cir. 2021). Congress prescribed "a pragmatic, factual approach" to market definition because the market "cannot be measured by metes and bounds." *United States v. Anthem Inc.*, 236 F. Supp. 3d 171, 193 (D.D.C. 2017) (cleaned up). As such, courts have determined relevant antitrust markets using, for example, only the *Brown Shoe* indicia. *E.g*., *Geneva Pharms. Tech. Corp. v. Barr Labs. Inc*., 386 F.3d 485, 496 (2d Cir. 2004) (relying on *Brown Shoe* factors, without reference to the HMT, in review of district court's determination of relevant market); *FTC v. Meta Platforms, Inc.*, 654 F. Supp. 3d 892, 919-20 (N.D. Cal. 2023) (basing "determination of the relevant product market on its *Brown Shoe* analysis . . . rather than the HMT . . . ."); *accord Regeneron Pharms., Inc. v. Novartis Pharma AG*, 96 F.4th 327, 340 (2d Cir. 2024) (discussing "legal frameworks such as the 'hypothetical monopolist' test *or* the *Brown Shoe* factors") (emphasis added); *see also* Merger Guidelines § 4.3.

30.    Moreover, a relevant market can exist even if certain customers "cross-shop" in

markets. *Whole Foods*, 548 F.3d at 1040-41 (cross-shopping "entirely consistent" with a group of core consumers); *IQVIA*, 2024 WL 81232, at *15-17 (rejecting broader market proposed by defendants and explaining that "the fact that an agency might shift money around during a campaign does not establish that these alternative channels are substitutes").

**a. The Brown Shoe Practical Indicia Demonstrate That "Accessible Luxury" Handbags Is a Relevant Product Market.**

31.    Analysis of the *Brown Shoe* practical indicia shows that "accessible luxury" handbags constitute a relevant product market.

32.    **Industry Recognition.** Industry participants, including Defendants, recognize "accessible luxury" as a distinct market. Over the last decade, and as recently as last year, Defendants have repeatedly referred to their Coach, Kate Spade, and Michael Kors brands as "accessible luxury" in statements to investors and in SEC filings. *See supra* Findings of Fact ¶¶ 70-75. Their ordinary-course documents are replete with references ▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ *E.g. id.* at ¶¶ 42-43. These analyses are prepared for the highest levels of each company, including their boards of directors. *E.g., id.* at ¶¶ 35, 72, 75. Defendants' repeated, and consistent, references to "accessible luxury" echo those of other "accessible luxury" brands, including ▆▆▆▆▆▆▆▆▆▆▆▆▆▆ and ▆▆▆ ▆▆▆, as well as suppliers, ▆▆▆▆▆▆▆▆▆▆▆▆. *See id.* at ¶¶ 30-34, 36.

33.    **Distinct Pricing.** Coach, Kate Spade, Michael Kors and other "accessible luxury" handbag brands generally focus their offerings on an opening price point of $100 and rarely approach or exceed $1,000. *See supra* Findings of Fact at ¶¶ 40-42; *Lancaster*, 434 F. Supp at 1093 ("Plainly, low or moderately-priced glassware, intended for everyday use, differs from fine glassware, such as lead crystal, sold at higher prices and marketed through different channels.").

34.    In statements to investors, Defendants have routinely acknowledged and touted

this "white space" or "delta" between the price points of "accessible luxury" and "true luxury" handbags. *See supra* Findings of Fact ¶¶ 43-44; *Geneva Pharms.*, 386 F.3d at 496-97; *Reynolds Metals Co. v. FTC*, 309 F.2d 223, 229 (D.C. Cir. 1962) ("Such a difference in price as appears on this record must effectively preclude comparison, and inclusion in the same market, of products as between which the difference exists . . . .").

35.    "Accessible luxury" handbags also have distinct pricing in that they are characterized by a high degree of, and frequent, discounting and promotions, particularly around major shopping holidays. *See supra* Findings of Fact ¶¶ 59-61, 124-125.

36.    **Peculiar Characteristics.**  "Accessible luxury" handbags boast high-quality materials (often leather) and elevated craftsmanship and construction. ███████████ ████████████████████████████  PX5058 (████████████ Dep.) at 13:21-15:8. Indeed, Tapestry has asserted that "high quality standards . . . are an integral part of our brands' identity." PX7105 (Tapestry 2023 Form 10-K) at 13. Michael Kors likewise hails its "distinctive designs, materials and craftsmanship."  PX7098 (2023 Capri 10-K) at 9.

