# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

FEDERAL TRADE COMMISSION,

                Plaintiffs,

      v.

TAPESTRY, INC.,

and

CAPRI HOLDINGS LIMITED,

                Defendants.

Civil Action No. 1:24-cv-03109 (JLR)

FILED UNDER SEAL

## DEFENDANTS TAPESTRY, INC. & CAPRI HOLDINGS LIMITED'S PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW

# TABLE OF CONTENTS

DEFENDANTS' PROPOSED FINDINGS OF FACT ................................................................1

I.      The U.S. Handbag Industry ................................................................................1

        A.      Handbag Sales In The United States Are Highly Competitive ...............................1

        B.      Hundreds Of Handbag Brands Compete For U.S. Customers ................................2

        C.      Consumers Have Easy Access To Handbags Through Many Channels .................5

        D.      Handbags Are Highly Differentiated Products ........................................................7

        E.      Handbags Come In All Shapes, Sizes, And Materials Across Price Points ...........7

        F.      Entry And Expansion Into Handbags Is Easy And Constant .................................8

        G.      Handbags Are Discretionary Purchases Made For Multifaceted Reasons .............9

        H.      Handbags Are Durable:  New Bags Compete With Presold Bags ........................10

II.     Tapestry's Acquisition Of Capri Is Procompetitive ............................................11

        A.      This Transaction Is About Expanding Sales Across All Capri Brands ................11

        B.      Tapestry Will Revitalize The Michael Kors Brand, Including Handbags ............12

III.    Customers Foresee No Harm From This Transaction .........................................13

IV.     Expert Witnesses Foresee No Harm From This Transaction ...............................13

V.      The Relevant Geographic Market Is No Narrower Than The Entire United States ..........15

VI.     Plaintiff Fails To Prove A Relevant Product Market ...........................................16

        A.      Plaintiff Cannot Define Or Identify An "Accessible Luxury" Handbag .............16

        B.      Plaintiff Cannot Prove That "Accessible Luxury" Handbag Brands Are A
                Proper Relevant Market ........................................................................................17

        C.      Dr. Smith's Hypothetical Monopolist Test Does Not Define A Relevant
                Market Of "Accessible Luxury" Handbags ..........................................................19

        D.      The *Brown Shoe* Factors Do Not Define An "Accessible Luxury"
                Handbag Market ....................................................................................................24

VII.    Plaintiff's Market Share Calculations Are Not Reliable And Cannot Be Used To
        Show Harm In Plaintiff's Alleged Market ..........................................................31

VIII.   Plaintiff Fails To Prove Anticompetitive Effects ...............................................34

        A.      There Is No Normal-Course Evidence In This Case Showing That It Is
                Possible To Raise Price Without Improving Handbag Value ...............................34

        B.      In the Event Of A Hypothetical Post-Transaction Price Increase,
                Competitors Would Quickly Enter, Expand, And Reposition .............................35

C.     Tapestry's Emphasis On Brand Autonomy Will Help Ensure Continued Competition Among Coach, Kate Spade, and Michael Kors .................................38

D.     Plaintiff's Economic Measures Of Competitive Effects Are Flawed ....................39

E.     No Loss Of "Close" Competition Shows Any Likelihood Of Harm....................39

DEFENDANTS' PROPOSED CONCLUSIONS OF LAW .........................................41

I.     Legal Framework ..........................................................................................................41

     A.     Section 13(b) Legal Framework ......................................................................41

     B.     Section 7 Legal Framework .............................................................................42

II.     Plaintiff's Prima Facie Burden:  Market Definition And Plausible Proof Of Market Concentration (Step 1)..................................................................................43

     A.     Plaintiff Must Put Forward A Relevant Antitrust Market ......................43

     B.     Methods for Determining Market Definition........................................44

III.     Defendants Can Rebut Plaintiff's Prima Facie Case With Proof That Plaintiff's Proposed Market And Shares Inaccurately Predict The Merger's Competitive Effects (Step 2) ...............................................................................48

IV.     Plaintiff Has The Ultimate Burden Of Persuasion And Must Put Forward Concrete Evidence That The Merger Will Likely Result In Higher Prices Post-Merger (Step 3)..............................................................................................50

V.     Balancing The Equities ................................................................................................50

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Aurora Astro Prod. LLC v. Celestron Acquisition, LLC*,
    691 F. Supp. 3d 1132 (N.D. Cal. 2023) ................................................................50

*Brown Shoe Co. v. United States*,
    370 U.S. 294 (1962)...............................................................................43, 46, 47

*City of New York v. Grp. Health Inc.*,
    649 F.3d 151 (2d Cir. 2011).........................................................................43, 44

*Concord Assocs., L.P. v. Entm't Props. Tr.*,
    817 F.3d 46 (2d Cir. 2016).................................................................................43

*FTC v. Arch Coal, Inc.*,
    329 F. Supp. 2d 109 (D.D.C. 2004) ........................................................... *passim*

*FTC v. Elders Grain, Inc.*,
    868 F.2d 901 (7th Cir. 1989) .............................................................................41

*FTC v. Freeman Hosp.*,
    69 F.3d 260 (8th Cir. 1995) ...............................................................................41

*FTC v. Lancaster Colony Corp.*,
    434 F. Supp. 1088 (S.D.N.Y. 1977).....................................................................41

*FTC v. Occidental Petroleum Corp.*,
    1986 WL 952 (D.D.C. Apr. 29, 1986) ..................................................................49

*FTC v. RAG-Stiftung*,
    436 F. Supp. 3d 278 (D.D.C. 2020) ....................................................................44

*FTC v. Thomas Jefferson Univ.*,
    505 F. Supp. 3d 522 (E.D. Pa. 2020) ...............................................42, 44, 45, 50

*Haagen-Dazs Co. v. Double Rainbow Gourmet Ice Creams, Inc.*,
    895 F.2d 1417 (9th Cir. 1990) ...........................................................................46

*In re AMR Corp.*,
    625 B.R. 215 (Bankr. S.D.N.Y. 2021)..................................................................49

*In re Super Premium Ice Cream Litig.*,
    691 F. Supp. 1262 (N.D. Cal. 1988) ...................................................................47

*Int'l Shoe Co. v. FTC,*
    280 U.S. 291 (1930) ................................................................42

*Ky. Speedway, LLC v. NASCAR, Inc.,*
    588 F.3d 908 (6th Cir. 2009) ....................................................44

*Murrow Furniture Galleries, Inc. v. Thomasville Furniture Indus., Inc.,*
    889 F.2d 524 (4th Cir. 1989) ............................................46, 47

*New York v. Deutsche Telekom,*
    439 F. Supp. 3d 179 (S.D.N.Y. 2020) ...................42, 48, 49, 50

*New York v. Kraft Gen. Foods, Inc.,*
    926 F. Supp. 321 (S.D.N.Y. 1995) ...........................................47

*Nifty Foods Corp. v. Great Atl. & Pac. Tea,*
    614 F.2d 832 (2d Cir. 1980) .....................................................47

*Ron Tonkin Gran Turismo, Inc. v. Fiat Distributors, Inc.,*
    637 F.2d 1376 (9th Cir. 1981) ..................................................46

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.,*
    792 F.2d 210 (D.C. Cir. 1986) ..................................................46

*Starbucks Corp. v. McKinney,*
    144 S. Ct. 1570 (2024) ......................................................41, 42

*United States v. Am. Express Co.,*
    838 F.3d 179 (2d Cir. 2016) ...............................................44, 45

*United States v. AT&T, Inc.,*
    916 F.3d 1029 (D.C. Cir. 2019) ................................................42

*United States v. Baker Hughes Inc.,*
    908 F.2d 981 (D.C. Cir. 1990) ........................................ *passim*

*United States v. Booz Allen Hamilton,*
    2022 WL 9976035 (D. Md. Oct. 17, 2022) ...............................43

*United States v. Gen. Dynamics Corp.,*
    415 U.S. 486 (1974) .................................................................49

*United States v. H&R Block, Inc.,*
    833 F. Supp. 2d 36 (D.D.C. 2011) ...........................................45

*United States v. Jos. Schlitz Brewing,*
    253 F. Supp. 129 (N.D. Cal. 1966) ..........................................47

*United States v. Marine Bancorporation, Inc.*,
    418 U.S. 602 (1974).....................................................................................42

*United States v. Oracle Corp.*,
    331 F. Supp. 2d 1098 (N.D. Cal. 2004) ....................................................44

*United States v. Sabre Corp.*,
    452 F. Supp. 3d 97 (D. Del. 2020)............................................................50

*United States v. Siemens Corp.*,
    621 F.2d 499 (2d Cir. 1980).................................................................41, 50

*United States v. Syufy Enters.*,
    903 F.2d 659 (9th Cir. 1990) ....................................................................48

*United States v. Waste Mgmt., Inc.*,
    743 F.2d 976 (2d Cir. 1984).......................................................................48

## STATUTES

15 U.S.C. § 18...............................................................................................41, 42, 45

15 U.S.C. § 53(b) ...............................................................................................41

## INDEX OF ABBREVIATIONS

| Abbreviation | Source | Date |
|---|---|---|
| FSM | Expert Report of Professor Fiona Scott Morton, including Appendix D | August 7, 2024 |
| FSM Aug. 27 App'x D | Appendix D, Expert Report of Professor Fiona Scott Morton | August 27, 2024 |
| JG | Excerpt of Expert Report of Jeff Gennette | August 7, 2024 |
| KG | Excerpt of Expert Report of Karen Giberson | August 7, 2024 |
| KG App'x C | Appendix C, Expert Report of Karen Giberson | |
| LS | Excerpt of Initial Expert Report of Dr. Loren K. Smith | July 26, 2024 |
| R. Armstrong | Ralph Lauren (Corporate Representative), Interim Head of Global Marketing Strategy & Chief of Staff to the Chief Marketing Officer | July 16, 2024 |
| P. Charles | Tapestry, Chief Supply Chain Officer | July 18, 2024 |
| D. Christilaw | Kurt Geiger (Corporate Representative), Chief Financial Officer | July 26, 2024 |
| J. Crevoiserat | Tapestry, Chief Executive Officer | July 2, 2024 |
| L. Fraser | Kate Spade, Chief Executive Officer & Brand President | July 18, 2024 |
| D. Gandhi | Dagne Dover (Corporate Representative), Founder & Chief Operating Officer | July 17, 2024 |
| Gennette | Jeff Gennette  (Defense Expert) | August 20, 2024 |
| G. Guez | NorthStar OpCo & House of Pliner, Chief Executive Officer | August 21, 2024 |
| P. Hamilton | Lululemon (Corporate Representative), VP, Global Merchandising | July 29, 2024 |
| E. Harris | Tapestry, SVP, Global Strategy & Consumer Insights | July 16, 2024 |
| J. Idol | Capri, Chief Executive Officer | July 10, 2024 |
| T. Kahn | Coach, Chief Executive Officer & Brand President | June 14, 2024 |
| M. Kors | Michael Kors, Chief Creative Officer | June 21, 2024 |
| J. Larian | Cult Gaia (Corporate Representative), Chief Executive Officer & Creative Director | July 18. 2024 |
| A. Melwani | LVMH (Corporate Representative), Chairman & Chief Executive Officer, LVMH North America | July 19, 2024 |
| R. Minkoff | Rebecca Minkoff, Chief Creative Officer | August 5, 2024 |

| Abbreviation | Source | Date |
|---|---|---|
| K. Mogyoros | MZ Wallace (Corporate Representative), Chief Operating Officer & Chief Financial Officer | July 17, 2024 |
| T. Murphy | Longchamp USA (Corporate Representative), VP, Finance & Operations | July 15, 2024 |
| P. Newman Chapuis | Michael Kors, President, Accessories & Footwear | July 18, 2024 |
| L. Parsons | Michael Kors, Vice President Strategy & Transformation | July 17, 2024 |
| Scott Morton | Fiona Scott Morton  (Defense Expert) | August 20, 2024 |
| Smith | Loren K. Smith  (Plaintiff Expert) | August 20, 2024 |
| C. Steinmann | Macy's (Corporate Representative), VP, Divisional Merchandising Manager | July 19, 2024 |
| S. Thacker | Brahmin (Corporate Representative), | July 24, 2024 |
| S. Tichner | Steve Madden (Corporate Representative), President of Handbags | July 22, 2024 |
| K. Welch | Dillard's (Corporate Representative), Divisional Merchandise Manager, Handbags | July 17, 2024 |
| C. Wilmotte | Michael Kors, Chief Executive Officer | July 10, 2024 |
| A. Yu | Tapestry, VP, Consumer Insights | June 25, 2024 |

## DEFENDANTS' PROPOSED FINDINGS OF FACT

### I.    THE U.S. HANDBAG INDUSTRY

#### A.    Handbag Sales In The United States Are Highly Competitive

**1.**    U.S. consumers have over 1,000 women's handbag brands to choose from, each of which offers numerous styles, sizes, designs, and prices of handbags.  Ex. 31,[1] FSM ¶ 45 & App'x Ex. 3; *also* Ex. 35, KG App'x C (sample images from over 230 handbag brands).

