**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

FEDERAL TRADE COMMISSION,

                    Plaintiff,

  v.

TAPESTRY, INC.,

  and

CAPRI HOLDINGS LIMITED.

                    Defendants.

Case No. 1:24-cv-03109-JLR

**REDACTED VERSION**

<u>**PLAINTIFF FEDERAL TRADE COMMISSION'S POST-HEARING
PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**</u>

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

THE FEDERAL TRADE COMMISSION'S PROPOSED FINDINGS OF FACT ...................... 3

I.      THE PARTIES AND THEIR PRODUCTS ...................................................... 3

    A.    Tapestry, Inc. ("Tapestry") ...................................................................... 3

    B.    Capri Holdings Limited ("Capri") ............................................................ 5

    C.    Handbags ................................................................................................ 7

II.     THE PROPOSED ACQUISITION ...................................................................... 8

III.    COACH COINS "ACCESSIBLE LUXURY" AND OTHERS FOLLOW SUIT. .......... 12

IV.     "ACCESSIBLE LUXURY" SIGNIFIES A DISTINCT SET OF HANDBAGS,
        MARKED BY HIGH QUALITY AT AFFORDABLE PRICES. .................................. 15

    A.    Pricing ................................................................................................... 16

    B.    Quality ................................................................................................... 20

    C.    Supply Chain .......................................................................................... 22

    D.    Other Characteristics of "Accessible Luxury" Handbags ..................... 23

V.      TAPESTRY AND CAPRI HAVE REPEATEDLY RECOGNIZED "ACCESSIBLE
        LUXURY" AS A  DISTINCT MARKET TO INVESTORS AND THEIR BOARDS. . 26

    A.    Defendants Have Long Acknowledged a Distinct Market for "Accessible
        Luxury" Handbags in Statements to Investors and Their Boards of Directors. .... 26

    B.    Investors and Wall Street Recognize a Market for "Accessible Luxury"
        Handbags. .............................................................................................. 27

    C.    Defendants' Market Positioning Remains the Same. ............................ 28

VI.     CONSUMERS RECOGNIZE A DISTINCT MARKET FOR "ACCESSIBLE
        LUXURY" HANDBAGS. ............................................................................... 29

VII.    OTHER TYPES OF HANDBAGS ARE NOT REASONABLE SUBSTITUTES. ........ 30

    A.    True Luxury Handbags ............................................................................ 30

    B.    Mass-Market Handbags .......................................................................... 36

C.    Other Types of Bags ........................................................................ 39

VIII.    QUANTITATIVE ECONOMIC ANALYSIS CONFIRMS A DISTINCT MARKET
FOR "ACCESSIBLE LUXURY" HANDBAGS. .......................................... 40

IX.    COACH, KATE SPADE, AND MICHAEL KORS DOMINATE "ACCESSIBLE
LUXURY" HANDBAGS IN THE UNITED STATES. ................................... 45

X.    TAPESTRY AND CAPRI—THROUGH THEIR COACH, KATE SPADE, AND
MICHAEL KORS BRANDS—COMPETE HEAD-TO-HEAD IN THE SALE OF
"ACCESSIBLE LUXURY" HANDBAGS. .................................................. 47

A.    Pricing and Discounts. ..................................................................... 48

B.    Design. .............................................................................................. 51

C.    Marketing. ........................................................................................ 54

D.    Brick-and-Mortar Stores. ................................................................. 55

E.    Labor. ............................................................................................... 56

F.    Sustainability ................................................................................... 57

XI.    THERE ARE BARRIERS TO SCALE "ACCESSIBLE LUXURY" HANDBAGS. ..... 58

A.    Building a Brand Takes Time. .......................................................... 58

B.    Brick-and-Mortar Is a Barrier to Scale. .......................................... 60

C.    Marketing and Advertising Is a Barrier to Scale. ............................ 62

D.    Data Is a Barrier to Scale. ............................................................... 63

E.    Celebrities Are Expensive and Alone Cannot Successfully Grow a Brand. ......... 64

XII.    TAPESTRY ANNOUNCES THE PROPOSED ACQUISITION IN AUGUST
2023. ............................................................................................................ 66

A.    Tapestry Asserts that It Will "Revitalize" the Michael Kors Brand. .................... 66

B.    Tapestry Asserts That It Will Run Its Brands Independently. ............................. 70

THE FEDERAL TRADE COMMISSION'S PROPOSED CONCLUSIONS OF LAW ........... 73

I.    THE FTC IS LIKELY TO SUCCEED IN THE MERITS PROCEEDING. .................. 77

A.    The Proposed Acquisition is Presumptively Illegal and Likely to Cause
Anticompetitive Effects in the "Accessible Luxury" Handbag Market. .............. 77

1.    "Accessible Luxury" Handbags Are a Relevant Product Market. ............... 78

    a.    The Brown Shoe Practical Indicia Demonstrate That "Accessible Luxury" Handbags Constitute a Relevant Product Market. ................ 82

    b.    "True Luxury" and Mass Market Handbags Are Not Reasonably Interchangeable with "Accessible Luxury" Handbags. ....................... 85

    c.    Economic Analysis Confirms "Accessible Luxury" Handbags in the United States Is a Relevant Market. .................................................... 86

2.    The Proposed Acquisition Creates a Presumptively Illegal Increase in Concentration in the "Accessible Luxury" Handbag Product Market. ........ 88

B.    The Acquisition Is Unlawful Regardless of Market Concentration Because It Will Eliminate Substantial Head-To-Head Competition. ...................................... 90

C.    Defendants Cannot Rebut the FTC's Case. .......................................................... 92

1.    Entry and Expansion Will Not Be Timely, Likely, or Sufficient to Counteract the Proposed Acquisition's Anticompetitive Effects. ............... 93

2.    Any Benefits Are Not Merger-Specific, Cognizable, or Verifiable. ........... 94

3.    Assertions That the Brands Will Be Run Autonomously Are Contrary to Law and Fact. .................................................................................................. 96

4.    The FTC Is Not Required to Show That Tapestry Will Raise Prices Post-Acquisition—But It Likely Will. ................................................................... 97

II.    THE EQUITIES SUPPORT A PRELIMINARY INJUNCTION. .................................. 99

# TABLE OF AUTHORITIES

**Cases**

*A. G. Spalding & Bros., Inc., v. FTC*, 301 F.2d 585 (3d Cir. 1962) ............................................. 84

*Beatrice Foods Co. v. FTC*, 540 F.2d 303 (7th Cir. 1976) ........................................................... 79

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) ....................................................... *passim*

*Chicago Bridge & Iron Co. N.V. v. FTC*, 534 F.3d 410 (5th Cir. 2008) ............................ 2, 91, 93

*Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30

    (2d Cir. 2010)................................................................................................................ 75

*Consol. Gold Fields v. Anglo American Corp.*, 698 F. Supp. 487 (S.D.N.Y. 1988) ................... 89

*Copperweld Corp. v. Ind. Tube Corp.*, 467 U.S. 752 (1984)....................................................... 96

*Credit Bureau Reports, Inc. v. Retail Credit Co.*, 358 F. Supp. 780 (S.D. Tex. 1971) ............... 77

*F. & M. Schaefer Corp. v. C. Schmidt & Sons, Inc.*, 597 F.2d 814 (2d Cir. 1979) ............... 75, 81

*FTC v. Advocate Health Care Network*, 841 F.3d 460 (7th Cir. 2016) ..................................... 78

*FTC v. Crescent Publ'g Grp., Inc.*, 129 F. Supp. 2d 311 (S.D.N.Y. 2001)................................. 73

*FTC v. Elders Grain, Inc.*, 868 F.2d 901 (7th Cir. 1989) (Posner, J.) ......................................... 75

*FTC v. H.J. Heinz Co.*, 246 F.3d 708 (D.C. Cir. 2001) ................................................................ 99

*FTC v. IQVIA Holdings, Inc.*, 710 F. Supp. 3d 329 (S.D.N.Y. 2024) ................................... *passim*

*FTC v. IQVIA Holdings, Inc.*, No. 23 Civ. 06188 (ER), 2023 WL 7152577

    (S.D.N.Y. Oct. 31, 2023) ............................................................................................ 73

*FTC v. Lancaster Colony Corp.*, 434 F. Supp. 1088 (S.D.N.Y. 1977)................................. *passim*

*FTC v. Meta Platforms, Inc.*, 654 F. Supp. 3d 892 (N.D. Cal. 2023)......................................... 81

*FTC v. Meta Platforms, Inc.*, No. 22 Civ. 04325 (EJD), 2022 WL 16637996

    (N.D. Cal. Nov. 2, 2022)....................................................................................... 73, 74

*FTC v. Peabody Energy Corp.*, 492 F. Supp. 3d 865 (E.D. Mo. 2020) ................................ 99, 100

*FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327 (3rd Cir. 2016) ..................... 75, 89, 99, 100

*FTC v. Sanford Health*, 1:17-cv-133, 2017 WL 10810016 (D.N.D. Dec. 15, 2017) ................. 97

*FTC v. Staples, Inc.*, 190 F. Supp. 3d 100 (D.D.C. 2016) ......................................... 84, 88, 92

*FTC v. Surescripts, LLC*, 665 F. Supp. 3d 14 (D.D.C. 2023) ....................................... 80

*FTC v. Swedish Match*, 131 F. Supp. 2d 151 (D.D.C. 2000) ...................................... 79, 80

*FTC v. Sysco Corp.*, 113 F. Supp. 3d 1 (D.D.C. 2015) ........................................... *passim*

*FTC v. Univ. Health, Inc.*, 938 F.2d 1206 (11th Cir. 1991) ...................................... 74, 99

*FTC v. Warner Commc'ns, Inc.*, 742 F.2d 1156 (9th Cir. 1984) ................................... 74

*FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028 (D.C. Cir. 2008) ........................... *passim*

*FTC v. Wilh. Wilhelmsen Holdings ASA*, 341 F. Supp. 3d 27 (D.D.C. 2018) ............... 83

*FuboTV Inc. v. Walt Disney Co.*, No. 24-CV-01363 (MMG), 2024 WL 3842116

(S.D.N.Y. Aug. 16, 2024) ...................................................................... 2, 76, 80, 90

*Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485 (2d Cir. 2004) .......... 78, 79, 81, 84

*Optronic Techs., Inc. v. Ningbo Sunny Elec. Co., Ltd.*, 20 F.4th 466 (9th Cir. 2021) ................. 81

*Photovest Corp. v. Fotomat Corp.*, 606 F.2d 704 (7th Cir. 1979) ................................. 82

*ProMedica Health Sys., Inc. v. FTC*, 749 F.3d 559 (6th Cir. 2014) ............................. 95

*R.C. Bigelow, Inc. v. Unilever N.V.*, 867 F.2d 102 (2d Cir. 1989) ............................... 80

*Regeneron Pharms., Inc. v. Novartis Pharma AG*, 96 F.4th 327 (2d Cir. 2024) ......................... 81

*Reynolds Metals Co. v. FTC*, 309 F.2d 223 (D.C. Cir. 1962) ....................................... 84

*St. Alphonsus Med. Ctr.–Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775

(9th Cir. 2015) ..................................................................................... 95

*Starbucks Corp. v. McKinney*, 144 S. Ct. 1570 (2024) .............................................. 74

*United States v. Aetna Inc.*, 240 F. Supp. 3d 1 (D.D.C. 2017) ...................................... 91

*United States v. Aluminum Co. of Am.*, 377 U.S. 271 (1964) ................................. 79, 80

*United States v. Anthem Inc.*, 236 F. Supp. 3d 171 (D.D.C. 2017) ............................. 81

*United States v. Anthem*, 855 F.3d 345 (D.C. Cir. 2017) ............................................ 97

*United States v. AT&T*, 916 F. 3d 1029 (D.C. Cir. 2019) ............................................ 96

*United States v. Bazaarvoice, Inc.*, No. 13-CV-00133-WHO, 2014 WL 203966

   (N.D. Cal. Jan. 8, 2014) ........................................................................................ 98

*United States v. Bertelsmann SE & Co.*, 646 F. Supp. 3d 1 (D.D.C. 2022) ........................ *passim*

*United States v. Falstaff Brewing Corp.*, 410 U.S. 526 (1973) (Marshall, J., concurring).......... 97

*United States v. H&R Block*, 833 F. Supp. 2d 36 (D.D.C. 2011) ........................................... *passim*

*United States v. Mfrs. Hanover Tr. Co.*, 240 F. Supp. 867 (S.D.N.Y. 1965) ....................... 77, 90

*United States v. Pabst Brewing Co.*, 384 U.S. 546 (1966) ....................................... 2, 89

*United States v. Phila. Nat'l Bank*, 374 U.S. 321 (1963) ....................................... *passim*

*United States v. Sun & Sand Imports, Ltd.*, 725 F.2d 184 (2d Cir. 1984) ................................... 74

*United States v. Von's Grocery Co.*, 384 U.S. 270 (1966) ................................. 2, 89, 93

## Statutes

15 U.S.C. § 18 ........................................................................................................ *passim*

15 U.S.C. § 53(b) ................................................................................................... *passim*

## Other Authorities

2023 U.S. Dep't of Justice and FTC Merger Guidelines ....................................... *passim*

H.R. Rep. No. 93-624 (1973) (Conf. Rep.)........................................................................ 75

## **INTRODUCTION**

After a seven-day evidentiary hearing, very little of the key facts in this case remain in dispute: Defendants use the term "accessible luxury" to demonstrate their "brand positioning" to the Securities & Exchange Commission ("SEC"), the investment community, and their respective Boards of Directors. *E.g.*, Hr'g Tr. 9/10 Crevoiserat (Tapestry) at 261:13-21, 263:7-13; Hr'g Tr. 9/9 Idol (Capri) at 144:20-145:4; PX1431 (Tapestry) at 12. This "brand positioning" is one of a "beautiful, well-crafted product" at an "incredible value." Hr'g Tr. 9/10 Crevoiserat (Tapestry) at 260:3-261:12. Other "accessible luxury" handbag brands tout similar brand positioning—including in consumer-facing materials. Industry participants, investors, and even consumers recognize a distinct segment of handbags known as "accessible luxury" (and similar terms). Coach, Michael Kors, and Kate Spade are among the biggest brands in this space—with fierce, long-time rivals Coach and Michael Kors dwarfing all other players, including a long tail of hundreds of very small competitors. PX6000 (Smith (FTC) Rep.) ¶ 186, tbl. 7.

The disagreement here is about the meaning of those facts. Defendants argue that Coach, Michael Kors, and Kate Spade compete with all handbags, even possibly the Hermès Birkin bag (*see* Hr'g Tr. 9/12 Wilmotte (Capri) at 772:4-12; Hr'g Tr. 9/12 Fraser (Tapestry) at 901:18-23)— even though they have repeatedly, and consistently, pointed investors and their Boards to the ever-widening "white space" between the pricing for their handbags and those of "true luxury" players like Louis Vuitton (*e.g.*, Hr'g Tr. 9/10 Crevoiserat (Tapestry) at 269:23-270:5; Hr'g Tr. 9/10 Kahn (Tapestry) at 439:16-20), and even though they told foreign regulators that their offerings constitute a separate product market from "mass-market" brands. PX2061 (Capri) at 4. But even assuming *arguendo* that were true, the size and scope of the relevant market matters only for measuring market concentration. It has no bearing on the mountain of evidence showing

that Coach and Kate Spade, on the one hand, and Michael Kors, on the other, are closest competitors, and this evidence alone demonstrates that these brands compete in a relevant market—and, with their eye-popping $3 billion in domestic handbag sales, that their merger would substantially lessen competition. *See FuboTV Inc. v. Walt Disney Co.*, No. 24-CV-01363 (MMG), 2024 WL 3842116, at *17, 29-30 (S.D.N.Y. Aug. 16, 2024); *FTC v. IQVIA Holdings, Inc.*, 710 F. Supp. 3d 329, 385 (S.D.N.Y. 2024); 2023 U.S. Dep't of Justice and FTC Merger Guidelines § 2.2 (hereinafter, the "Merger Guidelines"). That alone satisfies the FTC's burden to obtain a preliminary injunction to maintain the status quo until the legality of the merger can be adjudicated in the administrative proceeding.

To be clear, though, the FTC has established a relevant market of "accessible luxury" handbags in the United States, in which Defendants will claim a post-merger combined share of 58 percent, easily clearing the *Philadelphia National Bank* and HHI thresholds for a presumption of illegality. *See United States v. Phila. Nat'l Bank*, 374 U.S. 321, 363-64 (1963); Merger Guidelines § 2.1. Defendants point to the many brands, including new entrants, in the space, but there is no dispute on that score either. PX59; PX6001 (Smith (FTC) Reply Rep.) ¶ 62, tbl. 1. The dispute again is about the meaning of that fact—whether these brands undermine the FTC's evidence of market concentration (they do not), *see United States v. Von's Grocery Co.*, 384 U.S. 270, 272-74 (1966); *United States v. Pabst Brewing Co.*, 384 U.S. 546, 550-52 (1966); *see also United States v. H&R Block*, 833 F. Supp. 2d 36, 44, 92 (D.D.C. 2011), and whether they can replace the loss of competition from the merger (again, no), *see Chicago Bridge & Iron Co. N.V. v. FTC*, 534 F.3d 410, 430 (5th Cir. 2008); Merger Guidelines § 3.2. Nor do Tapestry's unsupported assertions that it will revitalize the Michael Kors brand rescue this unlawful merger.

The Court should grant the FTC's motion for a preliminary injunction.

## THE FEDERAL TRADE COMMISSION'S PROPOSED FINDINGS OF FACT

## I.    THE PARTIES AND THEIR PRODUCTS

### A.  *Tapestry, Inc. ("Tapestry")*

1.      Defendant Tapestry is "a leading New York-based house of accessible luxury accessories and lifestyle brands." PX7104 (2022 Tapestry 10-K) at 4.

2.      In its fiscal year 2023, Tapestry generated over $6.6 billion in revenue, with gross margins of 71 percent. PX7105 (2023 Tapestry 10-K) at 39, 79.

3.      Tapestry owns three brands: Coach, Kate Spade, and Stuart Weitzman, with the largest by far being Coach, which accounted for 74.5 percent of Tapestry's total net sales in fiscal year 2023. PX7105 (2023 Tapestry 10-K) at 5, 101.

4.      Founded in New York City in 1941, Coach is an American heritage brand that sells handbags, small leather goods, footwear, accessories, ready-to-wear apparel, jewelry, eyewear, luggage, watches, and fragrances. *Id.* at 5, 11, 12; Hr'g Tr. 9/10 Kahn (Tapestry) at 435:15-24 (American heritage brand). It is "a leader in the women's category for handbags." PX8169 (Lifford (Tapestry) Tr.) at 137:17-20.

5.      Coach operates approximately 300 retail and outlet stores in the United States in locations such as Iowa, Alabama, Nebraska, and New York. PX6000 (Smith (FTC) Rep.) ¶ 18; Hr'g Tr. 9/10 Kahn (Tapestry) at 436:21-25 (Coach operates over 300 stores in the United States); *see also* Hr'g Tr. 9/10 Crevoiserat (Tapestry) at 272:21-23.

6.      Coach purchased the Stuart Weitzman brand in 2015 and the Kate Spade brand in 2017, afterward renaming itself Tapestry. PX7104 (2022 Tapestry 10-K) at 4; PX6000 (Smith (FTC) Rep.) ¶ 16; Hr'g Tr. 9/17 Scott Morton (Defs.) at 1234:11-13.

7.      Kate Spade sells handbags, small leather goods, ready-to-wear apparel, footwear, and accessories (PX7105 (2023 Tapestry 10-K) at 8, 11-12) and operates almost 200 stores in the

United States in locations such as Iowa, Alabama, and New York. PX6000 (Smith (FTC) Rep.) ¶ 20; Hr'g Tr. 9/10 Crevoiserat (Tapestry) at 272:21-23.

8.      After its acquisition of Kate Spade, Tapestry installed a new designer to re-invent the brand, which "didn't work very well." Hr'g Tr. 9/12 Fraser (Tapestry) at 821:7-18.

9.      Stuart Weitzman is predominantly a footwear brand. PX7105 (2023 Tapestry 10-K) at 9, 11; PX6000 (Smith (FTC) Rep.) ¶ 22. It had just ███████ in handbag sales in 2023. PX6001 (Smith (FTC) Reply Rep.) ¶ 62, tbl. 1.

10.      Neither the Stuart Weitzman nor the Kate Spade acquisition have been particularly successful for Tapestry: as Coach CEO and Brand President Todd Kahn explained, "What we thought at the time [of the Kate Spade acquisition], which didn't fully come to fruition, was our ability to run stores in terms of operations in terms of recruitment of people, in terms of connecting with the customers. We thought we could transplant that to our acquired brands. It turned out in both Stuart Weitzman and Kate Spade's case it was not easy to do . . . ." Hr'g Tr. 9/17 Scott Morton (Defs.) at 1316:11-1317:15 (discussing Kahn's sworn testimony at his investigational hearing).

11.      Although the Tapestry brands have separate CEOs (Hr'g Tr. 9/10 Kahn (Tapestry) at 434:24-435:5; Hr'g Tr. 9/12 Fraser (Tapestry) at 820:4-821:6), margin targets for all of Tapestry's brands are also set in relation to Tapestry's overall earnings goals, and the brands receive competitively sensitive information about each other. Hr'g Tr. 9/10 Crevoiserat (Tapestry) at 272:14-17; *infra* Findings of Fact ("FoF") ¶¶ 269-280.

12.      Moreover, certain groups at Tapestry work across all of its brands. For instance, manufacturing decisions are made at the Tapestry level, rather than the brand level. Hr'g Tr. 9/12 Fraser (Tapestry) at 825:16:22; Hr'g Tr. 9/13 Charles (Tapestry) at 1011:9-20.

13.     Similarly, Liz Harris, who heads Tapestry's Global Strategy & Consumer Insights team, oversees the long-range plan process for *all* of Tapestry's brands and ensures each brand is setting high enough growth targets. Hr'g Tr. 9/10 Harris (Tapestry) at 359:17-360:6. The Global Strategy & Consumer Insights team is also responsible for Tapestry's brand health tracker. *Id.* at 361:11-13. Tapestry spends approximately ███████████ on consumer research. PX5074 (Harris (Tapestry) Tr.) at 16:15-19.

### B.  *Capri Holdings Limited ("Capri")*

14.     Capri is a global fashion firm headquartered in the United Kingdom, with offices in New York City. PX7098 (2023 Capri 10-K) at 37. In its fiscal year 2023, Capri generated approximately $5.6 billion in total global revenue, with gross margins of 66 percent. *Id.* at 011, 045. Capri owns three brands: Michael Kors, Jimmy Choo, and Versace. *Id.* at 9-10.

15.     Michael Kors is an American heritage brand launched in New York City in 1981 by the designer Michael Kors (*id.* at 9; Hr'g Tr. 9/16 Kors (Capri) at 1066:25-1067:1, 1083:15-17; 1085:6-9), who remains Chief Creative Officer of his brand four decades later. Hr'g Tr. 9/16 Kors (Capri) at 1067:9-13.

16.     Michael Kors "democratized luxury, quality and design" by making "designer products more appealing to a wider audience of customers who might not have had access before to a designer product." Hr'g Tr. 9/12 Wilmotte (Capri) at 737:13-23; PX2045 (Capri) at 7.

17.     For Capri's fiscal year 2023, the Michael Kors brand accounted for approximately 69 percent of Capri's total revenues. PX7098 (2023 Capri 10-K) at 11.

18.     The Michael Kors brand operates almost 250 stores in the United States, in places such as Iowa, Missouri, Alabama, and Nebraska (PX6000 (Smith (FTC) Rep.) ¶ 26), and has three lines: the Michael Kors Collection "luxury line"; the MICHAEL Michael Kors "accessible luxury line"; and Michael Kors Mens. (PX7098 (2023 Capri 10-K) at 9); *see also* PX2314

(Capri) at 1 (describing Michael Kors Collection line as a "true luxury label"); Hr'g Tr. 9/9 Idol
(Capri) at 82:21-83:7.

19.      In filings with the Securities Exchange Commission ("SEC"), Capri has referred
to MICHAEL Michael Kors (hereinafter "Michael Kors") as "the accessible luxury collection"
and boasted that it "addresses the significant demand opportunity in accessible luxury goods."
PX7098 (2023 Capri 10-K) at 9-10, 14; *see also* Hr'g Tr. 9/9 Idol (Capri) at 83:8-18 (statements
to SEC truthful and accurate).

20.      Capri's predecessor, Michael Kors Holdings Limited, purchased the Jimmy Choo
brand in 2017 and the Versace brand in 2018 (PX6000 (Smith (FTC) Rep.) ¶ 23), after which it
renamed itself Capri. PX7206 (Capri 8-K (Mar. 29, 2019) at 2.

21.      Capri has referred to Jimmy Choo and Versace as "luxury businesses" to the SEC
(PX7099 (2023 Capri 14-A) at 5); and as "pure luxury" in documents provided to its Board of
Directors, including as recently as May 2023. PX2428 (Capri) at 15, 18; Hr'g Tr. 9/9 Idol (Capri)
at 86:19-87:15 ("high-end fashion luxury category" for Versace and Jimmy Choo; "pure luxury"
for Versace); PX2435 at 5; PX2421 at 13 ("luxury" and "pure luxury" for Jimmy Choo); *see also*
PX2440 (Capri) at 2 (Capri views Versace and Jimmy Choo as its "luxury businesses").

22.      In fact, when it acquired Jimmy Choo, then-Michael Kors CEO John Idol
described Jimmy Choo as being in the "luxury space" and expressed a desire to focus "more on
pure luxury as we go forward because we think that space has a greater level of sustainability
and less volatility." PX2421 (Capri) at 13.

23.      When Capri uses credit card data to track its brands' performance against their
peers' performance, it compares Versace against brands like Dior, Gucci, and Fendi, while
analyzing Michael Kors against brands like Coach, Kate Spade, and Tory Burch. PX2395 (Capri)

at 4, 6; PX2394 (Capri) at 2, 5.

### C. *Handbags*

24.     As mentioned above, both Tapestry and Capri sell handbags, with their Coach, Kate Spade, and Michael Kors' brands boasting nearly $3 billion in combined handbag sales in the United States in 2023 alone. PX6000 (Smith (FTC) Rep.) ¶ 186, tbl 7.

25.     Handbags generally refer to small to medium-sized bags used for carrying personal items and money and have handles or a strap and are designed to be held in the hand or worn over the shoulder. *Id.* ¶ 30. They come in various styles, materials, and sizes, and are differentiated based on factors such as price, quality, design, features, and branding. *Id.* ¶ 31; Hr'g Tr. 9/11 Smith (FTC) at 521:1-23.

