## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

FEDERAL TRADE COMMISSION,

               Plaintiffs,

     v.

TAPESTRY, INC.,

and

CAPRI HOLDINGS LIMITED,

               Defendants.

Civil Action No. 1:24-cv-03109 (JLR)

REDACTED

## DEFENDANTS TAPESTRY, INC. & CAPRI HOLDINGS LIMITED'S PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW

# TABLE OF CONTENTS

## DEFENDANTS' PROPOSED FINDINGS OF FACT

I.    INTRODUCTION ...................................................................................................1

II.   THE REALITIES OF THE DYNAMIC U.S. HANDBAG INDUSTRY ..........................7

    A.    Consumers Have Robust Options For Handbags......................................7

    B.    There Are Low Barriers To Entry And Expansion ................................10

    C.    Consumers Set Handbag Prices .............................................................17

    D.    Industry Experts Agree That Consumers Will Remain Protected By
        Intense Competition ...............................................................................20

III.  TAPESTRY WILL REVITALIZE THE CAPRI BRANDS, INCLUDING
    MICHAEL KORS ...............................................................................................22

    A.    Michael Kors Is An Iconic Brand That Has Lost Relevance And Brand
        Heat ........................................................................................................22

    B.    Tapestry Has The Incentive And Ability To Turn Michael Kors Around............24

IV.   PLAINTIFF FAILED TO ADEQUATELY DEMONSTRATE THAT
    "ACCESSIBLE LUXURY HANDBAGS" ARE A RELEVANT PRODUCT
    MARKET .........................................................................................................28

    A.    The *Brown Shoe* Factors Do Not Define A Market Of "Accessible Luxury
        Handbags"...............................................................................................28

        1.    There Is No Separate Industry Or Public Recognition .............29

        2.    Handbag Characteristics And Uses Are Not Peculiar................32

        3.    Handbag Production Facilities Are Not Unique .......................34

        4.    Handbag Customers Are Not Distinct ......................................37

        5.    Handbag Prices Are Not Distinct..............................................39

        6.    Sensitivity To Price Changes And Specialized Vendors Do Not
            Shown ......................................................................................40

    B.    Plaintiff's Attempt To Segment The Industry Ignores How Handbag
        Brands Actually Compete .......................................................................41

    C.    Dr. Smith's Hypothetical Monopolist Test Is Fatally Flawed ...............44

        1.    Dr. Smith's Diversion Ratios Are Unreliable ...........................45

        2.    Dr. Smith Uses Inflated Gross Margins....................................52

        3.    Dr. Smith's Hypothetical Monopolist Test Leads To False
            Positives ...................................................................................52

    D.    "Bridge" And "Contemporary" Brand Labels Have No Connection To The
        Hypothetical Monopolist Test, *Brown Shoe*, Or Consumers' Substitutes............53

i

V.     PLAINTIFF FAILS TO SHOW UNDUE CONCENTRATION IN ANY RELEVANT MARKET ........................................................................................56

VI.    THE TRANSACTION IS NOT LIKELY TO LEAD TO A SUBSTANTIAL REDUCTION OF COMPETITION IN ANY RELEVANT MARKET ..........................61

    A.    Plaintiff Did Not Put Forward Factual Evidence Of Likely Consumer Harm ....................................................................................................61

    B.    Plaintiff's "Head-To-Head" Competition Theory Fails..............................64

    C.    Historic Market Shares Are Not Indicative Of Future Competition......................68

    D.    Dr. Smith's Quantitative Analyses Of Competitive Harm Are Not Credible........69

    E.    Continued Brand Autonomy And Competition Between The Brands Will Further Ensure No Anticompetitive Effects .........................................69

VII.   THE EQUITIES WEIGH AGAINST ANY PRELIMINARY INJUNCTION ................70


**CONCLUSIONS OF LAW**

I.     LEGAL STANDARDS ......................................................................................71

    A.    The Preliminary Injunction Standard:  Section 13(b) Of The FTC Act ...............71

    B.    The Substantive Law:  Section 7 Of The Clayton Act And The *Baker-Hughes* Burden Shifting Standard ........................................................73

II.    STEP 1:  PLAINTIFF IS NOT LIKELY TO CARRY ITS BURDEN TO SHOW THE TRANSACTION WILL RESULT IN UNDUE CONCENTRATION IN A PURPORTED "ACCESSIBLE LUXURY HANDBAG" MARKET ..............................74

    A.    Plaintiff Is Not Likely To Establish That "Accessible Luxury Handbags" Are A Relevant Market.............................................................74

        1.    The Evidence Shows That Plaintiff's "Accessible Luxury Handbag" Market Likely Will Not Survive Scrutiny Under The *Brown Shoe* "Practical Indicia" Factors....................................75

        2.    It Is Unlikely That Plaintiff Will Be Able To Define A Relevant Market Using Dr. Smith's HMT ................................................84

        3.    Plaintiff's "Accessible Luxury Handbag" Market and Dr. Smith's "NPD Bridge and Contemporary" Market Suffer From A Failure Of Proof Because They Fail to Account For Used Handbags .................88

    B.    Dr. Smith's Analysis Fails To Trigger A Presumption of Illegality In Any Relevant Market.................................................................90

    C.    Plaintiff Cannot Avoid Market Definition And Carry Its Burden to Show The Transaction Is Unlawful By Claiming This Is A Merger Of Closest Competitors..............................................................................90

III.    STEP 2: DEFENDANTS ARE LIKELY TO REBUT PLAINTIFF'S PRIMA FACIE CASE .................................................................................................91

    A.    Evidence of Dynamic Entry and Expansion Confirms That Plaintiff's Concentration Statistics Overstate The Transaction's Likely Competitive Effects .....................................................................................................92

    B.    The Decline Of Michael Kors Confirms That Plaintiff's Concentration Statistics Are Not Indicative Of Michael Kors' Future Competitive Success ....................................................................................................94

    C.    Tapestry's Emphasis On Brand Autonomy Will Ensure Competition Among The Coach, Kate Spade, And Michael Kors Brands Continues ..............95

IV.    STEP 3:  IT IS UNLIKELY THAT PLAINTIFF WILL BE ABLE TO CARRY ITS ULTIMATE BURDEN OF PERSUASION BECAUSE IT WILL NOT BE ABLE TO PROVE THE TRANSACTION IS LIKELY TO PRODUCE ANTICOMPETITIVE EFFECTS IN ANY RELEVANT MARKET ............................96

V.    THE EQUITIES WEIGH AGAINST AN INJUNCTION .............................................100

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Allen-Myland, Inc. v. Int'l Bus. Machines Corp.*,
  33 F.3d 194 (3d Cir. 1994)......................................................................................89

*Brown Shoe v. United States*,
  370 U.S. 294 (1962) ......................................................................................... *passim*

*Chi. Bridge & Iron Co. v. FTC*,
  534 F.3d 410 (5th Cir. 2008) ...............................................................................93

*FTC v. Arch Coal, Inc.*,
  329 F. Supp. 2d 109 (D.D.C. 2004) ................................................................. *passim*

*FTC v. Cardinal Health, Inc.*,
  12 F. Supp. 2d 34 (D.D.C. 1998) ........................................................................74

*FTC v. Elders Grain, Inc.*,
  868 F.2d 901 (7th Cir. 1989) ...............................................................................72

*FTC v. Freeman Hosp.*,
  69 F.3d 260 (8th Cir. 1985) .................................................................................91

*FTC v. IQVIA Holdings Inc.*,
  710 F. Supp. 3d 329 (S.D.N.Y. 2024)............................................................... *passim*

*FTC v. Lancaster Colony Corp.*,
  434 F. Supp. 1088 (S.D.N.Y. 1977)......................................................................72

*FTC v. Meta Platforms Inc.*,
  654 F. Supp. 3d 892 (N.D. Cal. 2023) ..................................................................72

*FTC v. Occidental Petroleum Corp.*,
  1986 WL 952 (D.D.C. Apr. 29, 1986) ...................................................................92

*FTC v. Promodes S.A.*,
  1989 WL 103748 (N.D. Ga. Apr. 14, 1989) ..........................................................92

*FTC v. RAG-Stiftung*,
  436 F. Supp. 3d 278 (D.D.C. 2020) .................................................................. *passim*

*FTC v. Staples, Inc.*,
  190 F. Supp. 3d 100 (D.D.C. 2016) ..........................................................77, 80, 98

*FTC v. Swedish Match*,
    131 F. Supp. 2d 151 (D.D.C. 2000) ...................................................................76

*FTC v. Sysco Corp.*,
    113 F. Supp. 3d 1 (D.D.C. 2015) .......................................................77, 78, 91

*FTC v. Thomas Jefferson Univ.*,
    505 F. Supp. 3d 522 (E.D. Pa. 2020) ........................................... *passim*

*FTC v. Warner Commc'ns Inc.*,
    742 F.2d 1156 (9th Cir. 1984) ...................................................................72

*FTC v. Weyerhaeuser Co.*,
    665 F.2d 1072 (D.C. Cir. 1981) ...............................................................100

*FTC v. Whole Foods Mkt., Inc.*,
    548 F.3d 1028 (D.C. Cir. 2008) .................................................... *passim*

*fuboTV Inc. v. Walt Disney Co.*,
    2024 WL 3842116 (S.D.N.Y. Aug. 16, 2024) ...............................71, 94

*Geneva Pharm. Tech. Corp. v. Barr Laboratories Inc.*,
    386 F.3d 485 (2d Cir. 2004) ..........................................................80, 83

*Haagen-Dazs Co. v. Double Rainbow Gourmet Ice Creams, Inc.*,
    895 F.2d 1417, 1990 WL 12148 (9th Cir. 1990) ...........................78

*IGT v. All. Gaming Corp.*,
    702 F.3d 1338 (Fed. Cir. 2012).................................................................79

*In re Fresh Del Monte Pineapples Antitrust Litig.*,
    2009 WL 3241401 (S.D.N.Y. Sept. 30, 2009)..........................................85

*In re Super Premium Ice Cream*,
    691 F. Supp. 1262 (N.D. Cal. 1988) .....................................................82

*Int'l Shoe Co. v. FTC*,
    280 U.S. 291 (1930).................................................................73, 96

*JBL Enterprises, Inc. v. Jhirmack Enterprises, Inc.*,
    509 F. Supp. 357 (N.D. Cal. 1981) .......................................................77

*Ky. Speedway v. NASCAR, Inc.*,
    588 F.3d 908 (6th Cir. 2009) .................................................................75

*Murrow Furniture Galleries, Inc. v. Thomasville Furniture Indus., Inc.*,
    889 F.2d 524 (4th Cir. 1989) ...............................................................82

*New York v. Deutsche Telekom AG,*
439 F. Supp. 3d 179 (S.D.N.Y. 2020)................................................................73, 97

*Nifty Foods Corp. v. Great Atl. & Pac. Tea,*
614 F.2d 832 (2d Cir. 1980)............................................................................82

*Ohio v. Am. Express Co.,*
585 U.S. 529 (2018)........................................................................................74

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.,*
792 F.2d 210 (D.C. Cir. 1986) .......................................................................81

*Starbucks Corp. v. McKinney,*
144 S. Ct. 1570 (2024)...............................................................................71, 72

*State v. Kraft General Foods, Inc.,*
926 F. Supp. 321 (S.D.N.Y. 1995) ...................................................77, 82, 85, 87

*U.S. v. Booz Allen Hamilton Inc.,*
2022 WL 9976035 (D. Md. Oct. 17, 2022) .....................................................85

*U.S. v. E.I. du Pont de Nemours Co.,*
353 U.S. 586 (1957)........................................................................................91

*U.S. v. Gen. Dynamics Corp.,*
415 U.S. 486 (1974)...................................................................................94, 95

*U.S. v. Int'l Harvester Co.,*
564 F.2d 769 (7th Cir. 1977) ..........................................................................95

*U.S. v. Marine Bancorporation, Inc.,*
418 U.S. 602 (1974)........................................................................................74

*U.S. v. Mfrs. Hanover Trust Co.,*
240 F. Supp. 867 (S.D.N.Y. 1965) .................................................................91

*U.S. v. Sabre Corp.,*
452 F. Supp. 3d 97 (D. Del. 2020), *vacated on other grounds*, 2020 WL
4915824 (3d Cir. July 20, 2020) .....................................................................96

*U.S. v. Waste Mgmt., Inc.,*
743 F.2d 976 (2d Cir. 1984)........................................................................92, 93

*United States v. Anthem Inc.,*
236 F. Supp. 3d 171 (D.D.C. 2017) *aff'd*, 855 F.3d 345 (D.C. Cir. 2017)..................... *passim*

*United States v. Baker Hughes, Inc.,*
908 F.2d 981 (D.C. Cir. 1990)................................................................73, 91, 93, 96

*United States v. Bertelsmann SE & Co. KGaA*,
    646 F. Supp. 3d 1 (D.D.C. 2022) ........................................................80

*United States v. Calmar Inc.*,
    612 F. Supp. 1298 (D.N.J. 1985) ........................................................93

*United States v. Gillette Co.*,
    828 F. Supp. 78 (D.D.C. 1993) ....................................................89, 97

*United States v. H&R Block, Inc.*,
    833 F. Supp. 2d 36 (D.D.C. 2011) ................................................ *passim*

*United States v. Joseph Schlitz Brewing Co.*,
    253 F. Supp. 129 (N.D. Cal. 1966), *aff'd*, 385 U.S. 37 (1966) ..............................82

*United States v. SunGard Data Systems, Inc.*,
    172 F. Supp. 2d 172 (D.D.C. 2001) ........................................................77

*United States v. United States Sugar Corp.*,
    73 F.4th 197 (3d Cir. 2023) ................................................75, 76, 88, 89

*United States. v. Oracle Corp.*,
    331 F. Supp. 2d 1098 (N.D. Cal. 2004) ........................................................77

*Winter v. NRDC*,
    555 U.S. 7 (2008) ........................................................72

## STATUTES

15 U.S.C.
    § 18 ........................................................73
    § 53(b) ........................................................71

Clayton Act
    § 7 ........................................................ *passim*
    § 16 ........................................................71

FTC Act § 13(b) ........................................................ *passim*

## INDEX OF ABBREVIATIONS

| Abbreviation | Source | Exhibit Number |
|---|---|---|
| FSM | Expert Report of Professor Fiona Scott Morton, including Appendix D | DX-0283 |
| JG | Expert Report of Jeff Gennette | DX-0284 |
| KG | Expert Report of Karen Giberson | DX-0281 |
| LS | Initial Expert Report of Dr. Loren K. Smith | PX6000 |
| Armstrong | Ryan Armstrong<br>Ralph Lauren (Corporate Representative), Interim Head of Global Marketing Strategy & Chief of Staff to the Chief Marketing Officer | PX8172 |
| Bernson | Matt Bernson<br>Kate Spade, Former Senior Director of Merchandising | PX5079<br>(Not Played in Hearing) |
| Bozeman | Andrea Bozeman<br>Michael Kors, Former VP Consumer Marketing & Global CRM | PX5080 |
| Charles | Peter Charles<br>Tapestry, Chief Supply Chain Officer | |
| Christilaw | Dale Christilaw<br>Kurt Geiger (Corporate Representative), Chief Financial Officer | DX-0925 |
| Crevoiserat | Joanne Crevoiserat<br>Tapestry, Chief Executive Officer | |
| Edwards | Thomas Edwards<br>Capri, Chief Financial Officer and Chief Operations Officer | |
| Fraser | Liz Fraser<br>Kate Spade, Former Chief Executive Officer & Brand President | |
| Gandhi | Deepa Gandhi<br>Dagne Dover (Corporate Representative), Founder & Chief Operating Officer | DX-0950<br>(Not Played in Hearing) |
| Gennette | Jeff Gennette  (Defense Industry Expert) | |
| Giberson | Karen Giberson (Defense Industry Expert) | |
| Guez | Griffin Guez<br>NorthStar OpCo & House of Pliner, Chief Executive Officer | |

| Abbreviation | Source | Exhibit Number |
|---|---|---|
| Hamilton | Phillip Hamilton<br>Lululemon (Corporate Representative), VP, Global Merchandising | DX-0931 |
| Harris | Liz Harris<br>Tapestry, SVP, Global Strategy & Consumer Insights | |
| Idol | John Idol<br>Capri, Chief Executive Officer | |
| Kahn | Todd Kahn<br>Coach, Chief Executive Officer & Brand President | |
| Kors | Michael Kors<br>Michael Kors, Chief Creative Officer | |
| Larian | Jasmin Larian<br>Cult Gaia (Corporate Representative), Chief Executive Officer & Creative Director | DX-0933 |
| Levine | Leigh Levine<br>Coach, President Coach North America | |
| Melwani | Anish Melwani<br>LVMH (Corporate Representative), Chairman & Chief Executive Officer, LVMH North America | PX8170 |
| Minkoff | Rebecca Minkoff<br>Rebecca Minkoff, Chief Creative Officer | PX8168 |
| Mogyoros | Kevin Mogyoros<br>MZ Wallace (Corporate Representative), Chief Operating Officer & Chief Financial Officer | DX-0926 |
| Murphy | Thomas Murphy<br>Longchamp USA (Corporate Representative), VP, Finance & Operations | DX-0927 |
| Newman | Philippa Newman Chapius<br>Michael Kors, President, Accessories & Footwear | |
| Parsons | Laura Parsons<br>Michael Kors, Vice President Strategy & Transformation | |
| Rocha-Rinere | Ashley Rocha-Rinere<br>Tapestry, Director of Strategy and Insights | PX5084<br>(Not Played in Hearing) |
| Roe | Scott Roe<br>Tapestry, Chief Financial Officer and Chief Operating Officer | PX5085 |
| Scott Morton | Fiona Scott Morton  (Defense Expert Economist) | |

| Abbreviation | Source | Exhibit Number |
|---|---|---|
| Smith | Loren K. Smith  (Plaintiff Expert Economist) | |
| Steinmann | Christopher Steinmann<br>Macy's (Corporate Representative), VP, Divisional Merchandising Manager | |
| Steinmann | Christopher Steinmann<br>Macy's (Corporate Representative), VP, Divisional Merchandising Manager | DX-0951<br>(Not Played in Hearing) |
| Tao | Rae Tao<br>Kate Spade, Head of Strategy and Chief of Staff | PX5087 |
| Thacker | Susan Thacker<br>Brahmin (Corporate Representative), Chief Executive Officer of Brahmin Leather Works | PX8171 |
| Tichner | Sloan Tichner<br>Steve Madden (Corporate Representative), President of Handbags | DX-0930 |
| Welch | Ken Welch<br>Dillard's (Corporate Representative), Divisional Merchandise Manager, Handbags | DX-0932 |
| Wilmotte | Cedric Wilmotte<br>Michael Kors, Chief Executive Officer | |
| Yang | Suwon Yang<br>Chanel, Inc (Corporate Representative), Head of Merchandising (Leather Goods and Accessories) | |
| Yu | Alice Yu<br>Tapestry, VP, Consumer Insights | |

## DEFENDANTS' PROPOSED FINDINGS OF FACT

## I.    INTRODUCTION

**1.**    As the preliminary injunction hearing made clear, there is no evidence that Tapestry's proposed acquisition of Capri is likely to substantially lessen competition.  Plaintiff failed to show that if Tapestry owns Capri, it could simply decrease quality or increase prices (without also increasing quality and the competitiveness of the Michael Kors brand).  Far from meeting its promise to show that Coach, Kate Spade, and Michael Kors are engaged in "fierce head-to-head competition" for wholesale customers and consumers that would be lost post-merger, Plaintiff merely showed that those brands monitor each other (and multiple other handbag brands) for investor and general benchmarking purposes.  Plaintiff also presented no evidence to support its theory that for many handbag customers, the only choices they have are Michael Kors, Kate Spade, and Coach.  Not a single witness in this case other than Plaintiff's economic expert suggested as much.  Indeed, even Plaintiff's expert was forced to admit that his theory did not comport with reality, in that Michael Kors' recent market share declines have not led to increased sales for Coach and Kate Spade combined.  Instead, the evidence shows that consumers consider—and purchase— handbags offered by hundreds of brands, across a broad spectrum of prices, and materials, all of which will be unaffected by the merger.  The market is just too competitive and dynamic and entry barriers are just too low for the transaction to have any anticompetitive effect.

**2.**    The parties agree that merger analysis is a consumer-centric exercise, meant to assess the options reasonably available to handbag consumers.  PX6000-024 (LS ¶ 45).  And there is no dispute that U.S. handbag consumers are flooded with choices.  There are hundreds of brands selling handbags through every sales channel.  *Id.* at 646:1-11 (Smith); *id.* at 1228:7-12 (Scott Morton); DX-0283-019 (FSM ¶ 45); *id.* at -184, to -186 (FSM App'x Ex. 12); DX-0937; DX-0282 (Giberson App'x C).  Each brand may sell hundreds or even thousands of different models, with

broad price ranges—from $50 to $25,000, for example. ███████████████

████████████████     Hr'g Tr. 966:2-968:18 (Giberson); *id.* at 1264:21-1265:9 (Scott

Morton); DX-0283-079, to -084 (FSM ¶¶ 187-93) (providing empirical evidence of broad prices).

**3.**     With so many options available, handbag sellers consistently report that they are at the

mercy of consumers when it comes to pricing. Both party and non-party witnesses testified that

consumers simply will not pay more for a handbag than the value they perceive in it. *See infra*

FOF ¶¶ 46-49. Even Plaintiff's economist agrees that the merging parties currently "can't raise

price because they're constrained by competition." *Id.* at 569:5-570:4 (Smith).

**4.**     Handbag brands face a hypercompetitive environment of striving to demonstrate value

through product innovation and creative storytelling to try to spark, what the industry calls, "brand

heat." *See* Hr'g Tr. 151:19-152:2 (Idol, Capri) ("It doesn't matter what your price is; if you don't

have exciting product, the consumer will not buy the product."); *id.* at 302:25-303:9 (Crevoiserat,

Tapestry) ("[B]eing a part of a fashion brand goes deeper for a consumer than just a transaction

and a product. It is really creating emotional connections to consumers with the brand and

leveraging those emotional connections to sell more product . . . ."); *id.* at 495:6-496:1 (Kahn,

Coach) ("[W]e sell an emotional product, and making sure that the emotional connection, the

desirability is top and center."); *id.* at 793:1-4 (Levine, Coach) ("We're constantly innovating our

product to make sure that we're moving along with our consumer . . . .").

**5.**     Brand heat is powerful. Brands, small and large, can quickly catch fire and experience

tremendous growth. ███████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████. It is easy to identify another dozen brands that more than doubled their handbag revenues from just 2021 to 2023. *See, e.g.*, DX-0936.

**6.**     Brand heat is also fickle. Brands that lose it can fall out of favor quickly. Michael Kors is one such cautionary tale. After experiencing strong growth from 2003 through 2016, Michael Kors' U.S. handbag sales have been in steady decline since 2018, dropping over $470 million in annual sales through 2023—a decline of almost 30% in the last five years. Hr'g Tr. 1110:3-16 (Edwards, Capri); *id.* at 132:6-133:3 (Idol, Capri). Michael Kors attributes its ongoing decline to an ever-increasing and evolving competitive set across the price spectrum, and to a loss of brand relevance in the consumers' eyes. *Id.* at 134:3-135:1 (Idol, Capri); *id.* at 223:24-226:20, 232:10-236:1, 238:2-239:6 (Newman, Michael Kors); *see also infra* FOF ¶¶ 63-64. Despite repeated efforts, Michael Kors has not been able to course correct—customers have not responded to its attempts to reinvent the brand. *Infra* FOF ¶¶ 65-66.

**7.**     The consequences of losing brand heat with consumers are more dire than merely selling fewer handbags. When consumers lose connection to a brand's products or do not value the brand, the brand must discount to sell its bags, which can cause consumers to view the product and brand as increasingly lower value. Hr'g Tr. 753:9-754:13 (Wilmotte, Michael Kors); *id.* at 162:11-23 (Idol, Capri); *id.* at 1158:23-1159:16 (Gennette); *id.* at 890:24-891:9 (Fraser, Kate Spade). Michael Kors is caught in this vicious cycle. Over the past five years, Michael Kors has raised its handbag list price, or MSRP, but its actual average out-the-door price ("AUR") has fallen steadily.

*See* DX-0934.  Michael Kors' U.S. retail handbag AUR has fallen to roughly $92 (despite an average MSRP of $450) and is falling further.  Hr'g Tr. 1105:15-1108:1 (Edwards, Capri).  About 70% of Michael Kors' retail handbags sold for under $100 in 2023.  DX-0283-084 (FSM Ex. 8).

**8.**     Michael Kors' lost sales are not going to Coach or Kate Spade.  According to Dr. Smith's calculations, from 2022 to 2023, Michael Kors' revenue share declined 16% in a single year in Plaintiff's relevant market, but the combined sales of Coach and Kate Spade stayed essentially constant.  *Id.* at 1372:7-20 (Smith).  Plaintiff (including Dr. Smith) has presented no evidence that Coach or Kate Spade is recapturing Michael Kors' lost sales, and its expert never performed any analysis to show that was occurring.  *Id.* at 629:23-630:7 (Smith).

**9.**     Coach, Kate Spade, and Michael Kors face intense competition for the sale of their handbags from brands that Plaintiff considers "mass market," "accessible luxury," and "luxury."  Companies in each of those categories sell handbags that directly overlap with the pricing of the merging parties' handbags, even if various brands' portfolio-wide *average* prices may differ.  *Infra* FOF ¶ 111.  Moreover, it is undisputed that the very same consumer typically owns multiple handbags across the spectrum of prices and brand positioning.  *Infra* FOF ¶ 116.  Consistent with this, the merging parties' documents show they monitor, study, and discuss competition from handbags sold by brands across the pricing spectrum.  *Infra* FOF ¶¶ 115, 117.

**10.**     Even handbags that sell for higher prices than the merging parties' products when new often end up being resold as used or preowned, at prices similar to Coach, Kate Spade, and Michael Kors products.  Resale is a big business, with a small sample set of only ▮▮▮ resellers generating over $1.18 billion in 2023, DX-0937-001, and one in two survey respondents for Tapestry's FY22 Brand Health Tracker indicating both past and intended purchases of used handbags.  PX1465-035.  Witness after witness testified to the growing competitive significance of resellers, with one

witness observing that the "growth of resale platforms more than double[d] in the last five years." Hr'g Tr. 407:18-408:1 (Harris, Tapestry); *id.* at 135:24-136:2 (Idol, Capri) (resale platforms are "a significant" and increasing source of competition); *id.* at 481:16-482:19 (Kahn, Coach) (resale landscape has "dramatically changed"); *id.* at 979:24-980:14 (Giberson) (resellers "formidable"); *id.* at 1138:5-21 (Gennette) (resale "exploding"); *id.* at 235:14-236:1 (Newman, Michael Kors).

11.     In the face of these industry realities, Plaintiff did not present evidence from a single end-user, wholesale customer, or industry participant stating concerns about Tapestry acquiring Capri. No one has complained, except for Plaintiff.  And no one else has expressed any belief that they will be harmed by this transaction.  Hr'g Tr. 593:7-25 (Smith); *id.* at 1007:18-1008:10 (Giberson).

12.     Nor is any harm to consumers likely.  There is no factual evidence that Tapestry could raise prices post-merger without also increasing consumers' perceived value in Michael Kors' products; nor any evidence that competition from Michael Kors is impacting Coach or Kate Spade pricing today.  *See infra* FOF ¶¶ 166-68.  Tapestry instead intends to build stronger customer connections with the Michael Kors brand, improve quality, and expand sales.  *Infra* FOF ¶¶ 72, 75, 78.

13.     To avoid confronting these industry realities, Plaintiff seeks to define an artificially narrow market that third-party fact witnesses and their ordinary course documents confirm does not exist. Although Plaintiff purports to present two paths to defining this market—one qualitative and one quantitative—it actually follows neither path and instead merely adopts a product market based entirely on brand labels assigned by NPD, a third-party tracking part of the wholesale sector only. NPD's brand labels are not consumer facing—consumers do not even know about them or NPD— and Plaintiff produced no testimony from NPD about how these labels are derived, or whether they reflect consumers' reasonable substitutes.  *See* Hr'g Tr. 1150:7-1158:16 (Gennette); *id.* at 927:1-6 (Steinmann, Macy's); *id.* at 614:24-616:1 (Smith).

14.    Plaintiff also presented no evidence that its qualitative market definition analysis supports its proposed product market based on NPD labels.  In fact, the evidence shows that the "practical indicia" or *Brown Shoe* factors Plaintiff describes (1) do not align with industry realities, most prominently the expansive range of handbag brand and style options available to consumers; and (2) do not show any sharp distinctions along the wide spectrum of available handbags.  Plaintiff's economist conceded that he did not attempt to apply the *Brown Shoe* factors to identify whether any products fall inside or outside of his proposed relevant market.  Hr'g Tr. 612:1-14 (Smith).  Instead, in his words, "[w]hen I define the accessible luxury market, I use the brands that are contained in those two [NPD] categories, bridge and contemporary" and "[s]o at that point, when I'm doing that, I'm not assessing the characteristics of the products."  *Id.* at 612:19-613:6.

