UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

FEDERAL TRADE COMMISSION,

                    Plaintiff,

          -against-

TAPESTRY, INC.,

          -and-

CAPRI HOLDINGS LIMITED,

                    Defendants.

---

Case No. 1:24-cv-03109 (JLR)

**OPINION AND ORDER**

JENNIFER L. ROCHON, United States District Judge:

Antitrust has come into fashion.  The Federal Trade Commission (the "FTC"), proceeding under Section 13(b) of the Federal Trade Commission Act (the "FTC Act"), 15 U.S.C. § 53(b), seeks to preliminarily enjoin the proposed merger of Tapestry, Inc. ("Tapestry") and Capri Holdings Limited ("Capri" and, together with Tapestry, "Defendants").  The FTC argues that the merger likely will substantially lessen competition in the market for accessible-luxury handbags, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.  Defendants deny that such a product market exists; in the alternative, Defendants contest the FTC's claims as to the merger's likely anticompetitive effects.

After hearing seven days of testimony, based on thorough consideration of all evidence and arguments presented, and for the following reasons, the Court GRANTS the FTC's motion to preliminarily enjoin the merger pending the completion of the FTC's in-house administrative proceeding.

**BACKGROUND**

## I.    Defendants

### A.  Tapestry

As it described itself in an August 2022 filing with the Securities and Exchange

Commission (the "SEC"), Tapestry "is a leading New York-based house of accessible luxury

accessories and lifestyle brands."  PX7104 at 4, 59.  It is incorporated in Maryland and

headquartered in New York.  Dkt. 1 (the "Complaint" or "Compl.") ¶ 24; Dkt. 91 ("Tapestry

Ans.") ¶ 24.  Tapestry owns three brands: Coach, Kate Spade, and Stuart Weitzman.  PX7435

at 4; Tr. at 259:13-15 (Crevoiserat).

Coach was founded in New York in 1941.  PX7435 at 4; Tr. at 435:22-24, 473:20-22

(Kahn).  It began as a small manufacturer of men's leather goods before expanding into

products targeted at women.  Tr. at 474:1-6 (Kahn).  Coach coined the term "accessible

luxury" in advance of its initial public offering in 2000.  *Id.* at 259:16-19 (Crevoiserat); *id.* at

437:20-438:6 (Kahn).  Coach purchased Stuart Weitzman in 2015 and Kate Spade in 2017.

DX0283 ("Scott Morton Rep.") ¶ 63.  Soon after the latter acquisition, the combined firm

renamed itself Tapestry, Inc.  PX7435 at 4.

During its fiscal year 2024 (which ended on June 29, 2024), Tapestry generated over

$6.6 billion in revenue, with gross margins of 73.3 percent.  *Id.* at 1, 38, 40, 79; *see also* Tr. at

107:24-108:15 (Idol discussing PX2429 at 12, a slide deck presented to Capri board: during

third quarter of 2023, Coach and Kate Spade had gross margins of 71.4 percent and 61.6

percent, respectively); *id.* at 272:14-17 (Crevoiserat: Kate Spade's margin goal is 60 to 70

percent).  In 2023, Tapestry's revenue-weighted profit margins for direct-to-consumer and

wholesale sales of crossbody bags, satchels, shoulder bags, and totes/shoppers were ▮

percent for Coach and ▮ percent for Kate Spade.  PX6000 ("Smith Rep.") ¶ 104.

Coach is the largest of the three brands in Tapestry's portfolio, accounting for 76.4 percent of Tapestry's total net sales in fiscal year 2024. PX7435 at 103. Coach is "a leader in the women's category for handbags." PX8169 at 137:17-20 (Lifford). It also sells small leather goods, footwear, accessories, ready-to-wear apparel, jewelry, eyewear, travel accessories, watches, and fragrances. PX7105 at 11-12; Tr. at 474:13-16 (Kahn). Tapestry's next largest brand is Kate Spade, which accounted for 20 percent of Tapestry's total net sales in fiscal year 2024. PX7435 at 103. Handbags are the largest part of Kate Spade's business. Tr. at 820:15-17 (Fraser). Kate Spade also sells small leather goods, ready-to-wear apparel, footwear, fragrances, watches, and accessories. *Id.* at 882:20-883:3 (Fraser); PX7105 at 8, 11-12. The smallest Tapestry brand, Stuart Weitzman, accounted for 3.6 percent of Tapestry's total net sales in fiscal year 2024. PX7435 at 103. "The significant majority of sales for Stuart Weitzman is attributable to women's footwear." *Id.* at 103 n.1; *see* PX6001 ("Smith Reply Rep.") ¶ 62 tbl.1 & n.3 (Stuart Weitzman had just ████ in handbag sales in 2023).

## B. Capri

Capri is a global fashion firm incorporated in the British Virgin Islands and headquartered in the United Kingdom. Compl. ¶ 25; Dkt. 92 ("Capri Ans.") ¶ 25. Capri owns three brands: Michael Kors, Jimmy Choo, and Versace. PX7261 at 8-9; Tr. at 81:15-16 (Idol).

The individual Michael Kors, to whom the Court will refer as "Mr. Kors" to avoid confusion, founded his namesake brand in New York in 1981. PX7261 at 8; Tr. at 1066:25-1067:1, 1084:13-1085:9 (Mr. Kors). Michael Kors purchased Jimmy Choo in 2017 and Versace in 2018. Scott Morton Rep. ¶ 68. In conjunction with the latter acquisition, the firm renamed itself Capri Holdings Limited. *Id.*; PX7206 at 2.

During its fiscal year 2024 (which, for Capri, ended on March 30, 2024), Capri generated about $5.2 billion in total global revenue, with gross margins of 64.6 percent. PX7261 at 1, 10, 47; *see also* Tr. at 107:24-108:15 (Idol discussing PX2429 at 12, a slide deck presented to Capri board: during third quarter of 2023, Michael Kors had margins of 63.6 percent, including 67.6 percent at retail).  In 2023, Michael Kors's revenue-weighted profit margins for direct-to-consumer and wholesale sales of crossbody bags, satchels, shoulder bags, and totes/shoppers was ■ percent.  Smith Rep. ¶ 104.

Michael Kors generated about 68 percent of Capri's revenue during fiscal year 2024. PX7261 at 10.  It began selling handbags in 2000.  Tr. at 1085:22-24 (Mr. Kors).  It also sells jewelry, watches, eyewear, ready-to-wear apparel, footwear, fragrances, and other products. *Id.* at 1087:22-25 (Mr. Kors).  As explained by Capri in a May 2023 SEC filing, Michael Kors offers three product lines: the "Michael Kors Collection luxury line" (the "MK Collection"), the "the MICHAEL Michael Kors accessible luxury line" ("MMK"), and the "Michael Kors Mens line" ("MK Mens").  PX7098 at 9, 69; *see id.* at 9-10 (MMK "addresses the significant demand opportunity in accessible luxury goods"); *id.* at 14 (MMK "is the accessible luxury collection"); *see also* Tr. at 82:10-83:18 (Idol); *id.* at 1067:20-1068:2 (Mr. Kors).  MMK is responsible for almost all of Michael Kors's handbag sales in the United States.  *See* Tr. at 740:21-741:17 (Wilmotte: in 2023, the MK Collection made less than $10 million in revenue from U.S. handbag sales, while MK Mens made between $10 million and $15 million; handbag revenue for these two lines is "significantly smaller" than handbag revenue for MMK); *id.* at 1110:3-11 (Edwards: in 2023, Michael Kors's total revenue from U.S. handbag sales was around $1.2 billion).  Meanwhile, as Capri noted in an October 2023 SEC filing, Versace and Jimmy Choo are "luxury businesses."  PX7099 at 5.

4

## II.    Procedural History

In mid-2022, Tapestry first began considering potential acquisition targets, including Capri.  Tr. at 285:5-288:25 (Crevoiserat discussing PX1216 at 4); *id.* at 367:1-368:6 (Harris discussing PX1175 at 1).  In March 2023, Tapestry's board of directors approved an approach to Capri.  PX1200 at 5, 7.  On August 10, 2023, Tapestry and Capri signed a merger agreement providing that Tapestry would acquire Capri for approximately $8.5 billion.  PX1014 at 1, 7; PX7175 at 1.

Following an investigation and a 5-0 approval vote by its commissioners, the FTC sued Defendants on April 23, 2024.  Compl.  The next day, the Court entered the parties' stipulated temporary restraining order, which prevented Defendants from consummating the transaction until after the Court ruled on the FTC's anticipated motion for a preliminary injunction.  Dkt. 16.  Following an initial conference on April 29, 2024, the Court approved the parties' agreed-upon case-management plan and scheduling order.  Dkts. 64, 71.

On May 3, 2024, Defendants moved for a more definite statement of the FTC's market definition or, in the alternative, for an order requiring the FTC to answer a contention interrogatory on the issue.  Dkt. 74 (brief); *see also* Dkts. 81 (opposition), 84 (reply).  At a hearing on May 13, 2024, the Court denied Defendants' motion.  Dkt. 88.  Defendants answered the Complaint on May 16, 2024.  Tapestry Ans.; Capri Ans.

On August 6, 2024, the FTC moved for a preliminary injunction.  Dkt. 122 ("Br.").  Defendants opposed the FTC's motion on August 20, 2024.  Dkt. 159 ("Opp.").  The FTC replied in support of its motion on August 27, 2024.  Dkt. 189 ("Reply").  On August 30, 2024, the parties submitted pre-hearing proposed findings of fact and conclusions of law.  Dkts. 277, 291.  On August 26, 2024, the parties cross-moved to exclude certain expert testimony under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  Dkts.

170, 175, 184 (notices of motion).  At a hearing on September 6, 2024, the Court denied the

parties' *Daubert* motions.  Dkt. 321.

The Court held the preliminary-injunction hearing from September 9, 2024, to

September 17, 2024.  Across seven hearing days, the Court heard from dozens of witnesses.[1]

---

[1] Sixteen fact witnesses testified live: Peter Charles, Chief Supply Chain Officer at Tapestry, *see* Tr. at 1008:16-1044:18; Joanne Crevoiserat, Chief Executive Officer ("CEO") of Tapestry, *see id.* at 258:13-358:20; Tom Edwards, Chief Financial Officer ("CFO") and Chief Learning Officer at Capri, *see id.* at 1103:2-1131:20; Elizabeth "Liz" Fraser, former CEO and Brand President of Kate Spade, *see id.* at 819:15-903:7; Griffin Guez, CEO of North Star Opco LLC and House of Pliner, *see id.* at 671:25-719:7; Elizabeth Harris, Senior Vice President of Global Strategy and Consumer Insights at Tapestry, *see id.* at 358:22-434:2; John Idol, CEO of Capri and Chair of its Board of Directors, *see id.* at 80:17-182:22; Todd Kahn, CEO and Brand President of Coach, *see id.* at 434:5-502:16; Michael Kors, Founder and Chief Creative Officer of Michael Kors, *see id.* at 1066:11-1102:18; Leigh Levine, President of Coach North America, *see id.* at 777:18-819:13; Philippa Newman Chapuis, President of Accessories and Footwear at Michael Kors, *see id.* at 182:24-242:22; Laura Parsons, Vice President, Strategy and Transformation, at Michael Kors, *see id.* at 1325:5-1334:12; Christopher Steinmann, Vice President, Divisional Merchandising Manager, at Macy's, *see id.* at 916:22-954:4; Cedric Wilmotte, CEO of Michael Kors, *see id.* at 732:6-777:16; Suwon Yang, Head of Merchandising for Accessories and Leather Goods at Chanel, *see id.* at 655:4-671:23; and Alice Yu, Vice President of Global Consumer Insights at Tapestry, *see id.* at 1183:6-1207:11.

Four individuals testified live as experts: Jeff Gennette, former Chairman and CEO of Macy's, qualified to testify as an industry expert in select aspects of the U.S. handbag industry, primarily the wholesale-distribution channel, *see id.* at 1131:23-1183:4; Karen Giberson, President and CEO of the Accessories Council, qualified to testify as an industry expert in the field of handbags, *see id.* at 954:6-1008:13; Dr. Fiona Scott Morton, the Theodore Nierenberg Professor of Economics at the Yale School of Management, qualified to testify as an expert in industrial-organization economics, *see id.* at 1215:10-1324:16; and Dr. Loren K. Smith, Executive Vice President at Compass Lexecon, qualified to testify as an expert in industrial-organization economics, *see id.* at 515:6-654:1, 1334:14-1395:21.

During the hearing, 12 fact witnesses testified through designations of prerecorded videos of their depositions: Ryan Armstrong, Interim Head of Global Marketing Strategy and Chief of Staff to the Chief Marketing Officer at Ralph Lauren, *see id.* at 903:9-907:4; Dale Christilaw, CFO of Kurt Geiger, *see id.* at 907:19-909:16; Philip Hamilton, Vice President of Global Merchandising for Lululemon, *see id.* at 1056:23-1058:1; Jasmin Larian, Founder, CEO, and Creative Director of Cult Gaia, *see id.* at 1056:2-1056:19; Pam Lifford, Member of Tapestry's Board of Directors, *see id.* at 502:23-504:15; Anish Melwani, Chair and CEO of LVMH, *see id.* at 722:4-723:9; Rebecca Minkoff (to whom the Court will refer as "Ms. Minkoff" to avoid confusion with the namesake brand), Chief Creative Officer of Rebecca Minkoff, *see id.* at

On September 24, 2024, the parties submitted post-hearing proposed findings of fact and conclusions of law. Dkt. 330 at 3-73 ("PFOF"); Dkt. 330 at 73-100 ("PCOL"); Dkt. 333 at 1-70 ("DFOF"); Dkt. 333 at 71-100 ("DCOL"). The parties presented summations and closing arguments on September 30, 2024. Dkt. 323.

## LEGAL STANDARDS

### I.    Section 7 of the Clayton Act

Section 7 of the Clayton Act prohibits mergers and acquisitions "where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition." 15 U.S.C. § 18. Through Section 7, Congress provided "authority for arresting mergers at a time when the trend to a lessening of competition in a line of commerce [i]s still in its incipiency." *Brown Shoe Co. v.*

---

242:24-245:17; Kevin Mogyoros, Chief Operating Officer ("COO") and CFO of MZ Wallace, *see id.* at 1044:20-1049:2; Thomas Murphy, Vice President of Finance and Operations at Longchamp USA, *see id.* at 1055:6-1055:25; Susan Thacker, CEO of Brahmin Leather Works, *see id.* at 723:11-724:8; Sloan Tichner, President of Handbags at Steve Madden, *see id.* at 1051:16-1052:13; and Ken Welch, Divisional Merchandise Manager for Handbags at Dillard's, *see id.* at 1049:4-1051:15.

The parties also jointly submitted post-hearing deposition designations on September 23, 2024, encompassing testimony from an additional 15 fact witnesses: Jennifer Avallon, Global Head of Product Management for Tumi, *see* DX0952; Matt Bernson, former Senior Director of Merchandising at Kate Spade, *see* PX5079; Jaryn Bloom, former Group President of North America Retail at Michael Kors, *see* PX5078; Andrea Bozeman, former Vice President, Consumer Marketing and Global CRM at Michael Kors, *see* PX5080; Jim Capiola, CFO and Head of Operations at Kate Spade New York and Stuart Weitzman, as well as Leader of Business Development and Global Environments at Tapestry, *see* PX5089; Christina Colone, Global Head of Investor Relations at Tapestry, *see* PX5081; Jennifer Davis, Vice President, Investor Relations and Market Intelligence at Capri, *see* PX5082; Deepa Gandhi, Co-Founder and COO of Dagne Dover, *see* DX0950; Jennifer Lyu, Senior Vice President of Design in the Categories of Leather Goods, Footwear, Jewelry, and Watches at Kate Spade, *see* DX0953; Andrea Resnick, Chief Communications Officer at Tapestry, *see* PX5083; Ashley Rocha-Rinere, Director of Strategy and Insights at Tapestry, *see* PX5084; Scott Roe, CFO and COO of Tapestry, *see* PX5085; Tim Ryan, Head of Finance at Tapestry, *see* PX5086; Rae Tao, Head of Strategy and Chief of Staff at Kate Spade, *see* PX5087; and Anne Walsh, President of North America Retail at Michael Kors, *see* PX5088.

*United States*, 370 U.S. 294, 317 (1962).  Determining whether a merger violates Section 7 therefore "requires not merely an appraisal of the immediate impact of the merger upon competition, but a prediction of its impact upon competitive conditions in the future."  *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 362 (1963).

"Congress used the words '*may be* substantially to lessen competition'" in Section 7 "to indicate that its concern was with probabilities, not certainties."  *Brown Shoe*, 370 U.S. at 323.  "Although Section 7 requires more than a mere possibility of competitive harm, it does not require proof of certain harm."  *United States v. AT&T, Inc.*, 916 F.3d 1029, 1032 (D.C. Cir. 2019) (quotation marks omitted).  "Instead, the [plaintiff] must show that the proposed merger is likely to substantially lessen competition, which encompasses a concept of reasonable probability."  *Id.* (emphasis and quotation marks omitted); *accord Fruehauf Corp. v. FTC*, 603 F.2d 345, 351 (2d Cir. 1979); *FTC v. Advoc. Health Care Network*, 841 F.3d 460, 467 (7th Cir. 2016).  "[T]here is certainly no requirement that the anticompetitive power manifest itself in anticompetitive action before § 7 can be called into play.  If the enforcement of § 7 turned on the existence of actual anticompetitive practices, the congressional policy of thwarting such practices in their incipiency would be frustrated."  *FTC v. Procter & Gamble Co.*, 386 U.S. 568, 577 (1967); *accord Fruehauf*, 603 F.2d at 352-53; *United States v. Dairy Farmers of Am., Inc.*, 426 F.3d 850, 858 (6th Cir. 2005).

"Federal courts assess § 7 claims under a three-part, burden-shifting framework." *FTC v. Hackensack Meridian Health, Inc.*, 30 F.4th 160, 166 (3d Cir. 2022); *accord In re AMR Corp.*, No. 22-901, 2023 WL 2563897, at *2 (2d Cir. Mar. 20, 2023) (summary order) (collecting cases); *United States v. Baker Hughes Inc.*, 908 F.2d 981, 982-83 (D.C. Cir. 1990) (Thomas, J., joined by R.B. Ginsburg & Sentelle, JJ.).  At the first step, the plaintiff "must establish a prima facie case that the merger is anticompetitive."  *United States v. U.S. Sugar*

*Corp.*, 73 F.4th 197, 203 (3d Cir. 2023).  To establish a prima facie case, the plaintiff must propose a proper relevant market and show that the effects of the merger in that market will likely be anticompetitive.  *Id.*; *FTC v. IQVIA Holdings Inc.*, 710 F. Supp. 3d 329, 352 (S.D.N.Y. 2024).  Usually, the plaintiff demonstrates likely anticompetitive effects "by showing that the transaction in question will significantly increase market concentration, thereby creating a presumption that the transaction is likely to substantially lessen competition."  *New York v. Deutsche Telekom AG*, 439 F. Supp. 3d 179, 199 (S.D.N.Y. 2020) (quoting *Chi. Bridge & Iron Co. v. FTC*, 534 F.3d 410, 423 (5th Cir. 2008)).  If the plaintiff successfully sets forth a prima facie case, "the burden shifts to the defendant to present evidence that the *prima facie* case inaccurately predicts the relevant transaction's probable effect on future competition, or to sufficiently discredit the evidence underlying the *prima facie* case."  *AT&T*, 916 F.3d at 1032 (quotation marks and citation omitted); *accord FTC v. Univ. Health, Inc.*, 938 F.2d 1206, 1218 (11th Cir. 1991).  If the defendant rebuts the plaintiff's prima facie case, "the burden of producing additional evidence of anticompetitive effects shifts to the [plaintiff], and merges with the ultimate burden of persuasion, which remains with the [plaintiff] at all times."  *U.S. Sugar*, 73 F.4th at 204 (citation omitted).

## II.    Section 13(b) of the FTC Act

Section 13(b) of the FTC Act authorizes the FTC to seek injunctive relief if it "has reason to believe" that "any person, partnership, or corporation is violating, or is about to violate, any provision of law enforced by the Federal Trade Commission" and that such relief "would be in the interest of the public."  15 U.S.C. § 53(b), (b)(1)-(2).  "Upon a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest, and after notice to the defendant, a

temporary restraining order or a preliminary injunction may be granted without bond." *Id.* at § 53(b).

The parties differ as to what they assert that the FTC must do to establish a "likelihood of ultimate success." *Id.* The FTC, citing decades of case law, argues that it "satisfies its burden of showing a likelihood of success on the merits if it raises serious questions about the antitrust merits that warrant thorough investigation in the first instance by the FTC." Br. at 7 (brackets, quotation marks, and citation omitted); *see also* Reply at 1-3; PCOL ¶¶ 4-9. Defendants disagree, insisting that this interpretation "cannot be squared with the statute's text, has not been adopted by the Second Circuit, and is wrong under recent Supreme Court [case] law." Opp. at 14 (citing *Starbucks Corp. v. McKinney*, 144 S. Ct. 1570, 1575-76 (2024)). Defendants argue that the FTC "must make a clear showing of a likelihood of success on the merits to obtain a preliminary injunction." *Id.* (quotation marks omitted); *see also* DCOL ¶¶ 2-7. The Court need not resolve this disagreement. Because the FTC prevails under either standard, the Court assumes without deciding that the FTC "must make a clear showing of a likelihood of success on the merits," as Defendants assert. Opp. at 14 (quotation marks omitted).

The parties also dispute whether the relevant forum for evaluating likelihood of success is an FTC administrative hearing, as the FTC contends, *see* PCOL ¶ 3 n.12, or a federal court of appeals reviewing an FTC determination, as Defendants argue, *see* Opp. at 14-15; DCOL ¶ 5. Defendants, in suggesting that the federal court of appeals' decision is the proper focus, seemingly invite the Court to predict that the FTC will reach a result that is unsupported by substantial evidence or contrary to law, such that a reviewing court will vacate it. *Cf. ProMedica Health Sys., Inc. v. FTC*, 749 F.3d 559, 564 (6th Cir. 2014) ("We review the Commission's legal conclusions de novo, and its factual findings under the substantial-

evidence standard."); *Chi. Bridge*, 534 F.3d at 422 (same).  The Court is disinclined to accept this invitation in light of the presumption of regularity, which generally requires courts to presume that an agency has "considered all the evidence and properly discharged its duties." *NLRB v. Newark Elec. Corp.*, 14 F.4th 152, 163 (2d Cir. 2021).  To be sure, the presumption of regularity does not "shield [agency] action from a thorough, probing, in-depth review." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977).  But the Court sees no reason to assume from the outset that an FTC determination will be reversed on appeal.  *See, e.g.*, *Delta Air Lines v. Civ. Aeronautics Bd.*, 228 F.2d 17, 19 (D.C. Cir. 1955) (per curiam) ("We decline to assume . . . that if the facts are established the Commission will fail to find accordingly, or that if the facts are found the Commission will inaccurately apply the law to them.").  In any event, the Court perceives little practical difference between the parties' positions.  Rather than parse the issue further, the Court assumes without deciding that the standard advanced by Defendants should be applied here: that the FTC must "prove that it is likely to succeed in convincing a federal court of appeals that the transaction violates Section 7."  Opp. at 15 (emphasis omitted).

Although the parties have different understandings of the likelihood-of-success requirement, they agree that to obtain a preliminary injunction under Section 13(b), the FTC need only show a sufficient likelihood of ultimate success and a favorable balance of the equities.  *See, e.g.*, *id.* at 13; Br. at 6; PCOL ¶ 3; DCOL ¶ 2.  The parties' shared understanding comports with numerous cases holding that in Section 13(b), Congress "remove[d] irreparable damage as an essential element of the preliminary injunction proponent's case and permit[ted] the judge to presume from a likelihood of success showing that the public interest will be served by interim relief."  *FTC v. Weyerhaeuser Co.*, 665 F.2d

1072, 1082 (D.C. Cir. 1981) (R.B. Ginsburg, J.); *accord FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 337 (3d Cir. 2016); *Univ. Health*, 938 F.2d at 1217-18; *FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1029 (7th Cir. 1988); *FTC v. Warner Commc'ns Inc.*, 742 F.2d 1156, 1159 (9th Cir. 1984) (per curiam).  The Court agrees with the parties on this point, although – as the analysis of the equities later in this opinion makes clear – the Court's ultimate ruling would be the same even if it needed to make findings as to irreparable harm and the public interest.  *Cf. We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 295 (2d Cir.) (per curiam) ("When the government is a party to the suit, our inquiries into the public interest and the balance of the equities merge."), *and clarified in* 17 F.4th 368 (2d Cir 2021).

Because this case comes before the Court on a motion for a preliminary injunction, the Court serves as the factfinder.  *See Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981); *Fed. Express Corp. v. Fed. Espresso, Inc.*, 201 F.3d 168, 177 (2d Cir. 2000).  Thus, the Court decides "whose testimony to credit and which of permissible inferences to draw," regardless of "whether those findings are based on witness testimony, or on documentary evidence, or on inferences from other facts."  *Ceraso v. Motiva Enters., LLC*, 326 F.3d 303, 316 (2d Cir. 2003); *see also Pope v. County of Albany*, 687 F.3d 565, 581 (2d Cir. 2012) ("The question of what weight to accord expert opinion is a matter committed to the sound discretion of the factfinder[.]").  The Court "is also entitled, just as a jury would be, to believe some parts and disbelieve other parts of the testimony of any given witness."  *JTH Tax, LLC v. Agnant*, 62 F.4th 658, 671 (2d Cir. 2023) (citation omitted).  That said, the Court's "findings of fact and conclusions of law . . . are not binding at trial on the merits," *Camenisch*, 451 U.S. at 395, and the FTC "remains free to reach its own legal conclusions and develop its own record in its administrative proceedings," *Starbucks*, 144 S. Ct. at 1579.

As a concession to the expedited and nonfinal nature of preliminary-injunction proceedings, the Court has at times relied on "procedures that are less formal and evidence that is less complete than in a trial on the merits." *Camenisch*, 451 U.S. at 395. For example, both sides have submitted – and the Court has admitted – limited hearsay evidence on the understanding that "hearsay evidence may be considered by a district court in determining whether to grant a preliminary injunction" and that, at this stage, "[t]he admissibility of hearsay under the Federal Rules of Evidence goes to weight, not preclusion." *Mullins v. City of New York*, 626 F.3d 47, 52 (2d Cir. 2010). Insofar as a piece of evidence contains hearsay, or otherwise may lack indicia of reliability, the Court accounts for that fact in deciding how much weight to assign that piece of evidence. In general, however, the Court has endeavored to apply trial-like procedures and to examine the parties' evidence and arguments thoughtfully, thoroughly, and rigorously.

## LIKELIHOOD OF SUCCESS

### I.    Prima Facie Case

To establish a prima facie case under Section 7, a plaintiff "must (1) define a relevant market, and (2) show that the effect of the merger in that market is likely to be anticompetitive." *IQVIA*, 710 F. Supp. 3d at 352; *accord United States v. Energy Sols., Inc.*, 265 F. Supp. 3d 415, 436 (D. Del. 2017). The Court addresses each element in turn.

### A.    Market Definition[2]

Determining the relevant market "is a necessary predicate to deciding whether a merger contravenes the Clayton Act." *United States v. Marine Bancorporation, Inc.*, 418 U.S.

---

[2] Generally, the standards for determining a relevant market "are the same under the various antitrust statutes, and courts routinely rely on cases decided under one statute when deciding cases under the other statutes." M. Howard Morse, *Product Market Definition in the Pharmaceutical Industry*, 71 Antitrust L.J. 633, 655 (2003); *accord In re AMR Corp.*, 527 B.R. 874, 883 n.7 (Bankr. S.D.N.Y. 2015). Indeed, the Supreme Court has stated that there is

602, 618 (1974) (quotation marks omitted); *accord FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 24 (D.D.C. 2015) ("Merger analysis starts with defining the relevant market."). That is because the Clayton Act addresses mergers and acquisitions whose effect "may be *substantially* to lessen competition," 15 U.S.C. § 18 (emphasis added), and "[s]ubstantiality can be determined only in terms of the market affected," *United States v. E.I. du Pont de Nemours & Co.*, 353 U.S. 586, 593 (1957). "Without a well-defined relevant market, an examination of a transaction's competitive effects is without context or meaning." *FTC v. Freeman Hosp.*, 69 F.3d 260, 268 (8th Cir. 1995). Therefore, market definition "is of critical significance" in Section 7 cases. *Stanley Works v. FTC*, 469 F.2d 498, 500 (2d Cir. 1972); *accord United States v. H & R Block, Inc.*, 833 F. Supp. 2d 36, 50 (D.D.C. 2011) ("Defining the relevant market is critical in an antitrust case because the legality of the proposed merger in question almost always depends upon the market power of the parties involved." (brackets and citation omitted)).

"For antitrust purposes, the concept of a market has two components: a product market and a geographic market." *Concord Assocs., L.P. v. Ent. Props. Tr.*, 817 F.3d 46, 52 (2d Cir. 2016); *accord United States v. Bertelsmann SE & Co.*, 646 F. Supp. 3d 1, 24 (D.D.C. 2022); U.S. Dep't of Just. & Fed. Trade Comm'n, *Merger Guidelines* § 4.3 (2023) (the "2023 Merger Guidelines" or the "Guidelines").[3] Here, the parties agree that the relevant geographic market

---

"no reason to differentiate between 'line' of commerce in the context of the Clayton Act and 'part' of commerce for purposes of the Sherman Act." *United States v. Grinnell Corp.*, 384 U.S. 563, 573 (1966). Therefore, as appropriate, the Court relies on discussions of market definition in cases under antitrust statutes other than the Clayton Act.

[3] In this opinion, the Court considers statements in the 2023 Merger Guidelines to the extent that the Court finds them persuasive – recognizing, of course, that the Guidelines are nonbinding. *See, e.g.*, *AMR*, 2023 WL 2563897, at *3 n.2 ("Plaintiffs also criticize the bankruptcy court for citing the Department of Justice's Horizontal Merger Guidelines. But the bankruptcy court specifically noted that the Guidelines were not binding and that it was

is the United States. *See* Br. at 19-20; Opp. at 5 n.1; Tr. at 533:6-9 (Smith); *id.* at 1287:23-

1288:1 (Scott Morton). But they fiercely dispute the relevant product market. Before

addressing the parties' arguments, the Court reviews some important doctrine.

"A 'relevant product market' is a term of art in antitrust analysis." *H & R Block*, 833

F. Supp. 2d at 50. It "consists of products that have reasonable interchangeability for the

purposes for which they are produced – price, use[,] and qualities considered." *Concord*, 817

F.3d at 52 (quotation marks omitted); *accord United States v. Visa U.S.A., Inc.*, 163 F. Supp.

_____

consulting them only as a helpful tool – as courts have repeatedly deemed appropriate."
(quotation marks and citations omitted)). The persuasiveness of a statement in the Guidelines,
as with any agency pronouncement, "will depend upon the thoroughness evident in its
consideration, the validity of its reasoning, its consistency with earlier and later
pronouncements, and all those factors which give it power to persuade, if lacking power to
control." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944); *see County of Maui v. Haw.
Wildlife Fund*, 590 U.S. 165, 180 (2020) ("[W]e often pay particular attention to an agency's
views in light of the agency's expertise in a given area, its knowledge gained through practical
experience, and its familiarity with the interpretive demands of administrative need.").

Defendants assert that as of August 20, 2024 (when they filed their opposition brief), "[n]o
court has cited" the 2023 Merger Guidelines "as persuasive authority." Opp. at 33 n.82. This
claim is incorrect. *See, e.g.*, *FTC v. Cmty. Health Sys., Inc.*, --- F. Supp. 3d ----, 2024 WL
2854690, at *20, *22 (W.D.N.C. June 5, 2024), *vacated as moot sub nom. FTC v. Novant
Health, Inc.*, No. 24-1526, 2024 WL 3561941 (4th Cir. July 24, 2024); *Tevra Brands LLC v.
Bayer HealthCare LLC*, No. 19-cv-04312, 2024 WL 1909156, at *3, *5, *7 (N.D. Cal. May 1,
2024); *see also In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, -- F.
Supp. 3d ---, 2024 WL 1556931, at *13 & n.14 (E.D.N.Y. Apr. 10, 2024) (relying on
Herfindahl-Hirschman Index thresholds from a U.S. Department of Justice webpage that, in
turn, cites the 2023 Merger Guidelines); *cf. Herfindahl-Hirschman Index*, U.S. Dep't of Just.
(Jan. 17, 2024), https://www.justice.gov/atr/herfindahl-hirschman-index
[https://perma.cc/C5DM-76T8]. Even if this claim were true, it would not surprise or trouble
the Court. After all, the Department of Justice and the FTC did not finalize the 2023 Merger
Guidelines until December 18, 2023, less than a year ago. *See Federal Trade Commission
and Justice Department Release 2023 Merger Guidelines*, FTC (Dec. 18, 2023),
https://www.ftc.gov/news-events/news/press-releases/2023/12/federal-trade-commission-
justice-department-release-2023-merger-guidelines [https://perma.cc/7WGR-MRLZ]; *see also
IQVIA*, 710 F. Supp. 3d at 368 n.19 (focusing on the 2010 Merger Guidelines because the
2023 Merger Guidelines were not issued until "after briefing and argument in this case had
concluded"); *United States v. JetBlue Airways Corp.*, 712 F. Supp. 3d 109, 151 n.51 (D. Mass.
2024) (similar), *appeal dismissed*, No. 24-1092, 2024 WL 3491184 (1st Cir. Mar. 5, 2024).

2d 322, 335 (S.D.N.Y. 2001) ("A relevant product market is composed of products that have

reasonable interchangeability, in the eyes of consumers, with what the defendant sells."

(quotation marks omitted)), *aff'd*, 344 F.3d 229 (2d Cir. 2003).  Reasonable interchangeability

is often analyzed using the concept of cross-elasticity of demand, *see, e.g.*, *Brown Shoe*, 370

U.S. at 325, which "refers to the change in the demand by consumers for one product as a

result of a change in the price of another product," *Hayden Publ'g Co. v. Cox Broad. Corp.*,

730 F.2d 64, 70 n.9 (2d Cir. 1984).  "Two products are reasonably interchangeable where

there is sufficient cross-elasticity of demand – that is, where consumers would respond to a

slight increase in the price of one product by switching to another product." *Regeneron*

*Pharms., Inc. v. Novartis Pharma AG*, 96 F.4th 327, 339 (2d Cir. 2024) (quotation marks

omitted).  "This analytical approach guides antitrust courts in attempting to answer one key

question: whether particular products are sufficiently close substitutes such that substitution to

one could constrain any anticompetitive pricing in the other." *United States v. Aetna Inc.*, 240

F. Supp. 3d 1, 20 (D.D.C. 2017) (ellipsis and quotation marks omitted).

   "[W]ithin [a] broad market, well-defined submarkets may exist which, in themselves,

constitute product markets for antitrust purposes." *Brown Shoe*, 370 U.S. at 325.  Under what

is known as the "narrowest market principle," a court usually must "identify the narrowest

market within which the defendant companies compete that qualifies as a relevant product

market." *IQVIA*, 710 F. Supp. 3d at 353 (citation omitted); *accord Aetna*, 240 F. Supp. 3d at

40.  "The prospective merger's likely competitive effects on *that* market will determine its

legality." *FTC v. Peabody Energy Corp.*, 492 F. Supp. 3d 865, 886 (E.D. Mo. 2020).  "[E]ven

if alternative submarkets exist . . . , or if there are broader markets that might be analyzed, the

viability of such additional markets does not render the one identified by the [plaintiff]

unusable." *Bertelsmann*, 646 F. Supp. 3d at 28; *accord* Phillip E. Areeda & Herbert

Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 929d, Lexis (database updated Sept. 2024) ("Areeda & Hovenkamp") ("The 'line of commerce' language of § 7 of the Clayton Act, and the general principles of merger policy, require the [plaintiff] to identify *some* grouping of sales that constitutes a relevant market in which prices might rise as a consequence of the merger.  That a larger or smaller grouping of sales might also constitute a market is beside the point."); Tr. at 1290:21-25 (Scott Morton agreeing that "there can be more than one relevant product market for evaluating a given transaction," and that, "[i]n fact, there usually is" more than one).  Thus, "the mere fact that a firm may be termed a competitor in the overall marketplace does not necessarily require that it be included in the relevant product market for antitrust purposes."  *Deutsche Telekom*, 439 F. Supp. 3d at 200 (citation omitted); *accord FTC v. Surescripts, LLC*, 665 F. Supp. 3d 14, 35 (D.D.C. 2023); *United States v. Anthem, Inc.*, 236 F. Supp. 3d 171, 195 (D.D.C.), *aff'd*, 855 F.3d 345 (D.C. Cir. 2017).

    The hypothetical-monopolist test (the "HMT") is a common method of evaluating a proposed market.  *See, e.g.*, *Regeneron*, 96 F.4th at 339; *Hackensack*, 30 F.4th at 167; *FTC v. Sanford Health*, 926 F.3d 959, 963 (8th Cir. 2019); 2023 Merger Guidelines § 4.3.A; *accord* Tr. at 529:5-15 (Smith); *id.* at 1255:23-1256:10 (Scott Morton).  The HMT asks "whether a hypothetical monopolist acting within the proposed market would be substantially constrained from increasing prices by the ability of customers to switch to other producers."  *United States v. Am. Express Co.*, 838 F.3d 179, 198 (2d Cir. 2016) ("*AmEx I*") (brackets and quotation marks omitted), *aff'd sub nom. Ohio v. Am. Express Co.*, 585 U.S. 529 (2018) ("*AmEx II*").  Implementing the HMT requires "imagining that a hypothetical monopolist has imposed a small but significant non-transitory increase in price ('SSNIP') within the proposed market."  *Id.* at 199.  The usual practice is to define the SSNIP as a five-percent increase in price.  *See,*

*e.g.*, *Hackensack*, 30 F.4th at 169; *H & R Block*, 833 F. Supp. 2d at 52; 2023 Merger Guidelines § 4.3.B; Tr. at 529:13-15 (Smith).  "If the hypothetical monopolist can impose this SSNIP without losing so many sales to other products as to render the SSNIP unprofitable, then the proposed market is the relevant market.  By contrast, if consumers are able and inclined to switch away from the products in the proposed market in sufficiently high numbers to render the SSNIP unprofitable, then the proposed market definition is likely too narrow and should be expanded."  *AmEx I*, 838 F.3d at 199; *accord Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 20 F.4th 466, 482 n.1 (9th Cir. 2021).[4]

"Hard data concerning cross-elasticity is not the only means of proving a relevant market."  *Emigra Grp., LLC v. Fragomen, Del Rey, Bernsen & Lowey, LLP*, 612 F. Supp. 2d 330, 355 (S.D.N.Y. 2009); *see, e.g.*, *U.S. Sugar*, 73 F.4th at 206 ("The District Court did not err by considering facts on the ground rather than relying upon HMT analysis."); *McWane, Inc. v. FTC*, 783 F.3d 814, 829 (11th Cir. 2015) (rejecting the contention that "the expert's analysis [of the product market] was insufficient because it did not involve an econometric analysis"; explaining that "there appears to be no support in the caselaw for [the] claim that such a technical analysis is always required," and that "courts routinely rely on qualitative economic evidence to define relevant markets" (original brackets and citation omitted)). Courts "often look to 'practical indicia' of market boundaries to identify whether two products are economic substitutes and compete within the same antitrust market."  *Regeneron*, 96 F.4th at 339 (quoting *Brown Shoe*, 370 U.S. at 325); *accord FTC v. Meta Platforms Inc.*, 654 F.

---

[4] The 2023 Merger Guidelines now refer to a "small but significant and nontransitory increase in price or worsening of terms," or an "SSNIPT."  Merger Guidelines § 4.3.A.  To conform with the majority of caselaw which refers to an SSNIP, the Court uses that term, noting that there is no relevant analytical difference when conducting the HMT with reference to an SSNIP or an SSNIPT.

Supp. 3d 892, 912 (N.D. Cal. 2023) ("There is no requirement to use any specific methodology in defining the relevant market," and "courts have determined relevant antitrust markets using, for example, only the *Brown Shoe* factors, or a combination of the *Brown Shoe* factors and the HMT." (quotation marks omitted)); *FTC v. Staples, Inc.*, 190 F. Supp. 3d 100, 118 (D.D.C. 2016) ("*Staples II*") ("Courts routinely rely on the *Brown Shoe* factors to define the relevant product market."). These indicia, known as the *Brown Shoe* factors, include "industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." 370 U.S. at 325. "This list is neither mandatory nor exhaustive. That is, 'the presence of some, and absence of others, is not dispositive.'" *Alaska Elec. Pension Fund v. Bank of Am. Corp.*, 306 F. Supp. 3d 610, 620 (S.D.N.Y. 2018) (quoting *Se. Mo. Hosp. v. C.R. Bard, Inc.*, 642 F.3d 608, 614 (8th Cir. 2011)); *accord IQVIA*, 710 F. Supp. 3d at 355 ("All the [*Brown Shoe*] factors need not be satisfied for the Court to conclude that the [plaintiff] has identified a relevant market.").

Whether approached quantitatively or qualitatively (or both), "market definition is a deeply fact-intensive inquiry," *Todd v. Exxon Corp.*, 275 F.3d 191, 199 (2d Cir. 2001) (Sotomayor, J.), requiring attention to "the commercial realities of the industry," *Brown Shoe*, 370 U.S. at 336 (footnote and quotation marks omitted). "Whatever the market urged by the plaintiff or the defendant, the other party can usually contend plausibly that something relevant was left out, that too much was included, or that dividing lines between inclusion and exclusion were arbitrary." Areeda & Hovenkamp ¶ 530d. "The Supreme Court has wisely recognized there is 'some artificiality' in any boundaries, but that 'such fuzziness' is inherent in bounding any market." *Id.* (quoting *Phila. Nat'l Bank*, 374 U.S. at 360 n.37); *accord Bertelsmann*, 646 F. Supp. 3d at 33; *FTC v. Tronox Ltd.*, 332 F. Supp. 3d 187, 202 (D.D.C.

2018); 2023 Merger Guidelines § 4.3.  This concession to the nature of legal categories is not

a license for "absurd market definition[s]," *Isr. Travel Advisory Serv., Inc. v. Isr. Identity

Tours, Inc.*, 61 F.3d 1250, 1252 (7th Cir. 1995), and "[n]o party," plaintiff or defendant, "can

expect to gerrymander its way to an antitrust victory without due regard for market realities,"

*It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676, 683 (4th Cir. 2016).  But it bears

emphasis that Congress "prescribed a pragmatic, factual approach to the definition of the

relevant market and not a formal, legalistic one."  *Brown Shoe*, 370 U.S. at 336.  This choice

reflects that "[t]he 'market,' as [is true of] most concepts in law or economics, cannot be

measured by metes and bounds," and "[i]ndustrial activities cannot be confined to trim

categories."  *United States v. Cont'l Can Co.*, 378 U.S. 441, 456 (1964) (first alteration in

original) (citations omitted); *accord New York v. Kraft Gen. Foods, Inc.*, 926 F. Supp. 321,

360 (S.D.N.Y. 1995) ("The market 'need not – indeed cannot – be defined with scientific

precision.'" (quoting *United States v. Conn. Nat'l Bank*, 418 U.S. 656, 669 (1974))).

     The FTC argues that "'accessible luxury' handbags constitute a relevant product

market."  PCOL ¶ 41.  This concept has two components: "accessible luxury" and

"handbags."  As defined by the FTC, "[h]andbags generally refer to small to medium-sized

bags used for carrying personal items and money and have handles or a strap and are designed

to be held in the hand or worn over the shoulder."  PFOF ¶ 25; *see also* Dkt. 277 at 3 ¶ 18

(same definition in the FTC's pre-hearing proposed findings of fact); Smith Rep. ¶ 30 (same

definition).  The Court – having considered the testimony and documentary evidence in the

record, as well as the dozens of handbags that Defendants carted into the courtroom as

demonstratives – finds that this is a proper definition of a "handbag."

     The central dispute concerns the FTC's claim that within this broader market of

handbags are three distinct submarkets: "mass market" (also identified using terms such as

"fast fashion" or "opening price point"), "accessible luxury" (also identified using terms such as "affordable luxury"), and "true luxury" (also identified using terms such as "luxury," "pure luxury," "pinnacle luxury," "traditional luxury," "European luxury," and "traditional European luxury"). PFOF ¶¶ 47, 61, 116, 132; Tr. at 24:20-23 (FTC Opening). The FTC argues that mass-market handbags and true-luxury handbags are not reasonably interchangeable with accessible-luxury handbags and therefore are not part of the relevant product market. PCOL ¶¶ 52-55; Tr. at 32:21-33:1 (FTC Opening).

Defendants disagree. In their view, the FTC's theory of the case is "completely divorced from the marketplace realities." Opp. at 1. Defendants dispute that there is any such thing as "accessible luxury," arguing instead that the FTC's market definition is no more than "a very artificially curated selection of handbag brands" and "an exercise in gerrymandering." Tr. at 58:24-25, 61:24-25 (Tapestry Opening). According to Defendants, "'accessible luxury' is a generalized concept rather than a separate relevant market," DFOF ¶ 91, and all handbags should be considered together as part of a single, undifferentiated market, *see* Opp. at 21-26.

The Court thus embarks on assessing the FTC's proposed relevant product market of accessible-luxury handbags. The Court will first address the qualitative evidence relating to market definition before turning to the quantitative evidence. *See IQVIA*, 710 F. Supp. 3d at 354 n.13 ("There is no uniform sequence in which courts approach th[e] analysis [of the relevant product market]."). As explained below, under either approach, the Court finds that the FTC has successfully described a relevant market.

### 1. Qualitative Analysis

The Court prefaces its *Brown Shoe* analysis with two observations.

First, it is true that accessible-luxury handbags function similarly to mass-market and true-luxury handbags. One can carry a wallet, a phone, or a personal item in a Trader Joe's

tote bag just as effectively as in an Hermès Birkin.  *Cf.* Tr. at 468:20-21 (Kahn); *id.* at 966:7-8 (Giberson).  But "functionally similar products may be in separate product markets, depending on the facts of the case."  *FTC v. Lundbeck, Inc.*, 650 F.3d 1236, 1241 (8th Cir. 2011).  This is because "even if two products are functionally fungible, consumers may still view them as *not* reasonably interchangeable – that is, consumers do not treat them as substitutes in the marketplace."  *Universal Surveillance Corp. v. Checkpoint Sys., Inc.*, No. 11-cv-01755, 2015 WL 6082122, at *4 (N.D. Ohio Sept. 30, 2015); *accord Regeneron*, 96 F.4th at 338-41; *Sysco*, 113 F. Supp. 3d at 26; *see Visa*, 163 F. Supp. 2d at 335 (examining "reasonable interchangeability *in the eyes of consumers*" (emphasis added) (quotation marks omitted)).

Therefore, even where two products are functionally interchangeable for most (or even all) purposes, they may nonetheless be divisible into separate product markets.  For instance, "Chevrolets and Fords might be interchangeable . . . , but Chevrolets and Lamborghinis are probably not."  *ProMedica*, 749 F.3d at 565.  As an even starker example, the Second Circuit has held that brand-name and generic versions of prescription drugs may constitute distinct antitrust markets, even though they are chemically and therapeutically equivalent.  *See Geneva Pharms. Tech. Corp. v. Barr Lab'ys Inc.*, 386 F.3d 485, 496-99 (2d Cir. 2004); *see also, e.g.*, *Regeneron*, 96 F.4th at 340 ("The fact that vials and [prefilled syringes] contain the same medicines and treat the same condition does not automatically mean that they compete in the same market."); *Henry v. Chloride, Inc.*, 809 F.2d 1334, 1342-43 (8th Cir. 1987) (sufficient evidence for jury to find that batteries sold through route trucks were in a separate market from identical batteries sold through warehouses); *United States v. Empire Gas Corp.*, 537 F.2d 296, 303-04 (8th Cir. 1976) (liquified petroleum ("LP") was a relevant product market even though "wood, coal, fuel oil, natural gas[,] and electricity are all functionally

interchangeable to a considerable degree with LP in some or all of its major uses"; because of their "inferior qualities," wood, coal, and fuel oil did not have a high cross-elasticity of demand with LP; conversely, natural gas and electricity were "comparable and perhaps even superior to" LP in quality, but a low cross-elasticity of supply kept them in a different product market); *FTC v. Syngenta Crop Prot. AG*, 711 F. Supp. 3d 545, 557, 565, 569 (M.D.N.C. 2024) (accepting market definition based on particular active ingredients used in pesticides, even though market definition excluded some products that had similar uses denoted by their EPA label registrations; "The EPA registrations may be probative of interchangeability, but they appear to speak to interchangeable *function*, not whether and how these [pesticides] are interchangeable in the *marketplace* – i.e., cross-elasticity of demand"); *FTC v. Staples, Inc.*, 970 F. Supp. 1066, 1075, 1080 (D.D.C. 1997) ("*Staples I*") ("The Court recognizes that it is difficult to overcome the first blush or initial gut reaction of many people to the definition of the relevant product market as the sale of consumable office supplies through office supply superstores. The products in question are undeniably the same no matter who sells them, and no one denies that many different types of retailers sell these products"; nonetheless, "the sale of consumable office supplies through office supply superstores is the appropriate relevant product market for purposes of considering the possible anti-competitive effects of the proposed merger between Staples and Office Depot."). Thus, the fact that a $50 polyurethane bag may look and function similarly to a $500 leather bag does not dispose of the market-definition analysis.

It may be true that, without knowing its brand, someone may not know with certainty whether a particular handbag is mass market, accessible luxury, or true luxury. *Cf.* Tr. at 64:1-9 (Tapestry Opening). But the evidence presented made clear to the Court that brand is a fundamental attribute of a handbag; one cannot ignore it any more than one could ignore the

brand of the prescription drug in *Geneva* in defining the separate markets of two chemically identical substances. *See* 386 F.3d at 496-99. Defendants only selectively acknowledge the importance of brands in the handbag industry. On the one hand, Defendants insist that Dr. Smith's reliance on brand surveys is flawed because "[c]onsumers do not purchase brands. They purchase particular handbags." DFOF ¶ 129. On the other hand, Defendants' entire argument about the revitalization of Michael Kors's "brand heat," *see* DFOF ¶ 6, presupposes that consumers base their purchasing decisions, to a significant extent, on their perceptions of the bag's brand. Defendants cannot have it both ways. In the Court's view, the conclusion most consonant with the evidence is that handbag consumers *do* "purchase brands." To ignore the peculiar role of brands in the handbag market would be to ignore the commercial realities of the industry.

Second, the FTC's market definition relies on the premise that higher-quality, higher-priced products may constitute a separate market than lower-quality, lower-priced products. *Brown Shoe* acknowledged that "'price/quality' differences, where they exist, . . . may be of importance in determining the likely effect of a merger," although it affirmed the district court's factual finding in that particular case that a division between "medium-priced shoes" and "low-priced shoes" was unwarranted on the evidence before it. 370 U.S. at 326. In other cases, with different factual records, courts have recognized that price and quality differences may play an important role in defining market boundaries where such tiering comports with commercial realities. *See, e.g.*, *Int'l Boxing Club of N.Y., Inc. v. United States*, 358 U.S. 242, 250-52 (1959) (affirming district court's finding that "there exists a 'separate, identifiable market' for championship boxing contests" as opposed to non-championship bouts (citation omitted)); *Syufy Enters. v. Am. Multicinema, Inc.*, 793 F.2d 990, 994-95 (9th Cir. 1986) (affirming jury's finding that "industry anticipated top-grossing films constitute a distinct

product market"); *A.G. Spalding & Bros. v. FTC*, 301 F.2d 585, 598 (3d Cir. 1962) (affirming FTC's finding that "higher priced and low priced categories [of sporting goods] can be distinguished competitively from each other and that they constitute separate and distinct lines of commerce" (quotation marks omitted)); *Bertelsmann*, 646 F. Supp. 3d at 28 (accepting market definition of "anticipated top-selling books" as "consistent with cases in which courts have recognized the 'high end' of other broad markets as distinct submarkets for antitrust purposes"); *Le v. Zuffa, LLC*, 216 F. Supp. 3d 1154, 1165-67 (D. Nev. 2016) (accepting market definitions of "live Elite Professional MMA bouts" and "live Elite Professional MMA Fighter services" as separate from non-elite bouts and fighters (quotation marks omitted)); *FTC v. Lancaster Colony Corp.*, 434 F. Supp. 1088, 1093 (S.D.N.Y. 1977) ("Plainly, low or moderately-priced glassware, intended for everyday use, differs from fine glassware, such as lead crystal, sold at higher prices and marketed through different channels.").  To be sure, if the factual record does not justify such distinctions – if "the differences are actually a *spectrum* of price and quality differences" within an otherwise indivisible market – then gradations based solely on price and quality will not be "sufficient to establish separate relevant markets."  *In re Super Premium Ice Cream Distrib. Antitrust Litig.*, 691 F. Supp. 1262, 1268 (N.D. Cal. 1988) (collecting cases), *aff'd*, 895 F.2d 1417 (9th Cir. 1990) (unpublished table decision); *see also* Opp. at 27 & n.73; DCOL ¶ 36.  But this is a question of fact, not a question of law.  *See Geneva*, 386 F.3d at 497 ("In *Brown Shoe*, . . . the Court simply clarified that a price differential alone should not override observed market conditions."); *see also Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 466-67 (1992) ("Legal presumptions that rest on formalistic distinctions rather than actual market realities are generally disfavored in antitrust law.  This Court has preferred to resolve antitrust

claims on a case-by-case basis, focusing on the particular facts disclosed by the record."
(quotation marks omitted)).

With these observations, the Court turns to the *Brown Shoe* factors.

### a. Peculiar Characteristics

The Court starts with the "peculiar characteristics" of affordable-luxury handbags.
*Brown Shoe*, 370 U.S. at 325. The Court finds that there is a significant difference in the
materials and craftsmanship commonly used in accessible-luxury handbags compared to
mass-market handbags.

Accessible-luxury handbags are typically made with "genuine materials" and, in
particular, "[g]enuine leather." Tr. at 932:24-934:13, 935:21-936:4 (Steinmann describing
handbags in Macy's "designer" category for handbags over $100, which includes Coach, Kate
Spade, and Michael Kors). Leather's predominance is evident not only as to the parties'
handbags, *see id.*; *see also id.* at 271:13-272:13 (Crevoiserat discussing Kate Spade); *id.* at
436:2-15 (Kahn discussing Coach), but also as to other accessible-luxury brands' handbags,
*see, e.g.*, PX3212 at 3 ███████████████████████████████████████
██████████████████; PX8171 at 9:18-10:10 ████████████████████████████
██████████████; DX0933 at 40:25-41:06 ███████████████████████████████
████████████████████████████. Accessible-luxury brands source their leather from
various locations inside and outside of Europe, depending on the brand and, sometimes, on the
product. *See, e.g.*, Tr. at 692:21-23 (Guez: Rebecca Minkoff primarily sources leather for its
handbags from Italy and China); *id.* at 1016:24-1017:3, 1037:25-1038:8 (Charles: about 60
percent of Tapestry's raw-material leather comes from Southeast Asia, and about 40 percent
comes from Italy; Tapestry primarily sources other fabrics and materials from Southeast
Asia); PX8171 at 82:16-82:25 ██████████████████████████████████████████

████████████████████    DX0933 at 39:15-40:08  ████████████████████

████████████████████

In contrast, most mass-market handbags are made of lower-quality and nonleather materials such as polyurethane ("PU"). For example, Christopher Steinmann, vice president, divisional-merchandising manager at Macy's, testified that handbags in Macy's "designer" category for bags over $100 – a category that includes Coach, Kate Spade, and Michael Kors – differ in their "materials and construction" from handbags in Macy's "mid-tier" category for bags between $50 and $100. Tr. at 932:25-934:6, 935:21-936:4. While bags in the "designer" category "are typically genuine materials or . . . are materials that have a higher quality standard," bags in the "mid-tier" category usually are made with "synthetic leather or faux leather." Tr. at 934:5-13 (Steinmann). Steinmann also opined that "designer" handbags have "better trims and just better construction" than "mid-tier" offerings. *Id.* at 934:14-23. Griffin Guez, CEO of the company that operates the Rebecca Minkoff brand, similarly stated that mass-market handbags are "[m]uch cheaper" in quality and "generally us[e] materials such as PU." *Id.* at 677:24-678:5. Other witnesses corroborated this testimony. *See, e.g.*, DX0930 at 31:4-15, 36:20-37:03 ████████████████████

████████████████████████████████████████

████████████████; PX8171 at 19:25-24:07 ████████████████████

████████████████████████████████████████

██████ *cf.* PX8168 at 13:21-15:08 ████████████████████████████

████████████████████████████████

It is true that some handbags produced by accessible-luxury brands are not made of leather. *See, e.g.*, Tr. at 700:11-701:3 (Guez discussing some nonleather handbags made by true-luxury brands); *id.* at 883:19-23 (Fraser listing nonleather materials used in some Kate

Spade handbags); *id.* at 1091:2-12 (Mr. Kors listing nonleather materials that he has used "at one point or another" for MMK handbags).  And some mass-market handbags are made of leather.  *See, e.g.*, Tr. at 983:1-11 (Giberson discussing a Patricia Nash handbag).  It is also true that some true-luxury handbags are not made of leather, like some Prada bags made of nylon and Louis Vuitton bags made primarily of coated canvas.  *See, e.g.*, Tr. at 973:19-974:8 (Giberson).

But when describing a product market, the existence of some exceptions to a general trait does not require a court to disregard that trait altogether.  Indeed, courts routinely describe product markets using language that admits of exceptions.  *See, e.g.*, *Geneva*, 386 F.3d at 498 ("Plaintiffs also offered evidence that Coumadin has been marketed *primarily* to physicians, while generics target wholesalers and chain pharmacies." (emphasis added)); *Spalding*, 301 F.2d at 598 ("[T]he citation of *a few examples of variations from the general pattern* hardly constitutes a persuasive argument that the Commission erred in interpreting AGMA price classifications as defining the higher priced categories as lines of commerce." (emphasis added) (footnote omitted)); *Meta*, 654 F. Supp. 3d at 918 ("The pricing of VR dedicated fitness apps likewise differs in at least one key respect from other VR apps and non-VR fitness offerings.  The main difference in comparison to the former category is that VR dedicated fitness apps are *more likely* to have a subscription-based pricing model." (emphasis added)); *Bertelsmann*, 646 F. Supp. 3d at 30 ("[C]ontracts for books that are expected to sell well are *more likely* to include favorable terms like higher royalty rates, higher levels of marketing support, 'glam' packages . . . , and airfare for authors." (emphasis added)); *Sysco*, 113 F. Supp. 3d at 20 ("[S]treet customers *usually* do not have written contracts with broadliners; instead, they negotiate prices on a weekly or other short term basis.  They also *tend to* diversify their purchases among multiple distribution channels." (emphases added));

*United States v. Bazaarvoice, Inc.*, No. 13-cv-00133, 2014 WL 203966, at *45 (N.D. Cal. Jan. 8, 2014) ("While *some* eCommerce platforms may offer some basic R & R functionality, they *generally* lack the features necessary to serve as a substitute for the R & R platforms offered by Bazaarvoice or PowerReviews." (emphases added)); *H & R Block*, 833 F. Supp. 2d at 56 ("[W]hile defendants[] have identified *isolated instances* in which assisted product offerings are priced lower than the average prices for typical assisted products, they do not and cannot demonstrate that this is *generally* the case." (emphases added)); *Staples I*, 970 F. Supp. at 1078 ("While the Court accepts that *some* small businesses with fewer than 20 employees as well as home office customers do choose other sellers of office supplies, the superstores' customers are different from those of *many* of the purported competitors." (emphases added)). So too here. While the existence of exceptions in the various categories leads the Court to attribute less weight to the peculiar-characteristic factor than it would otherwise, the Court finds that the factor still weighs in favor of a distinct mid-tier market under *Brown Shoe*.

### b.  Unique Production Facilities

Manufacturing also distinguishes accessible-luxury handbags, especially with respect to true-luxury handbags.  As Tapestry CEO Joanne Crevoiserat explained in a January 2023 email to colleagues, "our supply chain innovation over the years effectively created the accessible luxury market – balancing lower cost with quality well made product."  PX1704 at 1; *see also* Tr. at 298:14-300:3 (Crevoiserat discussing PX1731 at 48, a strategy document sent to Tapestry board in advance of February 2023 meeting).[5]

---

[5] Defendants argue that this description of Tapestry's supply chain cannot be "generalized across any purported accessible luxury market."  DFOF ¶ 97.  The Court disagrees. Defendants cite testimony by Peter Charles, Tapestry's chief supply-chain officer, that Tapestry's supply chain is superior to that of other brands, including Michael Kors and Tory Burch.  *See id.*; Tr. at 1027:8-1028:3, 1030:11-1031:2 (Charles).  Even if the Court credits Charles's self-serving opinion that his employer has a significantly better supply chain than

Accessible-luxury brands outsource almost all manufacturing to third parties in Southeast Asia.  Tapestry is emblematic: its supply chain is not vertically integrated, and no Coach or Kate Spade bags are made in Europe.  Tr. at 299:25-300:1, 338:14-17 (Crevoiserat); *id.* at 1036:20-1037:20 (Charles).  Instead, to make its handbags, Tapestry contracts with various third-party manufacturers in Southeast Asia.  Tr. at 461:21-462:7 (Kahn); Tr. at 1016:6-8, 1037:2-4 (Charles); PX1731 at 48; *see* PX1184 at 242-43 (May 2022 presentation to Tapestry board: "Vietnam remains an import supply market, planned to represent over 30% of leather goods units in Production Year [20]23"; Vietnam, Cambodia, the Philippines, and India collectively accounted for around 75 percent of Tapestry's leather-good production (emphases omitted)).  Most Coach handbags are made in Vietnam, Cambodia, and the Philippines; some are made in Indonesia, India, Bangladesh, and China.  PX7105 at 13; PX7435 at 9; Tr. at 462:5-7 (Kahn); *id.* at 1016:6-8, 1016:18-23, 1037:2-4 (Charles); *see also* PX1636 at 3 (October 2021 letter from Todd Kahn to Tapestry's board emphasizing importance of Coach's Vietnamese manufacturers).  Similarly, most Kate Spade handbags are made in Vietnam, Cambodia, the Philippines, and China.  PX7105 at 13; PX7435 at 9; Tr. at 1037:2-4 (Charles).

Although it does not have any "exclusive arrangements" or "long-term contracts," Tapestry has worked with many of the same factories for years and, "in some cases[,] over 30

---

other brands, the Court nonetheless concludes that the distinctive feature of Tapestry's supply chain – its use of third-party manufacturers based in Southeast Asia – is generalizable across the product market for accessible-luxury handbags.  Moreover, Tapestry is not the only producer of accessible-luxury handbags that has a team of people focused on supply-chain management.  *See, e.g.*, PX8170 at 123:02-123:16 ███████████████████████████
██████████████████████████████████████████████████
; DX0925 at 108:04-108:13 ████████████
████████████.

years." Tr. at 1022:4-12 (Charles). For instance, Simone – a manufacturer with its

headquarters in South Korea and factories in Vietnam, Cambodia, and Indonesia – has made

handbags for Tapestry for over 20 years. *Id.* at 200:7-8 (Newman); *id.* at 1039:25-1040:5,

1040:14-16 (Charles); PX1354 at 3-4. ███████████████████████████████

██████████████████████████████ PX8168 at 41:20-42:03 ████

████; *accord* PX1354 at 4, 7 (Tapestry October 2023 slide deck about Simone: "High

capacity and capability – producing all Leather product groups"; "Experienced and stable

technical and production leaders"; "Factory efficiency highest in the industry"). ████████

████████████████████████████████████████████████████████

████████████████████████████████████████████ PX5077

at 218:24-221:20 ███████████████████████

Although Coach was an industry innovator in supply-chain management, "many others

have followed" its example. Tr. at 299:11-300:3, 338:14-17 (Crevoiserat). For instance,

nearly all Michael Kors products are made by third-party contractors in Asia, with Simone

serving as the largest manufacturer of Michael Kors handbags. *Id.* at 82:1-6 (Idol); *id.* at

200:4-6 (Newman); PX7098 at 16; *see* PX1354 at 6 ███████████████████████

███████████████████████████████; Tr. at 463:21-464:2 (Kahn: at

manufacturing facilities in Vietnam, Coach and Michael Kors handbags sometimes are being

manufactured "in adjacent buildings or lines"). Tory Burch also uses third-party contractors

in Asia, including Simone. Tr. at 1040:11-13 (Charles); Smith Rep. ¶ 126 & n.240. ████████

████████████ PX8168 at 41:01-42:19, 47:04-47:09 ████████████████

████████████████████████████████████████████████████

████. Some Southeast Asian manufacturers that make bags for Tapestry also make bags for

Cole Haan, Marc Jacobs, and Ralph Lauren, other accessible-luxury-handbag brands. Tr. at

1018:5-12, 1018:24-1019:5 (Charles); *accord* PX8170 at 126:06-126:11 ███████

████████████████████████████████████████████████; PX8172 at 35:10-14,

40:07-40:18 ████████████████████████████████████████████████

██████████████████████. ████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████ PX8171 at 24:21-26:15 ███████; *see also* DX0734 at

14. ████████████████████████████████████████████████

██████████ DX0933 at 46:09-46:13, 90:05-90:07 █████ ████████████

████████████████████ DX0926 at 83:21-84:03 ██████. ████████████████

██████████████████████ DX0950 at 93:23-94:02 █████.



Meanwhile, as Boston Consulting Group ("BCG") noted in a September 2023 analysis

that Peter Charles, Tapestry's chief supply-chain officer, forwarded to Joanne Crevoiserat,

Tapestry's CEO, "[t]rue luxury and affordable luxury supply chains are fundamentally

different in several key aspects."  PX1327 at 4 (emphasis omitted).[6]  Most true-luxury

handbags are made in European countries such as France and Italy, with little (if any)

manufacturing presence in Asia.  Tr. at 464:3-9 (Kahn: European brands do not rely on Asian

---

[6] During cross-examination by the FTC, Charles acknowledged that BCG provides consulting services to Tapestry "for a variety of different projects and reasons."  Tr. at 1039:3-9.  On redirect, Charles tried to downplay this slide deck's significance, stating that it was not something that he "instructed BCG to provide," that BCG simply was "fishing for business" by "giv[ing Charles] a perspective from their point of view on the market," and that Charles "felt that it was important to share that [this slide deck] with Joanne [Crevoiserat] just because it's broader context for her."  *Id.* at 1043:2-12.  The Court does not find this redirect testimony persuasive.  The fact that Charles forwarded the BCG slide deck to his CEO – describing it, in the accompanying email, as something that "the BCG European based luxury team presented to [him a] couple of weeks ago," and that provided "useful context and a good reminder around luxury's SC organizing principles and main characteristics" – suggests that he believed its contents to be reliable.  PX1327 at 1; *see* Tr. at 1034:5-7 (Charles: "SC" means "supply chain").

manufacturing to the same extent as Coach or Michael Kors); *id.* at 680:21-681:1 (Guez: true-luxury handbags are manufactured "[l]argely in Europe"); PX1327 at 9 (BCG: true luxury is "[p]redominantly [m]ade in France & Italy"); Smith Rep. ¶ 153.  For instance, Chanel makes its handbags in France and Italy.  Tr. at 657:14-16 (Yang); PX4002 ¶ 3 (Yang). ■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■ PX8172 at 35:07-35:09

■■■■■■. ■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■.

PX8170 at 45:11-45:20, 51:02-51:04 ■■■■; *see also, e.g.*, Tr. at 1092:9-11 (Mr. Kors: MK Collection is made in Italy); PX7098 at 15-16 (Capri SEC filing in May 2023: "The vast majority of Versace's production is located in Italy.  The remaining production occurs elsewhere in Europe and a small portion is produced in Asia or North Africa. . . .  Most of Jimmy Choo's products are produced by specialists in Italy, supported by other factories across Europe, with a small portion produced in Asia.").  True-luxury brands are also less reliant on third-party manufacturers.  Brands such as Chanel, Gucci, Bottega Veneta, Fendi, and Louis Vuitton have vertically integrated at least some of their handbag manufacturing.  Tr. at 657:18-23 (Yang); PX1327 at 9-10. ■■■■■■■■■■■■■

■■■■■■ PX8170 at 45:04-45:07 ■■■■.  And vertical integration by true-luxury brands is increasing.  PX1327 at 7, 10.

To be sure, some true-luxury brands have handbags made in Southeast Asia.  *See, e.g.*, Tr. at 1019:9-15 (Charles: Alexander Wang, Balenciaga, Prada, and Burberry manufacture some handbags in Southeast Asia).  But it is unclear how many handbags these brands make in Southeast Asia, and no witness provided such an estimate.  Moreover, as noted previously, the existence of some exceptions to the general rule does not defeat a finding that products within a market generally possess certain traits.

Defendants also contend that "consumers do not view manufacturing location as a meaningful distinction."  Opp. at 23; *see also* Tr. at 65:12-17 (Tapestry opening).  Yet Defendants do not cite (and the Court has not found) any case holding that the distinct-production-facilities *Brown Shoe* factor – as opposed to the industry-or-public-perception factor – weighs in favor of a market definition only if consumers recognize that firms in the proposed market use distinct production facilities.  On the contrary, courts have found that a product market has unique production facilities without ever referring to consumers' knowledge about those facilities.  *See, e.g.*, *Gen. Foods Corp. v. FTC*, 386 F.2d 936, 943 (3d Cir. 1967) (affirming FTC's finding that "the equipment used for the production of steel wool is distinct from, and lacks any similarity to, the facilities required to manufacture the other cleaning devices that [the merged entity] contends should be included in the relevant market," with no mention of consumer recognition of that fact); *Peabody*, 492 F. Supp. 3d at 900-01 (finding that "coal mines and related processing facilities" were unique production facilities that supported finding that Southern Powder River Basin coal was a distinct product market with no mention of consumer recognition).

In sum, the Court finds that accessible-luxury handbags have unique production facilities as compared to true-luxury handbags.  This finding supports recognizing accessible-luxury handbags as distinct from true-luxury handbags.

### c.  Distinct Prices

Although it is generally true that "a price differential alone is insufficient to infer two separate product markets," *HDC Med., Inc. v. Minntech Corp.*, 474 F.3d 543, 547 (8th Cir. 2007), "the Supreme Court has held that a substantial price difference, along with other factors, can bear on definition of the product market," *Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 762 F.3d 1114, 1122 (10th Cir. 2014); *see, e.g.*, *United States v. Aluminum*

*Co. of Am.*, 377 U.S. 271, 277 (1964) ("*Alcoa*") ("[T]he price differential [between aluminum conductor and copper conductor products] further sets them apart [as distinct product markets].");  *Geneva*, 386 F.3d at 497 ("Here we find a substantial gap in pricing [of Coumadin and generic warfarin] indicative of separate markets.").  Although this *Brown Shoe* factor often focuses on the amount that consumers pay, it can also encompass the use of distinctive pricing models.  *See, e.g.*, *Meta*, 654 F. Supp. 3d at 918-19 ("VR dedicated fitness apps are more likely [than other VR apps and non-VR fitness apps] to have a subscription-based pricing model," which weighs "in favor of the existence of a VR dedicated fitness app market," although the existence of some exceptions means that "the overall weight of this factor is lessened.").

In the handbag industry, there are two common ways of describing a handbag's price: the manufacturer's suggested retail price (the "MSRP" or the "ticket price") and the average unit retail price (the "AUR" or the "out-the-door price").  MSRP and AUR can – and, for accessible-luxury handbags, often do – differ because AUR includes discounts and promotions.  Tr. at 161:14-162:9 (Idol); *id.* at 450:14-451:3 (Kahn); *id.* at 800:8-14 (Levine). In other words, "AUR is the price the consumer actually pays when they purchase the handbag."  *Id.* at 858:12-14 (Fraser).[7]

The extent of the gap between MSRP and AUR often depends on where the handbag is sold (such as at a brand's full-price store, at a brand's outlet store, on a brand's website, or by

---

[7] Meanwhile, the "wholesale price" is the sub-MSRP price that wholesalers like Macy's and Dillard's pay to handbag brands for their products.  Tr. at 162:5-9 (Idol).  Wholesalers then decide how much to charge consumers, with any difference between the AUR and the wholesale price accruing to the wholesaler as profit.  *Id.* at 162:5-9 (Idol); *id.* at 919:17-19, 935:7-17 (Steinmann).  The pricing discretion generally afforded to handbag wholesalers is why, for those wholesalers, the MSRP is very much a *suggested* retail price, although they may choose to honor it.  *See id.* at 935:16-17 (Steinmann: "Suppliers suggest prices.  We choose to accept or not accept prices.").

a third-party wholesaler such as Macy's or Dillard's). Although some handbags sold through a brand's full-price direct-to-consumer channel or through a third-party wholesaler may be discounted, *see, e.g.*, *id.* at 779:24-780:6 (Levine: during the past three to four years, Coach has worked to "reduce its discounts" in its "full price channel"); *id.* at 935:18-20 (Steinmann: Macy's discounts some handbags that it sells), handbags sold at outlets are more frequently and more heavily discounted than handbags sold elsewhere, *see, e.g.*, Scott Morton Rep. ¶ 55 ("An outlet store or factory outlet is a type of brand-specific store where a brand can sell excess, returned, clearance, or discontinued goods at discounted prices, as opposed to full price goods from the non-outlet version of the brand."); Tr. at 436:18-25 (Kahn: some Coach stores are "full-price retail stores" and other Coach stores are "outlet stores"); *id.* at 779:9-15, 779:21-23 (Levine: "around half of [Coach's] business is done at a discount . . . because the majority of Coach's customers transact in the outlet channel"; "There's always a discount going on in Coach's outlet"); *id.* at 825:23-24, 859:11-14, 886:18-20 (Fraser: Kate Spade has "outlet stores" and "full-price stores"; Kate Spade also has "two different e-commerce sites. One is for full price. One is for outlet."); *id.* at 1078:23-25 (Mr. Kors: Michael Kors's outlet stores have "a different price structure compared to full-price stores").

Based on the evidence presented, the Court finds that accessible-luxury handbags are distinct from mass-market and true-luxury handbags in two respects: (1) accessible-luxury handbags have an entry price point of approximately $100 and rarely approach or exceed $1,000; and (2) accessible-luxury handbags heavily rely on discounting. The Court addresses these aspects in turn.

To start, the Court finds that accessible-luxury handbags generally cost between $100 and $1,000. *See Bertelsmann*, 646 F. Supp. 3d at 28 ("Ample precedent supports [the] use of a numerical cutoff to identify a submarket. It is common for courts to use seemingly arbitrary

criteria to home in on a segment of a broader industry.")  This is true regardless of whether price is described in terms of MSRP or AUR.

Again, Tapestry is illustrative.  Coach's "product portfolio starts at $100 as [the] point of entry and does not exceed $1000."  PX1431 at 18 (March 2022 presentation to Tapestry board); *see also id.* at 19 (Coach's prices are "much lower than . . . $1000+").  Levine, president of Coach North America, confirmed that the price zone for Coach's brand positioning in North America is between $150 and $500, although two variations of the Tabby bag retail for $650 and $725, respectively.  Tr. at 790:12-17, 798:10-799:3; *accord* PX7054 at 12 (Kahn during August 2023 Tapestry earnings call: "We're extraordinarily focused on that $300 to $500 price range.  And that has created even greater white space between us and European luxury."); Tr. at 446:14-19 (Kahn discussing this remark: "[I]f you think of a bull's-eye, [$300 to $500 is] in the bull's-eye. And then we play in permutations outside of that bull's-eye, but we see a lot of value in that price point.").  Tapestry's internal calculations bear out these estimates.  *See, e.g.*, PX1387 at 27-28 (August 2023 presentation to Tapestry board: Coach "[p]rioritize[s] $100-$300"; in North America during fiscal year 2023, AUR was $295 at retail and $130 at outlet; during fiscal year 2024, AUR was $305 at retail and $130 at outlet, and "[o]nly 8% of our bags sold below $100.").

Similarly, Liz Fraser, who served as Kate Spade's CEO and brand president until September 1, 2024, has stated that "[t]he sweet spot [for Kate Spade handbag prices] is between $300 and $350."  PX1238 at 4 (February 2023 article in *Women's Wear Daily*); *see* Tr. at 835:18-836:23 (Fraser discussing this article); *see also* PX1250 at 7 (August 2023 letter from Fraser to Tapestry board: during fiscal year 2023, Kate Spade handbag AUR was $206 in "full price" channels and $102 in "off price" channels); PX1250 at 18 (during fiscal year 2023, 62 percent of Kate Spade handbags sold at outlet had AUR of $101 and up; projected to

increase to 66 percent in fiscal year 2024). During her tenure, Fraser "never suggested a $1,000 or more MSRP for a Kate Spade bag" because she "didn't believe that the Kate Spade customer would pay $1,000 for a Kate Spade bag." Tr. at 826:21-827:6, 878:12-14 (Fraser).

Other accessible-luxury brands also position themselves between $100 and $1,000. As previously noted, MMK – Michael Kors's self-described "accessible luxury line," PX7098 at 9 – is responsible for almost all of Michael Kors's handbag sales in the United States, Tr. at 740:21-741:17 (Wilmotte); *id.* at 1110:3-11 (Edwards). "Generally, MICHAEL Michael Kors handbags retail from $200 to $750." PX7098 at 14 (Capri Form 10-K filed in May 2023); *accord* Tr. at 81:23-25 (Idol: at least 95 percent of Michael Kors handbags have an MSRP between $300 to $450); *id.* at 240:25-241:7 (Newman: MMK generally does not set prices over $1,000). Similarly, ███████████████ Rebecca Minkoff ████████████ ████████████. PX4000 ¶ 14 ████. Rebecca Minkoff does not sell handbags for more than $1,000 because it does not "believe that [its] customers would purchase a handbag for more than $1,000 from [Rebecca Minkoff] based on [its] b[r]and positioning." Tr. at 677:9-15 (Guez); *see also id.* at 681:21-22 (Guez: "Our brand positioning doesn't allow for us to charge more than $500 for a handbag."). ████████████████████ ████████████████████████████████████ ████████████████████. PX8170 at 117:18-118:09 ██████; *see also, e.g.*, PX1723 at 9 (during fiscal year 2023, excluding outlets, the average MSRP for Coach, Kate Spade, Michael Kors, Tory Burch, and Marc Jacobs handbags was $403); PX3202 at 6 ███ ████████████████████████████████ ████████████████████████████ ████████████; PX3212 at 13 ████████████████████ ████████████████████████████; PX8171 at 21:02-21:17 ██████

[redacted]; PX8172 at 45:04-45:07 [redacted]; DX0926 at 17:06-19:09 [redacted]; DX0933 at 59:14-59:22 [redacted].

Mass-market and true-luxury handbags occupy price categories that are distinct from the price category for accessible-luxury handbags. Starting with the former, the Court finds that mass-market handbags generally are priced below $100. *See, e.g.*, Tr. at 459:23-460:2 (Kahn: "the predominant number" of mass-market handbags are under $100); *id.* at 933:11-19 (Steinmann: handbags in Macy's "opening price point" and "mid-tier price point" categories sell for under $50, and between $50 and $100, respectively); PX8171 at 22:22-24:07 [redacted]; PX8172 at 45:11-16 [redacted]; DX0930 at 24:22-25:5 [redacted].

According to Defendants, several numbers show that the FTC's "$100 dividing line between 'accessible luxury' and 'mass market' . . . makes little sense." DFOF ¶ 112. First, Defendants assert that "Michael Kors sold approximately 70.4% of its handbags through retail and online channels for less than $100 in 2023." *Id.* (citing Scott Morton Rep. ¶ 192, Ex. 8). Second, Defendants claim that in 2023, the AUR for a Michael Kors handbag was $92. *Id.* (citing Tr. at 1105:15-21 (Edwards); and DX0934). Third, Defendants assert that "Kate Spade sold approximately 61.9% of its handbags through retail and online channels for less

than $100 in 2023." *Id.* (citing Scott Morton Rep. ¶ 192, Ex. 8). Based on these figures, Defendants argue that the $100 dividing line "would relegate the majority of sales by both Michael Kors and Kate Spade outside of any 'accessible luxury' market." *Id.* As further evidence on this point, Defendants claim that "[e]ven Coach sold approximately 35% of its handbags through [retail and online] channels for under $100 in 2023." *Id.* (citing Scott Morton Rep. ¶ 192, Ex. 8).

Defendants' reliance on these statistics presupposes that AUR is the only relevant metric and that MSRP does not matter in defining the product market for handbags. Even if the Court accepts Defendants' assumption, the Court rejects their conclusion because the statistics they cite are deficient and ultimately misleading.

In claiming that the majority of Michael Kors and Kate Spade handbag sales (70.4 and 61.9 percent, respectively) and that a significant portion of Coach handbag sales (35 percent) were for less than $100 in 2023, Defendants rely solely on an exhibit ("Exhibit 8") in the report prepared by Defendants' economic expert, Professor Fiona Scott Morton. DFOF ¶ 112 (citing Scott Morton Rep. ¶ 192, Ex. 8). These figures, however, omit the wholesale category entirely. *See* Scott Morton Rep. ¶ 192, Ex. 8 n.1 ("Includes revenues from online and retail channels (excludes wholesale)."). Likewise, Edwards's estimate of a $92 AUR for Michael Kors handbags sold in 2023 does not account for wholesale sales. *See* Tr. at 1470:2-5 (Tapestry Closing).

By Professor Scott Morton's own estimate, this omission is significant: in 2023, 29.3 percent of Michael Kors's handbag revenue, 8.8 percent of Kate Spade's handbag revenue, and 6.9 percent of Coach's handbag revenue came from wholesale. Scott Morton Rep. ¶ 59, Ex. 2; *see also* Smith Rep. ¶¶ 19 tbl.1, 21 tbl.2, 27 tbl.3 (during the 12-month period spanning January 2023 to December 2023, 12.5 percent of Kate Spade's handbag units and 10.2 percent

of Coach's handbag units were sold at wholesale; during a similar 12-month period between January 2023 to December 2023, 21.4 percent of Michael Kors's handbag units were sold at wholesale); Tr. at 918:11-22, 933:20-25 (Steinmann: Macy's operates approximately 450 stores across 43 states; all Macy's stores sell handbags, as does Macy's e-commerce site; as measured by 2023 sales revenue, Michael Kors is the largest handbag brand at Macy's and Coach is the second largest.).  Indeed, in several portions of her expert report, Professor Scott Morton makes calculations using wholesale data for Coach, Kate Spade, and Michael Kors. *See, e.g.*, Scott Morton Rep. ¶ 59, Ex. 2 & n.3 (calculating handbag-sales revenue and noting that "[w]holesale channel revenue is reflective of Tapestry and Capri sales to wholesalers"); *id.* ¶ 190, Ex. 6 (using NPD data, which measures only wholesale sales, to calculate average tote prices in 2023; finding, after "correct[ing]" several purported "flaws" with Dr. Smith's analysis, that the average price of a Coach tote was $228, the average price of a Kate Spade tote was $172, and the average price of an MMK tote was $156); *id.* ¶ 204, Ex. 9 (calculating market shares based on NPD data); *id.* ¶ 293, Ex. 15 (presenting a "variation" on Dr. Smith's pricing simulation, including prices in the wholesale channel).  Yet she does not do so in Exhibit 8, and her report provides no explanation as to why.

The omission of wholesale is problematic because although some handbags sold at wholesale are discounted, *see, e.g.*, Tr. at 935:18-20 (Steinmann), discounting is much more frequent and steeper for handbags sold at outlet, *see, e.g.*, Tr. at 1078:23-25 (Mr. Kors: Michael Kors's outlet stores have "a different price structure compared to full-price stores."); PX1250 at 7 (August 2023 letter from Fraser to Tapestry board: during fiscal year 2023, Kate Spade handbag AUR was $206 in "full price channels" and $102 in "off-price" channels); PX1387 at 27 (August 2023 Coach presentation to Tapestry board: during fiscal year 2023, AUR at retail was $295 and AUR at outlet was $130).  The Court thus finds it likely that

Professor Scott Morton's exclusion of wholesale data – and the corresponding exaggeration of outlet sales – inflates her calculations in Exhibit 8 of the percentages of Michael Kors, Kate Spade, and Coach handbags sold for under $100 in 2023.  Likewise, Edwards's exclusion of wholesale data most likely results in an underestimation of his calculation of AUR for Michael Kors.

Professor Scott Morton's Exhibit 8 calculations are difficult to credit for another reason: they are inconsistent with ordinary-course documents bearing strong indicia of reliability.  For example, according to a slide deck presented to the Tapestry board in August 2023, *see* PX8169 at 90:25-92:09 (Lifford), less than one percent of Coach bags sold at retail and only 12 percent of Coach bags sold at outlet during fiscal year 2023 had an AUR of $100 or less, PX1387 at 27.  The next slide projected that during fiscal year 2024, those percentages would fall further.  *See id.* at 28.  Virtually no Coach bags sold at retail and only nine percent of Coach bags sold at outlet would have an AUR of $100 or less; altogether, "[o]nly 8% of [Coach's] bags [would be] sold below $100." *Id.*  These figures, which the Court deems highly reliable given their origin and context, are virtually impossible to reconcile with Professor Scott Morton's estimation that 35 percent of Coach handbag sales at retail and at outlet during 2023 were for under $100.  *See* Scott Morton Rep. ¶ 192, Ex. 8.  Likewise, according to a slide in the Kate Spade portion of the August 2023 presentation to the Tapestry board, 62 percent of Kate Spade handbags sold at outlet during fiscal year 2023 had an AUR of $101 or more.  PX1387 at 44.  The same slide projected that this figure would increase to 66 percent during fiscal year 2024.  *Id.*; *see also* Tr. at 837:1-23 (Fraser helped prepare the Kate Spade portion of this presentation, as also entered into evidence at PX1250).  Given that over 60 percent of Kate Spade's sales *at outlet* – which is the lowest-priced, most discount-heavy sales channel – were *over* $100, the Court cannot credit Professor Scott Morton's

estimation that 61.9 percent of Kate Spade's *overall* handbag sales during 2023 were *under* $100. *See also, e.g.*, PX1387. at 43 (during fourth quarter of fiscal year 2023, in non-outlet handbag-sales channels, AUR was $385 for Coach, $293 for Kate Spade, and $247 for Michael Kors).

Given these concerns, the Court rejects Professor Scott Morton's and Edwards's calculations as unreliable and contrary to other evidence in the record indicating that the AURs for Coach, Kate Spade, and Michael Kors handbags generally exceed $100. Accordingly, the Court finds that accessible-luxury handbags have distinct prices compared to mass-market handbags, whether measured by MSRP or AUR.

The price gap is even more pronounced in comparing accessible-luxury and true-luxury handbags. As stated in a March 2022 presentation to Tapestry's board, "luxury owns [the] market" above $1,000. PX1431 at 18; *see also id.* at 19 (referencing the "traditional luxury entry point of $1000+"); PX8169 at 126:09-126:19 (Lifford: "My understanding is once you hit a dollar threshold it is driven by a luxury brand. And so it looks as though [Tapestry's] records show that that's a thousand."); Tr. at 680:6-8 (Guez: starting price for a true-luxury handbag is $950 to $1,000 for a clutch and between $2,000 and $3,000 for a cross-body bag). And $1,000 is only the starting point for true luxury; the price can be much higher. For example, █████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████ PX8170 at 52:14-53:04, 57:22-58:02 ████████; *see also id.* at 53:14-53:21 ██████████ ████████████████████████████████████. Similarly, the price range of Chanel handbags sold in the United States is between $5,000 and $11,000, and "some are higher than" $11,000, while "[v]ery few are under" $5,000. Tr. at 660:2-8 (Yang); *see also*

PX4002 ¶ 6 (Yang: Chanel handbag AUR is $6,500); PX1393 at 152 (February 2023

presentation to Tapestry board: "Pricing architecture [for Versace] suggests product is at the

entry for European luxury, with average price ~2.5x to ~4.5x accessible luxury brands and

~45% below Gucci, the European luxury brand with next lowest average MSRP"); PX1723 at

9 (during fiscal year 2023, excluding outlets, the average MSRP for Louis Vuitton, Gucci, and

Prada handbags was $2,957); DX0933 at 101:16-102:11 ███████████████████████

████████████████████████████████████.

     The massive price differences between accessible luxury and true luxury are well

recognized.  Industry participants frequently describe a "gap," "white space," or "delta"

between these categories – and often note that this gap is increasing.  *See, e.g.*, PX7035 at 12

(Kahn during February 2022 Tapestry earnings call: "[T]he white space between where we

transact and where traditional European luxury transact is at the greatest delta in 20 years.

That gives us a lot of confidence and a lot of room to grow our price positioning."); PX7044

at 10 (Crevoiserat during May 2022 Tapestry earnings call: "[B]ecause we see pinnacle luxury

driving price increases, there's more white space for our brand[.]"); PX7138 at 11 (Idol during

June 2022 Capri earnings call: "[T]he delta between where Michael Kors is and the luxury

world continues to widen."); PX7053 at 13, 15 (Kahn during August 2022 Tapestry earnings

call: "the dramatic white space that exists today between Coach and the traditional European

luxury brands"; Crevoiserat: "we've seen the [p]innacle luxury players move price up pretty

substantially over the last 3 years," which "creates that white space for all of our brands[.]");

PX1635 at 29 (Kahn during September 2022 call with Tapestry investors: "And when you

couple that with the delta between us and traditional European luxury, there's so much room.

So, if our young consumer wants that great go-out bag and her choice is Pillow Tabby [for] a

few hundred dollars or a traditional European luxury, the delta there is $1,500."); PX7029 at

11 (Kahn during November 2022 Tapestry earnings call: "the average price points are so materially different"); PX1723 at 9 (May 2023 presentation to Tapestry board: "Luxury brands have increased prices at a higher rate than Accessible Luxury, widening the price gap between the two segments"; "The price gap has widened, creating white space for our brands; the pricing gap has grown from ~$1,700 in FY19 to ~$2,550 in FY23-to-date."); Tr. at 383:12-384:21 (Harris confirming that "white space," as used in PX1723, "refer[s] to the gap in the MSRP prices between the luxury brands and the accessible luxury brands," and that it "has been widening over time"); PX7045 at 10 (Kahn during May 2023 Tapestry earnings call: "[T]he white space that exists today between traditional European luxury, [and] where Coach play[s] is the largest we've ever experienced."); PX7054 at 12 (Kahn during August 2023 Tapestry earnings call: "even greater white space between us and European luxury"); PX1485 at 9 (November 2023 document prepared by Tapestry ahead of Bank of America bond offering: "All [Tapestry] brands continue to see AUR growth through price increases. There remains ample white space between our 3 brands and true luxury."); Tr. at 377:16-378:14 (Harris discussing PX1485); PX7030 at 11 (Kahn during November 2023 Tapestry earnings call: "[T]here's so much white space today between where our brand fits and where traditional European luxury sits."); PX7135 at 11 (Kahn during February 2024 Tapestry earnings call: white space is "at an all-time high"); *see also* PX8169 at 102:03-12 (Lifford: Tapestry board discussed white space between accessible luxury and true luxury at board meetings).

The Court also finds that accessible-luxury brands are distinct from true-luxury brands in their pricing model, insofar as accessible-luxury brands are heavily reliant on discounts and other promotions to sell their handbags. *See, e.g.*, Tr. at 162:3-4 (Idol: "[I]n our industry a significant amount of the product is sold on sale at a discount."); *id.* at 271:11-12

(Crevoiserat: "Promotions are part of all of our businesses."); *id.* at 675:8-11 (Guez: Rebecca Minkoff discounts its handbags to "drive a faster turn on the product"); *id.* at 743:18-22 (Wilmotte: "Michael Kors operates in a very promotional environment in the United States," "includ[ing] . . . for the sale of handbags"); PX5087 at 235:3-17 (Tao: Tory Burch, Coach, Michael Kors, Marc Jacobs, and Kate Spade discount their handbags); PX8172 at 68:21-25 ███████████████████████████████████████████████; *see also* PX2128 at 8-12 (June 2023 presentation to Capri board comparing promotional efforts by Coach, Tory Burch, Kate Spade, Marc Jacobs, and Michael Kors). Indeed, over 50 percent of Coach and Kate Spade handbags are sold at a discount. Tr. at 779:9-12 (Levine); *id.* at 827:17-828:1 (Fraser discussing PX1098 at 10). Capri CEO Wilmotte has even complained internally that Coach and Kate Spade are "racing to the bottom with such promotions." PX2097 at 1 (April 2023 email); *see also* Tr. at 744:19-745:16 (Wilmotte discussing this email).

Meanwhile, true-luxury brands discount their handbags less frequently. For example, Chanel does not use client-facing promotions to sell its handbags and does not discount its handbags. Tr. at 660:9-10 (Yang); PX4002 ¶ 6 (Yang). ████████████████████. PX8170 at 59:02-08 ████████. This is partly because, unlike accessible-luxury brands, true-luxury brands offer few (if any) handbags for sale at outlets, where (as noted) discounts are much more common. *Compare, e.g.*, PX2128 at 3 (June 2023 presentation to Michael Kors board: majority of Michael Kors, Coach, Kate Spade, and Tory Burch handbags are sold at outlet), *with, e.g.*, Tr. at 659:17-660:1 (Yang: Chanel does not sell handbags at outlet); *id.* at 1069:12-14 (Mr. Kors: MK Collection is not sold at outlet); PX8170 at 106:05-12 ██████████ ████████████████████████.

The Court recognizes that some handbags produced by some accessible-luxury brands are sold for less than $100 or more than $1,000, and that some handbags produced by mass-

market and true-luxury brands are sold for between $100 and $1,000. *See, e.g.*, Tr. at 986:19-

987:20 (Giberson discussing Tory Burch bag that is "priced over a thousand dollars");

DX0935 at 1, 3 n.5 ███████████████████████████████████████████████

██████████████████████████████████████████████. It is also true that

some true-luxury brands sell handbags at outlet stores, *see, e.g.*, Tr. at 237:10-21 (Newman

listing examples of brands that sell at Woodbury Common Premium Outlets, including

Loewe, Prada, and Gucci), although generally they do so only at a few locations, *see, e.g.*,

PX8170 at 189:16-190:17 █████████████████████████████████████████████

████████████████████████████████████████████████; *cf.* Tr.

at 436:18-25 (Kahn: Coach has about 190 outlet stores in North America); Tr. at 859:11-14

(Fraser: "Kate Spade has significantly more outlet stores than full-price stores"). But these

exceptions do not undermine the general pricing parameters that characterize these distinct

markets (and, indeed, that industry members consistently recognize). The Court reiterates that

"[i]ndustrial activities cannot be confined to trim categories," *Cont'l Can*, 378 U.S. at 456

(citation omitted), and that "isolated instances" of exceptions do not defeat a finding that a

product market is defined by certain characteristics, *H & R Block*, 833 F. Supp. 2d at 56;

*accord Spalding*, 301 F.2d at 598; *Bazaarvoice*, 2014 WL 203966, at *45; *Staples I*, 970 F.

Supp. at 1078. The evidence in the record shows that most accessible-luxury handbags are

sold for between $100 and $1,000, and the prices and pricing tactics for these handbags

materially distinguish them from mass-market and true-luxury handbags. This finding

supports the FTC's proposed product market.

### d. Industry or Public Recognition

An important *Brown Shoe* factor – and one that, in this case, especially favors the

FTC – is "industry or public recognition" of the market "as a separate economic entity." 370

U.S. at 325.  Industry recognition is significant because courts assume that "economic actors usually have accurate perceptions of economic realities." *Todd*, 275 F.3d at 205 (citation omitted); *accord Tronox*, 332 F. Supp. 3d at 198.  Thus, "[w]hen determining the relevant product market, courts often pay close attention to the defendants' ordinary course of business documents." *United States v. Google LLC*, --- F. Supp. 3d ----, 2024 WL 3647498, at *71 (D.D.C. Aug. 5, 2024) (quoting *H & R Block*, 833 F. Supp. 2d at 52); *accord IQVIA*, 710 F. Supp. 3d at 364.

Defendants insist that "the terms 'accessible' or 'affordable' luxury lack clear definition and are not well recognized in the industry."  Opp. at 22 (emphasis omitted).  Even if this were true – and it is not, as the Court will explain shortly – it would not be dispositive.  Although the fact that people in the industry use the same phrase to refer to a market supports a finding of industry recognition, uniform terminology is not required.  *See, e.g.*, *Bertelsmann*, 646 F. Supp. 3d at 32 ("Although the defendants proclaim that no one in the industry uses the term 'anticipated top seller,' that does not mean that such books do not exist. . . . Regardless of nomenclature, clear evidence demonstrates that the practice of identifying and giving special support to the books that will drive sales is common." (citation omitted)).

In any event, the Court finds that "accessible luxury," "affordable luxury," and similar terms are well recognized by handbag-industry participants as referring to good-quality handbags that cost under $1,000.  During the hearing, some of Defendants' executives and witnesses tried to downplay the significance of the term "accessible luxury" by suggesting that it is arcane and used mostly in speaking with investors.  *See, e.g.*, Tr. at 259:20-260:2 (Crevoiserat: "accessible luxury" is "an investor-facing marketing term"); *id.* at 437:24-25 (Kahn: "Coach coined the term ['accessible luxury'] to describe itself and really for the investment community."); *id.* at 765:13-766:3 (Wilmotte: "affordable luxury" and "accessible

luxury" are "outdated" and "something that is more . . . from the past 10 to 15 years ago").
The Court did not find this testimony credible. Some witnesses employed and/or called by
Defendants claimed that the term "accessible luxury" has no commonly understood meaning
at all, even within Tapestry and Capri. *See, e.g.*, Tr. at 416:20-417:4 (Harris "[w]ithin
Tapestry internally," there is no "common agreed upon definition of accessible luxury";
accessible luxury is not "a term that Tapestry uses to identify all the handbag brands that it
competes with"); *id.* at 880:10-22 (Fraser: "I'm aware of the term ['accessible luxury'], but it
wasn't one that we used at Kate Spade as a matter of course. . . . It's such a subjective term.
Just don't really think about [Kate Spade] that way."); *id.* at 970:4-16 (Giberson: accessible
luxury is "fuzzy," "not something that's well defined," and "not something that is a common
term"); *id.* at 1128:16-20 (Edwards: "accessible luxury" and "true luxury" are "broad
undefined terms"). The Court found this testimony even less credible.

The Court bases these credibility findings not only on its firsthand impressions of the
witnesses' demeanors while testifying, but also on the substantial body of compelling
evidence, including reams of ordinary-course documents, showing that terms like "accessible
luxury" are used frequently and consistently. The record is replete with references to
"accessible luxury," "affordable luxury," and similar terms, not only by Tapestry and Capri,
but also by other industry participants to describe good-quality handbags at affordable prices.

This language appears in SEC filings,[8] calls with investors,[9] emails,[10] internal analyses,[11]

internal presentations and slide decks (including many that were presented to companies'

---

[8] *See, e.g.*, PX7104 at 4 (Tapestry Form 10-K for fiscal year 2022); PX7105 at 15 (Tapestry Form 10-K for fiscal year 2023); PX7095 at 7 (Capri Form 10-K for fiscal year 2021); PX7096 at 7 (Capri Form 10-K for fiscal year 2022); PX7098 at 9-10, 14 (Capri Form 10-K for fiscal year 2023); PX7157 at 41 (Capri Form 10-Q for quarter ended December 30, 2023).

[9] *See, e.g.*, PX7027 at 13 (October 2018 Tapestry earnings call); PX7127 at 9, 11, 13 (May 2019 Capri earnings call); PX7028 at 9, 13 (August 2019 Capri earnings call); PX7335 at 5 (August 2020 Tapestry earnings call); PX1635 at 6 (September 2022 Tapestry call with investors); PX2379 at 11, 19 (May 2023 Capri earnings call); *see also* Tr. at 85:21-87:15 (Idol discussing PX2435 at 5, notes prepared for speaking with investors in September 2018).

[10] *See, e.g.*, PX1334 at 1 (February 2021 email from Tao to Tapestry, Coach, and Kate Spade executives discussing quarterly NPD data); PX1306 at 3 (same in April 2021); PX1642 at 2 (August 2022 email from Harris to Yu and Rocha-Rinere about assisting Crevoiserat with Investor Day keynote); PX1704 at 1 (January 2023 email from Crevoiserat to Charles and other Tapestry executives); PX2394 at 1 (September 2023 email from Davis to Wilmotte, Idol, Edwards, and other Capri executives about retail-sale trends).

[11] *See, e.g.*, Tr. at 263:14-265:18 (Crevoiserat discussing PX1730 at 1, a letter she sent to Tapestry board in August 2021); PX2129 at 4, 19, 37, 42, 44, 75 (October 2022 Capri investor study); PX1811 at 2 (February 2023 memorandum discussing Tapestry's supply chain); PX1250 at 7 (Fraser letter to Tapestry board in August 2023); PX3204 at 2 ███████████

boards of directors),[12] and other materials.[13]  Numerous witnesses from all parts of the

handbag industry testified that they have used "accessible luxury," "affordable luxury," or a

similar term.[14]

---

[12] *See, e.g.*, PX2166 at 3 (slide deck: mission is "to re-establish Michael Kors as leader in the affordable luxury accessories market" (further capitalization omitted)); Smith Rep. ¶ 63 (Newman prepared PX2166 for January 2018 Capri board meeting); PX1175 at 21, 27, 29, 41-42, 44, 49-50, 52 (February 2019 presentation to Tapestry board); PX1431 at 4, 12 (March 2022 presentation about Coach to Tapestry board); PX1230 at 4, 9 (May 2022 presentation: "Reclaim 'Accessible Luxury' space with elevated AURs and reduction of promotion" (emphasis omitted)); Tr. at 814:2-815:1 (Levine: PX1230 is Coach's long-range plan for North America for fiscal year 2023); PX1937 at 3 (summarizing "key insights" from Tapestry ethnography during the third quarter of fiscal year 2022: "Confirmed our global brand positioning"; "Our Position" is that "Coach enables people to explore their individual take on 'Accessible Luxury.'"); PX1536 at 15 (July 2022 Coach quarterly-brand-review slide deck); PX1715 at 10 (October 2022 analysis by Morgan Stanley on behalf of Tapestry: acquisition of Capri "reinforces the 'affordable luxury' nature of the portfolio"); Tr. at 289:3-5 (Crevoiserat: Morgan Stanley was Tapestry's M&A adviser); PX1186 at 8 (October 2022 Tapestry slide deck describing methodology for brand tracker: research focus is "'Broad Premium Market' = Women who purchased at least one accessible luxury or luxury brand handbag and/or SLG in the last 12 months from a qualified channel; HB $100+, SLG $50+" (footnotes omitted)); PX1393 at 152 (February 2023 presentation to Tapestry board about potential acquisition of Capri); PX2034 at 4, 7 (February 2023 Capri presentation about accessories); PX2680 at 5-6 (February 2023 Capri presentation about North America competitive landscape); PX1723 at 9 (May 2023 competitor update presented to Tapestry board); PX2428 at 3 (May 2023 presentation to Capri board); PX2436 at 12 (Michael Kors slide deck); Tr. at 158:23-159:14 (Idol: PX2436 was presented to the Capri board after first fiscal quarter of 2024, which ended in June 2023); PX1190 at 56 (July 2023 Tapestry slide deck); PX1387 at 43 (August 2023 presentation to Tapestry board about Kate Spade's annual operating plan); DX0885 at 6-7 (August 2023 presentation about Michael Kors to Capri board); PX1327 at 4, 6, 9 (September 2023 slide deck prepared by BCG); PX2430 at 15 (October 2023 presentation about Michael Kors to Capri board); PX2561 at 23 (March 2024 Capri strategic-planning slide deck); PX3150 at 2 ▮ ; PX3202 at 6 *see also* PX2439 at 4 (August 2023 Capri board meeting minutes: "Mr. Wilmotte next discussed with the Board the U.S. leather goods market and the accessible luxury market."); Tr. at 263:7-13 (Crevoiserat "personally ha[s] included the term 'accessible luxury' in [her] communications with Tapestry's board"); *id.* at 1127:25-1128:2 (Edwards has instructed colleagues at Capri to add the term "accessible luxury" to board materials).

In referring to "accessible luxury," industry members frequently invoke common traits relating to price, materials, and craftsmanship. *See, e.g.*, Tr. at 81:17:81:20 (Idol: "accessible luxury" is "a term that's used to define the way certain brands position themselves in the total handbag market"); *id.* at 260:3-261:12 (Crevoiserat: "accessible luxury" is a term that "frames . . . the value proposition we deliver [to consumers] and how we compete in the market; Tapestry "has used the term 'accessible luxury' to communicate the beautiful

---

[13] *See, e.g.*, DX0881 at 16 (2014 *New York Times* article excerpted in July 2023 Michael Kors slide deck: "At the Macy's in Fulton Mall in Brooklyn, . . . the popular Michael Kors bags are routinely locked up. The midpriced bags are known in marketing terms as an 'affordable luxury.'"); PX2423 at 3-4, 6, 23 (Capri investor study based on interviews conducted by Lazard in July and August 2022; Capri – for which "Michael Kors still dominates the portfolio" – seen as "[s]trong among accessible/affordable luxury peers . . . [b]ut not yet viewed as a major force in the global luxury industry"; specifically as to Michael Kors, "Tapestry/Coach viewed as the primary competitor"; noting concerns about "the impact that a recession might have on consumer spending for affordable luxury."); Tr. at 417:8-20, 429:12-430:25 (Harris discussing PX1936 at 27: in July 2022 ethnography study, third-party research vendor used "[a]ffordable luxury" to summarize consumers' perceptions of Coach); PX1238 at 4 (February 2023 article in *Women's Wear Daily* about Liz Fraser: "Situated in the accessible luxury range, Kate Spade's handbags range from $200 for small crossbodies to more than $500 for elevated pieces. The sweet spot is between $300 and $350, [Fraser] said."); PX1374 at 4 (August 2023 analysis by Wells Fargo Equity Research following announcement of Tapestry-Capri merger: "The addition of Michael Kors cements [Tapestry] as the number one player in the accessible luxury handbag market in the US by a wide margin."); PX7182 (the "About Us" page on Rebecca Minkoff's website describes Rebecca Minkoff as "[a]n industry leader in accessible luxury handbags, accessories, and apparel"); *see also* Tr. at 998:5-7, 1005:23-1006:3 (Giberson admitting that the Accessories Council's magazine, for which she serves as editor in chief, "has used the phrase affordable luxury before from time to time").

[14] *See, e.g.*, Tr. at 81:17-22, 144:20-145:4 (Idol: "accessible luxury"); *id.* at 185:21-23 (Newman: "affordable luxury"); *id.* at 259:16-260:11, 263:7-13, 265:9-18, 299:11-300:3 (Crevoiserat: "accessible luxury"); *id.* at 437:20-438:11 (Kahn: "accessible luxury"); *id.* at 675:12-677:18 (Guez: "accessible luxury" and "affordable luxury"); *id.* at 789:15-790:7 (Levine: "accessible luxury"); *id.* at 932:24-936:4 (Steinmann: "designer"); *id.* at 998:2-4 (Giberson: "accessible luxury"); PX8168 at 11:14-15:08 ███████████████████; PX8169 at 93:12-94:07, 136:07-136:17 (Lifford: "accessible luxury"); PX8171 at 19:25-21:14 ██████████████████████; PX8172 at 36:18-37:04, 45:04-45:07 ████████ ███████████████████; DX0930 at 29:01-29:17 ██████████████; DX0950 at 26:25-28:7 ████████████████████.

handcrafted product that Tapestry's consumers can access and attain relative to the value of the product[.]"); *id.* at 438:7-11 (Kahn: "I think our main idea [with accessible luxury] was to break the paradigm that you didn't have to spend an extraordinary amount of money to buy a high-quality handbag."); *id.* at 675:15-20 (Guez: "The term 'accessible luxury' applies because the handbags . . . have the make [that is] similar to a luxury handbag in an affordable price to customers."); *id.* at 789:16-25 (Levine: "The term 'accessible luxury' is a term that Coach coined to describe quality good[s] at an accessible price . . . in comparison to what the customer might have seen as traditional European luxury[.]"); PX8169 at 93:04-94:07, 136:12-17 (Lifford: "When you look at the top tier, which we have talked about as luxury, and it is the European luxury brands with a couple of others. And then you get to the bottom tier which is outlets, lower brands themselves and everything in the middle to me is accessible luxury."; "accessible luxury" refers to the "next tier down from luxury"; "accessible luxury" is about "the highest quality leather goods, it is an outstanding passion for detail, our detail and our craftmanship are superior"); PX8168 at 11:14-15:08 ███████████████████████

█████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

███████████████████████; PX8171 at 19:25-20:10, 21:02-21:17 █████████

███████████████████████████████████████████████████████████████

██████████████████████████; PX8172 at 45:04-45:07 ███████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████████; PX1431 at 12 (March 2022 presentation to Tapestry board: "Coach enables people to explore their individual take on 'Accessible Luxury.' We make the highest quality leather goods with an outstanding

passion for details and craftsmanship to make sure our bags are carried from one generation to another."); PX1704 at 1 (Crevoiserat email to colleagues in January 2023: "accessible luxury" is about "balancing lower cost with quality well made product"); *see also* Tapestry Ans. ¶ 3 ("Tapestry admits that it first used the phrase 'accessible luxury' over 20 years ago as part of marketing efforts and has continued to use the phrase, generally in marketing, including as a way to convey that its handbags and other products were high quality, yet approachable.").[15]

Notably, industry participants frequently recognize that certain brands – especially Coach, Kate Spade, Michael Kors, Tory Burch, and Marc Jacobs – qualify as accessible-luxury brands. Consider, for instance, a table in an April 2022 Coach presentation comparing five years' worth of handbag MSRPs and AURs for five "Acc Lux," or accessible luxury, brands: Coach, Kate Spade, Michael Kors, Tory Burch, and Marc Jacobs. Tr. at 453:8-454:8 (Kahn discussing PX1537 at 9). A separate part of the table compares MSRPs and AURs for four "Lux," or luxury, brands: Louis Vuitton, Dior, Prada, and Gucci. *Id.* This is not an isolated example. The record contains voluminous ordinary-course documents[16] and witness

---

[15] "Facts admitted in an answer, as in any pleading, are judicial admissions that bind the defendant throughout the litigation." *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 491 (2d Cir. 2014) (brackets and citation omitted).

[16] *See, e.g.*, PX1175 at 52 (February 2019 M&A strategy presentation to Tapestry board: "Acc[essible] Lux[ury] Benchmark includes Coach, Kate Spade, Michael Kors, Tory Burch, Longchamp, MCM[,] and Furla."); PX3201 at 18 ██████████████████████ ██████████  PX1404 at 26 (February 2022 Kate Spade slide deck comparing pricing for "accessible luxury handbag" brands: Coach, Kate Spade, Tory Burch, Michael Kors, and Marc Jacobs; separately comparing pricing for "luxury handbag" brands: Dior, Gucci, and Prada (capitalization omitted)); PX1536 at 15 (July 2022 Coach slide deck comparing handbag MSRPs and AURs for same brand groupings as PX1537 at 9, except omitting Prada); PX1743 at 2, 12, 17 (January 2023 slide deck presented to Tapestry board listing Coach, Kate Spade, Michael Kors, and Tory Burch as "accessible luxury"; also listing Coach, Kate Spade, and Tory Burch as Michael Kors's "bags competitor[s]" (capitalization omitted)); PX1393 at 78 (February 2023 slide deck about Coach brand update: "Accessible Luxury" brands are Coach, Kate Spade, Michael Kors, Tory Burch, Furla, Longchamp, and Marc Jacobs);

testimony[17] detailing similar groupings in describing accessible luxury.  Even when industry

members do not use the term "accessible luxury," they almost invariably identify the same

select group of brands as each other's main comparators and competitors.[18]  The Court does

---

PX3060 at 2 ███████████████████████████████████████████████████

███████████████████; PX1723 at 9 (May 2023 presentation to Tapestry board comparing "Luxury Bags

MSRP Prices" and "Accessible Luxury Bags MSRP Prices"; "Luxury reflects LV, Gucci[,]

and Prada.  Accessible Luxury includes Tory, Coach, MK, Marc Jacobs[,] and Kate Spade");

PX3212 at 9 ████████████████████████████████████████████ DX0885 at 7 (August

2023 slide deck presented to Capri board listing "Affordable Luxury" brands: Coach, Kate

Spade, Michael Kors, Tory Burch, Marc Jacobs, and Longchamp); PX1250 at 17 (August

2023 slide deck about Kate Spade's annual operating plan presented to Tapestry board

featuring table providing "Competitive Pricing Update" for Kate Spade and three other

"Accessible Luxury players": Michael Kors, Coach, and Tory Burch); PX3150 at 2 ███████

██████████████████████████.

[17] *See, e.g.*, Tr. at 81:17-22 (Idol: Michael Kors is accessible luxury); *id.* at 676:8-9, 678:21-
679:11 (Guez: Rebecca Minkoff is an accessible-luxury brand whose competitors include
fellow accessible-luxury brands Coach, Kate Spade, Michael Kors, Marc Jacobs, Kurt Geiger,
and Loeffler Randall); PX8169 at 93:12-94:07 (Lifford: Kate Spade, Michael Kors, Coach,
and Tory Burch are "accessible luxury players"); PX8171 at 19:25-20:23 ██████████████████
████████████████████████████; DX0950 at 27:25-28:4 ██████████████████████████████████████████.

[18] *See, e.g.*, PX1256 at 5 (August 2021 Kate Spade slide analyzing "competitive price
positioning by silhouette" for Kate Spade, Michael Kors, Coach, and Tory Burch
(capitalization omitted)); PX1546 at 42 (November 2021 Coach presentation discussing
strategic approach to outlet pricing: "Consider competitive landscape, looking at MK, TB, &
KS pricing structures to understand ticket opportunity"); PX1126 at 1 (January 2022 email
from Tapestry's Vice President for Strategy: "Do you happen to have the latest competitor
store count, broken out by retail vs. outlet and by region?  Am looking for Coach, KS, MK,
TB."; employee replied with requested figures); PX2404 at 1-3 (January 2022 email from
Jennifer Davis to Idol and others at Capri with charts comparing sales and pricing trends for
Michael Kors, Coach, Kate Spade, and Tory Burch); PX1404 at 76 (February 2022 Kate
Spade slide deck comparing brick-and-mortar store counts for Coach, Kate Spade, Michael
Kors, and Tory Burch); PX3110 ████████████████████████████████████████████████████████████
████████████████████████████; PX8036 at 18 (April 2022
Kate Spade presentation comparing handbag pricing of "key competitors": Michael Kors,
Coach, and Tory Burch); PX8028 at 2 (December 2022 slide with graphs comparing discount
rates and out-the-door prices at outlet for Coach with "the competitive set": Kate Spade, Tory

not find credible or persuasive some witnesses' strained explanations as to how the same

accessible-luxury brands are consistently grouped together in Tapestry's ordinary-course

Burch, and Michael Kors (emphasis omitted)); DX0580 at 7 ████████████████████
████████████████████████████████████; PX2429 at 12 (in
March 2023 presentation to Capri board, slide labeled "Michael Kors Peer Comparison" with
revenue and margins for Coach, Kate Spade, and Ralph Lauren); PX2395 at 6 (Capri April
2023 slide deck comparing sales trends for "Michael Kors vs Peers": Coach, Kate Spade, and
Tory Burch); PX3064 at 4, 13-21 ████████████████████████████████████████
████████████████████████████████████████████; PX2128 at 3, 8-
12 (June 2023 "competitive brand snapshot" for Michael Kors comparing it with Coach, Kate
Spade, Tory Burch, and Marc Jacobs (capitalization omitted)); PX2635 at 7 ██████████
████████████████ Tr. at 945:10-24 ███████████████████████████████████
█████████████████████████████████████████████████████████
PX3212 at 13 ██████████████████████████████████████████████████████
████████████████████████████████████████████████████████████;
PX2246 at 1 (August 2023 email from Mr. Kors to Bloom: "I think we need to look at a list
that separates outlet stores from full price stores in North America for Michael Kors, Coach,
Ralph Lauren, Tory Burch and Marc Jacobs. . . . Think it's great to have this information so
we can all sit down and look at it together to get a clear direction and to be aware of what the
competitors are currently looking like."); PX2430 at 16-17 (October 2023 presentation to
Capri board comparing quarterly retail-sales trades for Michael Kors, Coach, Kate Spade,
Tory Burch, and Marc Jacobs); PX1507 at 1 (December 2023 email from Kate Spade
executive to Fraser, Tao, and Capiola comparing discounts offered by Coach, Tory Burch, and
Michael Kors); PX1924 at 9-12 (January 2024 Kate Spade slide deck comparing MSRPs,
materials, and styles for Kate Spade and its "Key competitors": Coach, Marc Jacobs, Michael
Kors, and Tory Burch); PX2522 at 1 (January 2024 email from Mr. Kors to Michael Kors
executives requesting that they "put boards together every season with our suggested pricing
for each style in handbags and footwear and comparable pricing from Coach, Tory, Polo,
Lauren, Kate Spade, Stuart W[eitzman,] and Furla . . . so we can compare their price
structure. . . . This is the only way to get a clear strategy on our pricing."); PX8168 at 41:20-
42:19, 193:22-194:18, 197:21-198:9, 213:12-214:6 ████████████████████████████
███████████████████████████████████████████████████████████;
PX8170 at 95:13-95:20 ██████████████████████████████████████████████
████████████; PX8171 at 18:24-19:16 ████████████████████████████████████
███████████████████████████████████████████; PX8172 at 39:08-40:05
██████████████████████████████████████████████████.

documents. For example, Tapestry CEO Crevoiserat testified that the same group of companies (Michael Kors, Coach, Kate Spade, Marc Jacobs, and Tory Burch) are routinely listed in Tapestry's ordinary-course documents because they are public companies, Tr. at 327:19-25, 333:22-334:6, but later acknowledged that Tory Burch is not a public company, *see id.* at 351:17-352:2.

Industry participants also recognize that mass-market handbags are a distinct product category, sometimes referring to them as "fast fashion" or "opening price point." *See, e.g.*, Tr. at 96:7-15 (Idol: "fast fashion"); PX8172 at 47:11-18 ███████████████; DX0930 at 26:8-21 ████████████████████████████████████████████████████; PX8168 at 15:6-16:1 ███████████████. Commonly identified mass-market brands include Zara, H&M, Steve Madden, Tommy Hilfiger, and private-label brands. *See, e.g.*, DX0885 at 7 (August 2023 slide deck presented to Capri board listing "Mass Market" brands: Gap, Calvin Klein, Tommy Hilfiger, Abercrombie & Fitch, and Zara); DX0930 at 32:22-33:6 ████████████████████████████████████████████████████████ ; PX8168 at 15:11-16:1 ████████████████ ████████. Tellingly, Coach, Kate Spade, and Michael Kors do not regard mass-market brands as their peers or primary competitors. For example, Capri CEO Idol testified that he "do[es] not consider fast fashion companies to be Michael Kors'[s] peers." Tr. at 98:6-8. Similarly, according to Coach CEO Kahn, Coach does not consider itself to be a mass-market brand or to be competing with mass-market brands for customers' "mind share." Tr. at 459:3-19 (Kahn). Also, Tapestry does not include any mass-market brands in its list of five to ten brands that it tracks for benchmarking purposes. *Id.* at 394:15-395:20 (Harris). Even Defendants' industry expert Jeff Gennette "consider[s] Coach and Michael Kors to be above fast fashion, but below high-end designer brands." Tr. at 1178:9-11.

Similarly, industry participants recognize that true-luxury handbags, whether identified as "true luxury," "European luxury," or using a similar term, are a distinct product category. The "true luxury" terminology and its corresponding connotations regarding price, materials, and construction repeatedly appear in ordinary-course documents,[19] calls with investors,[20] and testimony presented to the Court.[21] Industry participants consistently agree that certain brands qualify as true luxury, including Louis Vuitton, Chanel, Hermès, Dior, Prada, Gucci, and Fendi.[22]

---

[19] *See, e.g.*, PX1542 at 8 (February 2022 Tapestry slide deck: "luxury" (capitalization omitted)); PX1431 at 19 (March 2022 presentation to Tapestry board: "traditional luxury"); PX2428 at 15, 18 (May 2023 presentation to Capri board: "pure luxury"); PX3212 at 9 ███; Tr. at 1080:9-21 (discussing PX2314 at 1, an August 2023 email where Mr. Kors described the MK Collection as the "true luxury label for the overall global MICHAEL KORS brand"); PX1485 at 9 (November 2023 document prepared by Tapestry ahead of Bank of America bond offering: "true luxury"); PX1924 at 25 (January 2024 Kate Spade slide providing "Luxury Hardware Snapshot" comparing Dior, Gucci, Saint Laurent, Celine, Loewe, and Polene); *see also, e.g.*, PX1067 at 1 (August 2021 text from Fraser to Kahn: "true luxury"); PX1271 at 3 (January 2022 text from Fraser to Kahn: "In European luxury, the PD people are extremely powerful. . . . We are the opposite").

[20] *See, e.g.*, PX7342 at 12 (Victor Luis, former Tapestry CEO, during February 2019 earnings call: "traditional European luxury"); PX7035 at 11-12 (Kahn during February 2022 Tapestry earnings call: "traditional European luxury"); PX7044 at 10 (Crevoiserat during May 2022 Tapestry earnings call: "pinnacle luxury"); PX7138 at 11 (Idol during June 2022 Capri earnings call: "luxury"); PX1635 at 20, 29 (Kahn during September 2022 call with Tapestry investors: "traditional European luxury"); PX7045 at 10 (same during May 2023 earnings call); PX7030 at 11 (same in November 2023); PX7135 at 11 (same in February 2024).

[21] *See, e.g.*, Tr. at 147:23:-148:11 (Idol: "true luxury" and "European luxury"); *id.* at 439:1-10, 443:3-14, 482:25-483:4 (Kahn: "pinnacle luxury" and "traditional European luxury"); *id.* at 660:14-661:1 (Yang: "luxury"); *id.* at 679:15-681:5 (Guez: "true luxury"); PX5088 at 125:4-14 (Walsh: "traditional luxury"); PX8169 at 93:19 (Lifford: "European luxury"); PX8171 at 21:19-23, 22:2-5 ███; DX0930 at 31:16-22, 32:1-8 ███; DX0926 at 120:05-16 ███; DX0950 at 26:5-28:7 ███.

[22] *See, e.g.*, Tr. at 85:21-87:15 (Idol discussing PX2435 at 5, notes prepared for speaking with investors in September 2018: Versace is "[p]ure luxury," while Michael Kors is "[a]ccessible luxury"); PX1175 at 52 (February 2019 M&A strategy presentation to Tapestry board:

Coach, Kate Spade, and Michael Kors (or, more precisely, MMK) are not considered to be – and do not regard themselves as – true-luxury brands. Capri has stated as much in its SEC filings, where it has described MMK as its "accessible luxury line" in contrast to the MK Collection "luxury line," PX7098 at 9 (May 2023), and in its internal documents, where it has listed Michael Kors as "Affordable Luxury" as distinct from "Luxury" brands such as Chanel, Prada, Louis Vuitton, Gucci, and Hermès, DX0885 at 7 (August 2023). Similarly, Tapestry board member Pam Lifford testified that "we don't really play today in that top tier." PX8169 at 98:14-23. Tapestry executives have expressed similar views in texts with one another. In August 2021, Todd Kahn, Coach's CEO and brand president, texted Liz Fraser, then serving

---

"Lux[ury] Benchmark includes Louis Vuitton, Gucci, Fendi, Celine, Dior, Bottega Veneta, Saint Laurent, Prada, Burberry, Hermes, Chanel, and Ferragamo"); PX2395 at 4-6 (in April 2023 Capri slide deck, one slide compares sales trends for "Versace vs Peers": Dior, Gucci, and Fendi; another slide compares sales trends for "Jimmy Choo vs Peers": Christian Louboutin, Gucci, and Yves Saint Laurent; a third slide compares sales trends for "Michael Kors vs Peers": Coach, Kate Spade, and Tory Burch); PX3201 at 18 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ PX1743 at 6 (January 2023 Tapestry slide deck identifying Dior, Gucci, Louis Vuitton, and Prada as Versace's handbag competitors); PX3212 at 9 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ DX0885 at 7 (August 2023 slide deck presented to Capri board listing "Luxury" brands: Yves Saint Laurent, Chanel, Prada, Valentino, Louis Vuitton, Gucci, and Hermès); PX3150 at 2 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Tr. at 443:3-14 (Kahn: Coach "is not a pinnacle luxury brand," whereas Chanel and Hermès are); *id.* at 656:24-25, 660:14-661:6, 663:17-19 (Yang: Chanel, Hermès, Louis Vuitton, Prada, Celine, Bottega Veneta, Gucci, Yves Saint Laurent, and Fendi are "luxury" handbag brands and "in the same sector of the business"; Coach, Kate Spade, and Michael Kors are not luxury brands); *id.* at 679:18-680:5 (Guez: true-luxury brands include Louis Vuitton, Chanel, Prada, Loewe, Gucci, and Fendi); PX5088 at 125:4-14 (Walsh: Louis Vuitton and Gucci are "traditional luxury"); PX8171 at 21:19-22:5 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇; DX0926 at 120:05-120:16 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇; DX0950 at 27:20-24 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇; *see also* PX8170 at 134:05-12 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.

as Kate Spade's CEO and brand president, that "Gucci bags at $2000 is just not our customer in NA." PX1067 at 1. When Fraser added that "[w]e should be focused on the correct market share," Kahn responded: "Take it from MK, TB etc." *Id.*; *see* Tr. at 458:23-459:1 (Kahn: "MK" means Michael Kors and "TB" means Tory Burch).[23] Fraser replied: "Exactly." PX1067 at 1. Or as Fraser texted Tim Ryan, now Tapestry's head of finance, in April 2022: "Bottom line, saying we're in the same market with true luxury is a joke. . . . Nobody says 'should I buy a LV bag or a Coach bag?'" PX1427 at 1-2; *see* Tr. at 832:22-832:1 (Fraser: "LV" means "Louis Vuitton").

Defendants respond in two ways. First, Defendants assert that "accessible luxury" is "a term that Coach and Tapestry used in the past," but that Tapestry "has largely moved away from [the term] in recent years." Tr. at 60:18-23 (Tapestry opening) (quotation marks omitted). Instead, Tapestry now prefers the term "expressive luxury." *See, e.g.*, Tr. at 493:5-16, 497:12-498:14 (Kahn); *id.* at 795:2-21 (Levine). As the FTC notes, however, Tapestry describes "expressive luxury" using much of the same language that it has used to describe "accessible luxury." *See* PFOF ¶ 106; *compare, e.g.*, PX1431 at 12 (March 2022 presentation to Tapestry board: "Coach enables people to explore their individual take on 'Accessible Luxury.' We make the highest quality leather goods with an outstanding passion for details and craftsmanship to make sure our bags are carried from one generation to another."; "Product focus will be between $150-500 for NA . . . and distributed through a multi-channel network."), *with* PX1731 at 23 (February 2023 presentation to Tapestry board: "Coach invites our community to be their true selves through Expressive Luxury. Luxury is not just about

---

[23] Given the evidence presented in this case, the Court does not credit Kahn's contrary testimony at the hearing that Coach is "successfully competing with a Gucci customer." Tr. at 483:24-484:13.

impressing, it's also about self-expression. We make the highest quality leather goods with an outstanding passion for detail and craftsmanship to make sure our bags are carried from one generation to another."; "Product focus will be between $150-500 for NA . . . and distributed through a multi-channel network." (emphases omitted)). In addition, Defendants – not to mention other industry participants – have continued to use the language of "accessible luxury" even after Tapestry's purported reframing. Indeed, Defendants repeatedly used the term in the months before and after the announcement of the merger – only for the term to disappear from their lexicon once the FTC filed suit in April 2024. *See, e.g.*, PX1723 at 9-10 (May 2023 slide deck presented to Tapestry board); PX7098 at 9-10, 14 (May 2023 Capri SEC filing); PX1250 at 7 (August 2023 letter from Fraser to Tapestry board); PX1250 at 17 (August 2023 slide deck presented to Tapestry board); PX2439 at 4 (August 2023 Capri board meeting minutes: "Mr. Wilmotte next discussed with the Board the U.S. leather goods market and the accessible luxury market."); PX2430 at 15 (October 2023 slide deck presented to Capri board); PX7157 at 41 (February 2024 Capri SEC filing); PX2561 at 23 (March 2024 Capri strategic-planning slide deck); *cf.* PX7261 (May 2024 Capri SEC filing does not mention "accessible luxury"); PX7435 (same for Tapestry in August 2024).

Second, Defendants fault the FTC for looking only to industry recognition, without considering whether the general public recognizes "accessible luxury" as a category. *See* DFOF ¶ 87; DCOL ¶¶ 24-27; *cf.* Tr. at 145:8-13 (Idol: Michael Kors does not use the term "accessible luxury" in marketing to consumers); *id.* at 498:23-499:1 (Kahn: Coach does not use the term "accessible luxury" in any "consumer-facing material[s]"); *id.* at 880:23-881:1 (during Fraser's tenure as CEO, Kate Spade did not market itself or its products to consumers as "accessible luxury"). This argument is unavailing. To start, even if consumers do not say "accessible luxury," consumers still may understand the concept to which the term refers:

good-quality bags at affordable prices.  *See, e.g.*, Tr. at 490:9-11 (Kahn: "The attributes that

we represent, whether it's genuine leather, whether it's quality, whether it's our American

heritage, those attributes resonate with our customer."); PX1325 at 42 (Tapestry September

2023 consumer survey quoting interviewee: "Coach is still for someone that wants to feel

maybe a little bit more affluent but isn't really splurging on something such as LV or

Gucci."); DX0754 at 2, 20 ███████████████████████████████

████████████████████████████████████████████.  More

importantly, evidence of formal public recognition is not required to satisfy this *Brown Shoe*

factor.  It is true that *Brown Shoe* described "men's, women's and children's shoes" as

"product lines . . . recognized by the public."  370 U.S. at 326; *cf.* DCOL ¶ 24.  But in

enumerating practical indicia more generally, *Brown Shoe* identified "industry *or* public

recognition of the submarket" as relevant to market definition.  370 U.S. at 325 (emphasis

added).  Evidence that "affordable-luxury handbags" is a publicly recognized term and

product line would bolster the FTC's market definition, but the lack of such evidence does not

render insufficient the substantial evidence of industry recognition presented by the FTC.

Indeed, courts often analyze this *Brown Shoe* factor – and conclude that it tips in the

plaintiff's favor – by looking only at evidence of industry recognition.  *See, e.g.*, *Meta*, 654 F.

Supp. 3d at 913-14 (based on evidence of industry recognition, including internal

communications and testimony from industry members, court found that "Defendants and the

broader fitness industry recognized VR dedicated fitness apps as an economically distinct

submarket"; no mention of consumer recognition); *Staples II*, 190 F. Supp. 3d at 119 (finding

that "the industry recognizes large B-to-B customers as a separate economic entity"; no

mention of consumer recognition); *Bazaarvoice*, 2014 WL 203966, at *22-24 ("The Court

found it persuasive that in the ordinary course of business, Bazaarvoice and PowerReviews

recognized that R & R platforms comprise a distinct market. . . .  Another factor supporting

this market definition is that competitors and former competitors in the R & R platform

market recognized that R & R is a distinct market."; no mention of consumer recognition).

In sum, the Court finds that the handbag industry understands "accessible luxury" as

encompassing a distinct group of handbag brands characterized by "quality well made

product[s]" at a "lower cost," PX1704 at 1 (Crevoiserat) – in other words, "craft at scale," Tr.

at 464:19 (Kahn).  This finding weighs strongly in favor of recognizing accessible-luxury

handbags as a relevant market.

### e.   Sensitivity to Price Changes

The price-sensitivity *Brown Shoe* factor "evaluates the change in sales of a possible

substitute product given a change in the price of products within the relevant market."  *Meta*,

654 F. Supp. 3d at 919.  "Because this is in essence the same question posed by the HMT, the

Court will not duplicate its analysis here."  *Id.* (citation omitted).  As explained below in the

discussion regarding the HMT, *see infra* at pp. 64-75, this factor supports the Court's finding

that accessible-luxury handbags are a relevant product market.

### f.   Final Analysis

As noted, the *Brown Shoe* indicia are "neither mandatory nor exhaustive."  *Alaska*

*Elec. Pension Fund*, 306 F. Supp. 3d at 620.  They "are practical aids as opposed to talismanic

criteria to be rigidly applied; thus, submarkets can exist even if only some of these factors are

present."  *Bertelsmann*, 646 F. Supp. 3d at 25 (quotation marks and citations omitted); *accord*

*IQVIA*, 710 F. Supp. 3d at 355.  Indeed, courts have recognized well-defined product markets

even where only three *Brown Shoe* factors were present.  *See, e.g.*, *Abex Corp. v. FTC*, 420

F.2d 928, 931-32 (6th Cir. 1970) (distinct prices, peculiar characteristics and uses, and unique

production facilities); *Reynolds Metals Co. v. FTC*, 309 F.2d 223, 227 (D.C. Cir. 1962)

(Burger, J.) (public and industrial recognition, distinct customers, and distinct prices); *see also United States v. Blue Bell, Inc.*, 395 F. Supp. 538, 542 (M.D. Tenn. 1975) (noting that in *Alcoa*, 377 U.S. at 276-77, "the Supreme Court found aluminum conductor to be a product market on the basis of certain distinctive end uses and distinct prices").

Here, four *Brown Shoe* indicia favor recognizing accessible-luxury handbags as a different product market than mass-market handbags: peculiar characteristics, distinct prices, industry recognition, and sensitivity to price changes. *See* 370 U.S. at 325. Likewise, four *Brown Shoe* indicia favor recognizing accessible-luxury handbags as a different product market than true-luxury handbags: unique production facilities, distinct prices, industry recognition, and sensitivity to price changes. *See id.* Examining the indicia holistically, and especially considering the highly compelling evidence of industry recognition, the Court finds that accessible-luxury handbags are a relevant antitrust market distinct from mass-market handbags and true-luxury handbags.[24]

### 2. Quantitative Analysis of the Relevant Market

The Court also finds that the FTC has defined a relevant antitrust market consisting of affordable-luxury handbags based on a quantitative approach. In particular, the Court finds persuasive the analysis and testimony of Dr. Loren K. Smith, the FTC's economic expert, confirming that accessible-luxury handbags are a relevant product market through application of the hypothetical-monopolist test (or HMT). Smith Rep. ¶ 11; Tr. at 522:19-23 (Smith); *see id.* at 1291:4-14 (Scott Morton: "the HMT is an appropriate tool for market definition").

---

[24] Because the other *Brown Shoe* indicia suffice to establish a relevant product market, the Court need not decide whether accessible-luxury handbags also have "distinct customers" or "specialized vendors." 370 U.S. at 325.

Dr. Smith is an executive vice president of Compass Lexecon, an economic-consulting firm, and received his Ph.D. in economics from the University of Virginia in 2006.  Smith Rep. ¶ 1; Tr. at 515:17-516:3 (Smith).  Before the hearing, Defendants moved *in limine* to exclude Dr. Smith's opinions regarding and relying on his diversion analysis.  Dkt. 184.  The Court denied the motion, explaining that the economic principles and methodology employed by Dr. Smith generally in conducting his diversion analysis are sufficiently reliable and recognized in the field of economics to be admissible in the preliminary injunction hearing before the Court.  Sept. 6, 2024 Tr. at 63:10-64:11; Dkt. 321.  At the hearing, Defendants "agree[d] that Dr. Smith is qualified to testify as an economist."  Tr. at 517:21-22.  The Court therefore found Dr. Smith qualified to testify as an expert in industrial organization economics and received his expert testimony and report.  *Id.* at 517:19-24, 529:18-530:5.  The Court will now comprehensively review Dr. Smith's methodology and analyze Defendants' critiques so that the Court may fully evaluate the reliability of Dr. Smith's opinions and determine the weight to afford his analyses.

Because Defendants raised critiques through several experts, the Court will first provide a brief overview of Defendants' expert witnesses.  Defendants offered two industry experts: Karen Giberson and Jeff Gennette.  Giberson is the president and CEO of the Accessories Council.  Tr. at 954:19-955:2 (Giberson); DX0281 ("Giberson Rep.") ¶ 1.  Gennette is the former CEO of Macy's, Inc., where he held a variety of roles from 1983 until April 2024.  Tr. at 1132:8-15 (Gennette); DX0284 ("Gennette Rep.") ¶¶ 1-2.  Before the hearing, the FTC moved *in limine* to exclude the testimony and opinions of both Giberson and Gennette in their entirety.  Dkts. 171, 176.  The Court denied the motions, holding that Giberson and Gennette would be allowed to opine as industry experts as to matters within their expertise, but that to the extent they testified to matters outside of their field of expertise

(including as to matters involving economic analysis), the Court would not afford their testimony any weight. Sept. 6, 2024 Tr. at 65:4-66:3. The Court thereafter found Giberson qualified to testify as an industry expert in the field of handbags, Tr. at 959:10-15, found Gennette qualified to testify as an industry expert in select aspects of the handbag industry, *id.* at 1135:1-7, and accepted their reports into evidence.[25]

Defendants also offered the expert testimony of an economist, Professor Scott Morton. Professor Scott Morton is a professor of economics at the Yale School of Management and holds a Ph.D. in economics from the Massachusetts Institute of Technology. *Id.* at 1216:4-11, 1218:20-21 (Scott Morton); Scott Morton Rep. ¶ 1. Without objection, the Court found Professor Scott Morton to be qualified in the field of industrial organization economics and received her testimony and report at the hearing. Tr. at 1220:1-12 (Scott Morton).

### a.  Dr. Smith's Proposed Market and the HMT

To define a relevant product market, Dr. Smith first analyzed party and nonparty qualitative evidence that, in his view, shows that accessible-luxury handbags – "a group of handbag products made of more durable and finer materials, and claiming finer craftsmanship, than mass-produced items, but also at prices well under $1,000" – are a distinct category of handbags. Smith. Rep. ¶ 51; *see id.* ¶¶ 50-91; PX1334 at 1; Tr. at 534:13-15, 535:13-536:1,

---

[25] The Court notes that to the extent Giberson and Gennette offered opinions outside their area of expertise, such opinions have not been afforded any weight in the Court's analysis here. For example, Giberson testified that the NPD's data is "just not great statistics," Tr. at 979:5-6 (Giberson), but she is not an expert on data analysis, statistics, or a related field, *id.* at 999:16-17. Additionally, to the extent that Giberson and Gennette offered opinions on matters as to which they had no knowledge, such opinions have also not been afforded weight by the Court. For example, Gennette opined that information in a particular document (PX3216) "confirm[s] the importance of resale to department stores today," Tr. at 1139:14-16 (Gennette), but when asked questions about the data contained in that document, Gennette was uncertain as to what the information represented, *id.* at 1149:1-1150:4 (Gennette). Thus, the Court discounts the testimony he presented in that regard.

537:24-538:8, 539:1-544:4 (Smith).  This assessment comports with the Court's review of the relevant factors based on a *Brown Shoe* qualitative analysis, as set forth previously.

Dr. Smith analyzed crossbody bags, satchels, shoulder bags, and totes as a "cluster" market for his analysis, Smith Rep. ¶ 35; Tr. at 531:16-18, because the parties' documents typically tracked relevant metrics at the handbag level, and because Tapestry and Capri had similarly high sales shares in these categories, Smith Rep. ¶ 93; Tr. at 532:3-533:5.  The Court finds that this approach is appropriate here.  "[C]ourts have upheld product market definitions that include a range of products that are related in the eyes of purchasers and that are marketed together by a particular type of seller."  *In re Pool Prods. Distrib. Mkt. Antitrust Litig.*, 940 F. Supp. 2d 367, 378-79 (E.D. La. 2013); *see, e.g.*, *Staples II*, 190 F. Supp. 3d at 117 ("Although a pen is not a functional substitute for a paperclip, it is possible to cluster consumable office supplies into one market for analytical convenience.  Defining the market as a cluster market is justified in this case because market shares and competitive conditions are likely to be similar for the distribution of pens to large customers and the distribution of binder clips to large customers." (quotation marks and citations omitted)); *Toys R Us, Inc.*, 126 F.T.C. 415, 593 (1998) (relevant product market was the retail sale of toys, including products as distinct as bikes, video games, and dolls), *aff'd sub nom. Toys "R" Us, Inc. v. FTC*, 221 F.3d 928 (7th Cir. 2000); *cf. ProMedica*, 749 F.3d at 565 (explaining that in *Brown Shoe*, "the Supreme Court analyzed together the markets for men's, women's, and children's shoes, because the competitive conditions for each of them were similar").

Defendants do not argue that Dr. Smith erred by using a cluster-market approach.  *See generally* Opp.; DFOF; DCOL.  Rather, Defendants' economic expert, Professor Scott Morton, critiques Dr. Smith's analysis because his cluster market does not include more silhouettes of handbags.  Scott Morton Rep. ¶ 32.  This critique falls short, however, because

Dr. Smith conducted an alternative analysis in his reply report that added more silhouettes to his proposed market – namely, clutches, wristlets, fashion backpacks, and belt bags – and that analysis yielded similar proportional results to those in his original cluster market.  Smith Reply Rep. ¶¶ 64-68.

Dr. Smith next identified a set of accessible-luxury handbag brands as his candidate market in the HMT.  Smith Rep. ¶ 50.  Dr. Smith drew from market size data maintained in the ordinary course by Tapestry, which identified and tracked a group of "Accessible Luxury brands."  *Id.* (citing PX1328).  Dr. Smith also observed that Tapestry subscribes to the third-party data service NPD, which collects wholesale-channel sales data for handbags.  *Id.*[26]  NPD categorizes the brands for whom it provides data into several segments, including "Bridge" and "Contemporary."  *Id.*  Because each of the brands identified as "Accessible Luxury" in Tapestry's 2022 market sizing model was included in NPD's categorizations of "Bridge" or "Contemporary," and because Tapestry has used NPD's Bridge and Contemporary categories to track the size of the accessible-luxury segment, Dr. Smith added each brand categorized by NPD in 2023 as "Bridge" or "Contemporary" to his candidate market.  *Id.* (citing PX1334).[27] In 2023, NPD categorized 125 brands as "bridge" and 83 brands as "contemporary."

---

[26] NPD is now known as Circana.  Tr. at 536:2-4 (Smith); Smith Rep. ¶ 67.  Because the parties have referred to the company as NPD throughout the proceedings, the Court will refer to the firm by its former name as well.

[27] For substantially the same reasons, the Court finds that NPD's "Bridge" and "Contemporary" categories conservatively approximate the product market qualitatively described *supra* at pp. 21-64 in the Court's *Brown Shoe* analysis.  Therefore, the market-share and market-concentration figures calculated *infra* at pp. 94-99 apply not only to the product market established quantitatively by the HMT but also the product market established qualitatively by *Brown Shoe*.

DX0498; DX0499.  Thus, Dr. Smith's candidate accessible-luxury-handbags market consists of over 200 handbag brands.  *See* Tr. at 549:14-16 (Smith).

Dr. Smith then tested his candidate market through an HMT analysis.  *Id.* at 544:5-15 (Smith).  To demonstrate that his candidate accessible-luxury-handbag market satisfies the HMT (and thus represents a relevant antitrust market), Dr. Smith used an aggregate-diversion analysis.  *Id.* at 548:15-16; Smith Rep. ¶ 102.  "[D]iversion refers to a consumer's response to a measured increase in the price of a product.  In other words, diversion measures to what extent consumers of a given product will switch (or be 'diverted') to other products in response to a price increase in the given product."  *H & R Block*, 833 F. Supp. 2d at 62; *see* Tr. at 551:11-13 (Smith: "[T]he particular question of interest is if I raise [the] price of one brand, where are the sales going to be diverted to.").  Because Defendants challenge certain elements of Dr. Smith's aggregate-diversion analysis, a detailed review of this analysis is necessary.

### i.    General Overview of Aggregate-Diversion Analysis

Aggregate-diversion analysis consists of three steps.  First, one determines the threshold aggregate-diversion ratio, that is, "the percentage of customers that would need to stay within the [candidate] market to make a price increase profitable."  *Sysco*, 113 F. Supp. 3d at 34.  "This is strictly a mathematical step, with the aggregate diversion ratio a function of the subject product's gross margin," which is "the price of selling one additional product minus the cost of selling the additional product."  *Id.*  Second, one determines "the *actual* aggregate diversion – that is, the actual percentage of customers of a single [firm] that would switch to another [firm] after a price increase."  *Id.*  "Since these lost sales are recaptured within the proposed market, they are not lost to the hypothetical monopolist."  *H & R Block*, 833 F. Supp. 2d at 63.  Third, one compares the threshold aggregate diversion ratio with the

actual aggregate diversion.  If the actual aggregate diversion exceeds the threshold aggregate-diversion ratio, then an SSNIP at that level would be profitable for a hypothetical monopolist. *Id.*; *accord Sysco*, 113 F. Supp. 3d at 34.  As applied here, this means that if the percentage of customers of a single accessible-luxury-handbag retailer who would switch to another accessible-luxury-handbag retailer (as opposed to another handbag retailer generally) in response to a price increase "is greater than the percentage of customers needed to stay within the market to make a price increase profitable, then the relevant product market is properly defined" as accessible-luxury handbags.  *Sysco*, 113 F. Supp. 3d at 34-35.

ii.    Dr. Smith's Aggregate-Diversion Analysis

At step one (that is, calculation of the threshold aggregate diversion), as explained above, Dr. Smith analyzed the price-cost margin for accessible-luxury handbags.  Dr. Smith assumed that the price-cost margin on accessible-luxury handbags was 60 percent, a figure lower than the price-cost margin for handbags reported by Coach, Kate Spade, and Michael Kors.  Smith Rep. ¶¶ 104-105; Tr. at 547:9-548:10 (Smith).  Defendants' economic expert, Professor Scott Morton, agreed with Dr. Smith that "handbag manufacturers have high gross margins" and that "[D]efendants' accounting margins are above 60%."  Tr. at 1301:25-1302:5.  Giberson, one of Defendants' industry experts, likewise opined that "most handbag sellers have very high margins," and that "many are higher even than Coach, Kate Spade, and Michael Kors."  Giberson Rep. ¶ 74.

Dr. Smith then used that conservative price-cost margin to calculate the threshold aggregate-diversion ratio, which he found to be 17 percent.  Smith Rep. ¶ 104; Tr. at 548:20-549:5 (Smith).  As explained by Dr. Smith (and not disputed by Defendants), a "hypothetical monopolist would increase price by at least 5% for a given product if the aggregate diversion ratio from that product to other products under the control of the hypothetical monopolist is at

least 10/$m$, where $m$ is the percentage price-cost margin on [the applicable] products."  Smith Rep. ¶ 104.  Here, where $m$ is 60, 10/60 = 17 percent.  "In other words, if the aggregate diversion ratio from any accessible luxury brand to all other brands in the candidate accessible luxury market is at least 17% it would be profitable for a hypothetical monopolist to implement a [SSNIP] of at least 5% on that product."  *Id.* ¶ 105.

Dr. Smith then turned to step two – that is, calculation of the actual diversion ratios from Coach, Kate Spade, and Michael Kors to all other accessible-luxury handbags.  To estimate actual diversion, Dr. Smith relied upon four surveys – two conducted by Kantar in 2021, one conducted by Kantar in 2022, and one from Bain in 2022 – that were commissioned by Tapestry.  *Id.* ¶¶ 246-247; Tr. at 550:16-24, 634:10-16, 647:18-22 (Smith); *see also, e.g.*, PX1697 (data from 2022 Bain survey commissioned by Tapestry).  These surveys asked consumers: (1) "What other brands did you consider before you made this purchase?" and (2) "The last time you purchased [a handbag] from [brand], what other [handbag] brands did you consider buying from?"  Smith Rep. ¶ 244, 247 (quotation marks omitted); *see, e.g.*, PX1185 at 10 (2023 Tapestry Brand Health Tracker survey questions); PX1647 at 9 (Tapestry 2022 Brand Health Tracker survey questions).[28]  To answer these questions, respondents were presented with a drop-down list of brands; they also had the option to answer "other" and write in up to three additional brands.  *See* Tr. at 1188:12-23, 1190:23-25 (Yu).

Dr. Smith used the responses from these surveys, which "relate[d] to a specific [past] purchase," *id.* at 551:17-18 (Smith), "as a proxy for where customers would divert their

---

[28] Tapestry maintains a "Brand Health Tracker" which is informed by yearly data from surveys conducted in partnership with the research firm Kantar.  *See, e.g.*, Tr. at 1197:6-1198:17 (Yu).  During the preliminary injunction hearing, the parties often referred to the relevant data from the Kantar surveys as the "Brand Health Tracker"; the Court accordingly adopts that terminology in this opinion.

purchases if they did not purchase, e.g., a Kate Spade handbag," Smith Rep. ¶ 247; *see* Tr. at 551:23-552:8 (Smith: this method "assum[es] that the brands that are considered [within the meaning of this survey question] are the next best option for the brand that was chosen"). If a survey respondent indicated that she considered multiple other brands before making their purchase, Dr. Smith assigned those brands equal probability as next-best options. Tr. at 552:3-16 (Smith). On the other hand, if the survey respondent indicated that they did not consider any other brands before making their purchase, Dr. Smith found that such a response "indicates . . . one of two things." *Id.* at 559:21 (Smith). In Dr. Smith's baseline analysis, he assumed that such a consumer was a brand loyalist who would not switch to another brand no matter what the price increase might be. *Id.* at 559:21-23 (Smith). Such a consumer is inframarginal. Smith Rep. ¶ 245 n.442 ("Inframarginal consumers are those who do not respond to a given price increase by changing their purchasing behavior."). Because an inframarginal consumer would not divert their sale elsewhere in the market despite a price increase, Dr. Smith excluded them from his baseline analysis. Tr. at 559:23-560:2 (Smith). Alternatively, such a consumer could be marginal (rather than an inframarginal brand loyalist) because "their next best option is not a handbag." *Id.* at 560:2-3 (Smith); *cf. id.* at 320:17-23 (Crevoiserat: "[I]f a customer doesn't like what we're providing, they could go anywhere. They could buy a pair of yoga pants or go out to dinner."). Although Dr. Smith testified that he thought this scenario was "less likely," he conservatively accounted for that possibility in his sensitivity analysis. *Id.* at 560:2-561:3 (Smith); Smith Rep. ¶ 245.

Using this data, Dr. Smith calculated the diversion ratio from Coach to other accessible luxury brands to be between 61 percent and 36 percent (representing his baseline analysis and sensitivity analysis, respectively), the diversion ratio from Kate Spade to other accessible luxury brands to be between 65 percent and 46 percent (same), and the diversion

ratio from Michael Kors to other accessible luxury brands to be between 64 percent and 51 percent (same). Smith Rep. ¶ 107. After Dr. Smith calculated his actual diversion ratios, he looked to sales data collected during discovery "to econometrically estimate substitution between the parties" in order to corroborate his results. Tr. at 562:3-8 (Smith); Smith Rep. ¶ 248 & n.448. Although Dr. Smith recognized that this data "is more limited" and such calculation was "challenging," his corroborating analysis "do[es] indicate high diversion ratios between the merging parties, and thus [is] supportive of the use of these diversion ratios." Tr. at 562:9-13 (Smith).

Step three of aggregate-diversion analysis involves comparing the actual diversion ratios to the threshold aggregate-diversion ratios. As explained above, if the diversion ratios of the products within the candidate relevant market exceed the threshold aggregate-diversion ratio, then an SSNIP at the tested level would be profitable for a hypothetical monopolist. *See H & R Block*, 833 F. Supp. 2d at 63. Here, each of the calculated diversion ratios far exceeds the threshold aggregate-diversion ratio of 17 percent needed to satisfy the hypothetical monopolist test. Smith Rep. ¶ 107 (diversion ratio from Coach calculated to be between 61 percent and 36 percent; diversion ratio from Kate Spade calculated to be between 65 percent and 46 percent; diversion ratio from Michael Kors calculated to be between 64 percent and 51 percent). That is, each of the calculated diversion ratios indicate that a hypothetical monopolist would find it profitable to implement an SSNIP of at least five percent on the products in the accessible-luxury handbag market, Smith Rep. ¶ 105, indicating that the candidate market of accessible-luxury handbags "passes the hypothetical monopolist test by a long ways," Tr. at 550:5-9 (Smith). Indeed, the calculated diversion here "is more than three times as high in the baseline case and more than two times as high in any of the sensitivity cases tha[n] is necessary to define a relevant market." *Id.* at 550:7-13 (Smith).

iii.    Dr. Smith's Alternative HMT

Dr. Smith also conducted an alternative HMT using data only from Tapestry and Capri.  Smith Rep. ¶ 108.  This alternative HMT showed that a hypothetical monopolist who controlled *only* the Coach, Kate Spade, and Michael Kors brands (rather than the more than 200 brands in Dr. Smith's candidate accessible-luxury-handbag market) would also find it profitable to impose an SSNIP on at least one of the brands.  *Id.* ¶¶ 108, 256-258.  Because the HMT is a tool to test whether a candidate market is too small, this indicates that Dr. Smith's candidate accessible-luxury-handbag market (which includes not only the three brands at issue here, but also all of the brands categorized by NPD as bridge and contemporary) is conservative.  *Cf. AmEx I*, 838 F.3d at 199 ("[If] consumers are able and inclined to switch away from the products in the proposed market in sufficiently high numbers to render the SSNIP unprofitable, then the proposed market definition is likely too narrow and should be expanded."); *Optronic*, 20 F.4th at 482 n.1 (similar).

The Court need not pause long on this alternative market because, given commercial realities, the FTC does not assert that Dr. Smith's alternative market of just the merging brands comprises a relevant market here.  Tr. at 571:11-14 (Smith: "[A] market of just Coach, Kate Spade, and Michael Kors is [not] the appropriate relevant antitrust market through which to evaluate the merger."); *see H & R Block*, 833 F. Supp. 2d at 64 ("The fact that [the plaintiff's expert's] analysis would validate other groupings of businesses does not undermine [the plaintiff's expert's] reliance on it to validate . . . the relevant market in this case.").  Indeed, Defendants' own economic expert, Professor Scott Morton, recognized in a 2020 co-authored article that a market may be "comprised solely of . . . two merging firms," but that in such a case, an agency might choose to define a market that is not the narrowest market in

order to prevent a court from "balk[ing] at a very narrow market that violates its intuition" or

that could be considered "a gerrymandered submarket."  PX7414 at 10.

### b. Defendants' Central Critiques

Defendants raise various critiques of Dr. Smith's quantitative approach to defining a

relevant market.  The Court will address each in turn.

#### i.    NPD

Defendants first challenge Dr. Smith's analysis because he relies upon NPD's

classification of brands as "bridge" or "contemporary" in defining his relevant market.  Opp.

at 29.  Defendants assert that Capri does not even subscribe to NPD, and that Tapestry does

not use NPD's bridge and contemporary categories as a proxy for an accessible-luxury-

handbag market.  *Id.*  Defendants also assert that NPD does not identify the brands labeled

bridge and contemporary as "accessible luxury" brands, and that neither Dr. Smith nor the

FTC understand the method by which NPD classifies its brands.  *Id.*  Defendants finally argue

that the FTC and Dr. Smith failed to do any analysis as to whether the brands classified by

NPD as bridge and contemporary fall within the relevant submarket based on the *Brown Shoe*

indicia.  *Id.*  For the following reasons, these critiques do not persuade the Court or undermine

the reliability or weight of Dr. Smith's opinions.

Although it is true that Capri does not subscribe to NPD, Tr. at 1118:4-5 (Edwards),

Tapestry subscribes to NPD and its executives consult NPD reports, *see, e.g.*, Tr. at 281:5-21

(Crevoiserat: "Tapestry leverages the information from Circana/NPD to understand the

context of performance of competitors in the wholesale channel[.]"); *id.* at 418:6-7 (Q: "Does

Tapestry purchase data from NPD?"  Harris: "We do."); *id.* at 881:21-24 (Fraser, as CEO of

Kate Spade, would "sometimes" look at NPD's "quarterly download"); PX1306 (April 2021

email to Crevoiserat, Kahn, Fraser, and other executives at Tapestry, Coach, Kate Spade, and

Stuart Weitzman analyzing NPD sales data); PX1121 (December 2021 email from Tapestry's director of strategy and consumer insights to Crevoiserat, Roe, Kahn, Fraser, Harris, and others attaching "NPD Strategic Session" slide deck). Tapestry has also conducted market-sizing analyses using data from NPD. Tr. at 388:25-389:17 (Harris: "Tapestry has a market sizing model" that "uses Euromonitor and NPD" data); Smith Rep. ¶¶ 64-67. Other accessible-luxury brands also purchase and use NPD's handbag data for market measurement and analysis. *See, e.g.*, PX3201 at 6 ████████████████████████████; DX0551 at 11 ████████████████████████. Even after this litigation commenced, Tapestry has continued to purchase and use NPD data to track and analyze the handbag market. *See, e.g.*, DX0139 at 40 (April 2024 Kate Spade Brand Review slide deck). Indeed, even one of Defendants' industry experts on handbags, Giberson, testified that NPD gives "amazing direction" regarding the handbag market. Tr. at 978:21-979:6 (Giberson). Given the use of NPD data by Tapestry and those in the industry to analyze the handbag market, the Court finds that Dr. Smith's reliance on data and information from NPD is appropriate. *See, e.g.*, *Sysco*, 113 F. Supp. 3d at 35 (crediting analysis by plaintiff's expert where expert had used "constructed" data sets based on requests for proposals, bidding summary information, and ordinary-course documents produced by defendants).

The Court also finds that it was appropriate for Dr. Smith to include NPD's "bridge" and "contemporary" handbag categories to round out his relevant candidate market. Before he added the more than 200 "bridge" and "contemporary" brands to his candidate market, Dr. Smith reviewed Tapestry and Capri's ordinary-course documents to initially identify the brands that Tapestry and Capri considered to be competitors (each of which is categorized by NPD as "bridge" or "contemporary"). *See supra* pp. 68-69. Dr. Smith also noted several internal documents that described NPD's "bridge" and "contemporary" categories as

accessible-luxury-handbag brands.  Smith Rep. ¶ 70; *see, e.g.*, PX1334 at 1, 3-4 (February

2021 email from Tao to Crevoiserat, Kahn, Fraser, and other Tapestry executives equating

accessible luxury with "Bridge & Contemporary" in description of NPD data); PX1306 at 3

(same in April 2021).[29]  Defendants' attempts to characterize these documents as stray and

inconsequential are unpersuasive.  Several of these documents are emails and attached

materials sent to Tapestry CEO Crevoiserat, Coach CEO Kahn, and then-Kate Spade CEO

Fraser by Rae Tao, who currently serves as Kate Spade's head of strategy and chief of staff

and reported directly to Harris and Fraser.  PX5087 at 68:4-12 (Tao).  Indeed, Tao served as

Tapestry's Rule 30(b)(6) witness on the topic of "Tapestry's efforts to calculate handbag

market share[,] total addressable market[,] or other market sizing exercises conducted in the

ordinary course of business."  PX5087 at 8:10-9:15 (Tao).  It is therefore disingenuous of

Defendants to refer to her dismissively as a mere "junior employee."  Tr. at 1480:12 (Tapestry

Closing).  Moreover, at her deposition, Tao testified that NPD's "bridge" and "contemporary"

brands were analyzed together as accessible-luxury brands in Tapestry's market sizing model

"historically," before she started in her role at Tapestry in 2014.  PX5087 at 15:21-16:12,

107:23-108:3, 108:23-109:4 (Tao).  Thus, the Court finds that Dr. Smith's use of the "bridge"

and "contemporary" NPD categories as proxies for the accessible-luxury category is entirely

appropriate.

 The Court is also not persuaded by Defendants' contention that Dr. Smith's reliance

on the NPD categorization to build the candidate market is improper because he did not

---

[29] The Court also notes that other third-party handbag retailers use the term "contemporary" to "refer to the same thing" as "accessible luxury."  Tr. at 682:1-3 (Guez); *see also, e.g.*, PX3060 at 2 ███████████████████████████████████████████████ ██████████████████████████ .

separately undertake a *Brown Shoe* analysis of the handbags in each of the "bridge" and

"contemporary" brand categories.  Opp. at 29.  It is true that Dr. Smith based his candidate

market on NPD's categorization of brands rather than the distinct characteristics of individual

handbags, but he included those categories based on his review of Tapestry's ordinary-course

documents identifying competitor accessible-luxury brands, and documents identifying those

NPD categories as "accessible luxury" competitors.  By including *all* brands in those

categories, Dr. Smith endeavored to be more conservative in his approach.  Defendants'

criticism that Dr. Smith was unable to determine whether a particular handbag belongs in his

product market without knowing its brand, *see* Tr. at 606:2-607:5 (Smith), simply

demonstrates the importance of brand as a distinguishing factor in the handbag industry.  The

same could be said of name-brand versus generic drugs, and the Second Circuit has found a

relevant antitrust market consisting of generic drugs as distinct from the same name-brand

drug.  *Geneva*, 386 F.3d at 496.

In sum, Defendants' critiques based on Dr. Smith's use of the NPD data to define a

relevant market are not persuasive.

### ii.    The 2021 and 2022 Surveys

Defendants also criticize Dr. Smith's reliance on four Tapestry-commissioned surveys

to estimate diversion ratios.  Defendants raise several issues with the survey questions,

including that the survey questions do not directly ask what a consumer would do in the event

of a price increase and therefore do not measure diversion.  Opp. at 30.  Defendants also argue

that the use of survey data from 2021 and 2022 cannot accurately predict consumer behavior

in 2024 because the handbag industry is dynamic.  DFOF ¶ 134.

The Court first addresses Defendants' critiques of the survey questions.  To start,

Defendants assert that Dr. Smith's diversion analysis is unreliable because the survey data

"did not ask consumer about switching their purchases . . . in response to a price increase." Opp. at 3; *see id.* at 30-31.  While a survey question that asks specifically about alternative purchases in the event of a price increase may have assessed diversion more directly, the questions relied on by Dr. Smith are sufficiently indicative of diversion because they elicited the consumer's next-best option.  *See* Smith Rep. ¶ 247.  In the surveys, consumers were asked about the brands they considered buying when they made their last purchase, which Dr. Smith used "as a proxy for where customers would divert their purchases if they did not purchase, e.g., a Kate Spade handbag." *Id.*  This was a reasonable approach.

Economists regularly estimate diversion ratios using non-price-response data, and courts use such analyses to assess mergers.  For example, in *Anthem*, the plaintiff's economic expert conducted a diversion analysis by utilizing the defendant's internal bidding data, which did not include a price-specific question, yet the court credited the expert's testimony relying on that diversion analysis.  236 F. Supp. 3d at 217, 220.  In *Sysco*, the court similarly credited the testimony of the plaintiff's expert which was based on requests for proposals and bidding data, which similarly did not directly address diversion due to a price-increase.  113 F. Supp. 3d at 35-37; *see also, e.g.*, *FTC v. Wilh. Wilhelmsen Holding ASA*, 341 F. Supp. 3d 27, 57 (D.D.C. 2018) (plaintiff's expert calculated diversion ratios based on revenue information, salesforce data, and win/loss data); *Bertelsmann*, 646 F. Supp. 3d at 39 (plaintiff's expert calculated diversion ratios based on market shares, win/loss data, runner-up data, and ordinary-course bidding data).

Defendants place undue reliance on *H & R Block* for the proposition that a court should reject an "expert's attempt in a merger challenge to calculate diversion ratios and define the relevant market based on survey data" that does not explicitly measure diversion based on price increases.  Opp. at 30-31.  It is true that in *H & R Block*, the court noted that

the IRS switching data that showed customers switching between tax-preparation methods/services did not "directly measure diversion because switching can occur for any number of reasons, many of which may not involve price."  833 F. Supp. 2d at 62. Notwithstanding this, however, the court ultimately relied upon the expert analysis using this data because it was "at least somewhat indicative of likely diversion ratios."  *Id.*

Defendants next take issue with Dr. Smith's assumption that the survey responses reflect a consumer's next-best option when the survey questions asked about the brands that consumers "considered."  Tr. at 551:23-552:8 (Smith).  Defendants argue that the survey questions – and hence Dr. Smith – did not take into account that the other brands that a consumer "considered" when making a purchase might have been brands that the consumer had no interest in buying then or in the future.  *See, e.g.*, Tr. at 412:9-15 (Harris: the survey cannot show whether people who purchased a Coach handbag "considered Michael Kors[,] didn't like it, and therefore didn't buy it").

While it is possible that a respondent "considered" alternative brands that the respondent would never actually purchase, the Court agrees with Dr. Smith that this is not the most logical conclusion, especially given the purpose of the surveys and their historical use by Tapestry.  *See id.* at 558:4-12 (Smith: "Was there an individual who listed a brand that they hated?  Yeah, it's possible, but it's not . . . the most logical conclusion.").  The Court finds that it is much more reasonable to assume, for example, that the 96 consumers who answered "Michael Kors" in response to the survey question asking for the brand they considered when they purchased their Coach bag, indicated that a Michael Kors bag was their next-best option. *See id.* at 412:18-22 (Harris: "[T]he 96 consumers who answered 'Michael Kors' [in response to the survey questions] are consumers who answered they had purchased a Coach bag and that they had considered Michael Kors.").  That is precisely what the surveys were intended to

measure – not brands that a consumer would never actually consider purchasing, as Defendants now suggest.  Indeed, Tapestry's vice president of global consumer insights testified that the 2021 and 2022 surveys analyzed a consumer's "path-to-purchase."  *Id.* at 1186:1-4 (Yu); *see id.* at 1186:17-20 (Yu: "[T]he previous tracker was tracking kind of people's behavior in some ways of their purchases[.]").

Tapestry commissioned these surveys for multiple years and presented the results regarding the market and their competitors to the highest-level executives at the company. *See, e.g.*, PX1216 at 12 (August 2022 Tapestry slide deck about potential acquisition of Michael Kors using data from 2022 Brand Health Tracker);[30] PX1465 at 10 (October 2022 Tapestry slide deck sent to Yu, Fraser, Harris, Capiola, Ryan, and others about brand tracking using data from 2022 Brand Health Tracker).  Alice Yu, Tapestry's vice president of global consumer insights, testified that she trusted Kantar, the company hired by Tapestry to conduct the Brand Health Tracker surveys over the years, Tr. at 1197:24-1198:7, and repeated later surveys with similar questions and format, supporting the conclusion that Tapestry found the 2021 and 2022 surveys reliable.  Tapestry also had input on and edited the survey questions. *See, e.g.*, PX1185 at 3-19 (2023 Brand Health Tracker questions showing edits and comments); Tr. at 1186:11-1187:20 (Yu: describing changing and editing later survey).

---

[30] Harris attempted to downplay the significance of the August 2022 slide deck as being put together in "probably about an hour" by "grab[bing] what already existed from existing reports."  Tr. at 421:17-20; *see id.* at 421:25-422:1 (Harris: "So this was what was just readily available and off the shelf at the time.").  She pointed to others on her team who had prepared the slides, *id.* at 427:16-429:7, claimed not to have reviewed them before they were given to the CEO, *id.* at 429:8-10, and testified that she "did not think this [slide discussing the brand survey] provided useful information" or "would be important or reliant or the focus of any meaningful conversations or analyses," *id.* at 422:6-13; *see also id.* at 413:20-414:1 (similar). The Court does not find it credible that Harris – "the senior vice president of global strategy and consumer insights" at a multibillion-dollar company, *id.* at 359:12-14 – would send a supposedly slipshod slide deck about consumer insights to her CEO that was useless, unimportant, or an improper basis for "meaningful conversations or analyses."

Tapestry would not have commissioned these surveys and then used the results over a period of years if the survey questions elicited brands that respondents would have never considered purchasing. Finally, Crevoiserat testified that "the customer really determines the competitive set, and that's why we do a lot of work with consumers. We survey consumers on what brands they *consider* when they buy our brands." Tr. at 309:9-16 (emphasis added). Thus, even Tapestry's CEO finds that "the competitive set" is clearly related to "what brands [consumers] *consider* when they buy our brands." Tr. 309:9-16 (Crevoiserat) (emphasis added).

Third parties also use similar language in their consumer surveys. In assessing their brand positioning and competition, a ███████ survey collected the other brands that ███ ███ "purchasers also *considered*." DX0580 at 8 (further emphases omitted). This data that reflected ████████ customers' "[t]op cross-considered brands" was presented in response to the question of who the company "compete[s] with," including an assessment of its "key competitors." *Id.* (emphases omitted). This third-party evidence further indicates to the Court that brands a consumer "considered" before making a purchase are a good proxy for a consumer's next-best option.

Defendants next critique the 2021 and 2022 survey questions by pointing out that Tapestry edited the relevant survey question in its Brand Health Tracker in subsequent years to be more "forward-looking." DFOF ¶ 133; Tr. at 1186:11-1187:20, 1197:6-16 (Yu: Tapestry overhauled the 2022 Brand Health Tracker to make the questions "more forward looking"; Yu "overhauled the fiscal year 2022 version of the brand health tracker when [she] took ownership of the fiscal year 2023 version"); *cf.* DX0288 (2024 Brand Health Tracker). The survey question was changed to ask consumers how "likely" they were to "consider choosing" certain brands in the next 12 months. PX1185 at 10. This new question does not

undermine the reliability of the prior questions in earlier surveys. As Tapestry acknowledged, the earlier surveys tracked consumer behavior with respect to an actual purchase. Tr. at 1186:11-1187:20 (Yu: Tapestry overhauled the 2022 Brand Health Tracker because "the previous tracker was tracking kind of people's behavior in some ways of their purchases"); *id.* at 1186:1-4 (Yu: the 2021 and 2022 surveys solicited information regarding a consumer's "path-to-purchase," meaning "looking at [transaction] history and the sort of things that [a consumer] did" or would do at the time, rather than understanding "the equity and brand health"). The Court agrees with Dr. Smith that questions tracking consumer behavior with respect to an actual purchase is more relevant to a diversion analysis than a question about possible considerations in making future purchases. *See* Tr. at 556:11-19 (Smith); *see also id.* at 1254:3-7 (Scott Morton: to test diversion, "you do need the purchase that [the survey respondent is] making *or did make*. Then you have to ask about other purchases." (emphasis added)). Such an approach is consistent with other courts who have relied on expert testimony regarding decisions about past purchases rather than forward-looking purchases. *See, e.g.*, *Sysco*, 113 F. Supp. 3d at 36-37 (crediting analysis of expert who relied upon past requests for proposal and bidding data, which is not forward-looking). Thus, that Tapestry later edited the survey question in its Brand Health Tracker in 2023 and beyond does not give the Court pause about Dr. Smith's reliance on the data from the 2021 and 2022 surveys.

Defendants also criticize the design of the 2021 and 2022 surveys for several reasons. They assert that the surveys are unreliable because they contained initial screening questions that restricted respondents' choices to a list of prepopulated brands and then ask the relevant question after an allegedly "meandering" series of other questions. DFOF ¶¶ 130-132. Professor Scott Morton, Defendants' economic expert, testified that in her experience, this type of survey created a risk of bias towards brands with high "awareness," Tr. at 1237:14-

1238:21, 1240:2-1241:21, and Yu testified that in her experience the survey design would result in respondent "fatigue," *id.* at 1193:1194:17. The Court finds that these critiques do not undermine the reliability of the surveys. Survey respondents were not constrained by the brands listed in the screening question and had the ability to write in additional brands that they considered in response to the relevant survey question. *Id.* at 1190:23-25 (Yu). Defendants presented no testimony by a survey expert to support their supposition that an open-ended-response option was an ineffective means of eliciting comprehensive responses or that the survey's length and structure would produce unreliable results. *See id.* at 1236:15-17 (Scott Morton is not a survey expert); *id.* at 1183-1206 (Yu not testifying as an expert). Indeed, Yu testified that she trusted Kantar, the company hired by Tapestry to conduct the Brand Health Tracker surveys over the years, *id.* at 1197:24-1198:7, and the same survey structure was commissioned (and used) by Tapestry multiple times. Tapestry also continued to work with Kantar in its later survey work. *See* PX1185; Tr. at 1197:24-1198:1 (Yu).

Defendants also complain that the surveys that Dr. Smith relied upon totaled "all combined, around a thousand observations." DFOF ¶ 123 (citation omitted). However, there was no testimony from any survey experts that indicates that a thousand observations is insufficient to measure diversion. Tapestry relied on the data from these surveys in the ordinary course of its business to understand consumer behavior and even represented to the FTC in this case that the Brand Health Tracker survey screened for "a robust sample of handbag or small leather good ('SLG') purchasers with specific characteristics." PX0050 at 1. Thus, the Court does not share Defendants' newly articulated litigation concerns that Tapestry's commissioned surveys were structurally flawed.

Defendants finally argue that the survey data from 2021 and 2022 is too stale to provide meaningful data for diversion because the market for handbags changes quickly.

DFOF ¶¶ 134-138; *see, e.g.*, Tr. at 400:10-17, 414:9-20 (Harris: "we can't look back that far. The data and information is just too obsolete"; data from 2021 "tell[s] you" "nothing" "about what brands [consumers] would consider today in 2024 and beyond"); *id.* at 1194:21-1195:13 (Yu: "[B]ehavior in 2021 . . . [cannot] predict what [consumers] will do in the future."). The Court acknowledges that it would have been ideal to use data from 2024 to analyze diversion in 2024, rather than data from 2021 and 2022. However, Dr. Smith testified that while there had been changes in the accessible-luxury handbag market from 2022 until present, the 2021 and 2022 surveys remained relevant indicators of consumer behavior today because the survey results have been consistent, Defendants' profit margins remain fairly constant, and the market shares held by Defendants' brands are also similar over the years (even if smaller handbag brands have entered the market or grew in proportional market share between 2022 and the present, and even if Michael Kors's revenue may have decreased). Tr. at 559:2-15, 1367:24-1368:9 (Smith); *see id.* at 562:19-563:3 (Smith: market shares for 2022 and 2023 for the merging parties were "very similar"); *id.* at 1367:11-23 (Smith: "[The i]mportant markers in the competitive environment, particularly [as to] the parties, are not changing significantly from 2022 to 2023, for example. They have similarly high shares, [and] similarly high margins[.]"). The Court credits this testimony. Even though fashion is an ever-changing industry, the competitive landscape had not changed significantly enough to render 2021 and 2022 survey data unreliable.

Despite some limitations with the data, the Court finds that Dr. Smith's approach is at least highly indicative of diversion, which is sufficient. *Cf. H & R Block*, 833 F. Supp. 2d at 62 (although the data plaintiff's expert relied upon in calculating diversion was "not without its limitations," it was "at least somewhat indicative of likely diversion ratios" and the court therefore relied on plaintiff's expert's analysis over defendant's objections). As a leading

antitrust treatise states, even if "some of the data one would like to have for a sophisticated approach to market definition" is "unavailable or difficult to obtain," "[a]s long as available data are sufficient for a reasonable judgment on the market issue, defendants should not prevail simply on a claim that other data *might* indicate a different and more favorable result." Areeda & Hovenkamp ¶ 929d (emphasis added). Moreover, and importantly, Dr. Smith's calculations of actual diversion are so much greater than the threshold diversion floor that marginal errors in the survey results would not cause his candidate market to fail the HMT. For these reasons, the Court finds Dr. Smith's diversion analysis based on the 2021 and 2022 Tapestry-commissioned survey data to be reliable.

### iii.    Dr. Smith's Past Testimony

Defendants next make much of the fact that Dr. Smith testified only once before in a Section 7 case, *FTC v. Thomas Jefferson University*, 505 F. Supp. 3d 522 (E.D. Pa. 2020), where his analysis was rejected, *see* Opp. at 31-32. Of course, the fact that a different district court rejected a different analysis by Dr. Smith does not require this Court to reject the analysis presented by Dr. Smith in this case. *See Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011) ("A decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case." (citation omitted)).

*Thomas Jefferson University* is also distinguishable from the case at hand as it dealt with an entirely different type of market: healthcare. As other courts have noted, "a complex healthcare market" is "not analogous" to a market involving "traditional sellers and buyers," *Hackensack*, 30 F.4th at 168, such as the market for accessible-luxury handbags in this case. The former, unlike the latter, features "a two-stage model of competition," with hospitals negotiating with insurers while also competing to attract patients. *Id.* "Thus, unlike a

traditional seller and buyer industry, healthcare involves different payors with different incentives and competitive constraints." *Id.* Dr. Smith's diversion analysis in that case also relied on data regarding *patient* behavior to predict *insurer* behavior, where there was no relevant correlation evidence regarding insurer and patient behavior. *See* 505 F. Supp. 3d at 554. Here, in a market involving traditional sellers and buyers, Dr. Smith analyzes data regarding consumer behavior to assess behavior of those consumers. Therefore, the criticisms levied against Dr. Smith's analysis in *Thomas Jefferson* do not apply here. *See Hackensack*, 30 F.4th at 168 ("We must always consider the commercial realities of the industry involved.").

### c. Final Analysis

For these reasons, the Court finds that the FTC has defined a relevant market based on a quantitative approach. The analysis conducted by Dr. Smith demonstrates that the candidate accessible luxury handbag market passes the HMT by significant amounts, and thus is an appropriate relevant market for antitrust purposes.

### 3. Defendants' Additional Market-Definition Arguments

Defendants make two additional interrelated arguments that, although not strictly responding to the FTC's qualitative or quantitative market analyses, nonetheless relate to the market definition: (1) the FTC's market definition does not accord with the commercial realities of handbag competition; and (2) the existence of cross-shopping defeats the FTC's market definition. The Court considers and rejects these arguments in turn.

Defendants assert that the FTC's market definition ignores evidence of "competition from handbags sold by brands across the pricing spectrum." DFOF ¶ 9. Indeed, the Court heard testimony, much of it from Defendants' executives and experts, that the competition in the handbag market is "vast and dynamic," Tr. at 326:8-14 (Crevoiserat), "highly" and

"increasing[ly]" competitive, *id.* at 400:19-401:2 (Harris), and "extremely fierce" and "as fierce as ever," *id.* at 227:6-8, 239:4-6 (Newman). As they tell it, companies like Coach, Kate Spade, and Michael Kors are "getting squeezed from the top and from the bottom," *id.* at 137:21-24 (Idol), and are facing an onslaught from "over 100 brands" that are "very fluid" and "ever-changing," *id.* at 475:6-9, 484:14-485:11 (Kahn); *accord id.* at 320:15-24 (Crevoiserat: "I[f customers a]re looking for a handbag, [they] have hundreds, literally hundreds of choices."); *id.* at 965:21-966:1 (Giberson: "There is literally hundreds of brands in every single price point, and there's new ones coming all the time."). In essence, Defendants assert that because Coach, Kate Spade, and Michael Kors potentially compete with every brand that sells handbags in the United States, the relevant product market must include all handbags. *See, e.g.*, *id.* at 324:20-23 (Crevoiserat: "We know that customers shop up and down the price spectrum. So we see competition from everywhere."); *id.* at 1089:5-19 (Mr. Kors: MMK competes with "everything from Lululemon to Zara, to Louis Vuitton, to resale").[31]

As a threshold matter, the Court finds incredible the convenient litigation assertions by Defendants that their brands compete with all handbags. Commercial realities simply do not support a conclusion that, for example, an MMK handbag competes with an Hermès Birkin bag. *See, e.g.*, *id.* at 772:4-8 (Q: "Do you believe that Michael Michael Kors handbags compete[] with the Hermès Birkin bag?" Wilmotte: "I believe that Michael Kors compete[s] with anyone who makes handbags at the end of the day, so I'm looking at how the consumer is shopping across the whole spectrum."). As Kate Spade's former CEO put it – *prior* to

---

[31] Mr. Kors's views on issues such as competition and cross-shopping were not based on market studies, consumer research, or even any personal experience with setting prices for Michael Kors handbags. Tr. at 1101:3-1102:2. Instead, as he put it, "the street is my research." *Id.* at 1102:2; *see also id.* at 1099:13-1100:02 (similar). The Court gives little weight to unspecified street observations.

litigation – "Nobody says 'should I buy a [Louis Vuitton] bag or a Coach bag?'"  PX1427 at

2; *see* Tr. at 831:22-832:1 (Fraser).  The ordinary-course documents in the record make clear

that Coach, Kate Spade, and Michael Kors do not regard brands like Zara and Louis Vuitton

as nearly as important to their bottom line as they regard one another, along with other usual

suspects like Tory Burch and Marc Jacobs.[32]  The Court finds these documents to be more

compelling evidence of commercial realities than the platitudes offered by Defendants'

executives and experts.  *See, e.g.*, *Geneva*, 386 F.3d at 498 ("Although the industry

undoubtedly acknowledges that Coumadin competes to some extent with generics, generic

manufacturers treat each other as the entities which most directly affect their pricing and

output decisions."); *Staples II*, 190 F. Supp. 3d at 132 ("Defendants' own documents created

in the ordinary course of their business show that Defendants view themselves as the most

viable office supply vendors for large businesses in the United States.  Not surprisingly,

Defendants view themselves as each other's fiercest competition." (citations omitted));

*Bazaarvoice*, 2014 WL 203966, at *22 (product market of R & R platforms supported by the

fact that "in the materials [that the defendant] regularly sent to its board members, [the

defendant] only named other R & R platform providers in the slides titled 'Competitive

Update'"); *H & R Block*, 833 F. Supp. 2d at 53 ("While, as defendants point out, parts of these

TaxACT documents also discuss the broader tax preparation industry, these documents make

---

[32] The Court's conclusion is not altered by evidence that Tapestry and Capri executives also
look to brands that are not accessible-luxury-handbag brands, such as Louis Vuitton and
Gucci, for design inspiration.  *See, e.g.*, Tr. at 165:24-166:7 (Idol); DX0853 at 7 (Michael
Kors presentation with Prada, Gucci, Yves Saint Laurant, and Fendi reference images).
Defendants' designs can be inspired by a myriad of things, such as "theatre," "the Ripley
television show on Netflix," "art exhibit[s]," "the street," and "people in an airport," as Mr.
Kors testified.  Tr. at 1088:7-20.  Just because Defendants unsurprisingly look externally for
design inspiration does not mean that their sources are necessarily included in the relevant
market for antitrust purposes.

clear that TaxACT's own view – and that conveyed by its investment bankers to potential
buyers – is that the company primarily competes in a DDIY market against Intuit and HRB
and that it develops its pricing and business strategy with that market and those competitors in
mind.  These documents are strong evidence that DDIY is the relevant product market.");
*FTC v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34, 49 (D.D.C. 1998) ("The Defendants'
documents show that the merging parties clearly viewed their economic competition to be
from their fellow drug wholesalers, and not from the other sources as suggested by the
Defendants at trial.").

Even if it were true that Defendants, in some broad sense, view the entire category of
handbags as competitors, "the mere fact that a firm may be termed a competitor in the overall
marketplace does not necessarily require that it be included in the relevant product market for
antitrust purposes."  *Deutsche Telekom*, 439 F. Supp. 3d at 200 (citation omitted); *accord
IQVIA*, 710 F. Supp. 3d at 353.  That there is a broad market for handbags overall does not
negate the existence of a relevant submarket of affordable-luxury handbags.  *See Brown Shoe*,
370 U.S. at 325 ("[W]ithin [a] broad market, well-defined submarkets may exist which, in
themselves, constitute product markets for antitrust purposes."); *see, e.g.*, *Cont'l Can*, 378
U.S. at 457-58 ("That there may be a broader product market made up of metal, glass[,] and
other competing containers does not necessarily negative the existence of submarkets of cans,
glass, plastic[,] or cans and glass together[.]"); *Alcoa*, 377 U.S. at 275 ("Admittedly, there is
competition between insulated aluminum conductor and its copper counterpart, . . . [which] is
enough to justify grouping aluminum and copper conductors together in a single product
market.  Yet . . . that degree of competitiveness does not preclude their division for purposes
of § 7 into separate submarkets[.]"); *Meta*, 654 F. Supp. 3d at 914 ("Defendants' evidence
shows that there is a broad fitness market that includes everything from VR apps to bicycles.

This in no way precludes the existence of a submarket constituting a relevant product market for antitrust purposes."); *Bon-Ton Stores, Inc. v. May Dep't Stores Co.*, 881 F. Supp. 860, 868 (W.D.N.Y. 1994) ("Obviously, in a broad sense, traditional department stores compete in a vast marketplace encompassing retailers in general. There is no reason, however, why submarkets could not exist within that broad market[.]"); *Ansell, Inc. v. Schmid Lab'ys, Inc.*, 757 F. Supp. 467, 472 (D.N.J.) ("Defendants claim that condoms sold at wholesale within the United States constitutes a relevant product market. Treating this assertion as accurate, however, would not foreclose the possibility that the sale of latex condoms through retail outlets constitutes an economically significant submarket within the broader market encompassing all wholesale sales, and that this submarket is itself a line of commerce for the purposes of the Clayton Act." (quotation marks omitted)), *aff'd*, 941 F.2d 1200 (3d Cir. 1991) (unpublished table decision).

In a similar vein, Defendants suggest that cross-shopping by consumers – that is, the fact that consumers may own handbags from mass-market, accessible-luxury, and true-luxury brands – disproves the existence of distinct handbag submarkets. *See, e.g.*, DFOF ¶¶ 24, 105-106. The Court disagrees. Consumers may cross-shop across multiple markets of goods that are functionally similar; that does not necessarily mean that consumers treat these goods as reasonably interchangeable or that there is a high cross-elasticity of demand for these goods. And because "[t]he goal in defining the relevant market is to identify the market participants and competitive pressures that restrain an individual firm's ability to raise prices or restrict output," *Geneva*, 386 F.3d at 496, a relevant market only "needs to include the competitors that would 'substantially constrain [the merged firm's] price-increasing ability,'" *Advocate*, 841 F.3d at 469 (quoting *AD/SAT v. Associated Press*, 181 F.3d 216, 228 (2d Cir. 1999) (per curiam)); *accord IQVIA*, 710 F. Supp. 3d at 353; *Deutsche Telekom*, 439 F. Supp. 3d at 200.

This proposition comports with common sense.  Defendants stress that consumers have several different types of handbags in their closet.  Tr. 397:15-21 (Harris: testifying that consumer research shows that there is a wide range of handbag brands in a consumer's closet); Tr. 48:15-17 (Defendant Opening: "Reality is that customers in their closets have a Gucci bag, lined up next to a Coach bag, lined up next to a Calvin Klein bag.").  But next to those handbags in the closet may also be several different items of clothing, such as hiking pants, blue jeans, dress pants for work, and a formal pantsuit.  Despite some functional equivalence, as a matter of economic reality, the products may be recognized as distinct and, more importantly for antitrust purposes, the prices set by one may not meaningfully constrain the prices set by the others.  *See* Tr. 1342:11-13 (Smith: "I have Polo shorts and dress shirts in my closet, they're not substitutes for going to court and, you know, handbags are similar.").

The case law confirms that cross-shopping is not necessarily indicative of reasonable interchangeability.  For example, in *Sysco*, the court found that "broadline food distribution" was a relevant product market and rejected defendants' argument that "the relevant market is the entire $231 billion foodservice distribution industry, consisting not only of broadline food distributors, but also specialty distributors, systems distributors, and cash-and-carry stores." 113 F. Supp. 3d at 24-25, 37.  The court noted that "Defendants [we]re indisputably correct that customers buy across channels, especially independent restaurants," and that "[t]hey [we]re also unquestionably correct that some customers, particularly quick service and fast food restaurant chains, are capable of moving large segments of business from broadline to systems." *Id.* at 30.  The court reasoned, however, that "the fact that Defendants sometimes compete against other channels of distribution in the larger marketplace does not mean that those alternative channels belong in the relevant product market for purposes of merger analysis." *Id.* at 30-31; *see also, e.g.*, *FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1040

(D.C. Cir. 2008) (opinion of Brown, J.) ("The fact that a customer might buy a stick of gum at a supermarket or at a convenience store does not mean there is no definable groceries market. Here, cross-shopping is entirely consistent with the existence of a core group of [premium, natural, and organic supermarket] customers."); *Google*, 2024 WL 3647498, at *85 ("The fact that advertisers may move money between search and social ads to achieve varying goals does not make them substitutes."); *IQVIA*, 710 F. Supp. 3d at 357-59 (similar); *FTC v. Microsoft Corp.*, 681 F. Supp. 3d 1069, 1087 (N.D. Cal. 2023) ("That customers may cross-shop between consoles and PCs does not demonstrate reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." (quotation marks omitted)); *Visa*, 163 F. Supp. 2d at 335, 338 (finding that "general purpose cards" was a relevant product market, and rejecting defendants' argument that "the relevant market is one which includes all methods of payment including cash, checks[,] and debit cards"; "although it is literally true that, in a general sense, cash and checks compete with general purpose cards as an option for payment by consumers and that growth in payments via cards takes share from cash and checks in some instances, cash and checks do not drive many of the means of competition in the general purpose card market").

So too here.  Defendants' evidence of handbag cross-shopping relates, at most, to whether there are wholly separate groups of customers for accessible-luxury handbags.  *See, e.g.*, DFOF ¶¶ 24, 105-106.  If distinct customers were dispositive of the *Brown Shoe* analysis, there would be no need for the other six factors.  Moreover, just because someone owns a Louis Vuitton bag, a Coach bag, and a Zara bag does not mean that person views those bags as reasonably interchangeable or treats them as such.  As ███████ explained (and as other evidence in the record bears out), a consumer may buy one true-luxury handbag "██████

█████████" and then buy an accessible-luxury handbag or two every year: "█████████

█████████████"  PX8168 at 194:06-194:18.

In sum, the Court rejects Defendant's arguments that the FTC's market definition is fundamentally incompatible with the commercial realities of the handbag industry, and that cross-shopping by handbag consumers precludes the existence of distinct handbag submarkets.

## B. Anticompetitive Effects

"After the relevant product and geographic markets are determined, a prima facie case is established if the plaintiff proves that the merger will probably lead to anticompetitive effects in that market." *Hackensack*, 30 F.4th at 172 (quotation marks omitted).  As noted, a plaintiff usually does so "by showing that the transaction in question will significantly increase market concentration, thereby creating a presumption that the transaction is likely to substantially lessen competition." *Deutsche Telekom*, 439 F. Supp. 3d at 199 (citation omitted); *accord IQVIA*, 710 F. Supp. 3d at 377.  Here, the FTC presents powerful quantitative evidence that the merger of Tapestry and Capri would result in the combined firm holding excessive market share and market concentration, thus establishing a presumption that the merger's effects will be anticompetitive.

### 1. Market Share and Market Concentration

#### a. The 30-Percent Threshold

Under longstanding precedent, "a merger which produces a firm controlling an undue percentage share of the relevant market, and results in a significant increase in the concentration of firms in that market is so inherently likely to lessen competition substantially that it must be enjoined in the absence of evidence . . . showing that the merger is not likely to have such anticompetitive effects." *Phila. Nat'l Bank*, 374 U.S. at 363; *accord United States*

*v. Phillipsburg Nat'l Bank & Tr. Co.*, 399 U.S. 350, 366-67 (1970); *United States v. Waste Mgmt., Inc.*, 743 F.2d 976, 981 (2d Cir. 1984); *F. & M. Schaefer Corp. v. C. Schmidt & Sons, Inc.*, 597 F.2d 814, 816 (2d Cir. 1979) (per curiam); *Polypore Int'l, Inc. v. FTC*, 686 F.3d 1208, 1213-16 (11th Cir. 2012); *IQVIA*, 710 F. Supp. 3d at 378-79; *Bertelsmann*, 646 F. Supp. 3d at 35-38; *Deutsche Telekom*, 439 F. Supp. 3d at 205-06.[33]  "Without attempting to specify the smallest market share which would still be considered to threaten undue concentration," the Supreme Court has stated that "30% presents that threat."  *Phila. Nat'l Bank*, 374 U.S. at 364; *see IQVIA*, 710 F. Supp. 3d at 378-79 (rejecting the argument that "the 30% threshold is no longer valid" to trigger the *Philadelphia National Bank* presumption).

After defining the relevant product market, Dr. Smith calculated the pre-merger and post-merger market shares.  Smith Rep. § IV.  For his market share calculations, Dr. Smith uses sales data from the parties and third parties in the accessible-luxury-handbag market where available.  *Id.* ¶¶ 181-185.  Where data was unavailable for third parties, Dr. Smith used a combination of NPD data and reasoned estimations to calculate those participants' respective market shares.  *Id.* ¶ 185.  Using this method, Dr. Smith calculated that Tapestry's acquisition of Capri would result in the combined firm accounting for an approximately 59

---

[33] Although "the *Philadelphia National Bank* presumption . . . remains alive and well in horizontal merger analysis," Herbert Hovenkamp & Carl Shapiro, *Horizontal Mergers, Market Structure, and Burdens of Proof*, 127 Yale L.J. 1996, 2018 (2018), one aspect of the decision appears to have been jettisoned.  *Philadelphia National Bank* stated that, to overcome the presumption of anticompetitive effects, there must be "evidence *clearly* showing that the merger is not likely to have such anticompetitive effects."  374 U.S. at 363 (emphasis added).  In subsequent decisions, the Supreme Court "discarded *Philadelphia [National] Bank*'s insistence that a defendant 'clearly' disprove anticompetitive effect, and instead described the rebuttal burden simply in terms of a 'showing.'"  *Baker Hughes*, 908 F.2d at 990-91; *see AMR*, 2023 WL 2563897, at *2 (citing *Baker Hughes* with approval).

percent share of the accessible-luxury-handbag market.  *Id.* ¶ 186.[34]  Table 7 from Dr. Smith's

report depicts the post-merger shares held by Defendants and other accessible-luxury handbag

brands:

Table 7: 2023 Accessible Luxury Handbag Market Shares and Concentration

| Brand | Total Sales ($M)[1,2] | Share |
|---|---|---|
| Coach | $1,399 | 29.3% |
| Kate Spade | $562 | 11.8% |
| Tapestry[3] | $1,962 | 41.1% |
| Michael Kors | $843 | 17.6% |
|  | $485 | 10.1% |
|  | $400 | 8.4% |
|  | $113 | 2.4% |
|  | $110 | 2.3% |
|  | $85 | 1.8% |
|  | $83 | 1.7% |
|  | $83 | 1.7% |
|  | $63 | 1.3% |
|  | $55 | 1.1% |
|  | $50 | 1.0% |
| OTHER | $448 | 9.4% |
| Total | $4,779 | |
|  | Combined Share | 58.7% |
|  | Delta HHI | 1,449 |
|  | Post HHI | 3,646 |

Source: NPD; Parties' Retail Data, Product Data, and Store Data; Third-Party
Productions

*Id.* at tbl.7.  Post-merger, the Defendants' combined approximately 59% market share is well

over 30 percent and thus creates a presumption of anticompetitive effects.  *See, e.g., IQVIA,*

710 F. Supp. 3d at 379 (structural presumption of anticompetitive effects applied where

combined firm's post-merger market share would be between 30.6 percent and 46 percent);

*Bertelsmann,* 646 F. Supp. 3d at 36-37 (same for post-merger market share of 49 percent);

---

[34] Dr. Smith also included a sensitivity in his report based on Euromonitor data.  Smith Rep.
¶ 187.  The shares held by the merged Defendants in the sensitivity were generally in line with
those in his baseline case.  Smith Rep. ¶ 187.

*Deutsche Telekom*, 439 F. Supp. 3d at 206 (same for post-merger market share between 34.4 percent and 37.8 percent).

Dr. Smith also noted in his report that he reviewed ordinary-course documents from Capri tracking the Michael Kors luxury leather goods sales at the "Total Market" level and the "Accessible Luxury Mkt" level. Smith Rep. ¶ 175. Per Capri's own calculations, Michael Kors comprised 39.5 percent, Coach comprised 29.4 percent, and Kate Spade comprised 8.2 percent of the accessible-luxury-leather-goods market. Together, Defendants' combined brands would account for 77 percent of the market – more than double the 30 percent threshold. Smith Rep. ¶¶ 176-177, 180. Dr. Smith also pulled data from Tapestry documents that purported to separately identify and calculate shares for "accessible luxury" brands. Smith Rep. ¶ 178. Using that data, Dr. Smith calculated that post-merger, Defendants' combined brands would account for 83 percent of the accessible-luxury market. Smith Rep. ¶ 180 & tbl.6. Although the Court need not rely on these figures, these calculations further illustrate the large market share – well over 30 percent – that Defendants would hold post-merger.

### b. The HHI

Courts also look to the Herfindahl-Hirshman Index (the "HHI"), "a tool commonly used to measure changes in market concentration," to evaluate anticompetitive effects of a contemplated merger. *IQVIA*, 710 F. Supp. 3d at 377. The HHI is calculated by summing the squares of each market participant's share of the relevant market. Tr. at 523:25-524:6 (Smith); *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690, 704 (4th Cir. 2021); *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 716 n.9 (D.C. Cir. 2001). By squaring individual firms' market shares, "[t]he HHI takes into account the relative size and distribution of the firms in a market, increasing both as the number of firms in the market decreases and as the disparity in size

among those firms increases." *Wilhelmsen*, 341 F. Supp. 3d at 58-59 (citation omitted); *accord Tronox*, 332 F. Supp. 3d at 207. "Under the convention commonly used in antitrust that market shares are expressed in percentages rather than fractions (e.g., a 10 percent share is expressed by the percentage 10 rather than the fraction 0.10), the HHI ranges from close to zero for competitively structured markets up to 10,000 for a monopoly." Areeda & Hovenkamp ¶ 931d3. For example, "a market with five firms of share $A = 30$, $B = 30$, $C = 20$, $D = 10$, $E = 10$, would have an HHI of 900 + 900 + 400 + 100 + 100, or 2400." *Id.* ¶ 930a.

"In determining whether the HHI demonstrates a high market concentration, [courts] consider both the post-merger HHI number and the increase in the HHI resulting from the merger." *Penn State*, 838 F.3d at 346-47; *accord Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 786 (9th Cir. 2015); *Bertelsmann*, 646 F. Supp. 3d at 37. A plaintiff "can establish a prima facie case simply by showing a high market concentration based on HHI numbers." *Penn State*, 838 F.3d at 347; *accord Saint Alphonsus*, 778 F.3d at 785; *H & R Block*, 833 F. Supp. 2d at 71. Under the 2023 Merger Guidelines, which the Court deems persuasive on this point, markets with an HHI greater than 1,000 are considered "concentrated," markets with an HHI greater than 1,800 are considered "highly concentrated," and a change of more than 100 points is regarded as a "significant increase." 2023 Merger Guidelines §§ 2.1, 2.4 n.21. "A merger that creates or further consolidates a highly concentrated market that involves an increase in the HHI of more than 100 points is presumed to substantially lessen competition or tend to create a monopoly." *Id.* § 2.1 (footnote omitted).[35]

---

[35] Since the introduction of the HHI to the Merger Guidelines in 1982, nearly every iteration has used these same figures as the relevant thresholds, *see* 2023 Merger Guidelines § 2.1 n.15 (citing 1982, 1992, and 1997 versions), and courts have routinely cited them in assessing the effects of a merger on market concentration, *see, e.g.*, *Chi. Bridge*, 534 F.3d at 431; *H.J.*

Here, Dr. Smith calculated the post-merger HHI to be 3,646, with a merger-induced change in HHI of 1,449.  Smith Rep. ¶ 186.  As for the post-merger HHI, 3,646 is double the 1,800 threshold considered to be "highly concentrated" by the 2023 Merger Guidelines.  2023 Merger Guidelines § 2.1.  And with respect to the merger-induced change in HHI, 1,499 is obviously far greater than the 100 points presumed to substantially lessen competition under the 2023 Merger Guidelines.  *Id.* § 2.1.  In sum, these HHI levels are more than high enough to create a presumption – indeed, a strong presumption – of anticompetitive effects.

### c.  Defendants' Central Critiques

Defendants do not critique any of Dr. Smith's mathematical calculations of post-merger market share and market concentration.  Instead, Defendants claim that Dr. Smith's reliance on NPD categorizations and data as the core of his market share calculations results in several flaws that overemphasize Defendants' market share.  Defendants claim that Dr. Smith's market-share calculations are flawed because they: (1) fail to account for preowned handbag sales; (2) exclude all handbags categorized as "designer," "moderate," and "better" by NPD; (3) exclude brands that NPD does not track; and (4) utilize unreasonable estimates and projections of sales data for a significant number of brands for which he only has NPD data.  DFOF ¶¶ 150-161.  These critiques do not alter the Court's conclusion.

As a threshold matter, these critiques underscore Defendants' general view that Dr. Smith's proposed accessible-luxury-handbag market is improperly defined because it excludes certain competitors.  But "the mere fact that a firm may be termed a competitor in the overall

---

*Heinz*, 246 F.3d at 716; *Univ. Health*, 938 F.2d at 1211 n.12.  In this respect, the 2010 Horizontal Merger Guidelines were an outlier by adopting higher thresholds.  *See Staples II*, 190 F. Supp. 3d at 128 (describing the thresholds under the 2010 Horizontal Merger Guidelines); *see also* Areeda & Hovenkamp ¶ 901.1b ("The belief that the 2010 concentration levels were too tolerant seems well substantiated.").

marketplace does not necessarily require that it be included in the relevant product market for antitrust purposes." *Deutsche Telekom*, 439 F. Supp. 3d at 200 (citation omitted). And it is fundamental that "even if alternative submarkets exist . . . , or if there are broader markets that might be analyzed, the viability of such additional markets does not render the one identified by the [plaintiff] unusable." *Bertelsmann*, 646 F. Supp. 3d at 28. Dr. Smith conducted an HMT that this Court finds to be reliable. If the market defined by Dr. Smith were too narrow, the HMT would fail – that is, he would find that it would be unprofitable for a hypothetical monopolist in the market as defined to raise prices by at least five percent. *See Optronic*, 20 F.4th at 482 n.1; *AmEx I*, 838 F.3d at 199. Yet Dr. Smith's candidate market passed the HMT – by leaps and bounds. Thus, the candidate market is an appropriate market to evaluate the anticompetitive effects here (and therefore, to evaluate the post-merger market share and market concentration). Because the Court analyzes the accessible-luxury-handbag market as defined here, comparisons of the Defendants' market shares as against a broader market are irrelevant. *Cf.* DFOF ¶ 161 (explaining that Professor Scott Morton calculated market shares to be approximately 16 percent using different methodology than the methodology accepted by the Court here). Nevertheless, the Court proceeds to analyze in more detail particular criticisms raised by the Defendants regarding the exclusion and inclusion of certain handbags from the market and Dr. Smith's reliance on the NPD data.

     i.  The Resale Market

    Defendants take issue with the fact that Dr. Smith did not include pre-owned handbags in his relevant market. Numerous Tapestry and Capri witnesses testified generally that "resale platforms have been an increased source of competition" over an unspecified period of time. Tr. at 135:24-136:2 (Idol); *see also* Tr. at 235:14-236:1 (Newman: resale has "become a phenomenon" and is viewed "as competition"); Tr. at 407:18-408:1 (Harris: "the resale of

used handbags . . . compet[es] against Tapestry's handbags" and the resale market is "growing"); Tr. at 481:19-482:19 (Kahn: resale market is growing, and Coach is "absolutely" competing with the resale of "traditional European luxury that was preowned"); Tr. at 962:25-963:2 (Giberson: "the resale market . . . has been really a phenom in the last couple of years that's impacted the handbag category specifically"); Tr. at 979:24-980:7 (Giberson: "the resale channel in the handbag industry" is "formidable" and "consumers consider used or resold handbags to be potential substitutes for new handbags"); Tr. at 1138:10-12 (Gennette: "resale . . . is exploding"); Tr. at 1245:9-15 (Scott Morton: "the used market has just really taken off in recent years"). The recent growth of the resale market for handbags, according to Defendants, undermines Dr. Smith's market analysis by excluding a portion of products that compete in the relevant market, thereby exaggerating anti-competitive effects. The Court does not agree.

First, there is insufficient evidence that the resale market for handbags has increased so dramatically over the past several years to render Dr. Smith's market share calculations unreliable. Although many witnesses testified vaguely that the resale market has generally grown, Defendants failed to present reliable evidence quantifying that growth. During the hearing, Defendants' expert Professor Scott Morton presented a demonstrative with a chart that seemed to indicate that sales of preowned handbags nearly doubled from 2020 to 2023. *See* Tr. at 1245:13-1246:8 (Scott Morton); DD0028-15. In presenting this opinion during the hearing, Professor Scott Morton was missing data from a major reseller, ███████, which she testified was "nonexistent in 2020." Tr. at 1247:14-17 (Scott Morton). Yet it is unclear whether that claim is accurate. *See* Tr. at 1288:10-12 (Scott Morton). The company's website – which Professor Scott Morton and Giberson cite in their respective expert reports, *see* Scott Morton Rep. ¶ 98 n.190; Giberson Rep. ¶ 21(e) n.64 – states that the company was

founded in ███ , *see* ████████████████████████████████████████████

████████████████████ .  That company's revenues from 2022 and 2023 were higher

than any other reseller listed on Professor Scott Morton's summary.  DD0028-15.  Therefore,

the lack of 2020 data for that company could substantially impact her conclusion that there

was a jump in reseller growth from 2020 to 2023, especially because the chart reflects that

total resale revenues were essentially stable from 2021 to 2023.  Tr. at 1247:1-9 (Scott

Morton: testifying that while her opinion was that the resale market has grown since 2020, she

didn't know why sales would be stable in 2021, 2022, and 2023).  Because Professor Scott

Morton was unable to adequately explain the discrepancies in the reseller data, the Court finds

unreliable her testimony that the resale market has grown significantly from 2020 to 2023.

Regardless of the size of the resale market, however, Dr. Smith's proposed market

without preowned handbags, Tr. at 642:19-643:7, passes the HMT, and thus does not need to

be expanded to contain other potential lines of competition.  But even if the Court assumes

that preowned handbags belong in the relevant market, the data presented by Professor Scott

Morton regarding the volume of sales of preowned handbags would still not alter the Court's

conclusion.  Professor Scott Morton opined that Dr. Smith erred by "[n]ot accounting for any

preowned handbag sales," and that "[s]ales information collected from a subset of just seven

resellers of handbags shows revenues of handbags under $1,000 that exceed $400 million in

2023."  Scott Morton Rep. ¶ 209(a).[36]  Although Dr. Smith testified that he believed there was

---

[36] Defendants' industry expert Jeff Gennette, who is not an economist, also asserted that "████
████████████████████████████████"  Gennette Rep. ¶ 90.  Yet in 2023, according to ███████, approximately
███████ of its handbag sales were from "████████████████
████████████████"  and the "average resale price of a handbag on ███████ is
approximately ███████."  PX4001 ¶ 7.  Gennette further testified that he "did not do any
analysis of cross elasticity between new handbags and secondhand handbags."  Tr. at 1171:8-
10 (Gennette).  Gennette also relied on a document (PX3216) that he asserted "confirm[s] the

"no basis" to include preowned handbags in his relevant market, even if he included an

additional $400 million in sales in the denominator of his calculation of market shares, the

merging parties' market shares would still well exceed 50 percent.  Tr. at 1348:1-8 (Smith).

Defendants argue in their papers that it is immaterial that Dr. Smith's market shares are not

substantially affected by the addition of $400 million in sales of used handbags, because "a

subset of eight resellers" have annual sales of "nearly $1.2 billion."  DFOF ¶ 160 n.20.

Putting aside the fact that the majority of those $1.2 billion in sales are for handbags selling

for over $1,000, and therefore are unlikely to be appropriately within the market here, this

critique also falls flat, because Dr. Smith testified that the merging parties' market shares

would still exceed 45 percent if he added an additional $1.2 billion in sales to the

denominator – again, well in excess of the 30 percent threshold.  Tr. at 1348:9-13 (Smith);

DFOF ¶ 160 n.20.  For these reasons, Defendants' arguments regarding the resale market are

unpersuasive.

ii.    Exclusion and Inclusion of Certain Handbags

Defendants also assert that Dr. Smith's market share analysis is flawed because he

excludes sales of handbags sold by brands that NPD categorizes as "designer," "'moderate,"

and "better," even when the prices of those handbags overlap with the prices that Defendants

charge or that are charged by others in the accessible luxury market, and he excludes sales by

handbag brands that NPD does not track.  DFOF ¶¶ 158, 159.

Again, as explained above, the Court credits Dr. Smith's market definition, which

passes the HMT by a large margin.  That Defendants now point to certain handbags that could

---

importance of resale to department stores today," Tr. at 1139:14-16 (Gennette), but was
unable to answer questions about what particular data in the document represented, Tr. at
1149:1-1150:4 (Gennette).  The Court therefore does not give weight to his opinion on
specific parameters of the resale market.

possibly have been included in another relevant market, or certain handbags that they assert

should have been excluded, does not mean that Dr. Smith's market share calculations for *this*

relevant market are incorrect.  This critique also misunderstands Dr. Smith's approach to

defining the market.  Although accessible-luxury handbag brands *typically* charge prices

below $1,000 and generally not less than $100, Dr. Smith does not define the market by a

hard price range.  Smith Reply Rep. ¶ 135.  Thus, the existence of certain handbags within this

general price range that are not in the relevant market (and, on the other hand, the existence of

certain handbags outside of this general price range that are in the relevant market) does not

undermine the market shares calculated by Dr. Smith.  *Cf. Bertelsmann*, 646 F. Supp. 3d at 51

(self-published books not a competitive constraint on the market for anticipated top-selling

books even when certain self-published books were top-sellers, and therefore irrelevant for

market share calculations even if such books competed).

### iii.    Extrapolation from NPD Data

Finally, Defendants assert that Dr. Smith's market share analysis was flawed because

of his estimation approach for sales data for certain portions of his market share analysis.  Dr.

Smith had actual sales data for the merging parties and some third parties in the accessible

luxury handbag market.  Dr. Smith also used NPD's data for wholesale data for all of the

accessible luxury handbag firms.  Smith Rep. ¶ 184.  For firms in the relevant market for

which Dr. Smith did not have actual sales data, he estimated those firms' non-wholesale sales

by extrapolating from their wholesale sales as reported by NPD.  Smith Rep. ¶ 185.

Specifically, Dr. Smith supplemented NPD's wholesale data with an estimate of sales through

the non-wholesale channels, calculated based on the average percentage of sales by channel –

here, Dr. Smith found that the average ratio of wholesale sales to total sales is approximately

40 percent.  Smith Rep. ¶ 185; Tr. at 564:6-565:7 (Smith).

Defendants claim that this approach was flawed. They note that Dr. Smith lacked actual non-wholesale sales for approximately 200 companies included in his relevant market. DFOF ¶¶ 150-154. Defendants further note that for certain companies, Dr. Smith's projections of sales for certain handbag brands are incorrect as compared to actual sales data. *See* DFOF ¶ 154 (For example, "Dr. Smith estimated ████████ for Kurt Geiger, but its Chief Financial Officer testified that Kurt Geiger's U.S. handbag revenues in 2023 were ████ ████"). Defendants also point to extrapolations by Dr. Smith that resulted in obviously erroneous estimates, such as the calculation that J Crew's estimated handbag sales in 2023 were a total of $197. DFOF ¶ 153; Tr. 1390:15-19 (Smith). Defendants also point out that Dr. Smith's methodology would have underestimated the revenues of Coach (had Dr. Smith applied his estimation methodology to Coach). DFOF ¶ 157; Tr. 1383:2-9. These arguments do not undermine the overall reliability of Dr. Smith's conclusions regarding market share.

Defendants do not claim that Dr. Smith erred in finding that the average percentage of sales though wholesale channels for brands in this market is approximately 40 percent. *Cf.* Tr. at 1270:13-24 (Scott Morton: agreeing that this figure "is the average for the . . . brands he was working with"). Rather, Defendants simply point to particular examples where his estimation approach did not comport with other evidence or resulted in clearly inaccurate results for some brands. However, as Defendants' examples show, some of Dr. Smith's estimates underrepresented total sales and some overestimated total sales, which is not surprising, given that the approach is based on averages. Moreover, Dr. Smith testified that "approximately . . . 75 percent or so of the revenues that [he] used in the share calculation are actual sales data from the parties and third parties," Tr. at 564:6-13, and that "less than 10 percent" of the portion of the sales in his market calculations relied on imputed sales, *id.* at 565:2-7. Most importantly, Defendants' post-merger market shares calculated by Dr. Smith

are so significant that even if Dr. Smith underestimated the market shares held by some third

parties, the Court agrees with Dr. Smith and the FTC that the post-merger market share held

by Defendants would still be so significant as to be presumptively anticompetitive.[37]

Dr. Smith's market-share and market-concentration calculations may not be perfect.

But they need not be.  A leading antitrust treatise describes the proper approach:

> [T]he plaintiff has the burden of proving the violation.  The fact
> that share data may be incomplete, however, does not
> necessarily mean that the plaintiff has failed.  It depends on the
> apparent significance of what is unknown.  If the apparent
> market shares are barely sufficient to cross the threshold of
> presumptive illegality, then the failure to count additional sales
> by others making the market larger would be fatal to the
> plaintiff's case.  In sharp contrast, where the defendant's
> apparent aggregate share is, say, 80 percent in a concentrated
> market, the true magnitude of total sales could be doubled
> without making the merger small enough to be lawful.  If there
> is no satisfactory way to make a reasonable estimate of what has
> been left out, the defendant must prevail.  But where we know
> that what has been omitted cannot be large enough to make the
> defendant's share lawfully small, the plaintiff should prevail,
> notwithstanding uncertainty about the defendant's exact share.

Areeda & Hovenkamp ¶ 929d.  Here, particularly in light of the high market-share and HHI

figures, the Court is convinced that the FTC "should prevail, notwithstanding uncertainty

about the [D]efendant[s'] exact share."  *Id.*

---

[37] Defendants also argue that NPD does not report actual wholesale data, but "instead [reports]
a mashup of sales data and projections."  DFOF ¶ 151.  Defendants point to a portion of the
NPD user guide, which states that NPD "projects the data it receives from its retail/data
partners to a larger universe that includes stores that are not included in the panel," and that
"projections may not accurately represent market trends within non-panel retailers/data
partners."  *Id.* (quotation marks omitted) (quoting PX3001 at 4).  Defendants therefore assert
that Dr. Smith's reliance on the NPD data renders his analysis unreliable.  There was no
testimony regarding these provisions of the NPD User Guide and, on its face, the guide's
reference to projections and trends for other *non-panel retailers* does not establish that the
NPD does not receive actual sales data from *its panel retailers*.  Tapestry and third-party
accessible-luxury-handbag sellers regularly rely on NPD data in the ordinary course, *see
supra* at pp. 75-76, and it was appropriate for Dr. Smith to do so here.

### d. Final Analysis

As explained, a plaintiff that has properly defined a relevant market can establish a prima facie case under Section 7 by showing a sufficiently high post-merger market share or sufficiently large post-merger HHI numbers. *See, e.g.*, *Phila. Nat'l Bank*, 374 U.S. at 363 (market share); *Penn State*, 838 F.3d at 347 (HHI); *Saint Alphonsus*, 778 F.3d at 785-86 (HHI); *Waste Mgmt.*, 743 F.2d at 981 (market share); *IQVIA*, 710 F. Supp. 3d at 377-82 (both); *Bertelsmann*, 646 F. Supp. 3d at 35-38 (both).  Because the FTC has shown both a sufficiently (and significantly) high post-merger market share (59 percent) and a sufficiently (and significantly) large post-merger HHI of 3,646 with a merger-induced change in HHI of 1,449, the Court finds that the FTC has established a strong prima facie case under Section 7.[38]

## II.  Rebuttal

At Step 2 of the Section 7 analysis, "the burden shifts to the defendant to present evidence that the *prima facie* case inaccurately predicts the relevant transaction's probable effect on future competition, or to sufficiently discredit the evidence underlying the *prima facie* case."  *AT&T*, 916 F.3d at 1032 (quotation marks and citation omitted).  "The more compelling the prima facie case, the more evidence the defendant must present to rebut it successfully."  *Baker Hughes*, 908 F.2d at 991; *accord Deutsche Telekom*, 439 F. Supp. 3d at 207.  A defendant's rebuttal case may address matters such as "the ease of entry into the market, the trend of the market either toward or away from concentration, the continuation of

---

[38] The Court recognizes that Section 7 plaintiffs, including the FTC here, often "present other evidence as part of the prima facie case."  *Saint Alphonsus*, 778 F.3d at 786; *accord Illumina, Inc. v. FTC*, 88 F.4th 1036, 1057 (5th Cir. 2023).  For the sake of organizational clarity, the Court will consider the FTC's evidence of additional anticompetitive effects after reviewing Defendants' rebuttal case.

active price competition, or unique economic circumstances that undermine the predictive value of the government's statistics." *Aetna*, 240 F. Supp. 3d at 19 (quotation marks omitted).

In addition to the previously discussed arguments attacking the evidence underlying the FTC's prima facie case, Defendants seek to rebut the prima facie case on three principal grounds: (1) barriers to market entry and expansion are low; (2) Tapestry's emphasis on brand autonomy will ensure continued competition between Coach, Kate Spade, and Michael Kors; and (3) the merger has a procompetitive rationale of revitalizing the Michael Kors brand. Opp. at 33-38; DCOL ¶¶ 64-76. Defendants also argued throughout the preliminary injunction hearing that consumers, not handbag sellers, set prices of handbags, which the Court views as an additional rebuttal argument. The Court addresses these arguments in turn.

### A.  Entry and Expansion

According to Defendants, the FTC's "market share statistics overstate the transaction's potential competitive effects because competitors can (and already do) quickly enter, expand, and reposition." Opp. at 34. The Court is not persuaded. Based on the evidence presented, the Court finds that potential entry, expansion, and repositioning would not constrain the post-merger handbag powerhouse.

Because "the ability of consumers to switch to a substitute restrains a firm's ability to raise prices above the competitive level," *City of New York v. Grp. Health Inc.*, 649 F.3d 151, 155 (2d Cir. 2011) (citation omitted), "[b]arriers to entry are important in evaluating whether market concentration statistics accurately reflect the pre- and likely postmerger competitive picture," *H.J. Heinz*, 246 F.3d at 717 n.13.  "If entry barriers are substantial, a market participant may be able to achieve or maintain market or monopoly power and use that power anticompetitively because its actions can go unchecked by new competitors." *Reazin v. Blue Cross & Blue Shield of Kan., Inc.*, 899 F.2d 951, 974 (10th Cir. 1990).  Conversely, "[i]f

108

barriers in an industry are low, new entrants into the industry will appear when [a firm] raises its prices" above a competitive level. *Chi. Bridge*, 534 F.3d at 436 (citation omitted). Based on these principles, "[a]s part of its rebuttal case, a defendant may introduce evidence that entry by new competitors will ameliorate the feared anticompetitive effects of a merger." *Aetna*, 240 F. Supp. 3d at 52. For example, in *Waste Management*, a case relied upon by the Defendants here, the defendant rebutted the plaintiff's prima facie case by showing that competitors could easily enter the market for hauling solid waste in Dallas; this ease of entry constrained the defendant from raising its prices above a competitive level after the merger. *See* 743 F.2d at 981-84.

Pointing to *Waste Management*, Defendants reject the proposition that "entry must be of the size and scale to replace Michael Kors'[s] footprint today." Opp. at 34 (emphasis omitted). Defendants contend that the proper question is "whether remaining and potential competitors have the *collective ability* to constrain" Tapestry after the merger. *Id.* (quotation marks and omitted). Defendants also argue that entry into the handbag market "is constant and relatively easy" and that, therefore, "there is an adequate competitive constraint on the merged entity." *Id.* at 34-35; *see also* DCOL ¶¶ 66-72. In essence, Defendants argue that even if the market cannot replace Michael Kors, it can recreate Michael Kors in the aggregate. The FTC concedes that a "collection of companies can constrain defendants" after a merger but argues that it will not happen here. Tr. at 1444:10-11 (FTC closing).

The Court agrees with the parties that the main question in this case is whether existing and potential handbag companies have the collective ability to constrain the post-merger Tapestry, as opposed to whether a new Michael Kors-sized brand will soon emerge. But the Court disagrees with Defendants' argument that existing and potential competitors will constrain the post-merger Tapestry's market power to such an extent as to undermine the

presumption of anticompetitive effects established by the FTC's prima facie case. "Entry of competitors into a market [or expansion of existing competitors] can offset anticompetitive effects . . . only if the entrance [or expansion] is timely, likely, and sufficient in its magnitude, character, and scope to deter or counteract the competitive effects of concern." *Sanford*, 926 F.3d at 965 (quotation marks omitted). The Court finds that entry and expansion into the market for affordable-luxury handbags will not be timely, likely, and sufficient in its magnitude, character, and scope to constrain Tapestry.

*Waste Management*, a case centrally relied upon by Defendants, is distinguishable. *Waste Management*'s holding rested on the factual finding that "entry into the product market [wa]s easy – indeed, individuals operating out of their homes c[ould] compete successfully with any other company." 743 F.2d at 978 (quotation marks omitted); *see id.* at 982 ("A person wanting to start in the trash collection business can acquire a truck, a few containers, drive the truck himself, and operate out of his home. A great deal depends on the individual's personal initiative, and whether he has the desire and energy to perform a high quality of service. If he measures up well by these standards, he can compete successfully with any other company for a portion of the trade, even though a small portion."). In the handbag industry, however, the Court finds that the barriers to entry are relatively high such that potential entrants and expanders will not adequately "fill the competitive void that will result" if Tapestry and Capri combine. *H & R Block*, 833 F. Supp. 2d at 73 (citation omitted).

There are two especially significant types of barriers that the Court addresses in turn: (1) barriers related to supply chain; and (2) barriers related to data and marketing. The Court also considers the cited examples of recent entrants and expanders.

### 1. Supply Chain

One barrier to entry and expansion into the market for accessible-luxury handbags is establishing and maintaining an effective supply chain. As described above, accessible-luxury brands' supply chains cross borders and span oceans, with most of their handbags manufactured in Southeast Asia only to be sold elsewhere (including, as relevant here, the United States). Given these complexities, large brands like those owned by Tapestry have entire teams dedicated to managing their handbag supply chains. *See* Tr. at 1027:24-1028:3 (Charles); *see also, e.g.*, PX8170 at 123:01-123:16 ██████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ██████████████████; DX0925 at 108:04-108:13 ████████████████████ █████████.

Making a handbag – let alone a thousand handbags, or a million handbags – is easier said than done, especially for smaller brands. For example, factories usually have minimum-order requirements that, although easier for large brands to meet, can pose a serious obstacle to smaller brands looking to break into the market. Founders and leaders of nascent brands testified that, even after a decade or more in business, they struggle to meet these thresholds. *See, e.g.*, PX8168 at 47:04-47:09, 112:02-112:13 ████████████████████████ ████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████ █████████████████████████████████; DX0933 at 36:10-36:20, 87:25-88:10, 89:16-90:02 ██████████████████████████████████████ ████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████

████████. Also, smaller brands often must pay manufacturers more per handbag than large brands do, in part because factories enjoy economies of scale when fulfilling larger orders. *See* DX0950 at 137:18-138:9 ████████████████████████████

███████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████

████████████████████████. These obstacles can stymie brands seeking to enter and expand.

Defendants take a different view, arguing that it is "easy to turn a handbag design into a physical product," that "[l]arge amounts of capacity exist among experienced manufacturers," and that "[t]hird-party logistics companies make it easy for companies to quickly enter and expand." DFOF ¶¶ 29-31. The Court is not persuaded.

To start, the Court regards much of the testimony cited by Defendants on this point to be unreliable, insofar as it was far afield of witnesses' knowledge and experience. For example, Defendants repeatedly cite Giberson's statements about handbag manufacturing and supply chains. *See, e.g.*, DFOF ¶¶ 29-31, 58, 99-101. But Giberson is not qualified as an expert in manufacturing or supply-chain management. *See* Tr. at 959:10-15 (Court: Giberson is "an industry expert in the field of handbags"). And although "the basis that underlies each of [her] opinions" is her "experience," Tr. at 960:19-24 (Giberson), she has no experience overseeing any portion of any brand's supply chain, let alone the supply chain for an up-and-coming handbag brand, *see* Giberson Rep. at A-1 to A-3 (listing her employment and

112

consulting history).  To be sure, Giberson is "a partner at a sourcing company called Edit

Consulting, [which] help[s] match people that want to make bags or leather goods with

factories, particularly factories in India."  Tr. at 958:5-11 (Giberson).  And she has "been in

hundreds of factories [that make handbags] all over the world."  *Id.* at 958:12-14 (Giberson).

But in both her expert report and her testimony, Giberson left ambiguous the nature and extent

of her work for Edit Consulting, which makes it difficult for the Court to rely on her opinions

based on that work.  Likewise, visits to unnamed factories in an unspecified capacity provide

a shallow well of probative experience on which to draw.  Therefore, the Court gives very

little weight to Giberson's testimony about manufacturing and supply chains.  *See Pope*, 687

F.3d at 581 ("A factfinder may certainly consider the bases for an expert's opinion and may

accord the opinion less, or even no, weight if the record suggests that the bases are defective,

incomplete, or questionable."); *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of

Am. Secs., LLC*, 691 F. Supp. 2d 448, 476 (S.D.N.Y. 2010) (vague, general, and conclusory

references to "experience" do not provide a reliable basis for expert testimony); *305 E. 24th

Owners Corp. v. Parman Co.*, 799 F. Supp. 353, 356 (S.D.N.Y. 1992) (not crediting expert

witness's opinion that was not "one his relevant experience could allow him to draw").

      The Court also affords little weight to much of the testimony by 

, whose views Defendants cite for the

proposition that "[t]hird-party logistics companies make it easy for companies to quickly enter

and expand."  DFOF ¶ 31 (citing, among other things, DX0927 at 152:6-24).

DX0927 at 126:04-129:13, 143:19-144:12



*Id.* at 125:09-125:17

Therefore, the Court is unsure on what basis, if any, ███ can opine on the ability of upcoming brands to enter and expand through third-party logistics companies. Even if the Court credits ███ statements about third-party logistics companies, ███ other testimony contradicts Defendants' narrative of easy entry. As ███ explained,

*Id.* at 152:25-153:20.

Defendants' most extensive evidence on supply chains came through testimony by Peter Charles, Tapestry's chief supply-chain officer. Charles testified as a fact witness, but he has 36 years of experience in supply-chain management at established brands, having worked not only at Tapestry but also at Tory Burch, Kenneth Cole, Jones Apparel Group, Stride Rite, Timberland, and Clarks Shoes. Tr. at 1009:14-1011:20 (Charles). Although the Court found Charles credible in describing some aspects of Tapestry's supply chain, the Court gives little weight to his testimony on matters as to which he has little to no relevant experience, such as barriers to entry for *nascent* handbag brands. *See JTH Tax*, 62 F.4th at 671 (when serving as factfinder, a district court is "entitled, just as a jury would be, to believe some parts and disbelieve other parts of the testimony of any given witness" (citation omitted)).

Charles testified that "in [his] experience, the barriers to entering this industry are very low. . . . [W]hat you really need to get into the business really is a sketch, a brand, and a design idea, and a business plan, and increasingly, you then connect into one of those

manufacturers in Asia."  Tr. at 1020:14-20; *see also id.* at 1025:3-12 (Charles: "the barriers to entry in this industry for someone who wants to start a new handbag brand and bring it to market from a supply chain product development standpoint" are "extremely low").  He likewise relied solely on his "experience" in stating that it is "[n]ot very difficult" for a new designer to connect with a manufacturer and produce a prototype; that manufacturers "can provide product development" and "material sourcing capabilities" to new entrants; that "most of the owners of these factories" have an interest in "see[ing] new entrants coming in because it keeps the industry vibrant, it keeps it competitive, it keeps it interesting"; that "manufacturers like taking bets on new entrants"; and that "many of these owners of these factories . . . will invest their time, energy, and money in supporting new designers getting into the business."  *Id.* at 1020:14-1022:20.

Charles, however, has no experience working for upstart handbag brands; he has worked only for established handbag brands and/or brands with little to no involvement in the handbag industry.  *See id.* at 1009:14-1011:20.  Charles also does not assess entry conditions in the U.S. handbag market in the course of his work at Tapestry.  *Id.* at 1033:9-12 (Charles). And although Charles has plenty of experience transacting *with* third-party manufacturers from the big-name brand's side of the table, he has no experience making business decisions *for* those manufacturers.  Nor does Charles provide any other basis for these claims.  The Court therefore gives little weight to Charles's generalizations about ease of entry and manufacturers' perceptions of new brands because he lacks the required relevant experience. The Court gives greater credence to the testimony it heard from recent industry entrants about the genuine and continuing difficulties they face in sourcing, manufacturing, and distributing their products.

Several other parts of Charles's testimony undermine, rather than support, Defendants' claim that there are no supply chain-related barriers to entry.  For example, although Charles stated that Tapestry does not have "exclusive arrangements" or "long-term contracts" with its manufacturers and instead "work[s] on a basis of purchase order to purchase order" with "about 18 individual companies," he also testified that Tapestry has "many, many strategic, long-term strategic relationships with [its] factories that go back in some cases over 30 years," and that "the genesis of [these relationships] come[s] out of the Coach brand."  *Id.* at 1022:4-14, 1023:23-1024:1.  Of course, a new entrant or a peripheral industry player looking to grow would lack these long-term relationships that Charles regards as so important.

The Court finds it significant that Charles emphasized, at multiple points during his testimony, the "skill sets" of people in Tapestry's "supply chain organization."  Tr. at 1030:22-1031:2.  Charles testified that Tapestry "work[s] hand-in-hand with [its third-party] manufacturing partners to produce the product": "we manage the quality, we manage the delivery, [and] we manage . . . the cost."  *Id.* at 1027:19-1028:3; *accord id.* at 1037:14-16 (Charles: "We don't have a vertically integrated supply chain, but we . . . manage all tiers of the supply chain at Tapestry.").  A key part of this, Charles explained, is that Tapestry "ha[s] a system of repeatable standard operating procedures . . . and standards that we apply into our products [and] into those third-party manufacturers."  *Id.* at 1026:8-13; *see also id.* at 1027:2-7 (Charles: "[W]e apply very rigorous quality standards and repeatable standard operating procedures into our manufacturing product from development through engineering through raw material management into production to create that final product that we believe meets the aspirations of our consumers."); *accord id.* at 464:15-465:19 (Kahn: "I generally believe that our facilities that we've worked and trained for more than a dozen years in some cases provide a beautiful crafted product at scale"; "The quality of trained operators matters in

handbag manufacturing," and the manufacturers that make Coach's more complicated bags "cannot be easily replaced"). If Charles is right about the importance of significant and longstanding internal supply-chain procedures in maintaining product quality (and the Court credits his testimony on this point), then the lack of such procedures, and of a history of manufacturing more generally, will be a significant barrier to entry and expansion.

Defendants also cite Charles's testimony for the proposition that "[l]arge amounts of capacity exist among experienced manufacturers" for new handbag brands to use. DFOF ¶ 30. It is true that "[t]he use of existing or idle facilities can facilitate entry into a market." *FTC v. CCC Holdings Inc.*, 605 F. Supp. 2d 26, 51 (D.D.C. 2009) (quotation marks omitted). But "economic realities may prevent a new entrant" from using these facilities. *Id.* Here, the evidence regarding existing facilities cannot bear the weight that Defendants assign it.

Charles testified that "there's an excess amount of capacity sitting in the marketplace today." Tr. at 1022:25-1023:2. To justify this claim, Charles stated that although manufacturers have "offer[ed]" Tapestry up to 75 million units of capacity, Tapestry only "manufacture[s] around 45 million units of handbags a year," meaning that "there's a 30 million unit delta between what [Tapestry] actually use[s] and what [third-party manufacturers are] offering in terms of capacity." *Id.* at 1023:2-3, 1024:15-21; *see also id.* at 1023:2-8 (Charles).

Citing only this testimony (as well as three other pieces of evidence that do not discuss excess capacity), Defendants assert that "third-party contractors . . . collectively have millions of units of excess capacity available for use by other handbag brands, regardless of size or experience." PFOF ¶ 30. Defendants' implication is that excess manufacturing capacity is sitting there untapped, just waiting for anyone with a dream of making a handbag. This suggestion is unsupported. Charles initially stated that Tapestry is offered much more

production capacity than it currently uses. Tr. at 1022:8-10, 1024:18-21. When asked to clarify, Charles acknowledged that Tapestry's use of less than the total offer of 75 million units does not mean that the "30 million is not being used by another company." *Id.* at 1024:22-1025:1. He also admitted that although the factories are "offering [this manufacturing capacity] to us if we needed it," these factories might then turn around and "sell that . . . capacity to other brands." *Id.* at 1024:22-1025:1. But a factory's offer to Tapestry, a multibillion-dollar handbag brand that has "many, many strategic, long-term strategic relationships with [its] factories that go back in some cases over 30 years," *id.* at 1022:8-10 (Charles), is likely different than its offer to an up-and-coming brand.

The Court's primary takeaway from this portion of Charles's testimony is that third-party manufacturers offer better terms to bigger brands than smaller brands – which, as noted, is a barrier to entry and expansion. *Accord* PX8168 at 112:02-112:13 ███████████████████████████████████████████████████████████████; DX0950 at 137:13-138:9 ███████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████. It requires a substantially further inferential leap – one that the Court declines to take – to conclude, based solely on this testimony by Charles, that a meaningful amount of capacity is simply going unused and will be made available to all comers regardless of their size, resources, or track record. Indeed, the prevalence of minimum-order requirements, which multiple witnesses described as a production challenge for nascent brands, suggests that manufacturers are not starved for customers (insofar as they

are able to turn away smaller and, accordingly, less desirable offers). *See, e.g.*, PX8168 at 47:04-47:09 ██████████; DX0933 at 89:16-90:02 ████████.[39]

In short, the Court finds that the difficulties in establishing and maintaining a supply chain constitute a barrier to entry into the market for accessible-luxury handbags. Even though this barrier may not forestall entry entirely, it will likely limit brands' ability to enter and/or expand in a manner that is "timely, likely, and sufficient in its magnitude, character, and scope" to restrain the post-merger Tapestry. *Sanford*, 926 F.3d at 965 (citation omitted).

## 2. Data and Marketing

"Control of essential or superior resources is a recognized barrier to entry." *Chi. Bridge*, 534 F.3d at 439 (quotation marks omitted). The post-merger Tapestry will have two types of superior resources that potential entrants and expanders will lack: large troves of consumer data and nine-figure marketing budgets. As explained by Defendants' economist, Professor Scott Morton, "establish[ing] a brand . . . is expensive. That involves marketing, understanding your consumer, research, all of the elements that go into produc[ing] a popular brand." Tr. at 1227:17-22. The Court finds that the time, effort, and expenses required for new and emerging brands to obtain essential consumer data and deploy effective marketing will deter and delay entry and expansion.

---

[39] In a portion of his testimony that Defendants do not cite, Charles states that, based on "market research" and "terrific market intelligence" provided by "significant teams on the ground," he knows that "there are other manufacturers that have capacity for growing brands." Tr. at 1024:2-12. Even if Defendants had cited this testimony, it would not change the Court's conclusion. Such vague references to "market research" and "market intel" – without providing any specifics or details as to the substance of that research, let alone presenting evidence of that research to the Court – deprive this testimony of persuasive value. The same goes for other allusions by Defendants' executives to potentially probative evidence that Defendants have not placed into the record. *See, e.g.*, *id.* at 322:18-20 (Crevoiserat).

First, Tapestry possesses a wealth of consumer data that up-and-coming firms will lack. The pre-merger Tapestry already has "a lot of data," Tr. at 307:4-5 (Crevoiserat), including at least 180 million "uniquely identified customer 360 profiles," PX1301 at 11 (August 2022 M&A strategy presentation to Tapestry board). Tapestry's main vehicle for collecting and analyzing this information is its Global Strategy and Consumer Insights Group, which has an annual budget of ████████████, PX5074 at 16:15-19 (Harris), and which oversees consumer research, brand-strategy planning, and long-range planning for each of Tapestry's brands and for Tapestry overall, Tr. at 359:12-24, 360:10-16 (Harris); (PX5027 at 13:12-17 (Harris). For its part, Capri's database has information on roughly 90 million consumers, of which 70 million are Michael Kors consumers. Tr. at 124:6-11 (Idol). Presumably, at least some of the customers in the Tapestry and Capri data collections overlap (although some information gathered may be complementary rather than duplicative). Even so, the combination of Tapestry and Capri will endow the post-merger Tapestry with a strong data-based advantage over existing and potential market participants. As Tapestry stated in a document that it prepared in connection with a bond offering to finance the merger with Capri: "Our greatest differentiator compared to competition is our data driven platform[.]" PX1485 at 9; *see also* PX1301 at 11 ("[O]nly ~14% of organizations can make customer profiles; peer databases are ~11x smaller vs. [Tapestry].").

There is no reason to believe that this data will remain siloed if Tapestry and Capri combine. Although each Tapestry brand has its "own discrete database," Tr. at 826:13-17 (Fraser), Tapestry gathers information and shares it across brands, *see, e.g.*, Tr. at 307:4-5 (Crevoiserat: "[Tapestry's] consumer insights can be leveraged across all of our brands in different ways."); PX1465 at 1 (October 2022 email from Tapestry employee to employees at Tapestry, Coach, Kate Spade, and Stuart Weitzman attaching "Brand Tracker" slide deck

providing in-depth overview of brand perceptions, customers' demographic data, and other information).  Indeed, one of the main reasons that Defendants give in arguing that Tapestry would revitalize the Michael Kors brand is that Tapestry's "investment in brand-supporting infrastructure and consumer-facing technology, data, and analytics . . . would position Michael Kors to succeed in its brand transformation."  DFOF ¶ 72.  Therefore, on Defendants' own account, Tapestry will share its entire wealth of data with Michael Kors (and, presumably, vice versa).

This data is important: brands use it to make decisions about design, pricing, marketing, and other important aspects of the business.  *See, e.g.*, PX1301 at 11 (August 2022 M&A strategy presentation to Tapestry board: "Our parenting advantages inform where we can add value to an asset"; once such advantage is "[c]onsumer engagement & analytics," which gives Tapestry the "[a]bility to leverage existing customer relationships and data to drive brand sales"); PX1465 at 5 (October 2022 slide deck: brand tracker's "[o]bjectives" include "[t]rack[ing] shifts in consumer preferences, behaviors[,] and mindset[s] . . . to develop actionable insights for brand strategy & functions" and "[t]rack[ing] brand perceptions of Coach, Kate Spade vs key players in the market to monitor brand health and identify opportunities for growth and market share gains"); Tr. at 124:12-14 (Idol: Michael Kors's customer data is "pretty vital to the Michael Kors business"); *id.* at 888:3-16 (Fraser: Kate Spade has "a vast trove of information of styles that we've sold in the past" and uses this "historical data" to make pricing decisions).  There no reason to believe that data about consumers, pricing, and other topics will shrink in importance in the years to come.  On the contrary, Crevoiserat – in extolling the "different ways" in which Tapestry's "consumer insights can be leveraged across all of our brands" – noted that "there's been tremendous innovation in the space of data and digital over the last few years alone."  *Id.* at 307:4-8.

Tapestry's strength in this area will be difficult for new and expanding brands to approach, let alone match. That is because the sources of this strength – including (1) a history of selling a large volume of handbags, which has enabled Tapestry (and Capri) to assemble consumer profiles, and (2) ample money to spend researching consumer trends, which will permit Tapestry to remain ██████ of the curve going forward – are not easily accessible to other firms, especially those starting from scratch.

Second, Tapestry has the capacity and demonstrated willingness to spend significant sums every year promoting its brands. The large amount that Tapestry spends on marketing reflects the fact that, as Fraser admitted, it is "very expensive to bring someone in as a customer." Tr. at 825:1-8. Tapestry spends ████████ of its revenue on marketing. PX1485 at 9. Kate Spade's annual marketing budget alone is ████████. PX5075 at 13:14-20, 15:6-14 (Fraser). Similarly, during fiscal year 2025, Michael Kors will spend ████ ████████ on marketing in the United States. PX2561 at 16. As the FTC notes, "[t]hese figures far eclipse the annual marketing spend of smaller brands." PFOF ¶ 240; *see, e.g.*, DX0925 at 30:24-32:11 ████████████████████████████ ████ ; DX0926 at 95:12-13, 96:2-4 ████████████████████████ ████████████████ ; DX0927 at 127:2-5 ████████████████████ ████████████████ ; DX0933 at 85:8-14, 87:21-24 ██████████████████ ████████████ ; DX0950 at 136:18-22 ██████████ ████████████████████████ . "In fact, Defendants' marketing budgets dwarf the entire handbag *revenue* of nearly each of the competitors addressed in Professor Scott Morton's report." PFOF ¶ 241. And, perhaps unsurprisingly, marketing is important in the handbag industry. Wilmotte testified that "spend[ing] money in promoting the brand and creating excitement" – including through print advertising, digital advertising, billboards, events, and

partnerships with influencers – is "the key thing in order to drive brand heat." Tr. at 768:4-14.

This is not only true for big brands: ███████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████ DX0950 at 43:7-22; *see id.* at 105:18-106:12

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████. Plainly, brands seeking

to compete with (and thereby constrain) Tapestry will struggle to consistently and effectively

"drive brand heat" with marketing budgets that are orders of magnitude smaller than the post-

merger accessible-luxury behemoth.

It is true, as Defendants note, that bags sometimes go viral without requiring a

multimillion-dollar marketing campaign. For instance, some small brands have been fortunate

enough to have people like Madonna, Beyoncé, Taylor Swift, and Princess Catherine carry

their handbags without being paid (or at least, so it appears). DFOF ¶ 28 & n.1; *cf.* PFOF

¶¶ 247-250. But counting on some of the world's biggest music stars or the Princess of Wales

to fortuitously carry one's handbag in public for free is not a dependable growth strategy, and

it certainly is not an indication that marketing is a low barrier to entry. On the contrary, hiring

an influencer or celebrity to promote a product is not cheap, with the cost of a single

endorsement ranging from ███████████████████████████████████████

███████████; apart from the rare exceptions noted above, the system is ███████████

PX8168 at 35:12-22, 36:3-21, 37:2-20, 38:6-20 ███████████.

In sum, the Court finds that gulfs in access to data and marketing will present a

significant barrier to other brands seeking to compete with the post-merger Tapestry.

### 3. Defendants' Examples and Final Analysis

Defendants assert that "[e]xamples of entry and expansion abound," highlighting five handbag brands. Opp. at 35. To be sure, evidence of "[a]ctual entry [or expansion] may . . . be used to rebut a statistical case of purported market power." *United States v. United Tote, Inc.*, 768 F. Supp. 1064, 1080 (D. Del. 1991). The Court does not doubt that there is some degree of entry and expansion of brands in the accessible-luxury-handbag market. However, the record does not demonstrate that, following a Tapestry-Capri merger, there would be likely entry or expansion in the accessible-luxury-handbag market sufficient to deter the anticompetitive effects of the merger and overcome the FTC's strong prima facie case.

Defendants highlight five brands as examples of the ample entry and expansion opportunities in this market, none of which convince the Court that a sufficient magnitude of entry or expansion is likely to occur following the merger. ▮▮▮▮▮▮ was founded more than ten years ago and still has not turned a profit. ▮▮▮▮ at 8:6-8, 32:12-15. ▮▮▮▮▮ started selling handbags more than ten years ago, and its handbag revenues declined from its peak in 2022 to less than ▮▮▮▮▮▮ in 2023. ▮▮▮▮ at 86:7-86:16; Smith Reply Rep. ¶ 62 tbl.1. ▮▮▮▮▮▮ started selling handbags 25 to 30 years ago and has recently "decreased resourcing" towards its handbag business. ▮▮▮ at 72:16-19, 157:12-21, 224:2-19 ▮▮▮▮▮. ▮▮▮▮▮ generated approximately ▮▮▮▮▮▮ in revenue for the sale all of its bags in the United States, but notably, more than ▮▮▮▮▮▮ of that revenue was generated by its ▮▮▮▮, for which sales are now declining due to market saturation. Smith Reply Rep. ¶ 213.[40] ▮▮▮▮▮▮, which was founded more than 60 years ago, relies on

---

[40] The Court is also doubtful that the ▮▮▮▮▮▮▮▮ could be properly considered as within the relevant market here. *See* ▮▮▮▮ at 28:15-17 (▮▮▮▮▮: "[T]he bag we've sold the most is the ▮▮▮▮▮▮▮▮, which ▮▮▮▮▮ does not consider as a handbag.").

private equity for financing, recently took out new debt to support its business in the United States, and its revenues are only ████ . ████ at 11:4-20, 15:21-24, 16:15-22, 18:19-23, 33:24-35:2 ████ ; Smith Reply Rep. ¶ 62 tbl.1.  The Court thus acknowledges that there have been firms that have entered or expanded in the accessible-luxury-handbag market. However, none of these firms have entered or expanded so successfully or with such magnitude, either on their own or in the collective, for the Court to find that *sufficient* entry and expansion is likely post-merger.

Supporting this conclusion, the Court also recognizes that brands have been exiting and declining in this market.  Indeed, numerous brands have exited the accessible-luxury-handbag market or remain in the market yet are not profitable.  *Cf. Anthem, Inc.*, 236 F. Supp. 3d at 222 ("To be likely, entry must be profitable, accounting for the assets, capabilities, and capital needed and the risks involved, including the need for the entrant to incur costs that would not be recovered if the entrant later exits." (quotation marks omitted)).  For example, ████ was founded in the mid-2000s but has still not been profitable.  Smith Rep. ¶ 275; ████ ¶ 5; ████ . ████ recently filed for bankruptcy, citing unpaid debt to suppliers and logistical issues, Smith Rep. ¶ 281, as did ████ , citing sales performance and lack of sufficient foot traffic to its locations, Smith Rep. ¶ 283.  And even ████ , highlighted by Defendants as a successful example, previously attempted to launch in the United States – but its stores were not profitable and all of its locations closed around ████ . ████ at 15:21-24, 16:15-22.  Altogether, Defendants have not convinced the Court that significant entry or expansion is likely.

More importantly, though, even if such entry or expansion was likely, it would likely be insufficient in magnitude to deter the merger's probable anticompetitive effects. Regardless of whether the potential market entrants are an aggregate of small companies or a

single large competitor, Dr. Smith's modification to his merger simulation assessed this possibility. In a modification of his merger simulation, Dr. Smith assumed that following the merger, a new accessible-luxury-handbag competitor entered the market that was the size of Tory Burch ███████████████████████████████████████ Smith Rep. ¶ 271; *see id.* at ¶ 180 tbl.6. This merger simulation assumes that this large new entrant takes market share from its close substitutes, including "from the merging parties," and also from the "new demand that's built by a new brand coming into the market." Tr. at 1344:5-14 (Smith). Even with these assumptions, the merger-simulation model indicated that the merger would still result in significant merger effects. Smith Rep. ¶ 271; tbl.12. Indeed, the introduction of a very large competitor (or 100 aggregate small competitors) into the merger simulation "*barely makes a dent* in the likely competitive effects." Tr. at 1343:22-1344:3 (Smith) (emphasis added). Dr. Smith testified that "even an entry that significant would only reduce the net upward pricing pressure, net of that [significant] entry, by about 2%." Tr. at 576:14-20 (Smith). That is, rather than post-merger upward pricing pressure of 17 percent, it would be 15 percent, which still is a significant pressure on the merged firm to increase prices. *Id.*

For these reasons, the Court finds that the barriers to entry into the market for accessible-luxury handbags are such that "the threat of actual or potential entry by new firms would not pose a significant constraint on unjustified price increases in the market" following a Tapestry-Capri merger. *United Tote*, 768 F. Supp. at 1079.

### B. Brand Autonomy and Internal Competition

Next, Defendants argue that "Tapestry's emphasis on brand autonomy will ensure [that] competition among Coach, Kate Spade, and Michael Kors continues." Opp. at 36 (emphasis and further capitalization omitted). According to Defendants, "Tapestry has no

incentive or plans to merge the brands, share pricing information between the brands, or to otherwise limit innovation.  Consistent with past practice, Tapestry plans to maintain the brands' separate identities and structures, ensuring they continue to compete against one another and the hundreds of other brands in the industry." *Id.*; *see also* DCOL ¶ 186.  The Court rejects this argument on the facts and the law.

Starting with the facts, testimonial and documentary evidence show that Tapestry's brands are currently not as separate as Defendants suggest.  To be sure, at the hearing, several witnesses testified to areas in which Tapestry's individual brands enjoy autonomy.  For instance, according to Crevoiserat, Coach and Kate Spade make "key strategic decisions" without Tapestry having any "role in that process," including on matters such as product offerings, prices, discounts, and marketing strategies.  Tr. at 304:5-17, 318:2-6; *see also id.* at 305:21-306:6 (Crevoiserat asserting that the same will be true at Michael Kors, Versace, and Jimmy Choo if the merger is consummated); *accord id.* at 1012:19-1014:19 (Charles: "[O]ur merchandising and design functions . . . sit very much inside each of our three brands – Coach, Kate Spade, and St[u]art Weitzman. . . .  [E]verything from a product development point of view is customized into each of the brands.").  Similarly, Kahn testified that Coach makes its own decisions about products, pricing, discounting, and marketing, and that "Tapestry doesn't play a role" in any of these decisions.  Tr. at 473:4-16, 500:3-21.  Kahn also testified that Coach does not coordinate its pricing with Kate Spade and that, in fact, Kate Spade's pricing is "wholly irrelevant" to him and that he is "not really interested in . . . how they go to market and what price points they set": "we are charging our own path."  Tr. at 500:25-501:12.  Levine, president of Coach North America, likewise stated that Coach and Kate Spade do not coordinate promotions "at all," and that the two brands "operate as separate entities.  We don't communicate like that."  *Id.* at 809:15-20.  On the Kate Spade side, Fraser

testified that Kate Spade determines its own product categories, handbag designs, MSRPs, discounts, promotions, and marketing, and that Tapestry does not "play any role at all" in any of this.  Tr. at 887:16-888:2, 896:1-897:17; *see also id.* at 919:10-16 (Steinmann: when Macy's buys bags from Coach and Kate Spade at wholesale, Macy's negotiates with separate teams from Coach and Kate Spade: "Tapestry does not negotiate as a whole with Macy's"); DX0932 at 119:20-120:16 ███████████████.

Even if this testimony were unimpeachable (and, as the Court will explain, it is not), Tapestry executives concede that some important aspects of Coach's and Kate Spade's operations are centrally planned or otherwise coordinated across brands.  For example, margin targets for Tapestry's brands are set in relation to Tapestry's overall earnings goals.  *See, e.g.*, Tr. at 272:14-20 (Crevoiserat).  As discussed above, Tapestry's Global Strategy and Consumer Insights Group oversees consumer research, brand-strategy planning, and long-range planning for each of Tapestry's brands.  *Id.* at 359:12-24, 360:10-16 (Harris).  Also, "[m]anufacturing decisions are made at the Tapestry level rather than the brand level."  *Id.* at 825:20-22 (Fraser).  Even the CEO of Kate Spade does "not get to make the decisions about the factories that manufacture Kate Spade handbags."  *Id.* at 825:16-19 (Fraser).  Likewise, it is Tapestry, not the individual brands, that directly interfaces with third-party suppliers and manufacturers.  Coach's and Kate Spade's orders for materials may be "completely separate," but once Coach and Kate Spade submit their orders, Tapestry's supply-chain team "place[s] the physical purchase orders with the service providers or factories and raw material supplie[r]s."  *Id.* at 1014:20-1015:24, 1039:13-17 (Charles).  And it is Tapestry, not Coach or Kate Spade, that picks up the products from factories in Southeast Asia and transports them to Tapestry's distribution hubs around the world.  *Id.* at 1015:7-13 (Charles).

Moreover, although some witnesses claimed that Coach and Kate Spade view each other's pricing as "wholly irrelevant," Tr. at 500:25-501:06 (Kahn); *see also id.* at 809:8-14 (Levine), and that they "don't communicate" about such matters, *id.* at 809:15-20 (Levine), ordinary-course documents tell a different story.  Consider, for instance, an August 2021 email that Michele Parsons – then serving as Kate Spade's chief merchandiser and in charge of setting MSRPs for Kate Spade – sent to a dozen people, including not only Liz Fraser but also two people whose email address domain names indicate that they were not Kate Spade employees: Campbell O'Shea (Coach) and Jennifer Wang (Stuart Weitzman).  PX1495 at 1; Tr. at 856:6-857:11 (Fraser).  Parsons explained that she was "[s]haring this recap . . . of the recent price increases that Michael Kors has taken on current prices in the US in Mainline," which Parsons described as "fairly significant."  PX1495 at 1 ("I'm very surprised to see the[ $]298 price point in totes go to $358.").  Parsons stated that "[w]e will consider what this means for us as we focus on elevating and MSRP's."  *Id.*  She added that she had included "Campbell and Jennifer for visibility" and because she "wonder[ed] if this has happened globally."  *Id.*  In other words, Kate Spade shared information about Michael Kors pricing trends with counterparts at Coach and Stuart Weitzman, indicated how Kate Spade would respond in its pricing, and invited them to answer in kind.

The record discloses other examples of Coach and Kate Spade sharing pricing information.  In February 2022, Levine sent an email to several Coach store regional directors with the subject line: "Outlet Price Tracking Proposal."  PX1547 at 2; Tr. at 787:14-20, 811:7-9 (Levine).  Levine wrote: "As we used to do a while back there is interest in tracking against pricing for certain styles (namely MK and TB).  Kate Spade has been doing this already and they will share the responsibly [*sic*] with us – and we don't need to track the KS pricing anymore because we can get it directly from them!"  PX1547 at 2.  Levine included a link to

"the format they are asking us to complete" and stated that Coach was responsible for tracking prices in New York, Florida, and Chicago on a monthly basis (starting on February 18, 2022), while Kate Spade would handle Delaware, California, and Canada.  PX1547 at 2.  This tracking continued through at least the end of December 2022.  *See* Tr. at 789:1-8 (Levine); PX8028 at 1-2 (December 2022 email sent by Coach's senior manager for global price positioning to Levine and several others, including someone with a Tapestry email address; providing "Dec[ember] Update" on "Outlet Competitive Price Tracking," which relied on information compiled by "COH and KS store associates").  Thus, for at least 11 months, Coach and Kate Spade not only shared their own commercially sensitive pricing information directly with one another, but also collaborated in gathering such information about Michael Kors and Tory Burch.

In addition to the foregoing concrete examples, the Court observes that the notion that Kate Spade's pricing is "wholly irrelevant" to Coach CEO Kahn is difficult to square with, among other things, the materials in the record prepared by and/or for him that compare Coach and Kate Spade prices.  *See, e.g.*, PX1783 at 51 (January 2023 email to Kahn and others attaching slides with pricing update on Coach vis-à-vis brands including Kate Spade). The same goes for Kahn's dubious assertion that Michael Kors "has no pricing constraint on [Coach's] activities" in the market for handbags, and that Coach does not "base [its] pricing on what Michael Kors charges."  Tr. at 491:16-492:2.  For similar reasons, the Court gives no credence to then-Kate Spade CEO Fraser's suggestion that Kate Spade "consider[s] the prices of other brands' handbags when setting its prices" rarely and only on an ad hoc basis, Tr. at 888:17-25 (Fraser), a suggestion which also is contradicted by record evidence, *see, e.g.*, PX1067 at 1 (Kahn to Fraser: "Gucci bags at $2000 is just not our customer in NA."); PX1547 at 2 (Coach and Kate Spade tracking Michael Kors and Tory Burch pricing).  Indeed,

taken seriously, this portion of Fraser's testimony implies that Kate Spade is largely disinterested in competing with *anyone* on price – something that should be true only of a hobbyist or a monopolist. Of course, Kate Spade is neither.

Not all communication between Coach and Kate Spade is about price. For instance, in January 2022, Fraser texted Kahn to complain about the similarities between the Coach heart handbag and the Kate Spade heart handbag, which were "extremely close" to one another. Tr. at 839:22-840:24 (Fraser discussing PX1271). Fraser wrote that "there are 100's of TikTok videos comparing the Coach heart vs the Kate one. We have a ████ investment in the bag so it's not a great situation for us," especially since "[t]he Coach investment was much lower." PX1271 at 1; *see* Tr. at 842:9-10 (Fraser: "[T]he heart bag was important to Kate Spade."). Fraser added: "I guess my question is whether Coach would recut the bag. It's not ideal for us." PX1271 at 1; Tr. at 841:18-842:3, 842:11-18, 902:22-25 (Fraser: confirming that she "didn't want [the Coach heart bag] to be so similar" to the Kate Spade heart bag and "was trying to politely ask him" to "not reproduce [Coach's] heart bag"). Even though Coach did not ultimately acquiesce to the request, the exchange illustrates efforts to coordinate at the highest level.

The record discloses other examples of Coach and Kate Spade sharing pricing and product information with one another. *See, e.g.*, Tr. at 842:20-848:1 (Fraser discussing PX8124, a slide deck about Coach's outlet pricing and strategy sent to Kate Spade executives in May 2021); *id.* at 848:20-849:20 (Fraser discussing PX8123, an email chain containing Coach's outlet-pricing data sent by the Global Strategy and Consumer Insights team in October 2022); PX1338 at 1, 10, 16, 20, 35, 78-80, 89-90 (February 2023 emails between executives at Tapestry, Coach, and Kate Spade regarding an "analysis [that] was done about a year ago for both Coach and kate spade"; attaching March 2022 "Product Comparison" slide

deck with multiple slides containing information about sourcing, costing, pricing, and consumer perceptions).  Each brand's CEO attends all Tapestry board meetings, where participants routinely discuss commercially sensitive information.  *See, e.g.*, Tr. at 849:22-853:19 (Fraser discussing PX1497, a March 2022 slide deck about Coach's long-range plan; according to Fraser, she "would have seen this [information] in a board meeting"); PX1387 at 17, 22-28, 34-35, 38, 41-49 (August 2023 presentation to Tapestry board including brand-specific information about strategy, revenue, profit margins, marketing, and other issues).

Thus, other evidence in the record belies the testimony by Defendants' executives that Tapestry and its brands are fully siloed at present.  And there is also no reason to predict that Michael Kors will be more isolated from Tapestry, Coach, and Kate Spade than the latter three currently are from each other.  If anything, the Court expects that Michael Kors would coordinate *more* with its parent company and sibling brands, given that Defendants' stated rationale for the merger is that Tapestry can "leverage" its "capabilities" to "revitalize[e]" Michael Kors.  DFOF ¶ 72.

Turning to the law, Defendants' brand-autonomy argument runs headfirst into "the legal principle of corporate-wide profit maximization," *AT&T*, 916 F.3d at 1044, which posits that a "division within a corporate structure pursues the common interests of the whole rather than interests separate from those of the corporation itself," and that "the operations of a corporate enterprise organized into divisions must be judged as the conduct of a single actor," *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 770 (1984).  Based on the strong economic incentives for corporate divisions to cooperate to maximize overall profit, antitrust courts are reluctant to treat these internal divisions as meaningful competitive restraints on one another.

*Bertelsmann* is instructive. There, the plaintiff successfully argued that the merger between two large publishers likely would substantially lessen competition in the market for acquiring anticipated top-selling books. *See* 646 F. Supp. 3d at 10-12. As relevant here, the court rejected the defendants' argument that existing internal competition between their imprints "increase[d] competition in the market beyond that represented in market shares," noting that this competition was "far from unrestrained." *Id.* at 49-50. The court also gave little credence to a proposed post-merger policy that, according to the defendants, "would go even farther in permitting internal competition than current policies allow[ed]." *Id.* at 50. As the court explained, "the proposed policy would not be profit-maximizing and [wa]s thus unreliable evidence of future conduct"; the promise to adhere to this policy could "be broken at will . . . at any time"; and the proposed policy still "would not prevent the merged entity from reducing internal imprint competition" in various ways. *Id.* at 50-51.

The Court reaches a similar conclusion here. Defendants' assurance that "Tapestry plans to maintain the brands' separate identities and structures, ensuring they continue to compete against one another" is unenforceable, and it elides the ways in which co-owned brands with "separate identities and structures" (such as Coach and Kate Spade at present) may nonetheless compete less with one another than they would under separate ownership. Opp. at 36. For example, it is presently true that separate brand teams negotiate Coach and Kate Spade handbag prices with Macy's, and that "Tapestry does not negotiate as a whole with Macy's." Tr. at 919:10-16 (Steinmann); *see also* DX0932 at 119:20-120:16 ███████

███████. But there is no effectual assurance that such separation would continue post-merger. Indeed, it would be economically irrational for the owner of the largest handbag brand at Macy's by sales revenue (Michael Kors) and second-largest handbag brand at Macy's by sales revenue (Coach), Tr. at 933:20-25 (Steinmann), to *not* cooperate in negotiations.

Also, Defendants' claim that "Tapestry intends to permit Michael Kors to operate autonomously, with only specific corporate-level support from Tapestry in certain areas," DFOF ¶ 186, is unlikely due to contrary economic incentives.  Dr. Smith persuasively explained that "as long as the brands are operating in the interest of the parent, they would have the incentive to increase price, [and] whether they're getting in a room and doing it or whether they're independently operating, they would consider each other's profits when they made the decision to set their own prices."  Tr. at 573:25-574:5.  Thus, the "assum[ption] that the merging parties, after they merge, would continue to compete as they do today . . . just contradicts fundamental economics.  [T]he key question is: Are [the merging parties] significant substitutes for one another?  If they are, they have a very significant incentive to increase price."  *Id.* at 573:7-17 (Smith).  Dr. Smith opined – and the Court agrees – that Tapestry is "a sophisticated firm, [and] they're not going to leave money on the table.  By continuing to compete as they do today, they'd be leaving significant money on the table."  *Id.* at 573:17-20.  Or as Professor Scott Morton explained in a 2020 paper she co-authored:

> [U]nsupported claims from individuals who are employed by the merging parties that they will not raise prices, or promises that are not embedded in consent decrees or binding private contracts, should be viewed very skeptically for several reasons: First, company officers and Boards of Directors have fiduciary duties to shareholders to maximize profits (using legal strategies).  If the merger creates the economic incentive for the merged firm to raise price (or reduce output, quality, or innovation), then such strategies will and must be implemented. Second, an executive may have financial or career benefits from the merger that distort his incentives or beliefs. Third, the relevant "person's" behavior in an antitrust case is the corporate person, not any particular executive.  Therefore, courts should focus on the evidence that shows the incentives of the firm and testimony about those incentives – and not on contrary self-serving statements.

PX7414 at 29.[41]

It may be true, as Kahn testified, that Coach and Kate Spade are "siblings" and, as siblings often do, "tend to compete" with one another. Tr. at 501:21-502:7 (Kahn). But it is also true that parents have the final say, just as Tapestry would here. Accordingly, the Court rejects Defendants' argument that competition between its brands will materially ameliorate the anticompetitive effects of the merger.

### C.  Revitalization

Defendants' third rebuttal argument is that "the transaction rationale is procompetitive: Tapestry intends to improve demand for Michael Kors handbags and drive increased sales." Opp. at 37 (emphasis and further capitalization omitted). The Court rejects this argument.

Michael Kors has experienced something of a decline over the better part of the past decade. *See, e.g.*, Tr. at 160:4-16 (Idol); *id.* at 751:14-19 (Wilmotte); *id.* at 1100:7-13 (Mr. Kors). Its total revenue for the most recent fiscal year was around $3.5 billion, down from a 2016 peak of $4.7 billion. *Id.* at 131:11-14, 132:18-21 (Idol). Similarly, its U.S. handbag revenues declined from about $1.65 billion in 2018 to about $1.2 billion in 2023. *Id.* at

---

[41] Professor Scott Morton agreed at the hearing that "the fundamental economics is that the conglomerate[ is] trying to maximize profit." Tr. at 1232:3-8. However, she also testified that Tapestry would not "get too involved in trying to coordinate" its brands, because "they're better off having differentiated brands that do a good job at differentiating [themselves rather] than trying to make some more homogeneous uniform plan." Tr. at 1232:7-1233:5. When the Court asked Professor Scott Morton how Tapestry would add value to Michael Kors without coordination between the brands, Professor Scott Morton testified that it was "hard to explain from the outside, but a corporation has capabilities and ways of doing things that are just the way they've always done it" and that "Tapestry's got some ways of operating and they say, okay, here's how we – here's the way we think about prices, here's the way we think about people, here's the way we think about consumer insights, go off and do that for Kors brand, we're not going to tell you how to run the Kors brand, but we want you to do it our way – that can be a source of – like a way to change course that might be more functional." Tr. 1279:25-1281:3. This testimony *supports* the Court's conclusion that Tapestry would not simply permit Michael Kors to continue operating completely independently of Coach and Kate Spade.

1110:3-11 (Edwards).  Executives identified various potential explanations for Michael Kors's malaise including high levels of competition in the industry, "brand fatigue" caused by the brand becoming "too ubiquitous," an overreliance on discounting, ineffectual marketing, and a general loss of "brand heat" and "brand relevance."  *See, e.g.*, *id.* at 134:3-135:1 (Idol); *id.* at 225:23-226:20 (Newman); *id.* at 737:6-8, 753:1-754:13 (Wilmotte); *id.* at 1100:7-13 (Mr. Kors); *see also* PX2321 at 2 (Mr. Kors text to Wilmotte in April 2023: "in general [I t]hink we spend too much $ consistently chasing a sale/ outlet/ cut up kind of customer").

Michael Kors has tried to change direction – to "try to get that brand heat back" – without much success.  Tr. at 133:4-134:2, 152:3-9 (Idol); *see also, e.g.*, *id.* at 228:22-229:14 (Newman).  For example, "Michael Kors designed the Parker bag as part of a recent revitalization effort."  DFOF ¶ 66.  According to Philippa Newman Chapuis, president of accessories and footwear at Michael Kors, the Parker was the Rolls Royce of handbags.  Tr. at 222:23-25.  Consumers took a different view.  *See id.* (Newman: "It was my belief that the product we were offering, qualitatively it was the equivalent to a Rolls Royce, but she was only willing to pay for a Fiat.").  Another recently launched bag, the Lulu, also failed to win over customers and is being discontinued.  *Id.* at 229:3-14 (Newman).

Defendants believe that Tapestry will "revitalize" Michael Kors.  Opp. at 11 (initial capitalization omitted).[42]  According to Defendants, "Tapestry sees opportunity . . . to help"

---

[42] Defendants claim that "Tapestry intends to unlock unrealized value in all three Capri brands," including Jimmy Choo and Versace.  DFOF ¶ 74; *see also, e.g.*, *id.* ¶ 76.  Defendants provide no evidence that Jimmy Choo and Versace need revitalization or that, if they do, Tapestry can help them do so.  Even if Tapestry could "revitalize" Jimmy Choo and Versace, it would mean only that those brands were stronger in markets other than the market for accessible-luxury handbags.  Yet the Supreme Court has rejected the notion that, under Section 7, "anticompetitive effects in one market could be justified by procompetitive consequences in another."  *Phila. Nat'l Bank*, 374 U.S. at 370; *accord Aetna*, 240 F. Supp. 3d at 94.  So too here.

Michael Kors "grow sales across the world." DFOF ¶ 75. To do so, Tapestry intends to "leverage" its "rich consumer insight work," "technology backbone and digital architecture," "supply chain," "talent," and "culture." Tr. at 306:07-308:11 (Crevoiserat); *see id.* at 308:22-309:2 (Crevoiserat: "I believe that we can inject more relevancy, more vibrancy into the Capri brands, improve execution, leverage our capabilities and really take what would then be a portfolio of six iconic brands and bring them to more customers, put more product in the hands of more customers globally."). Defendants also assert that the merger "will realize significant cost synergies. Tapestry projects more than $200 million in operational cost savings and supply chain efficiencies within three fiscal years." DFOF ¶ 79.

　　　To address this argument, it helps to clarify what Defendants are *not* arguing. Notably, Defendants are *not* asserting a failing-company defense, nor could they credibly do so. The failing-company defense "is, in a sense, a 'lesser of two evils' approach, in which the possible threat to competition resulting from an acquisition is deemed preferable to the adverse impact on competition and other losses if the company goes out of business." *United States v. Gen. Dynamics Corp.*, 415 U.S. 486, 507 (1974). It is available "only if two requirements are satisfied: (1) that the resources of [the acquired company] were so depleted and the prospect of rehabilitation so remote that it faced the grave probability of a business failure[,] and (2) that there was no other prospective purchaser for it." *United States v. Greater Buffalo Press, Inc.*, 402 U.S. 549, 555 (1971) (quotation marks and citation omitted). "Because the doctrine is narrow in scope, it rarely succeeds." *Energy Sols.*, 265 F. Supp. 3d at 444 (quotation marks and citations omitted). Simply put, Michael Kors faces no imminent risk of business failure. *See, e.g.*, Tr. at 124:18-21 (Idol: "[T]he Michael Kors brand will continue to exist whether Tapestry owns it or it is a standalone company[.]"); *id.* at 1083:18-20 (Mr. Kors: "Michael Kors is successful to this day[.]"); *id.* at 1316:2-6 (Scott Morton:

"Michael Kors is not a failing firm" and, in fact, is "currently profitable").  Defendants have also adduced no evidence regarding other prospective purchasers.  Thus, even if Defendants had asserted the failing-company defense, they would not qualify for it.  *See, e.g.*, *F. & M. Schaefer*, 597 F.2d at 817-18 (rejecting failing-company defense even though acquired company "ha[d] suffered declining sales and large losses in recent years" and its ability to reverse course was "not foreordained").

Defendants also deny that they are making "an efficiencies defense," Opp. at 37 – that is, a defense premised on the argument that the merger will "generate significant efficiencies and thus enhance the merged firm's ability and incentive to compete, which may result in lower prices, improved quality, enhanced service, or new products," *ProMedica*, 749 F.3d at 571 (citation omitted).  Although the Supreme Court has never expressly endorsed using an efficiencies defense to a Section 7 claim, *see Penn State*, 838 F.3d at 347, "[t]he trend among lower courts [is] to recognize or at least assume that evidence of efficiencies may rebut the presumption that a merger's effects will be anticompetitive," *Deutsche Telekom*, 439 F. Supp. 3d at 207 (collecting cases); *see also* 2023 Merger Guidelines § 3.3.  "For the efficiencies defense to be cognizable, the efficiencies must (1) offset the anticompetitive concerns in highly concentrated markets; (2) be merger-specific (*i.e.*, the efficiencies cannot be achieved by either party alone); (3) be verifiable, not speculative; and (4) not arise from anticompetitive reductions in output or service."  *Hackensack*, 30 F.4th at 176 (quotation marks omitted).

Defendants state that "the evidence on the deal rationale," when "combined with the other evidence" in the record, "suggests" that the FTC's prima facie case "overstat[es] the transaction's likely anticompetitive effects."  Opp. at 37-38.  Defendants thus dispute that "this evidence must meet the formal elements of an efficiencies defense to be considered by this Court."  *Id.* at 37.

The Court disagrees.  As the Third Circuit explained in rejecting a similar framing, the argument "that procompetitive effects must simply be weighed in the balance together with anticompetitive effects when considering whether [the defendants] have rebutted the [plaintiff]'s prima facie case . . . *is* an efficiencies defense." *Hackensack*, 30 F.4th at 176 (emphasis added).  It is difficult to conceive of Crevoiserat's testimony that Michael Kors will benefit from Tapestry's "rich consumer insight work," "technology backbone and digital architecture," "supply chain," "talent," and "culture" as anything other than a claim that Michael Kors will be more effective at selling handbags than it was before the merger.  Tr. at 306:07-308:11.  Matters are even clearer in considering Defendants' argument that the merger "will realize significant cost synergies," including "operational cost savings and supply chain efficiencies."  DFOF ¶ 79.  Try as they might, Defendants cannot reap the benefits of an efficiencies defense while evading its requirements.  The Court thus proceeds to analyze this rebuttal argument in the framework of an efficiencies defense and finds that Defendants fail to satisfy the necessary elements.

As a threshold matter, the asserted efficiencies certainly do not offset the competitive concerns here.  Defendants assert that the merger "will realize significant cost synergies" and that "Tapestry projects more than $200 million in operational cost savings and supply chain efficiencies within three fiscal years."  DFOF ¶ 79.  Even assuming that Tapestry's projection is entirely accurate, $200 million of savings within three fiscal years – that is, approximately $66.7 million annually – does not come close to outweighing the $365 million annually in consumer harm projected by Dr. Smith as part of his merger simulation, *see infra* at pp. 161-162.  *See* Tr. at 1395:8-18 (Smith); Smith Rep. ¶ 266.

Significantly, Defendants also do not persuade the Court that the claimed efficiencies are merger specific.  "An efficiency is said to be 'merger-specific' if it is a unique

consequence of the merger[.]"  Areeda & Hovenkamp ¶ 973a.  In other words, Defendants

"must show that their efficiencies[] cannot be achieved by either company alone because, if

they can, the merger's asserted benefits can be achieved without the concomitant loss of a

competitor."  *H & R Block*, 833 F. Supp. 2d at 90 (quotation marks omitted).  Defendants

cannot do so.

The claimed revitalization of Michael Kors is not merger specific because Defendants

have not shown that it "cannot be achieved by either company alone."  *Id.* at 90 (citation

omitted); *see, e.g.*, *id.* (rejecting efficiencies defense where acquired company could have

achieved lower costs on its own by relocating certain laborers to lower-cost areas and by

"taking a more cost conscious attitude"); *Evanston Nw. Healthcare Corp.*, No. 9315, 2007

WL 2286195, at *39 (F.T.C. Aug. 6, 2007) (rejecting efficiencies defense where acquired

hospital "could have made the large majority of the quality improvements asserted by

[acquiring hospital] without the merger," and where the acquired hospital "had plans in place

to improve its quality and expand services further without a merger, including many of the

same improvements that [the acquiring hospital] credits to the merger").  Defendants assert

that Tapestry can revitalize Michael Kors through its consumer insight work, supply chain

innovation, and talent base.  DFOF ¶ 75.  But the Court sees no reason, based on the evidence

presented, that Capri cannot realize the vast majority of those improvements alone, by, for

example, improving its own consumer insights work, supply chain, and talent base.

Part of the reason that the Court doubts that the claimed efficiencies are merger-

specific is that Michael Kors *already* is undergoing a brand transformation unrelated to the

potential merger between Tapestry and Capri.  Tr. at 242:10-16 (Newman).  The latest attempt

at brand transformation began in April 2023 when Wilmotte assumed the helm as CEO of

Michael Kors.  *Id.* at 732:22-733:11 (Wilmotte).  Over 100 people at Michael Kors are

working on the project. *Id.* at 738:2-4 (Wilmotte).  Wilmotte has established a "mini office"

to implement the transformation, created a committee that meets monthly to review the

progress of the transformation, and hired an outside consultant (Landor & Fitch) to host

workshops with the transformation team, including Wilmotte and members of his executive

team. *Id.* at 738:5-7, 738:16-739:10 (Wilmotte).

One component of the current brand-transformation program is "elevating Michael

Kors'[s] product design," including through new handbag designs that only recently hit the

market.  Tr. at 739:11-23 (Wilmotte); *see id.* at 739:24-740:4 (Wilmotte: the design of the

new handbags started in April 2023, so "[t]hey took over a year to go from that design to

being sold on the market").  Another element of the brand-transformation program is

redesigning Michael Kors stores. *Id.*at 741:18-20 (Wilmotte).  That redesign process has

already begun, with new store concepts to roll out between March and June 2025. *Id.* at

741:24-742:1 (Wilmotte).  Michael Kors has also started to "right size its distribution," which

"is meant to address Michael Kors'[s] ubiquity problems." *Id.* at 742:18-743:1 (Wilmotte).

This process of "right sizing" entails closing some Michael Kors stores, exiting some Macy's

department stores, and selling in new department-store locations such as Nordstrom's. *Id.* at

743:2-12 (Wilmotte).  Additional aspects include rebranding MMK by fall 2025, which

"involves moving away from the name Michael Michael Kors," and expanding clienteling,

which "involves building relationships with customers to better understand their shopping

preferences and habits." *Id.* at 740:5-11, 742:2-8 (Wilmotte).  Altogether, Wilmotte admitted

that "Michael Kors'[s] brand transformation is moving in the right direction." *Id.* at 743:13-

17 (Wilmotte).

Defendants attempt to downplay the transformation efforts by asserting that the

transformation is no longer proceeding as planned.  For example, during the hearing,

Wilmotte testified that the Michael Kors brand transformation was "not on track anymore." Tr. at 770:3-5 (Wilmotte); *see id.* at 767:3-7 (Wilmotte: "We're actually stalling in many of the initiatives that we wanted to push forward. And . . . it's not going where it should be going at this stage."). The Court finds this self-interested testimony less credible than Wilmotte's contrary testimony that the brand transformation was moving "in the right direction." Tr. at 743:13-17. Similarly, Mr. Kors testified that the plan to reenergize the Michael Kors brand is "unfortunately in a point of statis at this point," Tr. at 1081:22-24, but he also admitted that Michael Kors has "a plan independent of the transaction with Tapestry to reenergize Michael Kors," *id.* at 1083:12-14. The Court finds the latter testimony more credible.

For these reasons, Defendants fail to make out an efficiencies defense. But even if the Court agreed with Defendants that their revitalization argument does not require applying "the formal elements of an efficiencies defense," Defendants' "deal rationale" is in tension with established antitrust principles. Opp. at 37. "It is axiomatic that the antitrust laws were passed for 'the protection of *competition*, not *competitors*.'" *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 224 (1993) (quoting *Brown Shoe*, 370 U.S. at 320). That the merger may help Michael Kors sell more handbags does not automatically render the Tapestry-Capri merger procompetitive – especially given Defendants' incentive to reduce discounting and raise prices if the merger is consummated.

According to Defendants, the decline of Michael Kors "has resulted in an overreliance on discounting," and "even as Michael Kors has attempted to increase handbag prices," it has "ha[d] to raise discounts even more to sell its product." Opp. at 11-12; *see, e.g.*, Tr. at 161:1-3 (Idol: "[U]nfortunately as the brand heat was declining or is declining, we have had to lower prices and also have more discounts."). Defendants contend that, following the merger, "the

end result for consumers will be more relevant Michael Kors products for more consumers

globally at desirable prices."  DFOF ¶ 80.  By "desirable" prices, Defendants do not mean

*lower* prices.  They mean *higher* prices.  *See, e.g.*, Tr. at 78:10-15 (Tapestry Opening: "While

the spiral of deepening discounts may sound like a good thing for the consumer, it's not.  The

consumers' unwillingness to buy Michael Kors handbags without bigger and bigger discounts

reflects that Michael Kors handbags are providing diminishing value.  The consumer is not

getting more for less.  She's getting less for less."); *id.* at 162:11-17 (Idol: "[Discounting]

means [consumers] don't value your brand.  Therefore, in their minds they're going to get

something that's less, but the value of the brand is less at the same time.").

On this point, Tapestry's internal documents are telling.  Notably, in August 2022,

Harris and her team prepared and presented a slide deck to Crevoiserat "[i]n connection with

our M&A ambition[s]."  PX1216 at 4; *see* Tr. at 286:24-288:9 (Crevoiserat: PX1216 "was

meant to convey a process or approach that we may take when we got further into our M & A

process").  One slide in a section called "Pricing Insights" featured a chart comparing AURs

for Coach, Kate Spade, and Michael Kors.  PX1216 at 16-17.  The slide stated: "Coach has

been priced an average $147 above MK for the last 2 years; suggesting room to increase MK

AUR."  *Id.*  The next slide compared average discount rates for the same three brands.  *Id.* at

18.  This slide stated: "Over the last 2 years, MK has had an average discount rate of 45% vs.

37% for Coach and 28% for Kate Spade suggesting opportunity to reduce MK discounting."

*Id.* at 18. Harris claimed that "[i]n the context of this slide," the reference to "opportunity"

was "just another way to remark on the delta that we see" and "not at all a suggestion that you

could actually do that."  Tr. at 423:16-20.  The Court finds this explanation implausible given

that "the context of this slide" was a presentation to the CEO of Tapestry about the strategic

benefits of acquiring Michael Kors.  *See generally* PX1216.  Harris's explanation also defies

the ordinary meaning of the word "opportunity."  *See, e.g.*, *Opportunity*, Merriam-Webster, https://unabridged.merriam-webster.com/unabridged/opportunity (last visited Oct. 21, 2024) ("a combination of circumstances, time, and place suitable or favorable for a particular activity or action").

The evidence reflects that Tapestry perceived the acquisition of Michael Kors to be an opportunity to decrease Michael Kors's discounting and increase Michael Kors's prices – a recognized form of anticompetitive effects.  *See AmEx II*, 585 U.S. at 542.  Moreover, given the substantial market power that it will possess after the merger, Tapestry may also further reduce discounting by Coach and Kate Spade, as has been Tapestry's goal in recent years. *See, e.g.*, Tr. at 779:24-780:12, 796:3-5, 808:16-809:7 (Levine); Tr. at 890:24-891:9 (Fraser).

For these reasons, the Court rejects Defendants' rebuttal argument that the transaction is procompetitive because Tapestry intends to improve demand for Michael Kors handbags and drive increased sales.

### D.  Handbags as "Discretionary" Products

Defendants argue that after the merger is consummated, they could not raise prices of handbags without increasing value because consumers control the prices that they will pay and consumers could simply choose not to buy a handbag.  *See* DFOF ¶ 56 ("because handbags are a discretionary purchase, consumers can . . . respond to undesired price increases by electing not to purchase or delay a purchase until prices are reduced or discounted."); DFOF ¶¶ 166-171 (asserting that there is no evidence that Tapestry could increase price or reduce value post-merger).  Although Defendants' papers present this argument only vaguely, the Court views it as an additional rebuttal argument and therefore analyzes it here.

Several representatives from the merging parties testified that Tapestry would be unable to increase prices after the merger because consumers control pricing.  *See, e.g.*, Tr. at

347:22-348:4 (Crevoiserat: Tapestry would have "no ability" to raise the price of Michael Kors handbags if it acquired Capri); Tr. at 491:16-23 (Kahn: Michael Kors dos not "act[] as a pricing constraint on Coach" because "the consumer decides" pricing); Tr. at 800:15-25 (Levine: "the customer will decide what they want to pay" and "sets the price"); Tr. at 890:21-23 (Fraser: Kate Spade cannot "raise prices without elevating the product and brand heat."); Tr. at 424:20-23 (Harris: it is "[n]ot at all" possible that "Tapestry could successfully raise the price of Michael Kors handbags merely by acquiring Capri"); Tr. at 420:12-16 (Harris: similar).

The Court does not credit these self-interested statements. *See, e.g.*, *Bertelsmann*, 646 F. Supp. 3d at 40 n.27 (finding "incredible" "testimony [from defendants' witnesses] that the merger will have either no effect or positive effects on advances" and instead "credit[ing] the much stronger evidence that advances will decrease after the merger, based on the market-share data, economic analyses, and the more credible testimony regarding market dynamics"). Indeed, even Professor Scott Morton believes that "unsupported claims from individuals who are employed by the merging parties that they will not raise prices . . . should be viewed very skeptically" and that courts should instead "focus on the evidence that shows the incentives of the firm and testimony about those incentives – and not on contrary self-serving statements." PX7414 at 29 (2020 article co-authored by Professor Scott Morton).

Even if the present competitive landscape would not permit price increases, the proposed merger would change the calculus based on the economic analyses presented here. As Dr. Smith observed, "[w]hat changes . . . is that after the merger, . . . Tapestry would take into account that if it raises prices on Michael Kors, a significant amount of those sales would be diverted to Coach and Kate Spade, and they would recapture significant profit on those

sales when they're diverted." Tr. at 569:10-570:2.  The merger would thus would "give[] [Tapestry] an incentive to elevate price above what it is today." *Id.* at 570:2-4.

The potential decrease in pricing constraints and how diverted sales are recaptured in the theoretical post-merger world are subjects for complex economic analysis – not fortune-telling and hollow promises from company executives.  Indeed, the Supreme Court explained that a district court's "reliance" on "testimony by [officers of the merging firms] to the effect that competition among [the firms] was vigorous and would continue to be vigorous after the merger" was "misplaced." *Phila. Nat'l Bank*, 374 U.S. at 366-67.  Such "lay evidence on so complex an economic-legal problem as the substantiality of the effect of this merger upon competition [is] entitled little weight." *Id.* at 367.

As such, the Court does not afford any weight to the opinions of Defendants' industry experts, Gennette and Giberson, that Tapestry will not be able to raise prices on handbags without adding value to those handbags post-merger. *See, e.g.*, Tr. at 1159:17-24 (Gennette: it is not "a realistic proposition in the real world" that "Tapestry will be able to raise prices significantly on Michael Kors handbags without adding value to those handbags"); Giberson Rep. ¶ 76 (Dr. Smith's "conclusion just does not make sense based on what I know about the handbag industry and how consumers buy handbags").  Neither Gennette nor Giberson are economists and their conclusions regarding the economic effect of a merger on pricing incentives are outside of their respective scopes of expertise.

Defendants' argument that prices will not be impacted because consumers could just choose not to buy a handbag is also unavailing. *Cf.* Tr. at 320:18-24 (Crevoiserat: Handbags are "a discretionary category . . . if a customer doesn't like what we're providing, they could go anywhere.  They could buy a pair of yoga pants or go out to dinner."); Tr. at 481:7-10 (Kahn: a consumer could choose to "buy a handbag" or to "go out to dinner").  Not only are

146

handbags important to women in many aspects of their lives, as discussed in more detail *infra* at p. 165, Dr. Smith accounted for the possibility that certain consumer's next-best option in the event of a price increase was not a handbag in the sensitivity case for his aggregate-diversion analysis. Even in that sensitivity case, his candidate market passed the HMT by a wide margin. *See supra* at pp. 72-73.

Instead of giving weight to the self-serving statements of the merging parties, the Court credits the strong evidence that the merger will lead to anticompetitive harm based on the market dynamics discussed throughout this opinion.

## III.    Step 3

The FTC has already carried its burden of persuasion because it has established its prima facie case and Defendants have failed to rebut that case. *See Hackensack*, 30 F.4th at 179 (if a Section 7 plaintiff establishes a prima facie case that the defendant fail to rebut, "no additional evidence is necessary for the [plaintiff] to carry its ultimate burden of persuasion); *cf. Deutsche Telekom*, 439 F. Supp. 3d at 233 ("Defendants' rebuttal of [the plaintiff's] prima facie case . . . leaves [the plaintiff] with the ultimate burden of proof."). Nevertheless, even if Defendants had rebutted the FTC's prima facie case by showing that it "inaccurately predicts the relevant transaction's probable effect on future competition," thus shifting the burden of production back to the FTC, *AT&T*, 916 F.3d at 1032 (citation omitted), the FTC would still prevail due to the additional evidence of anticompetitive effects that it presents.[43]

---

[43] The FTC contends that "independent of any market-concentration analysis," it can meet its prima facie burden by demonstrating that the merger will eliminate head-to-head competition between close competitors. PCOL ¶ 17; *see also* Br. at 9; Reply at 3-4. This argument relies, in part, on language in Section 2.2 of the 2023 Merger Guidelines. *See* 2023 Merger Guidelines § 2.2 ("Although a change in market structure can also indicate risk of competitive harm . . . , an analysis of the existing competition between the merging firms can demonstrate that a merger threatens competitive harm independent from an analysis of market shares."). In response, Defendants argue that the FTC's position on this point is "radical[]" and that

Courts examine two types of additional evidence of anticompetitive harm: coordinated effects and unilateral effects.  *See, e.g.*, *Bertelsmann*, 646 F. Supp. 3d at 38, 44; *Anthem*, 236 F. Supp. 3d at 215; *H & R Block*, 833 F. Supp. 2d at 76-77.  Coordinated effects occur when market participants "coordinate their behavior, either by overt collusion or implicit understanding in order to restrict output and achieve profits above the competitive levels," typically in concentrated markets.  *Anthem*, 236 F. Supp. 3d at 215-16 (quoting *ProMedica*, 749 F.3d at 568); *accord H & R Block*, 833 F. Supp. 2d at 77.  In contrast, unilateral effects "are those that result directly from the elimination of competition between the merging parties," *Bertelsmann*, 646 F. Supp. 3d at 39, which "[c]ourts have recognized . . . can result in a substantial lessening of competition," *Sysco*, 113 F. Supp. 3d at 61.  The FTC does not argue that the merger will result in coordinated anticompetitive conduct, and the Court therefore does not analyze any potential coordinated effects.  Rather, the FTC argues the merger will result in unilateral anticompetitive effects, which the Court proceeds to analyze.

"Courts have recognized that a merger that eliminates head-to-head competition between close competitors can result in a substantial lessening of competition."  *Id.* (collecting cases).  This is because when close competitors merge, they may no longer need to compete with one another as intensely to retain market power.  *See* Gregory J. Werden, *Unilateral Competitive Effects of Horizontal Mergers I: Basic Concepts and Models*, 2 Issues in

---

Section 2.2 is a "recent aspirational policy announcement of the current administration."  Opp. at 32-33.  Because the Court finds that the FTC has sufficiently established that the merger will significantly increase concentration in a relevant market and thus proven its prima facie case, the Court need not decide whether the FTC could alternatively prove its prima facie case by demonstrating that the merger "will eliminate head-to-head competition between close competitors" without analyzing market concentration.  PCOL ¶ 71.  The Court instead considers the loss of head-to-head competition as additional evidence of the merger's anticompetitive effects in Step 3 of the burden-shifting framework, noting that other Courts have chosen to consider such evidence at Step 1.  *See, e.g.*, *IQVIA*, 710 F. Supp. 3d at 382-86; *Sysco*, 113 F. Supp. 3d at 61-72.

Competition L. & Pol'y 1319, 1319 (2008) ("Horizontal mergers give rise to unilateral anticompetitive effects if they cause the merged firm to act less intensely competitive than the merging firms[.]").  Courts therefore often find unilateral anticompetitive effects when a merger would eliminate competition between close competitors.  *See, e.g.*, *Sysco*, 113 F. Supp. 3d at 61-66; *H & R Block*, 833 F. Supp. 2d at 81-82, 88; *Staples I*, 970 F. Supp. at 1083.

Unilateral effects may be demonstrated either through qualitative evidence that a merger will eliminate head-to-head competition, *see, e.g.*, *Sysco*, 113 F. Supp. 3d at 61-62, 64 (ordinary-course documents indicated that defendants were "particularly close competitors"); *IQVIA*, 710 F. Supp. 3d at 383 ("the documents . . . reveal evidence of fierce competition between" the defendants), or through quantitative models showing harm to consumers, *see, e.g.*, *id.* at 386 (examining quantitative evidence of unilateral effects); *H & R Block*, 833 F. Supp. 2d at 86 (same).  The FTC presents both qualitative and quantitative evidence of unilateral effects, which the Court analyzes in turn.

### A.  Qualitative Evidence

The FTC presented numerous ordinary-course documents that indicate that Michael Kors is a particularly close competitor to Coach and/or Kate Spade.  The Court found particularly compelling the evidence that the merging parties repeatedly identify each other as significant competitors and that the merging parties respond to each other's pricing and marketing strategies.

### 1.  "Our Biggest Competitor"

Tapestry and Capri executives explicitly recognize Coach, Michael Kors, and Kate Spade as close competitors.  On the Capri side, for example, in a March 2021 email to a third-party, Capri CEO Idol highlighted the approach Michael Kors had taken with respect to a particular issue, and compared Michael Kors's approach to the approach taken by their "key

competitor Coach." PX2425 at 1-2.[44] In a June 2021 email, Michael Kors executive Newman

discussed a logistical issue facing Michael Kors and compared Michael Kors's issue with "our

biggest competitor," meaning Tapestry. PX2728 at 1 (Newman twice referring to "our

biggest competitor");[45] Tr. at 201:7-8, 201:16-18 (Newman confirming that "biggest

competitor" in PX2728 meant Tapestry); *see also* PX2043 at 2 (email chain continued from

PX2728).

Capri's investors also view Coach as the "primary" or "closest" competitor of Michael

Kors. For example, a 2022 investor study conducted by Capri's board of directors stated that

"Tapestry/Coach [is] viewed as the primary competitor" of the Michael Kors brand. PX2423

at 6; Tr. at 84:25-85:4 (Idol providing context regarding PX2423); *see also* PX2020 at 6

(investor letter presented during an April 2023 Capri board meeting comparing Michael Kors

to "the closest competitor, Coach"); Tr. at 100:20-23 (Idol providing context regarding

PX2020).

Indeed, Tapestry executives expressed concern leading up to the merger that Michael

Kors competes *too* closely with Tapestry's brands. In August 2022, when Tapestry was in the

beginning stages of developing its strategy to acquire Michael Kors, Tr. at 285:5-12

---

[44] Given the contrary ordinary-course documents, the Court does not credit the self-interested testimony of Idol at the preliminary injunction hearing that Michael Kors does not have close competitors and instead has "many, many competitors." Tr. at 164:6-11 (Idol).

[45] During the hearing, Newman tried to cabin and neutralize this document by stating that it simply referred to "the container issues and supply chain issues we were facing at the time" instead of supporting the notion that Coach or Kate Spade were Michael Kors's closest competitors "for the sale of handbags with consumers." Tr. at 207:11-18 (Newman). The Court does not find that testimony to be credible in light of the plain language of PX2728, which refers to Tapestry being Capri's "biggest competitor" and supports the recognition that the companies were close competitors for the sale of goods to consumers, as opposed to simply for supply chain resources.

(Crevoiserat), a Tapestry presentation entitled "MK Preliminary Consumer Pulse + M&A Survey Approach Details" stated that Michael Kors and Coach "are each other's top competition when consumers are considering other brands for purchase," PX1216 at 4;[46] Tr. at 288:24-25 (Crevoiserat).  Other deal documents articulated a concern for "cannibalization" between Coach, Kate Spade, and Michael Kors following the merger, due to "[h]igh cross-purchase overlap" between the brands.  *See, e.g.*, PX1715 at 10 ("High cross-purchase overlap with Coach and Kate Spade consumers would present cannibalization risks, though reinforces the 'affordable luxury' nature of the portfolio and leadership within luxury leather goods.").  Tapestry's CEO's personal notes regarding the Capri acquisition further highlighted her concern that her ███████████████████████████████████████████████ ███████████████  PX1144; Tr. at 294:24-295:10 (Crevoiserat: PX1144 represents her notes regarding Capri acquisition).  Cannibalization and ██████████ are of acute concern only for particularly close competitors.

Ordinary-course documents also reflect that Tapestry and Capri shared the concern that if their respective brands lose market share, that market share will primarily accrue to the other.  For example, when a COVID-related shutdown in Vietnam threatened Coach's ability to obtain its planned inventory ahead of the 2021 holiday season, Kahn, Coach's CEO, wrote to several colleagues that it was "hard to swallow that we ma[y] walk away from over $100 million of Demand that is there for our taking.  I would hate to see MK pick up that volume by default."  PX1533 at 1; *see* Tr. at 467:13-468:13 (Kahn: "MK" means "Michael Kors"); *see also* PX1306 at 1-2 (April 2021 Crevoiserat email commenting on Tapestry's handbag sales: "Have we really lost that much share to [Michael Kors] . . . (their business +26% to

---

[46] The Court does not find compelling Harris's attempt to downplay the significance of this document during the hearing.  *See supra* p. 81 n.30.

[Coach] -18% and KS -41%)?" but not commenting on Marc Jacobs' commensurate growth in market share).

On the other side of the same coin, Tapestry also views problems for Michael Kors as opportunities for Coach/Kate Spade to capture market share from Michael Kors. For example, in March 2021, Crevoiserat asked her subordinates to find out where Michael Kors was closing stores, noting that it "[f]eels like an opportunity to grab share." PX1703 at 2; PX1219 at 1, 5 (March 2021 email to Crevoiserat regarding Michael Kors store footprint).[47]

Overall, the ordinary-course documents demonstrate Tapestry and Capri's deep competitive focus on each other's brands, evidencing the significant competition between them that would be lost due to the merger. *See Aetna*, 240 F. Supp. 3d at 44 (defendants' ordinary-course documents identifying each other as the "primary" competitor and "most serious threat" was evidence of head-to-head competition); *IQVIA*, 710 F. Supp. 3d at 383 (defendant's records identifying other defendant as a significant competitor was evidence of fierce competition between them).

### 2. Pricing

Coach, Kate Spade, and Michael Kors also compete on pricing and discounting strategies. With respect to price, a 2023 Coach presentation shown to Crevoiserat, Roe,

---

[47] Defendants argue that Michael Kors's market share declined from 2022 to 2023, and that Tapestry's market share has not proportionally increased, DFOF ¶ 8, suggesting that Michael Kors, Coach, and Kate Spade are not particularly close competitors in a relevant market, Tr. at 1460:11-1461:8 (Tapestry Closing: "The reality is that companies like Michael Kors, Kate Spade, and Coach are . . . losing share not to each other" but to other handbag companies, demonstrating that "Kate Spade, Coach, and Michael Kors are just not putting any competitive pressure on one another that is unique from the multitude of other competitors out there today."). However, the data cited by Defendants shows that in 2022, Michael Kors declined in market share by 3.4 percent and Coach increased in market share by 1.1 percent. Smith Reply Rep., tbl.1. Thus, the Court does not agree with Defendants that the evidence does not show that Tapestry benefited from Michael Kors's loss of market share.

Harris, and Kahn, among others, detailed Coach's monthly average MSRPs and AURs for handbags compared to Tory Burch, Michael Kors, and Kate Spade.  PX1783 at 51.  This was not a one-off presentation; Coach presented similarly detailed price comparisons between its handbags and Tory Burch, Michael Kors, and Kate Spade year after year.  PX1536 at 15 (2022 Coach deck comparing prices to Tory Burch, Michael Kors, Kate Spade, and Marc Jacobs); PX1137 at 1-2 (2021 email chain with Kahn and Levine, among others, sharing Kate-Spade-collected data on Michael Kors price changes); Tr. at 783:15-21 (Levine: PX1137 "is an example of where [Levine was] suggesting looking at Michael Kors'[s] pricing to see the differences or similarities versus Coach's pricing"); *see also* PX8028 at 1-2 (2022 Coach document tracking Coach outlet pricing compared to Tory Burch, Kate Spade, and Michael Kors); PX1546 at 42 (2021 Coach deck: "Consider competitive landscape, looking at MK, TB, & KS pricing structures to understand ticket opportunity.").  Indeed, Levine, president of Coach North America, instructed her team members to track Michael Kors's prices, and sent her employees into Michael Kors stores regularly to monitor Michael Kors's pricing and foot traffic.  PX1547 at 1-2 (Levine instructing Coach team members to track Michael Kors and Tory Burch prices); Tr. at 782:2-4, 785:16-786:5, 788:14-25 (Levine).[48]  Notably, Levine testified that Coach does not send employees to stores *other* than Michael Kors, Tory Burch, and Kate Spade to monitor pricing and foot traffic, Tr. at 815:3-13 (Levine), further indicating that Michael Kors is a particularly close competitor of Coach.

　　　To the extent Defendants now argue that "Coach does not set its prices based on competitor prices, much less Michael Kors' prices," DFOF ¶ 173, the Court does not find

---

[48] The Court does not credit Levine's conclusory assertion, lacking any corroboration in ordinary-course documents, that Coach does not look at Michael Kors's offerings "as often" as it did in 2021 and early 2022.  Tr. at 801:8-16 (Levine); *see also id.* at 895:16-20 (Levine).

credible the conclusory and self-interested testimony by Tapestry witnesses that Michael Kors "has no pricing constraint on [Coach's] activities," Tr. at 491:16-23 (Kahn).  Indeed, Coach's President of North America testified that Coach monitors competitor pricing to "contextual[ize]" Coach's own pricing decisions, which *supports* the conclusion that Coach is in fact monitoring and responding to the prices set by the other largest players in the accessible-luxury-handbag market.  Tr. at 802:23-803:8 (Levine).[49]  There would be no reason for Coach to spend so much effort monitoring Michael Kors's pricing if Michael Kors's prices did not in any way affect Coach's pricing decisions.

Kate Spade also monitors and responds to the prices of Michael Kors handbags.  For example, one slide in an August 2023 Tapestry presentation depicted Kate Spade's "Competitive Pricing Update," which analyzed Kate Spade's target MSRPs and AURs for handbags as compared to Michael Kors, Coach, and Tory Burch.  PX1387 at 43.  Discussing a similar Kate Spade presentation, the then-senior director of merchandising at Kate Spade, Bernson, testified that Kate Spade's "long-term targets" were "for Kate Spade to price 5 percentage above Marc Jacobs, 10 percent above Michael Kors, 10 percent below Coach, and 25 percent below Tory Burch."  PX5079 at 160:13-24, 161:3-5 (Bernson).  In another example from August 2021, Parsons sent an email to Kate Spade executives (including Fraser) stating that Michael Kors increased its prices on a certain handbag silhouette.  PX1495 at 1.  After noting the precise changes in Michael Kors's prices, Parsons stated that the team

---

[49] Defendants also assert that Tapestry tracks Michael Kors's prices because its financial data is available "more easily," DFOF ¶ 172, not because Michael Kors is a close competitor of Coach and Kate Spade.  As explained earlier in this opinion, the Court does not find credible the strained testimony offered by Tapestry witnesses that the same companies are consistently tracked in Tapestry's ordinary-course documents because their data is easier to obtain.  *See supra* at pp. 55-57.

"will consider what this means for us as we focus on elevating and MSRP's [*sic*]." *Id.* In yet another example, an email in December 2023 to Fraser noted that "[c]ompetition is fierce. [Michael Kors] changed promotion mid-day yesterday." PX1923. That email continued with a list of "actions" to take in response to Michael Kors's switch-up, including "[a]mplifying promotions." *Id.* Other examples of Kate Spade executives tracking and analyzing Michael Kors's pricing abound. *See, e.g.*, PX1223 at 7 (2022 Kate Spade deck analyzing pricing targets compared to Michael Kors and Tory Burch); PX1404 at 28-29 (2022 Kate Spade slide deck comparing prices of particular handbag silhouettes and mix of price-points against Coach, Tory Burch, and Marc Jacobs); PX1784 at 5 (2023 Kate Spade slide comparing prices as against Michael Kors, Marc Jacobs, Coach, and Tory Burch). There would be no reason for Kate Spade to closely track Michael Kors's pricing and take "actions" like "[a]mplifying promotions" in response to Michael Kors's prices, PX1923, if Michael Kors's prices did not influence Kate Spade's prices.

Michael Kors also monitors and responds to the prices of Coach handbags. In a particularly compelling example, a 2023 Capri presentation entitled "Women's Outlet Accessories: Michael Kors vs. Coach Pricing Comparison," sets forth in great detail Michael Kors's pricing structure as compared to Coach's pricing structure for outlet accessories, including handbags. PX2108 at 2 (further capitalization omitted); *see generally id.* at 3-19; *see also, e.g.*, PX2178 at 2-3 (2023 Michael Kors pricing deck comparing pricing to Coach). An additional 2021 presentation compared Coach's and Michael Kors's price points for accessories of three levels of perceived quality. PX2727 at 3. Notably, for each price point, Michael Kors's price points were within a few dollars of Coach's price points. *Id.* And finally, in an August 2021 email, Newman, Capri's president of accessories and footwear, stated that Michael Kors "know[s] from inside intel that Coach is taking prices up" and that

"John [Idol] does want us to goal [*sic*] being more expensive than them."  PX2047 at 1.

Newman continued: "For now I would move everything up into the next bucket and then we

can see how that compares to their [Coach's] Fall prices and continue to monitor into Spring."

*Id.*  Indeed, consistent with the ordinary-course documents highlighted here, Idol testified that

he "most frequently compare[s] Michael Kors handbag prices to Coach."  Tr. at 101:6-8

(Idol).  These documents and internal communications demonstrate the detail with which

Michael Kors executives tracked and responded to Coach's pricing, evidencing head-to-head

competition.

      In fact, the merging parties track and respond to each other's pricing activities so

closely that Kate Spade and Michael Kors executives accused the other's brand of driving

down prices.  In March 2023, Fraser, then Kate Spade's CEO and brand president, lamented

the "race to the bottom" when examining handbag prices from Coach, Kate Spade, Marc

Jacobs, Michael Kors, and Tory Burch.  PX1321 at 1, 3.  In an April 2023 email forwarding a

Coach promotional email, Wilmotte, CEO of Michael Kors, asked his subordinate to prepare a

presentation with "2 or 3 examples of [C]oach and [K]ate [S]pade racing to the bottom with

such promotions" so that the Capri board could "see what [Michael Kors] [is] up against."

PX2097 at 1.  Idol, Capri's CEO, also monitored Coach's pricing and discounting in order to

present that information to Capri's board of directors.  *See, e.g.*, PX2331 at 1 (May 2023

email from Idol forwarding Coach email to Walsh, who forwarded email to Parsons: "A good

one for the BOD deck"); PX2128 at 8-12 (June 2023 Capri board presentation regarding

Michael Kors, detailing pricing and discounting of "competitive brand[s]" Coach, Tory

Burch, Kate Spade, and Marc Jacobs (capitalization omitted)); *see also, e.g.*, PX2433 at 1

(April 2021 email from Idol forwarding Coach outlet promotional email: "They are going

low!!!"); PX2396 at 1 (April 2021 email from Idol regarding Coach promotional activity: "Let

them blow their brakes out. Let's go for the margin[.]"); PX2260 (April 2021 email from Idol regarding Coach outlet strategy and growth).[50] Indeed, in some cases, Michael Kors explicitly changed their promotional strategies in response to Coach and Kate Spade's own discounting in order to "align with the competition." PX2105 at 1 (in response to April 2023 email from Idol forwarding Coach outlet promotional email, Michael Kors employee noting Coach and Kate Spade's discounting for Mother's Day and stating "we will be offering the same. Previously we had planned a [different strategy] but we need to ensure we get our share of the consumers' Mother's Day spend so we are going to align with the competition.").

Overall, the Court finds that there is there is significant ordinary-course evidence that the merging parties compete closely on pricing and discounting. *See Aetna*, 240 F. Supp. 3d at 45-46 (evidence of defendant analyzing competitor's price structure and changing pricing in response was evidence of significant head-to-head competition); *H & R Block*, 833 F. Supp. 2d at 82 (documents "that appear to acknowledge" that competitor "has put downward pressure on [its] pricing ability" is evidence of that merging parties "are head-to-head competitors").

### 3. Marketing

Defendants also compete on their marketing strategies. The evidence reflects that Michael Kors executives are focused on monitoring and responding to Coach's marketing

---

[50] In response to questioning from the Court, Defendants asserted that their ordinary-course documents referring to prices for accessible-luxury-handbags "racing to the bottom," *see* PX2097 at 1 (Wilmotte: "[C]oach and [K]ate [S]pade [are] racing to the bottom with such promotions."); PX1321 at 1, 3 (Fraser: Coach, Kate Spade, Marc Jacobs, Michael Kors, and Tory Burch are in a "race to the bottom"), referred to "what's going on in the industry" rather than "competitive action that occurs as a result of these statements," Tr. at 1457:25-1458:16 (Tapestry Closing). This is a distinction without a difference. The Defendants' actions in response to "what's going on in the industry" is in fact their response to the competitive environment in which they presently exist – that is, the pre-merger competitive environment.

efforts.  For example, in May 2023, Idol forwarded a marketing email from Coach to Michael

Kors executives, noting that "Coach's creativity on these emails (outlet in particular) is killing

us . . . .  Sorry our backgrounds look cheap and uninspiring.  This needs to be corrected

quickly. . . .  Help!!!  Fast!!!"  PX2412.  In April 2022, in response to another Coach

marketing email, Idol instructed other executives to "develop a strategy to compete with this,"

stating, "I don't love it but we have no choice."  PX2075 at 1.  Other examples of Capri and

Michael Kors executives responding to Coach's marketing strategies and lamenting Michael

Kors's ability to compete with Coach abound.  *See, e.g.*, PX2114 at 1 (Idol forwarding a

December 2021 holiday marketing email from Coach, stating that "[t]hey are winning with

the Outlet and promotional strategy in the US.  It's not just brand heat!"); PX2260 at 1 (Idol:

"Coach's always on outlet marketing is clearly working!"); PX2405 at 1 (Idol: "They are

clearly sending a massive amount more emails to consumers than we do.  I know you have

said that productivity drops when sending more than one email to a customer per day but they

seem to be having great success with a different formula."); PX2243 at 1 (June 2021 email

from Idol regarding Coach marketing email: "Love the hook up of Signature on ready to wear

and accessories.  We need more 'items' like this."); PX5078 at 158:8-16 (Bloom: Coach and

Kate Spade are "going after market share by increasing frequency of highly promotional

emails, which is fueling their growth and, we see in the data, hurting us.").  In fact, Capri

CEO Idol monitors Coach's marketing emails so closely that his subordinates joke that he is

"the most engaged audience that Coach has."  PX5088 at 162:1-10 (Walsh).  The fact that the

highest-level Capri executives monitor Coach's marketing so closely and request actions from

subordinates so that Michael Kors can compete effectively with such marketing clearly

evidences head-to-head competition.

Defendants also both engaged in "conquesting" and "counter-conquesting" strategies. "Conquesting" refers to one brand, for example, Kate Spade, "paying to use the term 'Michael Kors handbags' in order for Kate Spade handbags to show up in the search."  PX5088 at 215:15-216:5 (Walsh).  "[T]o put that into layman's terms, if [one] were to go Google and search Michael Kors," the search results would show "[a] Kate Spade handbag" rather than only Michael Kors handbags.  PX5088 at 215:21-216:8 (Walsh).  Witnesses testified that Kate Spade engaged in "conquesting" against Michael Kors in 2023, PX5088 at 211:15-19, 215:15-18 (Walsh), and that Michael Kors engaged in "retaliatory conquesting" against Kate Spade by auctioning Kate Spade's own terms in an attempt to "cause similar disruption" in consumer search results, PX5088 at 223:4-224:12 (Walsh); *see also* PX5080 at 136:11-15, 13:21-15:2 (Bozeman: during Bozeman's time as vice president at Michael Kors from June 2021 through May 2024, Michael Kors "counter-conquested . . . Kate Spade and Coach"); PX2295 at 2 (April 2023 Michael Kors presentation: "Kate Spade continues to bid on ('conquest') [Michael Kors] terms . . . Coach has not bid on [Michael Kors] terms since March 2022 . . . Coach stopped bidding after MK retaliated.").  There would be no reason for the merging parties to spend time and resources engaging in such conquesting and counter-conquesting if the brands were not close competitors.

### 4.  Final Analysis

In sum, compelling and significant ordinary-course evidence indicates that Defendants are particularly close competitors.  Despite the efforts of Tapestry and Capri witnesses to "minimize the significance of the evidence of head-to-head competition between" them, "the documents tell the story."  *IQVIA*, 710 F. Supp. 3d at 383, 385; *see Staples II*, 190 F. Supp. 3d at 132 ("Defendants' own documents created in the ordinary course of their business show that Defendants view themselves as the most viable office supply vendors for large businesses

in the United States.  Not surprisingly, Defendants view themselves as each other's fiercest competition." (citations omitted)); *Cardinal Health, Inc.*, 12 F. Supp. 2d at 49 ("The Defendants' documents show that the merging parties clearly viewed their economic competition to be from [each other], and not from the other sources as suggested by the Defendants at trial.").[51]

### B.  Quantitative Evidence

The documentary evidence of unilateral anticompetitive effects is corroborated by quantitative evidence.  Dr. Smith conducted a quantitative analysis to understand the likely competitive effects of the proposed merger.  He presented two quantitative assessments that indicated that the merger would lead to consumer harm: an upward pricing pressure ("UPP") analysis and a merger simulation.  Smith Rep. ¶ 227.

The Court first turns to the UPP analysis.  UPP "roughly reflects the incentive for the companies to increase prices after the merger."  *Deutsche Telekom*, 439 F. Supp. 3d at 238. As Dr. Smith explained in his initial report:

> UPP is derived from the fundamental economic principle of profit maximization and its predictions for the pricing behavior of a merging firm following the loss of competition.  After competing handbag brands merge, customer substitution between them no longer represents lost sales.  That is, because the merged firm profits from the sale of both merging brands, it "recaptures" what would have been lost sales absent the merger. This internalization of lost sales relaxes a competitive constraint on the merged firm's pricing incentives and puts upward pressure on prices.

---

[51] Because the Court finds compelling the evidence regarding head-to-head competition for pricing, discounting, and marketing efforts, the Court does not reach the FTC's further arguments that Coach, Michael Kors, and Kate Spade also compete regarding the designs of their handbags, PFOF ¶¶ 195-204, brick-and-mortar presence, *id.* ¶¶ 211-214, labor, *id.* ¶¶ 215-218, and sustainability efforts, *id.* ¶¶ 219-221.

Smith Rep. ¶ 230.  Dr. Smith's UPP analysis indicates that after the merger Tapestry could

raise prices on Coach, Kate Spade, and Michael Kors handbags by an average of 18 percent in

his baseline case, or 13.1 percent in his more conservative sensitivity case.  Smith Rep.

¶¶ 253-255 & tbls.9, 10; Tr. at 570:18-571:4 (Smith).

Dr. Smith also performed a "full merger simulation under standard assumptions on

consumer demand."  Smith Rep. ¶ 227.  The merger simulation assumed that fashion retailers

"choose prices to maximize the collective profits of their accessible-luxury-handbags brands,"

and takes into account the anticipated strategic pricing responses of rival firms.  Smith Rep.

¶ 259.  Dr. Smith's merger simulation indicated an average price increase of approximately 17

percent following the merger, Smith Rep. ¶ 266 & tbl.11, which could take the form of either

a higher-priced or lower-quality handbag.  Tr. at 571:24-572:8, 572:9-573:6 (Smith); *see*

*Hackensack*, 30 F.4th at 172 ("Anticompetitive effects can include price increases and

reduced product quality.").  Dr. Smith's merger simulation indicates consumer harm from the

merger of approximately $365 million per year.  Tr. at 1395:8-18 (Smith); Smith Rep. ¶ 266.

Defendants' only critique of Dr. Smith's UPP analysis and merger simulation is that

"they are all based on the same input, which is his diversion ratio."  DFOF ¶ 184 (quoting Tr.

at 1254:12-1255:6 (Scott Morton)); *see also* DFOF ¶ 16; DCOL ¶ 79.  For the reasons already

stated, the Court is not persuaded by Defendants' criticisms of Dr. Smith's diversion analysis.

*See supra* at pp. 75-87.  Even if the diversion ratio, and thus the merger simulation, may be

imprecise in some ways, it is still probative of potential price increases after the merger.

*IQVIA*, 710 F. Supp. 3d at 387 (finding that "while the merger simulation is an imprecise tool,

it nonetheless has some probative value in predicting the likelihood of a potential price

increase after the merger") (quotation marks omitted)).  Thus, the Court finds that Dr. Smith's

UPP analysis and merger simulation are persuasive additional evidence that the merger will

cause consumer harm of approximately $365 million per year.  This conclusion is reinforced by the foregoing qualitative evidence that shows that the Defendants are particularly close competitors, such that their merger would result in consumer harm.  *See, e.g.*, *Sysco*, 113 F. Supp. 3d at 64 (expert's conclusions following quantitative analysis were "corroborated by other evidence in the record" indicating that the merging parties were "close competitors"); *IQVIA*, 710 F. Supp. 3d at 388 (same).

### C.  Defendant's Central Counterarguments

Defendants assert that the evidence presented at the hearing "d[oes] not reveal the type of unique 'head-to-head competition' that is the focus of Section 7 law."  DCOL ¶ 81. Defendants initially cite to *International Shoe Co. v. FTC*, 280 U.S. 291, 298 (1930) for the proposition that "the elimination of some head-to-head competition and some lessening of competition is not sufficient under the law."  DCOL ¶ 77 (quotation marks omitted). However, the Second Circuit has stated that "the amendment of Section 7 [of the Clayton Act] in 1950 certainly casts doubt on decisions" such as *International Shoe* "interpreting that section as it stood previously."  *Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738, 741 (2d Cir. 1953).  Rather than looking to *International Shoe*, the Court has instead applied – throughout this opinion – more recent authority interpreting Section 7 of the Clayton Act since it has been amended.

In support of their argument that the FTC is not likely to succeed in showing anticompetitive effects in a relevant market, Defendants assert that in *Anthem*, 236 F. Supp. 3d at 217-21, *Staples*, 190 F. Supp. 3d at 119-20, 122, *H & R Block*, 833 F. Supp. 2d at 82, *IQVIA*, 710 F. Supp. 3d at 384, and *Whole Foods*, 548 F.3d at 1040, the respective plaintiffs offered evidence that the close competition between the merging parties resulted in lower prices.  DOCL ¶ 81-85.  Defendants argue that "[n]othing remotely close to the type of head-

to-head competition evidence" that existed in those cases exists here.  DCOL ¶ 86.
Defendants are incorrect.  There are numerous examples of Coach/Kate Spade and Michael
Kors in close competition, responding to pricing, discounting, and marketing strategies of
each other.  *See supra* at pp. 149-160.  In addition, Dr. Smith's merger simulation, which
indicates that the merger will result in $365 million in consumer harm annually, corroborates
the qualitative evidence indicating that the merger will result in a substantial lessening of
head-to-head competition.  The Court thus finds that the FTC has offered evidence that the
merger will likely lead to unilateral anticompetitive effects.

Defendants also argue that the FTC's case is deficient because it did not present
evidence of customers complaining that this merger will result in harm.  DCOL ¶ 86.  The
Court does not find the lack of consumer complaints to be probative.  Dr. Smith testified
persuasively that the lack of complaints from wholesalers or other handbag brands was not
surprising because wholesalers could likely pass along price increases to their customers and
competing brands that are substitutes for the merging parties' brands could likewise increase
their prices if the merger results in a lessening of competition.  Tr. at 647:23-648:19 (Smith).
Individual consumers may not be cognizant of the potential anticompetitive effects of the
merger on their future purchases, and would certainly not be privy to much of the evidence
presented to the Court during this preliminary injunction hearing (particularly the evidence of
the economic experts) until well after the FTC's action commenced.  Most importantly,
though, although Defendants accurately note that several FTC merger challenges have
highlighted consumer complaints, *see* Tr. at 1451:1-11 (Tapestry Closing), they do not point
the Court to any authority *requiring* customer complaints in a Section 7 case, *see generally*
Opp.; DCOL; *cf. Bazaarvoice*, 2014 WL 203966, at *4 (enjoining merger despite defendant

noting that "none of the 104 customers whose depositions are part of the record complained that the merger has hurt them.").

### D.  Final Analysis

For these reasons, the Court finds that the merging parties are close competitors, such that the merger would result in the loss of head-to-head competition.  The Court thus finds that there is persuasive additional evidence of unilateral effects of the merger causing anticompetitive harm.

### BALANCE OF EQUITIES

For the reasons set forth above, the Court finds that the FTC has made a "clear showing," *Starbucks*, 144 S. Ct. at 1575, of a "likelihood of ultimate success" on the merits, 15 U.S.C. § 53(b).  Put differently, the Court finds that the FTC has "prove[n] that it is likely to succeed in convincing a federal court of appeals that the transaction violates Section 7." DCOL ¶ 5.  This showing by the FTC "creates a presumption in favor of preliminary injunctive relief." *Penn State*, 838 F.3d at 352 (citation omitted).  Nevertheless, before granting a preliminary injunction under Section 13(b), the Court must "weigh[] the equities." 15 U.S.C. § 53(b).  Section 13(b) is "silent as to what specifically those equities are," but "[t]he prevailing view is that, although private equities may be considered, they are not to be afforded great weight." *Penn State*, 838 F.3d at 352.  *Id.*  As then-Judge Ginsburg explained, "[w]hen the Commission demonstrates a likelihood of ultimate success, a countershowing of private equities alone [does] not suffice to justify denial of a preliminary injunction barring the merger." *Weyerhaeuser*, 665 F.2d at 1083; *see* Opp. at 39 (favorably citing *Weyerhaeuser*'s discussion of Section 13(b) equities); DCOL ¶ 88 (same).

The Court begins by considering the interests of "the public, whom § 7 was designed to protect."  *F. & M. Schaefer*, 597 F.2d at 819.  There is a strong public interest "in

enforcement of the antitrust laws and in the preservation of competition." *United States v. Columbia Pictures Indus., Inc.*, 507 F. Supp. 412, 434 (S.D.N.Y. 1980); *accord Penn State*, 838 F.3d at 352; *United States v. Trib. Publ'g Co.*, No. 16-cv-01822, 2016 WL 2989488, at *5 (C.D. Cal. Mar. 18, 2016); *FTC v. Swedish Match*, 131 F. Supp. 2d 151, 173 (D.D.C. 2000).

Downplaying the importance of handbags as nonessential discretionary items that consumers can simply choose not to buy if the price is too high ignores that handbags are important to many women, not only to express themselves through fashion but to aid in their daily lives – from supporting their career aspirations by transporting their work materials home or inspiring confidence in professional settings, to holding important personal items such as medications or personal hygiene products, to carrying a young child's snacks or toys. Plaintiffs often prevail in Section 7 cases involving consumer goods that are arguably less essential. *See, e.g.*, *United States v. Pabst Brewing Co.*, 384 U.S. 546, 552-53 (1966) (beer); *Warner*, 742 F.2d at 1159 (prerecorded music); *F. & M. Schaefer*, 597 F.2d at 815-16 (regional beer); *Spalding*, 301 F.2d at 628-29 (sporting goods); *Bertelsmann*, 646 F. Supp. 3d at 12 (anticipated top-selling books); *United Tote*, 768 F. Supp. at 1065, 1087 (racetrack-gambling technology); *Hamilton Watch Co. v. Benrus Watch Co.*, 114 F. Supp. 307, 315 (S.D.N.Y.) (jeweled watches), *aff'd*, 206 F.2d 738 (2d Cir. 1953). "By enacting Section 7, Congress declared that the preservation of competition is always in the public interest." *Trib. Publ'g*, 2016 WL 2989488, at *5 (citation omitted). And by its text, Section 7 has no hierarchy of products: it applies to "*any* line of commerce." 15 U.S.C. § 18 (emphasis added). That includes handbags.

The Court finds that denying injunctive relief pending completion of the FTC's administrative proceedings would likely cause irreparable harm to the public. For one thing, "the potential harm that could occur to the public" during the interim, such as an increase in

prices, could not "be recovered at the conclusion of an administrative proceeding at which the government prevails." *FTC v. Libbey, Inc.*, 211 F. Supp. 2d 34, 54 (D.D.C. 2002). For another thing, although the FTC would have the formal authority to seek divestiture if it ultimately prevailed, *see* 15 U.S.C. § 21(b), "[a]dministrative experience shows that the Commission's inability to unscramble merged assets frequently prevents entry of an effective order of divestiture," *FTC v. Dean Foods Co.*, 384 U.S. 597, 606 n.5 (1966). "After a merger closes and the two entities combine their assets and operations into a single corporate unit, divestiture becomes decidedly more complex. The passage of time exacerbates those complexities, not only for the combined entity but also for nonparties who will be affected by a court order dividing the company." *Steves & Sons*, 988 F.3d at 729 (Rushing, J., concurring); *accord Univ. Health*, 938 F.2d at 1217 n.23 ("[O]nce an anticompetitive acquisition is consummated, it is difficult to 'unscramble the egg.'"). Meanwhile, "[o]f all the forms of equitable relief, a simple injunction prior to consummation of the merger transaction is the least disruptive to all concerned." Areeda & Hovenkamp ¶ 990c1.

If the Court did not enjoin the transaction, Tapestry "would acquire [Capri] and undertake all of the business actions . . . that normally accompany mergers," such as "consolidating operations, taking ownership of business-sensitive information, [and] terminating employees." *Trib. Publ'g*, 2016 WL 2989488, at *5; *see* PX1726 at 180-81 (February 2024 presentation to Tapestry board about integration plans during first 90 days post-merger). "It would be very difficult – if not impossible – to unwind these actions." *Trib. Publ'g*, 2016 WL 2989488, at *5. For instance, if Capri divulges confidential information to Tapestry, such as "its marketing, pricing, advertising, and new product plans," *F. & M. Schaefer*, 597 F.2d at 818, "ultimate divestiture will not fully restore competition because [Tapestry] will retain" that information, *Weyerhaeuser*, 665 F.2d at 1086. "These practical

difficulties cannot be written off so easily," *Penn State*, 838 F.3d at 353 n.11, and "[t]he Court

is simply not convinced by [Defendants'] attempt to downplay the significance of this

potential harm," *Tribune Publ'g*, 2016 WL 2989488, at *5; *cf.* Opp. at 40 n.100 (claiming,

unpersuasively, that "Tapestry's practice with its acquisitions of Kate Spade and Stuart

Weitzman has been to maintain them as separate, standalone businesses, which it will also do

here" and thereby mitigate "[t]he typical concern that an acquirer will 'scramble the eggs'").

> Defendants make two principal arguments regarding the equities.  First, they claim

that because the FTC is unlikely to prevail on the merits, granting injunctive relief is

inequitable.  *See* Opp. at 39-40; DCOL ¶ 89.  Given the Court's finding that the FTC is likely

to succeed, this argument fails.

> Second, Defendants assert that enjoining the merger preliminarily "will have the effect

of blocking the [merger] permanently."  DFOF ¶ 187.  To be sure, courts often consider the

possibility that a "preliminary injunction may kill, rather than suspend, a proposed

transaction."  *Weyerhaeuser*, 665 F.2d at 1087.  Usually, however, that is because the merging

parties directly state that they will abandon the merger if the court grants the preliminary

injunction.  *See, e.g.*, *Penn State*, 838 F.3d at 353 ("[T]he Hospitals have indicated in their

briefs to this Court that they would have to abandon the combination rather than continue to

expend substantial resources litigating if an injunction is issued." (original brackets and

quotation marks omitted)); *Wilhelmsen*, 341 F. Supp. 3d at 74 ("Defendants note that if this

court issues a preliminary injunction, they will abandon the transaction rather than continue

with the administrative proceeding – meaning that the efficiencies that they have identified

will be lost, along with their potential benefits to consumers."); *FTC v. Arch Coal, Inc.*, 329 F.

Supp. 2d 109, 160 (D.D.C. 2004) (merging companies said that they would "abandon the

transaction rather than undergo an administrative proceeding").  Yet Defendants have not

gone so far as to state that they will abandon the deal if the Court enjoins it.  *See generally*
Opp.; DFOF; DCOL.

At most, Defendants cite Capri CEO Idol's testimony that the FTC proceedings are
"very disruptive for our company," that Capri is "having a very difficult time currently
planning [its] future not knowing whether there will be a merger, [or] whether [Capri] will be
an independent company," and that the situation is making "a lot of employees . . . very
uncomfortable" because "[t]hey don't know what the situation is."  Tr. at 176:18-25; *see*
DFOF ¶ 190.  These remarks fall short of saying that Tapestry and Capri plan to part ways if
this Court preliminarily enjoins the merger.  And although the Court is not indifferent to the
uncertainties faced by the merging firms and their employees, their concerns amount to
"private equit[ies], and cannot on [their] own overcome the public equities that favor the
FTC."  *IQVIA*, 710 F. Supp. 3d at 401 (citation omitted).

Defendants nevertheless argue that "[b]ecause of the lengthy time required to go
through the administrative litigation process, granting an injunction will necessarily kill the
deal."  Opp. at 40.  The evidence does not necessarily bear that out.  The parties' merger
agreement provides that the merger "may be terminated" if the merger does not close by
February 10, 2025.  PX1014 at 71-72 § 8.1(d).  But until then, the parties "shall use their
reasonable best efforts to defend or contest, including through litigation or other means, any"
challenges to the merger.  *Id.* at 53-54 § 6.2(a).  And even if the merger does not close by
then, the parties "may" – not must – terminate the agreement.  PX1014 at 71-72 § 8.1(d); *see*
*Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 171 (2016) ("[T]he word 'may' . . .
implies discretion[.]").  The Court "see[s] no reason why, if the merger makes economic sense
now, it would not be equally sensible to consummate the merger following a[n] FTC
adjudication on the merits that finds the merger lawful."  *Penn State*, 838 F.3d at 353.

Defendants have not suggested any such reason, either. Thus, even if Defendants "abandon[ed] the merger following issuance of the injunction" but before the completion of the FTC's proceedings, that result "would be [Defendants'] doing." *Id.* Such a self-inflicted injury is an insufficient basis for the Court not to enjoin the merger.

Without question, the Court's findings of fact and conclusions of law in this opinion are merely preliminary. The FTC "remains free to reach its own legal conclusions and develop its own record in its administrative proceedings," where it will have the chance to apply its expertise to the complex issues at play. *Starbucks*, 144 S. Ct. at 1579. For now, however, the Court finds that the balance of the equities clearly favors granting the FTC's request for a preliminary injunction.

## CONCLUSION

For the foregoing reasons, the Court GRANTS the FTC's motion for a preliminary injunction. The Clerk of Court is respectfully directed to terminate the motion at Dkt. 121.

Dated: October 24, 2024
New York, New York

SO ORDERED.

JENNIFER L. ROCHON
United States District Judge