37.    Common features of "accessible luxury" handbags include: craftsmanship by skilled artisans to bring together intricate designs; durability and solid construction; and use of quality materials. *See supra* Findings of Fact ¶¶ 48-52.

38.    **Unique Production Facilities.**  "Accessible luxury" handbags are typically made offshore in Asia by skilled artisans, which enables "accessible luxury" brands to produce quality handbags ████████ *Id.* ¶¶ 46-58. Industry consultants recognize the distinct nature of the supply chain for "accessible luxury" handbags. *See id.* ¶ 55.

39.    **Distinct Customers.** Consumer research conducted by and on behalf of Defendants shows the majority of customers for Coach and Michael Kors have under $75,000-

$80,000 in household income. *See id.* at ¶ 65. Kate Spade's income demographics are ███, as are those of the other brands in the "accessible luxury" space. *See id.* at ¶ 66.

### b.  "True Luxury" and Mass Market Handbags Are Not Reasonably Interchangeable with "Accessible Luxury" Handbags.

40.     Other types of handbags do not share the same *Brown Shoe* practical indicia and are not reasonably interchangeable with "accessible luxury" handbags. They are thus not part of the relevant product market. *See IQVIA*, 2024 WL 81232, at *13-14.

41.     **<u>"True Luxury."</u>**  With handbags that retail at multiples of Defendants' offerings, "true luxury" handbags are not reasonable substitutes for "accessible luxury" handbags. *See supra* Findings of Fact ¶¶ 87-89. In the words of Kate Spade's CEO and Brand President: "Bottom line, saying we're in the same market with true luxury is a joke. . . . Nobody says 'should I buy a LV [Louis Vuitton] bag or a Coach bag?'" PX1427 (Tapestry) at 1.

42.     Beyond price, other characteristics distinguish "true luxury" handbags from "accessible luxury" handbags, including no discounting; more exclusive shopping experience with limited sales channels and few, if any, outlet stores; the imprimatur of the finest craftsmanship and materials; and manufacturing in Europe. *See supra* Findings of Fact ¶¶ 91-96.

43.     **<u>Mass-market.</u>**  Mass-market (or fast-fashion) handbags are similarly not reasonably interchangeable with "accessible luxury" handbags. *See id.* ¶¶ 97-102. Indeed, in filings with China's antitrust regulatory authority, Defendants admitted that even higher-end mass-market handbags were not substitutes for Defendants' offerings. *See id.* ¶¶ 103-104.

### c.  Economic Analysis Confirms "Accessible Luxury" Handbags in the United States Is a Relevant Market.

44.     The FTC has also shown a likelihood of establishing a relevant product market of "accessible luxury" handbags by use of the HMT. *E.g.*, *IQVIA*, 2024 WL 81232, at *25-31. This

test asks whether a hypothetical monopolist of products within a candidate market could profitability impose a small but significant and non-transitory increase in price or other worsening of terms on at least one product in the set. *Id.* at *25. If the monopolist could do so, "then a relevant product market exists for antitrust purposes." *Id.*

45.    To conduct the HMT, the FTC's expert Dr. Loren Smith first identified a candidate market comprised of brands identified as "accessible luxury" in Tapestry's market sizing models. PX6000 (Smith (FTC) Rep.) at ¶ 50 & § III.B.1.b.

46.    Dr. Smith then conducted an aggregate diversion analysis, a common tool in market definition. *See Sysco*, 113 F. Supp. 3d at 34-35 (describing aggregate diversion analysis). As Dr. Smith explained, "If the aggregate diversion is above a given threshold defined by a hypothetical price increase and the price-cost margins, then the candidate market is determined to be sufficiently broad to constitute a relevant market." PX6000 (Smith (FTC) Rep.) at ¶ 102. Dr. Smith found that estimated aggregate diversion ratios from Coach, Kate Spade, and Michael Kors exceed the threshold aggregate diversion ratio "by a substantial amount, indicating that the broad candidate set of accessible luxury brands constitutes a relevant market." *Id.* at ¶ 105.

47.    In fact, Dr. Smith's use ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ by Tapestry was conservative because an alternative analysis conducted by Dr. Smith shows that a hypothetical monopolist who controlled only the Coach, Kate Spade, and Michael Kors brands would find it profitable to increase the price of Michael Kors handbags by ▇▇▇▇▇▇▇▇▇ PX6000 (Smith (FTC) Rep.) at ¶¶ 101, 256-257 & § V.B.2.b.