**2.**    Customers shop hundreds and hundreds of handbag brands across a broad spectrum of prices.  *See* Ex. 26, A. Yu (Tapestry) Tr. 203:4-21 ("it is apparent that [customers are] actually engaging with a lot of different brands across a spectrum of brands");[2] Ex. 20, J. Idol (Capri) Tr. 80:13-20 ("People are not only shopping a singular set of brands in a singular set of price categories.  They move up and down and all over the spectrum."); ████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████

**3.**    Industry analysts estimate that total U.S. handbag sales ranged from $11.7 billion to over $32 billion in 2023.  *See* Ex. 31, FSM App'x Ex. 10.  Plaintiff's expert cites that total industry revenues are projected to grow over 50% by 2030.  Ex. 30, LS ¶ 30.  Handbag brands believe that the "market growth and sales [have] encouraged new entry of many new competitors and increased competition from established companies." ████████████████

**4.**    Competing handbag suppliers have also described a "super competitive market place," "a very competitive" and "very saturated market," and a "highly competitive" industry.  *See, e.g.,* ████████████████████████████████████████

---

[1]    Exhibits cited herein are attached to the accompanying declaration of D. Johnson.
[2]    Any objections are omitted from deposition testimony quotations, unless noted otherwise.

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

████████████████████████████████.

**5.**    The many handbag options available to consumers force brands to constantly innovate new designs in order to remain relevant.  Ex. 31, FSM ¶ 77; *see also* defense hearing witness testimony.

**6.**    Against this competitive backdrop, industry expert Karen Giberson, who has over 30 years of experience in the accessories and handbag industry, opined that neither Tapestry nor any of its individual brands, can "successfully raise the price of Coach, Kate Spade, or Michael Kors handbags without innovating or otherwise doing something to demonstrate increased value to consumers because consumers have so many other options to which they can turn."  Ex. 34, KG ¶¶ 1, 16, 104.

**7.**    Industry expert Jeff Gennette, the recent President, CEO, and Chairman of Macy's, Inc., and a 40-year fashion industry veteran, concludes from his experience that "a handbag simply will not sell at a price that exceeds consumers' willingness to pay" because there are too many options available to consumers to permit that.  Ex. 33, JG ¶¶ 1, 12, 64.

**8.**    Competing brands ████████████████ likewise testified that consumers will not pay more for handbags without any corresponding increase in value.  ████████████████

████████████████████████████████

### B.    Hundreds Of Handbag Brands Compete For U.S. Customers

**9.**    Hundreds of handbag brands sell thousands of handbag designs and styles at every potential price point.  Ex. 34, KG ¶ 18; Ex. 35, KG, App'x C.  Each individual handbag brand may offer

hundreds of different handbags. *See, e.g.,* ██████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████

**10.**    Even Plaintiff's expert, who has artificially limited the competitive options to brands that the wholesale-monitoring service NPD labels "bridge" and "contemporary," admits that over 230 brands compete with the merging parties. *See* Ex. 30, LS ¶ 43 n.75; Ex. 48, DX-0503 (134 brands in NPD "bridge"); Ex. 49, DX-0504 (89 brands in NPD "contemporary").

**11.**    The many third-party handbag brands that provided testimony during discovery have described a very broad set of brands they compete with that transcend any attempt to slice the U.S. handbag marketplace into narrow segments. For example, representatives of each company below testified that their brand competes with the merging parties' brands, plus numerous others:

a.   Ralph Lauren views ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████

b.   Kurt Geiger ███████████████████████████████

████████████████████████████████████████████████

██████████████████████    ████████████████████████

██████████████████████.

c.   MZ Wallace named ████████████████████████████

████████████████████████████████████████████████

██████████████████████████████    ██████████████████

███████████████████████████████

    d.  Dagne Dover identified ██████████████████████████

██████████████████████████████

████████████████████████.

    e.  Longchamp USA ████████████████████

██████████████████████████████

██████████████████  ████████████

████████████████████.

    f.  Cult Gaia ████████████████████████

████████████████████████████

██████████████████.

**12.**    Coach, Kate Spade, and Michael Kors similarly view themselves as competing within a broad "luxury" handbag market in the United States, that includes brands identified above, plus hundreds of others. Ex. 21, T. Kahn (Coach) Tr. 82:6-11; Ex. 17, L. Fraser (Kate Spade) Tr. 263:10-15; Ex. 20, J. Idol (Capri) Tr. 48:7-24, 82:8-21; Ex. 25, C. Wilmotte (Michael Kors) Tr. 287:10-289:10; Ex. 41, DX-0288-007, -012; Ex. 37, DX-0056-025 to -028, -032, -038, -039.

**13.**    While unable to obtain discovery from each of the 1,000-plus U.S. handbag competitors, Defendants obtained data from approximately 113 brands capable of calculating some portion of their U.S. handbag sales. Of those, over ██ had 2023 handbag sales exceeding $50 million. Ex. 32, FSM Aug. 27 Rep. App'x D. There are hundreds more whose sales were not determinable during discovery. As economic expert Dr. Fiona Scott Morton will explain, even if some of those brands are small, "there are hundreds of brands in this industry" and if you "add up hundreds of small brands, that accumulates to something substantial." Ex. 28, Scott Morton Tr. 232:7-23.

**14.**    Coach, Kate Spade, and Michael Kors had the following handbag sales in 2023:

    a. Coach's total U.S. handbag revenues were: ▓▓▓▓▓. Ex. 31, FSM Ex. 1.

    b. Kate Spade's U.S. handbag revenues were: ▓▓▓▓▓. *Id.*

    c. Michael Kors' U.S. handbag revenues were: ▓▓▓▓▓. *Id.*

**15.**    Michael Kors' handbag sales, however, have declined ▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓ as defense witnesses will describe at the hearing.

### C.    Consumers Have Easy Access To Handbags Through Many Channels

**16.**    Consumers can easily purchase handbags through numerous sales channels, including handbag brands' websites, wholesalers' websites, online resale marketplaces, social media platforms, department stores, off-price retailers, handbag brands' physical stores, and more. Ex. 31, FSM ¶¶ 52-61; Ex. 34, KG ¶ 21. The diversity of "retail channels contributes to the competitive nature of the handbag market." Ex. 31, FSM ¶ 52.

**17.**    The rise of online handbag sales is an important and growing trend. Analysts estimate that online sales are already 38% of all U.S. handbag sales, and will grow to over 50% by 2025. Ex. 31, FSM Ex. 12. In 2023, Coach and Kate Spade generated about ▓▓▓ of their handbag revenues from sales on their own websites, and Michael Kors generated ▓▓▓ *Id.* at Ex. 2.

**18.**    The growing prominence of e-commerce and online shopping opportunities "facilitates new entry" by handbag brands. *See id.* ¶ 244; *see also* Ex. 34, KG ¶ 97 ("Many handbag brands have successfully entered the U.S. handbag industry only or mainly through online channels in recent years and expanded into other distribution channels as they grow."); Ex. 33, JG ¶ 23; *infra* Finding of Fact ("FOF") 136-43 (discussing low barriers to entry).

**19.**    Wholesalers are another available channel for handbag sales. Wholesalers, such as Macy's and Dillard's, sell handbags in broadly distributed physical stores. *See* ▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

Wholesalers allow consumers to "touch and feel" a handbag in locations where the brand does not maintain brick-and-mortar stores, and also offer brands turn-key access to online marketplaces.
███████████████████████████████████████████████

**20.**     Department stores also host "shop-in-shops," where a handbag vendor places its own hardware within a department store to display and sell its handbags.  Macy's, for example, has shop-in-shops for ██████████████████████████████████████████ ████████████████████████     Department stores also offer thousands of handbags and generate many millions in handbag sales through their e-commerce websites.  ██████████████ ███████████████████████████████████████████████ █████████████████████████████████████████

**21.**     There are also off-price wholesalers, such as TJ Maxx and Gilt.com, who sell handbags at discounted prices.  For example, handbags from so-called "true luxury" brands Balenciaga, Chloe, and others sell for less than $1,000 through Gilt Groupe (Gilt.com), at very steep discounts.  Ex. 33, JG ¶¶ 32-34 & Figs. 8-9; Ex. 57, DX-0675. ████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ████████████████████

**22.**     Resale marketplaces have grown into another major channel.   A 2022 survey commissioned by Tapestry shows that half of consumers surveyed "engaged in the second hand/resale [handbag] market in the past year," and that "[m]ore than half of respondents will consider purchasing a second-hand/resale handbag in the next year."  Ex. 75, PX1465-035. Preowned handbags can be purchased and sold through many vendors, including Belk, Dillard's,

Fashionphile, The RealReal, Vestiaire Collective, eBay, Poshmark, FirstDibs, Craigslist, Facebook Marketplace, and others.  Ex. 31, FSM ¶ 98; Ex. 34, KG ¶¶ 21(e), 58-59; Ex. 20, J. Idol (Capri) Tr. 87:8-88:3 ███████████████████████████████████████

███████████████████████████████  Ex. 3, D. Gandhi (Dagne Dover) Tr. 116:4-117:7. The total amount of revenue generated from the resale of handbags in the United States is difficult to calculate, but is substantial.  ████████████████████ estimates that it sold over ███

██████ preowned handbags in 2023 alone, which is ████████ more than its sales of new Kate Spade handbags.  ████████████████████████████████████  And sales information from a subset of just seven resellers of handbags shows revenues of over $400 million, just for handbags sold for under $1,000.  Ex. 31, FSM ¶ 209(a).[3]

### D.    Handbags Are Highly Differentiated Products

**23.**    Handbags are highly "differentiated" products that comprise a large number and variety of shapes, sizes, styles, colors, materials, functions, and emotional appeal.  Ex. 31, FSM ¶ 10.

**24.**    Handbag differentiation is relevant to the analysis in this case because the ways in which handbags are differentiated is "not easily measurable," making handbag brands "less conducive to evaluating the 'closeness' of competitors relative to industries where measurable product attributes (and/or geographic location) are similarly valued by most consumers."  Ex. 31, FSM ¶ 10.

### E.    Handbags Come In All Shapes, Sizes, And Materials Across Price Points

**25.**    Handbags come in highly diverse materials, including leather, suede, vegan materials like mushroom and cactus, fabric, coated fabric, denim, cotton, canvas, straw, raffia, nylon, neoprene, PVC, exotics (e.g., alligator, ostrich, python), sequins, recycled materials, and many others.  *See,*

---

[3]    Resale data that became useable by the time of Defendants' Part 3 expert reports show 2023 sales of over $1.18 billion by ███████████████████████████████████████ ████████████████████████████████████  ████████ █████████████████████

*e.g.*, Ex. 35, KG App'x C (sample images from over 230 brands); Ex. 21, T. Kahn (Coach) Tr. 98:16-18; Ex. 22, M. Kors (Michael Kors) Tr. 164:23-25 ("the fabrics and materials that are used in the accessory world really run the gamut"); ███████████████████████

████████████████████████████████████████████

**26.**    The silhouettes or handbag styles available to consumers are broad and diverse.  Most brands offer a wide variety of shapes, styles, and sizes.  *See* Ex. 31, FSM ¶¶ 28-34 & App'x Ex. 1 (listing handbag style offerings among retailers and brands).  For example, silhouettes include backpacks, belt bags, camera bags, clutches, crossbody bags, shoulder bags, tote bags, duffle bags, hobo bags, bucket bags, and many others.  *Id.*; *see also* Ex. 35, KG App'x C.

**27.**    These many handbag silhouettes and designs are available for sale across a wide spectrum of price points.  Ex. 35, KG App'x C (sample of the many brands selling across a wide price range).

**F.    Entry And Expansion Into Handbags Is Easy And Constant**

**28.**    New handbag brands emerge constantly because there are low barriers to starting a new brand.  Brands can quickly enter by using third-party webservices companies to set up an e-commerce business and sell directly to consumers.  ██████████████████████

█████████████████████████████████████

**29.**    Manufacturing is also readily available.  New entrants can access contract manufacturers all over the world, such as Tivoli in Italy and Incas International in India.  Ex. 34, KG ¶¶ 87-89.  Companies like Vertical Collective and Millun Studio also exist to help new entrants with "end-to-end" management services, covering everything from design to delivery.  *Id.* ¶ 94; ████████

███████████████████████████████████████████

**30.**    New handbag entrants do not require a brick and mortar store presence to enter and succeed.  Companies can reach customers and grow sales through online and DTC sales.  ███████████

█████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

**31.**    New entrants can quickly gain sales and win consumer share of wallet from existing suppliers.  As fashion products, it can be difficult to predict consumer preferences and trends for handbags.  Brands compete broadly to maintain "brand heat" for their products.  Ex. 20, Idol (Capri) Tr. 119:14-15; Ex. 23, P. Newman Chapuis (Michael Kors) Tr. 21:4-23:10.