26.     NPD (owned by Circana), a third-party source for retail sales data used by Tapestry in the ordinary course of business (Hr'g Tr. 9/10 Crevoiserat (Tapestry) at 281:4-282:2), classifies cross body bags, satchels, and shoulder bags as handbag styles and classifies totes/shoppers as a type of bag (larger than bags in the handbag category). PX6001 (Smith (FTC) Reply Rep.) ¶ 34.

27.     In 2023, Tapestry's revenue-weighted profit margins for direct-to-consumer and wholesale sales of cross body bags, satchels, shoulder bags, and totes/shoppers were ▮ percent for Coach and ▮ percent for Kate Spade. *Id.* ¶ 104; *accord* Hr'g Tr. 9/10 Crevoiserat (Tapestry) at 272:14-17 (Kate Spade margin goal range is 60 to 70 percent); Hr'g Tr. 9/9 Idol (Capri) at 107:24-108:15 (margins for Coach and Kate Spade over 60 percent); PX2429 (Capri) at 12.

28.     That same year, Michael Kors revenue-weighted profit margins for direct-to-consumer and wholesales of cross body bags, satchels, shoulder bags, and totes/shoppers was ▮ percent. PX6000 (Smith (FTC) Rep.) ¶ 104; *see also* Hr'g Tr. 9/9 Idol (Capri) at 107:24-108:15 (margins for Michael Kors over 60 percent); PX2429 (Capri) at 12.

## II.    THE PROPOSED ACQUISITION

29.    On August 10, 2023, Tapestry and Capri announced that Tapestry had agreed to acquire Capri for approximately $8.5 billion, equivalent to $57 per share (the "Proposed Acquisition"). PX7175 (Tapestry Press Release, Aug. 10, 2023) at 1.

30.    The Proposed Acquisition would bring together two companies—and, specifically, Tapestry's Coach and Kate Spade brands on the one hand and Capri's Michael Kors brand on the other—that have long viewed themselves as each other's "key"—if not "biggest"—competitor. *E.g.*, PX2425 (Capri) at 2 ("[o]ur key competitor Coach"); PX2043 (Capri) at 2 ("our biggest competitor"); PX2423 (Capri) at 6 ("Tapestry/Coach viewed as the primary competitor."); PX1216 (Tapestry) at 4 (Coach and Michael Kors "are each other's top competition when consumers are considering other brands for purchase.").

31.    It would also bring together three of the biggest "accessible luxury" handbag brands in the United States. PX1374 (Tapestry) at 1 (Wells Fargo Equity Research, Aug. 10, 2023) ("The addition of Michael Kors cements T[apestry] as the number one player in the accessible luxury handbag market in the U.S. by a wide margin."); PX3204 (███████) at 2 (███████████████████████████████████████████████████████████████████ ███████████████); *see also infra* FoF ¶¶ 50-51, 164-71.

32.    Tapestry's path to acquisition began in 2022. Hr'g Tr. 9/10 Harris (Tapestry) at 367:1-377:14; Hr'g Tr. 9/10 Crevoiserat (Tapestry) at 285:4-12. By the summer of that year, Tapestry had begun to set its sights on Capri, which it had previously considered acquiring. PX1175 at 1 (July 2022 email attaching updated M&A section of Tapestry board materials).

33.    In August 2022, the Global Strategy & Consumer Insights Team, headed by Liz Harris, prepared for, and presented to, Tapestry CEO Joanne Crevoiserat a document analyzing a possible acquisition of the Michael Kors brand. PX1216 (Tapestry) at 1, 3. Among other things,

the analysis noted that, based on Tapestry's brand health surveys, "the consumer profile for Michael Kors and Coach are similar and consumers view the brands similarly in terms of image and perception" and "Both brands are each other's top competition when consumers are considering brands for purchase." *Id.* at 4; *see also* Hr'g Tr. 9/10 Crevoiserat (Tapestry) at 285:15-25, 286:24-287:3 (Tapestry's CEO expects Ms. Harris to provide truthful information).

34.     Notably, this M&A analysis also provided "Pricing Insights" (PX1216 (Tapestry) at 16), observing a gap between Coach and Michael Kors handbag prices "suggesting room to increase MK AUR." *Id.* at 17.[1] These "Pricing Insights" further noted a higher rate of discounting for Michael Kors as compared to Coach and Kate Spade, "suggesting opportunity to reduce MK discounting." *Id.* at 18.

35.     By the end of 2022, Tapestry executives were recommending to the Tapestry Board that the company "[p]ursue a scale play in a known category," with Capri as the "Modeled target." *E.g.*, PX1712 (Tapestry) at 15.

36.     As stated in a Tapestry Board document from November 2022, an acquisition of Capri would provide Tapestry access to a "luxury price point" and "luxury consumer" through the Jimmy Choo and Versace brands, as well as the Michael Kors Collection. *Id.*; Hr'g Tr. 9/10 Crevoiserat (Tapestry) at 292:4-293:25 ("luxury price point" refers to Jimmy Choo, Versace, and Michael Kors Collection, which would provide Tapestry with more exposure to a different consumer segment); Hr'g Tr. 9/10 Harris (Tapestry) at 373:13-374:10.

37.     A January 2023 Tapestry Board document echoed the same, observing that

---

[1] AUR stands for "average unit retail" and measures the "out-the-door" price that a consumer actually pays (Hr'g Tr. 9/9 Idol (Capri) at 160:21-24, 161:14-21; Hr'g Tr. 9/10 Kahn (Tapestry) at 450:23-451:3), as compared to manufacturer suggested retail price ("MSRP"), which is the ticket price (Hr'g Tr. 9/10 Crevoiserat (Tapestry) at 322:3-5).

"Comet's portfolio covers a wider range of price points than our portfolio today and the Versace brand boosts credibility in and exposure to the luxury market." PX1041 (Tapestry) at 10.[2]

38.     Along those same lines, a "Comet Competitor Assortment & MSRP Positioning" document created by Tapestry's Global Strategy & Consumer Insights team observed that, among all product categories, "███████████████████████████████████

███████████████████████████████████████████████████████████████

███████████" PX1743 (Tapestry) at 3; *see also* Hr'g Tr. 9/10 Harris (Tapestry) at 374:11-375:21 (Katelyn Rumsey produced PX1743); PX1381 (Tapestry) at 2-3 (showing Harris input and feedback). For handbags specifically, the analysis showed Versace with an average MSRP of $1600, with comparisons to "competitors" Dior, Gucci, Louis Vuitton, and Prada. *Compare* PX1743 (Tapestry) at 6 (Versace competitors and MSRP ranges), *with id.* at 17 (Michael Kors competitors and MSRP ranges).

39.     On the other hand, however, overlap and possible cannibalization between Michael Kors and Coach created concern for Tapestry's investment banker Morgan Stanley as well as certain of Tapestry's board members. PX1715 at 10 (October 2022 Morgan Stanley deck: "Acquisition of Capri (or Michael Kors) is transformative to Tapestry and unambiguously creates the largest luxury platform in North America . . . Brand survey suggests Michael Kors brand remains well regarded in the market across categories . . . High cross-purchase overlap with Coach and Kate Spade consumers could present cannibalization risks, though reinforces the 'affordable luxury' nature of the portfolio and leadership within luxury leather goods"); PX1144 at 2 (Crevoiserat notes of conversations with Tapestry board members: "AG: Team should push harder on consumer aspect – COH / MK differentiation"); Hr'g Tr. 9/10 Crevoiserat (Tapestry)

---

[2] Comet was Tapestry's code name for Capri. Hr'g Tr. 9/10 Crevoiserat (Tapestry) at 311:11-12.

at 294:16-295:8 ("AG" refers to Anne Gates, Chairwoman of Tapestry's Board).

40.    Nevertheless, in March 2023, the Tapestry Board approved an approach to Capri; notably, in materials prepared for the Board at that time, Tapestry indicated that it planned to reduce Michael Kors' reliance on wholesale, which will affect "an older, more price sensitive department store shopper." PX1200 (Tapestry) at 10.

41.    The two companies ultimately inked the deal in an Agreement and Plan of Merger ("Merger Agreement") in August 2023. PX1014 at 1.

42.    The closing date in the Merger Agreement automatically extends until February 10, 2025 (PX1014 (Merger Agreement) at § 8.1(d), 72), and both Tapestry and Capri are required to use "their reasonable best efforts to defend or contest, including through litigation or other means, any objection to, or Actions challenging, the consummation of the [Proposed Acquisition]," including through any appeal, up until the closing date. *Id.* at § 6.2(a), 53-54.

43.    The Proposed Acquisition builds on Tapestry's pattern and strategy of pursuing acquisitions, enabling Tapestry to "set the table for [a] string of pearls[,] or smaller deals," PX1152 (Tapestry) at 1, in quest of its plan to become a "Premium Fashion House." PX1175 (Tapestry) at 4; PX1301 (Tapestry) at 2.

44.    All told, economic analysis suggests that the Proposed Acquisition likely will cause higher retail prices for Coach, Kate Spade, and Michael Kors handbags, resulting in approximately $365 million in consumer harm annually. *See* Hr'g Tr. 9/17 Smith (FTC) at 1395:8-18; PX6000 (Smith (FTC) Rep.) ¶ 266; *see also* PX1216 (Tapestry) at 17-18.[3]

---

[3] Dr. Smith's competitive effects analyses do not depend on market definition (Hr'g Tr. 9/11 Smith (FTC) at 567:4-16; PX6000 (Smith (FTC) Rep.) ¶ 189), but they are consistent with the high market shares and market concentration metrics Dr. Smith calculated in the "accessible luxury" handbag market. *Id.* at 566:19-567:2; *see also infra* FoF ¶¶ 164-71.

### III.    COACH COINS "ACCESSIBLE LUXURY" AND OTHERS FOLLOW SUIT.

45.    Coined by Coach as part of its initial public offering, the term "accessible luxury" denotes a "quality well made product" produced at a lower cost and retailed at a fraction of the price of traditional European luxury. *E.g.*, PX1704 (Tapestry) at 1; Hr'g Tr. 9/10 Kahn (Tapestry) at 438:4-6 ("Coach coined the term accessible luxury when the company went public"); PX1635 (Tapestry 2022 Investor Day) at 6.

46.    As Coach's CEO and Brand President Todd Kahn put it in late 2022 when explaining to investors how Coach "invented Accessible Luxury": "It was the idea that you didn't have to spend an exorbitant amount of money to buy a high quality bag." PX1635 (Tapestry 2022 Investor Day) at 6; Hr'g Tr. 9/10 Kahn (Tapestry) at 438:7-20 (main idea of "accessible luxury" was to "break the paradigm that you didn't have to spend an extraordinary amount of money to buy a high quality handbag."); *see also* Hr'g Tr. 9/12 Levine (Tapestry) at 789:15-790:4 ("The term 'accessible luxury' is a term that Coach coined to describe quality good at an accessible price, correct? A. Yes, that's correct."). "Accessible luxury" has since framed how Tapestry competes in the market, its value proposition, and what it delivers consumers. Hr'g Tr. 9/10 Crevoiserat (Tapestry) at 260:3-11.

47.    Coach's rival Michael Kors thereafter adopted the term (along with equivalents like "affordable luxury") as a "brand position" and to describe a particular type of handbag product—specifically, one that offered high quality at a reasonable price. *E.g.*, PX7127 (Q4 2019 Capri Earnings Call) at 9; PX2034 (Capri) at 7; PX2166 (Capri) at 3 (Mission: "To Re-Establish Michael Kors As Leader in the Affordable Luxury Accessories Market"); PX2435 (Capri) at 5 ("Accessible luxury growing and Michael Kors positioned well."); Hr'g Tr. 9/9 Idol (Capri) at 144:20-25 (accessible luxury "refers to our brand position"); Hr'g Tr. 9/16 Edwards (Capri) at 1127:22-1128:15 (Capri has used the term accessible luxury in board materials, in SEC filings,

and in communications with investors).

48.    Other industry participants have done the same:

a.    For ▮▮▮▮, ▮▮▮▮▮▮▮▮ means ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮ PX8171 (▮▮▮▮▮▮▮▮▮▮) at
19:25-20:10.

b.    ▮▮▮▮▮▮ describes ▮▮▮▮▮▮▮▮▮▮
which denotes ▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮ PX8168 (▮▮▮▮▮▮▮▮▮▮) at
11:9-19, 12:3-12, 13:9-13:17, 13:21-22, 14:2-15:8); Hr'g Tr. 9/11 Guez
(Sunrise Brands) at 675:15-676:12; *accord* PX7182 (Rebecca Minkoff
website) at 1 ("industry leader in accessible luxury handbags").

c.    ▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮ PX8172 (▮▮▮▮▮▮
▮▮▮▮) at 34:2-14, 36:18-37:4; PX3202 (▮▮▮▮▮) at 6.

d.    ▮▮▮▮ and ▮▮▮▮ each too recognize a distinct "accessible
luxury" segment. PX3150 (▮▮▮▮) at 2; DX950 (▮▮▮▮▮▮
▮) at 26:25-28:7.

49.    Even Defendants' paid industry experts Jeff Gennette and Karen Giberson were
familiar with the term "accessible luxury" from industry conversations, and the term "affordable
luxury" has appeared in Ms. Giberson's organization's magazine. Hr'g Tr. 9/13 Giberson (Defs.)
at 970:9-16, 998:2-7; Hr'g Tr. 9/16 Gennette (Defs.) at 1150:13-19.

50.    Tapestry and Capri recognize that, within this segment, Coach, Michael Kors, and

Kate Spade are among the top handbag brands, along with Marc Jacobs and Tory Burch:

    a.   Strategic analyses prepared for Tapestry's Board of Directors—including several in the months leading up to the announcement of the Proposed Acquisition—designate Coach, Michael Kors, Kate Spade, Marc Jacobs, and Tory Burch as "accessible luxury." *E.g.*, PX1723 (Tapestry) at 9-10 (May 2023 Competitor Update); Hr'g Tr. 9/10 Harris (Tapestry) at 382:19-384:6 (discussing PX1723); PX1387 (Tapestry) at 43 (August 2023 Kate Spade Annual Operating Plan); PX8169 (Lifford Tr.) at 92:10-94:7.

    b.   Coach brand updates and pricing reviews sent to the highest levels of Tapestry frequently, and routinely, signify these five brands as representative of "accessible luxury." *E.g.*, PX1536 (Tapestry) at 15 (July 2022 Coach Brand Update sent to Tapestry executives designating "TB," Coach, "MK," "Marc," and "KS" as "Acc. Luxury"); Hr'g Tr. 9/10 Kahn (Tapestry) at 448:5-453:6; PX1537 (Tapestry) at 9 (April 2022 Coach Brand Update); PX1542 (Tapestry) at 8 (February 2022 Coach Pricing Discussion).

    c.   For its competitive pricing updates to the Tapestry Board, Kate Spade has benchmarked its pricing against Michael Kors, Coach and Tory Burch, setting target MSRP price positioning against those three brands. PX1250 (Tapestry) at 17; Hr'g Tr. 9/12 Fraser (Tapestry) at 839:9-16.

    d.   For its part, Capri has singled out these same brands for frequent comparison with Michael Kors. *E.g.*, PX2128 (Capri) at 3, 8-12 (Capri Board document identifying Coach, Kate Spade, Michael Kors, Tory Burch, Marc Jacobs); PX2430 (Capri) at 16 (same); *see also* PX2522 (Capri) at 1 (Mr. Kors asking

for Michael Kors pricing comparisons with Coach, Tory Burch, Kate Spade, among others); PX2395 (Capri) at 6 (Michael Kors credit card data peer analysis against Coach, Kate Spade, and Tory Burch); PX2515 (Capri) at 3 (comparing Coach and MK); PX2404 (Capri) at 1 ("MK was stronger than Coach the last two weeks of the quarter . . . ."); PX2394 (Capri) at 5-6; Hr'g Tr. 9/9 Idol (Capri) at 102:18-24, 106:7-13.

51.     Other smaller industry participants also widely acknowledge that Coach and Michael Kors as well as Kate Spade are among the major competitors within "accessible luxury" handbag brands. PX8171 (███████████) at 19:25-20:23; PX8168 (███████ ███████) at 41:20-42:19 (████████████████████████); Hr'g. Tr. 9/11 Guez (Sunrise Brands) at 678:21-679:14 (Coach, Kate Spade, and Michael Kors are largest "accessible luxury" handbag competitors); PX8172 (█████████████) at 39:8-10, 40:3-5 (████████████████████████████); PX3202 (████████) at 6 (████); PX3150 (████████) at 2 (████████████ ████████████).

## IV.    "ACCESSIBLE LUXURY" SIGNIFIES A DISTINCT SET OF HANDBAGS, MARKED BY HIGH QUALITY AT AFFORDABLE PRICES.

52.     "Accessible luxury" handbags boast a number of distinct characteristics, the chief ones being affordable prices and quality, which are the function of a unique supply chain. *E.g.*, Hr'g Tr. 9/10 Crevoiserat (Tapestry) at 299:11-20 (Tapestry's supply chain is "what enables [it] to deliver really beautiful well-crafted product to the market at an incredible value"); PX1704 (Tapestry) at 1 ("our supply chain innovation over the years effectively created the accessible luxury market—balancing lower cost with quality well made product."); PX1731 (Tapestry) at 48; *see infra* FoF ¶¶ 55-81.

53.    Industry participants recognize affordable prices and quality as distinct attributes for "accessible luxury" handbags. *E.g.*, PX8171 (████████████████) at 19:25-20:23 (████████████████); PX8168 (████████████████) at 11:18-19, 12:3-12:12, 13:21-22, 14:2-15:8 (████████████████████████████████████████ ████████████████████████████████); Hr'g Tr. 9/11 Guez (Sunrise Brands) at 675:21-676:1 ("well made . . . despite not being over $1000").

54.    Other characteristics for "accessible luxury" include discounting and promotions (including through outlets) and distinct customers. *Infra* FoF ¶¶ 82-93.

**A.  *Pricing***

55.    Coach, Kate Spade, and Michael Kors focus their handbag offerings on an entry price point of $100 and rarely approach or exceed $1,000. *E.g.*, PX1431 (Tapestry) at 18 (Tapestry Board document stating that Coach "product portfolio starts at $100 as point of entry and does not exceed $1000 where luxury owns the market"), 19 ("Room to stretch, but still much lower than traditional luxury entry point of $1000+"); PX8169 (Lifford (Tapestry) Tr.) at 126:9-19 ($100 is the "entry point for our product for a consumer"; "once you hit a dollar threshold it is driven by a luxury brand. And so it looks as though their records show that that's a thousand"); PX1387 (Tapestry) at 28 (████████████████████████████████████ ████); Hr'g Tr. 9/9 Newman (Capri) at 240:24-241:7.

56.    Coach CEO and Brand President Todd Kahn described the $300-$500 price range as Coach's "bull's-eye." Hr'g Tr. 9/10 Kahn (Tapestry) at 446:14-19 ("Q. And it's true that Coach has been extraordinarily focused on the $300 to $500 price point in North America, right? A. I think what I -- what I used it as, if you think of a bull's-eye, that's in the bull's-eye. And then we play in permutations outside of that bull's-eye, but we see a lot of value in that price point."); *see also* PX7054 (Tapestry Q4 2023 Earnings Call) at 12 (Coach is "extraordinarily

focused on that $300 to $500 price range"); *see also* PX1184 (Tapestry) at 130 (Coach: "Median Prices are still $500 and below globally").

57.    For Kate Spade, "[t]he sweet spot is between $300 and $350." Hr'g Tr. 9/12 Fraser (Tapestry) at 836:12-24; PX1238 (Tapestry) at 4. Its customers would not be willing to pay $1,000 for a Kate Spade handbag. Hr'g Tr. 9/12 Fraser (Tapestry) at 826:21-827:6.

58.    And Capri CEO John Idol testified that 95 percent or more of Michael Kors handbags have MSRPs between $300 and $450. Hr'g Tr. 9/9 Idol (Capri) at 81:23-25.

59.    Other "accessible luxury" handbag brands have similar price ranges:

  a.  Rebecca Minkoff's "brand positioning doesn't allow [it] to charge more than $500 for a handbag" (Hr'g Tr. 9/11 Guez (Sunrise Brands) at 681:17-25), and ████████████████████████████████ (*id.* at 687:19-22; PX4000 (████████████████) ¶ 14);

  b.  ████████████████████████████████████ ████████████████████████████████████ ██████████ PX3202 (██████████) at 6; PX3212 (██████████) at 13 (████████████████████████████████);

  c.  ████████████████████████████████ ██████ PX8170 (██████████████) at 118:4-9 (████████████ ████████████████);

  d.  An ████████████████████████████████ ████████████████████████. PX3037 (██████████) at 1; DX926 (████████████████) at 130:25-131:7; and

  e.  ████████████████████████████████████

 PX8171 (███████████████) at 21:2-17.

60.     A 2022 Coach strategic pricing analysis shows that the average MSRP for "accessible luxury" handbag brands Coach, Kate Spade, Michael Kors, Marc Jacobs, and Tory Burch ranged from $275 to $509, with the average for "accessible luxury" being $380. PX1542 (Tapestry) at 8. By contrast, the same analysis showed that "luxury" handbags are priced much higher—well over $1,000. *Id*. at 8-9.

61.     Other Tapestry analyses shared with the company's highest levels regularly highlight the wide gap in pricing between handbags offered by "accessible luxury" brands and those offered by "luxury" brands—or what the parties and industry participants also refer to as "traditional European luxury," "true luxury," or "European luxury" (hereinafter "true luxury"). *E.g.*, PX1542 (Tapestry) at 8 (labelling Dior, Gucci, Louis Vuitton, and Prada as "luxury" and Coach, Kate Spade, Marc Jacobs, Michael Kors, and Tory Burch as "accessible luxury"); Hr'g Tr. 9/10 Kahn (Tapestry) at 455:20-456:1 (discussing PX1542).

62.     In May 2023, just three months prior to the announcement of the Proposed Acquisition, the Tapestry Global Strategy & Consumer Insights team provided an analysis to the Tapestry Board showing the "white space" between "luxury" prices and "accessible luxury" prices. PX1723 (Tapestry) at 9; Hr'g Tr. 9/10 Harris (Tapestry) at 382:19-384:21 (discussing PX1723); PX8169 (Lifford Tr.) at 98:5-17 (same).

63.     In statements to investors, Defendants have routinely acknowledged this "white space" or "delta" between the price points of "accessible luxury" and true luxury. *E.g.*, Hr'g Tr. 9/10 Crevoiserat (Tapestry) at 269:23-270:5 ("white space" to "European luxury" addressed with investors); Hr'g Tr. 9/10 Kahn (Tapestry) at 439:16-20 ("white space" or "delta" in at least four earnings calls in last two years); PX1635 (Tapestry 2022 Investor Day) at 29; PX7053 (Tapestry

Q4 2022 Earnings Call) at 13, 15 ("dramatic white space"); PX7045 (Tapestry Q3 2023 Earnings Call) at 10; PX7054 (Tapestry Q4 2023 Earnings Call) at 12; PX7030 (Tapestry Q1 2024 Earnings Call) at 11; PX7029 (Tapestry Q1 2023 Earnings Call) at 11 ("when you talk about traditional luxury, the average price points are so materially different"); PX7138 (Capri Q4 2022 Earnings Call) at 11; Hr'g Tr. 9/9 Idol (Capri) at 90:18-91:3.

64.    Tapestry touted this "white space" in a document prepared for a bond offering with Bank of America to finance the deal. PX1485 (Tapestry) at 9 ("There remains ample white space between our 3 brands and true luxury."); *see also* Hr'g Tr. 9/10 Harris (Tapestry) at 377:16-378:14.

65.    This pricing gap with true luxury handbag brands has only been widening in recent years, as true luxury brands like Louis Vuitton and Gucci have hiked prices. *E.g.*, PX1723 (Tapestry) at 9 ("The pricing gap has grown from ~$1700 in FY19 to ~$2,550 in FY23-to-date"); Hr'g Tr. 9/10 Harris (Tapestry) at 383:25-384:21 (discussing PX1723 and the gap "widening over time" between "accessible luxury" and brands like Louis Vuitton, Gucci, and Prada); PX7138 (Capri Q4 2022 Earnings Call) at 11; Hr'g Tr. 9/10 Kahn (Tapestry) at 446:20-447:12 (with "pinnacle luxury" raising their prices, that resulted "in an increase of . . . white space between Coach and European pinnacle luxury."); *see also* Hr'g Tr. 9/12 Fraser (Tapestry) at 828:5-832:7; PX8169 (Lifford (Tapestry) Tr.) at 102:3-12.

66.    As a result, true luxury brands have boasted higher revenues, making it appear (misleadingly) that they are taking share from other handbag segments, including "accessible luxury" (*e.g.*, DX837 (Capri) at 1). In actuality, any increases in share are simply the result of price hikes. Hr'g Tr. 9/12 Fraser (Tapestry) at 828:5-832:7; *see also* PX1723 (Tapestry) at 9. As the former CEO and Brand President of Kate Spade succinctly summed it up: "If you double the

price of your handbag, you're selling the same number of handbags, but you're getting more market share." Hr'g Tr. 9/12 Fraser (Tapestry) at 830:23-831:17; *see also id.* at 829:24-830:6 (Louis Vuitton and Gucci were raising their prices by 50% per year so that "automatically, mathematically made Louis Vuitton and Gucci's share bigger.").

67.    Mass-market handbags likewise do not act as a competitive constraint on Coach, Kate Spade, and Michael Kors. *Infra* FoF ¶¶ 132-40.

**B.  *Quality***

68.    "Accessible luxury" handbags have high levels of craftsmanship and quality. Hr'g Tr. 9/10 Crevoiserat (Tapestry) at 338:1-13 ("we have been able to deliver really compelling product, beautiful product, well-made product at incredible value into the marketplace"); PX7098 (2023 Capri 10-K) at 9 ("Michael Kors features distinctive designs, materials, and craftsmanship"); PX8169 (Lifford (Tapestry) Tr.) at 136:2-17 ("the highest quality leather goods, it is an outstanding passion for detail, our detail and our craftsmanship are superior"); PX1431 (Tapestry) at 12.

69.    As ▮▮▮▮▮▮▮▮ put it: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮ PX8168 (▮▮▮▮▮▮▮▮▮▮▮▮▮) at 13:21-22, 14:2-15:8.