15.    Dr. Smith's quantitative hypothetical monopolist test fares no better.  Here, Dr. Smith utilizes a methodology known as an aggregate diversion analysis, which is supposed to identify the amount of sales of one product that would divert to other products if the first product were unavailable, or if its price were increased.  Hr'g Tr. 623:24-624:6 (Smith); *id.* at 1235:15-1236:3 (Scott Morton).  Instead of calculating actual product diversion, however, Dr. Smith simply relied on responses to historical surveys asking what brands consumers "considered" from July 2020 to June 2022 when making a purchase.  As Dr. Fiona Scott Morton, an expert for Defendants, explained, this survey question is "not asking the antitrust question of what is diversion from one bag to another" and, instead, "is a proxy that measures something else entirely."  *Id.* at 1223:10-12, 1236:4-14, 1237:9-13 (Scott Morton).  This, and other errors, led Dr. Smith to perform a hypothetical monopolist test that identifies an artificially narrow market consisting of only Coach, Kate Spade, and Michael Kors.  *Id.* at 1256:11-1257:7.  Recognizing that this result conflicts with

industry realities and is not an "appropriate" market, *id.* at 571:11-23 (Smith), Dr. Smith then pivots to a market defined by NPD's brand labels. *See infra* FOF ¶ 142.

16.    Dr. Smith continued to rely on his erroneous diversion proxies, incorporating them in every one of his quantitative estimates of consumer harm in this case, including his Upward Pricing Pressure analysis and his Merger Simulation analysis. *See infra* FOF ¶ 184.

17.    There is no evidence, other than Dr. Smith's flawed quantitative measures, indicating that there is any likelihood of consumer harm here.

18.    The real-world evidence shows that Coach, Kate Spade, and Michael Kors will continue to be constrained by vigorous competition from an ever expanding and growing number of handbag styles offered by hundreds of brands, including brands that Plaintiff considers "mass market" and "designer," as well as "accessible luxury," just as they are today. *See infra* FOF ¶¶ 114-19.

## II.    THE REALITIES OF THE DYNAMIC U.S. HANDBAG INDUSTRY

### A.    Consumers Have Robust Options For Handbags

19.    U.S. consumers have many thousands of handbag choices from "hundreds of brands." Hr'g Tr. 1228:7-12, 1230:19-1240:6, 1248:7-11 (Scott Morton); *id.* at 521:1-16, 595:22-25, 610:2-4 (Smith); *id.* at 965:16-966:19 (Giberson). These brands sell "a huge range of bags at a wide range of prices." *Id.* at 1264:21-1265:6 (Scott Morton); *id.* at 313:24-315:18 (Crevoiserat, Tapestry); *id.* at 475:2-14 (Kahn, Coach); ███████████████████████

20.    Professor Scott Morton identified no fewer than 1,200 handbag brands selling online and over 940 brands selling through wholesalers throughout the United States. Hr'g Tr. 1230:9-1231:6 (Scott Morton); DX-0283-019 (FSM ¶ 45); *id.* at -172 (FSM App'x Ex. 3); *id.* at -184 to -186 (FSM App'x Ex. 12); DX-0282 (Giberson App'x C). Plaintiff's economist, Dr. Loren Smith, did not even attempt to identify all of the brands selling handbags in the United States. Hr'g Tr. 610:2-9 (Smith) ("I identified many of them, but I did not endeavor to identify all of them.").

21.    It is easy to find handbag options.  Consumers can easily discover and purchase handbags through multiple sales channels.  Readily available online commerce allows consumers to research and easily purchase products from all different price points.  In particular, social media and ecommerce have made it easier to discover brands, learn about trends, and transact for handbags. Hr'g Tr. 1139:17-1140:13 (Gennette); *id.* at 1243:11-1244:12 (Scott Morton); PX5084, at 299:9-300:11 (Rocha-Rinere, Tapestry) ("competition has gotten more intense since 2022," including from brands that seemingly "popped up overnight"); *see also infra* FOF ¶ 28.  As described below, department stores offer thousands of handbags in a variety of silhouettes, materials, sizes, and price points from many different brands.  *See infra* FOF ¶¶ 33, 34.

22.    Because of the broad range of products and price points that each brand offers, it is not particularly informative to look at competitive conditions only at the brand level.  Hr'g Tr. at 1239:13-1240:1, 1264:21-1267:10 (Scott Morton); DX-0283-083 (FSM Ex. 7).  Rather, the competitive conditions between actual products are what matters.  *Id.*  This is also consistent with how consumers shop and how the merging parties price their handbags.  *See infra* FOF ¶ 51.

23.    A large part of bag-to-bag competition centers around design, creative elements, and innovation, not just price.  *See* Hr'g Tr. 1257:12-24 (Scott Morton) ("[A] major dimension of competition here is innovation."); *id.* at 151:19-152:2 (Idol, Capri) ("It doesn't matter what your price is; if you don't have exciting product, the consumer will not buy the product."); █████████ ████████████████████████████████████████ ████████████████████████████████ *see also* Hr'g Tr. 889:13-890:23 (Fraser, Kate Spade); *id.* at 796:15-799:15 (Levine, Coach) (describing Coachtopia initiative and Tabby bag innovation).

24.    Consumers do not limit purchases to only handbags from a single brand or group of brands, and instead cross-shop from many diverse brands.  As Tapestry's CEO Joanne Crevoiserat

testified, consumers "shop up and down the price spectrum," causing Coach and Kate Spade to compete with brands ranging from what Plaintiff labels "mass market" to what it calls "European luxury brands." Hr'g Tr. 324:16-326:2 (Crevoiserat, Tapestry); *see also id.* at 397:15-21 (Harris, Tapestry) ("[I]t's fairly common to see a broad range of brands owned by an individual consumer."); *id.* at 484:2-13 (Kahn, Coach) (testifying he is "100 percent convinced" that Coach is "successfully competing with a Gucci customer who maybe historically would have bought a $2,000 bag"); *id.* at 971:16-972:3 (Giberson); *id.* at 1150:22-1151:7 (Gennette) (testifying that consumers consider the "variety of offerings, both online and in stores[,] when they're thinking about purchasing a handbag"); *id.* at 150:9-21 (Idol, Capri) (testifying that "people are cross-shopping up and down the spectrum"); *id.* at 668:25-669:9 (█████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████ DX-0235-013 (identifying Gucci,

Burberry, Prada, Louis Vuitton, and "value players" as Coach competitors); ███████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████ Even the surveys on which

Dr. Smith relies for his diversion analysis and others show this cross-consideration. *See, e.g.*, PX1465-010; DX-0580, at -166; DX-0753-011, to -012; DX-0754-014.

## B. There Are Low Barriers To Entry And Expansion

25. The U.S. handbag industry is large and is projected to grow. Industry analysts estimate that U.S. handbag sales ranged from $11.7 billion to over $32 billion in 2023. DX-0283-090 (FSM ¶ 208). Dr. Smith reports that handbag industry revenues are projected to grow over 50% by 2030. PX6000-019 (LS ¶ 30); *see also* DX-0927, at 100:7-10 ████████████████████████████

████████████████████████

26. The evidence shows that barriers to entry and growth are low. ███████████████████

████████████████████████████████████████████████

████████████████████████████████████

27. Online handbag sales are estimated to overtake brick-and-mortar handbag sales in the United States by 2025. DX-0283-109 (FSM Ex. 12); Hr'g Tr. 1243:11-1244:23 (Scott Morton).

28. Internet sales, marketing, and social media have made it easier for brands to reach consumers.[1] *See, e.g.*, Hr'g Tr. 1095:25-1097:22 (Kors, Michael Kors) (describing how it is "actually easier now to get a new bag or a new idea out there," in part, because of social media); *id*. at 485:12-486:2 (Kahn, Coach) (explaining that wholesale distribution and magazine advertisements are "not as relevant today as getting a bag on perhaps an important influencer"); DX-0927, at 80:2-14 ████████████████████████████████

████████████████████████████████ Hr'g Tr. 1138:5-17

(Gennette); Hr'g Tr. 1243:23-1244:12 (Scott Morton) (increased online shopping "creates a very

---

[1]    Contrary to Plaintiff's suggestion, not all social media marketing opportunities are "pay to play." Mr. Kors described examples of Madonna, Beyoncé, and Taylor Swift carrying bags of more recent entrants, like Telfar and Aupen, without being paid to do so. Hr'g Tr. 1096:19-1097:22 (Kors, Michael Kors). A representative of ████████████████████████
████████████████████████████████████████████████
████████████████████████  ███████████████████████████
Strathberry recently became popular after Princess Catherine was seen wearing one, undoubtedly without being paid. Hr'g Tr. 989:3-20 (Giberson).

dynamic and vibrant market because there's just so much entry with people with ideas for new

bags"); ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████ DX-0237-001 (noting "Telfar and

Jacquemus have grown in large part due to their celeb constellation power"); PX8168, at 87:2-5

████████████████████████████████████████████████████

████████████████████

29.    It is also easy to turn a handbag design into a physical product.  As Tapestry's Chief Supply

Chain Officer described, "what you really need to get into the business really is a sketch, a brand,

and a design idea, and a business plan, and increasingly, you then connect into one of those

manufacturers in Asia."  Hr'g Tr. 1020:6-1021:15 (Charles, Tapestry).  Handbag factories have

evolved into "full-service manufacturers," which provide product development support to new

entrants and developing brands.  *Id*.; DX0281-093, to -094 (KG ¶ 94).

30.    Large amounts of capacity exist among experienced manufacturers, who routinely work

for multiple brands.   Hr'g Tr. 1021:16-1023:13 (Charles, Tapestry); *id.* at 989:21-990:9

(Giberson).  Both Tapestry and Capri utilize third-party contractors to manufacture handbags on a

purchase-order (i.e., non-long term contract basis); these manufacturers collectively have millions

of units of excess capacity available for use by other handbag brands, regardless of size or

experience.  *Id.* at 1021:1-1022:14 (Charles, Tapestry) (discussing how new entrants can easily

find and hire manufacturers with just a drawing); *id.* at 1022:21-1023:13 (describing available

excess manufacturing capacity); PX7261-015; ████████████████████████████████████

████████████████████████████████████████████

**31.**     Third-party logistics companies make it easy for companies to quickly enter and expand as well. ███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████

**32.**     Handbag brands can reach consumers through many distribution channels, including their own websites, wholesalers' websites, online resale marketplaces, social media platforms, department stores, off-price retailers, handbag brands' physical stores, and more.  *See* DX-0281-037, to -045 (KG ¶¶ 20-21); DX-0283-022, to -026 (FSM ¶¶ 52-61); DX-0284-010 (JG ¶ 13).  The diversity of "retail channels contributes to the competitive nature of the handbag market."  DX-0283-022 (FSM ¶ 52); DX-0284-018 (JG ¶ 23).

**33.**     Department stores are a prominent distribution channel for handbags, selling through broadly dispersed physical stores and e-commerce websites.  *See* DX-0284-035, to -036 (JG ¶¶ 46-48).  For example, in 2023, Macy's had ███████████ in handbag sales across 450 stores and online.  Hr'g Tr. 918:13-18, 922:15, 923:11-25 (Steinmann, Macy's); DX-0928; DX-0951, at 13:18-21 (Steinmann, Macy's).  The same year, ████████████████████████████████████████ ████████████████████   ██████████████████████████████████████ ████████████████████████████████████████.

**34.**     Within their brick-and-mortar locations, department stores also host "shop-in-shops," where a handbag vendor may lease space to display and sell its handbags.  Hr'g Tr. 925:7-12

(Steinmann, Macy's).  Macy's, for example, has shop-in-shops for Louis Vuitton, Gucci, Burberry, Longchamp, and others.  *Id.* at 925:24-926:15.

**35.**    One way that wholesalers seek to stay fresh and competitive is by offering new brands.  *Id.* at 1141:13-1144:5 (Gennette).



Chris Steinmann, testifying on behalf of Macy's, explained that Macy's is always looking to introduce new handbag brands.  Hr'g Tr. 927:14-21, 929:15-24 (Steinmann, Macy's).

**36.**    Wholesalers support new brands by exposing them to millions of consumers, offering logistical support, providing a physical location for consumers to "touch and feel" handbags, and through physical and online sale platforms.  Hr'g Tr. 1143:12-22 (Gennette); *id.* at 928:8-929:3 (Steinmann, Macy's);

**37.**    Another way wholesalers stay competitive is by encouraging brands that do not currently sell handbags to enter through a so-called "line extension."  Hr'g Tr. 1144:6-19 (Gennette). DKNY, Calvin Klein, and Veronica Beard are examples of brands that started in apparel, and then extended into handbags.  *Id.*  Macy's supported DKNY and Calvin Klein in expanding their handbag offerings, *id.*; DX-0284-034 (JG ¶ 43), and Nordstrom and other retailers have partnered with Veronica Beard, Hr'g Tr. 1144:6-19 (Gennette).

38.    With ready access to consumers through online marketplaces and dispersed wholesaler physical locations, it is not necessary for a handbag brand to have its own brick-and-mortar retail locations to enter and grow in the industry. ████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████ Hr'g Tr. 1243:12-1244:22 (Scott Morton).

39.    Consistent with those low barriers, multiple handbag brands have entered and grown rapidly in recent years.  Hr'g Tr. 323:3-11 (Crevoiserat, Tapestry). ████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████ DX-0752-004; Hr'g Tr. 323:12-324:6 (Crevoiserat, Tapestry).[2] ████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████

---

[2]    Plaintiff sought to diminish Lululemon as an active wear company whose breakthrough product was a belt bag.  That does not reduce its competitive significance. ████████████████

████████████████████████████████████████

██████████████████████████████

40.    Numerous pre-existing brands have rapidly expanded in recent years as well.  There are over 20 handbag brands that increased their revenues by over 50% in only the two years from 2021 to 2023; fourteen of those brands more than doubled their revenues during that time.  DX-0936.

41.    Preowned handbags sales are rapidly expanding as well.  Mr. Gennette testified that resale has been "exploding."  Hr'g Tr. 1138:3-17 (Gennette).  Preowned handbags have emerged as a significant competitor to the parties' bags.  *See supra* FOF ¶ 10 (citing sources).  Consumers can purchase preowned handbags through many vendors, including Fashionphile, The RealReal, Vestiaire Collective, eBay, Poshmark, FirstDibs, Craigslist, and Facebook Marketplace.  PX1465-035; DX-0281-040, -068 to -070 (KG ¶¶ 21(e), 58-59); DX-0283-042, to -043 (FSM ¶ 98); DX-0284-035, -036, -039, to -040 (JG ¶¶ 46, 48); DX-0950, at 116:4-16 (Gandhi, Dagne Dover); *see also* DX-0677 (study of handbag sales on eBay).  Sales information from a subset of just ███ handbag resellers shows revenues of over $1.18 billion.  DX-0937.

42.    In response to resale's popularity, department stores have "embraced" it and now sell preowned bags into their brick-and-mortar stores (and online), in some cases directly next to the parties' handbags.  Hr'g Tr. 1138:18-1139:10 (Gennette) (providing examples); *id.* at 481:16-482:19 (Kahn, Coach).  ████████████████████████████████

████████████████████████████████████████
████████████████████████████████████████
██████████████████

43.    The successful growth of many companies has further "encouraged new entry of many new competitors and increased competition from established companies."  ████████████████
████████████████████

44.    Many existing brands are executing on existing large-scale growth plans, which further demonstrates that barriers are low in this industry.  For example, ████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████  ██████████████████████████████

████████████████████████████████████████████

████████████  ████████████████████████  ██████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████  ██████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████

45.    Plaintiff's characterization of the industry as plagued by high barriers to entry and scale is inconsistent with the record evidence of recent, ongoing, and planned growth.[3]

---

[3]    Plaintiff's primary support for its contention of high barriers came from a declaration of Griffin Guez, whose family's company acquired Rebecca Minkoff in February 2022.  Mr. Guez was appointed to his position through family connections approximately 2.5 years ago with no educational or real-world experience with the handbag industry or starting a business.  Hr'g Tr. 688:7-19 (Guez, NorthStar).  He has no first-hand knowledge of Rebecca Minkoff's operations prior to 2022.  *Id.* at 689:4-12.  Despite his lack of experience, with adequate capital from his

### C.    Consumers Set Handbag Prices

**46.**    Given the vast amount of competition and the ease of accessing thousands of substitutable products, consumers can easily discipline handbag prices that they view to be out of line with their perceived value of the product.

**47.**    There are simply too many handbag choices available for consumers to permit a brand to push through undesired price increases.  Hr'g Tr. 320:15-24 (Crevoiserat, Tapestry); *id.* at 488:23-489:10 (Kahn, Coach); *id.* at 1158:17-1160:14 (Gennette); ████████████████████

████████████████████████████████████████████████████

**48.**    Dr. Smith concedes that currently the merging parties "can't raise price because they're constrained by competition."  Hr'g Tr. 569:14-17 (Smith); *id.* at 569:19-20 ("So the testimony about they couldn't raise price without raising quality, I agree with in the current market.").

**49.**    If a brand sets the price of a given handbag too high, it will be forced to discount or lose sales.  Hr'g Tr. 803:9-11, 804:9-19 (Levine, Coach) (providing example); *id.* at 318:7-15, 319:17-320:11 (Crevoiserat, Tapestry); *id.* at 1276:23-1277:15 (Scott Morton); ████████████████

████████████████████████████████████████████████

**50.**    Discounting to maintain sales of overpriced items can create a negative feedback loop that causes consumers to value a brand even less.  *See, e.g.*, PX5079, at 70:4-19 (Bernson, Kate Spade) (describing that discounting can have a "negative effect on brand perception" because customers may not view the products as desirable); Hr'g Tr. at 808:16-809:7 (Levine, Coach) ("If the consumer doesn't see the price value, then we have to discount.  And inherently if a customer sees our Coach product always at a discount . . . it loses brand equity in the mind of the consumer.");

---

family's company, Rebecca Minkoff was able to grow handbag sales ████████████████, and has plans to grow further.  *Id.* at 691:3-692:17.  ████████████████████████

████████████████████████████████████████████████████

*id.* at 154:7-12, 162:10-23 (Idol, Capri) ("you will usually have to reduce the price and or start to discount the product" if you fail to present a compelling value proposition narrative about the product); *id.* at 752:21-754:2 (Wilmotte, Michael Kors) (similar); DX-0869-001 (observing that "US is a disaster" because Capri had been "trying to maintain top line sales with discounting all day long vs refocusing on creating brand heat").

51.    Handbag prices are set at the individual bag level. As all parties agree, handbags are highly differentiated products. Hr'g Tr. 1226:2-24 (Scott Morton); *id.* at 521:1-16 (Smith). Consumers may utilize bags of different styles for different occasions. *See, e.g.*, *id.* at 335:16-336:2 (Crevoiserat, Tapestry); *id.* at 1239:13-22 (Scott Morton). Thus, when considering how to price a bag, that process "really depends on the bag" at issue. *Id.* at 888:19-889:12 (Fraser, Kate Spade).

52.    Multiple examples show that price increases must be associated with increased consumer value or they will fail. For example, ██████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████    █████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████████ And, of course, Michael Kors has experienced decreasing out-the-door AUR prices, dropping to $92 in 2023, despite its average MSRP increasing to $450. DX-0934; Hr'g Tr. 1107:2-19 (Edwards, Capri). Michael Kors' President Accessories and Footwear attributes this decline to a lack of "brand heat and brand desirability." *Id.* at 221:14-222:2 (Newman, Michael Kors); *see also* ████
████████████████████████████████████████████████████████████████████████████

53.     Similar pricing pressures exist in the wholesale channel.  Department stores purchase handbags from vendor brands in bulk at a wholesale price, which is negotiated with the brands and discounted off the MSRP.  Hr'g Tr. 1137:2-10 (Gennette); *id.* at 162:5-9 (Idol, Capri).  Department stores initially offer handbags to consumers at a ticket price set by the department store, which includes a mark-up from the wholesale price.  *Id.* at 1137:2-13 (Gennette).  But because handbags are a "fashion business," department stores must regularly introduce "new trends, new brands," and "new content."  *Id.* at 1137:14-22.  Products that do not "resonate with consumers at the MSRP" or ticket price are frequently discounted by retailers to "a price that consumers will pay," to make space for new inventory.  DX-0284-049 (JG ¶ 68); Hr'g Tr. 1137:14-1138:2 (Gennette).  When a department store discounts, handbag brands—including "luxury" brands—will discount their products in order to be "at market with their own products through their wholesale channels."

████████████████████████████████████████████████████████

████████  To clear inventory, department stores may also sell the handbags to discount retailers, such as TJ Maxx, where the handbags will be further discounted.[4]  DX-0284-053 (JG ¶¶ 71-72).  This dynamic "acts as a mechanism by which consumers exert authority over handbag prices."  *Id.*

54.     There are multiple examples in the record of wholesalers disciplining Michael Kors' prices and sales.  For example, industry expert Jeff Gennette testified that, during his tenure at Macy's, Macy's became too dependent on Michael Kors, and when Michael Kors lost brand relevancy and

---

[4]     Off-price wholesalers like TJ Maxx, and discount shopping websites like Gilt.com, sell handbags at discounted prices.  DX-0284-025, to -029 (JG ¶¶ 32-35).  For example, handbags from so-called "true luxury" brands Balenciaga, Chloe, and others sell for less than $1,000 through Gilt Groupe (Gilt.com), at very steep discounts.  DX-0284-025, to -027 (JG ¶¶ 32-33); DX-0675 (Loewe bags on Gilt.com).  ████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████

brand heat, it resulted in "a lot of markdowns."  Hr'g Tr. 1147:6-20 (Gennette).  This caused a "bad spiral" for both Michael Kors and Macy's and negatively impacted both brands.  *Id.*  Dillard's responded to Michael Kors' loss of brand heat by cutting back its distribution of Michael Kors and bringing in "new brands, new ideas, private label, et cetera," including Kurt Geiger, Hammitt, and What Goes Around Comes Around, its vintage resale brand.  *Id.* at 1148:5-15.

55.    If consumers are unsatisfied with new handbag prices and options, they can and increasingly do, also turn to preowned handbags.  *See supra* FOF ¶ 10.

56.    Ultimately, because handbags are a discretionary purchase, consumers can also respond to undesired price increases by electing not to purchase or delay a purchase until prices are reduced or discounted.  Hr'g Tr. 320:15-24 (Crevoiserat, Tapestry); *id.* at 1159:17-1160:5 (Gennette); *id.* at 480:25-481:15 (Kahn, Coach) ("[W]e're competing for share of wallet.  The consumer has lots of choices.  They make choices every day.  Do they buy a handbag, do they buy a piece of ready to wear?  Do they buy a piece of ready to wear, do they go out to dinner?"); *see also* DX-0283-043, to -045 (FSM ¶¶ 99-103).

### D. Industry Experts Agree That Consumers Will Remain Protected By Intense Competition

57.    The Court heard testimony from two industry experts who each described, based on their decades of experience and review of the evidentiary record, certain commercial realities in the handbag industry that render harm to consumers improbable.  Their testimony was reliable and useful for evaluating the likely competitive effects of the Proposed Transaction.

58.    Karen Giberson is an expert in the handbag industry.  Hr'g Tr. 954:19-959:15 (Giberson).  She has been involved in the industry for more than 30 years, including as the President and CEO of the Accessories Council, a trade association with 367 corporate members, including handbag brands, retailers, resellers, and manufacturers, and as the Editor-in-Chief of the Ac Magazine,

which publishes articles about the handbag industry. *Id.* at 954:19-955:19, 957:9-23, 958:19-25. She consults with handbag industry members daily, has personally worked with hundreds of handbag brands to help them start and grow their businesses, and has published hundreds of articles for Ac Magazine. *Id.* at 956:1-956:14, 957:13-958:4. In addition, Ms. Giberson has visited hundreds of handbag factories all over the world and personally witnessed handbags being made from start to finish. *Id.* at 958:5-958:18. Based on her experience and review of the evidentiary record, Ms. Giberson opined that the handbag industry is dynamic, constantly changing, and characterized by frequent brand revitalization, new entry, and expansion. *Id.* at 988:2-7; DX-0281-127, to -128 (KG Ex. 4) (collecting examples of entry, expansion, and collaborations reported in just one industry publication in the last 12 months). Ms. Giberson opined that there is ample manufacturing capacity available for companies to grow at scale to meet consumers' needs. Hr'g Tr. 989:21-990:9 (Giberson). And Ms. Giberson opined that consumers will still have many handbag choices if Tapestry is permitted to purchase Capri. *Id.* at 990:10-13.

**59.** Jeff Gennette is a handbag industry expert with over 40 years of experience in fashion retail. He is the former CEO and Chairman of Macy's Inc., which includes Macy's, Bloomingdale's, and beauty retailer BlueMercury. *Id.* at 1132:6-20 (Gennette). He served as Chief Merchant for Macy's from 2009 to 2014, after which he became President, CEO, and Chairman of Macy's Inc., successively. *Id.*

**60.** Based on his experience and review of the evidentiary record, Mr. Gennette opined that the competition across handbag distribution channels is increasingly intense, *id.* at 1136:9-1141:12, that multi-brand retailers are incentivized to foster handbag competition and to prevent any one company from being dominant, and that they are able to bring fresh offerings to consumers by introducing new brands, encouraging line extensions by existing brands, and offering private label

brands, *id.* at 1141:13-1148:15.  Mr. Gennette opined that handbag brands cannot simply impose a price increase without adding value because consumers will push back against price increases. *Id.* at 1158:17-1162:14.  He also believes that wholesalers would likewise push back against brands raising prices without increasing value because that would lead to decreased sales, increased markdowns, and reduced profits.  *Id.* at 1160:15-1162:14.

## III.  TAPESTRY WILL REVITALIZE THE CAPRI BRANDS, INCLUDING MICHAEL KORS

### A.  Michael Kors Is An Iconic Brand That Has Lost Relevance And Brand Heat

**61.**  Michael Kors is a designer-led luxury fashion brand founded in New York City in 1981. *Id.* at 1066:25-1067:1, 1084:13-1086:7 (Kors, Michael Kors).

**62.**  Michael Kors experienced strong growth between 2003 and 2016, growing its annual revenues across all products from roughly $17 million to roughly $4.7 billion.  *Id.* at 130:9-131:14 (Idol, Capri).  This growth resulted, in part, from Michael Kors' success at taking market share from European luxury companies.  *Id.* at 130:25-131:3.

**63.**  But since 2016, Michael Kors' sales have declined by over $1 billion, to roughly $3.5 billion in 2023 across all product lines.  *Id.* at 132:18-132:21 (Idol, Capri).  The decline of U.S. handbag sales has played a central role in the brand's diminishing performance, slipping by over $470 million from roughly $1.65 billion in 2018 to under $1.2 billion in 2023.  *Id.* at 1110:3-1110:13 (Edwards, Capri).  An almost 30% decline in only five years.  *Id.* at 1110:14-1110:16. Even Dr. Smith testified that Michael Kors' market share decreased by 16% from 2022 to 2023. *Id.* at 1372:7-20 (Smith).  In light of this, Capri's Chief Financial Officer Tom Edwards rejected Dr. Smith's contention that Michael Kors' revenues are "stable," and explained that even Capri's recent financial results have continued to be "very disappointing," with "several quarters of disappointing results."  *Id.* at 1110:3-1111:4 (Edwards, Capri).

64.     Michael Kors performance has declined, in part, because its products have lost resonance with consumers.  Michael Kors has "lost brand relevance with the consumer," including because its "storytelling is not as relevant as it was when [Michael Kors] first started the company," and because the brand has not been getting the "fashion trends right."  *Id.* at 134:3-135:1 (Idol, Capri). For example, in April 2023, Michael Kors observed sales declines across the board after the release of a new marketing campaign that Philippa Newman concluded simply did not resonate with consumers.  *Id.* at 225:23-226:20 (Newman, Michael Kors); DX-0864-002 to -003 ("I don't think she relates to our marketing"; "It's like she got turned off"); *see* Hr'g Tr. 1100:7-1100:13 (Kors, Michael Kors).

65.     Michael Kors has attempted to revitalize its brand image for years, but has been unable to do so, and its efforts have stagnated.  *Id.* at 133:4-134:2 (Idol, Capri); *id.* at 225:11-16 (Newman, Michael Kors).  Despite these efforts to reinvent the brand, customers have simply not responded. *Id.* at 224:22-225:16 (Newman, Michael Kors); DX-0864-001, to -003.

66.     The example of the Michael Kors Parker bag is illustrative.  Michael Kors designed the Parker bag as part of a recent revitalization effort.  The brand "tried to put more quality into [] the leathers and the hardware," and offered the bag in multiple sizes.  Hr'g Tr. 158:3-14 (Idol, Capri). Despite those efforts, because the "customer was not perceiving the storytelling and the brand value connecting and the price point that [Michael Kors] was putting on that Parker product," the bag had to be discontinued.  *Id.* at 157:21-158:22 (Idol, Capri); *id.* at 214:3-10, 223:12-23 (Newman, Michael Kors); DX-0859-001; PX2294-004, to -006 ("[W]e are giving her a Rolls [R]oyce and it's not working.").