48.    This finding is consistent with Defendants' ordinary-course documents that show they are closest competitors. *See supra* Findings of Fact § VIII; *see also IQVIA*, 2024 WL 81232, at *30 (collecting cases holding that expert opinions "support a proposed market definition

where they are broadly consistent with the rest of the evidence in the record").

49.     Accordingly, both the *Brown Shoe* practical indicia and the HMT support that an accessible luxury handbag market is a relevant antitrust product market.

### 2. The Proposed Acquisition Creates a Presumptively Illegal Increase in Concentration in the "Accessible Luxury" Handbag Product Market.

50.     To assess market concentration, courts either (1) assess whether a merger results in the combined firm exceeding a 30% share of the market or (2) often employ a statistical measure known as the Herfindahl-Hirschman Index (HHI) to assess market concentration. *See, e.g.*, *IQVIA*, 2024 WL 81232, at *32-34; *see also* Merger Guidelines § 2.1.

51.     "The HHI is calculated by summing the squares of the individual firms' market shares." *IQVIA*, 2024 WL 81232, at *34 (quoting *Penn State Hershey*, 838 F.3d at 346). Under the 2023 Merger Guidelines, "Markets with an HHI greater than 1,800 are highly concentrated, and a change of more than 100 points is a significant increase" that satisfies the structural presumption for illegality. Merger Guidelines § 2.1.

52.     Here, the Proposed Acquisition would result in a market share of over ▮▮ . *See, e.g. IQVIA*, 2024 WL 81232, at *32-34 (reaffirming validity of "30% threshold" above which a transaction is presumably illegal); PX6000 (Smith (FTC) Rep.) at ¶ 186, tbl. 7.

53.     The Proposed Acquisition would also cause the HHI in the "accessible luxury" handbags market to increase by over ▮▮ points to an overall total exceeding ▮▮—far surpassing the HHI thresholds for illegality under the Merger Guidelines and existing caselaw. PX6001 (Smith (FTC) Rep.) at ¶ 62, tbl. 1; PX6000 (Smith (FTC) Rep.) at ¶ 186, tbl. 7; *see, e.g.*, *IQVIA*, 2024 WL 81232, at *34 (post-merger HHI of 3,635 and increase of 997).

54.     Thus, the Proposed Acquisition leads to a highly concentrated market and a presumption of illegality. *IQVIA*, 2024 WL 81232, at *33.

**B.** **The Acquisition Is Unlawful Regardless of Market Concentration Because It Will Eliminate Substantial Head-To-Head Competition.**

55.     Independent of any market concentration analysis, the FTC can meet its prima facie burden by demonstrating that the Proposed Acquisition will eliminate head-to-head competition between close competitors. *FuboTV*, 2024 WL 3842116, at *17, *29 (granting preliminary injunction based on competitive effects, not market concentration); *IQVIA*, 2024 WL 81232, at *40 ("It is sufficient to show, as the FTC has, that Defendants vigorously compete head-to-head and that this competition would be eliminated by the proposed transaction."); *Sysco*, 113 F. Supp. 3d at 61; *United States v. Mfrs. Hanover Tr. Co.*, 240 F. Supp. 867, 950 (S.D.N.Y. 1965) (eliminating significant competition may by "'itself constitute[] a violation of § 1 of the Sherman Act,' and, a fortiori, of the Clayton Act"); Merger Guidelines § 2.2.

56.     What's more, the Court need not find a likelihood of success with respect to establishing *the market used to calculate market shares* to conclude that the FTC has met its burden for *a relevant market* in which head-to-head competition will be eliminated. *Mfrs. Hanover Tr. Co.*, 240 F. Supp. at 923, 955 (enjoining merger based on elimination of competition even though court rejected Government's proposed market); *see also FuboTV*, 2024 WL 3842116, at *24 (plaintiff likely to succeed on merits when "at least one of the . . . aspects of the JV will tend to produce anticompetitive effects *in a relevant market*.") (emphasis added).

57.     When conducting analysis of head-to-head competition, "[c]ourts frequently rely on ordinary course documents and witness testimony illustrating that two merging parties view each other as strong competitors." *IQVIA*, 2024 WL 81232, at *37. In addition, direct evidence of substantial head-to-head competition is itself evidence "that a relevant market exists in which the merger may substantially lessen competition and can be sufficient to identify the line of commerce and section of the country affected by a merger, even if the metes and bounds of the

market are only broadly characterized." Merger Guidelines § 4.3.