**32.**    There are numerous examples in the industry of handbags catching "brand heat" and increasing sales dramatically.  For example, ██████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████    ████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████    ████████████████████████

████████████████████

**33.**    Companies active in adjacent segments, like apparel, can also easily expand into handbags. For example, ██████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████

### G.    Handbags Are Discretionary Purchases Made For Multifaceted Reasons

**34.**    Handbags are discretionary purchases, which makes "consumer demand more sensitive to price changes," because consumers "have the option to avoid the purchase of any handbag entirely."  Ex. 31, FSM ¶¶ 11, 99-103; Ex. 34, KG ¶ 80 ("If a consumer does not see value in a

particular bag at a particular price, they can choose instead to buy a pair of shoes, jewelry, sunglasses—or nothing at all."); Ex. 24, L. Parsons (Michael Kors) Tr. 59:12-21.

**35.**    Many factors affect whether a consumer purchases a particular handbag, spanning both functional and emotional dimensions, and a combination of quality, craftsmanship, style, occasion, personal connection, ease of styling, customer service, and price. Ex. 16, J. Crevoiserat (Tapestry) Tr. 28:20-29:17; Ex. 25, C. Wilmotte (Michael Kors) Tr. 288:13-289:10; ████████████████████

████████████████████████████████████████████████████

**36.**    These "factors are quite personalized to the individual and to that [handbag] purchase," and a brand must establish "emotional connection" with the customer to make a sale. Ex. 26, A. Yu (Tapestry) Tr. 50:15-51:10, 328:10-329:15; ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

**37.**    Up to 22 percent of handbag purchases are made as gifts, which is relevant because "gift buyers may have more price-sensitive demand." Ex. 31, FSM ¶¶ 102-03. In other words, "the gift purchasers likely has more substitutes available to them to serve their purchase need," because they are more likely to consider a non-handbag product as a substitute. *Id* ¶ 103; Ex. 34, KG ¶ 80.

### H.    Handbags Are Durable:  New Bags Compete With Presold Bags

**38.**    Handbags are "durable goods" meaning that they are "consumed" for a long time after their initial purchase. Ex. 31, FSM ¶ 97. This is relevant to a competitive analysis in this case because (1) "at any given point of time, most consumers that have previously purchased handbags do not *need* to replace the handbag(s) they already own"; and (2) "durable goods can be resold, which creates more competitors for new handbags." *Id.* ¶¶ 97-98; Ex. 34, KG ¶ 80; Ex. 33, JG ¶ 48; *see also* ████████████████████████████████████████████████

████████████████████████████████████████████████

## II.    TAPESTRY'S ACQUISITION OF CAPRI IS PROCOMPETITIVE

### A.    This Transaction Is About Expanding Sales Across All Capri Brands

**39.**    As defense witnesses will describe at the hearing, Tapestry seeks to acquire Capri because it presents an opportunity to unlock value in all three Capri brands:  Michael Kors, Jimmy Choo, and Versace.  *See* Ex. 16, J. Crevoiserat (Tapestry) Tr. 132:13-16; Ex. 38, DX-0174-019.

**40.**    Tapestry has built a "modern consumer engagement platform" to "power iconic brands to move at the speed of the consumer, understanding the consumer and allowing the brands to stretch and grow faster."  Ex. 16, J. Crevoiserat (Tapestry) Tr. 133:3-11.  Tapestry sees opportunity to use this platform to help Jimmy Choo, Michael Kors, and Versace grow sales across the world.  *Id*. at 133:11-14.  Tapestry plans to "invest[] in innovation behind th[e]se brands and bring[] more relevant product behind each of the[] brands to more consumers globally."  *Id*. at 133:20-22.

**41.**    Tapestry's acquisition of Capri will also unlock growth opportunities that benefit consumers because of the range of products that each brand sells.  Across the three brands, Capri offers a greater proportion of clothing and footwear than Tapestry's three brands.  *Id.* at 132:20-23.  The acquisition will help Tapestry's brands build on Capri's expertise in these categories to broaden Tapestry's own non-handbag product offerings.  Ex. 39, DX-0181-009.

**42.**    Geographic complements will also enable Tapestry and Capri brands to grow post-Transaction. Ex. 16, J. Crevoiserat (Tapestry) Tr. 132:16-20.  This has been a core focus of the transaction from its inception.  *See, e.g.*, Ex. 39, DX-0181-023 (Transaction will strengthen "geographic diversification given highly complementary positions in Asia & Europe").

**43.**    Finally, the acquisition presents significant opportunities to realize cost synergies. Tapestry projects more than █████████████████████████████████████████

███████████████████████████████████████████████████████

**B.    Tapestry Will Revitalize The Michael Kors Brand, Including Handbags**

**44.**    Michael Kors' handbags sales have declined significantly in recent years ███████████ ████. *See* Ex. 31, FSM ¶¶ 295-97 & Exs. 16-18; Ex. 78, PX7157; *see also* forthcoming defense-witness hearing testimony.

**45.**    Because consumers no longer connect with the brand, Michael Kors has been unable to sell its products at list prices, leading to greater and greater discounts, and liquidation of unsold products through off-price wholesalers.  *See* forthcoming defense-witness hearing testimony.

**46.**    The average out-the-door price for Michael Kors' handbags through its retail channels has declined from around ████████████████████ Ex. 31, FSM ¶ 117 & FSM Ex. 18. Over 70% of its retail handbag sales were for an out-the-door price under $100 in 2023, Ex. 31, FSM Ex. 8, ███████████████  *See* forthcoming defense-witness hearing testimony.

**47.**    Michael Kors employees believe that its increased dependence on discounts has harmed the brand's image in the eyes of consumers and undermined its ability to create "brand heat."  Ex. 66, ████████████████████████████████████████████████ ████████████████████████████████████ Ex. 23, P. Newman Chapuis (Michael Kors) Tr. at 21:4-15.

**48.**    Michael Kors has attempted to revitalize its brand image for years, but has been unable to do so, and its efforts have stagnated.  *See* Ex. 24, L. Parsons (Michael Kors) Tr. 170:8-171:20 ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████ Ex. 23, P. Newman Chapuis (Michael Kors) Tr. 23:11-24:1, 29:16-30:9.

**49.**    Tapestry's CEO Ms. Crevoiserat believes Tapestry has the ability to "improve execution behind the Michael Kors brand to make it more relevant for modern consumers today and build better product and better experiences, and deliver more products to more customers globally."  Ex.

16, J. Crevoiserat (Tapestry) Tr. 89:10-13.  Defense witnesses will testify about how the infrastructure Tapestry provides would help Michael Kors improve its handbag quality and design to drive consumer demand and increase consumers' valuation of Michael Kors' products.

**50.**     Under Tapestry's ownership, Coach has successfully performed the type of revitalization that the Michael Kors brand needs.  Coach's CEO has explained that it was able to "transition" Coach's brand perception through a redoubled process of "understanding the consumer," "targeting the consumer" to address their "emotional and fashion" needs, and "focusing on product that [its] consumer wants."  Ex. 21, T. Khan (Coach) Tr. 33:14-34:16, 65:3-25, 154:12-20. Tapestry can help Michael Kors achieve the same outcome, as defense witnesses will testify to.

## III.    CUSTOMERS FORESEE NO HARM FROM THIS TRANSACTION

**51.**     Not a single retailer/customer has testified that it has concerns about Tapestry acquiring Capri or Michael Kors.  There are zero complaints from consumers or industry participants that this Transaction is likely to harm consumers in any way.  *See* Ex. 27, Smith Tr. 80:6-85:24 (Plaintiff's expert aware of no witness saying "consumers are likely to be harmed").

**52.**     The customers that did testify—wholesalers—explained why there will be no such harm. █████, for example, explained that it already offers consumers "enough choice when it comes to handbag brands that it ensures that the consumer gets a competitive price," it will still have enough brands to provide competitive pricing if Tapestry acquires Capri, and ███████ could easily add more brands for "whatever reason to offer its consumers competitive pricing."  ████████
████████████████████████████

## IV.    EXPERT WITNESSES FORESEE NO HARM FROM THIS TRANSACTION

**53.**     Dr. Scott Morton is an economic expert who specializes in competition and industrial organization economics; she is testifying for Defendants.  Ex. 28, Scott Morton Tr. 19:13-21.  She received a Ph.D. in Economics from MIT in 1994 and has taught Economics at the Yale School of

Management since 1999.  Ex. 31, FSM ¶ 1.  Dr. Scott Morton is a leading scholar in her field, having authored or co-authored over 50 scholarly articles; she served as the chief economist of the U.S. Department of Justice, Antitrust Division, from May 2011 through December 2012.  *Id.* ¶¶ 2-3.  Dr. Scott Morton has extensive experience testifying as an expert for the Department of Justice, the FTC, and private companies, including in merger cases.  *Id.*  ¶ 4.

**54.**    Dr. Scott Morton opines that Plaintiff and its economic expert Dr. Smith have not done the work required to accurately model the realities of the handbag industry and to analyze the potential effects of this Transaction.  *Id.* ¶ 15.  Dr. Scott Morton identifies fatal errors in each step of Dr. Smith's analyses.  She finds that Dr. Smith relies on "consideration" ratios from the 2021 and 2022 Tapestry surveys that have no bearing on economic substitution and cannot yield diversion ratios.  *Id.* ¶¶ 16, 18–19, 21, 24, 26.  Dr. Scott Morton also finds serious flaws in Dr. Smith's market concentration analysis, including his reliance on incomplete third-party data sources and his arbitrary and unscientific assumptions.  *Id.* ¶ 22.  Finally, Dr. Scott Morton opines that the Transaction is not likely to cause competitive harm because of the breadth and intensity of current competition, low barriers to entry and relative ease of entry in the handbag industry, the lack of evidence of price effects from Coach's prior acquisition of Kate Spade, and the independent pricing ability held by each Tapestry brand.  *Id.* ¶¶ 23, 25.

**55.**    Since 2005, industry expert Karen Giberson has served as the President and CEO of the 350-member Accessories Council—one of the largest and most prominent trade associations devoted solely to fashion accessories (including handbags).  Ex. 34, KG ¶¶ 1-2.  She is also the Editor-in-Chief of the Ac Magazine—the only publication dedicated solely to fashion accessories.  *Id.* ¶ 2.  Among other things, Ms. Giberson will testify that there is no well-understood definition of the term "accessible luxury" in the handbag industry generally or among consumers.

*Id.* ¶¶ 16(c), 22-28.  She will also testify that, given the extraordinary number of handbag options available to consumers at every price point and the dynamic nature of the handbag industry—including the continuous entry, expansion, and repositioning of players—Tapestry (or any individual brands) would not be able to successfully raise the price of Coach, Kate Spade, or Michael Kors handbags without innovating or otherwise doing something to demonstrate increased value to consumers because consumers have so many other options to which they can turn. *Id.* ¶¶ 16(e), 76-103; Ex. 35, App'x C.

**56.**    Industry expert Jeff Gennette worked in fashion retail for over four decades, serving, among other roles, as Chief Merchandising Officer of Macy's, before becoming President and then CEO of Macy's, Inc., the largest department store company in the country and owner of department store chains Macy's and Bloomingdale's.  Ex. 34, JG ¶¶ 1-2.  As Chief Merchandising Officer of Macy's, Mr. Gennette had direct responsibility for Macy's handbag strategy, and he oversaw that strategy for both Macy's and Bloomingdale's as President and CEO of Macy's Inc.  Ex. 29, Gennette Tr. 41:5-42:9, 45:2-47:1.  Mr. Gennette will testify, among other things, that based on his industry experience, if the merged parties were to attempt to raise prices without increasing value to consumers, multi-brand retailers would resist those price increases and be incentivized to offer other handbag choices to their customers.  Ex. 33, JG ¶¶ 5-6.

## V.    THE RELEVANT GEOGRAPHIC MARKET IS NO NARROWER THAN THE ENTIRE UNITED STATES

**57.**    Plaintiff has not proven, or attempted to prove, that the relevant geographic market for assessing the Transaction is any narrower than the entire United States and has not calculated market shares or estimated any competitive effect in any market other than the entire United States. Ex. 27, Smith Tr. 27:13-28:23.

## VI.    PLAINTIFF FAILS TO PROVE A RELEVANT PRODUCT MARKET

### A.    Plaintiff Cannot Define Or Identify An "Accessible Luxury" Handbag

**<u>58.</u>**    Most of Plaintiff's evidence in support of an "accessible luxury" market is little more than examples of the parties using the phrase "accessible luxury" or "affordable luxury" internally or in investor materials.  *See, e.g.*, Pl.'s Mem. of Law in Supp. of Prelim. Inj., at 12-13, ECF No. 122 ("Prelim. Inj. Mot."); Pl.'s Prelim. Inj. Reply, at 6-8, ECF No. 189.