70.    Common features of "accessible luxury" handbags include the following:

   a.   Craftsmanship by skilled artisans to create intricate designs. *E.g.*, PX8168 (▮▮▮▮▮▮▮▮▮▮▮▮) at 13:21-22, 14:2-15:8) (▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮); Hr'g Tr. 9/10 Kahn (Tapestry) at 465:13-466:14 (describing manufacture of complex handbags with more than 100 components); Hr'g Tr. 9/10 Crevoiserat (Tapestry) at 342:11-343:10 (Coach handbags "are high quality" and discussing stitching, drape, materials, and leather treatments).

b. Durability and solid construction—███████████████ *E.g.*, PX8168
(███████████████████) at 13:21-22; 14:2-15:8 (███████████████
███████████████████); Hr'g Tr. 9/10 Crevoiserat (Tapestry) at
267:25-268:12 ("Coach makes the highest quality goods with the outstanding
passion for detail and craftsmanship," which has "remain[ed] consistent and
constant . . . since 1941").

c. Use of quality materials. *E.g.*, PX8168 (████████████████) at
13:21-22, 14:2-15:8 (██████████████); Hr'g Tr. 9/13 Charles (Tapestry)
at 1028:7-20 (glove-tanned materials are a "key ingredient" for what Coach is
known for); Hr'g Tr. 9/10 Kahn (Tapestry) at 436:5-15 ("our glove tan
leather, which is a large portion of our handbags, we think the patina is
enhanced over time."); Hr'g Tr. 9/10 Crevoiserat (Tapestry) at 271:13-272:13
(most Kate Spade handbags made with leather).

d. Craftsmanship at scale. Hr'g Tr. 9/13 Charles (Tapestry) at 1032:7-11 ("our
entire mission in supply chain at Tapestry, we have a mantra, a vision
statement called craftsmanship and scale"). As Coach CEO Todd Kahn
explained: "one of the things Coach does so well is make craft at scale, and I
generally believe that our facilities that we've worked and trained for more
than a dozen years in some cases provide a beautiful crafted product at scale."
Hr'g Tr. 9/10 Kahn (Tapestry) at 464:15-22.

71. Not surprisingly, Tapestry has emphasized that "high quality standards . . . are an
integral part of our brands' identity." PX7105 (2023 Tapestry 10-K) at 13.

72. Michael Kors the designer feels that the trick to his work is making sure it is the

best designed, best quality, and best price. Hr'g Tr. 9/16 Kors (Capri) at 1075:14-1076:7.

### C. *Supply Chain*

73.    "Accessible luxury" brands typically outsource production of their handbags to third-party manufacturers in Southeast Asia. PX7105 (2023 Tapestry 10-K) at 13; PX7098 (2023 Capri 10-K) at 16; Hr'g Tr. 9/10 Kahn (Tapestry) at 462:5-7 (Coach's two largest manufacturing countries are Vietnam and Cambodia); PX1636 (Tapestry) at 3; PX8172 (███████████

████████) at 35:7-14; PX8171 (████████████████) at 24:21-25:8; Hr'g Tr. 9/13 Charles (Tapestry) at 1036:20-1037:4; Hr'g Tr. 9/10 Crevoiserat (Tapestry) at 338:14-17 (Tapestry uses third-party suppliers and does not own that supply chain).

74.    This manufacturing process enables "accessible luxury" brands to produce quality handbags at lower costs—and thus to retail them at lower prices to consumers; as Tapestry CEO Joanne Crevoiserat explained: "Our supply chain innovation is what enables us to deliver really beautiful well-crafted product to the market at an incredible value. Coach was really the founder of that and the innovator that created that many others have followed." Hr'g Tr. 9/10 Crevoiserat (Tapestry) at 299:11-20; *accord id.* at 342:11-343:10.

75.    Or as Ms. Crevoiserat said in preparation for a Tapestry Board of Directors meeting in February 2023, just six months before the announcement of the Proposed Acquisition: "our supply chain innovation over the years effectively created the accessible luxury market—balancing lower cost with quality well made product." PX1704 (Tapestry) at 1.

76.    This statement ultimately made its way into a Tapestry Board document. PX1731 (Tapestry) at 48 ("Our approach to delivering innovative, high-quality product while optimizing costs created the accessible luxury market."); Hr'g Tr. 9/10 (Crevoiserat) at 299:21-300:3; *see also* PX8169 (Lifford (Tapestry) Tr.) at 119:22-24 (Tapestry Board member accepts Board materials as truthful and accurate).

77.    Industry consultants also recognize the distinct nature of the supply chain for "accessible luxury" handbags. PX1327 (Tapestry) at 4 (); PX6000 (Smith (FTC) Rep.) ¶ 152.

78.    One key handbag supplier for Coach, Kate Spade, and Michael Kors, as well as Tory Burch and ▮▮▮▮▮▮▮▮, is Simone, which has facilities in Vietnam, Cambodia and Indonesia, and is headquartered in Seoul, South Korea. Hr'g Tr. 9/13 Charles (Tapestry) at 1039:25-1040:16; PX1354 at 4; PX8168 (▮▮▮▮▮▮▮▮▮▮▮) at 41:1-4, 41:20-42:19; PX1354 (Tapestry) at 6; Hr'g Tr. 9/9 Idol (Capri) at 82:1-6 (Simone is the largest manufacturer for Michael Kors handbags).

79.    Simone is recognized as having ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ PX8168 (▮▮▮▮▮▮▮▮▮) at 41:1-4, 41:20-42:19 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮); PX1354 (Tapestry) at 7 ("[e]xperienced and stable technical production leaders").

80.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮ PX5077 (Charles (Tapestry) Tr.) at 218:24-221:20 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).

81.    Tapestry and Capri have competed for manufacturing capacity from partners like Simone. Hr'g Tr. 9/9 Newman (Capri) at 200:25-201:18 (referring to Tapestry as Michael Kors' "biggest competitor" in connection with Simone); Hr'g Tr. 9/10 Kahn (Tapestry) at 467:22-468:13 (in talking to suppliers in Vietnam about production, Coach "would hate to see MK pick up [$100 million of demand] by default"); PX1533 (Tapestry) at 1.

### D.  *Other Characteristics of "Accessible Luxury" Handbags*

82.    "Accessible luxury" handbags are also characterized by a high degree of, and frequent, discounting and promotions, particularly around major shopping holidays. *E.g.*,

PX2128 (Capri) at 8-12 (Board of Directors presentation); PX8172 (███████████████████

███) 68:21-25; PX6000 (Smith (FTC) Rep.) ¶ 128; *see also* DX754 (███████████) at 22 ████

████████████████████████████████████████).

83.    Michael Kors brand President and CEO Cedric Wilmotte has recognized the

promotional environment in which "accessible luxury" brands play. Hr'g Tr. 9/12 Wilmotte

(Capri) at 743:18-22; *see also* Hr'g Tr. 9/16 Kors (Capri) at 1078:20-22; PX2097 (Capri) at 1

(discussing Coach and Kate Spade "racing to the bottom" on promotions).

84.    As Tapestry's CEO Joanne Crevoiserat put it: "promotions are part of all of our

businesses." Hr'g Tr. 9/10 Crevoiserat (Tapestry) at 271:9-12.

85.    "Accessible luxury" handbags are also often sold in outlets, at lower prices than

those in full-price retail or department stores. Hr'g Tr. 9/10 Kahn (Tapestry) at 436:21-25;

PX2128 (Capri) at 3 (Capri Board document showing estimates of full price and outlet splits for

Michael Kors, Coach, Kate Spade, Tory Burch, Marc Jacobs).

86.    All told, more than 50 percent of Coach and Kate Spade customers buy handbags

at a discount. Hr'g Tr. 9/12 Levine (Tapestry) at 779:9-23; Hr'g Tr. 9/12 Fraser (Tapestry) at

827:9-828:1; PX1098 (Tapestry) at 10.

87.    And all Michael Kors outlet customers buy with a discount of around 60 percent

according to a document shared with Capri's Board of Directors. PX2753 (Capri) at 45.

88.    This discounting in turn drives a distinct customer segment—one that is price

sensitive and motivated by bargains—as indicated by a document shared to Capri's Board in

which Michael Kors classified its customers into segments such as "Promotionally Persuaded,"

"Sale Savvy," "Spending Saver," "Right Product, Right Price," and "Handbag Bargain Hunter,"

with "Handbag Bargain Hunter" being the largest volume of sales. *Id.* at 43; *accord* PX2321

(Capri) at 2 (Michael Kors strategy is focused on a discount motivated customer); PX1301

(Tapestry) at 2 (Tapestry Board document stating that, with respect to Kate Spade, "the brand's

current customer is highly deal seeking"); Hr'g Tr. 9/10 Harris (Tapestry) at 368:18-369:10

(price is one of the reasons customers shop Kate Spade).

89.     Customer demographics compiled by both the parties bear this out, as

approximately half of Coach and Michael Kors customers have annual household incomes of

less than $75,000-$80,000. PX2128 (Capri) at 5-6; PX2753 (Capri) at 42 (more than half of

Michael Kors handbag customers have incomes below $75,000 and just 20 percent above

$150,000); PX1186 (Tapestry) at 14; PX1740 (Tapestry) at 148; PX2674 (Capri) at 11; *accord*

PX1078 (Tapestry) at 1 ("The reality [is] that the majority of our demand at Coach is coming

from low-income consumers"); PX1393 (Tapestry) at 152 (Michael Kors "skews low-income");

Hr'g Tr. 9/12 Fraser (Tapestry) at 850:14-20 (discussing PX1497, which shows that 65 percent

of Coach customers have a household gross income of $25,000 to $100,000).

90.     The demographics are similar for other "accessible luxury" brands like Kate

Spade, Marc Jacobs, and Tory Burch. PX2128 (Capri) at 5-6; PX2674 (Capri) at 11.

91.     As Defendants recognize, these customers are not purchasing $2,000 handbags.

PX1067 (Tapestry) at 1 ("Gucci bags at $2000 is just not our customer in NA"); Hr'g Tr. 9/10

Kahn (Tapestry) at 458:10-16 ("I did write that I didn't think our average customer was buying a

$2,000 handbag"); PX1427 (Tapestry) at 2 ("Nobody says should I buy a LV [Louis Vuitton]

bag or a Coach bag"); Hr'g Tr. 9/12 Fraser (Tapestry) at 828:15-21.

92.     Kate Spade's CEO and Brand President confirmed its customers would not pay

more than $1,000 for a Kate Spade handbag. Hr'g Tr. 9/12 Fraser (Tapestry) at 826:21-827:6.

93.     For ███████████ customer, ███████████████

████████████████████████████ PX8168 (███████████████████) at 189:2-14; *accord*

*id.* at 11:18-11:19, 12:3-12:12 (███████████████████████████████████████

████████████████), 190:11-191:03 (███████████████████████████████████████

██████████████████████████); Hr'g Tr 9/11 Guez (Sunrise Brands) at 677:9-15

(Rebecca Minkoff customers would not purchase a handbag for more than $1000).

## V.    TAPESTRY AND CAPRI HAVE REPEATEDLY RECOGNIZED "ACCESSIBLE LUXURY" AS A DISTINCT MARKET TO INVESTORS AND THEIR BOARDS.

### A.    *Defendants Have Long Acknowledged a Distinct Market for "Accessible Luxury" Handbags in Statements to Investors and Their Boards of Directors.*

94.    Since Coach coined the phrase "accessible luxury" during its initial public

offering, *supra* FoF ¶ 45, Tapestry has repeatedly, and consistently, referred to its brands,

including Coach and Kate Spade, as "accessible luxury" in SEC filings. *E.g.*, PX7105 (2023

Tapestry 10-K) at 15; PX7104 (2022 Tapestry 10-K) at 4.

95.    It has also done so in earnings calls, often times contrasting itself with true luxury.

*E.g.*, Hr'g Tr. 9/10 Crevoiserat (Tapestry) at 261:13-21 (Tapestry has used the term "accessible

luxury" with investors and the SEC); PX7053 (Q4 2022 Tapestry Earnings Call) at 13, 15;

PX7044 (Q3 2022 Tapestry Earnings Call) at 10; PX7335 (Q4 2020 Tapestry Earnings Call) at

5; PX7035 (Q2 2022 Tapestry Earnings Call) at 12; PX7342 (Q2 2019 Tapestry Earnings Call)

at 12; PX7027 (Q1 2019 Tapestry Earnings Call) at 13.

96.    And Tapestry regularly describes Coach and Kate Spade as "accessible luxury" to

its Board of Directors. *E.g.*, Hr'g Tr. 9/10 Crevoiserat (Tapestry) at 263:7-13 (Crevoiserat has

personally included the term in Board materials); PX1431 (Tapestry) at 12, 14 ("Our Global

Brand Positioning: Redefine and Own 'Accessible Luxury'"); PX1723 (Tapestry) at 9; PX1387

(Tapestry) at 43; PX1730 (Tapestry) at 1 (Crevoiserat letter to Tapestry Board referring to

"'close-in' accessible luxury peers"); PX8169 (Lifford (Tapestry) Tr.) at 93:4-94:7 (Tapestry

board member understands "accessible luxury").

97.    Capri has similarly described the MICHAEL Michael Kors line as "accessible luxury" in SEC filings. PX7157 (4Q 2023 Capri 10-Q) at 41; PX7098 (2023 Capri 10-K) at 9; PX7096 (2022 Capri 10-K) at 7; PX7095 (2021 Capri 10-K) at 7.

98.    Like Tapestry, Capri has told the investment community that Michael Kors is "accessible luxury," which is distinct from true luxury. PX2379 (Q4 2023 Capri Earnings Call) at 11, 19; PX7127 (Q4 2019 Capri Earnings Call) at 13; Hr'g Tr. 9/9 Idol (Capri) at 144:20-145:4 ("accessible luxury is an internal term that we use. It really refers to our brand positioning. We also use the term for the investor community as well."); *see also* PX2435 (Capri) at 5 (preparation for investor call); *see* Hr'g Tr. 9/9 Idol (Capri) at 85:16-18 (Capri's CEO has a fiduciary duty to give investors truthful, accurate, and reliable information).

99.    Similar to its representations to the SEC and investors, Capri had discussed "accessible luxury" with its Board. *Id.* at 107:15-23 (Capri discusses peers Michael Kors, Coach, Kate Spade, and Ralph Lauren with Capri Board); PX2436 (Capri) at 12; PX2166 (Capri) at 3 ("affordable luxury"); PX2429 at 2; *see* Hr'g Tr. 9/9 Idol (Capri) at 91:4-11 (Capri's CEO has a fiduciary duty to Capri's Board to provide it with truthful, accurate, and reliable information).

100.    Capri even did so on the eve of the announcement of the Proposed Acquisition. PX2439 (Capri) at 4 (August 2023 meeting minutes: "Mr. Wilmotte next discussed with the board the U.S. leather goods market and the accessible luxury market"); Hr'g Tr. 9/12 Wilmotte (Capri) at 735:12-15.

**B.  *Investors and Wall Street Recognize a Market for "Accessible Luxury" Handbags.***

101.    Given the parties' long use of "accessible luxury" to describe Coach, Michael Kors, and Kate Spade in earnings calls and investor statements, investors recognize a distinct market of "accessible luxury" handbags, in which Coach and Michael Kors are close

competitors. *E.g.*, PX2423 (Capri) (Investor Study) at 4, 6 ("Michael Kors is much more of an aspirational brand and therefore doesn't carry the same sort of weight in luxury."; "As much as John [Idol] would like to position Michael Kors as a luxury company. It's just not"); PX2020 (Capri) at 6 (investor letter discussed at the Capri Board of Directors meeting on April 10, 2023 comparing Michael Kors to its "closest competitor, Coach").

102.     An investor report sent to the highest levels of Capri referred to Coach as the "closest" and "primary" competitor to Michael Kors. PX2423 (Capri) (Investor Study) at 6.

103.     Wall Street analysts covering the industry likewise recognize a distinct market for "accessible luxury" handbags. *E.g.*, PX1374 (Tapestry) at 1 (Wells Fargo Equity Research, Aug. 10, 2023) ("The addition of Michael Kors cements T[apestry] as the number one player in the accessible luxury handbag market in the U.S. by a wide margin."); PX7028 (Q1 2020 Capri Earnings Call) (JP Morgan analyst: "John, maybe can you speak to the health of the accessible luxury handbag category"); *see also* Hr'g Tr. 9/9 Idol (Capri) at 89:6-90:5.

104.     And Tapestry's own investment banker referred to the Proposed Transaction with Michael Kors as reinforcing the "'affordable luxury' nature of the portfolio" due to the "high cross-purchase overlap with Coach and Kate Spade consumers." PX1715 (Tapestry) at 10.

**C.  *Defendants' Market Positioning Remains the Same.***

105.     On September 9, 2022, shortly after it started considering an acquisition of Capri, Tapestry stated it was repositioning itself as "expressive luxury." PX1635 (Tapestry 2022 Investor Day) at 6-7.

106.     "Expressive luxury," however, has the same characteristics as "accessible luxury," as two slides, sent to the Tapestry Board within a year of each other, make clear. *Compare* PX1431 (Tapestry) at 12 (March 2022) *with* PX1731 (Tapestry) at 23 (February 2023).

107.     As Ms. Crevoiserat affirmed: Coach remains "focus[ed] on the highest quality

leather goods, outstanding passion for detail and craftsmanship and making sure Coach bags are carried from one generation to another." Hr'g Tr. 9/10 Crevoiserat (Tapestry) at 267:25-268:4. These elements of Coach's brand position remain consistent and constant since 1941. *Id.* at 268:5-12.

108.    Moreover, despite its purported repositioning, Tapestry continued to refer to its Coach and Kate Spade brands as "accessible luxury" well into 2023, including with its Board of Directors and while it was pursuing the Proposed Acquisition. *E.g.*, PX1387 (Tapestry) at 43 (███████████████████████████████████████████████████████"); PX1723 (Tapestry) at 9-10 (May 2023).

109.    Capri too has continued to use the term to describe Michael Kors, including to its Board of Directors, even after Tapestry's offer of acquisition. PX2430 (Capri) at 15 (October 2023); PX2561 (Capri) at 23 (Michael Kors is a "leading American accessible luxury brand") (March 2024); *see also* PX2439 (Capri) at 4 (August 2023).

110.    Capri and Tapestry only dropped "accessible luxury" in their SEC filings after the FTC initiated this lawsuit in late April 2024. PX7261 (2024 Capri 10-K, filed May 29, 2024); PX7435 (2024 Tapestry 10-K, filed August 18, 2024).

## VI.    CONSUMERS RECOGNIZE A DISTINCT MARKET FOR "ACCESSIBLE LUXURY" HANDBAGS.

111.    Even though Tapestry has asserted that the term "accessible luxury" was never meant to be consumer-facing, in communications with consumers Tapestry has extolled the concept underlying "accessible luxury": strong value and a beautiful well-made product that many consumers can access. Hr'g Tr. 9/10 Crevoiserat (Tapestry) at 260:12-22. As Ms. Crevoiserat explained: "When we communicate to consumers, we communicate the beautiful, well-crafted product. And we believe we deliver an incredible value." *Id.* at 260:3-261:12.

112.    Indeed, even if the term "accessible luxury" was not meant to be consumer-facing, the concept of "accessible luxury" most certainly has been, as Defendants market their products to consumers as luxurious and accessibly priced. *See, e.g.*, Hr'g Tr. 9/9 Idol (Capri) at 130:16-24 (Michael Kors brand "storytelling around jet-set luxury"); DX844 (Capri) at 5 ("jet set strategy" deck); PX1387 (Tapestry) at 40 (describing Kate Spade's positioning as "joy is the new luxury"); *see also supra* FoF ¶¶ 55-67 (discussing pricing).

113.    Moreover, other "accessible luxury" brands have in fact used the term "accessible luxury" in consumer-facing communications; for instance, Rebecca Minkoff's website touts the brand as an "industry leader in accessible luxury handbags." PX7182 (Rebecca Minkoff website) at 1. And this messaging conveys to consumers; according to a recent ▮▮▮▮▮▮▮ survey: "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮." DX754 (▮▮▮▮▮▮) at 20.

114.    Women's Wear Daily, a fashion magazine, referred to Kate Spade as an "accessible luxury" brand in a February 2023 article about the brand, featuring quotes by brand CEO and President Liz Fraser. PX1238 (Tapestry) at 4; Hr'g Tr. 9/12 Fraser (Tapestry) at 835:20-836:23.

115.     Perhaps not surprisingly in light of the foregoing, Tapestry's own consumer research shows that consumers consider Coach "affordable luxury" (PX1936 (Tapestry) at 27) and "for someone who wants to feel a bit more affluent but isn't really splurging on something such as LV or Gucci" (PX1325 (Tapestry) at 42). This consumer research also "[c]onfirmed [Coach's] global brand positioning"—that is, "Coach enables people to explore their individual take on 'Accessible Luxury.'" PX1937 at 3; Hr'g Tr. 9/10 Harris (Tapestry) at 363:14-364:18.

## VII.    OTHER TYPES OF HANDBAGS ARE NOT REASONABLE SUBSTITUTES.

### A.  *True Luxury Handbags*

116.    Defendants and other industry participants recognize "true luxury" handbags as

distinct from "accessible luxury" handbags and refer to these brands by terms such as "luxury,"

"pure luxury," "traditional luxury," "pinnacle luxury," and "European luxury." *E.g.*, Hr'g Tr.

9/10 Kahn (Tapestry) at 439:1-10 ("European luxury"), 443:3-14 ("pinnacle luxury"); PX1485

(Tapestry) at 9 ("true luxury"); PX2435 (Capri) at 5 ("pure luxury"); PX2428 (Capri) at 3 ("pure

luxury"); Hr'g Tr. 9/11 Guez (Sunrise Brands) at 679:18-680:5 ("true luxury"); DX926

(██████ (██████) Tr.) at 120:5-16 (██████); PX8171 (██████ (██████) Tr.) at

21:19-23, 22:2-5 (██████); DX950 (██████ (██████) Tr.) at 26:4-28:7 (██

██████); DX930 (██████ (██████) Tr.) at 31:16-18, 31:20-32:4, 32:6-7 (██████);

Hr'g Tr. 9/11 Yang (Chanel) at 660:14-661:1 ("luxury"); *see also, e.g.*, PX8169 (Lifford

(Tapestry) Tr.) at 93:4-11 ("accessible luxury" refers to the "next tier down from luxury.").

117.    "True luxury" brands include Louis Vuitton, Prada, Gucci, Chanel, and Dior. Hr'g

Tr. 9/11 ██ (██) at 656:24-25, 660:14-661:6; PX3169 (Chanel) at U.S. Tab; PX8170

(██████ (██) Tr.) at 40:7-8, 40:10-12 ("██████████████████"),

134:5-134:7, 134:9, 134:11-12 (██████████████████████

██████); Hr'g Tr. 9/11 Guez (Sunrise Brands) at 679:18-680:5 ( "true luxury": Louis

Vuitton, Chanel, Prada, Loewe, Gucci, and Fendi); DX926 (██████ (██████) Tr.) at

120:5-16 (██████████████████████);

PX8171 (██████ (██████) Tr.) at 21:19-23, 22:2-5 (██████████████

██████); DX950 (██████ (██████) Dep.) at 27:20-24 (██████████████

██████████████); PX3201 (██████) at 18

(██████████████████████).

118.    With jaw-dropping prices at multiples of Defendants' offerings, true luxury

handbags are not reasonable substitutes for "accessible luxury" handbags. *E.g.*, PX1536

(Tapestry) at 15 (listing average MSRPs of $3,555 for Louis Vuitton, $3,620 for Dior, and $2,194 for Gucci in Q4 2022); PX1723 (Tapestry) at 9 (average MSRP for Louis Vuitton, Gucci, and Prada handbags for fiscal year 2023 to date was $2,957, as compared with $403 for "accessible luxury"); PX8170 (█████ (█████) Tr.) at 27:6-28:1, 30:9-13, 30:17-21 (████ █████████████████████████████████████████████████████████████ ██████); PX34 (██████) at 2.

119.    The prices for true luxury handbags typically start at $1,000 and only go up from there. *E.g.*, PX1431 (Tapestry) at 18 (above $1000 is "where luxury owns market"), 19 ("traditional luxury entry point of $1000+"); PX8169 (Lifford (Tapestry) Tr.) at 126:9-19; Hr'g Tr. 9/11 Guez (Sunrise Brands) at 680:6-8.

120.    As Todd Kahn, Coach CEO and Brand President, recognized in August 2021: "Gucci bags at $2000 is just not our customer in NA." PX1067 (Tapestry) at 1.

121.    Tapestry Board member Pamela Lifford likewise observed: "we don't really play today in that top tier." PX8169 (Lifford (Tapestry) Tr.) at 98:18-25, 99:2-24.

122.    And Liz Fraser, former Kate Spade CEO and Brand President, put it best when she wrote: "Bottom line, saying we're in the same market with true luxury is a joke. . . . Nobody says 'should I buy a LV [Louis Vuitton] bag or a Coach bag?'" PX1427 (Tapestry) at 1-2; *see also* Hr'g Tr. 9/12 Fraser (Tapestry) at 826:21-827:6 ("I didn't believe that the Kate Spade customer would pay $1000 for a Kate Spade bag").

123.    These witnesses were hardly alone. *E.g.*, PX8135 (Tapestry) at 1 ("█████████ ████████████████████████████████████████████████████████████").

124.    Although Defendants' executives repeatedly testified at the evidentiary hearing about cross-shopping between their "accessible luxury" brands and brands like Louis Vuitton

and even Hermès, the only support they provided for such statements were:

    a.  Anecdotal references to what they saw in stores or on the "street" (*e.g.*, Hr'g Tr. 9/9 Idol (Capri) at 132:6-17; Hr'g Tr. 9/10 Crevoiserat (Tapestry) at 341:25-342:2; Hr'g Tr. 9/16 Kors (Idol) at 1102:2-13), but which they apparently did not memorialize because these observations appear nowhere among the voluminous documentary evidence presented to this Court (*see* Hr'g Tr. 9/9 Newman (Capri) at 241:23-242:5 (Ms. Newman does not take any notes when she visits stores, or officially document the visits); Hr'g Tr. 9/16 Kors (Capri) at 1102:3-5); and

    b.  Consumer research and data, although they never pointed the Court to any specific research or data when making these assertions. *E.g.*, Hr'g Tr. 9/10 Crevoiserat (Tapestry) at 322:18-20, 325:9, 341:11-23; Hr'g Tr. 9/10 Harris (Tapestry) 402:18-403:4; Hr'g Tr. 9/13 Charles (Tapestry) 1024:2-12; Hr'g Tr. 9/16 Kors (Capri) 1101:24-1102:13.