67.     Plaintiff has emphasized that Michael Kors is attempting to revitalize itself organically again.  But witnesses from Michael Kors have stated that those efforts have not been successful,

Hr'g Tr. 133:4-134:2 (Idol, Capri), and the initiative is "challenge[d]," *id.* at 229:3-14 (Newman, Michael Kors). For example, the first bag launched as part of Michael Kors' recent revitalization effort—the Lulu—failed and is being discontinued. *Id.* Michael Kors recently cancelled a company-wide town hall meeting because there are no "positive updates or progress on the transformation to communicate." *Id.* at 1330:3-23 (Parsons, Michael Kors). The CEO of Michael Kors testified that recent efforts are "stalling in many of the initiatives that [Michael Kors] wanted to push forward" and "it's not going where it should be going at this stage." *Id.* at 766:15-770:8 (Wilmotte, Michael Kors). Michael Kors' continued financial decline has caused cutbacks or outright pauses on prospective brand revitalization efforts, including in-store revitalizations that Michael Kors "cannot afford" and "drastically" reducing marketing expenses. *Id.* at 767:20-769:7.

**68.**    As a result of Michael Kors' "extremely disappointing" financial performance recently, Michael Kors has decided to "slow down, stop, or just cancel" some of its transformation plans. *Id.* at 769:9-770:8; *see also id.* at 1329:11-1331:10 (Parsons, Capri). Michael Kors' CEO, Chief Creative Officer, and VP of Strategy and Transformation all believe the current brand transformation effort is not on track, unrelated to the Proposed Transaction. *Id.* at 1100:7-22 (Kors, Michael Kors); *id.* at 770:3-8 (Wilmotte, Michael Kors); *id.* at 1130:19-1131:2 (Edwards, Capri); *id.* at 1329:11-14 (Parsons, Michael Kors).

### B.    Tapestry Has The Incentive And Ability To Turn Michael Kors Around

**69.**    Tapestry is a New York-based house of accessories and lifestyle brands. PX7105-005. Tapestry has its origins in the Coach brand, which was founded in 1941. *Id.* During fiscal year 2015, Coach acquired the Stuart Weitzman brand, a footwear company. *Id.* During fiscal year 2018, Coach acquired the Kate Spade brand, a lifestyle accessories and ready-to-wear company. PX7015-005. Later in fiscal year 2018, Coach changed its name to Tapestry, Inc. *Id.* Tapestry provides a platform that will help iconic brands move at the speed of the consumer by enabling

brands to connect to consumers in a modern, relevant way.  Hr'g Tr. 303:21-304:4 (Crevoiserat, Tapestry).

70.  Coach is an 80-year brand started by immigrants on the Upper West Side of New York City, who made small leather goods for men inspired by leather from American baseball gloves. *Id.* at 473:17-474:6 (Kahn, Coach).  Today, Coach is headquartered in Hudson Yards in New York City and operates its flagship store called "Coach House" on Fifth Avenue and 54th Street in New York City.  *Id.* at 474:7-11.  The brand sells accessories, ready-to-wear, footwear, soft leather goods, and perfume, among other product categories.  *Id.* at 474:12-16.  Coach positions itself as inspired by the "vision of Expressive Luxury" and the "inclusive and courageous spirit" of New York, making "beautiful things, crafted to last – for you to be yourself in."  PX7105-006.

71.  Kate Spade is a global lifestyle brand founded in 1993 that is "known for color," "very feminine," and with "a very sort of whimsical approach, like a sense of humor."  Hr'g Tr. 883:7-12 (Fraser, Kate Spade)  The brand sells handbags, as well as ready-to-wear, footwear, and jewelry, and also has a licensing business for additional product categories such as pet accessories, fragrances, and watches.  *Id.* at 882:20-883:3.

72.  Tapestry's CEO testified that Tapestry has capabilities it can leverage to facilitate Michael Kors' effort to "bring more relevance and vibrancy" back to the brand, with the goal being to "put more handbags and product generally in the hands of more customers globally."  *Id.* at 317:6-18 (Crevoiserat, Tapestry).  Capri similarly believes that Tapestry's past success facilitating Coach's revitalization, its investment in brand-supporting infrastructure and consumer-facing technology, data, and analytics, and its financial strength would position Michael Kors to succeed in its brand transformation as a part of Tapestry.  *See id.* at 770:9-23 (Wilmotte, Michael Kors).

73.    Tapestry entered into a definitive agreement on August 10, 2023, to acquire all of Capri—not just Michael Kors.  PX7175-001.

74.    Tapestry intends to unlock unrealized value in all three Capri brands:  Michael Kors, Jimmy Choo, and Versace.  Hr'g Tr. 305:3-20 (Crevoiserat, Tapestry).  Michael Kors' brand image, differentiated from Coach's and Kate Spade's unique images, supports the opportunity in the handbag sector.  *Id.* at 309:4-20 ("The deal simply wouldn't pencil if all brands couldn't grow.").

75.    Tapestry has built a "modern consumer engagement platform" to power its portfolio of fashion brands.  *Id.* at 302:9-15.  Tapestry intends to leverage its "rich consumer insight work," "technology backbone and digital architecture," as well as its supply chain innovation and strong talent base to help the Capri brands.  *Id.* at 306:07-308:11; DD-TPR-01.  Tapestry sees opportunity to use this platform to help Jimmy Choo, Michael Kors, and Versace grow sales across the world.  *Id.* at 308:13-16.  Tapestry plans to grow each of the brands and "inject more relevancy, more vibrancy into the Capri brands, improve execution, leverage our capabilities and really take what would then be a portfolio of six iconic brands and bring them to more customers, put more product in the hands of more customers globally."  *Id.* at 308:13-309:2; PX1041-009.

76.    Tapestry's acquisition of Capri will also unlock growth opportunities that benefit consumers because of the range of products that each brand sells.  Across the three brands, Capri offers a greater proportion of ready-to-wear and footwear than Tapestry's three brands.  PX7175-003; PX1041-008.  The acquisition will help Tapestry's brands build on Capri's expertise in these categories to broaden Tapestry's own non-handbag product offerings.  PX7175-003.

77.    Geographic complementarity will also enable Tapestry and Capri brands to grow post-Transaction.  Hr'g Tr. 311:13-312:8 (Crevoiserat, Tapestry) ("Our businesses are actually quite complementary from a number of different angles, but particularly as we look at the global

footprint of each of our businesses. . . .  We think that presents an opportunity in the future to help their brands grow and penetrate further into those markets.").  Tapestry highlighted this geographic complementarity in its presentation to its Board of Directors while evaluating the proposed transaction with Capri, as well as in its public announcement of the transaction.  PX1041-09; PX7175-003. The complementary nature of the emotional territories of Capri's brands will also help Tapestry unlock greater value and growth post-acquisition.  Capri's brands feature "glamour, trend, and the jetset lifestyle in the brand iconography across all three brands" while "Coach targets a timeless and classic demand space, while Kate Spade features joyfulness and youthfulness as part of the focus on the Enthusiast."  PX1041-011; Hr'g Tr. 312:9-23 (Crevoiserat, Tapestry).

**78.** Tapestry's differentiated supply chain will also enable the improvement of the physical quality of Michael Kors' handbags.  Specifically, Tapestry's Chief Supply Chain Officer explained how Tapestry's manufacturing supply base can elevate Michael Kors product standards by applying rigorous quality standards and implementing manufacturing procedures that Tapestry has in place with suppliers.  *Id.* at 1031:3-17 (Charles, Tapestry).

**79.** Finally, the acquisition will realize significant cost synergies.  Tapestry projects more than $200 million in operational cost savings and supply chain efficiencies within three fiscal years.  PX1041-015; PX7175-004; PX5085, at 113:11-17, 134:23-136:4 (Roe, Tapestry).

**80.** Ultimately, the end result for consumers will be more relevant Michael Kors products for more consumers globally at desirable prices.  Hr'g Tr. 345:17-346:8 (Crevoiserat, Tapestry).

IV.   **PLAINTIFF   FAILED   TO   ADEQUATELY   DEMONSTRATE   THAT "ACCESSIBLE LUXURY" HANDBAGS ARE A RELEVANT PRODUCT MARKET**

   A.   **The *Brown Shoe* Factors Do Not Define A Market Of Accessible Luxury Handbags**

81.   As described below, while Plaintiff nominally describes some of the *Brown Shoe* factors, it does not apply those factors to define a relevant product market in this case.  Plaintiff has not analyzed how each factor applies to the brands included and excluded from FTC's relevant market. When pressed, Dr. Smith conceded that he performed no such analysis, adding, "I don't think it would affect my opinions to do so." *Id.* at 612:1-14 (Smith).

82.   The factors that Plaintiff does identify are also incapable of objective application in this case.  As Dr. Smith acknowledged, "not all handbags that are in [his] market would exhibit all those features, and not all handbags that are out of [his] market would exhibit none of those features." *Id.* at 611:12-15.  Plaintiff's use of the *Brown Shoe* factors is so unilluminating that Dr. Smith admitted he could not definitively say whether a product was an "accessible luxury handbag" or not, even if he knew the price of the bag, what it was made of, where it was assembled, and which brands its manufacturer believed it competed with.  *Id.* at 605:8-19, 606:16-607:5.  He further admitted that none of the supposed distinctions he asserts is "sharp." *Id.* at 603:22-604:3.

83.   Part of the difficulty in applying *Brown Shoe* factors to FTC's alleged market arises from Plaintiff's attempt to define its market around *brands*, rather than the actual *products* the brands sell.  *See id.* at 605:16-19.  This is problematic because, as described below, one brand may sell a wide range of handbags resulting in inconsistent categorizations under *Brown Shoe*.  For example,

although a high-end brand like ████████████████████████████████████
████████████████████████████████████████████████████.[5]

**84.**    Plaintiff's failure to apply the *Brown Shoe* factors to actual handbag products, combined with the lack of factual support for the artificial lines Plaintiff seeks to draw, defeats Plaintiff's attempt to qualitatively define a market of "accessible luxury" handbag brands.

### 1.    There Is No Separate Industry Or Public Recognition

**85.**    Plaintiff failed to present any evidence that the public recognizes "accessible luxury" handbags as a separate relevant market.

**86.**    Although references to "accessible luxury" or "affordable luxury" appear in the documentary record, there is no common definition of what those words mean even among industry participants. *See, e.g.*, Hr'g Tr. 337:13-18 (Crevoiserat, Tapestry) ("I don't think anybody can agree on what it even means."); *id.* at 415:16-25 (Harris, Tapestry) (testifying that there is no "commonly understood definition of 'accessible luxury handbags'"); *id.* at 765:15-766:9 (Wilmotte, Michael Kors) (describing the term "affordable" luxury that is both outdated and "extremely subjective"); ██████████████████████████████████████████
████████████████████████████████████████ Hr'g Tr. 1150:13-1151:7 (Gennette) (term "accessible luxury" has no clear definition); *id.* at 970:4-16 (Giberson) (accessible luxury is "not a common term" and is "not well defined" and "fuzzy"); *id.* at 880:20-22 (Fraser, Kate Spade) ("such a subjective term"); ██████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

---

[5]    As noted in the footnotes to this summary of Third-Party Handbag Brand Sales By Year, ██████████████████████████████████████████████████.

██████████████████████████████████████████████

██████████████████████████████████████████████

87.    The terms "accessible" or "affordable" luxury are not typically used in product marketing and there is no evidence that consumers understand what they mean.  Hr'g Tr. 416:8-19 (Harris, Tapestry); DX-0281-046, to -047 (KG ¶¶ 25-28).  After searching the record, Plaintiff's expert could not identify "any evidence" that Coach, Kate Spade, Michael Kors, or any other handbag brand has "market[ed] its handbags to consumers as accessible luxury handbags."  *Id.* at 591:1-592:6 (Smith); *see also id.* at 600:22-601:15; *id.* at 794:5-13 (Levine, Coach) ("It is not a consumer-facing term."); *id.* at 880:10-881:4, 881:12-18 (Fraser, Kate Spade) (testifying that Kate Spade and others do not market themselves to consumers as "accessible luxury"); *id.* at 498:23-499:11 (Kahn, Coach) ("We don't use the term 'accessible luxury' in consumer-facing material."); *id.* at 145:5-145:19 (Idol, Capri) (testifying that Michael Kors does not use the term accessible luxury with consumers because they "don't shop that way").

88.    Wholesalers do not use the term "accessible luxury" with consumers either.  *Id.* at 794:14-25 (Levine, Coach); *id.* at 926:16-20 (Steinmann, Macy's).

89.    The evidence also does not support that "accessible luxury," however defined, describes a distinct set of handbag competitors.  *See, e.g.*, *id.* at 337:10-18 (Crevoiserat, Tapestry) ("[I]t would be a very poor way to define a competitor."); *id.* at 794:11-13 (Levine, Coach) ("accessible luxury" does not define a "competitive set"); *id.* at 498:15-22 (Kahn, Coach) (similar).

90.    In his hearing testimony, Dr. Smith presented a demonstrative with four images from third-party documents to support for his view that the industry recognizes accessible luxury handbags as a distinct market.  *See id.* at 537:14-539:15 (Smith).  But each of those documents refers to brands Plaintiff considers outside the market, alongside brands Plaintiff considers inside the

market.  *See* PX3202-006 (listing "luxury" brands alongside so-called "accessible luxury" brands); *see also* ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████[6]

91.    The evidence shows that "accessible luxury" is a generalized concept rather than a separate relevant market.  The term originated and is commonly used in investor communications.  Hr'g Tr. 438:1-6 (Kahn, Coach) (Coach coined the term accessible luxury when the company went public); *id.* at 336:3-25 (Crevoiserat, Tapestry) (testifying that she primarily uses the term accessible luxury with investors to convey how Tapestry competes within a broader market against brands like Trader Joe's, Lululemon, Hermès, Chanel, and everything in between, by delivering incredible value); *see also* PX7105-015 (Tapestry 2023 10-K); PX7104-014 (Tapestry 2022 10-K).  Similarly, Capri's CEO uses the term accessible luxury with investors to communicate its positioning inside the overall handbag market.  Hr'g Tr. 144:20-145:4 (Idol, Capri).  Consistent with this, Capri's CEO told an analyst in 2021 that Capri does not really view what "you refer to it as the accessible luxury market or whatnot, as dramatically different from the luxury market" because Capri sees "consumers cross-shopping with what you would consider the more pure-play luxury brands and us as well."  *Id.* at 149:3-150:10.  More recently, as Coach's understanding of

---

[6]    Plaintiff produced no fact testimony about the meaning or interpretation of documents from ███████████████, which weakens any FTC reliance on them.  *See* Hr'g Tr. 582:19-25.  Attached hereto as **Appendix A** is a list of exhibits that Plaintiff admitted at the hearing without any substantive fact-witness testimony.

how it delivers value in the broad handbag industry has evolved, it has moved to the concept of "expressive luxury" in investor and internal communications. *Id*. at 497:9-498:14 (Kahn, Coach).

### 2. Handbag Characteristics And Uses Are Not Peculiar

**92.** As Plaintiff's expert concedes, there is no peculiar characteristic or use of a handbag that differentiates "accessible luxury" handbags from "mass market" or "luxury" handbags. *Id.* at 605:2-7 (Smith) (identifying "no particular characteristic of a handbag that is determinative of whether that product falls within the market of accessible luxury handbags or not").

**93.** Plaintiff has not identified any functional differences between handbags at different price points, and the evidence does not support the existence of any such functional differences. *See id.* at 608:13-609:6 (Smith). Plaintiff's expert agrees that an "accessible luxury" handbag is functionally interchangeable with a handbag from a brand that he considers to be "luxury" or "mass market." *Id.* at 608:13-609:2 ("There's no record evidence I'm relying on for that, that luxury handbags and accessible luxury handbags are not functional substitutes."); *id.* at 609:22-610:1 ("Q. Do you agree that a handbag that you consider to be an accessible luxury handbag could be used for the same purchase as a handbag that you consider to be a mass market handbag, correct, sir? A. Correct."); *see also id.* at 1094:19-1095:1 (Kors, Michael Kors) (describing that a $150 bag from Michael Michael Kors and a $1,500 bag from Michael Kors Collection have the "same functionality"); *id*. at 468:15-21 (Kahn, Coach) ("It's emotional and it's desirable and people can carry their stuff in a Trader Joe's bag or a $25,000 handbag").

**94.** Plaintiff's arguments on handbag material quality are also illusory and unsubstantiated. There is no evidence from any expert or fact witness identifying objective quality differences between handbag materials. Nor is such evidence possible because, as multiple witnesses testified, a handbag's perceived quality is largely subjective. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████"

███████████████████████████████; Hr'g Tr. 1098:17-25 (Kors, Michael Kors) ("[D]esigner, again, it's very subjective to the person, but when you buy something that's designed and thoughtfully designed, it's designer."); *id.* at 483:10-18 (Kahn, Coach) ("Our quality, our hand, that needle that I referred to is as good as any traditional European luxury brand."); ███████

████████████████████████████████████████████████

████████████ Hr'g Tr. 973:15-18, 974:13-23 (Giberson) (so-called European Luxury brands such as Burberry, Chloé and Prada do not have superior craftsmanship than a brand like Coach).

**95.**    So-called "luxury" brands do not limit their production to only the "finest quality" leather—however that might be defined.  Instead, the evidence shows myriad examples of "luxury" brands using manmade materials, including fabric, coated canvas, nylon, and others.  *See id.* at 973:19-24, 974:5-8 (describing Prada's popular nylon bags and Louis Vuitton's popular coated canvas Neverfull); ██████████████████████████████████████

████████████████████████████████████████████ Similarly, "accessible luxury" brands utilize many materials including "anything from cotton to denim, to PVC, to suede, to leather, to cactus leather, grape skin leather, metal, nylon … neoprene, the list goes on and on."  Hr'g Tr. at 1091:13-15 (Kors, Michael Kors); *see also id.* at 883:19-23 (Fraser, Kate Spade); DX-0661; DX-0664.  While Michael Kors has used every one of those materials, its creative director (Michael Kors himself) does not believe that any one of them is "more luxurious than another."  Hr'g Tr. at 1091:2-22 (Kors, Michael Kors).[7]

---

[7]    Plaintiff at times tried to argue that "mass market" products are different by relying on a regulatory filing that the merging parties made to antitrust authorities in China.  *See, e.g.*, Hr'g Tr. 98:12-100:18 (Idol, Capri).  Handbag products, prices, and consumer demand are different in China and the United States.  Plaintiff conceded as much when arguing that the relevant geographic market in this case is the United States, based on differences in market conditions in the United States and elsewhere.  *See, e.g.*, *id.* at 533:6-534:1, 643:20-644:11 (Smith).  The Chinese

96.    Plaintiff appears to be relying upon marketing claims to try to show distinct product characteristics for "accessible luxury" handbags.  But, as Ms. Giberson and ▇▇▇▇▇▇ testified, handbag origin labelling "isn't always clear because many factories will make portions of their bags in other countries and then possibly finish them in Italy" due to different regulations.  *Id.* at 976:10-25 (Giberson); ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇  And marketing claims of fine quality and handmade bags are not limited to so-called luxury brands.  *See, e.g.*, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

97.    To the extent Plaintiff relies on Tapestry's characterization of its supply chain as "balancing lower cost with quality well made product," Plaintiff has failed to show that this can be generalized across any purported accessible luxury market.  PX1704-001.  Tapestry's Chief Supply Chain Officer testified that Tapestry's supply chain produces higher quality products than brands that Plaintiff considers "accessible luxury."  Hr'g Tr. 1016:24-1017:3, 1027:8-1030:21 (Charles, Tapestry) (testifying that Tapestry sources 40% of its leather from Italy and manages its supply chain to achieve high levels of craftmanship comparable to European luxury).

### 3.    Handbag Production Facilities Are Not Unique

98.    Plaintiff has not shown that so-called "accessible luxury" handbags have unique production facilities.  Manufacturing occurs on a contract or purchase-order basis, meaning manufacturing capacity is readily available for anyone's use.  *Id.* at 1022:4-14 (Charles, Tapestry); ▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇  Tapestry, for example, does not have exclusive contracting

---

regulatory filing is discussing conditions "[f]rom the perspective of consumers" in China, not U.S. consumers.  PX2061-002.  Moreover, Tapestry conducts separate consumer surveys for China and the United States because of the different consumer context and the macroeconomic environments.  Hr'g Tr. 398:23-399:6 (Harris, Tapestry).

arrangements with any of its manufacturers.  Hr'g Tr. 1022:4-14 (Charles, Tapestry).  There is no evidence in the record of any other exclusive manufacturing relationships.

99.    Tapestry's Chief Supply Chain Officer Peter Charles and industry expert Karen Giberson testified on handbag manufacturing.  Both witnesses have decades of first-hand experience with handbag supply chains and manufacturing facilities.  *Id.* at 1009:14-1011:8; *id.* at 958:19-25 (Giberson).  Both testified that "[t]he fundamental process of manufacturing bags is the same, whether you're making private-label product for Target for mass market or whether you're producing European luxury product or anything in between."  *Id.* at 1025:19-22 (Charles, Tapestry); *id.* at 975:5-976:25 (Giberson).  Virtually all handbags—"it doesn't matter what the price point is"—are constructed using a similar process.[8]  *Id.* at 975:11-976:25 (Giberson); *see also id.* at 1092:19-1093:3 (Kors, Michael Kors) (rejecting the idea that Italian manufacturers are superior as one can "find great craftsmen to manufacture a handbag anywhere in the world").[9]  The location of manufacturing does not determine a handbag's quality.  Hr'g Tr. 1016:10-12, 1018:24-1020:3 (Charles, Tapestry).

100.    The fact that brands Plaintiff considers to be "accessible luxury" utilize factories all over the world proves that there are no unique production facilities for accessible luxury handbags.  ██ ██ manufactures handbags in China, Indonesia, Italy, and Vietnam, but does not consider its

---

[8]    Dr. Smith testified that he believes "mass market" handbags utilize a more machine-heavy process.  Hr'g Tr. 543:18-544:4 (Smith).  Dr. Smith, however, has no expertise in handbags and handbag manufacturing or sourcing.  *Id.* at 585:5-20.  Ms. Giberson, an expert in handbag manufacturing and sourcing, found Dr. Smith's "machine-heavy" claim "ridiculous."  *Id.* at 975:11-976:9 (Giberson).  Ms. Giberson explained that, even for a so-called mass market handbag like a Karl Lagerfeld bag, "50 people could have their hand on this bag from the beginning until the end," and it "would be impossible" to make this bag with the a push of a button.  *Id.*

[9]    Plaintiff has pointed to one document prepared by consulting firm BCG to support its argument that "accessible luxury" brands have a distinct supply chain approach from "true luxury" brands.  PX1327.  This document was not created at the direction of Tapestry – it was a sales pitch that BCG provided "fishing for business[.]"  Hr'g Tr. 1043:2-12 (Charles, Tapestry).

handbags made in China to be lower quality than its handbags made in Italy.  ████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

manufactures in China and Vietnam, and does not "view any quality difference between the

handbags." ███████████████████████████████ manufactures in China

and does not believe that manufacturing location makes its handbags lower quality than if

manufactured in Europe. ████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████

**101.**    The evidence makes clear that the facilities used by "accessible luxury" brands can, and

often do, manufacture bags sold at higher price points.  Ms. Giberson has visited factories all over

the world and personally "seen the same factories making bags that are entry-level price point," as

well as "designer-level bags."  Hr'g Tr. 975:5-10 (Giberson); *see also id.* 976: 10-20.  █████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████ Tapestry's Chief Supply Chain Officer testified that brands

like Balenciaga, Prada, and Alexander Wang manufacture handbags in the same factories as

Tapestry in Southeast Asia.  Hr'g Tr. 1018:24-1019:5 (Charles, Tapestry).

**102.**    The same is true for FTC's "mass market" brands.  Brands like Calvin Klein, Tommy

Hilfiger, Fossil, Kipling, Lululemon, and Guess manufacture in the same factories as Tapestry in

Southeast Asia.  *Id.* at 1018:2-23; *see also* █████████████████████████

████████████████████████████████████████

103.    Because handbags across the price spectrum are produced all over the world absent any quality differences, department stores do not advertise or identify handbags based on their manufacturing location. ████████████████████████

████████████████████████████████████████████

██████████████████████████████

### 4.    Handbag Customers Are Not Distinct

104.    There is no distinct set of customers that uniquely purchases "accessible luxury" handbags. Dr. Smith did not identify any "distinct subset of consumers whose only handbag purchases are those of the brands [that he] considers to be accessible luxury brands." Hr'g Tr. 607:21-25 (Smith). He also agreed that "some women have different styles and brands of handbags in their closets." Hr'g Tr. 607:6-12 (Smith); *see also id.* at 1150:22-24 (Gennette) (stating that there is not a "distinct accessible luxury customer for handbags").

105.    The evidence makes clear the same consumers purchase handbags that Plaintiff considers "mass market," "accessible luxury," and "luxury." Tapestry's consumer ethnography research shows that it is "fairly common to see a broad range of brands owned by an individual consumer." Hr'g Tr. 396:17-397:21 (Harris, Tapestry). Third-party surveys show consumers purchasing across a broad spectrum of brands, such as a survey of ████████████ customers showing they also "typically buy handbags" from Coach, Tory Burch, Marc Jacobs, Kate Spade, Louis Vuitton, Gucci, Yves Saint Laurent, Zara, Madewell, and others. ████████████ PX5080, at 320:11-322:5 (Bozeman, Michael Kors) ("[O]ur highest cross-shop likelihood is with Gucci, a brand that has a very similar emotional projection as we do, fashion, glitz and glam, not an understated style"). A ████████████ survey shows its customers' top "cross purchased" handbag brands as Chanel, Gucci, Louis Vuitton, Calvin Klein, Coach, and Michael Kors. ████████████

**106.**    Party and non-party witnesses testified to this cross shopping.  *See, e.g.*, Hr'g Tr. 150:9-151:1 (Idol, Capri) (explaining that "people are cross-shopping up and down the spectrum"); *id.* at 403:9-13 (Harris, Tapestry) (similar); ███████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████

**107.**    Plaintiff alleges a "distinct" set of accessible luxury customers based on household income below $75,000, but the evidence does not support that.  The very survey (from June 2022) that Plaintiff has relied on shows that substantial portions of customers of brands such as Louis Vuitton and Gucci have household income under $75,000.  PX1465-009.  Other brands Plaintiff labels "accessible luxury" show no clear customer divisions based on income.  ███████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████

**108.**    No witness testified that income is a determinative factor in the handbag brand that a consumer purchases.  Rather, several witnesses testified that income is not a good predictor of consumer purchase behavior.  *See, e.g.*, Hr'g Tr. 476:3-9 (Kahn, Coach) (testifying that it is "absolutely not accurate" that Coach targets consumers with household incomes below $75,000); *id.* at 963:17-964:10 (Giberson) (testifying that consumers with varying incomes buy bags across price points); ████████████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████. Dr. Smith similarly conceded that knowing a consumer had a low income would not conclusively identify her as a purchaser of a particular handbag brand. Hr'g Tr. 607:13-17 (Smith); *see also id.* at 607:18-20.

### 5. Handbag Prices Are Not Distinct

**109.** Dr. Smith declined to define his relevant market based on a price range and disclaimed that prices determine whether a handbag is "accessible luxury." Hr'g Tr. 605:8-12, 605:20-606:1 (Smith) (testifying that price range "is not strict in a determining fact of the relevant market.").

**110.** Dr. Smith's only analysis of prices shows the "average unit retail price from NPD" comparing three "luxury" brands, three "mass market" brands, and five "accessible luxury" brands. *See* Hr'g Tr. 540:22-541:3, 542:1-9 (discussing PX6000-083, -086 (LS Figures 18, 19)). This analysis excluded, and provided no pricing analysis for, well over 200 additional brands in the NPD data that Dr. Smith considers "accessible luxury," over 70 brands that Dr. Smith considers "luxury," and over 500 brands that Dr. Smith considers "mass market.". *See* DX-0495, DX-0496, DX-0497, DX-0498, DX-0499, DX-0500 (listing brands as categorized by NPD).

**111.** Analyzing an average price at the brand level is uninformative where brands sell handbags across wide price ranges. *See* Hr'g Tr. 1264:21-1265:9 (Scott Morton) (testifying that performing this "measurement analysis at the level of a brand [is] too broad because there's so much variety within that brand."). In particular, an analysis of out-the-door prices by Professor Scott Morton shows brands in NPD's "Better" group price over $100, "Bridge" and "Contemporary" brands price below $100 and over $1,000, and NPD's "Designer" brands price below $1,000. *See* DX-0283-081 (FSM Ex. 5); ████████████████████████████

████████████████ Industry expert Karen Giberson also compiled many examples of brands

offering handbags for a broad range of prices that do not conform with the $100 to $1,000 range that Plaintiff has hinted at.  *See* DX-0282-189 (Giberson App'x C) (Guess prices from $48 to $650); *id.* at -225 (Karl Lagerfeld prices from $75 to $629); *id.* at -283 (MCM prices from $390 to $1,790); *id.* at -089 (Burberry prices from $389.98 to $4,990); *id.* at -111 (Christian Louboutin prices from $579.98 to $5,990); *id.* at -181 (Givenchy prices from $495 to $19,140).