58.    There is no serious dispute that Coach, Michael Kors, and Kate Spade compete directly in a relevant market. *See IQVIA*, 2024 WL 81232, at \*20 n.17 ("substantial evidence" showing Defendants as "key competitors" provided "additional support for the market proposed by the FTC"); *FTC v. Staples, Inc.*, 190 F. Supp. 3d 100, 124 (D.D.C. 2016). Defendants have acknowledged to foreign regulators and the highest levels of their companies that these brands compete in one or more relevant markets. *See supra* Findings of Fact ¶¶ 27-29, 103-104.

59.    Coach, Kate Spade, and Michael Kors compete closely, and fiercely, in the sale of handbags—on many dimensions, from pricing to design to marketing to shopping experience to retail labor to sustainability—all of which benefit consumers but will be lost if the Proposed Acquisition proceeds. *See id.* § VIII. The FTC meets its prima facie case on this independent ground by showing that the Proposed Acquisition will squelch this longstanding, fierce head-to-head competition.

## C.  *Defendants Cannot Rebut the FTC's Case.*

60.    The recognized methods of rebutting a prima facie case are unavailable here.[6]

### 1.  Entry and Expansion Will Not Be Timely, Likely, or Sufficient to Counteract the Proposed Acquisition's Anticompetitive Effects.

61.    To meet their burden, Defendants must demonstrate that any entry by new firms, or expansion by existing firms, will be "timely, likely, and sufficient in its magnitude, character, and scope to deter or counteract the competitive effects of concern" of the Proposed Acquisition. *IQVIA*, 2024 WL 81232, at \*46; Merger Guidelines § 3.2. Put differently, entry or expansion

---

[6] Any argument that market shares are not indicative of antitrust issues because post-merger Defendants do not plan to eliminate competition among Coach, Kate Spade and Michael Kors is contrary to the law. *Copperweld Corp. v. Ind. Tube Corp.*, 467 U.S. 752, 771-72 (1984). It is also contrary to the evidence. *See supra* Findings of Fact ¶¶ 23-24.

must "fill the competitive void" resulting from the merger. *United States v. H&R Block, Inc.*, 833 F. Supp. 2d 36, 73 (D.D.C. 2011).

62.     Defendants cannot make that showing here: Coach, Kate Spade, and Michael Kors are household names in the United States, scoring as some of the most recognized brands in the fashion industry. These types of brands do not appear overnight, and more importantly, are not easily scaled. *Chicago Bridge & Iron Co. v. FTC*, 534 F.3d 410, 431-32 (5th Cir. 2008) (entry has to be "of a sufficient scale to compete on the same playing field") (cleaned up); *see supra* Findings of Fact ¶¶ 158-163.

63.     Moreover, despite the rise of e-commerce, ███████████████████ ████████████████████, making it important to ████████████████. *Id.* at ¶¶ 164-165. Brick-and-mortar presence, however, is challenging and costly. *Id.* at ¶ 166.

64.     Marketing and advertising are also costly, but necessary, to obtain the scale of Coach, Kate Spade, and Michael Kors. *Id.* at ¶¶ 167-170. And Defendants' treasure trove of consumer data is also presents a barrier to entry and scale. *Id.* at ¶¶ 171-172.

65.     The fact that there may be hundreds of other competitors does not alter the analysis. *See Sysco*, 113 F. Supp. 3d at 29 (rejecting argument that smaller or more specialized competitors can substitute for larger ones, when those competitors "cannot and do not serve as wide an array of customers" as the merging parties do); *see also United States v. Von's Grocery Co.*, 384 U.S. 270, 272-73 (1966) (thousands of independent grocery stores did not undermine concerns about merger that would create the second largest chain in Los Angeles).

### 2.  Any Benefits Are Not Merger-Specific, Cognizable, or Verifiable.

66.     Defendants do not contend that the merger would lead to any efficiencies in the traditional antitrust sense. Dkt. No. 159 at 37-38.

67.     Instead, they claim that the Proposed Acquisition "will result in procompetitive

efficiencies" by revitalizing "the declining Michael Kors brand." Dkt. No. 91 at ¶¶ 10, 15. This claim is so vague that it cannot possibly be verifiable, it is not merger specific, and it does not flow from an increase in competition. *St. Alphonsus Med. Ctr.–Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 792 (9th Cir. 2015) (Clayton Act does not excuse anticompetitive mergers "simply because the merged entity can improve its operations"). And Michael Kors is already in the process of an ongoing transformation. *See supra* Findings of Fact ¶¶ 152-156.

## II.    THE EQUITIES SUPPORT A PRELIMINARY INJUNCTION.

68.    The second step in determining whether to grant preliminary relief is to "weigh the equities in order to decide whether enjoining the merger would be in the public interest." *IQVIA*, 2024 WL 81232, at *51 (quoting *Penn State Hershey*, 838 F.3d at 352).