**<u>59.</u>**    The phrases Plaintiff relies on, however, have no defined meaning, as multiple industry participants testified.  *See infra* FOF 100-03.  Plaintiff's expert has repeatedly conceded that there are no "sharp" lines or characteristics that separate an "accessible luxury" handbag from other handbags.  *See, e.g.*, Ex. 27, Smith Tr. 111:20-24 ("None of these, by the way, are sharp characteristics."), 138:3-9, 167:10-15.

**<u>60.</u>**    The terms also do not reflect how consumers shop.  Dr. Smith also admitted he is unaware of any record evidence that consumers use or recognize the term "accessible luxury handbag," he has no evidence that Coach, Kate Spade, or Michael Kors market their products to consumers as "accessible luxury," and he is unaware of handbags being "marketed that way."  *Id.* at 113:15-114:25, 118:2-119:15, 116:4-117:13.

**<u>61.</u>**    Further, Plaintiff's attempt to define an "accessible luxury" handbag is often circular.  For example, when asked how to define an "accessible luxury" handbag brand, Dr. Smith responded that "[i]t's the merging parties' products," other companies "that are characterized as accessible luxury by the merging parties," or brands that consumers view as "more accessible to them than luxury products."  *Id.* at 107:3-108:22, 114:18-23.

**<u>62.</u>**    When asked how a consumer might "know whether a handbag is an 'accessible luxury handbag or not," Dr. Smith responded that "[t]hey would know by the characteristics of the handbag, whether it has a certain quality.  It would likely be reflected in its price, whether it's

similar to Michael Kors, Kate Spade, Coach handbags." *Id.* at 118:2-14.  But Dr. Smith could not

define those "characteristics" in any tangible way, *see* FOF 59, 96, and he insisted that the relevant

"market is not defined by a price range," Ex. 27, Smith Tr. at 148:19-21, 145:6-10, 140:17-21.

**63.**    When asked to identify a particular handbag silhouette, Dr. Smith conceded that he is "not

a handbag expert" and he "would not trust my eye to define the product."  *Id.* at 67:2-17.

### B.    Plaintiff Cannot Prove That "Accessible Luxury" Handbag Brands Are A Proper Relevant Market

**64.**    Plaintiff cannot prove that the commercial realities of the handbag industry support the

existence of a narrow, artificial "accessible luxury" handbag brand market that Plaintiff alleges.

**65.**    Plaintiff has no evidence that Coach, Kate Spade, or Michael Kors views its competitive

set as limited to only other so-called "accessible luxury" brands.  The evidence is to the contrary.

For example, Michael Kors described competition to include "everyone from Tumi, to Telfar, to

Coach, to Louis Vuitton at resale, to Hermes at resale, to MZ Wallace," and the "list could go on,"

because "we are all in the same game."  Ex. 22, M. Kors (Michael Kors) Tr. 119:8-15.  Coach's

CEO Mr. Kahn similarly testified that Coach competes "in a broad market," and that brands such

as Calvin Klein, Karl Lagerfeld, Lauren Ralph Lauren, Gucci, Guess, Marc Jacobs, Tommy

Hilfiger, Longchamp, and Burberry are "all in our market."  Ex. 21, T. Kahn (Coach) Tr. 121:10-

23.  Defense witnesses will testify to the broad competition that they each face during the hearing.

**66.**    Numerous firms that Plaintiff labels as "accessible luxury" identified companies that

Plaintiff labels as "mass market" and/or "true luxury" brands as competitors.  *See supra* FOF 11.

**67.**    The surveys Dr. Smith relies on show that consumers who purchased Coach, Kate Spade,

or Michael Kors also considered "mass market" brands Calvin Klein, Fossil, and Nine West, and

"true luxury" brands Gucci, Louis Vuitton, and Prada, among many others.  Ex. 75, PX1465-010.

**68.**    Michael Kors' analysis of its customer database similarly shows the brands most frequently cross-shopped by Michael Kors handbag consumers include Gucci and Burberry, which Plaintiff considers "true luxury" brands, and Tommy Hilfiger, Polo Ralph Lauren, and Anne Klein, which Plaintiff considers "mass market" brands.  *See* Ex. 76, PX2257-030, -037, Michael Kors Customer Insights Presentation.  Michael Kors' ordinary course documents also show competition with brands not labeled as "accessible luxury."  *See, e.g.*, █████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████

**69.**    Other normal course documents from Defendants that Plaintiff relies upon also show competition far broader than just brands labelled as "accessible luxury."  For example, Plaintiff and its expert repeatedly cite to a February 21, 2021 Tapestry email for the proposition that Tapestry "uses NPD's bridge and contemporary categories to model 'accessible luxury' brands in its ordinary-course market sizing exercise."  Pl.'s Prelim. Inj. Reply, at 13 n.42 (citing Ex. 73, PX1334); *see also* Ex. 30, SR ¶¶ 50 n.86, 162 n.316. ███████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████

**70.**    Dr. Smith concedes that he cannot show that Defendants' brands do not compete with "true luxury" and "mass market" brands.  He testified that he "never said that true luxury handbags don't compete with accessible luxury handbags," Ex. 27, Smith Tr. 344:19-345:5, he cannot draw any

"black and white line that different types of handbags don't compete with accessible luxury" handbags, *id.* at 345:12-346:6, and he agreed that "accessible luxury" and "mass market" handbags are "'functionally' the same," *id.* at 127:20:128:7.

### C.    Dr. Smith's Hypothetical Monopolist Test Does Not Define A Relevant Market Of "Accessible Luxury" Handbags

**71.**    In disregard of commercial realities, Dr. Smith attempts to define the relevant market with a flawed application of the hypothetical monopolist test ("HMT").  Ex. 31, FSM ¶¶ 144-75.

**72.**    This is Dr. Smith's first time testifying in a merger litigation since 2020 (his only other such testimony), when a court found that the market definition and diversion analysis work he performed did "not in and of themselves address, much less answer, the relevant antitrust question."  *FTC v. Thomas Jefferson Univ.*, 505 F. Supp. 3d 522, 543 (E.D. Pa. 2020); Ex. 27, Smith Tr. 23:8-10.  That court also criticized Dr. Smith for his "reliance, at face value, on what some of the insurers had to say" which was "misplaced and unsupported by the record as a whole."  *Thomas Jefferson*, 505 F. Supp 3d at 544.  The court found that Dr. Smith selectively adopted certain testimony in the record, and "had not done any other analysis" to corroborate what he claimed was "pretty basic economics."  *Id.*  The court found that Dr. Smith's diversion ratios did not reflect "the commercial realities" of the market at issue.  *Id.* at 541, 553-54.

**73.**    In this case, Dr. Smith purports to define a relevant market using the same type of "aggregate diversion analysis" that he "relied upon in [his] testimony in" *Thomas Jefferson*.  Ex. 27, Smith Tr. 218:19-219:5.

**74.**    The two inputs into the hypothetical monopolist test that Dr. Smith performs are (1) a "proxy" for "diversion ratios" that he calculates using survey results from Tapestry survey in 2021 and 2022; and (2) an estimate of Coach, Kate Spade, and Michael Kors gross margins.  Ex. 31, FSM ¶¶ 144-45.  Dr. Smith's attempt to calculate both of those inputs to his HMT is highly flawed.

## 1.     Dr. Smith's "Diversion Ratios" Do Not Reliably Measure Diversion

**75.**     Dr. Smith agrees that a "diversion ratio" is "supposed to measure the percentage of customers switching from a given product in response to a small price increase that would switch to another product inside the candidate product market, as opposed to product outside the candidate market." Ex. 27, Smith Tr. 219:6-220:11.  The key point of a diversion ratio being that it should measure "*sales lost* by the first product *due to* a change in terms such as *an increase in its price* that would be diverted to the second product." *Id.* at 39:9-40:3; Ex. 31, FSM ¶ 148.

**76.**     Dr. Smith could have conducted a survey to estimate how consumers might switch in the future in response to a price increase in a Coach, Kate Spade, or Michael Kors bag, but he did not. Ex. 27, Smith Tr. 71:24-72:4 ("I did not conduct additional surveys."); Ex. 31, FSM ¶¶ 148-52.

**77.**     All of the survey results that Dr. Smith relied upon were commissioned by Tapestry, not by Capri, and he did not attempt to calculate diversion ratios based on any other surveys, despite observing them in the record.  Ex. 27, Smith Tr. 75:7-23, 76:9-77:16, 79:3-14.

**78.**     Instead, Dr. Smith relied upon the results of surveys conducted for Tapestry in 2021 and 2022 for purposes other than how he tries to use them.  These surveys are not fit for Dr. Smith's analysis, as even Dr. Smith acknowledges because they (1) did not ask consumers which handbag brands they would switch to; and (2) did not ask consumers how they would respond to a price increase.  *Id.* at 226:23-227:10 ("They don't explicitly ask the question, what would you do in response to a price change."); *id.* at 227:24-228:2.

**79.**     These old surveys that Dr. Smith relied upon instead asked respondents what other brands did you "consider" before making a handbag purchase in the past 12 months.  Ex. 30, LS ¶ 248; Ex. 27, Smith Tr. 249:22-250:7; Ex. 31, FSM ¶¶ 145-55.  Dr. Smith filtered some of those responses to estimate "a proxy for where customers would divert their purchases if they did not purchase" a Coach, Kate Spade, or Michael Kors handbag.  Ex. 30, LS ¶ 247.

**80.**    As Dr. Scott Morton has explained, the question of what brands a consumer "considered" when making a purchase in the past twelve months (two years ago) cannot provide a reliable indication of how consumers are likely to switch in response to a future price increase of their preferred brand.  Ex. 31, FSM ¶¶ 148-49.  "Consider" is too broad and vague to capture the key element in a diversion analysis of switching in response to a future price increase.  *Id.* ¶¶ 148-50.

**81.**    The "consider" question asked in the 2021 and 2022 surveys provides no information on respondents' second-choice brands or ranking of the alternative brands.  *Id.* ¶ 153.  And a consumer may not have considered a product at the time they purchased one of the parties' brands, but would have considered and purchased the product if they did not purchase their first-choice bag due to a price increase.  *Id.* ¶ 149.  Thus, Dr. Smith's use of the consideration questions to estimate diversion uses "a fundamental[ly] wrong tool for the project."  Ex. 28, Scott Morton Tr. 236:3-6.

**82.**    Dr. Smith admits he is "not a survey expert."  Ex. 27, Smith Tr. 72:13-22.  Dr. Smith has no way to know if the survey respondents, after "considering" a brand at the time of their last purchase, came away with the conclusion that they disliked the alternative brand and it was not something they would purchase in the future.  *Id.* at 251:14-252:21.

**83.**    The old Tapestry surveys that Dr. Smith relied upon are also not good indicators of brands consumers may switch to in 2025 and beyond, because they were conducted in 2021 and 2022, and asked about purchases as far back as 2020.  *Id.* at 205:22-25, 206:14-20, 250:8-251:13.

**84.**    Dr. Smith bases his reliance on these surveys on his belief that Tapestry used the surveys in the "ordinary course," and thus viewed the "information important to their consideration of their brand and competition their brand is facing."  *Id.* at 253:9-254:3.  Tapestry witnesses will testify that they did not use the surveys for that purpose.  And Tapestry stopped asking survey participants the question about their "consideration" that Dr. Smith relies upon because Tapestry found the

results unhelpful to understand customer behavior.  *Id.* at 254:4-15; Ex. 19, E. Harris (Tapestry, 30(b)(6)) Tr. 49:11-19; 50:3-15.  Dr. Smith concedes that Tapestry stopped using this question and, even when the survey was active, never used this question to estimate "diversion."  Ex. 27, Smith Tr. 254:4-255:18.

### 2. Dr. Smith Misunderstands The Role Of Margins In This Industry

**85.**    The second input in Dr. Smith's HMT is a measure of margins.  Ex. 30, LS ¶ 105. Dr. Smith acknowledges that, if he overestimated the margins, "that could lead to erroneous conclusions on market definition."  Ex. 27, Smith Tr. 212:25-214:22, 216:14-23.  And "[w]hen gross margins are substantial, it often leads to relatively narrow markets that exclude some products that undoubtedly compete to some degree."  *Id.* at 301:20-302:2.

**86.**    Margins in the handbag industry, even for small and new companies, tend to be high because the products are so differentiated, not due to pricing power.  ██████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

### 3. Dr. Smith's HMT Leads To Clear False Positives—Rendering It Useless And Uninformative

**87.**    Dr. Smith's HMT method results in clear false positive results, which further demonstrates the unreliability of his model and the conclusion he attempts to draw.  Ex. 31, FSM ¶¶ 173-75. For example, as Dr. Scott Morton has explained, any combination of brands with sufficiently high margins and "consideration" percentages would satisfy Dr. Smith's hypothetical monopolist test. *Id.* ¶ 174.  Applying his formula to a combination of "designer" brands and "better" brands would satisfy Dr. Smith's hypothetical monopolist test and constitute a relevant market, even without including any "accessible luxury" products.  *Id.* ¶¶ 174-75.