125.  Evidence and testimony from other industry participants also undermines Defendants' claims of cross-shopping:

    a.  For example, ███████████ testified that her customers "████████  ██████████████████████████████████████████████ ████████████████████████████████████████" PX8168 (██████ (████████) Tr.) at 193:22-194:01, 194:3-194:18, 195:15-195:17, 195:19-196:1; *see also id.* at 197:21-198:1, 198:3-198:9, 213:12-19, 213:21-214:6 (████████████████████████████████ ██████████████); Hr'g Tr. 9/11 Guez (Sunrise Brands) at 682:4-12

(consumers do not normally consider "true luxury" handbags as an alternative to Rebecca Minkoff).[4]

    b. And Suwon Yang of Chanel testified that Chanel tracks brands like Hermès, Louis Vuitton, and Prada because "[t]hese are the brands that our client also carries, so we consider them as luxury brands to our clients' eyes. . . . based on their -- the clientele who we share and also the price point that they offer, we consider them as the other brand that are in the same sector of the business." Hr'g Tr. 9/11 Yang (Chanel) at 660:14-661:6, 662:25-664:10; *see also id.* 665:14-20 ("generally speaking, we notice that our clients looking at our product, shopping, amongst other brands that I mentioned earlier"). Michael Kors, Kate Spade, and Coach are simply not "part of the conversation when Chanel discusses luxury brands." *Id.* at 663:17-19.

126.    Aside from pricing, true luxury handbags are also distinguishable because they carry the imprimatur of the finest materials and craftsmanship and are usually manufactured in Europe. *E.g.*, PX8170 (████████ (███████) Tr.) at 46:22-51:1 ("█████████████████████ ████████████████████"); Hr'g Tr. 9/11 Yang (Chanel) at 657:14-16; Hr'g Tr. 9/11 Guez (Sunrise Brands) at 680:9-681:5 ("accessible luxury" have different quality of leather and hardware, and describing true luxury manufacturing locations largely in Europe); PX6000 (Smith (FTC) Rep.) ¶ 153, n.296; PX8172 (████████ (██████████) Tr.) at 35:7-9.

127.    For example, Chanel handbags are made by hand in France or Italy by skilled

---

[4] While certain Rebecca Minkoff surveys show that certain persons may purchase and/or like both Rebecca Minkoff and true luxury handbags, none of these surveys show whether survey participants were choosing between "accessible luxury" and true luxury brands when making a purchasing decision. Hr'g Tr. 9/11 Guez (Sunrise Brands) at 716:8-717:18.

artisans who have undergone special training. Hr'g Tr. 9/11 Yang (Chanel) at 657:10-16, 658:19-24, 658:3-7. It takes an average of 10 years of training for artisans to learn how to make Chanel's highest-quality handbags. *Id.* at 659:2-6; *see also* PX4002 (███ (███) Decl.) ¶ 3.

128.    Louis Vuitton's "highly trained artisans" go through extensive training and an apprenticeship to learn to make handbags in the way they have been made consistently for decades. The most seasoned experts are in Europe, and they train artisans located outside Europe. PX8170 (███ (███) Tr.) at 46:22-47:1, 47:4-12, 47:17-22, 48:2-3, 48:5-11.

129.    And Michael Kors Collection, a luxury line (PX7096 (Capri) at 42), manufactures its handbags in Italy. Hr'g Tr. 9/16 Kors (Capri) at 1092:9-11.

130.    What's more, true luxury handbag companies have their own manufacturing facilities. *E.g.*, PX8170 (███ (███) Tr.) at 44:21-45:1, 45:4-9; Hr'g Tr. 9/11 Yang (Chanel) at 657:18-23.

131.    Other characteristics distinguish "accessible luxury" from "true luxury" handbags:

a.    While discounting is common among "accessible luxury" handbags (*supra* FoF ¶¶ 82-88), true luxury brands typically do not discount. *E.g.*, Hr'g Tr. 9/11 Yang (Chanel) at 660:9-10 (Chanel does not discount); PX8170 (███ (███) Tr.) at 59:2-8 (███████████████).

b.    Unlike "accessible luxury" brands, which offer their products in outlets and a range of department stores (*supra* FoF ¶¶ 5, 40, 85, 177), true luxury brands aim for a more exclusive shopping experience with limited sales channels and few, if any, outlet stores. *E.g.*, PX8170 (███ (███) Tr.) at 106:11-12 (███████████████); Hr'g Tr. 9/11 Yang (Chanel) at 659:7-22 (Chanel sells to high end department stores and very few small retailers),

659:23-660:1 (Chanel does not sell its handbags online or through outlets);
*see also* PX7446 (Chanel website) at 3 ("There are no authorized sellers of
Chanel's leather goods . . . on the internet."); Hr'g Tr. 9/13 Steinmann
(Macy's) at 939:1-940:18 (Macy's offers limited luxury brand shop-in-shop
experiences, primarily at its flagship store at Herald Square); Hr'g Tr. 9/16
Kors (Capri) 1069:16-1070:8, 1091:23-1092:88 (Michael Kors Collection
does not sell through outlet).

   c. The true luxury consumer is also more affluent than the "accessible luxury"
customer. PX8170 (████ (████) Tr.) at 65:6-18, 66:1-9, 66:11-15,
66:17-18 (████████████████████████████████
████████); PX8168 (████ (████████) Tr.) at 193:22-194:1, 194:3-
194:18 (████████████████████████████████
████████████████████████████████
████████████████████).

**B.  *Mass-Market Handbags***

132.    Mass-market handbags are another category of handbags; industry participants
sometimes also refer to mass market as "fast fashion" or "opening price point." *E.g.*, Hr'g Tr. 9/9
Idol (Capri) at 96:7-12 ("Q. Fast fashion refers to the fact that they put out products very quickly
at a very reasonable and fair price, correct? A. Correct."); DX930 (████ (████████) Tr.)
at 26:8-11, 26:13-19, 26:21 ("████████████████████████████████
████"); PX8168 (████ (████████) Tr.) at 15:6-8, 15:9-16:1 ("████████"); Hr'g Tr.
9/11 Guez (Sunrise Brands) at 677:19-678:5 ("mass market"); PX8172 (████ (████
████) Tr.) at 47:11-12, 47:14-18 ("████████████████████████████████
████████████").

133.    Mass-market brands include Zara, H&M, Steve Madden, Nine West, Tommy

Hilfiger, Guess, and private label brands. DX930 (██████████████ Tr.) at 32:22-33:6

(██████████████████████████████████████████████████████████████

██████████████████████); PX8168 (████████████████ Tr.) at 15:11-16:1

(██████████████████████████); Hr'g Tr. 9/9 Idol (Capri) at 96:7-12.

134.    Mass market handbags do not boast the same quality of materials and

craftsmanship as "accessible luxury" handbags. DX930 (████████████ Tr.) at 31:4-15

(█████████████████████████████████████████████████████████████

███████████████████████████████████); PX8168 (██████████████

██████ Tr.) at 13:21-22, 14:2-16:1 ██████████████████████████████

██████████████████████████; Hr'g Tr. 9/9 Idol (Capri) at 96:13-15 ("Q. Quality of

materials distinguishes a fast fashion brand from a luxury brand, correct? A. Correct."); Hrg. Tr.

9/10 Kahn (Tapestry) at 460:3-10 ("Q. A Coach handbag is better quality than say a Calvin Klein

handbag, right? A. Generally I would say yes . . . ."); Hr'g Tr. 9/13 Steinmann (Macy's) at

933:11-16, 934:5-23 (Macy's "opening" and "mid-tier" handbags are priced below $100, use less

genuine materials, and have lower quality standards); Hr'g Tr. 9/11 Guez (Sunrise Brands) at

677:24-678:5 (mass-market handbags are constructed of lesser-quality materials such as

polyurethane in lower quality factories for very low cost); *accord* PX8171 (██████████████

Tr.) at 22:22-23:17, 23:20-24:7 (████████████████████████████).

135.    For example, for ██████████ handbags, ████████████████████████████

████████████████████████████████" DX930 (██████████████

██████ Tr.) at 31:4-15, 36:20-37:3.

136.    Mass-market handbags also typically sport suggested retail prices of under $100.

Hr'g Tr. 9/10 Kahn (Tapestry) at 459:20-460:2 ("the predominant number of [mass market]

handbags are under a hundred dollars"); DX930 (████████████ Tr.) at 24:22-25:1,

25:3-5 ██████████████████████████████████████████████████████████

████████; PX8171 (████████████ Tr.) at 22:22-23:17, 23:20-24:7; PX6000 (Smith

(FTC) Rep.) ¶¶ 158-161; *cf.* PX8172 (████████████ Tr.) at 44:25-45:10

████████████████████████████████████████████████████████████████

████████████████████

137.    Mass-market handbags are not a reasonable substitute for "accessible luxury"

handbags. Coach itself does not "think of mass as one of the areas that we compete with for

mindshare for the customer." Hr'g Tr. 9/10 Kahn (Tapestry) at 459:14-19.

138.    And in its price benchmarking exercises, Tapestry does not include "mass-

market" brands. Hr'g Tr. 9/10 Harris (Tapestry) at 395:11-20 ("THE COURT: Can I ask a

question. Do you include any, what have been characterized as 'mass-market brands' in your five

to ten for benchmarking? THE WITNESS: I don't know the exact. We keep a pretty tight, short

set of brands. I don't think in our benchmarking in that context that we have included those. THE

COURT: I'm looking back at 1273, page 9, it had luxury, it had accessible luxury, it didn't have

a category for mass market; right? THE WITNESS: That's correct.").

139.    As Capri told China's State Administration for Market Regulation while obtaining

regulatory clearance for this deal there: "high-end mass-market products also offer good quality

and performance and are made with decent materials and manufacturing processes, [but] they are

not on the same level as luxury products." PX2061 (Capri) at 4; *see also id.* (noting "distinction"

between luxury goods and high-end mass market goods and "suggesting that luxury goods may

constitute a distinct product market"); Hr'g Tr. 9/9 Idol (Capri) at 100:7-10 ("Q. As the chairman

and CEO of Capri, would you want Capri to give truthful, accurate, and reliable information to a foreign regulator? A. Yes, that's correct.").

140.    Capri CEO John Idol likewise does not consider fast-fashion brands to be peers of Michael Kors. Hr'g Tr. 9/9 Idol (Capri) at 98:6-8.

### C. *Other Types of Bags*

141.    Similarly, used true luxury handbags—or used bags of any type—are not a reasonable substitute with "accessible luxury" handbags. Hr'g Tr. 9/17 Smith (FTC) at 1347:24-1348:8 ("I've seen no evidence in ordinary course documents that indicates that they [defendants] consider used handbags to be a significant competitive constraint on pricing or strategic decision-making."); *accord* Hr'g Tr. 9/17 Scott Morton (Defs.) at 1290:4-7 (no recollection of a single contemporaneous business document from Defendants showing them reacting to used handbags), 1289:24-1290:3 (lacks data on used handbags), 1289:17-23 (no Tapestry executives gave any specific examples of taking used handbags into account).

142.    ████████████████, provided a sworn declaration ████████
████████████████████████████ (PX4001 (████████
Dec.) ¶ 7), far above the price of Coach, Kate Spade, and Michael Kors handbags. ████████
████████████████████████████████████████
████████████████ *Id.* ¶¶ 3-5. ████████████████
████████████████████████████ *Id.* ¶¶ 3, 8.
Despite relying on ████ data in his analysis, Defendants' industry expert, Jeff Gennette, failed to review this declaration. Hr'g Tr. 9/12 Gennette (Defs.) at 1168:24-1169:1.

143.    ████████ sworn statement is consistent with a June 2022 Capri analysis of the Real Real, a second-hand seller: "Bottom line – we found that the closest bags were a new MK for $298 vs a 'Good' Gucci for $475, but most comparable Gucci bags were at least double the

price of a new MK bag." DX837 (Capri) at 1; *see also* Hr'g Tr. 9/9 (Idol) at 180:12-20.

144.    Likewise, the Lululemon Everyday Belt Bag is not a reasonable substitute with "accessible luxury" handbags.



DX931 (

Tr.) at 73:2-22, 74:10-15, 72:13-72:23, 77:7-17, 80:16-81:1, 87:7-19, 88:4-8, 88:11.

145.    

(*id.* at 22:1-22:4, 83:3-8)—

(*id.* at 28:11-17), and, in any event,

*Id.* at 83:18-84:5.

146.    

*Id.* at 98:22-23, 98:25-99:1; *see also* DX752 at 8 (

). Moreover, in contrast to Defendants' offerings,

DX931 (

Tr.) at 81:12-17.

## VIII.    QUANTITATIVE ECONOMIC ANALYSIS CONFIRMS A DISTINCT MARKET FOR "ACCESSIBLE LUXURY" HANDBAGS.

147.    The quantitative economic analysis performed by the FTC's expert Dr. Loren Smith also demonstrated the existence of a distinct market for "accessible luxury" handbags in the United States.[5]

148.    The hypothetical monopolist test ("HMT") is a standard tool used by economists analyzing a merger to identify the outer bounds of a relevant product market. It asks whether a profit-maximizing hypothetical owner of a set of products would raise price by a small but significant increase in price or worsening of terms ("SSNIPT"). Hr'g Tr. 9/11 Smith (FTC) at 529:3-15; *see also* Hr'g Tr. 9/17 Scott Morton (Defs.) at 1291:4-10.

---

[5] Defendants concede the relevant geographic market is the United States. Dkt. No. 159 at 5 n.1.

149.     The HMT illustrates how the incentives of a hypothetical monopolist of all brands in a candidate market change relative to incentives that exist pre-merger, given that some sales previously lost due to increased prices are now recaptured by other brands in the candidate market the hypothetical monopolist also controls. Hr'g Tr. 9/11 Smith (FTC) at 544:16-545:18.

150.     The value to the hypothetical monopolist of the recaptured sales is determined by two inputs: (1) the significance of substitution between the products in the candidate market, and (2) the profit the hypothetical monopolist makes on the sales of those products. Hr'g Tr. 9/11 Smith (FTC) at 545:20-25.

151.     The significance of substitution between products in a candidate product market is measured by the diversion ratio between those products. A diversion ratio from brand A to brand B is the proportion of the sales lost by a brand A when it raises price that are recaptured by brand B. *Id.* at 546:1-9. The profit the hypothetical monopolist makes on the sales of diverted sales is measured by the average price-cost margins of the candidate set of products. *Id.* at 545:20-25; *see also* Hr'g Tr. 9/17 Scott Morton (Defs.) at 1302:6-12 (agreeing that "gross margins are the relevant margins for evaluating pricing competition.").

152.     In this case, Dr. Smith specifically conducted a quantitative application of the HMT called an aggregate diversion ratio analysis. Hr'g Tr. 9/11 Smith (FTC) at 548:11-25. While a diversion ratio measures the percentage of consumers diverted from one product to another in response to a SSNIPT, the aggregate diversion ratio measures the diversion from one product to all other products in a candidate market. *Id.* at 546:10-24. As Dr. Smith explained, "the aggregate diversion test calculates two things: one, a critical aggregate diversion beyond which a collection of brands would pass the hypothetical monopolist test, and then it calculates the actual aggregate diversion and determines whether that aggregate diversion passes the

hypothetical monopolist test by being beyond that critical threshold." Hr'g Tr. 9/11 Smith (FTC) 549:20-25; PX6000 (Smith (FTC) Rep. ¶ 103.

153.    To identify a candidate market to which to apply the HMT, Dr. Smith reviewed ordinary-course documents produced by Defendants and other industry participants. *Id.* at 535:1-10. In particular, Dr. Smith identified Tapestry market-sizing documents that used NPD's "Bridge" and "Contemporary" categories as proxies for an "accessible luxury" market. *Id.* at 535:25-536:15; PX1334 (Tapestry) at 3-4; *see also* PX1306 (Tapestry) at 3; Hr'g Tr. 9/10 (Crevoiserat) at 282:17-285:4; PX5087 (Tao (Tapestry) Tr.) at 108:23-109:4.[6]

154.    NPD's "Bridge" and "Contemporary" categories include over 200 separate handbag brands, as well as the collective categories "All Other Brands" for smaller brands and "Private Label." PX59; Hr'g Tr. 9/18 Smith (FTC) at 1336:2-18. Importantly, NPD's bridge and contemporary brands include Defendants' Coach, Kate Spade, and Michael Kors brands, as well as all brands regularly identified in Defendants' ordinary-course documents as "accessible luxury" and particularly close competitors, such as Marc Jacobs and Tory Burch. *See* PX59.

155.    Using data produced by Defendants, Dr. Smith calculated price-cost margins for Coach, Kate Spade, and Michael Kors sales in both mainline and wholesale sales and ultimately used an estimated (and conservative) 60 percent price-cost margin for the HMT. Hr'g Tr. 9/11

---

[6] Dr. Smith also defined a cluster market of four handbag styles: cross body bags, shoulder bags, satchels, and tote bags. Hr'g Tr. 9/11 Smith (FTC) at 531:13-18; PX6000 (Smith (FTC) Rep.) ¶¶ 92-93. A "cluster market" is a tool commonly used by economists to aggregate together sets of products that may not be close substitutes with one another but are sold under similar competitive conditions such that they can be analyzed together for the purposes of calculating market shares and concentration metrics. Hr'g Tr. 9/11 Smith (FTC) at 531:25-532:22. Professor Scott Morton agrees that a cluster market is an appropriate tool to use when there are many products in the same competitive environment. Hr'g Tr. 9/17 Scott Morton (Defs.) at 1291:20-23. Dr. Smith's ultimate conclusions in this matter, however, are not sensitive to the precise styles of bags included in the analysis. PX6001 (Smith (FTC) Reply Rep.) ¶¶ 67-68, tbl. 3.

Smith (FTC) at 547:9-548:10; *see also* Hr'g Tr. 9/17 Scott Morton (Defs.) at 1302:9-15

(Professor Scott Morton has "no quarrel" with Dr. Smith's use of Defendants' accounting data

and does not doubt his margin calculations).

156.    Based on these margin estimates, Dr. Smith calculated the critical aggregate

diversion ratio to be 17 percent. Hr'g Tr 9/11 Smith (FTC) at 549:1-5; PX6000 (Smith (FTC)

Rep.) ¶ 105. To estimate actual aggregate diversion ratios for the candidate market to compare to

this critical aggregate diversion ratio, Dr. Smith relied on ordinary-course surveys conducted by

survey firm Kantar on behalf of Tapestry for its brand health tracker, as well as a survey

conducted by Bain in March 2022. Hr'g Tr 9/11 Smith (FTC) at 549:24-551:5.

157.    Results from the brand health tracker have appeared in Tapestry Board materials.

Hr'g Tr. 9/10 Crevoiserat (Tapestry) at 275:13-276:9; Hr'g Tr. 9/10 Harris (Tapestry) at 361:14-

17. They have also been used to prepare Tapestry executives to speak with investors. Hr'g Tr.

9/10 Harris (Tapestry) at 361:18-21; PX1642 (Tapestry) at 2.

158.    The surveys on which Dr. Smith relied asked respondents to identify the other

brands they considered when making their most recent handbag purchase. *See* PX1647

(Tapestry) at 9 ("What other brands did you consider before you made this purchase?"); PX1697

(Tapestry) at Tab: US Questions ("The last time you purchased [a handbag] from [brand], what

other [handbag] brands did you consider buying from?"). Tapestry Vice President of Global

Consumer Insights Alice Yu described the Kantar surveys as a "path-to-purchase" type study

that looks at "history and the sort of things that the [customer] did"; although Tapestry later

revised this question in 2023, it did so not because prior surveys were unreliable, but to better

focus on brand equity. Hr'g Tr. 9/16 Yu (Tapestry) at 1185:18-1186:4.

159.    As Dr. Smith explained, to use these surveys to estimate diversion ratios, he made

the reasonable assumption grounded in economic logic that a respondent's next-best handbag choice is included among the brands they indicated that they considered when making their most recent purchase. Hr'g Tr. 9/11 Smith (FTC) at 551:7-552:8.

160.    In communications with the FTC before this lawsuit was initiated, counsel for Tapestry described the findings of the surveys on which Dr. Smith relied as "robust." PX50 (Tapestry) at 1 ("we detail how the survey screened for a robust sample of handbag or small leather good ("SLG") purchasers . . . .").

161.    These surveys are also consistent with other types of data that economists routinely rely on to estimate diversion ratios. Hr'g Tr. 9/11 Smith (FTC) at 555:2-556:5, 558:13-559:1, 653:7-13. Specifically, the data from the surveys is similar to the switching data used by the U.S. Department of Justice in matters in which Defendants' expert Professor Scott Morton was directly involved. *See* Hr'g Tr. 9/17 Scott Morton (Defs.) at 1218:5-17; Hr'g Tr. 9/17 Smith (FTC) at 1365:4-24.

162.    Although some respondents to Tapestry's ordinary course surveys indicated that they did not consider any other brands when making their most recent purchase, Dr. Smith explained that these responses likely indicate either a respondent is a "brand loyalist" who would make the same purchase regardless of the SSNIPT or one whose second-best option is something other than a handbag. Hr'g Tr. 9/11 Smith (FTC) at 559:16-560:8. Dr. Smith thus calculated two sets of diversion ratios: a baseline diversion ratio (which assumes that these respondents would stick with their preferred brand in response to a SSNIPT) and a sensitivity diversion ratio (which assumes that these respondents are marginal consumers with a second-best option of something other than a handbag). Hr'g Tr. 9/11 Smith (FTC) at 560:17-561:3.

163.    Using these surveys, Dr. Smith calculated aggregate diversion ratios of over 60

percent (in his baseline calculations) and over 35 percent (in his sensitivity calculations), results that in both cases well exceed the 17 percent critical aggregate diversion ratio needed to satisfy the HMT. Hr'g Tr. 9/11 Smith (FTC) at 550:5-13; PX6000 (Smith (FTC) Rep.) ¶ 106, tbl. 5. Any critique of the surveys would have to demonstrate significant error for the aggregate diversion rates to fail to meet the 17 percent critical value.

## IX. COACH, KATE SPADE, AND MICHAEL KORS DOMINATE "ACCESSIBLE LUXURY" HANDBAGS IN THE UNITED STATES.

164.    Tapestry's domestic revenues for "accessible luxury" handbags were $██████ in 2023. PX6001 (Smith (FTC) Reply Rep.) ¶ 62, tbl. 1. Capri's domestic revenues for "accessible luxury" handbags were $██████ in 2023. *Id.* The next largest brands by revenues were Tory Burch ($██████), Marc Jacobs ($██████), Dooney & Bourke ($██████), and Brahmin ($██████). *Id.* No other brand had more than $██████ in sales. *Id.*

165.    In the ordinary course, Tapestry has relied on commercially available data from NPD (now, Circana) and Euromonitor for market-sizing analyses. PX6000 (Smith (FTC) Rep.) ¶¶ 64-69, 167; Hr'g Tr. 9/10 Harris (Tapestry) at 379:12-15, 388:25-389:7. Results from these analyses have been incorporated into Tapestry Board and investor materials. Hr'g Tr. 9/10 Harris (Tapestry) at 378:19-379:11, 380:17-382:12 (discussing PX1740).

166.    When Tapestry does not have public data for brands, it "might use an assumption from how they've grown in NPD at a point in time as a proxy for how they've grown in the market in total." Hr'g Tr. 9/10 Harris (Tapestry) at 389:8-12. Tapestry "similarly" uses data from Euromonitor "as a basis for the annual establishment of the size of the category as a starting point." Hr'g Tr. 9/10 Harris (Tapestry) at 389:13-17.

167.    Based on sales data produced by Tapestry, Capri, and non-parties, as well as NPD data for wholesale sales, the FTC's economic expert, Dr. Loren Smith, calculated that Coach,

Kate Spade and Michael Kors combined post-merger will have over 58 percent market share in the "accessible luxury" handbag market. PX6001 (Smith (FTC) Reply Rep.) ¶ 62, tbl. 1.

168.    Specifically, Coach boasted ▮ percent of handbag sales among these 200+ "accessible luxury" brands in the United States in 2023; Michael Kors followed with ▮ percent. *Id.* Kate Spade comprised ▮ percent of "accessible luxury" handbag sales in the United States in 2023, followed by Tory Burch and Marc Jacobs with ▮ percent and ▮ percent, respectively. *Id.* No one else comprised more than ▮ percent. *Id.*[7]

169.    For its part, Capri has used data from third-party data provider Euromonitor to track an "accessible luxury" leather goods market. *E.g.*, PX2680 (Capri) at 6; PX2045 (Capri) at 10; PX6000 (Smith (FTC) Rep.) ¶ 170.

170.    According to a 2020 Euromonitor report regarding the market for *all* luxury leather goods in the United States (*i.e.*, not just "accessible luxury" leather goods), Michael Kors had a 15.2 percent market share, Coach had 13.8 percent market share, and Kate Spade had 4.5 percent market share, together adding up to 33.5% market share. DX837 (Capri) at 4; Hr'g Tr. 9/9 Idol (Capri) at 180:22-181:21. Other similar ordinary-course market sizing documents from Defendants show combined market shares for Coach, Kate Spade, and Michael Kors among accessible luxury brands as high as 83 percent. PX6000 (Smith (FTC) Rep.) ¶ 180, tbl. 6.

171.    Dr. Smith calculated a separate sensitivity of his market shares using Euromonitor data. Hr'g Tr. 9/11 Smith (FTC) at 565:20-566:1. The results show similarly high combined

---

[7] For third parties that did not produce useable direct-to-consumer sales data, Dr. Smith used available direct-to-consumer data to calculate an average wholesale/direct-to-consumer ratio. He then applied this ratio to the wholesale sales data for the remaining brands in NPD to estimate their direct-to-consumer sales. Hr'g Tr. 9/11 Smith (FTC) at 564:6-565:7. The majority of the data on which Dr. Smith relies, however, was actual sales data. *Id.* at 565:2-7; PX6001 (Smith (FTC) Reply Rep.) ¶ 142, tbl. 6.

shares. PX6000 (Smith (FTC) Rep.) at Appendix II, tbls. 14, 15.

X. **TAPESTRY AND CAPRI—THROUGH THEIR COACH, KATE SPADE, AND MICHAEL KORS BRANDS—COMPETE HEAD-TO-HEAD IN THE SALE OF "ACCESSIBLE LUXURY" HANDBAGS.**

172.    As mentioned above, Tapestry and Capri recognize Coach, Michael Kors, and Kate Spade as close competitors. *Supra* FoF ¶¶ 30, 33, 50, 101-02.