**112.**     Plaintiff's references to a $100 dividing line between "accessible luxury" and "mass market" also makes little sense, because that would relegate the majority of sales by both Michael Kors and Kate Spade outside of any "accessible luxury" market.  Michael Kors sold approximately 70.4% of its handbags through retail and online channels for less than $100 in 2023, DX-0283-084 (FSM Ex. 8), and its average out-the-door price was $92, Hr'g Tr. 1105:15-21 (Edwards, Capri); DX-0934.  Kate Spade sold approximately 61.9% of its handbags through retail and online channels for less than $100 in 2023.  DX-0283-084 (FSM Ex. 8).  Even Coach sold approximately 35% of its handbags through those channels for under $100 in 2023.  *Id.*

### 6.      Sensitivity To Price Changes And Specialized Vendors Do Not Shown

**113.**     Plaintiff did not present any evidence that (i) any sensitivity to a price change is useful for identifying a distinct segment of handbags, or (ii) that "accessible luxury" handbags are sold through any specialized vendors.  Plaintiff did not discuss either issue in its prehearing findings of fact or its preliminary injunction motion.  *See* FTC Prehearing Findings of Fact at 41-43, ECF No. 277 (discussing only "industry recognition," "distinct pricing," "peculiar characteristics," "unique production facilities," and "distinct customers"); FTC Prelim. Inj. Mot. at 11-17, ECF No. 122 (same).  For specialized vendors, there are no such conditions in this industry, where the merging parties and others sell through various broadly utilized sales channels.  *See* DX-0283-024 (FSM Ex. 2) (merging parties' sales by channel); *see also supra* FOF ¶ 32.

## B.    Plaintiff's Attempt To Segment The Industry Ignores How Handbag Brands Actually Compete

**114.**    Despite its expert repeatedly avowing that his market is not based on price, the undertone of Plaintiff's case has been to dismiss competition the merging parties face based on how some brands price at a brand-wide average level.  The fact that many handbags are priced both higher and lower than Coach, Kate Spade, and Michael Kors' products, however, does not somehow insulate the merging parties from competition, as Plaintiff contends.  Instead, it exposes the merging parties to competition from both above and below (in addition to competition at the same price point).  As multiple party witnesses described, brands in the middle are "getting squeezed from the top and the bottom."  Hr'g Tr. 137:21-138:5, 142:10-143:6 (Idol, Capri); *id.* at 764:1-765:12 (Wilmotte, Michael Kors) (describing "intensified competition" Michael Kors faces "from all side[s]"); DX-0885-006 (identifying "threats" of "[i]ntensified competition" and being "squeezed from the top and the bottom"); DX-0835-004 ("We are being squeezed at the top and bottom . . . ."); *id.* at 1089:5-19 (Kors, Michael Kors); DX-0053-001 (identifying Coach sales slowdown due to competition with "lower price point items" and because "[w]ith the price increases, customers prefer to spend more to purchase YSL, Gucci vs. paying up for Coach"); *id.* at 804:13-805:8 (Levine, Coach) (discussing DX-0053).

**115.**    From below, the merging parties face competition from brands such as Calvin Klein, Guess, Patricia Nash, Fossil, Tommy Hilfiger, ZARA, private label bags, and Hugo Boss, among many others.  Many of these brands offer handbags side-to-side with the handbags offered by the merging parties in department stores or at outlet malls.  For example, Mr. Idol testified that he visits department stores where Michael Kors handbags are positioned right across from Calvin Klein or Tommy Hilfiger handbags.  Hr'g Tr. 139:18-140:9 (Idol, Capri); DX-850-007, to -008 (describing "all the competition like ALL of it – luxury plus direct plus cheap (Calvin, DK, etc)"

41

Mr. Idol observed on store visit); DX-0908-003 (January 2024 Monthly Shop Manager Sales and Merchandising Recap lists competitors that include Karl Lagerfeld, DKNY, Calvin Klein, I.N.C. (private label), Gianni Bernini (private label), and Guess, among others); DX-0862-001 (Ms. Newman reporting that customers "could be going to private label[,] other brands like [Calvin Klein] or DKNY who have much lower prices than we do for essentially the same styles"); Hr'g Tr. 228:4-21 (Newman, Michael Kors) (discussing DX-0862). Mr. Kahn also explained that Coach "absolutely compete[s] with many, many brands" that sell bags under $100, pointing to examples at Woodbury Commons, where "300-plus brands are selling in that location," including brands like Calvin Klein, Guess, Karl Lagerfeld, and Tommy Hilfiger that have handbags under $100. *Id*. at 480:12-24 (Kahn, Coach). Mr. Kahn also pointed to T.J. Maxx, an off-price department store, as an example where there are "just so many alternatives to being able to buy bags." *Id*. Similarly, in a recent Brand Review strategy document, Kate Spade recognized that it was "losing share to players with non-leather proposition" while tracking trends in wholesale of lower-priced brands, including Calvin Klein, Patricia Nash, and Vera Bradley. DX-0139-040; Hr'g Tr. 893:1-20 (Fraser, Kate Spade). Ms. Fraser even testified that Kate Spade took several actions in direct competition with a five-dollar Trader Joe's shopping tote. *Id.* at 897:25-899:6. Michael Kors' handbags, in particular, are positioned closely price-wise to handbags sold by brands Plaintiff calls "mass market," particularly with the recent decline in average unit retail for the brand. Hr'g Tr. 160:21-161:3 (Idol, Capri); *id*. at 1105:15-1107:4, 1108:2-5 (Edwards, Capri).

**116.** From above, the merging parties face competition from brands such as Gucci, Louis Vuitton, Prada, and many others. Witnesses for the merging parties consistently testified that their customers cross-shop with products sold by so-called "luxury" brands. For example, Mr. Idol testified that Capri believes that it competes in the total handbag market where "people are cross-

shopping up and down the spectrum" and that customers come into Michael Kors stores with "handbags or shopping bags from Gucci and then walking out with a Michael Kors handbag." Hr'g Tr. 150:13-151:1 (Idol, Capri); DX-0819-026 ("[I]n particular, in accessories, we see consumers cross-shopping with what you would consider the more pure-play luxury brands and us as well."). Similarly, Ms. Crevoiserat testified that Tapestry sees its consumers "shop at the top of the market, the high-end European luxury brands as well as [Tapestry's] brands." Hr'g Tr. 341:15-342:4 (Crevoiserat, Tapestry). Tapestry has also seen evidence of cross-shopping in ethnographies, or studies of consumers' closets, where consumers reported owning handbags from Michael Kors, Kate Spade, Louis Vuitton, Madewell, Burberry, Coach, Dior, Staud, Chloe, Gucci, Tory Burch, Fossil, Tumi, Yves Saint Laurent, Lululemon, and others. PX1936-035.

117.    The merging parties also recognize that competition from European luxury brands has eroded their share of handbag sales. In an April 2024 presentation for Tapestry's CEO, Kate Spade noted that it has been "ceding share to European luxury players" over the "last few years." DX-0139-040; *see also* Hr'g Tr. 891:24-892:25 (Fraser, Kate Spade) (discussing DX-0139). A 2023 Tapestry Market & Consumer Update reported that "gains by Eurolux" had caused Coach and Kate Spade declines. PX1190-033; PX5087, at 197:24-198:14 (Tao, Kate Spade). Similarly, a discussion about a third party report on Michael Kors' market share prompted Mr. Idol to reflect that "luxury has dramatically impacted Michael Kors market share. We peaked at 30% 10 years ago." DX-0837-001, -004; *see also* Hr'g Tr. 134:3-135:1, 137:5-137:18 (Idol, Capri).

118.    As a result, executives from the merging parties are highly focused on competition from above. Mr. Idol testified that in addition to Coach, he looks to Gucci, Louis Vuitton, Yves Saint Laurent, and Prada to monitor what these brands are doing from a design perspective and to look at trends in the marketplace. *Id.* at 167:5-11 (Idol, Capri); *see also id.* at 210:13-24, 211:4-12

(Newman, Michael Kors) (describing monitoring of Louis Vuitton and Gucci). Notably, Michael Kors, the Chief Creative Officer, testified that he viewed "everything that's happening" as sources of competition with respect to design, specifically highlighting Lululemon, Zara, Louis Vuitton, Gucci, and less prominent direct-to-consumer brands. *Id.* at 1089:13-19 (Kors, Michael Kors). Ms. Harris testified that Tapestry includes Louis Vuitton, Gucci, and Prada in the basket of brands it tracks to benchmark the relative financial performance of Tapestry's brands, although those are not its "only meaningful competitors." *Id.* at 392:19-393:21 (Harris, Tapestry); *see also id.* at 877:15-19 (Fraser, Kate Spade) (similar). Tapestry also includes brands like Burberry, Louis Vuitton, and Prada in its consumer surveys because its own research has shown that Tapestry's consumers also shop these brands. *Id.* at 402:18-403:4 (Harris, Tapestry).

119.    The merging parties also face competition from the higher-end brands at outlet malls and resale platforms. Brands such as Prada, Gucci, and Saint Laurent all operate competing outlet stores near where the merging parties operate outlet stores. *Id.* at 140:10-141:11 (Idol, Capri); *id.* at 237:14-17 (Newman, Michael Kors); ██████████████████████████ ███████████████████████████████ And the tremendous growth and competitive might of resale platforms has been well documented in this case. *See supra* FOF ¶ 10.

### C.    Dr. Smith's Hypothetical Monopolist Test Is Fatally Flawed

120.    Plaintiff also attempts to define a relevant market using a hypothetical monopolist test as applied by Dr. Smith. Dr. Smith's hypothetical monopolist test relies upon two inputs: (1) a proxy for diversion ratios; and (2) a measure of gross margins. Hr'g Tr. 570:13-17 (Smith). Dr. Smith's calculation of both inputs is highly flawed, resulting in an unreliable hypothetical monopolist test, which, ultimately, even Dr. Smith recognizes leads to a result that is not "appropriate." *Id.* at 1256:11-1257:7, 1258:23-1261:15 (Scott Morton); *id.* at 571:11-23 (Smith).

### 1.    Dr. Smith's Diversion Ratios Are Unreliable

**121.**    All parties agree that a proper diversion ratio should measure "the fraction of unit sales lost by the first product due to a change in terms, such as an increase in its price that would be diverted to a second product." Hr'g Tr. 623:19-23 (Smith); *id.* at 1235:9-1236:3 (Scott Morton). In other words, as Dr. Smith acknowledged, the diversion ratio should "measure switching from one product to another in response to a price change." *Id.* at 625:22-25 (Smith).

**122.**    Dr. Smith relied upon responses to a question about what other brands respondents "considered" when making their most recent handbag purchase "as a proxy for where customers would divert their purchases." Hr'g Tr. 625:11-21 (Smith); *see also id.* at 551:7-22. Dr. Smith "assum[ed] that the brands that were considered were the next best option for the brand that was chosen." *Id.* at 551:23-552:8. None of his diversion analysis took place at the product level. *Id.* at 1239:13-1240:1, 1264:21-1267:5 (Scott Morton).

**123.**    The four surveys Dr. Smith relied on were conducted in July and August 2021, November and December 2021, March and April 2022, and May and June 2022. *See* Hr'g Tr. 550:16-551:5, 621:7-10 (Smith); *id.* at 1242:18-25 (Scott Morton). Dr. Smith testified that the responses he relied upon totaled, "all combined, around a thousand observations." *Id.* at 634:10-16 (Smith).

**124.**    Professor Scott Morton explained the numerous flaws in Dr. Smith's reliance on these limited survey results to try to approximate diversion and why doing so was not an acceptable economic methodology. *See generally* DX-0283-007, to -009, -052, -061 to -071 (FSM ¶¶ 16-19, 24, 26, 119-21, 144-70); Hr'g Tr. at 1235:5-1254:7 (Scott Morton).[10]

---

[10]    Dr. Smith claimed to have also performed an "econometric" diversion analysis, using only the merging parties' sales data. Hr'g Tr. 621:19-622:25 (Smith). Dr. Smith, however, admits that he did not rely on these "econometric analyses" for his "quantitative analyses of market definition or merger effects." *Id.* He did not do so because, by his admission, those measures are "limited to party data," which are "noisier" and did not allow a "robust econometric demand analysis." *Id.*

### a.    First:  The Survey Question About Brands "Considered" Is Not Informative Of Diversion

125.    As Professor Scott Morton correctly described, what Dr. Smith "uses for diversion is not in fact diversion," and instead "is a proxy that measures something else entirely."  Hr'g Tr. 1223:3-1224:1, 1236:4-14 (Scott Morton).

126.    Instead of calculating actual diversion, the survey that Dr. Smith relied upon did not ask respondents what they would do in response to a price increase, *id.* at 626:1-4 (Smith), did not ask respondents what action they would take in response to some change in terms for their preferred product, *id.* at 626:5-17, 632:13-20, did not ask respondents to identify their next best alternative handbag choice, *id.* at 626:23-627:2, and did not ask respondents to rank their available alternatives, *id.* at 627:3-8; *see also id.* at 413:12-19 (Harris, Tapestry).  Witnesses confirmed that Tapestry never used the responses to the "consider" question to draw any conclusions about consumer purchaser behavior, let alone switching behavior in response to a price increase.  *Id.* at 411:14-18 (Harris, Tapestry); *id.* at 415:3-7; *id.* at 1194:18-21 (Yu, Tapestry).

127.    To assess diversion, a more appropriate question would be the one recommended by the competition regulator for the UK, which phrases a sample diversion-related question as "[t]hinking about [your most recent purchase from x], what would you have done if the price of this product/service had gone up by £1?"  DX-0283-064 (FSM ¶ 152); Hr'g Tr. 1249:8-1250:3 (Scott Morton).  As Professor Scott Morton explained, this question is preferable because it asks about two purchases:  (1) the one you made; and (2) the one you would make if "you couldn't have bought that or it went up in price."  Hr'g Tr. 1303:12-1304:7 (Scott Morton).  Dr. Smith could have designed and conducted an appropriate survey to estimate diversion, but failed to do so.

128.    Other survey results demonstrate that a consumer indicating that she "considered" a brand does not convert to an intent or desire to *purchase* that brand's products.  Professor Scott Morton

discussed one such survey showing only one-third of consumers that "considered" Kate Spade indicated any intent to purchase.  *See* PX1180-008; Hr'g Tr. 1251:9-25 (Scott Morton).

### b.    Second:  The Survey's Focus On *Brands* Considered Renders It Meaningless For A Diversion Analysis

129.    The survey question that Dr. Smith relied upon is separately uninformative of diversion in an antitrust case because it asks about *brands* considered, rather than products considered.  This is problematic because "the same brand makes a vast array of kinds of bags," and there is a "big difference between choosing among brands and choosing among products."  Hr'g Tr. 1239:13-1240:1 (Scott Morton).  Consumers do not purchase brands.  They purchase particular handbags.  Thus, to answer the relevant diversion question, the survey should ask about actual handbag products.  *See id.* at 1264:21-1265:6; *see also id.* at 1189:13-1190:1 (Yu, Tapestry).

### c.    Third:    The Survey Design Is Circular And Restricts Respondent Choice

130.    The survey design is also not appropriate to measure diversion because it relies upon a restricted number of brands that do not reflect consumers' substitution options and engages respondents in a "memory test" exercise.  *Id.* at 1238:7-1239:12 (Scott Morton).

131.    Alice Yu, Tapestry's Vice President of Global Consumer Insights, based on her more than 20 years of consumer survey experience, explained how the design of the Brand Health Tracker survey would have biased survey respondents towards identifying fewer considered brands that have higher awareness.  *Id.* at 1183:17-1194:17 (Yu, Tapestry).  At the outset of the survey, respondents were presented with 49 pre-selected brands and asked to identify the brands that they were "aware" of or had "heard" of.[11]  *Id.* at 1188:12-23; *see also* PX1647-003.  Later, respondents

---

[11]    The list of brands pre-populated in the Kantar surveys are available at DX-0283-066 (FSM ¶ 157 n.261).  The list of brands pre-populated in the March-April 2022 Bain survey are available at DX-0283-069 (FSM ¶ 164 n.274).  The differences in brands in each survey affects the diversion calculated for those brands that appear in only one survey.  *Id.* at -069, -070 (FSM ¶ 165).

were asked to identify from the set of brands that they were aware of, those brands from which they have purchased a handbag in the last twelve months. PX1647-003. Respondents were then taken on a "meandering journey" of questions about that most recent handbag purchase. *Id*. at -003 to -009; Hr'g Tr. 1191:7-1193:1 (Yu, Tapestry). Ultimately, the survey repopulated the subset of the 49 brands that the respondent indicated she was initially aware of and asked "what other brands did you consider before you made" the most recent handbag purchase. PX1647-009; Hr'g Tr. 1193:4-8 (Yu, Tapestry); *id.* at 1237:14-1238:4 (Scott Morton). Notably, this list excluded any brands the survey respondent had identified as a brand she was aware of outside of the list of 49 brands. Hr'g Tr. 1189:2-8 (Yu, Tapestry). Respondents had the opportunity to write in brands that were not prompted to them, but only about one percent of all survey respondents went through the trouble of doing so. *Id.* at 1190:23-1191:6; *id.* at 1238:7-21 (Scott Morton); *see also* PX1647-003, and -009. In summary, the responses that Dr. Smith relied on were based upon a survey question that asked a consumer to remember the brands that she did not buy up to twelve months prior, after answering a long list of meandering questions. Hr'g Tr. 1193:24-1194:2 (Yu, Tapestry). Ms. Yu testified that it is "not surprising, given the lengthiness of the list [of brands]" and "the fatigue that a consumer might go through in answering the questions in the survey," that respondents might "just go down the list and check the ones that they're most aware of" in response to the consideration question. *Id.* at 1194:6-17.

**132.** The survey design biases the later question about brands considered by effectively limiting the respondent to only those brands within the limited, pre-selected set that they indicated "awareness" of previously. *Id.* at 1237:14-1238:21, 1240:2-18; *see also id.* at 1190:15-22 (Yu, Tapestry). As Professor Scott Morton described, this "[a]bsolutely" creates the risk of bias to only those limited brands that are included in the initial, pre-selected funnel, which are also prominent

brands.  *Id.* at 1240:14-18 (Scott Morton).  Professor Scott Morton showed the type of bias that can arise from repopulating the brands that respondents are "aware" of using another survey in the record.  *Id.* at 1240:19-1241:21 (Scott Morton).  Prominent brands that consumers are "aware" of have a negative correlation with purchase intent (i.e., they are less likely to buy them).  *Id.*; *see also id.* at 1189:13-1190:6 (Yu, Tapestry) (high aided awareness does not automatically translate to higher likelihood of purchase); PX3064-013.  By contrast, smaller brands that fewer consumers were aware of had higher respondent purchase intent.  Hr'g Tr. 1241:17-21 (Scott Morton).

**133.**    Tapestry has not asked the survey question that Dr. Smith relied on since Ms. Yu joined Tapestry in May 2022 and overhauled the Brand Health Tracker surveys.  Hr'g Tr. 1183:21-1187:20 (Yu, Tapestry).  Tapestry no longer asks this backward-looking "consider" question because Tapestry could not draw relevant learnings from that question.  *Id.* at 410:5-11 (Harris, Tapestry); *id.* at 1194:18-21 (Yu, Tapestry).  In particular, it was impossible for Tapestry to understand how consumers that took the survey interpreted the word "consider" in answering the survey question.  *Id.* at 411:19-22 (Harris, Tapestry); *id.* at 1193:20-23 "(Yu, Tapestry).  For instance, the question asks a consumer to remember the brands they chose not to purchase from up to twelve months ago, without providing additional insight as to why they did not buy.  *Id.* at 1193:24-1194:5 (Yu, Tapestry); *id.* at 412:12-15 (Harris, Tapestry).  Tapestry changed the "consider" question to be forward-looking and placed it in a more logical flow of the survey immediately after asking consumers about what brands they were aware of to help consumers navigate the survey more easily.  *Id.* at 1186:14-1187:17 (Yu, Tapestry).  After making these changes, Tapestry observed in the 2024 survey that consumers reported considering on average 30 brands in the next twelve months, *id.* at 404:3-405:1 (Harris, Tapestry); DX-0288-012, which is

significantly larger than the average of "just over two" brands considered that Dr. Smith found in the data for the 2021 and 2022 backwards-looking question, Hr'g Tr. 1366:19-20 (Smith).[12]

> ### d.    Fourth:    The Historical Surveys Dr. Smith Uses Are Not Informative Of Current Or Prospective Demand Conditions

**134.**    As described above, Dr. Smith relied on survey questions about handbag purchases made between July 2020 and June 2022. *Supra* FOF ¶ 123; *see also* Hr'g Tr. 628:10-22, 629:1-6 (Smith). Thus, as Dr. Smith acknowledged, none of the surveys would take into account any changes in the competitive landscape or consumer sentiment that have occurred since June 2022. *Id.*  In an industry as highly dynamic as this one, however, handbag brands that consumers considered when making a purchase over four years ago, in some cases, says nothing about the competitive or demand conditions that exist today, or that will exist. *See id.* at 1242:18-1248:23 (Scott Morton). Tapestry witnesses confirmed that they do not rely on survey results from 2021 or 2022 to try to understand consumer behavior today or in the future because consumer behavior changes rapidly in this industry. *Id.* at 399:17-400:17 (Harris, Tapestry); *id.* at 1194:22-1195:13 (Yu, Tapestry).

**135.**    Dr. Smith's reliance on outdated surveys fails to account for the decline of Michael Kors.[13] As described above, Michael Kors has lost resonance with consumers and, as a result, has experienced substantial revenue declines since 2018 and continuing to the present day. *Supra* FOF ¶ 63.  In the face of this decline, Dr. Smith's characterization of Michael Kors as "stable" is not credible. *Id.* at 1242:18-1243:18 (Scott Morton). ███████████████

████████████████████████████████████████████████████

██████████████████████████████████████████

---

[12]    Dr. Smith knew of the more recent surveys, but when asked if he calculated a diversion ratio using them, Dr. Smith responded:  "Not that I'm relying on, no." Hr'g Tr. 632:10-12 (Smith).
[13]    At the time of his deposition, Dr. Smith was unaware of the status of Michael Kors' financial condition in 2024. *See* Hr'g Tr. 629:7-15 (Smith).

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████  ██████████████████████

██████████████████████████████████████████████████

████████████████████████████  ██████████████████████

████████████████████████████████████

**136.**    Dr. Smith also did not adjust the survey results or his diversion proxy estimates to account for any effect that COVID may have had on survey respondents, or on the industry.  Hr'g Tr. 630:8-21 (Smith).  This was a significant oversight because COVID induced a dramatic shift toward direct-to-consumer and online shopping.  *Id.* at 1244:18-23 (Scott Morton); *id.* at 474:17-475:1 (Kahn, Coach); ███████████████████████████

**137.**    There also have been important shifts in competitive dynamics from 2020 or 2021 to the present day as new brands have entered and expanded.  ████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████  ████████

████  The fact that Tapestry adjusted the brands it included in its Brand Health Tracker survey since 2022, including adding Jacquemus, Kurt Geiger, Telfar, and The Sak, among others, also shows a changing environment.  *Compare* DX-0283-066 (FSM ¶ 157 n.261), *with* DX-0288-042.

**138.**    The many changes in competitive conditions, and the dynamic nature of the industry, make Dr. Smith's use of surveys conducted between July 2021 and June 2022 outdated and unreliable.

### 2. Dr. Smith Uses Inflated Gross Margins

**139.** Dr. Smith also relied upon gross accounting margins that do not take into account expenses for brand innovation. By excluding those important costs of innovation, Dr. Smith overestimates margins, causing his hypothetical monopolist test to be more easily satisfied with an artificially narrow market. *See* Hr'g Tr. 1257:8-1258:15 (Scott Morton).

### 3. Dr. Smith's Hypothetical Monopolist Test Leads To False Positives

**140.** Because Dr. Smith's hypothetical monopolist test is based on inflated diversion ratio proxies and inflated margins, it leads to the erroneous conclusion that Coach, Kate Spade, and Michael Kors alone are a relevant market. *Id.* at 1258:23-1259:9 (Scott Morton); *id.* at 640:10-15 (Smith). But when asked if, in his opinion, "a market of just Coach, Kate Spade, and Michael Kors is the appropriate relevant antitrust market through which to evaluate the merger," Dr. Smith responded: "No, it's not." *Id.* at 571:11-23 (Smith); *see also id.* at 642:2-6 ("I don't think it's the most useful market to look at when assessing the competitive effects of this transaction."). This false positive is a "red flag" that Dr. Smith's hypothetical monopolist test is not properly specified. *Id.* at 1259:4-9 (Scott Morton). Dr. Smith should have reevaluated the inputs into his test when he reached this anomalous outcome, but he did not do so. *Id.* at 1259:14-21 (Scott Morton).

**141.** Any number of other clearly incorrect markets would pass Dr. Smith's hypothetical monopolist test, further demonstrating its unreliability. Professor Scott Morton showed that a small subset of brands that NPD labels as "Better" and "Designer" would pass Dr. Smith's test, without including any "Bridge" or "Contemporary" brands. *See* DX-0283-073, to -074 (FSM ¶¶ 173-75); Hr'g Tr. 1261:19-1262:3 (Scott Morton). But that should not be possible under Plaintiff's characterization of "Better" and "Designer" brands as different in-kind. This shows that Dr. Smith's hypothetical monopolist test is "not grounded in how consumers actually shop" or in "how they behave and how they substitute." Hr'g Tr. at 1263:5-13 (Scott Morton).

### D. "Bridge" And "Contemporary" Brand Labels Have No Connection To The Hypothetical Monopolist Test, *Brown Shoe*, Or Consumers' Substitutes

**142.** At the point that Dr. Smith's hypothetical monopolist test generated the false-positive market of only Coach, Kate Spade, and Michael Kors, any other brand added to the market would also pass the same test. This is an "automatic" reaction of Dr. Smith's test. *Id.* at 1259:22-1260:24 (Scott Morton); *id.* at 640:16-20 (Smith). Thus, as Dr. Smith agrees, even if he added only brands that NPD labels as "Better" or only labels as "Designer," that would have satisfied Dr. Smith's hypothetical monopolist test. *Id.* at 640:21-641:9. Similarly, it was a foregone conclusion—an "automatic" result of the test design—that adding brands NPD labels as "Bridge" and "Contemporary" would also pass. *Id.* at 1259:22-1260:24 (Scott Morton). That mechanical result, building from Dr. Smith's initial false positive, says nothing about actual consumer behavior. *Id.*

**143.** Even if the results of his hypothetical monopolist test were not just an automatic result of his mis-specified model, Dr. Smith's reliance on NPD brand labels of "Bridge" and "Contemporary" to define his relevant market would be inappropriate. Those brand labels are not derived from the required perspective of consumer substitution. *Id.* at 1260:7-20. Despite relying heavily on NPD's brand classification, Plaintiff never subpoenaed NPD for testimony. Plaintiff presented no evidence that NPD bases its labels on consumer perspectives. Dr. Smith conceded that he would "be speculating about what [NPD does] to define those terms." *Id.* at 615:11-23 (Smith); *see also id.* at 614:24-615:3, 615:24-616:1. But he also conceded that products sold by brands that NPD labels "Designer" "would be, to some extent, substitutes" with products sold by brands that NPD labels as "Bridge" and "Contemporary." *Id.* at 600:10-21.

**144.**    Industry expert Ms. Giberson explained that there are "no hard, fast rule[s]" regarding how NPD labels brands.  *Id.* at 980:20-981:1 (Giberson).[14]  The NPD label may not reflect anything about a brand's handbag products, because NPD will assign a label based on whatever product the brand first sells through wholesale, including ready-to-wear products.  *Id.*  Ms. Giberson testified that, from her personal knowledge about how NPD labels brands, those labels do not convey anything about which brands consumers consider to be substitutes.  *Id.* at 981:9-23.  For example, NPD classifies the brand Naghedi as "moderate," but its bags sell for prices starting at $200, with the example Naghedi bag referenced by Ms. Giberson selling for $310.  *Id.* at 983:20-984:12.  And NPD classifies Patricia Nash as "better," even though the example small leather handbag Ms. Giberson referenced was priced at $178.  *Id.* at 983:1-19;  *see also id.* at 1153:15-1154:1 (Gennette); *id.* at 341:6-9 (Crevoiserat, Tapestry).  Karl Lagerfeld, a brand NPD classifies as "better," is often displayed near Kate Spade handbags at Macy's.  *Id.* at 938:12-18 (Steinmann, Macy's); *id.* at 982:9-18 (Giberson).  Similarly, Calvin Klein, a "better" brand, is often displayed near Coach and Kate Spade handbags at Macy's.  *Id.* at 937:15-19, 938:12-18 (Steinmann, Macy's); *id.* at 982:19-25 (Giberson).