69.    The equities under Section 13(b) go to the "consequences resulting from the requested injunction"—not any equities concerning the merger itself. *Meta Platforms*, 2022 WL 16637996, at *6; *accord Penn State Hershey*, 838 F.3d at 353.

70.    "The prevailing view is that, although private equities may be considered, they are not to be afforded great weight." *IQVIA*, 2024 WL 81232, at *52 (quoting *Penn State Hershey*, 838 F.3d at 352); *accord Univ. Health*, 938 F.2d at 1225 (interests of private parties carry "little weight" so as not to "undermine section 13(b)'s purpose of protecting the public-at-large, rather than individual private competitors." (internal quotation marks omitted)). As such, "no court has denied a Section 13(b) motion for a preliminary injunction based on weight of the equities where the FTC has demonstrated a likelihood of success on the merits." *FTC v. Peabody Energy Corp.*, 492 F. Supp. 3d 865, 918 (E.D. Mo. 2020) (internal quotation marks and citation omitted).

71.    "The principal public equity weighing in favor of issuance of preliminary [] relief is the public interest in effective enforcement of the antitrust laws." *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 726 (D.C. Cir. 2001). "If the acquisition is allowed to proceed but is later found to be

violative of the antitrust laws, divestiture will be required. At best, divestiture is a slow, cumbersome, difficult, disruptive and complex remedy." *Lancaster*, 434 F. Supp. at 1096; *accord IQVIA*, 2024 WL 81232, at *52; *Heinz*, 246 F.3d at 726 (recognizing that "divestiture is an inadequate and unsatisfactory remedy in a merger case").

72.     In this case, the equities support entry of a preliminary injunction pending resolution of the administrative proceeding.

73.     Without preliminary relief, Defendants will be permitted to close the Proposed Acquisition and begin integrating the two companies immediately. *Id.* (Commission may face the "daunting and potentially impossible task" of "unscrambling the eggs" if merger ultimately deemed unlawful (quoting *Sysco*, 113 F. Supp. 3d at 87)).  The loss from the elimination of substantial head-to-head competition between Coach, Kate Spade, and Michael Kors will be difficult, if not impossible, to reverse should Defendants consummate the Proposed Acquisition.

74.     In contrast, Defendants cannot establish harm merely from waiting for the administrative process, with a hearing set to begin on September 25, 2024, to play out.

75.     The grant of preliminary relief will not "kill the deal" (Dkt. No. 159 at 40), because the closing date in their merger agreement automatically extends until February 10, 2025, and both Defendants are required to use "reasonable best efforts to defend or contest, including through litigation or other means . . . [challenges to] the consummation of the [merger]" up until that date. PX1014 (Merger Agreement) § 6.2(a), 53; § 8.1(d), 72.

76.     There is "no reason why, if the merger makes economic sense now, it would not be equally sensible to consummate the merger following a[n] FTC adjudication on the merits that finds the merger lawful." *Penn State Hershey*, 838 F.3d at 353.

Dated: August 30, 2024

Respectfully submitted,

_S/ Abby L. Dennis_
Abby L. Dennis (*pro hac*)
DC Bar No. 994476
Federal Trade Commission
600 Pennsylvania Avenue, N.W.
Washington, DC 20580
Phone: 202-326-2494
Email: adennis@ftc.gov

Peggy Bayer Femenella (DC Bar No. 472770)
(*pro hac*)
Nicole Lindquist (DC Bar No. 975593) (*pro hac*)
Laura Antonini (CA Bar No. 271658) (*pro hac*)
Brandon Boxbaum (DC Bar No. 1615988) (*pro
hac*)
Peter Colwell (DC Bar No. 100287) (*pro hac*)
Kassandra DiPietro (MN Bar No. 0403547) (*pro
hac*)
Sean Hughto (DC Bar No. 421224) (*pro hac*)
Frances Anne Johnson (MD Bar – No Number)
(*pro hac*)
Sarah Kerman (DC Bar No. 90017957) (*pro hac*)
Andrew Lowdon (DC Bar No. 230095) (*pro hac*)
Danielle Quinn (NY Bar No. 5408943)
Blake Risenmay (WA Bar No. 52888) (*pro hac*)
Edmund Saw (DC Bar No. 1658446) (*pro hac*)
Victoria Sims (DC Bar No. 1006974) (*pro hac*)
Timothy Singer (DC Bar No. 1048769) (*pro hac*)

*Counsel for Plaintiff Federal Trade Commission*