**88.**    Applying Dr. Smith's HMT also results in a finding that Coach, Kate Spade, and Michael Kors alone are a relevant market unto themselves.  A market consisting of only Coach, Kate Spade, and Michael Kors does not fit the evidentiary record.  It would exclude numerous brands that Defendants regularly look to as competitors, and exclude over 230 brands that Plaintiff and Dr. Smith concede should be considered "accessible luxury" brands.  Nor would this three-brand market make sense, because it would mean that Coach's acquisition of Kate Spade in 2017 consolidated the industry from three to only two companies, yet there was no increase in average prices of Coach or Kate Spade handbags reasonably attributable to that merger.  *Id.* ¶¶ 273, 276.

**89.**    Dr. Smith recognizes that adhering to the actual results of his HMT, to define a three-brand market, would not accomplish the "goal of market definition," which is to "inform likely competitive effects."  Ex. 27, Smith Tr. 64:5-17.  So after finding that just the Defendants' three brands passed his HMT, he then chose to "expand the set of products in a way that provides additional information but does not risk undermining the purpose of market definition."  *Id.*[4]  But Dr. Smith provides no governing principle for why his expansion of brands did not continue outward to include additional brands that Defendants consider competitors.  Instead, he merely stated (repeatedly) that doing so would result in "undermining the purpose of market definition." *See, e.g.*, *id.* at 109:17-110:8, 171:14-20, 275:17-21.

**90.**    Dr. Smith stopped expanding the set of products at only those brands that third-party industry analyst NPD tracks in data it receives from a non-comprehensive set of wholesalers and

---

[4]    After finding that the HMT passed with just the Defendants' three brands, any additional brand that he included in the relevant market would also pass his HMT.  Ex. 27, Smith Tr. 275:3-276:15 ("[A]dding substitute products to a market that already defines the – or already satisfies the hypothetical monopolist test will always satisfy the hypothetical monopolist test.").

labels "bridge" or "contemporary."  Ex. 31, FSM ¶ 196.  As described further below, this excluded many important competitors to Coach, Kate Spade, and Michael Kors.  *See infra* FOF 126(e).

**91.**    Moreover, Dr. Smith's belief that Tapestry's documents support his choice of limiting the market to only NPD-designated "bridge" or "contemporary" brands is not supported by the record.  As described above, *supra* FOF 69, Dr. Smith is selectively reading isolated terms in documents devoid of their significance within the document as a whole.  Witness testimony at the hearing will further show that Dr. Smith and Plaintiff's characterization of those documents is misplaced.

**92.**    Capri does not subscribe to NPD, much less purport to limit its set of important competitors to only those brands designated by NPD as "bridge" and "contemporary," which further undermines Plaintiff's reliance on it.  *See* Ex. 26, C. Wilmotte (Michael Kors) Tr. 231:15-232:3.

**93.**    Plaintiff did not obtain any testimony from NPD on the purpose or creation of its brand labels.  But Defendants' industry expert Ms. Giberson does have first-hand knowledge of those facts and will testify that Plaintiff's reliance on NPD to define the set of brands that may be reasonably interchangeable is misplaced.  Ex. 34, KG ¶¶ 43-63; Ex. 33, JG ¶¶ 88-104.

> **D.    The *Brown Shoe* Factors Do Not Define An "Accessible Luxury" Handbag Market**
>
> **1.    Plaintiff Does Not Define A Market Using The *Brown Shoe* Factors**

**94.**    Although Plaintiff purports to describe "practical indicia" or *Brown Shoe* factors to define the relevant market, it does not apply those factors to identify market participants.  Neither Plaintiff nor its expert has produced a list of the 1,000 or more handbag brands, showing whether each product satisfies the supposed practical indicia of an "accessible luxury" handbag.

**95.**    Plaintiff has repeatedly disclaimed an ability to apply *Brown Shoe* factors without the use of an expert.  For example, when asked in written discovery whether certain brands are "accessible luxury," Plaintiff refused to respond.  *See, e.g.*, Ex. 42, DX-0314-010 to -018, -024, -025.

Plaintiff's only expert witness disclaimed any ability to actually determine from a handbag itself whether it fits the definition of "accessible luxury." Ex. 27, Smith Tr. 67:2-17; *supra* FOF 59, 61.

**96.**    In fact, when asked if he determined whether any brands that NPD designates as "designer," or "better," or "moderate" fit the practical indicia characteristics of an "accessible luxury" handbag, Dr. Smith said: "I don't analyze that and I don't think it would affect my opinions to do so." Ex. 27, Smith Tr. 165:11-166:4; *see also id.* at 167:2-23 ("I didn't look to see whether any mass market handbags had any of those characteristics. It's not that specific.").

**97.**    At the outset, Plaintiff's practical indicia factors make no sense because they relate to handbags as individual products (e.g., a red shoulder bag), but Plaintiff has defined the market around entire brands. *Compare* Prelim. Inj, Mot. at 11 ("The *Brown Shoe* Practical Indicia Demonstrate That 'Accessible Luxury' Handbags Is a Relevant Product Market"), *with id.* at 21 (describing "Dr. Smith's use of the *brands* identified as 'accessible luxury'" in his market share calculations); *see also* Ex. 27, Smith Tr. 144:5-18 (Dr. Smith describing that "if they are an accessible luxury brand, I would include all of their products in the relevant market"). This is problematic because, as described above, brands offer a broad range of handbag shapes, colors, sizes, materials, functions, and prices. *Supra* FOF 23-24, 105-08.

**98.**    Moreover, the practical indicia factors that Plaintiff identifies cannot be applied in an objective way, because they are not quantifiable or measurable, and there is no way to rank or weigh them to determine which indicia or combination of indicia controls. For example, if a handbag bears some indicia Plaintiff associates with "accessible luxury," but some with "true luxury," there is no way to balance and resolve that conflict. A tote made of fine Italian leather, but sold at discount for $400 cannot be objectively placed in or out of the market using Plaintiff's practical indicia factors—and so neither Plaintiff nor its expert has even tried. This is problematic,

because Plaintiff's expert admits that no one factor is determinative of whether a handbag brand is deemed "accessible luxury" under his definition. Plaintiff's expert concedes that there are no "sharp characteristics" defining an "accessible luxury" handbag. *Supra* FOF 59.

**99.** Even if Plaintiff's practical indicia factors could be applied, and Plaintiff actually applied them to the universe of handbag brands—neither of which is true—those factors do not actually differentiate a distinct set of handbag products.

### 2. There Is No Industry Or Public Recognition Of The Market As Defined By Plaintiff

**100.** Industry participants repeatedly testified that there is no industry recognition of what constitutes an "accessible luxury" handbag. Similarly, consumers have no recognition of what an "accessible luxury" handbag is. Simply put, the realities of the market show handbag purchases are not made that way. For example, a representative of ███████ testified that, compared to "luxury," the phrase "accessible luxury" is "a harder term to define because it's not an industry standard." ██████████████ testified that the phrase "affordable luxury" is not "something that is used forward-facing with the consumer" and she did not "believe that consumers understand the phrase 'accessible luxury.'" ███████ ███████████████ testified that the phrases "affordable" and "accessible luxury" have no "precise meaning" because "people probably view it all in a little bit of a different way." ████████████████

**101.** ███████ for example, does not use the term "accessible luxury" in its business, nor does it use the term "bridge" or "contemporary" when selling its handbags. ███████████ ████████████████████████████ ████████████████████████████ ██████████████████

**102.**    Plaintiff's expert, after surveying the record evidence in this case, is not aware of any wholesaler "that advertises any selection of bags as accessible luxury." Ex. 27, Smith Tr. 113:15-22. He has "not seen in the record any consumer calling their—using the term 'accessible luxury handbag.'" *Id.* at 118:2-119:15. And the term is "not, to my knowledge, a term that is widely used as a marketing tool and that customers would resonate with." *Id.* at 124:3-9.

**103.**    Handbag industry expert Ms. Giberson will testify that there is no well-understood definition of the term "accessible luxury" in the handbag industry generally and certainly not among consumers. In her experience, consumers do not categorize any particular set of brands or handbags as "accessible luxury," nor do consumers shop only within a limited category of brands. Ex. 34, KG ¶¶ 16(c), 22-28. She will also testify that Plaintiff is wrong about the attributes it contends make "accessible luxury" handbags distinct from other handbags. *Id.* ¶¶ 64-75.

### 3.    There Are No Peculiar Characteristics Or Uses For "Accessible Luxury" Handbags

**104.**    As described above, both Plaintiff and its expert have disclaimed the ability to physically identify a so-called "accessible luxury" handbag. *See supra* FOF 59, 95, 96.

**105.**    Dr. Smith has also agreed that a "mass market" handbag and an "accessible luxury" handbag "could be used for the same purpose," and he has no evidence that "luxury" handbags and "accessible luxury handbags are not functional substitutes." Ex. 27, Smith Tr. 124:24-128:7.

**106.**    Plaintiff claims that "true luxury" and "accessible luxury" handbags are primarily made of leather, while "mass market" handbags are not. But there is no proof of such clear dividing lines in materials used. And attempting to compare one material to another is entirely subjective. *See* Ex. 22, M. Kors (Michael Kors) Tr. 164:2-165:12 (describing that there is no "difference in quality between PVC and leather bags," because "[i]t's just what's your preference").

**107.** Brands that Plaintiff considers "true luxury" use non-leather materials, including Dior and Louis Vuitton's famous coated canvas tote bag. ████████████████

████████████████████████████████████████████████████

████████████████████████████████

**108.** Brands that Plaintiff considers "accessible luxury" utilize leathers from Italy and France and materials that they advertise as luxurious. ████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████

### 4.    There Are No Unique Manufacturers Of "Accessible Luxury" Bags

**109.** As industry expert Ms. Giberson has explained, from her experience, "virtually all handbags" are "produced using a similar handmade process regardless of whether the brand is something Dr. Smith would characterize as 'mass market,' 'accessible luxury,' or 'true luxury.'" Ex. 34, KG ¶¶ 68, 71-73.  Having visited factories all over the world, Ms. Giberson can explain that "the steps to make a handbag are generally the same no matter the brand." *Id.* ¶¶ 71-72.

**110.** There is no evidence in this case that consumers view manufacturing location as a meaningful distinction for handbags. ████████████████████████

**111.** There are no consistent differences in where the brands that Plaintiff categorizes as "luxury," "accessible luxury," and "mass market" manufacture their handbags.  For example,

████████████████████████████████████████████████████

████████████████████████████████    ████████████████████

████████████████████████████ has manufactured handbags in the United States for the last 30 years. ████████████████████████    Many brands that Plaintiff deems

"accessible luxury" manufacture handbags in Europe, including █████████████████ ████████████████████████████████████████████████████

**112.** Tapestry has product development hubs located in Italy and China, and sources ████ of its leather from Europe.  Ex. 15, P. Charles (Tapestry) Tr. 57:21-58:2; 98:18-24.

**113.** Wholesalers do not advertise or group handbags based on their geographic manufacturing location because, as a representative from ████████ testified, "[i]t's not something that we believe is important to the consumer." ████████████████████████████ ████████████████████████████████

### 5.    There Are No Distinct "Accessible Luxury" Handbag Consumers

**114.** No witness testified in this case that it believes it can identify a distinct set of "accessible luxury" handbag consumers.

**115.** Multiple handbag brands, including ones Plaintiff designated as "accessible luxury," testified that consumers buy handbags at a range of price points regardless of their household incomes. ████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████.

**116.** The document that Plaintiff cites to try to show that "accessible luxury" customers earn less than $75,000 annually, also states that 45% of customers earned income at or above $75,000, with 33% earning above $100,000 and 10% earning above $200,000. ████████████████

**117.** Other ordinary course documents and testimony show that many customers with incomes above $75,000 purchase handbags that Plaintiff labels "accessible luxury" handbags, while a significant percentage of customers buying "true luxury" handbags earn less than $75,000. ████████ ████████████████████████████████

### 6.    There Are No Distinct Prices For "Accessible Luxury" Handbags

**118.**    As Plaintiff's expert has conceded, "the price wouldn't define where – whether the brand was an accessible luxury item or not."  Ex. 27, Smith Tr. 145:6-13.