173.    When a 2021 analysis showed Michael Kors, Tory Burch, and Marc Jacobs wholesale handbag sales up as compared to Coach and Kate Spade, it was only Michael Kors' increase that caught the eye of Tapestry CEO Joanne Crevoiserat—even though Marc Jacobs' sales had increased *more* than those of Michael Kors. PX1306 (Tapestry) at 1-2 ("Have we really lost that much share to MK in Q3 in the wholesale channel (their business +26% to COH -18% and KS -41%)?"); Hr'g Tr. 9/10 Crevoiserat (Tapestry) at 283:2-285:3.

174.    Indeed, Tapestry's deal documents convey concern for "cannibalization" between Coach, Kate Spade, and Michael Kors post-acquisition and a need to differentiate Michael Kors. PX1715 (Tapestry) at 10; PX1144 (Tapestry) at 2 (Tapestry CEO notes on meetings with Board members regarding Capri deal include, "Team should push harder on consumer aspect – COH/MK differentiation"); Hr'g Tr. 9/10 Crevoiserat (Tapestry) at 294:24-295:3.

175.    Similarly, Capri's documents are laced with analyses comparing Michael Kors with its "key competitor" Coach, including on pricing and designs. *E.g.*, Hr'g Tr. 9/9 Idol (Capri) at 111:5-8 ("Coach is one of our key competitors"); PX2425 (Capri) at 2 (Idol calls Coach "key competitor" in email with Canada Goose executive)[8]; PX2108 (Capri) at 2-16 (comparing Michael Kors and Coach on pricing, assortment, design, and materials); PX2128 (Capri) at 6-7.

---

[8] Mr. Idol had this communication with Canada Goose, a competitor of Michael Kors. ████████████

176.    Tapestry's own consumer research shows that consumers view Coach, Kate Spade, and Michael Kors as close substitutes. *E.g.*, PX1186 (Tapestry) at 15; PX1216 (Tapestry) at 4 (Michael Kors and Coach "are each other's top competition when consumers are considering other brands for purchase").

177.    Not surprisingly, department stores place these brands near each other in their stores. PX3506 (███████) at 1; Hr'g Tr. 9/13 Steinmann (Macy's) at 937:15-938:11.

178.    As discussed below, these brands compete vigorously on many dimensions, from pricing to design to marketing to shopping experience to retail labor to sustainability.

**A.  *Pricing and Discounts.***

179.    Examples abound in Defendants' documents of analyses monitoring each other's prices for "accessible luxury" handbags.

180.    Coach routinely tracks, and compares its handbag prices with, those for Michael Kors handbags. PX1783 (Tapestry) at 51 (2023 Coach pricing comparison); PX1536 (Tapestry) at 15 (same analysis from 2022); *see also* PX1137 (Tapestry) at 1-2; Hr'g Tr. 9/12 Levine (Tapestry) at 783:15-21; PX1547 (Tapestry) at 1-2; PX8028 (Tapestry) at 1-2 (in-store Michael Kors price tracking).

181.    For instance, when considering its strategic approach to price increases in fiscal year 2023, Coach wrote, "Consider competitive landscape, looking at MK [Michael Kors], TB [Tory Burch] & KS [Kate Spade] pricing structures to understand ticket opportunity." PX1546 (Tapestry) at 42; Hr'g Tr. 9/12 Levine (Tapestry) at 784:3-785:15.

182.    And Coach has sent its employees into Michael Kors stores to monitor pricing and foot traffic. Hr'g Tr. 9/12 Levine (Tapestry) at 785:16-786:5; PX1547 (Tapestry) at 2 ("As we used to do a while back there is interest in tracking again pricing for certain styles with our competition (namely MK and TB). Kate Spade has been doing this already and they will share

the responsibility with us – and we don't need to track the KS pricing anymore because we could get it directly from them!").

183.    The President of Coach North America, Leigh Levine, could not recall any stores where Coach sent employees to track prices and discounting other than those for Michael Kors, Tory Burch, and Kate Spade. Hr'g Tr. 9/12 Levine (Tapestry) at 815:2-13.

184.    Kate Spade also monitors and prepares analyses concerning the prices for Michael Kors handbags. *E.g.*, PX1223 (Tapestry) at 7 (Kate Spade "Target MSRP Positioning +10% vs. Michael Kors"); PX1495 (Tapestry) at 1; PX1404 (Tapestry) at 28-29, 45; PX1256 (Tapestry) at 5-6; PX1929 (Tapestry) at 1; PX8036 (Tapestry) at 18; *see also* PX1784 (Tapestry) at 5; PX5087 (Tao (Tapestry) Tr.) at 215:9-14, 218:3-12, 219:3-12, 220:18-25, 221:2-4, 222:20-25, 223:2-4, 223:15-18) (███████████████████████████████████████
████████████████████████████████████).

185.    Long-range planning documents submitted to Tapestry show that Kate Spade sets MSRP targets in relation to Michael Kors. PX1740 (Tapestry) at 42 (Board LRP document showing Kate Spade's "Target MSRP Positioning" relative to Michael Kors, Coach, and Tory Burch); PX1223 (Tapestry) at 7 (Kate Spade target MSRP positioning relative to Michael Kors, Coach, and Tory Burch); Hr'g Tr. 9/12 Fraser (Tapestry) at 864:8-15 (Kate Spade relative MSRP targets shared with the Tapestry board).

186.    For its part, Michael Kors has used Coach's pricing for handbags as a benchmark when considering increasing prices. *E.g.*, PX2727 (Capri) at 3; PX2178 (Capri) at 2-3; PX2433 (Capri) at 1 (Capri CEO John Idol forwarding an e-mail about Coach outlet prices for handbags); PX2388 (Capri) at 1 (Michael Kors CEO noting that Coach bag prices are "largely in in line with" Michael Kors bag prices); Hr'g Tr. 9/9 Newman (Capri) at 196:14-199:19.

187.    Capri CEO John Idol admitted that Coach was the handbag competitor with whom he most frequently compared prices. Hr'g Tr. 9/9 Idol (Capri) at 101:6-7, 173:5-13. And Mr. Idol has instructed Michael Kors executives to align Michael Kors' pricing with Coach. PX2047 (Capri) at 1-2 (discussing John Idol's price goals relative to Coach).

188.    On another occasion, in response to a Coach marketing email that conveyed "very sharp price points," Mr. Idol told Michael Kors executives to "develop a strategy to compete with this. I don't love it but we have no choice." PX2075 (Capri) at 1.

189.    Mr. Idol testified that he had "more than 10" meetings to discuss messaging against Coach, and frequently circulated Coach promotional communications calling for a response. Hr'g Tr. 9/9 Idol (Capri) at 111:13-17; *see also* PX2114 (Capri) at 1 (e-mail from John Idol complaining that Coach is "winning with the Outlet and promotional strategy in the US"); PX2405 (Capri) at 1 (noting Coach sending a "massive amount more emails to consumers than we do"); PX2388 (Capri) at 1.

190.    Price competition between Coach, Kate Spade, and Michael Kors occurs beyond list prices, however, as Defendants closely monitor, and often match, each other's discounts and promotions, including for Mother's Day and members of the military. *E.g.*, PX1507 (Tapestry) at 1; PX1923 (Tapestry) at 1 ("Competition is fierce. MK changed promotion mid-day yesterday); PX6000 (Smith (FTC) Rep.) ¶ 210 nn. 392-393; PX2396 (Capri) at 1 (Michael Kors "keep[s] a close eye on Coach's promotional activity").

191.    Michael Kors brand CEO Cedric Wilmotte wanted to show Capri's Board "examples of coach and kate spade racing to the bottom with such promotions" so it could "see what we are up against." PX2097 (Capri) at 1 (e-mail from Mr. Wilmotte asking a subordinate to prepare "2 or 3 examples of coach and kate spade racing to the bottom with such promotions"

against Michael Kors to show to Capri's Board of Directors); PX2128 (Capri) at 8, 10 (Capri Board of Directors slide showing Coach and Kate Spade promotions); Hr'g Tr. 9/12 Wilmotte (Capri) at 744:9-745:15.

192.    And at Kate Spade, former brand CEO and President Liz Fraser lamented in March 2023 about the "race to the bottom" on handbags, asking a subordinate for information on age and ethnicity demographics, as she was "assuming we'll see that younger and more diverse customers pay more." PX1321 (Tapestry) at 1; Hr'g Tr. 9/12 Fraser (Tapestry) at 869:11-870:1 ("I'm tired of the race to the bottom.").

193.    Competition with discounts is so fierce that investors complained about the fierce discounting between these three brands: ███████████████████████

████████████████████████████████████████████████

████████████████████████████████████

████████████████████████ PX1074 (Tapestry) at 6.

194.    Economic analysis confirmed that the Proposed Acquisition likely will cause higher retail prices for Coach, Kate Spade, and Michael Kors handbags, potentially resulting in $365 million in consumer harm annually. *See* Hr'g Tr. 9/17 Smith (FTC) at 1395:8-18; PX6000 (Smith (FTC) Rep.) ¶ 266. These findings are not surprising in light of Tapestry's plans for the Michael Kors brand (*i.e.*, to raise AURs and decrease discounting (PX1216 (Tapestry) at 17-18, PX1200 (Tapestry) at 10)).

**B. *Design.***

195.    Coach, Michael Kors, and Kate Spade also compete regarding the designs of their handbags, materials, and elements. *E.g.*, PX1338 (Tapestry) at 15; PX1924 (Tapestry) at 11-13.

196.    Indeed, Michael Kors executives have observed the similarities between Coach and Michael Kors designs, even suggesting that a Coach handbag copied a Michael Kors

handbag. PX2310 (Capri) at 3 (new Coach bag was "basically the Parker saddle bag," a Michael Kors line); Hr'g Tr. 9/9 Newman (Capri) at 195:4-16 (Coach bag reminded Ms. Newman of the Parker bag because of its hardware and shape).

197.    The similarities in design led Philippa Newman—President for Accessories and Footwear for Michael Kors and who oversees Michael Kors' design team, production team, and the global merchandising team (Hr'g Tr. 9/9 Newman (Capri) at 183:12-184:1)—to observe during 2023 New York Fashion Week that Coach and Michael Kors were "in the same group, showing the same stuff, vying for the same customer." PX2308 (Capri) at 8; Hr'g Tr. 9/9 Newman (Capri) at 193:25-194:16.

198.    Similarly, Michael Kors monitors and compares Coach's product designs, and Capri's CEO John Idol often takes inspiration from Coach designs, reviewing Coach e-mail blasts for ideas and advising his team to do the same. *E.g.*, PX2108 (Capri) at 3-13; PX2419 (Capri) at 1; PX2401 (Capri) at 1; PX2416 (Capri) at 1.

199.    For example, over the course of just a few days in June 2021, Mr. Idol demanded that Michael Kors incorporate designs and elements he saw in multiple Coach marketing e-mails. PX2242 (Capri) at 1 ("The full bag stripe on signature looks nice. We should do something like this for next spring in full line and outlet"); PX2243 (Capri) at 1 ("Love the hook up of Signature on ready to wear and Accessories. We need more 'items' like this.").

200.    Later that same summer, Mr. Idol contacted Ms. Newman to discuss a new shape that Coach had introduced in its popular "Tabby" handbag line. PX2419 (Capri) at 1.

201.    The very next day, Ms. Newman asked her design team if "we need to evolve our Bradshaw into a larger size?? Like C&ach [sic] is doing with their Tabby. . . ." PX2346 (Capri) at 2; Hr'g Tr. 9/9 Newman (Capri) at 188:2-189:2 (Ms. Newman was "asking if Michael Kors

should evolve the Bradshaw bag into a larger size because, for example, Coach had done so with

the Tabby," and Tabby "was top of mind because of Mr. Idol's e-mail" the previous day).

202.    Michael Kors later introduced a similar bag as part of its Parker line. PX2350

(Capri) at 1-2 ("We have heard this feedback as well on Coach Tabby especially the pillow

version. We will have a similar Shoulder Bag for Fall 22 season with a new iconic MK hardware

name Parker."); Hr'g Tr. 9/9 Newman (Capri) at 189:18-190:4 ("Michael Kors launched a

similar shaped bag to Coach's Tabby").

203.    Mr. Idol has also instructed Michael Kors employees to purchase Coach handbags

to analyze hardware that Coach uses in its handbags. PX2294 (Capri) at 1 ("Just spoke to John. I

knew we should have bought those Coach bags for the hardware. He wants to see them."); Hr'g

Tr. 9/9 Newman (Capri) at 190:17-191:18 (discussing the purchase of Coach bags to look at the

hardware, interior functionality, and pockets); PX2183 (Capri) at 1, 4-11 (analyses of Coach

hardware one month after exchange in PX2294); Hr'g Tr. 9/9 Newman (Capri) at 192:17-193:11

(discussing the subsequent Michael Kors analysis of Coach hardware).

204.    Within Tapestry, when Coach and Kate Spade mimic each other's designs, it

leads to frank conversations between the brand CEOs to stop these practices: for instance, after

Coach launched a heart-shaped handbag that was extremely close in appearance to a Kate Spade

handbag, Kate Spade's Brand President & CEO complained to Coach's Brand President and

CEO and told him it would not be "ideal" for Coach to "recut" it: "We have a ██████

investment in the bag, so it's not a great situation for us." PX1271 (Tapestry) at 1. Kate Spade's

former CEO explained that she "didn't want this one to be so similar." Hr'g Tr. 9/12 Fraser

(Tapestry) at 840:15-842:18.[9]

### C.  *Marketing.*

205.    The three brands also pay close each attention to each other's marketing.

206.    Capri executives, including CEO John Idol, have signed up for, and monitor, Coach e-mail marketing blasts. Hr'g Tr. 9/9 Idol (Capri) at 111:18-112:1; Hr'g Tr. 9/9 Newman (Capri) at 186:1-3. Mr. Idol regularly forwards his subordinates information he receives from these e-mails. *E.g.*, PX2433 (Capri) at 1 (Coach is "going low!!!"); PX2396 (Capri) at 1 (discussing Coach promotional activity and Coach outlet); PX2114 (Capri) at 1 ("They are winning with the Outlet and promotional strategy in the US. It's not just brand heat!"); PX2388 (Capri) at 1 ("Look at these prices!").

207.    For instance, in April 2021, Mr. Idol wrote to his subordinates: "Coach's always on outlet marketing is clearly working!" PX2260 (Capri) at 1. And in February 2022, he wrote: "They are clearly sending a massive amount more emails to consumers than we do. I know you have said that productivity drops when sending more than one email to a customer per day but they seem to be having great success with a different formula." PX2405 (Capri) at 1.

208.    In yet another example, in May 2023, Mr. Idol wrote to Michael Kors executives: "Coach's creativity on these emails (outlet in particular) is killing us . . . our [Michael Kors] backgrounds look cheap and uninspiring . . . They are just bland product photos with no inspiration. Help!!! Fast!!!" PX2412 (Capri) at 1. Mr. Idol "expect[ed] [his team] to come back and present solutions on, our backgrounds." Hr'g Tr. 9/9 Idol (Capri) at 119:19-120:8.

209.    On another occasion, a Michael Kors executive observed that Coach and Kate

---

[9] This is just one example of how Tapestry's brands are not siloed, nor run independently, today. *See infra* FoF ¶¶ 269-80.

Spade were ████████████████████████████████████████████

███████████████████████████████████████████████████████

██████ PX5078 (Bloom (Capri) Tr.) at 152:1-15, 152:21-22, 152:24, 156:5-11, 158:8-16,

159:8-13, 159:15, 159:17-160:7 ███████████████████████████████

██████████████████████████████████████; PX2066 (Capri) at 4.

210.    And both Capri and Tapestry also engage ████████████████████

███████████████████████████████████████████████████████

██████████████████████████████. PX5080 (Bozeman

(Capri) Tr.) at 182:14-18 ████████████████████████████████

███████████████████████████████████████████████████████

██████; *see also id.* at 146:8-9, 146:18-22, 147:1-148:9 (discussing PX2624); PX2624 (Capri)

at 1 (████████████████████████████████████████████████

█████████████████████████); PX5080 (Bozeman (Capri) Tr.) at 162:6-7, 162:19-

164:1, 164:11-14, 165:8-166:11, 166:21-167:7 (discussing PX2100); PX2100 (Capri) at 1

(███████████████████████████████████████████████████

██████████); PX5080 (Bozeman (Capri) Tr.) at 176:4-5, 176:9-177:17, 178:15-179:19

(discussing PX2295); PX2295 (Capri) at 2 (█████████████████████████████

█████████████████████████████).

### D.  *Brick-and-Mortar Stores.*

211.    Although each rely on digital sales, Defendants recognize the value of a strong

brick-and-mortar presence. *E.g.,* PX7029 (Q1 2023 Tapestry Earnings Call) at 2; Hr'g Tr. 9/10

Kahn (Tapestry) at 437:9-11 (brick-and-mortar stores are an important sales vehicle for the

Coach brand); Hr'g Tr. 9/10 Crevoiserat (Tapestry) at 273:5-10 (omnichannel customers (*i.e.*,

consumers who shop in more than one channel) spend more money than single channel

customers); Hr'g Tr. 9/10 Harris (Tapestry) at 386:7-12 (brick-and-mortar stores are "an important touch point" for "consumers to have the opportunity to interact physically" with Tapestry's products); Hr'g Tr. 9/12 Wilmotte (Capri) 742:2-17 (importance of clienteling).

212.    As such, Coach, Kate Spade, and Michael Kors monitor each other's retail stores. *E.g.*, Hr'g Tr. 9/12 Levine (Tapestry) at 782:2-4 ("Q. You send Coach employees to Michael Kors stores to see what promotions Michael Kors is running, correct? A. Yes, that's correct."); PX1219 (Tapestry) at 3-36; *see also* PX2338 (Capri) at 1; PX1127 (Tapestry) at 3, 5.

213.    For example, when Michael Kors closed stores, Tapestry's CEO asked: "do we know where MK is closing stores? Feels like an opportunity to grab share if we can adjust marketing and if we have a presence in these areas." PX1703 (Tapestry) at 2; Hr'g Tr. 9/10 Crevoiserat (Tapestry) at 279:7-25 ("Q. You wanted to make sure these Michael Kors customers were aware of Tapestry's stores and location as an alternative, right? A. Right. . . ."). In response, Tapestry's Interim Chief Financial Officer sent her information regarding Michael Kors store closures as well as analyses that Coach had previously conducted regarding Michael Kors locations. PX1703 (Tapestry) at 1; PX1219 (Tapestry) at 5, 32; Hr'g Tr. 9/10 Crevoiserat (Tapestry) at 280:18-23.

214.    Coach, Kate Spade, and Michael Kors also monitor each other's stores to take cues regarding store layouts, product display and assortments, and in-store marketing campaigns. *E.g.*, PX1118 (Tapestry) at 2-7; PX1127 (Tapestry) at 2; PX1547 (Tapestry) at 2; PX8028 (Tapestry) at 1-2; *see also* PX2338 (Capri) at 1.

**E.  *Labor.***

215.    Both Tapestry and Capri have recognized their retail employees as providing a "competitive advantage" in the sale of handbags. *E.g.*, Hr'g Tr. 9/10 Crevoiserat (Tapestry) at 273:13-20 ("Tapestry has the best team in retail"); PX1635 (Tapestry 2022 Investor Day) at 3;

Hr'g Tr. 9/12 Wilmotte (Capri) at 742:2-17 (explaining how Michael Kors' retail associates use

"clienteling" to drive sales); Hr'g Tr. 9/10 Kahn (Tapestry) at 437:14-16 (Coach sales associates

"are important for the [Coach] brand"). These employees help brands connect with consumers.

Hr'g Tr. 9/10 Kahn (Tapestry) at 437:6-16. As the President of Coach North America explained,

one great benefit of shopping in a Coach store is access to its salespeople. Hr'g Tr. 9/12 Levine

(Tapestry) at 791:1-3.

216.    In July 2021, Tapestry increased the minimum wage for its retail associates to $15

per hour. Hr'g Tr. 9/10 Crevoiserat (Tapestry) at 273:21-274:5; PX7250 (Tapestry press release)

at 1. Tapestry did so to ensure it "could continue to attract the talent to continue to have our

people be a competitive differentiator." Hr'g Tr. 9/10 Crevoiserat (Tapestry) at 274:6-10. As Ms.

Crevoiserat explained, when retail associates feel pride in the company, that translates into better

customer experiences and better business. *Id.* at 273:11-275:12.

217.    Michael Kors immediately took notice, with CEO John Idol instructing his

subordinates to analyze increasing the minimum wage for Michael Kors employees to match.

PX2113 (Capri) at 1. This analysis showed that cost to raise the minimum wage for Capri's U.S.

retail employees was approximately $4.8 million a year. Hr'g Tr. 9/9 Idol (Capri) at 122:23-25;

PX2300. These employees are not unionized. Hr'g Tr. 9/9 Idol (Capri) at 120:20-22.

218.    Just a few months after Tapestry's increase—but notably well after retailers such

as Target—Michael Kors announced that it would increase its minimum wage to $15 per hour.

*Id.* at 120:23-121:20.

### F.  *Sustainability*

219.    Coach, Michael Kors, and Kate Spade also compete on sustainability efforts.

220.    For example, when Coach launched Coach "(Re)Loved," its handbag recycling

program, Michael Kors soon responded with "Pre-Loved" for customers to consign their used

handbags. *See* Hr'g Tr. 9/10 Harris (Tapestry) at 386:13-21.

221.    Tapestry took note of its copycat, with Tapestry SVP of Global Strategy &
Consumer Insights Liz Harris calling Michael Kors "ankle biters" and exclaiming that "Kors is
coming for Coach Reloved!" PX1278 (Tapestry) at 1; PX1448 (Tapestry) at 1. Another
employee noted: "They do know how to, rinse-repeat and repackage." PX1278 (Tapestry) at 1.

## XI.    THERE ARE BARRIERS TO SCALE "ACCESSIBLE LUXURY" HANDBAGS.

222.    Although a large number of brands offer "accessible luxury" handbags, *supra* FoF
¶¶ 153-54, barriers to meaningful entry and scale exist that prohibit these brands, and any new
entrants, from competitively constraining Coach, Michael Kors, and Kate Spade—or from
replacing any loss of competition between those three brands.

223.    The consistent high margins of Coach, Kate Spade, and Michael Kors belie that
entry of competitively constraining brands is easy. PX2429 (Capri) at 12; Hr'g Tr. 9/9 Idol
(Capri) at 107:24-108:15; Hr'g Tr. 9/11 Smith (FTC) at 521:17-23 (high margins indicates
importance of branding); Hr'g Tr. 9/17 Smith (FTC) at 1346:6-17 (building a brand is significant
entry barrier).

### A.    *Building a Brand Takes Time.*

224.    Brands like Coach, Kate Spade, and Michael Kors—which have a presence all
across the country (*supra* FoF ¶¶ 5, 7, 18)—do not appear overnight, and more importantly, are
not easily scaled. Defendants' own economic expert admitted that establishing a brand "is
expensive" because it "involves marketing, understanding your consumer, research, all of the
elements that go into produced [sic] popular brand." Hr'g Tr. 9/17 Scott Morton (Defs.) at
1227:11-23.

225.    ██████████████████████████████████████████████████
████████████████████████████    PX8168 (██████████████████    at 13:9-17,

30:16-31:3, 31:6-16, 57:1-20, 58:14-17, 58:19. ███████████████████████████

███████████████████████████████████████████████████

███████████ Hr'g Tr. 9/11 Guez (Sunrise Brands) at 683:24-686:13; PX8168 (████████

██████████) at 62:21-66:5, 111:17-20, 112:2-112:22. ███████████████████████

████████████████████████████████████████████████████████

██████████████ PX8168 ██████████████████████ at 37:17-37:20, 38:6-22.

226.    ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████ DX950 ██████████████████████ at 20:25-21:24, 32:12-15.███

████████████████████████████████████████████████████

██████████████████████████████████ *Id.* at 23:11-24:1; PX6001 (Smith (FTC) Reply Rep.) ¶ 206;

*see also* Hr'g Tr. 9/17 Smith (FTC) at 1345:16-1346:5 (discussing PD04). ████████████████

████████████████████████████████████████████████ DX950 ██████████

██████████ at 11:20-12:13, 12:22-13:24.

227.    ██████████████████████████ DX933 ██████████████████

at 7:3-5. ████████████████████████████████████████████████

████████████████████████████████ *Id.* at 75:2-17. ████

████████████████████████████████████████████████████████

*Id.* at 86:7-86:16; PX6001 (Smith (FTC) Reply Rep.) ¶ 206.[10] Today, ██████████████████

████████████████████████████████████ DX933 ████████████████ at

25:15-18, 81:21-82:1.

---

[10] ████████████████████████████████████████████████

████ DX933 ██████████████████ at 97:19-98:12.

228.    Founded in ██████████████████████████████████████

DX925 ███████████████████ at 11:19-20, 33:24-35:2. ████████████████

███████████████████████████████████ (*id.* at 24:20-25:5), ██████████

████████████████████████████████████████████████████████ *Id.* at

18:19-23; PX6001 (Smith (FTC) Reply Rep.) at tbl 1. ████████████████

██████████████████████████████████████████████████████████████

█████████████████████████████████████████ DX925 ████████████████

█████████ at 15:21-24, 16:15-22.

229.    Even Ralph Lauren, ████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████ PX8172 ██████████████████ 72:16-19, 77:24-80:1;

PX3213 ██████████████ at 9 ████████████████████████████████████

██████████████████████████████. Notably, despite earlier ████████████

██████████████████████████████████████████████████████ PX8172

█████████████████████ at 157:12-14, 157:16-21, 224:2-19.

### B. Brick-and-Mortar Is a Barrier to Scale.

230.    Despite the rise of e-commerce, most handbags today are still sold through stores.
Hr'g Tr. 9/10 Kahn (Tapestry) at 474:17-20 (only 30 percent of Coach sales are online); PX6000
(Smith (FTC) Rep.) ¶ 99; PX1121 (Tapestry) at 47; Hr'g Tr. 9/16 Gennette (Defs.) at 1180:4-13
(only about a third of Macy's business is e-commerce, which is the industry average).