**145.**    The evidence, including department store layout photographs presented as demonstratives, shows that retailers do not organize handbags based on NPD classifications.  DX-284-062, to -070 (JG ¶¶ 94-99); Hr'g Tr. 1156:1-1158:16 (Gennette).  Nor do industry publications appear to pay any attention to these classifications.  *See, e.g.*, DX-0281-064, to -065, -073 (KG ¶¶ 52, 62) (describing articles that include handbags from brands across multiple NPD categories on the same "must have" list).

---

[14]    Unlike Dr. Smith, Ms. Giberson has worked with NPD for nearly two decades, as they are a member of the Accessories Council and sit on the Accessory Council's Board of Directors and regularly communicates with NPD's Board Member.  *Id.* 977:11-978:3.

**146.**    Tapestry employees do not rely on how NPD gathers and slices its data, as NPD's calculations have been inconsistent with Tapestry's internal data. Hr'g Tr. 340:21-25 (Crevoiserat, Tapestry); *id.* at 418:21-25, 419:16-19 (Harris, Tapestry); *id.* at 882:16-19 (Fraser, Kate Spade).

**147.**    Capri does not even subscribe to NPD, much less purport to limit its set of important competitors to only those brands designated by NPD as "Bridge" and "Contemporary," which further undermines Plaintiff's reliance on it. *Id.* at 118:2-1119:3 (Edwards, Capri) (explaining belief that NPD data is not "reliable or accurate").[15]

**148.**    The primary basis Dr. Smith identified at the hearing for relying on NPD "Bridge" and "Contemporary" labels was one Tapestry employee email from 2021.[16] *See* PX1334; Hr'g Tr. 619:18-620:1.[17]   That email, however, does not indicate that the phrase "accessible luxury" or "bridge" or "contemporary" were intended to define the set of brands that Coach or Kate Spade compete with from the perspective of consumers, as Dr. Smith concedes. *Id.* at 620:17-22 (Smith). The author of the email noted that "bridge" and "contemporary" was not how Tapestry would define accessible luxury, in her experience, and explained that she did not have a consistent definition. PX5087, at 107:23-108:7 (Tao, Tapestry).  The email instead refers more frequently to an "addressable" market that is not limited to NPD "Bridge" and "Contemporary" brand labels,

---

[15]    Dr. Smith incorrectly testified that Capri elected not to purchase NPD because of its cost. Hr'g Tr. 616:18-25 (Smith).  In fact, Capri's CFO testified that his decision not to subscribe to NPD did not "have anything to do with the expense associated with subscribing to NPD." *Id.* at 1118:23-25 (Edwards, Capri).  Dr. Smith also repeatedly misstated that the "Parties" rely on NPD brand classifications, despite conceding that Capri does not. *See, e.g.*, *Id.* at 616:9-617:4, 1381:25-1382:4 (Smith).

[16]    Over four million documents were produced in this litigation. *Id.* at 590:13-20 (Smith).

[17]    Dr. Smith characterized this email as a "market-sizing exercise that the parties do . . . periodically." Hr'g Tr. 535:11-24 (Smith).  This is incorrect.  The email is a "quarterly update based on the NPD information" that Ms. Tao prepared.  PX5087, at 100:20-22, 101:8-14, 102:5-8, 102:10-12 (Tao, Tapestry).  The email summarizing updated NPD data was at this time sent quarterly because Tapestry received NPD data on a quarterly basis. *Id.* at 97:19-22.  Ms. Tao did not incorporate NPD data within her market sizing exercise. *Id.* at 98:9-13.

and includes brands as diverse as Calvin Klein, Gucci, and Yves Saint Laurent. *See* Hr'g Tr. 617:10-619:21; PX1334-001, -005. The email Dr. Smith relied upon calculates the merging parties' shares as 29% in that "addressable" market. PX1334-001; Hr'g Tr. 618:17-21 (Smith).

**149.**    Plaintiff has not adequately shown that reliance on NPD categories of "Bridge" and "Contemporary" to define a relevant market is consistent with reasonably available substitutes from the perspective of consumers or with commercial realities in this industry.

## V.    PLAINTIFF FAILS TO SHOW UNDUE CONCENTRATION IN ANY RELEVANT MARKET

**150.**    Even in a market for supposed "accessible luxury" handbag brands, Plaintiff fails to present reliable evidence that the merging parties' shares rise to the level of competitive concern. Plaintiff's market share calculations—performed by Dr. Smith—are riddled with errors, omissions, and unsupported assumptions that render them unreliable. *See generally* DX-0283-008, -085 to -103 (FSM ¶¶ 22, 196-230); Hr'g Tr. 1263:18-1273:10 (Scott Morton).

**151.**    To begin with, Dr. Smith starts his analysis with NPD's estimates of wholesale sales. *See generally* DX-0283-050 (FSM ¶¶ 114-15). NPD collects data from some wholesalers, but not all. Hr'g Tr. 565:8-9 (Smith). Dr. Smith testified that he believes NPD reports actual wholesale data. *Id.* at 1356:5-13. The NPD user guide shows that Dr. Smith is mistaken—"NPD projects the data it receives from its retail/data partners to a larger universe that includes stores that are not included in the panel." PX3001-004. Dr. Smith failed to recognize that the foundation of his market share calculation is not actual sales data, but instead a mashup of sales data and projections. NPD specifically cautions that its projections "may not accurately represent market trends with non-panel retailers/data partners." PX3001-004. Hence, as Mr. Gennette described, people in the retail fashion industry generally do not rely upon NPD to calculate market shares. Hr'g Tr. 1152:1-8. *See also id.* at 978:21-979:13 (Giberson); *id.* at 281:18-282:2 (Crevoiserat, Tapestry).

**152.**    Second, because NPD does not contain actual data from all wholesalers and projects missing sales in an undisclosed manner, Dr. Smith cannot identify whether the missing wholesalers are accurately reflected in the NPD data he relies upon.    PX5087, at 118:25-119:15 (Tao, Tapestry).    Missing wholesalers include TJ Maxx, Ross, Gilt.com, Marshalls, Rue La La, and specialty stores among others.    DX-0283-092 (FSM ¶ 209(e)); *see also* PX3001-006 (listing NPD tracked wholesalers).    Dr. Smith claims that the omission of TJ Maxx and Ross likely undercounts the merging parties' sales because they have a high percentage of "accessible luxury" sales made through those wholesalers.    But that ignores that Dr. Smith does not know if NPD already accounts for TJ Maxx and Ross in its projections of missing sales.    As Professor Scott Morton described, this is a "black box" problem.    Hr'g Tr. 1264:9-20, 1281:16-1282:12 (Scott Morton).    Tapestry has internally raised concerns about the accuracy of NPD's projections, noting in an analysis comparing actuals to NPD estimates that NPD was overestimating Coach's growth in wholesale sales.    PX1306-002 ("Coach actualized growth (-18%) is significantly below NPD's estimate of +8% (excluding disposition & off-price)"); PX5087, at 140:3-141:14 (Tao, Tapestry) (discussing PX1306); Hr'g Tr. 340:21-25 (Crevoiserat, Tapestry) ("[T]here have been many times when the NPD data was inconsistent with our internal data.").

**153.**    Third, Dr. Smith lacks data on non-wholesale sales for approximately 200 companies included in his relevant market.    *Id.* at 1267:22-1269:22 (Scott Morton).    Dr. Smith tries to estimate those sales using a ratio derived from the NPD estimates and actual sales data for twenty-one brands, including the merging parties' brands.    *Id.*    But Dr. Smith's estimation methodology leads to unreliable results.    Dr. Smith admitted that his methodology underestimated sales for brands such as Emporio Armani and J. Crew, which Dr. Smith counted as having sales of only $5,885 and $197, respectively.    *Id.* at 1387:8-17, 1390:9-19 (Smith).    Dr. Smith also recorded sales of only

$12 for Lancaster Paris, a brand with physical stores in France that sells many models of leather handbags, and he estimated only $75 for the entire private label category. *Id.* at 1384:11-1385:2, 1391:1-6.  When Dr. Smith generated these anomalously small calculations for market participants, he did not investigate them. *See id.* at 1386:19-1387:12, 1391:7-9.

**154.**  Dr. Smith's methodology of estimating non-wholesale sales leads to numerous other results in conflict with actual sales data produced in this case.  For example, Dr. Smith estimated $6.1 million for Dagne Dover, PD02-001, but ████████████████████████████████
████████████████████████████████████████████████████████
███████████████████████████████  █████████████████████
████████████████████████████████████████████████████
████████████████████  ██████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████ *Compare* PD02-001, *with* DX-0935-001.  Dr. Smith did not attempt to reconcile these differences.  Hr'g Tr. 1386:19-25 (Smith).

**155.**  One can see that Dr. Smith's methodology for estimating non-wholesale sales has a dramatic effect on his market share calculations by comparing the shares in NPD data *before* Dr. Smith performs his estimation.  From Dr. Smith's starting point of NPD wholesale estimates, the merging parties' sales are the following (DX-0283-089, FSM Ex. 9):

- <u>Bridge + Contemporary</u>:  31.4% combined share

- <u>Better + Bridge + Contemporary</u>:  23.2% combined share

- <u>Bridge + Contemporary + Designer</u>: 19.7% combined share

- <u>Better + Bridge + Contemporary + Designer</u>: 16.3% combined share

**156.**    After Dr. Smith adds in his approach for estimating non-wholesale sales, however, the merging parties' sales inflate to over 58%, using Dr. Smith's calculation. PX6000-097 (LS Table 7).  As Professor Scott Morton explained, this extrapolation from the NPD data inflates the merging parties' shares because Dr. Smith has all sales data for the merging parties, but is missing sales data from non-parties.  Hr'g Tr. 1269:23-1271:8 (Scott Morton).

**157.**    If Dr. Smith used the same method to estimate Coach's non-wholesale sales as he used for non-parties, he would have calculated Coach's sales to be only $231 million, instead of the $1.4 billion figure he calculates from Coach's actual data.  *Id.* at 1382:18-1383:9 (Smith).

**158.**    Dr. Smith excludes entirely several categories of sales from his relevant market, which also inflates the merging parties' market shares.  For example, he excludes all sales by any brand NPD labels as "Moderate," "Better,"[18] or "Designer," even when those brands sell handbags that overlap in price with Coach, Kate Spade, and Michael Kors' handbags.  For example, ███████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████ that are excluded from Dr. Smith's market share calculations, DX-0935.  *See also* DX-0282 (Giberson App'x C).

---

[18]    Dr. Smith suggested that Professor Scott Morton determined that including "Better" brands would result in a market share of 49%.  Professor Scott Morton did not present this as a reliable share calculation at all.  As explained in Professor Scott Morton's report, even that figure is corrupted by Dr. Smith's other share calculation errors.  *See* DX-0283-088 (FSM ¶ 203).

**159.**    Dr. Smith also excluded from his market share calculations any brand not tracked by NPD. Hr'g Tr. 614:9-18 (Smith).  He did not quantify how many handbag brands NPD fails to track.  *Id.* at 614:19-21.   But evidence from just some of the excluded brands shows those sales are substantial, including: ███████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████ [19]

**160.**    Dr. Smith's market share calculations also do not include any sales of preowned handbags. Hr'g Tr. 1373:1-4 (Smith).   Consumers are purchasing substantial quantities of preowned handbags, as both fact witnesses, industry experts, and Professor Scott Morton have shown.  *See* DX-0937; *see also supra* FOF ¶ 10.[20]

**161.**    Ultimately, as Professor Scott Morton testified, these omissions and miscalculations are a material problem, and they render his market share calculations unreliable, with the effect being to artificially inflate the merging parties' shares.  *See* Hr'g Tr. 1272:10-1273:10 (Scott Morton); *see also* DX-0283-183 (FSM App'x Ex. 11) (illustrating market share sensitivities reducing combined market shares from 59% to 16%).

**162.**    As the above highlights, Dr. Smith's analyses in this matter are unreliable and should not be credited.  Dr. Smith has previously been criticized for his "reliance, at face value," on portions

---

[19]    Each of these are companies that party witnesses described as within their competitive sets. *See, e.g.*, Hr'g Tr. 407:12-17 (Harris, Tapestry) (testifying that Tapestry brands "compete directly" with Cuyana and Polène, among others); *id.* at 332:5-333:10 (Crevoiserat, Tapestry); *id.* at 1089:5-19 (Kors, Michael Kors).

[20]    Dr. Smith tries to diminish those preowned sales by pointing out that, of nearly $1.2 billion in preowned handbag sales from a subset of ████ resellers, $430 million comes from sales of handbags under $1,000.  Hr'g Tr. 1347:10-19 (Smith).  But that should not matter, if correct, since Dr. Smith has testified that his market does not have a $1,000 price ceiling.  *See id.* at 605:11-12, 606:8-11.  Moreover, the ████ resellers in DX-0937 are just a sample.  Even the results from the survey that Dr. Smith relies upon shows additional handbag resellers that survey respondents were engaging with, including Facebook Marketplace, Mercari, thredUP, and others.  *See* PX1465-035.

of the evidence that were "unsupported by the record as a whole." *FTC v. Thomas Jefferson Univ.*, 505 F. Supp. 3d 522, 544 (E.D. Pa. 2020); Hr'g Tr. 595:8-596:13 (Smith). Similarly here, Dr. Smith's market definition analysis is largely superficial and inconsistently applied. For example, he acknowledges that "the terminology that a handbag brand uses to describe its products is not determinative of whether that brand is included or excluded" in the relevant market. *Id.* at 601:23-602:3 (Smith). But he then concedes that, when defining the relevant market, he was "relying on Tapestry's grouping of products as accessible luxury for the most part." *Id.* at 602:11-603:5; *see also id.* at 603:7-13 (agreeing that "if Coach viewed a brand as accessible luxury, that would lead it to be included in [Dr. Smith's] definition").

## VI.    THE TRANSACTION IS NOT LIKELY TO LEAD TO A SUBSTANTIAL REDUCTION OF COMPETITION IN ANY RELEVANT MARKET

### A.    Plaintiff Did Not Put Forward Factual Evidence Of Likely Consumer Harm

**163.**    The factual evidence presented does not support any finding of likely harm to consumers as a result of the Proposed Transaction. Plaintiff made allegations of consumer harm arising from nominal price increases (meaning the consumer paying more for less), reduced discounting, and potential loss of innovation. The factual evidence presented does not support these theories.

**164.**    Plaintiff presented no evidence that the intention of this transaction is to reduce output, raise nominal prices, or reduce competition. The evidence is to the contrary. FOF ¶¶ 72, 75, 78.

**165.**    While Plaintiff tries to paint Tapestry's plans to revitalize the Michael Kors brand as likely to result in reduced discounting, this is inconsistent with industry realities, including the reality that consumers set the price. *Supra* FOF ¶¶ 46-56. While Tapestry's goal will be to market Michael Kors handbags that consumers want to purchase at the ticket price, this will succeed only if consumers see the value. *See id*; *see also* Hr'g Tr. 319:25-320:24 (Crevoiserat, Tapestry).

**166.** No party witness, industry expert, or third-party believes it would be possible for Tapestry to increase prices for Michael Kors handbags without increasing value. Again, the testimony shows the opposite. Industry expert Mr. Gennette, for example, credibly described his belief that Tapestry could not raise prices post-transaction without adding value because he has observed such efforts fail in the past, and "[t]he consumer can sniff out if you're raising a price and there's not an accorded increase in value." *Id.* at 1159:17-1161:12 (Gennette). Consumers have "so many options," that a nominal price increase would not stick, based on Mr. Gennette's experience observing attempted prior price increases by Michael Kors, Burberry, and Ralph Lauren. *Id.* Wholesalers also testified that they would push back against any post-acquisition price increases that do not convey value, including by cutting back on their orders, reducing the number of stores selling the product, or warning the brand to expect markdowns. *Id.* at 929:25-931:4 (Steinmann, Macy's); *id.* at 1159:17-1160:24 (Gennette); DX-0284-057, to -059 (JG ¶¶ 84-87).[21]

**167.** Macy's, a significant customer of both Capri and Tapestry, has no concerns "whatsoever" about the effects of the Proposed Transaction on Macy's business, and will continue to offer its consumers competitive pricing regardless. Hr'g Tr. 929:4-9, 931:18-20 (Steinmann, Macy's).

**168.** There is no evidence Tapestry believes it could raise MSRPs for Michael Kors handbags post-acquisition without reinvigorating the brand or improving the quality of the handbags.[22] Plaintiff points to a single presentation from August 2022 sent by Liz Harris to Joanne Crevoiserat

---

[21]    Although Dr. Smith hypothesized that wholesalers would not "be harmed by an anticompetitive merger" because the wholesalers would also be "able to raise price and share in the profits," Hr'g Tr. 647:23-648:9 (Smith), Mr. Gennette testified that wholesalers would not be able to pass on price increases without commensurate increases in value. *Id.* at 1160:25-1161:9 (Gennette). Wholesalers would instead purchase the handbags at a higher wholesale price, but have to sell those handbags at a mark down. *Id.* at 1161:10-17.

[22]    This holds true for Coach and Kate Spade handbags post-merger too. *Id.* at 488:23-489:10 (Kahn, Coach); *id.* at 874:22-876:4 (Fraser, Kate Spade).

to support its claim that Tapestry plans to raise prices and reduce discounting for Michael Kors. *See* PX1216-001. But this presentation was put together on short notice by Tapestry's Strategy and Consumer Insights team using readily available data points for an informal meeting early in Tapestry's potential acquisition process. Hr'g Tr. 346:16-347:3 (Crevoiserat, Tapestry). The data points included were not requested by Ms. Crevoiserat, rather the presentation was meant to show what types of information the strategy team could provide regarding potential acquisition targets. *Id.* at 347:6-347:19; *id.* at 424:7-11 (Harris, Tapestry). Despite the hundreds of documents that Tapestry created in connection with evaluating the Proposed Transaction, the contents of that August 2022 presentation never appear outside of this impromptu touchbase. *Id.* at 426:18-23 (Harris, Tapestry); *id.* at 316:18-317:18 (Crevoiserat, Tapestry).

169.    The August 2022 touchbase presentation also does not indicate that Tapestry could raise prices for Michael Kors post-merger, which the two employees who created that document confirmed. *Id.* at 424:16-19, 426:24-427:5 (Harris, Tapestry); PX5084, at 281:10-283:18, 284:24-285:18 (Rocha-Rinere, Tapestry). Those employees instead testified that Tapestry would not have the ability to increase prices or reduce discounting for Michael Kors absent an improvement in the brand's value proposition. Hr'g Tr. 423:21-424:6, 424:24-425:4, 425:24-426:7 (Harris, Tapestry); PX5084, at 282:11-285:18 (Rocha-Rinere, Tapestry).

170.    Plaintiff similarly seeks to misconstrue references to "white space" in Tapestry executive conversations with investors as evidence of an intention or ability to raise prices. Those benign references mean nothing of the sort. Ms. Crevoiserat testified that white space refers to a "potential opportunity" to "deliver in terms of value and product and experiences" in order to take sales from competitors. Hr'g Tr. 344:2-15 (Crevoiserat, Tapestry). Mr. Kahn similarly testified that "white

space" refers to the difference Coach offers in terms of "compelling value for the consumer" with quality that is "as good as any traditional European luxury brand." *Id.* at 483:10-23 (Kahn, Coach).

171.    There is also no evidence that Tapestry could reduce innovation or quality of Coach, Kate Spade, or Michael Kors handbags upon close of the transaction.  In fact, the evidence shows the opposite:  Tapestry plans to reinvigorate the Michael Kors brand and continue to invest in innovation and quality improvements for all of its brands. *See supra* FOF ¶¶ 72, 75, 78.  Tapestry's Chief Supply Chain Officer emphatically denied that the Proposed Transaction would incentivize Tapestry to offer lower quality handbags, noting that Tapestry does not believe in putting out inferior-quality product, and Tapestry's supply chain will continue to live up to its vision statement of providing craftmanship at scale. *See* Hr'g Tr. 1032:1-11 (Charles, Tapestry).

## B.    Plaintiff's "Head-To-Head" Competition Theory Fails

172.    Plaintiff has not shown that Coach, Kate Spade and Michael Kors are engaged in regular "head-to-head" competition in a way that impacts handbag prices or quality.  Plaintiff attempts to rely on benchmarking documents to infer that Coach and Kate Spade directly respond to competitive positions taken by Michael Kors, and vice versa.  But that simply is not how pricing or promotional strategies are developed by the brands or industry at large, as witnesses explained. Because in the handbag industry there are so many competitors, Tapestry cannot track all of them consistently.  *Id.* at 325:10-327:25 (Crevoiserat, Tapestry).  Instead, Tapestry engages in benchmarking against a basket of larger and more established players that Tapestry has tracked historically and can obtain financial information for more easily.  *Id*. at 326:15-327:25; *id*. at 392:2-18, 393:1-6, 407:1-5 (Harris, Tapestry).[23]  With so many competitors to keep track of, Tapestry

---

[23]    In many of these benchmarking exercises, Tapestry includes information about high-end European luxury brands, such as Louis Vuitton, Gucci, and Prada, that Plaintiff argues are not in their relevant market.  *See* Hr'g Tr. 327:9-18 (Crevoiserat, Tapestry); *id*. at 393:11-21 (Harris,

supplements this benchmarking by focusing on consumers using surveys and other consumer-facing analyses that are updated each year. *Id.* at 334:7-16 (Crevoiserat, Tapestry); *id.* at 394:3-25 (Harris, Tapestry). In consumer surveys, where public-data availability is not a constraint, Tapestry casts the net more broadly, and studies approximately 50 brands that span the range of Plaintiff's concept of "mass market," "accessible luxury," and "luxury." *Id.* at 395:1-7.

173.    The evidence presented shows that Coach does not set its prices based on competitor prices, much less Michael Kors' prices. *Id.* at 490:16-23 (Kahn, Coach) (testifying that Michael Kors "has no pricing constraint on [Coach's] activities"). Coach CEO, Todd Kahn testified that the types of monitoring documents Plaintiff has relied upon to show "closeness" are used as a "sanity check" to understand what consumers are seeing when they shop, and that it would be "foolish to try to list a hundred brands" to reflect the full competitive set in those documents. *Id.* at 488:5-22. Coach's President of North America similarly testified that any monitoring of competitor pricing information is "contextual" and not used to make decisions. *Id.* at 802:23-803:8, 809:21-810:3 (Levine, Coach); *see also id.* at 809:8-14 (discussing Coach's unilateral approach to discounting).

174.    Given the content and cadence of the competitive pricing documents, it would be all but impossible for Coach to make pricing decisions based on competitors. Many of these documents look to average prices across a brand's portfolio, which Mr. Kahn confirmed are "not relevant at all" when Coach is setting prices for its individual handbags. *Id.* at 488:5-11 (Kahn, Coach). Additionally, Coach sets promotions well in advance of holidays, so it does not and could not respond to what a competitor is doing during mid-holiday season. *Id.* at 808:3-15 (Levine, Coach).

---

Tapestry). Plaintiff does not explain why, if the basis for determining close competition is how often a brand appears in Tapestry's benchmarking exercises, competition from Louis Vuitton, Gucci, and Prada should be excluded entirely from the relevant market analysis.

**175.** With respect to Kate Spade, Plaintiff focuses on Kate Spade documents that benchmark certain competitors' average MSRP, typically including Coach, Michael Kors, and Tory Burch, against Kate Spade's average MSRP. *See, e.g.*, PX1250-017; PX1223-007. This type of brand-level benchmarking does not involve individual, SKU-level, handbag product pricing decisions. Critically, the "MSRP Positioning" targets are uninformative of actual handbag prices. For example, Michael Kors' average MSRP is currently over $400, but its actual AUR is under $100. *Supra* FOF ¶ 112. As its former Chief Merchant testified in deposition, Kate Spade does not consider "MSRP positioning targets" when setting its own prices. PX5079, at 161:6-19 (Bernson, Kate Spade). When Kate Spade sets prices, it typically references its own product architecture and historical pricing, but when competitor pricing is referenced, it would involve a "wide range" of "comps." *Id.* at 161:6-19, 129:17-130:14. Kate Spade "did not take into account Michael Kors' pricing" when setting prices for handbags. *Id.* at 311:9-18. Liz Fraser similarly testified that it is not possible to just decide to change Kate Spade pricing based on MSRP positioning targets because pricing is "a process" that is "not so simple" that requires the brand to "build the inherent value into the product" and "have the kind of marketing that is going to make the brand as buzzy as possible and give you brand heat." *Id.* at 875:21-876:4 (Fraser, Kate Spade).

**176.** Plaintiff's evidence with respect to Michael Kors fares no better. As to discounting, the examples Plaintiff used to show Michael Kors being aware of Coach or Kate Spade promotional activity did not result in Michael Kors following suit.[24] *Id.* at 171:4-173:2 (Idol, Capri); *see also id.* at 170:9-173:2 (explaining that Michael Kors does not follow just because it is sometimes aware of others' public promotions). Rather, documents exist showing Michael Kors is aware of Coach's

---

[24]    Plaintiff represents PX2101 as proof of discount following, but the complete email shows the opposite. *See* DX-0816-001. Michael Kors did *not* match Tapestry's discount. *Id.*

prices because "it's one of the easiest brands" to obtain pricing about due to its breadth of products and e-commerce presence. *Id.* at 173:5-174:21. Professor Scott Morton aptly described this as analogous to tracking a few fish within a much larger school. *Id.* at 1230:9-18 (Scott Morton). But the most important factor in Michael Kors' process of price-setting is what Michael Kors believes "the consumer is going to be willing to pay for that product" and its internal financial objectives. *Id.* at 219:9-220:16 (Newman, Michael Kors); *id.* at 170:9-171:3 (Idol, Capri).

177.    On store designs, Plaintiff presented no evidence that Michael Kors actually adjusted its store design in response to Coach's or Kate Spade's store designs. Rather, the evidence shows only that Michael Kors monitors a large number of companies' stores in the normal course. *See, e.g.*, DX-0912 (store visits agenda tracking competition); DX-0824 (discussing Gucci store displays); Hr'g Tr. 232:10-235:1, 236:2-238:1 (Newman, Michael Kors).

178.    On product design, Michael Kors witnesses expressly denied that they are particularly close design competitors to Coach or Kate Spade. Hr'g Tr. 207:19-208:4 (Newman, Michael Kors); *id.* at 164:2-20, 167:5-11 (Idol, Capri). Instead, internal documents show the Michael Kors taking design inspiration from brands positioned even above the price points for Tapestry brands, such as Chloe, Fendi, Prada, and Yves Saint Laurent, among others. DX-0853-007, -008, -011; DX-0812; DX-0801; *see also* Hr'g Tr. 208:5-209:21 (Newman, Michael Kors).

179.    On wages, where Plaintiff has focused on a single Tapestry wage increase in July 2021, Michael Kors was already contemplating an increase well before Tapestry announced its move. Hr'g Tr. 120:23-121:11, 169:4-11 (Idol, Capri). Michael Kors was considering that change because of larger macro shifts in the retail employment landscape, brought about by COVID and non-fashion company wage movements. *Id*. at 120:23-121:11 (Idol, Capri). Michael Kors

competes with tens of thousands of different companies for retail employees, and was being responsive to the larger employment landscape. *Id.* at 168:7-169:11.

**180.**    Many of the documents that Plaintiff incorrectly asserts show head-to-head competition are a byproduct of stock investor comparisons between Tapestry and Capri, not competition for the sale of handbags. This is because investors often compare Tapestry and Capri as investment options for U.S. publicly-traded fashion companies. Hr'g Tr. 174:2-21 (Idol, Capri); *id.* at 205:24-206:8 (Newman, Michael Kors); *id.* at 1111:16-1114:2 (Edwards, Capri). As Capri's CFO explained, the factors that make Capri and Tapestry alternative investment vehicles have little to do with consumer-facing competition. *Id.* at 1112:15-23 (Edwards, Capri).

### C.    Historic Market Shares Are Not Indicative Of Future Competition

**181.**    Even if Dr. Smith had accurately calculated market shares in a relevant market in this case, those shares would not be indicative of future competitive harm for multiple independent reasons.

**182.**    First, as described above, Michael Kors' sales are declining rapidly even within the relevant market that Dr. Smith calculates, with a single year decline of 16% from 2022 to 2023 alone. *See supra* FOF ¶ 8. Those lost sales are not diverting to Coach and Kate Spade. *Supra* FOF ¶ 8.

**183.**    Second, numerous independent handbag brands are growing rapidly, and there is a demonstrated ability to scale quickly in this industry. *See supra* FOF ¶ 39. Plaintiff has not presented any credible evidence that there are any practical limitations to companies scaling quickly in this industry. Contrary to Plaintiff's contention, sufficient entry does not require a new entrant the size of Michael Kors; it could instead be accomplished "with 100 brands that are one-hundredth the size of Michael Kors," Hr'g Tr. 1276:8-18 (Scott Morton),[25] as long as consumers

---

[25]    Dr. Smith testified that he ran his merger simulation to include a duplicate of Tory Burch as a new entrant and it made little difference. Hr'g Tr. 1343:8-1344:3 (Smith). That proves nothing, because his simulation still depends on his incorrectly estimated diversion proxies, which also shape his estimation of diversion to this hypothetical entrant. *Id.* at 1344:5-14.

can purchase from those brands, which they can today easily, *supra* FOF ¶ 21.