**119.**    Plaintiff has presented no empirical analysis of handbag prices in this case.

**120.**    Handbag brands tend to offer products that span a wide range of prices.  For example, so-called "mass market" brands, such as ██████████████████████ price from less than $25 to well over $100 or $150.  *See* Ex. 31, FSM Ex. 7 (Handbags Price Distribution by Brand).  ████████offers bags at prices ranging from $38 to $198, and is implementing plans to enhance its products to elevate prices further.  ██████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████  ███████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████

**121.**    The parties' own products do not fit the pricing parameters that Plaintiff has alluded to.  Around ████ of Kate Spade and Michael Kors handbags are sold for less than $100, below the price range that Plaintiff vaguely attributes to "accessible luxury" handbags.  Ex. 31, FSM ¶ 209(c); FSM Ex. 8 (Coach, Kate Spade, and Michael Kors Handbag Revenue, Units, and Counts of Unique SKUs by Price Band).  And Coach and Michael Kors offer models that are priced over $1,000 as well, as hearing witnesses can describe.

### 7.    Discounting Does Not Distinguish "Accessible Luxury" Handbags

**122.**    Whether a handbag brand discounts is not a reliable indicator of whether that brand is "mass market," "accessible luxury," or "true luxury."  There are companies that Plaintiff considers "accessible luxury" that have policies against discounting or selling through outlets.  *See, e.g.,* ███

████████████████████████████████████████████████████████

████████████████████████████████████████

**123.**    There are companies that Plaintiff considers "luxury" that *do* sell through outlets at a discount, including █████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████

**124.**    Moreover, brands may end up for sale at discount, even if they do not intend for that to happen.  Plaintiff has admitted that brands it considers "true luxury" can be purchased through off-price fashion retailer TJ Maxx, including Gucci, Celine, Fendi, Bottega Veneta, Balenciaga, Valentino, Chloe, and Givenchy.  Ex. 42, DX-0314-022 to -023, RFA No. 14.  And such discounting of so-called "true luxury" brands is common.  *See* Ex. 33, JG ¶¶ 31-34.

## VII.    PLAINTIFF'S MARKET SHARE CALCULATIONS ARE NOT RELIABLE AND CANNOT BE USED TO SHOW HARM IN PLAINTIFF'S ALLEGED MARKET

**125.**    Plaintiff's expert relied upon NPD brand labels to calculate the merging parties' market shares, limiting the relevant market to only brands that NPD labelled in 2023 as "bridge" and "contemporary," and only certain styles.  Ex. 31, FSM ¶¶ 196-97; Ex. 27, Smith Tr. 179:18-180:5.

**126.**    Dr. Smith's reliance on NPD categorizations and data as the core of his market share calculations results in several flaws that cause him to overestimate the merging parties' market shares.  Dr. Scott Morton will describe those flaws during the evidentiary hearing, but they include at least the flaws below.  *See generally* Ex. 31, FSM ¶¶ 201-10.

a. Dr. Smith does not account in any way for preowned handbag sales, such as handbags sold on eBay, Poshmark, The RealReal, and in prominent department stores, regardless of the prices of those handbags and whether they are sales of "accessible luxury" handbags. *Id.* ¶ 209(a).

b. Dr. Smith treats handbag brands as either entirely in, or entirely out, of the relevant market. Because of this, he excludes any sales of handbags sold by brands that NPD labels "designer," even when the prices of those products overlap with the prices that Defendants charge. *Id.* ¶ 209(b).

c. Consistent with his all-in or all-out approach, Dr. Smith includes all of Coach, Kate Spade, and Michael Kors handbag sales within the market share calculations, even though Michael Kors and Kate Spade generate over ███████████ of their retail and online revenues from handbags sold for less than $100. *Id.* ¶ 209(c).

d. Dr. Smith's market share calculation excludes any sales by brands that NPD designates as "moderate," "better," and "active Leisure," even when the prices of those handbags overlap with the prices that Defendants charge. *Id.* ¶ 209(d). Pricing analysis of prominent "better" brands such as Calvin Klein, Guess, Patricia Nash, and Steve Madden shows that their ████████████████████████████████████ ████████████████████████████████████. *Id.* FSM Ex. 7.

e. Dr. Smith's market share calculation excludes any sales by any handbag brands that NPD does not track and NPD is missing data from prominent brands that are not sold through wholesale, including Louis Vuitton, Zara, Telfar, Cuyana, Lululemon, and others. Pricing analysis of some of these brands, ████████████████████, shows

that their products substantially overlap with prices that Coach, Kate Spade, and Michael Kors handbags sell for.  *See id.*

f.  NPD data contains sales information from only some wholesalers, and Dr. Smith does not take into account sales by missing wholesalers, such as RueLaLa, Gilt.  *Id.* ¶ 209(e).

g.  Dr. Smith lacks actual data on direct-to-consumer sales from at least 195 brands that he includes in the relevant "accessible luxury" market.  *Id.* ¶ 199.  Dr. Smith tries to estimate the direct-to-consumer sales by those companies, but that estimate "accounts for a sizeable percentage of his total estimated relevant market, and is highly sensitive to variations."  *Id.* ¶ 209(g).  For example, one adjustment to how he estimates these missing sales causes his calculation of the parties' market shares to decrease from a 59% combined share for the parties to a 32% combined share for the parties based on adjustments made to this one factor alone.  *Id.* ¶¶ 199-200; FSM App'x Ex. 11.

**127.**  As Dr. Scott Morton will explain, "[a]lthough the magnitude of the error generated by these choices, individually and combined, is difficult to quantify precisely, Dr. Smith's choices described likely have a large effect on his share calculations."  *Id.* ¶ 210.

**128.**  The significance of Dr. Smith's market definition choices and data adjustments can be seen with an example of only using the NPD data that Dr. Smith uses as the foundation of his market definition and calculation exercise.  Looking only at sales through the channels that NPD tracks—which are major wholesalers—the Defendants' shares (including all of their brands) are low regardless how the market is defined: (Ex. 31, FSM Ex. 9):

a.  <u>Bridge + Contemporary</u>: ██% combined share

b.  <u>Better + Bridge + Contemporary</u>: ██% combined share

c.  <u>Bridge + Contemporary + Designer</u>: ██% combined share

    d.  <u>Better + Bridge + Contemporary + Designer</u>:  ██% combined share

**129.**    NPD, of course, does not capture any of the parties' direct-to-consumer sales, or any other

handbag company's direct-to-consumer sales.  But since Dr. Smith lacks direct-to-consumer sales

for 195 brands that he includes in the relevant market, the above market share percentages are

informative of the impact that Dr. Smith's assumptions and management choices have on his

market share estimates.

## VIII.   PLAINTIFF FAILS TO PROVE ANTICOMPETITIVE EFFECTS

### A.    There Is No Normal-Course Evidence In This Case Showing That It Is Possible To Raise Price Without Improving Handbag Value

**130.**    Even if Plaintiff were able to define a relevant market, no normal course evidence supports

the idea that Tapestry could harm consumers by imposing a price increase on purchasers of Coach,

Kate Spade, or Michael Kors.  Knowledgeable industry experts believe that is not possible given

the commercial realities in the industry.  Ex. 34, KG ¶¶ 76-103; Ex. 33, JG ¶¶ 60-87.

**131.**    As a  ████  █████  █████████  testified, "based on [Ralph Lauren's] recent

experience . . . , it's not as simple as just increasing price.  There has to be a perception of increased

value." ██████████████████████████████████

**132.**    ████████  consumers have "other brands that suit the needs that they are looking for,"

which makes it "much more difficult" for the brand to "obtain the price it wants for a new handbag

if consumers don't perceive the value." ███████████████████

**133.**    When Michael Kors has attempted to raise prices in the past, it has experienced ████████

████████████████████████████████████████████████████

███████████████  This is because, as Michael Kors' President of Accessories and Footwear

Philippa Newman Chapuis explained, the price a consumer is willing to pay is a function of "what

[the consumer] believes is the right price for that particular brand at that particular time based on

its brand value.  Ex. 23, P. Newman Chapuis (Michael Kors) Tr. 132:4-10.  By attempting to increase price without also elevating the brand value in the eyes of the consumer, Michael Kors was left in a position of having to discount more to accomplish sales.  Ex. 31, FSM Ex. 17 (Average Monthly Price and Discount for Michael Kors Handbags).  And as described above, resorting to increased discounting can harm brand image even further.  *See supra* FOF 47.

**134.**    There is no evidence that Tapestry's prior acquisition of Kate Spade resulted in higher prices.  Tapestry acquired Kate Spade in July 2017.  Ex. 31, FSM ¶ 63.  Dr. Scott Morton studied the inflation-adjusted direct-to-consumer prices of Coach and Kate Spade handbags after that acquisition and found that "there was no increase in average prices of either brand that could reasonably be attributed to the merger."  *Id.* ¶¶ 273-79.  The continued downward trend of each brand's prices can be seen in Exhibit 13 to Dr. Scott Morton's report.  *Id.* at Ex. 13.

**135.**    Plaintiff's expert has not put forth any analysis showing that Tapestry's ownership of Kate Spade has led to higher prices, degradation of quality, or any other harm to consumers.

### B.    In the Event Of A Hypothetical Post-Transaction Price Increase, Competitors Would Quickly Enter, Expand, And Reposition

**136.**    Because barriers to entry and expansion are low, the hundreds of competing brands could quickly expand, or new companies could enter, in the event that Tapestry attempted to raise price without improving the value proposition to consumers.  *See supra* FOF 28-33.

**137.**    Industry participants have already observed "many" new handbag brands that "have begun selling handbags in the United States in the last three years" or quickly grown, including Dagne Dover, MZ Wallace, Karl Lagerfeld, Brandon Blackwood and, as a representative of ████████ ███████████████████████████████████████████████████████████.  Similarly, a representative of ████████ testified that he has "seen brands that have significantly increased their

sales in a short period of time," including Hammitt, Bogg Bags, and Kurt Geiger. ████████

████████████████████████

**138.**    If the merging brands attempted to raise price by reducing output, there would be plenty of manufacturing capacity available for competitors to expand.  Ex. 34, KG ¶¶ 86-89.

**139.**    Dr. Smith has not put forward any opinion, nor has Plaintiff identified any evidence, that manufacturing capacity is limited or a barrier to entry or expansion in this industry.

**140.**    Third-party webservices companies, such as Shopify, make it easy for companies to market and transact online. ███████████████████████

**141.**    Third-party logistics companies make it easy for companies to quickly enter and expand.

█████████████████████████████

█████████████████████████████

**142.**    Online marketplaces have lowered the initial costs associated with starting and growing a successful handbag brand considerably and facilitated new entry.  Ex. 31, FSM ¶¶ 137, 244-46. New entrants do not need brick and mortar store presence to succeed because they can grow sales through wholesale, online, and DTC channels.  Ex. 33, JG ¶¶ 38-40, 54-58; Ex. 34, KG ¶¶ 97-99;

█████████████████████████████

█████████████████████████████

█████████████████████████████

█████████████████████████████

█████████████████████████████

█████████████████████████████

█████████████████████████████

████████████████

**143.**    Recent competitor entry and expansion demonstrates that there are no meaningful barriers to entering and growing as a handbag competitor.   For example:

a.  **Kurt Geiger**:  Kurt Geiger had ▇ million in U.S. sales in 2018, but launched its U.S. ecommerce presence in ▇▇▇▇▇▇▇▇ million in U.S. sales by 2023.  It now plans to reach ▇▇▇▇▇ in annual U.S. sales.  Ex. 2, D. Christilaw (Kurt Geiger) Tr. 64:25-65:7, 75:5-9.

b.  **Ralph Lauren**:   Ralph Lauren has been in business for over 50 years, but it ▇▇ ▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇

c.  **Lululemon**:   Lululemon ▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇ ▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇

d.  **Dagne Dover**:  Dagne Dover's ▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇ ▇▇▇▇▇▇▇

e.  **MZ Wallace**:   MZ Wallace ▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇

███████████████ ███████████████████████████████

█████████████████████████████████████████████████

██████████████████████████████████████.

f.   **<u>Brahmin</u>**: ████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████████████

g.   **<u>Longchamp</u>**: ████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████████████████

h.   **<u>Cult Gaia</u>**: ████████████████████████████████

█████████████ ██████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████ ████████

█████████████████████████████████████████████████

**C.    Tapestry's Emphasis On Brand Autonomy Will Help Ensure Continued Competition Among Coach, Kate Spade, and Michael Kors**

**<u>144.</u>**    Today, Tapestry maintains the separate identity and corporate structures for each of its brands. *See, e.g.*, Ex. 77, PX7015-005, -007, 2017 Coach, Inc.'s Investor Call ("Importantly, as in the case of Stuart Weitzman, Kate Spade will continue to be operated as an independent brand,"

and that "teams dedicated to design, merchandising, marketing and sales will continue to run independently for each of [Coach, Inc.'s] brands.").

**145.** As Tapestry's CEO Ms. Crevoiserat will testify at the hearing, Tapestry has no incentive or plans to merge Michael Kors' pricing or brand management with Tapestry's existing brands, to share pricing information between brands, or to otherwise limit innovation within any of its brands to prevent them from competing with each other.