231.    As such, brick-and-mortar stores remain an important "touch point" for handbag
brands. Hr'g Tr. 9/10 Harris (Tapestry) at 385:5-10, 386:7-9; Hr'g Tr. 9/10 Kahn (Tapestry) at
437:9-11, 17-19 (brick-and-mortar stores are an important sales vehicle for the Coach brand);
PX8171 ██████████████████████ at 27:20-28:7, 28:10-12 (██████████████████████



); DX926 ██████████████ at 93:15-93:22 (██████████████████████ ███████████████████████); Hr'g Tr. 9/12 Levine (Tapestry) at 790:18-791:13 (advantages to brick and mortar include brand specific sales staff, quick purchases, seeing the product in person, and trying on the product).

232.    Handbags are a product that customers want to touch and feel, highlighting the importance of having a physical storefront. Hrg Tr. 9/10 Harris (Tapestry) at 386:7-12 (stores important "to have the opportunity to interact physically" with product); Hr'g Tr. 9/10 Kahn (Tapestry) at 437:12-13 (importance of touch and feel); PX8168 ████████████████ at 52:17-53:21 (████████████████████████); DX926 (███████████ ███████████) at 93:15-93:22 (████████████████████████ ███████████); Hr'g Tr. 9/12 Levine (Tapestry) at 791:10-13 (importance of seeing the product and buying it in store).

233.    As Defendants' industry expert Jeff Gennette explained, physical storefronts remain relevant because they can accommodate immediate consumer needs, allow consumers to actively engage with products, build brand awareness and affinity, and cater to consumers that prefer in-store shopping. Hr'g Tr. 9/16 Gennette (Defs.) at 1180:14-19.

234.    Indeed, Tapestry has found that consumers who shop its products in multiple sales channels (*i.e.*, digital and brick-and-mortar) spend over two times more than those who shop in just one. PX7029 (Q1 2023 Tapestry Earnings Call) at 3; Hr'g Tr. 9/10 Crevoiserat (Tapestry) at 272:21-273:10 (describing touchpoints and omnichannel experience for Tapestry customers and higher spend among omnichannel customers).

235.    Brick-and-mortar presence, however, is challenging and costly. PX8168 (██████

████████████████ ) 52:17-53:21 (████████████████████████████████████

████████████████████████████████████████████████ );

DX933 (████████████████ at 81:7-82:1 (████████████████████████████████

████████████████████ ); PX4000 (████████████████████ ) ¶ 10 (████████████████████

████████████████ ); DX926 (████████████████████████ ) at 91:16-21, 92:12-93:3 (████████

████████████████ ); DX925 (████████████████████ ) at 23:23-24:5, 24:20-25:5

(████████████████████████████████████ ). This is especially

true when it comes to maintaining the hundreds of stores that Coach, Kate Spade, and Michael

Kors each have throughout the country. PX6000 (Smith (FTC) Rep.) ¶¶ 18, 20, 26.

236.    Nor can new entrants and smaller brands rely entirely on wholesalers like Macy's

to provide a brick-and-mortar presence, given the unique challenges that these brands face when

doing business with large department stores. DX933 (████████████████ ) at 27:22-24, 28:2-8,

77:2-21 (████████████████████████████████████

████████████████████ ), 87:25-89:5, 89:9-15 (████████████████████████████████ ); PX8168

(████████████████████ ) at 29:13-30:6 (████████████████████████████

████████████ ), 63:9-64:20 (████████████████████████████████████

████████████████████████████████████████████████████

████████████████ ).

### C. Marketing and Advertising Is a Barrier to Scale.

237.    Customer acquisition is very expensive. Hr'g Tr. 9/12 Fraser (Tapestry) at

824:22-825:8; DX933 (████████████████████ ) at 91:19-92:3 (████████████████████████████

████████████████████████████████████ ).

238.    Defendants invest ████████████████ across numerous promotional channels. *E.g.*,

PX2561 (Capri) at 16; Hr'g Tr. 9/12 Fraser (Tapestry) at 823:6-25; PX5075 (Fraser (Tapestry



Tr.) at 13:14-20, 15:6-14 (Kate Spade's marketing budget is ████████████████ ███████████████████ per fiscal year).

239.     On the whole, Tapestry commits nine percent of its revenues to marketing. PX1485 (Tapestry) at 9. For its part, Michael Kors' expected spend on marketing in the United States for fiscal year 2025 was ████████████. PX2561 (Capri) at 16.

240.     These figures far eclipse the annual marketing spend of smaller brands. DX950 (██████████████████████) at 136:18-22 (████████████████); DX926 (████████ ██████████████) at 95:12-13, 96:2-96:4 ████████████████████; DX933 (████████████ ████████) at 85:8-14, 87:21-24 (████████████████); DX925 (██████████████████ ██) at 31:22-32:11 (██████████████████████████████████████████); DX927 (████████████████████) at 127:2-5) (██████████████████████████████ ████████████████).

241.     In fact, Defendants' marketing budgets dwarf the entire handbag *revenue* of nearly each of the competitors addressed in Professor Scott Morton's report. DX283 (Scott Morton (Defs.) Rep.) at 187-190, Appendix D.

242.     Marketing and advertising costs include spending on social media and influencers, which small brands recognize is costly. DX933 (████████████████) at 87:2-16, 91:19-92:3 (██████████████████████████████████████████████████ ██████████████); PX8168 (██████████████████) 37:2-16 (████████████████ ██████████████████████████████████████████), 38:6-38:22 (██████████████████████████████████).

### D. Data Is a Barrier to Scale.

243.     Tapestry has assembled an arsenal of consumer data, boasting a database of 180 million uniquely identified "customer 360 profiles." PX1301 (Tapestry) at 11; *see also* Hr'g Tr.

9/12 Fraser (Tapestry) at 826:18-20 (Kate Spade customer database includes a lot of information about "who's buying what"). Similarly, Capri has a database of information on 90 million consumers, the majority of which is from Michael Kors customers. Hr'g Tr. 9/9 Idol (Capri) at 124:6-14 (Q. The Michael Kors customer data is pretty vital to the Michael Kors business; correct? A. That's correct.").

244.    As Tapestry's CEO Joanne Crevoiserat explained during an investor call regarding the Proposed Acquisition, Tapestry's data platform "positions us to leverage our competitive advantages across a broader portfolio of brands." PX7055 (Aug. 10, 2023 Tapestry Call) at 2, 3, 8; *see also* PX7105 (2023 Tapestry 10-K) at 12 ("Leveraging our strategic investments in data and analytics tools across Tapestry's platform, merchandisers are able to gain a deeper understanding of customer behavior that empowers our teams to respond to changes in consumer preferences and demand as well as scale opportunities across brands with greater speed and efficiency.").

245.    As Tapestry boasted in a document prepared in connection with its bond offering to finance the Proposed Acquisition: "Our greatest differentiator compared to competition is our data driven platform." PX1485 (Tapestry) at 9.

### E. Celebrities Are Expensive and Alone Cannot Successfully Grow a Brand

246.     PX8168 ( ) at 35:12-22, 36:3-21. *Id.* at 37:6-20, 38:6-20.

247.    During the evidentiary hearing, Defendants referenced Aupen and Telfar as two brands who have made recent splashes due to Taylor Swift and Beyoncé, respectively, carrying their handbags. *See, e.g.*, Hr'g Tr. 9/16 Kors (Capri) at 1097:8-20; Hr'g Tr. 9/10 Crevoiserat

(Tapestry) at 333:4-6 (discussing the effect of Taylor Swift carrying a bag).

248.    Despite Taylor Swift carrying its handbag in 2023, Aupen ████████████ ████ in sales that year. PX6001 (Smith (FTC) Reply Rep.) ¶ 206, n. 326. Moreover, there is no evidence in the record about why Ms. Swift carried the Aupen bag or if she received payment or compensation of any type, despite Mr. Kors' assertion that Ms. Swift was not paid. Hr'g Tr. 9/16 Kors (Capri) at 1097:21-22, 1097:24-1098:2.

249.    Telfar, which was described as a "new brand" or startup (Hr'g Tr. 9/9 Idol (Capri) at 138:1-2; Hr'g Tr. 9/10 Kahn (Tapestry) at 485:2-3 (calling Telfar a "new brand"), has actually been selling handbags for over a decade. Hr'g Tr. 9/12 Wilmotte (Capri) at 759:24-760:4. It has a business model which is ██████████████████████████████████████████ PX4001 ████████████ ¶ 4; *cf*. DX881 (Capri) at 20 (Michael Kors document grouping Telfar with European luxury brands); Hr'g Tr. 9/12 Wilmotte (Capri) at 759:21-760:11 (discussing Telfar's placement in DX881).

250.    As was the case with Ms. Swift, there is no evidence in the record about why Beyoncé carried a Telfar bag or if she received payment or compensation of any type, despite Mr. Kors' assertion that she too was not paid. *See* Hr'g Tr. 9/16 Kors (Capri) at 1097:8-1098:2. In any event, Telfar's ████████████████████████████████ (PX6001 (Smith (FTC) Reply Rep.) ¶ 72 n.241), and its success is both unusual and an exception. *See* PX8168 (████████████████████) at 39:02-40:7 ████████████ ██████████████████████████████████████████ ██████████████████████████████████████████ ██████████████████████████████████ ██████ ).

## XII.    TAPESTRY ANNOUNCES THE PROPOSED ACQUISITION IN AUGUST 2023.

251.    Tapestry announced its proposed acquisition of Capri on August 10, 2023, after which the FTC began an investigation that ultimately culminated in a bipartisan 5-0 vote to initiate administrative proceedings to determine the legality of the Proposed Acquisition.

### A.    *Tapestry Asserts that It Will "Revitalize" the Michael Kors Brand.*[11]

252.    Throughout the hearing, Defendants' witnesses asserted that one potential benefit of the Proposed Acquisition was Tapestry's "revitalization" of Michael Kors, although they were light on details about how exactly Tapestry would do so. *E.g.* Hr'g Tr. 9/10 Crevoiserat (Tapestry) at 317:9-18, 344:19-345:16; Hr'g Tr. 9/13 Charles (Tapestry) at 1031:3-17.

253.    In any event, the Michael Kors brand remains profitable. PX7096 (2022 Capri 10-K) at 55; PX7098 (2023 Capri 10-K) at 55; PX7261 (2024 Capri 10-K) at 55-56. Capri had over $3.7 billion in gross profit in both 2022 and 2023, the majority of which was derived from Michael Kors. Hr'g Tr. 9/16 Edwards (Capri) at 1120:17-1121:23.

254.    Michael Kors also remains a "very strong" brand. Hr'g Tr. 9/9 Idol (Capri) at 124:15-17; *see also* Hr'g Tr. 9/16 Kors (Capri) at 1083:18-20 (Michael Kors is successful to this day); Hr'g Tr. 9/10 Crevoiserat (Tapestry) at 277:17-25 (Michael Kors has strong brand equity); Hr'g Tr. 9/17 Parsons (Capri) at 1327:20-22 (Michael Kors is a successful brand with a longstanding legacy); PX7055 (Aug. 10, 2023 Tapestry Call) at 8 (Tapestry's CEO: "Michael Kors is a strong brand and it's well positioned in the market with strong consumer resonance and awareness . . . .").

255.    A Capri investor study commissioned by its Board of Directors observed, as recently as October/November 2022, "Positive views on brand portfolio competitive position"

---

[11] Defendants do not contend that the merger would lead to any efficiencies in the traditional antitrust sense. Dkt. No. 159 at 37-38.

and "Strong among accessible/affordable luxury peers." PX2129 (Capri) at 4; Hr'g Tr. 9/16 Edwards (Capri) at 1125:17-1126:22. At the time of that study, Michael Kors had been increasing AUR by delivering value to the consumer based on its brand image, its brand delivery, and the product in particular. Hr'g Tr. 9/16 Edwards (Capri) at 1126:23-1127:10.

256.    And a January 2023 update to Tapestry's Board regarding Project Sunrise—the code name for Tapestry's M&A strategy (Hr'g Tr. 9/10 Crevoiserat (Tapestry) at 294:20-23)—listed Michael Kors as green for overall brand health. PX1041 (Tapestry) at 12; Hr'g Tr. 9/10 Crevoiserat (Tapestry) at 356:3-10.

257.    Defendants argue that the Michael Kors brand has lost the "brand heat" it had just a few years ago, but, as Michael Kors himself acknowledged, "when you've been a designer for 45 years, it is a very cyclical business. So you are definitely going to have highs and lows. So much of it is dependent on trend, the economy, consumer mood, and sometimes you will be the hottest thing on the block and other times you'll be lukewarm, other times you'll be cold, but you're always moving forward." Hr'g Tr. 9/16 Kors (Capri) at 1087:12-19.

258.    Although Defendants have claimed, and the record does support, that the Michael Kors brand has experienced recent decline (*e.g.* Hr'g Tr. 9/11 Smith (FTC) at 562:19-563:3), this decline is more likely one of the cyclical "lows" to which Mr. Kors referred, and not some catastrophic plunge that the brand suffered in just 10 months between late 2022 and when the Proposed Transaction was announced in August 2023—and that only Tapestry can arrest.

259.    Indeed, just as Mr. Kors testified, his brand has continued to be "always moving forward," implementing a transformation strategy that will occur irrespective of the Proposed Acquisition. Hr'g Tr. 9/16 Kors (Capri) at 1081:10-21, 1082:1-1083:14; Hr'g Tr. 9/17 Parsons (Capri) at 1327:9-12 ("[T]he transformation of the Michael Kors brand is taking place

independent of the merger between Tapestry and Capri."); *see also* Hr'g Tr. 9/9 Idol (Capri) at 124:18-21 (Michael Kors will exist with or without the merger).

260.    This brand transformation strategy is wide-ranging with more than 100 employees deployed (Hr'g Tr. 9/12 Wilmotte (Capri) at 738:2-4) and includes elevating Michael Kors' product design (*id.* at 739:11-14), redesigning Michael Kors' stores (*id.* at 741:18-742:1), rightsizing wholesale distribution (*id.* at 742:18-20), and expanding clienteling services to more locations (*id.* at 742:2-17).

261.    It also includes the launch of new refreshed products, including Michael Kors handbags that are just now hitting the market. *Id.* at 739:15-740:4; Hr'g Tr. 9/17 Parsons (Capri) at 1332:22-1333:5, 1334:5-7.

262.    Mr. Kors, who sees 97 or 98 percent of Michael Kors products before they hit the market (Hr'g Tr. 9/16 Kors (Capri) at 1067:14-16), has his design team in "lock step" and is excited by the new product. *Id.* at 1081:10-21.

263.    The transformation has also included a digital platform revitalization, which will benefit the Michael Kors brand and remains on-going. Hr'g Tr. 9/16 Edwards (Capri) at 1129:13-1131:2.

264.    Any plans by Tapestry to improve "brand heat" through product will be handled as they were at Capri, as Mr. Kors is expected to continue as Chief Creative Officer if the proposed transaction closes. Hr'g Tr. 9/16 Kors (Capri) at 1083:21-23.

265.    As such, as Capri and Michael Kors executives conceded, Michael Kors does not need Tapestry in order to revitalize itself. Hr'g Tr. 9/17 Parsons (Capri) at 1327:16-1328:2; Hr'g Tr. 9/9 Idol (Capri) at 124:18-21. In fact, Mr. Idol admitted that the only benefit from the Proposed Transaction is the share price premium that he and other Capri shareholders will

receive and that he has no perspective on any other benefits from the deal. Hr'g Tr. 9/9 Idol

(Capri) at 128:2-129:8 ("Q. Outside of the benefits to shareholders, are there any other benefits

that you were aware of from Tapestry's acquisition of Capri? A. I don't have any perspective on

that. Q. Capri shareholders will receive a premium to the closing price at the time of the

acquisition offer; correct? A. That's correct. Q. That is a very good thing for Capri shareholders;

correct? A. Absolutely.").

266.    Although it is true that certain of Defendants' witnesses have claimed that the

aforementioned transformation project is "stalling," this "stalling" notably (and coincidentally)

occurred only *after* these witnesses' depositions, which were taken only a few months ago.

*Compare* Hr'g Tr. 9/12 Wilmotte (Capri) at 743:13-17 (transformation program is moving in the

right direction), 776:14-777:10, *with* 767:3-7 (testifying the project was "stalling").

267.    In any event, the only part of the Michael Kors transformation project that has

been paused is the rebrand of MICHAEL Michael Kors, which includes release of new tissue

paper, packaging, and price tags. Hr'g Tr. 9/17 Parsons (Capri) at 1333:14-1334:4; *see also* Hr'g

Tr. 9/12 Wilmotte (Capri) at 740:5-8 (discussing rebrand planned for fall 2025).

268.    Moreover, it is speculative at best that, to the extent that Michael Kors is in need

of any revitalization, Tapestry can supply it, as evident by its struggles with "reinventing" the

Kate Spade brand after its acquisition, which "didn't work very well." Hr'g Tr. 9/12 Fraser

(Tapestry) at 821:7-18; *see also* PX1126 (Tapestry) at 1 (Liz Fraser: "I have to wonder if

[Tapestry] secretly had a plan to take [Kate Spade] down market"); Hr'g Tr. 9/17 Scott Morton

(Defs.) at 1316:11-1317:15 (Todd Kahn investigational hearing testimony that it was "not easy"

to transplant Coach's ability to connect with customers to Kate Spade and Stuart Weitzman);

PX1175 (Tapestry) at 1 (███████████████████████████████

████████████████████████ ).

**B.** *Tapestry Asserts That It Will Run Its Brands Independently.*

269.    Tapestry executives, along with Professor Scott Morton, have asserted that there will be no loss of competition between Coach, Kate Spade, and Michael Kors post-merger because the brands will be autonomous. *E.g.*, Hr'g Tr. 9/10 Crevoiserat (Tapestry) at 304:5-14; Hr'g Tr. 9/17 Scott Morton (Defs.) at 1231:11-1233:5; *but see* Hr'g Tr. 9/17 Scott Morton (Defs.) at 1279:3-1281:3 (discussing the apparent contradiction between Tapestry's assertion its brands will operate independently and its statement it can change the direction of Michael Kors).

270.    Aside from contradicting black-letter Supreme Court precedent, *see infra* Conclusions of Law ("CoL") ¶¶ 90-94, these assertions are belied by the structure of Tapestry as a company and how it runs its brands today.

271.    Notably, Tapestry's Global Strategy & Consumer Insights group works across *all* of its brands (Hr'g Tr. 9/10 (Harris) (Tapestry) at 359:12-24, 360:10-16; Hr'g Tr. 9/10 Crevoiserat (Tapestry) at 307:4-5 ("consumer insights can be leveraged across all of our brands in different ways"))—and it is this consumer work that will be responsible for understanding, and improving, how Michael Kors connects with consumers. Hr'g Tr. 9/10 Crevoiserat (Tapestry) at 303:21-304:4, 317:10-18, 344:19-345:16.

272.    The same is true of Tapestry's supply chain, which is handled centrally across *all* Tapestry brands. Hr'g Tr. 9/13 Charles (Tapestry) at 1011:9-20, 1031:3-17, 1039:10-17.

273.    Joanne Crevoiserat, Tapestry's CEO, testified that Tapestry's brands can leverage its consumer insights and data, digital platform capabilities, supply chain processes, and talent. Hr'g Tr. 9/10 Crevoiserat (Tapestry) at 306:7-308:11.

274.    Moreover, the record contains multiple instances of competitively sensitive brand information being shared between Coach and Kate Spade. For example, Kate Spade employees

have received:

    a.   Coach long-range planning documents, which contain "forward-looking financial information" that Tapestry itself designated as commercially sensitive during these proceedings. Hr'g Tr. 9/12 Fraser (Tapestry) at 850:14-853:19; PX1497 at 17, 19, 31 (pages with redactions for confidentiality). Ms. Fraser, Kate Spade's former CEO and Brand President, stated that she "certainly would have seen this information," including "in the board meeting." Hr'g Tr. 9/12 Fraser (Tapestry) at 851:23-852:5, 853:17-19.

    b.   Pricing and strategy information regarding Coach outlet plans, which also contained information that Tapestry designated as competitively sensitive during these proceedings. PX8124 (Tapestry) at 1, 4-6, 8. One of the Kate Spade employees to receive such information was Ingrid Crain, who was in the group responsible for setting Kate Spade MSRPs. Hr'g Tr. 9/12 Fraser (Tapestry) 842:20-848:1; and

    c.   Consumer research about Coach. PX1497 (Tapestry) at 5, 10.

275.    Some of this information came courtesy of the aforementioned Global Strategy & Consumer Insights team that, as mentioned above, works across all Tapestry brands. Hr'g Tr. 9/12 Fraser (Tapestry) at 848:20-849:20; PX8123 (Tapestry) at 1-2.

276.    In other instances, the CEOs of Coach and Kate Spade simply spoke directly to each other. *See, e.g.*, PX1067 (Tapestry) at 1; Hr'g Tr. 9/10 Kahn (Tapestry) at 457:7-459:1; Hr'g Tr. 9/12 Fraser (Tapestry) at 828:11-829:15.

277.    In one notable example, Liz Fraser, former CEO and Brand President of Kate Spade, pleaded to Coach's CEO not to recut (*i.e.*, produce again) a heart-shaped bag that

mirrored a Kate Spade offering. Hr'g Tr. 9/12 Fraser (Tapestry) at 840:4-842:17 ("I didn't think

it looked very much like a Coach bag and it looked a lot like a Kate Spade bag, and I'm not that

happy."); PX1271 (Tapestry) at 1.

278.    Although Tapestry did not intermediate between the brand CEOs, this

communication demonstrates that Coach and Kate Spade are not siloed as Defendants claim—or

that Ms. Fraser was coordinating with a competitor to allocate the market or limit output. Hr'g

Tr. 9/12 Fraser (Tapestry) at 903:1-3 ("Q. So is it your testimony you asked a competitor to stop

making a bag that competed with the Kate Spade heart bag? A. I guess so."). Either way, the

record shows that Tapestry's brands can and do receive commercially sensitive information

about each other and engage in strategy discussions that would be inappropriate for truly

independent competitors.

279.    What's more, just two months before this lawsuit was filed, Tapestry's CEO

wrote a letter to the Tapestry Board noting that Tapestry needed to "Reduce 'space' between the

Brands," including "Supply Chain efforts to tighten connections with the Brands," "Leverage the

momentum of Coach's success to the benefit of the enterprise," and enable the "cross-brand

mobility of key talent." PX1726 (Tapestry) at 24-25.

280.    Defendants' economic expert does not dispute that Tapestry as owner of its

brands maintains the rights to orchestrate price moves across brands and is entitled to require its

brands to make pricing changes. Hr'g Tr. 9/17 Scott Morton (Defs.) at 1296:8-15. Moreover, she

did not know that the brand CEOs jointly attend Board meetings. *Id.* at 1301:3-8. And, in a 2020

article, she wrote that, because of fiduciary duties to shareholders to maximize profits, "if a

merger creates the economic incentive for the merged firm to raise price (or reduce output,

quality, or innovation), then such strategies will and must be implemented." *Id.* at 1299:20-

1300:1. As such, the relevant person's behavior in an antitrust case is the corporate person, and the Court's focus should be on the corporation's incentives. *Id.* at 1300:11-16.

## THE FEDERAL TRADE COMMISSION'S PROPOSED CONCLUSIONS OF LAW

1. Section 13(b) of the FTC Act enables the FTC "to obtain a preliminary injunction '[u]pon a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest.'" *FTC v. Crescent Publ'g Grp., Inc.*, 129 F. Supp. 2d 311, 319 (S.D.N.Y. 2001) (quoting 15 U.S.C. § 53(b)).

2. Preliminary injunctions under Section 13(b) "are meant to be readily available to preserve the status quo." *FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1036 (D.C. Cir. 2008).

3. At this preliminary stage, courts "follow a two-step inquiry that asks (1) whether the FTC has shown a likelihood of ultimate success on the merits in the administrative proceeding, and (2) whether the equities weigh in favor of an injunction." *FTC v. IQVIA*, 710 F. Supp. 3d 329, 347 (S.D.N.Y. 2024).[12]

4. The district court "must exercise its independent judgment to determine" if the FTC has cleared that hurdle, but it "may not require the FTC to prove the merits of its case or to establish a violation of the Clayton Act. That inquiry is reserved for the administrative proceeding." *Id.* at 350; *FTC v. Lancaster Colony Corp.*, 434 F. Supp. 1088, 1091 (S.D.N.Y. 1977) ("Congress intended that on applications under Section 13(b), the district court be guided by preliminary and tentative findings of fact without attempting to resolve the underlying antitrust issues of fact.").

5. The Second Circuit has interpreted the phrase "proper showing" in Section 13(b)

---

[12] A "likelihood of ultimate success on the merits" means at the administrative proceeding— not a federal court of appeals. *FTC v. IQVIA Holdings, Inc.*, No. 23 Civ. 06188 (ER), 2023 WL 7152577, at **3-6 (S.D.N.Y. Oct. 31, 2023); *FTC v. Meta Platforms, Inc.*, No. 22 Civ. 04325 (EJD), 2022 WL 16637996, at **4-6 (N.D. Cal. Nov. 2, 2022).

to require only that the FTC "show preliminarily that it has a fair and tenable chance of ultimate success on the merits." *United States v. Sun & Sand Imports, Ltd.*, 725 F.2d 184, 188 (2d Cir. 1984) (citing *Lancaster*, 434 F. Supp. at 1090-91).

6.      The FTC satisfies this burden if it "raise[s] serious questions about the antitrust merits that warrant thorough investigation in the first instance by the FTC." *IQVIA*, 710 F. Supp. 3d at 350; *Whole Foods*, 548 F.3d at 1035; *FTC v. Warner Commc'ns, Inc.*, 742 F.2d 1156, 1162 (9th Cir. 1984); *FTC v. Univ. Health, Inc.*, 938 F.2d 1206, 1218 (11th Cir. 1991).

7.      Because "the scope of the Section 13(b) inquiry is necessarily limited and narrow," *IQVIA*, 710 F. Supp. 3d at 349 (quoting *Meta Platforms*, 2022 WL 16637996, at *5), the Court does not "resolve the conflicts in the evidence, compare concentration ratios and effects on competition in other cases, or undertake an extensive analysis of the antitrust issues." *Warner Commc'ns, Inc.*, 742 F.2d at 1164 (citing *Lancaster*, 434 F. Supp. at 1094, 1096); *see also IQVIA*, 710 F. Supp. 3d at 349.

8.      The Supreme Court's recent decision in *Starbucks Corp. v. McKinney*, 144 S. Ct. 1570, 1575-76 (2024)—a case about Section 10(j) of the National Labor Relations Act—does not displace five decades of precedent that is specific to the Federal Trade Commission Act and has no bearing on the standard that this Court should employ in this case.