### D.    Dr. Smith's Quantitative Analyses Of Competitive Harm Are Not Credible

184.    Dr. Smith put forward two quantitative measures of purported harm in this case: (1) an upward pricing pressure analysis; and (2) a merger simulation. "Dr. Smith makes it sound like these are all independent analyses that all give the same answer. But they are all based on the same input, which is his diversion ratio, which is deeply flawed." *Id.* at 1254:12-1255:6 (Scott Morton). Both measures "build[] on the same foundation" of the flawed diversion proxies. *Id.* Dr. Smith does not dispute that reliance. Hr'g Tr. 570:13-17, 623:1-12 (Smith); *see also* DX-0283-125, to -129 (FSM ¶¶ 286-94). Because those diversion proxies do not measure diversion at all, and are substantially overestimated, Dr. Smith's measures of quantitative harm are over estimated and are not reliable. *See* Hr'g Tr. 1255:7-22 (Scott Morton).

185.    Neither Plaintiff nor Dr. Smith has put forward any evidence or opinions demonstrating that any coordinated effects are likely as a result of the Proposed Transaction.

### E.    Continued Brand Autonomy And Competition Between The Brands Will Further Ensure No Anticompetitive Effects

186.    The fact that Tapestry intends to permit Michael Kors to operate autonomously, with only specific corporate-level support from Tapestry in certain areas, helps to ensure that Michael Kors will maintain the ability and incentive to compete with Coach and Kate Spade. Today, Tapestry operates Coach and Kate Spade separately and leaves the brands to independently manage product design, pricing, and marketing. *Id.* at 304:05-14, 318:2-6 (Crevoiserat, Tapestry); *id.* at 488:23-489:10, 500:14-21 (Kahn, Coach); *id.* at 872:8-19, 896:4-897:17 (Fraser, Kate Spade); *id.* at 1013:16-21 (Charles, Tapestry); *id.* at 1231:11-1234:10 (Scott Morton); *see also* DX-0283-045, to -049 (FSM ¶¶ 104-112). It is profit maximizing for Tapestry to do so because it allows Coach to maximize its own profits and Kate Spade to maximize its own profits by differentiating their

brands rather than adhering to a uniform plan that could dull innovation and creativity.  Hr'g Tr. 1232:3-1233:5 (Scott Morton); *id.* at 304:15-305:02 (Crevoiserat, Tapestry); *see also* Hr'g Tr. 218:19-219:8 (Newman, Michael Kors).  Tapestry will continue to follow that path of operational autonomy post-transaction.  *Id.* at 305:21-306:6 (Crevoiserat, Tapestry).

## VII.    THE EQUITIES WEIGH AGAINST ANY PRELIMINARY INJUNCTION

**187.**    Granting Plaintiff's request for a preliminary injunction until the conclusion of Plaintiff's administrative proceeding will have the effect of blocking the Proposed Transaction permanently.

**188.**    The termination date in the Parties' merger agreement is February 10, 2025.  PX1014-072.

**189.**    The administrative evidentiary record closed on September 12, 2024, and the trial is set to commence on October 28, 2024.[26]  Because of the multi-level process, the Parties will not have a ruling from the Commission until well past February 10, 2025.  *See* 16 C.F.R. §§ 3.51(b), 3.52(b).

**190.**    Even putting aside the merger agreement outside date, subjecting Capri to this further lengthy FTC administrative process will further harm Capri and its employees.  John Idol, the CEO of Capri, testified that the lengthy FTC administrative process would be very disruptive to Capri because Capri is "having a very difficult time currently planning [its] future not knowing whether there will be a merger[.]"  Hr'g Tr. 176:8-21 (Idol, Capri).  Mr. Idol further explained that Capri's employees are very uncomfortable with the uncertainty of the pending merger, which has become extremely disruptive inside the company.  *Id.* at 176:22-25.

---

[26]    *See* Order Granting Unopposed Motion to Continue Evidentiary Hearing, *In the Matter of Tapestry,    Inc.*,    Docket    No.    9429    (F.T.C.    Sept.    17,    2024), www.ftc.gov/system/files/ftc_gov/pdf/d09429_commission_order_continuing_hearing_unsigned .pdf; *see also* Scheduling Order, *In the Matter of Tapestry, Inc.*, Docket No. 9429 (F.T.C. May 16, 2024), www.ftc.gov/system/files/ftc_gov/pdf/610670.2024.05.16_scheduling_order.pdf.

## CONCLUSIONS OF LAW

### I.    LEGAL STANDARDS

#### A.    The Preliminary Injunction Standard:  Section 13(b) of the FTC Act

**1.**    The FTC cannot prevail under any articulation of the preliminary injunction standard.

**2.**    Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), governs Plaintiff's ability to seek a preliminary injunction and allows a court to grant the FTC a preliminary injunction only if the court finds the FTC has a "likelihood of ultimate success" in proving a Section 7 violation and after "weighing the equities." 15 U.S.C. § 53(b).  Plaintiff contends that it is only required it to "raise[] serious questions about the antitrust merits that warrant thorough investigation in the first instance by the FTC," Plaintiff's Pre-hearing Proposed Findings ("PFCL"), COL ¶ 5, (ECF No. 277) (citing *FTC v. IQVIA Holdings Inc.*, 710 F. Supp. 3d 329, 350 (S.D.N.Y. 2024)).

**3.**    In *Starbucks Corp. v. McKinney,* the Court held that, absent a contrary "clear command from Congress," a federal government agency must make a "clear showing" of a likelihood of success on the merits to obtain a preliminary injunction. 144 S. Ct. 1570, 1575-76 (2024) ("likelihood of success" standard means what it says and requires more than just showing that the agency's case poses a "substantial and not frivolous" question).  In so holding, the Court provided specific examples of when Congress indicates a "clear showing" and willingness to depart from the traditional common law standard. *Starbucks*, 144 S. Ct. at 1577 (summarizing examples).

**4.**    Section 13(b) provides no support for doing so and instead on its face requires courts to assess Plaintiff "likelihood of ultimate success." 15 U.S.C. § 53(b).  *Cf. fuboTV Inc. v. Walt Disney Co.*, 2024 WL 3842116, at *15 n.29 (S.D.N.Y. Aug. 16, 2024) (applying *Starbucks*'s formulation of the preliminary injunction standard and finding no intent in Section 16 of the Clayton Act to depart from the common law standard).

**5.**    Proving "likelihood of success on the merits" under Section 13(b) means Plaintiff must prove that it is likely to succeed in convincing a federal court of appeals that the transaction violates Section 7. *FTC v. Lancaster Colony Corp.*, 434 F. Supp. 1088, 1090-91 (S.D.N.Y. 1977) (requiring an assessment of "ultimate success," meaning the "determination by the FTC in the first instance and ultimately by the Court of Appeals"); *see FTC v. Warner Commc'ns Inc.*, 742 F.2d 1156, 1162 (9th Cir. 1984) (same); *FTC v. Elders Grain, Inc.*, 868 F.2d 901, 903 (7th Cir. 1989) ("likelihood of success" contemplates "a full administrative proceeding before the FTC, followed by judicial review . . . in one of the courts of appeals").

**6.**    Although *Starbucks* displaces Plaintiff's preferred lower standard, Defendants prevail under any standard, as other defendants in merger cases have done prior to *Starbucks*. *See, e.g., FTC v. Meta Platforms Inc.,* 654 F. Supp. 3d 892 (N.D. Cal. 2023) (siding with defendants in a Section 7 merger challenge brought under Section 13(b))*; FTC v. Thomas Jefferson Univ.,* 505 F. Supp. 3d 522 (E.D. Pa. 2020) (same); *FTC v. RAG-Stiftung*, 436 F. Supp. 3d 278, 290 (D.D.C. 2020) (same) (noting "[t]hat burden 'is not insubstantial, and a showing of a fair or tenable chance of success on the merits will not suffice for injunctive relief.'") (quoting *FTC v. Arch Coal, Inc.*, 329 F. Supp. 2d 109, 116 (D.D.C. 2004)).

**7.**    While Plaintiff would have the Court act as a virtual rubber stamp, it has always been clear—including in the FTC's cited cases—that a court "must exercise its 'independent judgment' in analyzing whether the FTC has met its burden to show a likelihood of success on the antitrust merits" warranting a preliminary injunction. *IQVIA*, 710 F. Supp. 3d at 349. *Starbucks* reinforces this fundamental principle and refutes Plaintiff's argument that it need not show much at all in order to obtain "an extraordinary remedy never awarded as of right." 144 S. Ct. at 1576 (citing *Winter v. NRDC*, 555 U.S. 7, 24 (2008)).

### B. The Substantive Law: Section 7 of the Clayton Act and the *Baker-Hughes* Burden Shifting Standard

**8.** Under Section 7 of the Clayton Act, 15 U.S.C. § 18, Plaintiff must prove that the effect of the transaction will be "substantially to lessen competition" in a "line of commerce"—known, colloquially, as a relevant antitrust market. 15 U.S.C. § 18; *see also Int'l Shoe Co. v. FTC*, 280 U.S. 291, 298 (1930) ("some lessening of competition[] is not forbidden").

**9.** The determination of whether Plaintiff can establish that it is likely to succeed on the merits of showing "that [a] substantial lessening of competition will be sufficiently probable and imminent to warrant relief," *Arch Coal*, 329 F. Supp. 2d at 115 (citations and internal quotation marks omitted), operates through a three step burden-shifting standard laid out in *United States v. Baker Hughes, Inc.*, 908 F.2d 981 (D.C. Cir. 1990). *See also New York v. Deutsche Telekom AG*, 439 F. Supp. 3d 179, 206-07 (S.D.N.Y. 2020).

**10.** Plaintiff bears the burden to establish a prima facie case that the merger is likely to result in substantial harm to competition in a relevant antitrust market by showing that the merger will result in "undue concentration" in a properly defined market. *Baker Hughes*, 908 F.2d at 982-83. If Plaintiff fails to prove its prima facie case, its whole case fails.

**11.** Otherwise, the case proceeds to step two, where Defendants can rebut Plaintiff's prima facie case by showing that it "inaccurately predicts the relevant transaction's probable effect on future competition." *Id*. at 991.

**12.** If Defendants produce evidence to rebut Plaintiff's prima facie case, under step three, the burden shifts back to Plaintiff to prove that the merger will substantially lessen competition in its relevant market. *Id*. at 983.

**13.** The ultimate burden of persuasion always rests with Plaintiff. *Id*.

II.     **STEP 1:  PLAINTIFF IS NOT LIKELY TO CARRY ITS BURDEN TO SHOW THE TRANSACTION WILL RESULT IN UNDUE CONCENTRATION IN A PURPORTED "ACCESSIBLE LUXURY HANDBAG" MARKET**

      A.     **Plaintiff Is Not Likely To Establish That "Accessible Luxury Handbags" Are A Relevant Market**

14.     The purpose of market definition is to determine "the area of effective competition" and the area of likely harm.  *Ohio v. Am. Express Co.*, 585 U.S. 529, 543 (2018) (citation omitted); *see also RAG-Stiftung*, 436 F. Supp. 3d at 291 ("The scope of the relevant market also dictates the analysis of market power and the merger's anticompetitive effects.").

15.     A relevant market has two components: a relevant product market and a relevant geographic market.  *U.S. v. Marine Bancorporation, Inc.*, 418 U.S. 602, 618 (1974) ("Determination of the relevant product and geographic markets is 'a necessary predicate' to deciding whether a merger contravenes the Clayton Act." (citation omitted)).  The parties do not dispute that the appropriate geographic market in this case is the United States.  Plaintiff has not, however, carried its prima facie burden to demonstrate its proposed relevant product market.

16.     A properly identified relevant market must correspond to the "commercial realities" of the industry, *Thomas Jefferson Univ.*, 505 F. Supp. 3d at 539 (citing *Brown Shoe v. U.S.*, 370 U.S. 294, 336 (1962)), and must include all reasonable alternatives that a consumer could turn to in the event of a price increase.  *FTC v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34, 46 (D.D.C. 1998) ("[T]he relevant market consists of all of the products that the Defendants' customers view as substitutes to those supplied by the Defendants.").  "[A]ntitrust theory and speculation cannot trump facts, and even Section 13(b) cases must be resolved on the basis of the record evidence relating to the market and its probable future." *Arch Coal*, 329 F. Supp. 2d at 116-17.

17.     Courts typically apply two methods for assessing whether a plaintiff's proposed market is a relevant antitrust market:  (1) the *Brown Shoe* practical indicia factors to confirm whether a

plaintiff has proven a distinct relevant market; and (2) the HMT to confirm that the proposed

relevant market is supported by the quantitative evidence. *IQVIA*, 710 F. Supp. 3d at 354, 368.

*See United States v. United States Sugar Corp.*, 73 F.4th 197, 206 (3d Cir. 2023).

**18.**    Here, Plaintiff identified in the complaint and its pre-trial pleadings an "accessible luxury

handbag" market, which it purported to confirm through an application of the *Brown Shoe* factors.

The accessible luxury handbag market Plaintiff purports to identify included products ranging in

price from $100-$1000 and with certain other characteristics. PFCL, COL ¶ 32-39.

**19.**    Plaintiff relies on Dr. Smith to provide the quantitative support for its "accessible luxury

handbag" market through an HMT, but Dr. Smith did not apply the HMT against Plaintiff's

relevant market. Instead, Dr. Smith ran his HMT to confirm a different market—i.e., handbags

sold by the brands in the NPD "bridge" and "contemporary" categories. FOF ¶¶ 140-49.

**20.**    Whether viewed through the lens of Plaintiff's "accessible luxury handbag" market (which

is not supported by the *Brown Shoe* factors and lacks quantitative support) or through the lens of

Dr. Smith's "NPD bridge and contemporary market" (which is arbitrary and divorced from

commercial realities), the law, facts, and quantitative evidence do not support Plaintiff's markets.

### 1.    The Evidence Shows That Plaintiff's "Accessible Luxury Handbag" Market Likely Will Not Survive Scrutiny Under The *Brown Shoe* "Practical Indicia" Factors

**21.**    *Brown Shoe* provides a series of "practical indicia" that courts may consider in determining

whether Plaintiff has properly defined a relevant product market. The indicia include "industry or

public recognition of the submarket as a separate economic entity, the product's peculiar

characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity

to price changes, and specialized vendors." *Brown Shoe*, 370 U.S. at 325.

**22.**    The *Brown Shoe* "practical indicia" factors are meant to ensure the Plaintiff's market share

analysis reflects the commercial realities of the industry at issue. *See Ky. Speedway v. NASCAR,*

*Inc.,* 588 F.3d 908, 918 (6th Cir. 2009) ("practical indicia come into play only after the 'outer boundaries of a product market are determined' by evaluating 'the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it'") (quoting *Brown Shoe*, 370 U.S. at 325); *Thomas Jefferson Univ.,* 505 F. Supp. 3d at 539 ("As prescribed by Congress, definition of relevant markets is a 'pragmatic' and 'factual' exercise and 'not a formal, legalistic one.' . . . [the] relevant market must 'correspond to the commercial realities of the industry.'") (citing *Brown Shoe*, 370 U.S. at 336); *U.S. Sugar.*, 73 F.4th at 206 (finding the court did not err in "considering facts on the ground" rather than relying on a discredited HMT analysis).

**23.**     The evidence confirms that Plaintiff's market is not likely to withstand scrutiny under the *Brown Shoe* practical indicia.  FOF ¶¶ 81-113.

> **a.     Industry participants and consumers do not recognize "accessible luxury handbags" as a separate economic entity**

**24.**     The public perception indicium requires a generally accepted and agreed upon definition of a "separate economic entity."  *Brown Shoe*, 370 U.S. at 325-26 (noting that the "public" recognized distinct product markets for men's, women's, and children's shoes).

**25.**     When courts have found the "public perception" indicium satisfied, there has been evidence that the industry as a whole, including consumers, has a clear and consistent understanding of the contours of the market.  See *United States v. Anthem Inc.*, 236 F. Supp. 3d 171, 196 (D.D.C. 2017) ("By the end of the trial, it was crystal clear that just about everyone in the industry, certainly everyone within [the defendants' firms], has a consistent understanding of exactly what [the relevant product, i.e.,] a national account is."), *aff'd*, 855 F.3d 345 (D.C. Cir. 2017); *FTC v. Swedish Match*, 131 F. Supp. 2d 151, 165 (D.D.C. 2000) (citing testimony that "[t]he products are very different. They're used in a different way from chewing tobacco. The consumer taste preferences are different. The demographics of the consumer base are different.

You'll find them in a smokeless tobacco section, but they're very distinct product markets."); *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 30 (D.D.C. 2015) (citing testimony from "Defendants' executives; executives from other broadline distributors; officers of non-broadline companies; and customers, large and small" that they uniformly recognize "broadline, systems, specialty, and cash-and-carry to be distinct modes of distribution"); *FTC v. Staples, Inc*., 190 F. Supp. 3d 100, 119 (D.D.C. 2016) (citing evidence that vendors in the office supply industry identify customers according to how much they spend annually and recognize B-to-B customers as a distinct group).

26.      In contrast, where the evidence demonstrates a lack of a consistent customer understanding of the market—or where the evidence is conflicting and/or vague—courts have held that the evidence undercuts a finding of a distinct market.  *See United States v. SunGard Data Systems, Inc.*, 172 F. Supp. 2d 172, 182-83 (D.D.C. 2001) ("[T]he striking heterogeneity of the market, particularly as reflected by the conflicting evidence relating to customer perceptions and practices, further undercuts plaintiff's product market definition."); *State v. Kraft General Foods, Inc.,* 926 F. Supp. 321, 360 (S.D.N.Y. 1995) (rejecting an "adult" ready-to-eat cereal market due to inconsistent classifications of submarkets by manufacturers and retailer treatment of ready-to-eat as a single market); *United States. v. Oracle Corp.*, 331 F. Supp. 2d 1098, 1103 (N.D. Cal. 2004) (finding that while many industry players did differentiate between large and mid-market customers, there was no widely accepted meaning of what constitutes a "large" customer); *JBL Enterprises, Inc. v. Jhirmack Enterprises, Inc.*, 509 F. Supp. 357, 371-72 (N.D. Cal. 1981) (rejecting that one type of seller constituted a relevant market after finding "substantial evidence" that one type of seller "maintains a distinctive identity" but the "brands consider themselves to be in competition with the entire industry").

27.     Industry participants and consumers do not recognize "accessible luxury handbags" as a separate economic entity that is clearly separate from handbags offered by brands that the FTC excludes from the proposed market.  FOF ¶¶ 85-91.  Likewise, there is no agreed-upon or commonly used definition of "accessible luxury" used within the industry or among handbag consumers.  FOF ¶ 86.  The fact that Tapestry and Capri have used the term "accessible luxury" in their own internal documents and in investor-facing communications does not change this conclusion.  These documents do not contain a particular, consistent definition of the term, much less one understood by consumers or the industry at large as a separate economic entity.  FOF ¶¶ 86-89.

> ### b.     "Accessible luxury handbags" do not have "peculiar characteristics" or "uses" that make them distinct from handbags outside of Plaintiff's market

28.     The "peculiar characteristics" prong of *Brown Shoe* requires evidence of concrete and measurable factors that make "accessible luxury handbags" distinct, meaning the differences between the markets must be readily apparent.  *See Haagen-Dazs Co. v. Double Rainbow Gourmet Ice Creams, Inc.*, 895 F.2d 1417 (Table), 1990 WL 12148, at *3-4 (9th Cir. 1990) ("super premium ice cream" and "other ice cream products" were in the same relevant market because they were not "so different that they [were] unsuited for the same purpose"); *IQVIA*, 710 F. Supp. 3d at 355-56 (programmatic advertising allowed clients to target customers across the internet compared to advertising through social medial and endemic websites, which were "walled gardens" or just featured ad inventory from a single website); *Sysco Corp.* 113 F. Supp. 3d at 28 ("No one entering a systems, specialty, or cash-and-carry outlet would mistake it for a broadline distribution facility."); *United States v. H&R Block, Inc.*, 833 F. Supp. 2d 36, 58 (D.D.C. 2011) ("The functional experience of using a DDIY product is meaningfully different from the self-service task of filling out tax forms independently."); *FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1045

(D.C. Cir. 2008) (Tatel, J., concurring) ("[E]verything Whole Foods sells is natural and/or organic, while many of the things sold by traditional grocery are not.").

29.     The evidence confirms that "accessible luxury handbags" do not have discernable "peculiar characteristics" or "uses" as compared to brands that the FTC labels as mass market, better, moderate, athleisure, used, or designer bags.  FOF¶¶ 92-97.  Plaintiff argues that the "peculiar characteristics" of "accessible luxury handbags" are that they are made of high-quality materials and have "elevated craftsmanship" compared to "mass market" handbags.  However, the evidence showed that neither of these is a unique characteristic of any particular type of handbag.  To the contrary, many handbags sold by brands across the spectrum from "mass market" to "luxury" are arguably made from high-quality materials and have elevated craftsmanship—both of which are subjective judgments that rest in the eye of the consumer.  FOF ¶¶ 94-97.

### c.     Plaintiff has not shown that "accessible luxury" handbags are made in "unique production facilities"

30.     The evidence confirms that "accessible luxury handbags" are not made in "unique production facilities" that are different from those where mass market, better, moderate, athleisure, used, or designer bags.  FOF ¶¶ 98-103.  Instead, the evidence showed that "accessible luxury handbags" are made in the same production facilities that also make handbags across the spectrum from "mass market" to "luxury."  FOF ¶¶ 101-02.

31.     Regardless, "manufacturer location" does not equate to "unique production facilities."  When, as here, manufacturers can make both the "relevant product" and a proposed substitute, courts find that there are not unique production facilities.  *See IGT v. All. Gaming Corp.*, 702 F.3d 1338, 1347 (Fed. Cir. 2012) (finding that manufacturers could make both wheel games and ordinary gaming machines).  As a result, a production facility location in one country does not make it unique from a facility located in another country if both can make the same products.

> **d.    Plaintiff has not shown that "accessible luxury handbags" have "distinct customers"**

32.    Whether there are "distinct customers" for the relevant product is an important *Brown Shoe* element because, if such customers exist, then they may be subject to price discrimination by a seller who can target them for price increases or other anticompetitive harm.  *See Anthem*, 236 F. Supp. 3d at 195 ("A submarket exists when sellers can profitably raise prices 'to certain targeted customers but not to others,' in which case regulators 'may evaluate competitive effects separately by type of customer.'") (quoting *Staples*, 190 F. Supp. 3d at 117).

33.    Courts find "distinct customers" for a particular product where there is clear evidence that a particular set of customers has unique needs that cannot be met elsewhere, such that they are vulnerable to price increases.  *See, e.g., Geneva Pharm. Tech. Corp. v. Barr Laboratories Inc.*, 386 F.3d 485, 497-98 (2d Cir. 2004) (identifying that there are price sensitive pharmaceutical customers that will almost always switch to generics and a set of customers with "strongly inelastic demand" that will stay with the brand drug and focusing on the former category for relevant market); *United States v. Bertelsmann SE & Co. KGaA*, 646 F. Supp. 3d 1, 31–32 (D.D.C. 2022) (authors of top selling books have "unique" and "specialized needs" that only the "Big Five" publishers can meet, which makes those authors vulnerable to price discrimination); *Whole Foods*, 548 F.3d at 1037, 1039-40 (focusing on distinct group of "core customers" that wanted a "package" of natural and organic perishable goods that is not available elsewhere which allowed Whole Foods to price discriminate against those customers); *Anthem*, 236 F. Supp. 3d at 196 (The "industry universally recognizes that national accounts exhibit different needs and characteristics that drive the design and pricing of their products."); *Sysco Corp.*, 113 F. Supp. 3d at 29-30 ("The largest broadline customers, such as GPOs, foodservice management companies, and hospitality providers, cannot use systems or cash-and-carry for their needs. . . . Even most independent

restaurants cannot use cash-and-carry stores as a reasonable substitute for their broadliner, even though such stores offer lower prices.").

34.    There is no evidence that there is a distinct set of customers for "accessible luxury handbags" within the meaning of this case law.  Plaintiff argues that a majority of Tapestry and Capri's customers are "lower income," but failed to show that is true of "accessible luxury handbag" customers generally across the 230+ brands Plaintiff contends are in the relevant market. FOF ¶ 107.  Indeed, the evidence shows that brands the FTC labels "accessible luxury" show no clear customer divisions based on income.  *Id*.  Plaintiff also failed to show that "lower income" customers have any unique handbag needs that cannot be met elsewhere or that that group of customers is vulnerable to price discrimination because they lack options.  FOF ¶¶ 104-08.  Rather, there is evidence that lower-income consumers purchase higher-priced "luxury" handbags and that higher-income consumers purchase lower-priced handbags.  FOF ¶¶ 107-08.  The record also contains ample evidence that consumers of all income levels would continue to have a wide variety of handbag options at every price point post-merger.  FOF ¶¶ 19, 21, 114.

> **e.    Plaintiff has not shown that "accessible luxury handbags" have distinct prices**

35.    The "distinct prices" and "sensitivity to price changes" *Brown Shoe* factors are intended to test cross-elasticity of demand and sensitivity to price changes based on the industry's commercial realities.  *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 218 n.4 (D.C. Cir. 1986).  As *Brown Shoe* noted, given the tendency of customers to substitute shoes where pricing occurred on a spectrum, "it would be unrealistic to accept Brown's contention that, for example, men's shoes selling below $8.99 are in a different product market from those selling above $9.00." 370 U.S. at 326 (rejecting argument "that medium-priced shoes do not compete with low-priced shoes").  As such, "the boundaries of the relevant market must be drawn with sufficient breadth to

include the competing products of each of the merging companies and to recognize competition where, in fact, competition exists." *Id.*

36.    Consistent with *Brown Shoe*, courts have repeatedly observed that defining markets by "price variances or product quality variances" is "economically meaningless where the differences are actually a *spectrum* of price and quality differences." *In re Super Premium Ice Cream*, 691 F. Supp. 1262, 1268 (N.D. Cal. 1988) (emphasis in original) (noting that "differentiated products face intense competition from other brands of the same product"); *Nifty Foods Corp. v. Great Atl. & Pac. Tea*, 614 F.2d 832, 840-41 (2d Cir. 1980) (finding that dividing a market into branded and private-label frozen waffles was "even less realistic" than the market proposed in *Brown Shoe* where the two types of waffles were "sold side by side in the same frozen food cases and distinguished only by label and price, and not quality"); *Murrow Furniture Galleries, Inc. v. Thomasville Furniture Indus., Inc.,* 889 F.2d 524, 528 (4th Cir. 1989) (rejecting a market definition of "name-brand" or "better branded" furniture); *United States v. Joseph Schlitz Brewing Co.*, 253 F. Supp. 129, 145-46 (N.D. Cal. 1966) (rejecting submarket of premium beers because "beer prices range over a wide spectrum" and there was "no rational way of choosing a point along this price spectrum"), *aff'd*, 385 U.S. 37 (1966).

37.    This is especially true in cases, like this one, involving differentiated products where competition occurs across a range of factors beyond price, including quality. *See Kraft Gen. Foods*, 926 F. Supp. at 333 (finding that all "ready to eat" cereals were in a single relevant market because such cereals were "so highly differentiated, and compete[d] with one another along so many different dimensions, that there [was] no clear break in the chain of substitutes," and thus, "[a]ny substantial price increase for any one type of RTE cereal would lead to significant demand-side substitution of many other RTE cereals").

38.    Courts have found support for distinct pricing when documents and testimony demonstrated that the company *actually decreased prices* in response to new competitors selling reasonable substitutes, but not in response to new competitors outside the product market.  *Geneva Pharm. Tech.*, 386 F.3d at 497 ("[S]enior vice president of sales and marketing confirmed that [competitor's] entry had a substantial effect on [defendant's] pricing."); *Whole Foods Mkt.* 548 F.3d at 1043-44 (Tatel, J., concurring) (FTC offered direct evidence that Whole Foods dropped prices when another PNOS opened nearby, but not in response to conventional grocery store).

39.    Such evidence is not present here.  Rather, consistent with the cases that rejected distinct markets, the evidence showed that handbags are differentiated products priced along a continuous spectrum.  FOF ¶¶ 2, 6, 9, 14, 51, 103.  Indeed, individual handbag brands, including those owned by both Defendants, sell products priced along a wide spectrum.  *Id.*  In fact, although Plaintiff contends that "accessible luxury handbags" are generally priced between $100 and $1000, its own expert refused to adopt that position and the undisputed evidence regarding Michael Kors' AUR refutes that claim.  FOF ¶¶ 109-12.  And Plaintiff wholly failed to produce evidence of the Parties making product pricing decisions based on the prices of other "accessible luxury" handbags to the exclusion of other products.  FOF ¶¶ 173-76.

> **f.    Plaintiff has not argued—nor tried to show that—"accessible luxury handbags" are sold through "specialized vendors"**

40.    Plaintiff does not even contend, much less offer any evidence, that "accessible luxury handbags" are sold through "specialized vendors."  A walk through a department store or scrolling online proves the opposite.  FOF ¶ 113.