**146.** ████████████████████████████████████████████████

████████████████████████████

**147.** Consistent with past practice, Tapestry plans to maintain the brands' separate identities and structures, ensuring they continue to compete against one another and the hundreds of other brands in the industry. Ex. 77, PX7015, at -005, 007, 2017 Coach, Inc.'s Investor Call.

**148.** Plaintiff has put forward no evidence of pricing coordination between Coach and Kate Spade, and no evidence of any historic price effects arising from competition between Coach or Kate Spade and Michael Kors. Hearing witnesses will explain that none of those events occurred.

**D.    Plaintiff's Economic Measures Of Competitive Effects Are Flawed**

**149.** All of Dr. Smith's calculations of competitive effects using his "upward pricing pressure" model and merger simulation are built on and critically rely upon the "diversion ratios" he calculated using the 2021 and 2022 survey responses. Ex. 31, FSM ¶¶ 287, 292. Dr. Smith admits this. Ex. 27, Smith Tr. 214:23-218:7. Because those "diversion ratios" are based on surveys that fundamentally do not measure switching, much less switching in response to a price increase, those measures of competitive effects are also unreliable. Ex. 31, FSM ¶¶ 287, 292.

**E.    No Loss Of "Close" Competition Shows Any Likelihood Of Harm**

**150.** As Dr. Scott Morton explained, the concept of "closeness" of competition makes little sense in an industry involving highly differentiated products purchased for highly multifaceted

reasons, such as handbags, where degrees of differentiation cannot be quantified.  Ex. 31, FSM ¶¶ 262-266.  The only quantification of "closeness" of competition between the merging parties is, again, based on Dr. Smith's flawed calculation of diversion ratios using surveys that do not inform the diversion question.  *Id.* ¶ 285; Ex. 27, Smith Tr. 213:10-214:22.

**151.**    The fact that the merging parties' documents refer to each other is unsurprising, because they are both large publicly traded companies for which there is information readily available.  Ex. 31, FSM ¶ 264.  Moreover, there are numerous documents showing the merging parties tracking a far larger set of brands.  *Id.* ¶ 265; ████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

**152.**    Coach, Kate Spade and Michael Kors each compete with many handbag brands.  No brand has a single "closest competitor."  Each brand considers designs and styles for a wide range of competitors, including both so-called "mass market" and "luxury" brands, which are widely available through multiple sales channels alongside brands across the spectrum of product positioning.  ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

## DEFENDANTS' PROPOSED CONCLUSIONS OF LAW

### I.     LEGAL FRAMEWORK

#### A.     Section 13(b) Legal Framework

**1.**     Absent a contrary "clear command from Congress," a federal government agency must make a "clear showing" of a likelihood of success on the merits to obtain a preliminary injunction. *Starbucks Corp. v. McKinney*, 144 S. Ct. 1570, 1576 (2024).  Consistent with that requirement, Section 13(b) allows a court to grant the FTC a preliminary injunction only if the court finds the FTC has a "likelihood of ultimate success" in proving a violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, and after "weighing the equities."  15 U.S.C. § 53(b).

**2.**     Section 13(b)'s requirement that the FTC show a "likelihood of ultimate success" means that the FTC must "do far more than merely raise sufficiently serious questions with respect to the merits."  *U.S. v. Siemens Corp.*, 621 F.2d 499, 506 (2d Cir. 1980); *accord FTC v Arch Coal, Inc.*, 329 F. Supp. 2d 109, 116 (D.D.C. 2004) (stating that "the FTC's burden is not insubstantial" in demonstrating likelihood of success on the merits).  Instead, the "likelihood of success" standard means what it says.  *Starbucks*, 144 S. Ct. at 1575-76 (holding that Congress's articulation of that standard requires more than just showing that an agency's case poses a "substantial and not frivolous" question).

**3.**     To carry its burden to show "likelihood of ultimate success," Plaintiff must prove that it is likely to succeed in convincing a federal court of appeals that the transaction violates Section 7. *FTC v. Lancaster Colony Corp.*, 434 F. Supp. 1088, 1091 (S.D.N.Y. 1977) (noting that the success inquiry is tied to a favorable "determination by the FTC in the first instance and ultimately by the Court of Appeals"); *see also FTC v. Freeman Hosp.*, 69 F.3d 260, 267 (8th Cir. 1995) (same); *FTC v. Elders Grain, Inc.*, 868 F.2d 901, 903 (7th Cir. 1989) (similar).

**4.**    In weighing the evidence to determine if the Plaintiff has carried its burden to show "a likelihood of ultimate success," a district court "must evaluate"—not ignore—"any factual conflicts or difficult questions of law." *Starbucks*, 144 S. Ct. at 1578.

**B.    Section 7 Legal Framework**

**5.**    Section 7 only prohibits transactions if "the effect of such acquisition . . . may be substantially to lessen competition." 15 U.S.C. § 18; *Int'l Shoe Co. v. FTC*, 280 U.S. 291, 298 (1930) (stating that "some lessening of competition, is not forbidden"); *U.S. v. AT&T, Inc.*, 916 F.3d 1029, 1032 (D.C. Cir. 2019).

**6.**    A plaintiff must show "that a substantial lessening of competition will be sufficiently probable and imminent to warrant relief." *Arch Coal*, 329 F. Supp. 2d at 115; *see also U.S. v. Marine Bancorporation, Inc.*, 418 U.S. 602, 622-23 (1974) (stating that Section 7 "deals in probabilities, not ephemeral possibilities").

**7.**    Courts follow a three-step burden-shifting standard laid out in *U.S. v. Baker Hughes Inc.* to evaluate the merits of a Section 7 claim involving a horizontal merger. *See* 908 F.2d 981, 982-83 (D.C. Cir. 1990); *New York v. Deutsche Telekom*, 439 F. Supp. 3d 179, 206-07 (S.D.N.Y. 2020).

**8.**    At step 1, Plaintiff must demonstrate that the "transaction will lead to undue concentration in the market for a particular product in a particular geographic area." *Baker Hughes*, 908 F.2d at 982. To do so, the Commission must "(1) propose the proper relevant market and (2) show that the effect of the merger in that market is likely to be anticompetitive." *FTC v. Thomas Jefferson Univ.*, 505 F. Supp. 3d 522, 538 (E.D. Pa. 2020).

**9.**    If Plaintiff fails to prove its prima facie case, its case fails. Otherwise, the case proceeds to step 2, where Defendants must show that Plaintiff's "prima facie case inaccurately predicts the relevant transaction's probable effect on future competition." *Baker Hughes*, 908 F.2d at 991. The standard for the quantum of evidence Defendants must produce to shift the burden back is

relatively low, particularly where, as here, Plaintiff's prima facie case is weak. *Arch Coal*, 329 F. Supp. 2d at 129 ("Certainly less of a showing is required from defendants to rebut a less-than-compelling prima facie case.").  Notably, Defendants bear only a "burden of production," not a "burden of persuasion." *Baker Hughes*, 908 F.2d at 991.

**10.**    If Defendants rebut Plaintiff's prima facie case, under step 3, the burden shifts to Plaintiff to prove that the merger will substantially lessen competition in its relevant market. *Baker Hughes*, 908 F.2d at 983.  The ultimate burden of persuasion always rests with Plaintiff. *Id.* at 991.

## II.    PLAINTIFF'S PRIMA FACIE BURDEN:    MARKET DEFINITION AND PLAUSIBLE PROOF OF MARKET CONCENTRATION (STEP 1)

### A.    Plaintiff Must Put Forward A Relevant Antitrust Market

**11.**    "[T]he proper definition of the market is a 'necessary predicate' to an examination of the competition that may be affected by the horizontal aspects of [a] merger." *Brown Shoe Co. v. United States*, 370 U.S. 294, 335 (1962).  "[W]ithout a definition of that market there is no way to measure the defendant's ability to lessen or destroy competition." *Concord Assocs., L.P. v. Entm't Props. Tr.*, 817 F.3d 46, 53 (2d Cir. 2016).

**12.**    Market definition is a "pragmatic" and "factual" exercise, "not a formal, legalistic one," which is designed to determine, from the consumers' perspective, the "area of effective competition," consistent with "the commercial realities of the industry." *Brown Shoe*, 370 U.S. at 324, 336; *U.S. v. Booz Allen Hamilton*, 2022 WL 9976035, at *10 (D. Md. Oct. 17, 2022) (noting that an antitrust plaintiff may not "gerrymander its way to victory without due regard for market realities").

**13.**    "The relevant market must be defined as all products reasonably interchangeable *by consumers* for the same purposes, because the ability of *consumers* to switch to a substitute restrains a firm's ability to raise prices above the competitive level." *City of New York v. Grp.*

*Health Inc.*, 649 F.3d 151, 155 (2d Cir. 2011)[5] (emphases added); *U.S. v. Am. Express Co.* ("*AmEx*"), 838 F.3d 179, 197-98 (2d Cir. 2016) ("The proper market definition [ ] can be determined only after a factual inquiry into the commercial realities faced by consumers."), *aff'd sub nom. Ohio v. Am. Express Co.*, 585 U.S. 529 (2018).

**14.**   Plaintiff's failure to define a relevant antitrust market means it cannot carry its prima facie burden and the injunction should be denied.  *Thomas Jefferson Univ.*, 505 F. Supp. 3d at 557-58; *FTC v. RAG-Stiftung*, 436 F. Supp. 3d 278, 311-12 (D.D.C. 2020) (denying FTC request for preliminary injunction where FTC failed to carry its burden on market definition).

### B.    Methods for Determining Market Definition

**15.**   Courts have applied two approaches to analyzing market definition:  (1) an analysis of "reasonable interchangeability" based on the Hypothetical Monopolist Test ("HMT") and (2) application of the *Brown Shoe* "practical indicia" factors.  The two tests serve complementary but distinct purposes.   "[T]he reasonable-interchangeability analysis is the essential test for ascertaining the relevant product market," and the "practical indicia come into play only after the outer boundaries of a product market are determined by evaluating the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it."  *Ky. Speedway v. NASCAR*, 588 F.3d 908, 918 (6th Cir. 2009).

**16.**   "Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient."  *City of New York.*, 649 F.3d at 155; *see also U.S. v. Oracle Corp.*, 331 F. Supp. 2d 1098, 1131-32 (N.D.

---

[5]     Unless otherwise noted, all internal citations and quotations have been omitted.

Cal. 2004) (noting product markets are underinclusive if they fail to include all reasonably interchangeable products that constrain a defendant's pricing).

### 1.    The Hypothetical Monopolist Test

**17.**    The HMT provides a methodology for applying economic analysis to determine reasonable interchangeability and determines "whether a hypothetical monopolist acting within the proposed market would be substantially constrained from increasing prices by the ability of customers to switch to other producers." *AmEx,* 838 F.3d at 198.

**18.**    One element of the HMT involves a diversion analysis, which examines "a consumer's response to a measured increase in the price of a product.  In other words, diversion measures to what extent consumers of a given product will switch (or be 'diverted') to other products in response to a price increase in the given product." *U.S. v. H&R Block, Inc.*, 833 F. Supp. 2d 36, 62 (D.D.C. 2011).  If the evidence shows that, in the event of a price increase, consumers would divert to other products, those products are in the relevant market.  *See id.* at 58.

**19.**    In the absence of data that tests for diversion, courts in Section 7 cases have held that it is not a proper application of the HMT to rely on a consumer survey that does not test for what consumers would do in the event of a price increase.  *Id.* at 70-71.  Nor is it a proper application of the HMT to rely on data that does not accurately capture all available substitutes to which consumers might turn.  *Thomas Jefferson Univ.*, 505 F. Supp. 3d at 553-54.

### 2.    *Brown Shoe* Practical Indicia Factors

**20.**    Courts sometimes apply the *Brown Shoe* "practical indicia" factors to test the boundaries of a market "by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors."

370 U.S. at 325.  Because merger analysis is fact-specific, there is scant law on several of the factors, though courts have observed some key principles.

**21.**     "**Peculiar characteristics and uses**" analyzes functional interchangeability at a factual level.  Products serving the same basic purpose are ordinarily grouped in the same relevant market.  *See, e.g.*, *Haagen-Dazs Co. v. Double Rainbow Gourmet Ice Creams, Inc.*, 895 F.2d 1417 (Table), 1990 WL 12148, at *3-4 (9th Cir. 1990) ("super premium ice cream" and "other ice cream products" were in the same relevant market because they were not "so different that they [were] unsuited for the same purpose"); *Murrow Furniture Galleries, Inc. v. Thomasville Furniture Indus., Inc.*, 889 F.2d 524, 528 (4th Cir. 1989) (rejecting narrower market where plaintiff did not meet its burden of showing that "better branded" furniture was not interchangeable with "name brand" or other furniture lines); *Ron Tonkin Gran Turismo, Inc. v. Fiat Distributors, Inc.*, 637 F.2d 1376, 1379-80 (9th Cir. 1981) (rejecting single branded market in favor of "cars in general" because "[t]he automobile market has always shown high cross-elasticity of demand).