9.      The text of the Federal Trade Commission Act, unlike the one at issue in *Starbucks*, directs the Court to "consider[]" the FTC's likelihood of success and weigh it with the equities to determine whether granting an injunction would be in the public interest. 15 U.S.C. § 53(b). And Congress made plain its intent at the time Section 13(b) was adopted: "The intent is to maintain the statutory or 'public interest' standard . . . The Conferees did not intend, nor do they consider it appropriate, to burden the Commission with the requirements imposed by the

traditional equity standard . . . ." H.R. Rep. No. 93-624 (1973) (Conf. Rep.), *as reprinted in* 1973 U.S.C.C.A.N. 2523, 2533; *Lancaster Colony*, 434 F. Supp. at 1090.

10.    Moreover, even under the traditional equity standard in this Circuit, a moving party need only show "sufficiently serious questions going to the merits to make them a fair ground for litigation." *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010).

11.    In enacting Section 7 of the Clayton Act, 15 U.S.C. § 18, Congress meant to "arrest[] mergers at a time when the trend to a lessening of competition in a line of commerce was still in its incipiency." *F. & M. Schaefer Corp. v. C. Schmidt & Sons, Inc.*, 597 F.2d 814, 816 (2d Cir. 1979) (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 317 (1962)).

12.    This incipiency standard entails that "wherever possible, without doing violence to the legislative objectives underlying the antitrust laws, we should 'lighten the burden of proof,' 'simplify the test of illegality' and 'dispense with elaborate proof of market structure, market behavior or probable anticompetitive effects.'" *Lancaster*, 434 F. Supp. at 1094 (citing, *inter alia*, *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 362-63 (1963)).

13.    Thus, even as to the ultimate merits "any 'doubts are to be resolved against the transaction.'" *FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 337 (3rd Cir. 2016) (quoting *FTC v. Elders Grain, Inc.*, 868 F.2d 901, 906 (7th Cir. 1989) (Posner, J.)).

14.    At the administrative merits proceeding, which will begin on October 28, 2024,[13] the ultimate question is whether the effect of the acquisition "may be substantially to lessen

---

[13] Earlier this month, Defendants moved the Commission (for a second time) to delay the start of the administrative trial to October 28, 2024, which the Commission granted. *In re Tapestry, Inc. and Capri Holdings Ltd.*, Doc. No. 9429, Order Granting Unopposed Motion to Continue Evidentiary Hearing (Sep. 17, 2024), *available at*: https://www.ftc.gov/system/files/ ftc_gov/pdf/d09429_commission_order_continuing_hearing_unsigned.pdf

competition, or to tend to create a monopoly," in "any line of commerce in any section of the country" in violation of Section 7 of the Clayton Act. *IQVIA*, 710 F. Supp. 3d at 350 (quoting 15 U.S.C. § 18).

15. In that forthcoming proceeding, the administrative court will assess the Section 7 claims under a burden-shifting framework. *IQVIA*, 710 F. Supp. 3d at 350. The plaintiff must first establish its prima facie case or presumption of illegality, and then the burden shifts to defendants to produce evidence rebutting the prima facie case or countervailing procompetitive benefits. *Id.* at 350, 389. If Defendants fail to meet this burden, and the equities weigh in favor of the FTC, a preliminary injunction must issue. *Id.* at 399-401.

16. The FTC has shown a likelihood of success on the merits of its Section 7 challenge in the administrative court, and the equities favor issuing a preliminary injunction. *First*, the Proposed Acquisition will consolidate three of the largest "accessible luxury" handbag brands in the United States—including the top two (Coach and Michael Kors) by far—leading to undue concentration and a presumption of illegality. *See Phila. Nat'l Bank*, 374 U.S. at 363-64; Merger Guidelines § 2.1; *infra* CoL ¶¶ 64-70.[14]

17. *Second*, independent of any market-concentration analysis, the Proposed Acquisition will eliminate fierce competition between Coach, Kate Spade, and Michael Kors. *See FuboTV Inc. v. Walt Disney Co*., No. 24-CV-01363 (MMG), 2024 WL 3842116, at *17, 29-30 (S.D.N.Y. Aug. 16, 2024) (granting a preliminary injunction based on competitive effects—and not market concentration—without a "comprehensive market analysis"); *accord* Merger Guidelines § 2.2 ("If evidence demonstrates substantial competition between the merging parties

---

[14] The Merger Guidelines outline the principal analytical techniques, practices, and enforcement policy to be applied with respect to mergers under the antitrust laws. The Merger Guidelines are persuasive authority in federal court. *E.g.*, *IQVIA*, 710 F. Supp. 3d at 368 n.19.

prior to the merger, that ordinarily suggests that the merger may substantially lessen competition. . . . [A]n analysis of the existing competition between the merging firms can demonstrate that a merger threatens competitive harm independent from an analysis of market shares."); *IQVIA*, 710 F. Supp. 3d at 385 ("It is sufficient to show, as the FTC has, that Defendants vigorously compete head-to-head and that this competition would be eliminated by the proposed transaction."); *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 61 (D.D.C. 2015) ("Courts have recognized that a merger that eliminates head-to-head competition between close competitors can result in a substantial lessening of competition."); *United States v. Mfrs. Hanover Tr. Co*., 240 F. Supp. 867, 950 (S.D.N.Y. 1965) (eliminating significant competition may by "'itself constitute[] a violation of § 1 of the Sherman Act,' and, a fortiori, of the Clayton Act"); *infra* CoL ¶¶ 71-79.

18.    The Proposed Acquisition also builds on Tapestry's pattern and strategy of serial acquisitions. *See Credit Bureau Reports, Inc. v. Retail Credit Co.,* 358 F. Supp. 780, 794 (S.D. Tex. 1971); Merger Guidelines § 2.8 ("A firm that engages in an anticompetitive pattern or strategy of multiple acquisitions in the same or related business lines may violate Section 7.").

19.    The equities also "weigh in favor of injunctive relief 'to preserve the status quo while the FTC develops its ultimate case.'" *IQVIA*, 710 F. Supp. 3d at 401 (quoting *Whole Foods*, 548 F.3d at 1036 (opinion of Brown, J.)); *infra* CoL ¶¶ 99-108.

## I.    THE FTC IS LIKELY TO SUCCEED IN THE MERITS PROCEEDING.

### A.    *The Proposed Acquisition is Presumptively Illegal and Likely to Cause Anticompetitive Effects in the "Accessible Luxury" Handbag Market.*

20.    The FTC can meet its prima facie burden by showing that the Proposed Acquisition is presumptively unlawful because it will lead to undue concentration in a relevant market. *E.g.*, *IQVIA*, 710 F. Supp. 3d at 382 ("The high post-merger levels of market concentration alone would be sufficient for the FTC to state a prima facie case.").

21.     Under Supreme Court precedent, "a merger which produces a firm controlling an undue percentage share of the relevant market, and results in a significant increase in the concentration of firms in that market is so inherently likely to lessen competition substantially that it must be enjoined in the absence of evidence clearly showing that the merger is not likely to have such anticompetitive effects." *Phila. Nat'l Bank*, 374 U.S. at 363 (citation omitted).

22.     Here, the Proposed Acquisition easily satisfies the thresholds for a presumption of illegality using either combined market shares or the Herfindahl-Hirschman Index.

### 1.   "Accessible Luxury" Handbags Are a Relevant Product Market.

23.     "The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe*, 370 U.S. at 325.[15]

24.     In a Section 13(b) proceeding, however, it is "not necessary" for the FTC "to *prove* the existence of the [relevant product] market." *IQVIA*, 710 F. Supp. 3d at 368 (quoting *Whole Foods*, 548 F.3d at 1041 (opinion of Brown, J.)) (emphasis in original). At the Section 13(b) stage, the FTC meets its burden if it simply "rais[es] some question of whether [the alleged market] is a well-defined market." *Whole Foods*, 548 F.3d at 1037.

25.     The goal of market definition is "to identify the market participants and competitive pressures that restrain an individual firm's ability to raise prices or restrict output." *Geneva Pharms. Tech. Corp. v. Barr Labs. Inc*., 386 F.3d 485, 496 (2d Cir. 2004); *see also FTC v. Advocate Health Care Network*, 841 F.3d 460, 469 (7th Cir. 2016) (noting that the relevant market need only include "the competitors that would 'substantially constrain [the merged firm's] price-increasing ability'").

---

[15] As mentioned above, Defendants have conceded the relevant geographic market is the United States. Dkt. No. 159 at 5 n.1.

26.     Accordingly, "[i]n evaluating reasonable interchangeability, 'the mere fact that a firm may be termed a competitor in the overall marketplace does not necessarily require that it be included in the relevant product market for antitrust purposes.'" *IQVIA*, 710 F. Supp. 3d at 368 (quoting *Sysco*, 113 F. Supp. 3d at 26).

27.     And the inquiry does not look at all products that are interchangeable for any purpose—only "reasonably interchangeable" products. *E.g.*, *FTC v. Swedish Match*, 131 F. Supp. 2d 151, 158-59 (D.D.C. 2000); *see also United States v. H&R Block*, 833 F. Supp. 2d 36, 54-60 (D.D.C. 2011) (finding that digital do-it-yourself tax preparation software was a relevant market, even though a taxpayer could use pen and paper in a particularly simple year or hire an accountant in a particularly complex year); *Beatrice Foods Co. v. FTC*, 540 F.2d 303, 308-09 (7th Cir. 1976) (analysis of paint brushes and rollers—and the exclusion of sprayers and aerosols—was appropriate, even though, at some level, all the products were "interchangeable for some end uses").

28.     The Supreme Court has recognized that, within a broader market, "well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes." *Brown Shoe*, 370 U.S. at 325 (citation omitted); *see also United States v. Aluminum Co. of Am.*, 377 U.S. 271, 275 (1964) (while aluminum and insulated copper conductors could be analyzed as a "single product market," that "does not preclude their division for purposes of [Section] 7 into separate submarkets").

29.     The Second Circuit too has concluded that two products may occupy separate, distinct markets even when they are functionally identical, differentiated primarily by a brand name. *See Geneva Pharms.*, 386 F.3d at 496-499 (applying *Brown Shoe* factors to determine that therapeutically equivalent brand and generic products occupied distinct markets); *see also Alum.*

*Co. of Am.*, 377 U.S. at 275-76 (aluminum and copper conductors could be divided into separate sub-markets despite competition between them).

30.    "[T]he viability of such additional markets does not render the one identified by the government unusable." *IQVIA*, 710 F. Supp. 3d at 368 (quoting *United States v. Bertelsmann SE & Co.*, 646 F. Supp. 3d 1, 28 (D.D.C. 2022)).

31.    At any rate, arguments regarding the viability of such alternative markets are beyond the scope of Section 13(b) preliminary injunction proceedings. *FuboTV*, 2024 WL 3842116, at *17 (granting preliminary injunction without "a comprehensive market analysis"); *cf. R.C. Bigelow, Inc. v. Unilever N.V.*, 867 F.2d 102, 110-11 (2d Cir. 1989) (market definition is "a judgment to be made by the district court following a full trial on the merits").

32.    In assessing relevant product markets, the Supreme Court has identified multiple "practical indicia," including "industry or public recognition of the [relevant market] as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Brown Shoe*, 370 U.S. at 325.

33.    The *Brown Shoe* indicia are "practical aids," not "talismanic" criteria "to be rigidly applied." *Swedish Match*, 131 F. Supp. 2d at 159. Moreover, they must be "viewed in totality" and not in isolation. *FTC v. Surescripts, LLC*, 665 F. Supp. 3d 14, 43 (D.D.C. 2023); *accord IQVIA*, 710 F. Supp. 3d at 355 ("All the factors need not be satisfied for the Court to conclude that the FTC has identified a relevant market.") (citation omitted).

34.    In assessing the relevant market, courts "regularly consider ordinary course documents." *IQVIA*, 710 F. Supp. 3d at 362-63.

35.    In addition to qualitative evidence, the Government can also define a market

using quantitative evidence of interchangeability derived from the hypothetical monopolist test ("HMT"). *E.g.*, *id.* at 368-69.

36.     There, however, is "no requirement to use any specific methodology in defining the relevant market." *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co., Ltd.*, 20 F.4th 466, 482 (9th Cir. 2021). Congress prescribed "a pragmatic, factual approach" to market definition because the market "cannot be measured by metes and bounds." *United States v. Anthem Inc.*, 236 F. Supp. 3d 171, 193 (D.D.C. 2017) (cleaned up).

37.     As such, courts have determined relevant antitrust markets using, for example, only the *Brown Shoe* indicia. *E.g.*, *Geneva Pharms*, 386 F.3d at 496 (relying on *Brown Shoe* factors, without reference to the HMT, in review of district court's determination of relevant market); *FTC v. Meta Platforms, Inc.*, 654 F. Supp. 3d 892, 919-20 (N.D. Cal. 2023) (basing "determination of the relevant product market on its *Brown Shoe* analysis . . . rather than the HMT"); *accord Regeneron Pharms., Inc. v. Novartis Pharma AG*, 96 F.4th 327, 340 (2d Cir. 2024) (discussing "legal frameworks such as the 'hypothetical monopolist' test *or* the *Brown Shoe* factors") (emphasis added). In addition, evidence of substantial head-to-head competition between the merging parties can itself be evidence of a relevant antitrust market in which the parties compete. *See* Merger Guidelines § 4.3 (direct evidence of substantial competition "can be sufficient to identify the line of commerce and section of the country affected by a merger, even if the metes and bounds of the market are only broadly characterized.").

38.     At bottom, for Section 7 purposes, a relevant market is not defined by answering the question "where the parties to the merger do business or even where they compete" but by determining "where, *within the area of competitive overlap*, the effect of the merger on competition *will be direct and immediate*." *F. & M. Schaefer Corp.*, 597 F.2d at 817 (citing

*Phila. Nat'l Bank*, 374 U.S. at 357) (emphasis added).

39. Moreover, a relevant market can exist even if certain customers "cross-shop" in other markets. *Whole Foods*, 548 F.3d at 1040 ("The fact that a customer might buy a stick of gum at a supermarket or at a convenience store does not mean there is no definable groceries market. Here, cross-shopping is entirely consistent with the existence of a core group of [premium, natural, and organic supermarkets] customers."); *IQVIA*, 710 F. Supp. 3d at 357-59 (rejecting broader market proposed by defendants and explaining that "the fact that an agency might shift money around during a campaign does not establish that these alternative channels are substitutes"); *see also, e.g.*, *Sysco*, 113 F. Supp. 3d at 16, 29 (noting that customers engage in "mixing and matching to suit their needs," but finding distinct customers in part because of the merging parties' ability to service a wide array of customers).

40. Similarly, the *Brown Shoe* practical indicia do not require that customers be exclusive to a relevant market. *Photovest Corp. v. Fotomat Corp.*, 606 F.2d 704, 714 (7th Cir. 1979) ("the law does not require an exclusive class of customers for each relevant submarket").

### a. The Brown Shoe Practical Indicia Demonstrate That "Accessible Luxury" Handbags Constitute a Relevant Product Market.

41. Analysis of the *Brown Shoe* practical indicia shows that "accessible luxury" handbags constitute a relevant product market.

42. **Industry or Public Recognition.** Industry participants, including Defendants, recognize "accessible luxury" as a distinct market. Over the last decade, and as recently as last year, Defendants have repeatedly referred to their Coach, Kate Spade, and Michael Kors brands as "accessible luxury" in statements to investors and in SEC filings. *Supra* FoF ¶¶ 94-100. Their ordinary-course documents are replete with references to "accessible luxury" and strategic analyses of the "accessible luxury" market. *E.g.*, *id.* ¶¶ 47, 50, 74-76. These analyses are

prepared for the highest levels of each company, including their Boards of Directors. *E.g.*, *id.* ¶¶ 96, 99, 108-09. Defendants repeated, and consistent, references to "accessible luxury" echo those of other "accessible luxury" brands, including Ralph Lauren, Brahmin, Tory Burch, and Rebecca Minkoff, as well as suppliers, investors, and industry analysts. *Id.* ¶¶ 48-49, 51, 101-04.

43.     Moreover, consumers recognize an "accessible luxury" market, even if they do not use this exact nomenclature. PX1936 (Tapestry) at 27 (consumers referring to Coach as "affordable luxury"); PX1325 (Tapestry) at 42 (Coach is "for someone who wants to feel a bit more affluent but isn't really splurging on something like LV or Gucci"); PX1937 (Tapestry) at 3 (Tapestry consumer research "[c]onfirmed [Coach's] global brand positioning"—that is, "Coach enables people to explore their individual take on 'Accessible Luxury.'"). This is not surprising, given that both Defendants have boasted the key tenets of "accessible luxury"—*i.e.*, quality luxury products at an affordable price—in communications with their consumers. Hr'g Tr. 9/10 Crevoiserat (Tapestry) at 260:23-261:4 ("When we communicate to consumers, we communicate the beautiful, well-crafted product. And we believe we deliver an incredible value."); *see also supra* FoF ¶¶ 111-15. Moreover, other market participants use the term in consumer-facing materials. PX7182 (Rebecca Minkoff website) at 1.

44.     In any event, courts have routinely concluded a relevant market existed even when the terminology used in legal proceedings to describe those markets is not public-facing or even used in the industry at all. *See, e.g.*, *Whole Foods*, 548 F.3d at 1039-40 (no suggestion that "Premium Natural and Organic Supermarkets" was a consumer-facing term); *FTC v. Wilh. Wilhelmsen Holdings ASA*, 341 F. Supp. 3d 27, 47-52 (D.D.C. 2018) (marine water treatment products to global fleets a relevant market even though no evidence that this terminology was public-facing or used in the industry); *FTC v. Staples, Inc.*, 190 F. Supp. 3d 100, 127 (D.D.C.

2016) (finding that a cluster market of consumable office supplies sold to large business-to-business customers was a relevant market, with no suggestion of an agreed industry or public-facing term or shorthand describing that market); *cf. IQVIA*, 710 F. Supp. 3d at 362-66 (focusing on the defendants' recognition of the market for healthcare programmatic advertising).

45.     **Distinct Pricing.** Coach, Kate Spade, Michael Kors and other "accessible luxury" handbag brands generally focus their offerings on an opening price point of $100 and rarely approach or exceed $1,000. *Supra* FoF ¶¶ 55-60; *Lancaster*, 434 F. Supp at 1093 ("Plainly, low or moderately-priced glassware, intended for everyday use, differs from fine glassware, such as lead crystal, sold at higher prices and marketed through different channels."); *A. G. Spalding & Bros., Inc., v. FTC*, 301 F.2d 585, 598 (3d Cir. 1962).

46.     In statements to investors, Defendants have routinely acknowledged and touted this "white space" or "delta" between the price points of "accessible luxury" and "true luxury" handbags. *Supra* FoF ¶¶ 61-66; *see also Geneva Pharms.*, 386 F.3d at 496-97 (finding branded and generic pharmaceuticals are in separate antitrust markets, despite "[f]unctional interchangeability," due, in part, to the "price differential between [the branded pharmaceutical] and generics" and the "marked gap in price between the products"); *Reynolds Metals Co. v. FTC*, 309 F.2d 223, 229 (D.C. Cir. 1962) ("Such a difference in price as appears on this record must effectively preclude comparison, and inclusion in the same market, of products as between which the difference exists").

47.     "Accessible luxury" handbags also have distinct pricing in that they are characterized by a high degree of, and frequent, discounting and promotions, particularly around major shopping holidays. *Supra* FoF ¶¶ 82-87.

48.     **Peculiar Characteristics.** "Accessible luxury" handbags boast high-quality

materials (often leather) and elevated craftsmanship and construction. ███████████
████████████████████████████████████ PX8168 (███████████████████████) at
13:21-22, 14:2-15:8. Tapestry has asserted that "high quality standards . . . are an integral part of
our brands' identity." PX7105 (2023 Tapestry 10-K) at 13. Michael Kors likewise hails its
"distinctive designs, materials and craftsmanship." PX7098 (2023 Capri 10-K) at 9.

49.    Common features of "accessible luxury" handbags include: craftsmanship by
skilled artisans to bring together intricate designs; durability and solid construction; and use of
quality materials. *Supra* FoF ¶¶ 68-72.

50.    **Unique Production Facilities.** "Accessible luxury" handbags are typically made
offshore in Asia by skilled artisans, which enables "accessible luxury" brands to produce quality
handbags at lower costs. *Id.* ¶¶ 70, 73-81. Tapestry's CEO Joanne Crevoiserat said in an email in
preparation for a Board of Directors meeting: "our supply chain innovation over the years
effectively created the accessible luxury market - balancing lower cost with quality well made
product." PX1704 (Tapestry) at 1; *see also* Hr'g Tr. 9/10 Crevoiserat (Tapestry) at 299:11-20.
Industry consultants recognize the distinct nature of the supply chain for "accessible luxury"
handbags. *Supra* FoF ¶ 77.

51.    **Distinct Customers.** Consumer research conducted by and on behalf of
Defendants shows that the majority of customers for Coach and Michael Kors have under
$75,000-$80,000 in household income. *Id.* at ¶ 89. Kate Spade's income demographics are
similar, as are those of the other brands in the "accessible luxury" space. *Id.* at ¶ 90. This
customer segment is price sensitive and motivated by bargains. *Id.* at ¶¶ 88, 91-93.

       **b.  "True Luxury" and Mass Market Handbags Are Not Reasonably
            Interchangeable with "Accessible Luxury" Handbags.**

52.    Other types of handbags do not share the same *Brown Shoe* practical indicia and

are not reasonably interchangeable with "accessible luxury" handbags. They are thus not part of the relevant product market. *See IQVIA*, 710 F. Supp. 3d at 355-57.

53.    **<u>"True Luxury."</u>** With handbags that retail at multiples of Defendants' offerings, "true luxury" handbags are not reasonable substitutes for "accessible luxury" handbags. *Supra* FoF ¶¶ 116-31. In the words of Coach's CEO and Brand President Todd Kahn: "Gucci bags at $2000 is just not our customer in N[orth]A[merica]." PX1067 (Tapestry) at 1. Former Kate Spade CEO and Brand President Liz Fraser put it more bluntly: "Bottom line, saying we're in the same market with true luxury is a joke. . . . Nobody says 'should I buy a LV [Louis Vuitton] bag or a Coach bag?'" PX1427 (Tapestry) at 1-2.

54.    Beyond price, other characteristics distinguish "true luxury" handbags from "accessible luxury" handbags, including no discounting; more exclusive shopping experience with limited sales channels and few, if any, outlet stores; the imprimatur of the finest craftsmanship and materials; and manufacturing in Europe. *Supra* FoF ¶¶ 126-31.

55.    **<u>Mass-market.</u>** Mass-market (or fast-fashion) handbags are similarly not reasonably interchangeable with "accessible luxury" handbags. *Id.* ¶¶ 132-40. Indeed, in filings with China's antitrust regulatory authority, Capri admitted that even higher-end mass-market handbags were not substitutes for Defendants' offerings: "[H]igh-end mass market products also offer good quality and performance and are made with decent materials and manufacturing processes, [but] they are not on the same level as luxury products." PX2061 (Capri) at 4.

       c.  **Economic Analysis Confirms "Accessible Luxury" Handbags in the United States Is a Relevant Market.**

56.    The FTC has also shown a likelihood of establishing a relevant product market of "accessible luxury" handbags by use of the HMT. *E.g.*, *IQVIA*, 710 F. Supp. 3d at 368-76. This test asks whether a profit maximizing hypothetical monopolist would undertake a SSNIPT on at

least one product in the set. *Id.* at 369. If the monopolist would do so, "then a relevant product market exists for antitrust purposes." *Id*.

57. To conduct the HMT, the FTC's expert Dr. Loren Smith first identified a candidate market comprised of brands identified as "accessible luxury" in Tapestry's market sizing models. *See* FoF ¶¶153-54.

58. Dr. Smith then conducted an aggregate diversion analysis, a common tool in market definition. *See Sysco*, 113 F. Supp. 3d at 34-35 (describing aggregate diversion analysis). Dr. Smith found that estimated aggregate diversion ratios from Coach, Kate Spade, and Michael Kors exceed the threshold aggregate diversion ratio "by a long way[]," noting "[t]he aggregate diversion is more than three times as high in the baseline case and more than two times as high in any of the sensitivity cases tha[n] is necessary to define a relevant market." Hr'g Tr. 9/11 Smith (FTC) at 550:5-13; *see also* PX6000 (Smith (FTC) Rep*.*) ¶¶ 105-107; FoF ¶¶ 155-63.

59. In fact, Dr. Smith's use of the brands identified as "accessible luxury" by Tapestry was conservative because an alternative analysis conducted by Dr. Smith shows that a hypothetical monopolist who controlled only the Coach, Kate Spade, and Michael Kors brands would find it profitable to increase the price of Michael Kors handbags by well over 30 percent. Hr'g Tr. 9/11 Smith (FTC) at 571:5-23; PX6000 (Smith (FTC) Rep.) ¶¶ 253-58, tbl. 10.[16]

60. This finding is consistent with Defendants' ordinary-course documents that show Coach, Michael Kors, and Kate Spade are closest competitors. *Supra* FoF § X; *see also IQVIA*, 710 F. Supp. 3d at 375-76 (collecting cases holding that even where there are some questions

---

[16] Defendants' expert Professor Scott Morton's testimony that it was "a bit of a red flag" that Defendants' brands alone passed the HMT contradicts her own writing on the subject, which acknowledges that two merging firms can properly pass the HMT. Hr'g Tr. 9/17 Scott Morton (Defs.) at 1258:23-1259:9, 1294:16-1295:7; PX7414 at 9-10.

raised about precise methods, expert opinions may "support a proposed market definition where they are broadly consistent with the rest of the evidence in the record").

61.     "Defining a cluster market is justified [where] market shares and competitive conditions are likely to be similar." *Staples, Inc.*, 190 F. Supp. 3d at 117. Dr. Smith conducted his analysis across a cluster market of four bag styles: cross body bags, satchels, shoulder bags, and totes, because the merging parties are significant sellers of these handbags, and competitive conditions do not significantly differ across these styles of bag. Hr'g Tr. 9/11 Smith (FTC) 531:13-533:5; PX6000 (Smith (FTC) Rep.) ¶¶ 92-93, tbl. 4.

62.     Sensitivity testing can and does validate his analysis. *See supra* FoF ¶ 153 n.6.; *infra* CoL ¶ 68 n.17; *cf. Bertelsmann,* 646 F.3d at 27-28 (finding it was appropriate for the government to demarcate the market as an analytical tool, even if there is "no magic place that's the right place to draw the line"); *Staples*, 190 F. Supp. 3d at 118 n. 10 (accepting analysis involving some line-drawing, while noting that there was no "magic place that's the right place to draw the line").