41.    For all these reasons, the evidence introduced about the *Brown Shoe* factors does not support the conclusion that Plaintiff is likely to prove "accessible luxury handbags" are a legally cognizable relevant antitrust market for this case.

## 2.    It Is Unlikely That Plaintiff Will Be Able To Define A Relevant Market Using Dr. Smith's HMT

42.    Plaintiff's expert Dr. Smith's HMT is the only quantitative analysis Plaintiff put forth in this case to support its "accessible luxury handbag" market definition.  FOF ¶¶ 13, 184.  Dr. Smith determined that a market comprised of the "NPD bridge and contemporary" brands satisfied the HMT based on aggregate diversion ratios he calculated from a years-old consumer survey.  Dr. Smith's HMT is not reliable as a matter of law for two independent reasons.

### a.    Dr. Smith Arbitrarily Defined His Market Based On A Third-Party Data Set, Which He Failed To Show Was Supported By Commercial Realities

43.    Dr. Smith did not apply the HMT against the relevant market defined by Plaintiff, meaning he did not confirm it.  Instead, Dr. Smith chose a distinctly different market—i.e., handbags sold by the brands encompassed in the NPD "bridge" and "contemporary" categories, and ran his HMT over that market.  FOF ¶¶ 13-14, 142-43.

44.    Dr. Smith did no quantitative or qualitative analysis to determine whether the NPD bridge and contemporary brands match up with the accessible luxury handbag market defined by Plaintiff or comport with the *Brown Shoe* factors on which Plaintiff attempts to base its accessible luxury handbag market.  Nor did Smith validate that either party used NPD to define the parameters of any market, let alone an "accessible luxury market."  FOF ¶¶ 146-48.  In fact, Capri does not subscribe to NPD data, further undermining the validity of basing a market definition on the parties' use of that data.  FOF ¶ 147.  Instead, Dr. Smith relied on a few stray references in Tapestry's documents where one employee in 2021 appeared to refer to those categories as constituting accessible luxury, but did not address that that same document showed Tapestry was comparing itself to a much broader set of competitors.  FOF ¶ 148.

45.     The market Dr. Smith analyzed excludes numerous brands and types of handbags that should be included under Plaintiff's proposed accessible luxury handbag market, without explanation, and as such is not supported by the commercial realities of the industry in which defendants compete.  *See e.g.*, *Thomas Jefferson Univ.*, 505 F.Supp. 3d, at 541 ("Market definition can rest on a mathematical equation only if the variables used in the equation reflect the market's commercial realities."); *cf. U.S. v. Booz Allen Hamilton Inc.*, 2022 WL 9976035, at *10 (D. Md. Oct. 17, 2022) ("By defining the market so narrowly, the Government attempts to 'gerrymander its way to victory without due regard for market realities.'").

46.     Courts reject the opinions of expert economists when they apply the HMT "in an overly mechanical fashion" on a "much more narrow 'tentative' product market" that overlooks relevant facts.  *In re Fresh Del Monte Pineapples Antitrust Litig.*, 2009 WL 3241401, at *9 (S.D.N.Y. Sept. 30, 2009); *Thomas Jefferson Univ.*, 505 F. Supp. 3d at 542-43 ("The Government acknowledges, however, that the geographic market which passes the HMT must correspond with commercial realities.  And as [defendants' expert] explained, 'some markets can pass [the HMT] and be more logical with respect to competitive realities and others can be less [so].'" (citations omitted)).

47.     That is especially true where, as here, the antitrust plaintiff purports to define a market based on an artificial data set created for purposes unrelated to antitrust market definition.  *See, e.g.*, *Kraft Gen. Foods*, 926 F. Supp. at 334 ("It is not appropriate to use, as plaintiff's expert has done, the marketing segments adopted from time to time by any particular RTE cereal producer to define a relevant economic product market.").

    **b.**  **Dr. Smith Based His HMT On Aggregate Diversion Ratios He Calculated From Surveys That Did Not Analyze Diversion**

48.     Dr. Smith based his HMT on diversion ratios he calculated using surveys that were unfit for that purpose.  FOF ¶¶ 121-38.  Diversion in Section 7 cases means something specific: it "refers

to a consumer's response *to a measured increase in the price of a product*" and "measures to what extent consumers of a given product will switch (or be 'diverted') to other products *in response to a price increase in the given product*." *H&R Block*, 833 F. Supp. 2d at 61 (emphasis added).

**49.** It is possible to obtain reliable data on diversion through a consumer survey that asks consumers about which product they would switch to in the event of a price increase; however, Dr. Smith did not conduct such a survey here. FOF ¶ 127. Instead, Dr. Smith relied on surveys that Tapestry conducted in the ordinary course in 2021 and 2022. FOF ¶¶ 134-38. These surveys are not reliable for purposes of estimating diversion in this case for two reasons. First, because the surveys were conducted in 2021 and 2022 and ask about purchases consumes made as far back as 2020 and 2021, they are too old to be reliable indicators of choices consumers would make post-merger, in a dynamic market. *Id.* Second, the question the surveys asked—*i.e.,* which brands did you consider when you made your last purchase?—did not address diversion at all, much less diversion due to a price increase. FOF ¶¶ 125-33.

**50.** Other courts have rejected diversion ratios based on unreliable consumer surveys. In *H&R Block*, 833 F. Supp. 2d at 36, the court rejected the defendants' expert's attempt to calculate diversion ratios and define the relevant market based on survey data that provided respondents with a pre-selected list of alternative options and only asked them about what products they would switch to if they became dissatisfied with their current tax preparation method on the basis of price, functionality or quality. *Id.* at 69-71. Even though the survey question addressed the concept of switching, the court noted that the survey asked about concerns with functionality and quality instead of just price, which meant that there was no real way to know *why* a consumer was picking a different option. Was it price or something else? *Id.* at 70. The survey also offered only a pre-

selected list of choices that might have "led respondents to select options they otherwise would not have selected." *Id.*

51.    The court similarly rejected use of surveys to define a market in *Kraft General Foods*, 926 F. Supp. at 321.  There, the court noted that "[i]nteraction indices measure only the propensity of households to purchase two products.  Interaction indices are not equivalent to, or proxies for, cross-price elasticities, because they do not purport to measure changes in consumption as a function of changes in price." *Id*. at 333.  The court observed that while these results were used in the acquirer's ordinary course of business, the acquirer did "not rely exclusively on interaction indices to make major business decisions.  Interaction indices [were] simply one piece of information provided to [the acquirer] once a year." *Id.*  With regard to reliance on a survey that does not focus on switching patterns that would result from a price increase, the court stated:

> Shifting studies provide information about purchases from one period to the next, but they do not identify the factors that led to those changes.  They do not relate changes in consumption to changes in price, to changes in promotional activity, to changes in advertising, or to other factors that may affect purchasing.

*Id*. (citations omitted).

52.    The Tapestry surveys suffer from many of the same flaws.  For example, the relevant survey question did not ask survey respondents *in what way* they "considered" other handbag brands, nor did it ask whether they would consider *purchasing* handbags from any of the brands that they had "considered."  FOF ¶¶ 125-29.  Similarly, this consideration question appeared after a long set of looping questions when participants would have been fatigued, and then offered participants a pre-set list of choices that Tapestry had selected.  FOF ¶¶ 130-33.  This dynamic can "le[a]d respondents to select options they otherwise would not have selected." *H&R Block*, 833 F. Supp. 2d at 70.

53.    Plaintiff contends that the Tapestry surveys are similar to win/loss or switching data that courts have sometimes found to provide at least some indication of diversion.  That is not true. When courts have credited the use of switching data as an indication of diversion, they typically have done so because the data reflects actual consumer behavior, not hypothetical predicted behavior, and have been based on significant data sets.  *See, e.g.*, *id.* at 62 (using switching data with over 100 million entries).  Switching data shows the consumers actually bought a particular second product, even if it does not explain why they did so.  But courts do not rely on switching data as conclusive evidence of diversion, recognizing that diversion based on switching data has "limitations," and is at best "some estimate of diversion."  *Id.*  Here, unlike switching data, the years-old Tapestry surveys provide no evidence that any consumer viewed any product as, in Dr. Smith's words, the "next best alternative" to one of the Parties' handbags, nor that they would buy a different handbag at all, much less in response to a price increase.  FOF ¶¶ 121-33.

### 3.    Plaintiff's "Accessible Luxury Handbag" Market and Dr. Smith's "NPD Bridge and Contemporary" Market Suffer From A Failure Of Proof Because They Fail to Account For Used Handbags

54.    In addition to the challenges with proving a relevant market under *Brown Shoe* and Dr. Smith's application of the HMT, Plaintiffs markets suffer from an additional incurable flaw:  a failure of proof as to whether the "accessible luxury handbag" market is properly defined (and therefore sufficiently concentrated) because it excludes used bags from the market but has not done any work to support omitting them.  Dr. Smith's diversion ratios and his market concentration statistics likewise altogether ignore used handbags.  FOF ¶ 160.  This failure is material because the unrebutted evidence demonstrates that customers consider used handbags as reasonable substitutes for the products sold by the Parties, but Plaintiff does not consider how their inclusion would affect the total size of their proposed market.  FOF ¶¶ 10, 41, 42, 54, 55, 119.

55.    When a product market artificially limits sellers in the market, the proposed product market cannot qualify as a relevant antitrust market.  For example, in *U.S. v. U.S. Sugar Corp.*, the Department of Justice ("DOJ") sought to block a merger under Section 7 based on a relevant product market that included only firms that engaged in the "production and sale" of refined sugar. 73 F.4th 197, 204 (3d Cir. 2023).  DOJ argued that "a proper application of the HMT requires us to limit our focus to only those firms that both produce *and* sell refined sugar and to exclude sellers who do not themselves refine sugar."  *Id.*  It thus excluded "distributors" of refined sugar from its market.  The Third Circuit rejected this argument, holding that the "Government introduced no evidence at trial that purchasers care whether their sugar supplier is a . . . distributor" and observed that defining the market in this way was "irrelevant to consumer welfare and purely self-serving description by the government."  *Id.*; *see also Allen-Myland, Inc. v. Int'l Bus. Machines Corp.*, 33 F.3d 194, 203 (3d Cir. 1994) (used products not already counted in the market should be included in the denominator because "they provide an alternative that limits IBM's power in the market").

56.    Similarly, in *United States v. Gillette Co.*, 828 F. Supp. 78, 84 (D.D.C. 1993), the court denied the DOJ's request for a preliminary injunction to block a merger of two premium fountain pen companies under Section 7.  As to market definition, the court held that although "plaintiff has provided ample evidence that fountain pens in the $50 to $400 range effectively do not compete with fountain pens either below or above that range," the "product market proposed by [the government] [was] far too narrow" because the market included "all premium writing instruments" to which fountain pen consumers would substitute.  *Id.* at 83.  Because the DOJ did "not allege[] that this market is highly concentrated either before or after the merger and has not demonstrated that the merger will have anti-competitive effects on this market," the court held that plaintiff did not make its prima facie case and that an injunction was not warranted.  *Id.*

57.     Here, Plaintiff has categorically excluded all resale sales despite the unrebutted evidence that resale is a significant and increasing competitive constraint in the handbag industry.  FOF ¶¶ 10, 41, 42, 54, 55, 119.  This failure means Plaintiff is not likely to prove a legally cognizable relevant market in the Part 3 administrative proceeding, or on appeal, and thus Plaintiff is not likely to prove this transaction violates Section 7.

### B.      Dr. Smith's Analysis Fails To Trigger A Presumption of Illegality In Any Relevant Market

58.     Dr. Smith's market shares that supply the sole basis for his concentration statistics are based on a "market" that is divorced from commercial realities.  FOF ¶¶ 14, 142-49. He did no econometric or qualitative analysis to conclude that his relevant market should exclude bag brands deemed by NPD as moderate, better, athleisure, used handbags, or designer handbags; instead, he simply proclaims that his market is correct and that the shares are high.  FOF ¶ 14.

59.     Likewise, Dr. Smith has not provided a reliable analysis to show that his estimates of the shares attributable to sales he includes in the market are accurate and reliable.  FOF ¶¶ 150-62.

60.     Because Dr. Smith's market share and concentration statistics rest on a factually indefensible foundation, they are not reliable and thus Plaintiff is not likely to be able to carry its prima facie burden.  *RAG-Stiftung*, 436 F. Supp. 3d at 310 ("The Court is unaware of a single case in which a court has enjoined a merger, even at this preliminary stage, where the Government failed to show undue concentration in a relevant market as its prima facie case requires, almost always through an HHI or similar metric.").

### C.      Plaintiff Cannot Avoid Market Definition And Carry Its Burden to Show The Transaction Is Unlawful By Claiming This Is A Merger Of Closest Competitors

61.     Plaintiff contends that it can bypass its burden to define a product market if it can prove that Michael Kors and Coach are close competitors.  As an initial matter, Plaintiff has not shown

that Michael Kors and Coach are close competitors. *Infra* § IV. In any event, that is not the law. The Supreme Court has made clear that as a "necessary predicate" to a Section 7 claim, Plaintiff must show that a transaction is likely to substantially reduce competition in a relevant market. *U.S. v. E.I. du Pont de Nemours Co.*, 353 U.S. 586, 593 (1957).

**62.**    The fact that the Plaintiff is the FTC in a Section 13(b) action does not change the legal elements of a Section 7 claim. *See, e.g.*, *FTC v. Freeman Hosp.*, 69 F.3d 260, 268 (8th Cir. 1985).

**63.**    Every case Plaintiff has cited to advance its novel position confirms that the law requires finding a relevant market before analyzing anticompetitive effects. *See Sysco Corp.*, 113 F. Supp. 3d at 24 ("Merger analysis starts with defining the relevant market."); *IQVIA*, 710 F. Supp. 3d at 352 ("For the FTC to make out a prima facie case, it must [ ] define a relevant market . . . ."); *Whole Foods*, 548 F.3d at 1036 (rejecting the FTC's argument that "a market definition is not necessary in a § 7 case," noting that "the framework we have developed for a *prima facie* § 7 case rests on defining a market and showing undue concentration in that [relevant] market"); *U.S. v. Mfrs. Hanover Trust Co.*, 240 F. Supp. 867, 887 (S.D.N.Y. 1965) (noting the question under § 7 is whether the merger cause harm "in the relevant market.").

**54.**    Plaintiff's failure to define a market and establish concentration in that market means it cannot establish its prima facie case, which ends the analysis. *RAG-Stiftung*, 436 F. Supp. 3d at 310 (FTC's "failure to make out a prima facie case is generally considered a 'fundamental defect' that dooms its case"); *Thomas Jefferson Univ.*, 505 F. Supp. 3d at 557-58; *Arch Coal*, 329 F. Supp. 2d at 116 ("[A] failure of proof in any respect will mean the transaction should not be enjoined.").

**III.    STEP 2: DEFENDANTS ARE LIKELY TO REBUT PLAINTIFF'S PRIMA FACIE CASE**

**64.**    If Plaintiff meets its burden under the first step, Defendants can rebut the presumption that the transaction is anticompetitive by demonstrating that "statistics on market share, market

concentration, and market concentration trends inaccurately predict the merger's probable effects on competition." *Baker Hughes*, 908 F.2d at 991; *see id*. at 992 ("market share" does not always translate to "market power, which is the ultimate consideration" in whether a defendant can rebut a plaintiff's prima facie showing).

65.    The amount of evidence defendants must produce to shift the burden back is relatively low, particularly where, as here, the Plaintiff's prima facie case is weak. *Arch Coal*, 329 F. Supp. 2d at 129 (noting "less of a showing is required" to rebut a "less-than-compelling prima facie case").

### A.    Evidence of Dynamic Entry and Expansion Confirms That Plaintiff's Concentration Statistics Overstate The Transaction's Likely Competitive Effects

66.    Concentration statistics that are "artificially restricted to existing firms competing at one moment may yield market share statistics that are not an accurate proxy for market power when substantial potential competition able to respond quickly to price increases exists." *U.S. v. Waste Mgmt., Inc.*, 743 F.2d 976, 982 (2d Cir. 1984).  As such, Defendants can rebut Plaintiff's showing by demonstrating that entry in the relevant market is easy, meaning that remaining and potential competitors—of any size, individually or in the aggregate—have the collective ability to constrain supracompetitive prices.  *Id.* at 982-84 (reversing finding of Section 7 liability based on potential for entry where firms had a combined 48.8% share of the relevant market, but where barriers to entry were sufficiently low such that ease of entry constrained every firm in the market).

67.    Any analysis of entry is necessarily linked to a focus on *barriers to entry* because in markets with low entry barriers, "existing competitors could not succeed in raising prices for any significant period of time." *Id.* at 982; *FTC v. Promodes S.A.*, 1989 WL 103748, at *1 (N.D. Ga. Apr. 14, 1989); *FTC v. Occidental Petroleum Corp.*, 1986 WL 952, at *15 (D.D.C. Apr. 29, 1986) ("If entry barriers are low, then an acquisition will be unlikely to lessen competition, regardless of the market shares of the existing firms or the degree of concentration in the relevant market.").

68.    Plaintiff contends that entry must be of the size and scale to replace Michael Kors' footprint today.  PFCL at 31 (arguing the standard is "barriers to scale").  That is wrong as a matter of law. *See, e.g.*, *Waste Mgmt.*, 743 F.2d at 979 (current or potential competitors must simply have the collective ability to "constrain the prices charged by [the merging parties]"); *id.* at 982-83 (low barriers to entry rebutted the government's prima facie case even though the "majority of new entrants" had "either remained relatively small or disappeared" because "[e]ase of entry constrain[ed] . . . every firm in the market"); *United States v. Calmar Inc.*, 612 F. Supp. 1298, 1300, 1305-07 (D.N.J. 1985) (denying preliminary injunction where, despite post-merger market shares of 83% and 79% in the relevant markets, there were low entry barriers because the products were easy to make, consumer preferences were dynamic, and a large number of firms had the potential to enter); *Baker Hughes*, 908 F.2d at 988 ("If barriers to entry are insignificant, the *threat* of entry can stimulate competition in a concentrated market, regardless of whether entry ever occurs." (emphases in original)).  The question is *not whether one entrant will enter with scale to replace the Michael Kors' footprint*; instead, the focus is on *whether existing, potential, and future competitors can discipline the merged firm's ability to raise prices*.  The single case Plaintiff points to in support of its "barriers to scale" theory, *Chi. Bridge & Iron Co. v. FTC*, 534 F.3d 410, 429 (5th Cir. 2008), makes clear that the question is *whether remaining and potential competitors have the collective ability* "to constrain supracompetitive prices."

69.    Here, Plaintiff's market share statistics overstate the transaction's potential competitive effects because competitors can (and already do) quickly enter, expand, and reposition.  FOF ¶¶ 26-45.  These facts confirm that there is an "absence of significant barriers [to entry]" and that, even if the transaction created an incentive to raise prices, Defendants "probably cannot maintain supracompetitive pricing for any length of time."  *Baker Hughes*, 908 F.2d at 987.

70.     The overwhelming evidence on ease of entry/expansion in this case stands in stark contrast to the cases Plaintiff cites where courts found entry would not be timely or sufficient.  For example, in *fuboTV*, 2024 WL 3842116, at \*1, the defendants, three horizontal competitors that control more than 50% of the licensing rights for live sports, created a joint venture to launch a live sports streaming service.  The court found that each defendant had a contractual obligation to the joint venture as well as its own economic incentive not to license its rights to enable a competing streaming service.  *Id.* \*21-24.  Thus, the joint venture had the power to insulate itself from having any meaningful competition through entry or expansion.  *Id.*

71.     In *Anthem*, 236 F. Supp. 3d at 223-24, the government offered evidence that there were substantial barriers to entry because a new entrant would have to build a national provider network *and* a robust enough membership list to negotiate provider discounts, and would have to be able to meet the "complex administrative, analytical, and technological demands" of national accounts.  And two of the most prominent regional providers testified that they ***were not*** able to expand into national accounts.  *Id.* at 224-225.  In *H&R Block*, 833 F. Supp. 2d at 74-76, the two next largest players who confirmed they were unlikely to timely expand, if at all, and other entry or expansion was unlikely is such a "mature" industry.

72.     The facts of those cases contrast with those here, where virtually every existing handbag brand has concrete plans to continue to expand its business (with many already succeeding), there is a vibrant and growing resale channel, and the number of new entrants continues to grow as does the overall size of the industry.  FOF ¶¶ 19, 25-44.

### B.      The Decline Of Michael Kors Confirms That Plaintiff's Concentration Statistics Are Not Indicative Of Michael Kors' Future Competitive Success

73.     In considering whether Plaintiff's concentration statistics accurately reflect the risk of a transaction's anticompetitive effects, courts also consider the acquired firm's competitive

significance and, specifically, whether its weakened competitive state means it is likely to be a unique competitive threat going forward. *U.S. v. Gen. Dynamics Corp.*, 415 U.S. 486, 498 (1974) (noting that market share statistics are not determinative of whether a merger will have anticompetitive effects and that courts must examine the particular sector, including developing and ongoing transformations in the industry, to evaluate a merger's probable effects).

74.    Market shares can overstate the anticompetitive effects of a deal even if the acquired firm is healthy and strong where an industry is undergoing significant change, including new entry and new competitive pressures. *Id.* at 506 (holding that "[s]uch evidence" of fundamental change "went directly to the question of whether future lessening of competition was probable"); *see also U.S. v. Int'l Harvester Co.*, 564 F.2d 769, 777-80 (7th Cir. 1977) (citing evidence of intensified industrial competition and *General Dynamics* as a basis to clear the transaction under Section 7).

75.    Consistent with *Brown Shoe*'s holding that a court should not rely merely on market share statistics, but rather should conduct a "further examination of the particular market—its structure, history and probable future" to judge "the probable anticompetitive effect of the merger," 370 U.S. at 322 n.38, it is proper to credit the fact that the Michael Kors brand has struggled to stay relevant in a highly competitive industry, resulting in its declining competitive significance, FOF ¶¶ 61-68.

### C.    Tapestry's Emphasis On Brand Autonomy Will Ensure Competition Among The Coach, Kate Spade, And Michael Kors Brands Continues

76.    Plaintiff's market shares are also not indicative of an antitrust issue because Plaintiff's theory in challenging this transaction rests on a fallacy that, after the merger, Tapestry intends to eliminate competition among Coach, Kate Spade, and Michael Kors. Plaintiff offered no evidence that the merging parties' brands are looking to each other today to set strategy or prices, and there is no evidence that will change post-closing. The evidence confirms that Tapestry intends to continue to run these as three independent brands. FOF ¶186. As such, Dr. Smith's market shares—

which assume consolidation of the brands—"produce an inaccurate account of the merger's probable effects on competition in the relevant market," *Arch Coal*, 329 F. Supp. 2d at 116. For these reasons, the evidence shows that Defendants are likely to rebut Plaintiff's prima facie case.

## IV.    STEP 3:  IT IS UNLIKELY THAT PLAINTIFF WILL BE ABLE TO CARRY ITS ULTIMATE BURDEN OF PERSUASION BECAUSE IT WILL NOT BE ABLE TO PROVE THE TRANSACTION IS LIKELY TO PRODUCE ANTICOMPETITIVE EFFECTS IN ANY RELEVANT MARKET

**77.**    Plaintiff must prove that it is likely to prevail on the merits of its claim that the transaction is likely to have substantial anticompetitive effects in a relevant market.  Put differently, the elimination of some head-to-head competition and "some lessening of competition" is not sufficient under the law.  *Int'l Shoe*, 280 U.S. at 298 (noting that Section 7 "deals only with such acquisitions as probably will result in lessening competition to a substantial degree"); *see also RAG-Stiftung*, 436 F. Supp. 3d at 318 (noting that while there is some loss of head-to-head competition, it does not meet the statutory standard for a substantial lessening of competition). This means Plaintiff must put forward a defensible, "forward-looking analysis" which proves that the acquirer likely will harm consumers post-merger. *U.S. v. Sabre Corp.*, 452 F. Supp. 3d 97, 146 (D. Del. 2020), *vacated on other grounds*, 2020 WL 4915824 (3d Cir. July 20, 2020); *see also Baker Hughes*, 908 F.2d at 988, 991 (explaining that merger analysis "focus[es] on the future" and requires the Court to "[p]redict[ ] future competitive conditions").

**78.**    In *Gillette Co.*, the court held that, even if the government met its prima facie burden, the government failed to show anticompetitive effects because (1) pen types are functionally interchangeable, so "an increase in one type of pen will make it relatively less attractive than other types of pen"; (2) if the combined entity "were to increase prices on its fountain pens, it would likely lose customers to its other pens in the same family (if not to other manufacturers)"; (3) there were low entry barriers in the relevant market; and (4) "innovation (particularly in design) [was]

crucial to maintaining market share," so if the combined entity "desires to remain competitive in the fountain pen market, it must compete with other companies' innovations in fountain pens and in other modes of writing."  828 F. Supp. at 84-85; *see also Deutsche Telekom*, 439 F. Supp. 3d at 243 (plaintiffs lost at Step 3 because the anticompetitive effects that plaintiffs predicted were "unlikely" in the "intensely competitive and rapidly changing" relevant market). The same features are true of the handbag industry here.  FOF ¶¶ 19-45, 53.

**79.**    Plaintiff offers essentially three arguments for why it believes Tapestry is likely to raise price post-merger.  First, it argues that Dr. Smith's merger simulation predicts Tapestry will have the ability to raise prices.  However, Dr. Smith's merger simulation is unreliable because it depends upon the same unreliable aggregate diversion ratios he used in connection with his HMT, as discussed above.  *Supra* § II.A.2.b.  His results also contradict the overwhelming real-world evidence that Coach, Kate Spade and Michael Kors cannot raise prices without also increasing value in the eyes of the consumer.  FOF ¶¶ 52-56.

**80.**    Second, Plaintiff cites to one ordinary course document (PX1216) to try to show that Tapestry intends to raise price post-merger.  However, that is not what the document says, and the creators of that document (Liz Harris and Ashely Rocha-Rinere) and its recipient (Joanne Crevoiserat) all testified the document does not mean what Plaintiff contends.  FOF ¶¶ 168-69.

**81.**    Finally, Plaintiff argues that this transaction will eliminate "fierce head-to-head competition" that exists today between Michael Kors, Coach, and Kate Spade.  PFCL, COL ¶ 14.  However, the evidence at trial did not reveal the type of unique "head-to-head competition" that is the focus of Section 7 law.  FOF ¶¶ 172-80.  "Head-to-head competition" has a particular meaning in Section 7 cases.  It requires evidence that, today, the two firms are actually impacting the price or quality of each other's product offerings to customers.  For example, in *Anthem*, the government

offered evidence that the large employer customers solicited bids from the four large health insurers (including defendants) and "play[ed] the top bidders against each other" to get lower prices.  236 F. Supp. 3d at 217.  There was extensive evidence that the merging parties had competed head-to-head in "auction" style bidding to win these customers' business and had lowered their prices in order to do so.  *Id.* at 217-220.  And customers themselves testified that the loss of this head-to-head competition would reduce the opportunities to negotiate for lower prices during the bidding process.  *Id.* at 221.

82.    Similarly in *Staples*, 190 F. Supp. 3d at 120, the FTC presented evidence that large B-to-B customers solicited RFPs for multi-year office supply contracts, that there is "intense competition between the top two or three bidders," and that customers obtain lower prices by "pit[ting] Defendants against each other" in these RFP processes.  And the government offered evidence that this process actually resulted in lower prices for customers in the real world.  *Id.* at 119-20, 122.

83.    In *H&R Block*, the government showed that H&R Block had "lowered its DDIY prices to better compete with free online products, the category pioneered by TaxACT, and ha[d] directly considered TaxACT's prices in setting its own prices."  833 F. Supp. 2d at 82.  The government also showed that H&R Block had "determined the nature of its free offerings in response to competitive activity from TaxACT", and its documents acknowledged that "TaxACT ha[d] put downward pressure on HRB's pricing ability."  *Id.*

84.    In *IQVIA*, the FTC introduced extensive evidence that the two firms competed directly against each other on price when they bid on RFPs and RFIs to the same customers, and that the two firms lowered their prices to win particular customer business when bidding against each other.  710 F. Supp. 3d at 384.  "[C]ustomers and other industry participants" testified that this head-to-head competition actually existed and would be lost post-merger.  *Id.* at 384-85.

85.     And in *Whole Foods*, Whole Foods' CEO told his Board that Wild Oats "is the only existing company that has the brand and number of stores to be a meaningful springboard for another player to get into this space.  Eliminating them means eliminating this threat forever, or almost forever."  548 F.3d at 1049 (Tatel, J., concurring).  The FTC also presented direct evidence that prices declined based on the opening of a Whole Foods near a Wild Oats.  *Id.* at 1040.  This direct evidence was further supported by Whole Food's prospective diversion analysis that showed most customers would go to Whole Foods if their local Wild Oats store closed.  *Id.* at 1043-44.