**22.**     "**Unique production facilities**" examines whether "the ability of other producers to shift resources to make the product would be limited" if "the producer raises the price above the competitive level."  *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 218 n.4 (D.C. Cir. 1986).  If production resources are not constrained then "uniqueness" itself is irrelevant since they are in abundant supply.  *Id.* at 218 (noting that the more widely production facilities are available, the easier it is for those facilities to support functionally interchangeable products).

**23.**     "**Distinct prices**" and "**sensitivity to price changes**" are intended to test cross-elasticity of demand and sensitivity to price changes based on the industry's commercial realities.  *Rothery Storage*, 792 F.2d at 218 n.4.  As *Brown Shoe* noted, given the tendency of customers to substitute shoes where pricing occurred on a spectrum, "it would be unrealistic to accept Brown's contention

that, for example, men's shoes selling below $8.99 are in a different product market from those selling above $9.00."  370 U.S. at 326.

**24.**    Courts have repeatedly observed that defining markets by "price variances or product quality variances" is "economically meaningless where the differences are actually a *spectrum* of price and quality differences."  *In re Super Premium Ice Cream Litig.*, 691 F. Supp. 1262, 1268 (N.D. Cal. 1988) (emphasis in original), *aff'd*, 1990 WL 12148, at *3 (noting that "differentiated products face intense competition from other brands of the same product"); *Nifty Foods Corp. v. Great Atl. & Pac. Tea*, 614 F.2d 832, 840-41 (2d Cir. 1980) (finding that dividing a market into branded and private-label frozen waffles was "even less realistic" than the market proposed in *Brown Shoe* where the two types of waffles were "sold side by side in the same frozen food cases and distinguished only by label and price, and not quality"); *Murrow Furniture,* 889 F.2d at 528 (rejecting a market definition of "name-brand" or "better branded" furniture); *U.S. v. Jos. Schlitz Brewing*, 253 F. Supp. 129, 145-46 (N.D. Cal. 1966) (rejecting submarket of premium beers because "beer prices range over a wide spectrum" and thus there was "no rational way of choosing a point along this price spectrum"), *aff'd*, 385 U.S. 37 (1966).

**25.**    This is especially true in cases involving differentiated products where competition occurs across a range of factors beyond price, including quality.  *See New York v. Kraft Gen. Foods, Inc.*, 926 F. Supp. 321, 333 (S.D.N.Y. 1995) (finding that "ready to eat" cereals were in a single relevant market because such cereals were "so highly differentiated, and compete[d] with one another along so many different dimensions, that there [was] no clear break in the chain of substitutes," and thus, "[a]ny substantial price increase for any one type of RTE cereal would lead to significant demand-side substitution of many other RTE cereals").

47

### III.    DEFENDANTS CAN REBUT PLAINTIFF'S PRIMA FACIE CASE WITH PROOF THAT PLAINTIFF'S PROPOSED MARKET AND SHARES INACCURATELY PREDICT THE MERGER'S COMPETITIVE EFFECTS (STEP 2)

**26.**    If Plaintiff meets its burden at step 1, Defendants can rebut Plaintiff's prima facie case by demonstrating that "statistics on market share, market concentration, and market concentration trends portray inaccurately the merger's probable effects on competition." *Baker Hughes*, 908 F.2d at 991, 992 ("market share" does not always translate to "market power, which is the ultimate consideration" in whether a defendant can rebut a plaintiff's prima facie showing).

**27.**    "Relevant evidence may include unique economic circumstances and nonstatistical evidence that undermines the predictive value of market share statistics, such as ease of entry into the market, the trend of the market toward or away from concentration, and the continuation of active price competition." *Deutsche Telekom*, 439 F. Supp. 3d at 207.

**28.**    The standard for the quantum of evidence defendants must produce to shift the burden back is relatively low particularly where the Plaintiff's prima facie case is weak. *Arch Coal*, 329 F. Supp. 2d at 129 ("Certainly less of a showing is required from defendants to rebut a less-than-compelling prima facie case.").

**29.**    Defendants can rebut Plaintiff's showing at step 1 by demonstrating that entry in the relevant market is easy, which, in turn, requires a focus on barriers to entry because in markets with low entry barriers, "existing competitors could not succeed in raising prices for any significant period of time." *U.S. v. Waste Mgmt., Inc.*, 743 F.2d 976, 982 (2d Cir. 1984) (noting that a market definition "artificially restricted to existing firms competing at one moment may yield market share statistics that are not an accurate proxy for market power when substantial potential competition able to respond quickly to price increases exists"); *see also U.S. v. Syufy Enters.*, 903 F.2d 659, 664, 667 (9th Cir. 1990) (barriers to entry did not exist where entry into the market was not "limited by government regulation or licensing requirements," "onerous front-end investments" were not

required, the market did not depend on a "scarce commodity," and there were no exclusive contracts or distribution arrangements to lock out competitors).

**30.**     To demonstrate ease of entry, competitors (either currently in the market or potential entrants) must simply have the collective ability to constrain supracompetitive prices—even if those competitors never actually enter the market.  *Baker Hughes*, 908 F.2d at 988 ("If barriers to entry are insignificant, the *threat* of entry can stimulate competition in a concentrated market, regardless of whether entry ever occurs." (emphasis in original)); *see Deutsche Telekom*, 439 F. Supp. 3d at 225-26 (relying in part on potential for entry by a single entrant to find that the government's prima facie case was rebutted); *FTC v. Occidental Petroleum Corp.*, 1986 WL 952, at *15 (D.D.C. Apr. 29, 1986) (declining to preliminarily enjoin a merger partly because firms could easily enter the market by using existing facilities).

**31.**     Courts consider whether Plaintiff's post-merger concentration statistics fail to accurately portray the merging company's weak competitive stature which can be indicated by its declining competitive significance.  *See U.S. v. Gen. Dynamics Corp.*, 415 U.S. 486, 497-99 (1974).

**32.**     Plaintiff's post-merger concentration statistics can also misstate competitive effects where there is evidence of procompetitive efficiencies arising from the merger.  *See In re AMR Corp.*, 625 B.R. 215, 253-54 (Bankr. S.D.N.Y. 2021), *aff'd*, 2023 WL 2563897 (2d Cir. Mar. 20, 2023).

**33.**     Courts recognize that "evidence of efficiencies may rebut the presumption that a merger's effects will be anticompetitive, even if such evidence could not be used as a defense to an actually anticompetitive merger," provided that the claimed efficiencies are "merger-specific and verifiable."  *Deutsche Telekom*, 439 F. Supp. 3d at 207-08 (collecting cases); *accord Arch Coal*, 329 F. Supp. 2d at 151 (noting that, "even where evidence of efficiencies in the relevant market

will not support an outright defense to an anticompetitive merger, such evidence is relevant to the competitive effects analysis").

**34.**    Efficiencies need not be precisely quantified to be verifiable.  *Deutsche Telekom*, 439 F. Supp. 3d at 216.

## IV.    PLAINTIFF HAS THE ULTIMATE BURDEN OF PERSUASION AND MUST PUT FORWARD CONCRETE EVIDENCE THAT THE MERGER WILL LIKELY RESULT IN HIGHER PRICES POST-MERGER (STEP 3)

**35.**    Plaintiff must put forward a defensible, "forward-looking analysis" which proves that the acquirer likely will raise prices post-merger.  *U.S. v. Sabre Corp.*, 452 F. Supp. 3d 97, 146 (D. Del. 2020), *vacated on other grounds*, 2020 WL 4915824 (3d Cir. July 20, 2020); *Baker Hughes*, 908 F.2d at 988, 991 (explaining that merger analysis "focus[es] on the future" and requires the court to "[p]redict[ ] future competitive conditions"); *Aurora Astro Prod. LLC v. Celestron Acquisition, LLC*, 691 F. Supp. 3d 1132, 1149 (N.D. Cal. 2023) (noting that a plaintiff must show that the merger "create[s] an appreciable danger of higher prices in the relevant market in the future").

## V.    BALANCING THE EQUITIES

**36.**    In balancing the equities, "[t]he Court considers whether the injunction, not the merger, would be in the public interest."  *Thomas Jefferson Univ.*, 505 F. Supp. 3d at 538.  "The question is whether the harm that the [parties] will suffer if the merger is delayed will, in turn, harm the public more than if the injunction is not issued."  *Id.*

**37.**    The lengthy time required to go through the administrative litigation process and the fact that doing so may kill a deal is relevant to balancing the equities where doing so will deprive consumers of the procompetitive advantages resulting from a merger.  *See, e.g., Arch Coal*, 329 F. Supp. 2d at 159-60.  "Where the harm to defendants is great and there is little likelihood that consummation of the merger would jeopardize ultimate relief, the court clearly may deny injunctive relief."  *Siemens Corp.*, 621 F.2d at 506.

Dated: August 30, 2024

Respectfully submitted,

*Alfred C. Pfeiffer*
Alfred C. Pfeiffer (*pro hac vice*)
Christopher S. Yates (*pro hac vice*)
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Telephone: (415) 395-8240
Facsimile: (415) 395-8095
al.pfeiffer@lw.com
chris.yates@lw.com

Amanda P. Reeves (*pro hac vice*)
Ian R. Conner (*pro hac vice*)
Lindsey S. Champlin (*pro hac vice*)
Jennifer L. Giordano
David L. Johnson (*pro hac vice*)
Seung Wan (Andrew) Paik (*pro hac vice*)
Mary A. Casale (*pro hac vice*)
Christopher J. Brown (*pro hac vice*)
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
Telephone: (202) 637-2200
Facsimile: (202) 637-2201
amanda.reeves@lw.com
ian.conner@lw.com
lindsey.champlin@lw.com
jennifer.giordano@lw.com
david.johnson@lw.com
andrew.paik@lw.com
mary.casale@lw.com
chris.brown@lw.com

Lawrence E. Buterman
LATHAM & WAKINS LLP
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
Facsimile: (212) 751-4864
lawrence.buterman@lw.com

Sean M. Berkowitz (*pro hac vice*)
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800

51

Chicago, IL 60611
Telephone: (312) 876-7700
Facsimile: (312) 993-9767
sean.berkowitz@lw.com

*Attorneys for Tapestry, Inc.*

<u>Jonathan M. Moses</u>
Jonathan M. Moses[6]
Elaine P. Golin
Adam L. Goodman
Karen Wong
Brittany A. Fish
51 West 52nd Street
New York, New York 10019
Telephone: (212) 403-1000
JMMoses@wlrk.com
EPGolin@wlrk.com
ALGoodman@wlrk.com
KWong@wlrk.com
BAFish@wlrk.com

*Attorneys for Capri Holdings Limited*

---

[6] Electronic signatures used with consent in accordance with Rule 8.5(b) of the Court's ECF Rules and Instructions.

## APPENDIX A

## INDEX OF 2023 NPD LABELS FOR CITED BRANDS

This table shows how NPD labels brands that are cited in Defendants' Proposed Findings of Fact above.[7]  This is not a comprehensive list of all brands that NPD tracks.  Only brands cited in these Proposed Findings of Fact are included in this Index.

| Better | Bridge | Contemporary | Designer | Unclassified |
|---|---|---|---|---|
| Anne Klein | Brahmin | Clare V. | Alexander McQueen | Aupen |
| Baggallini | Brandon Blackwood | Cult Gaia | Balenciaga | Cartier |
| Baggu | Coach | Hammitt | Bottega Veneta | Cuyana |
| Bogg Bag | Cole Haan | Hugo Boss | Burberry | Everlane |
| | Dagne Dover | Jacquemus | Celine | Hermes |
| Calvin Klein | DKNY | Loeffler Randall | Chanel | Le Tanneur |
| Fossil | Dooney & Bourke | Marc Jacobs | Chloe | Louis Vuitton |
| Guess | Furla | MCM | Christian Dior | Luar |
| Karl Lagerfeld | Kate Spade | Rebecca Minkoff | Fendi | Lululemon |
| Nine West | Kurt Geiger | Staud | Ferragamo | Polene |
| Patricia Nash | Lauren Ralph Lauren | Ulla Johnson | Gabriela Hearst | Princess Polly |
| Polo Ralph Lauren | Longchamp | | Givenchy | Telfar |
| Steve Madden | MICHAEL Michael Kors | | Gucci | Zara |
| Tommy Hilfiger | MZ Wallace | | J.W. Anderson | |
| Vera Bradley | Tory Burch | | Loewe | |
| | Tumi | | Loro Piana | |
| | Vince Camuto | | Michael Kors Collection | |
| | | | Mulberry | |
| | | | Prada | |
| | | | Ralph Lauren Collection | |
| | | | Stella McCartney | |
| | | | The Row | |
| | | | Tod's | |
| | | | Valentino | |
| | | | Versace | |
| | | | Yves Saint Laurent | |

---

[7] *See* DX-0496, DX-0497, DX-0498, DX-0499 (Summaries of 2023 NPD Brand Classifications).