63.     Accordingly, both the *Brown Shoe* practical indicia and the HMT support that an "accessible luxury" handbag market is a relevant antitrust product market.

### 2. The Proposed Acquisition Creates a Presumptively Illegal Increase in Concentration in the "Accessible Luxury" Handbag Product Market.

64.     To assess market concentration, courts either (1) assess whether a merger results in the combined firm exceeding a 30 percent share of the market, *see, e.g.*, *Phila. Nat'l Bank*, 374 U.S. at 364, or (2) employ a statistical measure known as the Herfindahl-Hirschman Index (HHI) to assess market concentration. *See, e.g.*, *IQVIA*, 710 F. Supp. 3d at 375-80; *see also* Merger Guidelines § 2.1. These calculations are useful indirect indicators of the likely harm posed by a merger. Hr'g Tr. 9/11 Smith (FTC) at 526:24-527:8.

65.    In evaluating market concentration, the "FTC need not present market shares and HHI estimates with the precision of a NASA scientist." *IQVIA*, 710 F. Supp. 3d at 382.

66.    "The HHI is calculated by summing the squares of the individual firms' market shares." *IQVIA*, 710 F. Supp. 3d at 379 (quoting *Penn State Hershey*, 838 F.3d at 346); *see also* Hr'g Tr. 9/11 Smith (FTC) at 523:24-524:11.

67.    Under the 2023 Merger Guidelines, "Markets with an HHI greater than 1,800 are highly concentrated, and a change of more than 100 points is a significant increase" that satisfies the structural presumption for illegality. Merger Guidelines § 2.1; *Consol. Gold Fields v. Anglo American Corp.*, 698 F. Supp. 487, 500-501 (S.D.N.Y. 1988), *aff'd in relevant part*, 871 F.2d 252, 255 (2d Cir. 1989) (applying same thresholds that now appear in latest Merger Guidelines).

68.    Here, the Proposed Acquisition would result in a market share of over 58%. *See, e.g.*, *IQVIA*, 710 F. Supp. 3d at 378-79 (citing *Philadelphia Nat'l Bank* and reaffirming validity of "30% threshold" above which a transaction is presumably illegal); PX6000 (Smith (FTC) Rep.) ¶ 186, tbl. 7; *supra* FoF ¶ 167. This combined market share vastly exceeds the 30 percent presumption set forth in *Philadelphia Nat'l Bank*, even with some 200+ firms in the market. *Supra* FoF ¶ 167; *accord United States v. Von's Grocery Co.*, 384 U.S. 270, 272-73 (1966) (thousands of independent grocery stores did not undermine concerns about merger that would create the second largest chain in Los Angeles); *United States v. Pabst Brewing Co.*, 384 U.S. 546, 550-52 (1966) (merger with 86 competitors in the narrowest relevant market may violate Section 7).[17]

69.    The Proposed Acquisition would also cause the HHI in the "accessible luxury"

---

[17] Professor Scott Morton's sensitivity analysis including NPD "Better" brands, which include mass-market brands, demonstrates that the combined share of Coach, Kate Spade and Michael Kors is still approximately 49 percent. Hr'g Tr. 9/17 Smith (FTC) at 1350:7-18, 1355:10-23.

handbags market to increase by over 1,400 points to an overall total exceeding 3,500—far surpassing the HHI thresholds for illegality under the Merger Guidelines and existing caselaw. Hr'g Tr. 9/11 Smith (FTC) at 523:12-23; PX6001 (Smith (FTC) Reply Rep.) ¶ 62, tbl. 1; *see also, e.g.*, *IQVIA*, 710 F. Supp. 3d at 380 (post-merger HHI of 3,635 and increase of 997).

70.    Thus, the Proposed Acquisition leads to a highly concentrated market and a presumption of illegality. *See IQVIA*, 710 F. Supp. 3d at 380.

**B.    *The Acquisition Is Unlawful Regardless of Market Concentration Because It Will Eliminate Substantial Head-To-Head Competition.***

71.    Independent of any market concentration analysis, the FTC can meet its prima facie burden by demonstrating that the Proposed Acquisition will eliminate head-to-head competition between close competitors. *FuboTV*, 2024 WL 3842116, at *17, *29 (granting preliminary injunction based on competitive effects, not market concentration); *IQVIA*, 710 F. Supp. 3d at 385 ("It is sufficient to show, as the FTC has, that Defendants vigorously compete head-to-head and that this competition would be eliminated by the proposed transaction."); *Sysco*, 113 F. Supp. 3d at 61-62; *Mfrs. Hanover Tr.*, 240 F. Supp. at 950 (eliminating significant competition may by "'itself constitute[] a violation of § 1 of the Sherman Act,' and, a fortiori, of the Clayton Act"); Merger Guidelines § 2.2.

72.    What's more, the Court need not find a likelihood of success with respect to establishing *the market used to calculate market shares* to conclude that the FTC has met its burden for *a relevant market* in which head-to-head competition will be eliminated. *Mfrs. Hanover Tr.*, 240 F. Supp. at 923, 955 (enjoining merger based on elimination of competition even though court rejected Government's proposed market); *see also FuboTV*, 2024 WL 3842116, at *24 (plaintiff likely to succeed on merits when "at least one of the . . . aspects of the JV will tend to produce anticompetitive effects *in a relevant market*") (emphasis added).

73.     Direct evidence of substantial head-to-head competition is itself evidence "that a relevant market exists in which the merger may substantially lessen competition and can be sufficient to identify the line of commerce and section of the country affected by a merger, even if the metes and bounds of the market are only broadly characterized." Merger Guidelines § 4.3.

74.     When conducting analysis of head-to-head competition, "[c]ourts frequently rely on ordinary course documents and witness testimony illustrating that two merging parties view each other as strong competitors." *IQVIA*, 710 F. Supp. 3d at 383; *United States v. Aetna Inc*., 240 F. Supp. 3d 1, 26 (D.D.C. 2017) (ordinary-course documents demonstrated where the merging parties focused "most of their competitive efforts").

75.     Self-serving testimony by corporate executives, however, is entitled to little weight. *E.g.*, *IQVIA*, 710 F. Supp. 3d at 385 ("the Court is more persuaded by the plain import of their contemporaneous statements as reflected in the documentary record than by Defendants' attempts to diminish the substantial evidence of head-to-head competition"); *cf. Chicago Bridge & Iron Co. N.V. v. FTC*, 534 F.3d 410, 435 (5th Cir. 2008) (evidence that "could arguably be subject to manipulation" is deemed of limited value); *Aetna*, 240 F. Supp. at 88 (actions taken to improve litigation position should be discounted).

76.     That is because, as is the case here, executives have strong incentives, including potential financial windfalls, to push for a proposed merger to succeed. *E.g.*, Hr'g Tr. 9/9 Idol (Capri) at 127:9-16 (personal stock value of roughly $210 million if merger closes).[18]

77.     There is no serious dispute that Coach, Michael Kors, and Kate Spade compete

---

[18] By way of example, several of Defendants' witnesses were unwilling to admit that even the Hermès Birkin bag did not compete with Coach, Michael Kors, or Kate Spade (*see* Hr'g Tr. 9/12 Wilmotte (Capri) at 772:4-12; Hr'g Tr. 9/12 Fraser (Tapestry) at 901:18-23). Scott Morton was not willing to go that far. (Hr'g Tr. 9/17 Scott Morton (Defs.) at 1285:20-1286:1 ("The Birkin bag is pretty distinctive, different, so I think I would hesitate to say that.").

directly in a relevant market. *See IQVIA*, 710 F. Supp. 3d at 363 n.17 ("substantial evidence" showing Defendants as "key competitors" provided "additional support for the market proposed by the FTC"); *see also Staples*, 190 F. Supp. 3d at 124. Defendants have acknowledged to foreign regulators and the highest levels of their companies that these brands compete in one or more relevant markets. *Supra* FoF ¶¶ 30, 33, 50, 101-02.

78.     Coach, Kate Spade, and Michael Kors compete closely, and fiercely, in the sale of handbags. Tapestry and Capri recognize these brands are close competitors, so much so that Tapestry's documents show a concern for "cannibalization" between the Coach, Kate Spade, and Michael Kors brands post-acquisition and thus a need to differentiate Michael Kors. *Id.* ¶¶ 39, 174-76. For its part, Capri CEO and Chairman John Idol's has referred to Coach as "[o]ur key competitor." PX2425 (Capri) at 2. There is good reason for Defendants to focus on each other: their own consumer research shows that customers view Coach, Kate Spade, and Michael Kors as close substitutes. *E.g.*, PX1186 (Tapestry) at 15; PX1216 (Tapestry) at 4.

79.     These brands compete vigorously on many dimensions, from pricing to design to marketing to shopping experience to retail labor to sustainability—all of which benefit consumers but will be lost if the Proposed Acquisition proceeds. *See* FoF § X. The FTC meets its prima facie case on this independent ground by showing that the Proposed Acquisition will squelch this longstanding, fierce head-to-head competition.

**C.  *Defendants Cannot Rebut the FTC's Case.***

80.     The recognized methods of rebutting a prima facie case are unavailable here because Defendants have not demonstrated that entry and expansion will be timely, likely, or sufficient to counteract the Proposed Acquisition's anticompetitive effects, nor have Defendants established any procompetitive benefits that outweigh the likely anticompetitive effects.

### 1. Entry and Expansion Will Not Be Timely, Likely, or Sufficient to Counteract the Proposed Acquisition's Anticompetitive Effects.

81.     To meet their burden, Defendants must demonstrate that any entry by new firms, or expansion by existing firms, will be "timely, likely, and sufficient in its magnitude, character, and scope to deter or counteract the competitive effects of concern" of the Proposed Acquisition. *IQVIA*, 710 F. Supp. 3d at 393; Merger Guidelines § 3.2. Put differently, entry or expansion must "fill the competitive void" resulting from the merger. *H&R Block.*, 833 F. Supp. 2d at 73.

82.     Defendants cannot make that showing here: Coach, Kate Spade, and Michael Kors are household names in the United States, scoring as some of the most recognized brands in the fashion industry. These types of brands do not appear overnight, and more importantly, are not easily scaled. *Chicago Bridge*, 534 F.3d at 430 (entry has to be "of a sufficient scale to compete on the same playing field") (cleaned up); *supra* FoF ¶¶ 222-29.

83.     Moreover, despite the rise of e-commerce, most handbags today are still sold through brick-and-mortar stores, making it important to have a brick-and-mortar presence. *Id.* at ¶¶ 230-34. Brick-and-mortar presence, however, is challenging and costly. *Id.* at ¶¶ 235-36

84.     Marketing and advertising are also costly, but necessary, to obtain the scale of Coach, Kate Spade, and Michael Kors. *Id.* at ¶¶ 237-42. And Defendants' treasure trove of consumer data also presents a barrier to entry and scale. *Id.* at ¶¶ 243-45.

85.     The fact that there may be hundreds of other competitors does not alter the analysis. *See Sysco*, 113 F. Supp. 3d at 29 (rejecting argument that smaller or more specialized competitors can substitute for larger ones, when those competitors "cannot and do not serve as wide an array of customers" as the merging parties do); *see also Von's Grocery.*, 384 U.S. at 272-73 (finding Section 7 violation despite presence of thousands of independent grocery stores); *Bertelsmann*, 646 F. Supp. 3d at 39-41 (finding a loss of competition where the merging parties

were the only two bidders in either 6 to 7 percent or 12 percent of book transactions).

86.    Indeed, despite testifying that she had not seen a case as this one in which so many competitors would still exist after the Proposed Acquisition (Hr'g Tr. 9/17 Scott Morton (Defs.) at 1324:3-12), Defendants' economic expert Professor Scott Morton has participated in several enforcement actions by the Department of Justice that, in fact, involved markets with many competitors. *Id.* at 1218:5-17 (discussing H&R Block/TaxAct and Anheuser Busch/Modelo mergers). For instance, *H&R Block* involved tax preparation services, a market replete with countless small firms and accountants as alternatives. *H&R Block*, 833 F. Supp. 2d at 44. And the Anheuser Busch/Modelo merger, which ultimately resulted in a post-complaint consent decree (Final Judgment, *United States v. Anheuser-Busch InBEV SA/NV*, (No. 05-1631), ECF No. 48, 2013 WL 7018607 (D.D.C. Oct. 24, 2013)), implicated the beer market, where, as Dr. Smith noted, "any beer drinker knows there are hundreds of microbrews in the United States. But the DOJ has been fairly active in beer markets in the past decade despite that large number of individual brands competing."[19] Hr'g Tr. 9/17 Smith (FTC) at 1340:17-1341:2.

### 2.  Any Benefits Are Not Merger-Specific, Cognizable, or Verifiable.

87.    Defendants do not contend that the merger would lead to any efficiencies in the traditional antitrust sense. Dkt. No. 159 at 37-38.

88.    Instead, they claim that the Proposed Acquisition "will result in procompetitive efficiencies" by revitalizing "the declining Michael Kors brand." Dkt. No. 91 at ¶¶ 10, 15. This claim is so vague that it cannot possibly be verifiable, it is not merger specific, and it does not

---

[19] *See also* Competitive Impact Statement at 9, *Anheuser-Busch InBEV*, (No. 05-1631), ECF No. 30 (D.D.C. April 19, 2013) ("While consumers have undoubtedly benefited from the launch of many individual craft and specialty beers in the United States, the multiplicity of such brands does not replace the nature, scale, and scope of competition that Modelo provides today, and that would otherwise be eliminated by the proposed transaction.").

flow from an increase in competition, as it involves reduced discounting, *supra* FoF ¶ 34, and thus is not a cognizable efficiency, even if it occurs. *St. Alphonsus Med. Ctr.–Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 792 (9th Cir. 2015) (Clayton Act does not excuse anticompetitive mergers "simply because the merged entity can improve its operations"). Moreover, the record does not support that the Michael Kors brand is in any sort of freefall—as opposed to the natural ebb and flow of the fashion industry that Michael Kors himself eloquently explained. Hr'g Tr. 9/16 Kors (Capri) at 1087:12-19 ("when you've been a designer for 45 years, it is a very cyclical business. So you are definitely going to have highs and lows. So much of it is dependent on trend, the economy, consumer mood, and sometimes you will be the hottest thing on the block and other times you'll be lukewarm, other times you'll be cold, but you're always moving forward."); *see also ProMedica Health Sys., Inc. v. FTC,* 749 F.3d 559, 572 (6th Cir. 2014) (a weakened competitor defense has been described as "the Hail-Mary pass of presumptively doomed mergers").

89.     And, even if it were, there is no evidence that Tapestry—which struggled with both the Kate Spade and Stuart Weitzman acquisitions, Hr'g Tr. 9/12 Fraser (Tapestry) at 821:7-18; *see also* PX1126 (Tapestry) at 1 (Liz Fraser: "I have to Wonder if [Tapestry] secretly had a plan to take [Kate Spade] down market."); Hr'g Tr. 9/17 Scott Morton (Defs.) at 1316:11-1317:15 (Todd Kahn investigational hearing testimony that it was "not easy" to transplant Coach's ability to connect with customers to Kate Spade and Stuart Weitzman); PX1175 at 1 (considering a "footwear divestiture" in July 2022 even though Tapestry had acquired Stuart Weitzman only seven years prior)—has a secret sauce to reinvigorate the brand over and above the ongoing transformation efforts already occurring at Michael Kors. *Supra* FoF ¶¶ 8-10; Hr'g Tr. 9/17 Scott Morton (Defs.) at 1279:25-1281:3.

### 3. Assertions That the Brands Will Be Run Autonomously Are Contrary to Law and Fact.

90.     Defendants and their economic expert Professor Scott Morton have contended that market shares are not indicative of antitrust issues because post-merger Tapestry intends to run the brands separately, with each making its own pricing decisions. Hr'g Tr. 9/17 Scott Morton (Defs.) at 1231:11-1232:2.

91.      These assertions are contrary to the law. As the Supreme Court has made clear, divisions within one company are viewed as a single actor under the antitrust laws. *Copperweld Corp. v. Ind. Tube Corp.*, 467 U.S. 752, 771 (1984) ("their general corporate actions are guided or determined not by two separate corporate consciousnesses, but one"); *accord Bertelsmann*, 646 F. Supp. 3d at 49-51 ("[c]ompanies with multiple divisions must be viewed as a single actor, and each division will act to pursue the common interests of the whole corporation." (alterations in original) (quoting *United States v. AT&T*, 916 F. 3d 1029, 1043 (D.C. Cir. 2019)).

92.     If that were not the case, divisions within firms could violate the Sherman Act by coordinating on pricing and output. *Copperweld*, 467 U.S. at 753, 771 ("coordinated activity of a parent and its wholly owned subsidiary must be viewed as that of a single enterprise for purposes of § 1 of the Sherman Act"); Hr'g Tr. 9/12 (Fraser) at 902:22-903:3 ("Q. So we previously discussed, when I was last up here, that you asked Todd Kahn, CEO of Coach to stop making a heart bag that looked like the Kate Spade heart bag, correct? A. I was trying to politely ask him not to recut it. Q. So is it your testimony you asked a competitor to stop making a bag that competed with the Kate Spade heart bag? A. I guess so.").

93.     Defendants' arguments are also contrary to basic principles of economics (Hr'g Tr. 9/17 Scott Morton (Defs.) at 1296:8-15, 1299:20-1300:1, 1300:11-16), as well as the evidence. Indeed, Coach and Kate Spade can and do share competitively sensitive information.

*See* FoF ¶¶ 271-80. And there is an entire Global Strategy & Consumer Insights group at Tapestry that works across all brands. *Id.* at 271. Moreover, this argument is contrary to Defendants' claim that Tapestry will revitalize the Michael Kors brand; indeed, when asked by the Court, Defendants' economic expert Professor Scott Morton could not articulate specifically how Tapestry could revitalize Michael Kors while keeping the brand "autonomous." Hr'g Tr. 9/17 Scott Morton (Defs.) at 1279:25-1281:3.

94.     Indeed, as courts have routinely recognized, promises of internal competition with no enforcement mechanism should not be credited and may in fact indicate an awareness of the competitive harms of the proposed transaction. *Bertelsmann*, 646 F. Supp. 3d at 50-51 (giving no weight to an "unenforceable promise" that merged brands would continue to bid against each other, observing that, among other things, it may not be profit maximizing and could be broken at will); *see also United States v. Falstaff Brewing Corp.*, 410 U.S. 526, 568 (1973) (Marshall, J., concurring) ("any statement of future intent will be inherently self-serving"); *Univ. Health*, 938 F.2d at 1223 (refusing to permit a "defendant to overcome a presumption of illegality based solely on speculative, self-serving assertions").

### 4.  The FTC Is Not Required to Show That Tapestry Will Raise Prices Post-Acquisition—But It Likely Will.

95.     Defendants argue that the FTC must provide a "forward-looking analysis" which "proves that the acquirer will raise prices post-merger." Defs.' Opp. at 38. That, however, is inconsistent with the caselaw showing the antitrust laws do not focus solely on price. *E.g.*, *United States v. Anthem*, 855 F.3d 345, 360-61 (D.C. Cir. 2017) ( "threat to innovation is anticompetitive in its own right"); *FTC v. Sanford Health*, 1:17-cv-133, 2017 WL 10810016, at *7, *13 (D.N.D. Dec. 15, 2017) (competition improves quality, convenience, breadth of offering), *aff'd* 926 F.3d 959 (8th Cir. 2019); *H&R Block*, 833 F. Supp. 2d at 81 (analyzing

whether "the acquiring firm will *have the incentive to* raise prices *or reduce quality* after the acquisition") (emphasis added).

96.     In any event, Dr. Smith conducted two analyses of the competitive effects of the proposed transaction: an upward pricing pressure analysis and a merger simulation. Hr'g Tr. 9/11 Smith (FTC) at 525:1-526:7. The results of Dr. Smith's upward pricing pressure analysis show that, following the Proposed Acquisition, Tapestry could raise prices on Coach, Kate Spade, and Michael Kors handbags by an average of 18 percent. Hr'g Tr. 9/11 Smith (FTC) at 570:18-571:4; PX6001 (Smith (FTC) Reply Rep.) ¶ 190, tbl 8. Dr. Smith's merger simulation results showed a slightly smaller average price increase of 17 percent following the Proposed Acquisition, which could include either a higher-price or lower-quality handbag. Hr'g Tr. 9/11 Smith (FTC) at 572:9-573:6; PX6000 (Smith (FTC) Rep.) ¶ 266, tbl. 11. This result indicates a total loss of consumer surplus from the merger of approximately $365 million per year. Hr'g Tr. 9/17 Smith (FTC) at 1395:8-18; PX6000 (Smith (FTC) Rep.) ¶ 266.

97.     Testimony by Defendants' witnesses to the contrary carries little to no weight. *Bertelsmann*, 646 F. Supp. 3d at 40 n.27 (finding testimony from the merging parties' executives "that the merger will have either no effect or a positive effect" to be "incredible," and instead crediting "market-share data, economic analysis, and the more credible testimony regarding market dynamics"); *see also Phila. Nat'l Bank*, 374 U.S. at 366-67 (the district court's reliance on "testimony by bank officers" that competition "was vigorous and would continue to be vigorous after the merger" was misplaced; such testimony was "entitled to little weight").

98.     Defendants' arguments that there is no third-party support for this case is irrelevant and does not change the analysis. *See, e.g., United States v. Bazaarvoice, Inc*., No. 13-CV-00133-WHO, 2014 WL 203966, at *4 (N.D. Cal. Jan. 8, 2014) (enjoining merger even

though "none of the 104 customers whose depositions are part of the record complained"; those parties were "not privy to most of the evidence presented to the Court"). Moreover, Dr. Smith explained that there is no evidence that wholesale customers, like Macy's and Dillard's—as opposed to working everyday American consumers—would suffer harm in the face of a price increase. Hr'g Tr. 9/11 Smith (FTC) at 647:23-648:9.

## II.    THE EQUITIES SUPPORT A PRELIMINARY INJUNCTION.

99.    The second step in determining whether to grant preliminary relief is to "weigh the equities in order to decide whether enjoining the merger would be in the public interest." *IQVIA*, 710 F. Supp. 3d at 400 (quoting *Penn State Hershey*, 838 F.3d at 352).

100.    "The principal public equity weighing in favor of issuance of preliminary [] relief is the public interest in effective enforcement of the antitrust laws." *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 726 (D.C. Cir. 2001). "If the acquisition is allowed to proceed but is later found to be violative of the antitrust laws, divestiture will be required. At best, divestiture is a slow, cumbersome, difficult, disruptive and complex remedy." *Lancaster*, 434 F. Supp. at 1096; *accord Heinz*, 246 F.3d at 726 ("Section 13(b) itself embodies congressional recognition of the fact that divestiture is an inadequate and unsatisfactory remedy in a merger case").

101.    "The prevailing view is that, although private equities may be considered, they are not to be afforded great weight." *IQVIA*, 710 F. Supp. 3d at 400 (quoting *Penn State Hershey*, 838 F.3d at 352); *accord Univ. Health*, 938 F.2d at 1225 (interests of private parties carry "little weight" so as not to "undermine section 13(b)'s purpose of protecting the public-at-large, rather than individual private competitors." (internal quotation marks omitted)).

102.    As such, "no court has denied a Section 13(b) motion for a preliminary injunction based on weight of the equities where the FTC has demonstrated a likelihood of success on the merits." *FTC v. Peabody Energy Corp.*, 492 F. Supp. 3d 865, 918 (E.D. Mo. 2020) (internal

quotation marks and citation omitted).

103.    In this case, the equities support entry of a preliminary injunction pending resolution of the administrative proceeding.

104.    Without preliminary relief, Defendants will be permitted to close the Proposed Acquisition and begin integrating the two companies immediately. *See Peabody*, 492 F. Supp. 3d at 918 (Commission may face the "daunting and potentially impossible task" of "unscrambling the eggs" if merger ultimately deemed unlawful (quoting *Sysco*, 113 F. Supp. 3d at 87)). The loss from the elimination of substantial head-to-head competition will be difficult, if not impossible, to reverse should Defendants consummate the Proposed Acquisition.

105.    In contrast, Defendants cannot establish harm merely from waiting for the administrative process, with a hearing set to begin on October 28, 2024, to play out.

106.    The grant of preliminary relief will not "kill the deal" (Dkt. No. 159 at 40), because the closing date in their merger agreement automatically extends until February 10, 2025, and both Defendants are required to use "reasonable best efforts to defend or contest, including through litigation or other means . . . [challenges to] the consummation of the [merger]" up until that date. PX1014 (Merger Agreement) at 53-54, § 6.2(a), 72 § 8.1(d).

107.    Moreover, to the extent that the administrative proceeding has been drawn out in this case, it has been at the request of Defendants. *Supra* CoL ¶ 14 n.13.

108.    There is "no reason why, if the merger makes economic sense now, it would not be equally sensible to consummate the merger following a[n] FTC adjudication on the merits that finds the merger lawful." *Penn State Hershey*, 838 F.3d at 353.

Dated: September 24, 2024

Respectfully submitted,

*S/ Abby L. Dennis*
Abby L. Dennis (*pro hac*)
DC Bar No. 994476
Federal Trade Commission
600 Pennsylvania Avenue, N.W.
Washington, DC 20580
Phone: 202-326-2494
Email: adennis@ftc.gov

Peggy Bayer Femenella (DC Bar No. 472770)
(*pro hac*)
Nicole Lindquist (DC Bar No. 975593) (*pro hac*)
Laura Antonini (CA Bar No. 271658) (*pro hac*)
Brandon Boxbaum (DC Bar No. 1615988) (*pro hac*)
Peter Colwell (DC Bar No. 100287) (*pro hac*)
Kassandra DiPietro (MN Bar No. 0403547) (*pro hac*)
Sean Hughto (DC Bar No. 421224) (*pro hac*)
Frances Anne Johnson (MD Bar – No Number)
(*pro hac*)
Sarah Kerman (DC Bar No. 90017957) (*pro hac*)
Andrew Lowdon (DC Bar No. 230095) (*pro hac*)
Danielle Quinn (NY Bar No. 5408943)
Blake Risenmay (WA Bar No. 52888) (*pro hac*)
Edmund Saw (DC Bar No. 1658446) (*pro hac*)
Victoria Sims (DC Bar No. 1006974) (*pro hac*)
Timothy Singer (DC Bar No. 1048769) (*pro hac*)

*Counsel for Plaintiff Federal Trade Commission*