86.     Nothing remotely close to the type of head-to-head competition evidence that existed in *Anthem, Staples, H&R Block*, *IQVIA*, or *Whole Foods* exists here.  If Coach, Kate Spade and Michael Kors really were competing head-to-head on a daily basis, the Court would have expected to see numerous examples of those brands changing the prices that consumers paid for handbags or the design/quality of their handbags in direct response to competition from each other.  Plaintiff did not present such evidence.  Plaintiff also did not present any evidence that wholesale customers played these brands off of each other to obtain lower prices, or that any customer otherwise has any concerns about this transition.  To the contrary, customers like Macy's testified they had no concerns about this deal and that there is ample competition for Macy's to maintain competitive handbag prices.  FOF ¶ 167.  Plaintiff did present evidence that the companies monitor each other's businesses (as well as multiple other handbag brands) at a high level for investor and general benchmarking purposes and to stay informed on the marketplace, but that is not the type of head-to-head competition evidence on which Section 7 cases focus.  When courts have enjoined a merger of this sort, they had concrete, real world evidence that existing head-to-head competition would stop.  That evidence simply does not exist here.

**87.**    In sum, Plaintiff is unlikely to carry its ultimate burden of persuasion that this transaction is likely to substantially harm competition in an "accessible luxury handbag" market.

## V.    THE EQUITIES WEIGH AGAINST AN INJUNCTION

**88.**    To determine whether to grant a preliminary injunction under Section 13(b), a court must balance the equities.  *FTC v. Weyerhaeuser Co.*, 665 F.2d 1072, 1083 (D.C. Cir. 1981).  The kinds of equities that may be considered "[are] not qualified" by the statute.  *Id.*

**89.**    Where the plaintiff cannot carry its burden under the *Baker Hughes* framework, the equities weigh against an injunction.  *Thomas Jefferson Univ.*, 505 F. Supp. 3d at 558.  This is particularly the case here, given that the discovery record for the administrative proceeding is closed and it is not materially different.  FOF ¶ 189.  It will simply be an extended do-over of this rigorous proceeding:  the core of Plaintiff's case remains the same fact witnesses, the same documents, and the same economic evidence.  Indeed, perhaps most critically, nothing about Dr. Smith's opinions have changed in the administrative proceeding.  As such, having weighed all of the evidence, there is no need to grant a preliminary injunction if this Court concludes that Plaintiff's case is weak: because the FTC conducted the administrative proceeding process in parallel to the federal court hearing, it cannot argue that some future proceeding will involve different discovery, an opportunity for a more robust evidentiary record, or new theories or facts.

**90.**    Tapestry intends to revive the Michael Kors brand, invest in all the Capri brands, and sell more handbags, making the industry more competitive—not less.  FOF ¶¶ 72-80. That future competition will benefit consumers in an intensely competitive and dynamic industry where every consumer has hundreds of handbags choices. Granting Plaintiff's request for a preliminary injunction until the conclusion of Plaintiff's administrative proceeding will have the effect of blocking the Proposed Transaction permanently.  FOF ¶ 187.  The equities weigh against granting an injunction.

Dated: September 24, 2024

Respectfully submitted,

_Alfred C. Pfeiffer_
Alfred C. Pfeiffer (*pro hac vice*)
Christopher S. Yates (*pro hac vice*)
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Telephone: (415) 395-8240
Facsimile: (415) 395-8095
al.pfeiffer@lw.com
chris.yates@lw.com

Amanda P. Reeves (*pro hac vice*)
Ian R. Conner (*pro hac vice*)
Lindsey S. Champlin (*pro hac vice*)
Jennifer L. Giordano
David L. Johnson (*pro hac vice*)
Seung Wan (Andrew) Paik (*pro hac vice*)
Mary A. Casale (*pro hac vice*)
Christopher J. Brown (*pro hac vice*)
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
Telephone: (202) 637-2200
Facsimile: (202) 637-2201
amanda.reeves@lw.com
ian.conner@lw.com
lindsey.champlin@lw.com
jennifer.giordano@lw.com
david.johnson@lw.com
andrew.paik@lw.com
mary.casale@lw.com
chris.brown@lw.com

Lawrence E. Buterman
LATHAM & WAKINS LLP
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
Facsimile: (212) 751-4864
lawrence.buterman@lw.com

Sean M. Berkowitz (*pro hac vice*)

LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
Telephone: (312) 876-7700
Facsimile: (312) 993-9767
sean.berkowitz@lw.com

*Attorneys for Tapestry, Inc.*

<u>Jonathan M. Moses</u>
Jonathan M. Moses[27]
Elaine P. Golin
Adam L. Goodman
Karen Wong
Brittany A. Fish
51 West 52nd Street
New York, New York 10019
Telephone: (212) 403-1000
JMMoses@wlrk.com
EPGolin@wlrk.com
ALGoodman@wlrk.com
KWong@wlrk.com
BAFish@wlrk.com

*Attorneys for Capri Holdings Limited*

---

[27]    Electronic signatures used with consent in accordance with Rule 8.5(b) of the Court's ECF Rules and Instructions.

### APPENDIX A

## PX ADMITTED WITHOUT SUBSTANTIVE QUESTIONING

| Exhibit Number | Date Admitted | Questions Asked By Plaintiff About Exhibit | Citation |
|---|---|---|---|
| PX1078 | 9/10/2024 | "Q. PX 1078 is an e-mail from Ashley Rocha-Rinere to you and Alice Yu dated August 14, 2023 and attaching a slide deck, correct?  A. Yes, that is correct." | Hr'g Tr. 362:17-20 (Harris, Tapestry) |
| PX1118 | 9/12/2024 | "Q. PX 1118 is an email from Adrianne Kirszner to you and others, dated January 18th, 2022, with subject line, 'Outlet comp feedback Jan week 2,' correct?  A. Yes, that's what it says." | Hr'g Tr. 855:20-23 (Fraser, Kate Spade) |
| PX1121 | 9/10/2024 | "Q. Let's look at another document. It's in your binder as PX 1121.  This is from Sharon Guiliano to you and others; right?  A. Yes.  Q. The subject line is NPD strategic discussion; right?  A. Yes." | Hr'g Tr. 470:11-16 (Kahn, Coach) |
| PX1152 | 9/10/2024 | "Q. Please turn to PX1152 in your binder. You can put that document aside.  Am I correct that PX1152 is an e-mail from you to yourself dated September 26, 2022, with the subject line "MS notes," right?  A. Yes, That is correct." | Hr'g Tr. 372:16-21 (Harris, Tapestry) |
| PX1200 | 9/10/2024 | "Q. You can put that document to the side and please turn to PX 1200 in your binder. PX 1200 is an e-mail from you to Timothy Ryan and Christina Colone dated March 18, 2023, correct?  A. Yes.  That is correct.  Q. You attach a document about something called Project Sunrise, right?  A. Correct." | Hr'g Tr. 377:4-11 (Harris, Tapestry) |
| PX1219 | 9/10/2024 | "Q. Please turn in your binder to PX 1219. Is PX 1219 an e-mail from Andrea Resnick to yourself dated March 25, 2021 and attaching two documents?  A. Yes.  Q. This is just four days after the e-mail you sent Ms. Resnick that we just discussed?  A. Yes." | Hr'g Tr. 280:17-23 (Crevoiserat, Tapestry) |

| Exhibit Number | Date Admitted | Questions Asked By Plaintiff About Exhibit | Citation |
|---|---|---|---|
| PX1328 | 9/11/2024 | "MR. LOWDON: Your Honor, I would like to move into the record the documents that are cited in Dr. Smith's demonstratives which are included in the larger binder provided….Thank you, your honor. We will do that now. The documents we are moving in are PX-1185, PX-1327, PX-1328, PX-1334, PX-1465, PX-1647, PX-1697, PX-1704, PX-2128, PX-2680, PX-3001, PX-3060, PX-3110, PX-3150, PX-3202, PX-4000, and PX-8036." | Hr'g Tr. 582:7-583:12 (Smith) |
| PX1334 | 9/11/2024 | "MR. LOWDON: Your Honor, I would like to move into the record the documents that are cited in Dr. Smith's demonstratives which are included in the larger binder provided….Thank you, your honor. We will do that now. The documents we are moving in are PX-1185, PX-1327, PX-1328, PX-1334, PX-1465, PX-1647, PX-1697, PX-1704, PX-2128, PX-2680, PX-3001, PX-3060, PX-3110, PX-3150, PX-3202, PX-4000, and PX-8036." | Hr'g Tr. 582:7-583:12 (Smith) |
| PX1338 | 9/10/2024 | "Q. You can put that document away and please turn to PX 1338 in your binder. PX 1338 is an e-mail from you to Hannah Phillips dated March 7, 2023, attaching a slide deck, correct? A. Yes, that is correct." | Hr'g Tr. 376:19-23 (Harris, Tapestry) |
| PX1381 | 9/10/2024 | "Q. I am going to come back to that in a minute, but in the meantime can you please turn to PX 1381 in your binder. PX1381 is an e-mail chain with the top e-mail in the chain from Katelyn Rumsey to yourself dated January 27, 2023, correct? A. Yes. That is correct." | Hr'g Tr. 375:8-13 (Harris, Tapestry) |
| PX1507 | 9/12/2024 | "Q. PX1507 is an email from Adrianne Kirszner to you dated December 18, 2023, with the subject FP competition, correct? A. Yes. . . . Q. If you look down, do you see where it says MK? A. Yes, I do. Q. And MK, again, is Michael Kors? A. Yes, it is. Q. And FP competition is full price competition, correct? A. Yes, it is." | Hr'g Tr. 865:25-866:12 (Fraser, Kate Spade) |

| Exhibit Number | Date Admitted | Questions Asked By Plaintiff About Exhibit | Citation |
|---|---|---|---|
| PX1647 | 9/11/2024 | "MR. LOWDON: Your Honor, I would like to move into the record the documents that are cited in Dr. Smith's demonstratives which are included in the larger binder provided....Thank you, your honor. We will do that now. The documents we are moving in are PX-1185, PX-1327, PX-1328, PX-1334, PX-1465, PX-1647, PX-1697, PX-1704, PX-2128, PX-2680, PX-3001, PX-3060, PX-3110, PX-3150, PX-3202, PX-4000, and PX-8036." | Hr'g Tr. 582:7-583:12 (Smith) |
| PX1697 | 9/11/2024 | "MR. LOWDON: Your Honor, I would like to move into the record the documents that are cited in Dr. Smith's demonstratives which are included in the larger binder provided....Thank you, your honor. We will do that now. The documents we are moving in are PX-1185, PX-1327, PX-1328, PX-1334, PX-1465, PX-1647, PX-1697, PX-1704, PX-2128, PX-2680, PX-3001, PX-3060, PX-3110, PX-3150, PX-3202, PX-4000, and PX-8036." | Hr'g Tr. 528:4-583:12 (Smith) |
| PX1726 | 9/10/2024 | "Q. PX 1726 are materials prepared for Tapestry's board; correct? A. It appears to be all of the materials, sadly several hundreds of pages prepared for Tapestry's board meeting....Q. Ms. Crevoiserat, I'd like to direct your attention to pages 24 and 25 of PX 1726. Please let me know when you're there. A. I'm there. Q. This is a letter from you, Denise Kulikowsky and Amy Nerenberg to the Tapestry board, dated February 8th 2024; correct? A. Yes, that's correct." | Hr'g Tr. 265:25-266:10 (Crevoiserat, Tapestry) |
| PX1783 | 9/10/2024 | "Q. You can set that aside. Let's look at another document. It's in your binder as PX 1783. Page 2 shows an email from Alex Brocklehurst to Ms. Crevoiserat and others, copying you and others; correct? A. Correct. Q. It also shows an attachment called January 2023 Coach brand review; right? A. That's correct." | Hr'g Tr. 469:22-470:4 (Kahn, Coach) |

| Exhibit Number | Date Admitted | Questions Asked By Plaintiff About Exhibit | Citation |
|---|---|---|---|
| PX1923 | 9/12/2024 | "Q. PX 1923 is an email from you to Adrianne Kirszner and Jim Capiola dated December 6, 2023, correct?  A. Yes, it is.... Q. Now if you could please look at PX 1923-001?  A. Okay. Q. Do you see where Ms. Kirszner writes to you: Competition is fierce.  MK changed promotion midday yesterday.  Do you see that?  A. I do. Q. And MK is Michael Kors, correct?  A. Yes, it is." | Hr'g Tr. 865:7-21 (Fraser, Kate Spade) |
| PX1929 | 9/12/2024 | "Q. PX 1929 is an email between you and Victoria Santoriello dated February 8, 2024, with subject line: Fall price change request, correct? A. Yes, it is." | Hr'g Tr. 866:16-18 (Fraser, Kate Spade) |
| PX2020 | 9/9/2024 | "Q. Sir, could you please look at PX 2020.  PX 2020 is a Capri board meeting agenda and packet, dated April 10th, 2023; correct?  A. Yes. Yes." | Hr'g Tr. 100:20-23 (Idol, Capri) |
| PX2047 | 9/9/2024 | "Q. PX 2047 is an email chain, with the top email from Ms. Baron to you and others, from August 17th, 2021, at 10:35 p.m.; correct?  A. Yes." | Hr'g Tr. 202:6-9 (Newman, Capri) |
| PX2075 | 9/9/2024 | "Q. PX 2075 is an email from you to Anne Walsh and others, forwarding a Coach email, dated April 17th, 2022, with the subject, 'We dropped prices on our best bags,' correct?  A. Yes." | Hr'g Tr. 115:3-6 (Idol, Capri) |
| PX2105 | 9/12/2024 | "Q. Mr. Wilmotte, I will ask that you turn to PX 2105 in your binder.  This is an email from John Idol to Anne Walsh at Michael Kors with yourself copied in the cc line, dated April 21, 2023, subject: Savings alert.  We're unveiling Mom approved gifts plus an extra 15 percent off, correct?  A. Yes." | Hr'g Tr. 749:18-23 (Wilmotte, Michael Kors) |
| PX2242 | 9/9/2024 | "Q. PX2242 is an email chain with the top email from yourself to Mr. Idol on June 6th, 2021 at 4:41 p.m.; correct?  A. Yes....Q. Do you see on page 1 of PX 2242 Mr. Idol forwarded you a Coach Outlet email?  A. Why.  Q. Mr. Idol says, the full bag stripes on our signature looks nice. We should do something like this for next spring in full line and outlet; correct?  A. Yes." | Hr'g Tr. 186:6-15 (Newman, Capri) |

| Exhibit Number | Date Admitted | Questions Asked By Plaintiff About Exhibit | Citation |
|---|---|---|---|
| PX2246 | 9/16/2024 | "Q. I'm done with that document. Please turn to PX 2246. This is an email, dated August 1st, at 6:46 p.m. from Mr. Le Pere's email, correct? A. Yes, it is. Q. And you wrote the email from Mr. Le Pere's email address, correct? A. Yes, I did." | Hr'g Tr. 1079:9-15 (Kors, Capri) |
| PX2255 | 9/9/2024 | "Q. PX2255 is a text chain between you, Ms. Yoon, and Mr. Ho from April 21st, 2023; correct? A. Yes." | Hr'g Tr. 201:22-24 (Newman, Michael Kors) |
| PX2338 | 9/16/2024 | "Q. I'm done with that document. You can move that to the side. Please turn to PX 2338 in your binder. Mr. Kors, you sent the email at 9:43 p.m., signed 'Michael' from Mr. Le Pere's email, correct? A. Yes, I did." | Hr'g Tr. 1080:22-1081:2 (Kors, Michael Kors) |
| PX2396 | 9/9/2024 | "Q. PX 2396 is an email from you, dated April 7th, 2021; correct? A. Correct. Q. And it involves an email that Ms. Walsh received from the Coach Outlet; correct? A. Correct. Q. Ms. Walsh is currently the president of retail North America for Michael Kors; correct? A. That's correct. Q. At this time in 2021, she was the vice president of merchandising for Michael Kors in North America; correct? A. Correct." | Hr'g Tr. 113:5-16 (Idol, Capri) |
| PX2416 | 9/9/2024 | "Q. PX 2416 is an email from you to Cedric Wilmotte, dated September 16th, 2023, forwarding a Coach Outlet email, with the subject, "New quilted bags have arrived," correct? A. Correct. Q. Mr. Wilmotte is the CEO of Michael Kors; correct? A. Correct." | Hr'g Tr. 115:14-19 (Idol, Capri) |
| PX2421 | 9/9/2024 | "Q. PX 2421 is the Michael Kors earnings call dated July 25, 2017, regarding the acquisition of Jimmy Choo, correct? A. Correct. Q. On PX 2421-002 you are listed as a participant, correct? A. Correct." | Hr'g Tr. 87:19-23 (Idol, Capri) |
| PX2423 | 9/9/2024 | "Q. PX 2423 is an investor study that the Capri board of directors conducted, correct? A. It looks that way." | Hr'g Tr. 85:2-4 (Idol, Capri) |
| PX2428 | 9/9/2024 | "Q. Sir, PX2428 is dated May 1, 2023. You are the recipient of the email with the subject BOD budget presentation, correct? A. Correct....Q. BOD is board of directors, correct? A. That's correct. Q. This was a board of directors budget presentation correct? A. Correct." | Hr'g Tr. 92:8-16 (Idol, Capri) |

| Exhibit Number | Date Admitted | Questions Asked By Plaintiff About Exhibit | Citation |
|---|---|---|---|
| PX2430 | 9/12/2024 | "Q. And Mr. Wilmotte, this is an email from Laura Parsons to John Idol with yourself copied in the cc line, sent October 25, 2023, with the subject: Re: MK FY24 Q2 global board presentation, correct?  A. Correct." | Hr'g Tr. 748:20-24 (Wilmotte, Michael Kors) |
| PX2544 | 9/12/2024 | "Q. Mr. Wilmotte, I will ask that you turn to PX 2544 in your binder.  Mr. Wilmotte, PX 2544 is an email from yourself to Caitlin at highsnobeity.com, sent July 23, 2023, subject: MK plus LNF 710 insights and strategic choices workshop recap deck, correct?  A. Correct." | Hr'g Tr. 750:5-10 (Wilmotte, Michael Kors) |
| PX2561 | 9/9/2024 | "Q. PX 2561 is an email from Ms. Parsons to you and others from March 13th, 2024; correct? A. Yes." | Hr'g Tr. 202:16-18 (Newman, Michael Kors) |
| PX2674 | 9/9/2024 | "Q. PX 2674 is an email from Ms. Davis to you from December 19th, 2022; correct?  A. Yes." | Hr'g Tr. 202:25-203:2 (Newman, Michael Kors) |
| PX2680 | 9/11/2024 | "MR. LOWDON: Your Honor, I would like to move into the record the documents that are cited in Dr. Smith's demonstratives which are included in the larger binder provided….Thank you, your honor.  We will do that now.  The documents we are moving in are PX-1185, PX-1327, PX-1328, PX-1334, PX-1465, PX-1647, PX-1697, PX-1704, PX-2128, PX-2680, PX-3001, PX-3060, PX-3110, PX-3150, PX-3202, PX-4000, and PX-8036." | Hr'g Tr. 582:7-583:12 (Smith) |
| PX2753 | 9/9/2024 | "Q.  PX 2753 is a January 2022 board meeting deck, correct?  A. Yes." | Hr'g Tr. 91:19-20 (Idol, Capri) |
| PX3001 | 9/11/2024 | "MR. LOWDON: Your Honor, I would like to move into the record the documents that are cited in Dr. Smith's demonstratives which are included in the larger binder provided….Thank you, your honor.  We will do that now.  The documents we are moving in are PX-1185, PX-1327, PX-1328, PX-1334, PX-1465, PX-1647, PX-1697, PX-1704, PX-2128, PX-2680, PX-3001, PX-3060, PX-3110, PX-3150, PX-3202, PX-4000, and PX-8036." | Hr'g Tr. 582:7-583:12 (Smith) |

| Exhibit Number | Date Admitted | Questions Asked By Plaintiff About Exhibit | Citation |
|---|---|---|---|
| PX3110 | 9/11/2024 | "MR. LOWDON: Your Honor, I would like to move into the record the documents that are cited in Dr. Smith's demonstratives which are included in the larger binder provided….Thank you, your honor. We will do that now. The documents we are moving in are PX-1185, PX-1327, PX-1328, PX-1334, PX-1465, PX-1647, PX-1697, PX-1704, PX-2128, PX-2680, PX-3001, PX-3060, PX-3110, PX-3150, PX-3202, PX-4000, and PX-8036." | Hr'g Tr. 582:7-583:12 (Smith) |
| PX4002 | 9/11/2024 | "Q. Ms. Yang, is PX-4002 the declaration that you provided to the Federal Trade Commission? A. Yes." | Hr'g Tr. 664:23-25 (Yang, Chanel) |
| PX7027 | 9/10/2024 | "Q. Thank you. You can set that aside. Let's look at another earnings call transcript. It's in your binder as PX7027. This is the Q1 2019 Tapestry Inc. earnings call transcript; correct? A. Q1 2019, yes. Q. It's dated October 30th, 2018; correct? A. Yes, it is. Q. And you were Tapestry's president and chief administrative officer at this time; correct? A. I was, yes." | Hr'g Tr. 470:22-471:6 (Kahn, Coach) |
| PX7028 | 9/9/2024 | "Q. PX 7028 is dated August 7, 2019, and is the Q1 2020 Capri Holdings Ltd. earnings call final, correct? A. Correct. Q. You gave truthful, accurate, and reliable information in this earnings call, correct? A. Correct." | Hr'g Tr. 88:20-25 (Idol, Capri) |
| PX7030 | 9/10/2024 | "Q. Would you please pull out your second binder, the smaller one. A. Gladly. Q. This binder contains nine exhibits. For the record, they are PX7029, PX7030, PX7035, PX7044, PX7045, PX7053, PX7054, PX7335 and PX7336. Am I correct that these exhibits are all transcripts of Tapestry earnings calls in which you participated? A. Yeah, they appear to be the transcripts of earnings calls." | Hr'g Tr. 270:12-21 (Crevoiserat, Tapestry) |
| PX7035 | 9/10/2024 | "Q. Would you please pull out your second binder, the smaller one. A. Gladly. Q. This binder contains nine exhibits. For the record, they are PX7029, PX7030, PX7035, PX7044, PX7045, PX7053, PX7054, PX7335 and PX7336. Am I correct that these exhibits are all transcripts of Tapestry earnings calls in which you participated? A. Yeah, they appear to be the transcripts of earnings calls." | Hr'g Tr. 270:12-21 (Crevoiserat, Tapestry) |

| Exhibit Number | Date Admitted | Questions Asked By Plaintiff About Exhibit | Citation |
|---|---|---|---|
| PX7044 | 9/10/2024 | "Q. Would you please pull out your second binder, the smaller one. A. Gladly. Q. This binder contains nine exhibits. For the record, they are PX7029, PX7030, PX7035, PX7044, PX7045, PX7053, PX7054, PX7335 and PX7336. Am I correct that these exhibits are all transcripts of Tapestry earnings calls in which you participated? A. Yeah, they appear to be the transcripts of earnings calls." | Hr'g Tr. 270:12-21 (Crevoiserat, Tapestry) |
| PX7045 | 9/10/2024 | "Q. Would you please pull out your second binder, the smaller one. A. Gladly. Q. This binder contains nine exhibits. For the record, they are PX7029, PX7030, PX7035, PX7044, PX7045, PX7053, PX7054, PX7335 and PX7336. Am I correct that these exhibits are all transcripts of Tapestry earnings calls in which you participated? A. Yeah, they appear to be the transcripts of earnings calls." | Hr'g Tr. 270:12-21 (Crevoiserat, Tapestry) |
| PX7055 | 9/10/2024 | "Q. Am I correct that PX7055 is a transcript of that call on August 10, 2023? A. It appears to be, yes." | Hr'g Tr. 296:11-13 (Crevoiserat, Tapestry) |
| PX7095 | 9/9/2024 | "Q. You will see on the binder that you have PX7095, PX 7096, PX 7099, PX 7157, PX 7206 and PX 7261. These are all Capri filings to the SEC, correct? A. Correct." | Hr'g Tr. 84:12-15 (Idol, Capri) |
| PX7096 | 9/9/2024 | "Q. You will see on the binder that you have PX7095, PX 7096, PX 7099, PX 7157, PX 7206 and PX 7261. These are all Capri filings to the SEC, correct? A. Correct." | Hr'g Tr. 84:12-15 (Idol, Capri) |
| PX7099 | 9/9/2024 | "Q. You will see on the binder that you have PX7095, PX 7096, PX 7099, PX 7157, PX 7206 and PX 7261. These are all Capri filings to the SEC, correct? A. Correct." | Hr'g Tr. 84:12-15 (Idol, Capri) |
| PX7127 | 9/9/2024 | "Q. PX 7127 is dated May 29, 2019, and is the Q4 2019 Capri Holdings Ltd. earnings call final, correct? A. Correct. Q. You gave truthful, accurate, and reliable information in this earnings call? A. Correct." | Hr'g Tr. 88:7-12 (Idol, Capri) |
| PX7157 | 9/9/2024 | "Q. You will see on the binder that you have PX7095, PX 7096, PX 7099, PX 7157, PX 7206 and PX 7261. These are all Capri filings to the SEC, correct? A. Correct." | Hr'g Tr. 84:12-15 (Idol, Capri) |

| Exhibit Number | Date Admitted | Questions Asked By Plaintiff About Exhibit | Citation |
|---|---|---|---|
| PX7175 | 9/10/2024 | "Q. If you could please turn in your binder to PX 7175. PX7175 is that press release, correct? A. That's correct." | Hr'g Tr. 296:25-297:2 (Crevoiserat, Tapestry) |
| PX7206 | 9/9/2024 | "Q. You will see on the binder that you have PX7095, PX 7096, PX 7099, PX 7157, PX 7206 and PX 7261. These are all Capri filings to the SEC, correct? A. Correct." | Hr'g Tr. 84:12-15 (Idol, Capri) |
| PX7250 | 9/9/2024 | "Q. PX 7250 is a Tapestry press release, dated July 28, 2021; correct? A. Correct. Q. Do you see the third bullet point where it says at the end, 'commits to minimum $15 an hour wage for U.S. hourly employees'? A. Correct." | Hr'g Tr. 121:14-20 (Idol, Capri) |
| PX7335 | 9/10/2024 | "Q. Would you please pull out your second binder, the smaller one. A. Gladly. Q. This binder contains nine exhibits. For the record, they are PX7029, PX7030, PX7035, PX7044, PX7045, PX7053, PX7054, PX7335 and PX7336. Am I correct that these exhibits are all transcripts of Tapestry earnings calls in which you participated? A. Yeah, they appear to be the transcripts of earnings calls." | Hr'g Tr. 270:12-21. (Crevoiserat, Tapestry) |
| PX7336 | 9/10/2024 | "Q. Would you please pull out your second binder, the smaller one. A. Gladly. Q. This binder contains nine exhibits. For the record, they are PX7029, PX7030, PX7035, PX7044, PX7045, PX7053, PX7054, PX7335 and PX7336. Am I correct that these exhibits are all transcripts of Tapestry earnings calls in which you participated? A. Yeah, they appear to be the transcripts of earnings calls." | Hr'g Tr. 270:12-21 (Crevoiserat, Tapestry) |
| PX7342 | 9/10/2024 | "Q. Finally, I'd like to look at one more earnings call transcript. It's in your binder as PX 7342. This is the Q2 2019 Tapestry, Inc. earnings call transcript; correct? A. Yes, it is. Q. And it's dated February 17th, 2019; correct? A. I think it's dated February 7th, 2019. Q. You're absolutely right, I misspoke. February 7th, 2019; correct? A. Yes. Q. And you were also Tapestry's president and chief administrative officer at this time; correct? A. Yes, I was." | Hr'g Tr. 471:12-23 (Kahn, Coach) |
| PX7446 | 9/11/2024 | "Q. Ms. Yang, please go to PX-7446 in your binder. Ms. Yang is this a page from Chanel's website? A. Yes." | Hr'g Tr. 666:10-12 (Yang, Chanel) |

| Exhibit Number | Date Admitted | Questions Asked By Plaintiff About Exhibit | Citation |
|---|---|---|---|
| PX8028 | 9/12/2024 | "Q. Ms. Levine, I would like to direct your attention to PX 8028 in your binder.  PX 8028 is an email from Ms. Lainez to you and others, dated December 28, 2022, and attaching a document with the electronic file name GPP_outlet in-store price tracking_12.28.22.pdf, correct?  A. Correct.  Q. And Ms. Levine, you received this email, correct?  A. Yes, I did." | Hr'g Tr. 789:1-8 (Levine, Coach) |
| PX8036 | 9/11/2024 | "MR. LOWDON: Your Honor, I would like to move into the record the documents that are cited in Dr. Smith's demonstratives which are included in the larger binder provided….Thank you, your honor.  We will do that now.  The documents we are moving in are PX-1185, PX-1327, PX-1328, PX-1334, PX-1465, PX-1647, PX-1697, PX-1704, PX-2128, PX-2680, PX-3001, PX-3060, PX-3110, PX-3150, PX-3202, PX-4000, and PX-8036." | Hr'g Tr. 582:7-583:12 (Smith) |